# EXHIBIT A

1  ROBBINS ARROYO LLP
   BRIAN J. ROBBINS (190264)
2  brobbins@robbinsarroyo.com
   CRAIG W. SMITH (164886)
3  csmith@robbinsarroyo.com
   ASHLEY R. RIFKIN (246602)
4  arifkin@robbinsarroyo.com
   STEVEN R. WEDEKING (235759)
5  swedeking@robbinsarroyo.com
   5040 Shoreham Place
6  San Diego, CA 92122
   Telephone: (619) 525-3990
7  Facsimile: (619) 525-3991

8  Attorneys for Plaintiff

9              UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11                   SAN JOSE DIVISION

12  TERRENCE ZEHRER, Derivatively on      )  Case No.
    Behalf of APPLE INC.,                 )
13                                        )
                          Plaintiff,      )  VERIFIED STOCKHOLDER
14                                        )  DERIVATIVE COMPLAINT FOR
           v.                             )  BREACH OF FIDUCIARY DUTY,
15                                        )  WASTE OF CORPORATE ASSETS,
    TIMOTHY D. COOK, LUCA MAESTRI,        )  UNJUST ENRICHMENT, AND
16  CRAIG FEDERIGHI, ARTHUR D.            )  INDEMNIFICATION AND
    LEVINSON, ALBERT GORE, JR.,           )  CONTRIBUTION
17  ANDREA JUNG, JAMES A. BELL,           )
    RONALD D. SUGAR, ROBERT A. IGER,      )
18  and SUSAN L. WAGNER,                  )
                                          )
19                        Defendants.     )
                                          )
20         -and-                          )
                                          )
21  APPLE INC., a California corporation, )
                                          )
22                    Nominal Defendant.  )  DEMAND FOR JURY TRIAL
                                          )
23

24

25

26

27

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff, by his attorneys, submits this Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, and Indemnification and Contribution. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC"), court filings, and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1. This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Apple Inc. ("Apple" or the "Company") against certain of its officers and directors for breach of fiduciary duty, waste of corporate assets, unjust enrichment, and indemnification and contribution, in connection with the Individual Defendants' (as defined herein) responsibility for ensnaring Apple in an unlawful scheme. These wrongs resulted in billions of dollars in damages to Apple's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed Apple to billions of dollars in potential liability for violations of state and federal law.

2. Apple is a multinational technology company that designs, develops, and sells consumer electronics. The iPhone smartphone is Apple's most popular product and by far the most profitable, generating nearly two-thirds of the Company's net sales in fiscal year 2017 and 2018. As a result of Apple's financial success depending upon the iPhone and due to the smartphone market's competitive nature, the Company typically releases a new iPhone model each year with more innovative features at increased prices. Apple also routinely publishes updates to the operating system utilized by the iPhone, known as iOS. Because most applications require the most recent version of iOS, updating iOS is effectively required for iPhone users. In some cases, iOS updates are even automatic.

3. In late 2016, older model iPhones began shutting down inexplicably and without warning. Unknown to consumers at the time, these shutdowns were not caused by the age of the iPhone itself, but rather the iPhone's aging battery—which delivered power unevenly and could not handle processing demands. Therefore, simply replacing the battery on these older model iPhones would have resolved the issue. Instead of alerting customers about this solution, beginning in January 2017, Apple published iOS

updates that secretly "fixed" the shutdown issues by dramatically slowing the performance of older iPhone models without the owner's knowledge or consent. These updates silently introduced a trade-off between battery life and performance reduction without informing iPhone owners that a simple $79 replacement battery would restore both. This deceived older model iPhone owners into believing their devices could no longer perform at an adequate level, coercing them into upgrading to newer iPhone models on accelerated timetables.

4. In December 2017, independent investigations unearthed that Apple was deliberately causing these slowdowns in older iPhone models through iOS updates. The independent investigations also revealed, importantly, that the underlying cause was not device-related, but battery-related, and that therefore replacing the iPhone's battery would have resolved the issue. These reports heightened suspicion that Apple was using planned obsolescence to force users into buying new iPhones.

5. Faced with consumer outrage and confronted with the overwhelming evidence from these investigations, on December 20, 2017, Apple was forced to belatedly admit to intentionally slowing the performance of older model iPhones. This controversy came to be known as "Batterygate." On December 28, 2017, in response to the backlash, Apple announced that it would offer replacement iPhone batteries at a discount, charging $29 instead of $79.

6. As a direct result of this unlawful course of conduct, consumers from around the world began filing class action lawsuits against Apple in state and federal courts alleging violations of computer intrusion laws, consumer-protection laws, and the common law. Several of these actions were consolidated into a putative worldwide class action pending in the U.S. District Court for the Northern District of California under the caption *In re: Apple Inc. Device Performance Litigation*, No. 5:18-md-02827-EJD (the "Worldwide Class Action"). The Worldwide Class Action asserts seventy-six causes of action arising under one federal statute, all fifty states' statutes, and the common law seeking enjoinment, actual and statutory damages (including punitive damages), as well as restitution. The plaintiffs generally allege that Apple intentionally and significantly reduced the performance of certain iPhone models through iOS updates without the users' knowledge or authorization.

7. On October 1, 2018, Judge Edward J. Davila granted in part and denied in part Apple's motion to dismiss several claims in the Worldwide Class Action's amended consolidated complaint.

1    Specifically, Judge Davila ruled that the following claims survived the motion to dismiss: (i) the federal

2    Computer Fraud and Abuse Act ("CFAA") claim; (ii) the California Computer Data Access and Fraud

3    Act claim ("CDAFA"); (iii) the trespass to chattels claim under California common law; and (iv) the

4    California Unfair Competition Law ("UCL") claim.[1]   In upholding the claim under the CFAA, a federal

5    criminal statute that authorizes civil actions, the court found the plaintiffs' "adequately pled that Apple

6    [intentionally] caused damage to their iPhones without permission."   The court further noted the

7    allegations of slowed processor speeds caused by the iOS updates "readily fit" the definition of damages,

8    and that "even though [p]laintiffs voluntarily installed the iOS updates, they never gave permission for

9    Apple to cause damage to their iPhones."[2]   For similar reasons, the court also rejected Apple's motion to

10   dismiss the CDAFA claim, the California state analogue to the federal CFAA codified in the California

11   Penal Code.   As to the trespass to chattels claim, the court found the plaintiffs sufficiently alleged that

12   Apple "intentionally and without authorization interfered with plaintiffs possession of their iPhones …

13   [through] iOS updates … designed to slow their iPhones' processing speed."   The court further found the

14   plaintiffs alleged an injury by pleading "that the iOS updates impaired the functioning of their iPhones by

15   substantially slowing their processing speed (by as much as 50%)."[3]

16       8.       There is also a California state court consolidated class action pending in the Superior

17   Court of the State of California for the County of San Francisco, captioned *Apple OS Cases*, JCCP No.

18   4976, asserting substantially similar claims under California law and based on facts nearly identical to the

19   Worldwide Class Action.   On June 20, 2019, Judge Anne-Christine Massullo overruled Apple's demurrer

20   to the plaintiffs' UCL and trespass to chattels claims, granting the plaintiffs leave to amend certain claims

---

[1] Apple's motion to dismiss was limited to the complaint's first six claims, including the California statutory claims, the trespass to chattels claim, and the federal CFAA claim.

[2] The court denied Apple motion to dismiss the CFAA claim to the extent that it is based on 18. U.S.C. §1030(a)(5)(A), which creates liability for whoever "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer."

[3] The Worldwide Class Action plaintiffs later filed a second amended complaint ("SAC"), which Apple also attempted to dismiss.   On May 3, 2019, Judge Edward J. Davila granted in part and denied in part Apple's motion to dismiss the SAC.   Although certain fraud and contract based claims were dismissed, the court rejected the second opportunity to dismiss the CFAA, CDAFA, UCL, and trespass to chattels claims, maintaining that they still survive.

that were sustained upon Apple's motion to demurrer.

9.     Further yet, Apple is confronted with governmental scrutiny and federal regulatory proceedings due to these iOS updates.  As reported by *Bloomberg* on January 30, 2018 and subsequently confirmed by Apple, both the U.S. Department of Justice ("DOJ") and the SEC are investigating Apple's disclosures concerning the software updates.

10.    Scrutiny and reprimand of Apple's actions extends even beyond the United States. International governments have similarly commenced or are in the process of regulatory proceedings and investigations concerning Apple's conduct, including Canada, Israel, Italy, China, South Korea, France, Brazil, and Spain.  Notably, on October 24, 2018, Italian regulators ordered Apple to pay €5 million, the maximum fine, finding that the Company had "implemented dishonest commercial practices" and that the iOS updates "caused serious malfunctions and significantly reduced performance, thus accelerating phones' substitution."  Italy fined Apple an additional €5 million for failing to give customers clear information about essential characteristics of their batteries, including their average life expectancy and how to maintain or replace them.

11.    The list of harm caused by Batterygate continues.  Between August 1, 2017 and January 2, 2019, Apple made a series of improper statements concerning the Company's sales growth and future financial prospects in the Company's press releases, public filings with the SEC, and during earnings calls. In particular, the Individual Defendants routinely touted strong iPhone demand while concealing that this demand was driven by Apple's intentional and undisclosed throttling of iPhones and while downplaying the negative impact of the battery replacement program and macroeconomic issues in China.

12.    On January 2, 2019, Apple revealed the truth about its declining iPhone sales.  In a press release titled "Letter from Tim Cook to Apple Investors," the Company revealed that, due to plummeting iPhone sales, Apple would fail to achieve the revenue guidance established just eight weeks earlier.  In the press release, Apple attributed blame for the lack of upgrades on the battery replacement program as well as economic issues in China, concerns that the Individual Defendants had previously renounced when raised by analysts during Apple's earnings conference calls.

13.    In the wake of this disclosure, Apple's stock plunged nearly 10%, or $15.73 per share, on January 3, 2019, to close at $142.19 per share compared to the previous trading day's closing of $157.92

per share, erasing over $74 billion in market capitalization in a single day.

14.     As a direct result of these improper statements, Apple is now the subject of at least two federal securities class action lawsuits filed in the U.S. District Court for the Northern District of California on behalf of investors who purchased Apple's shares (the "Securities Class Actions").  The Securities Class Actions assert claims against Apple and defendants Timothy D. Cook ("Cook") and Luca Maestri ("Maestri") for violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  In particular, the Securities Class Action complaints allege that Apple and its fiduciaries made misleading statements concerning the iOS updates, the battery replacement program, macroeconomic issues in China, and the Company's future prospects, among other things.

15.     Plaintiff brings this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

## JURISDICTION AND VENUE

16.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

17.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Apple maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Apple, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## INTRADISTRICT ASSIGNMENT

19.     A substantial portion of the transactions and wrongdoings which give rise to the claims in this action occurred in the County of Santa Clara, and as such, this action is properly assigned to the San

Jose division of this Court.

## THE PARTIES

**Plaintiff**

20.     Plaintiff Terrence Zehrer has continuously been a stockholder of Apple since August 19, 2014.  Plaintiff is a citizen of Nevada.

**Nominal Defendant**

21.     Nominal Defendant Apple is a California corporation with principal executive offices located at One Apple Park Way, Cupertino, California.  Accordingly, Apple is a citizen of California. Apple designs, manufactures, and markets mobile communication and media devices and personal computers, and sells a variety of related software, services, accessories, and third-party digital content and applications.  As of September 29, 2018, the Company had approximately 132,000 full-time equivalent employees.

