# EXHIBIT B

1  James M. Wagstaffe (#95535)
   Frank Busch (#258288)
2  **WAGSTAFFE, VON LOEWENFELDT,**
   **BUSCH & RADWICK LLP**
3  100 Pine Street, Suite 725
   San Francisco, California 94111
4  Telephone: (415) 357-8900
   Facsimile: (415) 357-8910
5  wagstaffe@wvbrlaw.com
   busch@wvbrlaw.com
6
   *Liaison Counsel for Plaintiff*
7  *Steamfitters Local 449 Pension Plan*

8  [Additional counsel appear on signature page.]

9            **UNITED STATES DISTRICT COURT**

10          **NORTHERN DISTRICT OF CALIFORNIA**

11  STEAMFITTERS LOCAL 449 PENSION      )
    PLAN, Individually and on Behalf of All )
12  Others Similarly Situated,              )  **Case No.:**
                                            )
13                Plaintiff,                )  <u>**CLASS ACTION**</u>
                                            )
14         vs.                              )  **COMPLAINT FOR VIOLATION OF THE**
                                            )  **FEDERAL SECURITIES LAWS**
15  APPLE INC., TIMOTHY D. COOK and         )
    LUCA MAESTRI,                           )
16                                          )
                  Defendants.               )
17  _____    )  <u>**DEMAND FOR JURY TRIAL**</u>
                                            )
18  _____    )

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Plaintiff Steamfitters Local 449 Pension Plan ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned counsel, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's counsel, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Apple Inc. ("Apple" or the "Company"), as well as media and analyst reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a securities fraud class action on behalf of all those who purchased or otherwise acquired Apple securities during the period from August 1, 2017, through January 2, 2019, inclusive (the "Class Period"), who were damaged thereby (the "Class") seeking to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder. Excluded from the Class are: Defendants (as defined herein); the officers and directors of the Company during the Class Period (the "Excluded D&Os"); members of Defendants' and the Excluded D&Os' immediate families; the subsidiaries and affiliates of the Company, including the Company's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and any entity in which Defendants or the Excluded D&Os have or had a controlling interest; and the legal representatives, heirs, successors or assigns of any excluded person or entity.

2.      Apple is a multinational technology company headquartered in Cupertino, California that designs, develops, and sells consumer electronics, computer software, and online services. The Company's most profitable product is the iPhone smartphone, which since 2012 has represented more than 40 percent of the Company's revenue. China is the Company's third-largest market, and most important growth market, yet it is susceptible to geopolitical and

macroeconomic uncertainty and increased competition from emerging Chinese smartphone manufacturers.

3.  In late 2016, reports surfaced of older model iPhones experiencing sudden shutdown issues. Unknown to the market at the time was that the shutdowns were caused by aging iPhone batteries, as opposed to the age of the iPhone itself. In order to remediate this problem, on January 23, 2017, Apple published iOS update 10.2.1 to every iPhone in the world to secretly "fix" the shutdown issues by intentionally slowing down the performance of iPhones with older batteries. The update disclosed only that it included "bug fixes and improves the security of your iPhone or iPad."

4.  Defendants' undisclosed practice of slowing down iPhones with older batteries came with an undisclosed "benefit" for the Company. Frustrated with iPhones operating in diminished capacity and falsely believing their devices to be obsolete, consumers opted to purchase brand new iPhones on accelerated timetables. These premature upgrades artificially inflated iPhone sales, provided the appearance of consistent iPhone sales growth, and resulted in record iPhones sales throughout 2017. During this period, Defendants falsely attributed iPhone upgrade rates, progressing at "highest that [they've] seen," to a myriad of factors—none of which remotely touched upon the undisclosed phone "throttling."

5.  On August 1, 2017, the start of the Class Period, Defendants began to report a record number of iPhone upgrades. Undisclosed to consumers and investors, however, these "record" upgrades were driven by the concealed slowdown of older iPhones.

6.  Only in December 2017 did an independent investigation reveal that Apple's software updates were the cause of the slowdown in older model iPhones. More importantly, the investigation revealed that the slowdowns were not device-related, but *battery-related*. Therefore, simply replacing the iPhone's battery would have rectified the issue.

7.  Defendants subsequently confessed to the patch-induced slowdown and, in an effort to preserve the Company's reputation and retain customer goodwill, offered to replace iPhone batteries at a substantial discount. Customers of the affected iPhone models could then

benefit from a phone operating at peak performance (for another two years) that felt like a "new" iPhone. Accordingly, as a direct and primary result of the previously undisclosed iPhone throttling during 2017, the 2018 battery replacement program worked to cannibalize Apple's sales of newer model iPhones. Specifically, customers could now simply purchase a discounted replacement battery in lieu of buying a costly new iPhone that would cost up to 30 times more.

8. On February 1, 2018, Defendants surprised the market by announcing relatively flat iPhone sales guidance. When questioned as to whether the battery replacement program had caused the flattened sales guidance by elongating iPhone upgrade cycles, Defendants stated that they "did not consider in any way, shape, or form, what [battery replacements] would do to upgrade rates." Analysts, however, forecasted an elongated sales cycle caused by what would be known as "Batterygate."

9. Defendants were asked again on July 31, 2018 whether the battery replacement program was negatively impacting iPhone upgrade rates. Defendants responded that they had "never done an analysis internally about how many people decided to get a lower-priced battery than buy another phone." Unknown to investors, however, was that Defendants either knew, or at the very least recklessly disregarded, that the battery replacement program was negatively impacting iPhone sales growth.

10. On November 1, 2018, Apple released its financial results for its fourth fiscal quarter 2018 for the period ended September 29, 2018. On this date, Defendants offered light guidance for the holiday season, again revealing flat iPhones sales projections. Likely concerned at the market's negative reaction to the slowing iPhone sales growth, Defendants announced they would no longer report unit sales. Defendants, however, touted the demand for Apple's newest iPhone offering, stating that it "got off to a really good start." Additionally, when attributing the flat guidance, in part, to "macroeconomic uncertainty" in the Company's emerging markets, Defendants stated they "would not put China in that category." Finally, Defendants again failed to disclose a sales decline in newer model iPhones due to the battery replacement program. Importantly, Apple was already one month into its first fiscal quarter 2019 at this time.

11.     Just eight weeks later and for the first time in fifteen years, on January 2, 2019, Apple cut its previously issued quarterly revenue forecast for the already-complete first fiscal quarter 2019.  Defendants attributed these negatively revised projections to lower-than-expected iPhone sales.  Specifically, Defendants attributed the decline in iPhone sales, in part, due to "some customers taking advantage of significantly reduced pricing for iPhone battery replacements," as well as emerging market issues, "primarily in Greater China."

12.     On this news, the price of Apple stock fell precipitously by more than $15 per share, or approximately 9 percent, closing at $142.19 per share on January 3, 2019 on unusually heavy trading volume.

13.     Throughout the Class Period, Defendants misled investors by making materially false and misleading statements related to the Company's revenues and demand for iPhones that artificially inflated and/or maintained Apple's stock price.  Specifically, (1) because Apple intentionally throttled older-model iPhones during 2017, customers artificially accelerated iPhone upgrades rates during that year, thereby unsustainably boosting unit sales and cannibalizing future sales; (2) the Company's replacement battery program during 2018 (enacted as a direct and primary response to the Company's intentional phone throttling during 2017) was negatively impacting iPhone sales; and (3) macroeconomic and geopolitical issues in China were negatively impacting iPhones sales in Greater China.

## JURISDICTION AND VENUE

14.     Jurisdiction is conferred by § 27 of the Exchange Act. The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and § 27 of the Exchange Act.

