# EXHIBIT A

1  Joel E. Elkins (SBN 256020)
   jelkins@weisslawllp.com
2  WEISSLAW LLP
   9107 Wilshire Blvd., Suite 450
3  Beverly Hills, CA 90210
   Telephone: 310/208-2800
4  Facsimile: 310/209-2348

5  *Attorneys for Plaintiffs*

6

7

8

9

10

11

12                    **UNITED STATES DISTRICT COURT**

13                   **NORTHERN DISTRICT OF CALIFORNIA**

14                          **SAN JOSE DIVISION**

15
    ANDREW FINE, TAMMY FEDERMAN              )  Case No.
16  SEP/IRA, and THE ROSENFELD               )
    FAMILY FOUNDATION, Derivatively on       )
17  Behalf of APPLE INC.,                    )
                                             )  VERIFIED STOCKHOLDER
18                      Plaintiffs,          )  DERIVATIVE COMPLAINT FOR
                                             )  BREACH OF FIDUCIARY DUTY,
19           v.                              )  WASTE OF CORPORATE ASSETS,
                                             )  UNJUST ENRICHMENT,
20  TIMOTHY D. COOK, LUCA MAESTRI,           )  INDEMNIFICATION AND
    CRAIG FEDERIGHI, ARTHUR D.               )  CONTRIBUTION, AND
21  LEVINSON, ALBERT GORE, JR.,              )  VIOLATION OF THE FEDERAL
    ANDREA JUNG, JAMES A. BELL,              )  SECURITIES LAWS
22  RONALD D. SUGAR, ROBERT A. IGER,         )
    and SUSAN L. WAGNER,                     )
23                                           )
                        Defendants.          )
24                                           )
                                             )
25           -and-                           )
                                             )
26  APPLE INC., a California corporation,    )
                                             )
27                  Nominal Defendant.       )  DEMAND FOR JURY TRIAL
    _____)
28

─────────────────────────────────────────────────
             **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiffs Andrew Fine, Tammy Federman SEP/IRA, and the Rosenfeld Family Foundation ("Plaintiffs"), by and through their undersigned counsel, respectfully submit this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, Indemnification and Contribution, and violation of the Federal Securities Laws derivatively on behalf of Apple Inc. ("Apple" or the "Company") against certain of its officers and directors named herein (the "Individual Defendants," as defined below, and, collectively with Apple, the "Defendants"). Plaintiffs base their allegations on personal knowledge as to their own acts, and on information and belief as to all other allegations, based upon the investigation conducted by and through their counsel.

**PRELIMINARY STATEMENT**

1. This derivative action brought for the benefit of Apple seeks to recover the Company's damages, as described herein, from the directors and officers whose breaches of fiduciary duties and other legal violations caused those damages.

2. Apple's flagship product is its iPhone, accounting for nearly two-thirds of the Company's revenues in 2017 and 2018. Much of the revenues derived by Apple from the iPhone stem from users upgrading their older model to a new one. Apple periodically provides information to the public reflecting demand for and sales of the iPhone due to its materiality to the Company's financial condition and business prospects.

3. Given the importance of the iPhone to the Company, Apple's directors and officers were required to investigate and take action regarding reports from frustrated consumers of Apple products that they had experienced unexplained shutdowns with their Apple devices even though the batteries were sufficiently charged.

4. In November 2016, Apple admitted there was a problem, but claimed that it was limited to the iPhone 6s manufactured in September and October 2015. In fact, the problem stemmed from the degrading of the lithium-ion batteries that power iPhones. Thus, installing a new battery would have solved the issue. Rather than be up front with its customers and warn them both about

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

the problem and the easy solution therefor, Apple disseminated an update to its operating system, "iOS," that purported to "fix" the shutdown issue, but did so by "throttling" the iPhone, *i.e.*, dramatically slowing the performance of older iPhone models, without informing the user of that slowdown or securing his or her consent. As such, the update didn't fix the shutdown issue; it simply reduced the speed of the processor so that it could continue to be powered by the degraded lithium-ion battery.

5. In December 2017, reports regarding independent investigations into the shutdown issue and the "fix" provided by Apple circulated publicly. The investigations found that the iOS updates provided by Apple to fix the shutdown issue was, in fact, slowing down older iPhone models and that the shutdown issue was the result of the degrading of the lithium-ion batteries that powered iPhones. These reports heightened suspicions that Apple was using planned obsolescence to force users into buying new iPhones.

6. On December 20, 2017, in the face of the independent reports and growing outrage from customers, Apple admitted that the iOS update circulated by the Company intentionally slowed the performance of older iPhones. In an attempt to ameliorate customers' anger, Apple offered a discounted replacement battery to customers.

7. Class action lawsuits were swiftly filed both here and abroad against the Company after the revelation of the secret throttling of iPhones was made. Numerous of these class action lawsuits have been consolidated under the caption *In re: Apple Inc. Device Performance Litigation*, No. 5:18-md-02827-EJD (N.D. Cal.) (the "Consumer Class Action"), which seeks damages on behalf of those consumers (including punitive damages), and an injunction, as well as restitution. The motion to dismiss in that litigation was denied, in part, and granted, in part, leaving Apple to fight four state and federal claims brought on behalf of the putative class.

8. Class actions were also filed in California state courts that were consolidated under the caption *Apple OS Cases*, JCCP No. 4976 (the "OS Cases"), asserting claims under California law

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

and based on facts in common with the Consumer Class Action. The court denied Apple's demurrer to two of the claims pled in the OS Cases, while allowing the plaintiffs there to re-plead those claims for which the demurrer was sustained.

9. Regulators and governmental authorities have also taken action with regard to Apple's misconduct, launching investigations that pose further material harm to the Company. The United States Department of Justice (the "DOJ") and the SEC commenced investigations into Apple's disclosures concerning the software updates. Regulators and governmental authorities in Canada, Israel, Italy, China, South Korea, France, Brazil, and Spain have likewise investigated Apple. In fact, Italian regulators have already assessed a five million euro fine against the Company, the maximum fine allowable, for its "dishonest commercial practices," and an additional five million euro fine for failing to give customers clear information about essential characteristics of their batteries, including their average life expectancy and how to maintain or replace them.

10. The full extent of the misconduct had not yet become clear until January 2, 2019 when declining iPhone sales were disclosed. Tim Cook ("Cook"), Apple's Chief Executive Officer ("CEO"), informed investors in a press release that the revenue guidance provided merely eight (8) weeks earlier would not be met as a result of lower iPhone sales. Defendant Cook attributed the shortfall to users' decisions not to upgrade, or to delay upgrading, their iPhones after getting the discount battery replacement, as well as macroeconomic issues in China despite the Individual Defendants' having repeatedly disclaimed those issues as having an effect on iPhone demand in calls with analysts. After Apple revealed the truth regarding demand for iPhones, the Company's stock spiraled downward by almost 10%, costing over $74 billion in market capitalization in a single day.

11. Securities class action lawsuits were swiftly filed against Apple, Cook and Luca Maestri, Apple's Senior Vice President and Chief Financial Officer, for violations of the federal securities laws. The Company is now besieged with litigation, and investigations as a result of the Individual Defendants' misconduct. Apple will be forced to expend substantial sums to defend itself

in these lawsuits and investigations and stands to incur further material costs if it resolves those lawsuits whether by settlement, or after trial. The Company has also been financially damaged by the securities laws violations. Apple is named as a defendant in the securities class action lawsuit, leading to substantial expenses to defend itself and further damages if the action is resolved unfavorably to the Company. Further, during the period that Apple stock is alleged to have been artificially inflated in the securities class action, the Individual Defendants caused Apple to repurchase substantial quantities of its stock at prices artificially inflated by the false and misleading statements and omissions made by them to the detriment of the Company and its stockholders.

12. Through this action, Plaintiffs seek to recover from the Individual Defendants, for the benefit of Apple, the damages inflicted upon the Company through their breaches of fiduciary duty and securities laws violations. Plaintiff has made no demand upon the Company's Board of Directors since it would be a futile, wasteful and useless act due to the lack of independence and disinterest of the Board members and their substantial likelihood of liability for the misconduct described herein.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that the Complaint states a federal question. The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

14. This Court has general jurisdiction over each named Defendant who is a resident of California. Additionally, this Court has specific jurisdiction over each named non-resident Defendant because these Defendants maintain sufficient minimum contacts with California to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Apple maintains its United States headquarters in California, and because the allegations contained herein are brought derivatively on behalf of Apple, Defendants' conduct was purposefully directed at California. Exercising jurisdiction over any non-resident Defendant is reasonable under these circumstances.

4

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

15. Venue is proper in this District under 28 U.S.C. § 1391 because: (a) Apple maintains its principal place of business in this District; (b) one or more of the Defendants resides in or maintains offices in this District; (c) a substantial portion of the transactions and wrongs complained of herein—including the Individual Defendants' primary participation in the wrongful acts—occurred in this District; and (d) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## INTRADISTRICT ASSIGNMENT

16. A substantial portion of the transactions and wrongdoing that give rise to the claims asserted in this action occurred in the County of Santa Clara, and as such, this action is properly assigned to the San Jose division of this Court.

## THE PARTIES

**Plaintiffs**

17. Plaintiff Andrew Fine has continuously been an Apple stockholder since April 28, 2014.

18. Plaintiff Tammy M. Federman SEP/IRA has continuously been an Apple stockholder since June 7, 2007.

19. Plaintiff the Rosenfeld Family Foundation has continuously been an Apple stockholder since January 12, 2000.

**Nominal Defendant**

20. Nominal Defendant Apple is a corporation duly organized and existing under the laws of the State of California with its principal offices located at One Apple Park Way, Cupertino, California. Apple is a multinational technology company that designs, develops, and sells consumer electronics, and computer software. The majority of its revenue coming from the iPhone. Apple stock trades on the NASDAQ under the ticker symbol "AAPL."

**Defendants**

21.     Defendant Cook has served as Apple's interim then actual Chief Executive Officer ("CEO") since January 2011, and served as the Company's Chief Operating Officer ("COO") from October until January 2011.  He previously served as Executive Vice President ("EVP"), Worldwide Sales and Operations from 2002 until 2005; Senior Vice President ("SVP"), Worldwide Operations, Sales, Service and Support from 2000 until 2002; and SVP, Worldwide Operations upon joining the Company in 1998 until 2000.   For the fiscal year ended September 27, 2014, Cook received $9,222,638 in total compensation from the Company.  This included $1,748,462 in salary, $6,700,000 in non-equity incentive plan compensation, and $774,176 in all other compensation.  For the fiscal year ended September 26, 2015, Cook received $10,281,327 in total compensation from the Company.   This included $2,000,000 in salary, $8,000,000 in non-equity incentive plan compensation, and $281,327 in all other compensation.  For the fiscal year ended September 24, 2016, Cook received $8,747,719 in total compensation from the Company.  This included $3,000,000 in salary, $5,370,000 in non-equity incentive plan compensation, and $377,719 in all other compensation.  For the fiscal year ended September 30, 2017, Cook received $12,825,066 in total compensation from the Company.  This included $3,057,692 in salary, $9,327,000 in non-equity incentive plan compensation, and $440,374 in all other compensation.  For the fiscal year ended September 29, 2018, Cook received $15,682,219 in total compensation from the Company.  This included $3,000,000 in salary, $12,000,000 in non-equity incentive plan compensation, and $682,219 in all other compensation.

