1   MELINDA L. HAAG (SBN 132612)
    mhaag@orrick.com
2   JAMES N. KRAMER (SBN 154709)
    jkramer@orrick.com
3   ALEXANDER K. TALARIDES (SBN 268068)
    atalarides@orrick.com
4   ORRICK, HERRINGTON & SUTCLIFFE LLP
    The Orrick Building
5   405 Howard Street
    San Francisco, CA  94105-2669
6   Telephone:     (415) 773-5700
    Facsimile:     (415) 773-5759
7
    Attorneys for Defendants Apple Inc.,
8   Timothy Cook, and Luca Maestri

9

10                 UNITED STATES DISTRICT COURT

11                NORTHERN DISTRICT OF CALIFORNIA

12                      OAKLAND DIVISION

13

14                                          Civil Action No. 4:19-cv-02033-YGR
    IN RE APPLE INC. SECURITIES
15  LITIGATION                              **DEFENDANTS' MOTION TO DISMISS**

16                                          Date:      March 3, 2020
                                            Time:      2:00 p.m.
17                                          Judge:     Honorable Yvonne Gonzalez Rogers
                                            Ctrm:      1, 4th Floor
18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND RELIEF REQUESTED**

PLEASE TAKE NOTICE that on March 3, 2020, at 2:00 p.m., or at such later date and time as the Court may order, Defendants Apple Inc. ("Apple" or the "Company"), Timothy Cook, and Luca Maestri (the "Individual Defendants," and collectively with Apple, "Defendants"), will move the Court pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 (the "PSLRA"), for an order dismissing Lead Plaintiff's ("Plaintiff") Consolidated and Amended Class Action Complaint for Violation of the Federal Securities Laws (the "CAC").   Defendants' motion is based on this Notice of Motion; the Memorandum of Points and Authorities below; the accompanying Request for Judicial Notice and exhibits attached thereto; the accompanying Proposed Order; the Court's files; and oral argument of counsel at the hearing.

**STATEMENT OF ISSUES TO BE DECIDED**

1.      Whether Plaintiff's claim for violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) ("Section 10(b)"), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), should be dismissed because the CAC:

  a.   Constitutes impermissible puzzle pleading and fails to conform with the pleading requirements of Rule 8.

  b.   Fails to plead any actionably false or misleading statement, and thus fails to plead the element of "falsity."

  c.   Fails to plead particularized facts giving rise to a strong inference that Defendants made a false or misleading statement with a fraudulent state of mind, and thus fails to plead the element of "scienter."

  d.   With respect to certain categories of alleged misstatements and omissions, fails to plead facts showing that Apple's stock price declined because of the materialization of a previously concealed risk, and thus fails to plead the element of "loss causation."

2.      Whether Plaintiff's claim for violation of Section 20(a) of the Exchange Act, 15

U.S.C. § 78t(a) ("Section 20(a)"), should be dismissed because the CAC fails to plead a primary violation of Section 10(b).

/ / /

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II.    BACKGROUND .......................................................................................... 3

      A.    The Performance Management Feature and Battery Replacement Program ................................................................................................ 3

      B.    Apple's Uncontested Business Results Refute Plaintiff's Claims ............ 4

      C.    Apple Lowers Revenue Guidance for Q1 FY 2019 .................................... 6

III.    THE RIGOROUS PLEADING STANDARDS GOVERNING THIS MOTION ............. 6

IV.    ARGUMENT ............................................................................................... 8

      A.    As Plaintiff's Chart Confirms, The CAC Is Puzzle-Pled ........................... 8

      B.    The CAC Fails to Allege a False or Misleading Statement ...................... 9

            1.    Accurate Statements of Historical Results Regarding Q3 FY 2017 ........................................................................................... 9

            2.    Accurate Statements of Historical Results for the Remainder of the Class Period ...................................................................... 12

            3.    Forward-Looking Statements Protected by the PSLRA Safe Harbor ....................................................................................... 16

            4.    Generalized Statements of Corporate Optimism.......................... 19

            5.    Statements of Opinion and Belief ................................................ 21

            6.    Apple's Risk Warnings ................................................................ 22

            7.    The CAC's Remaining Misstatement Allegations Also Fail ........ 24

      C.    The CAC Does Not Allege Facts Supporting a "Strong Inference" of Scienter ................................................................................................ 28

            1.    The CAC's CW Allegations Do Not Support Any Inference of Scienter ................................................................................. 30

            2.    The Stock Sales Allegations Do Not Support An Inference Of Scienter ................................................................................. 34

            3.    Plaintiff's Remaining Scienter Allegations Are Unavailing ......... 36

            4.    The CAC's Allegations Do Not Give Rise to a Reasonable Inference of Scienter, Much Less One That Is Cogent and at Least as Compelling as the Alternative Innocent Explanation ................................................................................ 38

      D.    The CAC Fails to Plead Loss Causation .................................................. 39

      E.    The Section 20(a) Claim Fails For Lack Of A Predicate Primary Violation ................................................................................................ 40

V.    CONCLUSION ........................................................................................... 40

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*In re Accuray, Inc. Sec. Litig.*,
  757 F. Supp. 2d 936 (N.D. Cal. 2010) ...............................................................11, 31

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .....................................................................................................6

*Bao v. SolarCity Corp.*,
  2016 WL 54133 (N.D. Cal. Jan. 5, 2016) .................................................................31

*Bodri v. GoPro, Inc.*,
  252 F. Supp. 3d 912 (N.D. Cal. 2017) ......................................................................38

*Brodsky v. Yahoo! Inc.*,
  592 F. Supp. 2d 1192 (N.D. Cal. 2008) .......................................................................8

*Brody v. Transitional Hospitals Corp.*,
  280 F.3d 997 (9th Cir. 2002)...........................................................................9, 10, 15, 22

*Browning v. Amyris, Inc.*,
  2014 WL 1285175 (N.D. Cal. Mar. 24, 2014) ..........................................................30

*In re Caere Corp. Sec. Litig.*,
  837 F. Supp. 1054 (N.D. Cal. 1993) ...................................................................10, 26

*In re Cisco Sys., Inc. Sec. Litig.*,
  2013 WL 1402788 (N.D. Cal. Mar. 29, 2013)......................................................20, 38

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
  957 F. Supp. 2d 277 (S.D.N.Y. 2013).......................................................................20

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  2013 WL 6441843 (N.D. Cal. Dec. 9, 2013) ............................................................20

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017).....................................................................................22

*In re Convergent Techs. Sec. Litig.*,
  948 F.2d 507 (9th Cir. 1991)......................................................................................11

*In re Copper Mountain Sec. Litig.*,
  311 F. Supp. 2d 857 (N.D. Cal. 2004) ................................................................16, 21

*In re Cornerstone Propane Partners, L.P. Sec. Litig.*,
  355 F. Supp. 2d 1069 (N.D. Cal. 2005) ....................................................................19

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010)........................................................................16, 18, 19

*E. R.R. Presidents Conference v. Noerr Motion Freight, Inc.*,
365 U.S. 127 (1961) ..........................................................................................24

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) ............................................................................................7

*In re Finisar Corp. Sec. Litig.*,
2013 WL 211206 (N.D. Cal. Jan. 16, 2013) .....................................................13

*Goldstein v. Quantum Health Res., Inc.*,
1996 WL 813245 (C.D. Cal. Dec. 23, 1996) ....................................................14

*Greenberg v. Cooper Cos., Inc.*,
2013 WL 100206 (N.D. Cal. Jan. 7, 2013) .......................................................16

*In re Harmonic Inc. Sec. Litig.*,
163 F. Supp. 2d 1079 (N.D. Cal. 2001) ............................................................26

*In re IMPAX Labs., Inc. Sec. Litig.*,
2006 WL 6361942 (N.D. Cal. Mar. 1, 2006) ....................................................36

*In re Intel Corp. Sec. Litig.*,
2019 WL 1427660 (N.D. Cal. Mar. 29, 2019)..........................................20, 21, 24

*Kleinman v. Elan Corp., PLC*,
706 F.3d 145 (2d Cir. 2013)..............................................................................21

*Knox v. Yingli Green Energy Holding Co. Ltd.*,
2016 WL 6609210 (C.D. Cal. May 10, 2016) ...................................................21

*In re LeapFrog Enters., Inc. Sec. Litig.*,
527 F. Supp. 2d 1033 (N.D. Cal. 2007) ............................................................20

*Lipton v. Pathogenesis Corp.*,
284 F.3d 1027 (9th Cir. 2002)......................................................................36, 37

*Lu v. Align Tech., Inc.*,
2019 WL 5579520 (N.D. Cal. Oct. 29, 2019)...................................................32

*Maritime Asset Mgmt., LLC v. NeurogesX, Inc.*,
2013 WL 5442394 (N.D. Cal. Sept. 30, 2013) .............................................10, 37

*Mark Aero, Inc., v. Trans World Airlines, Inc.*,
580 F.2d 288 (8th Cir. 1978)............................................................................24

*McCasland v. FormFactor Inc.*,
2009 WL 2086168 (N.D. Cal. July 14, 2009)..............................................29, 31

*In re Mellanox Techs. Ltd. Sec. Litig.*,
   2014 WL 12650991 (N.D. Cal. Mar. 31, 2014) ............................................................19, 20

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ....................................................................7, 12, 35, 36

*Monachelli v. Hortonworks, Inc.*,
   225 F. Supp. 3d 1045 (N.D. Cal. 2016) ........................................................................10

*Monroe Cty. Employees' Ret. Sys. v. YPF Sociedad Anonima*,
   15 F. Supp. 3d 336 (S.D.N.Y. 2014) ............................................................................40

*Nathanson v. Polycom, Inc.*,
   87 F. Supp. 3d 966 (N.D. Cal. 2015) ...........................................................................32

*Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*,
   2018 WL 3126393 (N.D. Cal. June 26, 2018) ...............................................................31

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
   730 F.3d 1111 (9th Cir. 2013) ...............................................................................39, 40

*In re NVIDIA Corp. Sec. Litig.*,
   768 F.3d 1046 (9th Cir. 2014) ..................................................................................7, 34

*In re OmniVision Techs., Inc. Sec. Litig.*,
   937 F. Supp. 2d 1090 (N.D. Cal. 2013) ..........................................................................9

*Or. Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*,
   774 F.3d 598 (9th Cir. 2014) ......................................................................................28

*Osher v. JNI Corp.*,
   308 F. Supp. 2d 1168 ..................................................................................................36

*Paciga v. Invuity Inc.*,
   2018 WL 7286503 (N.D. Cal. Sept. 26, 2018) ..............................................................21

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ...............................................................................30, 32

*Primo v. Pac. Biosciences of Cal., Inc.*,
   940 F. Supp. 2d 1105 (N.D. Cal. 2013) ..........................................................................8

*In re Read-Rite Corp. Sec. Litig.*,
   335 F.3d 843 (9th Cir. 2003) ......................................................................................29

*In re Rigel Pharms., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) ........................................................................................7

*Rodriguez v. Gigamon, Inc.*,
   325 F. Supp. 3d 1041 (N.D. Cal. 2018) ........................................................................35

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001)........................................................................10, 23

*Shields v. Citytrust Bancorp, Inc.*,
  25 F.3d 1124 (2d Cir. 1994).................................................................................21

*In re Silicon Graphics, Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999)...........................................................7, 28, 35, 36

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
  160 F. Supp. 2d 1059 (N.D. Cal. 2001) .............................................................19

*In re Stac Elecs. Sec. Litig.*,
  89 F.3d 1399 (9th Cir. 1996)...........................................................................11, 12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ...........................................................................3, 7, 29, 38

*Tuosto v. Philip Morris USA Inc.*,
  2007 WL 2398507 (S.D.N.Y. Aug. 21, 2007) ..................................................24

*In re Ubiquiti Networks, Inc. Sec. Litig.*,
  33 F. Supp. 3d 1107 (N.D. Cal. 2014) ...............................................................20

*Veal v. LendingClub*,
  2019 WL 5698072 (N.D. Cal. Nov. 4, 2019)....................................................22

*In re VeriFone Sec. Litig.*,
  784 F. Supp. 1471 (N.D. Cal. 1992) .............................................................27, 28

*In re Violin Memory Sec. Litig.*,
  2014 WL 5525946 (N.D. Cal. Oct. 31, 2014) ...................................................22

*Webb v. SolarCity Corp.*,
  884 F.3d 844 (9th Cir. 2018)...............................................................................39

*Welgus v. TriNet Grp., Inc.*,
  2017 WL 6466264 (N.D. Cal. Dec. 18, 2017) ..................................................28

*Wenger v. Lumisys, Inc.*,
  2 F. Supp. 2d 1231 (N.D. Cal. 1998) ..................................................8, 9, 10, 11

*In re Worlds of Wonder Sec. Litig.*,
  35 F.3d 1407 (9th Cir. 1994)...............................................................................35

*Yourish v. Cal. Amplifier*,
  191 F.3d 983 (9th Cir. 1999)...........................................................................11, 12

*Zamir v. Bridgepoint Educ., Inc.*,
  2016 WL 3971400 (S.D. Cal. July 25, 2016) ....................................................35

MOTION TO DISMISS | C.A. No. 4:19-cv-02033-YGR

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009)........................................................................................ *passim*

**Statutes and Rules**

15 U.S.C.
    § 78j(b)................................................................................................................ *passim*
    § 78u–5(c)(1)(A)(i)...........................................................................................16
    § 78u–5(c)(1)(B)..........................................................................................16, 19
    § 78u–4(b)........................................................................................................ *passim*
    § 78u–4(b)(1)...............................................................................................7, 8
    § 78u–4(b)(2)................................................................................................7
    § 78u–5(c)(2)-(3).........................................................................................18
    § 78u-5(e)...................................................................................................17

17 C.F.R.
    § 240.10b5–1(c)..........................................................................................35

Fed. R. Civ. P.
    Rule 8 .................................................................................................2, 8, 9
    Rule 9(b) ..........................................................................................6, 7, 27
    Rule 12(b)(6)....................................................................................6

1     **MEMORANDUM OF POINTS AND AUTHORITIES**

2     **I.      INTRODUCTION AND SUMMARY OF ARGUMENT**

3            The CAC is a sprawling, 190-page riddle of confusing, contradictory, and often irrelevant

4     allegations, with a theory of fraud that is difficult to discern.  This Motion will unwind the CAC's

5     allegations and demonstrate why the CAC fails to state a claim under the PSLRA and should be

6     dismissed in its entirety.

