1

**LABATON SUCHAROW LLP**
Carol C. Villegas (admitted *pro hac vice*)

2

Christine M. Fox (admitted *pro hac vice*)
140 Broadway

3

New York, New York 10005
Telephone: (212) 907-0700

4

Facsimile: (212) 818-0477
cvillegas@labaton.com

5

cfox@labaton.com

6

*Counsel for Lead Plaintiff Employees'*
*Retirement System of the State of Rhode Island*

7

*and the Proposed Class*

8

**WAGSTAFFE, VON LOEWENFELDT,**
**BUSCH & RADWICK LLP**

9

James M. Wagstaffe (SBN 95535)
Frank Busch (SBN 258288)

10

100 Pine Street, Suite 725
San Francisco, California 94111

11

Telephone: (415) 357-8900
Facsimile: (415) 357-8910

12

wagstaffe@wvbrlaw.com
busch@wvbrlaw.com

13

*Liaison Counsel for Lead Plaintiff Employees'*

14

*Retirement System of the State of Rhode Island*
*and the Proposed Class*

15

16

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

17

18

)
)

19

)   Civil Action No. 4:19-cv-02033-YGR
)

20

IN RE APPLE INC. SECURITIES
LITIGATION

)   **LEAD PLAINTIFF'S OPPOSITION TO**
)   **DEFENDANTS' MOTION TO DISMISS**
)

21

)   Date:   March 3, 2020
)   Time:   2:00 p.m.

22

)   Judge:  Honorable Yvonne Gonzalez Rogers
)   Ctrm:   1, 4th Floor

23

)

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

I.    INTRODUCTION ......................................................................................................... 1

II.   BACKGROUND ........................................................................................................... 3

    A.   Apple's iPhone and the Importance of the Chinese Market ................................. 3

    B.   The Impact of the Elongating Smartphone Upgrade Cycle on iPhone Sales ......... 4

    C.   Apple Experiences a Slow Down in iPhone Sales Growth, Especially in
       Greater China .................................................................................................. 5

    D.   Apple Throttles its iPhones to Boost Sales ......................................................... 6

    E.   Apple Admits That It Had Been Intentionally Throttling iPhones, But
       Conceals The Impact Defendants Knew This Was Having on iPhone
       Demand ........................................................................................................... 7

    F.   Apple Continues Throttling iPhones Despite Saying It Would Stop..................... 8

    G.   The Risks Concealed By Defendants' False and Misleading Statements
       Materialize ...................................................................................................... 9

III.  ARGUMENT ............................................................................................................... 10

    A.   Applicable Legal Standard................................................................................. 10

    B.   The Complaint Is Not A Puzzle Pleading ........................................................... 11

    C.   The Complaint Adequately Alleges Falsity......................................................... 11

       1.   Defendants' 2017 Statements About iPhone Sales and Demand Are
          Actionable Omissions ........................................................................... 12

       2.   Defendant Cook's Statements During the February 1, 2018 and
          July 31, 2018 Earnings Calls Regarding The Battery Replacement
          Program Are Actionable ......................................................................... 15

       3.   Statements in the February 2, 2018 Letter to Congress Are
          Actionable ............................................................................................ 17

       4.   Defendants' June 1, 2018 Statement in UBS Analyst Report Is
          Actionable ............................................................................................ 17

       5.   Defendants' 2018 Statements About iPhone Sales and Demand Are
          Actionable Omissions ........................................................................... 18

6.    Defendant Maestri's November 1, 2018 Statements Regarding Emerging Markets and Unit Sales Are Actionable ................................. 21

7.    Defendants' Statements Regarding The Strength of Apple's iPhone Business in China Are Actionable Omissions ........................................... 22

8.    Apple's Risk Warnings and Statements About the Company's Market Risk Were Materially False and Misleading ............................... 24

9.    Alleged Forward Looking Statements Are Not Protected By The Statutory Safe Harbor ................................................................................ 25

10.   Statements Defendants Challenge As Corporate Optimism and Opinion Are Actionable .......................................................................... 28

D.    The Complaint Adequately Alleges Scienter ....................................................... 32

1.    The Individual Defendants' Stock Sales During The Class Period Were Highly Unusual and Suspicious ....................................................... 32

2.    Statements By Former Employees and Others With Knowledge Corroborate That Defendants Closely Tracked iPhone Sales and Apple's Business in Greater China .......................................................... 34

3.    Apple's Business in Greater China and Sales of the iPhone Are Core Operations of the Company ............................................................. 37

4.    Additional Evidence of Scienter ............................................................. 38

5.    Defendants' Non-Culpable Explanations Do Not Undermine Scienter .................................................................................................... 38

E.    The Complaint Adequately Alleges Loss Causation ........................................... 39

F.    The Complaint Adequately Alleges Claims Under Section 20(a) ....................... 40

IV.   CONCLUSION ................................................................................................................ 40

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Abdo v. Fitzsimmons,*
5     2017 WL 6994539 (N.D. Cal. Nov. 3, 2017) ...........................................................11

6

*In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.,*
    794 F. Supp. 1424 (D. Ariz. 1992) ......................................................................17

7

*Anderson v. Peregrine Pharm., Inc.,*
8     2013 WL 4780059 (C.D. Cal. Aug. 23, 2013).......................................................37

9

*Berson v. Applied Signal Tech., Inc.,*
10     527 F.3d 982 (9th Cir. 2008) ............................................... 11-12, 16, 37

11

*Bielousov v. GoPro, Inc.,*
    2017 WL 3168522 (N.D. Cal. July 26, 2017).......................................................25, 32

12

*In re Bridgepoint Educ. Inc. Sec. Litig.,*
13     2013 WL 5206216 (S.D. Cal. Sep. 13, 2013) ......................................................34

14

*Brody v. Transitional Hospitals Corp.,*
15     280 F.3d 997 (9th Cir. 2002) ................................................................13

16

*Carvelli v. Ocwen Fin. Corp.,*
    934 F.3d 1307 (11th Cir. 2019) ...........................................................31

17

*In re Celera Corp. Sec. Litig.*
18     2013 WL 4726097 (N.D. Cal. Sept. 3, 2013) ......................................................25

19

*Chicago Conservation Ctr. v. Frey,*
20     40 F. App'x 251 (7th Cir. 2002) ..........................................................31

21

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.,*
    856 F.3d 605 (9th Cir. 2017) .........................................................10, 31

22

*Cooper v. Pickett,*
23     137 F.3d 616 (9th Cir. 1997) ................................................................18

24

*Cunha v. Hansen Nat. Corp.,*
    2012 WL 12886194 (C.D. Cal. Oct. 22, 2012).....................................................13

25

*Cutler v. Kirchner,*
26     696 F. App'x 809 (9th Cir. 2017) .........................................................24, 29

27

28

*Cutler v. Rancher Energy Corp.*,
  2014 WL 1153054 (C.D. Cal. Mar. 11, 2014) ................................................................29

*In re CV Therapeutics, Inc. Sec. Litig.*,
  2004 WL 1753251 (N.D. Cal. Aug. 5, 2004) .................................................................25

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ......................................................................................38

*In re Extreme Networks, Inc. Sec. Litig.*,
  2018 WL 1411129 (N.D. Cal. Mar. 21, 2018) ...............................................................35

*In re Finisar Corp. Sec. Litig.*,
  2013 WL 211206 (N.D. Cal. Jan. 16, 2013) ..................................................................19

*Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017) ...........................................................................33

*In re Gilead Scis. Sec. Litig.*,
  2009 WL 3320492 (N.D. Cal. Oct. 13, 2009) ................................................................36

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ......................................................................................40

*Hatamian v. Advanced Micro Devices, Inc.*,
  87 F. Supp. 3d 1149  (N.D. Cal. 2015 ...........................................................................35

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) ......................................................................................35

*In re Intel Corp. Sec. Litig.*,
  2019 WL 1427660 (N.D. Cal. Mar. 29, 2019) ..........................................................17, 30

*In re Intuitive Surgical Sec. Litig.*,
  65 F. Supp. 3d 821, 831(N.D. Cal. 2014) ......................................................................11

*Karinski v. Stamps.com*,
  2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ..................................................................29

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ............................................................................10, 12, 23

*In re LendingClub Sec. Litig.*,
  254 F. Supp. 3d 1107, 1118 (N.D. Cal. 2017) ...............................................................13

*Mallen v. Alphatec Holdings, Inc.*,
  861 F. Supp. 2d 1111 (S.D. Cal. 2012) .........................................................................26

*Maritime Asset Management, LLC v. NeurogesX, Inc.*,
  2013 WL 5442394 (N.D. Cal. Sept. 30, 2013) ...................................................................14

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)..............................................................................................10, 32

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) .......................................................................24

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014)......................................................................................24

*In re MicroStrategy, Inc. Sec. Litig.*,
  115 F. Supp. 2d 620 (E.D. Va. 2000) ..........................................................................33

*Milkovich v. Lorain Journal Co.*,
  497 U.S. 1 (1990)................................................................................................17

*Miller v. Thane Int'l, Inc.*,
  519 F.3d 879 (9th Cir. 2008) ..................................................................................12

*Mineworkers' Pension Scheme v. First Solar Inc.*,
  881 F.3d 750 (9th Cir. 2018) ..............................................................................39, 40

*Mulligan v. Impax Laboratories, Inc.*,
  36 F. Supp. 3d .......................................................................................... *passim*

*Murphy v. Precision Castparts Corp.*,
  2017 WL 3084274 (D. Or. June 27, 2017) ............................................................11, 13, 14

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding
  Corp.*,
  320 F.3d 920 (9th Cir. 2003) ..................................................................................40

*In re Nuvelo, Inc. Sec. Litig.*,
  668 F. Supp. 2d 1217 (N.D. Cal. 2009) .......................................................................40

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)..............................................................................................31

*In re OmniVision Techs., Inc.*,
  2005 WL 1867717 (N.D. Cal. July 29, 2005).................................................................34

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010) ..................................................................................35

*Police and Fire Ret. Sys.of the City of Detroit v. Crane*,
  87 F. Supp. 3d 1075, 1082-83 (N.D. Cal. 2015)......................................................13, 20, 35

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996) ..................................................................................33

*In re Quality Systems, Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ............................................................... *passim*

*In re Questcor Inc. Sec. Litig.*,
  2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ...........................................................34

*Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526, 555 (S.D.N.Y. 2017)...........................................................33

*Roberti v. OSI Sys., Inc.*,
  2015 WL 1985562 (C.D. Cal. Feb. 27, 2015).........................................................25

*Rudolph v. UTStarcom*,
  2008 WL 4002855 (N.D. Cal. Aug. 21, 2008) .......................................................40

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ..................................................................32, 37, 38

*Schueneman v. Arena Pharm., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ...........................................................12, 14, 20, 32

*In re Seebeyond Techs. Corp. Sec. Litig.*,
  266 F. Supp. 2d 1150 (C.D. Cal. 2003) .................................................................34

*Shenwick v. Twitter, Inc.*,
  282 F. Supp. 3d 1115, 1141 (N.D. Cal. 2017) .......................................................29

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999) ..................................................................32, 33

*In re STEC Inc. Sec. Litig.*,
  2011 WL 2669217 (C.D. Cal. Jun. 17, 2011) ........................................................12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)...........................................................................10, 32

*Todd v. STAAR Surgical Co.*,
  2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ........................................................25

*Union Asset Mgmt. Holding AG v. SanDisk LLC*,
  2017 WL 3097184 (N.D. Cal. June 22, 2017).........................................................30

*Vancouver Alumni Asset Holdings Inc. v. Daimler AG*,
  2017 WL 2378369 (C.D. Cal. May 31, 2017) ........................................................37

*In re Verifone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) ................................................................32

*In re Viropharma Inc. Sec. Litig.*,
21 F. Supp. 3d 458, 474 ................................................................39

*In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*,
694 F. Supp. 2d 1192 (W.D. Wash. 2009)................................................35

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ................................................................35

**Statutes**

Securities Exchange Act of 1934 §20(a), 15 U.S.C. §78t(a) ................................40

1    Lead Plaintiff Employees' Retirement System of the State of Rhode Island ("Plaintiff")

2    respectfully submits this memorandum in opposition to Defendants' Motion to Dismiss the

3    Consolidated and Amended Class Action Complaint ("Motion" or "Mot.").[1]

4    ## I.      INTRODUCTION

5    This securities class action involves a scheme by Defendants to secretly slow down, or

6    "throttle," iPhones with older batteries to force consumers into falsely believing their devices

7    were obsolete and prematurely upgrading their iPhones, which artificially inflated Apple's

8    iPhone sales in 2017 and early 2018.  Before that, starting in 2015, Apple experienced relatively

9    flat iPhone unit sales after being unable to duplicate the innovation of the iPhone 6.  The

10   faltering growth in iPhone sales threatened the long term health of the Company as Apple's

11   customer base for its flagship product stalled and the potential universe of customers for its

12   services and other products stagnated. But, these artificially inflated sales in 2017 provided the

13   appearance of a reversal of the flat-to-declining iPhone sales growth, reinvigorating market

14   interest in Apple.

