**Pages 1 - 55**

                    UNITED STATES DISTRICT COURT

                    NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

                              )
                              )
**IN RE APPLE, INC., SECURITIES )**    **NO. CV 19-02033-YGR**
LITIGATION,                   )
                              )
_____)

                         Oakland, California
                         Wednesday, March 11, 2020

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Lead Plaintiffs:
                         LABATON SUCHAROW LLP
                         140 Broadway
                         New York, NY  10005
                 BY:  **CAROL C. VILLEGAS, ESQUIRE**
                      **CHRISTINE FOX, ESQUIRE**

For Plaintiff
City of Roseville Employees' Retirement System:
                         ROBBINS, GELLER, RUDMAN & DOWD LLP
                         Post Montgomery Center
                         One Montgomery Street
                         Suite 1800
                         San Francisco, CA  94104
                 BY:  **SHAWN A. WILLIAMS, ESQUIRE**

For Defendants:
                         ORRICK, HERRINGTON & SUTCLIFFE LLP
                         The Orrick Building
                         405 Howard Street
                         San Francisco, CA 94105
                 BY:  **JAMES N. KRAMER, ESQUIRE**
                      **ALEX TALARIDES, ESQUIRE**
                      **ARIEL WINAWER, ESQUIRE**


Reported By:      Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                  Official Reporter

```
APPEARANCES CONTINUED:

For Defendants:
                        APPLE
                        One Apple Park Way, MS 169-2NYJ
                        Cupertino, CA  95014
                 BY:  STEPHANIE FINE, ESQUIRE
```

| | |
|---|---|
| 1 | **Wednesday - March 11, 2020**                          **2:03 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---oOo---** |
| 4 | **THE CLERK:**  Calling Civil Action 19-2033, In Re Apple, |
| 5 | Inc., Securities Litigation. |
| 6 | Counsel, please come forward and state your appearances. |
| 7 | **MS. VILLEGAS:**  Good afternoon, Your Honor.  Carol |
| 8 | Villegas from Labaton Sucharow for lead plaintiffs and the |
| 9 | class, and with me is Chris Fox from our office. |
| 10 | **THE COURT:**  Okay.  Great.  Thank you. |
| 11 | **MR. KRAMER:**  Good afternoon, Your Honor.  James Kramer |
| 12 | from Orrick, Herrington & Sutcliffe.  With me from Orrick are |
| 13 | Alex Talarides and Ariel Winawer, and we also have Stephanie |
| 14 | Fine, in-house counsel from Apple, who is here as well. |
| 15 | **THE COURT:**  You are welcome to sit at counsel table. |
| 16 | Okay.  Mr. Kramer. |
| 17 | **MR. KRAMER:**  Yes, ma'am? |
| 18 | **THE COURT:**  I have Alexander Talarides, but who is the |
| 19 | other one from your firm? |
| 20 | **MR. KRAMER:**  Ariel Winawer.  And she is at counsel |
| 21 | table with us as well. |
| 22 | **THE COURT:**  She is not showing up on our list, so if |
| 23 | you can make sure that we've got a card or that the docket is |
| 24 | updated. |
| 25 | **MR. KRAMER:**  Yes, Your Honor.  We did give Frances a |

card.

        **THE COURT:**  Okay.

    And do I have someone here from City of Roseville?

        **MR. WILLIAMS:**  Yes, Your Honor.  Shawn Williams, Robbins, Geller, Rudman & Dowd.

        **THE COURT:**  Mr. Williams, come sit at the counsel table with plaintiffs.

    Okay.  Well, as you can tell or you might be able to discern, your flexibility probably inured to your benefit.  We did not finish our trial day yesterday until 4:20.  I think that was with two 15-minute breaks, a 10-minute break, and a 30-minute break, so we had a busy day.  We needed to make sure that we got that jury deliberating yesterday.

    That would have given you about 20 minutes to make your arguments total, and given how long the Complaint is, I figured you might want a little bit more time than that.

    So let's start with scienter (pronounced "see-en-ter") or scienter (pronounced "si-en-ter").  I'm not exactly sure which is the right pronunciation.

    But it seems to me that with respect to the much wider class period that the plaintiffs are asking for as opposed to the narrow one that was suggested in the companion case, you've got a major issue with respect to scienter, and if you can't get past that, then all the work we did in evaluating all of this -- all of the allegations from effectively paragraph 270

1   to paragraph 395, which we have analyzed, I will say,

2   individually -- we never really need to ultimately get there

3   because you have to be able to show scienter, and I have

4   significant doubts, other than, again, a more narrow class

5   period, that you can satisfy the standard under the PSLRA.

6        So we'll begin with you, Ms. Villegas.

7        **MS. VILLEGAS:**   Thank you, Your Honor.

8        So when I -- when I look at this class period, I like to

9   think of it in three buckets, and I want to address scienter

10  for those buckets.

11       The first bucket is the time period between the beginning

12  of the class period and about February 2018, and that's the

13  battery-gate bucket.  That's the time period when we say

14  defendants misled the market because there were these

15  artificially-elevated upgrades going on because of the

16  throttling that was occurring.  And that's the first bucket.

17       The second bucket involves the battery replacement

18  program.  And for that bucket, between February 2018 and

19  January 2019, we alleged defendants made false and misleading

20  statements about the fact that they weren't tracking the

21  battery replacement or the effect that this would have on the

22  upcoming upgrade cycle at the end of 2018.

23       And then we have the China statements, and the China

24  statements overlay the whole class period.  So we allege that

25  defendants made false and misleading statements about China

1  demand going back to 2017 --

2       THE COURT:  So I'm hearing a cell phone.

3     Okay.  Keep going.

4       MS. VILLEGAS:  (Continuing) -- 2017 through 2019, and

5  that there were statements made about sales in China, the sales

6  of the iPhone X, strength in China, and basically the Chinese

7  market in general, and then towards the end of the class

8  period, the --

9       THE COURT:  Can you give me a date specifically when

10  the China sales were declining because despite the length of

11  your Complaint, it's still somewhat amorphous.

12       MS. VILLEGAS:  Sure.  So the confidential witnesses

13  pin the time to late 2017.

14       THE COURT:  I'm looking for a date.

15       MS. VILLEGAS:  We have a number --

16       THE COURT:  What does "late 2017" mean specifically?

17       MS. VILLEGAS:  So Confidential Witness No. 3 -- this

18  is at paragraph 218 -- said there was a slowing down of demand

19  after the launch of the iPhone 8 in September of 2017.

20     Then we have Confidential Witness No. 7 -- this is at

21  paragraph 220 -- who said there was a decrease in sales of

22  iPhones since at least the end of 2017.

23     Then we have Confidential Witness No. 5, who says sales

24  dropped across the board in Greater China for January and

25  February 2018, around the time when the iPhone X was newly

1    available.  That's paragraph 224.

2         Then we have CW-6 who reported that prior to the launch of

3    Apple's new iPhones in September of 2018 -- these are the

4    iPhone XS, the XS Max, and the XR -- he noticed that presale

5    intent-to-purchase numbers were low and not many clients were

6    inquiring about the new iPhones.  That's paragraph 227.

7         **THE COURT:**  You do understand that in terms of the

8    test with respect to establishing scienter, if I'm looking

9    at -- well --

10        **MS. VILLEGAS:**  I do have a few other witnesses that

11   support that Apple was losing its market share during this time

12   as well.

13        So our allegations are that these witnesses corroborate

14   that throughout the whole class period, there was a weakening

15   demand in China, and most particularly, CW-2 said that senior

16   management at Apple knew China demand was soft going into the

17   first quarter of 2019.  And this is significant because

18   Defendant Cook makes a statement about a third of the way into

19   that quarter --

20        **THE COURT:**  The problem with CW 2 is that CW 2 doesn't

21   actually have access to Cook.  I mean, they reported to someone

22   who reported to someone who reported to someone, and you

23   haven't made the link.

24        **MS. VILLEGAS:**  Well --

25        **THE COURT:**  And access in and of itself is not

1  sufficient.

2          **MS. VILLEGAS:**  So I think the link is actually

3  established by witnesses who tell us what was tracked

4  internally at the company in China and that these numbers were

5  tracked at headquarters --

6          **THE COURT:**  How do you know -- okay.  But you -- all

7  right.

8      Think about it as a chain of evidence.  I see you have

9  something at the beginning, and I see you have a conclusion at

10  the end, and you're missing about two or three steps.

