# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE APPLE INC. SECURITIES LITIGATION** | CASE NO. 19-cv-02033-YGR |
| | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS** |
| | Re: Dkt. No. 91 |

Lead plaintiff Employees' Retirement System of the State of Rhode Island brings this securities class action litigation alleging false and misleading statements and omissions between August 2, 2017 and January 2, 2019 (the "Class Period"), against defendants Apple Inc. ("Apple" or the "Company"), Timothy D. Cook (Chief Executive Officer, or "CEO," of Apple), and Luca Maestri (Chief Financial Officer, or "CFO," of Apple). Specifically, plaintiff raises two causes of action: (1) violation of Section 10(b) of the Securities Exchange Act ("Exchange Act") and Rule 10b-5 promulgated thereunder by all defendants, and (2) violation of Section 20(a) of the Exchange Act by the individual defendants.

Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Defendants challenge plaintiff's Section 10(b) and Rule 10b-5 claims on four grounds: (1) the complaint presents impermissible puzzle pleading that fails to conform to the requirements of Federal Rule of Civil Procedure 8; (2) none of the challenged statements are false or misleading, or otherwise actionable; (3) plaintiff fails to establish a strong inference of scienter, and (4) plaintiff fails to establish "loss causation" for certain statements. Defendants further move to dismiss plaintiff's Section 20(a) claim on the ground that plaintiff fail to plead a primary violation of Section 10(b).

Having considered the papers submitted and the pleadings in this action, the hearing held on March 10, 2020, and for the reasons below, the Court hereby **GRANTS IN PART** and **DENIES IN PART** the motion to dismiss **WITH LEAVE TO AMEND**.

## I.    BACKGROUND

The following facts are alleged in the Corrected Consolidated and Amended Class Action Complaint for Violation of the Federal Securities Laws ("CCAC").

### A.    Apple's iPhone Business

Apple is a multinational technology company that designs, develops, and sells consumer electronics, computer software, and online services.  (CCAC ¶ 2.)  Apple is the world's largest information technology by revenue and enjoys significant reach in emerging markets, including China.  (*Id*. ¶¶ 2, 4.)  The Company's flagship product is the Apple iPhone, which generated more than 60% of Apple's revenue in 2018.  (*Id*. ¶ 3.)  To profit from the iPhone, Apple relies significantly on "upgrading"—that is, the practice where consumers replace their older iPhones with a newer model.  (*Id*. ¶ 65.)  Apple has released on average one new iPhone model per year between 2007 and 2015 to encourage upgrading.  (*Id*. ¶ 47.)

Greater China (a region that includes mainland China, Hong Kong, and Taiwan) represents an important market for Apple's iPhone business.  (*Id*. ¶ 4.)  In addition to being the third-largest market after the United States and Europe, Greater China is also Apple's highest growth market and represented nearly 20% of Apple's total annual sales for fiscal year 2018.  (*Id*.)  The Chinese market experiences significant competition from lower-cost smartphone makers, including Huawei, Xiaomi, and Oppo.  (*Id*. ¶ 5.)

After nearly a decade of uninterrupted growth, the smartphone market began to stagnate in 2016.  (*Id*. ¶¶ 6, 81.)  Among other factors contributing to the decline, consumers were reportedly waiting longer to upgrade their phones.  (*Id*. ¶¶ 58-60.)  As sales of iPhones in the United States and Europe plateaued, Apple began relying increasingly more on China to sustain its rate of growth.  (*Id*. ¶ 52.)  However, competition from lower-cost smartphone makers—in addition to slowing economic growth and the U.S.-China trade war—have threatened Apple's ability to maintain sales in China.  (*Id*. ¶¶ 55, 93-97.)

United States District Court
Northern District of California

**B.**     **Apple's Throttling of Older iPhones**

In 2016, reports surfaced that older iPhones were unexpectedly shutting down.  (*Id*. ¶¶ 8, 109.)  Apple initially responded by offering "battery replacement, free of charge" to a small range of devices.  (*Id*. ¶ 111.)  However, as reports showed that a greater number of phones were affected, Apple released a software update, iOS 10.2.1, that purportedly addressed the issue and that had the effect of "throttling," or slowing down, iPhone models 6 and later.  (*Id*. ¶¶ 8, 114.)  Apple did not disclose that the software update throttled old phones, but only claimed that it addressed the shutdown issue.  (*Id*. ¶ 116.)

Following the release of the "throttling" update in January 2017, consumers grew increasingly frustrated with their older phones.  (*Id*. ¶ 119.)  Sales of newer iPhones surged as consumers began buying new phones to replace their slowed-down older iPhones.  (*Id*.)  The premature upgrading was a boon to Apple.  (*Id*. ¶ 124.)  Beginning in August 2017, Apple reported record upgrade rates, strong demand, and all-time record revenue for the iPhone.  (*Id*. ¶¶ 124-25.)  Defendants Cook and Maestri touted these results to investors.  (*Id*. ¶¶ 268-395.)  For example, Cook told investors that the iPhone experienced "strong demand at the high end of our lineup" and "our highest ever" upgrades in 2017, with the newest iPhone being "our most popular iPhone."  (*Id.* ¶ 124.)  He did not mention the existence of throttling or the possibility that throttling may artificially inflate demand for newer iPhones.  (*Id*. ¶ 13.)  The market responded by driving up Apple's stock price.  (*Id*. ¶¶ 277, 284.)

In December 2017, an independent report revealed that Apple's software updates were causing the slowdown of older iPhones.  (*Id*. ¶ 10.)  The report also revealed that the unexpected shutdowns were caused by aging batteries and could be remedied by replacing the batteries (at the low cost of $79 per battery).  (*Id*.)  Shortly after, Apple admitted that it had deliberately throttled older model iPhones to save on battery life and avoid unexpected shutdowns.  (*Id*. ¶ 11.)  Consumers responded with outrage.  (*Id*. ¶ 132.)  Congress sent Apple a letter demanding answers about throttling, and Apple responded, in part, by assuring that "hardware updates" in newer iPhones would address the shutdown issues instead.  (*Id*. ¶¶ 163-64.)

///

United States District Court
Northern District of California

To contain the public fallout from the throttling revelations, Apple offered to replace iPhone batteries at the discounted price of $29 throughout 2018. (*Id*. ¶ 138.) Customers took advantage of the program: 11 million batteries were reportedly replaced under the program. (*Id.* ¶ 147.) Apple also offered battery replacements at 60% discount in China. (*Id*. ¶ 150.) According to Apple employees, the Company was tracking the rate of battery replacement. (*Id*. ¶¶ 251, 254.) Apple was also aware that battery replacements may hurt sales, as consumers were replacing batteries instead of upgrading their iPhones. (*Id*. ¶ 250.) For example, one employee reports that the gap between battery replacement numbers and missed sales was "practically one-to-one." (*Id*.)

The throttling revelations resulted in significant negative publicity for Apple, as well as multiple government investigations, consumer lawsuits, and regulatory fines. (*Id*. ¶¶ 156-59, 173-90.) However, the market did not immediately react to the revelations. (*Id*. ¶ 192.) Although Apple's stock price decreased, Apple again reported record profitability for the first fiscal quarter of 2018, while providing lower revenue guidance for the next quarter. (*Id*. ¶ 21.) Defendants continued to talk up financial results—which were in line with increasingly weakened guidance— until January 2, 2019, when Cook sent a letter to investors informing them that revenue for the first quarter of 2019 was expected to fall below guidance. (*Id.* ¶¶ 22-23, 25-28.) The letter cited the battery replacement program, as well as emerging market issues in Greater China, as reasons for the poor showing. (*Id*. ¶ 28.) Until that point, Cook claimed that Apple did not track battery replacement or even consider the program's effect on iPhone demand. (*Id*. ¶ 21.) The letter caused Apple's stock market to decrease by approximately 10%. (*Id*.)

Apple continued to throttle iPhones throughout 2017 and into 2019. (*Id*. ¶¶ 120, 168-81.)

### C.     Declining iPhone Sales in China

The throttling revelations came amid worsening business outlook in China. Multiple factors dampened demand for Apple iPhones beginning in 2016, driving Apple into fifth place for market share of China's smartphone market. (*Id*. ¶ 88.) These factors included increased competition from low-cost smartphone makers, worsening economic growth in 2018, the U.S.-China trade war, and reduced consumer confidence. (*Id*. ¶¶ 193, 201.) The throttling revelations accelerated these negative trends. (*Id*. ¶¶ 148-155.) Apple was aware that its sales were declining

or expected to decline in China,[1] based on at least the following facts:

(1) News publications broadly reported on the factors leading to decline in high-end smartphone demand throughout the Class Period (*id*. ¶¶ 194-200);

(2) Apple tracked "unbricking" of new iPhones (i.e., turning them on for the first time) on a daily basis (*id*. ¶¶ 216-17);

(3) Employees who worked in Apple's Asian offices report widespread negativity and anxiety, as well as general knowledge of declining sales, in 2017 and 2018 (*id*. ¶¶ 218-20);

(4) Employees who worked in Apple's Asian offices report that sales were tracked, analyzed, and discussed at meetings and that they showed declining sales and other negative economic outlook data in 2017 and 2018 (*id*. ¶¶ 223-32, 235-36, 256-67);

(5) Foxconn, an assembler of Apple iPhones, shut down iPhone production lines and decreased the number of workers involved in iPhone manufacturing between 2017 and 2018, according to two Foxconn employees (*Id*. ¶¶ 237, 240-42);

(6) Apple reportedly instructed two of its smartphone assemblers to halt plans for further production lines in November 2018 (*id*. ¶ 27);

Nevertheless, throughout the Class Period, defendants claimed that business was going well in China. For example, in May 2018, Cook assured investors that the iPhone was "the most popular smartphone in all of China." (*Id*. ¶ 201.) In November 2018, Cook stated that while macroeconomic uncertainty in emerging markets was affecting business outlook, China was not part of that trend because Apple experienced double-digit growth there in the last quarter. (*Id*. ¶ 26.) Apple's risk disclosures (which were certified by Cook and Maestri) identified generic risks, such as macroeconomic uncertainty, but did not identify China-specific risks. (*Id*. ¶¶ 278-79.)

---

[1] Plaintiff relies on confidential witnesses to provide a timeline for when iPhone sales began to decline in China. (CCAC ¶¶ 220, 235, 240.) However, those timelines are conflicting. One witness claims that sales began to decline "since at least the end of 2017," while another states that Apple iPhone sales decreased "starting in 2018," and a third contends that iPhone sales began decreasing after "early 2016." (*Id*.) At the hearing for this motion, plaintiff clarified that it intended to argue that sales started to decline in late 2017. (Dkt. No. 108 ("Tr.") at 6:9-13.)

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Cook's letter to investors on January 2, 2019 was therefore the first time that defendants

2   identified emerging markets issues in Greater China as a cause for weak results.  (*Id.* ¶ 28.)

3   **D.      Additional Scienter Allegations**

4   Plaintiff alleges that defendants operated with the intent to deceive, manipulate, or

5   defraud—or at least with deliberate recklessness—based on the following additional facts.  (*Id.* ¶

6   444.)  First, Cook's and Maestri's trading patterns were suspicious and unusual during the time:

7   Cook disposed of approximately 30.3% of his total shares from August 2, 2017 to January 2, 2019

8   (the "Class Period"), which resulted in proceeds of over $100 million—a 24% increase over the

9   proceeds he received during the equal sized time period immediately preceding (the "Control

10  Period").  (*Id.* ¶¶ 450, 454.)  Similarly, Maestri disposed of 92.3% of his total shares during the

11  Class Period for proceeds equaling to $30.6 million—130% more than his proceeds of the Control

12  Period.  (*Id.* ¶¶ 451, 454.)

13  Second, the Greater China region was highly important to Apple's business and strategy.

14  (*Id.* 444(b).)  As described previously, Greater China made up almost 20% of Apple's sales in

15  2018 and presented an important growth market for the Company.  (*Id.* ¶¶ 461-62.)  Apple's senior

16  management, including Cook and Maestri, were considering iPhone sales in China and frequently

17  travelled to China to monitor the market.  (*Id.* ¶ 444(c), 465.)

