1
2
3
4
5
6
7
8
9
10
11

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE APPLE INC. SECURITIES LITIGATION** | CASE NO.  19-cv-02033-YGR |
| | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE REVISED CONSOLIDATED CLASS ACTION COMPLAINT** |
| | Re: Dkt. No. 118 |

Lead plaintiff Norfolk County Council as Administering Authority of the Norfolk Pension Fund ("Norfolk") brings this securities class action litigation alleging false and misleading statements and omissions between November 2, 2018 and January 2, 2019 (the "Class Period"), against defendants Apple Inc. ("Apple" or the "Company"), Timothy D. Cook (Chief Executive Officer, or "CEO," of Apple), and Luca Maestri (Chief Financial Officer, or "CFO," of Apple). Specifically, plaintiff raises two causes of action: (1) violation of Section 10(b) of the Securities Exchange Act ("Exchange Act") and Rule 10b-5 promulgated thereunder by all defendants, and (2) violation of Section 20(a) of the Exchange Act by the individual defendants.

Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Defendants argue that none of the challenged statements are false or misleading, and plaintiff fails to plead facts to establish a strong inference of scienter. Defendants further move to dismiss plaintiff's Section 20(a) claim for lack of a primary violation of Section 10(b), as well as failure to plead that Maestri exercised power or control over any alleged primary violator.

Having considered the papers submitted and the pleadings in this action, and for the reasons below, the Court hereby **GRANTS IN PART** and **DENIES IN PART** the motion to dismiss.

United States District Court
Northern District of California

# I.   BACKGROUND

## A.   Factual Allegations

Plaintiffs allege the following facts in the Revised Consolidated Class Action Complaint for Violation of the Federal Securities Laws.  (Dkt. No. 114 ("CCAC").)

Apple is a multinational technology company that sells, among other things, the well-known iPhone smartphone.  (*Id.* ¶ 5.)  Apple has a significant presence in China.  (*Id.* ¶ 8.)  China began experiencing slowing economic growth in 2018, which reportedly led consumers to reduce their consumption beginning in mid-2018.  (*Id.* ¶¶ 12-13.)  Compounding the problem, the Trump Administration imposed tariffs on Chinese goods in April, July, and September 2018, while threatening to impose more.  (*Id.* ¶ 11.)

In September 2018, Apple released two new expensive iPhones, the iPhone XS (priced up to $1349) and iPhone XS Max (priced up to $1449), as well as one slightly less expensive iPhone, the iPhone XR (priced up to $899).  (*Id.* ¶ 14.)  The iPhone launches were "staggered," meaning that the iPhone XSs launched on September 14 and 21 and the iPhone XR on October 26.  (*Id.*)  Analysts questioned whether these iPhones would sell well in the economic climate.  (*Id.* ¶ 16.)  Nevertheless, on November 1, Apple released its revenue guidance for 1Q19 at "a new all-time record" of $89 billion to $93 billion.  (*Id.* ¶ 17.)

Later that day, on November 1, Apple held a conference call with analysts and investors.  (*Id.* ¶ 18.)  After short statements, an analyst asked Cook about emerging markets:

> Tim, there has been some real deceleration in some of these emerging markets, partly driven by some concerns around some of the rules the administration is contemplating and partly driven by things more specific to China, for instance, like some of the regulations around gaming.  So can you talk about how you see the trajectory there for the business and what you think of the initiatives of some companies like Netflix and Fortnite trying to bypass the App Store around subscriptions?

(*Id.*; Dkt. No. 119-1 ("Shareholder/Analyst Call Tr.") at 11.[1])  Cook answered, in relevant part:

---

[1] For the reasons explained below, the Court finds it appropriate to take judicial notice of the transcript of the analyst call.  The Court quotes the question in full together with more of the answer for greater context.

> Starting with emerging markets. The emerging markets that we're seeing pressure in are markets like Turkey, India, Brazil, Russia, these are markets where currencies have weakened over the recent period. In some cases, that resulted in us raising prices, and those markets are not growing the way we would like to see. To give you a perspective in – at some detail, our business at India in Q4 was flat. Obviously, we would love to see that be a huge growth. Brazil was down somewhat compared to the previous year. And so I think – or at least the way that I see these is each one of the emerging markets has a bit of a different story. And I don't see it as some sort of issue that is common between those for the most part.
>
> In relation to China specifically, I would not put China in that category. Our business in China was very strong last quarter. We grew 16%, which we're very happy with. iPhone, in particular, was very strong double-digit growth there. Our other products category was also stronger, in fact, a bit stronger than even the company – overall company number.

(CCAC ¶ 56; Shareholder/Analyst Call Tr. at 11.)

Analysts also asked about the new iPhone line-up:

> With the staggered iPhone launch, were you able to discern any impact on the Xs and Xs Max from buyers potentially waiting for the XR? And what, if anything, can we take away from the December quarter guidance related to what you're seeing for early demand on the XR.

(CCAC ¶ 57; Shareholder/Analyst Call Tr. at 12.) Cook answered:

> The Xs and Xs Max got off to a really great start, and we've only been selling for a few weeks. The XR, we've only got out there for, I guess, 5 – 5 days or so at this point and so that it's – we have very, very little data there. Usually, there is some amount of wait until a product shows – another product shows up in look, but in – that – in looking at the data, on the sales data for Xs and Xs Max, there's no obvious evidence of that in the data as I see it.

(CCAC ¶ 57; Shareholder/Analyst Call Tr. at 12.)

