# EXHIBIT 23

Pages 1 - 36

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Donna M. Ryu, Magistrate Judge

IN RE:  LITHIUM ION BATTERIES  )
ANTITRUST LITIGATION,          )   **NO. M. 13-02420 YGR (DMR)**
_____ )

San Francisco, California
Tuesday, October 3, 2017

**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL
ELECTRONIC SOUND RECORDING**

**APPEARANCES**:

For Indirect Purchaser Plaintiffs:
                    Hagens Berman Sobol Shapiro LLP
                    715 Hearst Avenue, Suite 202
                    Berkeley, CA  94710
                    (510) 725-3000
            BY:  **BENJAMIN JACOB SIEGEL**

For Defendants Panasonic Corporation; Sanyo Electric Co., Inc.:
                    Winston & Strawn LLP
                    200 Park Avenue
                    New York, NY  10166
                    (212) 294-3519
                    (212) 294-4700 (fax)
            BY:  **CRISTINA M. FERNANDEZ**

For Non-Party Simplo Technology USA Logistic Company, Ltd.:
                    Squire Sanders US LLP
                    555 Flower Street, 31st Floor
                    Los Angeles, CA 90071-2300
                    (213) 624-2500
            BY:  **ADAM R. FOX**
                 **HELEN H. YANG**

Transcribed By Lydia Zinn, CSR #9223, FCRR, Official Reporter

```
 1  Tuesday - October 3, 2017                    11:04 a.m.

 2                    P R O C E E D I N G S

 3                        ---oOo---

 4          THE CLERK:  Calling 13-MD-2420 YGR, In re:  Lithium

 5  Antitrust Litigation.  Counsel, please approach your podium and

 6  identify yourself.

 7          MR. SIEGEL:  Good morning, Your Honor.

 8  Benjamin Siegel, of Hagens Berman Sobol Shapiro, for the

 9  Indirect Purchaser Plaintiffs.

10          THE COURT:  Good morning.

11          MR. FOX:  And good morning, Your Honor.  Adam Fox,

12  for Simplo, USA.

13          THE COURT:  Good morning.  Okay.  We're here on the

14  IPPs' motion to enforce a subpoena issued to Simplo, USA, to

15  obtain essentially transactional information from Simplo USA's

16  parent, Simplo Taiwan.

17      So I've reviewed the joint letter, as well as the

18  deposition from the 30(b)(6) deponent on the relationship

19  between the two entities.  As both sides noted, the law in the

20  Ninth Circuit is provided by the In re: Citric Acid case.  And

21  the question is:  Under what circumstances can one entity be

22  determined to have control of the documents for another entity,

23  for purposes of requiring the first entity to produce those

24  documents?

25      The Ninth Circuit follows the legal-right-to-demand test,
```

1    and specifically rejected the practical-ability test that's

2    followed by other Circuits, like the Second Circuit.

3        So I want to start with the control test.  I know the IPPs

4    also argued alter ego.  Let's start with control.  Mr. Siegel,

5    what evidence is there of legal right to demand, as opposed to

6    practical ability?

7        **MR. SIEGEL:**  Thank you, Your Honor.

8        And that is the question I thought you'd ask, so let's go

9    right there.  I think in this situation, what you have is you

10   show that -- it shows that all of Simplo USA's work, including

11   negotiating the sale of Simplo USA's batteries, shipping those

12   batteries, et cetera, is done by employees who have the right

13   to obtain the very data IPPs seek; meaning this is not a

14   situation where there's a separate corporation, and you're

15   really asking, you know:  Does a separate corporation have the

16   right to obtain the data of the parent?

17       Here what you have is all of the people who do

18   Simplo USA's work are at Simplo Taiwan, and have the right to

19   access and obtain that data.

20       **THE COURT:**  I'm not sure what the evidence shows.

21       I mean, you submitted some statements by the 30(b)(6)

22   deponent about how she has seen the Simplo Taiwan information.

23       The attorney who was present for another defendant -- I

24   think it was Ms. Fernandez -- had some questions, and elicited

25   a lot of testimony about how Simplo USA does not have the

1    right -- a legal right or contractual right -- to demand the

2    information; how, if the USA's subsidiary wanted to get

3    information from Simplo Taiwan, then it had to seek

4    authorization.  It didn't have the automatic right to demand.

5    And that's really the test here.

6        So I get that there's some testimony saying that the -- or

7    the people who are employees of Taiwan who are also holding

8    officer positions for Simplo USA have seen the Simplo Taiwan

9    information -- the parent's sales data -- but that doesn't mean

10   they have the legal right to demand it.

11       So in reviewing the cases -- this is what I really want

12   you to get at, Mr. Siegel -- I thought the closest one to these

13   facts are really the *Micron* case, which is Judge Lloyd's case.

14   In that case, a foreign subsidiary -- sorry -- foreign parent

15   created a USA-based subsidiary, in order for it to be the sales

16   agent in the USA, which is a lot like what happened here.

17       And Judge Lloyd found that while there may be a practical

18   ability --

19       So, in other words, maybe in a different Circuit, the

20   subsidiary would have to produce the parent's sales data.

21       In this Circuit, under the legal-control test, there was

22   no evidence of a legal right to demand.  You know, certainly

23   people could access it, but you know, there was that kind of

24   closeness of the entities, and a practical ability to get the

25   information; but not a legal right to demand, which is a much

1 more rigorous standard.

2     So I understand *Micron* is not binding on this Court.  And

3 every case is different.

4         **MR. SIEGEL:**  Mm-hm.

5         **THE COURT:**  It's a factual inquiry.  But that seemed

6 pretty compelling to me.  How do you differ this case from that

7 one?

