Pages 1 - 32

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE JUDGE

| | | |
|---|---|---|
| IN RE APPLE, INC. SECURITIES LITIGATION. | )<br>)<br>) | NO. 19-cv-02033 YGR (JCS) |

San Francisco, California
Friday, April 16, 2021


**TRANSCRIPT OF PROCEEDINGS**


**APPEARANCES**:  (By Zoom Videoconference)


For Plaintiffs:

        ROBBINS GELLER RUDMAN & DOWD LLP
        One Montgomery Street
        Suite 1800
        San Francisco, California  94104
   BY:  **SHAWN A. WILLIAMS, ESQ.**
        **DANIEL J. PFEFFERBAUM, ESQ.**

For Defendants:

        ORRICK HERRINGTON & SUTCLIFFE, LLP
        405 Howard Street
        San Francisco, California  94105
   BY:  **JAMES N. KRAMER, ESQ.**
        **ARIEL B. WINAWER, ESQ.**

        ORRICK HERRINGTON & SUTCLIFFE, LLP
        777 South Figueroa Street
        Suite 3200
        Los Angeles, California  90017
   BY:  **KEVIN M. ASKEW, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
        Official Reporter, U.S. District Court


     (Appearances continued, next page)

**APPEARANCES, CONTINUED**:

                    LABATON SUCHAROW LLP
                    140 Broadway
                    New York, New York  10005
              BY:   **CHRISTINE M. FOX, ESQ.**

| | |
|---|---|
| 1 | **Friday - April 16, 2021** **10:17 a.m.** |

2        **P R O C E E D I N G S**

3        **THE COURTROOM DEPUTY:**  We are calling Case No.

4  19-cv-2033, In Re Apple, Incorporated, Securities Litigation.

5    Counsel, could you please raise your hands?  Thank you.

6    Start with appearances, please, first starting with

7  plaintiffs.

8       **MR. WILLIAMS:**  Good morning, Your Honor.  Shawn

9  Williams, Robbins Geller Rudman & Dowd, on behalf of

10  plaintiffs.

11       **THE COURT:**  Good morning, Mr. Williams.

12       **THE COURTROOM DEPUTY:**  Mr. Pfefferbaum, we can't hear

13  you.

14       **MR. PFEFFERBAUM:**  Good morning, Your Honor.  Dan

15  Pfefferbaum on behalf -- Robbins Geller Rudman & Dowd, on

16  behalf of plaintiffs, as well.

17       **THE COURT:**  Good morning.

18       **MR. PFEFFERBAUM:**  Good morning.

19     **MS. FOX:**  Good morning.  Christine Fox on behalf of

20  plaintiffs from Labaton Sucharow.

21       **THE COURT:**  Good morning.

22       **MS. FOX:**  Good morning.

23       **THE COURTROOM DEPUTY:**  Any more for plaintiffs?

24    (No response)

25       **THE COURTROOM DEPUTY:**  Okay.  Defendants, please.

1            **MR. KRAMER:**  Good morning, Your Honor.  James Kramer

2     from Orrick Herrington & Sutcliffe, on behalf of defendants.

3            **THE COURT:**  Good morning.

4            **MR. ASKEW:**  Good morning, Your Honor.  Kevin Askew,

5     also from Orrick Herrington & Sutcliffe, on behalf of

6     defendants.

7            **THE COURT:**  Good morning.

8            **MS. WINAWER:**  Good morning, Your Honor.  Ariel

9     Winawer, also of Orrick Herrington & Sutcliffe, on behalf of

10    defendants.

11           **THE COURT:**  Good morning.  All right.  Thank you.

12    As usual when I get to one of these things, I'm always

13    baffled why they can't be resolved.  Everybody seems to, you

14    know, act on the operating assumption that they're going to win

15    a hundred cents on the dollar when they get to the court on

16    these discovery matters.  And of course, they're almost

17    universally wrong.  And this is not any different.

18           So I have a thought to run by you, and here's what it is.

19    My thought is this.  This is a case which -- in which there

20    are, at least for discovery that's being sought now, two

21    relevant issues.

22           First is:  What was the situation in China.

23           And the second is -- and perhaps that's the most

24    important -- the most important issue is what of that situation

25    was known to Mr. Cook.  That's the critical issue.  The first

1   issue is only relevant to the extent the information was passed

2   on to Mr. Cook.  It may be, by its nature, it is of the type of

3   information, there may be inferences it was passed.  There may

4   be other questions that can be asked about whether it was

5   passed.  But it is relevant, to the extent that Mr. Cook

6   presented -- had it.

7        That makes this sort of an upside-down case to this

8   extent.  It makes the top-level direct reports to Mr. Cook more

9   important for discovery than the next level and further levels

10  down, which are -- ordinarily we'd be doing the other sort of

11  discovery, going from the bottom up.