**Defendants**

22.     Defendant Cook is Apple's Chief Executive Officer ("CEO") and a director and has been since August 2011.  Defendant Cook was also Apple's Chief Operating Officer from October 2005 to August 2011; Executive Vice President, Worldwide Sales and Operations from 2002 to 2005; Senior Vice President, Worldwide Operations, Sales, Service and Support from 2000 to 2002; and Senior Vice President, Worldwide Operations from 1998 to 2000.  Defendant Cook joined Apple in March 1998. Defendant Cook is named as a defendant in related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Cook knowingly, recklessly, or with gross negligence: (i) caused or allowed the Company to unlawfully slow the performance of iPhones through iOS updates; (ii) failed to implement or maintain adequate internal controls necessary to ensure Apple's compliance with the law; and (iii) made or allowed Apple to make improper statements in the Company's press releases and public filings concerning Apple's sales growth, iPhone demand, and future financial prospects.  Apple paid defendant Cook the following compensation as an executive:

| Year | Salary | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|----------------------------------------|------------------------|-------|
| 2018 | $3,000,000 | $12,000,000 | $682,219 | $15,682,219 |
| 2017 | $3,057,692 | $9,327,000 | $440,374 | $12,825,066 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1  Defendant Cook is a citizen of California.

2      23.      Defendant Maestri is Apple's Senior Vice President and Chief Financial Officer and has

3  been since May 2014. Defendant Maestri was also Apple's Vice President and Corporate Controller from

4  March 2013 to May 2014. Defendant Maestri is named as a defendant in related securities class action

5  complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Maestri

6  knowingly, recklessly, or with gross negligence: (i) caused or allowed the Company to unlawfully slow

7  the performance of iPhones through iOS updates; (ii) failed to implement or maintain adequate internal

8  controls necessary to ensure Apple's compliance with the law; and (iii) made or allowed Apple to make

9  improper statements in the Company's press releases and public filings concerning Apple's sales growth,

10  iPhone demand, and future financial prospects. Apple paid defendant Maestri the following compensation

11  as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2018 | $1,000,000 | $21,491,888 | $4,000,000 | $17,804 | $26,509,692 |
| 2017 | $1,019,231 | $20,000,113 | $3,109,000 | $13,271 | $24,141,615 |

15  Defendant Maestri is a citizen of California.

16      24.      Defendant Craig Federighi ("Federighi") is Apple's Senior Vice President, Software

17  Engineering and has been since August 2012. Defendant Federighi was also Apple's Vice President, Mac

18  OS Engineering from April 2009 to August 2012, and Director of Engineering from 1997 to February

19  1999. Defendant Federighi knowingly, recklessly, or with gross negligence caused or allowed the

20  Company to unlawfully slow the performance of iPhones through iOS updates. Defendant Federighi is a

21  citizen of California.

22      25.      Defendant Arthur D. Levinson ("Levinson") is Apple's Chairman of the Board of Directors

23  (the "Board") and has been since November 2011, and a director and has been since August 2000.

24  Defendant Levinson was also Apple's colead director from 2005 to November 2011. Defendant Levinson

25  is a member of Apple's Audit and Finance Committee and has been since at least January 2017. Defendant

26  Levinson knowingly or recklessly: (i) caused or allowed the Company to unlawfully slow the performance

27  of iPhones through iOS updates; (ii) failed to implement or maintain adequate internal controls necessary

28  to ensure Apple's compliance with the law; and (iii) made or allowed Apple to make improper statements

in the Company's press releases and public filings concerning Apple's sales growth, iPhone demand, and future financial prospects. Apple paid defendant Levinson the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $300,000 | $249,961 | $17,227 | $567,188 |
| 2017 | $300,000 | $250,007 | $6,355 | $556,362 |

Defendant Levinson is a citizen of California.

26. Defendant Albert Gore, Jr. ("Gore") is an Apple director and has been since March 2003. Defendant Gore is also a member of Apple's Nominating and Corporate Governance (hereinafter the "N&CG Committee") and has been since at least January 2017. Defendant Gore knowingly or recklessly: (i) caused or allowed the Company to unlawfully slow the performance of iPhones through iOS updates; (ii) failed to implement or maintain adequate internal controls necessary to ensure Apple's compliance with the law; and (iii) made or allowed Apple to make improper statements in the Company's press releases and public filings concerning Apple's sales growth, iPhone demand, and future financial prospects. Apple paid defendant Gore the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $100,000 | $249,961 | $8,582 | $358,543 |
| 2017 | $100,000 | $250,007 | $7,204 | $357,211 |

Defendant Gore is a citizen of Tennessee.

27. Defendant Andrea Jung ("Jung") is an Apple director and has been since January 2008. Defendant Jung is also a member of Apple's N&CG Committee and has been since at least January 2017. Defendant Jung knowingly or recklessly: (i) caused or allowed the Company to unlawfully slow the performance of iPhones through iOS updates; (ii) failed to implement or maintain adequate internal controls necessary to ensure Apple's compliance with the law; and (iii) made or allowed Apple to make improper statements in the Company's press releases and public filings concerning Apple's sales growth, iPhone demand, and future financial prospects. Apple paid defendant Jung the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $130,000 | $249,961 | $23,145 | $403,106 |
| 2017 | $130,000 | $250,007 | $3,767 | $383,774 |

Defendant Jung is a citizen of New York.

28. Defendant James A. Bell ("Bell") is an Apple director and has been since October 2015. Defendant Bell is a member of Apple's Audit and Finance Committee and has been since at least January 2017. Defendant Bell knowingly or recklessly: (i) caused or allowed the Company to unlawfully slow the performance of iPhones through iOS updates; (ii) failed to implement or maintain adequate internal controls necessary to ensure Apple's compliance with the law; and (iii) made or allowed Apple to make improper statements in the Company's press releases and public filings concerning Apple's sales growth, iPhone demand, and future financial prospects. Apple paid defendant Bell the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $100,000 | $249,961 | $12,704 | $362,665 |
| 2017 | $100,000 | $250,007 | $3,736 | $353,743 |

Defendant Bell is a citizen of California.

29. Defendant Ronald D. Sugar ("Sugar") is an Apple director and has been since November 2010. Defendant Sugar is the Chair of Apple's Audit and Finance Committee and has been since at least January 2017. Defendant Sugar knowingly or recklessly: (i) caused or allowed the Company to unlawfully slow the performance of iPhones through iOS updates; (ii) failed to implement or maintain adequate internal controls necessary to ensure Apple's compliance with the law; and (iii) made or allowed Apple to make improper statements in the Company's press releases and public filings concerning Apple's sales growth, iPhone demand, and future financial prospects. Apple paid defendant Sugar the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $135,000 | $249,961 | $24,500 | $409,461 |
| 2017 | $135,000 | $250,007 | $12,419 | $397,426 |

Defendant Sugar is a citizen of California.

30.     Defendant Robert A. Iger ("Iger") is an Apple director and has been since November 2011. Defendant Iger is the Chair of Apple's N&CG Committee and has been since at least January 2017. Defendant Iger knowingly or recklessly: (i) caused or allowed the Company to unlawfully slow the performance of iPhones through iOS updates; (ii) failed to implement or maintain adequate internal controls necessary to ensure Apple's compliance with the law; and (iii) made or allowed Apple to make improper statements in the Company's press releases and public filings concerning Apple's sales growth, iPhone demand, and future financial prospects. Apple paid defendant Iger the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $125,000 | $249,961 | $2,920 | $377,881 |
| 2017 | $125,000 | $250,007 | $7,877 | $382,884 |

Defendant Iger is a citizen of California.

31.     Defendant Susan L. Wagner ("Wagner") is an Apple director and has been since July 2014. Defendant Wagner is a member of Apple's Audit and Finance Committee and has been since at least January 2017. Defendant Wagner knowingly or recklessly: (i) caused or allowed the Company to unlawfully slow the performance of iPhones through iOS updates; (ii) failed to implement or maintain adequate internal controls necessary to ensure Apple's compliance with the law; and (iii) made or allowed Apple to make improper statements in the Company's press releases and public filings concerning Apple's sales growth, iPhone demand, and future financial prospects. Apple paid defendant Wagner the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $100,000 | $249,961 | $3,220 | $353,181 |
| 2017 | $100,000 | $250,007 | $2,178 | $352,185 |

Defendant Wagner is a citizen of New York.

32.     The defendants identified in ¶¶22-24 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶22, 25-31 are referred to herein as the "Director Defendants." The

defendants identified in ¶¶25, 28-29, 31 are referred to herein as the "Audit and Finance Committee Defendants." The defendants identified in ¶¶26-27, 30 are referred to herein as the "N&CG Committee Defendants." Collectively, the defendants identified in ¶¶22-31 are referred to herein as the "Individual Defendants."

## **DUTIES OF THE INDIVIDUAL DEFENDANTS**

**Fiduciary Duties**

33.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Apple and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Apple in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Apple and not in furtherance of their personal interest or benefit.

34.     To discharge their duties, the officers and directors of Apple were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Apple were required to, among other things:

(a)     ensure that Apple was operating in a diligent, honest, and prudent manner in accordance with all applicable laws and regulations, including consumer laws, and pursuant to the Company's own Ethics Policy;

(b)     refrain from engaging in deceptive conduct;

(c)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     remain informed as to how Apple conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws;

(e)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Apple and procedures for the reporting of business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(f)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Apple's operations would comply with all applicable laws and Apple's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's stockholders would be accurate; and

(g)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate.

35.     In addition, according to Apple's Corporate Governance Guidelines in effect during the relevant period:

> The Board oversees the Chief Executive Officer (the "CEO") and other senior management in the competent and ethical operation of the Corporation on a day-to-day basis and assures that the long-term interests of the shareholders are being served. To satisfy its duties, directors are expected to take a proactive, focused approach to their position to ensure that the Corporation is committed to business success through the maintenance of high standards of responsibility and ethics.

36.     In the section titled, "Director Qualifications," the Corporate Governance Guidelines recognize that the Board maintains an oversight function, stating: "The Board should monitor the mix of skills and experience of its directors in order to assure that the Board has the necessary tools to perform its oversight function effectively."

37.     Further, the Corporate Governance Guidelines specifically contains a section titled "Ethics and Conflicts of Interest," which states: "The Board expects in directors, as well as officers and employees, to act ethically.  Directors are expect to adhere to the Corporation's Business Conduct Policy."

**Apple's Business Conduct Policy**

38.     Beyond the duties outlined above, Apple has adopted a code of ethics, "Business Conduct: The way we do business worldwide," that applies to every employee, director, and officer of the Company

(the "Code").[4]   The Code provides that "*Apple conducts business ethically, honestly, and in full compliance with applicable laws and regulation.  This applies to every business decision in every area of the company worldwide.*"  The Code requires the Individual Defendants to comply with "Apple's Principles of Business Conduct," which specifies that Apple's success depends upon "demonstrating integrity in every business interaction."  These principles, which "define the way [Apple] do[es] business worldwide," according to the Code, include:

- **Honesty**. Demonstrate honesty and high ethical standards in all business dealings.

- **Respect**. Treat customers, suppliers, employees, and others with respect and courtesy.

- **Confidentiality**. Protect the confidentiality of Apple's information and the information of our customers, suppliers, and employees.

- **Compliance**. Ensure that business decisions comply with applicable laws and regulations.

39.     In addition, the Code outlines Apple's "Customer Focus," stating that "[e]very product [Apple] make[s] and every service [Apple] provide[s] is for [the Company's] customers."  Under this section of the Code, the Individual Defendants are required to "[f]ocus on providing innovative, high-quality products and services *demonstrating integrity in every business interaction.  Always apply Apple's principles of business conduct.*"

40.     The Code therefore requires the Individual Defendants to focus on Apple's consumers, and to demonstrate honesty, integrity, and courtesy in every interaction with those consumers.