15.     Venue is proper in this District pursuant to § 27 of the Exchange Act, as Apple is headquartered in this District and many of the false and misleading statements alleged herein were disseminated from this District.

16.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**PARTIES**

17.     Plaintiff purchased Apple common stock during the Class Period, as set forth in the accompanying certification incorporated by reference herein, and has been damaged thereby.

18.     Defendant Apple is a Cupertino, California-based tech company.  Apple common stock is listed and trades on the NASDAQ, an efficient market, under the ticker symbol "AAPL." As of April 22, 2019, the Company had approximately 4.6 billion shares issued and outstanding.

19.     Defendant Timothy D. Cook ("Cook") is, and was at all relevant times, CEO of Apple and a member of its Board of Directors.

20.     Defendant Luca Maestri ("Maestri") is, and was at all relevant times, Senior Vice President and Chief Financial Officer ("CFO") of Apple.

21.     Defendants Cook and Maestri are sometimes referred to herein as the "Individual Defendants."  Apple and the Individual Defendants are referred to herein, collectively, as "Defendants."

22.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Apple's quarterly reports, shareholder letters, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and

misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

### COMPANY BACKGROUND AND IMPORTANCE OF CHINESE MARKET

23.     Apple is a multinational technology company headquartered in Cupertino, California that designs, develops, and sells consumer electronics, computer software, and online services.  The Company's most well-known products include its iPhone smartphones, the iPad tablet computer, the Mac personal computer, the iPod portable media player, the Apple Watch smartwatch, the Apple TV digital media player, and the HomePod smart speaker.

24.     Since its release in 2007, the iPhone has served as the Apple's flagship product, utilizing Apple's iOS operating system and powering the Company's signature applications such as Apple Pay and Siri.  Additionally, the iPhone for some time has been the Company's most profitable offering, generating approximately 62 percent of Apple's net sales in its fiscal year 2017 and 63 percent of Apple's net sales in its fiscal year 2018.[1]  Apple releases, on average, its next generation of iPhones every year, typically at increased prices.

25.     The following chart lists Apple's recent iPhone releases:

| iPhone Model | Release Date | Pricing |
|---|---|---|
| iPhone 6S / 6S Plus | September 25, 2015 | $649/$749/$849 ($749/$849/$949) |
| iPhone SE | March 31, 2016 | $399/$499 |
| iPhone 7 / 7 Plus | September 16, 2016 | $649/$749/$849 ($769/$869/$969) |
| iPhone 8 / 8 Plus | September 22, 2017 | $699/$849 ($799/$949) |
| iPhone X | November 3, 2017 | $999/$1149 |
| iPhone XS / XS Max | September 21, 2018 | $999/$1149/$1349 ($1099/$1249/$1449) |
| iPhone XR | October 26, 2018 | $749/$799/$899 |

---

[1] Apple's fiscal year ends in September of each calendar year.  Apple's 2018 fiscal year began on September 31, 2017 and ended on September 29, 2018.

26.     Greater China, a region that includes mainland China, Hong Kong, and Taiwan, is Apple's third-largest market after the United States and Europe, accounting for $52 billion in sales in Apple's fiscal year 2018, ended September 29, 2018—nearly 20 percent of Apple's total fiscal year 2018 annual sales.

27.     Several factors, however, threaten Apple's ability to maintain sales growth in Greater China.  First, emerging Chinese companies have begun to offer comparable smartphones at substantially lower prices.  Second, Apple's business in China is more susceptible to geopolitical trade maneuvers by the United States and China, including the import tariffs arising from the brewing U.S. China trade war.  Finally, throughout 2018 China experienced its slowest economic growth in nearly three decades.  These issues, coupled with the strength of the U.S. dollar and the rising prices of newer model iPhones, therefore jeopardized the Company's iPhone sales in its most important emerging market.

### APPLE SECRETLY SLOWS DOWN OLDER MODEL IPHONES

28.     In late 2016, certain older model iPhones began to suddenly shutdown without warning.  Unbeknownst to consumers and investors at the time, the shutdowns were caused by the iPhone's aging batteries, as opposed to the age of the device itself.  Specifically, the aging batteries delivered power unevenly, and upon over-exertion caused device-crashing power spikes.

29.     On January 23, 2017, Apple released a software update to secretly fix the emerging shutdown issues in older model iPhones.  In order to "fix" the shutdowns, the update drastically throttled, *i.e.*, slowed down, the performance of iPhones with older batteries (which by default, were older model iPhones) in order to address the unexpected shutdown issue.  By slowing down the iPhones, the battery-related power issues were ameliorated, thus preventing shutdowns.

30.     Defendants' undisclosed practice of slowing down iPhones with older batteries came with an undisclosed "benefit" for the Company.  Consumers, frustrated with their weakened iPhones and falsely believing their devices to be obsolete, upgraded to newer iPhone

models.  These premature upgrades artificially inflated iPhone sales and provided the appearance of consistent iPhone sales growth.  In fact, by artificially reducing iPhone upgrade cycles, Apple enjoyed a record year in iPhone sales during 2017.

31.     On December 2, 2017, Apple released iOS 11.2.  Similar to the Company's iOS 10.2.1—and unbeknownst to consumers and investors—this update was also designed to throttle the performance of older model phones.  iOS 11.2 would not only affect the iPhone 6S and iPhone 6S Plus, but also the iPhone 7 and iPhone 7S.

32.     On December 9, 2017, an independent investigation revealed that Apple's software updates were in fact the cause of the slowdown in older model iPhones.  More importantly, the investigation revealed that the slowdowns were not device-related, but *battery-related*.  Therefore, simply replacing the iPhone's battery would rectify the issue, regardless of whether it was an older model.  Following the investigation, Apple faced public outcry and the first of many consumer lawsuits.[2]

33.     In light of the emerging consumer outrage at the revelation that the Company intentionally throttled the performance of older iPhones, on or about December 20, 2017, Apple publically admitted that it had been intentionally slowing down iPhones with older batteries. Finally, on or about December 28, 2017, in an effort to retain customer goodwill, Apple announced that throughout calendar year 2018, it would offer discounts for its replacement iPhone batteries, charging $29 down from $79.

34.     Shortly after Apple's December 2017 disclosure that it had intentionally throttled iPhones, regulators in Brazil, China, Italy, France, and South Korea, announced they had launched independent investigations into whether Apple's conduct was fraudulent.  Additionally, on January 31, 2018, *Bloomberg* reported that Apple was now facing probes from the Justice Department and the SEC regarding whether the Company violated the federal securities laws over the intentional iPhone slowdowns.

---

[2] A multi-district class action litigation against Apple is currently pending in this District, captioned *In re: Apple Inc. Device Performance Litigation*, No. 18-md-02827.

35.     On October 24, 2018, the Italian regulators, who had been investigating Apple, fined the Company €5 million, finding that Apple had "implemented dishonest commercial practices" by implementing the iPhone slowdowns, which ultimately pressured consumers to prematurely replace their devices.  Apple was fined an additional €5 million for failing to give consumers basic information about the batteries in the iPhones, such as the average lifespan and replacement procedures.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS

**Defendants Artificially Inflate Revenues by Throttling Older iPhones**

36.     The Class Period begins on August 1, 2017, when Apple released its financial results for its third fiscal quarter 2017 ended June 30, 2017, announcing earnings and revenue above analyst estimates.  Apple also provided revenue guidance for the upcoming quarter of $49 to $52 billion.  That same day, Apple held a conference call with analysts and investors to discuss the Company's results.  Defendant Cook touted consumer demand for the iPhone 7, as well as favorable consumer upgrade rates, stating in pertinent part:

> iPhone results were impressive, with especially strong demand at the high end of our lineup. ***iPhone 7 was our most popular iPhone, and sales of iPhone 7 Plus were up dramatically compared to 6s Plus in the June quarter of last year***. The combined iPhone 7 and 7 Plus family was up strong double digits year over year. One decade after the initial iPhone launch, we have now surpassed 1.2 billion cumulative iPhones sold.
>
> * * *
>
> It's interesting to note that ***upgraders through both for the quarter and actually for the full fiscal year to date was our highest ever***. And so that we felt very good about.
>
> [F]rom an absolute quantity point of view, ***the upgrades for this fiscal year are the highest that we've seen***. And so we feel good about that. However, if you look at it from an upgrade rate point of view instead of the absolute number, the rate is similar to what we saw with the previous iPhones, except for iPhone 6, which as we called out in the past had an abnormally high upgrade rate.
>
> ***I think the upgrade rate is a function of many, many different things***, from the size of the installed base, the age of the installed base, the product that is new at the time, the regional distribution, the upgrade plans that are in various markets around the world.