22.     Defendant Arthur D. Levinson ("Levinson) is Apple's Chairman of the Board since August 2011, having previously served as Lead Director from August 2000 until November 2011.  He is a member of the Company's Audit and Finance Committee.  For the fiscal year ended September 27, 2014, Levinson received $522,855 in total compensation from the Company.  This included $262,500 in fees earned or cash paid, $249,964 in stock awards, and $10,391 in other compensation.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

For the fiscal year ended September 26, 2015, Levinson received $559,198 in total compensation from the Company.  This included $300,000 in fees earned or cash paid, $250,016 in stock awards, and $9,182 in other compensation.  For the fiscal year ended September 24, 2016, Levinson received $552,379 in total compensation from the Company.  This included $300,000 in fees earned or cash paid, $250,028 in stock awards, and $2,351 in other compensation.  For the fiscal year ended September 30, 2017, Levinson received $556,362 in total compensation from the Company.  This included $300,000 in fees earned or cash paid, $250,007 in stock awards, and $6,355 in other compensation.  For the fiscal year ended September 29, 2018, Levinson received $567,188 in total compensation from the Company.  This included $300,000 in fees earned or cash paid, $249,961 in stock awards, and $17,227 in other compensation.

23.     Defendant James A. Bell ("Bell") is an Apple director since October 2015.  He is a member of the Company's Audit and Finance Committee.  For the fiscal year ended September 24, 2016, Bell received $465,551 in total compensation from the Company.  This included $100,000 in fees earned or cash paid, $360,375 in stock awards, and $5,176 in other compensation.  For the fiscal year ended September 30, 2017, Bell received $353,743 in total compensation from the Company.  This included $100,000 in fees earned or cash paid, $250,007 in stock awards, and $3,736 in other compensation. For the fiscal year ended September 29, 2018, Bell received $362,665 in total compensation from the Company.  This included $100,000 in fees earned or cash paid, $249,961 in stock awards, and $12,704 in other compensation.

24.     Defendant Albert A. Gore, Jr. ("Gore") is an Apple director since March 2003.  He is a member of the Company's Compensation Committee and the Nominating and Corporate Governance (the "NCG") Committee.  For the fiscal year ended September 27, 2014, Gore received $316,481 in total compensation from the Company.  This included $62,500 in fees earned or cash paid, $249,964 in stock awards, and $4,017 in other compensation.  For the fiscal year ended September 26, 2015, Gore received $353,035 in total compensation from the Company.  This included

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

$100,000 in fees earned or cash paid, $250,016 in stock awards, and $3,019 in other compensation. For the fiscal year ended September 24, 2016, Gore received $352,492 in total compensation from the Company.  This included $100,000 in fees earned or cash paid, $250,028 in stock awards, and $2,464 in other compensation.  For the fiscal year ended September 30, 2017, Gore received $357,211 in total compensation from the Company.  This included $100,000 in fees earned or cash paid, $250,007 in stock awards, and $7,204 in other compensation.  For the fiscal year ended September 29, 2018, Gore received $358,543 in total compensation from the Company.  This included $100,000 in fees earned or cash paid, $249,961 in stock awards, and $8,582 in other compensation.

25.    Defendant Robert A. Iger ("Iger") is an Apple director since November 2011.  He is the Chair of the Company's NCG Committee and a member of its Compensation Committee.  For the fiscal year ended September 27, 2014, Iger received $317,757 in total compensation from the Company.  This included $66,250 in fees earned or cash paid, $249,964 in stock awards, and $1,543 in other compensation.  For the fiscal year ended September 26, 2015, Iger received $373,859 in total compensation from the Company.  This included $115,000 in fees earned or cash paid, $250,016 in stock awards, and $8,843 in other compensation.  For the fiscal year ended September 24, 2016, Iger received $377,289 in total compensation from the Company.  This included $125,000 in fees earned or cash paid, $250,028 in stock awards, and $2,261 in other compensation.  For the fiscal year ended September 30, 2017, Iger received $382,884 in total compensation from the Company.  This included $125,000 in fees earned or cash paid, $250,007 in stock awards, and $7,877 in other compensation.  For the fiscal year ended September 29, 2018, Iger received $377,881 in total compensation from the Company.  This included $125,000 in fees earned or cash paid, $249,961 in stock awards, and $2,920 in other compensation.

26.    Defendant Andrea Jung ("Jung") is an Apple director since January 2008, having served as Lead Director from December 2009 until 2011.  She is the Chair of the Company's Compensation Committee and a member of the NCG Committee.  For the fiscal year ended

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

September 27, 2014, Jung received $334,156 in total compensation from the Company.  This included $82,500 in fees earned or cash paid, $249,964 in stock awards, and $1,692 in other compensation.  For the fiscal year ended September 26, 2015, Jung received $375,322 in total compensation from the Company.  This included $120,000 in fees earned or cash paid, $250,016 in stock awards, and $5,306 in other compensation.  For the fiscal year ended September 24, 2016, Jung received $382,191 in total compensation from the Company.  This included $130,000 in fees earned or cash paid, $250,028 in stock awards, and $2,163 in other compensation.  For the fiscal year ended September 30, 2017, Jung received $383,774 in total compensation from the Company.  This included $130,000 in fees earned or cash paid, $250,007 in stock awards, and $3,767 in other compensation.  For the fiscal year ended September 29, 2018, Jung received $403,106 in total compensation from the Company.  This included $130,000 in fees earned or cash paid, $249,961 in stock awards, and $23,145 in other compensation.

27.     Defendant Ronald D. Sugar ("Sugar") is an Apple director since November 2010.  He is the Chair of the Company's Audit Committee.  For the fiscal year ended September 27, 2014, Sugar received $342,940 in total compensation from the Company.  This included $87,500 in fees earned or cash paid, $249,964 in stock awards, and $5,476 in other compensation.  For the fiscal year ended September 26, 2015, Sugar received $379,661 in total compensation from the Company.  This included $125,000 in fees earned or cash paid, $250,016 in stock awards, and $4,645 in other compensation.  For the fiscal year ended September 24, 2016, Sugar received $390,522 in total compensation from the Company.  This included $135,000 in fees earned or cash paid, $250,028 in stock awards, and $5,494 in other compensation.  For the fiscal year ended September 30, 2017, Sugar received $397,426 in total compensation from the Company.  This included $135,000 in fees earned or cash paid, $250,007 in stock awards, and $12,419 in other compensation.  For the fiscal year ended September 29, 2018, Sugar received $409,461 in total compensation from the Company.  This included $135,000 in fees earned or cash paid, $249,961 in stock awards, and $24,500 in other compensation.

9

28.     Defendant Susan L. Wagner ("Wagner") is an Apple director since July 2014.  She is a member of the Company's Audit and Finance Committee.  For the fiscal year ended September 27, 2014, Wagner received $186,366 in total compensation from the Company.  This included $25,000 in fees earned or cash paid, $156,897 in stock awards, and $4,469 in other compensation.  For the fiscal year ended September 26, 2015, Wagner received $351,499 in total compensation from the Company.  This included $100,000 in fees earned or cash paid, $250,016 in stock awards, and $1,483 in other compensation.  For the fiscal year ended September 24, 2016, Wagner received $351,675 in total compensation from the Company.  This included $100,000 in fees earned or cash paid, $250,028 in stock awards, and $1,647 in other compensation.  For the fiscal year ended September 30, 2017, Wagner received $352,185 in total compensation from the Company.  This included $100,000 in fees earned or cash paid, $250,007 in stock awards, and $2,178 in other compensation.  For the fiscal year ended September 29, 2018, Wagner received $353,181 in total compensation from the Company.  This included $100,000 in fees earned or cash paid, $249,961 in stock awards, and $3,220 in other compensation.

29.     Defendant Luca Maestri ("Maestri") is Apple's SVP and Chief Financial Officer ("CFO") since May 2014.  He was previously the Company's Vice President ("VP"), Finance and Controller from February 2013 until May 2014.  For the fiscal year ended September 27, 2014, Maestri received $14,002,801 in total compensation from the Company.  This included $717,211 in salary, $11,335,043 in stock awards, $1,608,255 in non-equity incentive plan compensation, and $342,292 in all other compensation.  For the fiscal year ended September 26, 2015, Maestri received $25,337,977 in total compensation from the Company.   This included $1,000,000 in salary, $20,000,105 in stock awards, $4,000,000 in non-equity incentive plan compensation, and $337,872 in all other compensation.   For the fiscal year ended September 24, 2016, Maestri received $22,803,569 in total compensation from the Company.   This included $1,000,0000 in salary, $20,000,083 in stock awards, $1,790,000 in non-equity incentive plan compensation, and $13,486 in

all other compensation.  For the fiscal year ended September 30, 2017, Maestri received $24,141,615 in total compensation from the Company.  This included $1,019,231 in salary, $20,000,113 in stock awards, $3,109,000 in non-equity incentive plan compensation, and $13,271 in all other compensation.  For the fiscal year ended September 29, 2018, Maestri received $26,509,692 in total compensation from the Company.  This included $1,000,000 in salary, $21,491,888 in stock awards, $4,000,000 in non-equity incentive plan compensation, and $17,804 in all other compensation.

30.     Defendant Craig Federighi ("Federighi") is Apple's SVP, Software Engineering since August 2012.  He was previously the Company's VP, Mac Software Engineering from 2009 until August 2012; and Director of Engineering upon joining the Company in 1997 until February 1999.

31.     The Defendants referenced in ¶¶ 21-30 are collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

32.     By reason of the Individual Defendants' positions as directors and/or officers of Apple, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owe Apple and its shareholders fiduciary obligations of good faith, loyalty, and due care, and are required to use their utmost ability to control and manage Apple in a fair, just, honest and equitable manner.

33.     The Individual Defendants, consistent with their duties, were and are required to act in furtherance of the best interests of Apple and its shareholders — not in furtherance of their personal interest or benefit.

34.     Each Individual Defendant owes to Apple and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, in the use and preservation of its property and assets, and to uphold the highest obligations of good faith, loyalty, due care, and fair dealing.  Additionally, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's management and

operations so that the market price of the Company's stock would accurately reflect the Company's true financial condition, business prospects and value.

35.      To discharge their duties, the Individual Defendants were and are required to exercise reasonable and prudent supervision over the management, policies, practices and internal controls of the Company.

36.      The conduct of the Individual Defendants complained of herein involves a violation of their fiduciary duties, the absence of good faith on their part, and a disregard of their duties to the Company that Defendants were aware or should have been aware posed a risk of serious injury to the Company.

37.      The Individual Defendants breached their fiduciary duties by, among other things, failing to implement appropriate and effective internal controls, allowing and/or authorizing the dissemination of false and misleading information and failing to take action to recover the damages caused to the Company, permitting the Company to be mismanaged, and failing to investigate and take action with regard to red flags of misconduct when such investigation and timely action could have prevented, or at least minimized, the damage caused to the Company and its shareholders.

38.      By reason of their positions of control and authority as executive officers and/or directors of Apple, the Individual Defendants were able to and did, directly and indirectly, control the matters and transactions complained of herein. The Individual Defendants have and have had the duty to exercise reasonable control and supervision over the officers, employees, agents, business and operations of Apple; to be and remain informed as to how Apple was operating and, upon receiving notice or information of an imprudent, questionable or unsound decision, condition, or practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts; and to conduct the affairs of Apple in the best interests of the Company for the benefit of its shareholders.

## A. The Business Conduct Policy

39. According to Apple's Business Conduct Policy (the "Conduct Policy"), the Individual Defendants have a responsibility to conduct themselves with the highest levels of integrity in everything they do. Specifically, the Individual Defendants must "[d]emonstrate honesty and high ethical standards in all business dealings."

40. The Conduct Policy charges the Individual Defendants with meeting the Company's legal, financial, and management obligations. This includes the duty to "ensure that all records and reports, including timecards, customer information, technical and product information, correspondence, and public communications, are full, fair, accurate, timely, and understandable."

41. According to the Conduct Policy, the Individual Defendants must not "engage in any pricing or other practices that could defraud a supplier or others." The Conduct Policy also charges the Individual Defendants with the responsibility to "comply with applicable laws and regulations and operate in ways that benefit the communities in which we conduct business."