7            The core theory of fraud asserted by the CAC is that during the putative class period of

8     August 2, 2017 through January 2, 2019 (the "Class Period"), Defendants intentionally

9     misrepresented Apple's allegedly declining iPhone sales and business in China in order to keep

10    the price of Apple's stock artificially inflated.  But the CAC does not claim that Defendants

11    misrepresented the number of iPhones sold or Apple's business results in China—indeed, the

12    CAC does not challenge Apple's historical business results at all.  Instead, the CAC argues that

13    the iPhone's sales, though accurately reported, were purportedly "artificially inflated" by battery

14    slowing, and that demand for new iPhones allegedly later declined as a result of Apple's

15    discounted battery replacement program.  According to Plaintiff, Defendants thus lacked a

16    "reasonable basis in fact" for their otherwise accurate historical statements of the Company's

17    business results and were required to disclose that Apple's "business metrics and financial

18    prospects were not as strong as [they] had led the market to believe."  CAC ¶ 13.  In other words,

19    the CAC does not allege that Defendants' statements were affirmatively false (because they

20    plainly were not), but rather that they were misleading because they omitted to disclose that

21    Apple's results were positive for allegedly "artificial" reasons.  *Id.*

22           That theory requires the CAC to take several flights of fancy.  As an initial matter, it

23    requires that the Court disregard the judicially noticeable fact that despite Plaintiff's insistence

24    that Apple's business faced headwinds during the Class Period, Apple's business—including its

25    iPhone revenues and revenues from greater China—actually improved year-over-year for every

26    quarter of the Class Period until the last quarter, Q1 of FY 2019, when the Company missed its

27    revenue guidance for the first time in years.  As Plaintiff would have it, despite the fact that

28    Apple's iPhone revenues increased year-over-year until Q1 FY 2019, Defendants should have

disclosed that Apple actually began experiencing "declining iPhone demand [sometime] in 2017" (CAC at 76), or "since at least the end of 2017" (*id.* ¶ 220), or maybe "starting in 2018" (*id.* ¶ 235), or perhaps after "early 2016" (*id.* ¶ 240), or sometime "in 2018" (*id.* ¶ 261). But again, the undisputed, judicially noticeable facts lay waste to Plaintiff's core theory of fraud. Likewise, while Apple's revenues in Greater China also grew year-over-year until Q1 FY 2019, Plaintiff alleges that beginning with the results for Q3 FY 2017, Defendants were required to disclose that revenue growth in China was "expected to continue to deteriorate long term." *Id.* ¶ 280. Not surprisingly, the CAC fails to plead any specific factual allegations to establish why Defendants would have been required to disclose those alleged untruths. Indeed, as discussed more fully below, the CAC should be dismissed for a series of independently dispositive reasons.

*First*, the CAC is an extreme example of puzzle pleading. Rather than allege the specific reason why any purported misstatement was false or misleading when made, the CAC offers long lists of block-quoted statements (*see, e.g.*, *id.* ¶¶ 269-76) together with laundry lists of reasons for why *all* of those statements are allegedly misleading (*id.* ¶¶ 280(a)-(d)). As the Court will see, the CAC contains hundreds of paragraphs of vague, redundant, and often irrelevant allegations, and thus does not conform with the presentation requirements of Rule 8.

*Second*, the CAC does not allege any actionable material misstatement or omission. It largely challenges *undisputedly accurate* statements of historical facts without offering any contemporaneous factual allegations demonstrating how those accurate statements affirmatively misled investors or were inconsistent with the purportedly undisclosed truth. The remaining challenged statements are legally inactionable statements of corporate optimism, statements of opinion, forward-looking statements protected by the PSLRA safe harbor, or statements whose alleged falsity is not supported in any way by facts alleged in the CAC.

*Third*, the CAC falls *far* short of pleading the requisite "strong inference" of scienter. Section 10(b) and the PSLRA require securities fraud complaints to allege specific facts creating a powerful inference that Defendants acted with, at a minimum, deliberate recklessness, but the CAC is devoid of *any* factual allegations regarding any Individual Defendant's state of mind. While the CAC relies on the purported statements of ten confidential witnesses (the "CWs") to

1  establish scienter, none of the CWs purport to have had any contact whatsoever with the

2  Individual Defendants, and thus they lack any personal knowledge regarding what the Individual

3  Defendants knew or did not know at the time the challenged statements were made.[1]

4  *Fourth*, any inference of scienter is overwhelmed by judicially noticeable facts that are

5  fundamentally inconsistent with fraudulent intent.  Most notably, Apple engaged in a massive

6  stock buyback program during the Class Period, spending *$88 billion* to purchase its own stock.

7  It would have made no sense to purchase that stock if Defendants knew that Apple's stock price

8  was artificially inflated due to fraud, as Plaintiff claims.  Further, Defendants did not wait until

9  the release of Apple's final financial results for Q1 FY 2019 to inform the market about the

10  Company's revenue guidance miss for that quarter, as they were permitted to do under SEC rules.

11  They instead chose to inform the market about the guidance miss almost a month earlier than

12  required in a "Letter from Tim Cook to Investors" dated January 2, 2019 (the "Cook Letter")—

13  hardly the actions of Defendants intent on deceiving investors.  Against this backdrop, the CAC

14  does not advance even a reasonable inference of scienter, much less the cogent and compelling

15  inference necessary under the PSLRA and *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S.

16  308 (2007).

17  **II.**     **BACKGROUND[2]**

18          **A.**     **The Performance Management Feature and Battery Replacement Program**

19          On January 23, 2017, in response to customer reports in late 2016 of unexpected iPhone

20  shutdowns, Apple released a free operating system upgrade, iOS 10.2.1, which included a

21  performance management feature designed to halt the inevitable effects of aging batteries and

22  prevent unexpected shutdowns.  CAC ¶ 114.  Apple released two additional system updates, iOS

23  11 and iOS 11.2, in September and December 2017, respectively, to continue to manage the

24  performance of system components and reduce the occurrence of unexpected shutdowns.  *Id.*

25  ¶¶ 120-22.

26  _____

27  [1] The utter lack of any interaction or contact between the CWs and the Individual Defendants is illustrated in the summary chart set forth below at page 31.

28  [2] All "Ex. __" references are to the exhibits attached to Defendants' Request for Judicial Notice.

On December 9, 2017, the press noted that iOS 10.2.1 and later had the effect of slowing down performance of certain iPhones in certain instances (*id.* ¶ 127), a fact that Apple itself disclosed to customers on December 20, 2017 (*id.* ¶ 130), and that was widely reported in the media.[3]   Numerous consumer class action lawsuits were filed against Apple following the disclosure.[4]  *Id.* ¶ 166.  Also, on December 20, 2017, Apple notified customers that starting in January 2018 it would offer a substantial price reduction for out-of-warranty battery replacements throughout 2018.  *Id.* ¶ 138.[5]  Notwithstanding these disclosures, Apple's stock price *increased* from December 8 to December 11 (the next trading day) by $3.30 per share, and again by $0.65 per share from December 20, 2017 to December 21 and 22, 2017.[6]

Plaintiff asserts that investors who purchased Apple stock during the Class Period were misled because Apple failed to disclose that the Company's battery replacement program could negatively impact iPhone sales.  *See, e.g.*, *id.* ¶ 298.  But industry analysts raised that question when the replacement program was announced.  On January 3, 2018, for example, a Barclays analyst wrote that "even a small percentage opting for battery replacement over upgrade could have *meaningful impact* on iPhone sales," which could mean as much as $10.29 billion in lost revenue.  Ex. 48 at 1, 3.  That prediction was echoed in numerous news articles published between January 3-5, 2018.[7]  Yet Apple's stock price did not decline in response to this information, but *increased* in value, gaining $2.74 per share between January 2, 2018 and January 5, 2018.  Ex. 49.

**B.** **Apple's Uncontested Business Results Refute Plaintiff's Claims**

The linchpins of Plaintiff's theory of liability are the repeated assertions that (i) iPhone revenues in Apple's FY 2017 were artificially inflated "at the expense" of iPhone revenues in FY 2018, and (ii) iPhone revenues in FY 2018 were further "cannibalized" by customers who chose

---

[3] *See, e.g.*, Ex. 1 (cited at CAC ¶ 128 n.43); Exs. 54-55.

[4] *See, e.g.*, Exs. 56-58.

[5] A few months later, Apple additionally extended a credit to customers who obtained a full-price, out-of-warranty battery replacement in 2017.  CAC ¶ 139.

[6] *See* Ex. 49.

[7] *See* Ex. 2 (cited at CAC ¶ 140); Exs. 59-63.

to replace their battery instead of upgrading.  *See, e.g.*, CAC ¶¶ 13, 315.  In short, Plaintiff asserts that Defendants committed a fraud that caused Apple's iPhone revenues *in FY 2018* to suffer. But as the Forms 8-K that announced Apple's quarterly results conclusively demonstrate,[8] global iPhone revenues *increased* for each quarter of FY 2018 as compared year-over-year to FY 2017, and total global iPhone unit sales also increased year-over-year for the last three quarters of FY 2018, as shown below:

| | FY 2016 | FY 2017 | FY 2018 | FY 2019 |
|---|---|---|---|---|
| **Q1 (October to December)** | | | | |
| Total Revenue from Global iPhone sales | $51.6 billion | $54.5 billion | $61.5 billion | $51.9 billion |
| Total iPhone units sold globally | 74.8 million | 78.2 million | 77.3 million | |
| Total revenue from Greater China | $18.3 billion | $16.2 billion | $17.9 billion | $13.1 billion |
| Revenue Guidance Met? | Yes | Yes | Yes | No |
| **Q2 (January to March)** | | | | |
| Total Revenue from Global iPhone sales | $32.8 billion | $33.2 billion | $38 billion | |
| Total iPhone units sold globally | 51.2 million | 50.8 million | 52.2 million | |
| Total revenue from Greater China | $12.4 billion | $10.7 billion | $13 billion | |
| Revenue Guidance Met? | Yes | Yes | Yes | |
| **Q3 (April to June)** | | | | |
| Total Revenue from Global iPhone sales | $24 billion | $24.8 billion | $29.9 billion | |
| Total iPhone units sold globally | 40.3 million | 41 million | 41.3 million | |
| Total revenue from Greater China | $8.8 billion | $8 billion | $9.5 billion | |
| Revenue Guidance Met? | Yes | Yes | Yes | |
| **Q4 (July to September)** | | | | |
| Total Revenue from Global iPhone sales | $28.1 billion | $28.8 billion | $37.1 billion | |
| Total iPhone units sold globally | 45.5 billion | 46.7 million | 46.9 million | |
| Total revenue from Greater China | $8.7 billion | $9.8 billion | $11.4 billion | |
| Revenue Guidance Met? | Yes | Yes | Yes | |

The CAC further asserts that Defendants failed to disclose that demand for iPhones in Greater China was purportedly declining in FY 2018.  *See, e.g.*, CAC ¶ 360.  But the CAC cannot allege any specific facts to support that conjecture, and, indeed, the Forms 8-K summarized above demonstrate that revenues from Greater China *increased* for each quarter of FY 2018 as

---

[8] *See* Exs. 4-9, 50-53 at Ex.-99.2; *see also* chart, *supra*.  The alleged Class Period is reflected in those quarters of the chart shaded grey.  Given the seasonal nature of iPhone sales, iPhone revenues are typically highest in Q1 of each fiscal year, and lowest in Q3, as shown above.

compared year-over-year to FY 2017.[9]  Indeed, Apple's fortunes continued to rise throughout the Class Period until Q1 FY 2019 when, as alleged, Apple missed its revenue guidance for the first time in years.  *See id.* ¶ 29.

### C.    Apple Lowers Revenue Guidance for Q1 FY 2019

On January 2, 2019, Apple issued the Cook Letter, in which the Company disclosed that its revenues for the just-completed Q1 FY 2019 quarter were expected to be approximately $84 billion, lower than the previously-provided guidance of $89 billion to $93 billion.  *See* CAC ¶ 28; Ex. 3.  The letter explained that, although the Company had "anticipated some challenges in key emerging markets, [it] did not foresee the magnitude of the economic deceleration, particularly in Greater China."  Ex. 3 at 2.  Mr. Cook attributed the decreased guidance primarily to a decline in revenues in Greater China, stating that "most of our revenue shortfall to our guidance, and over 100 percent of our year-over-year worldwide revenue decline, occurred in Greater China across iPhone, Mac and iPad."  *Id.*  While the letter made clear that the revenue decline in Greater China was the main driver of the lowered guidance, Mr. Cook also identified a number of "other factors" that the Company believed had impacted iPhone performance in developed markets, "including consumers adapting to a world with fewer carrier subsidies, US dollar strength-related price increases, and some customers taking advantage of significantly reduced pricing for iPhone battery replacements."  *Id.*  Apple's stock price declined by approximately $15 per share on the day following the letter's release.  CAC ¶ 28.[10]

## III.    THE RIGOROUS PLEADING STANDARDS GOVERNING THIS MOTION

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted).  Rule 9(b) and the PSLRA impose additional, exacting pleading requirements in securities fraud cases like this one.