15   When an independent investigation revealed that Apple's routine software updates had

16   caused the slowdown in older iPhone models, and that the slowdowns were battery-related,

17   Apple responded by admitting that it had deliberately throttled performance on some iPhones,

18   purportedly to preserve battery life and avoid unexpected shutdowns. In an effort to retain

19   customer goodwill after this admission, Apple announced that during calendar year 2018, it

20   would offer a discount for replacement iPhone batteries, charging $29, down from $79. Despite

21   the discounted battery offer, the damage to the Company's reputation and goodwill, especially in

22   the protectionist Chinese market, was done.

23   The first negative financial effects of the Company's throttling came in February 2018,

24   when Apple announced disappointing guidance for Q2 FY18. The disappointing guidance

25   signaled declining iPhone demand for two reasons. First, instead of upgrading for nearly $1,000

26

27   [1] Defendants are defined herein as Apple Inc. ("Apple" or the "Company"), Timothy Cook, and
     Luca Maestri (the "Individual Defendants"). References to the Corrected Consolidated and

28   Amended Class Action Complaint (the "Complaint") (ECF No. 98) are denoted as "¶__".

1  a phone (as consumers had been doing for the past two quarters), consumers were instead taking

2  advantage of Apple's $29 battery replacement. Second, consumers also were upset with Apple's

3  tactics and turned away from the iPhone to competitors when it came time to upgrade or

4  purchase a new phone. This led to a marked decline in market share throughout the Class Period,

5  particularly in Greater China, one of Apple's most important markets.

6        In order to further conceal Apple's declining share of the smartphone market, throughout

7  the Class Period (August 2, 2017 through January 2, 2019, inclusive), Defendants misled

8  investors by making materially false and misleading statements and omissions related to the

9  Company's revenues and demand for iPhones that artificially inflated or artificially maintained

10  Apple's stock price. However, Defendants knew and failed to disclose, or deliberately

11  disregarded, among other things, that higher iPhone demand in 2017 and early 2018, including in

12  Greater China, was driven by artificially accelerated upgrade rates and that Apple's $29 battery

13  replacement program was negatively impacting demand for the newer model iPhones (including

14  the iPhone XS, XS Max, and XR, released in September and October 2018).

15        Moreover, Defendants knew and failed to disclose, or deliberately disregarded, that a

16  confluence of factors was negatively impacting demand for iPhones in Greater China and

17  decimating Apple's pricing power in that country's smartphone market including:

18  (i) macroeconomic and geopolitical issues, as well as trade tensions and a worsening economy in

19  2018, (ii) Apple's continued throttling of recent models of iPhones, which negatively affected

20  the perception of the Company, and (iii) severe competition in the Chinese smartphone market.

21        Statements of former employees of Apple and certain of its suppliers confirm that during

22  the Class Period, Defendants meticulously tracked point of sales data for the iPhone and knew

23  that sales growth was stalling, especially in Greater China, where lower-priced competitors'

24  smartphones with better features were proliferating. Moreover, former employees confirm that

25  Apple also tracked and discussed: (i) lengthening smartphone and iPhone upgrade cycles; and

26  (ii) how the Company's battery replacement offer would affect iPhone upgrade cycles, and knew

27  that accelerated upgrade rates in calendar 2017 would negatively affect iPhone revenues later in

28  2018.

Despite knowing these facts because they had access to and closely tracked these metrics, during the Class Period, Defendants repeatedly boasted about record results in Apple's Q3 FY17, Q4 FY17, and Q1 FY18. Defendants continued to laud "strong revenue growth in iPhone" in Q2 FY18.  However, what Defendants failed to inform the market was that the "strong revenue growth in iPhone" concealed a drop in iPhone unit sales worldwide which was masked, in part, by the significantly higher average selling prices ("ASPs") for Apple's latest iPhone models.

The truth came to the market on January 2, 2019, when, for the first time in 15 years, Apple slashed its prior quarterly revenue forecast for the already completed Q1 FY19 amid falling iPhone sales. Apple disclosed that revenues for Q1 FY19 were expected to be $84 billion, far below the already-disappointing guidance range of $89 billion to $93 billion the Company had announced just eight weeks earlier. Discussing why Apple had experienced "fewer iPhone upgrades than [it] had anticipated," Defendant Cook blamed the Company's discounted battery replacement program, as well as emerging market issues, "primarily in Greater China." This shocking news caused Apple's stock price to fall by more than $15 per share, or approximately 10 percent. That same day, *Bloomberg* reported that: "Apple failed in the No. 1 mission of being a public company: being honest with investors about its business. The company simply denied the reality that was staring it in the face, until denial was no longer an option."

While Defendants Cook and Maestri were issuing materially false and misleading statements and omissions related to the Company's revenues and demand for iPhones, these two top executives were selling their Apple stock in unusual and suspicious amounts ***totaling more than $131.5 million*** while in possession of material non-public information regarding Apple's declining iPhone sales growth, the effects of the Company's battery replacement program, and the impact increased competition would have on iPhone sales.

## II.   BACKGROUND

### A.   Apple's iPhone and the Importance of the Chinese Market

Apple is a multinational technology company that sells some of the world's most widely used consumer electronics, including the iPhone—Apple's flagship product. ¶¶42-44, 45-50. The iPhone is Apple's most important product in terms of revenue, accounting for more than 60

1   percent of Apple's net sales over the past five years. ¶¶45-46.  In recent years, however, as the

2   global smartphone market has stagnated, Apple has had to look outside the U.S. for growth. ¶52.

3   Indeed, Apple's success—and sales of the iPhone—have become increasingly reliant on the

4   Chinese market, which is Apple's third-largest market by sales after the United States and

5   Europe. ¶51. Greater China's share of Apple's revenues has grown steadily over the past five

6   years. *Id.* Indeed, between Q4 FY14 and Q4 FY15, Apple's revenue from China grew from $5.7

7   billion to $12.5 billion—a 99% jump. ¶52. The Greater China market is especially important for

8   iPhone sales given the sheer size of the smartphone market in that region, which has been

9   estimated to include 660 million smartphone users (roughly one-third of the two billion users

10  worldwide). ¶53.

11          **B.       The Impact of the Elongating Smartphone Upgrade Cycle on iPhone Sales**

12          Consumers are increasingly holding onto their smartphones for longer periods of time,

13  rather than upgrading them regularly, as was more common in years past. ¶¶57-60. Recent

14  studies have shown that in 2018, consumers waited an average of 2.83 years to upgrade their

15  smartphones, up from 2.39 years just two years earlier. ¶60. A number of factors have

16  contributed to this elongated upgrade cycle, some of which have more acutely impacted the

17  iPhone upgrade rate. Technological advances have transformed mobile phones into fixtures of

18  everyday life, with new models boasting consistently improved features like larger screens,

19  longer battery life, and more powerful cameras. ¶57. This has significantly driven up the retail

20  price of smartphones. *Id.* Over the last five years, for example, the price of an iPhone has

21  increased from the $99-$399 range maintained through 2013 to a top offering price of $1,449 for

22  the Apple XS Max released in September 2018. ¶¶47-48. The higher price points for a new

23  smartphone has meant that consumers are more likely to hold onto their current phones for

24  longer. Compounding this is the fact that more recent phone models lack significant feature

25  differentiation from prior models. ¶68. Thus, as prices increase and the rate of observable

26  innovation in new phones have plateaued, consumers are opting to stick with their current

27  phones rather than spend an ever-increasing amount of money to buy a new phone. ¶¶71-73.

28

### C.   Apple Experiences a Slow Down in iPhone Sales Growth, Especially in Greater China

Beginning in 2016, stricken by an elongated upgrade cycle and slowing product innovation, the smartphone industry as a whole suffered stagnating growth. ¶81. Apple's iPhone sales were particularly impacted by this slow down: between 2015 and 2018, Apple's iPhone unit sales were relatively flat, as Apple struggled to duplicate the innovation of the iPhone 6. *Id.* Also negatively impacting iPhone sales growth was increased competition in international and emerging markets, as consumers opted for local smartphone vendors who offered a better value alternative. ¶¶82-92.

This was particularly true in Greater China, where Apple faced increased competition from Chinese smartphone manufacturers who sold products that, unlike the iPhone, were designed specifically to address the needs and preferences of Chinese consumers. ¶¶93-108. Apple's loss of market share in Greater China was significant. ¶¶95-97. During the first quarter of 2016, Apple's share of the Chinese smartphone market was 12%, trailing only Huawei and Xiaomi. ¶95. By the second quarter of 2017, Apple dropped to fifth place in terms of its share of the Chinese smartphone market—a position it has effectively occupied ever since. ¶97. Indeed, Apple faced a number of quarters of negative growth on a year-over-year basis in Greater China from Q2 FY16 to Q3 FY17. ¶98.

One of the main reasons the iPhone lost market share in China was that it lacked many features that Chinese consumers wanted in smartphones (features Apple's competitors *did* offer), including dual SIM card capability and advanced camera technology. ¶¶100, 103. Another problem Apple has faced in China relates to the prominence of WeChat, a do-it-all smartphone app that serves as a de facto operating system that could be used in lieu of Apple iOS, meaning Chinese consumers have had less of a need to buy an iPhone specifically for its operating system. ¶102. This is especially true considering that Chinese smartphone manufacturers sell phones that are far less expensive than the iPhone, which has resulted in a Chinese smartphone market that is highly concentrated in mid-range phones that cost roughly $300 to $450 dollars— far less than the cost of an iPhone. ¶¶105-107.

Apple's loss of market share and declining demand for iPhones had a dual effect on the Company. ¶84. During this time, Apple was becoming increasingly reliant on sources of revenue other than—but still dependent on—the sale of iPhones, such as Apple Services, Apple Watches, and AirPods. *Id.* As iPhone growth slowed, so too did revenue from these other products and services. *Id.* Thus, Apple needed to find ways to increase iPhone sales. ¶7.

### D.   Apple Throttles its iPhones to Boost Sales

Starting in February 2016, iPhone users worldwide, including in China, began reporting on Apple's official discussion boards that they were experiencing battery problems with their iPhones, including that their iPhones were unexpectedly shutting down despite apparent extant battery life. ¶¶109-10. Months later, in November 2016, Apple released a statement acknowledging the shutdown issue; although the statement represented that the issue was limited only to the iPhone 6s, which was not accurate. ¶111. In December 2016, Apple conceded that the shutdown issue was impacting additional iPhone models. ¶113.

On January 23, 2017, Apple released iOS 10.2.1, a seemingly routine update of its operating system. ¶114. Although Apple disclosed that the update was designed to address the shutdown issue, the Company did not disclose that this "fix" to the shutdown issue came with a significant tradeoff: the software update throttled old iPhones—i.e., artificially slowed down the performance of iPhones with older batteries, which, by default, were older model iPhones. ¶¶115-18. Defendants' undisclosed practice of slowing down iPhones with older batteries came with an undisclosed benefit for the Company: consumers, frustrated with their weakened iPhones and falsely believing that their devices were obsolete, upgraded to new iPhone models from late 2016 to early 2018. ¶119. This artificially inflated iPhone sales and provided the appearance of consistent iPhone sales growth, which explained why Apple experienced a record year in iPhone sales during 2017. *Id.* Indeed, Apple reported record upgrade rates on August 1, 2017 (when reporting the Company's 3Q FY17 results) and reported iPhone unit sales growth of 14% for 4Q FY17. ¶¶124-25. Apple continued to release the "throttling" software in later versions of its iOS as new iPhones were introduced, including iOS 11.2, released on December 2, 2017. ¶¶120-22.

### E.   Apple Admits That It Had Been Intentionally Throttling iPhones, But Conceals The Impact Defendants Knew This Was Having on iPhone Demand

In December 2017, the market discovered that Apple's software updates were the cause of the slowdown in older model iPhones, and that the cause of the issue was battery-related—not device-related—meaning that simply replacing the battery on an older model iPhone would fix the slowdown issue. ¶¶127-29. On December 20, 2017, in light of the emerging consumer outrage, Apple publicly admitted that it had deliberately throttled the performance on some iPhone models to save battery life and avoid unexpected shutdowns. ¶130. However, Apple did not disclose that it had throttled its older model phones in order to shorten the life of its iPhones (and force consumers to upgrade sooner), *id.*, and in fact Defendants affirmatively denied trying to "intentionally shorten the life of any Apple product."  ¶157.