11          **MS. VILLEGAS:**  So in terms of the reports that

12  defendants received that had information that we know

13  defendants received because a confidential witness tells us

14  these reports went to Cook and Maestri, we have allegations

15  about that as well.  And these allegations --

16          **THE COURT:**  Give me an example.

17          **MS. VILLEGAS:**  Sure.  So we have paragraph 259.

18          **THE COURT:**  Hold on.

19          **MS. VILLEGAS:**  I can even take a step back.  If you

20  start at paragraph 385, Tim Cook is admitting in this paragraph

21  that he is actually looking at sales data for the

22  newly-launched iPhones, the XS and the XS Max.  So if you look

23  at that paragraph, he says, "The XS and the XS Max got off to a

24  really great start," and at the end of the paragraph he says,

25  "In looking at the data on the sales data for XS and XS Max,

1   there's not obvious evidence of that in the data as I see it."

2       And we actually allege that this is false and misleading

3   because there are a number of witnesses, one in China and one

4   in the U.S., who say that the XS Max actually got off to a very

5   weak start, and that sales for the XS, XS Max were not doing

6   well.  So starting from that premise, Tim Cook is saying, "I'm

7   looking at sales data."

8       We also have another witness -- and this is at paragraph

9   259 -- that says supply-and-demand reports went to both Cook

10  and Maestri.

11       **THE COURT:**  Right.  But with respect to 385, that is

12  in the more narrow time period that was being alleged by the

13  other plaintiff, by the Robbins Geller firm.  That is not --

14  does not refer to everything that preceded in this much wider

15  time frame that you want going back to August 2nd of 2017 as

16  opposed to the one that they're referring to, which is

17  November 1st, 2018.  And paragraph 385 connects with that more

18  narrow time period.

19       **MS. VILLEGAS:**  Yes.  That's true, Your Honor.

20       **THE COURT:**  So take me back to something from 2017 or

21  September of 2017, which is so far the earliest part of 2017

22  that you seem to be mentioning in terms of weakening demand.

23       **MS. VILLEGAS:**  Well, we do have a number of

24  confidential witnesses who tell us that they were tracking the

25  battery replacement.

1    **THE COURT:**  I understand that.  That's step 1.  Okay?

2    Access is not sufficient.  How do you get beyond what your

3    lower-level confidential witnesses are saying?

4    **MS. VILLEGAS:**  So at paragraph 259, we do have a

5    witness that says supply-and-demand reports went to Cook and

6    Maestri, and these reports had a weekly snapshot.  It was a

7    100-page slide deck.  There is specificity as to the type of

8    information that was in there such as run rates, sales,

9    forecasts, comps, and trends.

10       At paragraph 259, it says at those weekly meetings with

11   Cook, senior leadership also would discuss product lifetimes

12   and volumes.  So this sales information would reach both Cook

13   and Maestri.

14                 (Cell phone rings.)

15       **THE COURT:**  Okay.  What is that?

16       **MR. KRAMER:**  I'm sorry, Your Honor.  That was -- my

17   phone was on mute, but apparently my watch was not.  I just

18   turned it off.  It rang to my watch.  My apologies, Your Honor.

19       **MS. VILLEGAS:**  In that same paragraph --

20       **THE COURT:**  And where's the time period?

21       **MS. VILLEGAS:**  Well, it was during CW-1's tenure at

22   the company, Your Honor.

23       **THE COURT:**  Okay.  So where is that?

24       All right.  So 206.  He's saying or she, whoever it is,

25   CW 1 worked out of the corporate headquarters.

1          **MS. VILLEGAS:**  Right.

2          **THE COURT:**  And did CW 1 prepare these reports and

3     send them to Cook, Maestri, and Williams?

4          **MS. VILLEGAS:**  No, Your Honor.  That's not alleged in

5     the Complaint.

6          **THE COURT:**  Well, then how -- explain that to me.  So

7     I've got CW 1 in paragraph 206 saying that they worked in the

8     headquarters.

9          **MS. VILLEGAS:**  Right.  And they worked on new product

10    introductions, and CW 1 provides a lot of information about how

11    these new products were launched, that there were war rooms,

12    that there were a number of people involved in following it,

13    that Cook and Maestri received emails about the sales when new

14    products were launched --

15         **THE COURT:**  How does CW 1 know that?  Was CW 1 on the

16    emails?  I'm just trying to understand.  How does CW 1 know

17    that?

18         **MS. VILLEGAS:**  This is information that CW 1 told us

19    based on his tenure at the company.

20         **THE COURT:**  How does he know?  I'm asking.

21         **MS. VILLEGAS:**  He works at the headquarters.  He is an

22    employee of Apple.  He sees what's going on around him.  He's

23    involved in the new product launches, so it's reasonable to

24    infer that he knows what is --

25         **THE COURT:**  If you can talk to CW 1, you can ask the

1    question, can't you:  "How do you know?  Are you on the emails?

2    Did someone tell you?"

3        I mean, there are thousands of people who work at Apple.

4    So what?  And I don't mean that in a pejorative way.  I mean

5    that you've got to explain -- if you want me to draw an

6    inference, you have to explain why I should draw that

7    inference.

8            MS. VILLEGAS:  So in paragraph 259, CW 1 does say how

9    he and his colleagues constantly prepared reviews and trading

10   summaries that went straight to the top.

11           THE COURT:  Okay.  Why is it that they can't say that,

12   you know, "were prepared for Cook, Maestri and Williams"?

13           MS. VILLEGAS:  Well, this witness does say the

14   supply-and-demand reports went directly to Cook, Maestri, and

15   Williams.

16           THE COURT:  What paragraph?

17           MS. VILLEGAS:  That's paragraph 259.

18           THE COURT:  So you want --

19           MS. VILLEGAS:  So that's the first line, Your Honor.

20           THE COURT:  All right.  Keep going.

21           MS. VILLEGAS:  I mean, this witness does provide

22   specificity about when these meetings would occur.  I mean, the

23   CW says in the -- line 16 on that page, "CW 1 confirmed that

24   leadership from supply and demand, senior directors and above,

25   met every Friday with Defendant Cook to discuss a weekly

1  snapshot of the status of the business, which was a 100-page

2  slide deck."  I mean it's a very specific allegation.  It gives

3  a day of the week, every week, that this witness saw or

4  observed Defendant Cook having a meeting about this weekly

5  snapshot.

6       THE COURT:  It doesn't say "saw or observed," but

7  okay.  Right?  He doesn't say that.

8       MS. VILLEGAS:  No, but he did -- he did confirm with

9  us that this happened.

10      And the allegations of the Complaint should be taken as

11  true.  The level of specificity provided by this witness in

12  both this paragraph and in other paragraphs in the Complaint

13  also lend credence to what he's saying is true.

14      THE COURT:  All right.  So CW 1 is your critical

15  person?

16      MS. VILLEGAS:  I mean, we also have CW 2, who was also

17  at headquarters who also worked in this new product group, and

18  who was, I think, three reporting levels down from the COO, and

19  gives a lot of information about the new product launches,

20  which we think is significant because a lot of the case

21  involves the battery replacements and how this was going to

22  affect the new upgrade cycle in the fall.

23      So when new products are launching, CW 2 tells that there

24  is a lot of activity around it.  There is a war room.  There

25  are SKUs that are being ticked off.  Everyone is on top of it.

It's a very big deal at the company.  And he says that
executives, including Cook, Maestri, and Williams, received
email updates about this, which shows that they were tracking
things.  And I think this is -- this is corroborating
information from what CW 1 tells us, that the supply-and-demand
reports are also getting to the defendants.

CW 4 -- this is paragraph 262 -- also tells us that Apple
tracked specific data about iPhone sales, and he provided Apple
leadership with guidance on how the program was doing.  And CW
4 gets into specifics about how the company was looking at how
many people were upgrading, when they were upgrading, which
carriers they were using, and the conditions of the phones that
customers returned when purchasing a new one.  So this is even
more information in a report CW 4 prepared that he said went to
Apple leadership.

At paragraph 266, we have allegations that Apple finance
team analyzed sales data for company's leadership and that the
leadership could access the SAP system with data any time.  I
think if you take these allegations of leadership and senior
management and juxtapose them with the allegations that we get
from CW 1 that this supply-and-demand report was actually going
to Cook and Maestri, we have an inference that defendants are
looking at all of this data.