18  Third, plaintiff alleges that the individual defendants knew, or at least recklessly

19  disregarded, that Apple iOS software updates were being used by the Company to throttle its

20  iPhones and were aware of the public's negative reaction to throttling, especially in Greater China.

21  (*Id.* ¶ 444(d).)  News reports at the time show that Apple was increasingly dependent on its

22  revenue from Services, which relied on the iOS operating system, and that revenue was threatened

23  by the throttling revelations.  (*Id.* ¶¶ 467-69, 472.)  Fourth, defendants possessed motive and

24  opportunity to accelerate the iPhone upgrade cycle artificially because growth in the iPhone

25  industry stagnated in 2016 and throttling reversed that decline by forcing premature upgrades.  (*Id.*

26  ¶¶ 444(e), 473-76.)

27  Fifth, statements by former Apple employees and employees of Apple's competitors and

28  suppliers show that defendants tracked iPhone sales and had information that iPhone demand was

6

stalling, as well as that the battery replacement program would further hurt demand.  (*Id.* ¶ 444(f).)  Confidential Apple employees report that Apple's China sales were carefully tracked and discussed at meetings.  (*Id.* ¶¶ 223-236.)  Additionally, Apple's suppliers shut down production lines in 2017 and 2018 in response to declining sales.  (*Id.* ¶¶ 237-244.)  Finally, plaintiff claims that Apple attempted to obscure declining sales by no longer reporting unit sales.  (*Id.* ¶ 444(g).)

## II.   LEGAL STANDARD

The standards here are basic and not in dispute.  A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint.  *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199 (9th Cir. 2003).  "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  All allegations of material fact are taken as true and construed in the light most favorable to the plaintiff.  *Johnson v. Lucent Techs., Inc.*, 653 F.3d 1000, 1010 (9th Cir. 2011).  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  That requirement is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inferences that the defendant is liable for the misconduct alleged."  *Id.*

Furthermore, claims for fraud must meet the particularity requirements of Federal Rule of Civil Procedure 9(b), which requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  Rule 9(b) "requires . . . an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations."  *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks omitted).  Further, plaintiffs are required to state with particularity the facts giving rise to a strong inference of defendants' scienter.  *See* 15 U.S.C. § 78u–4(b)(2).  "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations" and a court "must consider plausible nonculpable explanations for the defendant's conduct."  *See Tellabs, Inv. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

United States District Court
Northern District of California

**III.     REQUEST FOR JUDICIAL NOTICE**

Defendants request judicial notice of 64 documents in support of their motion to dismiss. (Dkt. No. 92 ("RJN").)  For each document, defendants rely on either incorporation by reference or judicial notice pursuant to Federal Rule of Evidence 201.  Specifically, defendants claim that Exhibits 3-44 are incorporated by reference through the CCAC, while the remaining Exhibits are subject to judicial notice.  Plaintiff does not oppose defendants' request.

Incorporation by reference is a judicial doctrine that prevents plaintiffs from "selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir 2018) (citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998)).  The mere mention of a document in a complaint is insufficient to incorporate by reference.  *Id.* (citing *Ritchie Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010)).  Instead, plaintiff must "extensively" refer to the document, or else the document must "form[] the basis of plaintiff's claim."  *Id.*  Even so, incorporation by reference does not mean that the court assumes the truth of the document contents.  *Id.* at 1003.  It is improper to assume the truth of an incorporated document only "to dispute facts stated in a well-pleaded complaint."  *Id.*

Here, Exhibit 3 is Cook's letter to investors informing them of missed earning guidance.  The document is cited extensively in the CCAC.  (CCAC ¶¶ 28, 410, 489, 493.)  The document also forms a basis for plaintiff's claims:  plaintiff claims that the letter "disclosed the true state" of Apple's sales concealed by defendants' earlier statements and represents materialization of the risk that led to stock price decline.  (*Id.* ¶¶ 410-13.)  Exhibits 4-21 and 23-44 are related to SEC filings:  Exhibits 4-9 are Form 8-Ks; Exhibits 10-15 are transcripts of shareholder/analyst calls; Exhibits 16-21 are Form 10-Ks; and Exhibits 23-44 are Form 4s.  Plaintiff claims that Apple's SEC filings contained misleading statements, and they therefore form the basis of plaintiff's claims.  (*See, e.g.*, *id.* ¶¶ 281, 286.)  Plaintiff also uses individual defendants' Form 4s to show suspicious trading patterns that demonstrate scienter, which makes them also integral to plaintiff's claims.  (*See id.* ¶ 446-56.)  Finally, Exhibit 22 is Apple's letter to Congress regarding throttling.  Plaintiff claims that this letter contained misleading statements, and it therefore forms the basis of plaintiff's

United States District Court
Northern District of California

8

1    claims. (*Id.* ¶¶ 317-18.)  Accordingly, the Court finds incorporation by reference proper for these

2    documents.[2]

3         Turning to judicial notice, a court may take judicial notice of "adjudicative fact[s]" that are

4    "not subject to reasonable dispute."  Fed. R. Evid. 201.  As with incorporation by reference, "a

5    court cannot take judicial notice of *disputed* facts contained in" judicially noticed documents.

6    *Khoja*, 899 F.3d at 999 (emphasis added).  Here, defendants seek judicial notice of Exhibits 45-53,

7    which are additional SEC filings that were not cited in the CCAC.  Courts routinely take judicial

8    notice of SEC filings in securities cases where authenticity is not disputed because their accuracy

9    cannot reasonably be questioned.  *See Dreiling v. Am. Exp. Co.*, 458 F.3d 942, 946 n.2 (9th Cir.

10   2006); *In re Extreme Networks, Inc. S'holder Derivative Litif.*, 573 F. Supp. 2d 1228, 1231 n.2

11   (N.D. Cal. 2008) (citing cases).  Because plaintiff does not dispute the authenticity of the SEC

12   filings, the Court finds judicial notice of the existence of statements in these filings proper.

13        Defendants also seek judicial notice of Exhibits 1-2 and 54-64.  Exhibit 1 is a Reddit post

14   cited in the CCAC, while Exhibits 2 and 54-64 are news articles discussing Apple's throttling, the

15   battery replacement program, and the program's potential effect on iPhone demand.  The Court

16   will take judicial notice of these documents not for the truth of the matter asserted, but "for the

17   purpose of showing that particular information was available to the stock market."  *See Helitrope*

18   *Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999) (taking judicial notice "that

19   the market was aware of the information contained in news articles submitted by the defendants");

20   *see also In re Kalobios Pharm., Inc. Sec. Litig.*, 258 F. Supp. 3d 999, (N.D. Cal. 2017) (same); *In*

21   *re American Apparel, Inc. Shareholder Litig.*, 855 F. Supp. 2d 1043, 1062 (C.D. Cal. 2012)

22   (same).  Exhibit 48 is a UBS analyst report discussing the potential effect of the batter replacement

23   program on demand.  As with the news articles, the Court takes judicial notice of the contents of

24   the report to determine "whether and when certain information was provided to the market," but

25   not for the truth of the matter.  *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1023-24 (C.D.

---

[2] Specifically, the Court considers the cautionary statements that preceded Apple's earnings calls, the risk disclosures in its SEC filings, the context provided in Apple's and Cook's letters, and the facts of Cook and Maestri's trading patterns in determining defendants' motion.

United States District Court
Northern District of California

Cal. 2008); *see In re Century Aluminum Co. Sec. Litig.*, No. C 09-10001 SI, 2011 WL 830174, at *9 (N.D. Cal. Mar. 3, 2011) (noting that "courts routinely take judicial notice of analyst reports").

Finally, Exhibit 49 is a Yahoo Finance report showing Apple's historical stock prices for the Class Period. "[C]losing stock price is public information 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *In re Finisar Corp. Derivative Litig.*, 542 F. Supp. 2d 980, 989 n.4 (N.D. Cal. 2008) (citing Fed. R. Evid. 201). Because plaintiff does not dispute the authenticity of the Yahoo report, the Court takes judicial notice of Apple's historical stock prices.

## IV.   COUNT 1: SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10-B5

Plaintiff contends that defendants violated Section 10(b) of the Exchange Act and Rule 10-B5 by making false and misleading statements about Apple's financial outlook in China and elsewhere. Plaintiff advances four theories of "falsehood." *First*, plaintiff claims that defendants touted positive iPhone revenues, sales, and upgrades during the Class Period, without revealing that the positive results were driven by artificially inflated upgrading due to defendants' throttling of old iPhones. (*Id.* ¶ 313(a).) *Second*, plaintiff claims defendants touted their growth in Greater China without revealing that low-cost competition, economic decline, and other factors were causing iPhone sales to decline in the region. (*Id.* ¶ 313(d).) *Third*, plaintiff contends that defendants falsely stated that they were not tracking or considering the effect of the battery replacement program when, in fact, they were tracking battery replacements rates. (*Id.* ¶ 313(b).) *Fourth*, plaintiff claims that defendants failed to disclose that the battery replacement program was hurting iPhone sales and demand. (*Id.* ¶ 313(c).)

Defendants move to dismiss these claims on the grounds that none of the challenged statements are false or misleading, that plaintiff failed to plead facts showing that defendants acted with scienter, and that even if the statements were false or misleading, the stock price did not decline as a result. The Court considers each argument below.

### A.   Legal Framework

Section 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b), makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any

manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b–5 implements this provision by making it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b). Similarly, under the Exchange Act, any person who "directly or indirectly, controls any person liable under any provision of [the Exchange Act] or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . ." 15 U.S.C. § 78t(a).

In 1995, Congress enacted the PSLRA, which includes "exacting pleading requirements," as a check against abusive litigation by private parties.[3] *Tellabs, Inc.*, 551 U.S. at 313. To state a claim under Section 10(b), a plaintiff "must show that the defendant made a statement which was '*misleading* as to a *material* fact.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)) (emphases in original). Under the PSLRA's heightened pleading requirement, plaintiffs must also allege facts sufficient to establish: (i) that the defendant made a material misrepresentation or omission of fact; (ii) that the misrepresentation was made with scienter; (iii) a connection between the misrepresentation or omission and the purchase or sale of a security; (iv) reliance on the misrepresentation or omission; (v) loss causation; and (vi) economic loss. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).

Here, defendants challenge the sufficiency of the first, second, and fifth elements: material misrepresentation or omission, scienter, and loss causation. The Court examines each element.

---

[3] Members of the House and Senate "observed that plaintiffs routinely were filing lawsuits 'against issuers of securities and others whenever there [was] a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually to some plausible cause of action[.]'" *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 978 (9th Cir. 1999) (alterations in original) (citation omitted).

United States District Court
Northern District of California

### B.   Material Misrepresentation or Omission

#### 1.   *Legal Standard*

 "Materially misleading statements or omissions by a defendant constitute the primary element of a section 10(b) and rule 10b-5 cause of action." *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1017 (S.D. Cal. 2005) (quoting *Marksman P'ners, L.P. v. Chantal Pharma. Corp.*, 927 F. Supp. 1297, 1305 (C.D. Cal. 1996)).  To plead this element, a complaint must "identify[ ] the statements at issue and set[ ] forth what is false or misleading about the statement and why the statements were false or misleading at the time they were made." *In re Rigel Pharma., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012); *see also* 15 U.S.C. § 78u-4(b)(1)(B) (pleading falsity under the PSLRA requires a plaintiff to "specify each statement alleged to have been misleading" and the "reasons why the statement is misleading").

A statement is misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (internal quotation marks omitted).  To be misleading, a statement must be "capable of objective verification." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).  For example, "puffing"—expressing an opinion rather than a knowing false statement of fact—is not misleading.  *Id.*; *see also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206–07 (9th Cir. 2016); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).  Qualitative buzzwords such as "good," "well-regarded," or other "vague statements of optimism" cannot form the basis of a false or misleading statement.  *Apollo*, 774 F.3d at 606 (citing *Cutera*, 610 F.3d at 1111 ("When valuing corporations, . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers.  This mildly optimistic, subjective assessment hardly amounts to a securities violation.")).  Indeed, "professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives[.]" *In re VeriFone Sec. Litig.*, 784 F. Supp. 1471, 1481 (N.D. Cal. 1992), *aff'd sub nom.*, 11 F.3d 865 (9th Cir. 1993).