Four days after the call, *Nikkei Asian Review* reported that Apple cancelled its "production boost" for the iPhone XR, which indicated a 20-25% reduction in expected sales. (CCAC ¶ 27.) Then, on November 12, Wells Fargo issued a report estimating that Apple had reduced iPhone production by "as much as . . . 30%." (*Id*. ¶ 29.) Finally, on December 4, *Bloomberg* published an article reporting that "in October, about a month after the iPhone XS went on sale and in the days around the launch of the iPhone XR," Apple moved marketing staff to sales, according to an anonymous source. (*Id*. ¶ 31.) *Bloomberg*'s source interpreted the action as a "fire drill" and a

"possible admission that the devices may have been selling below some expectations." (*Id.*)

On January 2, 2019, Cook sent a letter to investors announcing that Apple will miss its earnings guidance by up to $9 billion. (*Id.* ¶ 33.) The letter explained that "[w]hile we anticipated some challenges in key emerging markers, we did not foresee the magnitude of the economic declaration, particularly in Greater China." (*Id.* ¶ 35.) As the letter noted, "China's economy began to slow in the second half of 2018," and the economic environment in China "has been further impacted by rising trade tension with the United States." (*Id.*) This economic deceleration accounted for "most of our revenue shortfall" and "over 100 percent of our year-over-year worldwide revenue decline." (*Id.*) Moreover, "[l]ower than anticipated iPhone, primarily in Greater China, accounts for all of our revenue shortfall to out guidance and for much more than our entire year-over-year revenue decline." (*Id.*)

Cook confirmed the facts stated in the letter in a CNBC interview, where he explained:

> [A]s we look at what's going on in China – it's clear that the economy begins to slow there for the second half. And what I believe to be the case is the trade tensions between the United States and China put additional pressure on their economy.
>
> And so we saw, as the quarter went on, things like traffic in our retail stores, traffic in our channel partner stores, the reports of the smartphone industry contracting, particularly bad in November – I haven't seen the December number yet, but I would guess that would not be good either. And so that's what we've seen.

(*Id.* ¶ 36.) Apple's stock price declined from $157.92 to $142.19 per share as the result. (*Id.* ¶ 37.)

**B.    Procedural Background**

This case initially had a different lead plaintiff. (*See* Dkt. No. 72.) The first lead plaintiff filed a complaint alleging more far-ranging deception, stemming from iPhone throttling, declining demand in China, and the effects of a battery replacement program, and therefore a longer class period. (*See* Dkt. No. 98.) The Court dismissed the majority of those allegations because they were based on inactionable statements and plaintiffs could not show that defendants acted with scienter. (*See* Dkt. No. 110 ("MTD Order").) However, the Court allowed the statements made on the November 1, 2018 call to proceed based, in part, on Norfolk's supplemental brief, which the Court permitted while giving defendants opportunity to respond. (Dkt. No. 102.)

United States District Court
Northern District of California

## II.   LEGAL STANDARD

### A.   Federal Rules of Civil Procedure

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint.  *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199 (9th Cir. 2003).  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  That requirement is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inferences that the defendant is liable for the misconduct alleged."  *Id.*  In evaluating a motion to dismiss under Rule 12(b)(6), the Court takes all allegations of material fact are taken as true and construes them in light most favorable to the plaintiff.  *Johnson v. Lucent Techs., Inc.*, 653 F.3d 1000, 1010 (9th Cir. 2011).

Claims sounding in fraud must further meet the particularity requirements of Federal Rule of Civil Procedure 9(b).  Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Rule 9(b) "requires . . . an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations."  *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (internal quotation marks omitted).

### B.   Private Securities Litigation Reform Act[2]

Congress enacted the PSLRA "[a]s a check against abusive [securities fraud] litigation by private parties."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  To state a claim for private securities fraud, plaintiff must allege facts sufficient to show that:  (i) defendant made a material misrepresentation or omission of fact; (ii) with scienter; (iii) in connection with the purchase or sale of a security; (iv) on which plaintiff relied; (v) and which caused plaintiff ("loss causation"); (vi) economic loss.  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008); *see also Dura Pharmas., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (citing cases).

---

[2] Given the extensive discussion of background securities law in the first motion to dismiss Order, the Court provides an abbreviated discussion here.

United States District Court
Northern District of California

The PLSRA provides for heightened pleading requirements for the first and second elements: misleading statements or omissions and scienter. *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir. 2005). To plead misleading statements or omissions, plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . all facts on which the belief is formed." 15 U.S.C. § 78u-4(b)(1). To plead scienter, plaintiff must, "with respect to each act or omission," "state with particularity facts giving rise to a strong inference that defendant acted with required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

Generally, under the first element, plaintiff "must show that the defendant made a statement which was '*misleading* as to a *material* fact.'" *Matrixx Initiatives, Inc. v. Siricusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)) (emphases in original). A statement is misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (internal quotation marks omitted). Even if a statement is not false, it may be misleading if it omits material information. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir 2018). However, an omission is only actionable when disclosure is "necessary 'to make statements made, in light of the circumstances under which they were made, not misleading.'" *Id.* at 1009 (quoting *Matrixx*, 563 U.S. at 44). In either case, "[a] misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Id.* (citation omitted).

Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976). Contrary to ordinary pleading rules, in pleading scienter under the PSLRA, "[i]t does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind." *Tellabs*, 551 U.S. at 314. Rather, courts must "engage in comparative evaluation" by considering "not only inferences urged by the plaintiff" but also "competing inferences rationally drawn from the facts alleged." *Id.* Thus, an inference of scienter is only "strong" if it is "cogent and at least as compelling as any

opposing inference of non-fraudulent intent." *Id.* In making this evaluation, the court accepts all factual allegations in the complaint as true, considers the allegations holistically, and takes into account plausible opposing inferences. *Id*. at 322-23.

### III.   REQUEST FOR JUDICIAL NOTICE

Defendants request judicial notice of three exhibits cited in the complaint, including the transcript of the shareholder/analyst call, the *Nikkei Asian Review* article, and Cook's letter to investors.[3] (Dkt. No. 119 ("RJN").) Defendants claim that judicial notice is appropriate under the incorporation by reference doctrine. That doctrine permits a court to consider documents "as though they are part of the complaint" when the complaint cites those documents "extensively" or they "form the basis of the plaintiff's claim." *Khoja*, 899 F.3d at 1002. The doctrine "prevents plaintiffs from "selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id.* (citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998)).