8         **MR. SIEGEL:**  So I think I could first talk about what

9 the facts are in this case, and what -- the law that I think

10 applies; and then also talk about *Micron*.

11     So first of all, I believe that it's -- a party can have

12 the legal right to obtain something, as proven by conduct.

13 There does not have to be an actual written document that says

14 that.  That is, for example, the essence of an implied-in-fact

15 contract, or legal right to do something.

16         **THE COURT:**  Give me a case that you're relying on,

17 because I didn't see any of this in your briefing --

18         **MR. SIEGEL:**  Okay.  So --

19         **THE COURT:**  -- nor was it really in the cases that

20 the parties cited.

21         **MR. SIEGEL:**  So let's look at *Choice-Intersil*, for

22 example, which I think is -- first of all, I think it's

23 important for one thing.  Defendants cite that case.  And they

24 say that's distinguishable, as long -- in addition to the

25 *LG Display* case, because though cases cited Southern District

1  of New~York law in the Second Circuit, which applies the

2  practical-ability test.

3      That's actually incorrect.  The *Choice-Intersil* case

4  actually relied on the *Camden Iron* case, which is from the

5  District of New Jersey.  And the District of New Jersey relied

6  on controlling Third Circuit law, which is the *Gerling* case.

7  Now, the *Gerling* case was cited by *Citric Acid*, as an example

8  of the appropriate application of the legal right to obtain,

9  the legal control test.  And I think that's very important,

10  because what you find in *Choice-Intersil*, also *Camden* --

11      And if you look at the *Camden* case and you key cite it,

12  then you'll see that that's also been cited favorably by other

13  cases in the Ninth Circuit.

14      What they said in *Choice-Intersil*, which is consistent

15  with *Camden* and *Gerling* -- and again, cited by the *Citric Acid*

16  case -- is that you had a situation there where we had a

17  company that was a wholly owned subsidiary of another.  The

18  subsidiary in that case would have marketed the parent's -- the

19  parent's product.  Here we have actual sales of the parent's

20  product.

21      They shared databases.  Again, that's the situation here.

22      And then it has a situation where, upon demand, the

23  subsidiary was able to obtain the documents.

24      Now, the situation here -- and again, I think this is also

25  the way this case is distinguishable from *Micron* and other

 1 | cases -- is that there is no separate company.  There is no

 2 | separate U.S. subsidiary company.

 3 |      So, for example, I asked the witness.  I said, *Who does*

 4 | *the negotiating?  Who determines?  Who -- who does the*

 5 | *negotiating with Dell, the only customer?*

 6 |      Simplo Taiwan's employees.

 7 |      *Who determines if the price is something that's acceptable*

 8 | *to Simplo USA?*

 9 |      Simplo Taiwan's employees.

10 |      Who -- now, those employees -- I asked her.  I said, *Now,*

11 | *those employees -- do they have access to the databases at*

12 | *Simplo Taiwan?*

13 |      Yes.

14 |           **THE COURT:**  That's different:  Access, versus legal

15 | right to demand.

16 |      So I get that it may not need to be tied down in a

17 | contract.

18 |           **MR. SIEGEL:**  Mm-hm.

19 |           **THE COURT:**  But "legal right to demand" has meaning.

20 | It's not just access, which is practical ability.

21 |      And Judge Larson's Opinion in *Choice-Intersil* doesn't

22 | really talk about the Ninth Circuit standard, so I'm not sure

23 | what the basis for his ruling was with respect to whether there

24 | was legal control.

25 |      You're right.  He talked about *Camden*.  And he also talks

1  about *Cooper*, which is a Second Circuit case.  So I'm not sure

2  what his reasoning was there.

3        **MR. SIEGEL:**  So -- and I -- and I -- so this is where

4  I think we are.  I think we are -- the situation's -- the cases

5  that we cite, frankly, are not perfectly on point.  And the

6  cases that Simplo cites are not perfectly on point, because in

7  every single case -- and I can cite the language from those

8  cases, but I think it's pretty clear.

9        For example, in the *Micron* case, the Court specifically

10  said -- and this is a quote -- *There were separate operations.*

11  *They had no access to the parent's document-storage systems or*

12  *computer network.*

13        That is not this case.  If there's ever a situation where

14  conduct -- not actual written -- but conduct can show --

15        And I think the actual -- what *Citric Acid* said is the

16  legal right to obtain -- if conduct can ever show that, then

17  this is that case, because those Simplo Taiwan employees --

18  what are they using?  What do they use to negotiate on behalf

19  of Simplo USA?

20        **THE COURT:**  Okay.

21        **MR. SIEGEL:**  The database is in Simplo, Taiwan.

22        Just also, if you look at *Citric Acid*, itself, if you look

23  at the facts there -- and we all know that, you know -- or

24  often, the facts is really what's important -- in that

25  particular case, C&L US, and C&L Switzerland -- the Court said

1    there was no evidence that one firm exercised management

2    authority or control over the other firms in the family.  And

3    there was no evidence that C&L Switzerland had an economic and

4    legal interest in C&L USA.  Those were the facts.

5         Those are not the facts here.  We have the Simplo

6    Taiwan -- that certainly exercises management authority or

7    control.

8         Now, in our opinion, that clearly shows alter ego.  This

9    is like a textbook example.

10            **THE COURT:**  Let's not go to alter ego.

11            **MR. SIEGEL:**  Okay.

12            **THE COURT:**  And I don't think you need alter ego.  I

13   really don't, but let's not go there.  I'll give you a chance

14   to talk me out of that view, but let's stick with the control

15   question.