12       But, what I thought I'd do is I went through the list of

13  custodians, and I picked out the ones who it seemed to me to be

14  at or closer to that top-level reporting obligation, and to

15  have relevant -- be in a relevant area.  And I picked out them

16  for this next round to add to the list.  And the ones that I

17  picked out are Jeff Williams, Angela Ahrendts, Deirdre O'Brien.

18  I also picked out Sabih Khan, because they're -- they seem to

19  be such a critical area -- Phil Schiller and Greg Joswiak, as

20  the ones that I thought that should be added to the list.

21       My thought would be that to add those to this list of

22  custodians, that you go through the custodians and you see what

23  information you get from their particular document set.  We'll

24  set a date for compliance.

25       And then you see whether or not there are -- there's a

1    need for additional custodians who might have additional

2    information.   Not just to cover the waterfront of everybody who

3    might have ever received an email on this subject.

4         But, that's my thought.   Let me start with the plaintiffs,

5    and then I can hear from defendant.

6         **MR. WILLIAMS:**   Sure, Your Honor.   Shawn Williams,

7     Robbins Geller Rudman & Dowd.

8         And I appreciate that Your Honor has seen these sets of

9    circumstances many, many times, and I appreciate your effort to

10   sort of identify what is apparent to you from the list that we

11   provided.

12        I should say that, you know, we have been very, very

13   conservative in our approach, particularly with respect to the

14   identification of custodians.   And I've seen scorched earth,

15   and this is not it.

16        However, I do want to go back to your initial premise,

17   which -- about the case being about, you know, what was going

18   on in China.   That is, I think, astute and accurate.   And the

19   second point that you made, which is that the case is

20   secondarily about what was known to Mr. Cook.

21        And I -- with respect to that second point, I think that

22   that is too narrow.   I think that the Court's two opinions on

23   the motions to dismiss very ably identify why that is a bit too

24   narrow.   And I want to make a couple of points about

25   defendants' letter to the Court.

```
 1          Defendants' letter to the Court suggests that Judge
 2     Gonzalez Rogers found that this case was about whether or not
 3     Mr. Cook had an opinion about what was going on in China.  And
 4     therefore, the issue was whether his opinion had a reasonable
 5     basis.  That was generally what they stated in their letter.
 6     But that was, number one, incorrect.
 7          If you go back to Judge Gonzalez Rogers' opinion which was
 8     issued on June 2nd, 2020, and the cite to that opinion which
 9     defendants correctly apply, she specifically states that
10     (As read):
11               "By contrast, the following statement is actionable:
12               'In the context of emerging markets, "[i]n relation
13               to China specifically, I would not put China in that
14               category.  Our business in China was very strong last
15               quartern....iPhone, in particular, was very strong
16               double-digit growth there."'"
17     But the Court went on to say (As read):
18               "This statement contains representations of fact --
19               that China is not facing emerging market issues like
20               other countries and that Apple's business is strong
21               there."
22          She goes on to suggest that even if it were a statement of
23     opinion -- and that was the argument that the defendants made
24     to the Court at the motion to dismiss, that this was really a
25     statement of opinion -- she largely rejected that.  But went on
```

1    to say that even if it was a statement of opinion:

2                "Plaintiff adequately alleges that Cook's statement

3                did not align with the information he possessed at

4                the time and was therefore misleading."

5        Now, defendants' letter emphasizes --

6            THE COURT:  So, isn't this about scienter?

7            MR. WILLIAMS:  It's -- it's --

8            THE COURT:  I mean, I understand you'll want to prove

9    that whatever statements Mr. Cook made are false.  Whether

10   it's opinion or fact, you're going to want to prove that

11   they're false.

12       But in order to prove they were made with the relevant

13   scienter, don't you have to show that he had information that

14   made it reckless for him to make those statements?

15           MR. WILLIAMS:  So I was going to address why that is

16   a bit narrower.  Is -- is too narrow.

17           THE COURT:  Okay.

18           MR. WILLIAMS:  So defendants were unhappy with that

19   conclusion, and filed another motion to dismiss.  And the

20   Court issued another order on the motion to dismiss, which

21   defendants do not cite in their papers.  And the Court

22   specifically indicates that Apple is a defendant.  Not just

23   Tim Cook.

24       And if you look at ECF 123, which is the Court's second

25   order on the motion to dismiss, she does not address the

 1  opinion nature of the statement at all, because defendants

 2  clearly understood that she had rejected that before.  But what

 3  she specifically says on Page 18 of that order -- sorry.  Line

 4  27, going on to 28 and to the next page (As read):

 5              "These allegations plausibly state deliberate

 6              recklessness because they show that Cook had

 7              reasonable grounds to believe material facts existed

 8              (i.e., that Apple may be experiencing pressure in

 9              China) that were misstated or omitted (Cook said that

10              it was not) but failed to obtain and disclose facts

11              although he could have done so without extraordinary

12              effort.  (Apple possessed the data that showed

13              troubling signs and weak iPhone demand in China)."