41.     Under Apple's N&CG Committee Charter in effect during the relevant period, the N&CG Committee Defendants, defendants Gore, Iger, and Jung, were charged with monitoring compliance with Apple's Code.

**Additional Duties of the Audit and Finance Committee Defendants**

42.     In addition to these duties, under the Audit and Finance Committee Charter in effect since February 12, 2018, the Audit and Finance Committee Defendants, defendants Levinson, Bell, Sugar, and Wagner, owed specific duties to Apple to assist the Board in overseeing: (i) the integrity of Apple's

---

[4] The Code was adopted in 2012 and last revised in October 2015.

financial statements; (ii) the Company's compliance with legal, regulatory, and public disclosure requirements; (iii) the performance of Apple's independent auditor; (iv) Apple's systems of internal controls; (v) treasury and finance matters; (vi) enterprise risk management, privacy, and data security; and (vii) the auditing, accounting, and financial reporting process generally.  To fulfill their duties and responsibilities, specifically with respect to financial reporting, the Charter requires the Audit and Finance Committee to do the following:

9. Review with management and the independent auditor:

- the Corporation's annual audited financial statements, and related footnotes, and quarterly unaudited financial statements, including the disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Corporation's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;

- the independent auditors' audit of the annual financial statements and their report thereon;

- the accompanying management letter and any reports with respect to interim periods;

- any material changes to the Corporation's accounting principles and practices used in preparing financial statements to be filed with the SEC;

- any significant changes required in the independent auditors' audit plan;

- any difficulties or disputes with management encountered during the course of the audit; and

- other matters related to the conduct of the audit that are to be communicated to the Committee under the auditing standards of the Public Company Accounting Oversight Board.

10. Review with management, the independent auditors, and the Corporation's counsel, as appropriate, any legal and regulatory matters that may have a material impact on the financial statements, related compliance policies, and programs and reports received from regulators.

11. Review and discuss earnings press releases, including the use of non-GAAP financial measures, prior to public disclosure.

12. Provide a report for inclusion in the Corporation's proxy statement in accordance with the rules and regulations of the SEC.

13. Oversee compliance with the requirements of the SEC for disclosure of auditors' services and audit committee member qualifications and activities.

14. Discuss with the independent auditors the financial statements and audit findings, including any significant adjustments, management judgments and accounting estimates, significant new accounting policies and disagreements with management and any other matters required to be discussed by Public Company Accounting Oversight Board Auditing Standard No. 1301 ("Communications with Audit Committees") and Rule 2-07 of SEC Regulation S-X ("Communication with audit committees"), as in effect at the time in the case of annual statements, and Statement on Auditing Standards No. 100, as in effect at the time in the case of quarterly statements.

43. With respect to duties and responsibilities related to "Internal Control over Financial Reporting and Disclosure Controls and Procedures," the Charter provides that the Audit and Finance Committee is required to "[r]eview the adequacy of [Apple's] internal control over financial reporting and the disclosure controls and procedures designed to ensure compliance with applicable laws and regulations." Further, the Audit and Finance Committee must:

17. Periodically review with management any significant deficiencies or material weaknesses in the design or operation of internal controls over financial reporting, ***any fraud involving any employees who have a significant role in the Corporation's internal control over financial reporting***, and any significant changes in internal controls over financial reporting or in other factors that could significantly affect internal controls over financial reporting, including management's responses thereto.

18. Establish procedures for receiving, retaining and treating complaints received by the Corporation regarding accounting, internal accounting controls, or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

44. Regarding "Management Discussions," the Audit and Finance Committee must:

23. Review with management and the independent auditors any correspondence with regulators or governmental agencies and any employee complaints regarding the Corporation's financial statements or accounting policies.

24. Periodically review separately with each of management, the independent auditors, and the head of Internal Audit (i) any disagreements between management and the auditors in connections with any audits, (ii) any difficulties encountered during the course of audits, including restrictions in scope or access to required information, and (iii) management's response.

25. Consider and approve, if appropriate, significant changes to the Corporation's accounting principles and financial disclosure practices as recommended by management and the independent auditors. Review with management and the independent auditors, at appropriate intervals, the extent to which any changes or improvements in accounting or financial practices, as approved by the Committee, have been implemented.

45. Importantly, pursuant to its Charter, the Audit and Finance Committee must "[r]eview and discuss with management":

- management's program to identify, assess, manage, and monitor significant business risks of the [Company], including financial, operational privacy, security, business continuity, legal and regulatory, and ***reputational risks***; and

- management's risk management decisions, practices, and activities.

The Audit and Finance Committee is required to "[r]egularly report to the Board the substance of such reviews and discussions and, as necessary, recommend to the Board such actions as the Committee deems appropriate."

**Breaches of Duties**

46. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Apple, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

47. The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in: (i) violations of law, including computer intrusion law, consumer protection law, competition and trade practices law, and federal securities law; and (ii) making improper statements concerning Apple's sales growth and future financial prospects. These were improper practices that wasted the Company's assets, and caused Apple to incur substantial damage.

48. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Apple, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. As a result, and in addition to the damage the Company has already incurred, Apple has expended, and will continue to expend, significant sums of money.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

49. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired

- 16 -

with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

50.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) secretly slow the performance of consumers iPhones without their knowledge or consent; (ii) conceal harmful information relating to Apple's business, operations, and prospects that rendered statements in Apple's SEC filings and public announcements improper; (iii) deceive the investing public, including stockholders of Apple, regarding the Individual Defendants' management of Apple's operations, sales growth, iPhone demand, and future financial prospects; and (iv) enhance the Individual Defendants' executive and directorial positions at Apple and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

51.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

52.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and indemnification and contribution; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

53.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

54.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the

- 17 -

1 wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary

2 wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her

3 overall contribution to and furtherance of the wrongdoing.

4 **SUBSTANTIVE ALLEGATIONS**

5 **Company Background, the Importance of the Chinese Market, and the iPhone**

6      55.    Apple is a multinational technology company that designs, develops, and sells consumer

7 electronics, computer software, and online services.  Apple's best-known products include its iPhone

8 smartphones, the iPad tablet computer, the Mac personal computer, the iPod portable media player, the

9 Apple Watch smartwatch, the Apple TV digital media player, and the HomePod smart speaker.

10      56.    The Company and its products enjoy a significant geographic reach extending to emerging

11 markets.  The Company's third-largest market after the United States and Europe is Greater China, a region

12 encompassing mainland China, Hong Kong, and Taiwan.  The importance of Greater China to the

13 Company is demonstrated by the region accounting for $52 billion of sales in Apple's fiscal year 2018,

14 representing roughly 20% of the Company's total sales in that year.

15      57.    The iPhone has served as the Company's flagship product since its release in 2007.  The

16 iPhone utilizes Apple's iOS operating system and powers the Company's signature applications, such as

17 Siri, Apple Pay, and Face ID.  The iPhone has also been Apple's most important product, generating

18 approximately 62% and 63% of the Company's net sales in fiscal year 2017 and 2018, respectively.[5]  As

19 a result, Apple's financial success largely depends on its ability to continue selling iPhones.

20      58.    Due to the smartphone market's competitive nature, Apple admits it must continuously

21 develop innovative new devices and enhance existing products so as to stimulate demand.  As Apple states

22 in its public filings with the SEC:

23         ***The Company's future financial condition and operating results depend on the***

24         ***Company's ability to continue to develop and offer new innovative products*** and services
        in each of the markets in which it competes.

25                \*       \*      \*

26

27 ───────────────

[5] Apple's fiscal year ends in September of each calendar year.  Apple's 2018 fiscal year began on September 31, 2017, and ended on September 29, 2018.

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Due to the highly volatile and competitive nature of the industries in which the Company competes, the Company must continually introduce new products, service and technologies, enhance existing products and services, ***effectively stimulate customer demand*** for new and upgraded products and services and successfully manage the transition to these new and upgraded products and services.

59.     As such, Apple typically releases a new generation of the iPhone each year.  Historically, Apple's "latest and greatest" iPhone is sold at aggressively increased prices for better features, processing speeds, and battery life.  The following chart provides Apple's more recent iPhone releases:

| *iPhone Model* | *Release Date* | *Pricing* |
| --- | --- | --- |
| iPhone 6S /6S Plus | September 25, 2015 | $649/$749/$849 ($749/$849/$949) |
| iPhone SE | March 31, 2016 | $399/$499 |
| iPhone 7 / 7 Plus | September 16, 2016 | $649/$749/$849 ($769/$869/$969) |
| iPhone 8 / 8 Plus | September 22, 2017 | $699/$849 ($799/$949) |
| iPhone X | November 3, 2017 | $999/$1149 |
| iPhone XS / XS Max | September 21, 2018 | $999/$1149/$1349 ($1099/$1249/$1449) |
| iPhone XR | October 26, 2018 | $749/$799/$899 |

60.     In addition to routinely releasing new iPhones, Apple also develops new iOS software updates available for iPhone users to download to their iPhones.  Improvements to iOS are also integral to Apple's success.  As admitted by Apple in its public filings: "The Company's financial condition and operating results depend substantially on the Company's ability to continually improve iOS and iOS devices in order to maintain their functional and design advantages."  Several of these iOS updates have purported to optimize device performance, such as by increasing battery life.  Apple automatically notifies iPhone users of new iOS updates with a red signal, and, in some cases, the updates are automatically installed.  In addition, certain iPhone applications refuse to open or work without the latest version of iOS.  As a result, updating iOS is effectively mandatory for iPhone users.

**Apple Throttles the Performance of iPhones Through iOS Updates**

61.     In 2016, older iPhone models began shutting down inexplicably and without warning.  Unbeknownst to consumers and investors at the time, these shutdowns were caused by the iPhone's aging battery, not the age of the device itself.  The aging batteries delivered power unevenly, resulting in device-crashing power spikes.  This issue could have been resolved by simply replacing the battery.  Apple's

1    fiduciaries, however, failed to inform consumers of this relatively uncomplicated solution, one which was

2    far less expensive than replacing the iPhone with a newer model.

3        62.    In lieu of transparency to iPhone users, on January 23, 2017, Apple released a software

4    update to secretly "fix" the emerging shutdown issues.  The update, iOS 10.2.1, was published to every

5    single iPhone in the world without much explanation for its purpose other than "bug fixes and improves

6    the security of your iPhone or iPad."  Similarly, less than ten months later, on December 2, 2017, Apple

7    announced the release of iOS 11.2.0, also disclosing little about the update other than, "introduces Apple

8    Pay Cash [and] includes bug fixes."  Through these updates, Apple intentionally and drastically throttled,

9    or slowed down, the performance of iPhones with older batteries, which, by virtue, were older model

10   iPhones.  By slowing down these iPhones, the updates prevented the battery-related power issues that had

11   caused sudden shutdowns.  The update, however, did little more than exchange one problem for another

12   —all without disclosure to those affected.  Although iPhone users no longer faced sudden shutdowns, they

13   were left with phones that were drastically slower than they were before the update, and even slower than

14   the devices were when iPhone users first purchased them.  Clueless due to Apple's concealment that

15   replacing the batteries would have rectified the issue, consumers believed their iPhones were obsolete and

16   needed replacement.

17       63.    Apple published these updates within one year of the much anticipated iPhone X, the

18   minimum selling price of which was $999, a sharp increase from the iPhone 8's lowest asking price of

19   $699.  Confronted with the choice of either accepting a snail-paced iPhone or replacing it, many consumers

20   found themselves spending significantly more than they ever had before to purchase a new iPhone.  These

21   premature upgrades artificially inflated Apple's iPhone sales and gave an appearance of consistent growth.

22   In fact, in 2017, Apple enjoyed a record year of iPhone sales.  During this period, the Individual

23   Defendants attributed iPhone upgrade rates, accelerating at the "highest that [they've seen] seen," to a

24   variety of factors—none of which included the undisclosed phone throttling.