37. Defendant Maestri also touted the demand and sales growth of the iPhone, stating in pertinent part:

> During the quarter we sold 41 million iPhones and reduced iPhone channel inventory by 3.3 million units, leaving us with our lowest level of channel inventory in 2.5 years and well within our five-week to seven-week target inventory range. *iPhone sales were up year-over-year in most markets we track*, with many markets in Asia, Latin America, and the Middle East growing unit sales by more than 25%. We are very pleased with these iPhone results, especially considering the tough comparison to the June quarter last year when we launched iPhone SE.
>
> *iPhone ASP[3] was $606, up from $595 a year ago, thanks to strong demand for iPhone 7 Plus, which represented a higher percentage of the iPhone mix compared to the Plus model a year ago*. The impact of the stronger mix on ASP was partially offset by negative foreign exchange year over year and the reduction in channel inventory, which took place entirely at the high end of the portfolio.
>
> Customer interest and satisfaction with iPhone are very strong with both consumers and business users. In the U.S., the latest data from 451 Research on consumers indicates a 95% customer satisfaction rating for iPhone 7 and 99% for iPhone 7 Plus. *Among consumers planning to buy a smartphone, purchase intention for iPhone was nearly 3X the rate of our closest competitor. Among corporate smartphone buyers, iOS customer satisfaction was 94%. And of those planning to purchase smartphones in the September quarter, 78% plan to purchase an iPhone*.

38. On November 2, 2017, Apple released its results for its fourth fiscal quarter 2017 ended September 30, 2017, announcing earnings and revenue above analyst estimates. Apple also reported sequential iPhone unit sales growth of *14 percent*. In the accompanying press release, Defendant Maestri was quoted lauding the results: "Apple's year-over-year revenue growth rate accelerated for the fourth consecutive quarter and drove EPS growth of 24 percent in the September quarter." Finally, the Company gave revenue guidance between $84 billion and $87 billion for the upcoming quarter.

39. That same day, Defendants held a conference call with analysts and investors to discuss Apple's results. Defendant Cook stated in pertinent part:

> As we closed the books on 2017, I have to say I couldn't be more excited about Apple's future. *This was our biggest year ever in*

---

[3] ASP stands for average selling price. Increases in ASP for companies such as Apple reveal trends that consumers on average are buying higher priced products, *e.g.*, newer model iPhones.

*most parts of the world with all-time record revenue in the United States, Western Europe, Japan, Korea, the Middle East, Africa, Central and Eastern Europe and Asia. We had particularly strong finish this year, generating our highest September quarter revenue ever as year-over-year growth accelerated for the fourth consecutive quarter.* Revenue was $52.6 billion, above the high end of our guidance range, and up 12% over last year. We generated revenue growth across all of our product categories and showed all-time record results for our Services business.

\* \* \*

Let me talk a little bit about Q4 in China to give you a little bit of color on the results. The – We increased market share for iPhone, Mac and iPad during the quarter. We hit all-time revenue records for Services and for Mac for the PRC during the quarter. We had very strong iPad revenue growth. *We had double digit unit growth in iPhone and both the upgraders and Android switchers were both up on a year over year basis during the quarter. And so the results were broad based.* They were pretty much across the board, as I indicated.

40. Defendant Maestri added, in pertinent part:

*During the quarter, we sold 46.7 million iPhones, up 3% over last year.* We were very pleased to see double digit iPhone growth in many emerging markets including mainland China, the Middle East, Central and Eastern Europe, India and Mexico. We gained share not only in those markets but also in Canada, Germany, France, Italy, Spain, Sweden and Singapore, based on the latest estimates from IDC.

*Customer interest and satisfaction with iPhone are very strong with both consumers and business users.* In the U.S., the latest data from 451 Research on consumers indicates a customer satisfaction rating of 97% or higher across all iPhone models. *Among consumers planning to buy a smartphone in the next 90 days, purchase intention for iPhone was 69%, more than 5X the rate of the closest competitor with a loyalty rate for current iPhone owners of 95% compared to 53% for the next highest brand.* For corporate smartphone buyers, iOS customer satisfaction was 95% and of those planning to purchase smartphones in the December quarter, 80% planned to purchase iPhone. That is the highest score for iPhone in the history of the survey.

41. Each of Defendants' statements set forth in ¶¶ 36–40 was materially false and misleading because each of the Defendants knew and failed to disclose or deliberately disregarded:

(a)    that the Company's iOS updates were drastically reducing the performance of older model iPhones;

(b) because of the throttling, customers upgraded their iPhones at a faster rate, thereby boosting unit sales and cannibalizing future sales;

(c) therefore, iPhone sales growth was unsustainable; and

(d) as a result of the foregoing, Defendants lacked a reasonable basis in fact when issuing the Company's revenue outlook and/or making the related statements concerning demand for its products, as Apple's business metrics and financial prospects were not as strong as Defendants had led the market to believe.

**Battery Replacement Program Begins to Materially Impact iPhone Sales**

42. On February 1, 2018, Apple released its financial results for its first fiscal quarter of 2018 ended December 29, 2017, the final reporting period before its battery replacement program would go into full effect. On that date, the Company reported record results, with Defendant Cook touting it as the "***biggest quarter in Apple's history***." In addition, Defendant Maestri lauded the "all-time record profitability during the quarter." Additionally, the Company reported sequential iPhone unit sales growth of ***66 percent***—likely the final throttling-induced sales growth. Notwithstanding these record results, however, Defendants gave disappointingly flat revenue guidance of $60 to $62 billion for the upcoming quarter.

43. On that same date, Defendants held a conference call with analysts and investors to discuss the Company's results for its first fiscal quarter 2018. On the call, analysts questioned whether the relatively flat guidance for the upcoming quarter was due to Apple's discounted replacement batteries elongating iPhone upgrade cycles. Defendant Cook responded by first stating that active iPhone users was a more important metric than unit sales (ironically touting the "fantastic" reliability of the iPhone), and second stating that the Company was not looking into any potential impact:

> **Analyst:** You commented on how your install based over the last couple of years has grown 30%. And iPhone is clearly the largest component of that, and so iPhone install base is probably growing close to that number perhaps less, call it 20% through 25%. Yet, if we look at iPhone unit growth for fiscal '18 what's implied with your guidance fiscal '17 and fiscal '16, it's been relatively flat. So you have an installed base that's 20% plus higher, and a unit growth that's relatively flat, which would suggest that your upgrade rate is going down or your replacement cycle is

elongating. And I'm wondering whether you agree with that and whether investors should be worried about that. And maybe if I could just add one other wrinkle to potentially get your response on is, *given consumers' heightened awareness of their ability to replace batteries going forward as opposed to upgrades. Isn't that also something that investors should potentially be concerned about in terms of its impact on upgrade rate going forward?*

**Cook:** I think it's up to investors as to what things they would like to focus on, so I don't want to put myself in the position of that. The way that I look at this and I – the numbers you've quoted, I have a different view of them. *But generally what we see with iPhone is the reliability of iPhone is fantastic.* The second – or the previously owned market has expanded in units over the years. And you see in many cases, carriers and retailers having very vibrant programs around trading an iPhone in. And because iPhone has the largest residual rate on it, it acts as a buffer for the customer to buy a new one and it winds up with another customer somewhere else that is perfectly fine with having a previously owned iPhone.