## B. The Corporate Governance Guidelines

42. The Individual Defendants are responsible for overseeing management performance on behalf of Apple shareholders, to ensure that the long-term interests of shareholders are being served, monitor adherence to Company standards and policies, promote responsible corporate citizenship, and perform the duties and responsibilities assigned to them by California law.

43. The Individual Defendants must abide by the duties imposed by the Corporate Governance Guidelines, which include:

- Spending the time and attention necessary to discharge their duties properly;

- Reviewing and assessing the CEO's performance annually to ensure he is providing effective leadership of the Company;

- Acting ethically and adhering to the Corporation's Conduct Policy; and

- Communicating with shareholders.

44. The Corporate Governance Guidelines also addresses director responsibilities, including the duty to:

> [E]xercise their business judgment to act in what they reasonably believe to be the best interests of the Corporation and its shareholders. In fulfilling that responsibility, directors reasonably may rely on the honesty and integrity of the Corporation's senior management and expert legal, accounting, financial and other advisors.

## C. The Audit and Finance Committee Charter

45. Apple's Audit and Finance Committee is appointed to assist the Board in fulfilling its responsibilities to oversee, among other things:

- Apple's financial statements and other financial information provided by the Company to its shareholders and others;

- Apple's systems of internal controls, including the Internal Audit function; and

- Compliance with legal, regulatory and public disclosure requirements.

46. Further, the Audit and Finance Committee Charter imposes the following, among other, responsibilities on its members:

- Review the external audit of Apple's financial statements and recommend that the audited financial statements be included in the Company's Annual Report on Form 10-K;

- Review financial statements to be included in the Company's Annual Report, such as risk factors, and the adequacy of such disclosures;

- Review with management the Company's interim financial statements, prior to filing, to be included in Forms 10-K and 10-Q;

- In consultation with management, the internal auditors and the auditors, review the Company's guidelines and policies with respect to risk assessment, risk management and internal financial and disclosure controls;

- Review with management and the auditors, as appropriate, earnings releases, as well as the type of financial information to be made public with such disclosures;
- Review at least annually internal quality control procedures described by the independent auditor, as well as all material issues raised by its most recent review;

- Review legal, regulatory, and financial risks with management;

- Review, with appropriate members of senior management, the Company's disclosure controls and procedures, including management's conclusions about the

14

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

effectiveness thereof and any material non-compliance therewith, and any audit steps adopted in light of any such non-compliance; and

- Maintain high standards of responsibility and ethics.

### D. The Nominating and Corporate Governance Committee Charter

47. The NCG Committee is required by its Charter to identify and evaluate all potential Director candidates and recommend nominees for election to the Board; develop and recommend Corporate Governance Guidelines applicable to Apple; lead the Board in an annual performance review of the Board and its Committees; recommend Director nominees for Committees; review the Company's policies and programs relating to the Conduct Code; as well as any other such matters related to Apple's responsibilities as a corporate citizen.

48. The Charter also charges the NCG Committee with the following, among other, responsibilities:

- The compensation and benefits of non-employee directors;
- The qualifications of Board Committee members;
- The performance of the Board at least annually;
- Apple's Corporate Governance Guidelines and any proposed changes;
- The Company's Conduct Policy; and
- Consider matters of corporate governance and periodically review the Corporation's corporate governance policies and recommend to the Board modifications to the policies as appropriate.

49. The events that have transpired, as alleged herein, demonstrate that the Individual Defendants breached their fiduciary duties of loyalty and good faith in failing, *inter alia*, to identify, maintain, and manage key areas of the Conduct Policy, to wit: the obligation to deal fairly and ethically with customers, ensure compliance with the law by maintaining internal controls, and issuing financial and other public statements that represent a true picture of the Company's financial condition, business prospects, growth, and sales.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

50.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

51.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) secretly slow the performance of consumers' iPhones without their knowledge or consent; (ii) conceal material information relating to Apple's business, operations, and prospects that rendered statements in Apple's SEC filings and public announcements false and misleading; (iii) enhance the Individual Defendants' executive and directorial positions at Apple and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

52.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and indemnification and contribution; and to conceal adverse information concerning the Company's operations,

53.     Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

54.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the

16

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### A.   The iPhone And The iOS Operating System Are Known By The Individual Defendants To Be Apple's Core Operations

55.     Apple first released the iPhone in 2007.  Since that time, the iPhone has become Apple's highest-revenue generating product, accounting for nearly two-thirds of the Company's net sales in 2017 and 2018.  As such, the sale of iPhones, as well as customer satisfaction regarding the iPhone, is highly material to the Company and part of its "core operations."

56.     Apple created and developed a mobile operating system ("iOS") that presently powers many of the Company's mobile devices, including the iPhone, and iPad.  As such, the function of iOS and the continual improvement thereof is known by the Individual Defendants to be material to the Company's financial condition and business prospects.  Apple "pushes" software updates directly to consumers' Apple devices.  Apple users cannot practically avoid downloading an iOS software update.  Indeed, in the Annual Report on Form 10-K filed by Apple with the SEC on November 3, 2017 (the "2017 10-K"), it is expressly admitted that: "The Company's financial condition and operating results depend substantially on the Company's ability to continually improve iOS and iOS devices in order to maintain their functional and design advantages."  In the 2017 10-K it is further admitted that:

> **To remain competitive and stimulate customer demand, the Company must successfully manage frequent product introductions and transitions.**
>
> Due to the highly volatile and competitive nature of the industries in which the Company competes, the Company must continually introduce new products, services and technologies, enhance existing products and services, effectively stimulate customer demand for new and upgraded products and successfully manage the transition to these new and upgraded products. The success of new product introductions depends on a number of factors including, but not limited to, timely and successful product development, market acceptance, the Company's ability to manage

the risks associated with new product production ramp-up issues, the availability of application software for new products, the effective management of purchase commitments and inventory levels in line with anticipated product demand, the availability of products in appropriate quantities and at expected costs to meet anticipated demand and the risk that new products may have quality or other defects or deficiencies in the early stages of introduction. Accordingly, the Company cannot determine in advance the ultimate effect of new product introductions and transitions.

57.     In the 2017 10-K, the Individual Defendants recognized the material risk to Apple that "quality problems" can "result in decreased sales and operating margin and harm to the Company's reputation":

> **The Company's products and services may experience quality problems from time to time that can result in decreased sales and operating margin and harm to the Company's reputation.**
>
>     The Company sells complex hardware and software products and services that can contain design and manufacturing defects. Sophisticated operating system software and applications, such as those sold by the Company, often contain "bugs" that can unexpectedly interfere with the software's intended operation. The Company's online services may from time to time experience outages, service slowdowns or errors. Defects may also occur in components and products the Company purchases from third parties. There can be no assurance the Company will be able to detect and fix all defects in the hardware, software and services it sells. Failure to do so could result in lost revenue, significant warranty and other expenses and harm to the Company's reputation.

58.     The Company's Annual Report on Form 10-K filed with the SEC on November 5, 2018 (the "2018 10-K") also discusses the materially negative effect that defects with Apple products may have on the Company's financial condition and business prospects:

> **The Company's products and services may be affected from time to time by design and manufacturing defects that could materially adversely affect the Company's business and result in harm to the Company's reputation.**
>
>     The Company offers complex hardware and software products and services that can be affected by design and manufacturing defects. Sophisticated operating system software and applications, such as those offered by the Company, often have issues that can unexpectedly interfere with the intended operation of hardware or software products. Defects may also exist in components and products the Company purchases from third parties. Component defects could make the Company's products unsafe and create a risk of environmental or property damage and personal injury. These risks may increase as the Company's products are introduced into specialized applications, including healthcare. In addition, the Company's service offerings may have quality issues and from time to time experience outages, service slowdowns or

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

errors. As a result, the Company's services may not perform as anticipated and may not meet customer expectations. There can be no assurance the Company will be able to detect and fix all issues and defects in the hardware, software and services it offers. Failure to do so could result in widespread technical and performance issues affecting the Company's products and services.  In addition, the Company may be exposed to product liability claims, recalls, product replacements or modifications, write-offs of inventory, property, plant and equipment, and/or intangible assets, and significant warranty and other expenses, including litigation costs and regulatory fines. Quality problems could also adversely affect the experience for users of the Company's products and services, and result in harm to the Company's reputation, loss of competitive advantage, poor market acceptance, reduced demand for products and services, delay in new product and services introductions and lost revenue.

59.     The Company also notes in the 2018 10-K that it faces substantial competition and, in order to stay ahead of that competition, it must develop "new innovative products":

The Company's services also face substantial competition, including from companies that have significant resources and experience and have established service offerings with large customer bases. The Company competes with business models that provide content to users for free. The Company also competes with illegitimate means to obtain third-party digital content and applications.

The Company's future financial condition and operating results depend on the Company's ability to continue to develop and offer new innovative products and services in each of the markets in which it competes. The Company believes it offers superior innovation and integration of the entire solution including the hardware (iOS devices, Mac, Apple Watch and Apple TV), software (iOS, macOS, watchOS and tvOS), online services and distribution of digital content and applications (Digital Content and Services).

### 1.     The iPhone Battery

60.     The iPhone and iPad are powered by a lithium-ion battery.  The batteries used by Apple are not replaceable by the user.  Replacing these batteries requires special skills and tools. Replacement batters are not sold directly to consumers.  Rather, the consumer must buy a new battery and have it installed by an Apple representative.

61.     Lithium-ion batteries degrade over time.  As such, there are limits to how often they can be recharged.

## B.    iOS Users Experience Shutdowns And Other Problems

62.    In the Fall of 2016, a rising number of incidences involving unexpected shutdowns of iPhones running versions of iOS 10 software were reported.  These shutdowns were reported to have occurred despite the fact that the iPhones' battery indicator showed that the battery was 30% or more charged.

63.    Apple was aware of these issues, and diagnostic information it obtained confirmed that the shutdown problem was the foreseeable consequence of a serious design defect in the Company's iPhones.  The problem stemmed from the fact that the ever-increasing speed and power of the iPhone processing units required more power from the phone's battery.

64.    Since lithium-ion batteries degrade over time, older batteries have a reduced ability to produce peak power output.  The fix typically employed for such a problem is to design batteries that are more powerful than initially needed.  Thus, when the battery degrades, it still can meet the power demands of the processor.

65.    Apple's iPhone battery, however, was not designed to continue to supply the processor with sufficient power as the battery aged.

66.    Apple could have simply admitted this defect at the time and supplied sufficient batteries to consumers.  Instead, the Company continued to conceal the defect and attempted to secretly fix the problem.  On January 23, 2017, Apple released iOS 10.2.1, claiming that it was one of the many routine software updates for iOS.

67.    The push notification to iPhone users for the iOS 10.2.1 update represented that the purpose of the update was "bug fixes and improves the security of your iPhone or iPad."  In February 2017, Apple added that "[w]ith iOS 10.2.1, Apple made improvements to reduce occurrences of unexpected shutdowns that a small number of users were experiencing with their iPhone."

68.    What Apple failed to disclose to its users was that the purported "fix" for the reported shutdowns employed in iOS 10.2.1 was not a fix at all.  Rather, the update slowed down the processors

20

in Apple devices so that the degraded battery could continue to power them.  Since the processor would now run more slowly, it would require less power from the battery.  As the battery continued to degrade, as all lithium-ion batteries do, the processing speed would continue to slow up.  This "throttling" effect was not disclosed and users did not consent to its use on their devices.

69.     On December 2, 2017, Apple announced the release of iOS 11.2.0, also disclosing little about the update other than that it "introduces Apple Pay Cash [and] includes bug fixes." Through these updates, Apple intentionally and drastically slowed down the performance of older model iPhones.  While the updates prevented the sudden shutdowns, they exchanged one problem for another—all without disclosure to those affected.  Although iPhone users no longer faced sudden shutdowns, they were left with phones that were drastically slower than they were before the update. Replacing their batteries would have solved the issue, but instead iPhone users were, by virtue of the drastic slowdown of the processors, deceived into believing that their iPhones were obsolete and needed replacement.