---

[9] To be clear, the disclosed revenues for Greater China concern *all* revenues for Greater China, and not merely for iPhone sales in Greater China.  iPhone revenues and unit sales for a particular region, such as Greater China, are not disclosed.

[10] Apple's stock price recovered and surpassed its January 2, 2019 price before the end of that month.  *See* Ex. 49.

"Rule 9(b) requires particularized allegations of the circumstances constituting fraud, including identifying the statements at issue and setting forth what is false or misleading about the statement[s] and why the statements were false or misleading at the time they were made." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012).  The PSLRA similarly requires a complaint to specify each statement alleged to have been misleading and the reasons why it was misleading when made, and to "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).  "This means that a plaintiff must provide, *in great detail*, all the relevant facts forming the basis of her belief." *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999) (emphasis added).  "A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008).

The PSLRA further requires a complaint to "state with particularity facts giving rise to a strong inference that [each] defendant acted with" scienter.  15 U.S.C. § 78u-4(b)(2).  Because the Supreme Court has defined "scienter" in the context of Section 10(b) and Rule 10b-5 as a "mental state embracing intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976), the complaint must plead specific facts giving rise to a strong inference that the defendant made a false or misleading statement with, "at a minimum, *deliberate recklessness*," *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014) (quotations omitted).  This standard "for recklessness is actually much closer to one of intent." *Id.*  Thus, the complaint "must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent" to mislead.  *Silicon Graphics*, 183 F.3d at 979.

A "strong inference" of scienter is one that is "more than merely plausible or reasonable— it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S at 314.  The Court must weigh all facts and inferences, including those that weigh *against* a finding of scienter.  *Id.* at 323-24.  If the facts alleged and those subject to judicial notice do not create an inference of fraudulent intent that is cogent and at least as compelling as the competing innocent explanation for the same facts, the complaint must be dismissed.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1006-07 (9th Cir. 2009).

1   **IV.   ARGUMENT**

2       **A.   As Plaintiff's Chart Confirms, The CAC Is Puzzle-Pled**

3       The PSLRA requires Plaintiff to specify with particularity each statement alleged to have

4   been materially misleading, the reason why the statement was misleading when made, and, if an

5   allegation regarding the statement is made on information and belief, all facts on which that belief

6   is formed.  15 U.S.C. § 78u-4(b)(1).  Plaintiff utterly fails in this regard.  The CAC repeatedly

7   cites long lists of alleged misstatements followed by a conclusory laundry list of reasons why all

8   of the statements are purportedly misleading, without identifying *which* specific alleged "true

9   fact" from the laundry list renders a particular statement false or misleading when made.[11]  Thus,

10  because Plaintiff has "place[d] the burden on the reader to sort out the statements and match them

11  with the corresponding adverse facts to solve the 'puzzle' of interpreting [its] claims," *Primo v.*

12  *Pac. Biosciences of Cal., Inc.*, 940 F. Supp. 2d 1105, 1111-12 (N.D. Cal. 2013), the CAC should

13  be dismissed on that basis alone.  *See, e.g.*, *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1244

14  (N.D. Cal. 1998); *Brodsky v. Yahoo! Inc.*, 592 F. Supp. 2d 1192, 1198 (N.D. Cal. 2008).

15      Plaintiff's Supplemental Chart (Dkt. No. 88, the "Chart") attempts to cure that fatal flaw

16  by identifying the subcategory of each falsity allegation that applies to each alleged misstatement.

17  *Compare* CAC ¶ 280 (listing *four* reasons why the misstatements alleged in CAC ¶ 270 were

18  false), *with* Chart at #1 (citing CAC ¶ 280(*a*) as the *single* reason why the misstatements alleged

19  in CAC ¶ 270 were false).  In doing so, however, the Chart not only violates the Court's order

20  (which required that the Chart "strictly adhere to the allegations in the operative complaint" (see

21  Dkt. No. 87)), but also tacitly *admits* that the CAC does not specifically identify why each

22  statement is allegedly misleading and is therefore puzzle-pled.[12]

23  _____

24  [11] *See, e.g.*, CAC ¶¶ 296-304 (identifying 20 alleged misstatements); *id.* ¶ 313 (identifying five
    separate "true facts" purportedly explaining why each of the preceding 20 alleged misstatements
25  is misleading).  The purported "true facts" set forth in the CAC plainly cannot each be meant to
    apply to every alleged misstatement.  For example, Mr. Cook's statement on February 1, 2018
26  that Apple "did not consider in any way, shape, or form, what [battery replacements] would do to
    upgrade rates" (CAC ¶ 308) cannot possibly have been rendered misleading by a failure to
    disclose the purported fact that "iPhone demand in Greater China was declining" (*id.* ¶ 313).

27  [12] The CAC also should be dismissed because "[d]etermining whether the "'pleader is entitled to
    relief'" under Rule 8 "requires a laborious deconstruction and reconstruction of a great web of
28  scattered, vague, redundant and often irrelevant allegations."  *Wenger*, 2 F. Supp. 2d at 1243.

**B.    The CAC Fails to Allege a False or Misleading Statement**

The CAC also should be dismissed because it fails to allege a materially false or misleading statement.  Nearly all of the challenged statements are alleged to be misleading by way of omission.  But for a statement to be misleading by omission, it must "*affirmatively* create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (emphasis added). "[I]t is not enough to allege that [a] statement is incomplete; rather, the plaintiff must state facts showing that, due to its incompleteness, the statement *affirmatively led the plaintiff in the wrong direction* (rather than merely omitted to discuss certain matters)."  *In re OmniVision Techs., Inc. Sec. Litig.*, 937 F. Supp. 2d 1090, 1101 (N.D. Cal. 2013) (quotations omitted).

The CAC asserts over 80 allegedly misleading statements during the seventeen-month Class Period.  As explained below, none of them is actionable or otherwise false or misleading.

**1.    Accurate Statements of Historical Results Regarding Q3 FY 2017**

Most of the alleged misstatements cited in the CAC concern Apple's accurate—and *undisputed*—historical results.  For example, the CAC challenges the following accurate statements of historical results from Apple's Q3 FY 2017 investor call on August 1, 2017:

- "iPhone 7 was our most popular iPhone, and sales of iPhone 7 Plus were up dramatically compared to 6s Plus in the June quarter of last year."  CAC ¶ 270.
- "From an absolute quantity point of view, the upgrades for this fiscal year are the highest that we've seen." *Id.*
- "iPhone sales were up year-over-year in most markets we track." *Id.* ¶ 271.
- "[I]n constant-currency terms, we were actually up 6% in Mainland China."  *Id.* ¶ 272.
- "[U]pgraders through – both for the quarter and actually for the full fiscal year to date was our highest ever."  *Id.*
- "[T]he upgrades for this fiscal year are the highest that we've seen." *Id.* ¶ 273.
- "[T]he rate is similar to what we saw with the previous iPhones, except for iPhone 6." *Id.*
- "The installed base is growing." *Id.* ¶ 276.

---

Here, the first 20 pages of the CAC are repeated and realleged in the next 170 pages; the CAC cites over 200 articles and analyst reports that are largely irrelevant to Plaintiff's core allegations of fraud; the CAC contains more than 50 pages of purported background allegations (*see* CAC at 21-73); and the CW allegations are a tangled jumble that requires each CW allegation (*id.* ¶¶ 216-67) to be cross-referenced against the period during which the CW was purportedly employed or involved with Apple (*id.* ¶¶ 206-15) in order to try and determine the time-frame to which the CW allegation purportedly applies.  Those confusing and largely incomprehensible allegations fail "to conform with the presentation requirements" of Rule 8, and therefore the CAC should be dismissed on that ground, as well. *Wenger*, 2 F. Supp. 2d at 1243.

Accurate statements of historical results, even when accompanied by general statements of optimism, are not actionable because they "contain no implicit prediction that those events or conditions will continue in the future." *In re Caere Corp. Sec. Litig.*, 837 F. Supp. 1054, 1058 (N.D. Cal. 1993) (citing *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 513 (9th Cir. 1991)).[13] In an effort to work around that black letter rule of law, Plaintiff asserts that the historically accurate statements listed were misleading because they failed to disclose that "higher iPhone demand in 2017 . . . was driven by artificially accelerated upgrade rates as a result of Apple intentionally throttling older-model iPhones during 2017 . . . at the expense of iPhone revenues in 2018." Chart at #1-3, 5, 8 (citing CAC ¶ 280(a)). But that allegedly omitted "fact" does not render any of the challenged statements misleading.

First, none of the alleged misstatements "*affirmatively* create[s] an impression of a state of affairs that differs in a material way from the one that actually exists," *Brody*, 280 F.3d at 1006 (emphasis added), because none of them broaches or refers in any way to the *reasons* for "higher iPhone demand in 2017." *See, e.g.*, *Maritime Asset Mgmt., LLC v. NeurogesX, Inc.*, 2013 WL 5442394, at *7 (N.D. Cal. Sept. 30, 2013) (Rogers, J.) ("[W]hile Plaintiffs may have wanted to know" the purportedly undisclosed facts, "the statements at issue were not rendered misleading by virtue of failure to disclose [those] fact[s]."). For example, accurate statements about iPhone sales being up "year-over-year in most markets" (CAC ¶ 271) or "upgrades for this fiscal year [being] the highest we've seen" (*id.* ¶ 273), do not state or imply anything about whether "iPhone demand in 2017 . . . was driven by artificially accelerated upgrade rates" (*id.* ¶ 280(a)). *See Brody*, 280 F.3d at 1006-07.

Second, the allegedly omitted fact is "not inconsistent with the statements so as to show that the statements must have been false or misleading when made." *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001). Even if the allegedly omitted fact that "iPhone demand in 2017 . . . was

---

[13] *See also Monachelli v. Hortonworks, Inc.*, 225 F. Supp. 3d 1045, 1055 (N.D. Cal. 2016) ("[D]isclosure[s] of accurate historical data accompanied by general statements of optimism" and "failure to disclose internal forecasts of future performance are not actionable." (quotations omitted)). As a matter of law, the "[d]isclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future." *Wenger*, 2 F. Supp. 2d at 1245.

driven by artificially accelerated upgrade rates" was true—and it is not—that fact does not contradict anything within the accurate historical statements challenged in the CAC. *See, e.g.*, *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 946 (N.D. Cal. 2010) (statement was not misleading because allegedly concealed true facts were "not inconsistent with Accuray's prior representation"). The Company's historic results were correctly reported.

Third, to the extent Plaintiff's reason for falsity implicates future results—"customers upgraded their iPhones . . . at the expense of iPhone revenues in 2018" (CAC ¶ 280(a))—the "[d]isclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future." *Wenger*, 2 F. Supp. 2d at 1245. Companies are "not required to forecast future events or to caution 'that future prospects [may not be] as bright as past performance.'" *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1406 (9th Cir. 1996). In short, the challenged historically accurate statements are not misleading as a matter of law for failing to make predictions about the future, as they "do not imply any comparison between the rate of past and future growth." *Convergent*, 948 F.2d at 513.

Fourth, and lastly, the CAC also fails to allege particularized facts and corroborating details showing why the alleged misstatements were purportedly false when made. Inherent in the concept of falsity is the requirement of contemporaneousness—a statement must have been "untrue or misleading *when made*." *Yourish v. Cal. Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999) (emphasis added). But as the Chart's citations to the purported "Supporting Facts" aptly demonstrate, the CAC contains no specific allegations to show the allegedly omitted information existed at the time the challenged statements were made. *See* Chart at #1-3 (citing CAC ¶¶ 56-60, 61-67, 74-77, 81-86, 88, 90, 109, 114-19, 120-24, 126, 245, 262-67). Indeed, none of the allegations cited in the Chart contain any specific factual allegations—dates, times, places—*at all* to support the notion that "higher iPhone demand in 2017 . . . was driven by artificially accelerated upgrade rates as a result of Apple intentionally throttling older-model iPhones during 2017." CAC ¶ 280(a).[14] Nor can the CAC explain how anyone purportedly knew, as of August

---

[14] In fact, while the CAC alleges that Defendants' August 1, 2017 statements were misleading because they omitted to disclose that iPhone demand "in 2017" was artificially *inflated* (CAC ¶ 280), in other places the CAC alleges "Apple experienced *declining* iPhone demand . . . starting

1, 2017, that iPhone revenues in FY 2017 were being inflated "at the expense of iPhone revenues in 2018" (*id.*), given that, as shown above, *they were not*. As noted above, iPhone revenues *increased* for each quarter of FY 2018 as compared year-over-year to FY 2017. Exs. 4-9, 51-52 at Ex.-99.2; *see also supra* at 5.

Plaintiff's Chart also asserts that three of the statements listed above (at CAC ¶¶ 272, 276) were further misleading because they also failed to disclose that "revenue growth in Greater China was negative year-over-year with iPhone demand expected to continue to deteriorate long term." Chart at #3, 8 (citing CAC ¶ 280(b)). But none of the alleged misstatements is affirmatively misleading about or inconsistent with the allegedly omitted information. For example, the statement that Apple was "actually up 6% in *Mainland* China" (CAC ¶ 272) is not inconsistent with the fact that "revenue growth in *Greater* China was negative year-over-year" (*id.* ¶ 280(b)).[15] Moreover, the statements do not address and were not required to address whether "demand was expected to *continue* to deteriorate." *See, e.g.*, *Stac*, 89 F.3d at 1406.