Until Apple disclosed its battery throttling in December 2017, the market was not aware that Apple had been slowing down its iPhones in order to encourage consumers to upgrade to new iPhones, believing that their older, slower iPhones were obsolete—a phenomenon known in the industry as "planned obsolescence." ¶¶134-37. Indeed, throughout the Class Period, Defendants failed to disclose that higher iPhone demand in 2017 and early 2018, including in Greater China, was driven by artificially accelerated upgrade rates as a result of intentional throttling. *E.g.*, ¶313. Shortly after Apple's disclosure that it had intentionally throttled iPhones, regulators around the world, including in China and the United States, announced that they had launched independent investigations into whether Apple's conduct was fraudulent. ¶¶156-57.

On December 28, 2017, in an effort to retain customer goodwill, Apple announced that, starting in late January 2018, the Company would offer a $50 discount for out-of-warranty iPhone battery replacements, charging $29 rather than the prior $79 cost. ¶138. Apple's discounted battery replacement program led to reduced demand for iPhone upgrades, as consumers recognized that they could extend the life of their phones by purchasing a $29 battery, rather than having to purchase a new phone. ¶¶140-47. Indeed, consumers flocked to Apple stores to replace their iPhone batteries, *id.*, so much so that battery replacements were on backorder and Apple was forced to make additional resources available at Apple stores to

1    manage the higher-than-anticipated number of replacements. ¶143.

2         On February 1, 2018, Apple released its financial results for its first fiscal quarter of 2018

3    (ended December 30, 2017)—the final reporting period before its battery replacement program

4    would go into effect. ¶21. As part of this disclosure, Apple issued disappointingly flat revenue

5    guidance of $60 to $62 billion for the second quarter of fiscal 2018—which was a partial

6    materialization of the risk concealed by Defendants' misstatements. ¶490.

7         Indeed, despite the impact the battery replacement program had on demand for new

8    iPhones, Defendants continued to mislead the market about the actual effect it had (and would

9    continue to have) on iPhone sales, failing to disclose, for instance, that Apple was tracking the

10   number of consumers taking advantage of the program and that the rate at which customers were

11   replacing their batteries would negatively impact demand for the next generation of iPhones.

12   *E.g.*, ¶313. Indeed, Defendants even falsely told the market that Apple "did not consider in any

13   way, shape, or form, what [battery replacements] would do to upgrade rates," ¶300, and that the

14   Company "never d[id] an analysis internally about how many people decided to get a lower-

15   priced battery than buy another phone," ¶353, despite that, in reality, Defendants tracked the

16   replacement rate and understood that it would negatively impact iPhone demand. ¶¶13, 248-55.

17   Statements of former Apple employees confirm that, during the Class Period, Defendants

18   understood and tracked the impact that the battery replacement program (and the disclosure of

19   throttling) was having on iPhone demand. ¶¶14, 206-67.

20        **F.    Apple Continues Throttling iPhones Despite Saying It Would Stop**

21        In a letter to Congress on February 6, 2018, Apple represented that the iPhone 8, 8 Plus,

22   and X "include hardware updates that allow a more advanced performance management system

23   that more precisely allows iOS to anticipate and avoid an unexpected shutdown." ¶¶163-64.

24   Because unexpected shutdowns were the reason Apple had throttled iPhones in the first place,

25   Apple's disclosure that hardware updates would eliminate the shutdown problem led the market

26   to believe that Apple would not continue throttling its iPhones, and certainly would not throttle

27   the newly released iPhone 8 and iPhone X. ¶¶164-65. Despite representing in February 2018 that

28   it would stop throttling its iPhones, Apple continued to throttle them and later revealed in

October 2018 that throttling was part of its normal practice. ¶¶168-81. Market participants were outraged, because it became clear after Apple continued throttling its iPhones despite saying it would no longer engage in that practice, that Apple could not be trusted to provide fulsome and truthful disclosures about the iPhone's hardware, battery, and operating system. ¶¶173-81.

Apple's lack of transparency with respect to throttling had a particularly strong impact in the Chinese market where consumers had an ever-growing number of better priced smartphones that also happened to be better suited to their unique needs. ¶¶173, 182-85. Reports indicated that Chinese consumers—especially younger generations—were especially troubled by news that Apple continued throttling its phones, which only made things worse for Apple in a market with fierce local competition, ¶¶182-90, and where a worsening economy forced consumers to become more price-sensitive. ¶¶193-205.

### G. The Risks Concealed By Defendants' False and Misleading Statements Materialize

On November 1, 2018, Apple released its financial results for Q4 FY18 (ended September 29, 2018), issuing revenue guidance of $89 billion to $93 billion for the first quarter of fiscal 2019—***well below what analysts were expecting***. ¶¶26, 191, 491. The lower-than-expected guidance reflected Apple's awareness that iPhone demand would be negatively impacted by its disclosure just days earlier that the Company would continue throttling iPhones—despite representing months earlier that it would not. ¶191. However, Apple continued to conceal that iPhone sales would not be able to meet even this weak guidance once consumers absorbed the news of the continued throttling and either replaced the batteries in their old phones with $29 discounted battery replacements (an offer ending in December 2018), or, especially in China, purchased a phone from a competitor. ¶¶26, 191. Apple also surprised investors by announcing that it would no longer disclose unit sales for iPhones and other hardware. ¶¶26, 491. On this news, Apple's stock price fell $14.74 per share, or 6.6 percent. ¶491.

Additional details of Apple's misconduct came to light on November 5, 2018, when news reports revealed that Apple had instructed its top smartphone assemblers, Foxconn and Pegatron, to "halt plans for additional production lines" for the recently released iPhone XR. ¶¶27, 492. On

1  this news, Apple's stock price fell $5.89 per share, or 3 percent, to close at $201.59 per share on

2  November 5, 2018. ¶492.

3          Finally, on January 2, 2019, Apple disclosed the true state of its declining iPhone demand

4  when, for the first time in 15 years, the Company slashed its previously announced quarterly

5  revenue guidance for the already completed Q1 FY19.  ¶¶28, 410-13, 493.  In a "Letter from Tim

6  Cook to Apple Investors," Apple disclosed that it would miss revenue guidance because the

7  Company experienced "fewer iPhone upgrades than [it] had anticipated," driven by the

8  discounted battery replacement program, as well as emerging market issues, "primarily in

9  Greater China." *Id.* On this shocking news, Apple's stock price fell more than $15 per share, or

10 approximately 10 percent, on unusually high volume of more than 91.1 million shares, the

11 highest one-day trading volume experienced by the Company in nearly two years. ¶413.

12 **III.   ARGUMENT**

13       **A.   Applicable Legal Standard**

14          In order to withstand a motion to dismiss, a plaintiff "need only allege 'enough facts to

15 state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563

16 U.S. 27, 45 n.12 (2011). The Court must "accept the plaintiffs' allegations as true and construe

17 them in the light most favorable to plaintiffs."  *City of Dearborn Heights Act 345 Police & Fire*

18 *Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 612 (9th Cir. 2017).  When "faced with a . . . motion

19 to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a

20 claim on which relief can be granted . . . consider the complaint in its entirety."  *Tellabs, Inc. v.*

21 *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).[2]

22

23

24

___

25 [2] Plaintiff does not oppose Defendants' Request for Judicial Notice (ECF No. 92) of Apple's
   SEC filings during the Class Period, certain conference call transcripts, analyst reports and news
26 articles about Apple cited in the Complaint, and Apple's stock price chart. However, Plaintiff
   notes that these documents only may be considered for their existence—not for the truth of the
27 matters asserted therein or for matters that are disputed. *See Khoja v. Orexigen Therapeutics,*
   *Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).
28

### B.   The Complaint Is Not A Puzzle Pleading

Defendants are wrong that the Complaint is a puzzle-pleading. The Complaint is carefully organized; alleges each specific misstatement and omission, including the associated date, circumstances, and the speaker or signatory; highlights those portions of longer statements that are alleged to be actionable; and after each group of misstatements, provides the reason(s) why those specific statements were materially false or misleading by omission when made.[3]

Courts have routinely found this style of pleading permissible. *See In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831(N.D. Cal. 2014) (holding that the complaint satisfied "Rule 8 by putting defendants on notice of the true substance of the claims against them" when the complaint "detailed each problematic statement, alleged that each statement is false and misleading, and alleged the reasons as to why each statement was false or misleading."); *Abdo v. Fitzsimmons*, 2017 WL 6994539, at *7 (N.D. Cal. Nov. 3, 2017) (puzzle pleading argument was not adequate basis to dismiss complaint); *Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *7 (D. Or. June 27, 2017) (rejecting puzzle pleading argument).

Here, the Complaint's allegations are sufficiently particularized to provide Defendants with fair notice, which is what Courts require. Defendants' puzzle-pleading argument also is inconsistent with their Motion: Defendants claim they cannot identify why each statement is alleged to be misleading, Mot. at 8, and then spend the next 20 pages of their Motion identifying the alleged false and misleading statements and arguing that they are not actionable, *id.* at 9-28.[4]

### C.   The Complaint Adequately Alleges Falsity

A statement is false and misleading if it "would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists."

---

[3] Plaintiff also has prepared (at the Court's instruction) a chart that details this information. ECF No. 99 (the "Supplemental Chart").

[4] Defendants argue that the "Supplemental Chart" (ECF No. 99) attempts to cure a "fatal flaw" in the Complaint. Mot. at 8. However, Plaintiff only submitted the Supplemental Chart at the Court's direction in connection with the request for a page-limit extension on this Motion. Nonetheless, the Supplemental Chart demonstrates that the Complaint alleges the "who, what, where, how and why" of each and every alleged material misstatement and omission and identifies the reason(s) why the statements and omissions were false and misleading when made.

*Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). "[S]tatements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). When a company chooses to tout positive information, it must also "disclos[e] adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). "[W]hether a public statement is misleading . . . is a mixed question to be decided by the trier of fact." *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *9 (C.D. Cal. Jun. 17, 2011). It cannot be resolved as a matter of law unless "the adequacy of the disclosure . . . is so obvious that reasonable minds could not differ." *Orexigen*, 899 F.3d at 1014-15.

### 1. Defendants' 2017 Statements About iPhone Sales and Demand Are Actionable Omissions

Plaintiff alleges that certain of Defendants' statements made in connection with Apple's announcement of the Company's Q3 and Q4 FY17 results regarding iPhone sales and demand were false and misleading for what they failed to disclose. ¶¶270-71, 273-74, 276, 285-88. For example, Defendants touted the "strong demand" for iPhone 7 Plus, ¶271, iPhone unit growth, ¶286, and that "from an absolute quantity point of view, the [iPhone] upgrades for this fiscal year are the highest that we've seen," ¶273, while failing to disclose that the true reason for strong demand and increased upgrades to new iPhones was that the Company had been artificially accelerating upgrades by surreptitiously throttling older-model iPhones during 2017. ¶280.

Defendants argue that these statements are not actionable because they are "accurate statements of historical results." Mot. at 9-10. But this mischaracterizes the law. Courts in the Ninth Circuit are clear that once a company touts its positive results, like Apple did here, it is "obligated to share [] information" that "diminish[ed] the weight of those results," including that those results were driven by artificial sales, or do not reflect true customer demand. *Orexigen*, 899 F.3d at 1015-1016 (statements that "were . . . technically accurate" found to be misleading because defendants failed to disclose certain information that based on those statements); *see also Berson*, 527 F.3d at 987 (once defendants "chose to tout" certain information, "they were bound to do so in a manner that wouldn't mislead investors").