I would also just add on the battery replacement side of
it that we do have a number of witnesses who talk about how

1   that data was tracked and that the information was showing that

2   there was going to be a weakness in the upgrade cycle.

3       And so for those allegations, we have CW 2, who says Apple

4   was absolutely tracking every single battery replacement and

5   Apple increased head count to deal with all the battery

6   replacements at the store level.  That's paragraph 251.

7       We have CW 1, who confirmed that battery replacements were

8   definitely being tracked in 2018 and that it was tracked at the

9   store, city, and county level and could be rolled up.  That's

10  paragraph 254.

11      And these CWs also talk about how Apple tracked the

12  lengthening iPhone upgrade cycle and that it was negatively

13  impacted by these battery replacements.  So, again, if you take

14  these allegations and juxtapose with the allegations of CW 1

15  who says supply and demand went to Cook and Maestri, CWs 2 and

16  4 who talk about senior leadership and members from the top

17  reviewing all these reports and receiving all of this

18  information and even Cook's own statement that at least for one

19  part of the class period, he looked at sales figures, I mean, I

20  think you can infer that he's looking at the sales figures.  He

21  is the one providing the market --

22          **THE COURT:**  This is not a reasonable inference.  It's

23  a strong inference.

24          **MS. VILLEGAS:**  Yes, Your Honor.

25          **THE COURT:**  And it is contemporaneous knowledge.  So

1   broad-brushing doesn't work for me.  You actually have to do

2   the work to show the inferences and contemporaneous knowledge

3   with respect to any and all of these individual statements.

4   Much of what you're arguing is very broad-brush, and that's a

5   concern.

6           MS. VILLEGAS:  So when these witnesses provide us with

7   information, Your Honor, they provide us with information of

8   what's happening at their tenure.  When the witnesses are

9   telling us that they're tracking the battery replacement

10   program, they're talking about during their tenure.  I mean, I

11   think that's apparent from the allegations, and if it's not, I

12   apologize, but that's -- they're telling us about their time

13   when they were at Apple.

14       CW 1 tells us that Cook and Maestri are looking at these

15   supply-and-demand reports.  It's throughout that individual's

16   tenure at Apple.

17       I mean, it was their job to prepare information that went

18   to these defendants so they would know.  And when they say that

19   there were meetings, they were every Friday, not just a

20   specific Friday, but every Friday where they got together to

21   discuss this information.

22       So I think that to the extent that we have witnesses that

23   are telling us that there is soft demand in China or that the

24   battery replacement program is being tracked and there's

25   weakness in the upgrade cycle, that this information is getting

1   to the defendants.

2           **THE COURT:**  Response.

3           **MR. KRAMER:**  Thank you, Your Honor.  Jim Kramer for

4   the defendants.

5       So, Your Honor, we have allegations that defendants were

6   reading reports, tracking its sales, but we know from *Zucco*

7   that in addition to describing with very specific facts and

8   particularity the reasons the confidential witnesses have

9   personal knowledge about what the defendants received -- what

10  the defendants received, the statements which were reported by

11  the confidential witness, must be indicative of scienter.

12      Simply because someone gets a sales report -- right?  We

13  talked about paragraph 259.  Paragraph 259 says that Mr. Cook

14  and Mr. Maestri received sales reports.  That can't be

15  indicative of scienter, Your Honor, because if that were the

16  case, every executive would act with scienter.

17      What they need are specific facts that show they got

18  reports which go to the scienter, the underlying falsity.  And

19  one of the things that plaintiffs do in this Complaint and

20  throughout their opposition is they presuppose the underlying

21  falsity.  And I want to just spend a few minutes on that,

22  Your Honor, because I think it's important.

23      So I heard counsel say they saw all this data.  They had

24  all this information, specifically that sales were weakening,

25  specifically that the battery replacement program was causing

1    demand be weakened.  There is not one single allegation in this

2    Complaint of an internal report that showed that because people

3    were trading in their phones to get new batteries, that it was

4    affecting the upgrade cycle.  There is not one internal report

5    referenced.

6        Similarly on the performance management, there is not one

7    document cited in this Complaint.  There is not one reference

8    to facts which support their core theory, which is specifically

9    that Apple decided that they were going to slow down phones to

10   pull in sales.

11       And, Your Honor, this is -- remember, this is a -- this is

12   an omissions case.  Right?  The plaintiffs have conceded that

13   the company's statements, its results during the class period,

14   were accurate.  What they've instead said is, "Yeah, but you

15   didn't disclose that those sales were impacted by some other

16   business practices."  Specifically they've got -- and they've

17   got two main theories.  One is this performance management

18   theory, which they say, quote, that we -- defendants

19   artificially slowed the phones so that they could cause people

20   to upgrade sooner.  And that they did this despite the fact

21   that it would cannibalize future results.

22       The problem is, Your Honor, they have got no facts that

23   back that up.  So they presuppose that fact exists and then say

24   there was an omission.  And, Your Honor, we know from *Brody* and

25   we know from the *City of Sunrise/Oracle* case that Judge Freeman

decided that you don't even get to the *Brody* analysis unless
you've pled that underlying core set of facts.

The table stakes in an omissions case is you've got to
come up with facts that show that the defendants were doing
what you claim.  That defendants were here intentionally and
secretly slowing down the iPhones in order to force people to
upgrade prematurely.

Your Honor, it just doesn't exist in the Complaint.  We
looked so hard.  Their opposition cites paragraph 119.
That's -- that's it.  That's where we show you the facts.  But
if you look at paragraph 119, Your Honor, paragraph 119 just
has a conclusion.  There is not a confidential witness that
says this occurred.  There is no internal document that says it
occurs.  They just start with the premise it did occur.  That
you did this.  And then the whole Complaint is about how you've
now misled the market through omission.

So you don't even get to the -- the *Brody* analysis,
Your Honor, unless you find that underlying fact here, again,
is that the defendants schemed.  They intended to slow down the
phones to force people to upgrade more quickly.  That just
doesn't exist.  And, again, that's table stakes.

And if you say, "Okay, fine.  We'll assume.  We will do
what Judge Freeman did in *Oracle*, and we'll just assume that
those exist" -- when you line up that claim with the company's
public statements, you still end up in the same place that

20

1   there is no omission because the underlying facts -- again,

2   assuming this was happening -- only render the statement

3   materially misleading based on what was said.  And here, Apple

4   did not say, "Oh, and, by the way, we achieved these results

5   without any impact of the operating systems being impacted or

6   slowed down."  It just doesn't exist.

7        So, again, it's an omissions case.  You got to look and

8   say have they pled the allegedly-admitted fact with

9   specificity.  Here they have an under-theory -- their first

10  theory of performance management.  But even if you did and you

11  looked at the public statements under *Brody*, you don't have a

12  situation where you've created -- affirmatively created an

13  impression of a state of affairs that differs materially from

14  what was going on.  Doesn't exist.

15       And I would challenge counsel to find in the Complaint

16  where there are specific facts alleged that show during 2017,

17  the defendants intended to artificially increase the upgrade

18  rates by slowing down the iOS.  I would challenge her to do

19  that.

20       If I might, Your Honor, I have -- we had a chart on page 5

21  of our brief.  I have a large copy, if that helps.  I'd be

22  happy to hand it up.  If you have it, I don't have to do it.

23  It's up to you, Your Honor.

24       **THE COURT:**  The one page is fine, if you want to hand

25  that up.

1      **MR. KRAMER:**  Okay.  I will hand it to Frances.

2          What you see here, Your Honor -- and, again, these are --

3      so, first of all, all these results were incorporated by

4      reference in the Complaint.  We also moved for judicial notice,

5      and they didn't oppose it.

6          What this chart does is it lays out on a

7      quarter-by-quarter basis the company's announced results, and

8      what you see, Your Honor, is that this -- the plaintiffs'

9      theory as it relates to the slowing of the iOS system, it's

10     like a snake eating its tail.  It doesn't work.  It collapses

11     upon itself.

12         Their theory is that in 2017, Mr. Cook and Mr. Maestri

13     said, "Hmm, we need to accelerate our sales.  Let's slow down

14     the phones."

15         Well, let's look and see what happened.  If you look at --

16     this supposedly happened starting in the third quarter, which

17     is April, you see that the sales of units of iPhone sales did

18     go up from 40.3 million to 41 million, and then the next

19     quarter, they went up from 45.5 billion to 46.7 billion.  That

20     should be a "B."  And then what you also see is when you get to

21     Q1 of '18, which is the October to December period, the sales

22     go down.