Even if a statement is not false, it may be misleading if it omits material information. *Khoja*, 899 F.3d at 1008–09 (citing *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir.

2014)).  "[A]n omission is material 'when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available.'"  *Matrixx*, 563 U.S. at 38.  But omissions are actionable only where they "make the actual statements misleading": it is not sufficient that an investor "consider the omitted information significant."  *Markette v. XOMA Corp.*, No. 15-cv-03425-HSG, 2017 WL 4310759, at *7 (N.D. Cal. Sept. 28, 2017) (internal quotation marks omitted).

### 2.   *Analysis*

Defendants challenge the sufficiency of plaintiff's allegations regarding false or misleading statements on two grounds.  First, defendants claim that the CCAC engages in "puzzle pleading" that fails to inform defendants of the alleged misrepresentations or omissions and the reasons for their falsity in a clear or precise manner.  Second, defendants argue that the CCAC fails to allege any actionable material misstatement or omission.

### a.   *Puzzle Pleading*

"Puzzle pleading" occurs when the "plaintiffs have left it up to defendants and the court to try to figure out exactly what the misleading statements are, and to match the statements up with the reasons they are false or misleading."  *Primo v. Pacific Biosci. of Cal., Inc.*, 940 F. Supp. 2d 1105, 1111 (N.D. Cal. 2013) (quoting *In re Autodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 841 (N.D. Cal. 2000)); *see also In re Oak Tech. Sec. Litig.*, No. 96-20552 SW, 1997 WL 448168, at *5 (N.D. Cal. Aug. 1, 1997) (puzzle pleading places "the burden [] on the reader to sort out the statements and match them with the corresponding adverse facts to solve the 'puzzle' of interpreting plaintiff's claims").  Courts have decried puzzle-pleading as "an unwelcome and wholly unnecessary strain on defendants and the court system."  *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1244 (N.D. Cal. 1998).  For this reason, puzzle-pled complaints have been dismissed as failing to comply with the "short and plain statement" requirement of Rule 8, as well as the PSLRA.  *See Primo*, 940 F. Supp. 2d at 1112; *Wenger*, 2 F. Supp. 2d at 1244 (listing cases).

Having reviewed the CCAC and the relevant authority, the Court finds that plaintiff satisfies the requirements of Rule 8.  Unlike the cases cited by defendants—in which the complaint set forth blocks of statements without alleging which specific portion was misleading or

the reasons for why it was misleading—the CCAC includes a separate section listing each misleading statement, places bold and italic emphasis on each allegedly misleading portion, and follows each statement with specific reasons for why it is false or misleading. (*See* CCAC ¶¶ 268-409.) The reasons are specific to each statement. Though lengthy,[4] the CCAC is "well-structured, logical, and clearly lay[s] out the relevant events and misstatements and why plaintiffs allege that those misstatements were misleading." *Abdo v. Fitzsimmons*, No. 17-cv-00851-EDL, 2017 WL 6994539, at *7 (N.D. Cal. Nov. 3, 2017). And the form of plaintiff's CCAC has been affirmed as non-puzzle-pled by other courts. *See In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014) (finding that breadth of complaint allegations did not create "puzzle pleading" where plaintiff "precisely detailed each problematic statement, alleged that each statement is false and misleading, and alleged the reasons as to why each statement was false or misleading").

Defendants claim that plaintiff's Supplemental Chart (Dkt. No. 88 ("Chart")) identifying each category of false allegation demonstrates that the CCAC is puzzle-pled because it differs on some points from the CCAC. For example, while the CCAC identifies certain statements made on the August 1, 2017 conference call as misleading for four reasons (CCAC ¶ 280), the Chart identifies only one reason. (Chart # 1.) To the extent that the Chart differs from the allegations in the Complaint, it fails to comply with the Court's Order that the Chart "adhere[] to the allegations in the operative complaint." (Dkt. No. 87.) In this case, however, there appears to be no inconsistency between the Chart and the CCAC because the former simply breaks down the allegations in different paragraphs into separate entries. (*Compare* CCAC ¶ 270-80, *with* Chart #1-9.) The additional reasons provided for some of the of the statements correspond to those made in the complaint. (*See id.*) While plaintiff could have been more particular in the CCAC, the reasons provided are related and easy to discern. Accordingly, the CCAC does not constitute impermissible puzzle pleading.

---

[4] Although the CCAC runs nearly 200 pages long, the Ninth Circuit has cautioned against applying a strict requirement for a "short" statement under Rule 8 in light of the heightened pleading standards of Rule 9(b) and PSLRA. *See In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1555-56 (9th Cir. 1994) (Norris, J. concurring), *superceded by statute as stated in S.E.C. v. Todd*, 642 F.3d 1207 (9th Cir. 2011).

*b.      Lack of Actionable Statements*

Defendants next argue that none of the alleged misrepresentations or omissions cited in the complaint are actionable because they are (1) accurate descriptions of historical fact; (2) forward-looking statements protected by the PSLRA safe harbor, (3) legally inactionable expressions of corporate optimism, (4) statements of opinion, or (5) statements whose alleged falsity is not supported by the facts alleged in the CCAC.  For simplicity, the Court adopts those categories herein and addresses them below.[5]

i.      <u>Statements of Historical Results</u>

Defendants claim that numerous statements challenged by the plaintiff are accurate descriptions of historical results.  For example, plaintiff challenges the following statements as false or misleading in the CCAC:

- "iPhone 7 was our most popular iPhone, and sales of iPhone 7 Plus were up dramatically compared to 6s Plus in the June quarter of last year…. From an absolute quantity point of view, the upgrades for this fiscal year are the highest that we've seen."  (CCAC ¶ 270.)

- "iPhone sales were up year-over-year in most markets we track, with many markets in Asia, Latin America, and the Middle East growing unit sales by more than 25%."  (*Id.* ¶ 271.)

- "Apple's year-over-year revenue growth rate accelerated for the fourth consecutive quarter and drove EPS growth of 24 percent in the September quarter."  (*Id.* ¶ 285.)

- "During the quarter, we sold 46.7 million iPhones, up 3% over last year.  We were very pleased to see double digit iPhone growth in many emerging markets including mainland China*,* the Middle East, Central and Eastern Europe, India and Mexico."  (*Id.* ¶ 287.)

- " . . . iPhone X orders are very strong for both direct customers and for our channel partners, which as you know, are lots of carrier throughout the world."  (*Id.* ¶ 288.)

- "We're thrilled to report Apple's biggest quarter ever, which set new all-time records in both revenue and earnings.  We generated revenue of $88.3 billion, which is above the high end of our guidance range, and it is up almost $10 billion or 13% over the previous all-time record we set a year ago."  (*Id.* ¶ 297.)

---

[5] Defendants challenge several statements on multiple grounds.  In cases where dismissal is granted, the Court addresses only the strongest ground.

- "Starting with revenue, we're reporting an all-time record, $88.3 billion, up nearly $10 billion or 13% over the prior record set last year.  It is our fifth consecutive quarter of accelerating revenue growth."  (*Id.* ¶ 298.)

(*See also id.* ¶¶ 274, 276, 285-88.)  Defendants contend that these statements are accurate—judicially noticed documents show that iPhone upgrades and revenue in the relevant quarters were record high at the time.  Plaintiff claims that they are nevertheless misleading because they failed to disclose that the high upgrade rates and revenues were driven by Apple's throttling of old iPhones—information that would meaningfully contextualize the otherwise positive financial results.  (*Id.* ¶ 280.)

"[L]iteral truth is not the standard for determining whether statements . . . are misleading." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008).  Even if a statement is "technically accurate," a party may be obligated to disclose additional "adverse information that cuts against the positive information" if it chooses to tout the positive data.  *See Khoja*, 899 F.3d at 1009; *Schueneman v. Arena Pharma., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008).  For example, in *Khoja*, a biotechnology firm promoted interim clinical study results of a drug showing improvement in heart attacks.  899 F.3d at 995.  The study was eventually halted after additional data revealed no benefit for heart attacks.  *Id.* at 995-97.  The company nevertheless continued to promote the interim results to investors, without mentioning the study's failure, which caused investors to buy its stock.  *Id.*  The Ninth Circuit found that the company's statements were misleading: "[a]lthough the 25 percent interim results were still technically accurate," the party, "having learned new information that diminished the weight of those results," was "obligated to share that information."  *Id.* at 1015; *see also Berson*, 527 F.3d at 988 (holding that company that touted its backlog was obligated to disclose information that suggests the backlogged orders would be cancelled).  Thus, the question is whether defendants affirmatively placed any facts at issue to require disclosure of additional information to prevent creating a misleading impression for investors.  *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).[6]

_____

[6] The requirement that statements affirmatively create a misleading impression stems from

United States District Court
Northern District of California

General descriptions of historical results have generally been found not to require disclosure of adverse factors. *See, e.g.*, *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, No. 18-cv-04844-BLF, 2019 WL 6877195, at *12 (N.D. Cal. Dec. 17, 2019); *In re Finisar Corp. Sec. Litig.*, No. 5:11-cv-01252 EJD, 2013 WL 211206, at *4 (N.D. Cal. Jan. 16, 2013). Courts have reasoned that descriptions of historical performance do not represent anything about the causes of that performance or suggest that the performance will continue. *See Finisar*, 2013 WL 211206, at *4 (finding "no duty to opine on how [the party] achieved its previously earned revenues or explain that those conditions would not continue throughout the class period); *In re Caere Corp. Sec. Litig.*, 837 F. Supp. 1054, 1058 (N.D. Cal. 1993) (statements of past results "contain no implicit prediction that those events or conditions will continue"). This has been held true even where the positive performance was achieved through fraudulent practices. *See City of Sunrise Firefighters' Pension Fund*, 2019 WL 6877195, at **12-14 (finding accurate reports of "illusory" sales driven by "extortionate tactics" were not misleading); *In re Redback Networks, Inc. Sec. Litig.*, No. C 03-5642 JF, 2007 WL 4259464, at *3 (N.D. Cal. Dec. 4, 2007) (finding disclosures of "illegitimate" sales driven by bribery not misleading).

However, where a party goes beyond describing historical results and touts specific factors driving those results, it is obligated to disclose negative information related to those factors. *See In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1118 (N.D. Cal. 2017); *Murphy v. Precision Castparts Corp.*, No. 3:16-cv-00521-SB, 2017 WL 3084274, at **8-9 (D. Or. June 27, 2017). For example, if a party expressly touts "organic" growth, it must disclose that the sales were not, in fact, organic. *In re LendingClub Sec. Litig.*, 254 F. Supp. 3d at 1118 (finding that party touting "organic growth" was obligated to disclose sales stemmed from self-dealing); *Murphy*, 2017 WL 3084274, at **8-9 (finding securities laws violation where party claimed it could sustain organic

---

a lack of "completeness" requirement in the Exchange Act. *See Brody*, 280 F.3d at 1006. As explained in *Brody*, a "completeness" rule would create endless liability because "[n]o matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." *Id.* The reasoning of *Brody* applies here. Taken to its logical extreme, plaintiff's argument would require defendants to disclose not only throttling, but *all* factors that could *possibly* "artificially" affect positive results, as well as any market where sales fell below expectations, on each earnings call. Such rule would be untenable and would re-impose a "completeness" requirement rejected by the Ninth Circuit.

growth without disclosing that it used unsustainable sales tactics); *Conha v. Hansen Natural Corp.*, No. EDCV 08-1249-GW (JCx), 2012 WL 12886194, at *3 (C.D. Cal. Oct. 22, 2012) (finding that defendants were obligated to disclose that revenue was driven by "channel-stuffing").