Here, the three exhibits are cited extensively and form the basis of Plaintiff's claims. Norfolk argues that Cook made false and misleading statements on the November 1, 2018, shareholder/analyst call. (CCAC ¶¶ 54-57.) It is only appropriate to consider the full context of the challenged statements. The *Nikkei* article forms part of the key allegations to show scienter. (*Id.* ¶¶ 27, 68.) That too is properly considered holistically. Finally, the letter from Tim Cook represents the "admission" of fraud that caused stock price to decline, which represents a key part of Norfolk's loss causation allegations. (*Id.* ¶¶ 36, 83.) Accordingly, the Court considers each of these documents as if they were part of the complaint.

Apple further seeks judicial notice of Apple's Form 10-Q filed on January 30, 2019. "Public records, such as SEC filings, are properly the subject of judicial notice, and routinely considered in deciding a motion to dismiss in a security case." *In re Extreme Networks, Inc. v. S'holder Derivative Litig.*, 573 F. Supp. 2d 1228, 1231 n.2 (N.D. Cal. 2008) (citing cases). The Court therefore takes judicial notice of the filing and defendants' certifications.

---

[3] Plaintiff does not oppose defendants' request.

United States District Court
Northern District of California

## IV.   COUNT 1: SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10-B5

Plaintiffs claim that defendants misrepresented Apple's business outlook in China and demand for new iPhones on the November 1, 2018 shareholder/analyst call.  First, plaintiffs argue that Cook's statement that he "would not put China in th[e] category" of decelerating emerging markets was false or misleading, in light of Cook's later admissions that Apple's China business was experiencing pressure at the time.  Second, plaintiffs argue that Cook's statement that "[t]he [iPhone] X[S] and X[S] Max got off to a really great start" was false or misleading, given that Apple canceled iPhone production lines mere days after the statement was made.

Defendants move to dismiss Plaintiff's section 10(b) claims for failure to plead a material misrepresentation or omission and failure to plead scienter.  In light of the Court's previous order on these issues, defendants focus on providing greater factual context to show that the challenged statements were not misleading, as well as legal arguments that plaintiff's scienter allegations are insufficient as a matter of law.  The Court addresses each issue, by statement, below.

### A.   Material Misrepresentation or Omission

#### 1.   *Emerging Market Statements*

Defendants claim that Cook's statements about China were not false or misleading because context shows that Cook was referring to the previous quarter, not the present tense.  Defendants further claim, in the alternative, that even if the statement referred to the present, plaintiffs failed to allege that it was false or misleading when made.

Defendants fail to persuade on both counts.  The Court has carefully reviewed the context of the China-related statements and finds that they plausibly refer to the present.  First, the analyst question that spurred Cook's answer refers to Apple's present and future state of affairs:  the analyst noted that "there has been some real deceleration in some of these emerging markets" and asked Cook how he "see[s] the trajectory there for the business."  (Shareholder/Analyst Call Tr. at 11.)  Second, Cook began answering by referring to the present:  he stated that the "emerging markets that we're *seeing* pressure in are markets like Turkey, Brazil, Russia."  (*Id*. (emphasis supplied).)  Although Cook subsequently referred to the previous quarter, he apparently did so to provide an illustration for his present-tense description.  (*See id.* ("[t]o give you a perspective").)

United States District Court
Northern District of California

Thus, Cook's subsequent statement that "I would not put China in that category" plausibly refers to the category of "emerging markets [where] we're seeing pressure," not emerging markets where Apple saw pressure last quarter. (*Id.*) At this stage in the proceedings, the Court must draw inferences in favor of plaintiff. Applying that standard, the Court finds that plaintiff plausibly alleges that Cook represented that Apple was not experiencing pressure in China. Indeed, analysts allegedly interpreted the statement in just this way. (*See* CCAC ¶¶ 22-23, 86, 108.)

Furthermore, plaintiff adequately alleges that the statement was false when made. Cook admitted in January 2019 that Apple was seeing emerging market pressure on November 1, 2018. Specifically, in a CNBC interview on January 2, 2019, Cook allegedly noted that "it's clear that the economy begins to slow [in China] for the second half [of 2018]" and that Apple "saw, *as the quarter went on*, things like traffic in our retail stores, traffic on our channel partner stores, the reports of the smartphone industry contracting." (*Id.* ¶ 36 (emphasis supplied).) Defendants claim that this admission does not show that Apple was experiencing these issues on November 1, 2018. That argument is unconvincing. There are only three months in 1Q19: October, November, and December. Cook stated that the signs of deceleration were "particularly bad" in November and that he had not "seen the December numbers yet." (*Id.*) Drawing all inferences in favor of plaintiff, Apple saw troubling signs in October, the only month that is not November (which was only "particularly" bad) or December.[4]

Moreover, plaintiff alleges other facts that show that iPhone sales were declining at the time of the November 1, 2018 call, including that Apple cut production lines for the iPhone XR four days later and reduced production by 30% for all iPhones on November 12. (*Id.* ¶¶ 27, 29.)

---

[4] Defendants cite cases suggesting that post-class admission must be of the "I knew it all along" variety. *See Jui-Yang Hong v. Extreme Networks, Inc.*, No. 15-cv-04883-BLF, 2017 WL 1508991, at *21 (N.D. Cal. Apr. 27, 2017). The Court addresses those cases below, but notes at this stage that each case must be considered on its own facts. For example, in *Yourish v. California Amplifier*, 191 F.3d 983, 996-97 (9th Cir. 1999), the court found the alleged admission insufficient because context showed that the challenged statements referred to "follow-along" business from a large contract, while the "admission" referred to the contract itself. *Yourish* thus stands for the unremarkable proposition that an admission must suggest facts that actually render the challenged statements false—a standard satisfied here because both the challenged statements and the admission refer to pressure on Apple's business from deceleration in China on November 1. *See also In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994) (distinguishing an admission based on true facts from inconsistent statements caused by other factors).