16        And I want to turn to Mr. Fox now.  I think that

17   Mr. Siegel has a point.  I mean, this case is pretty different

18   from any of the ones that I reviewed, in that Simplo Taiwan

19   really exists almost in name only, as a separate entity.  It is

20   a separate entity.  It is incorporated into Wyoming; but

21   there's no employees.  It is there solely because Dell asked

22   that Simplo Taiwan create a hub in the US for the sales of

23   Simplo Taiwan to Dell of lithium-ion batteries.  That's the

24   only reason it exists.  No employees there.

25        All of the negotiation of the pricing for Dell happens in

1  Taiwan, with Simplo Taiwan employees.

2      And the record does show, in, you know, one of the -- I

3  think the key pieces of testimony from Mr. Siegel's clients is

4  that the simply Taiwan employees who are negotiating the price

5  for Dell for Simplo USA look at the data for other sales for

6  Simplo Taiwan's customers.

7      And, in a way, don't they have to?  I mean, don't they

8  have to look at that to know what price would be appropriate

9  for simply USA sales to Dell?

10     So it is a different set of facts from any of the other

11 cases.  And, yes, there's some testimony in the deposition that

12 said, *We have no legal right to demand*.  *We have no contract*.

13     That's, you know -- as to legal right, that's pretty

14 conclusory.  And the record is not entirely clear, because we

15 do know that salespeople took a look at the parent's sales data

16 to other customers, in order to figure out what their price tag

17 should be for Dell.

18     So what do you think of all of that, Mr. Fox?

19         **MR. FOX:**  Well, I think I'd liked where you started

20 earlier.

21         **THE COURT:**  I'm sure you did, but this one -- as I

22 said, there's no case right on point here.

23         **MR. FOX:**  No.  You're absolutely right, but there

24 usually is no case that's exactly on point.  It's very rare

25 when you find a case on all fours.  If there were, then we

1  probably wouldn't be here, disputing the issue.

2      That said, I don't think it's simply a matter of Simplo's

3  obligation to produce evidence.  You mentioned a moment ago

4  that the deposition testimony about there being no right may be

5  or could be construed as conclusory.

6      **THE COURT:**  Yes.  It was actually conclusory.

7      **MR. FOX:**  I would submit that it is incumbent upon

8  the Indirect Purchaser Plaintiffs to -- if they're not going to

9  produce evidence, to at least identify:  Where does this legal

10  right come from?

11      They haven't identified a contract that calls for --

12      **THE COURT:**  Are you saying that it has to be a

13  contract, or can it be inferred through conduct?

14      **MR. FOX:**  It could be inferred through conduct.

15      **THE COURT:**  Okay.

16      **MR. FOX:**  I suppose it is possible, although I don't

17  really believe that they've cited a case on point -- but I

18  would go through and just kind of, step by step, say, *There is*

19  *no contract.  They don't point to a statute.  They don't*

20  *identify any governing common law that would create this right.*

21      **THE COURT:**  But they've pointed to conduct.  And the

22  conduct is pretty compelling, which is that -- that they

23  need -- in order to do the work of this Simplo USA that exists

24  for just one purpose, and doesn't really exist in Wyoming,

25  except on paper -- right? -- they have to look at the parent's

 1 | data.  I mean, there's nothing that disputes that in the
 2 | record.
 3 |         **MR. FOX:**  Well, and that's where I would disagree, in
 4 | terms of the manner in which the Court is inferring from that,
 5 | that there is a legal right to do all of these other things:
 6 | To control; to actually control, because it is the control
 7 | test.  Simply consulting data -- that's very common in
 8 | integrated multinational companies.
 9 |         **THE COURT:**  How else do --
10 |         **MR. FOX:**  Very, very common.
11 |         **THE COURT:**  That's different, though.
12 |     I mean, well, first of all, I'd love for you to cite me a
13 | case that says that doesn't amount to control, but this is
14 | something that's necessary.  I mean, I -- I don't think anyone
15 | disputes that in order to find the right price tag for Dell,
16 | they had to take a look at the other data.
17 |     That's different from, *Gee, I can just consult it.  I can,*
18 | *you know -- I have practical access to it.*
19 |     If it's part of the very business of Simplo USA, I think
20 | that starts to feel a lot more like legal right than a
21 | practical access.
22 |         **MR. FOX:**  I think it doesn't -- it doesn't quite
23 | cross that bridge, because it -- just like in the concepts of
24 | agency -- and that's not at issue here, but just like that --
25 | I'm analogizing for a moment -- you can have limited agency.

1 Right?  You can have a very limited scope.

2     And so if there is a limited ability for Simplo Taiwan

3 employees -- or even acting on behalf of Simplo USA -- to

4 consult information, that doesn't mean that Simplo USA has the

5 ability to control.

6     And, in fact, there's deposition -- from this deposition,

7 there is testimony -- I'll refer the Court to page 117.  I know

8 the Court's already read it -- read this, but at lines 17

9 through 20, for example, there was the question:  Has there

10 ever been an instance in which Simplo USA distributed Simplo

11 Taiwan's data to --

12          **THE COURT:**  That's --

13          **MR. FOX:**   -- anyone outside of the company?

14          **THE COURT:**  That's a really different question,

15 though.

16          **MR. FOX:**  But I think it -- it is a different

17 question, but it goes to the fundamental issue of:  Is there

18 control; and has that control ever manifested in the practice

19 that they're seeking to infer a legal right from?

20     Without all of the elements of control, without all of the

21 conduct that would give rise to actually having enough control

22 to exercise it in any way one wishes, if they're limited, and

23 if they're limited in this instance to simply consulting and

24 looking at data, particularly when they are putting on the hat

25 of the company Simplo USA, rather than Simplo Taiwan, that

1  is -- that is very common.