14      So the District Court very ably and capably, with all of

15  the facts that were before it -- and it was a lot -- concluded

16  that the issue was not only whether Mr. Cook had the

17  information.  It was whether or not Mr. Cook had that

18  information available to him at the time that he made the

19  statement.

20      And defendants --

21          **THE COURT:**  I guess -- and the argument would be that

22   that that -- he was reckless in not obtaining it.

23          **MR. WILLIAMS:**  That's what the Court found.

24          **THE COURT:**  Right.

25          **MR. WILLIAMS:**  And so to the extent that defendants

1   have tried to narrow the funnel --

2            **THE COURT:**  Got it.

3            **MR. WILLIAMS:**  -- to Mr. Cook's actual knowledge and

4   what he got is too narrow.  And their letter to the Court

5   you've reviewed is inconsistent with the nature and spirit of

6   the District Court's order.

7        So as I indicated, I appreciate that you added certain

8   witnesses or certain custodians to the list, and that you've

9   done so as best as you can, with the limited facts that you

10  have before you.

11       I would add that the others were reasonably drawn from not

12  simply us closing our eyes (Indicating) and pointing at

13  different names.  I'll tell you that seven of the people that

14  are on our 16-member list were in our initial disclosures on

15  December 18th, four months ago.  And that was before we took

16  two depositions which confirmed that the other people were

17  people likely to have relevant information.

18       And the people -- the two people who we deposed were

19  people that Apple designated as 30(b)(6) witnesses.  So those

20  people confirmed our initial investigation, and added others.

21  So --

22            **THE COURT:**  Let me ask you this question

23  Mr. Williams.

24            **MR. WILLIAMS:**  (Nods head)

25            **THE COURT:**  I appreciate that you were careful.

1        Don't you think you're going to get -- since these are the

2   people through whom Mr. Cook receives information, you're going

3   to get most everything you need through the direct reports?

4        **MR. WILLIAMS:**  Here, I'll say I don't know, and I'll

5    tell you why.  I don't know that these are actually the direct

6    reports, because we don't have an organizational chart.

7    That's number one.

8        Number two.  We, throughout -- for the last several

9   months, we have asked defendants whose files they would be

10   searching.  They refused to tell us whose files they would be

11   searching.

12    I asked:  Well, what search terms are you going to use to

13   search these files?  They refused to tell us what search terms

14   they were going to use.  We asked them to include our

15   custodians.  They refused to include our custodians.

16        So what they have done, which is -- which I think is going

17   to create more costs, more time to prosecute this case, is

18   individually -- or unilaterally identified what they believe

19   the case is about, identified the people whose files they are

20   going to search without telling us, using search terms that

21   they think are going to be useful to the case without telling

22   us --

23        **THE COURT:**  So the parties have not agreed on search

24    terms?

25        **MR. WILLIAMS:**  We have not.

1          **THE COURT:**  Well, that's ridiculous.  That's not

2    going to -- that's not going to happen.

3      Okay.  Let me hear from the other side on this.

4          **MR. KRAMER:**  Good morning, Your Honor.  Jim Kramer on

5    behalf of defendants.

6      Your Honor, a couple things.  First, we have taken what we

7    think is a very thoughtful approach to the issues of the case,

8    which I'll come back to in a minute.  And we've never taken the

9    position that the list we generated was the static list, full

10   stop.  We've taken a position, instead, that we're going to run

11   searches.  And if we identify other custodians, we will add

12   them.

13     As Your Honor undoubtedly knows we have a fact discovery

14   cutoff of March, 2022.

15         **THE COURT:**  I know.  But I don't -- I don't accept

16   that as just a premise for cutting out custodians.  I don't --

17   you know, this thing will take a long time, no matter what.

18   And it's already taken a long time to get just to this thing.

19   So I don't -- I don't -- as a general proposition, that

20   doesn't impress me.

21     I want you to address the specifics that he said.

22         **MR. KRAMER:**  Yes, Your Honor.

23         **THE COURT:**  That he said:  We're going to go beyond

24   the direct reports because we're going to be allowed to show

25   that there is information that was so readily available to

1    Mr. Cook that he was reckless in not seeking it, and in making

2    this statement.

3            **MR. KRAMER:**  Yes, Your Honor.

4        So first, one of the issues that Your Honor didn't

5    identify, and nor did plaintiffs, was whether or not the

6    statement was historical.