25       64.    Consumers finally learned the disappointing truth about the once-admired tech company

26   in December 2017, when independent investigations unearthed that the iOS updates were indeed slowing

27   down the performance of older model iPhones.  These revelations began on December 9, 2017, when a

28   Reddit user under the handle "TeckFire" posted online benchmarks comparing the processing speed of his

iPhone 6 operating on its old battery versus a replacement battery. TeckFire found that with a new battery, the iPhone 6's processing speed had increased by 50%.

65.     On December 18, 2017, induced by the conversations ensuing from TeckFire's post, Primate Lab's software engineer John Poole published a report determining that, based on an analysis of 100,000 iPhones, the iOS updates were the cause of dramatically slowed performance in certain iPhones. Thus, only through independent investigations were iPhone users able to determine what the Company and its fiduciaries had intentionally concealed: Apple was deliberately slowing the performance of certain iPhones without their knowledge or consent, and these slowdowns were not actually device-related, but battery-related.

66.     In response to consumer outrage upon this revelation and in an effort to explain these updates through a public relations maneuver, on December 20, 2017, Apple tacitly admitted to the public that the Company had indeed been intentionally slowing the performance of iPhones through iOS updates (the "December 20 Admission"). The December 20 Admission stated:

> Our goal is to deliver the best experience for customers, which includes overall performance and prolonging the life of their devices. Lithium-ion batteries become less capable of supplying peak current demands when in cold conditions, have a low battery charge or as they age over time, which can result in the device unexpectedly shutting down to protect its electronic components.
>
> Last year we released a feature for iPhone 6, iPhone 6s and iPhone SE to **smooth out** the instantaneous peaks only when needed to prevent the device from unexpectedly shutting down during these conditions. We've now extended that feature to iPhone 7 with iOS 11.2, and plan to add support for other products in the future.

67.     Shortly after the December 20 Admission, regulators around the world announced that they had launched independent investigations into whether Apple's conduct was fraudulent. On January 30, 2018, *Bloomberg* reported that the DOJ and SEC were investigating whether Apple violated federal securities laws over the intentional iPhone slowdowns. Meanwhile, consumers began filing several class actions against Apple.

68.     On December 28, 2017, in an attempt to maintain consumer goodwill, Apple announced that it would offer discounts for replacement iPhone batteries, charging $29 rather than $79. Affected iPhones could then operate at peak performance for another two years as they did when first purchased. Thus, as a result of Apple's previously undisclosed iPhone throttling during 2017, the 2018 battery

replacement program effectively cannibalized the Company's sales of newer model iPhones because consumers could simply purchase a discounted replacement battery in lieu of buying a new iPhone. However, the Individual Defendants would deny any negative impact resulting the battery replacement program, just as they had concealed the Company's growth being driven by the undisclosed throttling, until January 2, 2019.

**Defendants Caused or Were Well Aware of Apple's Unlawful Throttling**

69.     The Individual Defendants caused, or at the very least knew of and permitted, Apple's unlawful throttling of iPhones.  The iPhone was and is Apple's signature product.  Thus, any major changes, such as the throttling features imbedded in iOS, would require approval from Apple's Board and top executives.  In addition, Apple's intentional throttling of iPhones deviated from the Company's previous response to sudden shutdown issues.  Again, the significant deviation of dealing with problems facing the Company's core product would require Board approval.  Further, Apple's fiscal 2016, the year prior to the throttling, was marked by declining iPhone sales.

70.     In addition, Apple admits in public filings that "[t]he Company's financial condition and operating results depend substantially on the Company's ability to continually improve iOS and iOS devices in order to maintain their functional and design advantages."  As such, senior executives and the Board would need to approve the throttling feature imbedded in iOS before the Company could activate it.  The Board also must have known that the emerging shutdown issues facing the Company's most profitable product, the iPhone, was an increasing problem for Apple.  Even the inventor of the iPod, Tony Fadell, voiced frustration over his iPhone unexpectedly shutting down regardless of its charged battery, stating: "It's happening to me every other day-especially while using the mapping app.  Have to always carry an external battery to revive it."[6]  On December 6, 2016—after countless consumers complained of the unexpected shutdowns on the Apple's official Support Communities website—the Company published a letter on its Chinese website titled (as translated), "Information about the iPhone and unexpected shutdown," acknowledging that "a small number of customers reported an unexpected shutdown" while

---

[6] Tony Faddell Twitter Comment, (Nov. 30, 2016), responding to another user on Twitter who wrote, "Anyone else's iPhone suddenly shutting down with ~30% battery left? Strange new habit…." Available at https://twitter.com/tfadell/status/804215290871607296?lang=en (last visited Aug. 14, 2019).

failing to inform those customers that replacing their batteries would resolve this issue. Instead, Apple stated in the December 6, 2016 letter that they will add a diagnostic feature in the next iOS update to gather more information on the matter and potentially implement "improvements" through further iOS updates. Specifically, the letter stated:

> Outside the affected area [of iPhone 6s determined to have a manufacturing defect], a small number of customers reported an unexpected shutdown. Some of these shutdown conditions may be normal, as the iPhone protects its electronic components by shutting down. To gather more information, we'll add an additional diagnostic feature to the iOS software update that will be released next week. This feature collects a variety of information over the next few weeks, and this information may help us improve the algorithms used to manage battery performance and shutdown operations. If such improvements are implemented, we will deliver them through further software updates.

Accordingly, defendants knew about the shutdown issue and the unlawful throttling feature introduced through iOS as a proposed solution.

71.    In addition, defendant Federighi—who, according to Apple, "oversees the development of iOS" and reports directly to defendant Cook—would not have decided to unilaterally resolve the colossal shutdown issues facing the Company by developing iOS updates with throttling features, at least not without first discussing the matter with defendant Cook.

72.    Following Batterygate's revelation, on January 18, 2018, during an interview with ABC News, defendant Cook conceded his knowledge of and responsibility for slowing down users' iPhones, suggesting that other members of Apple's upper management were also aware. Specifically, in response to the ABC News reporter's question about whether he thought "Apple fumbled on teaching its customers about what was going on with their phones," defendant Cook stated:

> About a year ago, we released some code that essentially what it does is, all batteries age over time, and they become unhealthy at a point in time. And an unhealthy battery has a probability that it will create an unexpected restart. When we did put it out, we did say what it was, but I don't think a lot of people were paying attention, maybe we should have been clearer, as well. And so we deeply apologize for anybody that thinks we had some other kind of motivation.

73.    Notably, this was not the first time Apple responded to sudden shutdown issues. In November 2016, Apple determined that iPhone 6s within a limited serial number range were experiencing unexpected shutdowns due to a manufacturing defect. To resolve these unexpected shutdowns, Apple decided the proper course of action was to fix the underlying cause by replacing the batteries rather than

- 23 -

1  throttling the devices.  Seeing unexpected shutdowns as a flaw and knowing that replacing the battery

2  would fix the problem without compromising processing speed, Apple notified iPhone 6s users of this

3  resolution.  Not only that, the Company offered eligible iPhone 6s users a replacement battery free of

4  charge.  The program covered all affected iPhone batteries for three years after the first retail sale of the

5  unit.  In other words, Apple expected batteries to hold for three years.

6       74.  Yet, when countless iPhone devices began unexpectedly shutting down because their

7  batteries could not handle processing loads before reaching three years, Apple shifted gears entirely.

8  Under this analysis, deceptive and unlawful conduct became an attractive course of action.  The Company

9  left consumers completely in the dark about batteries causing the unexpected shutdowns, depriving them

10  of the opportunity to fix the underlying cause.  Then, to conceal and secretly "fix" the shutdown issues

11  (which Apple had previous conceded amounted to a defect), the Company published iOS updates that

12  throttled the performance of iPhones without the user's knowledge or consent.  By doing so, the Company

13  avoided the need to offer replacement batteries free of charge in mass quantities.  Not only that, the

14  Company knew that leaving consumers with frustratingly slow "old" iPhones would essentially force them

15  into purchasing new iPhones, thereby coercing iPhone sales.

16       75.  Further, in 2016, Apple reported an annual sales decline for the first time since 2001.  As

17  admitted by the Company's Annual Report on Form 10-K for the fiscal year ended September 24, 2016,

18  filed with the SEC on October 26, 2016 (the "2016 Form 10-K"), iPhone unit sales declined by 8%

19  compared to the previous year.  In the 2016 Form 10-K, the Individual Defendants stated the sales decline

20  was "due primarily to a lower rate of iPhone upgrades during 2016 compared to 2015 and challenging

21  macroeconomic conditions in a number of major markets in 2016."  At the same time, Apple was facing

22  increased competition in the smartphone market, which included Chinese upstart rivals offering similar

23  products at competitive prices.  In addition, third-party vendors began phasing out two-year service

24  contracts that allowed iPhone upgrades for discounted prices.   Given these factors, the Individual

25  Defendants were motivated to find ways to increase sales, and must have known that secretly throttling

26  the performance of iPhones would have done the trick.

27

28

**Various Factors Threaten Apple's Ability to Maintain Sales Growth in Greater China**

76. In addition to Batterygate, Apple's ability to maintain sales growth in Greater China, the Company's third-largest market, faced several threats—threats exacerbated by Batterygate. First, Apple has faced increased competition from upstart Chinese companies that offered comparable all-screen smartphones for a fraction of the iPhone's price.[7] As a result, Apple's pricing power and smartphone market share in Greater China has been diminishing. Second, the Company's business in China is susceptible to geopolitical trade maneuvers from the U.S.-China trade war, including the import tariffs imposed by the Trump administration throughout 2018. Although the Individual Defendants have sought to deny or minimize any perceived impact, the U.S.-China trade war has also threatened Apple's sales in the region. Third, throughout 2018, China experienced its lowest economic growth in nearly three decades. These factors, combined with the strength of the U.S. dollar, made the iPhone unreachable for many Chinese consumers who would might have otherwise upgraded. As a result, Apple's sales growth stagnated in its most important emerging market. However, consistent with their practice of concealing negative issues facing the Company, the Individual Defendants nonetheless provided a rosy outlook on Greater China to investors despite knowing or being recklessly unaware of the problems in that region.

## **IMPROPER STATEMENTS**

77. Between August 1, 2017 and January 2, 2019, the Individual Defendants made or caused Apple to make a series of improper statements concerning Apple's sales growth and future financial prospects in the Company's press releases, public filings with the SEC, and during earnings conference calls. In particular, the Individual Defendants routinely touted strong iPhone demand while concealing that this demand was driven by Apple's intentional and undisclosed throttling of iPhones and while downplaying the negative impact of the battery replacement program and macroeconomic issues in China.

78. On August 1, 2017, Apple issued a press release announcing strong financial results for its third fiscal quarter ended July 1, 2017 ("Q3 2017") exceeding analyst estimates. In the press release, Apple provided revenue guidance for the upcoming quarter of between $49 billion and $52 billion. On

---

[7] For example, Chinese upstart company Huawei Technologies Co. Ltd.'s top-end handsets start at about $600, while Xiaomi Corporation's comparable models start at even less.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

the same day, the Company held an earnings conference call with analysts and investors to discuss its Q3 2017 results. During the call, defendant Cook lauded consumer demand for the iPhone 7 while highlighting the product's "highest ever" upgrade rates. Defendant Cook proceeded to attribute this record upgrade rate to "many, many different things," none of which included the intentional throttling of older iPhones. When specifically asked whether the upgrade rate was sustainable, defendant Cook assured that "there's a lot of factors that are very positive for [Apple]" and that Apple has "a lot of opportunity." In particular, defendant Cook stated:

> iPhone results were impressive with especially strong demand at the high end of our lineup. *iPhone 7 was our most popular iPhone and sales of iPhone 7 Plus were up dramatically compared to 6s Plus in the June quarter last year*. The combined iPhone 7 and 7 Plus family was up strong double digits year-over-year. One decade after the initial iPhone launch, we have now surpassed 1.2 billion cumulative iPhones sold.