And so I view all of that to be incredibly positive. It's more people on iPhones the better. I would like to point out that the – every major product hit a high on the active installed base. And so that's iPad, it's Mac and those are huge numbers as well. And so as we've always said, there is a large part of the – or the vast majority of the services are kind of mapped to the install base instead of the quarterly sales. And there's – this quarter is no different on that.

Toni – On the battery, Toni, *we did not consider in any way, shape, or form, what it would do to upgrade rates. We did it because we thought it was the right thing to do for our customers*. And I – sitting here today, I don't know what effect it will have. And again, it's not – was not in our thought process of deciding to do what we've done.

44.     On May 1, 2018 the Company released its financial results for its second fiscal quarter 2018 ended March 30, 2018.  In the accompanying press release, Defendant Cook was quoted touting the Company's "*best March quarter ever, with strong revenue growth in iPhone* . . . ."  Additionally, the Company issued revenue guidance between $51.5 billion and $53.5 billion for the following quarter.  Notwithstanding Defendants' positive outlook, however, iPhone sequential sales growth was down *32 percent*.

45.     On that same date, Defendants held a conference call with analysts and investors to discuss Apple's financial results.  On the call, Defendant Maestri touted iPhone demand and sales growth, stating in pertinent part:

> iPhone revenue grew 14% year-over-year, with iPhone ASP increasing to $728 from $655 a year ago, driven primarily by the performance of iPhone X, iPhone 8 and iPhone 8 Plus.
>
> During the quarter we sold 52.2 million iPhones, up 3% over last year, and we grew iPhone units by double digits in several markets including Japan, Canada, Switzerland, Turkey, Central and Eastern Europe, Mexico and Vietnam. ***Our performance from a customer demand standpoint was even stronger than our reported results, as we reduced iPhone channel inventory by 1.8 million units, 600,000 units more than the March quarter reduction last year.*** We exited the March quarter within our target range of five to seven weeks of iPhone channel inventory.
>
> Our customers are extremely happy with their iPhones. The latest survey of U.S. consumers from 451 Research indicates that across all iPhone models, the customer satisfaction rating was 95%, and combining iPhone 8, 8 Plus and iPhone X, customer satisfaction was even higher, at 99%. And among business buyers who plan to purchase smartphones in the June quarter, 78% plan to purchase iPhones.

46. Each of Defendants' statements set forth in ¶¶ 42–45 was materially false and misleading because each of the Defendants knew and failed to disclose or deliberately disregarded:

(a) that the Company's replacement battery program during 2018 (enacted as a direct and primary response to the Company's intentional phone throttling during 2017) was negatively impacting iPhone sales; and

(b) as a result of the foregoing, Defendants lacked a reasonable basis in fact when issuing the Company's revenue outlook and/or making the related statements concerning demand for its products, as Apple's business metrics and financial prospects were not as strong as Defendants had led the market to believe.

**Macroeconomic and Geopolitical Issues in China Impact Sales in Greater China; Battery Replacement Program Continues to Cannibalize iPhone Sales**

47. On July 31, 2018, Apple released its financial results for its third fiscal quarter 2018 ended June 30, 2018. In the accompanying press release, Defendant Cook was quoted touting the Company's results, which were "***driven by continued strong sales of iPhone***, Services, and Wearables . . . ." Notwithstanding these results, Apple again reported sequential

declines in iPhone sales, this time by *21 percent*.  Finally, the Company issued revenue guidance of $60 to $62 billion for the following quarter.

48.    On that same date, Defendants held a conference call with analysts and investors to discuss the Company's results.  Analysts again questioned Defendants as to whether Apple's replacement battery program was materially impacting iPhone upgrade cycles.  In response, Defendant Cook first assured investors that there was no cause for alarm due to the enormity and health of the smartphone market, and again stated that the Company was not analyzing any potential impact related to the battery replacement program:

> **Analyst:** Okay. Tim, I was wondering if you could just comment a little bit about the health of the smartphone market. Apple's smartphone iPhone units have been relatively flat for 4 years and I think you've probably been a share gainer during the period, which would suggest at least at the high end of the market, that it's perhaps flat-to-down. And I'm wondering if you can comment on, ***whether you believe that and what you think might be happening with replacement cycles, and specifically, also what impact, if any, you've seen from wider availability and less expensive replacement batteries for iPhones***.
>
> **Cook:** ***I think the smartphone market is very healthy.*** I think it's actually the best market in the world to be in for someone that is in the business that we're in. So it's an enormous-sized market and whether it grows—from our point of view, whether it grows 1% or 2% or 5% or 6% or 10% or shrinks 1% or 2%, it's a great market because it's just huge. And so that's kind of the way that I view that.
>
> ***In terms of batteries, we have never done an analysis internally about how many people decided to get a lower-priced battery than buy another phone because it was never about that for us. It was always about doing something great for the user and I think if you treat the users and the customers well, then you have a good business over time and so that's how we'd look at that***.

49.    Finally, analysts questioned Defendant Cook "as to what [he was] seeing in China and how [he was] thinking about it as [he] look[ed] forward."  In his response, Defendant Cook discussed the ongoing tariffs imposed on China by the U.S. during 2018.  Specifically, he stated that to-date, "***none of [Apple's] products were directly affected by the tariffs.***"

50.    On November 1, 2018 after the close of trading, Apple released its financial results for its fourth fiscal quarter 2018 ended September 29, 2018.  In the accompanying press

release, Defendant Cook emphasized that "[o]ver the past two months, [Apple had] delivered huge advancements for [its] customers through new versions of iPhone, Apple Watch, iPad and Mac as well as [its] four operating systems, and [that it was] enter[ing] the holiday season with [its] strongest lineup of products and services ever." Apple, however—then already more than one-third of the way into first fiscal quarter 2019—gave light revenue guidance of $89 billion to $93 billion for the upcoming and all-important holiday quarter.

51. During the conference call held with analysts and investors that same day, Defendants repeated the representations in the release, with defendant Maestri emphasizing again that Apple had "the strongest lineup ever as [it] enter[ed] the holiday season," justifying "a new all-time record" of "expect[ed] revenue [of] between $89 billion and $93 billion." When Defendant Maestri discussed the light revenue guidance, he attributed it to a number of factors which were accurately "reflect[ed]" in that revenue range: (1) reversed launch timing of its new top-end iPhone model, *i.e.*, releasing the top-end iPhone XS in the fourth fiscal quarter 2018, and the more affordable iPhone XR in the first fiscal quarter 2019; (2) the impact of foreign exchange due to the strength of the U.S. dollar; (3) supply and demand uncertainty related to the ramp up of new products; and (4) macroeconomic uncertainty in the Company's emerging markets.

52. Defendant Maestri, however, emphasized that Apple's strong product lineup for the holiday season purportedly provided a strong basis for the "record" financial guidance being issued that day, stating in pertinent part:

> [A]t the revenue level, we started from the fact that we are very, very excited about the lineup of products and services that we have getting into the holiday season. It's the strongest lineup that we've ever had. And our guidance range, by the way, represents a new all-time quarterly revenue record . . . .