## C.     Independent Investigations Reveal The iPhone Slowdown

70.     On December 9, 2017, a Reddit user under the name "TeckFire" posted the results of an investigation performed showing that the replacement of the old battery on his iPhone 6 with a new battery resulted in a 50% increase of the processor's speed, which should not be the case.

71.     On December 18, 2017, John Poole, a software engineer at Primate Labs, published a report, based on an analysis of 100,000 iPhones, that the performance slowdowns experienced by iPhone users was caused by Apple's iOS 10.2.1 and iOS 11.2 updates and not by the degradation of the lithium-ion batteries.  The analysis found that Apple was deliberately slowing the performance of certain iPhones without users' knowledge or consent, and these slowdowns were not device-related, but battery-related.

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

**D.    Apple's December 20 Admission Regarding The Slowdown**

72.    On December 20, 2017, Apple tacitly admitted that the iOS 10.2.1 and iOS 11.2 software updates intentionally slowed down older iPhones (the "December 20 Statement") on which the updates were downloaded:

> Our goal is to deliver the best experience for customers, which includes overall performance and prolonging the life of their devices. Lithium-ion batteries become less capable of supplying peak current demands when in cold conditions, have a low battery charge or as they age over time, which can result in the device unexpectedly shutting down to protect its electronic components.
>
> Last year we released a feature for iPhone 6, iPhone 6s and iPhone SE to smooth out the instantaneous peaks only when needed to prevent the device from unexpectedly shutting down during these conditions.  We've now extended that feature to iPhone 7 with iOS 11.2, and plan to add support for other products in the future.

73.    On December 28, 2017, Apple offered consumers discounted replacement batteries for their iPhones, which would allow older iPhones to operate at peak performance for another two years.

74.    On January 18, 2018, during an interview with ABC News, defendant Cook conceded his, as well as other Apple executives', knowledge of and responsibility for the slowing down of users' iPhones.  Specifically, in response to a question from an ABC News reporter inquiring whether Cook thought "Apple fumbled on teaching its customers about what was going on with their phones," Defendant Cook stated:

> About a year ago, we released some code that essentially what it does is, all batteries age over time, and they become unhealthy at a point in time.  And an unhealthy battery has a probability that it will create an unexpected restart. When we did put it out, we did say what it was, but I don't think a lot of people were paying attention, maybe we should have been clearer, as well.  And so we deeply apologize for anybody that thinks we had some other kind of motivation.

**E.    Consumers Bring Class Action Lawsuits Against Apple
          That Were Sustained Upon Apple's Motions to Dismiss**

75.    In the wake of the December 20 Statement, angry consumers filed class action lawsuits against Apple.  Numerous of these class action lawsuits have been consolidated under the caption *In re: Apple Inc. Device Performance Litigation*, No. 5:18-md- 02827-EJD (N.D. Cal.) (the "Consumer

Class Action"), which seeks damages on behalf of those consumers (including punitive damages), and an injunction, as well as restitution.

76.     On October 1, 2018, Judge Edward J. Davila granted, in part, and denied, in part, Apple's motion to dismiss several claims in the Consumer Class Action's amended consolidated complaint.  Specifically, the Court ruled that the following claims survived the motion to dismiss: (i) the federal Computer Fraud and Abuse Act ("CFAA") claim; (ii) the California Computer Data Access and Fraud Act claim ("CDAFA"); (iii) the trespass to chattels claim under California common law; and (iv) the California Unfair Competition Law ("UCL") claim.[1]  The Court found the plaintiffs "adequately pled that Apple [intentionally] caused damage to their iPhones without permission."  The allegations that the iOS updates slowed down iPhone processors were found by the Court to "readily fit" the definition of damages, and that "even though [p]laintiffs voluntarily installed the iOS updates, they never gave permission for Apple to cause damage to their iPhones."  For similar reasons, the court also rejected Apple's motion to dismiss the CDAFA claim, the California state analogue to the federal CFAA[2] codified in the California Penal Code.  As to the trespass to chattels claim, the court found the plaintiffs sufficiently alleged that Apple "intentionally and without authorization interfered with plaintiffs possession of their iPhones … [through] iOS updates … designed to slow their iPhones' processing speed."  The court further found the plaintiffs alleged an injury by pleading "that the iOS updates impaired the functioning of their iPhones by substantially slowing their processing speed (by as much as 50%)."[3]

---

[1] Apple's motion to dismiss was limited to the complaint's first six claims, including the California statutory claims, the trespass to chattels claim, and the federal CFAA claim.

[2] Apple's motion to dismiss the CFAA claim was denied by the Court to the extent that the claim is based on 18 U.S.C. §1030(a)(5)(A), which places liability on anyone who "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer."

[3] Apple also moved to dismiss the Consumer Class Action plaintiffs' second amended complaint. On May 3, 2019, the Court granted, in part, and denied, in part, Apple's motion to dismiss. Certain fraud and contract based claims were dismissed, but the Court again denied Apple's motion as to the CFAA, CDAFA, UCL, and trespass to chattels claims.

23

77. There is also a California state court consolidated class action pending in the Superior Court of the State of California for the County of San Francisco, captioned *Apple OS Cases*, JCCP No. 4976, asserting substantially similar claims under California law and based on facts nearly identical to the Consumer Class Action.

78. On June 20, 2019, Judge Anne-Christine Massullo overruled Apple's demurrer to the plaintiffs' UCL and trespass to chattels claims in the OS Cases, granting the plaintiffs leave to amend certain claims that were sustained upon Apple's motion to demurrer.

## F. Regulators and Government Authorities Investigate Apple's Misconduct

79. Apple has been subjected to governmental investigations and federal regulatory proceedings due to its misconduct with regard to the iOS updates. As reported by *Bloomberg* on January 30, 2018 and subsequently confirmed by Apple, both the United States Department of Justice ("DOJ") and the SEC are investigating Apple's disclosures concerning the software updates.

80. Such scrutiny has extended internationally to other countries where Apple does business. Foreign governments have similarly commenced or are in the process of regulatory proceedings and investigations concerning Apple's conduct, including Canada, Israel, Italy, China, South Korea, France, Brazil, and Spain.

81. On January 10, 2018, the United States Senate Committee on Commerce, Science and Transportation launched an investigation of Apple and the throttling scheme.

82. On October 24, 2018, Italian regulators ordered Apple to pay 5 million euros, the maximum fine, finding that the Company had "implemented dishonest commercial practices" and that the iOS updates "caused serious malfunctions and significantly reduced performance, thus accelerating phones' substitution." Italy fined Apple an additional 5 million euros for failing to give customers clear information about essential characteristics of their batteries, including their average life expectancy and how to maintain or replace them.

### G. The Threat To Sales Growth in Greater China

83. Greater China is Apple's third largest market. Apple's continued sales growth in Greater China has been threatened on several fronts and those threats have become all the more pressing after revelation of the throttling scheme.

84. Apple's competition from Chinese companies offering comparable smartphones for a lower price than the iPhone's has increased. As a result, Apple's pricing power and smartphone market share in Greater China has been diminishing. Further, Apple's sales in Greater China are threatened by the trade war between China and the United States, such as the tariffs imposed by the Trump administration throughout 2018, despite the Individual Defendants' denials and attempts to minimize the perceived impact of the trade war. Finally, China reported its lowest economic growth in nearly three decades in 2018. These three threats, in addition to the strength of the United States dollar, made the iPhone too expensive for many consumers in China who might have otherwise upgraded. As a result, Apple's sales growth stagnated in its most important emerging market.

### H. The Individual Defendants' Materially False And Misleading Statements

85. On August 1, 2017, Apple filed with the SEC a Current Report on Form 8-K disclosing its financial results for the third quarter 2017, ended July 1, 2017. Attached to the 8-K was a press release announcing that its third quarter 2017 earnings and revenue were above analyst estimates and provided revenue guidance for its fourth quarter of $49 to $52 billion. On an analyst conference call regarding the financial results, Defendant Cook highlighted demand for the iPhone 7, as well as the upgrade rates:

> iPhone results were impressive, with especially strong demand at the high end of our lineup. iPhone 7 was our most popular iPhone, and sales of iPhone 7 Plus were up dramatically compared to 6s Plus in the June quarter of last year. The combined iPhone 7 and 7 Plus family was up strong double digits year over year. One decade after the initial iPhone launch, we have now surpassed 1.2 billion cumulative iPhones sold.
>
> * * *
>
> It's interesting to note that upgraders through both for the quarter and actually for the full fiscal year to date was our highest ever. And so that we felt very good about.

* * *

From an absolute quantity point of view, the upgrades for this fiscal year are the highest that we've seen. And so we feel good about that. However, if you look at it from an upgrade rate point of view instead of the absolute number, the rate is similar to what we saw with the previous iPhones, except for iPhone 6, which as we called out in the past had an abnormally high upgrade rate.

* * *

I think the upgrade rate is a function of many, many different things, from the size of the installed base, the age of the installed base, the product that is new at the time, the regional distribution, the upgrade plans that are in various markets around the world.

86.      On the call, Defendant Maestri also highlighted iPhone demand and sales growth:

During the quarter we sold 41 million iPhones and reduced iPhone channel inventory by 3.3 million units, leaving us with our lowest level of channel inventory in 2.5 years and well within our five-week to seven-week target inventory range. iPhone sales were up year-over-year in most markets we track, with many markets in Asia, Latin America, and the Middle East growing unit sales by more than 25%. We are very pleased with these iPhone results, especially considering the tough comparison to the June quarter last year when we launched iPhone SE.

iPhone ASP[4] was $606, up from $595 a year ago, thanks to strong demand for iPhone 7 Plus, which represented a higher percentage of the iPhone mix compared to the Plus model a year ago. The impact of the stronger mix on ASP was partially offset by negative foreign exchange year over year and the reduction in channel inventory, which took place entirely at the high end of the portfolio.

Customer interest and satisfaction with iPhone are very strong with both consumers and business users. In the U.S., the latest data from 451 Research on consumers indicates a 95% customer satisfaction rating for iPhone 7 and 99% for iPhone 7 Plus. Among consumers planning to buy a smartphone, purchase intention for iPhone was nearly 3X the rate of our closest competitor. Among corporate smartphone buyers, iOS customer satisfaction was 94%. And of those planning to purchase smartphones in the September quarter, 78% plan to purchase an iPhone.

87.      On November 2, 2017, Apple filed with the SEC a Current Report on Form 8-K disclosing its financial results for the fourth quarter 2017, ended September 30, 2017.  Attached to the 8-K was a press release  which reported that the Company's earnings and revenue were above analyst estimates and that sequential iPhone unit sales had grown by 14 percent. The accompanying press release quoted Defendant Maestri touting the financial results: "Apple's year-over-year revenue growth rate accelerated for the fourth consecutive quarter and drove EPS growth of 24 percent in the

---

[4] "ASP" is an abbreviation for "average selling price."  A higher reported ASP would indicate a consumer trend toward buying higher priced products, *e.g.*, newer model iPhones.

26

September quarter." The Company also gave guidance for its first fiscal quarter of 2018 of revenues between $84 billion and $87 billion for the upcoming quarter.