Thus, the only remaining question is whether the CAC alleges particularized facts and corroborating details to show that the alleged statements were misleading when made, *Metzler*, 540 F.3d at 1070; and, as before, the Chart's citation to the purportedly "Supporting Facts" demonstrates that it does not. *See* Chart at #3, 8 (citing to CAC ¶¶ 93-100, 103-05, 111, 245-46). None of those cited allegations contains any specific facts to show that, as of August 1, 2017, iPhone demand was *then* "expected to continue to deteriorate long term due to competitive forces" (CAC ¶ 280(b)), and indeed, as discussed above, it did not.

### 2. Accurate Statements of Historical Results for the Remainder of the Class Period

The analysis set forth above applies with equal force to the remainder of the accurate

---

in 2017," (*id.* at 76 and ¶ 220 ("CW-7 also confirmed a decrease in sales in iPhones since at least the end of 2017")), or maybe even since "early 2016" (*id.* ¶ 240). Later the CAC reverses itself again and alleges that iPhone demand was artificially inflated through "early 2018." *Id.* ¶ 292. Those contradictory allegations cannot satisfy the PSLRA's pleading burden and, in any event, are refuted by Apple's uncontested historical results.

[15] *See* CAC at 2 n.4 (explaining that the term "mainland China" is a subset of "Greater China," which also includes Hong Kong and Taiwan).

historical statements made during the Class Period that are challenged by the CAC.  *See* Chart at #10-15, 17-26, 30-37, 44-45, 49-50, 56, 59 (citing CAC ¶¶ 285-88, 296, 304, 325-30, 332, 336, 350-51, 354, 386, 388).  According to Plaintiff, those accurate historical statements are allegedly misleading for six reasons, none of which is sufficient to state a claim for the reasons explained above.

First, as above, Plaintiff asserts that nearly all of the remaining challenged statements of historical fact are misleading because they omitted to state that "higher iPhone demand in 2017 and early 2018, including in Greater China, was driven by artificially accelerated upgrade rates as a result of Apple . . . throttling older-model iPhones during 2017 . . . at the expense of iPhone revenues in 2018."  *See* Chart at #10-15 (citing CAC ¶ 292(a)), at #17-26 (citing CAC ¶ 313(a)), #30-37 (citing CAC ¶ 338(a)), #44-45, 49-50 (citing CAC ¶ 360(a)), and #56 and 59 (citing ¶ 396(a)).  As discussed above, however, that allegation is demonstrably false because global iPhone revenues for each quarter of FY 2018 were *higher* year-over-year as compared to FY 2017.  *See* Exs. 4-9, 51-52 at Ex.-99.2; *see also supra* at 5.  Further, none of the alleged misstatements references or refers to the *reasons* for iPhone demand, and thus could not have affirmatively misled investors in that regard.  *See, e.g.*, *In re Finisar Corp. Sec. Litig.*, 2013 WL 211206, at *4 (N.D. Cal. Jan. 16, 2013) (defendants not required to disclose that demand was inorganic or unsustainable where statements did not affirmatively reference the reasons for demand).  And Plaintiff's supposed "Supporting Facts" (*see* Chart at #10-15, 17-26, 30-37, 44-45, 49-50, 56, 59) do not allege any specific facts regarding iPhone demand, let alone specific facts to show "iPhone demand in 2017 and early 2018 . . . was driven by artificially accelerated upgrade rates."

Second, Plaintiff alleges that certain accurate statements of historical fact from Q4 FY 2017 were otherwise misleading because they omitted to disclose that "revenue growth in Greater China was negative year-over-year with iPhone demand expected to continue to deteriorate long term due to competitive forces."  *See* Chart at #12, 14 (citing CAC ¶ 292(b)).  In fact, revenue in Greater China for Q4 FY 2017 was *higher* year-over-year as compared to Q4 FY 2016.  *See* Exs. 5, 50 at Ex.-99.2.  And while the CAC alleges that "iPhone demand [was] expected to continue to

---

1    deteriorate long term due to competitive forces" (CAC ¶ 292(b)), judicially noticeable facts

2    demonstrate that iPhone demand was *not* deteriorating as of Q4 FY 2017 and did not "continue to

3    deteriorate."  Chart at #12, 14 (citing CAC ¶ 292(b)).  Both global iPhone revenues and unit sales

4    *increased* in Q4 FY 2017 as compared to Q3 FY 2017 (Ex. 5 at Ex.-99.2), *and* as compared to Q4

5    FY 2016 (Ex. 50 at Ex.-99.2).  Global iPhone revenues also continued to increase each quarter of

6    FY 2018 as compared year-over-year to FY 2017.  *See* Exs. 4-9, 51-52 at Ex.-99.2; *see also supra*

7    at 5.  None of those judicially noticeable facts is contradicted by the conclusory "Supporting

8    Facts" cited in the Chart.  *See* Chart at #12, 14.

9         Third, Plaintiff alleges that certain of Defendants' accurate statements of historical fact

10   were misleading because they failed to disclose that "the rate at which Apple customers were

11   replacing their batteries in older iPhones, under Apple's $29 battery replacement program would

12   negatively impact demand for the next generation of iPhones (typically released between

13   September and November)."  *See* Chart at #19-20, 23-26 (citing CAC ¶ 313(c)), #31, 33-37, 39

14   (citing CAC ¶ 338(b)), #44-45, 49-50 (citing CAC ¶ 360(c)), and #56-59 (citing ¶ CAC 396(b)).

15   But none of the challenged statements say anything about *future* demand for iPhones, and the

16   market believed it obvious that people who replaced their iPhone batteries may be less likely to

17   purchase a new iPhone.  "It is not a violation of the securities laws to fail to disclose a result that

18   is obvious."  *Goldstein v. Quantum Health Res., Inc.*, 1996 WL 813245, at *6 (C.D. Cal. Dec. 23,

19   1996) (quoting *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1220 (9th Cir. 1990)).[16]

20        Fourth, Plaintiff alleges that, beginning in Q1 FY 2018, certain of Defendants' accurate

21   statements of historical fact were misleading because they failed to disclose that "iPhone demand

22   in Greater China was declining and expected to continue to deteriorate long term due to a

23

---

24   [16] As alleged in the CAC, on February 1, 2018, the same day as the allegedly misleading
     statements were made, Barclays acknowledged "that the $29 battery replacement program would
25   negatively impact iPhone unit sales" (*id.* ¶ 308), an acknowledgment that was mirrored by
     countless other newspapers and analysts at the time.  *See, e.g.*, Ex. 59 ("Apple Inc's offer to
26   replace flagging batteries at a slashed rate could be a hurdle for iPhone unit sales in 2018 if more
     users take the deal over upgrading to a new device"); Ex. 61 ("[A]nalysts believe that millions of
27   Apple customers could opt for a battery replacement over a new iPhone); Ex. 64 ("Apple will be
     significantly affected by its decision to offer $29 battery replacement to address the iPhone
28   battery controversy, as the company stands to lose iPhone sales worth over $10 billion.").

confluence of factors." *See* Chart at #21-22, 26 (citing CAC ¶ 313(d)), #32-37, 39 (citing CAC ¶ 338(c)), #44-45, 49-50 (citing CAC ¶ 360(d)), #56, 59 (citing CAC ¶ 396(c)). But, again, Defendants were under no obligation to predict the future of iPhone demand in Greater China, and none of the challenged statements affirmatively misrepresents or is inconsistent with the possibility of declining future demand. In any event, iPhone demand was *not* declining in Q1 of FY 2018, and in fact revenues from global iPhone sales *increased* year-over-year for every quarter FY 2018 as compared to FY 2017 (*see* Exs. 4-9, 51-52 at Ex.-99.2; *see also supra* at 5), and global iPhone unit sales also *increased* every quarter year-over-year for the remainder FY 2018 (see *id.*). By the same token, revenue from Greater China also continued to *grow* year-over-year for every quarter of FY 2018 as compared to FY 2017. *Id.* The conclusory "Supporting Facts" cited by the Chart cannot overcome those judicially noticeable facts (*see* Chart at #21-22, 26, 32-37, 39, 44-45, 49-50, 56 and 59), and allege nothing specific whatsoever about iPhone demand in Greater China during any point of the Class Period.

Fifth, Plaintiff alleges that beginning in Q3 of FY 2018, certain of Defendants' accurate statements of historical fact were misleading because they failed to disclose that "as a result of slowing demand, Apple had slashed production orders from suppliers for the new 2018 iPhone models." *See* Chart at #30, 33-37, 39 (citing CAC ¶ 338(d)), #44-45, 49-50 (citing CAC ¶ 360(c)), #56, 59 (citing CAC ¶ 396(d)). But none of the challenged statements say or imply anything about "orders from suppliers for the new 2018 iPhone models," and are not misleading or inconsistent in that regard. *See Brody*, 280 F.3d at 1006. Further, to the extent Plaintiff is alleging Defendants were required to disclose iPhone production was slashed because it evidenced "slowing demand" (CAC ¶ 360), Defendants were not required to predict the future and, in any event, iPhone demand was not slowing, it was growing, with both global iPhone revenues and global iPhone unit sales increasing year-over-year from Q2 to Q4 of FY 2018. Exs. 7-9 at Ex.-99.2; *see also supra* at 5. The "Supporting Facts" cited in Plaintiff's chart do not and cannot allege any specific facts to show otherwise. *See* Chart at #30, 33-37, 39, 44-45, 49-50, 56, 59.

Sixth, Plaintiff alleges that in Q4 FY 2018, certain of Defendants' accurate statements of

historical fact were misleading because they failed to disclose that "as a result of slowing demand, Apple had cut prices on the latest generation of iPhone models."  *See* Chart at #54, 56, 59 (citing CAC ¶ 396(e)).  But, as before, none of the challenged statements references or refers to iPhone pricing, or the *reasons* for iPhone pricing, and are then not affirmatively misleading or inconsistent with regards to the allegedly omitted facts.  Nor can Plaintiff explain how the "Supporting Facts" asserted in the Chart (see Chart #54, 56, 59) would have caused the challenged statements to be otherwise misleading.

### 3.    Forward-Looking Statements Protected by the PSLRA Safe Harbor

In addition to accurate statements of historical results, the CAC challenges a number of forward-looking statements.  Under the PSLRA, "forward-looking statements" are not actionable as a matter of law if they are identified as such and accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1)(A)(i).  A forward-looking statement is "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *Greenberg v. Cooper Cos., Inc*., 2013 WL 100206, at *11 (N.D. Cal. Jan. 7, 2013) (Rogers, J.).  The safe harbor also applies to statements that, while stated in the present tense, are dependent on future events before their truth or falsity can be discerned.  *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 880 (N.D. Cal. 2004).

"[I]f a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010).  On the other hand, if a forward-looking statement is not identified as such or is unaccompanied by meaningful cautionary language, then the statement is actionable only if the plaintiff pleads facts showing that the statement "was made with actual knowledge" of its falsity.  15 U.S.C. § 78u–5(c)(1)(B).

Here, the CAC challenges forward-looking statements made during investor calls regarding (i) iPhone demand, (ii) the Chinese market, and (iii) tariffs on Chinese goods, which are

italicized below:

- "iPhone was relatively flat year-on-year . . . we see all of those as *very encouraging signs*… But what I – what we see in the mainland *is definitely much more encouraging*." CAC ¶ 272.
- iPhones "had an abnormally high upgrade rate . . . . And so where that affects us in the short term, even though we have great results, *it probably bodes well later on*." *Id.* ¶ 273.
- With regards to iPhones, "between the upgraders and the switchers that we see and still – the first-time buyer category . . . Between those 3 areas, *I think we have a lot of opportunity*." *Id.* ¶ 274.
- "I think in general, even the performance in China . . . *will continue to improve*." *Id.* ¶ 275.
- "The installed base is growing. It's still *growing very strongly. That will generate more upgrades over time.*" *Id.* ¶ 276.
- "[W]e believe iPhone *revenue will grow double digits* as compared to . . . the December quarter." *Id.* ¶ 302.
- "So in summary, our guidance for iPhone, we got double-digit year-over-year growth and acceleration of sell-through growth on a year-over-year basis. For the balance of the company, in the aggregate, *we expect to grow strong double digits year-over-year*." *Id.* ¶ 302.
- "And so everywhere I look, *I feel really good about how we're doing in China*." *Id.* ¶ 304.
- The iPhone X is "the most popular smartphone in all of China last quarter" . . . *not "buy[ing] the view that the [smartphone] market's saturated.* I don't see that from a market point of view or – and certainly not from an iPhone point of view." *Id.* ¶ 328.
- "iPhone X winds up at the most selling – most popular for every week of the time since the launch . . . And so obviously, at some point, if those technologies move to lower price points and that – *there's probably more unit demand*." *Id.* ¶ 329.
- "The demand trends are 21 percent revenue there is powered by three main areas – *iPhone, of course, is growing*. In order to grow 21 percent at the country level in Greater China you have to grow really well at the iPhone level." *Id.* ¶ 332.
- "*I don't think that iPhone will get a tariff on it*, is my belief, based on what I've been told and what I see." *Id.* ¶ 346.
- "*We expect the growth to come from strong growth from iPhone*." *Id.* ¶ 352.
- "There is a fourth tariff . . . also focused on goods that are imported from China. . . . *Probably like everyone else, we're evaluating that one*, and we'll be sharing our views of it with the administration." *Id.* ¶ 354.