1    Here, Apple's Q3 and Q4 FY17 statements concerning iPhone demand and upgrade rates

2    may have been technically accurate, but Defendants failed to disclose to investors that those

3    numbers were artificially inflated because the Company was secretly slowing down iPhones in

4    an effort to force premature upgrades on consumers. ¶¶270-76, 285-88. Thus, although Apple

5    accurately reported strong iPhone demand, *e.g.*, ¶271, upgrade rates, *e.g.*, ¶¶270, 273, and

6    growth rates, *e.g.*, ¶286, it was Defendants' failure to disclose the true drivers of those results

7    that renders the statements actionable. This is consistent with the law in this Circuit and

8    elsewhere, finding that even accurate statements of historical results can be misleading when a

9    company fails to disclose material information about how those results were generated. *See*

10   *Precision Castparts*, 2017 WL 3084274, at *9 (representations about organic growth were

11   misleading because defendant did not also disclose the "additional facts that [it] was aggressively

12   pulling in sales"); *Police and Fire Ret. Sys.of the City of Detroit v. Crane*, 87 F. Supp. 3d 1075,

13   1082-83 (N.D. Cal. 2015) (statements that revenue growth was "accelerating" misleading where

14   company failed to disclose that it was secretly engaging in a practice that materially impacted the

15   "quality" of its sales results).[5]

16   Defendants also actively misled investors about the drivers of iPhone demand, stating, for

17   instance, that the "upgrade rate is a function of many, many different things" and listing certain

18   examples, ¶270, without disclosing that the upgrade rate was actually artificially accelerated as a

19   result of intentional throttling. ¶280(a). Statements disclosing certain drivers of success while

20   omitting others are materially misleading. *See In re LendingClub Sec. Litig.*, 254 F. Supp. 3d

21   1107, 1118 (N.D. Cal. 2017) (omission misleading because defendant represented  that millions

22   of dollars of loans were the result of "organic matches," while failing to disclose that the loan

23   amounted was "inflated artificially through self-dealing disguised as real transactions").

24   Defendants rely on *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir.

25   2002) to argue that these alleged omissions are not actionable because the statements themselves

---

[5] *Cunha v. Hansen Nat. Corp.*, 2012 WL 12886194, at *3 (C.D. Cal. Oct. 22, 2012) (failure to disclose reliance on channel stuffing "could at the very least cause those results to be misleading where it resulted in an overloaded supply chain that could not sustain impressive early results" and made "investors think there was sustainably higher demand for [the company's] products").

did not reference or refer to the **reasons** for higher iPhone demand in 2017. Mot. at 10.
Defendants argue, for example, that "accurate statements about iPhone sales being up 'year-over-year in most markets [¶271] . . . do not state or imply anything about whether 'iPhone demand in 2017 . . . was driven by artificially accelerated upgrade rates.'" Mot. at 10. But this reads the import of Defendants' statements too narrowly.

Defendants' statements about the strength of Apple's iPhone sales are inherent representations about the quality and sustainability of those sales. Indeed, because Defendants knew that iPhone sales were actually generated in reliance on a practice (in this case, intentional throttling) that artificially inflated those sales, Defendants were obligated to tell this to the market, for reasons including that it is material to investors that those positive results would not continue once the unsustainable practice became known. *See Precision Castparts*, 2017 WL 3084274, at *9 (failure to disclose that company's sales were generated in reliance on aggressive sales practices was misleading); *Schueneman*, 840 F.3d at 706 ("[O]nce defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.").[6] Indeed, Defendants' statements about strong iPhone demand, *e.g.*, ¶271, upgrade rates, *e.g.*, ¶¶270, 273, and growth rates, *e.g.*, ¶286, ***do*** create an impression that the reason for these favorable indicators of financial success are legitimate and sustainable—a state of affairs that differed from the one that actually existed.

---

[6] Defendants' reliance on *Maritime Asset Management, LLC v. NeurogesX, Inc.*, 2013 WL 5442394, at *7 (N.D. Cal. Sept. 30, 2013), Mot. at 10, is misplaced because that case did not involve a situation in which a company was touting its sales while failing to disclose that they were generated in reliance on an unsustainable practice designed to artificially inflate those sales. Here, Defendants' statements were inherent representations about the quality and sustainability of those sales—a type of material omission that was not at issue in *Maritime*. Similarly misplaced is Defendants' argument that the alleged omitted facts do not contradict anything in Defendants' statements. Mot. at 10-11. But Plaintiff alleges these statements were materially false and misleading because Defendants concealed adverse facts that cut against the positive information, which renders those statements actionable. *Schueneman*, 840 F.3d at 706.

**2.** **Defendant Cook's Statements During the February 1, 2018 and July 31, 2018 Earnings Calls Regarding The Battery Replacement Program Are Actionable**

Plaintiff alleges that Defendant Cook's February 1, 2018 statement that Apple "did not consider in any way, shape, or form what [the battery replacement program] would do to upgrade rates," ¶300, was materially false and misleading because Apple was, in fact, tracking the number of customers taking advantage of iPhone battery replacement and the impact it would have on upgrade rates in 2018. ¶313. Former Apple employees confirm that Apple tracked these metrics. ¶¶248-55. For example, CW-2, who worked in Apple's Worldwide New Product Introduction Product Launch Readiness from January 2017 until April 2019, explained that Apple was "absolutely" tracking every single battery replacement and that it was his understanding that there was a tool that tracked these numbers. ¶¶207, 251. In fact, CW-2 confirmed that Apple had to hire significantly more personnel at stores to handle the number of battery replacements. ¶251. Likewise, CW-1, who worked in Supply and Demand Management at Apple from July 2017 to October 2018, stated that Apple "definitely" tracked the battery replacement numbers and "knew exactly how many batteries they replaced." ¶¶206, 254. Because Defendants *were* tracking battery replacements—which Defendants, notably, do not dispute—this statement was false for this reason alone.

Defendants implausibly argue that this statement was not about whether the Company was tracking battery replacements, but was simply about "whether Apple considered the effect the battery replacement program would have on new iPhone demand." Mot. at 25. Indeed, Defendants argue that "Mr. Cook's statement that he did not then 'know what effect [the battery replacement program] will have' is not inconsistent with the alleged fact that the Company was tracking battery replacements." Mot. at 26. But this misrepresents the context of the alleged misstatement: Defendant Cook was specifically asked whether, with regard to the battery replacement program, investors "should potentially be concerned . . . of its impact on upgrade rate going forward," to which Defendant Cook responded "we did not consider in any way, shape, or form, what it [i.e., the battery replacement program] would do to upgrade rates." ¶300. Given that this answer was given in response to a question from a financial analyst that

1    specifically asked whether there was concern that the battery replacement program would affect

2    upgrade rates, investors understood the response to mean that Apple was not concerned—which

3    was misleading considering that Apple was tracking battery replacements and therefore

4    understood the negative impact on iPhone upgrade rates. It is also implausible that Apple tracked

5    battery replacements—as Defendants have tacitly acknowledged—but did not "consider in any

6    way, shape, or form" whether the replacement program would impact upgrade rates (i.e., sales)

7    of the iPhone—Apple's flagship product.

8            Plaintiff also alleges that Defendant Cook's statement on the same call that "it's very

9    difficult currently to ever get a real-time handle on replacement rate because . . . you don't know

10   the replacement rate for the products you're currently selling" (¶301) is false, because, as

11   detailed above, Apple *did* track replacement rates, and Defendant' Cook's failure to disclose this

12   renders this statement materially false and misleading. Defendants argue that this statement is

13   consistent with "the information Plaintiff claims was omitted." Mot. at 26. Not so. Defendant

14   Cook's statement that "it's very difficult currently to ever get a real-time handle on replacement

15   rate," ¶301, certainly would give a reasonable investor the impression of a state of affairs that

16   "differs in a material way from the one that actually exists," *Berson*, 527 F.3d at 985—i.e., that

17   Apple was actually tracking the battery replacement rate. Defendants' semantic gymnastics do

18   not change this fact.

19           Plaintiff also alleges that Defendant Cook's statement on the July 31, 2018 earnings call

20   that, "we have never done an analysis internally about how many people decided to get a lower-

21   priced battery than buy another phone because it was never about that for us," (¶353) was

22   materially false and misleading because, as detailed above, Apple was, in fact, tracking the

23   number of customers taking advantage of iPhone battery replacements, and the impact it would

24   have on iPhone upgrade rates. ¶360. Defendants again repeat the implausible argument that this

25   statement is not inconsistent with the allegedly undisclosed information, because Apple could be

26   tracking battery replacements but not performing an analysis of "how many people decided to

27   get a lower-priced battery than buy another phone." Mot. at 27. But if Apple tracked battery

28   replacements and saw that they were significantly larger than usual, it is reasonable to infer that

1   Apple was likewise monitoring the impact this uptick in battery replacements would have on

2   upgrade rates (i.e., sales) of Apple's most important product.

3         **3.**      **Statements in the February 2, 2018 Letter to Congress Are Actionable**

4         Apple's statement in its February 2, 2018 letter to Congress that iPhone 8, iPhone 8 Plus,

5   and iPhone X "include hardware updates that allow a more advanced performance management

6   system . . . and avoid an unexpected shutdown," ¶317, was materially false and misleading

7   because it led the market to believe that these hardware innovations would mean that Apple

8   would no longer need to throttle iPhones to prevent unexpected shutdowns, despite that, as Apple

9   later admitted on October 30, 2018, Apple did throttle these models of iPhones as part of its

10  regular practice. ¶¶318, 376-81. Defendants argue that this statement was not made in connection

11  with the purchase or sale of a security. Mot. at 24. But Defendants fail to cite any authority for

12  the proposition that public statements made to Congress are not directed at, and appreciated by,

13  the investment community. In fact, Plaintiff specifically alleges that these statements were

14  appreciated by the investment community and were covered by financial and technology

15  publications, such as *Forbes* and *Tech Crunch*. ¶¶163-66. The only case Defendants cite—*In re

16  Intel Corp. Sec. Litig.*, 2019 WL 1427660, at *11 n.14 (N.D. Cal. Mar. 29, 2019)—is inapposite,

17  because there the statements were made on product webpages and plaintiffs did "not allege that

18  the product statements were directly targeted to investors or the investment community." *Id.*

19  (explaining that there "is no rule that only market-related documents . . . can contain actionable

20  misstatements under Section 10(b)").[7]

21        **4.**      **Defendants' June 1, 2018 Statement in UBS Analyst Report Is
    Actionable**

22

23        Plaintiff alleges that Defendants' statement released in a June 1, 2018 UBS analyst report

24  that "the battery replacement program is having little impact on shipments," ¶345, is false and

    misleading for failing to disclose that the battery replacement program was actually negatively

25

26  _____

    [7] The *Noerr-Pennington* doctrine that Defendants argue applies, Mot. at 24 n.25, is inapplicable
    because "there is no constitutional value in false statements of fact," *Milkovich v. Lorain Journal
27  Co.*, 497 U.S. 1, 18 (1990), and the doctrine "does not protect all communications with the
    government." *In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F. Supp. 1424, 1448
28  (D. Ariz. 1992) (The *Noerr-Pennington* doctrine "is not a shield for fraud." ).

impacting demand for new iPhones. ¶348(a). Defendants' sole challenge to the actionability of this statement is that Apple cannot be liable for "statements of third-party analysts." Mot. at 26-27. This argument is wholly inapplicable here. The cases Defendants cite address entanglement in the context of analyst's forecasts or reports. Here, UBS is merely reiterating a statement made by Apple to UBS with the intention of public dissemination. Therefore, Defendants can be liable for this statement. *See, e.g.*, *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997) (finding that a defendant may be liable for its "misleading statements to the analysts with the intent that the analysts communicate those statements to the market.").

### 5. Defendants' 2018 Statements About iPhone Sales and Demand Are Actionable Omissions

Plaintiff also alleges that certain of Defendants' statements made in 2018 regarding iPhone sales and demand were false and misleading for what they failed to disclose. ¶¶296, 297, 298, 299, 302, 304, 325, 326, 327, 329, 350, 351, 352, 354, 385, 386, 388.

As with the 2017 statements discussed above, *see supra* at 12-14, Defendants' statements were materially false and misleading for failing to disclose that the true reason for strong demand and increased upgrades to new iPhones was that the Company had been artificially accelerating upgrades by surreptitiously throttling older-model iPhones during 2017. *E.g.*, ¶360(a). Defendants argue that their 2018 statements touting iPhone sales and demand are not actionable because they are accurate statements of historical results. Mot. at 12-16. But, as discussed above, once Apple touted its positive results, it was obligated to share information that "diminishe[d] the weight of those results," including that those results were driven by artificial sales, or do not represent true customer demand. *See supra* at 12-14.[8] Here, for example, Defendant Maestri's February 1, 2018 statement that "[d]uring [1Q 2018  (i.e., the quarter ending December 30,

---

[8] The same is true of Plaintiff's allegations that Defendants failed to disclose that "as a result of slowing demand, Apple had slashed production orders from suppliers for the new 2018 iPhone models," ¶¶338(d), 360(e), 396(d), and that Defendants failed to disclose that, "as a result of slowing demand, Apple had cut prices on the latest generation of iPhone models," ¶396(e). Indeed, while touting positive results, Defendants were obliged to disclose information that diminished the weight of those results. Defendants again argue that these statements said nothing about "orders from suppliers," Mot. at 15, or "the reasons for iPhone pricing," at 16, but this reads Defendants' duty to disclose obligations too narrowly.