23         So the plaintiffs' theory is that, you know, people had

24     their phones, they weren't working.  They said, "Man, my phone

25     doesn't work.  I got to go upgrade," because, according to

1    plaintiffs, consumers didn't know what was going on.  They just

2    assumed their phone was now obsolete.

3        So if that were true, you would expect in the fourth

4    calendar -- quarter of the calendar year or the company's first

5    fiscal quarter, you would expect the sales numbers to be higher

6    than they were year over year.  They were lower.  It just

7    doesn't support it.

8        And similarly, the idea is that as a result of this, you

9    pulled sales in from '18 into '17, so in '18, you were going to

10   have a problem with sales.  But if you follow the chart through

11   '18, the company's sales are up every quarter.  They don't go

12   down.  And, Your Honor, this company hit its guidance in every

13   single quarter until it announced on January 2nd of 2019 that

14   it was going to miss.  It hit its quarters.

15       So when we're looking at what confidential information the

16   CWs give you, when you look at what went to the plaintiffs -- I

17   mean, went to the defendants, allegedly, you have to take all

18   this into account because it's not a misstatement case.  It is

19   an omissions case, and this company hit its guidance.  So if

20   the company was lying, why was it giving guidance it met?  It

21   just doesn't make sense.

22       And if I might, Your Honor, indulge you with one more

23   page, we have a chart, which is the Confidential Witness Chart,

24   which is on page 19 of our opening brief, and what you see

25   here, Your Honor, is I think what Your Honor was alluding to.

1   They have ten confidential witnesses.  Seven were Apple

2   employees.  Zero of them reported to any individual defendant.

3   Zero of them have said they had a conversation with the

4   individual defendant.  Zero of them had other contact with the

5   other defendants, and zero of them have personal knowledge --

6            **THE COURT:**  This is not very -- this is not very

7   useful for me because it's not as if they still can't know.

8            **MR. KRAMER:**  I agree, but this is what's pled, not

9   what they might know in their mind.  This is based -- we are

10  doing what counsel said, which is we are taking what is alleged

11  at face value.  This is based on what's pled.  Right?  And,

12  believe me, counsel knows how to do these Complaints.

13       If the confidential witness had contact with Mr. Cook or

14  Mr. Maestri, that's in there.  Right?  This is -- the whole

15  reliance-on-confidential-witness thing is not something new to

16  this firm.  I have litigated many, many cases with them.

17       What I'm saying is this is really -- when we did this, I

18  said let's not be, quote/unquote, advocates, although I

19  appreciate we always are.  I said let's go on what they have

20  actually alleged.  Have they alleged that they were an Apple

21  employee?  Have they alleged did they report to an individual

22  defendant?  Have they alleged a discussion with Mr. Cook or

23  Mr. Maestri?  Have they alleged other contact?  And let's put

24  it in the chart.  So you're right, maybe they have more, but

25  based on the Complaint, this is simply a survey of what the

1   plaintiffs have alleged.

2        And, again, Your Honor, it's not going to be enough in

3   this omissions case to say they got reports.  It's not enough

4   to say they tracked it.  They've got to have access to

5   information that's indicative of scienter.

6        And I want to talk about the batteries for a minute

7   because their second theory of omission, this battery

8   replacement program, is one that is really interesting.

9        Here they allege that the company offered you a battery

10  and that you could replace your battery for between $29 and

11  $79, and that people got this battery and said, "Hmm, now my

12  battery lasts a long time, so I'm going to delay my upgrade.

13  I'm not going to spend a thousand dollars for a new phone."

14       The theory here, though, is that the defendants hid the

15  impact.  Hid the impact.  And this is cited in their Complaint;

16  that we at Apple, Mr. Cook and Mr. Maestri, knew this is going

17  to demolish our results.

18       Now, I refer back to the chart I gave you.  It didn't

19  demolish the results.  They hit them every quarter, but it's

20  that we hid it.  The problem is, Your Honor, it wasn't hid

21  because the press picked this up.  On December 28th of 2017,

22  the company announced it was going to offer this battery

23  replacement program.  Within days, there were news articles,

24  analyst reports reporting on the battery replacement program.

25  And, Your Honor, they cite this in the Complaint.  Right?  This

1    is not a -- you know, Orrick request for judicial notice.  This

2    is cited in their Complaint at paragraphs 140 to 146.

3         *Washington Post*, January 2018, quote, "Run don't walk to

4    the Apple Store to replace your battery."  Paragraph 140,

5    "Customers faced long wait times and even wait lists."

6    Paragraph 140.  Apple -- and there's a reference in paragraph

7    146 to the fact that people started thinking about holding on

8    to their phones longer.  There is a reference to -- and that's

9    an article that was written by *The Verge*.  There is a reference

10   to a Deutsche Bank analyst report titled "Weekly Take on

11   Apple's News," referring to the fact that there is

12   unprecedented demand for the batteries.

13        Your Honor, their theory is that when we gave our results

14   for 2018, those results were materially misleading because we

15   didn't disclose that the battery replacement program was going

16   to impact us going forward.  Again, they admit it's an

17   omissions case.  But, again, we know, Your Honor, that when you

18   accurately report your financial results, there is no

19   obligation to predict what's going to happen in the future,

20   which, by the way, we did.  We gave guidance, and we met --

21        **THE COURT:**  Let's take a look, for instance, at 272.

22   So in 272, one of the allegations is that you indicate that you

23   were up six percent in Mainland China, and they allege that

24   that was actually false.

25        **MR. KRAMER:**  And where is the allegation that was

1   actually false?  Where are the facts, Your Honor?  That's what

2   I'm asking.  They make the conclusion it was false, but, again,

3   we know we hit every quarter.  I don't see a fact in there

4   which says Mr. Cook got a report that was different.  I don't

5   see facts in there which say "no, that was wrong" at the time

6   that statement was made.  Where is it?  That's my point.  They

7   presuppose the fact.  That fact existed, demand was soft.

8        Your Honor, we know that the company hit its guidance for

9   every quarter until November.  So -- and I didn't -- I really

10  meant that.  If the plaintiffs have a place where Mr. Cook

11  received facts or there is contemporaneous allegations that he

12  received contrary information, they didn't point it out in

13  their opposition brief and I couldn't find it in the Complaint.

14           **THE COURT:**  All right.

15       Let me have a response on that particular point.  He's

16  made others, but I would like a response on that one.

17           **MS. VILLEGAS:**  On the Mainland China point?

18           **THE COURT:**  Correct.

19           **MS. VILLEGAS:**  So we allege that that statement is

20  false and misleading by omission.  We concede that

21  historical -- accurate historical results -- that they're

22  accurate historical results, but they could still be misleading

23  by omission, and there is a lot of case law on this.

24       I will direct the Court in particular to the *Crane* case

25  which we cited in our brief.  The *Crane* case was also cited in

1   *Oracle*, which I thought was pretty interesting.  When I first

2   read *Oracle*, I thought *well, this is a really bad case for us*,

3   but the more I read it, the more I realized that *Oracle* is

4   actually making the point for us by citing *Crane*.

5       And the proposition that *Crane* stands for is that if a

6   company is passing off revenue numbers from one quarter year

7   over year and passing it off as an apples-to-apples comparison,

8   this could be misleading if they're not also telling the market

9   that the way -- that their sales practices have changed.

10  That's the *Crane* case.

11      And *Oracle* cites to this and says -- you know, *Oracle's*

12  different than *Crane*.  I think we're more like *Crane*.  Not just

13  for the Mainland China statement, which talks about being up

14  six percent so it's in comparison to something else, but also

15  in the other statements that are made on that same day about

16  the upgrade being -- rate being high quarter over quarter.

17      And if you look at it that way, Your Honor, what they're

18  not telling the market is that the reason the upgrade rate is

19  higher, the reason they're up in Mainland China is because

20  people are artificially accelerating their purchases, and this

21  was caused by the throttling.

22      They admit to the throttling.  They admit to the

23  throttling in December.  They said, "Yes, it happens."  We have

24  a confidential witness who tells us it was intentional.

25      And so when you take all those facts together, and in

1   particular those statements where it's comparative, that can be

2   misleading.