Here, many statements challenged by plaintiff accurately describe historical results, without implicating the causes of those results, and are thus not actionable. Specifically, the Court finds that the statements challenged by plaintiff in paragraphs 271, 272, 285, 286, 287, 288, 296, 297, 298, 304, 325, 326, 327, 350, 351, and 354 are not actionable.

However, in a few instances, defendants go beyond representing general historical results and tout specific factors—such as high upgrade rates—that seem to require disclosure of "adverse information that cuts against the positive information." *Khoja*, 899 F.3d at 1009. For example, on the Q3 FY17 earnings call, Cook stated that "the upgrades for this fiscal year are the highest that we've seen" and then affirmatively opined on the causes of the high upgrade rate without mentioning throttling. (CCAC ¶ 270.) Cook then specifically highlighted the "abnormally high" upgrade rate for iPhone 6—the phone that Apple was throttling—and opined that it "bodes well later on." (*Id.* ¶ 273.) Assuming the truth of all facts alleged in the CCAC, these statements are affirmatively misleading because they create the impression that the upgrade rate for the throttled phone was the result of "ordinary" factors that "bode[] well" for future sales.[7] *See Hewlett-Packard Co.*, 845 F.3d at 1275 (a statement is misleading if "it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists").

Additionally, in a few instances, plaintiff challenges defendants' statements about Apple's business in Greater China. Plaintiff does not allege that overall revenue in China was declining (judicially noticed documents show that it was increasing), so defendants' statements about that revenue are not misleading.[8] (*See* CCAC ¶¶ 286, 298, 304, 325, 327, 354.) However, the CCAC

---

[7] Defendants challenge plaintiff's "throttling" theory on the ground that plaintiff pleads no facts to show that throttling was responsible for the high upgrade rates. According to defendants, the upgrade rates really were the result of "many factors." Defendants' argument amounts to a plausibility challenge; because the Court finds plaintiff's theory plausible in light of the subsequent effect of battery replacement on demand, it does not dismiss on this ground.

[8] Defendants' statements about unit growth "rebound" in late 2017 in China also appears to be consistent with facts alleged in the CCAC. (*Compare* CCAC ¶ 286-88, *with id.* ¶ 91.)

United States District Court
Northern District of California

*does* allege declining iPhone sales and low market share in China beginning in late 2017 and 2016, respectively. (*Id*. ¶¶ 95-97, 108, 153, 185, 221-29.)  Several of defendants' challenged statements directly contradict these allegations.  For example, in the Q1 FY18 earnings call, Cook claimed that "the top 5 smartphones [in urban China] were all iPhones," and in the Q2 FY18 earnings call, Cook again stated that the iPhone was "the most popular smartphone in all of China last quarter." (*Id*. ¶¶ 299, 328; *see also id.* ¶¶ 329-30, 332.)  In Form 10-Q for Q2 FY18, Apple also represented that iPhone sales in Greater China were increasing in 2018.  (*Id.* ¶ 336.)  Assuming the truth of the facts alleged in the CCAC, these statements were false.  (*See id.* ¶¶ 108 (showing iPhone in fifth place for market share in China), 153 (showing declining market share), 220 (alleging that sales in China were declining).)

Finally, plaintiff challenges defendants' statements on the Q4 FY18 earnings call about positive iPhone sales, as well positive business outlook in China.  (*Id.* ¶¶ 385-86.)  Plaintiff alleges that sales in China were declining during this time period, and Apple reportedly told its suppliers to halt additional productional lines for the iPhone mere days after making the statement.  (*Id.* ¶¶ 400-405.)  And two months later, Cook admitted to investors that lower than anticipated iPhone revenue "primarily in Greater China" led to missed guidance.  (*Id.* ¶ 410.)  Drawing all inferences in favor of plaintiff, the earlier statements were either false or misleading.[9]  *See Berson*, 527 F.3d at 987 (finding that company that touted its backlog was obligated to disclose information that suggests the backlogged orders would be cancelled in the near future).

Accordingly, the Court finds that the statements at paragraphs 271, 272, 285, 286,  287, 288, 296, 297, 298, 304, 325, 326, 327, 350, 351, 354, and 384 of the CCAC are not actionable, but declines to dismiss on this ground the statements at paragraphs 270, 273, 299, 328-30, 332, 336, and 385-86.

///

///

---

[9] Plaintiff challenges Cook's statement on the Q4 FY 2018 call about that there is "some level of uncertainty at the macroeconomic level in some emerging markets."  (CCAC ¶ 384.) Even assuming the Apple's China business had deteriorated, the statement appears to be accurate when made and unrelated to China specifically.

ii.     <u>Forward Looking Statements</u>

Defendants claim that certain statements are protected by the PSLRA safe harbor for forward-looking statements.  Under 15 U.S.C. § 78u-5(c)(1)(A), a forward-looking statement is not actionable when accompanied by a cautionary statement that the actual results might differ materially from those projected.  Additionally, under 15 U.S.C. § 78u-5(c)(1)(B), a forward-looking statement made by a natural person is not actionable when the plaintiff fails to prove that the person had actual knowledge that the statement was false or misleading.  Here, many of the challenged statements were made on investor calls that began with cautionary statements and that further directed investors to Apple's risk disclosures in Forms 10-K and 10-Q.  (*See* RJN Exs. 10-15.)  Defendants thus argue that these statements are protected by the safe harbor.

The PSLRA safe harbor applies only when "the truth or falsity of the statement cannot be discerned until some point in time after the statement is made."  *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1126 (S.D. Cal. 2012).  By contrast, statements involving future predictions are actionable when they make representations about the past or present that "can demonstrably be proven false."  *See Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 964-65 (N.D. Cal. 2014) (finding that statements that company had "begun" making changes and was "on track" were representations of current fact) (discussing cases); *Mallen*, 861 F. Supp. 2d at 1126 (finding statement that revenue "will continue to grow" actionable because it represents that revenue is already growing).  In the case of "mixed" statements, the forward-looking portion of the statement is protected, but the representations of current or past fact are not.  *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1150 (9th Cir. 2017).

Here, defendants plausibly challenge a number of purely forward-looking statements. Specifically, the Court finds that the following statements are purely forward-looking and protected by the PSLRA safe harbor:

- In the context of providing earnings guidance, "we believe iPhone revenue will grow double digits as compared to last year during the March quarter, and also and importantly, that iPhone sell-through growth on a year-over-year basis will be actually accelerating during the March quarter as compared to the December quarter."  (CCAC ¶ 302.)

United States District Court
Northern District of California

- "So in summary, our guidance for iPhone, we got double-digit year-over-year growth and acceleration of sell-through growth on a year-over-year basis. For the balance of the company, in the aggregate, we expect to grow strong double digits year-over-year and particularly very strong performance in service and in wearables like we've seen during the December quarter."  (*Id.*)

However, defendants also challenge nine "mixed" statements that contain assertions of past and present fact, including the following:

- 1: iPhone 6 (the throttled iPhone) "had an abnormally high upgrade rate . . . . And so where that affects us in the short term, even though we have great results, it probably bodes well later on." (CCAC ¶ 273.)

- 2: With regards to iPhones, "between the upgraders and the switchers that we see and still –the first-time buyer category . . . Between those 3 areas, I think we have a lot of opportunity."  (*Id.* ¶ 274.)

- 3: "I think in general, even the performance in China, Tim has mentioned it, we think that the performance will continue to improve.  So those are the drivers of our guidance range for the quarter." (*Id.* ¶ 275.)

- 4: In the context of a question of whether Apple can expand its market share, "I do think that we can grow both in units and market share . . . .  The installed base is growing. It's still growing very strongly.  That will generate more upgrades over time." (*Id.* ¶ 276.)

- 5: The iPhone X is "the most popular smartphone in all of China last quarter."  (*Id.* ¶ 328.)

- 6: Cook is "not "buy[ing] the view that the [smartphone] market's saturated.  I don't see that from a market point of view or – and certainly not from an iPhone point of view."  (*Id.* ¶ 328.)

- 7: "iPhone X winds up at the most selling – most popular for every week of the time since the launch . . .  And so obviously, at some point, if those technologies move to lower price points and that – there's probably more unit demand."  (*Id.* ¶ 329.)

- 8: "The demand trends are 21 percent revenue there is powered by three main areas – iPhone, of course, is growing. In order to grow 21 percent at the country level in Greater China you have to grow really well at the iPhone level."  (*Id.* ¶ 332.)

- 9: "We expect the growth to come from strong growth from iPhone from Services and from Wearables, which has been a bit of our pattern during the course of the year."  (*Id.* ¶ 352.)

United States District Court
Northern District of California

These nine statements make representations about both past or present fact and future predictions. Protection is not afforded the former.  Defendants nevertheless claim that these "mixed" statements do not contain *false* representations about the past and present.

The first and second statements (¶¶ 273-74) represent that upgrade rates have been high and that the *present* facts suggest a positive future outlook.  The third, fifth, sixth, and eighth statements (¶¶ 275, 328, 332) represent that performance in China is currently improving, that the market is not presently saturated, and that iPhone demand in China is growing.  The fourth and seventh statements (¶¶ 276, 329) represent that the installed base is growing and that the iPhone X has been popular since its launch.  And the last statement (¶ 352) represents that growth from the iPhone "has been" the pattern over the last year.

As to the statements in paragraphs 274, 275, 276, 328 (sixth statement), and 352, the Court agrees with defendants.  Plaintiff has not adequately alleged that the representations of past or present fact in these statements was false.  However, for the reasons stated in the previous section, the representations of past and present fact in paragraphs 273, 328 (fifth statement), 329, and 332 are adequately alleged to be misleading.  Specifically, Cook's touting of high upgrade rates for the throttled iPhone creates the misleading impression of organic demand, while the statements in paragraphs 328, 329, and 332 touted positive business outlook mere days before cutting production orders.  Plaintiff has therefore adequately alleged that the past- and present- facing portions of these mixed statements are false or misleading.

Accordingly, the Court finds that the statements in paragraph 302 are inactionable as forward-looking statements protected by the PSLRA safe harbor; that the statements in paragraphs 274, 275, 276, 328 (sixth statement), and 352 are inactionable as mixed statements whose past and present fact representations are not misleading; but that statements in paragraphs 273, 329, 332, and 328 (fifth statement) are actionable as mixed statements whose past- and present- facing portions are adequately alleged to be misleading.

### iii.   Puffery

"[V]ague, generalized, and unspecific assertions of corporate optimism or statements of mere puffing cannot state actionable material misstatements of fact under federal securities laws."

*In re Cornerstone Propane Partners, L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005).  Statements are puffery when they are "not measurable" or not "capable of objective verification."  *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 606.  However, even "general statements of optimism" may be misleading "when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly."  *In re Quality Sys.*, 865 F.3d at 1143. For example, statements that a company "anticipates a continuation of its accelerated expansion schedule" when the expansion is already failing are materially misleading.  *Id.* (citing *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)); *see also Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (statements that "everything [was] going fine" with FDA approval was misleading when clinical studies failed to produce results that could lead to FDA approval); *Karinski v. Stamps.com, Inc.*, No. CV 19-1828-MWF (SKx), 2020 WL 281716, at **10-11 (C.D. Cal. Jan. 17, 2020) (statement that company was "very happy" with a business partner and its reseller practice was misleading where company was trying to end the reseller practice) .

Here, plaintiff challenges a number of statements that defendants correctly identify as puffery.  Thus:

- "However, if you look at it from an upgrade rate point of view instead of the absolute number, the rate is similar to what we saw with the previous iPhones, except for iPhone 6, which as we called out in the past had an abnormally high upgrade rate . . . .  And so where that affects us in the short term, even though we had great results, it probably bodes well later on."  (*Id.* ¶ 273.)

- "I think it's up to investors as to what things they would like to focus on, so I don't want to put myself in the position of that.  The way that I look at this and I – the numbers you've quoted, I have a different view of them.  But generally what we see with iPhone is the reliability of iPhone is fantastic."  (CCAC ¶ 300.)