Defendants claim that these allegations do not show that iPhone sales were weak on November 1. However, at this stage of the proceedings, the Court finds it plausible that Apple makes decisions with the ordinary speed of a large company, which suggest that it had information that led to its decisions more than a few days in advance of its actions.  Moreover, plaintiff cites reports that Apple moved marketing staff to sales as a "fire drill" in October 2018 "as a possible admission" that devices sold below expectations. (*Id*. ¶ 31.)  Read in conjunction with defendants' later statement that "[l]ower than anticipated iPhone revenue" occurred "primarily in Greater China," plaintiff adequately alleges pressure on Apple's iPhone business in China on November 1, 2018.[5]

Accordingly, plaintiff adequately pleads that the China-related statements were materially false or misleading when made.

2.   *iPhone Demand Statements*

Defendants next claim that Cook's statement that "[t]he X[S] and X[S] Max got off to a really great start" was not misleading because they are accurate—the two iPhones really did sell well initially.  By contrast, plaintiff's allegations regarding production lines that were cut four days after the call relate to the iPhone XR, for which Cook said that he had "very, very little data."

As an initial matter, the Court notes that defendants did not raise this argument in the first motion to dismiss.  There, they argued that the statement was puffery.  The Court agreed that the statement was puffery, but found that it was nevertheless misleading because plaintiff adequately alleged that Cook knew that the phones were selling poorly.  *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) ("[E]ven 'general statements of optimism, when taken in context, may form a basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly."); *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (finding assurance that "everything is going fine" with FDA approval misleading where company knew that FDA approval would not come).

---

[5] Defendants argue that plaintiff's allegations fail to plead falsity because they do not exclude other possibilities, such as that the cancelled production boost reflects lower demand in other geographic markets or a shift in the expected product mix.  The Court is aware of no law that requires plaintiff to exclude alternative explanations at the pleading stage.  Plaintiff's allegations are plausible and particularized, which is all that is required.

United States District Court
Northern District of California

Having examined the context of the statement in detail, and as explained more specifically below, the Court finds that plaintiffs have not sufficiently alleged that it was false or misleading.[6] In sum, the iPhone XS and XS Max allegedly launched in September 2018—meaning, 4Q18 rather than 1Q19.  (CCAC ¶ 14.)  While plaintiff alleges facts that suggest the iPhones sold poorly in October and November, (*id.* ¶¶ 27-31), the complaint contains no allegations that the iPhones XS and XS Max did not launch successfully in September.  On the contrary, during the November 1, 2018 analyst/shareholder call, defendants reported "a new September quarter record, fueled by . . . the very successful launch of iPhone X[S] and iPhone X[S] Max."  (Shareholder/Analyst Call Tr. at 5; *see also id.* at 8 ("iPhone ASP [increased], driven by strong performance of iPhone X, 8 and 8 Plus, as well as the successful launch of iPhone X[S] and X[S] Max in the September quarter this year.").)  Cook's subsequent statement that the "sales data for X[S] and X[S] Max" does not suggest that XR preorders were detracting from XS and XS Max sales refers to 1Q19, but is not inconsistent with XS and XS Max sales declining for other reasons.  (*See id.* at 13.)  And Cook's statement that he has "very, very little data" regarding the iPhone XR launch appears to be accurate.  In short, these are the type of vague, hedging, hyper-specific statements that are not likely to give investors an impression of a state of affairs one way or the other.[7]

Accordingly, the Court finds that plaintiff fails to allege that the iPhone demand statements were false or misleading because they are puffery and do not address the *specific* areas that defendants allegedly knew to be doing poorly.

---

[6] Plaintiff argues that defendants' motion should be governed by the standards for reconsideration, since the facts here are a subset of those previously alleged.  In general, the Court would agree.  However, given the page limitations in the first round, and the change in counsel with a new focus in the amended complaint, the Court finds the issue appropriate for analysis. This approach has Ninth Circuit support.  *See Askins v. U.S. Dept. of Homeland Sec.*, 899 F.3d 1035, 1043 (9th Cir. 2018) (suggesting that "permitting the filing of an amended complaint requires a new determination").

[7] In the first motion to dismiss, the Court found that plaintiff alleged through confidential witnesses and news reports that "iPhone XS and XS Max sales were weak and that preorders were lower than for previous iPhones."  (MTD Order at 41 n.15.)  Plaintiff has since removed those allegations from the complaint.  Plaintiff's sole remaining allegation comes from an analyst report predicting lower sales for the iPhone XS and XS Max "over a two-month period," which is not inconsistent with a successful "start."  (CCAC ¶ 16.)

United States District Court
Northern District of California

**B.    Scienter**

In the Ninth Circuit, scienter covers not only "'intent to deceive, manipulate, or defraud,' but also 'deliberate recklessness.'"  *Quality Systems*, 865 F.3d at 1144 (quoting *Schueneman v. Arena Pharmas.*, 840 F.3d 698, 705 (9th Cir. 2016)).  Deliberate recklessness requires "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (quoting *in re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 976 (9th Cir. 1999)).  "[A]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000)).  Deliberate recklessness is a form of intentional or knowing misconduct.  *Silicon Graphics*, 183 F.3d at 977.

In the first motion to dismiss order, the Court found that plaintiff adequately pled scienter based on the combination of the core operations doctrine (China presented an important market for Apple), post-class admissions that defendants "saw" worrying signs in China during the quarter, and the close temporal proximity between the challenged statements and actions inconsistent with those statements, including cutting production lines and admitting a $9 billion shortfall two months later.  (*See* MTD Order at 42.)  Defendants challenge each of these factors and further argue that plaintiff's theory of fraud "does not make sense," relying on the recent decision in *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020).  As with the first order, the Court first addresses each factor individually and then considers the allegations holistically.  *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702-03 (9th Cir. 2012).