2      We cited for the Court the *United States against Bestfoods*

3  case from the Supreme Court; *Doe against Unocal* from the

4  Ninth Circuit.  They all recognize that you can have

5  overlapping employees.  And I recognize that's different.

6          **THE COURT:**  Sure, yeah.  No.  We're --

7          **MR. FOX:**  They recognize that you can have shared,

8  common --

9          **THE COURT:**  We are not talking about that.  We really

10 are not getting to alter ego at this moment, which is --

11     I'm not -- I think it's fairly common to have overlapping

12 officers, or that kind of thing.  And that doesn't necessarily

13 result in a subsidiary having to produce documents on behalf of

14 the parent.

15     But here's my point.  If, in this unique circumstance

16 where it's undisputed that Simplo USA exists only because Dell

17 asked for it, and all the work is done in Taiwan to facilitate

18 and negotiate the sales from Simplo Taiwan through Simplo USA

19 to Dell, if Simplo USA could not access the Simplo Taiwan data

20 for other customers, could it even do its business?  Is there

21 any way that it could do its business?

22          **MR. FOX:**  Well, again, let me try another analogy,

23 which I think --

24          **THE COURT:**  That's a "Yes" or "No."

25          **MR. FOX:**  Yes, I think it can do its business.

1      **THE COURT:** How? How would it be able to do it,

2  without looking at the sales data of other customers to

3  understand what the right price point was for Dell?

4      **MR. FOX:** Well, it can do that, but it can share it

5  with -- you can share information from, in this case,

6  great-grandparent to subsidiary. You can share information.

7      That doesn't mean that --

8      You should not automatically infer from that a legal right

9  of control.

10      **THE COURT:** If it could not access that data one way

11  or the other, could it exist?

12      **MR. FOX:** Perhaps it may not be as efficient or

13  profitable.

14      **THE COURT:** Well, I'm --

15      **MR. FOX:** Well, I mean, you're asking a hypothetical

16  that I really don't know the answer to, because it is

17  hypothetical. We're not in that situation.

18      But I don't think that one can construe from that the fact

19  that information is shared between great-grandparent and

20  great-grandchild subsidiary, that that -- that implies,

21  certainly, that that compels a conclusion that there is a legal

22  right of control.

23      And I think this is very similar to even individuals; not

24  just myself, or anyone else in the room. If they have an LLC,

25  or even if they have a trust, that performs -- it's separate as

1  a legal entity.

2      And I recognize we're not going to alter ego, but this

3  does --

4         **THE COURT:**  I'm trying to keep you out of alter ego,

5  because I think that's a different legal question.

6         **MR. FOX:**  Yeah.  I do, too; but it does go to the

7  issue of control.

8      If I am the sole principal, or my wife and I are the sole

9  owners of an LLC that we use for investment purposes, for

10  someone to then say, *I'm going to propound discovery on that*

11  *LLC, and we're going to ask for Mr. Fox's personal bank*

12  *accounts* -- I don't think anyone would say that's reasonable,

13  but that's precisely what's going on here.

14      The LLC doesn't have any employees.  I control it.  I

15  dominate it, but it is a separate legal entry.  It respects

16  corporate formalities.  So there's no alter ego.

17      The question is:  Is there a legal control, or is it --

18  does the pass the control test within the Ninth Circuit?

19      And simply because I have access to all of the information

20  of my investment LLC, and I use my own information for maybe

21  even other companies, in order to make determinations and enter

22  contracts on behalf of that LLC, that doesn't mean that the LLC

23  has the ability to control my own personal finances.

24      I don't think this is any different.

25         **THE COURT:**  Okay.  Mr. Siegel.

1     **MR. SIEGEL:** Well, I think you hit the nail on the

2 head with your question; and his response also, I think, was

3 very illustrative.

4     Simplo Taiwan and the employees who are executing Simplo

5 USA's business have to access and do access the Simplo Taiwan

6 data; and they do it every time they want to.

7     And there was testimony of the 30(b)(6) that there is no

8 prohibition on either the CEO of Simplo USA or these employees'

9 right to access this data.

10     I don't think it's true. You can't just say, *Well, yes,*

11 *they have the right to access the data where they need it to*

12 *run Simplo USA's business*, but as soon as someone asks for the

13 data, that's not what they want to use it for, then all of a

14 sudden, now we can't produce it. That's not the way the law

15 works. You can't just access it whenever you want to; have no

16 prohibition on when you're going to access it; and then when

17 you're served with a subpoena for the data that you have the

18 right to obtain and access, and put no prohibitions on your

19 right to access, then say you don't have to produce it.

20     I think that's -- that's the situation we're in here.

21     When you look at the actual facts of the case, these

22 employees who are -- and he was talking about agency, and

23 principles of agency. These people are the agents of Simplo

24 USA. They're the ones who are doing Simplo USA's business.

25 They're the ones who are negotiating with the customer; making

1  the decisions on price; doing everything.  There's -- no

2  testimony that Simplo USA doesn't do anything.

3      Now, these agents --

4      -- which is different than, you know, an individual who

5  set up a trust.

6      These agents -- these individuals who are running Simplo

7  USA -- have the right to obtain and have to use this data of

8  Simplo Taiwan.  There's no other way that they could run Simplo

9  USA's business, except for looking at the prices and the data

10  of Simplo Taiwan, because that's how they're determining their

11  negotiating position with Dell.

12      And there's --

13      **THE COURT:**  What do you think of Mr. Fox's analogy to

14  a trust?

15      And sort of -- sort of -- I viewed it as the

16  opening-the-floodgates argument.  Any time there's some

17  connection where you, you know, can access the information and

18  would, in fact, have to access information to make investment

19  decisions, for example, someone coming in with a subpoena could

20  get higher-up financial records.