7        You can tell from the quote Mr. Williams read, the analyst

8    asked about the prior quarter.  And in the prior quarter, in

9    emerging markets, there were some challenges.  But the

10   company's sales in the prior quarter were up 16 percent in

11   China.  That's the specific question Mr. Cook was responding

12   to.

13       So the first issue we have to address is:  Was he speaking

14   historically to Q4?  Or was he speaking to the current quarter?

15   And I think --

16           **THE COURT:**  I don't have to decide that for discovery

17   purposes.

18           **MR. KRAMER:**  I understand.  I just raise that that's

19   an issue.

20       If it is true that there's a dispute as we have today as

21   to whether it's in the current quarter, the issue is whether or

22   not Mr. Cook -- whether or not there were facts that were

23   available to Mr. Cook at -- you know, and what's available to

24   Mr. Cook is not some employee in China.  It's not some

25   mid-level employee.  As you know, the data get funneled up.  It

 1  gets analyzed; it gets looked at carefully.

 2      We're in a situation where it's literally the first month

 3  of the quarter where the company has just launched new iPhone

 4  10s, including one a week earlier.  And that's data that's

 5  coming almost daily.

 6      And the key here, Your Honor, is sales.  Not what's

 7  happening with suppliers.  The entire complaint was pivoted off

 8  of one communication that was reported in the press that Apple

 9  had reached out to a supplier and said:  We don't need surge

10  capacity.

11      But yet, the issue is whether or not sales were down.  Not

12  whether or not Apple had canceled surge capacity.  So when we

13  approached this --

14          **THE COURT:**  I don't know.  They're -- they're

15  interrelated.

16          **MR. KRAMER:**  Actually, Your Honor, as counsel has

17  pointed out, there have been two depositions in this case.

18  And the two people who were deposed make clear that the

19  company's guidance is not tied directly to surge capacity.

20  There's base level capacity that's built in.

21      But whenever you launch a new product -- and this is the

22  testimony -- whenever you launch a new product you build in

23  with suppliers excess capacity because you don't know which

24  models are going to be popular.  Is it going to be the XR

25  that's blue, the XR that's red, or are more people going to buy

1    the XS or the X Max?

2        So you build in lots of surge capacity with your suppliers

3    like Foxconn in China.  And then as the product sales start,

4    you start to pivot.  You lower some, you keep others.  Right?

5        So our approach is this case is about sales, because the

6    guidance given was about sales.  And so we worked very hard to

7    identify the key people who were the clearinghouse for what the

8    company believes is happening with sales to Mr. Cook.

9        And those --

10       **THE COURT:**  So you're saying surge capacity, and

11   whether you have surge capacity, whether you use surge

12   capacity, whether you change surge capacity, has nothing to do

13   with ongoing sales.

14       **MR. KRAMER:**  It has nothing to do with whether or

15   not, you know, sales in China are going to be at or below

16   guidance.  That's right.  Because --

17       **THE COURT:**  I see.  I see.  So if you decided we need

18   no surge capacity anywhere, then you think that doesn't have

19   anything to do with whether or not -- and you cannot draw any

20   inferences about whether the company thought the sales would

21   be higher or lower.

22       **MR. KRAMER:**  That's correct, Your Honor.  And that's

23   what the witnesses testified to.  They are different analyses,

24   different groups.

25       So what we did --

1          **THE COURT:**  So I think that's a matter for discovery

2     and for dispute.  Not a matter for certainty.

3          **MR. KRAMER:**  I understand, Your Honor.  But our point

4     is what we did was, based on the testimony, again, that two

5     witnesses gave, that's how we approached the witnesses.  And

6     we worked very hard --

7          **THE COURT:**  No, I understand that.  You're trying to

8     draw the narrowest limitation that you thought was reasonable

9     for the case.  I don't disagree with that.

10          **MR. KRAMER:**  Yeah, that's right.  I don't disagree.

11          **THE COURT:**  I don't -- I don't draw the narrowest

12     limitation that's reasonable for the case.

13          **MR. KRAMER:**  Okay.

14          **THE COURT:**  I draw the limitation that's reasonable

15     for the case.

16          **MR. KRAMER:**  Well, so Your Honor, look.  I think the

17     situation we're in which is, you know, the situation that

18     we've had in other -- in other -- you know, like the motion

19     for additional deposition in this case, right?

20          In the first five weeks of this case, we've had two

21     discovery motions.  You know, I -- you know, I rarely have

22     discovery motions in situations where I can't agree with the

23     other side.

24          They wanted 20 depos from the beginning.  We said: You

25     know what?  Let's see how it goes.  We'll be very thoughtful

1   about it.  And if you need more, the last thing I want to do is

2   go before Judge Spero and have him say:  Hey, Kramer, you're

3   being a jerk.  Give them more depos.