> \* \* \*

> It's interesting to note that *upgraders through -- both for the quarter and actually for the full fiscal year to date was our highest ever*. And so that we felt very good about.

> \* \* \*

> The -- from an absolute quantity point of view, *the upgrades for this fiscal year are the highest that we've seen and so we feel good about that*. However, if you look at it from an upgrade rate point of view instead of the absolute number, the rate is similar to what we saw with the previous iPhones, except for iPhone 6, which as we've called out in the past, had an abnormally high upgrade rate.

> \* \* \*

> I think *the upgrade rate is a function of many, many different things*, from the size of the installed base, the age of the installed base, the product that is new at the time, the regional distribution, the upgrade plans that are in various markets around the world. ... And – but I think in general, because our installed base is -- was up strong double digit once again, *there's a lot of factors that are very positive for us*. And between the upgraders and the switchers that we see and still -- the first-time buyer category is still out here, too, in several countries, including some that you may not think there is, there is still sizable base in some. Between those 3 areas, *I think we have a lot of opportunity*.

79. Defendant Maestri echoed these remarks on iPhone's demand and sales growth during the call, stating in relevant part:

> During the quarter, we sold 41 million iPhones and reduced iPhone channel inventory by 3.3 million units, leaving us with our lowest level of channel inventory in 2.5 years and well within our 5- to 7-week target inventory range. *iPhone sales were up year-over-year*

*in most markets we track*, with many markets in Asia, Latin America and the Middle East growing unit sales by more than 25%. We are very pleased with these iPhone results, especially considering the tough comparison to the June quarter last year when we launched iPhone SE.

*iPhone ASP[8] was $606, up from $595 a year ago, thanks to strong demand for iPhone 7 Plus, which represented a higher percentage of the iPhone mix compared to the Plus model a year ago*. The impact of the stronger mix on ASP was partially offset by negative foreign exchange year-over-year and the reduction in channel inventory, which took place entirely at the high end of the portfolio.

Customer interest and satisfaction with iPhone are very strong with both consumers and business users. In the U.S., the latest data from 451 Research on consumers indicates a 95% customer satisfaction rating for iPhone 7 and 99% for iPhone 7 Plus. *Among consumers planning to buy a smartphone, purchase intention for iPhone was nearly 3x the rate of our closest competitor. Among corporate smartphone buyers, iOS customer satisfaction was 94%. And of those planning to purchase smartphones in the September quarter, 78% plan to purchase an iPhone*.

80.     Analysts reacted positively to Apple's statements regarding its 3Q 2017 results and future prospects.  For example, on August 2, 2017, J.P. Morgan published a report raising Apple's price target to $176 from $165.

81.     On November 2, 2017, Apple issued a press release announcing earnings and revenue above analyst estimates for its fourth fiscal quarter ended September 30, 2017 ("Q4 2017").  For Q4 2017, Apple reported above guidance revenue of $52.6 billion and sequential iPhone unit sales growth of 14%. Defendant Maestri was quoted in the press release touting the Q4 2017 results, stating: "Apple's year-over-year revenue growth rate accelerated for the fourth consecutive quarter and drove [earnings per share] growth of 24 percent in the September quarter."  Also in the press release, Apple set revenue guidance for the upcoming quarter of between $84 billion and $87 billion.

82.     On the same day, the Company held an earnings conference call with analysts and investors to discuss Apple's Q4 2017 results.  During the call, defendant Cook boasted the Company's "biggest year ever," "all-time record revenue," and "double-digit unit growth in iPhone."  He further highlighted Apple's year-over-year increases in upgraders, all while concealing that these upgrades were driven by the

---

[8] ASP is average selling price.  An increase in iPhone's ASP indicates that consumers are buying higher priced product offerings, or newer iPhones models.

Company's undisclosed practice of unlawfully throttling older model iPhones through iOS updates. Specifically, defendant Cook stated:

> *This was our biggest year ever in most parts of the world with all-time record revenue in the United States, Western Europe, Japan, Korea, the Middle East, Africa, Central and Eastern Europe and Asia*.
>
> We had particularly strong finish this year, generating our highest September quarter revenue ever as year-over-year growth accelerated for the fourth consecutive quarter. Revenue was $52.6 billion, above the high end of our guidance range and up 12% over last year.
>
> \*   \*   \*
>
> Let me talk a little bit about Q4 in China to give you a little bit of color on the results. The -- we increased market share for iPhone, Mac and iPad during the quarter. We hit all-time revenue records for services and for Mac in the -- for the PRC during the quarter. We had very strong iPad revenue growth. *We had double-digit unit growth in iPhone, and both the upgraders and Android switchers were both up on a year-over-year basis during the quarter*. And so, the results were broad based. They were pretty much across the board, as I indicated.

83.     During the call, defendant Maestri reiterated the Company's iPhone sales growth, adding further that "[c]ustomer interest and satisfaction with iPhone are very strong."  In particular, defendant Maestri stated:

> *During the quarter, we sold 46.7 million iPhones, up 3% over last year*. We were very pleased to see double-digit iPhone growth in many emerging markets, including mainland China, the Middle East, Central and Eastern Europe, India and Mexico. We gained share, not only in those markets, but also in Canada, Germany, France, Italy, Spain, Sweden and Singapore, based on the latest estimates from IDC.
>
> iPhone channel inventory increased by 1.3 million units sequentially to support the launch of iPhone 8 and 8 Plus, significantly less than the increase in the September quarter a year ago. *Customer interest and satisfaction with iPhone are very strong with both consumers and business users*.
>
> In the U.S., the latest data from 451 Research on consumers indicates a customer satisfaction rating of 97% or higher across all iPhone models.  *Among consumers planning to buy a smartphone in the next 90 days, purchase intention for iPhone was 69%, more than 5x the rate of the closest competitor with a loyalty rate for current iPhone owners of 95% compared to 53% for the next highest brand*.

84. On February 1, 2018, Apple issued a press release announcing its financial results for its first fiscal quarter of 2018 ended December 30, 2017 ("Q1 2018"), the last period before the battery replacement program would go into full effect. For Q1 2018, Apple reported "*all-time record*" *revenue* and sequential *iPhone unit sales growth of 66%*—unsustainable albeit impressive results caused by throttling-induced iPhone sales. At the same time, the press release provided unexpectedly flat revenue guidance of between $60 billion and $62 billion for the upcoming quarter.

85. Defendant Cook commented in the press release, touting the "biggest quarter in Apple's history," which he attributed to growing iPhone sales. Despite knowledge, defendant Cook failed to disclose that these record results were artificially achieved by intentionally throttling older model iPhones and, consequently, reflected unsustainable growth. In particular, defendant Cook stated in the press release:

> We're thrilled to report the biggest quarter in Apple's history, with broad-based growth that included the highest revenue ever from a new iPhone lineup. iPhone X surpassed our expectations and has been our top-selling iPhone every week since it shipped in November.

86. Defendant Cook also lauded the Company's growth in updated devices in the press release. Defendant Cook claimed the growth in updates was "a testament to the popularity of our products and the loyalty and satisfaction of [Apple's] customers," when, in reality, consumers were essentially forced into updating their impaired devices under the false notion that the updates improved, rather than diminished, the performance of their iPhones. Specifically, defendant Cook stated:

> We've also achieved a significant milestone with our active installed base of devices reaching 1.3 billion in January. That's an increase of 30 percent in just two years, which is a testament to the popularity of our products and the loyalty and satisfaction of our customers.

87. Also in the press release, defendant Maestri reiterated Apple's "all-time record profitability." Defendant Maestri falsely claimed Apple's record performance during Q1 2018 was "[t]hanks to great operational and business performance," rather than forced iPhone sales.

88. On the same day, the Company held an earnings conference call with analysts and investors to discuss Apple's Q1 2018 results. In the very beginning of his opening remarks, defendant Cook stressed the growth in Apple's active installed base, again falsely claiming that this growth "speaks to the strength and reliability of our products and our ecosystem as well as the loyalty, satisfaction and engagement of

- 29 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

our customers." Defendant Cook also pointed out that Q1 2018 was Apple's "fifth consecutive quarter of accelerating revenue growth." While Apple's growth was "broad-based," defendant Cook explained that "a key driver was iPhone, which generated its highest revenue ever." Even though consumers were essentially forced into purchasing new iPhones, defendant Cook falsely conveyed these improved sales resulted from the iPhone X's "innovative" "new features."

89.  During the call, an analyst noted Apple's relatively flat guidance and specifically questioned whether the battery replacement program would elongate iPhone upgrade cycles. Defendant Cook first responded by, ironically, touting the "fantastic" reliability of the iPhone. He then proceeded to highlight expansion in the secondary iPhone market as well as growth in active install base, stating "[the] more people on iPhones, the better." Finally, defendant Cook addressed the analyst's actual question, stating that Apple "did not consider in any way, shape or form what [the battery replace program] would do to upgrade rates." Specifically, the analyst asked and defendant Cook replied:

**A.M. Sacconaghi** – *Sanford C. Bernstein & Co., LLC., Research Division – Senior Analyst*

I have a question and a follow-up. You commented on how your installed base over the last couple of years has grown 30%. And iPhone is clearly the largest component of that. And so iPhone installed base is probably growing close to that number, perhaps less, call it 20% or 25%. Yet if we look at iPhone unit growth for fiscal '18, sort of what's implied with your guidance, fiscal '17 and fiscal '16, it's been ***relatively flat***. So you have an installed base that's 20-plus percent higher and a unit growth that's relatively flat, which would suggest that your upgrade rate is going down or your replacement cycle is elongating. And I'm wondering whether you agree with that and whether investors should be worried about that. And maybe if I could just add one other wrinkle to potentially get your response on is ***given consumers' heightened awareness of their ability to replace batteries going forward as opposed to upgrade, isn't that also something that investors should potentially be concerned about in terms of its impact on upgrade rate going forward?*** And then, believe it or not, I have a follow-up.

**[Defendant] Cook**

I think it's up to investors as to what things they would like to focus on, so I don't want to put myself in a position of that. The way that I look at this, and I -- the numbers you quoted, I have a different view of them. But generally, ***what we see with iPhone is the reliability of iPhone is fantastic***. The second -- or ***the previously owned market has expanded in units over the years***. And you see, in many cases, carriers and retailers having very vibrant programs around trading an iPhone in. And because iPhone has the largest residual rate on it. It acts as a buffer for the customer to buy a new one, and it winds up with another customer somewhere else that is perfectly fine with having a previously owned iPhone. And so I view all of that to be incredibly positive. ***It's more people on iPhones, the better***.

I would like to point out that the -- every major product hit a *high on the active installed base*. And so that's iPads, it's Mac, and those are huge numbers as well. And so as we've always said, there's a large part of the – or the vast majority of the services kind of are mapped to the installed base instead of the quarterly sales. And there's -- this quarter is no different on that. Toni -- on the battery, Toni, *we did not consider in any way, shape or form what it would do to upgrade rates*. We did it because we thought it was the right thing to do for our customers. And I -- sitting here today, I don't know what effect it will have. And again, it's not -- was not in our thought process of deciding to do what we've done.