53. On the call analysts questions how strong demand was for the iPhone XS and XS Max—the most expensive iPhones to-date which started shipping in September 2018. Additionally analysts further questioned whether Defendants had seen purchasers hold off on XS or XS Max purchases pending the rollout of the cheaper iPhone XR in October 2018. In

response, Defendant Cook stated demand for the iPhone XS and XS Max was strong. According to Cook:

> *The XS and XS Max got off to a really great start*, and we've only been selling for a few weeks. The XR, we've only got out there for, I guess, 5–5 days or so at this point and so that it's—we have very, very little data there. Usually, there is some amount of wait until a product shows—another product shows up in look, but in—that—*in looking at the data, on the sales data for XS and XS Max, there's not obvious evidence of that in the data as I see it.*

54. When questioned about any "macroeconomic uncertainty" in "emerging markets," Defendant Cook maintained that those concerns did not include Apple's greater China sales growth and that its greater China sales growth was strong, stating in pertinent part as follows:

> To give you a perspective in – at some detail, our business at India in Q4 was flat. Obviously, we would like to see that be a huge growth. Brazil was down somewhat compared to the previous year. And so I think – or at least the way that I see these is each one of the emerging markets has a bit of a different story. And I don't see it as some sort of issue that is common between those for the most part. In relation to China specifically, *I would not put China in that category. Our business in China was very strong last quarter.* We grew 16%, which we're very happy with. iPhone, in particular, was very strong double-digit growth there. Our other products category was also stronger, in fact, a bit stronger than even the . . . overall company number.

55. Additionally on the call, Defendant Maestri shocked analysts and investors by announcing that Apple would no longer report unit sales moving forward:[4]

> [S]tarting with the December quarter, we will no longer be providing unit sales data for iPhone, iPad and Mac. As we have stated many times, our objective is to make great products and services that enrich people's lives and to provide an unparalleled customer experience so that our users are highly satisfied, loyal and engaged. As we accomplish these objectives, strong financial results follow.
>
> *As demonstrated by our financial performance in recent years*, the number of units sold in any 90-day period is not necessarily representative of the underlying strength of our business. *Furthermore, our unit of sale is less relevant for us today than it was in the past given the breadth of our portfolio and the wider sales price dispersion within any given product line.*

---

[4] Unit sales represent total sales earned on a per-unit basis, *e.g.*, specific iPhone models. Therefore, unit sales are an important metric used in determining ASP over a period of time to analyze sales performance.

56.     Defendants tried to justify the Company's decision to withhold iPhone unit sales, rejecting the proposition raised by analysts that the reason for withholding iPhone unit data was because "*iPhone units are going to start going negative . . . [and] it's easier to talk about great things and not show the details of things that aren't going so great*." Instead, Defendants Maestri and Cook each insisted that the revenue and profit margin guidance being provided that day was all investors should focus on—maintaining that demand was still strong for Apple's more expensive iPhone offerings, stating in pertinent part:

> **Maestri:** *Given the rationale on why we do not believe that providing unit sales is particularly relevant for our company at this point, I can reassure you that it is our objective to grow unit sales for every product category that we have.* But as I said earlier, a unit of sale is less relevant today than it was in the past. To give you an example, *the unit sales of iPhone at the top end of the line have been very strong during the September quarter. And that's very important because we are attracting customers to the most recent technologies and features and innovation that we bring into the lineup*, but you don't necessarily see that in the number that is reported. And so therefore, we will – as I said, *we'll provide the qualitative commentary when it is important and relevant*, but at the end of the day, we make our decisions to – from a financial standpoint, to try and optimize our revenue and our gross margin dollars. And that, *we think, is the focus that is in the best interest of our investors*.

> **Cook:** Jim, let me just add a couple things to that for color. Our installed base is growing at double digit, and so there's no – and *that's probably a much more significant metric for us from an ecosystem point of view and customer loyalty*, et cetera. The second thing is this is a little bit like if you go to the market and you push your cart up to the cashier and she says or he says, "How many units you have in there?," it sort of – it doesn't matter a lot how many units there are in there in terms of the overall value of what's in the cart.

57.     In an interview with *Reuters* that same day, Defendant Cook reiterated the four factors which led Defendants to issue light revenue guidance for the first fiscal quarter 2019 discussed above.   Defendant Cook stressed to *Reuters*, however, that the Company was *happy* with its performance in China.

58.     Each of Defendants' statements set forth in ¶¶ 47–57 was materially false and misleading because each of the Defendants knew and failed to disclose or deliberately disregarded:

(a)    that the Company's replacement battery program during 2018 (enacted as a direct and primary response to the Company's intentional phone throttling during 2017) was negatively impacting iPhone sales;

(b)    that the U.S.-China trade war, declining Chinese economy, and strength of the U.S. dollar had negatively impacted demand for iPhones and Apple's pricing power in Greater China, one of Apple's most important growth markets;

(c)    the decision to withhold iPhone unit sales was designed to conceal declining sales; and

(d)    as a result of the foregoing, Defendants lacked a reasonable basis in fact when issuing the Company's revenue outlook for its first fiscal quarter 2019 and/or making the related statements concerning demand for its products, as Apple's business metrics and financial prospects were not as strong as defendants had led the market to believe.

## THE TRUTH IS REVEALED

59.    On January 2, 2019 after the close of trading, Apple disclosed the true state of its declining iPhone sales.  For the first time in 15 years, Apple slashed its prior quarterly revenue forecast for the already complete first fiscal quarter 2019 ended December 29, 2018 amid falling iPhone sales.  In a "Letter from Tim Cook to Apple Investors," released after the close of trading that night, Apple disclosed that its revenues for its first fiscal quarter 2019 were only $84 billion, far below the already-disappointing guidance range of $89 billion to $93 billion the Company had announced just eight weeks earlier on November 1, 2018.  Discussing why Apple had experienced what was characterized as "fewer iPhone upgrades than [it] had anticipated," the Letter blamed the discounted battery replacement program as well as sales in China, stating in pertinent part as follows:

**Emerging Market Challenges**

While we anticipated some challenges in key emerging markets, ***we did not foresee the magnitude of the economic deceleration, particularly in Greater China. In fact, most of our revenue shortfall to our guidance, and over 100 percent of our year-over-year worldwide revenue decline, occurred in Greater China*** across iPhone, Mac and iPad.

***China's economy began to slow in the second half of 2018.*** The government-reported GDP growth during the September quarter was the second lowest in the last 25 years. We believe the economic environment in China has been further impacted by rising trade tensions with the United States. As the climate of mounting uncertainty weighed on financial markets, the effects appeared to reach consumers as well, with traffic to our retail stores and our channel partners in China declining as the quarter progressed. And ***market data has shown that the contraction in Greater China's smartphone market has been particularly sharp.***

\* \* \*

**iPhone**

Lower than anticipated iPhone revenue, ***primarily in Greater China***, accounts for all of our revenue shortfall to our guidance and for much more than our entire year-over-year revenue decline. In fact, categories outside of iPhone (Services, Mac, iPad, Wearables/Home/Accessories) combined to grow almost 19 percent year-over-year.

While Greater China and other emerging markets accounted for the vast majority of the year-over-year iPhone revenue decline, ***in some developed markets, iPhone upgrades also were not as strong as we thought they would be***. While macroeconomic challenges in some markets were a key contributor to this trend, ***we believe there are other factors broadly impacting our iPhone performance, including*** consumers adapting to a world with fewer carrier subsidies, US dollar strength-related price increases, and ***some customers taking advantage of significantly reduced pricing for iPhone battery replacements.***

60. Though Apple did not conduct a conference call on January 2, 2019, defendant Cook appeared on CNBC. Discussing the reference to "rising trade tensions" in the Letter, defendant Cook expressly stated in pertinent part that:

[A]s we look at what's going on in China – it's clear that the economy begins to slow there for the second half. And what I believe to be the case is the trade tensions between the United States and China put additional pressure on their economy. And so we saw, as the quarter went on, things like traffic in our retail stores, traffic in our channel partner's stores, the reports of the smartphone industry contracting, particularly bad in November—I

haven't seen the December number yet, but I would guess that would[n't] be good either. And so that's what we've seen.