88.    Apple held an analysts conference call regarding the financial results at which Defendant Cook stated, in part:

> As we closed the books on 2017, I have to say I couldn't be more excited about Apple's future. This was our biggest year ever in most parts of the world with all time record revenue in the United States, Western Europe, Japan, Korea, the Middle East, Africa, Central and Eastern Europe and Asia. We had particularly strong finish this year, generating our highest September quarter revenue ever as year-over-year growth accelerated for the fourth consecutive quarter. Revenue was $52.6 billion, above the high end of our guidance range, and up 12% over last year. We generated revenue growth across all of our product categories and showed all-time record results for our Services business.
>
> * * *
>
> Let me talk a little bit about Q4 in China to give you a little bit of color on the results. The – We increased market share for iPhone, Mac and iPad during the quarter. We hit all-time revenue records for Services and for Mac for the PRC during the quarter. We had very strong iPad revenue growth. We had double digit unit growth in iPhone and both the upgraders and Android switchers were both up on a year over year basis during the quarter. And so the results were broad based. They were pretty much across the board, as I indicated.

89.    On the analyst call, Defendant Maestri also commented on consumer demand for the iPhone and sales growth, stating:

> During the quarter, we sold 46.7 million iPhones, up 3% over last year. We were very pleased to see double digit iPhone growth in many emerging markets including mainland China, the Middle East, Central and Eastern Europe, India and Mexico. We gained share not only in those markets but also in Canada, Germany, France, Italy, Spain, Sweden and Singapore, based on the latest estimates from IDC.
>
> * * *
>
> Customer interest and satisfaction with iPhone are very strong with both consumers and business users. In the U.S., the latest data from 451 Research on consumers indicates a customer satisfaction rating of 97% or higher across all iPhone models. Among consumers planning to buy a smartphone in the next 90 days, purchase intention for iPhone was 69%, more than 5X the rate of the closest competitor with a loyalty rate for current iPhone owners of 95% compared to 53% for the next highest brand. For corporate smartphone buyers, iOS customer satisfaction was 95% and of those planning to purchase smartphones in the December quarter, 80% planned to purchase iPhone. That is the highest score for iPhone in the history of the survey.

90.    On November 3, 2017, the Individual Defendants caused to be filed with the SEC the 2017 10-K, in which the following was represented:

The Company's stock price has experienced substantial price volatility in the past and may continue to do so in the future. Additionally, the Company, the technology industry and the stock market as a whole have experienced extreme stock price and volume fluctuations that have affected stock prices in ways that may have been unrelated to these companies' operating performance. Price volatility over a given period may cause the average price at which the Company repurchases its own stock to exceed the stock's price at a given point in time. The Company believes its stock price should reflect expectations of future growth and profitability. The Company also believes its stock price should reflect expectations that its cash dividend will continue at current levels or grow and that its current share repurchase program will be fully consummated. Future dividends are subject to declaration by the Company's Board of Directors, and the Company's share repurchase program does not obligate it to acquire any specific number of shares. If the Company fails to meet expectations related to future growth, profitability, dividends, share repurchases or other market expectations, its stock price may decline significantly, which could have a material adverse impact on investor confidence and employee retention.

91.     On February 1, 2018, Apple filed with the SEC a Current Report on Form 8-K disclosing its financial results for the first quarter of 2018, ended December 30, 2017, the final reporting period before its battery replacement program would go into full effect. Attached to the 8-K was a press release touting the Company's record results, including sequential iPhone unit sales growth of 66 percent. The Defendants provided revenue guidance of $60 to $62 billion for the second quarter of 2018.

92.     In the press release, Defendant Cook highlighted the first quarter 2018 as the "biggest quarter in Apple's history" and claimed the results were "a testament to the popularity of our products and the loyalty and satisfaction of customers."

93.     The press release also quoted Defendant Maestri as touting the "all-time record profitability during the quarter." Maestri attributed the financial results to "great operational and business performance," making no mention of the throttling issue.

94.     An analyst conference call was held that day regarding the financial results. Analysts delved into the relatively flat guidance for the second quarter 2018, asking whether Apple's replacement battery program had extended iPhone upgrade cycles. Defendant Cook answered that active iPhone users was a more important metric to the Company than unit sales, touting the

"fantastic" reliability of the iPhone. Cook further stated that the Company did not consider "in any way, shape or form" the effect of the battery replacement program on "upgrade rates":

> **Analyst:** You commented on how your installed base over the last couple of years has grown 30%. And iPhone is clearly the largest component of that, and so iPhone install base is probably growing close to that number perhaps less, call it 20% through 25%. Yet, if we look at iPhone unit growth for fiscal '18 what's implied with your guidance fiscal '17 and fiscal '16, it's been relatively flat. So you have an installed base that's 20% plus higher, and a unit growth that's relatively flat, which would suggest that your upgrade rate is going down or your replacement cycle is elongating.
>
> And I'm wondering whether you agree with that and whether investors should be worried about that. And maybe if I could just add one other wrinkle to potentially get your response on is, given consumers' heightened awareness of their ability to replace batteries going forward as opposed to upgrades. Isn't that also something that investors should potentially be concerned about in terms of its impact on upgrade rate going forward?
>
> **Cook:** I think it's up to investors as to what things they would like to focus on, so I don't want to put myself in the position of that. The way that I look at this and I – the numbers you've quoted, I have a different view of them. But generally what we see with iPhone is the reliability of iPhone is fantastic. The second – or the previously owned market has expanded in units over the years. And you see in many cases, carriers and retailers having very vibrant programs around trading an iPhone in.
>
> And because iPhone has the largest residual rate on it, it acts as a buffer for the customer to buy a new one and it winds up with another customer somewhere else that is perfectly fine with having a previously owned iPhone. And so I view all of that to be incredibly positive. It's more people on iPhones the better. I would like to point out that the – every major product hit a high on the active installed base. And so that's iPad, it's Mac and those are huge numbers as well. And so as we've always said, there is a large part of the – or the vast majority of the services are kind of mapped to the install base instead of the quarterly sales. And there's – this quarter is no different on that.
>
> Toni, we did not consider in any way, shape, or form, what it would do to upgrade rates. We did it because we thought it was the right thing to do for our customers. And I – sitting here today, I don't know what effect it will have. And again, it's not – was not in our thought process of deciding to do what we've done.

95.     On February 2, 2018, the Individual Defendants caused to be filed with the SEC the Company's Quarterly Report on Form 10-Q for its first quarter ended December 30, 2017 (the "Q1 2018 10-Q"). The Q1 2018 10-Q stated that Apple had repurchased 29,073,000 shares on the open market during the fourth quarter of 2017, at an average price of $154.78 per share, at a total cost of $4.5 billion. Additionally, the Q1 2018 10-Q stated that the Company had repurchased 30,181,000 shares on the open market during the first quarter of 2018, at an average price of $169.26 per share,

at a total cost of over $5.1 billion. The prices at which Apple repurchased its common stock were artificially inflated by the Individual Defendants' false and misleading statements and omissions and the Company and its stockholders were damaged thereby.

96.     On May 1, 2018, Apple filed with the SEC a Current Report on Form 8-K disclosing its financial results for the second quarter of 2018, ended March 31, 2018. Attached to the 8-K was a press release in which Defendant Cook lauded the Company's "best March quarter ever, with strong revenue growth in iPhone . . . ." Apple reported that sequential iPhone sales growth was down 32 percent, but gave guidance of between $51.5 billion and $53.5 billion in revenues for the third quarter 2018.

97.     An analyst conference call was held regarding the second quarter 2018 financial results. On the call, Defendant Maestri highlighted the demand for iPhones and sales growth:

> iPhone revenue grew 14% year-over-year, with iPhone ASP increasing to $728 from $655 a year ago, driven primarily by the performance of iPhone X, iPhone 8 and iPhone 8 Plus.

> During the quarter we sold 52.2 million iPhones, up 3% over last year, and we grew iPhone units by double digits in several markets including Japan, Canada, Switzerland, Turkey, Central and Eastern Europe, Mexico and Vietnam. Our performance from a customer demand standpoint was even stronger than our reported results, as we reduced iPhone channel inventory by 1.8 million units, 600,000 units more than the March quarter reduction last year. We exited the March quarter within our target range of five to seven weeks of iPhone channel inventory.

> Our customers are extremely happy with their iPhones. The latest survey of U.S. consumers from 451 Research indicates that across all iPhone models, the customer satisfaction rating was 95%, and combining iPhone 8, 8 Plus and iPhone X, customer satisfaction was even higher, at 99%. And among business buyers who plan to purchase smartphones in the June quarter, 78% plan to purchase iPhones.

98.     On the call, Defendant Cook responded to an analyst question regarding whether the Company had taken steps "to preempt any risk of tariffs going forward," Defendant Cook represented that he was "very optimistic," since he was "a big believer that the 2 countries together can both win and grow the pie, not just allocate it differently."

99.     The Company's press release attached to its May 1, 2018 8-K announced the Board's new program to repurchase up to $100 billion of the Company's common stock. During the

Company's Second Quarter 2018 Earnings Call held that same day, UBS analyst Steven Milunovich asked Defendant Maestri for the Company's time frame for executing its $100 billion stock repurchase program, which Maestri had said would be conducted at a "fast pace." Maestri responded that between dividends and buybacks, "our view is that we see a lot of value in the stock. We believe the stock is undervalued and so we have a bias towards the buyback."

> So the dividend is a very large component of capital return because we're going to be returning more than $13 billion a year to investors through dividends but we believe that given where we are with the valuation of the stock, we think that we continue to do the buyback primarily.
>
> We are not giving an end date to the program this time because the amount is very, very large and so we will try to execute it. As you've seen from our track record during the last five years, we will do it at a very fast pace but we also want to do it efficiently. We want to make sure that we buy back the stock at the right time. And so with that in mind, we have done $23.5 billion of repurchases during the March quarter. We will give you an update on our activities at the end of every quarter and then 12 months from now we will actually talk about an update to the entire program. So you will be able to keep track of our progress every 90 days.

100.    On May 3, 2018, the Individual Defendants caused to be filed with the SEC the Company's Quarterly Report on Form 10-Q for its second quarter, ended March 31, 2018 (the "Q2 2018 10-Q"). The Q2 2018-10-Q stated that during the second quarter of 2018, Apple had repurchased 137,040,000 shares of its common stock on the open market at an average price per share of $171.48, at a total cost of $23.5 billion. The prices at which Apple repurchased its common stock were artificially inflated by the Individual Defendants' false and misleading statements and omissions and the Company and its stockholders were damaged thereby.

101.    On July 31, 2018, Apple filed with the SEC a Current Report on Form 8-K disclosing its financial results for the third quarter of 2018, ended June 30, 2018. Attached to the 8-K was a press release in which Defendant Cook commented on the Company's results, representing that they were "driven by continued strong sales of iPhone, Services, and Wearables . . . ." Apple reported that sequential iPhone sales were down by 21 percent, but gave guidance of $60 to $62 in revenues for the fourth quarter 2018.

102.     An analyst conference call was held regarding the third quarter 2018 financial results. In response to analyst questions as to whether Apple's replacement battery program was materially impacting iPhone upgrade cycles, Defendant Cook assured investors that there was no need for concern since the smartphone market was enormous and healthy.  In fact, Cook represented that Apple saw no need to investigate the battery replacement program's effect on sales:

> **Analyst:** Okay…. Tim, I was wondering if you could just comment a little bit about the health of the smartphone market. Apple's smartphone iPhone units have been relatively flat for 4 years and I think you've probably been a share gainer during the period, which would suggest at least at the high end of the market, that it's perhaps flat-to-down. And I'm wondering if you can comment on, whether you believe that and what you think might be happening with replacement cycles, and specifically, also what impact, if any, you've seen from wider availability and less expensive replacement batteries for iPhones.
>
> **Cook:** I think the smartphone market is very healthy. I think it's actually the best market in the world to be in for someone that is in the business that we're in. So it's an enormous-sized market and whether it grows—from our point of view, whether it grows 1% or 2% or 5% or 6% or 10% or shrinks 1% or 2%, it's a great market because it's just huge. And so that's kind of the way that I view that.
>
> * * *
>
> In terms of batteries, we have never done an analysis internally about how many people decided to get a lower-priced battery than buy another phone because it was never about that for us. It was always about doing something great for the user and I think if you treat the users and the customers well, then you have a good business over time and so that's how we look at that.