Tellingly, Plaintiff's quotations of Defendants' forward-looking statements avoid mentioning the detailed risk disclosures that accompanied the statements. Under the PSLRA, however, on a "motion to dismiss . . . the court *shall consider* any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement . . . cited by the defendant." 15 U.S.C. § 78u-5(e) (emphasis added). Here, each of the challenged forward-looking statements was made on an investor call where Apple representatives identified forward-looking statements "regarding [Apple's] revenue, gross margin, operating expenses, other income and expense, taxes and future business outlook," and specifically cautioned that

"[a]ctual results or trends could differ materially from our forecast." *See, e.g.*, Ex. 10 at 4.[17] Each of the investor calls also directed listeners to the more fulsome and detailed risk factors discussed in Apple's Forms 10-K and 10-Q, and to the Forms 8-K filed contemporaneously with each investor call. *Id.* Under the PSLRA, cautionary statements disclosed in SEC filings may be orally incorporated by reference (15 U.S.C. § 78u-5(c)(2)-(3)), and here the Forms 8-K issued with each investor call specifically warned of the risks that Plaintiff asserts later came to pass, including risks regarding "the effect of competitive and economic factors . . . on consumer and business buying decisions with respect to the Company's products," the "ability of the Company to deliver to the marketplace and stimulate customer demand for new programs, products, and technological innovations," the "effect that product introductions and transitions . . . could have on the Company's gross margin," and the "risks associated with the Company's international operations." *See* Ex. 4 at 2. Those specific, substantive risk warnings in the press releases were updated on a regular basis throughout the Class Period,[18] and the Company's quarterly and annual filings further warned that "[g]lobal and regional economic conditions could materially adversely affect the Company" (Ex. 16 at 34); "[g]lobal markets for the Company's products and services are . . . subject to rapid technological change, and the Company may be unable to compete effectively in these markets" (*id.* at 35); and the "Company's business is subject to the risks of international operations," including the potentially adverse effect of "tariffs" (*id.* at 39).[19] Apple's quarterly and annual filings further warned that "[t]here can be no assurance the Company will be able to detect and fix all defects in the hardware, software and services," and "[f]ailure to do so could result in lost revenue," (Ex. 18 at 38), and that "[t]he Company expects its quarterly revenue and operating results to fluctuate" (*id.* at 43).

In short, the challenged forward-looking statements were accompanied by meaningful cautionary language and are thus inactionable as matter of law. *See Cutera,* 610 F.3d at 1112.

---

[17] *See also* Exs. 11-15 at 4.

[18] *See, e.g.*, Exs. 5-7 at Ex.-99.1.

[19] *See also* Ex. 45 at 33-42; Ex. 46 at 33-42; Ex. 16 at 34-43; Ex. 20 at 8-16; Ex. 17 at 33-42; Ex. 18 at 35-44; Ex. 19 at 36-45; Ex. 21 at 8-17.

Even if the challenged statements were not accompanied by cautionary language, however, none of them would be actionable in any event because the CAC does not allege any facts that establish any Individual Defendant had *actual knowledge* that any forward-looking statement was false when made. *See* 15 U.S.C. § 78u–5(c)(1)(B).  As discussed below in Section IV.C., the CAC contains zero allegations that would connect any Individual Defendant to the allegedly omitted information, and at most offers the conclusory assertions that Defendants "absolutely" knew of the information or "would have been informed" about the information.  CAC ¶ 259.  Conclusory allegations are no substitute for well pled facts and cannot be used to establish "actual knowledge" under the PSLRA.  *See, e.g.*, *Cutera*, 610 F. 3d at 1112 (dismissing forward-looking statements supported only by "conclusory allegations" of knowledge); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1070 (N.D. Cal. 2001) ("Nor is it adequate to allege that defendants had access to certain internal reports . . . without identifying the documents or communications, their contents, the people who made or prepared them, or which officers received or reviewed them.").

### 4.        Generalized Statements of Corporate Optimism

Other statements challenged by the CAC are not actionable as a matter of law because they are statements of corporate optimism.  Such "vague, generalized, and unspecific assertions of corporate optimism or statements of mere puffing cannot state actionable material misstatements of fact under federal securities laws."  *In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005) (quotations omitted).  "Such statements employ terms that are 'not measurable'" or "'capable of objective verification' and 'lack a standard against which a reasonable investor could expect them to be pegged.'"  *In re Mellanox Techs. Ltd. Sec. Litig.*, 2014 WL 12650991, at *7 (N.D. Cal. Mar. 31, 2014).  The italicized portions of the alleged misstatements below are textbook examples of inactionable corporate optimism:

- "We were actually up by 6% in Mainland China. And so *we're very encouraged by that*."  CAC ¶ 272.
- "*[S]trong demand* for iPhone 7 Plus…"  *Id.* ¶ 271.
- "[W]hat we see in the mainland is definitely *much more encouraging*."  *Id.* ¶ 272.
- "It *probably bodes well* later on."  *Id.* ¶ 273.

- "*I think we have a lot of opportunity.*" *Id.* ¶ 274.
- "[W]e think that the performance [in China] *will continue to improve.*" *Id.* ¶ 275.
- "*I feel good about our ability to convince people to switch.*" *Id.* ¶ 276.
- "iPhone sales *exceeded our expectations.*" *Id.* ¶ 286.
- "iPhone X orders *are very strong . . .*" *Id.* ¶ 288.
- "[W]e could not be more pleased with how we're doing." *Id.* ¶ 304.
- "*I feel really good about how we're doing in China.*" *Id.*
- "XS and XS Max *got off to a really great start.*" *Id.* ¶ 385.
- We "*try and optimize* our revenue and our gross margin dollars." *Id.* ¶ 388.

These statements are the types of "vague," "generalized," and "unspecific" expressions of corporate optimism that are inactionable as a matter of law. *See, e.g.*, *In re Intel Corp. Sec. Litig.*, 2019 WL 1427660, at *9 (N.D. Cal. Mar. 29, 2019) (Rogers, J.) ("non-verifiable vague statements of optimism" are not actionable). For example, run-of-the-mill statements such as "strong demand for iPhone 7 Plus" (CAC ¶ 270) and "iPhone X orders are very strong" (*id.* ¶ 288) are "vague and immaterial as a matter of law." *See Intel*, 2019 WL 1427660, at *12 (words like "strong," "outstanding," and "optimize" held to be inactionable). Similarly, statements expressing optimism about company progress, such as "we could not be more pleased with how we're doing" (CAC ¶ 304), "I feel really good about how we're doing in China" (*id.*), "XS and XS Max got off to a really great start," (*id.* ¶ 385), and "iPhone sales exceeded our expectations" (*id.* ¶ 286) are also inactionable.[20] The statement that we "try and optimize our revenue and our gross margin dollars" (*id.* ¶ 388) is likewise inactionable. *See Intel*, 2019 WL 1427660, at *12 ("optimize interconnectivity" not actionable).[21] And no facts are alleged in the CAC to show that Defendants were not "try[ing]" to "optimize [their] revenue and [] gross margin dollars."

---

[20] *See, e.g.*, *In re Ubiquiti Networks, Inc. Sec. Litig.*, 33 F. Supp. 3d 1107, 1132 (N.D. Cal. 2014) (Rogers, J.), *aff'd in relevant part*, 669 Fed. Appx. 878 (9th Cir. 2016) ("A claim of 'solid momentum' . . . is the sort of vague, generalized statement of corporate optimism that Courts in the Ninth Circuit have consistently held to be non-actionable 'puffery.'"); *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1050 (N.D. Cal. 2007) (vague statements such as "[w]e are pleased with our progress" held not actionable); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 2013 WL 6441843, at *11 (N.D. Cal. Dec. 9, 2013) (statement reporting a "great start to the year" held not actionable); *In re Cisco Sys., Inc. Sec. Litig.*, 2013 WL 1402788, at *13 (N.D. Cal. Mar. 29, 2013) (rejecting as inactionable phrase "exceeding expectations").

[21] *See also, e.g.*, *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 293 (S.D.N.Y. 2013) (phrases "optimize [] assets" and "potential to optimize [] project" not actionable).

Statements expressing corporate confidence in "predictions" and "forecasts" are likewise not actionable because they are "not of the type [of statement] subject to objective verification." *Copper Mountain*, 311 F. Supp. 2d at 868; *see also Intel*, 2019 WL 1427660, at \*12-13. Moreover, under Section 10(b), "[p]eople in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994). Thus, statements such as, "[i]t probably bodes well later on" (CAC ¶ 273), "I think we have a lot of opportunity" (*id.* ¶ 274), "we think that the performance [in China] will continue to improve" (*id.* ¶ 275), and "I feel good about our ability to convince people to switch" (*id.* ¶ 276) are the types of statements that are insufficient to support a claim for securities fraud.[22] Statements such as "we're very encouraged by [being up 6% in Mainland China]" (*id.* ¶ 271) and "what we see in the mainland is definitely much more encouraging" (*id.* ¶ 272) are also inactionable, run-of-the-mill statements of corporate optimism. *See Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 153 (2d Cir. 2013) (words like "encouraging" are "expressions of puffery and corporate optimism" that are not actionable).

### 5.    Statements of Opinion and Belief

The CAC further challenges a number of statements that are obvious expressions of opinion and belief.[23] For statements of opinion and belief to be actionable under a theory of

---

[22] *See, e.g.*, *Paciga v. Invuity Inc.*, 2018 WL 7286503, at \*5 (N.D. Cal. Sept. 26, 2018) (statement that company was seeing "a lot of opportunity" not actionable); *Knox v. Yingli Green Energy Holding Co. Ltd.*, 2016 WL 6609210, at \*14 (C.D. Cal. May 10, 2016) (statement that company will "continue to … improve the profitability …" not actionable).

[23] *See, e.g.*, CAC ¶ 270 ("I think the upgrade rate is a function of many . . . things"), ¶ 274 (same), ¶ 275 ("we think the performance in China will . . . improve"), ¶ 276 ("I do think that we can grow"), ¶ 302 ("we believe iPhone revenue will grow"), ¶ 328 ("not buying the view that the [smartphone] market's saturated"), ¶ 346 ("I don't think that iPhone will get a tariff on it, is my belief"), ¶ 347 (same), ¶ 352 ("we expect the growth to come from strong growth from iPhone"), ¶ 302 ("we believe iPhone revenue will grow"), ¶ 353 ("I think the smartphone market is very healthy"), ¶ 354 ("I am optimistic that the countries will get through this"), ¶ 386 ("I would not put China in that category"), ¶ 387 ("our unit of sale is less relevant for us today than it was in the past"), ¶ 388 ("we do not believe that providing unit sales is . . . relevant for our Company at this point"), ¶ 388 ("we make our decisions to . . . try and optimize our revenue"); ¶ 388 ("Our installed base is . . . probably a much more significant metric for us").

1    material misrepresentation, Plaintiff is required to allege specific facts establishing "both that 'the

2    speaker did not hold the belief she professed' *and* that the belief is objectively untrue."   *City of*

3    *Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th

4    Cir. 2017) (emphasis added).   Further, "when a plaintiff relies on a theory of omission, the

5    plaintiff must allege 'facts going to the basis for the issuer's opinion . . . whose omission makes

6    the opinion statement at issue misleading to a reasonable person reading the statement fairly and

7    in context.'"   *Id.* at 616.   The CAC, however, fails to meet either of these standards.   First, the

8    CAC does not allege any facts, specific or otherwise, to show what any Individual Defendant

9    knew and when, and thus fails to show what *subjective* "belief" any Individual Defendant held at

10   the time any of these statements were made.   Nor does the CAC allege that any of the statements

11   were "objectively untrue."   It does not, for example, allege facts to show that statements like "I do

12   think that we can grow" (CAC ¶ 276) or "we believe iPhone revenue will grow" (*id*. ¶ 302) were

13   false at the time because Apple could not grow, or iPhone revenue would not grow (which it has).

14   Finally, the CAC does not allege any particularized facts "going to the basis for the issuer's

15   opinion" whose omission renders any of the challenged statements misleading to a reasonable

16   person reading the statements in context.

17              **6.      Apple's Risk Warnings**

18         The CAC alleges that certain of the risk warnings in Apple's Forms 10-Q and 10-K (*see*

19   CAC ¶¶ 279, 311, 335, 337, 357-58, 395) were materially misleading because they omitted to

20   state that the risks being warned of had purportedly already materialized (*id.* ¶¶ 281, 293, 315,

21   340, 362, 395, 398).   But where, as here, "a company's filings contain abundant and specific

22   disclosures regarding the risks facing the company, as opposed to terse, generic statements, the

23   investing public is on notice of these risks and cannot be heard to complain that the risks were

24   masked as mere contingencies."   *In re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *12

25   (N.D. Cal. Oct. 31, 2014) (Rogers, J.); *see also Veal v. LendingClub*, 2019 WL 5698072, at *14

26   (N.D. Cal. Nov. 4, 2019).   Furthermore, the challenged risk warnings do not give rise to securities

27   liability because they do not "affirmatively create an impression of a state of affairs that differs in

28   a material way from the one that actually exists," *Brody*, 280 F.3d at 1006, and are not

inconsistent with the allegedly omitted information. *Ronconi*, 253 F.3d at 434.