2017)], we sold 77.3 million iPhones, the highest ever for a 13-week quarter," ¶298, was false and misleading because he failed to disclose that those results were artificially inflated because the Company was secretly slowing down iPhones in an effort to force premature upgrades on consumers. Relatedly, and as discussed above, Defendants' argument that none of the alleged misstatements references the ***reasons*** for iPhone demand and therefore could not have misled investors is beside the point.[9] Indeed, Defendants' statements touting record-breaking iPhone sales, ¶297, for example, are inherent representations about the quality of those sales, and it was materially misleading for Defendants not to disclose that those sales were generated via artificially inflated demand that was not sustainable. ¶313(a). *See supra* at 12-14.

Defendants' 2018 statements regarding iPhone sales and demand were also false and misleading for the additional reason that Defendants failed to disclose that Apple was tracking the number of consumers taking advantage of the discounted battery replacement program—announced on December 28, 2017, ¶138, and knew or recklessly disregarded that the rate at which consumers were taking advantage of this program would negatively impact demand for the next generation of iPhones, released in late 2018. Indeed, Apple understood that the battery replacement program elongated the iPhone sales cycle, because consumers could now extend the life of their iPhone simply by replacing the battery instead of upgrading to a new model. ¶249. This meant that consumers taking advantage of the battery replacement program in early 2018 had less of a reason to upgrade to a new model in late 2018, which negatively impacted demand for these new iPhone models—a fact that Defendants failed to disclose. For example, Defendant Cook's July 31, 2018 statement that "iPhone had a very strong quarter" with revenue "up 20% year-over-year" omitted material information—i.e., that these results were driven by prematurely accelerated iPhone upgrades (due to Apple's battery throttling) and that demand for iPhones was

---

[9] Defendants' reliance on *In re Finisar Corp. Sec. Litig.*, 2013 WL 211206, at *4 (N.D. Cal. Jan. 16, 2013) is misplaced, because there the alleged undisclosed fact—customers deciding to load up on inventory, *id.* at *6—was not the result of Defendants' own conduct, whereas here Plaintiffs' allege that Defendants ***themselves*** intentionally throttled iPhones to increase upgrade rates and failed to disclose this fact.

1   deteriorating, as customers chose to take advantage of the battery replacement program in lieu of

2   upgrading to newer models. ¶351.

3        The statements of former Apple employees confirm that, during the Class Period, the

4   battery replacement program was negatively impacting iPhone demand—a fact Defendants

5   concealed from investors. Indeed, CW-2, who worked in Apple's Worldwide New Product

6   Introduction Product Launch Readiness from January 2017 until April 2019, recounted that there

7   were "numerous conversations" within sales demand management about the disclosure of

8   throttling and how it would impact demand for new iPhones and elongate the upgrade cycle

9   going forward. ¶¶207, 248. CW-2 also confirmed that there were "absolutely" internal

10   conversations regarding elongated sales cycles and concerns about upgrade cycles being

11   impacted by the battery replacement program, and that the battery replacement program hurt

12   sales. ¶¶249-50, 252. CW-1 also confirmed that battery replacements were "definitely" being

13   tracked in 2018, and that Apple tracked the lengthening iPhone upgrade cycles, which was

14   negatively impacted by the battery replacement program. ¶¶245-46, 254.

15        Defendants' touting of iPhone demand and growth rates while failing to disclose these

16   facts renders Defendants' statements actionable. *See Schueneman*, 840 F.3d at 705-06 (when

17   touting positive information, a company is "bound to do so in a manner that wouldn't mislead

18   investors, including disclosing adverse information that cuts against the positive information").

19   Such disclosures were necessary to render these statements not misleading. *Crane*, 87 F. Supp.

20   3d at 1083 ("[A] company must disclose material information . . . if the failure to disclose would

21   leave the public with a misimpression about the health of the company.").

22        Defendants argue that it was not misleading for them to conceal that the rate at which

23   Apple customers were replacing batteries pursuant to the battery replacement program would

24   negatively impact iPhone demand for the next generation of iPhones, suggesting that none of the

25   challenged statements say anything about future demand and that, in any event, this was

26   "obvious" to investors. Mot. at 14. First, certain of Defendants' statements ***did*** relate to future

27   demand. *E.g.*, ¶302 ("we believe iPhone revenue will grow double digits as compared to last year

28   during the March quarter"), ¶352 ("We expect the growth to come from strong growth from

iPhone."). Second, while the market might have assumed that "people who replaced their iPhone batteries may be less likely to purchase a new iPhone," Mot. at 14, the **actual rate** at which people were replacing their batteries—and the impact this was having on iPhone demand—was certainly not an "obvious" fact to investors (nor was it obvious that Apple was actively tracking the actual rate). It was Defendants' failure to disclose that it was tracking this **actual rate** that renders their statements materially false and misleading.[10] Finally, Apple's stock price dropped significantly (approximately 10 percent) after Defendants disclosed on January 2, 2019 that Apple missed its already-disappointing guidance range because customers taking advantage of the battery replacement program led (in part) to fewer iPhone upgrade rates. ¶¶410-13. Thus, news that the battery replacement program negatively impacted demand for new iPhones shocked investors, indicating that this fact was not "obvious" as Defendants suggest.[11]

### 6. Defendant Maestri's November 1, 2018 Statements Regarding Emerging Markets and Unit Sales Are Actionable

Plaintiff alleges that Defendant Maestri's November 1, 2018 statement about emerging markets was materially false and misleading. ¶384. Indeed, on January 2, 2019, Apple slashed its revenue guidance for Q1 FY19, in part because of "particularly sharp" contraction in the Greater China smartphone market and a significant "economic deceleration" in the region. ¶410. Just two months earlier, when Apple first announced that revenue guidance, Defendant Maestri stated that one of the reasons it was lower-than-expected was because there was "some level of uncertainty at the macroeconomic level in some emerging markets, where, clearly, consumer confidence is not as high as it was 12 months ago." ¶384. This statement was materially misleading because Defendants failed to disclose that iPhone demand in Greater China was declining and expected to continue deteriorating, as former employees confirm was understood within the Company. *See*

---

[10] Plaintiff alleges that Defendant Cook's November 1, 2018 statement that "XS and XS Max got off to a really great start," ¶385, was materially false and misleading for the additional reason that Defendants failed to disclose that preorders for these models appeared weaker than for the prior generation iPhones and initial sales for these new models also were weak. ¶397.

[11] Defendants' argument that Barclays acknowledged the battery replacement program would impact demand, Mot. at 14 n.16, is misplaced for these same reasons, and also because an analyst's speculation about what might happen is not a substitute for a company's own fulsome disclosures.

*infra* at 22-23, 36; ¶¶14, 206-67. Defendant Maestri's statement—made so close in time to the January 2, 2019 revelation of the truth—materially misled the market about the impact that economic uncertainty in China would have on iPhone demand.

Plaintiff also alleges that Defendant Maestri's November 1, 2018 statement that Apple would stop reporting unit sales data purportedly because this information was "less relevant for us today than it was in the past," ¶387,  was false and misleading because the decision to withhold iPhone unit sales was intentionally designed to conceal declining iPhone sales. ¶396(f). Indeed, analysts expressed shock and dismay that Apple would no longer be reporting such a closely followed metric that investors had relied upon to assess the Company's strength. ¶¶479-485.[12]  In fact, iPhone revenues declined following the end of the Class Period falling from Q1 FY18 to Q3 FY18.  Indeed, in Q2 and Q3 FY18, Apple's iPhone revenues dropped by 17% and 12%, respectively, compared with the same period a year earlier. ¶485.

### 7.     Defendants' Statements Regarding The Strength of Apple's iPhone Business in China Are Actionable Omissions

Defendants' statements regarding the strength of Apple's iPhone business in China were false and misleading for failing to disclose that demand for iPhones in the region had been driven by artificially accelerated upgrade rates as a result of intentional throttling and also that iPhone demand in Greater China was deteriorating. ¶¶272, 275, 286, 287, 298, 299, 304, 325, 327, 328, 329, 330, 332, 336, 346, 347, 354, 386.

Statements of former employees confirm that, during the Class Period, Defendants meticulously tracked point of sales data for the iPhone (including in Greater China) and knew that sales growth was stalling, especially in Greater China, where lower-priced competitors' smartphones were proliferating. ¶¶14, 206-67. For example, CW-7, who was a Regional Operations Manager at Apple in Jiangsu, China from before the start of the Class Period through August 2018, confirmed that Apple performed significant internal analysis showing that sales in China were slowing, ¶¶212, 220, driven by its higher price as compared to Chinese smartphone

---

[12] Contrary to what Defendants argue, trying to hide declining sales of your key product by ceasing to report a highly-followed metric is different than simply removing language from an SEC filing. Mot. at 28.

1  competitors, ¶221, and that these competitors sold phones that possessed the features Chinese

2  consumers wanted (whereas iPhones lacked these features). ¶222; *see also* ¶¶231-32 (CW-6

3  confirming that Apple was losing market share to competitors for this same reason); ¶235 (CW-8

4  confirming sales decline in China). Moreover, according to CW-3, a Senior Manager, Pacific

5  Retailer Operations at Apple from March 2016 to April 2018, there was a "fair amount of

6  negativity going around" because it was believed that consumers in the region did not think the

7  iPhone 8 was a significant enough improvement over previous generation phones. ¶¶208, 218-

8  19. CW-6, a former Apple employee in Shanghai between July 2015 and August 2018 who

9  served most recently as a Client Manager, observed that prior to the launch of Apple's new

10  iPhones in September 2018 (iPhone XS, XS Max, and XR), pre-sales/intent to purchase numbers

11  in China for the new iPhones were low. ¶¶211, 227.

12  Defendants argue that their statements regarding China beginning in Q1 FY18—which

13  Plaintiff alleges were false and misleading for failing to disclose that iPhone demand in Greater

14  China was declining and would continue to deteriorate due to a confluence of factors—are not

15  actionable because "Defendants were under no obligation to predict the future of iPhone demand

16  in Greater China" and because these statements are not inconsistent with declining demand. Mot.

17  at 14-15. But Defendants regularly touted positive information about iPhone sales in China, *e.g.*,

18  ¶327 ("we were especially pleased to see 21% year-over-year growth in Greater China, our

19  strongest growth rate from that segment in 10 quarters"), and once they did so, they were "bound

20  to do so in a manner that does not mislead investors, including disclosing adverse information

21  that cuts against the positive information." *Orexigen*, 899 F.3d at 1009 (citing *Crane*, 87 F. Supp.

22  3d at 1082. *See supra* at 12-14.

23  Defendants also argue that iPhone demand was *not* declining by pointing to (a) ***global***

24  iPhone sales and (b) ***total*** revenue from Greater China (i.e., including all Apple revenue for the

25  region), Mot. at 15—neither of which says anything about iPhone sales in Greater China—a

26  metric Apple notably did not report. Thus, this Court should ignore Defendants' claim that

27

28

iPhone demand in Greater China was not declining, which is dependent on pointing to metrics

that actually say nothing about the specifics of iPhone sales or demand in Greater China.[13]

### 8. Apple's Risk Warnings and Statements About the Company's Market Risk Were Materially False and Misleading

Apple's risk warnings issued in connection with its Forms 10-Q and 10-K (¶¶279, 291,

311, 335, 357, 358, 395) were materially false and misleading because the Company was

warning of risks that already materialized.[14] For example, Defendants warned of the risk that

competition would intensify and that Apple might not be able to compete effectively in certain

markets, ¶311, while failing to disclose that Chinese smartphone competitors were ***already***

taking market share from Apple in China. ¶¶315, 93-108; *see also supra* at 22-23. Defendants'

risk warnings are therefore actionable.[15]

In addition, Defendants' representations throughout the Class Period that there were no

material changes to Apple's market risk, ¶¶312, 337, 359, were materially false and misleading

because Apple's practice of intentionally throttling phones, which led to the decision to offer

discounted battery replacements, posed a risk to sales of iPhones, Apple's most important

product. ¶316. Moreover, by May 2, 2018, this disclosure was misleading because Defendants

knew that Apple had already replaced millions more batteries during fiscal 2018 than historical

rates, which would have an adverse effect on sales in the next upgrade cycle. ¶¶341, 363.

Moreover, Defendants' argument that the reference in Apple's FY 2017 10-K to "market risk"

---

[13] The same goes for Defendants' claim that their Q4 FY17 China-related statements were not materially false and misleading, Mot. at 13-14, for which Defendants similarly point to ***total*** revenue for Greater China, *id.* at 13, and ***global*** iPhone revenue, *id.* at 14—neither of which say anything about Apple's iPhone revenue in Greater China specifically.