3       And I think that this case is a lot more like the

4   *Precision Castparts* case that we cited.  *Oracle* cited that

5   case, too, and said *Oracle* is different than *Precision*

6   *Castparts*.  We are more like *Precision Castparts*.  That case

7   involved a pull-in of future revenues.  And while the pull-in

8   itself is not illegal or improper, they were pulling in revenue

9   and they weren't telling the market about it, very similar to

10  what was happening here.  And in *Precision Castparts*, the court

11  found that to be false and misleading.

12      The other thing I will say about *Oracle*, Your Honor, in

13  the context of the statements that we're looking at here in

14  November and August is *Oracle* talks about how if you're giving

15  the reasons for revenue -- for why revenue has increased,

16  *Oracle* actually supports that that could be misleading.

17      We have a statement here that says, "I think the upgrade

18  rate is a function of many, many things," and Cook goes on to

19  list what all of those things are.  He doesn't mention that

20  part of the reason why the upgrade rate is higher is because

21  people are turning in their phones because of the throttling

22  and upgrading them.

23      If you look at *Oracle*, *Oracle* actually says -- and this

24  is, I think, at page 19 in *Oracle* -- 16 -- that this could be

25  misleading.  The issue *Oracle* has with that statement in *Oracle*

1     is that they don't find that the materiality was pled

2     sufficiently.  And so that's the distinction that *Oracle* makes

3     on that kind of a statement.

4         And our position is that we have pled materiality as to

5     those statements:  The seriousness, the impact of the upgrade

6     cycle, the amount of batteries that ultimately ended up being

7     replaced.

8         So I think *Oracle* can be easily distinguished on our

9     facts, and I -- I think the *Crane* and the *Precision Castparts*

10    case show that there should be liability for those statements

11    in this case.

12            **MR. KRAMER:**  Your Honor --

13            **MS. VILLEGAS:**  I --

14            **MR. KRAMER:**  Oh, I'm sorry.

15            **MS. VILLEGAS:**  I wanted to address the chart,

16    Your Honor, because I think that there are a couple of things

17    that are just a little bit misleading in the context of our

18    case which deal with iPhone units.

19        So defendants make a big deal that revenue in China was

20    going up and that global iPhone units were going up, but they

21    never report iPhone units in China.  That's not a metric that

22    gets reported by Apple.

23        So it's entirely possible, as we allege, that unit sales

24    could be going down while revenue goes up, and that's because

25    the average selling prices were going up around the same time,

1  so that's not inconsistent.

2       And in the context of this chart, I would actually direct

3  the Court to page 31.  We have our own chart in there which

4  shows the unit sale trend over the course between 2017 and

5  2018, and it shows an incredible arc going up between 2007 and

6  2015 and then the unit sales drop.  And that's really what

7  we're talking about.  So, yes, unit sales may have increased a

8  little bit between 2016 and 2018, but what the market was

9  concerned about was really this drop in iPhone units and how

10  that was going to affect the company and the ecosystem of its

11  products moving forward.

12       And if -- if I could address just the falsity of the

13  battery statements because I think it's pretty stark.  You have

14  statements made by Defendant Cook in February, statements made

15  by Defendant Cook in July.  They were directly asked by an

16  analyst because an analyst wanted to know.  They didn't

17  understand was the battery replacement program actually having

18  a negative effect, was it small, was it big, what was going to

19  happen --

20            THE COURT:  What paragraph?

21            MS. VILLEGAS:  So paragraph 300 for the February 1st

22  statement and 353 for the July 31st statement.

23       And for the February 1st statement, Cook says, "We did not

24  consider in any way, shape, or form what the battery

25  replacement program would do to upgrades."  And even worse in

July, he says, "In terms of batteries, we have never done an analysis internally about how many people decided to get a lower-priced battery than buy another phone because it was never about that for us."

I mean, by July, we're seven months into the battery replacement program.  We know 11 million batteries were ultimately replaced.  By this time, a critical mass of batteries had to have been replaced.  We have confidential witnesses telling us that the batteries were tracked and that it was having a negative effect.

Confidential Witnesses No. 2 tells us at paragraphs 249 to -50 and 252 that the battery replacement program was hurting sales; that they weren't meeting their sales goals; that there were numerous conversations within sales demand management about the disclosure of throttling and how it would impact demand for new iPhones and elongate the upgrade cycle going forward.

So this was all tracked, this was all in reports, and just going back to Confidential Witness No. 1, these reports were making their way up to Cook and Maestri.

And just to make a point on some of the China statements, I know that we were -- we started off talking about scienter and now we're talking about falsity, but some of the China statements are pretty stark.  I mean, not even omissions but just straight-up false statements when, on May 1st -- this is

at paragraph 329, 332 and 330 -- defendants claim that iPhone X
was the most selling and most popular smartphone in China and
that the top three phones in China were iPhones.  We have
witnesses that are telling us no, iPhone X was not selling well
in China.

And we also have -- we also have pled in the Complaint
that Apple's market share at the time was a mere 8.4 percent in
China.  That's at paragraph 339.  It's really not reasonable to
believe that with this market share, Apple could have the top
three selling phones, and this is corroborated by the
confidential witnesses.

Also on November 1st -- and this is more than a third of
the way into the first quarter -- into the first quarter of
2019 -- Cook says -- he provides guidance.  He talks about
deceleration in emerging markets, and he says, "I wouldn't put
China in that category.  Our business in China was very strong
last quarter."

Now, Confidential Witness No. 2 tells us that China demand
was soft going into the first quarter.  So even before Cook is
making this statement, demand is soft in China, but he is
saying he wouldn't put China in the category of the emerging
markets that weren't doing well.

So we think that this is a significant false statement.
He's -- CW 2 also tells us that senior management at Apple knew
of how -- everyone who had access to see China sales could see

1    this weakness and how super-soft sales numbers were from China

2    in the first quarter of fiscal 2019.  That's at paragraph 236.

3        And of course just a few weeks later, January 2nd, they

4    announce, "Yes, wow, we" -- "for the first time in 15 years, we

5    missed our guidance, and a huge part of that, almost all of it,

6    was attributable to China."  Part of it was attributed to the

7    battery replacement and the elongated sales cycles, but how

8    could they not have seen that coming?  CW 2 tells us that it

9    was coming before Cook even made the statement in November.

10           **MR. KRAMER:**  Your Honor --

11           **THE COURT:**  Response.

12           **MR. KRAMER:**  Your Honor, this is -- this argument

13   illustrates exactly why a 200-page Complaint that's totally

14   circular and that the chart doesn't really help us with -- you

15   had asked for a supplemental chart.  It just doesn't line up.

16   Right?

17        And we're arguing over what's in the Complaint, and

18   everything counsel said is not in the Complaint.  So

19   specifically, the reason the upgrade rates were higher in China

20   was because of throttling.

21           **THE COURT:**  Was what?

22           **MR. KRAMER:**  Was because of throttling, because of the

23   performance management of the operating system.  I quoted it.

24   "The reason the upgrade rates were higher in China was because

25   of throttling."

1      Where is that in the Complaint?  What paragraph?  It's

2  not.  We have the conclusion.  Right?  And, remember, with

3  the -- with -- the whole idea here is that the results were

4  accurately reported, but by throttling, you were materially

5  impacting -- what they call "throttling" -- you are materially

6  impacting the upgrade rates.  Not that it had an impact.  Not

7  that five more people might have traded in.  That it was

8  material.

9      **THE COURT:**  All right.  So where is the "throttling"?

10  I thought it was 270, but maybe I'm wrong.

11      **MS. VILLEGAS:**  Your Honor, we have a whole section in

12  our Complaint which talks about the Chinese market being

13  incredibly upset about the throttling and how the, you know,

14  Chinese launched an investigation into Apple.  So that

15  throttling wasn't occurring in China.  I mean, that's in here.

16  I mean, I'll find the section for you.  I understand the

17  Complaint is very long.  We had a lot of background information

18  to allege.  But it's in there.

19      **MR. KRAMER:**  Your Honor, the specific question -- and

20  I challenge counsel on the battery piece as well -- where is

21  the factual allegation from a confidential witness, from an

22  internal report, that the -- the performance management, what

23  the plaintiffs called "battery throttling" -- where is the

24  factual allegation that that had a material impact on the

25  upgrade rate?  Where is that?  It's not in there.  It's all

1   circular.  She won't be able to find it.

2          But, Your Honor, even if she did -- even if she did

3   have --

4                  **THE COURT:**  Well, let me get a response.