- "[W]e'll provide the qualitative commentary when it is important and relevant, but at the end of the day, we make our decisions to – from a financial standpoint, to try and optimize our revenue and our gross margin dollars.  And that, we think, is the focus that is in the best interest of our investors."  (*Id.* ¶ 388.)

However, plaintiff also challenges defendants' over-optimistic statements in areas where plaintiff alleges defendants knew they were going to fail.  For example, plaintiff challenges the following statements made during the Q3 FY17 and Q3 FY18 earnings call:

United States District Court
Northern District of California

- "The XS and XS Max got off to a really great start, and we've only been selling for a few weeks. . . . Usually, there is some amount of wait until a product shows—another product shows up in look, but in—that—in looking at the data, on the sales data for XS and XS Max, there's not obvious evidence of that in the data as I see it." (*Id.* ¶ 385.)

According to plaintiff, this statement was made mere days before Apple cut production lines for the iPhone. Although investors understand that corporate optimism may be unreliable, a party cannot affirmatively create a positive impression of an area it knows to be doing poorly. *See In re Quality Sys.*, 865 F.3d at 1143. Accordingly, the Court finds that the statements at paragraphs 273, 300, and 388 are inactionable puffery, but that the statement at paragraph 385 is actionable.

### iv.   Statements of Opinion or Belief

Defendants argue that a number of the challenged statements are inactionable as opinions and beliefs. To allege that such statements are misleading, plaintiff must show that (1) the speaker did not hold the belief expressed, and (2) the belief is objectively untrue. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017) (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175, 186 (2015)).[10] Alternatively, plaintiff may show that a statement of fact contained within an opinion statement is materially misleading because it is untrue. *Id.* at 616. Finally, plaintiff may also raise an omission theory by alleging "facts going to the basis of the [speaker's] opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.*

Here, the Court finds that the following statements are inactionable because plaintiff fails to allege facts to show that the speaker did not hold the belief or that the belief was objectively untrue, or that any representation of fact or omission in these statements was false or misleading:

---

[10] Plaintiff cites out-of-circuit cases stating that just statements couched in the terms "I think" or "I believe" do not cease to be actionable. *E.g.*, *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1322 (11th Cir. 2019). Those cases are consistent with the standard applied here.

United States District Court
Northern District of California

- "I think the upgrade rate is a function of many, many different things, from the size of the installed base, the age of the installed base, the product that is new at the time, the regional distribution, the upgrade plans that are in various markets around the world."[11] (CCAC ¶ 270.)

- "I don't think that iPhone will get a tariff on it, is my belief, based on what I've been told and what I see."  (*Id.* ¶ 346.)

- "I don't think that Apple is going to get caught up in a tariff there.  But I don't know this, but I don't think so because if we were it would hurt the U.S.  And so it doesn't make sense to do, from that point of view."  (*Id.* ¶ 347.)

- "I think the smartphone market is very healthy."  (*Id.* ¶ 353.)

- "There is a fourth tariff . . . also focused on goods that are imported from China. . . . Probably like everyone else, we're evaluating that one, and we'll be sharing our views of it with the administration."  (*Id.* ¶ 354.)

- "As demonstrated by our financial performance in recent years, the number of units sold in any 90-day period is not necessarily representative of the underlying strength of our business.  Furthermore, our unit of sale is less relevant for us today than it was in the past given the breadth of our portfolio and the wider sales price dispersion within any given product line."  (*Id.* ¶ 387.)

- "Given the rationale on why we do not believe that providing unit sales is particularly relevant for our company at this point, I can reassure you that it is our objective to grow unit sales for every product category that we have."  (*Id.* ¶ 388.)

- "Our installed base is growing at double digit, and so there's no – and that's probably a much more significant metric for us from an ecosystem point of view and customer loyalty, et cetera.  The second thing is this is a little bit like if you go to the market and you push your cart up to the cashier and she says or he says, 'How many units you have in there?,' it sort of – it doesn't matter a lot how many units there are in there in terms of the overall value of what's in the cart."  (*Id.*)

Plaintiff fails to allege any facts to show that defendants did not hold the beliefs expressed here.  Plaintiff also fails to allege any facts to show that the representations of fact or omissions in these statements were false or misleading.  Plaintiff claims that Apple stopped reporting unit sales to "cover up" their decline, but its assertions are purely speculative and insufficient to show these

---

[11] Although plaintiff claims that high upgrade rates were driven by throttling, Cook's statement is not inconsistent with that allegation.  As the Supreme Court explained, a statement is not misleading simply because the speaker "knows, but fails to disclose, some fact going the other way."  *Omnicare*, 575 U.S. at 189.  "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts" and "the presence of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty."  *Id.* at 189-90.

statements were false.  Plaintiff also alleges no facts to suggest that the tariff-related statements were false or misleading.

By contrast, the Court finds that the following statement is actionable:

- In the context of emerging market issues, "[i]n relation to China specifically, I would not put China in that category.  Our business in China was very strong last quarter. . . . iPhone, in particular, was very strong double-digit growth there."  (*Id.* ¶ 386.)

This statement contains representations of fact—that China is not facing emerging market issues like other countries and that Apple's business there is strong.  Although defendants claim that this statement is literally true because it concerns "last quarter," the context clearly suggests that business there continues to be strong.  Apple itself admitted mere two months later that it "saw" troubling signs coming out of China, as well as emerging market issues, "as the quarter went on" that were "particularly bad in November," when the statement was made.  (*Id.* ¶ 411.)  Even when framed as an opinion, a reasonable investor "expects not just that the issuer believes the opinion (however irrational), but that it fairly aligns with the information in the issuer's possession at the time."  *Align Tech.*, 856 F.3d at 615 (quoting *Omnicare*, 575 U.S. at 189).  Plaintiff adequately alleges that Cook's statement did not align with the information he possessed at the time and was therefore misleading.

Accordingly, the Court finds that statements alleged at paragraphs 270, 346, 347, 353, 354, 387, and 388 of the CCAC are inactionable expressions of opinion, but that the statement at paragraph 386 is actionable.

v.    <u>Remaining Statements</u>

(i)    <u>Risk Disclosures</u>

Plaintiff challenges the adequacy of Apple's risk disclosures, which defendants move to dismiss.  Typically, "where a company's filings contain abundant and specific disclosures regarding the risks facing the company, as opposed to terse, generic statements, the investing public is on notice of these risks and cannot be heard to complain that the risks were masked as mere contingencies."  *In re Violin Memory Sec. Litig.*, No. 13-cv-5486 YGR, 2014 WL 5525946,

United States District Court
Northern District of California

at *12 (N.D. Cal. Oct. 31, 2014) (quoting *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 832 (C.D. Cal. 1998)).  However, when the risks have already materialized, disclosing them "in the abstract" while omitting that they have "already come to fruition" is misleading.  *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009).  For example, in *Siracusano*, the court found that a company's risk disclosures warning of product liability claims in the abstract were misleading when the company was already facing multiple such lawsuits.  *Id.*; *see also Berson*, 527 F.3d at 986 (finding that risk disclosure of contract cancellations did not immunize statements touting backlog orders that would be cancelled).  The conclusion followed from the general rule that once a company makes an affirmative representation, it must do so in a way that does not mislead investors.  *Siracusano*, 585 F.3d at 1181 (citing *Berson*, 527 F.3d at 987).

Here, Apple's risk disclosures broadly address risks from competition and economic conditions.  (CCAC ¶¶ 279, 291, 311, 335, 358, 395.)  Plaintiff claims that these disclosures are inadequate because they warned of risks that already materialized, including risk from throttling revelations, the battery replacement program, and deteriorating economic conditions in China.  However, none of the risk disclosures broach any those topics, "in the abstract" or otherwise; they are simply silent about them.  At most, the disclosures address global risks of economic downturn and competition, but do not specifically address economic conditions or business outlook in China.  Accordingly, plaintiff fails to state an omission theory because it fails to show that the disclosures affirmatively broached any topic to make the lack of additional disclosure misleading.  *Markette*, 2017 WL 4310759, at *7; *see also Maritime Asset Mgmt., LLC v. NeurogesX, Inc.*, No. 12-CV-5034 YGR, 2013 WL 5442394, at *7 (N.D. Cal. Sept. 30, 2013) ("[W]hile plaintiffs may have wanted to know [the omitted fact], the statements at issue were not rendered misleading by virtue of failure to disclose that fact.").

Plaintiff also argues that the disclosures are misleading because they represented that "there have been no material changes in market risk."  (CCAC ¶¶ 312, 337, 357, 359.)  The Court may consider the context in which statements were made in order to determine if they are actionable.  *Mulligan*, 36 F. Supp. 3d at 966.  Here, context demonstrates that the statement related to "market risk" refers to interest rate and foreign currency risks, not risks related to throttling or

economic downturn.  (*See* RJN Exs. 17 at 32, 18 at 33, 19 at 35; *see also id.* Ex. 20 at 36 (discussing market risk in terms of interest rate and foreign currency).)  Accordingly, the statements that "market risk" remains unchanged are not adequately alleged to be false or misleading.  Apple's risk disclosures are therefore not actionable.

(ii)     Cook's Letter to Congress

Plaintiff challenges Apple's February 2, 2018 letter to Congress as false or misleading. Following the throttling revelations in December 2017, U.S. Senator John Thune (R-S.D.) sent Apple a letter posing a series of questions about its throttling practice.  In relevant part, Senator Thune asked "[d]oes Apple plan to release a similar software update feature to throttle back processing performance for newer iPhone models" and "[w]hat notice does it plan to provide to customers before doing so?"  (RJN Ex. 22 at 4.)  Apple responded as follows:

> All iPhone models have basic performance management to ensure that the battery and overall system operates as designed and internal components are protected.  And, in the case of hot temperature, the performance management ensures that the device stays within safety limits.  Such basic performance management is required for safety and expected function, and it cannot be turned off.
>
> iPhone 8, iPhone 8 Plus, and iPhone X models include hardware updates that allow a more advanced performance management system that more precisely allows iOS to anticipate and avoid an unexpected shutdown.

(*Id.*; CCAC ¶ 317.)  Defendants claim that this statement is not misleading because it does not constitute a "promise" not to throttle and does not relate to plaintiff's stated reason for its falsity (that throttling "previous year's iPhones was a part of Apple's regular practice" [CCAC ¶ 318]). The Court disagrees.  In the context of Senator Thune's question regarding whether Apple intends to throttle new phones, Apple's answer constitutes a representation that it does not intend to do so because hardware updates make throttling unnecessary.  Plaintiff adequately alleges that this statement was false or misleading because Apple continued to throttle newer iPhones as recently as 2019.  (*Id.* ¶¶ 168-73.)

Defendants also argue that this statement was not made "in connection with the purchase or sale of a security."  A statement is made "in connection with" purchase or sale of securities if it was made "in a manner reasonably calculated to influence the investing public."  *McGann v. Ernst*

28

& *Young*, 102 F.3d 390, 393 (9th Cir. 1996) (quoting *Wessel v. Buhler*, 237 F.2d 279, 282 (9th Cir. 1971)).  Although the kind of statements found to satisfy this requirement typically target investors directly, "there is no rule that only market-related documents, such as regulatory filings, public presentations, or press releases, can contain actionable misstatements under Section 10(b)."  *Intel*, 2019 WL 1427660, at *11 n.14.  The Court finds it plausible that "reasonable investors would base their investment decisions" on Apple's representations to Congress.  *See id.* (quoting *Buen v. LifeLock, Inc.*, No. CV 0-14-00416, 2015 WL 12819154, at *9 (D. Ariz. July 21, 2015)).

Lastly, defendants argue that Apple's letter to Congress is protected by the *Noerr-Pennington* doctrine.  The *Noerr-Pennington* doctrine protects "those who petition any department of the government for redress . . . from statutory liability for their petitioning conduct."  *SOSA v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006).  The seldom-used doctrine originated to protect concerted political activity from liability under the Sherman Act.  *See United Mine Worker of Am. v. Pennington*, 381 U.S. 657 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961).  However, it has been extended to shield false statements in other contexts.  *See Nunag-Tanedo v. E. Baton Rouge Parish School Bd.*, 711 F.3d 1136, 1139 (9th Cir. 2013) (summarizing cases).  For example, in *Tuosto v. Philip Morris USA Inc.*, the court found that a cigarette company's testimony about cigarette health risks to Congress was protected by the doctrine.  No. 05 Civ. 9284(PKL), 2007 WL 2398507, at **5-6 (S.D.N.Y. Aug. 21, 2007).