1.    *Core Operations Doctrine*

The core operations doctrine permits a court to "infer 'that facts critical to a business's core operations or an important transaction are known to a company's key officers.'"  *Webb v. Solarcity Corp.*, 884 F.3d 844, 854 (9th Cir. 2018) (quoting *S. Ferry LP, No. 2 v. Killinger*, 542

United States District Court
Northern District of California

1   F.3d 776, 783 (9th Cir. 2008)).  Scienter through the core operations doctrine may be alleged in

2   several ways, including "'in any form,' as part of a holistic analysis" or "'in a more bare form,

3   without accompanying particularized allegations, in rare circumstances where the nature of the

4   relevant fact is of such prominence that it would be absurd to suggest that management was

5   without knowledge of the matter.'"  *Id.* (quoting *S. Ferry*, 542 F.3d at 785-86).  For example, in

6   *Berson v. Applied Signal Technology, Inc.*, the court found scienter sufficiently pled where "it's

7   hard to believe that [defendants] would not have known about stop-work orders that allegedly

8   halted tens of millions of dollars of the company's work."  527 F.3d 982, 988 (9th Cir. 2008).

9   Similarly, in *Siracusano v. Matrixx Initiatives, Inc.*, the court found allegations of scienter

10  sufficient because "the inference that high-level executives . . . would know that the company was

11  being sued in a product liability action is sufficiently strong."  585 F.3d 1167 (9th Cir. 2009).

12      Here, plaintiff makes no particularized allegations that information about Apple's China

13  business was communicated to Cook before he made the challenged statements on November 1,

14  2018.[8]  Nevertheless, plaintiff makes multiple allegations that makes an inference of scienter for

15  those statements more likely.  First, plaintiff alleges that Greater China is Apple's third-latest

16  market, its highest growth market, and accounts for nearly 20% of Apple's revenue.  (CCAC ¶¶ 8-

17  10.)  Plaintiff also alleges that Cook frequently travels to China to track business there, an

18  allegation consistent with Cook's own statements to that effect.  (*Id.* ¶ 50 n.9; Shareholder/Analyst

19  Call Tr. at 14 (Cook confirming that he travelled to China a few weeks before the November 1

20  call).)  Plaintiff thus adequately alleges that Apple's China business was a "core operation" of the

21  Company to which Cook paid close attention.

22      Second, plaintiff alleges that China began experiencing economic decline and trade

23  tensions with the United States beginning in summer 2018.  (CCAC ¶¶ 11-13, 35.)  These issues

24  _____

25      [8] The Ninth Circuit requires allegations of scienter "with respect to each of the individual
    defendants," although it has left the door open to "collective scienter" where "a company's public
26  statements [are] so important and so dramatically false that they would create a strong inference
    that at least *some* corporate officials knew of the falsity upon publication."  *Or. Pub. Empls. Ret.*
27  *Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607-08 (9th Cir. 2014); *Glazer Capital Mgmt., LP v.*
    *Magistri*, 549 F.3d 736, 743-44 (9th Cir. 2008); *see also Makor Issues & Rights, Ltd. v. Tellabs*
28  *Inc.*, 513 F.3d 702, 710 (7th Cir. 2008) (giving example where "General Motors announced that it
    had sold one million SUVs in 2006, and the actual number was zero").

United States District Court
Northern District of California

1   are alleged to have been widely reported by the media, which raises a strong inference that Cook

2   knew about them.  (*See id.*)  Indeed, it strains credulity that Cook would not have known about the

3   trade tensions and their potential impact on Apple's business, particularly where Cook opined on

4   those tensions on the November 1 call.  (*See* Shareholder/Analyst Call Tr. at 14.)  Finally, plaintiff

5   adequately alleges that the iPhone presents a "core operation" of Apple's business, as the

6   Company's most important product that accounts for more than 60% of Apple's sales.  (CCAC ¶

7   6.)

8           None of these allegations, by themselves, raise a strong inference that Cook knew that

9   Apple experienced pressure in China in October 2018.  However, they raise a strong inference that

10  Cook knew about the *risk* of such pressure from economic deceleration and trade tensions in

11  China when he made the challenged statements.  For the reasons explained below, that inference

12  as part of the holistic analysis raises a cogent and compelling inference that Cook did not act

13  innocently or with mere negligence.

14                          2.      *Admission*

15          In the first motion to dismiss order, the Court found that Cook's post-class admission that

16  Apple "saw, as the quarter went on, things like traffic in our retail stores, traffic in our channel

17  partner stores, the reports of the smartphone industry contracting" bolsters the inference that

18  defendants knew of "pressure" in the China market on November 1, 2018.  Defendants challenge

19  this conclusion because the admission does not identify the starting point for the troubling signs

20  and does not suggest that defendants "knew . . . all along" that sales would decline.

21          As to the first issue, the Court has already explained that the statement plausibly suggests

22  that defendants saw troubling sings in October.  Again, the inferences here are not hard.  There are

23  three months in the quarter:  as relevant, October, November, and December.  Cook stated that he

24  saw signs that were "particularly bad" in November.  That plausibly suggests that defendants saw

25  troubling signs some other month as well.  Cook also stated that he had not seen the December

26  numbers.  By process of elimination, that suggests defendants saw troubling signs in October.  By

27  contrast, the competing inference that the *entirety* of the *$9 billion* shortfall occurred in November

28  and December is not itself consistent with Cook's post-class description of a gradual decline.

As to the second issue, an after-the-fact statement must "contradict[] the substance of an earlier statement and essentially state[] 'I knew it all along'" to constitute an admission. *Lopes v. Fitbit, Inc.*, No. 18-cv-06665-JST, 2020 WL 1465932, at *11 (N.D. Cal. Mar. 23, 2020). In other words, it does not suffice that defendants made an optimistic statement and then a pessimistic statement some time later. *Yourish*, 191 F.3d at 996. That is because the inconsistent statements could be caused by intervening factors, such as a shift in consumer demand, or by changes in internal evaluation such as different accounting practices. *GlenFed*, 42 F.3d at 1548-49. Here, for example, defendants may have simply failed to anticipate the extent of economic deceleration in China, despite making good faith projections in light of the available facts. *See Browning v. Amyris, Inc.*, No. 13-cv-02209-WHO, 2014 WL 1285175, at *20 (N.D. Cal. Mar. 24, 2014) (finding statement that company did not anticipate a difficulty was not an admission).