21      **MR. SIEGEL:**  Yeah.  What I think the situation is

22  here, which is different, is that these Simplo Taiwan

23  employees --

24      We're asking for the data that the Simplo Taiwan

25  employees, acting for Simplo USA, actually rely on.

1    We're not opening the floodgates for all of Simplo

2 Taiwan's data.  We're not asking for things that are completely

3 unconnected with what they actually have the right to obtain to

4 run Simplo USA's business.

5    We're asking for the data that the testimony shows that

6 they actually use to run Simplo USA.  It's -- it's contained to

7 that.

8    It's not everything related to Simplo Taiwan.

9    It's the actual data that is used to run Simplo USA.  So I

10 think that it's self-contained, because we're talking

11 specifically about what they have the right to obtain to run

12 Simplo USA.

13    **THE COURT:**  Okay.  Let's talk about alter ego.  This

14 is why I don't think this is an alter-ego case.  And alter ego

15 happens in rare circumstances.  It's where you're really

16 piercing through, to hold one company liable, usually for

17 damages of another company.

18    And you've got the unity-of-interests prong; and then you

19 have the inequitable prong, which is really about fraud or

20 injustice; not just inconvenience, or even unfairness.

21    So in this case, the record shows that there -- you know,

22 are some things that go to a unity of interests.  I mean, we've

23 kind of gone over them.  They're a wholly owned indirect

24 subsidiary.  They don't have any employees.  The officers of

25 Simplo USA are Simplo Taiwan employees.  They, you know, have,

1   as I said, complete ownership of Simplo Taiwan over Simplo USA.

2   They have shared e-mail.  They have shared databases.

3       All of those things are -- although they support a unity

4   of interests, they're also very common.  I mean, it's a company

5   that has very low overhead, essentially.

6       But there aren't the other kinds of indicia of unity of

7   interests we usually see in alter ego, like commingling of

8   funds.  I mean, we don't have any evidence that there's shared,

9   you know, bank accounts, or funding, or evidence of holding out

10  that Simplo Taiwan is responsible for the debts of Simplo USA.

11  Those are the kinds of important facts that we'd see in a true

12  alter-ego case.

13      And then we move over to the injustice.  There's really no

14  evidence of fraud that this was somehow done to dupe somebody.

15  I mean, it's done legitimately as a corporation of Wyoming,

16  because Dell asked for it.  And that's not fraudulent; or at

17  least, there's no evidence of it here.

18      As to undercapitalization, again, the fact that you don't

19  have an office doesn't mean you're undercapitalized.

20      Undercapitalized goes more to, you know, do you really not

21  have enough money in the kitty to fund your operations, so

22  you're running a business that is really, you know, looking --

23  that will not be responsible for meeting its debts?

24      So I think it's a real stretch here on this record to find

25  alter ego; but you can talk me out of it if you want.

1          Mr. Siegel.

2               **MR. SIEGEL:**  Okay.  I'll do my best.

3          So in terms of the unity of interests, there are, as we

4     know, like, 30 different factors that courts look at; but what

5     I would point you to is, in particular, those cases -- and the

6     *Zoron Corp. versus Chen* case is one.  Obviously, *Mesler's* the

7     leading case, in general, in this area.  And those cases talk

8     about the situation where there's such domination and control

9     by one company over another, that there is actually a unity of

10    interest.

11         And I believe, respectfully, that those cases show that

12    you don't have to have commingling of funds; that you don't

13    have to have fraud.

14         If there's such a unity of interest, and -- I mean,

15    sometimes you call it the "domination and control test."

16    Sometimes, I think, courts say -- and this is a direct quote

17    from a district in California case -- that *one company is used*

18    *as the mere shell, instrumentality, or conduit of the business*

19    *of another*.  Then, again, that's another circumstance with a

20    unity-of-interest test is met.

21         And I believe if you look at the case law, there are

22    different types of situations where the unity-of-interest test

23    is met.  And one is this mere -- kind of mere shell,

24    instrumentality, or conduit situation.

25         And if the law does show -- and I believe that cases that

1  we cite say that -- that that is enough to show a unity of

2  interests, then -- textbook example of that.  Simplo USA has no

3  employees.  Simplo USA has no office.  I mean, as the testimony

4  you've already talked about shows, Simplo Taiwan does

5  everything for Simplo USA.  Simplo USA is nothing but a

6  mailbox.  It's nothing but something that was established,

7  because Dell wanted them to.  This is -- Simplo USA is just an

8  instrumentality, or a shell, or a conduit.

9      I mean, a conduit's a perfect example.  I mean, Dell

10  asked, *We need a conduit in the US.  We need a US address*.

11  And -- and I think that that is enough here.

12      I mean, for example --

13          **THE COURT:**  Okay.

14          **MR. SIEGEL:**  Yes.

15          **THE COURT:**  Okay.  So I get your unity-of-interest

16  argument.

17          **MR. SIEGEL:**  Mm-hm.

18          **THE COURT:**  And let me just back up, and say I think

19  the choice-of-law issue and the piercing through multiple

20  layers -- you all didn't really get a chance to explore that.

21  I know you didn't have a lot of room --

22          **MR. SIEGEL:**  Mm-hm.

23          **THE COURT:**  -- but where I land on this is

24  essentially I don't know if you need to pierce through each

25  one.  Nobody gave me a case that says, "You must," or "You

1    can't," that was a really compelling case on point.

2        But as to the choice of law --

3        And at the end of the day, I don't know that Wyoming and

4    California law are very different on this.  Maybe there's a

5    little bit of a difference, because California would accept

6    undercapitalization, alone, to meet the second prong.  I don't

7    know what Wyoming law is on that, but I think we end up in the

8    same place.