4       We took the same approach here.  We said:  Let us do our

5   search.  And remember, we're searching eight custodians.  If

6   some of the other people you've mentioned or the plaintiffs

7   identified, if they sent emails to those eight custodians,

8   they're going to get picked up by the keyword searches.  Right?

9       So it's not like we were only saying we're only going to

10   give you the emails for Tim Cook.  Or Luca Maestri.  Right?

11       **THE COURT:**  I appreciate that.  But that's not good

12   enough.  Because otherwise, you could never search downstream.

13   And -- just because you assume that everything that you ever

14   would send in an email would always automatically by picked up

15   with the others, with the people.  -- so --

16       **MR. KRAMER:**  Your Honor, I understand that.  But --

17       **THE COURT:**  Plus, plus he's made the point -- and I

18   think it's a fair point -- that it's not -- it's what was

19   available to Mr. Cook.  Not just known to him.

20       **MR. KRAMER:**  Yes, Your Honor.  But what's available

21   is what the company actually believes.

22       Let's assume -- Apple's an employer of tens of thousands

23   of people.  If someone in the middle -- a middle analyst says:

24   Hey, I may -- I think there may be an issue here --

25       **THE COURT:**  That's not these people.  That's a red

1  herring.  That's not the 15 people they want.

2       **MR. KRAMER:**  I understand.  But the people we've

3  identified in our list of eight are the people that make the

4  decision about what's actually happening in the business.

5       **THE COURT:**  Okay.  So here's what I think.  I think

6  you both were unwilling to compromise, and that's why we here.

7  I think you decided it had to be your way or the highway.  You

8  took a reasonable approach; they had to agree with it.  And if

9  you didn't agree with it, we're not going to go any further.

10  That's why we keep getting this.

11       And the plaintiffs did the same thing:  We want our 15;

12  you won't agree to our 15, we're stopping.  Full stop.

13       I don't see any indication, of either side, of the

14  recognition that this is a soft area.  That nobody has an

15  absolute right and nobody has an absolute monopoly on truth.

16  So the next time this happens, I'm going to have some very

17  harsh words for counsel, and I'm going to sanction someone.

18       This one, you needed to compromise.  Both of you.  Some --

19  you don't need to get just your custodians, and the plaintiffs

20  don't need to get all 16 of what they want, or 15, whatever it

21  is.  Fifteen custodians.  You're both wrong.  This is not

22  absolutes.

23       And you don't get to come in here and say: Well, we didn't

24  want to do any more of those, so we just stuck our heels in it,

25  because we're right.

1          Well, okay.  There's an off chance that some judge might

2    just say:  Well, you're right.  I think that judge would have

3    to be in a position where they don't know -- where they're more

4    confident than I am about their ability to discern what's

5    actually important in a case.  I'm not.  You know, you guys

6    know a thousand times more than I will ever know about this

7    case, and I can't possibly know it.  I know what I know from

8    what you've told me, which is, you know, thin (Indicating), to

9    say the least.

10         So I expect compromises in the future.  I expect you

11   people to be compromising.  Even when you think you're right.

12   On discovery, I expect you to compromise.

13         Custodians are a big deal.  It's expensive to search a

14   custodian.  It's expensive -- the search, itself, is moderately

15   expensive.  The review of those documents is very expensive.

16   So I appreciate that we're talking about, for each additional

17   custodian, a significant additional expense.

18         And I appreciate that the company is trying to keep those

19   expenses down, and as they should, and as you should.  I

20   appreciate that.  But I'm going to insist on compromises.

21         And so even this argument suggests that no one wants to

22   compromise.  You know.  It's -- counsel for plaintiff, you

23   know, made some extremely good points, all of which ended up

24   with saying:  Give us all -- essentially -- he didn't say it,

25   but Mr. Williams was essentially saying: We need more than what

1  you suggested.   Judge, we need the 15.   We're very careful

2  about this.

3      And your argument was:   We're very careful about this, and

4  if there's some additional, we'll -- that kind of approach is a

5  recipe for what we've got here.   And what we had last time,

6  frankly.   And I'm not interested in that.   I'm really not

7  interested in that.

8      I think it is -- it is -- it is the way lots of people

9  practice law these days.   My personal view is it's an

10 abdication of the responsibility that the Court has put upon

11 you.

12     So in the future, I expect to you compromise.   And not

13 just come up with what you think is a reasonable way of doing,

14 and stick to it when it comes to discovery.   Because there

15 aren't any absolutes here.

16     So that's what I'm going to do.   I'm going to allow -- I'm

17 going to add those custodians that I listed to the list.   If

18 there's a good reason to add later custodians later, we can add

19 them.   It won't be just that they're in the same space.