90.     On May 1, 2018, Apple issued a press release announcing its financial results for its second fiscal quarter ended March 31, 2018 ("Q2 2018").  The press release announced "quarterly revenue of $61.1 billion, an increase of 16 percent from the year-ago quarter."  Defendant Cook commented in the press release boasting Apple's "*best March quarter ever*," while emphasizing "*strong revenue growth in iPhone*."  Defendant Cook further highlighted that "[c]ustomers chose iPhone X more than any other iPhone each week in the March quarter, just as they did following its launch in the December quarter." Despite the Individual Defendants' positivity, however, iPhone unit sales for Q2 2018 were only 52,217, reflecting a *32% sequential sales decrease* from Q1 2018's unit sales of 77,316.

91.     On the same day, the Company held an earnings conference call with analysts and investors to discuss Apple's Q2 2018 results.  During the call, defendant Maestri lauded consumer demand and satisfaction for iPhones, stating in relevant part:

iPhone revenue grew 14% year-over-year with iPhone ASP increasing to $728 from $655 a year ago, driven primarily by the performance of iPhone X, iPhone 8 and iPhone 8 Plus. During the quarter, we sold 52.2 million iPhones, up 3% over last year, and we grew iPhone units by double digits in several markets, including Japan, Canada, Switzerland, Turkey, Central and Eastern Europe, Mexico and Vietnam.

*Our performance from a customer demand standpoint was even stronger than our reported results* as we reduced iPhone channel inventory by 1.8 million units, 600,000 units more than the March quarter reduction last year. We exited the March quarter within our target range of 5 to 7 weeks of iPhone channel inventory.

*Our customers are extremely happy with their iPhones*. The latest survey of U.S. consumers from 451 Research indicates that across all iPhone models, the customer satisfaction rating was 95%, and combining iPhone 8, 8 Plus and iPhone X, customer satisfaction was even higher at 99%. And among business buyers who plan to purchase smartphones in the June quarter, 78% plan to purchase iPhones.

92.     Also during the call, an analyst asked whether the threat of the U.S.-China trade war was impacting demand and if Apple had taken any actions "to preempt any risk of tariffs going forward." In response, defendant Cook assured that he was "very optimistic" about the two countries futures, stating further that he is "a big believer that the 2 countries together can both win and grow the pie, not just allocate it differently."

93.     On July 31, 2018, Apple issued a press release announcing its financial results for its second fiscal quarter ended June 30, 2018 ("Q3 2018"). The press release announced "quarterly revenue of $53.3 billion, an increase of 17 percent from the year-ago quarter." Defendant Cook commented in the press release touting the Company's "**best June quarter ever**, and [Apple's] fourth consecutive quarter of double-digit revenue growth." He further commented that Apple's strong Q3 2018 results "were **driven by continued strong sales of iPhone**." While the Individual Defendants boasted strong demand, however, Apple's Q3 2018 **iPhone sales had actually declined by 21%** from the previous quarter.

94.     On the same day, the Company held an earnings conference call with analysts and investors to discuss its Q3 2018 results. During the call, the same analyst mentioned above again questioned whether the battery replacement program was negatively impacting iPhone replacement sales. Defendant Cook responded by rejecting the analyst's concern, as he did before. Instead, defendant Cook reassured investor confidence by pointing out the health and enormity of the smartphone market and by highlighting iPhone's revenue growth and innovation. Further, defendant Cook repeated that Apple was not analyzing the battery replacement program's potential impact on unit sales. In particular, the analyst asked and defendant Cook replied:

**A.M. Sacconaghi** - *Sanford C. Bernstein & Co., LLC., Research Division - Senior Analyst*

Okay. Tim, I was wondering if you could just comment a little bit about the health of the smartphone market. Apple's smartphone iPhone units have been relatively flat for 4 years. And I think you've probably been a share gainer during the period, which would suggest, at least at the high end of the market, that is perhaps flat to down. And I'm wondering if you can comment on, a, ***whether you believe that and what you think might be happening with replacement cycles and specifically also what impact, if any, you've seen from wider availability and less expensive replacement batteries for iPhones***.

**[Defendant] Cook**

*I think the smartphone market is very healthy*. I think it's actually the best market in the world to be in for someone that is in the business that we're in. So *it's an enormous-sized market* and whether it grows -- from our point of view, whether it grows 1% or 2% or 5% or 6% or 10% or shrinks 1% or 2%, it's a great market because it's just huge. And so that's kind of the way that I view that. iPhone revenues are up 20% for the quarter over last year. We're really pleased with that. And if you look at the sort of this cycle, which I'll define as Q1, Q2, Q3 for ease, you'll see that we've grown like mid-single digits and -- on an average weekly sales point of view and, of course, double-digit on ASP. And so I think it's really healthy. In terms of replacement cycles, as I've mentioned I think on a previous call, some replacement cycles are lengthening. I think that the major catalyst for that was probably the subsidy plans becoming a much smaller percentage of total sales around the world than they were at one time. And so I think that some are lengthening and -- but I think for us, the thing that we always have to do is come out with a really great innovative product. And I think that iPhone X shows that when you deliver great innovative product, there's enough people there that would like that, and it can be a really good business. And so that's how I look at that. In terms of the -- our installed base, which is something very important for us as it is one of the key drivers of Services, our active installed base on iPhone grew double digits over last year during the quarter. And so we're thrilled with that. And you can see that carrying through to the Services line, in the -- and the growth that we have there. *In terms of batteries, we have never done an analysis internally about how many people decided to get a lower-priced battery than buy another phone because it was never about that for us. It was always about doing something great for the user. And I think if you treat the users and customers well, then you have a good business over time, and so that's how we look at that*.

95.     Also during the call, an analyst asked defendant Cook about what he was "seeing in China and how [he was] thinking about it as [he] look[s] forward." Defendant Cook responded by highlighting "*double-digit growth in Greater China*" and discussing the ongoing tariffs imposed on China by the U.S., specifically stating that "*none of [Apple's] products were directly affected by the tariffs*."

96.     On November 1, 2018, Apple issued a press release announcing its financial results for its fourth fiscal quarter and year ended September 29, 2018 ("Q4 2018"). In the press release, defendant Cook boasted the Company's "tremendous fiscal 2018" noting that the Company "achieved the strongest revenue and earnings in Apple's history." Though these results would fail to continue into the next year due to the battery replacement program and macroeconomic issues in China, defendant Cook falsely assured the public that Apple was well positioned to deliver strong results. In particular, defendant Cook stated in the press release: "Over the past two months, [Apple] delivered huge advancements for [its] customers through new versions of iPhone, Apple Watch, iPad, and Mac as well as [its] four operating

- 33 -

systems, and [the Company] enter[s] the holiday season with [its] strongest lineup of products and services ever." Based on this strong lineup among other factors, Apple—then already more than one-third of the way into its first quarter of 2019—provided revenue guidance of between $89 billion and $93 billion for the upcoming and all-important holiday quarter.

97.     On the same day, the Company held an earnings conference call with analysts and investors to discuss its Q4 2018 results, during which the Individual Defendants reiterated the positive representations made in the press release. Defendant Maestri again emphasized that Apple had "the strongest lineup ever as [it] enter[ed] the holiday season," justifying "a new all-time record" of "expect[ed] revenue [of] between $89 billion and $93 billion." Defendant Maestri assured investors that this all-time record range accurately "reflect[ed] a number of factors [that the Individual Defendants had] considered." These considered factors included, according to defendant Maestri: (i) reverse launch timing of new top-end iPhone model, i.e., releasing the more expensive iPhone XS in Q4 2018 and the more affordable iPhone XR in the following quarter; (ii) the impact of foreign exchange due to the strength of the U.S. dollar; (iii) supply and demand uncertainty relating to new products ramping; and (iv) "macroeconomic uncertainty, particularly in emerging markets."

98.     When specifically asked about macroeconomic uncertainty and deceleration in emerging markets during the call, defendant Cook maintained that those concerns did not encompass Apple's Greater China sales growth. Defendant Cook further reassured investors Company's growth in Greater China was strong, particularly with respect to iPhone. Specifically, defendant Cook stated:

> To give you a perspective in -- at some detail, our business at India in Q4 was flat. Obviously, we would like to see that be a huge growth. Brazil was down somewhat compared to the previous year. And so I think -- or at least the way that I see these is each one of the emerging markets has a bit of a different story. And I don't see it as some sort of issue that is common between those for the most part. In relation to China specifically, *I would not put China in that category. Our business in China was very strong last quarter. We grew 16%, which we're very happy with. iPhone, in particular, was very strong double-digit growth there*. Our other products category was also stronger, in fact, a bit stronger than even the company -- overall company number.

99.     During the call, an analyst pressed for further information on how Apple determined the provided revenue range given "all the things that are going on in the world right now," including geopolitical trade maneuvers. Defendant Maestri responded by emphasizing Apple's strong product

lineup for the holiday season, assuring that this strong lineup provided a strong basis for the "record"

guidance issued that day. In particular, defendant Maestri stated:

> …[A]t the revenue level, we started from the fact that we are very, very excited about the lineup of products and services that we have getting into the holiday season. It's the strongest lineup that we've ever had. And our guidance range, by the way, represents a new all-time quarterly revenue record….

100. Analysts also questioned how strong demand was for the two new iPhones that started

shipping in September 2018—the most expensive iPhones yet, the XS and the XS Max. Specifically, the

analyst asked whether buyers were holding off until the cheaper XR iPhone rolled out in October. In

response, defendant Cook assured that demand was strong, stating:

> *The Xs and Xs Max got off to a really great start, and we've only been selling for a few weeks*. The XR, we've only got out there for, I guess, 5 -- 5 days or so at this point and so that it's -- we have very, very little data there. Usually, there is some amount of wait until a product shows -- another product shows up in look, but in -- that -- *in looking at the data, on the sales data for Xs and Xs Max, there's not obvious evidence of that in the data as I see it.*

101. During the call and to the surprise of investors and analysts, defendant Maestri reported

that going forward Apple will no longer provide unit sales numbers, claiming the metric fails to represent

the strength of Apple's business and is "less relevant" than it once was. In reality, however, the Individual

Defendants decided to withhold unit sales in order to conceal sales declines in Apple's flagship products.

Specifically, defendant Maestri announced:

> …[S]tarting with the December quarter, we will no longer be providing unit sales data for iPhone, iPad and Mac. As we have stated many times, our objective is to make great products and services that enrich people's lives and to provide an unparalleled customer experience so that our users are highly satisfied, loyal and engaged. As we accomplish these objectives, strong financial results follow.
>
> *As demonstrated by our financial performance in recent years, the number of units sold in any 90-day period is not necessarily representative of the underlying strength of our business. Furthermore, our unit of sale is less relevant for us today than it was in the past* given the breadth of our portfolio and the wider sales price dispersion within any given product line.

102. The Individual Defendants attempted to justify Apple's decision to withhold iPhone unit

sales during the call, rejecting the suggestion raised by at least one analyst that the reason for concealing

unit data was because "iPhone units are going to start going negative ... [and] it's easy to talk about great

things and not show the details of things that aren't going so great."  Defendants Maestri and Cook both insisted that revenue and active install base metrics were the more significant metrics that investors should focus on—maintaining that demand was still strong for Apple's more expensive iPhone offerings.  In particular, defendants Cook and Maestri stated:

> **[Maestri:]** *Given the rationale on why we do not believe that providing unit sales is particularly relevant for our company at this point*, I can reassure you that it is our objective to grow unit sales for every product category that we have. But as I said earlier, *a unit of sale is less relevant today than it was in the past*. To give you an example, the *unit sales of iPhone at the top end of the line have been very strong during the September quarter. And that's very important because we are attracting customers to the most recent technologies and features and innovation that we bring into the lineup, but you don't necessarily see that in the number that is reported*. And so therefore, we will -- as I said, we'll provide the qualitative commentary when it is important and relevant, but at the end of the day, we make our decisions to -- from a financial standpoint, to try and optimize our revenue and our gross margin dollars. And that, we think, is the focus that is in the best interest of our investors.