* * *

[M]y sense is the much larger issue is the slowing of the economy and then this – the trade tension that's further pressured.

61.     Defendant Cook also emphasized the negative impact the battery replacement program had had on the pace of phone replacements during 1Q19, stating in pertinent part:

[S]ort of in addition to those two things, we've started a program worldwide where we dramatically lowered the battery replacement price. And so we have sort of a collection of items going on, some that are macroeconomic and some that are Apple specific . . . .

62.     On this news, the price of Apple stock fell precipitously by more than $15 per share, or more than 9 percent, closing at $142.19 per share on January 3, 2019, on unusually high volume of more than 91.1 million shares traded, the highest one-day trading volume experienced by the Company in nearly two years.

## POST-CLASS PERIOD REVELATIONS

63.     On January 3, 2019, *Yahoo Finance* published an article, entitled "Apple's mind-blowing warning means CEO Tim Cook now has a major credibility problem," stating that "Apple CEO Tim Cook and his management team should read the coverage of their mind-blowing warning to every investor on the planet on Apple News and then ask: 'Should investors trust us right now? And, how can we regain that trust.'" The article highlighted how Apple's investors were duped, stating in pertinent part as follows:

***They failed to keep it real with investors on what they were seeing in iPhone demand data late in 2018. Simply no longer providing unit sales data wasn't enough of a signal to investors that something was wrong, bottom line.***

As a result, Apple's stock could be "broken" until credibility is restored. "Apple's stock is now at a crossroads. Some investors will consider the stock broken and never reward it with a "proper" multiple, but we've followed the company long enough to know there is cyclicality in the market's relationship with Apple," cautions long-time Apple analyst Gene Munster of Loup Ventures.

**A poor job done with guidance.**

Apple said in a filing released after market close Wednesday that it now sees first quarter revenue of about $84 billion. It previously

anticipated $89 billion to $91 billion. In the filing, Cook attributed the reduced guidance to weakness in emerging markets and in Greater China as well as supply constraints on new products. Cook also hinted strongly that Apple felt resistance from consumers to the new $1,000 plus iPhone XS line.

64.     *ZDNet*'s Adrian Kingsley-Hughes surmised in a January 4, 2019 report, entitled "This is why Apple doesn't want you fixing your smartphone," that "[a]midst all the finger-pointing associated [with] the sudden and unexpected profits warning from Apple was a revelation about how much the company relies on premature obsolescence to drive sales."

65.     Kingsley-Hughes' report further stated that: "First, and perhaps most significant is this – How many iPhones does Apple sell to people simply because the battery in their existing iPhone is worn?  Over the years there's been a great deal of chatter around the subject of 'planned obsolescence,' and here *we have Apple essentially confirming that this is indeed part of the business model.*"  His report concluded: "At this point, it's worth pointing out that if indeed the battery replacement program was a significant factor in the profits warning, *Apple only has itself to blame for throttling iPhones in the first place.*"

66.     On January 29, 2019, Apple held a conference call with analysts and investors to discuss the Company's fiscal first quarter 2019 results ended December 29, 2018.  On the call, Defendant Cook again attributed the drop off in iPhone sales, in part, to the Company's battery replacement program, stating in pertinent part:

> *Now our customers are holding on to their older iPhones a bit longer than in the past. When you pair this with the macroeconomic factors, particularly in emerging markets, it resulted in iPhone revenue that was down 15% from last year.* Our iPhone results accounted for significantly more than our entire year-over-year revenue decline. In fact, outside of iPhone, our business grew strongly by 19%.
>
> Third, our battery replacement program. *For millions of customers, we made it inexpensive and efficient to replace the battery and hold onto their existing iPhones a bit longer*. Some people have suggested that we shouldn't have done this because of the potential impact on upgrades, but we strongly believe it was the right thing to do for our customers.

**APPLICATION OF PRESUMPTION OF RELIANCE:**
**FRAUD ON THE MARKET**

67.     Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     Apple securities traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Apple common stock; and

(e)     Plaintiff and other members of the Class (as defined below) purchased or otherwise acquired Apple securities between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

68.     At all relevant times, the market for Apple securities was efficient for the following reasons, among others:

(a)     As a regulated issuer, Apple filed periodic public reports with the SEC; and

(b)     Apple regularly communicated with public investors via established market communication mechanisms, including through the regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

**LOSS CAUSATION/ECONOMIC LOSS**

69.     During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Apple securities and operated as a fraud or deceit on those who purchased or otherwise acquired Apple securities during the Class Period.  As Defendants'

1    misrepresentations and fraudulent conduct became apparent to the market, the price of Apple

2    securities fell precipitously, as the prior artificial inflation came out of the price. As a result of

3    their purchases or other acquisitions of Apple securities during the Class Period, plaintiff and

4    other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities

5    laws.

6         70.    On February 1, 2018, Defendants surprised the market by announcing relatively

7    flat iPhone sales guidance. When questioned as to whether the battery replacement program had

8    caused the flattened sales guidance by elongating iPhone upgrade cycles, Defendants stated that

9    they "did not consider in any way, shape, or form, what [battery replacements] would do to

10   upgrade rates." Analysts, however, forecasted an elongated sales cycle caused by what would be

11   known as "Batterygate." In light of this lower-than-expected guidance, Apple stock fell $7.28 on

12   February 2, 2018, and continued to fall $4.01 of the following trading day, closing at $156.49 on

13   February 5, 2018, representing a total decline of approximately 7 percent.

14        71.    On April 20, 2018 an analyst at Morgan Stanley predicted that Apple's iPhone

15   sales would fall nearly 10 million below Wall Street forecasts. On that same date, an analyst at

16   Mirabaud predicted that the iPhone X would likely be discontinued within 2018 due to, in part, a

17   decline in orders. On this news, the price of Apple common stock fell $7.08, or 4 percent, to

18   close at $165.72 on April 20, 2018.

19        72.    On May 1, 2018 the Company released its financial results for its second fiscal

20   quarter 2018 ended March 30, 2018. In the accompanying press release, Defendant Cook was

21   quoted touting the Company's "***best March quarter ever, with strong revenue growth in***

22   ***iPhone*** . . . ." Additionally, the Company issued revenue guidance between $51.5 billion and

23   $53.5 billion for the following quarter. Notwithstanding Defendants' positive outlook, however,

24   iPhone sequential sales growth was down ***32 percent***. On that same date, Defendants held a

25   conference call with analysts and investors to discuss Apple's financial results and strong iPhone

26   demand.

27

28

73.     Due to Defendant's failure to disclose that the replacement battery program had begun to cannibalize iPhones unit sales, they were able to assuage potential investor concern and buoy the price of Apple common stock.  Specifically, on May 1, 2018, by touting continued demand for the iPhone Defendants were able to inflate the price of Apple stock by $7.47, or 4.4 percent, closing at $176.57 on May 2, 2018.