103.     Finally, analysts questioned Defendant Cook "as to what [he was] seeing in China and how [he was] thinking about it as [he] look[ed] forward."  In his response, Defendant Cook discussed the ongoing tariffs imposed on China by the U.S. during 2018. Specifically, he stated that "none of [Apple's] products were directly affected by the tariffs."

104.     On August 1, 2018, the Individual Defendants caused to be filed with the SEC the Company's Quarterly Report on Form 10-Q for its third quarter of 2018, ended June 30, 2018 (the "Q3 2018 10-Q").  The Q3 2018-10-Q stated that: (i) from April 1, 2018 to May 5, 2018, Apple had repurchased 67,707,000 shares of its common stock at an average price of $170.46 per share; (ii) from May 6, 2018 to June 2, 2018, Apple had repurchased 22,026,000 shares of its common stock at an average price of $187.56 per share; and (iii) Apple had repurchased 23,045,000 shares of its common

32

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

stock from June 3, 2018 to June 30, 2018 at an average price of $187.78 per share. The total cost for these stock repurchases was $20 billion. The prices at which Apple repurchased its common stock were artificially inflated by the Individual Defendants' false and misleading statements and omissions and the Company and its stockholders were damaged thereby.

105. On November 1, 2018, Apple filed with the SEC a Current Report on Form 8-K disclosing its financial results for the fourth quarter of 2018, ended September 29, 2018. Attached to the 8-K was a press release in which Defendant Cook emphasized that "[o]ver the past two months, [Apple had] delivered huge advancements for [its] customers through new versions of iPhone, Apple Watch, iPad and Mac as well as [its] four operating systems, and [that it was] enter[ing] the holiday season with [its] strongest lineup of products and services ever." The Company gave guidance of $89 billion to $93 billion in revenue for the first quarter 2019, which included the holiday season.

106. The Company held a conference call with analysts regarding the fourth quarter 2018 financial results. On the call, Defendant Maestri emphasized again that Apple had "the strongest lineup ever as [it] enter[ed] the holiday season," justifying "a new all-time record" of "expect[ed] revenue [of] between $89 billion and $93 billion." Maestri attributed the disappointing revenue guidance to a number of factors which were accurately "reflect[ed]" in that revenue range: (1) reversed launch timing of its new top-end iPhone model, *i.e.*, releasing the top-end iPhone XS in the fourth fiscal quarter 2018, and the more affordable iPhone XR in the first fiscal quarter 2019; (2) the impact of foreign exchange due to the strength of the U.S. dollar; (3) supply and demand uncertainty related to the ramp up of new products; and (4) macroeconomic uncertainty in the Company's emerging markets.

107. Defendant Maestri, however, emphasized that Apple's strong product lineup for the holiday season purportedly provided a strong basis for the "record" revenue guidance issued:

> [A]t the revenue level, we started from the fact that we are very, very excited about the lineup of products and services that we have getting into the holiday season. It's

the strongest lineup that we've ever had. And our guidance range, by the way, represents a new all-time quarterly revenue record . . . .

108. On the call, in response to analyst questions regarding the strength of demand for the iPhone XS and XS Max, the most expensive iPhones to-date, and questions as to whether Defendants had seen purchasers hold off on XS or XS Max purchases pending the rollout of the cheaper iPhone XR in October 2018, Defendant Cook responded that demand for the iPhone XS and XS Max was strong:

> The XS and XS Max got off to a really great start, and we've only been selling for a few weeks. The XR, we've only got out there for, I guess, 5–5 days or so at this point and so that it's—we have very, very little data there. Usually, there is some amount of wait until a product shows—another product shows up in look, but in— that—in looking at the data, on the sales data for XS and XS Max, there's not obvious evidence of that in the data as I see it.

109. When questioned about any "macroeconomic uncertainty" in "emerging markets," Defendant Cook maintained that those concerns did not include Apple's sales growth in China, which was strong:

> To give you a perspective in – at some detail, our business at India in Q4 was flat. Obviously, we would like to see that be a huge growth. Brazil was down somewhat compared to the previous year. And so I think – or at least the way that I see these is each one of the emerging markets has a bit of a different story. And I don't see it as some sort of issue that is common between those for the most part. In relation to China specifically, I would not put China in that category. Our business in China was very strong last quarter. We grew 16%, which we're very happy with. iPhone, in particular, was very strong double-digit growth there. Our other products category was also stronger, in fact, a bit stronger than even the . . . overall company number.

110. On the call, Defendant Maestri announced that Apple would no longer report unit sales moving forward:[5]

> [S]tarting with the December quarter, we will no longer be providing unit sales data for iPhone, iPad and Mac. As we have stated many times, our objective is to make great products and services that enrich people's lives and to provide an unparalleled customer experience so that our users are highly satisfied, loyal and engaged. As we accomplish these objectives, strong financial results follow. As demonstrated by our financial performance in recent years, the number of units sold in any 90-day period is not necessarily representative of the underlying strength of our business. Furthermore, our unit of sale is less relevant for us today than it was in the past given

---

[5] Unit sales represent total sales earned on a per unit basis, *e.g.*, specific iPhone models. Therefore, unit sales are an important metric used in determining ASP over a period of time to analyze sales performance.

34

the breadth of our portfolio and the wider sales price dispersion within any given product line

111.    Defendants rejected analyst suggestions that the reason for withholding iPhone unit data was because "iPhone units are going to start going negative . . . [and] it's easier to talk about great things and not show the details of things that aren't going so great." Instead, Defendants Maestri and Cook each insisted that the revenue and profit margin guidance was all that investors should focus on, insisting that demand for the Company's more expensive iPhone offerings was strong:

**Maestri:** Given the rationale on why we do not believe that providing unit sales is particularly relevant for our company at this point, I can reassure you that it is our objective to grow unit sales for every product category that we have. But as I said earlier, a unit of sale is less relevant today than it was in the past. To give you an example, the unit sales of iPhone at the top end of the line have been very strong during the September quarter. And that's very important because we are attracting customers to the most recent technologies and features and innovation that we bring into the lineup, but you don't necessarily see that in the number that is reported. And so therefore, we will – as I said, we'll provide the qualitative commentary when it is important and relevant, but at the end of the day, we make our decisions to – from a financial standpoint, to try and optimize our revenue and our gross margin dollars. And that, we think, is the focus that is in the best interest of our investors.

**Cook**: Jim, let me just add a couple things to that for color. Our installed base is growing at double digit, and so there's no – and that's probably a much more significant metric for us from an ecosystem point of view and customer loyalty, et cetera. The second thing is this is a little bit like if you go to the market and you push your cart up to the cashier and she says or he says, "How many units you have in there?," it sort of – it doesn't matter a lot how many units there are in there in terms of the overall value of what's in the cart.

112.    In an interview with *Reuters* that same day, Defendant Cook reiterated the four factors that led Defendants to issue the light revenue guidance for the first fiscal quarter 2019 discussed above. Defendant Cook stressed to *Reuters*, however, that the Company was happy with its performance in China.

113.    On November 5, 2018, the Individual Defendants caused to be filed with the SEC the Company's Annual Report on Form 10-K for its fiscal year ended September 29, 2018 (the "2018 10-K"). The 2018 10-K stated that from July 1, 2018 to August 4, 2018, Apple had repurchased 26,859,000 shares of its common stock for an average price of $192.50 per share; from August 5,

2018 to September 1, 2018, Apple repurchased 36,575,000 shares of its common stock for an average price of $214.07 per share; and Apple repurchased 29,029,000 shares of its common stock from September 2, 2018 to September 29, 2018, for an average price of $222.07 per share. The total amount Apple paid for these stock repurchases was over $8.2 billion. The prices at which Apple repurchased its common stock were artificially inflated by the Individual Defendants' false and misleading statements and omissions and the Company and its stockholders were damaged thereby.

## I. The Truth Is Revealed

114. On January 2, 2019 after the close of trading, Apple disclosed the truth regarding its declining iPhone sales. For the first time in 15 years, Apple slashed its prior quarterly revenue forecast for the already complete first fiscal quarter 2019, ended December 29, 2018. In a "Letter from Tim Cook to Apple Investors," Apple disclosed that first fiscal quarter 2019 revenues were only $84 billion, substantially under-performing the previous revenue guidance of $89 billion to $93 billion provided only eight weeks earlier. Discussing why Apple had experienced what was characterized as "fewer iPhone upgrades than [it] had anticipated," the Letter blamed the discounted battery replacement program, as well as sales in China, stating in pertinent part as follows:

**Emerging Market Challenges**

While we anticipated some challenges in key emerging markets, we did not foresee the magnitude of the economic deceleration, particularly in Greater China. In fact, most of our revenue shortfall to our guidance, and over 100 percent of our year-over-year worldwide revenue decline, occurred in Greater China across iPhone, Mac and iPad.

China's economy began to slow in the second half of 2018. The government-reported GDP growth during the September quarter was the second lowest in the last 25 years. We believe the economic environment in China has been further impacted by rising trade tensions with the United States. As the climate of mounting uncertainty weighed on financial markets, the effects appeared to reach consumers as well, with traffic to our retail stores and our channel partners in China declining as the quarter progressed. And market data has shown that the contraction in Greater China's smartphone market has been particularly sharp.

\* \* \*

**iPhone**

Lower than anticipated iPhone revenue, primarily in Greater China, accounts for all of our revenue shortfall to our guidance and for much more than our entire year-over-year revenue decline. In fact, categories outside of iPhone (Services, Mac, iPad, Wearables/Home/Accessories) combined to grow almost 19 percent year-over-year.

36

While Greater China and other emerging markets accounted for the vast majority of the year-over-year iPhone revenue decline, in some developed markets, iPhone upgrades also were not as strong as we thought they would be. While macroeconomic challenges in some markets were a key contributor to this trend, we believe there are other factors broadly impacting our iPhone performance, including consumers adapting to a world with fewer carrier subsidies, US dollar strength-related price increases, and some customers taking advantage of significantly reduced pricing for iPhone battery replacements.

115.    On January 2, 2019, Defendant Cook appeared on CNBC and elaborated upon the Letter's reference to "rising trade tensions":

[A]s we look at what's going on in China – it's clear that the economy begins to slow there for the second half. And what I believe to be the case is the trade tensions between the United States and China put additional pressure on their economy. And so we saw, as the quarter went on, things like traffic in our retail stores, traffic in our channel partner's stores, the reports of the smartphone industry contracting, particularly bad in November—I haven't seen the December number yet, but I would guess that would[n't] be good either.  And so that's what we've seen.

* * *

[M]y sense is the much larger issue is the slowing of the economy and then this – the trade tension that's further pressured.

116.    Defendant Cook also emphasized the negative impact the battery replacement program had had on the pace of phone replacements during the first quarter of 2019:

[S]ort of in addition to those two things, we've started a program worldwide where we dramatically lowered the battery replacement price. And so we have sort of a collection of items going on, some that are macroeconomic and some that are Apple specific . . . .

117.    On this news, on January 3, 2019, Apple stock fell by more than $15 per share, or more than 9 percent, closing at $142.19 per share on unusually high volume of more than 91.1 million shares traded, the highest one-day trading volume experienced by the Company in nearly two years.

118.    On January 3, 2019, *Yahoo Finance* published an article, entitled "Apple's mind-blowing warning means CEO Tim Cook now has a major credibility problem," which reported that "Apple CEO Tim Cook and his management team should read the coverage of their mind-blowing warning to every investor on the planet on Apple News and then ask: 'Should investors trust us right now? And, how can we regain that trust.'"  The article went on to discuss how Apple investors had been misled:

They failed to keep it real with investors on what they were seeing in iPhone demand data late in 2018.  Simply no longer providing unit sales data wasn't enough of a signal to investors that something was wrong, bottom line.