The CAC asserts that beginning in Apple's Form 10-Q for Q3 FY 2017, filed on August 2, 2017, and continuing through each successive Form 10-Q and 10-K through the Form 10-K for FY 2018, filed on November 5, 2018, Apple's risk warning that "global and regional economic conditions could materially adversely affect the Company"[24] (CAC ¶¶ 279, 291, 311, 335, 357, 395) was misleading because it omitted to state that "Apple artificially inflated demand for its iPhones during the quarter . . . by forcing premature upgrades" (*id.* ¶¶ 281, 293, 340, 362, 398). But the challenged risk warning says nothing affirmative about iPhone demand or upgrades; the two statements are not inconsistent (the purported "artificial demand" was not the result of "global and regional economic conditions"); and the CAC does not, and cannot, allege that "global and regional conditions" had already "adversely affected" the Company such that the warned-of risk had materialized at the time the statement was made. *See supra* at Section II.B.

The CAC further asserts that beginning with the May 2, 2018 filing of Apple's Form 10-Q for Q2 of FY 2018, and continuing through the FY 2018 Form 10-K filed on November 5, 2018, that same risk warning (cited at CAC ¶ 279) became further misleading because it omitted to state that "increased competition and worsening economic conditions in China had already negatively affected iPhone demand in Greater China" (*id.* ¶¶ 340, 362, 398) and "iPhone sales growth in China" (*id.* ¶ 398). But again: the challenged risk warning concerns adverse material effects of "global and regional economic trends" on the Company (*id.* ¶ 279), not on iPhone demand or growth in China, and there are no allegations to show that "worsening economic conditions in China" materially adversely affected the Company until Q1 FY 2019. To the contrary, judicially noticeable facts establish iPhone unit sales, iPhone revenues, Greater China revenues, and total revenue all *increased* in FY 2018 year-over-year. *See supra* at Section II.B.

That same analysis applies to the challenged risk warning in Apple's Form 10-Q for Q3 FY 2018, filed on July 31, 2018, which warned that "the Company's business may be impacted by political events" including "trade disputes" and "tariffs." CAC ¶ 358. The CAC admits, as it

---

[24] The challenged risk warning continues on for another two pages (*see* CAC ¶ 279), though the CAC does not allege which parts of it are purportedly false.

must, that "none of Apple's products or components were directly affected by [any] tariffs as of July 31, 2018" (*id.* ¶ 360(d)), but alleges the risk warning was nonetheless misleading because it omitted to disclose that "sales of iPhones in 2018 would be cannibalized by the combined effect of the premature upgrades in 2017 . . . and the 2018 battery replacement program," and "increased competition and worsening economic conditions in China . . . would continue to negatively affect the Company's business in the short term" (*id.* ¶ 362).  As before, the risk warning bears no relationship to the allegedly omitted information, and thus does not affirmatively mislead in that regard.  Further, as before, judicially noticeable facts demonstrate that the allegedly omitted information is simply false—iPhone unit sales and revenues *increased* for the remainder of FY 2018, as did revenues in Greater China.  *See supra* at Section II.B.

### 7.    The CAC's Remaining Misstatement Allegations Also Fail

The CAC challenges several other alleged misstatements that do not fit into the categories enumerated above, none of which give rise to securities liability.

First, the CAC challenges the statement in Apple's February 2, 2018 letter to Congress that newer iPhone models "include hardware updates that allow a more advanced performance management system . . . and avoid an unexpected shutdown."  *See* Chart at #29 (citing CAC ¶¶ 317-18); *see also* Ex. 22 at 4.  Apple's letter to Congress, however, was made in response to questions from Senator John Thune (CAC ¶ 318) and *not* "in connection with the purchase or sale of a security," and therefore cannot form the basis for securities liability.  *See Intel*, 2019 WL 1427660, at *11 n. 14 (collecting cases holding that statements that are not alleged to have been "directly targeted to investors or the investment community" are not actionable under the securities laws).[25]  Furthermore, while the CAC alleges this challenged statement "was false and

---

[25] Apple's statement to Congress is further shielded by the *Noerr–Pennington* doctrine, which bars civil claims where the activity challenged consists of "petitioning legislatures, administrative bodies, and the courts, even if the defendant's actions had an anticompetitive or otherwise injurious purpose or effect." *Tuosto v. Philip Morris USA Inc.*, 2007 WL 2398507, at *5-6 (S.D.N.Y. Aug. 21, 2007) (quotations omitted).  *Noerr–Pennington* protection has been extended to all advocacy intended to influence government action, including to allegedly false statements. *See, e.g.*, *E. R.R. Presidents Conference v. Noerr Motion Freight, Inc.*, 365 U.S. 127, 139 (1961) (holding that if statements to Congress could form the basis for civil liability, it would "deprive the government of a valuable source of information and, at the same time, deprive the people of their right to petition in the very instances in which that right may be of the most importance to them"); *Mark Aero, Inc., v. Trans World Airlines, Inc.*, 580 F.2d 288, 297 (8th Cir. 1978).

misleading when made" because "throttling the previous year's iPhones was a part of Apple's regular practice" (CAC ¶ 318), the CAC does not explain how Apple's practices regarding "the previous year's iPhones" had any bearing on the veracity of Apple's statements regarding the then-current "iPhone 8, 8 Plus and iPhone X" (*id.* ¶ 318). Further, while the CAC asserts that this statement was a "*promise*" to "investors and Congress" that Apple "would not need to throttle later-generations of iPhone models" (CAC ¶ 137 (emphasis added)), the plain language of the letter shows that it was not. *See* Ex. 22 at 4.

The CAC next challenges Apple's repeated disclosure that "there have been no material changes to the Company's market risk," which appeared in the Company's Forms 10-Q for the first three quarters of FY 2018 (*see* CAC ¶¶ 312, 337, 359), and referred investors to the market risk discussion in Apple's Form 10-K for FY 2017. *See* Exs. 17 at 32, 18 at 33, 19 at 35. The Chart asserts that the "market risk" statement in the Forms 10-Q was misleading for a host of reasons related to iPhone demand and the Company's battery replacement program (*see* Chart at #28, 40 and 53 (citing CAC ¶¶ 316, 341, 363)), but as the discussion in the FY 2017 10-K demonstrates, "market risk" in this context relates to "interest rate and foreign currency risks." *See* Ex. 20 at 36. In short, Apple's certification that "there have been no material changes to the Company's market risk" says or implies nothing at all about iPhone demand or the battery replacement program, and thus cannot be said to be misleading or inconsistent with the information Plaintiff alleges was omitted.

The CAC also challenges Mr. Cook's statements on the February 1, 2018 investor call that Apple "did not consider in any way, shape or form what [battery replacement] would do to upgrade rates. We did it because we thought it was the right thing to do for our customers. And I—sitting here today, I don't know what effect it will have." CAC ¶ 300. The Chart asserts that those statements were misleading because, in pertinent part, they omitted to state that "Apple was, in fact, tracking the number of consumers taking advantage of iPhone battery replacements and the expected negative effect of those battery replacements on iPhone upgrade rates for 2018." Chart at #23 (citing CAC ¶ 313(b)). But Mr. Cook's first statement addressed whether Apple considered the effect the battery replacement program would have on new iPhone demand in

---

1   choosing to offer low-cost battery replacements ("We did it because . . . it was the right thing to

2   do")—*not* whether the Company was then tracking battery replacements.  Further, Mr. Cook's

3   statement that he did not then "know what effect [the battery replacement program] will have" is

4   not inconsistent with the alleged fact that the Company was tracking battery replacements, and

5   there are no specific allegations to show that as of February 1, 2018, the Company could then

6   predict the *effect* of the battery replacement program such that his statement was false *when*

7   made.[26]

8        The CAC also challenges Mr. Cook's statement on that same February 1, 2018 investor

9   call that "it's very difficult currently to ever get a real-time handle on replacement rate because …

10  you don't know the replacement rate for the products you're currently selling.  You only know

11  that in a historical sense."  CAC ¶ 301.  The Chart asserts that this statement was misleading

12  because, in pertinent part, Apple was tracking battery replacements and knew "the rate at which

13  Apple customers were replacing their batteries in *older* iPhones . . . would negatively impact

14  demand."  Chart at #19 and 23 (citing CAC ¶ 313(c) (emphasis added)).  But Mr. Cook's

15  statement related to products Apple was "currently selling," and correctly stated that it would be

16  difficult to predict the future and determine the rate at which current purchasers would later

17  choose to replace those products.  Indeed, the statement that "[y]ou only know that in a historical

18  sense" (*id.* ¶ 301) is entirely *consistent* with the information Plaintiff claims was omitted.

19       The CAC further alleges that Defendants are liable for the following statement in a June 1,

20  2018 analyst report published by UBS: "Apple says the battery replacement program is having

21  little impact on shipments."  CAC ¶ 345.  To establish that corporate defendants are liable for the

22  statements of third-party analysts, Plaintiff was required to allege specific facts establishing that

23  Defendants sufficiently "entangled [themselves] with the analysts' forecasts" to render those

24  predictions attributable to them.  *Caere Corp.*, 837 F. Supp. at 1059; *see also In re Harmonic Inc.*

25

26  _____

[26]  At most, CW1 alleges that at some unidentified point in time, "Apple knew the battery
replacement program hurt sales."  CAC ¶ 250.  But there are no allegations to show *when* Apple
knew that fact, let alone that it was known to Mr. Cook before his February 1, 2018 statements.
Further, the allegations by CW1 and CW2 that battery replacements were "absolutely" or
"definitely" being tracked (*see* Chart at #23 (citing CAC ¶¶ 251, 254)) do not show that Apple
was analyzing the *effect* of the battery replacement program on upgrade rates.

*Sec. Litig.*, 163 F. Supp. 2d 1079, 1094-95 (N.D. Cal. 2001) ("[D]efendants are liable for forecasts made by third-party analysts only if the defendants have 'put their imprimatur, express or implied, on the projections.'").   Courts in this district have held that in order to plead entanglement with the specificity required by Rule 9(b) and the PSLRA, plaintiffs must identify at least the time, place, and nature of the alleged entanglement activity, *see, e.g.*, *In re VeriFone Sec. Litig.*, 784 F. Supp. 1471, 1487 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865 (9th Cir. 1993), *and* must also allege that defendants had some measure of control over the content of the final report issued by the analysts.   *Id.* at 1486.   The CAC does not satisfy those requirements, and thus cannot premise Defendants' liability on a third-party statement.

The CAC next challenges Mr. Cook's July 31, 2018 investor call statement that "we have never done an analysis internally about how many people decided to get a lower-priced battery than buy another phone because it was never about that for us.   It was always about doing something great for the user."   CAC ¶ 353.   The Chart asserts that this statement was misleading because, in pertinent part, "Apple was, in fact, tracking the number of consumers taking advantage of iPhone battery replacements and the expected effect . . . on iPhone's upgrade rates for 2018."   Chart at #48 (citing CAC ¶ 360(b)).   But regardless of whether Apple tracked battery replacement numbers, there are no allegations to establish that Apple ever performed "an analysis about how many people decided to get a lower priced battery than buy a phone," let alone that Apple did it before Mr. Cook's July 31, 2018 statement.   Further, his statement is not inconsistent with the allegedly undisclosed information, because Apple could be tracking battery replacements without ever doing an internal analysis "about how many people decided to get a lower-priced battery than buy another phone."   CAC ¶ 353.   The two statements are not mutually exclusive, and could both be true at the same time.

On the November 1, 2018 investor call, Mr. Maestri stated that there was "some level of uncertainty at the macroeconomic level in some emerging markets, where, clearly, consumer confidence is not as high as it was 12 months ago."   CAC ¶ 384.   The Chart asserts that Mr. Maestri's statement was misleading because, among other reasons, (i) "higher iPhone demand in 2017 and early 2018, including in Greater China, was driven by artificially accelerated upgrade

rates" (Chart at #54 (citing CAC ¶ 396(a))), (ii) "the rate at which Apple customers were replacing their batteries in older iPhones . . . was negatively impacting demand for the newer model iPhones" (*id.* (citing CAC ¶ 396(b))), and (iii) "iPhone demand in Greater China was declining and expected to deteriorate long term due to a confluence of factors . . . [that] were negatively impacting demand for iPhones" (*id.* (citing CAC ¶ 396(c))).  But Plaintiff does not attempt to explain how Mr. Maestri's statement was affirmatively misleading or inconsistent with regard to those purportedly omitted facts.

Finally, the CAC challenges Mr. Maestri's November 1, 2018 statement that Apple would no longer be providing unit sales data for iPhones because "our unit of sale is less relevant for us today than it was in the past given the breadth of our portfolio and the wider sales price dispersion within any given product line."  *Id.* ¶ 387.  Plaintiff's Chart asserts that this statement was misleading because, in pertinent part, "the decision to withhold iPhone unit sales was intentionally designed to conceal declining iPhone sales."  Chart at #57 (citing CAC ¶ 396(f)).  But there are no allegations to support that accusation, and to the extent Plaintiff is alleging the removal of iPhone unit sales data somehow demonstrates that prior sales data was false, Plaintiff is wrong on the law.  "[I]f the law viewed a company's editing or removal of language from an SEC filing as a tacit admission that the language was false when made, 'no public company would ever remove disclosures from its filings.'"  *Welgus v. TriNet Grp., Inc.*, 2017 WL 6466264, at *8 (N.D. Cal. Dec. 18, 2017), *aff'd*, 765 F. App'x 239 (9th Cir. 2019).