[14] *See Cutler v. Kirchner*, 696 F. App'x 809, 813 (9th Cir. 2017) (risk warnings are misleading when they merely disclosed "a risk in the abstract . . . that [] had already come to fruition"); *Flynn.*, 2016 WL 3360676, at *11 (risk disclosures found to be misleading because the risks warned of had already materialized); *see also In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1267 n.9 (N.D. Cal. 2000), quoting *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981) ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.").

[15] *See Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) ("A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability.").

relates to "interest rate and foreign currency risks," Mot. at 25, is a question of fact not appropriate for determination on this motion to dismiss.

### 9. Alleged Forward Looking Statements Are Not Protected By The Statutory Safe Harbor

The statements Defendants challenge as forward looking (¶¶272, 273, 274, 275, 276, 302, 304, 328, 329, 332, 346, 352, 354, *see* Mot. at 16-17) are not protected by the statutory safe harbor because the Complaint alleges that these statements are false and misleading for failing to disclose present and historical facts.[16]  For example, Defendant Maestri's statement on the February 1, 2018 earnings call that "we believe iPhone revenue will grow double digits as compared" to prior quarters, ¶302, is false and misleading for what it fails to disclose—i.e., that higher iPhone demand in 2017 and early 2018 was driven by artificially accelerated upgrade rates, ¶313(a), and that the rate at which Apple customers were replacing their batteries in older iPhones would negatively impact demand for the next generation of iPhones. ¶313(c). This statement—as well as the others that Defendants challenge as forward looking—omitted present and historical facts and therefore are not protected by the statutory safe harbor.

Moreover, certain of the statements Defendants challenge as forward looking (¶¶272, 273, 274, 275, 276, 304, 328, 332, 346, 354), and therefore, in their view, protected by the statutory safe harbor, are not actually forward looking at all, because they are based on representations of historical and/or current facts. *See Mulligan v. Impax Laboratories, Inc.*, 36 F. Supp. 3d. 942, 965 (N.D. Cal. 2014) (finding that "statements of past or present facts are not

---

[16] *In re Celera Corp. Sec. Litig.* 2013 WL 4726097, at *2 (N.D. Cal. Sept. 3, 2013) ("The safe harbor applies to forward-looking statements only, and not to material omissions or misstatements of historical fact."); *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *10 (C.D. Cal. Apr. 12, 2016) (the PSLRA safe harbor does not apply to the alleged omission of present facts); *In re CV Therapeutics, Inc. Sec. Litig.*, 2004 WL 1753251, at *10 (N.D. Cal. Aug. 5, 2004) ("The fact that defendants used those inadequately disclosed historical facts to support unsound projections does not shield their alleged misrepresentations as forward-looking statements."); *Bielousov v. GoPro, Inc.*, 2017 WL 3168522, at *4-5 (N.D. Cal. July 26, 2017) (statement that the company was "on track to [meet] revenue guidance" was not forward-looking when defendants omitted the fact that their new product had a defect and was in short supply); *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *9 (C.D. Cal. Feb. 27, 2015) ("to the extent Plaintiffs [ ] challenge Defendants' alleged omission of present facts . . ., the PSLRA's safe harbor does not apply").

1   covered by the safe harbor provision—even when they are inextricably tied with forward-looking

2   statements").  For example, Defendant Maeistri's August 1, 2017 statement that "I think, in

3   general, even the performance in China . . . we think that the performance will **_continue_** to

4   improve," ¶275, is not a forward looking statement because, though couched in temporal terms,

5   for performance to "continue to improve" is necessary that performance has **_already been_**

6   **_improving_**—i.e., a statement of historical fact. *See Mallen v. Alphatec Holdings, Inc.*, 861 F.

7   Supp. 2d 1111, 1126 (S.D. Cal. 2012) ("While ostensibly couched in terms of the future, this

8   statement also concerns historical and current facts. Notably, for the revenues to 'continue to

9   grow,' it is necessary that they have already been growing."). Likewise, the statement "I feel

10  really good about how we're doing in China," ¶304, is a representation of **_present_** facts—i.e.,

11  how Apple is "doing" in China currently. *Mulligan*, 36 F. Supp. 3d. at 965 (statements "premised

12  on representations of present facts" are not forward looking).

13          Finally, even assuming arguendo that portions of the statements Defendants challenge as

14  forward looking are, in fact, forward looking, many of these statements are actually mixed

15  statements that contain non-forward looking statements about current and past facts. ¶¶272, 273,

16  274, 276, 302, 304, 328, 329, 332, 346, 354. The Ninth Circuit has made clear that "non-

17  forward-looking portions of mixed statements are not eligible for the safe harbor provisions of

18  the PSLRA," *In re Quality Systems, Inc. Sec. Litig.*, 865 F.3d 1130, 1150 (9th Cir. 2017), and so

19  Defendants' argument that these statements are protected by the statutory safe harbor should be

20  rejected.

21          Defendants also challenge Defendant Cook's statement at ¶273 as forward looking by

22  cherry picking the words "it probably bodes well later on" from a longer quote that discusses

23  present facts. Mot. at 17. Reading this language in the context of the words that immediately

24  precede it reveals that Defendant Cook is making a statement of present facts: "**_even though we_**

25  **_had great results_**, [the upgrade rate] probably bodes well later on." Moreover, as part of this

26  larger statement, Defendant Cook made numerous representations of present facts, such as: "the

27  upgrades for this fiscal year are the highest that we've seen," and "the [upgrade] rate is similar to

28  what we saw with the previous iPhones." ¶273.

1    These non-forward looking statements about iPhone sales and upgrade rates are

2  materially false and misleading because, as detailed herein, *see supra* at 12-14, Defendants failed

3  to disclose to investors that those numbers were artificially inflated because the Company was

4  secretly slowing down iPhones in an effort to force premature upgrades on consumers. The fact

5  that these statements are made as part of a larger statement that includes some purported forward

6  looking language does not mean that the entire statement is therefore forward looking and

7  protected by the statutory safe harbor. *See Quality Systems*, 865 F.3d 1150 (non-forward looking

8  portions of mixed statements are not protected by the statutory safe harbor).

9    The same goes for Defendant Cook's statement that "[t]he installed base is growing. It's

10 still growing very strongly. That will generate more upgrades over time." ¶276. Again, this

11 statement is not forward looking simply because it has words that reference the future. What is

12 false and misleading about this statement relates to the representation of present facts—i.e., that

13 the installed based "*is* growing" and "*still* growing," *id.*, which clearly are statements of the

14 Company's "then-present circumstances." *Quality Systems*, 865 F.3d at 1142 ("Nor is the safe

15 harbor designed to protect [companies] when they make a materially false or misleading

16 statement about current or past facts, and combine that statement with a forward-looking

17 statement."). This statement was undermined by the reality that higher iPhone demand in 2017

18 and early 2018 was driven by artificially accelerated upgrade rates as a result of intentional

19 throttling of older-model iPhones. ¶280(a).

20    As for the forward-looking portions of these mixed statements, the Ninth Circuit has also

21 made clear that "[i]f the non-forward-looking statement is materially false or misleading, it is

22 likely that no cautionary language—short of an outright admission of the false and misleading

23 nature of the non-forward looking statement—would be 'sufficiently meaningful' to qualify the

24 statement for the safe harbor." *Quality Systems*, 865 F.3d at 1146-47. As the Ninth Circuit in

25 *Quality Systems* explained: "For cautionary language accompanying a forward-looking portion

26 of a mixed statement to be adequate under the PSLRA, that language must accurately convey

27 appropriate, meaningful information about not only the forward-looking statement but also the

28 non-forward-looking statement. Where, as here, forward-looking statements are accompanied by

non-forward-looking statements about current or past facts, ***that the non-forward-looking statements are, or may be, untrue is clearly an "important factor" of which investors should be made aware***." *Id.* at 1148 (emphasis added).

Defendants spill a lot of ink pointing out that these statements were "accompanied by meaningful cautionary language" and arguing that they were therefore not actionable. Mot. at 16-19. But the purported cautionary language was not adequate because it did not "convey appropriate, meaningful information about . . . the non-forward looking statement[s]," *Quality Systems*, 865 F.3d at 1148, that it accompanied—i.e., that the non-forward looking portions of the statements were materially misleading because, for example, Defendants touted iPhone sales and upgrade rates, while failing to disclose to investors that those numbers were artificially inflated because the Company was secretly slowing down iPhones in an effort to force premature upgrades on consumers. Thus, the alleged "mixed" statements are not protected by the statutory safe harbor.

### 10.   Statements Defendants Challenge As Corporate Optimism and Opinion Are Actionable

Defendants also argue that certain alleged misstatements are inactionable because they are statements of corporate optimism (i.e., puffery). Mot. at 19-20 (citing ¶¶271, 272, 273, 274, 275, 276, 286, 288, 304, 385, 388).  While it is generally true that vague, generalized statements are not actionable, courts are clear that "even 'general statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly."  *Quality Sys.*, 865 F.3d at 1143 (internal citation omitted). "For example, reassuring investors that 'everything [was] going fine' with FDA approval when the company knew FDA approval would never come was materially misleading." *Id.* (citing *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)). "Similarly, a statement that the company 'anticipates a continuation of its accelerated

1    expansion schedule' when the expansion had already failed was materially misleading." *Id*. at

2    1143-44 (*citing Fecht v. Price Co.,* 70 F.3d 1078, 1081 (9th Cir. 1995)).[17]

3        "[T]he question is whether a reasonable investor would understand [the statements], ***in***

4    ***context***, to communicate only a general optimism, or a factual representation about the actual

5    condition of [the company's] business." *Cutler*, 696 F. App'x at 814.  It is for this reason that

6    "determining whether a given statement is material entail[s] fact-intensive assessments that are

7    more properly left to the jury," which is why courts "must exercise great caution" when deciding

8    whether a statement is puffery at the motion to dismiss stage. *Mulligan*, 36 F. Supp. 3d at 966.

9        Here, Defendants have improperly cherry-picked snippets of statements out of context in

10    an attempt to convince the Court that it must conclude, as a matter of law at the pleading stage,

11    that certain statements are immaterial puffery. The Court should not entertain this tactic.

12    *Mulligan*, 36 F. Supp. 3d at 966 ("[T]he Court may not assess the statements listed in the

13    [complaint] in a vacuum, 'plucking the statements out of their context to determine whether the

14    words, taken per se, are sufficiently 'vague' so as to constitute puffery,' but rather will examine

15    the entire statement and its circumstances to determine if it is actionable.").[18]

16        For example, Defendants argue that the following statement is a "textbook" example of

17    inactionable corporate optimism: "We were actually up by 6% in Mainland China. And so ***we're***

18    ***very encouraged by that***." Mot. at 19 (citing ¶272). Defendants suggest that "we're very

19    encouraged by that" is puffery, rendering the entire statement inactionable. But this is

20

---

21    [17] *Accord Mulligan*, 36 F. Supp. 3d at 966 ("What might be innocuous 'puffery' or mere
statement of opinion standing alone may be actionable as an integral part of a representation of

22    material fact when used to emphasize and induce reliance upon such a representation.") (citing
*Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989)).

23    [18] *See also Cutler v. Rancher Energy Corp.*, 2014 WL 1153054, at *8 (C.D. Cal. Mar. 11, 2014)
("Although standing alone such an assertion would likely constitute puffery, the nature of the

24    assurances and the context in which they were given combine to make this statement
actionable."); *Karinski v. Stamps.com,* 2020 WL 281716, at *11-13 (C.D. Cal. Jan. 17, 2020)

25    (additional context made "very happy" statement misleading and "affirmatively create[d] an
impression of a state of affairs that differ[ed] in a material way from the one that actually

26    exist[ed].");  *Shenwick v. Twitter, Inc.,* 282 F. Supp. 3d 1115, 1141 (N.D. Cal. 2017)
("defendant's reassurances to investors that sales were 'unchanged, or even growing, compared

27

28    to previous quarters' was a 'concrete description,' not a '"feel good"' optimistic statement").

1    misleading, because the falsity of this statement has to be considered as a whole—i.e., as part of

2    the sentence that precedes it, which is "We were actually up 6% in Mainland China." ¶272. This

3    indisputably is not a statement of corporate optimism (and Defendants do not argue otherwise),

4    but is instead a concrete statement of Apple's actual financial results—and Defendant Cook is

5    stating the Company is "encouraged" by Apple's actual results in Mainland China. This is not

6    mere corporate optimism. The same goes for Defendants' argument that the following statement

7    is inactionable puffery: "it probably bodes well later on." ¶273. This statement has to be

8    considered in context, as part of a statement Defendant Cook made about actual iPhone upgrade

9    rates. *See id.* ("[F]rom an absolute quantity point of view, the upgrades for this fiscal year are the

10   highest that we've seen.").