5          **MS. VILLEGAS:**  I think that defendants admitted on

6   January 2nd when they say that part of the miss was due to the

7   battery replacement and the upgrade cycles.  They don't

8   quantify what the "miss" was, but China was a big part of it,

9   and they mention -- it was their statement.  They said the

10  battery replacement played a part and the upgrade cycle played

11  a part in them missing guidance for the first time in 15 years.

12         **MR. KRAMER:**  We are talking about throttling.  Her

13  response was on battery replacement, and it was about something

14  that happened two years later.

15         She said the reason we did well in China was because we

16  throttled, we slowed down the phones.  And the response is,

17  "Well, in January of '19 at the end of the class period, you

18  said you had a miss."

19         Your Honor, they've got to allege facts at the time the

20  statement was made.  They don't.  It's not in here.  It is not.

21  I promise you that.  And they can't find it.

22         But, Your Honor, even if that fact was in there, let's

23  presume they've got some statement in the summer of '18 from

24  some report that says, "Hey, guys at Apple, we're doing really

25  well in China because people think their phones don't work and

they're trading it up."

That statement, those facts, would only be applicable here, would only serve as a predicate for securities fraud if we had made a statement to the market which said, "and our upgrade rate is not impacted by throttling," because it's an omissions case.  And we know -- we know from *Brody* that an omissions case, you line up the statement with the allegedly-omitted fact.

My point is they don't even get an omitted fact to even get to the *Brody* analysis.  There is zero in this Complaint that there was a report, that there was a confidential witness, that the slowdown of the iOS materially accelerated.  Not that it had some impact.  Not that three people traded it. "Materially."

Similarly, on battery replacement, Your Honor, the theory isn't that -- the theory is that you didn't disclose the impact.  And as I cited, paragraphs 140 to 146, it lays out exactly what's going on.  And, by the way, whatever the impact was, we met guidance.

So, again, they concede all the results we made were accurate, all the statements we made about our sales were accurate, but that somehow you didn't disclose facts that go to the quality of that -- of those announcements.  And this is just like the *City of Sunrise*.  There Oracle had engaged in sales programs which were one-offs because people were

1   transitioning to the Cloud, and as Judge Freeman held, those

2   were deals that were done, cash came in the door, people got

3   product.  Those were real sales.  There is no obligation to say

4   more.

5       If you had said, "And, by the way, we achieved these

6   results despite doing X, Y, or Z," well, then maybe you could

7   have an omission.

8       The plaintiffs' job is to lay it out in a clear and

9   concise way.  It shouldn't be this hard for me.  Honestly, it

10  shouldn't be this hard for the Court.  They should say, "Here

11  is the statement."  They've got the statements.  Why was our

12  statement in Q3 of '17 false?  If they claim it was because our

13  sales were artificially inflated by slowing down the operating

14  system, they should have facts that say at that time, that was

15  true:  A confidential witness, an internal report, some facts.

16  And then they have to line that up with our statement and say

17  it was materially misleading.

18      We got nothing.  We really have nothing.  I know we

19  started on scienter.  We haven't talked about the stock period

20  sales.  We haven't talked about the company's 88 billion-dollar

21  buyback.

22          **THE COURT:**  You have a few minutes.  Go ahead.

23          **MR. KRAMER:**  So, Your Honor, it's -- you know, you've

24  got -- of course you could look at them individually under

25  *Tellabs*.  You have got class-period purchases which are not

1    dramatically out of line with -- with the prior class period

2    sales.  And you've got sales that are all being done pursuant

3    to a 10b5-1 plan.  You've got --

4             **THE COURT:**  Well, that doesn't help you because that's

5    an affirmative defense.

6             **MR. KRAMER:**  Fair enough, Your Honor.  Fair enough.  I

7    will give on that.

8        You've got all these trades during the class period by

9    10b5-1, and all of them are admittedly consistent with prior

10   trades.

11       You've got a company who is buying back $88 billion in

12   stock during the class period.  And, remember, the inherent

13   theory here is that Mr. Cook and Mr. Maestri knew that the

14   company's results were artificially inflated because we -- you

15   know, we were lying to the market about what was going on.  We

16   were lying.  So we went ahead and bought back $88 billion of

17   stock?

18       And, by the way, Your Honor, there is not a single sale of

19   stock by any of the defendants in the -- until -- between the

20   time of the guidance and when the company pre-released on

21   January 2nd.  And just so it's clear, that would be our JAMS

22   Exhibit 31 for Mr. Cook and our JAMS Exhibit 44 for Maestri.

23   There were no sales in that last six days of the class period.

24       So you've got no stock sales.  You've got sales that did

25   occur under the 10b5-1 plan.  You've got a company buying back

1   all of its stock.  And you've got a company that's

2   pre-releasing earlier than it has to, to get to the market as

3   soon as it figures out what the miss is going to be.

4       Now, as you know, Your Honor, companies will often say

5   "Hmm, I think we've got a problem this quarter.  We may miss."

6   I typically advise clients don't go to the market until you can

7   give some sense of what that miss is going to be.  You can give

8   a revised range, which is totally appropriate.  There is no

9   duty to update the guidance.  But once this company knew --

10  once Apple knew what the guidance range was, it went to the

11  market.

12      So we've got this grand theory of fraud, which implicitly

13  requires the CEO and CFO to be involved.  They spend $88

14  billion of the company's stock while the fraud is occurring and

15  don't profit their own -- to themselves.

16      Honestly, Your Honor, even if you do a holistic approach,

17  when you take into account the falsity and you take into

18  account -- I know they argued core operations -- you still

19  don't get there because, remember, core ops requires more than

20  they were aware of the core operations of the company.  It

21  requires more than they were reading reports.  What it requires

22  is that they received some report that had adverse information.

23  And we know from -- we know this from *Intuitive Surgical*.

24  Quote, you need specific allegations connecting the individual

25  defendants --

1                **THE COURT:**  You need to slow down, Mr. Kramer.

2                **MR. KRAMER:**  I apologize, Your Honor.

3        "You need specific allegations connecting the individual

4    defendants to specific reports of adverse information;

5    otherwise, you are just saying they were aware of core

6    operations of the company.  No facts in that situation suggest

7    scienter."

8            They've got to allege -- it can't be, you know, that --

9    that Mr. Cook got a report on sales.  Of course he did.  It

10   can't be the company tracked how many batteries were being

11   replaced.  Of course it did.  They've got to connect the

12   adverse facts to the individual defendants on the iOS slowdown,

13   on the throttling, as they call it.  They need a report that

14   says, "Hey, by doing this, we're pulling in sales from '18

15   because we're accelerating the sales cycle."  Nothing.  Zero.

16   Not in the Complaint.  No facts.  No confidential witnesses.

17           On the battery replacement, again, the theory is we hid

18   it.  We plainly did not because it was all over the press.  Big

19   surprise.  Anything that happens with Apple, it's all over the

20   press.  But they've got no facts which suggest, *hey, folks,*

21   *this battery replacement, this is going to have a negative*

22   *impact on your results because people are going to keep their*

23   *phones longer.*  And as I showed you in the chart I gave you

24   from page 5 of our opening brief, it didn't.  The company hit

25   its guidance every quarter.

1    So how do you lie when your results are historically

2  accurate?  Under the plaintiffs' theory, yet it's an omission

3  theory, you should have told people that these results were

4  artificially inflated by the battery replacement program.

5  Well, then where are the factual allegations that that's true?

6  There is no confidential witness that says, "our results were

7  materially impacted by battery replacement."  There is no

8  confidential witness that said, "I talked to Mr. Cook and

9  Mr. Maestri about it."  There is no confidential witness that

10  says there is even a report that lines up how many batteries

11  got replaced with the sales cycle and whether it was going to

12  be elongated.  It doesn't exist.

13    And, Your Honor, I keep coming back to this because it was

14  very frustrating reading their opposition because the entire

15  brief assumed they had alleged the underlying omitted fact.

16  And, again, that's table stakes.  Right?  But even if they

17  couldn't -- have the table stakes, which they don't, when you

18  line up the allegedly-missed information with what's in the

19  market, there is no material omission under *Brody*.

20    Now, as to Mr. Cook's statement about "I wouldn't include

21  China in that bucket," he was referring to the prior quarter,

22  and there has been no allegation that in the prior quarter what

23  he said about China wasn't true.  Nothing.  Right?  He

24  wasn't -- it wasn't forward looking.