The Court declines to dismiss based on the *Noerr-Pennington* doctrine.  There is no evidence that Apple was seeking any redress from Congress that implicates its First Amendment right to petition.  *See Nunag-Tanedo*, 711 F.3d at 1139.  According to the CCAC, the letter was sent in response to an inquiry by Senator Thune.  (CCAC ¶ 163.)  There is no evidence that any particular legislation or government effort was pending that Apple intended to influence.  In light of the underdeveloped factual record and the abbreviated legal arguments, the Court declines to dismiss on this ground at this stage.

(iii)    June 1, 2018 Statement in UBS Analyst Report

Plaintiff alleges that defendants falsely represented to a UBS analyst that "the battery replacement program is having little impact on shipments."  (CCAC ¶ 345.)  The statement was

United States District Court
Northern District of California

United States District Court
Northern District of California

reprinted in an analyst report titled as follows:  "Apple says the battery replacement program is having little impact on shipments."  (*Id.*; *see also* RJN Ex. 48.)  Defendants now claim that the statement is inactionable as a "statement[] of third-party analysts."  *See Caere Corp.*, 837 F. Supp. at 1059 (holding that in order to be liable for forecasts by outside analysts, a corporate insider must have adopted the forecast and known that the forecast was unreasonable while failing to disclose that unreasonableness to investors).

Here, Defendants' argument fails.  The UBS analyst report is not a "forecast[] made by outside securities analysts"; it is a reprinting of Apple's statement.  Defendants may be liable for statements made to outside analysts.  *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1235 (9th Cir. 2004) ("[W]hen statements in analysts' reports clearly originated from the defendants, and do not represent a third party's projection, interpretation, or impression, the statements may be held actionable even if they are not exact quotations."); *Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997) (rejecting argument that party cannot be liable for misleading statements made to securities analysts).

(iv)   <u>Statements Regarding the Battery Replacement Program</u>

Plaintiff challenges defendants' representations about tracking or analyzing the effect of the battery replacement program.  Specifically, plaintiff challenges Cook's following statements:

- "Toni – On the battery, Toni, we did not consider in any way, shape, or form, what it would do to upgrade rates.  We did it because we thought it was the right thing to do for our customers.  And I – sitting here today, I don't know what effect it will have." (CCAC ¶ 300.)

- "I would point out that, that happened some time ago, and so it's very difficult currently to ever get a real-time handle on replacement rate because you're obviously not -- you don't know the replacement rate for the products you're currently selling." (*Id.* ¶ 301.)

- "In terms of batteries, we have never done an analysis internally about how many people decided to get a lower-priced battery than buy another phone because it was never about that for us.  It was always about doing something great for the user.  And I think if you treat the users and customers well, then you have a good business over time, and so that's how we look at that."  (*Id.* ¶ 353.)

Plaintiff alleges that these statements were false because Apple *was* tracking battery replacement rates, both at the store level and globally.  (*Id.* ¶¶ 251, 254 (citing confidential witnesses).)  Plaintiff also alleges that Apple was having internal discussions about the impact of battery replacement on the upgrade cycle (*id.* ¶ 252) and was having all-hands "state of the union" meetings discussing the effects of the battery replacement program on iPhone sales.  (*Id.* ¶ 253.)

Defendants argue that these statements were technically true.  Defendants claim that Cook's statement that Apple "did not consider in any way, shape or form what [the program] would do to upgrade rates" was correct because Cook was describing the decision-making process that *led up* to the battery replacement program, not its after-effects.  Defendants similarly claim that Cook's statement that "you don't know the replacement rate for the products you're currently selling" was true because the battery replacement program concerned *past* products (i.e., not the iPhones Apple was currently selling).  Finally, defendants claim that Cook's statement that "we have never done an analysis internally about how many people decided to get a lower-priced battery than buy another phone" was correct because tracking and analysis are not the same.

Defendants' arguments are largely unpersuasive.  Even if the statements are technically correct, they are misleading when read in context because they create an "impression of a state of affairs that differs in a material way from the one that actually exists."  *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund*, 845 F.3d at 1275.  Specifically, the first statement came in response to a question about earnings *guidance* as it relates to the battery replacement program effect on demand.  (CCAC ¶ 300.)  Similarly, the second and third statements arose in the context of questions regarding the battery replacement program's impact on current demand and sales.  (*Id.* ¶ 301, 353.)  In the context of these questions, the answers create a misleading impression that defendants possessed no information to suggest that the battery replacement program would hurt demand.  Accordingly, the Court does not dismiss on this ground.

***

In summary, and for the reasons stated above, the Court finds that the following material misrepresentations or omissions are sufficiently pled to be false or misleading:

- Statements about strong market share and iPhone sales in China.  (*Id.* ¶¶ 299, 328, 329, 330, 332, 336, 385, 386.)

- Statements about tracking and considering the effect of the battery replacement program on demand.  (*Id.* ¶¶ 300, 301, 345, 353.)

- Cook's letter to Congress.  (*Id.* ¶ 317.)

The Court finds the remaining statements inactionable for the reasons stated above.

### C. Scienter

#### 1. *Legal Standard*

Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976).  To plead scienter, the complaint must "state with particularity facts giving rise to *a strong inference* that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2)(A) (emphasis supplied).  "The inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'"  *Tellabs*, 551 U.S. at 324 (citation omitted).  Rather, a complaint survives if, "[w]hen the allegations are accepted as true and taken collectively . . . a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference."  *Id.* at 326.  In determining whether this requirement is met, the Court must view the allegations as a whole and determine whether plaintiffs have raised an inference of scienter that is "cogent and compelling, thus strong in light of other explanations," to satisfy the PSLRA standard.  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (citing *Tellabs*, 551 U.S. at 326).  When assessing allegations holistically, the Court views circumstances that are probative of scienter with a practical and common-sense perspective.  *Id.*

Nonetheless, the PSLRA demands "particular allegations which strongly imply defendants' *contemporaneous* knowledge that the statement was false when made."  *Berson*, 527 F.3d at 989 (emphasis in original).  A strong inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent."  *Tellabs*, 551 U.S. at 314.  The inference must be that "the defendant[ ] made false or misleading statements either *intentionally* or with *deliberate recklessness*."  *Zucco*

32

1   *P'ners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (emphasis supplied) (internal

2   quotation marks omitted).  Deliberate recklessness means that the reckless conduct "reflects some

3   degree of intentional or conscious misconduct."  *S. Ferry LP*, 542 F.3d at 782.  "[A]n actor is

4   [deliberately] reckless if he had reasonable grounds to believe material facts existed that were

5   misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could

6   have done so without extraordinary effort."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th

7   Cir. 2010) (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000)).

8       "[F]acts showing mere recklessness or a motive to commit fraud and opportunity to do so

9   [may] provide some reasonable inference of intent," but are not independently sufficient.  *In re

10  Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999), *abrogated on other grounds

11  by S. Ferry LP*, 542 F.3d at 784.  It may also be reasonable to conclude that high-ranking

12  corporate officers have knowledge of the critical core operation of their companies.  *S. Ferry LP*,

13  542 F.3d at 785–86.

14              2.       *Analysis*

15      Because Plaintiff advances four different theories of falsehood, the CCAC must allege

16  facts showing scienter under each theory.  Specifically, plaintiff must allege facts to show that

17  defendants acted with scienter when promoting high iPhone upgrade rates to investors without

18  disclosing the effects of throttling; describing strong market share and iPhone sales in China;

19  claiming that Apple was not considering the effect of the battery replacement program; and

20  representing to Congress that hardware updates would address battery shutdowns in newer phones.

21

22      Plaintiff seeks to establish scienter using three avenues: (1) evidence of insider trading, (2)

23  statements by confidential witnesses, and (3) the "core operations" theory.  The Ninth Circuit has

24  approved of a dual analysis—"first considering whether any individual allegation gives rise to

25  scienter and then assessing the allegations in combination"—to determine scienter.  *In re VeriFone

26  Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702-03 (9th Cir. 2012).  Accordingly, the Court first

27  considers each type of allegation by itself and then considers them in combination to obtain a

28  "holistic" view of scienter allegations for each theory.

United States District Court
Northern District of California

*a.     Alleged Insider Trading*

Plaintiff first claims that Cook and Maestri engaged in highly unusual and suspicious stock sales during the Class Period. "'Unusual' or 'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter." *Quality Sys.*, 865 F.3d at 1146 (quoting *Silicon Graphics*, 183 F.3d at 986). However, to be probative of scienter, the level of trading must be "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed information." *Zucco*, 552 F.3d at 1005 (quoting *Silicon Graphics*, 183 F.3d at 986)). Courts consider three factors in this regard: "(1) the amount and percentage of shares sold by insiders, (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.* (quoting *Silicon Graphics*, 183 F.3d at 986).

Plaintiff focuses primarily on the first and third factors to argue that defendants' trading was suspicious. First, plaintiff points out that the amounts sold by the individual defendants were objectively large—Cook sold $100 million worth of shares, while Maestri sold $30.6 million worth of shares. (CCAC ¶¶ 450-51.) These sales constituted a large percentage of defendants' total shares—Cook sold 30.3% of his overall shares, while Maestri sold 92.3% during the Class Period. (*Id.*) Second, the sales generated greater proceeds compared to the Control Period. Cook's proceeds increased by 24% during the Class Period, while Maestri's increased by 130%. (*Id.* ¶ 454.) Plaintiff thus claims that the sales were "unusual." Finally, plaintiff alleges that the timing was suspicious because the sales occurred before the market was fully aware of the risks associated with throttling, decreasing demand in China, and the effects of the battery replacement program. (*Id.* ¶ 456.)

Although defendants' sales were undoubtedly large, they appear to be consistent with Cook's and Maestri's historical trading practices. As alleged in the CCAC, Cook sold more shares during the Control Period than during the Class Period—742,454 shares compared to 533,783.[12] (*Id.* ¶ 448.) The proceeds from these sales increased by around $20 million, but the difference

---

[12] The magnitude of the sales was also consistent on a percentage basis. According to defendants, Cook sold 45.2% of his available holdings during the Control Period, compared to 30.3% allegedly sold in the Class Period. (RJN at 4.) Maestri sold 99.4% of his holdings during the Control Period, compared to 92.3% during the Class Period. (*Id.*)

could be explained by the higher price per share.  (*Id.*)  Maestri sold somewhat more shares during the Class Period—144,136 compared to 107,114 shares—and reaped more from the proceeds, which is marginally less consistent with historic trading practices.  The timing of the sales also does not suggest unusual or suspicious practices.  As alleged in the CCAC, Cook sold most of his shares in a two-day period in August 2017 and August 2018, shortly after Apple's release of quarterly results.  (*Id.* ¶¶ 448, 269, 349.)  Such timing is common—officers of publicly traded corporations frequently make stock transactions following positive earnings announcements.  *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002).  Plaintiff's only allegation regarding suspicious timing is that defendants made the sales while aware of the alleged risks, but plaintiff does not connect the timing to the manifestation or onset of any risk.  (*Id.* ¶ 456.)  Indeed, defendants' sales occurred far in time from the onset of the throttling practice or the alleged decline in Greater China iPhone demand.