The statement here satisfies that standard and constitutes an "I knew it all along" type of admission. Cook stated that Apple "saw"—using the past tense that suggests contemporaneous knowledge—troubling signs in China "as the quarter went on." For the reasons explained above, that plausibly suggests that Apple saw negative signs in China in October. The statement is inconsistent with economic deceleration caused by unexpected intervening factors because that would presumably be described as seeing troubling signs "beginning in November" or would use present-tense verbs to suggest hindsight analysis. Accordingly, although the statement is not as precise as many statements found to be admissions, it has the same thrust because it suggests that Apple had information suggesting economic pressure in China on November 1, 2018, contrary to Cook's challenged statement. *See Purple Mountain Tr. v. Wells Fargo & Co.*, 432 F. Supp. 3d 1096, 1104-05 (N.D. Cal. 2020) (finding admission where defendant admitted that an issue was elevated to him in September but stated that he "was not aware of any issues" in November).

Thus, Cook's admission raises a strong inference that Apple had data regarding "troubling signs" in China that suggests pressure on Apple's business on November 1, 2018. That said, the Court does not conclude that Cook himself had such information because the complaint lacks particularized allegations that the information was communicated to him.

### 3. *Timing*

In the first motion to dismiss order, the Court found that the close temporal proximity between Cook's statements and actions inconsistent with those statements, such as production line cuts, bolster an inference of scienter.  Apple argues that the temporal proximity cannot establish scienter by itself and further challenges the allegations as uncorroborated.

With regard to timing, the law is clear that close temporal proximity between an allegedly fraudulent statement or omission and a later disclosure may bolster an inference of scienter, even if it cannot independently establish such an inference.  *See Yourish*, 191 F.3d at 997; *Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001).  That is because temporal proximity makes more plausible that intervening events did not cause the inconsistent statements.  *Fecht v. Price Co.*, 70 F.3d 1078, 1083-84 (9th Cir. 1995).  In other words, close timing between misleading statements and disclosure of inconsistent facts suggests that (1) the facts existed at the time the challenged statements were made, and (2) the facts were not caused by intervening factors, such as a shift in consumer demand, that only became evident after the challenged statements were made.  *See id.*; *GlenFed*, 42 F.3d at 1548-49.  For example, if Apple announced that it would sell a million iPhones, and then immediately cut production to zero for lack of demand, that would suggest scienter because no change in the market or new information could realistically justify the changed evaluation.  Because temporal proximity cannot eliminate these alternative possibilities, it cannot establish scienter or falsity by itself.  *See Yourish*, 191 F.3d at 997.

Here, plaintiff makes two allegations based on inconsistent facts disclosed shortly after the November 1 call.  First, plaintiff alleges that Apple cut production lines for the iPhone XR four days after Cook made the optimistic statements.  (CCAC ¶ 27.)  Plaintiff also alleges that Apple cut production lines by 30% on November 12.  (*Id.* ¶ 29.)  As explained above, the Court finds this allegation to raise a strong inference that defendants had information about lower iPhone demand before the decisions were made, including on November 1.  Indeed, the competing inference that defendants decided to cut production lines spontaneously, based on only a few days' worth of data, is itself implausible.  Plaintiff therefore adequately alleges that defendants possessed data

showing a relatively stable trend of low iPhone demand on November 1.[9]

Second, plaintiff alleges that Apple announced that it will miss its earnings guidance two months after setting that guidance.  (*Id.* ¶ 86.)  Apple lowered its guidance by $9 billion.  (*Id.* ¶ 34.)  Even for a company of Apple's revenues, the amount is substantial and represented almost 10% of its guidance.  (*Id.* ¶¶ 82, 87.)  These allegations raise an inference of scienter for several reasons.  As an initial matter, it is easier to lose $9 billion in three months than in two months.  A competing innocent inference here would require the Court to assume that everything was going well, until Apple suddenly saw a sharp $9 billion decline in November and December.  But defendants do not allege any intervening events, such as a natural disaster, that would justify such a sudden and extreme change of fortune.  On the contrary, Cook later explained that China's economy began to slow in the second half of 2018, which suggests a gradual trend over the entire quarter, inconsistent with defendants' competing inference of a sharp mid-quarter decline.

Furthermore, the magnitude and timing of the decline bolsters the inference that defendants knew that his statements were misleading.  Even if the vast majority of the $9 billion shortfall occurred in November and December, a one percent shortfall in October would still represent millions of dollars.  With the magnitude of the decline that large, defendants plausibly had data and information to suggest the decline was taking place.  *See Berson*, 527 F.3d at 988 n.5 (finding implausible that defendants would not know "about stop-work orders that allegedly halted tens of millions of dollars of the company's work").  In light of Apple's later representation that "most" of the revenue shortfall came from Greater China, these also allegations raise an inference that defendants knew of "pressure" in the China market on November 1, 2018.

Defendants argue that plaintiff cannot rely on these allegations because they stem from news reports that relied on anonymous sources.  Defendants claim that the particularity standards governing confidential witnesses apply to these allegations.  *See Zucco*, 552 F.3d at 995 (requiring

---

[9] In light of the admission that the lost iPhone sales came "primarily" from Greater China, the allegations of weak iPhone demand also suggest signs of weakness in China.  Moreover, Apple executive Greg Joswiak allegedly told reporters that "the iPhone XR has been the company's best seller since it went on sale at the end of October," which suggests that the other iPhones were not experiencing stronger demand.  (CCAC ¶ 78.)

United States District Court
Northern District of California

particularized descriptions of confidential witnesses to establish their personal knowledge of alleged facts); *see also In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1172 (C.D. Cal. 2007) (discounting allegations in a newspaper article absent such corroboration).  The Court declines to adopt that standard here.  The purpose of describing confidential witnesses with particularity is to prevent plaintiff from "set[ting] forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate her claim."  *Silicon Graphics*, 183 F.3d at 985.  When other types of information corroborate the witness statements, such detailed descriptions are not necessary.  *See Zucco*, 552 F.3d at 995 (allowing "other factual information, such as documentary evidence" to substitute confidential witness descriptions); *see also In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) (crediting newspapers articles that provide detailed factual allegations).  Here, plaintiff's allegations are based on detailed reports that provide specific numbers based, in part, on formal announcements by Apple's suppliers.  (*See* CCAC ¶¶ 98, 103, 31.)  These allegations satisfy the particularity standards of the PSLRA and Rule 9.