9        It didn't sound like either side disagreed with that

10    notion, but Mr. Fox, let me ask you:  Is Wyoming law that

11    different from California law on this?

12        **MR. FOX:**  Wyoming law is not that different, but

13    where we think there is a significant difference is the law of

14    the United Kingdom, which would apply to the intermediate

15    companies between Simplo Taiwan and the US.

16        **THE COURT:**  Oh, I see.  I get it now.  I wasn't sure

17    that I followed that in your papers, but I understand the point

18    now.

19        So let me --

20        Assuming you meet unity of interest, which I'm not sure

21    that you did, but let's just assume it for purposes of

22    argument, I don't see how you get anywhere on the second prong.

23        **MR. SIEGEL:**  Okay.  And I'll just say, just as a side

24    note, if you want to address the issue of whether you need to

25    pierce all the way up, they're just completely wrong on the

1   law. And there are cases on point on that, so I can discuss

2   that if you'd like.

3      However, I will answer your question about the second

4   prong, because that's a question you asked, so I'm going to

5   answer it. So I think if you look at the *Mesler* case, what the

6   *Mesler* case said is that you look at whether there would be an

7   inequitable result in the particular case presented. Now,

8   *Mesler* is interesting --

9         **THE COURT:** "Inequitable" is not unfair.

10   "Inequitable" is really fraudulent; that there's a -- you know,

11   somebody robbed us of justice here, because they made --

12   because this is a sham. I mean, it's not just unfair.

13         **MR. SIEGEL:** No. I agree.

14      And I think the *Mesler* case is on point on this because,

15   you know, obviously, it's the leading case on this in

16   California. And if you look at the case, itself, I think it's

17   interesting, because when it first lays out the test, you know,

18   to show unity of interest --

19      And then you have to show --

20      Would you like me to go to the case, or just talk about it

21   through memory?

22         **THE COURT:** You can go ahead and argue.

23         **MR. SIEGEL:** Okay. So what I would say, if you look

24   at the *Mesler* case, is that after the Court discusses, you

25   know, what the basic requirements are, then what it talks about

is these interesting cases that it relies on.  And some of them
are divorce cases.

And the Court says, *Look.  It may be a situation where,
for example, a wife, to get at the assets of the husband --
you're going to pierce the corporate veil*.  And that doesn't
mean that in every circumstance you're going to pierce the
corporate veil of the husband's business, for example.  That
just means in this particular case, it would be inequitable for
the wife in a divorce proceeding, for a fair property
settlement, that -- to have a corporate entity to stand in the
way of the wife -- the wife being an equitable result.

So it says the law of this, for example --

And I'm quoting 39 Cal 3d. at 301.  And it's talking about
these -- the marriage-dissolution cases that I was -- that I
was just discussing.  And it says, *To the extent the purpose of
a corporation* -- and it says, *to fraudulently deprive the wife
of a fair property settlement, the corporate entity would be
disregarded.  The law of the state is that the separate
corporate entity would not be honored, where to do so would be
to defeat the rights and equities of third parties.*

And then it says -- again, it cites another case; and this
is the McLaughlin case; and this is what I was talking about --
*Bypassing the corporate entity to reach an alter-ego
corporation for the sole purpose of avoiding an injustice;
otherwise, the corporation remains separate.*

1      And I think that's the situation here.  And why there's an

2    inequitable result is you have Simplo Taiwan, which is

3    establishing Simplo USA to get the benefits of having a US

4    presence.  And the benefits are being able to sell batteries to

5    Dell, a US company.  And they also are afforded the protections

6    of US law.

7      And it wouldn't be just.  It would be inequitable if they

8    could have a US presence, enjoy the benefits of US

9    incorporation, enjoy the benefits of being able to sell to a US

10   company; but unlike a US branch office, when someone goes to

11   that company and says, *Hey, you've been served with a subpoena*

12   *in a lawsuit*, and if it were a branch office, the Court would

13   say, *Therefore you have to produce the data, whether it's in*

14   *the US or Taiwan*, they'd say, *Oh, no.  We're separate.  We're*

15   *completely separate.  Therefore, we don't have to give the*

16   *data*, when the situation, in fact, is that it's one

17   corporation.  It's the same corporation.

18     It would be inequitable to allow them to have a US

19   presence and enjoy the benefits of that US presence, without

20   having to pay the costs.  And that's the cost of being in the

21   US.  When you have a US presence and you do business in the US,

22   you have obligations to Your Honor, to this Court, to produce

23   data in a case when you're subpoenaed.

24         **THE COURT:**  Well, they did.  My understanding is

25   Simplo USA produced lots of data about Simplo USA.  They met

1    their obligations as to that entity.

2        But what the IPPs are trying to do is get them to reach up

3    the chain, and pull down information from Simplo Taiwan.

4        So that's -- that's where, you know --

5        I think I understand your argument, but I'm just not

6    seeing it.

7        Mr. Fox, I don't need argument on this; but if you feel

8    you need to put something on the record, I'll let you.

9        **MR. FOX:**  I will put just a few very minor points on

10   the record.

11       One, again, I agree with where the Court began on this

12   subject.  Alter ego is -- and piercing of the corporate veil is

13   very sparingly used, and that's even in the archetypal case of

14   when you are trying to pierce a veil of a defendant in the

15   case -- a party to the case -- in order to get assets.  That's

16   why undercapitalization is so frequently talked about in these

17   cases.

18       I would point the Court to -- to one authority that was

19   not in the papers, but I think is very relevant.  That is the

20   *Orloff against Allman* case.  It's at 819 Fed. 2d. 904.  It's a

21   Ninth Circuit 1987 case.  And I would specifically point to

22   page 909, in which the Court there specifically noted that

23   undercapitalization is a key issue in alter-ego cases, because

24   an undercapitalized company threatens to deprive creditors of a

25   judgment that may be satisfied.