20 Because this is getting a large group of custodians in the

21 space that should be -- should be able to answer the question,

22 both the ones that I pose and the one that Mr. Williams posed,

23 about:   Were there facts reasonably available to Mr. Cook or

24 available to Mr. Cook, in an easy fashion that he didn't reach

25 out for, under circumstances where he should?

 1        You know, I have no idea whether that's true or not.  It's
 2   -- I don't -- I don't know the circumstances well enough to
 3   make any sort of opinion on that.  But, so, we're just going to
 4   do those additional one, two, three, four, five, six -- is that
 5   it?  Williams, Ahrendts, O'Brien, Khan, Schiller, and Joswiak.
 6   And we're not going to do the rest of them.  I mean, those will
 7   be in addition to the ones that Apple's already identified.

 8        So I want to set two more deadlines.  Number one is -- let
 9   me just write down what I'm doing here.

10        I want an agreement on the search terms.  What's a
11   reasonable period of time for you to agree on search terms?

12        **MR. KRAMER:**  Your Honor, I'll have to defer to my
13   colleagues, Mr. Askew and Ms. Winawer.  We have not started
14   discussions, and so I don't know how long that is going to
15   take.

16        Maybe, Mr. Askew?

17        **MR. ASKEW:**  Your Honor, it's Kevin Askew.  I think we
18   could work out that process in the next two weeks.

19        And just to go back to something Mr. Williams said, it is
20   not correct that we have refused to provide search terms.
21   We've agreed to provide them, and we're still working through
22   that.

23        We --

24        **THE COURT:**  When are you going to provide to them
25   your search terms?

1              MR. ASKEW:  We'll do it next week, Your Honor.  And

2    then --

3              THE COURT:  Good.  Monday, defendant will provide its

4    proposed search terms.

5              MR. KRAMER:  Your Honor, if I might?

6              THE COURT:  Uh-huh.

7              MR. KRAMER:  I hate to impose on the Court.  I'm

8    having a medical procedure on Monday, which requires me to be

9    under general anesthesia and out of pocket for --

10             THE COURT:  Oh, that's terrible.

11             MR. KRAMER:  Just having two disks replaced in my

12   neck, Your Honor.  Just --

13             THE COURT:  Okay.

14             MR. KRAMER:  And I would like to have the opportunity

15   to review before they go out.  And I don't know how many days

16   I'm going to be out of pocket.  And I hate to raise that, and

17   make sure I have a chance to weigh in.

18        So if we could ask the Court for some indulgence on that,

19   I would appreciate it.

20             THE COURT:  Well -- neck surgery.

21             MR. KRAMER:  Yes, sir.

22             THE COURT:  Monday is your surgery.

23             MR. KRAMER:  Yes, sir.

24             THE COURT:  You will not be available Tuesday or

25   Wednesday.

1          **MR. KRAMER:**  I'm thinking if you can give us by

2   Friday, I have some confidence I will be off the painkillers

3    enough that I can -- you know.

4        And Mr. Askew, of course, will push this forward with our

5   clients, but I do want to have the chance to weigh in since I'm

6   the senior person on the case.

7          **THE COURT:**  That's fine.

8          **MR. KRAMER:**  Thank Your Honor.

9          **THE COURT:**  So Friday of next week, you will provide

10    your proposed search terms to the plaintiff.  Then I want the

11    parties -- then I'm going to give a deadline for the parties

12    to finalize the list.

13        Let's see, Friday of next week is the 23rd.  April 7, to

14   finalize the list.

15          **MR. KRAMER:**  I believe you mean May 7th, Your Honor?

16          **THE COURT:**  May 7, yes.  I did.  I'm sorry.  May.

17          **MR. KRAMER:**  Okay.  No problem.

18          **MR. WILLIAMS:**  And we'll obviously propose any

19   supplements to that search terms --

20          **THE COURT:**  Yes, of course, of course.  I would

21   expect you to.  But I want you both to be, you know, sensitive

22    to each other's concerns, and compromise on these things.

23        My experience with search terms is you almost universally

24   get more than you can use.  And almost never miss something

25   because of the search term parameters.  So, of course you're

1   going to want to add search terms.  The defendants will provide

2   what they think are the narrowest reasonable search terms.  But

3   I expect you all to compromise on that.

4         And then, third, date for compliance.  When -- assuming,

5   you know, beginning in May we've got the search terms, we've

6   now got, I guess, what, a total of eight plus six, 14

7   custodians.

8         What is a reasonable time -- maybe Mr. Askew knows -- for

9   production of those documents?

10          MR. ASKEW:  My only hesitation here, Your Honor, is

11    that until we have collected the documents and applied the

12    search terms, we don't have a great sense of the volume.  We

13    can, of course, devote significant resources to it if the

14    volume is large.

15        But I'm not comfortable giving you a date that is any

16   sooner than late summer timeframe, with the understanding that

17   we would do it much sooner than that if we are able to.