> **[Cook:]** Jim, let me just add a couple things to that for color. Our installed base is growing at double digit, and so there's no -- *and that's probably a much more significant metric for us from an ecosystem point of view and customer loyalty*, et cetera. The second thing is this is a little bit like if you go to the market and you push your cart up to the cashier and she says or he says, "How many units you have in there?", it sort of -- it doesn't matter a lot how many units there are in there in terms of the overall value of what's in the cart.

103.    Analysts responded positively to Apple's Q4 2018 press release and conference call, believing that the Company was experiencing strong demand, accepting the Individual Defendants' reasoning for withholding unit sales, and expecting the Company to achieve or beat the guidance for the upcoming quarter.  For example, on November 1, 2018, Canaccord Genuity LLC published a report commenting that Apple's "*impressive installed base should drive strong iPhone replacement sales*" and "*[w]e believe demand trends are solid for the three new iPhone* models and anticipate strong ASPs and margin trends for the iPhone franchise going forward."  On November 2, 2018, Piper Jaffray & Co. published a report stating that, "we believe Apple is simply trying to change the focus towards the overall installed base and services revenue per user."  Similarly, on the same day, Wedbush Securities published a report commenting that "[a]s explained on the conference call we understand the logic of not providing these [unit] metrics anymore."  Based on Apple's statements, Wedbush Securities stated, "*we maintain our OUTPERFORM rating and $310 price target*."

**REASONS THE STATEMENTS WERE IMPROPER**

104. The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that:

      (a)    Apple's iOS updates had intentionally and drastically reduced the performance of older model iPhones without the user's knowledge or consent;

      (b)    due to this throttling, consumers upgraded their iPhones at expedited rates, which boosted unit sales and cannibalized future sales;

      (c)    as a result, iPhone sales growth was not sustainable;

      (d)    Apple's battery replacement program was negatively impacting iPhone sales;

      (e)    macroeconomic uncertainty and the U.S.-China trade war were negatively impacting demand for iPhones and diminishing the Company's pricing power in one of its most important markets, Greater China; and

      (f)    as a result of the foregoing, the Individual Defendants' representations concerning the Company's future prospects and demand for Apple's products were improper.

**THE TRUTH EMERGES**

105. On January 2, 2019, Apple revealed the truth about its declining iPhone sales as the Company issued a press release titled "Letter from Tim Cook to Apple Investors." The press release reveals that, due to plummeting iPhone sales, for the first time in fifteen years, Apple slashed its previous revenue forecast for the already complete first fiscal quarter of 2019 ended December 29, 2018 ("Q1 2019"). The press release disclosed that Apple's Q1 2019 revenues were only $84 billion, far below the range of between $89 billion and $93 billion that Apple had led investors to expect just eight weeks earlier on November 1, 2018. The Company explained that the disappointing revenue slash resulted from "fewer iPhone upgrades than [Apple] had anticipated."

106. In the press release, Apple attributed blame for the lack of upgrades on the battery replacement program as well as economic issues in China, concerns that the Individual Defendants had previously renounced when raised by analysts during Apple's conference calls. The press release specifically cited "economic deceleration" and "rising trade tensions" in Greater China, going directly

against defendant Cook's assurances that these were nonissues during Apple's Q4 2018 earnings call. Further, despite the Individual Defendants' rosy projections and routine claims of strong iPhone demand, in the press release, Apple conceded that "[even] in some developed markets, iPhone upgrades were also not as strong as [Apple] thought they would be." In addition, Apple finally admitted that the battery replacement program contributed to the low upgrade rates. In particular, the press release stated:

**Emerging Market Challenges**

While we anticipated some challenges in key emerging markets, *we did not foresee the magnitude of the economic deceleration, particularly in Greater China*. In fact, *most of our revenue shortfall to our guidance, and over 100 percent of our year-over-year worldwide revenue decline, occurred in Greater China across iPhone, Mac and iPad*.

*China's economy began to slow in the second half of 2018*. The government-reported GDP growth during the September quarter was the second lowest in the last 25 years. We believe *the economic environment in China has been further impacted by rising trade tensions with the United States*. As the climate of mounting uncertainty weighed on financial markets, the effects appeared to reach consumers as well, with traffic to our retail stores and our channel partners in China declining as the quarter progressed. And *market data has shown that the contraction in Greater China's smartphone market has been particularly sharp*.

\* \* \*

**iPhone**

*Lower than anticipated iPhone revenue, primarily in Greater China*, accounts for all of our revenue shortfall to our guidance and for much more than our entire year-over-year revenue decline. In fact, categories outside of iPhone (Services, Mac, iPad, Wearables/Home/Accessories) combined to grow almost 19 percent year-over-year.

While Greater China and other emerging markets accounted for the vast majority of the year-over-year iPhone revenue decline, *in some developed markets, iPhone upgrades also were not as strong as we thought they would be*. While macroeconomic challenges in some markets were a key contributor to this trend, we believe there are other factors broadly impacting our iPhone performance, including consumers adapting to a world with fewer carrier subsidies, US dollar strength-related price increases, and some *customers taking advantage of significantly reduced pricing for iPhone battery replacements*.

107. While Apple did not conduct a conference call on January 2, 2019, defendant Cook did appear on CNBC. During his appearance, defendant Cook expanded on his reference to "rising trade tensions" in the letter, further revealing that the U.S.-China trade war was negatively impacting Apple's sales. Defendant Cook also admitted that the worldwide battery replacement program, which he

- 38 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

previously stated that Apple refused to "consider in any way, shape or form" during the Company's Q1
2018 conference call, was negatively impacting sales.  Specifically, defendant Cook stated:

> And so as we look at what's going on in China -- it's clear that the economy begins to slow
> there for the second half. And what I believe to be the case is the trade tensions between
> the United States and China put additional pressure on their economy. And so we saw, as
> the quarter went on, things like traffic in our retail stores, traffic in our channel partner
> stores, the reports of the smartphone industry contracting, particularly bad in November --
> I haven't seen the December number yet, but I would guess that would not be good either.
> And so that's what we've seen.

*   *   *

> And then sort of in addition to those two things, we've started a program worldwide where
> we dramatically lowered the battery replacement price.

108.     On this news, Apple's market capitalization dropped by nearly 10%, or $15.73 per share,
on January 3, 2019, to close at $142.19 per share compared to the previous trading day's closing of $157.92
per share, erasing over $74 billion in market capitalization in a single day.

109.     On January 3, 2018, *Yahoo Finance* published an article titled "Apple's Mind-Blowing
Warning Means CEO Tim Cook Now Has a Major Credibility Problem," commenting that "Apple CEO
Tim Cook and his management team should read the coverage of their mind-blowing warning to every
investor on the planet on Apple News and then ask: 'Should investors trust us right now? And, how can
we regain that trust."   The article highlights how the Individual Defendants damaged the Company's
reputation and credibility by issuing deceptive statements and concealing material information concerning
iPhone demand.  The article provides, in relevant part:

> No doubt January 2, 2019 will go down as one of the worst days in Apple's history. It's not
> akin to 1997 when Apple founder Steve Jobs returned to a failing tech company that was
> losing billions. But sill one that amounts to a complete smashing down of the reset button
> on how Wall Street and the average investor views Apple (AAPL).

> And as tough as it is to say, given Cook's generally strong leadership since the passing of
> Jobs, *he and his management team bare the responsibility for the shocking warning.
> They failed to keep it real with investors on what they were seeing in iPhone demand
> data late in 2018. Simply no longer providing unit sales data wasn't enough of a signal
> to investors that something was wrong, bottom line*.

> As a result, Apple's stock could be "broken" until credibility is restored.

"Apple's stock is now at a crossroads. Some investors will consider the stock broken and never reward it with a "proper" multiple, but we've followed the company long enough to know there is cyclicality in the market's relationship with Apple," cautions long-time Apple analyst Gene Munster of Loup Ventures.

**A poor job done with guidance.**

Apple said in a fling released after market close Wednesday that it now sees first quarter revenue of about $84 billion. It previously anticipated $89 billion to $91 billion. In the fling, Cook attributed the reduced guidance to weakness in emerging markets and in Greater China as well as supply constraints on new products. Cook also hinted strongly that Apple felt resistance from consumers to the new $1,000 plus iPhone XS line.

110.    Similarly, on January 4, 2019, *ZDNet* published an article titled, "This Is Why Apple Doesn't Want You Fixing Your Smartphone," in which the author, Adrian Kinsley-Hughes, observes that "[a]midst all the finger-pointing associated [with] the sudden and unexpected profits warning from Apple was a revelation about how much the company relies on premature obsolescence to drive sales." Mr. Kingsley-Hughes further wrote that the battery replacement program's impact on iPhone sales "raises a number of questions." The article provides:

First, and perhaps most significant is this – How many iPhones does Apple sell to people simply because the battery in their existing iPhone is worn? Over the years, there's been a great deal of chatter around the subject of "planned obsolescence," and here *we have Apple essentially confirming that this is indeed part of the business model*.

Which leads on to the next obvious question – How many iPhones are being junked or recycled just because they need a new battery? For a company that likes to boast about its environmental credentials, this should be a concern.

*    *    *

At this point, it's worth pointing out that if indeed the battery replacement program was a significant factor in the profits warning, *Apple only has itself to blame for throttling iPhones in the first place*.

111.    On January 29, 2019, Apple held an earnings conference call with analysts and investors to discuss the Company's Q1 2019 results, during which defendant Cook further confirmed the battery replacement program's negative impact on iPhone sales. Specifically, defendant Cook stated:

*Now our customers are holding on to their older iPhones a bit longer than in the past. When you pair this with the macroeconomic factors, particularly in emerging markets, it resulted in iPhone revenue that was down 15% from last year*. Our iPhone results accounted for significantly more than our entire year-over-year revenue decline.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

\* \* \*

Third, our battery replacement program. ***For millions of customers, we made it inexpensive and efficient to replace the battery and hold onto their existing iPhones a bit longer***. Some people have suggested that we shouldn't have done this because of the potential impact on upgrades, but we strongly believe it was the right thing to do for our customers.

## DAMAGES TO APPLE

112.     The Individual Defendants' unlawful throttling of users' iPhones has destroyed Apple's reputation.   Their betrayal of consumers' trust has already begun to show its impact on iPhone's diminishing loyalty rates as more smartphone users are switching to Apple's competitors.   According to one report, iPhone's current loyalty rate sits at 73%, falling behind Samsung's current loyalty rate, and marking a significant reduction from iPhone's peak loyalty rate of 92% in 2017, prior to the battery-throttling scandal's revelation.   Another report found that iOS-based devices accounted for just 36% of phone sales in the U.S. during the quarter ended June 2019, down 2.4% from the same quarter last year, while Android sales were up 2.5% and accounted for 61% of all sales.

113.     Further, the Individual Defendants' illegal throttling forced the Company to enact the battery replacement program in order to try and save some of Apple's reputation, which caused additional harm.  Specifically, for each customer taking advantage of the $29 battery offering discounted from $79, Apple loses $50 that it would have received in the absence of the battery replacement program.  This also indirectly elongated iPhone upgrade cycles, causing the Company to forgo future iPhone sales.  Defendant Cook admitted that the battery replacement program, which was enacted as a direct response to the unlawful throttling, was damaging Apple's sales, stating that the program, "made it inexpensive and efficient to replace the battery and hold onto … existing iPhones a bit longer."  In public relations charades, defendant Cook repeatedly touted that the battery replacement program was "the right thing to do for … customers" while ignoring that the Individual Defendants failed to do the right thing for customers in the first place is what caused the need for the program.  If the Individual Defendants had informed customers about the essential characteristics of their iPhones' batteries, giving them the option to replace those batteries for $79, be throttled, or, alternatively, to replace their iPhone, the Company would not have had to discount the batteries.  Instead, however, the Individual Defendants engaged in an unlawful course of

1    action inconsistent with Apple's Code, resulting in the battery replacement program, and, consequently,

2    lost revenue.