74.     On July 31, 2018, Apple released its financial results for its third fiscal quarter 2018 ended June 30, 2018.  In the accompanying press release, Defendant Cook was quoted touting the Company's results, which were "***driven by continued strong sales of iPhone***, Services, and Wearables . . . ."  Notwithstanding these results, Apple again reported sequential declines in iPhone sales, this time by ***21 percent***.  Finally, the Company issued revenue guidance of $60 to $62 billion for the following quarter.  On that same date, Defendants held a conference call with analysts and investors during which Defendant Cook first assured investors that there was no cause for alarm due to the enormity and health of the smartphone market, and again stated that the Company was not analyzing any potential impact related to the battery replacement program.  Defendant Cook also discussed the ongoing tariffs imposed on China by the U.S. during 2018, stating that "***none of [Apple's] products were directly affected by the tariffs.***"

75.     Due to Defendant's failure to disclose that the replacement battery program had begun to cannibalize iPhones unit sales, and that the declining Chinese economy was leading to slower sales growth in Greater China they were able to assuage potential investor concern and buoy the price of Apple common stock.  Specifically, based on Defendants' omission of these adverse materials facts on August 1, 2018, they were able to inflate the price of Apple stock by $17.10, or 9 percent, closing at $207.39 on August 2, 2018.

76.     On October 24, 2018, the Italian regulators, who had been investigating Apple, fined the Company €5 million, finding that Apple had "implemented dishonest commercial practices" by implementing the iPhone slowdowns, which ultimately pressured consumers to prematurely replace their devices.  Apple was fined an additional €5 million for failing to give

consumers basic information about the batteries in the iPhones, such as the average lifespan and replacement procedures.  On this news, the price of Apple stock fell $7.64 per share, or 3.4 percent, to close at $215.09 on October 24, 2018.

77.     On November 2, 2018, following the disappointing sales forecast for the holiday season, the market reacted negatively.  For example, on that date an analyst at Bank of America Merrill Lynch downgraded Apple from "buy" to "neutral" and lowered the price target of Apple stock.  Of the reasons cited for the downgrade, the analyst included slower revenue growth in China, guidance reflecting weaker-than-expected iPhone sales, weaker growth in emerging markets, as well as the Company's decision to withhold unit sales.  On this date, the price of Apple stock dropped $14.74 or 6.6 percent, to close at $207.48 on November 2, 2018.

78.     On November 5, 2018 an analyst at Rosenblatt Securities also downgraded Apple stock and lowered price targets due to the disappointing guidance.  On this date, the price of Apple stock fell $5.89, or 3 percent, closing at $201.59 on November 5, 2018.  In total, Apple stock fell for a total of $20.63, or 9.3 percent.

79.     On November 14, 2018 an analyst at Guggenheim downgraded Apple stock from "buy" to "neutral" under the belief that iPhone unit sales would drop substantially in the Company's fiscal year 2019.  That analyst stated, in pertinent part:

> Over the past 10 years, Apple's iPhone ASP has increased a dramatic + $220, or 40%, reflecting its growing value to both consumer and business markets, but nearly HALF of all that just came in FY18 alone, making a period of digestion now likely.
>
> * * *
>
> [W]e now estimate iPhone units (down) 5% Y/Y in FY19 vs. flat Y/Y in FY18, BUT unlike last year, do NOT see ASP increases providing enough offset, with our forecast that blended iPhone ASPs increase only 3% Y/Y.

On this news, the price of Apple stock fell $9.43 or 5 percent, to close at $186.80 on November 14, 2018.

80.     On November 19, 2018, Apple announced it had drastically cut production orders for its iPhone XR, XS, and XS Max models.  Specifically, the Company slashed production of

one third of its order, or approximately **70 million units**.  On this news, the price of Apple stock fell $7.67 or 4 percent, closing at $185.86 on November 19, 2018.  The stock continued to fall by $8.88 the following day, closing at $176.98 the following day.  Together, Apple stock fell $16.55 or 8.5 percent over the two trading sessions.

81.     On January 2, 2019 after the close of trading, Apple disclosed the true state of its declining iPhone sales.  For the first time in 15 years, Apple slashed its prior quarterly revenue forecast for the already complete first fiscal quarter 2019 ended December 29, 2018 amid falling iPhone sales.  In a "Letter from Tim Cook to Apple Investors," released after the close of trading that night, Apple disclosed that its revenues for its first fiscal quarter 2019 were only $84 billion, far below the already-disappointing guidance range of $89 billion to $93 billion the Company had announced just eight weeks earlier on November 1, 2018.  Discussing why Apple had experienced what was characterized as "fewer iPhone upgrades than [it] had anticipated," the Letter blamed the discounted battery replacement program as well as sales in China.  On this news, the price of Apple stock fell precipitously by more than $15 per share, or approximately 9 percent, closing at $142.19 per share on January 3, 2019 on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

82.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Apple securities during the Class Period (the "Class").  Excluded from the Class are: Defendants; the officers and directors of the Company during the Class Period (the "Excluded D&Os"); members of Defendants' and the Excluded D&Os' immediate families; the subsidiaries and affiliates of the Company, including the Company's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and any entity in which Defendants or the Excluded D&Os have or had a controlling interest; and the legal representatives, heirs, successors or assigns of any excluded person or entity.

83.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Apple securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Apple and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

84.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

85.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

86.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by defendants as alleged herein;

(b)     whether statements made by defendants misrepresented material facts about the business and prospects of Apple; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

87.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of § 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

88. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

89. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

90. Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases or other acquisitions of Apple securities during the Class Period.

91. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Apple securities. Plaintiff and the Class would not have purchased Apple securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of § 20(a) of the Exchange Act
### Against All Defendants

92. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

93. The Individual Defendants acted as controlling persons of Apple within the meaning of § 20(a) of the Exchange Act. By reason of their positions with the Company, and

their ownership of Apple common stock, the Individual Defendants had the power and authority to cause Apple to engage in the wrongful conduct complained of herein. Apple controlled the Individual Defendants and all of its employees. By reason of such conduct, Defendants are liable pursuant to § 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  May 24, 2019                    Respectfully submitted,

                                        */s/ Christopher J. Keller*
                                        **LABATON SUCHAROW LLP**
                                        Christopher J. Keller (*pro hac vice* pending)
                                        Eric J. Belfi (*pro hac vice* pending)
                                        Francis P. McConville (*pro hac vice* pending)
                                        140 Broadway
                                        New York, New York 10005
                                        Telephone: (212) 907-0700
                                        Facsimile: (212) 818-0477
                                        ckeller@labaton.com
                                        ebelfi@labaton.com
                                        fmcconville@labaton.com

                                        *Counsel for Plaintiff*
                                        *Steamfitters Local 449 Pension Plan*

James M. Wagstaffe (#95535)
Frank Busch (#258288)
**WAGSTAFFE, VON LOEWENFELDT,**
**BUSCH & RADWICK LLP**
100 Pine Street, Suite 725
San Francisco, California 94111
Telephone: (415) 357-8900
Facsimile: (415) 357-8910
wagstaffe@wvbrlaw.com
busch@wvbrlaw.com

*Liaison Counsel for Plaintiff*
*Steamfitters Local 449 Pension Plan*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 24, 2019, I was authorized to electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

/s/ Frank Busch
Frank Busch

# CERTIFICATION

I, Joseph M. Little, as Chairman of the Board of Trustees of Steamfitters Local 449 Pension Plan ("Local 449"), hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of Local 449.  I have reviewed a Complaint prepared against Apple, Inc. ("Apple") alleging violations of the federal securities laws, and generally adopt its allegations without waiving the right to alter the allegations in a consolidated and/or amended complaint;

2.      Local 449 did not purchase securities of Apple at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.      Local 449 is willing to serve as a lead plaintiff and representative party in this matter, including providing testimony at deposition and trial, if necessary;

4.      Local 449's transactions in Apple securities during the Class Period are reflected in Exhibit A, attached hereto;

5.      Local 449 sought to serve or currently serves as a lead plaintiff in the following class actions under the federal securities laws filed during the last three years:

> *Lentch v. Vista Outdoor*, No. 1:17-cv-0012 (D. Utah.)
> *Steamfitters Local 449 Pension Plan v. Molina Healthcare, Inc.*, No. 2:18-cv-3579 (C.D. Cal.)
> *Potts v. Weight Watchers International, Inc.*, No. 1:19-cv-2005 (S.D.N.Y.)