As a result, Apple's stock could be "broken" until credibility is restored. "Apple's stock is now at a crossroads. Some investors will consider the stock broken and never reward it with a 'proper' multiple, but we've followed the company long enough to know there is cyclicality in the market's relationship with Apple," cautions long-time Apple analyst Gene Munster of Loup Ventures.

**A poor job done with guidance**

Apple said in a filing released after market close Wednesday that it now sees first quarter revenue of about $84 billion. It previously anticipated $89 billion to $91 billion. In the filing, Cook attributed the reduced guidance to weakness in emerging markets and in Greater China as well as supply constraints on new products. Cook also hinted strongly that Apple felt resistance from consumers to the new $1,000 plus iPhone XS line.

119. *ZDNet*'s Adrian Kingsley-Hughes surmised in a January 4, 2019 report, entitled "This is why Apple doesn't want you fixing your smartphone," that "[a]midst all the finger-pointing associated [with] the sudden and unexpected profits warning from Apple was a revelation about how much the company relies on premature obsolescence to drive sales."

120. The *ZDNet* article noted: "First, and perhaps most significant is this – How many iPhones does Apple sell to people simply because the battery in their existing iPhone is worn? Over the years there's been a great deal of chatter around the subject of 'planned obsolescence,' and here we have Apple essentially confirming that this is indeed part of the business model." The article concluded: "At this point, it's worth pointing out that if indeed the battery replacement program was a significant factor in the profits warning, Apple only has itself to blame for throttling iPhones in the first place."

121. On January 29, 2019, Apple held a conference call with analysts and investors to discuss the Company's fiscal first quarter 2019 results ended December 29, 2018. On the call, Defendant Cook again attributed the drop off in iPhone sales, in part, to the Company's battery replacement program, stating in pertinent part:

Now our customers are holding on to their older iPhones a bit longer than in the past. When you pair this with the macroeconomic factors, particularly in emerging markets, it resulted in iPhone revenue that was down 15% from last year. Our iPhone results accounted for significantly more than our entire year-over-year revenue decline. In fact, outside of iPhone, our business grew strongly by 19%.

* * *

Third, our battery replacement program. For millions of customers, we made it inexpensive and efficient to replace the battery and hold onto their existing iPhones a bit longer. Some people have suggested that we shouldn't have done this because of

the potential impact on upgrades, but we strongly believe it was the right thing to do for our customers.

122. After Apple revealed the truth regarding the iPhone sales slowdown, the effect of the battery replacement program, and the slowdown in revenues from China, securities class action lawsuits began to be filed against the Company, as well as Defendants Cook and Maestri. The securities class actions have been consolidated under the caption *In re Apple Inc. Securities Litigation*, 4:19-cv-02033-YGR (N.D. Cal.), and bring claims for relief under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

123. Plaintiffs bring this action derivatively in the right and for the benefit of Apple to redress injuries suffered, and to be suffered, by Apple and its stockholders as a direct result of the breaches of fiduciary duties by the Individual Defendants. Apple is named as a nominal defendant solely in a derivative capacity.

124. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

125. Plaintiffs will adequately and fairly represent the interests of Apple in enforcing and prosecuting its rights.

126. Plaintiffs have not made a demand upon the Apple Board of Directors to institute this action because such a demand would be a futile, wasteful and useless act.

127. The Apple Board consists of eight (8) directors. A majority of the Board is neither disinterested nor independent and faces a substantial likelihood of liability for breaches of fiduciary duty for their participation or acquiescence in the wrongs alleged herein and/or failures to comply with their fiduciary duties and the Company's Conduct Policy. Therefore, demand would be futile as to each of the Individual Defendants.

128.    The Individual Defendants face a substantial likelihood of liability for their individual misconduct.  The Individual Defendants were required to ensure that the Company implemented and maintained an effective system of internal controls so that the Company's SEC filings, financial statements, press releases, and other public statements and presentations on behalf of the Company were accurate and complete.

129.    Apple has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein.  The Individual Defendants have not attempted to recover the damages the Company has suffered or will suffer thereby.  Further, the Individual Defendants have failed to terminate the parties responsible for the wrongdoing alleged herein and permitted them to continue in their positions.

130.    The Individual Defendants reviewed, authorized, and/or caused the publication of materially false and misleading statements and failed to make certain that adequate controls and procedures were in place.  Defendants Cook, Levinson, Gore, Jung, Bell, Sugar, Iger, and Wagner breached their fiduciary duties of loyalty by making improper statements in the Company's press releases, SEC filings, and during earnings calls concerning Apple's sales growth, iPhone demand, and future financial prospects.

131.    These Individual Defendants, if demand was made of them, would have to evaluate whether to sue themselves and/or their fellow directors in evaluating the wrongdoing alleged and the request to bring an action for their breaches of fiduciary duties.  This is not something they would or could do.  Therefore, demand upon them would be futile.

132.    In addition, Defendants Gore, Iger, and Jung failed to fulfill their responsibilities as members of the Board's NCG Committee. The NCG Committee was charged with monitoring compliance with Apple's Conduct Policy, which requires the Individual Defendants to "[e]nsure that all records and reports, including timecards, customer information, technical and product information, correspondence, and public communications, are full, fair, accurate, timely, and understandable."

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

The NCG Committee Defendants utterly failed to fulfill this responsibility, as demonstrated by Apple's deceptive and unlawful practice of intentionally throttling consumers' devices without their knowledge or consent. Accordingly, because Defendants Gore, Iger, and Jung face a substantial likelihood of liability, any demand upon them is futile.

133. Defendants Levinson, Bell, Sugar, and Wagner are members of the Audit and Finance Committee. As such, they will take no action against one another or other members of the Board or the other Defendants because each member of the Audit and Finance Committee breached important specific duties as Audit and Finance Committee members. Pursuant to the Company's Audit and Finance Committee Charter, the Audit and Finance Committee is responsible for reviewing the adequacy, completeness, and veracity of the Company's disclosures. Thus, the Audit and Finance Committee Defendants breached their fiduciary duties in allowing and/or permitting the making of the false and misleading statements pled herein. Further, the Audit and Finance Committee Charter provides that it is responsible for reviewing and discussing with management significant business risks facing the Company, including business, legal, and reputational risks. The "throttling" of users' iPhones through iOS updates, and related misconduct posed a material risk to the Company's reputation, financial condition and business prospects. In violation of their fiduciary duties, however, the Audit and Finance Committee members allowed and/or permitted the materialization of this material risk to the Company. Accordingly, the Audit and Finance Committee members face a substantial likelihood of liability for their breach of fiduciary duties, rendering any demand upon them futile.

134. Further, the Individual Defendants are neither disinterested nor independent because Apple, Cook and Maestri are named as defendants in the securities class action lawsuits. The Individual Defendants will not bring claims against those responsible for the misconduct described herein since such an action could affect Apple's defense in those lawsuits.

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

135. Defendant Cook is an employee of Apple, derives substantial income from Apple, and is not independent. Further, Cook is a Defendant in the securities class action and is neither disinterested nor independent regarding the matters at issue herein. As such, Demand upon him would be futile.

136. Publicly traded companies, such as Apple, typically carry director and officer liability insurance from which Apple could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" exclusion that would foreclose a recovery therefrom in the event that Apple sues to recover its damages from the Individual Defendants.

137. Plaintiffs did not make a demand upon Apple's stockholders to commence this action. In light of the following facts, making such a demand would be futile and/or impracticable:

(a) According to the Quarterly Report on Form 10-Q filed by Apple with the SEC on July 31, 2019, the Company has 4,519,180,000 shares of common stock issued and outstanding and, as such, has thousands of stockholders;

(b) Plaintiffs do not know the names, addresses, and/or phone numbers of Apple stockholders and do not have the means to collect that information; and

(c) The cost of making a demand on all Apple shareholders would be prohibitive and, in any event, is impracticable.

## COUNT I

### Breach of Fiduciary Duty
### (Derivatively Against the Individual Defendants)

138. Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

139. The Individual Defendants owed and owe fiduciary duties to Apple and its shareholders. By reason of their fiduciary duties, the Individual Defendants owed and owe Apple and its shareholders the highest obligation of good faith, due care and loyalty in the administration of

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

the affairs of the Company, including, without limitation, disseminating truthful, full, and accurate information regarding, among other things, the throttling of older iPhones through iOS updates, including that the throttling boosted iPhone sales, but reduced future sales when the truth emerged; that the Company's battery replacement program was reducing iPhone sales by causing customers to hold onto their older iPhones for a longer than they ordinarily would have; and the U.S.-China trade war was having a negative effect on the Company's sales.

140. Apple now faces material liability for the Individual Defendants' misconduct.

141. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary duties, Apple has sustained, and will continue to sustain, significant damages – both financially and to its reputation and goodwill.

142. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company for the damages resulting directly and proximately from these breaches of fiduciary duty.

## COUNT II

### Waste of Corporate Assets
### (Derivatively Against the Individual Defendants)

143. Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

144. The Individual Defendants breached their fiduciary duties and, thereby, caused Apple to waste its assets, expend millions of dollars of corporate funds, and impair its reputation and credibility for no legitimate business purpose, as a result of which the Company has been and continues to be substantially damaged.

145. As a direct and proximate result of these breaches of their fiduciary duties, Apple has sustained and will continue to sustain significant damages, as alleged herein. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

## COUNT III

### Aiding and Abetting
### (Derivatively Against the Individual Defendants)

146.    Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

147.    Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, disregard to the fact that the other Individual Defendants are in breach of their fiduciary duties to Apple and have participated in such breaches of fiduciary duties.

148.    In committing the wrongful acts alleged herein, each of the Individual Defendants has pursued, or joined in the pursuit of, a common course of conduct.  They have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their duties.

149.    Because the actions described herein occurred with the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

150.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

## COUNT IV

### Gross Mismanagement
### (Derivatively Against the Individual Defendants)

151.    Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

152.     The Individual Defendants had a duty to Apple and its shareholders to prudently supervise, manage and control the operations, business and internal controls of Apple.

153.     The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Apple in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith, due care, loyalty, diligence and candor in the management and administration of Apple's affairs and in the use and preservation of Company assets.

154.     During the course of the discharge of their duties, the Individual Defendants knew or disregarded the unreasonable risks and losses associated with their misconduct.  As a result, the Individual Defendants grossly mismanaged the Company.

**COUNT V**

**Waste of Corporate Assets**
**(Derivatively Against the Individual Defendants)**

155.     Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

156.     The Individual Defendants breached their fiduciary duties and, thereby, caused Apple to waste its assets, expend corporate funds, and impair its reputation and credibility for no legitimate business purpose, as a result of which the Company has been and continues to be substantially damaged.

157.     The Individual Defendants, among other things, have caused the Company to repurchase shares at prices artificially inflated by their false and misleading statements and omissions.

158.     As a direct and proximate result of this waste of corporate assets, Apple has sustained and will continue to sustain significant damages, as alleged herein.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

## COUNT VI

### Unjust Enrichment
### (Derivatively Against the Individual Defendants)

159.   Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

160.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Apple.

161.   An inequity exists due to the Individual Defendants' unjust enrichment at Apple's expense and to its detriment.

162.   Plaintiffs seek restitution from these Individual Defendants and seeks an Order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

## COUNT VII

### Violations of Section 10(b) of the Exchange Act
### (Derivatively Against the Individual Defendants)

163.   Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

164.   The Individual Defendants disseminated and/or approved false and/or misleading statements about Apple, which they knew, or recklessly disregarded, were false or misleading and/or omitted material information and were intended to deceive, manipulate, or defraud.  Those false or misleading statements and the Individual Defendants' course of conduct were designed to, and did, artificially-inflate the price of the Company's common stock.