## C.    The CAC Does Not Allege Facts Supporting a "Strong Inference" of Scienter

Not only does the CAC fail to plead any actionable misstatement, it also fails to plead facts creating a "strong inference" of scienter.  "Where, as here, the Plaintiffs seek to hold individuals and a company liable on a securities fraud theory, [the Ninth Circuit] require[s] that the Plaintiffs allege scienter with respect to each of the individual defendants."  *Or. Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 607 (9th Cir. 2014).  Moreover, because Section 10(b) scienter requires "some degree of intentional or conscious misconduct," the plaintiff "must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent" to mislead investors.  *Silicon Graphics*, 183 F.3d at 977, 979.

While Plaintiff offers the conclusory assertion that "[s]enior management, including the Individual Defendants, closely tracked iPhone sales, and Apple's business in Greater China" (CAC ¶ 444(c)), conspicuously missing from the CAC are any particularized contemporaneous facts supporting this assertion, let alone any facts showing that the Individual Defendants had contemporaneous knowledge that any statement was false or misleading when made.  *See, e.g.*, *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 847 (9th Cir. 2003) (affirming dismissal because "complaint contains no factually particular allegations which strongly imply Defendant's *contemporaneous* knowledge that the statement was false when made").  Indeed, the CAC does "not (1) identify any specific information that was either received or communicated by any [Individual] [D]efendant, that (2) contradicts any public statement at the time it was made." *McCasland v. FormFactor Inc.*, 2009 WL 2086168, at *6 (N.D. Cal. July 14, 2009).

The CAC relies heavily on the accounts of ten unnamed CWs.  *See* CAC ¶¶ 206-67.  But as described below, the CW allegations do not create even a reasonable inference of scienter, much less one that is "cogent and at least as compelling" as the opposing inference of nonfraudulent intent.  *Tellabs*, 551 U.S. at 324.  Further, Plaintiff's Chart, which prominently features the CW allegations, serves only to highlight Plaintiff's failure to plead facts that establish scienter.  The Chart sets forth laundry lists of "facts" that purportedly undercut Defendants' statements, prefacing each list with a bare assertion that one or both of the Individual Defendants "knew, or at least recklessly disregarded" those purported facts.  *See, e.g.*, Chart at #1.  But noticeably missing from the Chart (and the CAC) is any explanation—detailed or otherwise— explaining *how* the Individual Defendants "knew, or at least recklessly disregarded" the purported facts.  Indeed, in many instances the Chart states that Cook or Maestri "knew" a purported fact even though the CAC contains no such allegation.  For example, the Chart states that Maestri "knew, or at least recklessly disregarded, that there were internal discussions at Apple regarding throttling iPhones because the phones could not keep up with the new releases of iOS software." Chart at #10 (citing CAC ¶ 478(d)).  But the cited portion of the CAC does not say *anything* about Maestri, let alone suggest that he was part of any such "internal discussions."  The Chart is replete with other examples of Plaintiff adding bare assertions that "Cook knew" or "Maestri

knew" purported facts,[27] in contravention of the Court's admonition that the Chart "must strictly adhere to the allegations in the operative complaint and may not contain any new or supplemental information," *see* Dkt. No. 87, and which in any event lack the particularized facts necessary to establish a strong inference of scienter.

Moreover, any inference of scienter is overwhelmed by judicially noticeable facts that are fundamentally inconsistent with any inference of scienter.  When these facts are considered, it is evident that the *only* cogent, and hence most compelling, inference that can rationally be drawn from the facts alleged is that Defendants acted appropriately, without any intent to defraud.

### 1.    The CAC's CW Allegations Do Not Support Any Inference of Scienter

"[A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements."  *Zucco*, 552 F.3d at 995.  "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge."  *Id.*  "Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter."  *Id.*  "[T]he Court may disregard confidential witness statements that are speculative, lack specificity, or are not based on personal knowledge," or that are not actually "indicative of falsity or scienter."  *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *18 (N.D. Cal. Mar. 24, 2014) (quotations omitted).

The CAC's CW allegations suffer from numerous defects, but the most fundamental is that *none* of the CWs provide any facts relevant to the state of mind of the Individual Defendants.  *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (CWs did not create a strong inference of scienter because they "lack first hand knowledge regarding what the individual defendants knew or did not know").  As illustrated in the chart below (created based on the allegations in CAC ¶¶ 206-67), *none* of the CWs claims to have had *any* interaction or contact whatsoever with either Individual Defendant, much less offers any facts

---

[27] *See, e.g.*, Chart at #12 (stating, without any support in the CAC, that Cook knew or recklessly disregarded that there was "a fair amount of negativity going around"); *id.* at #19 (stating, without any support in the CAC, that Cook knew about or recklessly disregarded a purported discussion during a "state of the union" meeting).

to establish his or her personal knowledge of either Individual Defendant's state of mind:

| CW | Apple Employee? | Reported to Individual Defendant? | Discussions with Individual Defendant? | Other Contact or Interaction with Individual Defendant? | Any Personal Knowledge Regarding Individual Defendant? |
|---|---|---|---|---|---|
| 1 | Yes | No | No | No | No |
| 2 | Yes | No | No | No | No |
| 3 | Yes | No | No | No | No |
| 4 | Yes | No | No | No | No |
| 5 | Yes | No | No | No | No |
| 6 | Yes | No | No | No | No |
| 7 | Yes | No | No | No | No |
| 8 | No | No | No | No | No |
| 9 | No | No | No | No | No |
| 10 | No | No | No | No | No |

It is thus "difficult to surmise how the opinions and observations of the CWs could support a reasonable inference about what these individual Defendants knew or did not know at the time each of the challenged statements was made." *Accuray*, 757 F. Supp. 2d at 949. Further, while several CWs make vague assertions—often untethered to specific time periods—about a purported "decline of iPhone sales (*see, e.g.*, CAC ¶ 220), or about the purported fact that demand for iPhones in China was "soft" (*id.* ¶ 233)—*none* of the CWs provide any *specific* information that contradicts anything in the statements that are alleged to be misleading. *See, e.g.*, *McCasland*, 2009 WL 2086168, at *5 (CW allegations did not support scienter inference because complaint did not "allege that any CW heard or read any specific private statement by a defendant that contradicted a public statement"); *Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*, 2018 WL 3126393, at *8 (N.D. Cal. June 26, 2018).

For example, while CW1 says he "confirmed that CEO Tim Cook, CFO Luca Maestri and COO Jeff Williams were 'absolutely' receiving reports on Supply and Demand" (CAC ¶ 259), the CAC does not allege how CW1 could confirm this purported fact given that he has no personal knowledge whatsoever as it relates to Messrs. Cook, Maestri, and Williams. *See, e.g.*, *Bao v. SolarCity Corp.*, 2016 WL 54133, at *5 (N.D. Cal. Jan. 5, 2016) (CWs' conclusory statements that individual defendants were "definitely" "involved in financial and accounting policy decisions" and were "quite hands-on" were "too conclusory, speculative, and/or vague to hold

weight").  Moreover, the CAC does not identify a *single specific fact* contained within those purported "reports," let alone any facts allegedly contradicting any of Defendants' purportedly misleading statements.  Similarly, CW1 contends that "Cook, Maestri and Williams also would have been informed by Apple's Sales & Marketing group about the elongating iPhone sales cycle."  CAC ¶ 259.  But again, no details are provided (or facts from personal knowledge to corroborate the assertion that these individuals would have been so "informed").  What specific information about the iPhone sales cycle was provided to the Individual Defendants?  When and how was it provided?  The CAC does not answer these basic questions.  These kinds of "negative characterizations of reports relied on by insiders, without specific reference to the contents of those reports, are insufficient to meet the heightened pleading requirements of the PSLRA." *Intuitive*, 759 F.3d at 1063 (brackets omitted); *see also Lu v. Align Tech., Inc.*, 2019 WL 5579520, at *9 (N.D. Cal. Oct. 29, 2019) (CWs' references to internal reports did not support a strong inference of scienter where they "fail[ed] to cite a single metric from any of the reports . . . that Defendants supposedly tracked" and did not identify a "single figure" from the reports).

With respect to CW2, he or she concludes that "internally Apple 'knew demand [in China was] soft'" (CAC ¶ 233) and that there were "'absolutely' internal conversations at the Company regarding elongated sales cycles and concerns about upgrade cycles being impacted by Apple's offer of discounted battery replacements" (*id.* ¶ 249).[28]  But "these sorts of generalized claims about corporate knowledge that offer no reliable personal knowledge concerning the individual defendants' mental state are insufficient to satisfy the scienter requirement."  *Nathanson v. Polycom, Inc.*, 87 F. Supp. 3d 966, 980 (N.D. Cal. 2015) (brackets and quotations omitted); *see also Zucco*, 552 F.3d at 998 (same).

As for CW3, a "Senior Manager, Pacific Retailer Operations" based in Singapore (CAC ¶ 208), he or she contends that "[a]fter the launch of the iPhone 8 in September 2017, the unbrickings and unbricking data in Asia was slow" (*id.* ¶ 218), causing "anxiety among

---

[28] CW2's contention that Apple was "'absolutely' tracking every single battery replacement" does not help Plaintiff.  CAC ¶ 251.  That Apple may have tracked the number of batteries it replaced does not establish that Apple knew that the rate of battery replacements "was negatively impacting demand for the newer model iPhones," as Plaintiff alleges.  *See, e.g., id.* ¶ 396(b).

employees in Asia operations" (*id.*).  CW3 further claims that it was "[p]retty well known that things were slowing down in China."  *Id.* ¶ 219.  These vague and unspecific statements do not support an inference of scienter.  While CW3 mentions "reports" about "unbricking" data that he or she was "informed" were delivered to Apple executive Deirdre O'Brien (*id.* ¶ 216), CW3 fails to identify any metric in those reports, let alone any specific information that was provided to the Individual Defendants and that contradicted anything in the challenged statements.

CW4, for his or her part, speculates that it was "[u]nlikely Apple did not analyze how the battery replacement program was impacting sales."  *Id.* ¶ 255.  CW4 does not, however, offer anything other than his or her own speculation as to what was "unlikely" to suggest that Apple did in fact analyze how the battery replacement program was impacting sales.  CW4 vaguely mentions "reports" that "went up to senior Apple leadership, which usually included Nick Severino (*id.* ¶ 267)—but just like CW3, CW4 does not link these "reports" to the Individual Defendants or identify a single metric purportedly contained in these reports.

CW5, who held an unspecified role in Apple's "B2B Solution Direct Sales" in Shanghai until February 2018 (*id.* ¶ 210), says that he or she "received reports" showing a purported "year-on-year loss" in "relationship revenue"—which CW5 defines as "revenue made through established clients and existing relationships"—as of December 2017 (*id.* ¶ 223).  Like the other CWs, CW5 is not alleged to have any contact with the Individual Defendants and cannot offer any facts to establish scienter.  Indeed, all that CW5 offers are assertions related to a purported "year-on-year loss for the Greater China region" in "relationship revenue," and a "Greater China 2018 Q1 score card," which purportedly showed that "sales dropped across the board in Greater China for January and February 2018."  *Id.* ¶ 224.  But CW5 does not adequately explain what this information represents.  Is a decline in "relationship revenue" incompatible with an increase in total revenue in Greater China?  Was CW5 even privy to details about sales and revenues outside the "B2B Solution Direct Sales Group"—which by CW5's own admission generated only "13% - 45% of Apple's total sales in Greater China depending upon the time frame"?  *Id.* ¶ 210.  The CAC sheds no light on these questions.  CW5 similarly fails to explain how the data he or she references—none of which is alleged to have been provided to the Individual Defendants—

demonstrates that any of the Individual Defendants acted with the requisite scienter.

As for CW6, a former "Client Manager" in Shanghai, he offers his opinion—not facts—based on "his own personal experiences," that "prior to the launch of Apple's new iPhones in September 2018 . . . pre-sale/intent to purchase numbers were low and not many clients were inquiring about the new iPhones." *Id.* ¶ 227. CW6 also states that at an unspecified time, he "believed he witnessed a decline in sales in Greater China" (*id.* ¶ 229), and further opines that "figures illustrating declining iPhone sales and market share were available to absolutely everyone within Apple" (*id.* ¶ 232). These vague, conclusory statements do not offer any particularized facts bearing on the Individual Defendants' alleged scienter.

CW7, a former "Regional Operations Manager" in Jiangsu, China (*id.* ¶ 212), similarly reports a "decrease of sales in iPhones since at least the end of 2017" that was "widely known within Apple" (*id.* ¶ 220). But like CW6, CW7 fails to identify any specific metrics, let alone metrics that were communicated to the Individual Defendants and that would have cast doubt on any of Defendants' allegedly misleading statements.

The final three CWs—CW8, CW9, and CW10—are not even alleged to have worked for Apple. CW8 is a former employee of Huawei, an Apple competitor, who says that starting at an unspecified time in 2018, it became "widely known within *Huawei* that Apple's iPhone sales were declining." *Id.* ¶ 235 (emphasis added). CW9 and CW10 are former employees of Foxconn, a contract assembler of iPhones. CW9 contends that Foxconn shut down certain iPhone production lines in China in 2017 and 2018 (*id.* ¶ 237), while CW10 states that iPhone demand in China had been declining ever since 2016 (*id.* ¶ 240). But none of these three non-Apple CWs are alleged to have had access to complete information about Apple's sales and revenues, let alone any information regarding what the Individual Defendants knew and when. *See NVIDIA*, 768 F.3d at 1061 (CWs' "experiences do not contribute to an inference of scienter" where "some witnesses never worked for NVIDIA").