11           Relatedly, Defendants pluck out of context the bold and italicized portion of the

12   following statement to argue that it is inactionable puffery: "iPhone ASP was $606, up from

13   $595 a year ago, thanks to ***strong demand for iPhone 7 Plus***, which represented a higher

14   percentage of the iPhone mix compared to the Plus model a year ago." ¶271. But this language

15   must be read in the context—Defendant Maestri is explaining that strong iPhone 7 demand

16   contributed to higher ASP for the iPhone than for the same period in the prior year. *See Union*

17   *Asset Mgmt. Holding AG v. SanDisk LLC*, 2017 WL 3097184, at *1 (N.D. Cal. June 22, 2017)

18   (statement that "we have made strong progress" was not puffery because it was "made in a

19   particular context that could reasonably have led investors to rely on their accuracy and

20   completeness"). This is not a description of iPhone demand "in subjective or emotive terms," but

21   is instead a "concrete description of the past and present." *Quality Systems*, 865 F.3d at 1144

22   (statement that sales were "unchanged, or even growing, compared to previous quarters" not

23   puffery).[19]

24

25

---

26   [19] Defendants rely on *Intel*, 2019 WL 1427660, at *9 to argue that words like "strong" are
     inactionable. Mot. at 20. But in *Intel* the word "strong" was found inactionable when used in the
27   following context—"strong security without compromising performance or impacting your
     experience," *id.*—which is not comparable to (and far less concrete than) a statement that
28   Apple's iPhone results were driven by "strong demand." ¶272.

1   The same goes for Defendants' argument that certain statements are inactionable because

2 they are statements of opinion and belief, Mot. at 21-22, certain of which overlap with statements

3 that Defendants contend are puffery. Again, Defendants cherry-pick certain phrases from larger

4 statements and strip them of context. When viewed in their appropriate context, these statements

5 are not actually statements of opinion and belief, but instead "contain factual representations at

6 their core." *Mulligan*, 36 F. Supp. 3d at 967. What's more, "that certain statements are predicated

7 with indications that the speaker 'thought' or 'believed' a given statement does not change this

8 result." *Id.* (citing *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 141 (S.D.N.Y.1999) ("It is

9 disingenuous to suggest that factual assertions are puffery and opinion that no reasonable

10 investor could reasonably rely on for their truth simply because Oxford claims only to have

11 stated that it believes in their truth.").[20]

12   And even for the small number of statements that are arguably statements of opinion,

13 those statements are materially false and misleading because Plaintiff has "identif[ied] particular

14 (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer

15 did or did not conduct or the knowledge it did or did not have—whose omission makes the

16 opinion statement at issue misleading to a reasonable person reading the statement fairly and in

17 context." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175,

18 194 (2015).[21] Indeed, Defendants repeatedly touted Apple's iPhone sales, growth, and demand,

19 including in Greater China, without disclosing critical facts, including: (a) the higher iPhone

20 demand in 2017 and early 2018, including in Greater China, was driven by artificially

21 accelerated upgrade rates as a result of intentional throttling, (b) that the rate at which Apple

22 customers were replacing their batteries in older phones under the battery replacement program

23

24 [20] *See also Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1322 (11th Cir. 2019) ("Of course, simply because a statement is couched as opinion—'I believe,' 'I think,' or even 'In my opinion'—doesn't foreclose a finding that it constitutes an express or implied misrepresentation of fact."); *Chicago Conservation Ctr. v. Frey*, 40 F. App'x 251, 257 (7th Cir. 2002) ("It is true that merely prefacing a statement with phrases such as 'I think' or 'I believe' will not transform an otherwise factual assertion into a nonactionable opinion.").

27 [21] *See also Align Tech.*, 856 F.3d at 616 (falsity of omissions shown where "the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy").

was negatively impacting demand, and (c) iPhone demand in Greater China was declining and

expected to continue deteriorating—facts that are corroborated by former employees. ¶¶206-67.

By omitting these key facts, while touting iPhone demand including in Greater China,

Defendants' statements were materially misleading at the time they were made. *See, e.g.*, *GoPro*,

2017 WL 3168522, at *5 (finding the statement "[w]e believe we're still on track to make that

[projection] as well" to be an actionable statement of present opinion).

### D.  The Complaint Adequately Alleges Scienter

Scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud,

but also deliberate recklessness." *Schueneman*, 840 F.3d at 705. The issue is "whether *all* of the

facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any

individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc.,* 551 U.S. at

322-23 (emphasis in original). "In making this determination, the court must review all the

allegations holistically." *Matrixx Initiatives,* 563 U.S. at 48 (internal quotations omitted). "Thus,

*Tellabs* counsels us to consider the totality of circumstances, rather than to develop separately

rules of thumb for each type of scienter allegation." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d

776, 784 (9th Cir. 2008). Accordingly, in assessing scienter, "the sum is greater than the parts."

*In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 698 (9th Cir. 2012). A strong inference of

scienter arises, "[w]hen the allegations are accepted as true and taken collectively," a "reasonable

person would deem the inference of scienter cogent and at least as compelling as any opposing

inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324-26. The inference of

"scienter need not be irrefutable, i.e., of the 'smoking gun' genre, or even the 'most plausible of

competing inferences.'" *Id.* at 324.

### 1.  The Individual Defendants' Stock Sales During The Class Period Were Highly Unusual and Suspicious

In the Ninth Circuit, "[i]nsider trading in suspicious amounts or at suspicious times is

probative of bad faith and scienter." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 987

(9th Cir. 1999); *Quality Sys.*, 865 F.3d at 1146.  As detailed in the Complaint, Defendants Cook

and Maestri engaged in stock sales during the Class Period that were highly unusual in terms of

(a) the total amount of shares sold, (b) the percentages of shares sold compared to the number of total shares available for sale during the Class Period, (c) the contrast with their prior trading history, and (d) the timing of the stock sales. ¶¶445-56. This supports an inference of scienter. *See Silicon Graphics*, 183 F.3d at 986 (among the relevant factors Courts consider to determine whether insider trading has occurred are: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history"); *see also Provenz v. Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) (stock sales supported scienter where defendant sold "about 20% of his stock for $1,340,000").[22]

Specifically, Defendant Cook disposed of approximately 30.3% of the total shares, including stock units, he had available for sale during the Class Period, for proceeds of more than $100 million, ¶¶449-50, which was approximately 24% more than proceeds he received during the Control Period. ¶¶453-54. Likewise, Defendant Maestri disposed of approximately 92.3% of the total shares, including stock units, he had available for sale during the Class Period, for proceeds of $30.6 million ¶¶449, 451, which was approximately 130% more than proceeds he received during the Control Period.[23] ¶454. Also, collectively, Defendants Cook and Maestri made approximately 40% more in insider trading proceeds during the Class Period (more than $131 million) as compared to their collective insider trading proceeds during the Control Period ($94.8 million). ¶453.

Individually, Defendants' sales, as measured in proceeds, also increased dramatically during the Class Period. Defendant Maestri's proceeds from Apple sales ***increased by***

---

[22] *See also In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 646-47 (E.D. Va. 2000) ("[T]he magnitude of the Individual Defendants' sales must be viewed along a continuum where maximum profits and total loss of control are at one end, and minimum profits and maximum retention of control are at the other. Accordingly, the fact that the point on this continuum that the Individual Defendants chose to draw did not entail near-total divestment of their total holdings in [the company] does not preclude an inference of an intent on the Individual Defendants' part to profit from fraud and maintain control of the Company.").

[23] The fact that certain of such sales were made for tax purposes does not mean that those sales should be excluded. *See Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 555 (S.D.N.Y. 2017) ("[T]here is little principled reason to exclude in-kind sales [i.e., sales to cover tax liabilities] as a categorical matter. Money is fungible; in-kind and take-home cash sales affect the seller's bottom line equally.").

1   *approximately 130% during the Class Period*—from approximately $13.4 million during the

2   Control Period to $30.6 million during the Class Period.[24] Defendant Cook's trading proceeds

3   *increased by approximately 24% during the Class Period*—from $81.4 million during the

4   Control Period to approximately $100.9 million during the Class Period. ¶454. Moreover, during

5   the Class Period, Defendant Maestri substantially increased the number of Apple shares he sold

6   from 107,114 during the Control Period to 144,136 shares during the Class Period.[25]  In addition,

7   Defendants' stock sales were suspiciously timed in that they sold a vast number of shares, at a

8   high value, while in a unique position to appreciate all of the factors affecting iPhone demand

9   and before the market was able to appreciate the these factors. ¶456. These highly unusual sales

10  support an inference of scienter.[26]  Defendants point to the fact that certain trades were made

11  pursuant to 10b5-1 trading plans. Mot. at 35. But, Defendants cannot rely on their 10b5–1

12  trading plan at the pleading stage.[27]

13              **2.      Statements By Former Employees and Others With Knowledge
                          Corroborate That Defendants Closely Tracked iPhone Sales and
14                        Apple's Business in Greater China**

15          As detailed herein and in the Complaint, statements by former employees and others with

16  knowledge corroborate that Defendants specifically tracked: (i) iPhone sales data (including in

17  Greater China); (ii) lengthening iPhone upgrade cycles; and (iii) how the battery replacement

18  program would elongate the iPhone upgrade cycle. ¶¶206-67, 477-78. These particularized

19  _____

20  [24] Defendants conveniently ignore the large dollar amount and percentage of insider sales during
    the Class Period and instead focus attention only on the percentage of holdings sold by
21  Defendant Maestri during the Control Period. Mot. at 36.

22  [25] Defendant Cook sold fewer Apple shares during the Class Period versus the Control Period,
    Mot. at 35, but as a result of the artificial inflation of Apple stock during the Class Period, he
23  made significantly more money on his Class Period insider trading. ¶455.

    [26] *See In re Seebeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003)
24  (holding that a sale of just 7.6% of personal holdings during class period for proceeds of $18
    million was sufficient to create inference of scienter); *In re OmniVision Techs., Inc.*, 2005 WL
25  1867717, at *4 (N.D. Cal. July 29, 2005) (insider trading allegations sufficient where one
    individual sold 18% of holdings).
26
    [27] *See In re Questcor Inc. Sec. Litig.*,, 2013 WL 5486762, at *16 (C.D. Cal. Oct. 1, 2013 (finding
27  defendant's "trading plan alone does not negate the suspicious nature of the sales as a whole");
    *In re Bridgepoint Educ. Inc. Sec. Litig.*, 2013 WL 5206216, at *27 (S.D. Cal. Sep. 13, 2013)
28  ("Defendants may not use trading plans at the pleading stage to defeat an inference of scienter.").

1   allegations meet the Ninth Circuit's standard set forth in *Zucco Partners, LLC v. Digimarc*

2   *Corp.*, and support a strong inference of scienter. 552 F.3d 981, 995 (9th Cir. 2009). Under

3   *Zucco*, CW statements raise a strong inference of scienter when they "describe[] [the CWs] with

4   sufficient particularity to establish their reliability and personal knowledge," and when those

5   statements themselves are "indicative of scienter." *Id.* The Complaint's CW allegations readily

6   meet the *Zucco* standard.

7           In this Circuit, a plaintiff can plead deliberate recklessness scienter by alleging

8   defendants had access to information or reports contradicting their statements. *In re Oracle*

9   *Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010). To allege scienter this way, a plaintiff must

10  plausibly allege that Defendants "had reasonable grounds to believe material facts existed that

11  were misstated or omitted, but nonetheless failed to obtain and disclose such facts although

12  [Defendants] could have done so without extraordinary effort." *Howard v. Everex Sys., Inc.*, 228

13  F.3d 1057, 1064 (9th Cir. 2000). Such allegations can be bolstered by CW statements regarding

14  the Defendants' access to contradictory information or reports. *See, e.g.*, *In re Wash. Mut., Inc.*

15  *Sec., Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1211-1212 (W.D. Wash. 2009) (finding

16  scienter supported by allegations from CW that management reviewed reports about

17  underwriting standards and approved changes to those standards).

18          Here, numerous former employees corroborate that Apple senior management, including

19  the Individual Defendants, tracked iPhone sales data and product lifetimes, and were provided

20  access to reports and information contradicting their public statements about iPhone growth.