25    Similarly, the other statements they cite, as we said in

1    our brief, are statements of --

2              THE COURT:  Paragraph number.

3         MR. KRAMER:  Counsel cited it.  I believe it was

4    actually --  I believe it was 286, Your Honor.  Lots of

5    paragraph numbers being thrown around, Your Honor.

6         Your Honor, I thought the chart was going to help us, but

7    it actually didn't, and I think if you look at the chart, it

8    kind of exposes some of the factual defects I was talking

9    about.

10        286.  And he says, "In relation to China, I would not put

11   China" --

12             THE COURT REPORTER:  I'm sorry.

13        MR. KRAMER:  I'm sorry.  I will speak more slowly.

14        In -- this is 286.  "In relation to China specifically, I

15   would not put China in that category.  Our business in China

16   was very strong last quarter."  Last quarter.

17        And there is no facts alleged to show that at the time

18   Mr. Cook said the business in China was, quote, strong last

19   quarter, that was false.  I think it's likely inactionable

20   anyway had you objectively verified "strong last quarter," but

21   it doesn't matter because there is nothing alleged.  All they

22   allege is in the next quarter, it wasn't strong because we

23   missed.  That's all they allege.  And that's indicative of

24   what's going on.

25        Your Honor, I do want to spend 30 seconds on loss

causation because I think it is critical because it really
shows they can't fix this.

They allege under the throttling part of their theory,
again, that we withheld information that the sales cycle was
being accelerated and that caused our results to be
artificially inflated in 2017, fiscal 2017 and the first
quarter of 2018.

There is no disclosure that would support loss causation
there.  Right?  When the company announced it was missing its
guidance on January 2nd, there was nothing about the iOS
slowdown.  There is just no loss causation there.

And on the battery replacement, the theory there, again,
is that we somehow hid the impact battery replacement would
have.  As I articulated in -- earlier, paragraphs 140 to 146 is
a sampling of the news reports out there that said this could
have an impact on the company's business.

So I think as a legal matter, the risk was not concealed,
and under the theory that somehow that risk came out later,
they're just dead on arrival.

The final areas on WeChat and China, again, there is no,
quote, corrective statement.  And on China, if we are going to
talk about that last quarter, what it really is, is a guidance
case.  You have got a forward-looking statement that is
accompanied by reasonable, cautionary language and then you
have a miss.  You've got no stock sales.  The statement itself

1    under the Reform Act is not actionable.  There is no
2    confidential witnesses that -- even if the plaintiffs could say
3    there wasn't cautionary language, there is no confidential
4    witnesses that say Mr. Cook or Mr. Maestri knew otherwise, so
5    they can't show actual knowledge even if that was available to
6    them.  There is no stock sales.
7         So the China piece is what it is.  It's a situation where
8    the company gave guidance and then realized that during the
9    holiday zone, which is, based on the chart I showed you -- is
10   the biggest season for this company.  Right?  Not surprising
11   that people trade up their phones, buy spouses phones over
12   Christmas.  When we realized that sales were not trending the
13   way we had projected, the company got its arms around it and
14   proactively went to the market.
15        So it's -- Your Honor, again -- and I apologize if I got a
16   little frustrated by this, but it really shouldn't have been
17   this hard for us to do this brief.  Here's the statement.  We
18   know it's an omissions case.  Where is the underlying facts
19   that were omitted?  Again, not in the Complaint.  And when you
20   line up those allegedly-omitted facts, does it show the
21   statement is false?  That's the analysis we should be doing
22   here.  And, instead, what we get in the brief and in argument
23   here is largely conclusions.  No cite to specific facts.
24        So, Your Honor, that's why we think this Complaint should
25   be dismissed.  It's not that hard.  These standards are not --

1    we're not making new law here.  This is basic stuff that we

2    deal with every day in the securities litigation world.

3             **THE COURT:**  All right.

4        Any comments from the plaintiff?

5             **MS. VILLEGAS:**  Yeah.  I would like to address a number

6    of comments that defense counsel made.

7        First, in terms of the China statements, specifically the

8    paragraph 386, we do allege facts that those statements were

9    false.  We have a confidential witness who tells us at

10   paragraph 227 that prior to the launch of Apple's new iPhone in

11   September 2018, he noticed that presale intent to purchase

12   numbers were low and not many clients were inquiring about the

13   new iPhones.  That's in China.

14       And the paragraph before that at paragraph 385, I mean,

15   that confidential witness directly contradicts this affirmative

16   statement about the XS and the XS Max getting off to a really

17   good start, and that's not just puffery because it's tethered

18   to sales reports, sales data that Defendant Cook says he is

19   looking at.  He says, "I'm looking at sales data and the XS and

20   the XS Max got off to a really good start."  We have a

21   confidential witness saying that's not true, and it's not true

22   in China.  So there are facts that are pled specifically on

23   China on that point for that date that that is false.

24       Now, I understand there is a tension between us not having

25   to plead evidence but still pleading enough to show the Court

1    that we have scienter.  And we believe we have done that by

2    talking about the witnesses who tell us that there was weakness

3    in China going back to the end of 2017, through 2018, through

4    the release of the iPhone X, into the XS and the XS Max, into

5    the statements that are made on November 1, which aren't just

6    guidance statements, as I pointed out.  Paragraph 386 is not a

7    guidance statement.  And through the end of the class period.

8    So we do have allegations for China that cover the whole class

9    period.

10        We have witnesses telling us that there are reports that

11   show this weakness in China; that they're being sent to

12   headquarters and that headquarters is even sending them back

13   reports about the weakness in China, the market demand problem.

14   So that's all in there for China.

15        We have the other confidential witnesses, CW 1 and CW 2,

16   who work at headquarters, and they're the ones telling us that

17   all of the sales data is going up to Defendant Cook and

18   Maestri.

19        I do want to make a point about loss causation.  We happen

20   to be in the circuit of *First Solar*.  *First Solar* says that

21   there are an infinite number of ways that we can plead loss

22   causation, and all we have to do is show proximate cause.

23        Now, of course I admit that when the market learned about

24   the throttling -- defendants admitted to the throttling in

25   December, and when the market learned, there wasn't an

1   immediate market reaction, but *Gilead*, which is another Ninth

2   Circuit decision, says there doesn't have to be.  It might take

3   some time before the market can appreciate what's actually

4   happening.  And that's what happened in this case.

5       So Apple admits to throttling phones.  They said they did

6   it.  The modus behind it -- we say it's because they wanted to

7   make more money.  They say no, that's not true.  But

8   notwithstanding, they were throttling the phones.  And that

9   wasn't known to anyone.  That's why people were upgrading their

10  phones.  When people found out about, it took a little while

11  for them to realize this is going to have an effect.

12      The point about the battery replacement is that nobody

13  knew what the effect was going to be.  Analysts directly asked

14  Tim Cook, "What effect is the battery replacement going to

15  have?  Is it going to be small?  Is it maybe the new iPhones

16  are so good that people are going to upgrade no matter what?"

17  And Tim Cook did not answer the question.  He said, "We don't

18  analyze that stuff."  So that was extremely misleading.  This

19  is directly in response to an analyst's question about the

20  issue because they were concerned.

21      In terms of the market knowing and there being truth on

22  the market, I mean, that's really a fact question I don't think

23  it's appropriate to resolve right now.  If the market really

24  understood what was happening and knew on that February date

25  everything that was going to happen and how many batteries were

1   being replaced, why would they have continued to ask Tim Cook

2   about it?  Why would there have been a market reaction on

3   January 2nd?  I mean, I think the market didn't fully

4   appreciate what was happening.  And in the circuit of *First*

5   *Solar*, I think that we should be given a little bit of leeway

6   on the loss causation issue, especially as to that point.

7        As to the battery replacement, which is the February to

8   the end of the class period, again, defendants are concealing

9   the amount of batteries that are being replaced.  They know the

10   amount of batteries that are being replaced, and they're not

11   telling the market.

12        And on the China issue, which spans the whole class

13   period, again, we have witnesses that are telling us that there

14   is weakened demand in China.  Defendants are instead making

15   positive statements about iPhone X, XR, and that there aren't

16   issues in China, and that gets revealed on January 2nd when the

17   company says, "Yes.  Almost all of this drop is due to China,

18   but some of it is still due to the battery replacement and the

19   loss of the upgrade cycle."

20        So for all of those reasons, Your Honor, we ask that you

21   sustain this Complaint.

22        **MR. KRAMER:**  Can I have the last word, Your Honor,

23   since it's my motion?