Accordingly, plaintiff's sole evidence of unusual and suspicious trading lies in the magnitude of the transactions.  Because the size of the transactions appears to be consistent with historical practices, and the timing of the sales is not unusual, the Court finds that these transactions are not so "dramatically out of line" as to evidence scienter.  *See Zucco*, 552 F.3d at 1005; *see also Metzler*, 540 F.3d at 1067 (finding that sale of large percentage of holdings, without more, was not probative of scienter); *Osher v. JNI Corp.*, 308 F. Supp. 2d 1168, 1195 (S.D. Cal. 2004) (same).[13]

### b.    Confidential Witnesses

Plaintiff also relies on statements by confidential witnesses ("CWs")—former Apple employees and employees of Apple's competitors and suppliers—to establish that defendants were aware of declining iPhone sales and considered the effects of the battery replacement program.  (CCAC ¶¶ 206-267.)  A complaint relying on statements of confidential witnesses "must pass two

---

[13] Defendants also argue that the transactions were not suspicious because they were made pursuant to 10b5-1 trading plans.  However, the use of the 10b5-1 plan is an affirmative defense that does not rebut well-pled allegations of scienter at the pleading stage.  *See In re Questcor Sec. Litig.*, No. SA CV 12-01623 DMG (FMOx), 2013 WL 5486762, at *16 (C.D. Cal. Oct. 1, 2013); *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009).

United States District Court
Northern District of California

hurdles to satisfy the PSLRA pleading requirements." *Zucco*, 552 F.3d at 995. First, the complaint must describe the confidential witnesses with sufficient particularity to establish their reliability and personal knowledge. *Id*. Second, the statements reported by the confidential witnesses must themselves be probative of scienter. *Id*. Defendants challenge plaintiff's allegations on both grounds. First, defendants point out that none of the CWs knew or had any interactions with Cook or Maestri, so cannot plausibly opine on those defendants' knowledge. Second, defendants argue that the allegations related to "sales reports" and other corporate practices are too vague to establish scienter.

Personal knowledge of the defendants is not strictly necessary to establish scienter. *See Nursing Home Pension Fund*, 380 F.3d at 1231 (relying on statements by former employees and managers to find that defendants knew of sales data). However, "if a plaintiff is to rely on the existence of reports as a means of establishing knowledge, she must 'include adequate corroborating details,' such as the 'sources of her information with respect to the reports, how she learned of the reports, who drafted them, . . . which officers received them, and 'an adequate description of their contents.'" *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087-88 (9th Cir. 2002), *abrogated on other grounds as recognized by In re Arrowhead Pharma., Inc. Sec. Litig.*, 782 F. App'x 572 (9th Cir. 2019); *see also Police Ret. Sys. Of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (finding witness statements did not support scienter because they "do not detail the actual contents of the reports the executives purportedly referenced or had access to"). Allegations of "corporate management's general awareness of the day-to-day workings of the company's business do not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to fraud." [14] *Metzler*, 540 F.3d at 1068; *see also Zucco*, 552 F.3d at 1000 (finding allegations that senior management reviewed accounting numbers and held meetings to discuss the numbers insufficient for scienter).

---

[14] As explained in *Vantive*, "[t]he reason for requiring such details [is] that 'every sophisticated corporation uses some kind of internal reporting system reflecting earlier forecasts,'" so "allowing a plaintiff to go forward with a case based on general allegations of 'negative internal reports' would expose all those companies to securities litigation whenever their stock prices dropped." 283 F.3d at 1088.

1    Here, plaintiff relies on statements by CWs to show that Apple tracked iPhone sales and

2    battery replacement rates, including in China.  (CCAC ¶¶ 249-50, 251, 254, 245-46.)  Specifically:

3    • CW-1, who worked in at Apple's headquarters in Supply and Demand Management,
       claims to have prepared reports on Supply and Demand that went "straight to the top"
4      and that Supply and Demand leadership met with Cook every Friday to discuss a
5      weekly "snapshot" of the state of business.  (*Id.* ¶¶ 206, 259.)

6    • Several witnesses claim that battery replacement rates were tracked using a corporate
       tool.  (*Id.* ¶ 251, 254-55.)  CW-1 admits that access to the data was limited within the
7      company and none of the witnesses allege to have seen the data.  (*Id.*)

8
9    • CW-3, a senior manager in Apple's Singapore office, claims that Apple tracked
       "unbricking" of iPhones (turning them on for the first time) and that the resulting
10     report went to Apple's VP of Worldwide Sales and Operations.  (*Id.* ¶¶ 208, 216-17.)

11   • CW-2 claims that Apple tracked iPhone preorders and that the "war room" for new
       products included senior executives, such as Angela Ahrendts, but not Cook or
12     Maestri.  (*Id.* ¶ 260.)

13   • CW-4 reports that Apple tracked upgrade rates and various other data that would get
       "rolled up" into a weekly report that went to "managers, directors and VPs," but not
14     Cook or Maestri.  (*Id.* ¶¶ 262-64.)  CW-4 also claims that the sales data was maintained
15     in a SAP system and discussed with the retail finance team, which included Apple's
       VP of Finance, but not Cook or Maestri.  (*Id.* ¶¶ 265-66.)
16
17   • Several witnesses recount meetings and internal discussions about throttling and its
       effects we, but none allege that Cook or Maestri attended the meetings or participated
18     in the discussions.  (*Id.* ¶¶ 248-49, 252-53.)

19   • Additionally, several former employees in Apple's Asian offices recount "widespread
       negativity" and knowledge of declining sales in China, which were discussed in local
20     meetings.  (*Id.* ¶¶ 218-20, 228-29, 236.)

21
22   • CW-6 claims to have seen sales reports that came from Apple headquarters that show
       declining sales in Greater China.  (*Id.* ¶¶ 229, 232.)

23   • Employees of Apple's suppliers and competitors claim that they could see a drop in
24     Apple iPhone sales.  (*Id.* ¶¶ 235, 238.)

25   These allegations are plainly insufficient to establish scienter.  None of the CWs claim to

26   have conveyed any information or prepared any reports for defendants that detail the specific facts

27   that render defendants' statements allegedly false—the effects of throttling and battery

28   replacement on demand, declining sales and market share in China, or intent to continue throttling

new iPhones.  At most, these allegations show that defendants generally had access to sales and battery replacement data.  However, "corporate management's general awareness of the day-to-day workings of the company's business do[es] not establish scienter."  *Metzler*, 540 F.3d at 1068; *see also Silicon Graphics*, 183 F.3d at 988 (finding general allegations of "negative reports" insufficient); *Bao v. Solarcity Corp.*, No. 14-cv-01435-BLF, 2016 WL 4192177, at *11 (N.D. Cal. Aug. 9, 2016) ("[G]eneralized allegations of access to reports showing negative margins are insufficient to establish defendants' contemporaneous knowledge of negative sales margins.").  The allegations are therefore insufficient to establish that defendants possessed information that rendered their statements false or misleading.

Finally, the CW's statements do not support scienter through deliberate recklessness.  Plaintiff still fails to show that defendants "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts," even though they "could have done so without extraordinary effort."  *Howard*, 228 F.3d at 1064.  Plaintiff simply does not explain what those alleged "reasonable grounds" were.  Deliberate recklessness is not a substitute for knowledge; even if specific knowledge of falsity is not required, plaintiff must still plead facts to show that defendants knew *something* that ought to have prompted them to investigate.  Here, there are insufficient allegations to show that Cook or Maestri received information about iPhone throttling (much less the effect of throttling on upgrading), the effects of battery replacement program on demand, or declining iPhone sales and market share in China that would have alerted them that the challenged statements were likely to be false.  Accordingly, the CWs fail to demonstrate scienter.

### c.    Core Operations Theory

Under the core operations theory, a plaintiff may allege corporate officers' knowledge of the core operations of their companies in one of three ways.  *S. Ferry*, 542 F.3d at 785.  First, the allegations "when read together" may "raise an inference of scienter that is cogent and compelling."  *Id*.  Second, "such allegations may independently satisfy the PSLRA when they are particular and suggest defendants had actual access to the disputed information."  *Id*. at 786.  Third, even bare-bones and non-particularized allegations may satisfy scienter "where the nature

1    of the relevant fact is of such prominence that it would be absurd to suggest that management was

2    without knowledge of the matter." *Id.*; *see, e.g.*, *Berson*, 527 F.3d at 987-89 (finding "absurd" that

3    top management would not know about stop-work orders that halted tens of millions of dollars of

4    operation); *No. 84 Employer-Teamster Joint Council Pension Trst. Fund v. Am. West Hold. Corp.*,

5    320 F.3d 920, 943 n.21 (9th Cir. 2003) (finding evidence that Board members attended meetings

6    sufficient to show scienter where it would be "absurd" to suggest the Board did not know about

7    FAA investigations); *Mulligan*, 36 F. Supp. 3d at 970 (finding "absurd" that CEO and CFO would

8    not know about issues pervading manufacturing and quality control divisions—the "heart of a

9    company whose main business is manufacturing pharmaceuticals for public consumption").

10    Proof under the core operations theory "is not easy." *Police Ret. Sys.*, 759 F.3d at 1062.  A

11    complaint must produce either "specific admissions" by the executive of "detailed involvement in

12    the minutia of a company's operations, such as data monitoring," or else "witness accounts

13    demonstrating that executives had actual involvement in creating false reports." *Id.* (quoting *S.*

14    *Ferry LP*, 542 F.3d at 785).  Most recently, in *Police Retirement System of St. Louis*, the Ninth

15    Circuit suggested that even under this standard, where it is "absurd to suggest that management

16    was without knowledge of the matter," some evidence that the corporate officers received

17    information about the matter is required.  *See id.* at 1063 (reasoning that it is not "absurd" that

18    management lacked knowledge of matters described in reports because there are no allegations

19    that those reports were discussed).

20    Plaintiff adequately alleges that Apple's Greater China business was highly important to

21    the company.  (CCAC ¶¶ 460-62.)  Plaintiff also adequately alleges that demand for the iPhone is

22    also critically important to Apple's core operations.  (*See id.* ¶¶ 2-4.)  However, as discussed

23    above, there is simply no evidence that either Cook or Maestri received information about Apple's

24    throttling of old iPhones, the battery replacement program, or the program's effect on demand.

25    Indeed, it is plausible and not "absurd" that Apple's executives may not have known about

26    throttling or the effects of the battery replacement program—plaintiff's key theories of falsity.

27    Such information may well not have been "prominent" enough to render defendants' ignorance

28    implausible.  Thus, without specific allegations that information about throttling and the battery

39

United States District Court
Northern District of California

replacement program was communicated to defendants, plaintiff cannot establish scienter under those theories of falsity using the core operations doctrine. As for the China theory, plaintiff's argument is more plausible. However, it is undermined by the specificity of plaintiff's allegations. Plaintiff does not allege that overall revenue, or even iPhone specific revenue, was falling in China for most of the Class Period. On the contrary, plaintiff alleges that the revenue was "artificially inflated" by throttling, which led to a "rebound" in sales in late 2017. (*See id.* ¶¶ 91-92.) According to the CCAC, "it wasn't until the next upgrade cycle in Q1 2019 (ended in December 31, 2018) that Apple really felt the impact, in the form of drastically reduced iPhone revenues, especially in China," from its actions. (*Id.* ¶ 161.) Thus, even assuming that Cook and Maestri knew of Apple's business in China as a "core operation" of the Company, they may not have known of the *specific metrics* (market share and unit sales) that plaintiff alleges were decreasing during the Class Period. Accordingly, plaintiff cannot establish scienter under the core operations theory absent specific admissions or allegations that Cook and Maestri received information about decline in those metrics.

Nevertheless, the Court will consider the importance of the iPhone business and the China market to the Company as probative of scienter in the holistic analysis below.

### d. Is an Inference of Scienter at Least as Strong as any Other Inference?

The Court next considers whether the allegations viewed holistically and combined with additional evidence presented by the parties and Norfolk Pension Fund ("Norfolk") make an inference of scienter at least as compelling as any other inference.