Thus, plaintiff's timing allegations raise a strong inference that defendants had information of declining iPhone demand—and, in light of later admissions, declining demand in China—on November 1, 2018.  To be clear, the Court does not necessarily conclude that Cook knew of that information (though it appears plausible that he did).  Rather, the Court finds that plaintiff plausibly alleges that Apple possessed the information and that this inference is at least as strong as the competing inferences that demand declined later in the quarter or that Apple did not know of the decline on November 1.

### 4.    *Holistic Analysis*

For the reasons explained above, plaintiff alleges sufficient facts to raise the strong inferences that on November 1, 2018:  (1) Cook knew that economic deceleration and trade tensions in China posed a significant risk to Apple's business, (2) Apple possessed data that such risks were materializing in the form of "troubling signs" and weak iPhone demand, and (3) Cook nevertheless represented to investors that Apple was not experiencing pressure in China.  These allegations plausibly state deliberate recklessness because they show that Cook had reasonable

United States District Court
Northern District of California

1   grounds to believe material facts existed (i.e., that Apple may be experiencing pressure in China)

2   that were misstated or omitted (Cook said that it was not) but failed to obtain and disclose such

3   facts although he could have done so without extraordinary effort (Apple possessed data that

4   showed troubling signs and weak iPhone demand in China). *Oracle*, 627 F.3d at 390. They also

5   suggest an "extreme departure from the standards of ordinary care" because the China market and

6   Apple's iPhone business represented "core operations" for the Company that posed significant risk

7   to earnings.[10] *Zucco*, 552 F.3d at 991. Accordingly, the Court examines competing inferences to

8   determine if scienter, in addition to being plausible and cogent, is at least as compelling as

9   alternative inferences. *See Tellabs*, 551 U.S. at 314.

10        Defendants argue that plaintiff's theory of fraud "does not make sense" because defendants

11   did not profit from the alleged fraud but, on the contrary, engaged in a $1 billion stock repurchase

12   at supposedly inflated prices. Defendants compare the current case to *Nguyen*, where the Ninth

13   Circuit rejected a theory of fraud that it found "does not make a whole lot of sense." 962 F.3d at

14   415. In *Nguyen*, a defendant represented to investors that it "remained on track" to obtain FDA

15   approval for a medical device, despite running into serious issues with approval in Europe. *Id*. at

16   410-12. Plaintiff claimed that defendant knew that the FDA would not approve the device based

17   on the same "intractable" issues that prevented approval in Europe, but misrepresented the state of

18   affairs. *Id*. at 415. The court found that the scienter allegation "does not resonate in common

19   experience" because "[i]t depends on the supposition that defendants would rather keep the stock

20   price high for a time and then face the inevitable fallout once [the] 'unsolvable' . . . problem was

21   revealed." *Id*. The court thus dismissed the allegations as implausible.

22        The Court notes at the outset that *Nguyen* presents an unusual case because both the

23   Supreme Court and the Ninth Circuit have found scienter on fairly similar allegations. For

24   example, in *Matrixx*, the Court found a strong inference of scienter where defendant failed to

25   disclose reports linking its drug product to loss of smell because plaintiff alleged that defendant

26   _____

27        [10] In distinguishing deliberate recklessness from "inexcusable negligence," the Court notes that defendants provided not merely optimistic but "all-time record" earnings guidance for 1Q19.

28   (CCAC ¶ 17.) Given the exceptional optimism, defendants had an added duty to ensure that facts on the ground supported their extraordinary claims.

was concerned about the reports and affirmatively misrepresented available studies.  563 U.S. at 48-49.  Similarly, in *Schueneman*, the Ninth Circuit found scienter adequately pled where a pharmaceutical company stated that its drug was likely to be approved, even though the FDA was strongly concerned about studies showing that the drug caused cancer.  840 F.3d at 707-08.  And in *Warshaw*, the court found securities fraud sufficiently pled where a company represented that FDA approval was "going fine," even though it knew that approval was unlikely.  74 F.3d at 959-60.  None of these cases involved an obvious motive for fraud.  On the contrary, these courts expressly held that allegations of motive are *not* required.[11]  *See Matrixx*, 563 U.S. at 48; *Schueneman*, 840 F.3d at 709 n.8; *accord Tellabs*, 551 U.S. at 325 (rejecting argument that lack of pecuniary motive is dispositive for scienter).

In light of these considerations, the Court does not interpret *Nguyen* to require a specific theory of defendants' motives at the pleading stage.  Instead, the Court considers *Nguyen* on its facts:  defendants there apparently failed to plead sufficient facts to show the "intractable" issues would lead the FDA to withhold approval.  *See* 962 F.3d at 417-18.  The only allegations related to the "intractable" issues were one study, which was disclosed to investors and which used a different metric, and a report of a single patient who experienced the issue.  *Id*.  Without stronger allegations of contemporaneous facts contradicting defendants' statements, the "more plausible inference" was that "defendants made promising statements about the timing of FDA approval based on the initial results of the U.S. clinical trial, but then modulated their optimism when the results began to raise questions."  *Id*. at 419.  Thus, while lack of obvious motive presented a challenge, the deeper concern stemmed from lack of data of contemporaneous falsity.

The Court thus finds that plaintiff's lack of allegations regarding motive do not defeat an inference of scienter under a holistic analysis.  Moreover, while several courts in this District have found stock buy-backs to undermine scienter, the Court does not find that dispositive either.  *See*

---

[11] *Nguyen* distinguished *Matrixx* and *Schueneman* on the grounds that they involved a greater number of studies, particularized allegations that FDA approval depended on those studies, and statements that flatly contradicted available information.  969 F.3d at 418-19.  While these are valid factual distinctions, the Court respectfully fails to see how they make the theory of fraud "resonate in common experience," since the cases are based on the same "delaying the inevitable" conduct as *Nguyen*.