1   What we're dealing with here is a case which, to my

2   knowledge, would be the first of its kind, where a third

3   party -- a nonparty -- is having its veil pierced so that you

4   can get documents that the IPPs are already seeking through

5   letters rogatory.

6   **THE COURT:** Well, that point is not well taken. I

7   mean, there's no prohibition on trying to get the documents any

8   way you can. The fact that they have letters rogatory

9   outstanding in Taiwan does not in any way affect their ability

10  to try to get them another way, as long as it's a valid way.

11  **MR. FOX:** I think that you're absolutely right about

12  that. However, I would note that in these cases when you talk

13  about fraud or injustice or inequity, mere burden doesn't

14  count.

15  In fact, in the very context I was just speaking of --

16  collecting a judgment -- the *Gerritsen* case, which was cited in

17  the IPPs' portion of the brief -- it says at page 1144 that

18  California courts routinely reject the view that the potential

19  difficulty a plaintiff faces collecting a judgment is not an

20  inequitable result.

21  That is simply my point here; that because they're already

22  seeking another method, it may be more burdensome. The fact

23  that they want to avoid that burden -- that doesn't reach the

24  level of inequity, and particularly when they're not even

25  seeking to enforce a judgment, or to bring a defendant into the

 1  case so that they can enforce a judgment.  They're seeking

 2  information.

 3       **THE COURT:**  Okay.  Any last arguments before you

 4  submit it?

 5       **MR. SIEGEL:**  I would just point out that --

 6       **THE COURT:**  I don't just mean just alter ego.  I

 7  mean -- we've been going almost 45 minutes.  I mean this

 8  motion.

 9       **MR. SIEGEL:**  Yes.  No.  I understand.

10       So I think the big picture here is that the facts show

11  that Simplo Taiwan -- Simplo has chosen to run Simplo USA from

12  Taiwan as a shell, existing only to satisfy Dell's wishes for

13  the U.S. mailbox.  That was Simplo's choice, for whatever

14  reason, whether it be for convenience or for control.  It could

15  have run the company, like in the other cases that have been

16  cited by Simplo, where it's a separate company; maybe

17  occasionally they access the data, but it actually has a

18  separate presence -- and that's what the courts have talked

19  about -- but it chose not to do that.

20       And if you're not going to run a company as a separate

21  presence, and you're going to use the data, you're going to

22  obtain the data, you're never going to tell any employee that

23  you don't have the right to access the data, then either you

24  have the right to append the data because that's what the facts

25  show, and the legal-right-to-obtain test is satisfied, or it's

1   one company, and the US office is merely a corporate office in

2   the US.  You can't have it both ways.

3       They're talking about -- he was talking about separate

4   hats before.  There are no separate hats.  There's one hat.

5   This is not a case where people wear different hats.  They wear

6   one hat.  This is Simplo.  They use the data.  They access the

7   data.  They obtain the data.  They do everything for Simplo

8   USA.

9       If they were actually wearing separate hats, then it would

10  be a different case.  And that's the cases they cite.  This is

11  not.  They wear one hat; and the hat is the Simplo hat.  And if

12  you're going to do that, then there are -- then there are

13  consequences, under the law.  And I would just submit that to

14  Your Honor.

15      And I can talk also more about the relevance of the case,

16  the data, or anything else, if you'd like.

17          **THE COURT:**  Okay.  Mr. Fox, any last arguments you

18  want to make?

19          **MR. FOX:**  No, thank you.

20          **THE COURT:**  Okay.  Then here's what I find.  Right?

21      I already found there's no alter ego here; but on the

22  unique facts of this case, I do find that there is a legal

23  right to control, under the *Citric Acid* test.

24      And this is, you know --

25      The third party has conceded that a legal right can be

based on conduct, rather than a contract or a statute.  And in
this case, where we have the existence of a company really
essentially on paper, where all of the actual work of
Simplo USA is done in Simplo Taiwan, where there is not only no
prohibition on Simplo USA having access to the sales data for
Simplo Taiwan for other customers in order to conduct its work;
it's necessary.  I mean, for Simplo USA to do its work, it has
to have access to that to be able to appropriately price the
batteries for their one customer, which is Dell.

     So although there is some testimony that there's no legal
right, I find that that's conclusory.  The only testimony about
access is that there's no prohibition on it.  So there was some
testimony about having to get authorized to distribute it, but
that's not the question here.  The question is whether Simplo
USA has the legal right to obtain the sales data of its parent,
Simplo Taiwan.

     So again, as we've said for the past 45 minutes, these are
pretty unique facts.  There's plenty of other cases where this
would not be the outcome.  So in looking at *Micron*, which I
found to be the closest, the difference there is they really
were two different companies.  I mean, they're two different
entities; two different operations.  That is certainly one of
the key differences between *Micron* and this one, where there's
virtually no separation, except maybe on paper, between
Simplo USA and Simplo Taiwan.

1    Although there was an argument that production's

2 burdensome, it was, again, a conclusory argument about burden

3 or proportionality.  There's nothing in the record showing that

4 this would actually be a burdensome process.

5    The only thing that I think that Simplo Taiwan has to turn

6 over through Simplo USA is the transactional data for the

7 batteries; nothing more.  That's really what was at issue here.

8 That's the only thing that's relevant.  It's the only thing

9 where there's a record that there's a legal right to access.

10    So this needs to happen pretty quickly.  I mean, the

11 class-cert. papers are already on file.  So, Mr. Fox, how

12 quickly can this be done?