18          MR. KRAMER:  Your Honor, if it's helpful -- it's Jim

19    Kramer -- what we can do is run the search terms, look at the

20    volume.  And then propose to plaintiffs a deadline by which

21    we'll have substantial completion.  And if they're

22    comfortable, we can submit it to the Court.  If they're not

23    comfortable, we can try to work something out.

24        I had a case recently where I thought there would be very

25   little documents resulting from the search terms, and it was

```
 1   humungous.  And I just don't want to be in a situation where
 2   we're giving a date without some basis.  And since we haven't
 3   run the search terms, as Mr. Askew said, I think we're in a
 4   difficult position here.
 5            THE COURT:  Well, I think that's a fair point.  I
 6    still want to set an outside date.
 7        And I'll take you up, to this extent.  I mean, even in
 8   negotiating what search terms you use, you may want to run some
 9   search terms to figure out what you're agreeing to.  But once
10   you've agreed on search terms, you'll run them, you'll get a
11   sense of the volume of the data, and you may have a better idea
12   of what -- what date to agree on.
13        And you should work with plaintiff on that subject.
14            MR. KRAMER:  Yes.  Your Honor, one thing that might
15    help us is if we have a good sense of the time period we're
16    searching.  As Mr. Williams pointed out, we're talking about a
17    statement made on November 1st.  I -- you know, I wouldn't
18    think we'd need to go back in time, you know, significantly
19    before then.  And I wouldn't think we'd have to go into the
20    future significantly after that.
21        In my experience, having a narrower time period does keep
22   the volume under control.  I don't know if Your Honor has
23   thoughts on that.
24            THE COURT:  My thoughts are:  Work it out.
25            MR. KRAMER:  Yes, Your Honor.  We'll try to do that.
```

1          **THE COURT:**  That's your first test for -- second

2     test, third test.

3          **MR. WILLIAMS:**  Your Honor --

4          **THE COURT:**  Wait, I'm not done.  I want to set an

5     outside deadline.

6        Yes, Mr. Williams, did you want to comment on what the

7     timing is?

8          **MR. WILLIAMS:**  I do -- so, the timing of production.

9          **THE COURT:**  Yeah.

10         **MR. WILLIAMS:**  I heard Mr. Askew say late summer for

11    the production.  And, you know, maybe that's the practical,

12    you know, reality.  It is going to affect the schedule that

13    the Court set for the overall discovery and case timeline, if

14    we're not getting any documents until late summer.  Let's say

15    that means August.  We may have to come back and revisit the

16    issue with you, because we just don't know at this point.

17        But I will say that, you know, that nothing has been

18    produced to this point.  And what we tried to do is ask the

19    defendants to look at the documents that can and should be

20    produced without the necessity of search terms.

21        For example, there are categories of information that Tim

22    Cook referenced in his -- in the January 2nd disclosure

23    regarding the information that they saw concerning declines in

24    traffic in stores in China.  There's the conference call

25    transcripts, and the drafts of those transcripts.  Information

1    concerning, you know, cancellations with certain suppliers

2    during the relevant period.  Issues that the company talked

3    with investors about when it explained why the earnings

4    forecast was missed, that could be collected from some people's

5    files very early on.

6         To suggest that nothing is capable of being collected and

7    produced easily, even without search terms, for nine or ten

8    months after the Court issued the order on the motion to

9    dismiss, we've thought is a bit unreasonable.  And we also

10   believe that an early production of that sort could help us

11   work through some of the other discovery issues.

12        That's one point.  I -- I'm compelled to just go back just

13   a moment, if I can, Your Honor, because I want us to be careful

14   that we don't end up in the same place six months from now.

15        Mr. Kramer made arguments to you that the District Court

16   flatly rejected a year ago.  The argument that the issue is

17   whether or not Mr. Cook was referring to the prior quarter when

18   he's --

19            THE COURT:  That's -- I wasn't basing any of my

20    thoughts on his arguments about that subject.

21            MR. WILLIAMS:  Okay.

22            THE COURT:  Not -- not -- not for a second.  As I

23    said to him, that's something that will be fought about in

24    court, not on discovery.  So you don't have to worry about

25    that.  And I have a solution to your issue about these things.

1     So here's what I'm going to do.  I'm going to set --

2  require that these documents be produced on a rolling basis,

3  number one.

4     Number two, I'm going to require the parties to meet and

5  confer, and set a deadline for production of certain categories

6  of documents that can be produced without search terms.

7     Number three.  I'm going to set an absolute outside

8  deadline of July 15th.

9     Now, the parties shall -- are going to meet and confer,

10  once we know the volume, and decide whether or not there can be

11  an earlier outside deadline.  But in any event, you'll do it on

12  a rolling production.