3          114.    As an additional result of the Individual Defendants' improprieties, Apple disseminated

4    improper, public statements concerning the Company's sales growth, iPhone demand, and future financial

5    prospects.  These improper statements have devastated Apple's credibility as reflected by the Company's

6    almost $431 billion, or 39%, market capitalization loss from its October 2018 high to the present.

7          115.    Apple's performance issues also damaged its reputation within the business community and

8    in the capital markets.  Apple's current and potential investors consider a company's trustworthiness and

9    ability to accurately value its business prospects and evaluate sales and growth potential.  Apple's ability

10    to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company

11    stands to incur higher marginal costs of capital and debt because the improper statements and misleading

12    projections disseminated by the Individual Defendants have materially increased the perceived risks of

13    investing in and lending money to the Company.

14          116.    Further, as a direct and proximate result of the Individual Defendants' actions, Apple has

15    expended, and will continue to expend, significant sums of money.  Such expenditures include, but are

16    not limited to:

17          (a)    costs incurred from defending and paying any settlement in the Worldwide Class

18    Action or *Apple OS Cases* class action for violations of computer intrusion laws, consumer-protection

19    laws, and common law;

20          (b)    costs incurred from regulatory proceedings, investigations, and fines, both within

21    the United States and internationally;

22          (c)    costs incurred from defending and paying any settlement in the Securities Class

23    Actions for violations of federal securities laws; and

24          (d)    costs incurred from compensation and benefits paid to the defendants who have

25    breached their duties to Apple.

26

27

28

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

117.     Plaintiff brings this action derivatively in the right and for the benefit of Apple to redress injuries suffered, and to be suffered, by Apple as a direct result of breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and contribution and indemnification, as well as the aiding and abetting thereof, by the Individual Defendants.  Apple is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

118.     Plaintiff will adequately and fairly represent the interests of Apple in enforcing and prosecuting its rights.

119.     Plaintiff has continuously been a stockholder of Apple since August 19, 2014.

120.     The current Board of Apple consists of the following eight individuals: defendants Cook, Levinson, Gore, Jung, Bell, Sugar, Iger, and Wagner.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Cook, Levinson, Gore, Jung, Bell, Sugar, Iger, and Wagner Face a Substantial Likelihood of Liability for Their Misconduct**

121.     As alleged herein, defendants Cook, Levinson, Gore, Jung, Bell, Sugar, Iger, and Wagner breached their fiduciary duty of loyalty by causing or allowing the Company to unlawfully throttle the performance of iPhones through iOS updates without the knowledge or consent of the iPhone's owner. Considering the importance of the iPhone and iOS updates, defendants Cook, Levinson, Gore, Jung, Bell, Sugar, Iger, and Wagner must have discussed the iPhone shutdown issues that emerged in 2016, and must have discussed the intentional slowing of users' devices through iOS updates as a proposed solution.  This unlawful business practice has harmed the Company by, among other things: (i) damaging its reputation; (ii) exposing the Company to governmental probes and fines; and (iii) forcing Apple to defend the Worldwide Class Action and *Apple OS Cases* class action.  Defendants Cook, Levinson, Gore, Jung, Bell, Sugar, Iger, and Wagner face a substantial likelihood of liability for causing or allowing the unlawful throttling, or for completely and utterly failing to exercise their duty to monitor the Company's operations and ensure Apple's compliance with applicable laws and regulations.  Accordingly defendants Cook,

Levinson, Gore, Jung, Bell, Sugar, Iger, and Wagner face a substantial likelihood of liability and therefore any demand upon them is futile.

122. In addition, defendants Gore, Iger, and Jung failed to fulfill their responsibilities as members of the Board's N&CG Committee. The N&CG Committee was charged with monitoring compliance with Apple's Code, which requires the Individual Defendants to focus on Apple's consumers, and to demonstrate honesty, integrity, and courtesy in every interaction with those consumers. The N&CG Committee Defendants utterly failed to fulfill this responsibility, as demonstrated by Apple's deceptive and unlawful practice of intentionally throttling consumers' devices without their knowledge or consent. Accordingly, because defendants Gore, Iger, and Jung face a substantial likelihood of liability, any demand upon them is futile.

123. In addition, as alleged above, defendants Cook, Levinson, Gore, Jung, Bell, Sugar, Iger, and Wagner breached their fiduciary duties of loyalty by making improper statements in the Company's press releases, SEC filings, and during earnings calls concerning Apple's sales growth, iPhone demand, and future financial prospects. As a result, defendants Cook, Levinson, Gore, Jung, Bell, Sugar, Iger, and Wagner face a substantial likelihood of liability. Therefore, demand upon them is futile.

124. Defendants Levinson, Bell, Sugar, and Wagner, as members of the Audit and Finance Committee, reviewed and approved the improper statements and earnings guidance. The Audit and Finance Committee's Charter provides that it is responsible for compliance with accounting, legal, regulatory, and public disclosure requirements. Thus, the Audit and Finance Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls. Moreover, the Audit and Finance Committee Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, the Audit and Finance Committee Defendants caused these improper statements. Further, the Audit and Finance Committee Charter provides that it is responsible for reviewing and discussing with management significant business risks facing the Company, including business, legal, and reputational risks. Accordingly, the Audit and Finance Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, defendants Levinson, Bell, Sugar, and Wagner face a substantial likelihood of liability for their

breach of fiduciary duties, rendering any demand upon them futile.

125. Any suit by the current directors of Apple to remedy these wrongs would expose defendants Cook and Maestri, and Apple to liability for violations of the federal securities laws in the pending securities class actions, and would result in civil actions being filed against one or more of the other Individual Defendants. The securities class actions allege violations of sections 10(b) and 20(a) of the Exchange Act. If the Board elects for the Company to press forward with its right of action against defendants Cook and Maestri in this action, then Apple's efforts would compromise its defense of the securities class actions. Accordingly, demand on the Board is excused. Further, because defendant Cook is named as a defendant in the pending securities class actions, he is incapable of impartially considering a demand to commence and vigorously prosecute this action. As such, demand is excused upon defendant Cook.

126. The principal professional occupation of defendant Cook is his employment with Apple, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above. Accordingly, defendant Cook lacks independence from defendants Levinson, Gore, Jung, Bell, Sugar, Iger, and Wagner due to his interest in maintaining his executive position at Apple. This lack of independence renders defendant Cook incapable of impartially considering a demand to commence and vigorously prosecute this action. Apple paid defendant Cook the following compensation:

| Year | Salary | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $3,000,000 | $12,000,000 | $682,219 | $15,682,219 |
| 2017 | $3,057,692 | $9,327,000 | $440,374 | $12,825,066 |

Accordingly, defendant Cook is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Demand is futile as to defendant Cook.

127. Plaintiff has not made any demand on stockholders of Apple to institute this action because such a demand would be a futile and useless act for the following reasons:

(a)     Apple is a publicly traded company with thousands of stockholders and over 4.5 billion shares of common stock outstanding as of July 19, 2019;

(b)     making a demand on such a number of stockholders would be impossible for plaintiff, who has no means of collecting the names, addresses, and/or phone numbers of Apple stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur excessive expense and obstacles, assuming all stockholders could even by individually identified with any degree of reasonable certainty.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

128.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129.     The Individual Defendants owed and owe Apple fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Apple the highest obligation of good faith, fair dealing, loyalty, and due care.

130.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Apple, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

131.     The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that: (i) Apple's iOS updates had intentionally and drastically reduced the performance of older model iPhones without the user's knowledge or consent; (ii) due to this throttling, consumers upgraded their iPhones at expedited rates, which boosted unit sales and cannibalized future sales; (iii) as a result, iPhone sales growth was not sustainable; (iv) Apple's battery replacement program was negatively impacting iPhone sales; (v) macroeconomic uncertainty and the U.S.-China trade war were negatively impacting demand for iPhones and diminishing the Company's pricing power in one of its most important markets, Greater China; and (vi) as a result of

- 46 -

the foregoing, the Apple's representations concerning sales growth, demand, and the Company's future financial prospects were improper.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

132.    The Director Defendants, as directors of the Company, owed Apple the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly causing or allowing the Individual Defendants, and Apple to violate the law by intentionally slowing the performance of users' iPhones without their knowledge or consent and by completely and utterly failing to exercise their duty to oversee the Company's compliance with applicable law and regulation.  The Director Defendants knew or were reckless in not knowing that: (i) Apple's iOS updates had intentionally and drastically reduced the performance of older model iPhones without the user's knowledge or consent; (ii) due to this throttling, consumers upgraded their iPhones at expedited rates, which boosted unit sales and cannibalized future sales; (iii) as a result, iPhone sales growth was not sustainable; (iv) Apple's battery replacement program was negatively impacting iPhone sales; (v) macroeconomic uncertainty and the U.S.-China trade war were negatively impacting demand for iPhones and diminishing the Company's pricing power in one of its most important markets, Greater China; and (vi) as a result of the foregoing, the Apple's representations concerning sales growth, demand, and the Company's future financial prospects were improper. Accordingly, these defendants breached their duty of loyalty to the Company.

133.    The Audit and Finance Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit and Finance Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit and Finance Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit and Finance Committee Charter in effect at the time.

134.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Apple has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

135.    Plaintiff, on behalf of Apple, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

136.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137.    As a result of the wrongdoing detailed herein and by failing to conduct proper supervision, the Individual Defendants have caused Apple to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

138.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

139.    Plaintiff, on behalf of Apple, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

140.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

141.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Apple.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Apple.

142.    Plaintiff, a stockholder and representative of Apple, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

143.    Plaintiff, on behalf of Apple, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Indemnification and Contribution

144.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

145. The conduct of the Individual Defendants described above has exposed Apple to significant liability under various federal and state laws by their disloyal acts.

146. Apple is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein.

147. The Individual Defendants have caused Apple to suffer substantial harm through their disloyal acts.

148. Apple is entitled to contribution and indemnification from the Individual Defendants in connection with all such claims that have been, are, or may be asserted against Apple by virtue of the Individual Defendants' wrongdoing.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of Apple, demands judgment as follows:

A. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and contribution and indemnification;

B. Directing Apple to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Apple and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1. a proposal to strengthen the Board's oversight of its consumer law compliance policies, procedures, and training;

2. a proposal to strengthen the Company's internal controls concerning computer intrusion and consumer laws and regulations;

3. a proposal to strengthen Apple's communications and disclosures to customers regarding device functioning and iOS updates;

4. a proposal to strengthen Apple's oversight of its disclosure procedures;

5. a proposal to strengthen the Company's controls over financial reporting;

- 49 -

6.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

7.  a provision to permit the stockholders of Apple to nominate at least three candidates for election to the Board.

C.  Requiring that the Company add at least one female director to the Board, as mandated by California Senate Bill 826, which requires publicly held companies based in California with more than six directors to have a minimum of three women on their boards of directors by 2021;

D.  Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Apple has an effective remedy;

E.  Awarding to Apple restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

F.  Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.  Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 19, 2019

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
ASHLEY R. RIFKIN
STEVEN R. WEDEKING

/s/*Brian J. Robbins*
BRIAN J. ROBBINS

5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
        csmith@robbinsarroyo.com
        arifkin@robbinsarroyo.com
        swedeking@robbinsarroyo.com

Attorneys for Plaintiff

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Terrence Zehrer, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, and Indemnification and Contribution. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:_____8/18/18_____

_____
TERRENCE ZEHRER