6.      Local 449 sought to serve as a representative party but not as a lead plaintiff in the following class actions under the federal securities laws filed during the last three years:

> *Steamfitters Local 449 Pension Plan v. Eaton Corporation PLC*, No. 1:16-cv-06393 (S.D.N.Y.)
> *Steamfitters Local 449 Pension Plan v. Maximus, Inc.*, No. 1:17-cv-0884 (E.D. Va.)
> *Steamfitters Local 449 Pension Plan v. Skechers U.S.A., Inc.*, No. 1:17-cv-08107 (S.D.N.Y.)

7.      Beyond its pro rata share of any recovery, Local 449 will not accept payment for serving as a lead plaintiff and representative party on behalf of the Class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this ___ day of May, 2019.

Joseph M. Little
Chairman of the Board of Trustees
Steamfitters Local 449 Pension Plan

**EXHIBIT A**

**TRANSACTIONS IN APPLE, INC.**

| Transaction Type | Trade Date | Shares | Price Per Share | Cost / Proceeds |
|---|---|---|---|---|
| Sale | 08/29/17 | (400.00) | $162.80 | $65,120.00 |
| Sale | 11/16/17 | (700.00) | $170.51 | $119,357.00 |
| Sale | 11/16/17 | (1,800.00) | $170.51 | $306,918.00 |
| Sale | 12/26/17 | (500.00) | $170.50 | $85,250.00 |
| Sale | 03/02/18 | (400.00) | $174.20 | $69,680.00 |
| Sale | 07/09/18 | (500.00) | $190.31 | $95,155.00 |
| Purchase | 07/12/18 | 500.00 | $190.51 | ($95,255.00) |
| Purchase | 11/29/18 | 700.00 | $179.54 | ($125,678.00) |
| Purchase | 12/03/18 | 800.00 | $181.85 | ($145,480.00) |

JS-CAND 44 (Rev. 06/17)

Case 4:19-cv-02033-YGR Document 76-2 Filed 09/24/19 Page 38 of 39
Case 3:19-cv-02891-VC Document 1 Filed 05/24/19 Page 1 of 1

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| **I. (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| STEAMFITTERS LOCAL 449 PENSION PLAN | APPLE INC., TIMOTHY D. COOK and LUCA MAESTRI |
| **(b)** County of Residence of First Listed Plaintiff *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant *(IN U.S. PLAINTIFF CASES ONLY)* NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)* WAGSTAFFE, VON LOEWENFELDT, BUSCH & RADWICK LLP, 100 Pine Street, Suite 725, San Francisco, CA 94111 (415) 357-8900 | Attorneys *(If Known)* |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| | 340 Marine | | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 151 Medicare Act | 345 Marine Product Liability | **PERSONAL PROPERTY** | 751 Family and Medical Leave Act | 840 Trademark | 460 Deportation |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 350 Motor Vehicle | 370 Other Fraud | | | 470 Racketeer Influenced & Corrupt Organizations |
| | 355 Motor Vehicle Product Liability | 371 Truth in Lending | 790 Other Labor Litigation | **SOCIAL SECURITY** | 480 Consumer Credit |
| 153 Recovery of Overpayment of Veteran's Benefits | 360 Other Personal Injury | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | 861 HIA (1395ff) | 490 Cable/Sat TV |
| 160 Stockholders' Suits | 362 Personal Injury -Medical Malpractice | 385 Property Damage Product Liability | **IMMIGRATION** | 862 Black Lung (923) | ☒ 850 Securities/Commodities/ Exchange |
| 190 Other Contract | | | 462 Naturalization Application | 863 DIWC/DIWW (405(g)) | 890 Other Statutory Actions |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 465 Other Immigration Actions | 864 SSID Title XVI | 891 Agricultural Acts |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | | 865 RSI (405(g)) | 893 Environmental Matters |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | **FEDERAL TAX SUITS** | 895 Freedom of Information Act |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | 870 Taxes (U.S. Plaintiff or Defendant) | 896 Arbitration |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | 871 IRS–Third Party 26 USC § 7609 | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | | |
| 240 Torts to Land | 446 Amer. w/Disabilities–Other | **OTHER** | | | 950 Constitutionality of State Statutes |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | |
| 290 All Other Real Property | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee— Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation–Transfer
- ☐ 8 Multidistrict Litigation–Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Private Securities Litigation Reform Act: Sections 10(b) & 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) & 78t(a)) and Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5)

Brief description of cause:
Securities fraud class action on behalf of all those who purchased or otherwise acquired Apple securities during the period from August 1, 2017, through January 2, 2019

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S), IF ANY *(See instructions):*

JUDGE Yvonne Gonzalez Rogers; Lucy H. Koh

DOCKET NUMBER 4:19cv02033; 5:19-cv-02615

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)
**(Place an "X" in One Box Only)**

☒ SAN FRANCISCO/OAKLAND ☐ SAN JOSE ☐ EUREKA-MCKINLEYVILLE

DATE 05/24/2019     SIGNATURE OF ATTORNEY OF RECORD     /s/ Frank Busch

JS-CAND 44 (rev. 07/16)

Case 4:19-cv-02033-YGR Document 76-2 Filed 09/24/19 Page 39 of 39
Case 3:19-cv-02891-JD Document 71-2 Filed 09/24/19 Page 2 of 2

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-CAND 44

**Authority For Civil Cover Sheet.** The JS-CAND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I. a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**b) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

**II. Jurisdiction.** The basis of jurisdiction is set forth under Federal Rule of Civil Procedure 8(a), which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

(1) <u>United States plaintiff</u>. Jurisdiction based on 28 USC §§ 1345 and 1348. Suits by agencies and officers of the United States are included here.

(2) <u>United States defendant</u>. When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

(3) <u>Federal question</u>. This refers to suits under 28 USC § 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

(4) <u>Diversity of citizenship</u>. This refers to suits under 28 USC § 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III. Residence (citizenship) of Principal Parties.** This section of the JS-CAND 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV. Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V. Origin.** Place an "X" in one of the six boxes.

(1) <u>Original Proceedings</u>. Cases originating in the United States district courts.

(2) <u>Removed from State Court</u>. Proceedings initiated in state courts may be removed to the district courts under Title 28 USC § 1441. When the petition for removal is granted, check this box.

(3) <u>Remanded from Appellate Court</u>. Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

(4) <u>Reinstated or Reopened</u>. Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

(5) <u>Transferred from Another District</u>. For cases transferred under Title 28 USC § 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

(6) <u>Multidistrict Litigation Transfer</u>. Check this box when a multidistrict case is transferred into the district under authority of Title 28 USC § 1407. When this box is checked, do not check (5) above.

(8) <u>Multidistrict Litigation Direct File</u>. Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

<u>Please note that there is no Origin Code 7</u>. Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC § 553. Brief Description: Unauthorized reception of cable service.

**VII. Requested in Complaint.** <u>Class Action</u>. Place an "X" in this box if you are filing a class action under Federal Rule of Civil Procedure 23.

<u>Demand</u>. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

<u>Jury Demand</u>. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS-CAND 44 is used to identify related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**IX. Divisional Assignment.** If the Nature of Suit is under Property Rights or Prisoner Petitions or the matter is a Securities Class Action, leave this section blank. For all other cases, identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated."

**Date and Attorney Signature.** Date and sign the civil cover sheet.