165.   At the same time that Apple's stock price was inflated due to the Individual Defendants' false or misleading statements, the Individual Defendants caused the Company to

repurchase millions of shares of common stock at artificially-inflated prices to the detriment of Apple and its stockholders.

166. The Individual Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Apple in connection with the Company's purchases of Apple stock.

167. The Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or the United States mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made various false or misleading statements of material facts and omitted material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Apple's stock.

168. The Individual Defendants were executives and/or the directors of the Company, and were, therefore, directly responsible, and are liable for all materially false and misleading statements and material omissions alleged above.

169. The misstatements and omissions of material facts set forth herein were either known to Individual Defendants or were so obvious that Individual Defendants should have been aware of them. The Individual Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

170. Individual Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of Apple's stock by the Company.

47

171.     As a result of Individual Defendants' misconduct, Apple has and will suffer damages in that it paid artificially inflated prices when purchasing Apple common stock and suffered losses when the previously undisclosed facts occurring during the relevant period were disclosed.  Apple would not have purchased these securities at the prices it paid, but for the artificial inflation in the Company's stock price caused by Individual Defendants' false or misleading statements.

172.     As a direct and proximate result of Individual Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of Apple stock.  By reason of such conduct, Individual Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

173.     Plaintiffs brought this claim within two years of discovery of the facts constituting the violation and within five years of the violation.

## COUNT VIII

### Violations of Section 20(A) of the Exchange Act
### (Derivatively Against the Individual Defendants)

174.     Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

175.     This Count is asserted on behalf of Apple against each of the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

176.     During their tenures as officers and/or directors of Apple, each of the Individual Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of Apple, the Individual Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  Each of the Individual Defendants was able to and did control, directly and indirectly, the content of the false and misleading public statements described herein, thereby causing

the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

177.    In their capacities as senior corporate officers of the Company, and as more fully described above, the Individual Defendants had direct involvement in the day-to-day operations of the Company, in reviewing and managing its financial, regulatory and legal compliance, internal control procedures, and its accounting and reporting functions.  As a result of the foregoing, the Individual Defendants, as a group and individually, were controlling persons of Apple within the meaning of Section 20(a) of the Exchange Act.

178.    As set forth above, the Individual Defendants violated Section 10(b) of the Exchange Act by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of Apple and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, to the Company.  Moreover, as detailed above, during the respective times the Individual Defendants served as officers and/or directors of Apple, each of these Defendants was culpable for their material misstatements and omissions, as set forth above.

179.    As a direct and proximate result of the Individual Defendants' conduct, Apple has suffered damages in connection with the wrongs alleged above.

180.    Plaintiffs on behalf of Apple have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

a.  Determining that this action is a proper derivative action maintainable under the law and that demand is excused;

b.  Finding that the Individual Defendants breached their fiduciary duties;

c.  Finding that all Individual Defendants were unjustly enriched;

d. Against all Individual Defendants in favor of the Company as a result of the Individual Defendants' breaches of fiduciary duty;

e. Against all Individual Defendants and in favor of the Company for extraordinary equitable and injunctive relief as permitted by law and/or equity;

f. Directing the Company to take all necessary actions to reform and improve its internal controls and Board oversight over its financial reporting and public disclosures;

g. Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorney's, consultant's and expert's fees; and

h. Granting such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: September 20, 2019

WEISSLAW LLP
JOEL E. ELKINS

/s/ *Joel E. Elkins*

Joel E. Elkins
9107 Wilshire Blvd., Suite 450
Beverly Hills, CA 90210
Telephone: 310/208-2800
Facsimile:  310/209-2348

WEISSLAW LLP
David C. Katz
Mark D. Smilow
Josh Rubin
1500 Broadway, 16th Floor
New York, NY  10036
Telephone:  212/682-3025
Facsimile:  212/682-3010

*Plaintiffs' Counsel*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

JS-CAND 44 (Rev. 07/19)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

ANDREW FINE, TAMMY FEDERMAN SEP/IRA, and THE ROSENFELD FAMILY FOUNDATION, Derivatively on Behalf of APPLE INC.,

**DEFENDANTS**

TIMOTHY D. COOK, LUCA MAESTRI, CRAIG FEDERIGHI, ARTHUR D. LEVINSON, ALBERT GORE, JR., ANDREA JUNG, JAMES A. BELL, RONALD D. SUGAR, ROBERT A. IGER, and SUSAN L. WAGNER, and APPLE INC., a California corporation, Nominal Defendant

**(b) County of Residence of First Listed Plaintiff**   Erie County, NY
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c) Attorneys** *(Firm Name, Address, and Telephone Number)*
Joel E. Elkins, WeissLaw LLP
9107 Wilshire Blvd., Suite 450 Beverly Hills, CA 90210
Telephone: 310/208-2800 Facsimile: 310/209-2348

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | **LABOR** | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 710 Fair Labor Standards Act | 830 Patent | 430 Banks and Banking |
| | 340 Marine | **PERSONAL PROPERTY** | 720 Labor/Management Relations | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 151 Medicare Act | 345 Marine Product Liability | 370 Other Fraud | 740 Railway Labor Act | 840 Trademark | 460 Deportation |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 350 Motor Vehicle | 371 Truth in Lending | 751 Family and Medical Leave Act | **SOCIAL SECURITY** | 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 790 Other Labor Litigation | 861 HIA (1395ff) | 480 Consumer Credit |
| | 360 Other Personal Injury | 385 Property Damage Product Liability | 791 Employee Retirement Income Security Act | 862 Black Lung (923) | 485 Telephone Consumer Protection Act |
| 160 Stockholders' Suits | 362 Personal Injury -Medical Malpractice | | | 863 DIWC/DIWW (405(g)) | 490 Cable/Sat TV |
| 190 Other Contract | | | **IMMIGRATION** | 864 SSID Title XVI | ☒ 850 Securities/Commodities/ Exchange |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 462 Naturalization Application | 865 RSI (405(g)) | 890 Other Statutory Actions |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | 465 Other Immigration Actions | **FEDERAL TAX SUITS** | 891 Agricultural Acts |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | 870 Taxes (U.S. Plaintiff or Defendant) | 893 Environmental Matters |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | 871 IRS–Third Party 26 USC § 7609 | 895 Freedom of Information Act |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | | 896 Arbitration |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 240 Torts to Land | 446 Amer. w/Disabilities–Other | **OTHER** | | | 950 Constitutionality of State Statutes |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | |
| 290 All Other Real Property | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation–Transfer   ☐ 8 Multidistrict Litigation–Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1331
Brief description of cause:
Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, and Indemnification and Contribution

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, Fed. R. Civ. P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S), IF ANY *(See instructions)*:

JUDGE  Hon. Edward J. Davila

DOCKET NUMBER  5:18-md-02827-EJD

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

*(Place an "X" in One Box Only)*   ☐ SAN FRANCISCO/OAKLAND   ☒ SAN JOSE   ☐ EUREKA-MCKINLEYVILLE

DATE  09/20/2019   SIGNATURE OF ATTORNEY OF RECORD   /s/ Joel E. Elkins

| Print | Save As... | Reset |
|---|---|---|

JS-CAND 44 (rev. 07/19)
Case 4:19-cv-02033-YGR Document 183-2 Filed 09/20/21 Page 54 of 57
Case 5:19-cv-05863 Document 1-1 Filed 12/08/19 Page 54 of 57

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-CAND 44

**Authority For Civil Cover Sheet.** The JS-CAND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I. a)   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   b)   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   c)   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

II.   **Jurisdiction.** The basis of jurisdiction is set forth under Federal Rule of Civil Procedure 8(a), which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

   (1)   <u>United States plaintiff</u>. Jurisdiction based on 28 USC §§ 1345 and 1348. Suits by agencies and officers of the United States are included here.

   (2)   <u>United States defendant</u>. When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

   (3)   <u>Federal question</u>. This refers to suits under 28 USC § 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

   (4)   <u>Diversity of citizenship</u>. This refers to suits under 28 USC § 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III.   **Residence (citizenship) of Principal Parties.** This section of the JS-CAND 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.   **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.   **Origin.** Place an "X" in one of the six boxes.

   (1)   <u>Original Proceedings</u>. Cases originating in the United States district courts.

   (2)   <u>Removed from State Court</u>. Proceedings initiated in state courts may be removed to the district courts under Title 28 USC § 1441. When the petition for removal is granted, check this box.

   (3)   <u>Remanded from Appellate Court</u>. Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

   (4)   <u>Reinstated or Reopened</u>. Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

   (5)   <u>Transferred from Another District</u>. For cases transferred under Title 28 USC § 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

   (6)   <u>Multidistrict Litigation Transfer</u>. Check this box when a multidistrict case is transferred into the district under authority of Title 28 USC § 1407. When this box is checked, do not check (5) above.

   (8)   <u>Multidistrict Litigation Direct File</u>. Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

   <u>Please note that there is no Origin Code 7</u>. Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI.   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** *Example:* U.S. Civil Statute: 47 USC § 553. Brief Description: Unauthorized reception of cable service.

VII.   **Requested in Complaint.**   <u>Class Action</u>. Place an "X" in this box if you are filing a class action under Federal Rule of Civil Procedure 23.

   <u>Demand</u>. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

   <u>Jury Demand</u>. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.   **Related Cases.** This section of the JS-CAND 44 is used to identify related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

IX.   **Divisional Assignment.** If the Nature of Suit is under Property Rights or Prisoner Petitions or the matter is a Securities Class Action, leave this section blank. For all other cases, identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated."

**Date and Attorney Signature.** Date and sign the civil cover sheet.

## VERIFICATION

I, Andrew Fine, hereby verify that I am a stockholder of Apple Inc. ("Apple" or the "Company"), was a stockholder at the time of the transactions complained of in the Verified Stockholder Derivative Complaint ("Complaint"), and has continuously held Apple stock at all times relevant therein. I am ready, willing, and able to pursue this stockholder derivative action on behalf of Apple. I have reviewed the allegations in the Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true. Having received a copy of the foregoing complaint, and having reviewed it with my counsel, I hereby authorize its filing.

*andrew Fine*
andrew Fine (Sep 19, 2019)

Sep 19, 2019

ANDREW FINE

## VERIFICATION

I, Tammy M. Federman, trustee of the Tammy Federman SEP/IRA, hereby verify that Tammy Federman SEP/IRA is a stockholder of Apple Inc. ("Apple" or the "Company"), was a stockholder at the time of the transactions complained of in the Verified Stockholder Derivative Complaint ("Complaint"), and has continuously held Apple stock at all times relevant therein. Tammy Federman SEP/IRA is ready, willing, and able to pursue this stockholder derivative action on behalf of Apple. On behalf of Tammy Federman SEP/IRA, I have reviewed the allegations in the Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true. Having received a copy of the foregoing complaint, and having reviewed it with my counsel, I hereby authorize its filing on behalf of Tammy Federman SEP/IRA.

*Tammy G. Federman*
Tammy G. Federman (Sep 18, 2019)

Sep 18, 2019

TAMMY M. FEDERMAN

## **VERIFICATION**

I, Barry Rosenfeld, trustee of the Rosenfeld Family Foundation (the "RFF"), hereby verify that the RFF is a stockholder of Apple Inc. ("Apple" or the "Company"), was a stockholder at the time of the transactions complained of in the Verified Stockholder Derivative Complaint ("Complaint"), and has continuously held Apple stock at all times relevant therein. The RFF is ready, willing, and able to pursue this stockholder derivative action on behalf of Apple. On behalf of the RFF, I have reviewed the allegations in the Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true. Having received a copy of the foregoing complaint, and having reviewed it with my counsel, I hereby authorize its filing on behalf of the RFF.

DATED: September 19, 2019

Barry Rosenfeld, as Trustee for the
Rosenfeld Family Foundation