### 2. The Stock Sales Allegations Do Not Support An Inference of Scienter

Plaintiff's allegations concerning the Individual Defendants' stock sales (CAC ¶¶ 445-59) likewise provide no support for an inference of scienter. Insider stock sales provide

1    circumstantial evidence of scienter only when they are "'dramatically out of line with prior

2    trading practices at times calculated to maximize the personal benefit from undisclosed inside

3    information.'"  *Silicon Graphics,* 183 F.3d at 986.  Factors relevant to the determination of

4    whether stock sales meet this standard include: "(1) the amount and percentage of shares sold by

5    insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's

6    prior trading history."  *Id.*  When these factors are considered with respect to the shares that

7    Defendants Cook and Maestri are alleged to have sold during the Class Period (CAC ¶ 448),[29] the

8    facts point decisively away from an inference of fraud.

9        As an initial matter, *all* of the Individual Defendants' alleged sales were made pursuant to

10   10b5-1 trading plans.  CAC ¶¶ 457-59; Exs. 30-31, 42-44.  Under Rule 10b5–1, corporate insiders

11   can set up trading plans to sell company shares at predetermined times and amounts to avoid

12   accusations of illegal insider trading.  *See* 17 C.F.R. § 240.10b5–1(c); *Metzler,* 540 F.3d at 1067

13   n.11 (stock sales conducted pursuant to a pre-determined Rule 10b5-1 trading plan may "rebut []

14   an inference of scienter"); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1427-28 (9th Cir.

15   1994).  The fact that neither Individual Defendant is alleged to have traded outside of his 10b5-1

16   plan cuts strongly against a finding of scienter.  *See Rodriguez v. Gigamon, Inc.*, 325 F. Supp. 3d

17   1041, 1056 (N.D. Cal. 2018) ("In general, automatic sales made pursuant to Rule 10b5-1 plans do

18   not support a strong inference of scienter.").

19       Moreover, the Individual Defendants' stock sales during the Class Period were consistent

20   with their prior trading history and their vesting schedules.  Plaintiff alleges that Cook sold

21   approximately 30.3% of the total shares he had available for sale during the Class Period.  CAC

22   ¶ 450.  Yet, during the preceding "Control Period" alleged by Plaintiff, Cook sold *more shares*

23   than he did during the Class Period, CAC ¶ 448, totaling 45.2% of his available holdings, *see*

24

---

25   [29] The CAC erroneously appears to suggests that the 586,217 shares of Company stock that were
     "withheld by the Company to pay [Cook's] personal taxes in connection with Company-issued

26   stock" and the 184,556 shares of Company stock that were "withheld by the Company to pay
     [Maestri's] personal taxes in connection with Company-issued stock" (CAC ¶¶ 450-51) are

27   indicative of scienter.  However, such non-discretionary transactions executed to satisfy tax
     obligations are irrelevant for purposes of analyzing scienter.  *See, e.g.*, *Zamir v. Bridgepoint*

28   *Educ., Inc.*, 2016 WL 3971400, at *10 (S.D. Cal. July 25, 2016).

RJN at 4.  Thus, Cook's Class Period sales were not "dramatically out of line with prior trading practices."  *Silicon Graphics*, 183 F.3d at 986.  Similarly, while Maestri is alleged to have sold 92.3% of his total holdings during the Class Period, this percentage is smaller than the *99.4%* of his available holdings sold during the Control Period (*see* RJN at 5) which means that his Class Period Sales, too, were not dramatically out of line with prior trading practices.  *See Metzler*, 540 F.3d at 1067 (defendant's sales constituting 100% of holdings did not raise scienter inference since trading was consistent with pre-class period sales); *Osher v. JNI Corp.*, 308 F. Supp. 2d 1168, 1195 (defendant's sales constituting 98.48% of holdings did not raise scienter inference because she "sold 100% of her available stocks" before class period), *aff'd in relevant part*, 183 F. App'x 604, 605 (9th Cir. 2006).

Finally, there is nothing suspicious about the timing of the Individual Defendants' stock sales.  All but two of the Class Period sales occurred within several weeks following the release of Apple's quarterly results.  CAC ¶¶ 15-25, 448.  As the Ninth Circuit has recognized, "[o]fficers of publicly traded companies commonly make stock transactions following the public release of quarterly earnings and related financial disclosures."  *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002).  Thus, "an insider's sale of stock after announcement of positive quarterly results d[oes] not give rise to a finding of scienter."  *In re IMPAX Labs., Inc. Sec. Litig.*, 2006 WL 6361942, at *8 (N.D. Cal. Mar. 1, 2006) (citing *Lipton*, 284 F.3d at 1037).

### 3.     Plaintiff's Remaining Scienter Allegations Are Unavailing

Plaintiff makes a handful of additional allegations in an attempt to plead scienter.  None of them are availing.  First, the CAC cites the "importance of Greater China to Apple's business and growth strategy" (CAC ¶ 444(b)), claiming that "Defendants Cook and Maestri closely monitored the Chinese smartphone market and Apple's iPhone business there" (*id.* ¶ 463).  But vague and conclusory allegations that the Individual Defendants "closely monitored" Apple's business in China cannot make up for the fact that the CAC does not identify any specific information made available to the Individual Defendants that contradicts any public statement at the time it was made.  *See Metzler*, 540 F.3d at 1068 ("[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter . . . absent some additional

---

1    allegation of specific information conveyed to management and related to the fraud.”).

2        Second, Plaintiff contends that “Defendants possessed the motive and opportunity to

3    artificially accelerate the iPhone upgrade cycle once sales for the iPhone peaked in 2016 and

4    threatened to derail the Company’s business[.]”  CAC ¶ 444(e).  But this purported “motive” to

5    “accelerate the iPhone upgrade cycle” is untethered to Plaintiff’s claim in this case, which is that

6    Defendants made misleading statements to investors about the Company’s results and

7    performance.  In any event, the CAC cites no facts linking the Individual Defendants to any

8    attempt to “artificially accelerate the iPhone upgrade cycle.”  Further, these kinds of bare

9    “allegations of motive and opportunity, without more, are insufficient to allege scienter.”

10   *Maritime*, 2013 WL 5442394, at *7; *see also Lipton*, 284 F.3d at 1038 (“If scienter could be

11   pleaded merely by alleging that officers and directors possess motive and opportunity to enhance

12   a company’s business prospects, virtually every company in the United States that experiences a

13   downturn in stock price could be forced to defend securities fraud actions.”) (quotations omitted).

14       Finally, the CAC alleges that Apple’s announcement on November 1, 2018 that it would

15   no longer report iPhone unit sales data for future quarters is indicative of Defendants’ scienter.

16   CAC ¶¶ 479-85.  According to Plaintiff, the change in reporting was an attempt by the Company

17   to “obscure declining iPhone sales growth.”  *Id.* ¶ 444(g).  However, the Company *did* report

18   iPhone unit sales for Q4 FY 2018 on November 1—the last disclosure during the Class Period—

19   while announcing that it would stop reporting unit sales for *future* quarters.  Ex. 9 at Ex.-99.2; Ex.

20   15 at 9; CAC ¶ 479.  As the CAC acknowledges, the announcement was “interpreted by some

21   analysts negatively—that if the iPhone was entering a decline, then not reporting its sales

22   numbers might help avoid the negative publicity.”  CAC ¶ 482.  So if, as Plaintiff contends,

23   Defendants were bent on inflating the price of Apple stock during the Class Period, then why

24   would they have disclosed these plans for *future* reporting a full quarter before the change was set

25   to be implemented?  In any event, the CAC contains no particularized facts suggesting that the

26   Individual Defendants intended to mislead investors by deciding to no longer report iPhone unit

27   sales.

28

1

2

     **4.**     **The CAC's Allegations Do Not Give Rise To a Reasonable Inference of Scienter, Much Less One That Is Cogent and at Least as Compelling as the Alternative Innocent Explanation**

3

4

5

6

7

Plaintiff's failure to plead scienter is even more glaring when examined under *Tellabs'* holistic analysis.   551 U.S. at 323-24, 326.   Under this comparative inquiry, the Court must "compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference."   *Zucco*, 552 F.3d at 991.

8

9

10

11

12

13

The CAC's allegations, viewed holistically, do not create even a *reasonable* inference of scienter, much less a cogent one.   The CAC posits a vague and amorphous theory of fraud, and is utterly lacking in particularized allegations bearing on the mental states of the Individual Defendants.   The CAC contains nothing of substance to indicate that the Individual Defendants (or any other "speaker") did not believe that the allegedly misleading statements were accurate at the time they were made.   Moreover, the statements *were* accurate.   *See* Section IV.B, *supra*.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Conversely, the opposing innocent inference is compelling and far outweighs any possible inference of scienter.   First, Apple spent approximately *$88 billion* to repurchase its own stock during the Class Period (*see* Ex. 20 at 19; Ex. 17 at 43; Ex. 18 at 45; Ex. 19 at 46; Ex. 47 at 44), which would have made no sense if Defendants believed that Apple's stock price was artificially inflated due to alleged fraud.   Simply put, "it is illogical that [Apple] would have been repurchasing its shares had it been aware of facts that would indicate the price would fall."   *In re Cisco Sys. Inc. Sec. Litig.*, 2013 WL 1402788, at *8 (N.D. Cal. Mar. 29, 2013) (citation omitted); *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 933 (N.D. Cal. 2017).   Second, Defendants accurately reported Apple's iPhone sales and revenue and Greater China revenue throughout the Class Period—indeed, Plaintiff does not contest the accuracy of the reported figures.   Third, Defendants made good faith efforts to issue reasonable revenue guidance, without hesitating to set guidance lower than analyst expectations when circumstances warranted (*see* CAC ¶¶ 26, 490(a)).   Fourth, when economic conditions in China deteriorated more severely than the Company had anticipated, causing revenue to be projected to come in lower than expected, Defendants did not wait until the release of Apple's financial results to inform the market about the Company's

guidance miss, as they were permitted to do under SEC rules—they instead chose to proactively inform the market about the lower-than-expected revenue almost a month early, on January 2, 2019.  *Cf. Webb v. SolarCity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018) (fact that defendants "were forthcoming with the public" regarding adverse facts undermined scienter inference).

Against this backdrop, the most cogent and compelling inference is that Defendants simply did not "foresee the magnitude of the economic deceleration [in Q1 FY 2019], particularly in Greater China" (Ex. 3 at Ex.-99.1), as the Cook Letter stated.  As a matter of law, such an inference cannot sustain a securities fraud claim.

### D.       The CAC Fails to Plead Loss Causation

In addition to failing to allege falsity and scienter, the CAC also fails to allege loss causation with respect to Defendants' alleged failure to disclose that: (1) Apple's battery replacement program in 2018 was negatively impacting demand (CAC ¶ 13(b)-(c)); (2) "higher iPhone demand in 2017 and early 2018 . . . was driven by artificially accelerated upgrade rates" (*id.* ¶ 13(a)); and (3) "WeChat's core features competed directly with many of the core features of Apple's iOS operating system" (*id.* ¶ 13(f)).

Where, as here, a plaintiff purports to rely on the "materialization of the risk" doctrine to plead loss causation (*see* CAC ¶¶ 487, 515), it must allege facts showing that "misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value of a security."  *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013) (quotation omitted).  With respect to the alleged omissions regarding Apple's battery replacement program, the "materialization of the risk" doctrine does not apply because Plaintiff cannot plausibly allege that the potential risks of that program were "concealed" throughout the Class Period.  To the contrary, and as discussed above, by early January 2018 the market was fully aware of the risk— widely discussed in the media—that Apple's battery replacement program would negatively impact new iPhone sales.  *See* Section II.A., *supra*.  To the extent that the drop in Apple's stock price following the release of the January 2, 2019 "Letter from Tim Cook to Apple Investors" was in any way tied to the disclosures in that letter relating to battery replacements, that drop

"represented the materialization of a known risk, rather than the disclosure of a concealed one." *Monroe Cty. Employees' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 357–58 (S.D.N.Y. 2014) (loss causation not pled where allegedly concealed risks were the subject of extensive media coverage well before the alleged materialization of the risk).

In addition, the CAC fails to allege with particularity that any risks relating to "higher iPhone demand in 2017 and early 2018," or to competition with WeChat, ever "materialized and played some part in diminishing the market value" of Apple's stock. *Nuveen*, 730 F.3d at 1120. The CAC nowhere alleges that Apple's stock price dropped as a result of a disclosure that "higher iPhone demand in 2017 and early 2018 . . . was driven by artificially accelerated upgrade rates as a result of Apple intentionally throttling older-model iPhones during 2017." CAC ¶ 13(a). Similarly, the CAC wholly fails to identify any purported materialization of any risk relating to the alleged fact that "WeChat's core features competed directly with many of the core features of Apple's iOS operating system" (*id.* ¶ 13(f)), let alone allege any facts demonstrating that the market reacted negatively to any such information.

### E.   The Section 20(a) Claim Fails For Lack Of A Predicate Primary Violation

Section 20(a) claims may be dismissed summarily "if a plaintiff fails to adequately plead a primary violation of [S]ection 10(b)." *Zucco*, 552 F.3d at 990. Because Plaintiff fails to plead a violation of Section 10(b), its Section 20(a) claim must likewise be dismissed.

## V.   CONCLUSION

For these reasons, the CAC should be dismissed.

Dated: December 16, 2019     ORRICK, HERRINGTON & SUTCLIFFE LLP


                */s/ James N. Kramer*
                 James N. Kramer

              Attorneys for Defendants Apple Inc.,
              Timothy Cook, and Luca Maestri