21  This supports an inference of scienter. *See In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL

22  1411129, at *27 (N.D. Cal. Mar. 21, 2018) (corroboration supports reliability); *Hatamian v.*

23  *Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1163 (N.D. Cal. 2015) (same).  Former

24  employees confirm that Apple tracked the rate at which battery replacements were impacting

25  iPhone demand. CW-2 confirmed that there were "absolutely" internal conversations at the

26  Company regarding elongated sales cycles and concerns about upgrade cycles being impacted by

27  the battery replacement program, and that the battery replacement program hurt sales. ¶¶249-50,

28  252. In addition, CW-2 confirmed that Apple was "absolutely" tracking every single battery

replacement, ¶251.  CW-1 similarly explained that battery replacements were "definitely" being tracked in 2018, ¶254, as well as that Apple tracked the lengthening iPhone upgrade cycles, which was negatively impacted by the battery replacement program. ¶¶245-46. Again, corroborated testimony supports an inference of scienter. *See In re Gilead Scis. Sec. Litig.*, 2009 WL 3320492, at *2 (N.D. Cal. Oct. 13, 2009) (corroboration supports reliability).

In addition, CW-1 confirmed that Defendants Cook and Maestri, were "absolutely" receiving reports on Supply and Demand, and that CW-1 personally prepared reviews and trading records on a regular basis that went to senior management. ¶259. CW-1 also reported that leadership from Supply and Demand met weekly with Defendant Cook to discuss a weekly "snapshot" that detailed metrics such as run rates, sales, forecasts, and trends, as well as product lifetimes and volumes. *Id.* CW-4 similarly confirmed that Apple tracked numerous data points about iPhone sales, and that this data was compiled and reviewed on a weekly basis. ¶263. All of this data "gets rolled up into a weekly report that would go to all the necessary decision makers," ¶264, including information about how long customers were holding onto their iPhones. ¶262. CW-4 reported that Apple's finance team analyzed iPhone sales data in an effort to provide Company leadership with information about how Apple's business was doing. ¶266.

First-hand accounts of former employees also confirm that senior management knew about declining sales in China. For example, CW-6 explained that Apple managers in China reported market share losses to Apple headquarters. ¶232. In addition, CW-6 stated that certain sales reports showing a decrease in iPhone business in Greater China came directly from Apple's headquarters, and that figures showing declining iPhone sales and market share loss were available to everyone at Apple. *Id.* CW-2 stated that senior management knew China demand was soft going into the first quarter of fiscal 2019 and that internally at Apple there were discussions amongst "everyone who had access to see China" sales, including him, about how "super soft" sales numbers were from China in the first quarter of fiscal 2019. ¶236.

Viewed holistically, the reliable and highly corroborative CW allegations regarding Defendants' knowledge of operational issues raise a strong inference of scienter.

### 3. Apple's Business in Greater China and Sales of the iPhone Are Core Operations of the Company

Under the core operations doctrine, knowledge of facts critical to a business's core operations may be imputed to a company's key officers "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter," scienter may be inferred. *See S. Ferry,* 542 F.3d at 786; *Anderson v. Peregrine Pharm., Inc.*, 2013 WL 4780059, at *12 (C.D. Cal. Aug. 23, 2013); *see also Berson*, 527 F.3d at 987-89 (it would be "absurd to suggest" that top management did not know facts involving significant losses on company's largest contract). In addition, "the Ninth Circuit has found that allegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement when used in any form along with other allegations that, when read together, raise an inference of scienter that is cogent and compelling, thus strong in light of other explanations." *Vancouver Alumni Asset Holdings Inc. v. Daimler AG*, 2017 WL 2378369, at *15 (C.D. Cal. May 31, 2017) (internal quotations omitted).

Here, Greater China is critical to Apple's business and growth strategy. ¶¶460-62. Indeed, Apple's revenue in the region grew by ***99 percent*** between Q4 FY14 and Q4 FY15, ¶461; by the end of Apple's fiscal year 2018, Greater China made up almost 20 percent of Apple's total fiscal year annual sales. ¶462. Defendants Cook and Maestri also closely tracked the Chinese smartphone market and sales of the iPhone there. ¶¶463-66. In addition, demand for Apple's iPhone is critical to the Company's business, as is the iOS operating system and the impact it has on iPhone demand. ¶¶467-72.

The Individual Defendants also spoke frequently about Apple's iPhone business, including in Greater China. *Id.* An inference of Defendant's knowledge of declining demand in Greater China and of the impact of throttling on demand for the iPhone—Apple's most important product—is therefore appropriate, as these are core operations of the Company. *See S. Ferry*, 542 F.3d at 782-83 (9th Cir. 2008) ("[F]acts critical to a business's core operations . . . are known to a company's key officers."); *Mulligan*, 36 F. Supp. 3d at 970 (inferring knowledge of facts involving a critical element of company's business operations). Indeed, it would be "absurd" to

1   think that the Individual Defendants did not know critical facts that impacted demand for the

2   iPhone and sales in the Greater China region. *S. Ferry*, 542 F.3d at 786.[28]

3         **4.     Additional Evidence of Scienter**

4         Additional facts also support an inference of scienter. *First*, Defendants possessed the

5   motive and opportunity to artificially accelerate the iPhone upgrade cycle, considering that so

6   much of the Company's revenue was dependent on iPhone sales. ¶¶473-76. Indeed, as iPhone

7   sales growth slowed, not only was Apple losing revenue from sales of iPhones themselves, but

8   revenue derived from owners of iPhones also suffered. *Id.* Defendants therefore possessed the

9   motive to accelerate the upgrade cycle—which they did by intentionally throttling phones. This

10  supports an inference of scienter.

11        *Second*, Apple's decision to stop reporting iPhone unit sales, announced on November 1,

12  2018, was designed to conceal declining iPhone sales, and also supports an inference of scienter.

13  ¶¶479-85. Indeed, the day after the announcement, many analysts were openly concerned that the

14  move was an indicator that iPhone growth was over and that negative unit sales growth lay

15  ahead. For example, one analyst noted that the move "left investors speechless" and that "some

16  investors will view this as a negative that the company is trying to hide information that in the

17  past was so important to assess the company's strength." ¶483. Others called the pullback a "jaw

18  dropper" and "frustrating," noting that "the Street will find this a tough pill to swallow this

19  morning as the transparency of the Cupertino story takes a major dent." ¶484.

20        **5.     Defendants' Non-Culpable Explanations Do Not Undermine Scienter**

21        Non-culpable explanations do not undermine an inference of scienter. Defendants suggest

22  that Apple's stock repurchases cut against an inference of scienter. But, as courts have explained,

23  "[t]here are many inferences that a Court could draw from a stock repurchase" and a

24

---

25  [28] Defendant Cook also frequently traveled to China, including at the end of March 2018, a few
    months into Apple's battery replacement program, and again in early October 2018, right before
26  Apple provided lower-than-expected revenue guidance for Q1 FY 19 (¶¶463-66). *See In re Daou*
27  *Sys., Inc.*, 411 F.3d 1006, 1022 (9th Cir. 2005) ("[A]dmissions from top executives that they are
    involved in every detail of the company and that they monitored portions of the company's
28  database are factors in favor of inferring scienter in light of improper accounting reports").

1  "repurchasing plan weighs neither in favor of nor against an inference of scienter." *In re*

2  *Viropharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 474 n. 23 (E.D. Pa. 2014). These courts

3  recognize that an executive cannot use company dollars to buy immunity from the securities laws

4  by announcing a share repurchase program on the same day he issues a false statement. *Id.*

5       Defendants' argument that Apple made good-faith efforts to issue reasonable revenue

6  guidance also does not help their cause, considering that Defendants could have recognized that

7  issuing a guidance that actually reflected what they knew about demand would have been even

8  more damaging to Apple's share price than issuing a guidance just above that point that was

9  nevertheless misleading. And the same goes for Defendants' argument that Defendants came

10  forward to inform the market of their missed revenue guidance early. Mot. at 38-39. Defendants

11  could have hoped to preempt what would have been an even worse hit to their share price if they

12  waited until the Company's Q1 FY19 financial results were released.

13      **E.**    **The Complaint Adequately Alleges Loss Causation**

14       The Complaint adequately pleads loss causation.  The Ninth Circuit in *Mineworkers'*

15  *Pension Scheme v. First Solar Inc.* reiterated that the standard for loss causation "requires no

16  more than the familiar test for proximate cause." 881 F.3d 750, 753 (9th Cir. 2018). Indeed, '[t]o

17  prove loss causation, plaintiffs need only show a causal connection between the fraud and the

18  loss . . . by tracing the loss back to the very facts about which the defendant lied." *Id.* Further,

19  "[r]evelation of fraud in the marketplace is simply one of the 'infinite variety' of causation

20  theories a plaintiff might allege to satisfy proximate cause." *Id.* at 754.

21       The Complaint alleges that Defendants misrepresented and failed to disclose certain

22  material facts about artificially accelerated upgrade rates and the Company's battery replacement

23  program, and the impact these were having on iPhone demand, as well as the fact that Apple

24  faced greater competitive pressures in Greater China than Defendants conveyed to the market.

25  The Complaint also alleges that Defendants' misrepresentations and omissions concealed the

26  material risk that iPhone demand was deteriorating, including in Greater China. The Complaint

27  further alleges that the truth Defendants concealed through their false and misleading statements

28  was revealed through four corrective disclosures, and that these disclosures also represented the

1  materializations of the risk concealed by Defendants' false and misleading statements. ¶¶486-93.

2  Finally, the Complaint alleges that, on the final corrective disclosure, the market reacted to news

3  that Apple's first fiscal quarter 2019 revenue suffered because the Company experienced "fewer

4  iPhone upgrades than [it] had anticipated," due to the discounted battery replacement program

5  and weak sales in China. ¶493. The Complaint therefore adequately alleges that the loss was

6  foreseeable and that the loss was caused by the materialization of the concealed risk which is all

7  that a plaintiff must plead at this stage. *First Solar*, 881 F.3d at 753.[29]

8       Defendants argue that with respect to the alleged omissions regarding the battery

9  replacement program, Plaintiff cannot show that the potential risks of that program were

10  concealed during the Class Period because they claim the market was purportedly aware that

11  Apple's battery replacement program would negatively impact new iPhone sales. Mot. at 39.

12  However, whether the market fully appreciated these risks is a question of fact not appropriate

13  for determination on a motion to dismiss, *see Rudolph v. UTStarcom*, 2008 WL 4002855, at *4

14  (N.D. Cal. Aug. 21, 2008) ("[L]oss causation is a fact-intensive inquiry better suited for

15  determination at trial than at the pleading stage."), as is Defendants' argument that the Complaint

16  fails to allege with particularity that any risks relating to "higher iPhone demand in 2017 and

17  early 2018" played a part in diminishing the market value of Apple's stock. Mot. at 39.

18       **F.    The Complaint Adequately Alleges Claims Under Section 20(a)**

19       Defendants seek dismissal of the Section 20(a) claim based solely on their argument that

20  Plaintiff failed to plead a predicate violation of Section 10(b). Mot. at 40. The Complaint

21  adequately alleges that the Individual Defendants were "controlling persons," ¶¶518-24, and

22  Plaintiff has adequately pled a violation of Section 10(b). *See No. 84 Employer-Teamster Joint*

23  *Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003).

24  **IV.    CONCLUSION**

25       Defendants' Motion should be denied in its entirety.

26

27  [29] Moreover, loss causation does not require an "immediate market reaction" to a corrective
disclosure. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057-58 (9th Cir. 2008); *In re Nuvelo,*
28  *Inc. Sec. Litig.*, 668 F. Supp. 2d 1217, 1226 (N.D. Cal. 2009).

DATED:  January 30, 2020

Respectfully submitted,

*/s/  Carol C. Villegas*
**LABATON SUCHAROW LLP**
Carol C. Villegas (admitted *pro hac vice*)
Christine M. Fox (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
cvillegas@labaton.com
cfox@labaton.com
ebelfi@labaton.com

*Counsel for Lead Plaintiff Employees'*
*Retirement System of the State of Rhode Island*
*and the Proposed Class*

*/s/  James M. Wagstaffe*
**WAGSTAFFE, VON LOEWENFELDT,**
**BUSCH & RADWICK LLP**
James M. Wagstaffe (SBN 95535)
Frank Busch (SBN 258288)
100 Pine Street, Suite 725
San Francisco, California 94111
Telephone: (415) 357-8900
Facsimile: (415) 357-8910
wagstaffe@wvbrlaw.com
busch@wvbrlaw.com

*Liaison Counsel for Lead Plaintiff Employees'*
*Retirement System of the State of Rhode Island*
*and the Proposed Class*