24        **THE COURT:**  Mr. Williams, do you have anything to add?

25   I did allow you all to file something.

1    **MR. WILLIAMS:**  Your Honor --

2        **THE CLERK:**  Come to a mic.

3        **MR. WILLIAMS:**  I -- Your Honor, I think that our

4    papers were very clear on what the issues were for us.  There

5    has been a lot of argument here today, but I don't think that

6    it's changed our position with respect to what Your Honor asked

7    us to do.

8        And the question -- the question Your Honor asked us to

9    address was whether or not we thought that the lead plaintiffs'

10   opposition was sufficient, and we clearly don't think that it

11   was sufficient.

12       The first point that -- the first point and most important

13   point we make is this loss causation piece.  The theory there

14   was very specifically that -- a materialization of a concealed

15   risk theory, and that theory just simply is not tenable.  The

16   risk that they claim was concealed was specifically elucidated

17   by analysts a year before the January 2nd disclosure.

18       The reason we believe, as we indicated, you know, a few

19   months ago, that they have tethered themselves to this theory

20   is because there really is no other way to maintain a class

21   period relating to battery-gate and going back to August of

22   2017.  That's -- that's the first part.

23       The second issue is that with respect to the China claims

24   that we begin -- we allege begin in November of 2018, it

25   appears that they have avoided the strongest arguments

1   demonstrating that the November 1st statements were false and

2   misleading, and specifically two things:  The almost immediate

3   information coming out of China that the -- that the company

4   had canceled substantial orders for the new iPhone XR.  And

5   these disclosures came just one business day and I think five

6   actual days after Tim Cook's representations on November 1st.

7        Now, the temporal proximity of those statements to just --

8   to the representations on November 1st simply could not have

9   been true.  Your Honor actually addressed this issue in your

10  *Restoration Hardware* opinion not very long ago, and there I

11  think you identified a five-week period that suggested that a

12  mis -- an alleged misrepresentation and a contrary disclosure

13  coming from five weeks apart might suggest that the -- that the

14  initial representation was not true.

15       But on top of that, the lead plaintiffs' opposition fails

16  to discuss the significance of the January 2nd disclosures and

17  what the company said it knew about what was occurring in China

18  prior to November 1st and how big an impact that China had on

19  its overall result.

20       What did they say?  They said, "Almost all of our

21  worldwide revenue miss is associated with the slow sales in

22  China."  They also say, "100 percent of our iPhone miss is

23  related to China."  Then they go on to add -- Tim Cook went on

24  CNBC, and he was asked very specific questions about what

25  happened in China, and he admitted that they saw this occurring

1    in China.  So this goes to the scienter point, which was never

2    made by the lead plaintiff.  It was never truly addressed by

3    the defendants in their -- in their reply, although Your Honor

4    gave them additional time specifically to address to our brief.

5         But what he said was, "We saw traffic declining in our

6    stores in China.  We saw traffic declining in our partner

7    stores in China.  We saw the smartphone market declining in

8    China."  And, you know, what we did in our brief, we tried to

9    identify the tense that Mr. Cook used, and I think that it's

10   important, because he didn't say that this just happened.  He

11   said, "We saw it happening in China in the second half," and he

12   got a little bit more specific.  He said, "This" -- "We saw

13   this occurring during the quarter, and it got particularly bad

14   in November, but we haven't seen the December numbers yet."

15   And what can you infer from that?  Well, it was clearly

16   happening in October.  Got a little worse in November.  They

17   didn't see December yet -- December numbers yet.

18        So, again, I think that, you know, our papers were rather

19   clear on what we think the issues are.  If Your Honor has any

20   questions for me, I would be happy to answer them.

21            THE COURT:  No.  Thank you, Mr. Williams.

22        All right.  Mr. Kramer.

23            MR. KRAMER:  Thank you, Your Honor.

24        So, Your Honor, the statement that Mr.-- that was just

25   referred to is paragraph 411.  That's what he refers to in his

1    opposition.  This is what he refers to.

2         **THE COURT:**  You need to speak into the mic.

3         **MR. KRAMER:**  I apologize, Your Honor.

4         The statement Mr. Williams refers to is paragraph 411 of

5    the Complaint, and that's a reference to a January 2nd, 2019

6    CNBC discussion.  That's not contemporaneous with November when

7    the guidance was given.  And nowhere in that -- in what he said

8    does he say anything close to "in November we saw this."  Not

9    there.  He doesn't say "in early November."  He -- you know,

10   it's hindsight.  It's looking after the fact.

11        And I think what you need to do, Your Honor, is line up

12   the statements made at the time, and there has to be adverse

13   facts that are known to Mr. Cook.  The fact that the company

14   was tracking sales doesn't establish that because we don't know

15   how much of the guidance included China.

16        Now, Mr. Williams also said that you can line these

17   statements as apples to apples.  They're not.  The apple was

18   guidance for the whole company.  The miss was China.  So when

19   the company gave guidance on November -- I'm sorry -- on

20   November 1st, it gave guidance, top-line guidance for the whole

21   company.  It didn't break out China.  The reason for the miss

22   was China.  So there's not an apple-to-apple comparison.

23        And as I said earlier, Your Honor, even on the guidance

24   piece, that's protected as forward looking.  There is risk

25   factors.  It's not actionable as a matter of law even if he

1    knew, and he didn't.  And there is nothing else to establish

2    scienter.  Right?  Maybe they should have -- I mean, maybe the

3    argument is they should have known, but that's not enough for

4    security fraud.

5        And just real quick, you had asked counsel about scienter

6    on -- on some of the other issues I had raised, and, again, she

7    went back to China and went back to the fact that people were

8    upset when they learned that Apple was throttling its phones.

9    Well, respectfully, Your Honor, that's a consumer class action

10   case.  That's not a securities fraud case.

11       A securities fraud case, as plaintiffs have alleged it, is

12   that you historically reported accurate results, but you misled

13   investors into thinking that those results were somehow better

14   than they should have been because you were throttling.  You

15   should have told them that your results were impacted by

16   throttling.  And the *City of Sunrise* case and, Your Honor, I

17   think your *Intel* case as well make clear that you don't have to

18   disclose all the stuff that leads to your results.

19       And, again, going back to my table-stakes argument

20   earlier, there are no facts alleged to show that slowing down

21   the iOS system materially impacted the results.  Not a report,

22   not a document.  We have some confidential witness saying, "We

23   think it did," but we don't know how much.  Right?  Again, was

24   it five phones or was it a thousand phones?  These guys sell

25   hundreds of millions of phones.  How much was it?  So for their

1    theory even to be relevant for the whole *Brody* analysis --

2    again, I keep referring to it as table stakes -- they need to

3    have that in there.

4        You know, it's -- you know, on the battery replacement,

5    you know, they -- the Tim Cook statement -- again, when Tim

6    says, you know, "We did consider the battery replacement, we

7    did what's right for the consumer," he's not saying anything

8    more than that.  The plaintiffs claim that you somehow knew

9    that it was going to have an impact on your results.  Again,

10   there is no facts.  It's just conclusions.

11       So what we would hope the Court would do, Your Honor, is

12   look carefully at their theory, omissions; look carefully at

13   the core theory they've asserted, we didn't disclose the effect

14   of the iOS throttle, we didn't disclose -- and we hid the

15   effect of the battery replacement, and we also lied about

16   China; and go back and see if it's in the Complaint.

17       And, again, on China -- and I know the horse is dead on

18   this, Your Honor -- but we hit every single quarter.  The only

19   quarter we missed, the only falsity that they try to identify

20   is the guidance on November 1st.  Every other quarter we hit

21   guidance.  Apple never missed.  So how was there a false

22   statement earlier?

23           **THE COURT:**  Okay.

24       I understand from -- Ms. Villegas, from your lack of a

25   request to amend that this is the best you can do.

1          **MS. VILLEGAS:**  Well, part of that, Your Honor, was

2     that you said this was the only opportunity we would get.  I

3     mean, if the Court -- we would like to go back and see if there

4     is any additional information we could find in the next 30

5     days.  If we can't, then we would stand on our Complaint the

6     way it is.

7          **THE COURT:**  Okay.  I will be in touch.  Thank you.

8               (Proceedings adjourned at 3:21 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    <u>CERTIFICATE OF REPORTER</u>

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:    Wednesday, March 25, 2020

8

9     *Pamela Batalo Hebel*

10    _____
      Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11    U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25