#### i. November 1, 2018 Statements

Norfolk submits additional briefing to argue that defendants November 1, 2018 statements demonstrate scienter based on timing. Temporal proximity between an allegedly false statements and a disclosure of the truth may bolster an inference of scienter when combined with other facts. *Yourish v. Cal. Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999) (holding that temporal proximity

1    "without more" cannot satisfy pleading requirements but may bolster an inference of scienter if

2    combined with other facts); *see, e.g.*, *Berson*, 527 F.3d at 988 n.5 (finding that the size of the stop-

3    work orders, combined with a two-week time gap between misleading statements and admission

4    of truth, bolsters "the inference that defendants knew about the order when they made the

5    statement"); *Rihn v. Acadia Pharma. Inc.*, No. 15cv00575 BTM (DHB), 2016 WL 5076147, at *9

6    (S.D. Cal. Sept. 19, 2016) (finding that temporal proximity between statement that company was

7    "on track" to submit an NDA and an admission less than a month later that submission was

8    delayed supported scienter in light of the importance of the drug to the company).

9         Here, Norfolk argues that defendants made positive representations about iPhone sales and

10   business outlook in China mere days before taking inconsistent actions and two months before

11   admitting the truth. Specifically, on the Q4 FY18 analyst call—which took place on November 1,

12   2018—Cook represented that "[t]he XS and XS Max got off to a really great start."[15]  (CCAC ¶

13   385.) When asked about emerging market issues, which Apple cited as a reason for lowered

14   guidance, Cook stated that: "I would not put China in that category" because "[o]ur business in

15   China was very strong last quarter" and "iPhone, in particular, was very strong double-digit

16   growth there." (*Id*. ¶ 384.) Thus, analysts walked away from the call believing that demand

17   trends were "solid." (*Id*. ¶ 392.)

18        A mere four days after the call, the publication *Nikkei* reported that Apple told its biggest

19   manufacturers, Foxconn and Pagatron, to "halt plans for additional production lines" for the

20   iPhone XR. (*Id*. ¶ 400.) The publication *Barron's* similarly reported that Apple directed Foxconn

21   to reduce iPhone XR production lines by 20-25%. (*Id*. ¶ 403.) A week after that, Wells Fargo

22   reported that Apple told supplier Lumentum "to materially reduce" iPhone shipments. (*Id*. ¶ 407.)

23   Then, on January 2, 2019, Cook admitted to investors that Apple failed to meet guidance due to

24   declining demand. (*Id*. ¶ 410.) Cook wrote that "we did not foresee the magnitude of the

25   economic deceleration, particularly in Greater China," and further admitted that Apple "saw, as

26   the quarter went on" negative economic signs in China. (*Id*. ¶ 411.) Decline in Greater China

27

28        [15] Confidential witnesses and news reports state that iPhone XS and XS Max sales were
     weak and that preorders were lower than for previous iPhones. (CCAC ¶¶ 73, 227, 261, 397, 429.)

United States District Court
Northern District of California

1   accounted for most of the missed guidance and fall in iPhone demand.  (*Id.* ¶ 410.)

2        The close temporal proximity of defendants' optimistic and pessimistic statements

3   suggests scienter when the first statements were made.  Defendants challenge this argument

4   because they claim the statements do not show that *on November 1, 2018* (i.e., four days before

5   production lines were first cut), defendants had knowledge that demand for new iPhones would

6   fall or that Chinese economic conditions were deteriorating.  However, combined with plaintiff's

7   allegations that China represented a critically important market for Apple for which the Company

8   was carefully tracking sales—as well as the admission that defendants "saw" as "the quarter went

9   on" negative business indicators in China—plaintiff  adequately raises an inference of scienter.

10  Absent some natural disaster or other intervening reason, it is simply implausible that Cook would

11  not have known that iPhone demand in China was falling mere days before cutting production

12  lines.  *See Berson*, 527 F.3d at 987-89 (finding "absurd" that top management would not know

13  about millions-of-dollars-worth of stop-work orders).  It is also implausible that Cook was

14  unaware of emerging market issues in China despite admitting two months later that the Company

15  observed worrying signs throughout the quarter.  Further, defendants' decision to stop reporting

16  unit sales—announced on the same call despite negative investor reaction—plausibly suggests that

17  defendants expected unit sales to decline.[16]  Accordingly, the Court finds that plaintiff adequately

18  pled scienter for the statements in paragraphs 385 and 386 of the CCAC.

19                              ii.    Throttling Statements

20       By contrast, plaintiff fails to raise a strong inference of scienter for the "throttling"

21  statements—the statement that hardware updates in newer iPhones would obviate the need for

22  throttling.  (CCAC ¶¶ 273, 317.)  Plaintiff's strongest argument for scienter here is that defendants

23  possessed motive and opportunity to throttle old iPhones to promote upgrading.  However, the

24  Ninth Circuit has rejected the argument that motive and opportunity alone can establish scienter.

25  _____

26       [16] Defendants point out that unit sales reporting ended the *next* quarter—after the Class
    Period.  Nevertheless, defendants presumably made the decision based on information they had at
27  the time, even if they did not reap any benefits until later.  Defendants further argue that they had
    diligently reported earnings and lowered guidance throughout the Class Period, and that Cook
28  alerted investors to the earnings miss ahead of time.  These facts do not make an inference of
    scienter *at the time the statements were made* less plausible than any innocent inference.

United States District Court
Northern District of California

*See Silicon Graphics*, 183 F.3d at 974.  Plaintiff alleges no other facts to suggest scienter.  Even assuming that defendants carefully tracked upgrade rates—and that Cook received such information—plaintiff alleges no facts that defendants knew that throttling was driving those upgrade rates.  Moreover, plaintiff alleges no facts to show knowledge or intent for Apple to continue throttling newer phones at the time of Cook's letter to Congress.  Absent such allegations, plaintiff cannot establish scienter for those statements or raise an inference that is "at least as strong" as an innocent inference.  Accordingly, the Court finds the throttling statements at paragraph 317 inactionable for lack of scienter allegations.

iii.    China Statements

Plaintiff's allegations regarding the "China" statements—statements about strong market share and unit sales in China prior to the second half of 2018 (CCAC ¶¶ 299, 328, 329, 330, 332, 336)—also fail to raise a strong inference of scienter.  As noted above, plaintiff does not allege that iPhone revenues were declining during this time, claiming instead that they were "artificially" increasing due to throttling.  Cook's letter to investors confirms that economic deceleration did not begin to impact defendants' revenue in China until the second half of 2018.  Accordingly, the challenged statements—which were made in February and May of 2018—are only allegedly false because the specific metrics challenged by plaintiff (market share and unit sales) were alleged to be declining.  But plaintiff alleges no facts to show that defendants considered or received those metrics when making those statements.  Accordingly, an innocent explanation—that some data or analysis showed those metrics were increasing even if other data indicated otherwise—is more plausible than an inference of scienter.  The Court thus finds that plaintiff failed to raise a strong inference of scienter for the "China" statements.

iv.    Battery Replacement Program Statements

Finally, plaintiff's allegations of scienter for the "battery replacement" statements—Cook's statements that Apple was not considering the impact of the battery replacement program on demand, as well as the analyst report statement, "Apple says the battery replacement program is having little impact on shipments" (CCAC ¶¶ 300, 301, 345, 353)—fail to raise an inference of scienter.  Plaintiff claims that defendants were tracking battery replacement rates.  But tracking

43

battery replacements and analyzing their impact are different things.  Plaintiff alleges that low-level employees were aware that battery replacement was eating into demand, and the Company had "state of the union" meetings to discuss the topic (*id.* ¶¶ 252-53) but does not allege that any concrete information was generated or communicated to Cook.  Absent such information, Cook's statements about not considering the impact of battery replacement and implementing the program because "it was the right thing to do" appear to be dodging questions to which he may not have known the answer.  Accordingly, plaintiff fails to raise an inference of scienter for these statements that is at least as strong as any innocent inference.

As to the UBS report statement, plaintiff does not allege that Cook or Maestri made the statement to the analyst.  The Ninth Circuit requires plaintiff to allege scienter for individual speakers.  *Or. Pub. Emps. Ret. Fund v. Apollo Grp., Inc.*, 774 F.3d 598, 607 (9th Cir. 2014).  Although individual scienter may be inferred where "a company's public statements were so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication," this is not such a case.  *See Glazer Capital M'gment, LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008).  Accordingly, absent more concrete allegations that corporate officers or the individual defendants were involved in making the UBS report statement, plaintiff fails to raise an inference of scienter.

\*\*\*

For the reasons stated above, the Court finds that plaintiff fails to allege scienter for statements in paragraphs 299, 300, 301, 317, 328, 329, 330, 332, 336, 345, and 353, but finds scienter adequately alleged for statements in paragraphs 385 and 386.

### D.     Loss Causation

Defendants move to dismiss plaintiff's remaining challenged statement—that "[i]n terms of WeChat," the application's widespread use in China "makes the switching opportunity even greater" and "that's more the case than the risk" posed by the competition—for lack of loss causation.[17]  Plaintiff alleges that the statement is false or misleading because competition from

---

[17] Defendants also challenge the loss causation for the "throttling" and "battery

United States District Court
Northern District of California

1    WeChat was negatively, not positively, impacting demand.  (CCAC ¶ 280(c).)  Defendants do not

2    challenge any other legal element for this statement.

3         Loss causation typically requires a plaintiff to show "that the revelation of [the]

4    misrepresentation or omission was a substantial factor in causing a decline in the security's price,

5    thus creating an actual economic loss for the plaintiff."  *Nuveen Mun. High Income Opportunity*

6    *Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013) (citation omitted).  However,

7    a plaintiff may also plead a "materialization of the risk" theory by showing that "misstatements

8    and omissions concealed the price-volatility risk (or some other risk) that materialized and played

9    some part in diminishing the market value of a security."  *Id.* (citation omitted).  Said another way,

10   a plaintiff may allege that the concealed risk itself—not the party's misstatements and

11   omissions—caused the decline in the price of the security.  *Id.*  Any kind of proximate cause

12   satisfies this requirement.  *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-

13   54 (9th Cir. 2018); *see, e.g.*, *Berson*, 527 F.3d at 989-90 (finding loss causation where stock price

14   dropped after earnings miss, even though the market was unaware of the fraud).

15        Here, plaintiff alleges that competition from WeChat reduced the need for customers in

16   China to buy iPhones to benefit from iOS features.  (CCAC ¶ 102.)  Plaintiff also alleges that the

17   capability of accessing WeChat accounts from competitor phones, but not the iPhone, drove down

18   demand for the iPhone.  (*Id.* ¶ 222.)  However, there is no evidence that any of these risks were

19   concealed.  According to the CCAC, WeChat's competition with iOS features was widely reported

20   and predicted to cause consumers to "throw away their iPhones" as early as mid-2017.  (*Id.* ¶ 102.)

21   There are no allegations that any investor dismissed these concerns based on Cook's statement.

22   Further, plaintiff fails to allege that competition from WeChat led to any lowered guidance or

23   missed earnings, which appeared to stem primarily from macroeconomic issues (according to

24   Cook's letter).  Accordingly, plaintiff fails to allege loss causation for the WeChat statement.

25        //

26        //

27

28   _____
     replacement program" statements.  Because the Court dismisses plaintiff's claims for those
     statements on other grounds, it does not consider the issue here.

United States District Court
Northern District of California

## V.   COUNT II: SECTION 20(A) OF THE EXCHANGE ACT

Under Section 20(a), "a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates 'a primary violation of federal securities law' and that 'the defendant exercised actual power or control over the primary violator.'" *Zucco*, 552 F.3d at 990.  Defendants move to dismiss plaintiff's Section 20(a) claim based solely on the failure to state a predicate claim under Section 10(b).  In light of the analysis above, plaintiff's Section 20(a) claim against the individual defendants fails to the same extent that it fails to allege a predicate claim under Section 10(b).

## VI.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** defendants' motion to dismiss as to all challenged statements except those alleged in paragraphs 285 and 286, for which defendants' motion is **DENIED**.  Based on the procedural history of this case, and the findings in this Order, the Court intends to reconsider the motion for lead counsel as discussed at considerable length with counsel.  Plaintiff's counsel shall meet and confer with counsel for Norfolk for the orderly transition of leadership.  A revised consolidated complaint consistent with this Order shall be filed within twenty-one days.  Apple shall file an answer within 21 days thereafter.

This Order terminates Docket Number 91.

**IT IS SO ORDERED.**

Dated: June 2, 2020

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**