United States District Court
Northern District of California

*Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 933 (N.D. Cal. 2017); *In re Cisco Sys. Inc. Sec. Litig.*, No. C 11-1568 SBA, 2013 WL 1402788, at *8 (N.D. Cal. Mar. 29, 2013).  As the Third Circuit has noted, motives must generally accrue to the *personal* benefit of the individual defendants, rather than their benefit in a corporate capacity.  *See Inst. Inv. Grp. v. Avaya, Inc.*, 564 F.3d 242, 278-79 (3d Cir. 2009).  Individual defendants may often act against the interest of the company in perpetuating fraud.  With regards to stock buy-backs, cursory background knowledge suggests that they enrich shareholders, such as Cook and Maestri, in a way that is entirely consistent with scienter.  After all, it is not Cook himself who spent a billion dollars buying back shares at inflated prices, but the Company.[12]

Thus, the competing inferences require comparing an inference of deliberate recklessness, where Cook deliberately disregarded immense risks in representing that macroeconomic factors in China were not affecting Apple's business, despite having access to data suggesting otherwise, with knowledge that investors may be misled, against an inference of innocence or negligence, where the risks did not materialize until November and December, and defendants simply underestimated their eventual impact.  At this stage of the proceedings, both inferences are compelling.[13]  In particular, defendants' post-class statements and conduct throughout the class period are more consistent with a gradual decline that would have been known or obvious to defendants in October than with a sharp mid-quarter downturn after Cook made the challenged statements.  Accordingly, plaintiff has pled an inference of scienter that is "cogent" and "as compelling as any opposing inference," and therefore strong.  *Tellabs*, 551 U.S. at 323-24.

For these reasons, the Court dismisses plaintiff's claims based on the iPhones XS and XS Max statement, but denies defendants' motion as to the China statement.[14]

---

[12] The Court further finds *Makor* persuasive in terms of motive.  There, the Seventh Circuit found that defendant "may have thought that there was a chance that the situated regarding the [issues] would right itself" and thus misrepresented facts as a "gamble" that "bad news . . . will be overtaken by good news."  513 F.3d at 710.  Similarly, the defendants here may have hoped that the situation in China would improve, a hope that does not justify misleading investors.

[13] The Court reminds parties that the inference of scienter "need not be irrefutable, i.e., of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'"  *Tellabs*, 551 U.S. at 324.  The purpose of the PSLRA is "to curb frivolous, lawyer-driven litigation," not to exclude meritorious claims.  *Id.*

[14] The parties further debate the import of defendants' stock sales during the class period.

21

## V.     COUNT II: SECTION 20(A) OF THE EXCHANGE ACT

Defendants move to dismiss plaintiff's section 20(a) claim against Maestri, arguing that he lacked control over Cook when he made the challenged statements.  Section 20(a) holds a "control person" jointly liable with a "primary violator" where "'the defendant exercised actual power or control over the primary violator.'"  *Zucco*, 552 F.3d at 990; 15 U.S.C. § 78t(a).  At the pleading stage, plaintiff need not show actual participation or exercise of actual power, but "a defendant is entitled to a good faith defense if he can show no scienter and an effective lack of participation."  *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).  Control person liability is generally "an intensely factual question" that requires "scrutiny of defendant's participation in" and "power to control corporate actions."  *Id*.

The dispute comes down to the identity of the primary violator.  If the primary violator is Cook, then Maestri does not exercise plausible control over his statements.  *See Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1194 (C.D. Cal. 2007); *In re Energy Recovery Inc. Sec. Litig.*, No. 15-cv-00265-EMC, 2016 WL 324150, at *26 (N.D. Cal. Jan. 27, 2016).  If the primary violator is Apple, then plaintiff adequately alleges that Maestri acted as a control person because he spoke on the Company's behalf as CFO during earnings calls and thus exercised control over its statements.  *See SEC v. Todd*, 642 F.3d 1207, 1223 (9th Cir. 2011); *Howard*, 228 F.3d at 1066.  The complaint resolves the dispute:  it identifies Apple as the primary violator.  (CCAC ¶ 126); *cf. Todd*, 642 F.3d at 1223 ("The definition of 'person' under the Act encompasses a 'company.'").

Although defendants are correct that Maestri did not control *Cook's* statements, he plausibly controlled *Apple's* statements.  In particular, Maestri allegedly co-hosted the November 1, 2018 call where the challenged statements were made, and he could have corrected the record, disclosed omitted facts, and explained that Apple faced issues in China that may undermine its earnings.  Having failed to do so, Maestri may be liable as the executive charged with delivering the company's financial information who understood it to have made misleading statements.

---

The Court agrees with plaintiff that these sales are not properly at issue on this motion.  In any case, the Court analyzed Cook's and Maestri's stock sales in the previous order and found that they were not indicative either way, being large but not out of line with historical practices.

Accordingly, the Court does not dismiss the Section 20(a) claims.[15]

**I.     CONCLUSION**

For the foregoing reasons, the Court **GRANTS** defendants' motion to dismiss as to the iPhone XS and XS Max statement, but **DENIES** the motion as to the China statements and the Section 20(a) violation.  Apple shall answer the complaint within fourteen (14) days.  The Court further **SETS** a case management conference for December 14, at 2:00 p.m.  Instructions for a Zoom link will be docketed a few days before the hearing.

This Order terminates Docket Number 118.

**IT IS SO ORDERED.**

Dated: November 4, 2020

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California

---

[15] Defendants have the burden to prove that Maestri acted in good faith and did not induce the primary violation.  *See Hollinger v. Tital Capital Corp.*, 914 F.2d 1564, 1574 (9th Cir. 1990).  Accordingly, plaintiff has met its pleading burden by alleging that Maestri acted as a control person.  Defendants further move to dismiss for lack of a primary section 10(b) violation.  That part of the motion is denied for the reasons described in the previous section.