13        **MR. FOX:**  Well, I'm not precisely sure, but I don't

14 think it's -- it's as easy a matter as -- as the Court is

15 advising.  It's probably --

16        **THE COURT:**  Well, I'm smarter than that, because

17 Simplo Taiwan didn't give me any information.  So I -- you

18 know, I'm picturing what I learned from the depo, which is that

19 this data exists on a database, you know, where the Simplo USA

20 data lives, and that that --

21    I didn't hear that that was a hard process.

22    I'm imagining there's more data than for Simplo USA, but

23 why don't you walk me through exactly what needs to happen?

24        **MR. FOX:**  I think my colleague, Helen Yang, may be

25 more in a position to speak to that.

```
 1              THE COURT:  Great.

 2              MS. YANG:  Good afternoon, Your Honor.  Helen Yang,

 3   on behalf of Simplo USA.

 4        The burden that would cause on Simplo Taiwan to compile

 5   the documents because of the --

 6              THE COURT:  Just a moment.

 7              MS. YANG:  Oh.

 8              THE COURT:  So I'm not entertaining a burden

 9   argument --

10              MS. YANG:  Okay.

11              THE COURT:  -- because it wasn't in the papers, and

12   it can't be conclusory.  Nowadays if you're arguing burden or

13   proportionality, you need to show your work.  I mean, I need to

14   hear all the facts.  So that was not met.

15        So now it's just a question of:  When can this get done?

16   What are the steps that need to happen?

17              MS. YANG:  Okay.  So because of the length of time

18   requested from the document production, it would require hiring

19   10 people working 15 hours a week for 8 weeks to obtain the

20   documents.  The workers would cost Simplo USA at least $72,000.

21              THE COURT:  Okay.  So that's burden stuff.

22              MS. YANG:  Right.

23              THE COURT:  What I'm really --

24              MS. YANG:  So eight -- eight weeks.

25              THE COURT:  So what is the process exactly?
```

1          **MS. YANG:**  It would --

2          **THE COURT:**  What are those 10 people doing?

3          **MS. YANG:**  Just to extract the data, because of the

4  volume of data that we're looking at.  It's --

5          **THE COURT:**  It's hard for me to picture needing 10

6  people to extract data from a database.  So do you know more

7  about what that process is?

8          **MS. YANG:**  That's -- that's the extent of what I

9  have.

10          **THE COURT:**  Okay.  And that's the kind of information

11  that unfortunately is not very helpful to --

12          **MS. YANG:**  Mm-hm.

13          **THE COURT:**  -- really getting down to the specifics

14  of how this process is done.  I can't really evaluate it, but

15  what I'm going to have you to do is meet and confer with the

16  plaintiff to figure out, you know:  Is there a way to phase

17  this, so that some more critical information is where you

18  start?

19      Maybe there's ways to streamline the process, where your

20  person can talk through exactly what the extraction process is,

21  because there may be agreements you can reach to turn over

22  information, subject to a Protective Order or some kind of

23  limits.  And make the plaintiff -- the IPPs -- do some of this.

24      I don't know.  I don't want to speculate, but I think you

25  should have a more detailed discussion.  And that needs to

1  happen quickly.

2     I'm not going to order a time for production, given that I

3  don't know how quickly this can happen, but I am ordering that

4  it happen as soon as possible, given the press of the case in

5  its current posture.  So as fast as it can reasonably be done

6  is when it should be done.  Okay?

7         **MS. YANG:**  We will confer with IPPs, Your Honor.

8         **THE COURT:**  Terrific.  Thank you.

9         **MR. SIEGEL:**  Could I ask one thing?  Just for the

10  record, you know, obviously, I think the next -- the next major

11  deadline for IPPs is our Reply Brief in Support of Class

12  Certification, which is November 21st.  Optimal for us would be

13  to have a good amount of data the third week in October --

14  really, the end of October -- because of our experts can do

15  that.

16     So I would just -- I mean, I know you're not ordering a

17  specific time, but if -- if --

18         **THE COURT:**  Mr. Siegel, I've just said --

19         **MR. SIEGEL:**  Yes.  I'm sorry.

20         **THE COURT:**  -- what I can say about this.

21         **MR. SIEGEL:**  I'm sorry.  Okay.

22         **THE COURT:**  The best thing you can do in your

23  circumstances is to try to brainstorm with Ms. Yang and her

24  team to figure out:  Is there critical information that --

25     You know, could this be done on a rolling basis?

1    Are there things that they need to do that you can help

2  with, or ease, or, you know, speed up on your side?

3    But I don't know the specifics.  And, you know, I've said

4  please get this done as fast as reasonably possible.  That's

5  the best I can do in this circumstance.

6        **MR. SIEGEL:**  I understand.  And I apologize for that.

7        **THE COURT:**  Okay.  All right.  Thank you, everyone.

8        **MR. SIEGEL:**  Thank you.

9        **MS. YANG:**  Thank you, Your Honor.

10       **THE CLERK:**  This court is now adjourned.

11    (At 11:54 a.m. the proceedings were adjourned.)

12                **CERTIFICATE OF REPORTER**

13    I certify that the foregoing is a true and correct

14  transcript, to the best of my ability, of the above pages of

15  the official electronic sound recording provided to me by the

16  U. S. District Court, Northern District of California, of the

17  proceedings taken on the date and time previously stated in the

18  above matter.

19    I further certify that I am neither counsel for, related

20  to, nor employed by any of the parties to the action in which

21  this hearing was taken; and, further, that I am not financially

22  nor otherwise interested in the outcome of the action.

23        *Lydia Zinn*

24  _____    October 5, 2017

           Signature of Transcriber      Date

25