13     I assume if this is completely insane, someone will bring

14  it to my attention.  But my experience is that if we set

15  deadlines, people tend to take action.

16     I'm also concerned about not getting anywhere near to, you

17  know, the fall or the end of the year before this first round

18  of production is done, given the relatively early 2022

19  discovery cutoff.

20          **MR. KRAMER:**  Yes, Your Honor.  Your Honor, if I

21   might?

22          **THE COURT:**  Yeah.

23          **MR. KRAMER:**  Just to make clear, we have produced

24   materials already that don't require search terms.  We have

25   produced analyst reports, for example, and other documents.

 1   So there has been a production.  Mr. Askew can provide the

 2   specifics if that's helpful.  But we have made productions.  I

 3   think we made three productions so far.  So, just making sure

 4   the record's clear.

 5       On the deadline, I think that's fine.  We will run the

 6   search terms through the custodians you've identified and the

 7   ones we agreed to, including the ones we added as a compromise

 8   as part of the meet-and-confer process with plaintiffs, because

 9   we did compromise and add some.  Or add one, I should say.

10       And if we determine that there's an issue with July 15th,

11   we will continue -- we will produce things on a rolling basis.

12   We will not hold off.  And we will let plaintiffs know if we

13   think we can't complete it, and attempt to meet and confer with

14   them if we need more time.

15       And if we can't reach an agreement, we'll let you know.

16   But, we will move with all due haste on this.

17           **THE COURT:**  So, okay.  But, just don't get me wrong

18   on this.  I expect you to get it done by July 15th.

19           **MR. KRAMER:**  I understand, Your Honor.

20           **THE COURT:**  I expect you to devote whatever resources

21   it takes, you know, to that project.  It would take a pretty

22   extreme circumstance for me to believe that -- and there might

23   be one; I don't know -- for me to believe that that deadline

24   needs to be extended.

25           **MR. KRAMER:**  Fair enough, Your Honor.

1        **THE COURT:**  It's possible.  So just bear that in mind

2    when you're thinking about it, when you're -- of course, meet

3    and confer on that subject.

4        Okay.  I think I've covered everything I wanted to cover.

5    Is there anything that anyone else wanted to cover that I

6    haven't?

7        **MR. WILLIAMS:**  There's a lot that I would like to

8    cover, Your Honor, but I understand where we are.

9        **THE COURT:**  I appreciate both of your hesitancy in

10   bringing up other things.

11       **MR. WILLIAMS:**  Yeah.  I think that one of the things

12   that I would like to do is have the opportunity to come back

13   to the Court regarding the custodian, without it necessarily

14   being a dispute.

15       **THE COURT:**  No.  There is no chance I'm doing that.

16   There is zero chance I am doing that.

17       You know, this -- it is too normal in many of these

18   litigations for you all to resort to the Court.  I don't want

19   -- want to set a new standard.  It is not normal to resort to

20   the Court.

21       I expect you all to work it out.  It makes better sense

22   for your clients and you get a much better result for the

23   clients if you do it the other way, but the Federal Rules of

24   Civil Procedure insist on that, anyway.  So I am not doing

25   that.  This is your job, not mine, in the first instance.

1           And I'm sorry to be so forceful about it.  But it's really

2   important, because the attitude in this case is all wrong:

3   We'll insist on our way of doing it because we think we are

4   very reasonable, and if they don't agree, we'll just go to the

5   Court.

6           That is going to be -- I want you to jettison that

7   attitude.  Both sides have it.

8                 **MR. WILLIAMS:**  Very well, Your Honor.

9                 **THE COURT:**  No.  This is for you to work out.  This

10   is for you to the work out.  And I don't want to have to get

11   to the point where I start taking enforcement mechanisms to

12   get that going.

13          So please, please, don't to come me unless there is a

14   dispute that you absolutely can't work out, even with

15   compromises.

16                 **MR. WILLIAMS:**  Thank you, Your Honor.

17                 **THE COURT:**  You'll see in my standing order that

18   you're required to give me compromises.  Those were somewhat

19   contained, I suppose, in this letter, but they were a

20   neglected part of the letter, I would say.

21          I really want people to go out and -- out and do real

22   serious compromises that mean they're sacrificing something

23   important that they don't think they have to sacrifice, but to

24   get this done, they'll do it.  Maybe not important, but I mean

25   a sacrifice at some cost.  So that's my thinking.

1          All right, thank you all.   Appreciate it.

2               **MR. WILLIAMS:**   Thank you, Your Honor.

3               **MR. KRAMER:**   Thank you, Your Honor.

4               **THE COURT:**   Yeah.

5               **MR. ASKEW:**   Thank you.

6          (Proceedings concluded)

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_/s/ Belle Ball_

Belle Ball, CSR 8785, CRR, RDR

April 24, 2021