Pages 1 - 26

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Joseph C. Spero, Judge

IN RE:  APPLE, INC. SECURITIES )
LITIGATION,                    )**NO. C 19-02033 YGR (JCS)**
 _____)


                         San Francisco, California
                         Friday, May 28, 2021


              **TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**


**APPEARANCES VIA ZOOM**:

For Plaintiff:
                    ROBBINS, GELLER, RUDMAN & DOWD LLP
                    Post-Montgomery Center
                    One Montgomery Street - Suite 1800
                    San Francisco, California  94104
               BY:  **SHAWN A. WILLIAMS, ATTORNEY AT LAW**
                    **DANIEL J. PFEFFERBAUM, ATTORNEY AT LAW**
                    **KENNETH J. BLACK, ATTORNEY AT LAW**

For Hon Hai:
                    HERRERA KENNEDY LLP
                    1300 Clay Street - Suite 600
                    Oakland, California  94612
               BY:  **NICOMEDES S. HERRERA, ATTORNEY AT LAW**




Reported By:        Marla F. Knox, RPR, CRR, RMR
                    Official Reporter

**Friday - May 28, 2021**                                      **10:48 a.m.**

                              **P R O C E E D I N G S**

                                  **---000---**

        **THE CLERK:**  The next matter we are calling is

19-CV-2033, In Re: Apple, Inc. Securities Litigation.

      Counsel, could you please raise your hands.

                        (Pause in proceedings.)

        **THE CLERK:**  So good morning.  And appearances, please,

first starting with the Plaintiffs.  And then this one involves

the non-party, and then -- so we will take that appearance

next.

        **THE COURT:**  Wait, wait, wait.  I'm sorry, this is

docket number.

        **THE CLERK:**  This is 167.

        **THE COURT:**  I thought this was 170.

        **THE CLERK:**  No.  170 is set for Tuesday.

        **THE COURT:**  Hold on.  Let me pull up my notes.  Bear

with me a little bit here.

                        (Pause in proceedings.)

        **THE COURT:**  Okay.  Go ahead.  Got it.

        **MR. WILLIAMS:**  Good morning, Your Honor, Shawn

Williams, Robbins Geller Rudman & Dowd, on behalf of

Plaintiffs.

        **THE COURT:**  Good morning, Mr. Williams.

        **MR. PFEFFERBAUM:**  Good morning, Your Honor, Dan

1   Pfefferbaum from Robbins Geller Rudman & Dowd, also here on

2   behalf of Plaintiffs.

3            **THE COURT:**  Good morning.

4            **MR. BLACK:**  Good morning, Kenneth Black, also Robbins

5   Geller, on behalf of Plaintiff Norfolk County Pension Fund.

6            **THE COURT:**  Good morning.

7            **MR. HERRERA:**  Good morning, Your Honor, Nicomedes

8   Herrera from Herrera Kennedy, and we represent Hon Hai.

9            **THE COURT:**  Good morning, everyone.

10     So I'm sorry for that little bit of delay while I pulled

11   up my notes on this.

12     You have asked me to rule on a couple of different things

13   about the objections to information, and I'm prepared to do

14   that.

15     I -- and then I have -- and then I'm going to push back

16   on -- and suggest that you do some of it, the work.  But the

17   first question is whether or not the information beyond what

18   was sent to or from Apple is relevant to the case.  I guess

19   that's the first issue.

20     And my -- my ruling is that -- you know, it is because at

21   least falsity can be proven by information that was

22   communicated, not communicated.

23     So I would rule that information not to -- just because

24   information was sent -- was not sent to or from Apple does not

25   mean it is not discoverable.

1    Second, on the other hand, I think that I'm going to limit

2  the information to market conditions and demands for Apple's

3  smart phones in greater China, not other smart phones.

4    This is a non-party.  I'm going to -- at some point I have

5  to apply some sorts of -- more than just the proportionality

6  tests, the reasonable test for the non-party.  What is unique

7  to this non-party is that you can get direct information about

8  the Apple smart phone demand because that's what they worked on

9  with respect to Apple.

10    So I won't allow discovery from this non-party regarding

11  market conditions and market demands for smart phones other

12  than the Apple smart phones.

13    The last component is communications with component

14  suppliers.  You know, I think there is some relevance to that

15  information.  I don't -- I don't think that's really -- really

16  can be disputed, but I would limit that to a reasonable number

17  of the top suppliers by volume.

18    And I push to you-all to negotiate what a reasonable

19  number is.  And if you can't, you can come back to me; and I

20  will decide it.  But that is something you can probably work

21  out.

22    I think those are the three areas in which you needed

23  review.  So I'm happy to hear your comments on those or if I

24  have missed something, I would like to know that, please.

25    **MR. HERRERA:**  Your Honor, this is Nicomedes Herrera on

1  behalf of Hon Hai.

2          **THE COURT:**  Yes.

3          **MR. HERRERA:**  There are two other issues.  First, if I

4  may just make an observation as to your statement, that falsity

5  can be proven by information even if it was not possessed by

6  Apple.

7          I would refer to the Court to Docket Number 123, which is

8  Judge Gonzalez' order, which Plaintiffs cited but they didn't

9  cite the second part of the statement.

10          On page 18 the Court said that it's clear that just

11  because Apple -- Tim Cook didn't know it doesn't mean it

12  couldn't be used to prove the Plaintiffs' case.

13          But the next line, I think, is critical because in the

14  very next sentence -- and this was omitted by Plaintiffs in

15  their brief -- the Court said that Apple possessed the

16  information.

17          So, in other words, the Court found that the Plaintiff

18  plausibly alleged that the -- that Apple possessed that

19  information.

20          And what Hon Hai has offered is to say that look, if it

21  was given or received from Apple, that is something that we are

22  going to produce.

23          And even if it was not received or given by Apple but

24  rather it referred to a communication by Apple, we would

25  produce that as well.

1      For example, if there is a document that says, you know,

2  that Apple told me over the phone that demand is much lower, we

3  would produce that as well.

4      But given that the touchstone that the Court had focused

5  on --

6      **THE COURT:**  That's wrong.  That's just -- you are not

7  arguing summary judgment here.  You are not arguing a Motion To

8  Dismiss.  You are arguing a discovery motion.

9      And if they can figure out something from your files that

10  is information that if Apple had it, it would help prove

11  falsity or scienter or whatever it is, then they would have to

12  try to figure out whether they can link it to Apple.  That's a

13  separate question.

14      So it's in discovery.  I'm actually -- I thought about

15  that, of course, because it was pointed out to me; but I'm

16  not -- I don't want you to re-argue things that you have

17  already argued.

18      **MR. HERRERA:**  Okay.  And would that apply to suppliers

19  as well?  In terms of -- there is correspondence to

20  suppliers -- there is going to be a lot of correspondence with

21  suppliers.

22      And I think what we were offering is reasonable, which is

23  if the correspondence with the supplier is nearly implementing

24  what is in the MPS reports -- which we offered and volunteered

25  to give and actually identified -- that is not really relevant

1    because the MPS reports -- this is very important -- has a

2    rolling estimate projection for the next 40 weeks of what Apple

3    says its demand is going to be.

4         And if the MPS report says, Our demand is X; and Hon Hai

5    sent out thousands of communications to its dozens of suppliers

6    saying, Well, okay, this demand is going to be X.  Apple said

7    it and it is implementing that, that is not really relevant.

8         Really what would be relevant is if there is something

9    indicated to the suppliers that was different -- materially

10   different from what was in the MPS reports and that is

11   something that Apple reasonably would have known.

12        So I think that as stated, it would be a little bit too

13   broad because it is going to capture so many documents that

14   have absolutely no relevance and that is already indicated

15   through the MPS reports.

16        **THE COURT:**  Well, it may or may not be indicated

17   through the MPS reports.  It may be inconsistent with them, as

18   you say.  It may have additional information that may have

19   ultimately resulted in further communications to Apple on that

20   subject.

21        That's why I'm trying to limit it to a reasonable -- yes,

22   I think it does extend -- my scope does extend to

23   communications with component suppliers.

24        The question, though, is how many?  I don't think you need

25   a lot.  I think you need a reasonable number, the top

1  suppliers, to capture some information about what you are

2  telling your suppliers.

3      It doesn't need to be all, you know, whatever numbers --

4  there are dozens of them, I assume.

5      It needs to be, you know, maybe even -- I hate to put a

6  number on it because it will just prejudice the negotiations on

7  this subject, but I'm not looking for a large number.

8      I'm looking for a small number, so that is it is a more

9  reasonable scope to gather and that it gets you a sampling that

10  you can look at and say:  Well, okay, so these reports from

11  Apple, they are actually what was communicated in the field.

12  They are not inconsistent with it.  The truth is this.  The

13  false -- you know, that sort of thing.

14      So I hear your concern and I appreciate it, but I'm trying

15  to get at it in a different way.

16      **MR. HERRERA:**  So, Your Honor, we will produce the

17  communications with suppliers; but there is a part of my

18  question that I don't think you answered, which is:  If it is a

19  communication that was not with -- excuse me -- that was just

20  merely implementing the demand, you mentioned that could be a

21  change; that could have been subsequent to Apple -- we would be

22  willing to produce it.  In fact, we are producing documents

23  with Apple.

24      But if it is not a material change from the demand that

25  was -- that was conveyed by Apple in the MPS reports, we are

having a hard time understanding why that large volume of

documents that implement the demand --

      **THE COURT:**  So I'm -- I'm -- I don't understand why

you are asking for that because that seems like a harder thing

for you to do than what I have asked because then you have to

read every single communication and say:  Well, is that

implementing.

     And I don't really understand why you would want to

increase your burden that way.  But also I don't think the

other side has to rely on you to decide whether it is just

implementing.  That's why I wouldn't go that direction.

      **MR. HERRERA:**  Okay, Your Honor.  I think that leads to

two additional questions that I would like to ask the Court, if

I may.

      **THE COURT:**  Yes, please.

      **MR. HERRERA:**  The first is given the fact that the

Court's order may lead to the production of large volumes of

documents, we have asked that the cost of responding to the

subpoena be shifted, anything above $15,000.

     And I think that may clarify, and it may actually

encourage Plaintiffs to be more reasonable in how much they are

asking for.

     So the Ninth Circuit has said that it's mandatory to shift

costs when it is substantial, and in that case, $20,000, the

Court had no problem deciding it was substantial; and, in fact,

1   cited a case where it was only 9,000.

2       What I think Hon Hai has offered is we will pay for the

3   first 15,000.  But after that, you are really putting a

4   substantial burden on Hon Hai to produce documents that you can

5   really get most of them from Apple.

6       And so we think they ought to be bear the cost of anything

7   above $15,000, which is pretty much in the sweet spot of what

8   the Ninth Circuit has said is substantial and subject to

9   mandatory shifting.

10       **THE COURT:**  Well, so let me just go through a couple

11   of things on that.

12       I don't -- we will go down to the expenses.  On expenses,

13   how much is it going to cost?

14       **MR. HERRERA:**  It really depends on the number of --

15                   (Video feed interruption.)

16       **THE COURT:**  I lost you there for a second.  You froze.

17   Can you say it again?

18       **MR. HERRERA:**  Yes, Your Honor.  It depends on how many

19   custodians they insist on.  We offer a custodian that is --

20       **THE COURT:**  Well, let's go back.

21       The -- there were -- I did have a couple other things.  As

22   I say, I'm just getting through this.

23       The, I guess, I don't understand why Hon Hai's proposal on

24   custodians isn't -- isn't reasonable.  You know, it's -- and

25   that -- so that's -- maybe I need to address that question.

1   Anyone from Apple want to take that on -- I mean, from the

2   Plaintiffs want to take that on?

3        **MR. BLACK:**  Yes, Your Honor.  Mr. Herrera just said it

4   depends on how many custodians Plaintiffs insist on.

5        We haven't insisted on a number of custodians.  What

6   happened is Hon Hai hasn't shared with us any information about

7   the custodians, so they proposed one.

8        What we would like is what happened in *Cohen v. Apple*

9   where the Court ordered the identities and the titles of the

10  custodians to be disclosed.

11       This is something that Mr. Herrera has told he would do in

12  the past.  He was investigating custodians.  And now instead,

13  all we have been offered is one single custodian.

14       **THE COURT:**  So I guess my -- what I will ask you to do

15  is to work this out.  I'm not -- I'm not inclined to just

16  automatically go with the one custodian because Hon Hai says

17  it's the right one.  You have got to prove, Mr. Herrera, to

18  somebody that it's the right one.

19       And you are just saying it doesn't make it so.  Even the

20  description you --

21       **MR. HERRERA:**  Your Honor, here is --

22       **THE COURT:**  Go ahead.  You were saying.

23       **MR. HERRERA:**  I'm sorry.  I didn't mean to cut you

24  off.  There was a pause.  I thought you were done.  I'm so

25  sorry.

1    **THE COURT:**  No.  I mean, I just -- you said that you

2    identified potential custodians, and this is the most likely

3    one to have it; but that's -- you know, that's all you have

4    done.

5         You said, Well, we will figure it out later if there is

6    more that need to be done.  I think that's not the way

7    custodian negotiations work.

8         I think that you should have an actual discussion about it

9    and provide them information about why -- what the potential

10   custodians are that you have looked at and what -- and why you

11   picked this one and let them react to that.

12        Because I don't want -- because, you know, I want to get

13   discovery done.  I don't want it to be so rolling that it takes

14   forever.  So --

15             **MR. BLACK:**  Your Honor, if I may --

16             **THE COURT:**  Yes, sir.

17             **MR. BLACK:**  -- I cut you off.

18             **MR. HERRERA:**  -- give you some background because I

19   think we did do that.  One of the reasons, the most important

20   reasons, is the MPS reports I view as being one of the critical

21   documents because they are the documents where Apple is

22   conveying to Hon Hai what their rolling projections are for

23   demand over the next four weeks.

24        And there were eleven of those separate reports during the

25   relevant time period.  And each of those reports would have,

1    you know, maybe a dozen or more recipients.  And of those

2    recipients, most of them were involved in kind of ministerial

3    production issues; but there were only two people that received

4    all of those reports.

5        And that -- only one of those persons were in charge,

6    focused on capacity planning.  And that's the custodian that we

7    suggested we produce.

8        And I think in the future, we are not adverse to maybe

9    opening up to some of the people who only received seven of

10   them.  But the fact is the person that received all of them and

11   whose job title it was --

12       **THE COURT:**  Fine.  I just rejected exactly what you

13   said.  That's not how we do this.  You have to show them -- you

14   can't just make unilateral decisions.  This is a unilateral

15   decision.

16       I want you to show them the list that you are working from

17   and explain to them who these people are on the list and why

18   you did it the way you did it.

19       And they may agree or they may say we want one more or we

20   want two more.  Obviously you are a non-party, and I take that

21   very seriously.  So I don't want them to overreach, but I do

22   want you to work it out.  So the order on the custodians is to

23   work it out.

24       **MR. BLACK:**  Your Honor, can I address this one point?

25   Mr. Herrera described that he identified custodians based on

1   who received the MPS report, which is a document about iPhone

2   production.

3       We do have other requests that don't go just to iPhone

4   production but the tracking of iPhone orders; also to the

5   issues you said just now are potentially relevant including

6   iPhone production as related to market issues or the Chinese

7   economy and requests related to communications with financial

8   analysts in the media, which are directly relevant to some of

9   the disclosures in our case.

10      So I would ask that you have him also propose custodians

11  or a custodian or more that --

12          **THE COURT:**  I'm not going to do anything like that.

13  First of all, this is a non-party.  He is going to propose

14  custodians.

15      If you don't think they are adequate, you can have a

16  discussion about that.  But I want you to know exactly what he

17  has done.  But I also think that you may find that the person

18  who actually gets this information may be a person who is going

19  to be producing the most relevant information that you have on

20  those subjects -- on those other subjects.  But I need to do

21  that now.

22      So the parties are ordered with respect to initial

23  custodians to meet and confer and provide information about

24  what custodians they think are appropriate and why others are

25  not.

1          With respect to the deposition subpoena, the 30(b)(6), has

2     that been worked out yet?

3          **MR. BLACK:**  No, Your Honor, because they have not

4     offered to put up a custodian.

5          **MR. HERRERA:**  That's not true.  Your Honor, although

6     we believe that as a matter of law that we don't have to

7     produce a custodian from China -- where all of the relevant

8     people are located, not in the United States -- we offered a

9     very common sense compromise, which is that -- China makes it

10    illegal for someone in China to give a deposition in

11    furtherance of a U.S. litigation unless they are -- essential

12    authority is involved.

13          And what we offered is someone from China might even be

14    able to go to --

15          **THE COURT:**  So I'm not interested in you repeating

16    your discovery letter.  I'm actually not.

17          **MR. HERRERA:**  Okay.

18          **THE COURT:**  I'm actually interested in a discussion

19    about this.  Why not Phil Lim?  He is the global -- Apple

20    Global Sales Director at Hon Hai Interconnect Technology in

21    Santa Clara.

22          **MR. HERRERA:**  Phil Lim is --

23          **THE COURT:**  Says he's responsible for the global

24    account for Apple.  Why not --

25          **MR. HERRERA:**  Yeah.

1              **THE COURT:**  By the way, it doesn't -- it doesn't seem

2      to me that -- he seems to have information relevant to it.  The

3      person who you pick doesn't have to be the person who has a

4      hundred cents on the dollar of all the information.

5          It is a 30(b)(6) witness.  You might have to prepare them

6      with information from the company, but he seems to be in the

7      right area.

8              **MR. HERRERA:**  Absolutely, Your Honor.  He is not.  And

9      the reason why you didn't know that because they didn't quote

10     very important information on his LinkedIn profile.

11          They said that he interfaces with Apple.  What they didn't

12     say is that he was responsible for new designs and sales

13     increases -- with increased sales revenue in the connector

14     cable and acoustics products line.

15          It is not the iPhone product line.  He is dealing with

16     cables and connectors, and that is not --

17              **THE COURT:**  Apple cables and connectors?

18              **MR. HERRERA:**  Yes.

19              **THE COURT:**  So why didn't you put anything that is not

20     just on his LinkedIn profile about what his position is?

21              **MR. HERRERA:**  We didn't know these individuals.  They

22     brought it up for the first time.

23              **THE COURT:**  Well, I understand.  But it has been a

24     while.  You could have called up and said, Who is this person.

25              **MR. HERRERA:**  In their letter they brought it up for

1    the first time and we have information about who they are.

2        And none of the people that they listed have anything to

3    do with production of iPhones that would be relevant to --

4        **THE COURT:**  How about -- do they have -- it is not

5    just production.  It is also global sales.

6        **MR. HERRERA:**  So the people -- so Jasmine Huang, she

7    is an engineer and that's -- that is apparent --

8        **THE COURT:**  I don't want you to go through everyone.

9    I'm asking you a question:  Is anybody in the United States who

10   deals with Apple sales worldwide?

11       **MR. HERRERA:**  No.  They deal with -- excuse me.  Let

12   me say that:  There is no one in the United States that I know

13   that deals with the production of Apple iPhones.

14       **THE COURT:**  Okay.

15       **MR. HERRERA:**  There are --

16       **THE COURT:**  How about sales of Apple iPhones?

17       **MR. HERRERA:**  I don't have that information that I

18   would be willing to represent.  I don't think so but let me

19   confirm that.

20       **THE COURT:**  But you are saying Phil Lim has nothing to

21   do with this?

22       **MR. HERRERA:**  Yes.  He has to do with --

23       **THE COURT:**  With iPhones at all?

24       **MR. HERRERA:**  Connectors and cables and the same thing

25   with the Dandan Li.  And Jasmine and Ryan are also just

1  components or they are engineers.

2      There is three types of employees, really, that Hon Hai

3  has in the United States.

4      One is research and development engineer, which is -- they

5  have identified two of them, that are about new product

6  development R&D.

7      The second are the quality control and implementation,

8  which is something that also Jasmine has -- was involved in.

9      And new product vetting and development.  They don't deal

10  with the production of iPhones and especially the forecasting

11  matters.

12      I don't know whether any of them has any, quote-unquote,

13  sales connections because it was made clear to me that they

14  wouldn't know anything.  None of the existing Apple people in

15  the United States would have relevant information that the

16  Plaintiffs are looking for.

17      And in terms of the cases that we cite, I think the Courts

18  that have looked at it impose a very reasonable standard.  They

19  are saying it is -- you can't hide the ball by saying:  Well,

20  the most relevant person is in China.  But we are not doing

21  that.

22      What the Courts are saying is that if the people that are

23  within the United States don't have preexisting knowledge that

24  would be relevant to the topics that the -- that the company is

25  not obligated to educate someone that didn't have a preexisting

1   job description because that would be unreasonable.

2       For example, if the only people there were engineers that,

3   you know, made cars or catalytic converters, they would not be

4   expected to be educated to deal with accounting matters because

5   the job description --

6           **THE COURT:**  No, no, I understand that.  I understand

7   that.  That's all.

8           **MR. HERRERA:**  That is what is happening here.

9           **THE COURT:**  So let me hear from the other side.

10          **MR. BLACK:**  That is not what is happening here.  We

11  have spent months asking Mr. Herrera what he has done to

12  inquire where the relevant people are.

13      We pointed out all the different employees -- not

14  necessarily all these four -- we said:  It looks like Hon Hai

15  is here.  They are operating with Apple.  They are making, you

16  know, millions or billions of dollars from doing so.

17      There has to be lots of people.  All the evidence

18  indicates that there are people who can be prepared.  Hon Hai

19  is here taking advantage of the corporate forum.  So they have

20  an obligation to prepare a corporate representative.

21          **THE COURT:**  Well, if you can identify somebody, then

22  that's right.  If you don't -- if they can't identify somebody

23  that is actually involved and has some knowledge about Apple

24  iPhone productions or Apple iPhone sales, then that would be

25  the -- you would be right.

1          **MR. BLACK:**  Your Honor, it appears that these people

2     do.  We have received no information to the contrary.

3          **THE COURT:**  Well, you have produced -- none of the

4     people you have given to me are the ones that do.

5          **MR. BLACK:**  If Your Honor thinks that it is our

6     obligation to do all of this research without any input from

7     Hon Hai, we can hire a private investigator.  We can look at

8     into it in other ways.

9          **THE COURT:**  All I have got right now is Mr. Herrera's

10    say-so.

11         **MR. BLACK:**  And that's all we have.  You know, we have

12    a conclusory statement that there is no person, but there is no

13    evidence --

14         **THE COURT:**  Here is what I want:  I want a declaration

15    from a person with knowledge at Hon Hai.

16         **MR. HERRERA:**  Your Honor, we did provide a declaration

17    at the end of the letter, and it is a declaration that -- it is

18    a very short one-page declaration at the end of May.

19       She is Carrie Huang, Director of Supply Chain Management

20    and says:  There are no individuals including employees and

21    officers of Hon Hai and its affiliated entities working or

22    residing in the United States who are familiar with or have any

23    relevant personal information or knowledge pertaining to the

24    topics described in the Plaintiffs' deposition subpoena.

25       And it is not just my say-so, Your Honor.  If we look at

1    the MPS reports, which I go back to are the most relevant

2    documents, I will point out of the 60 or so recipients of those

3    MPS reports, not a single person is in the United States.  A

4    hundred percent of them work in China.

5         That says something.  That says that the people that are

6    getting the communications about the forecast from Apple, none

7    of them are in the United States.  A hundred percent of them

8    are in China, which gives great credence to what Ms. Huang has

9    declared under the penalty of perjury; that they are all in

10   China.  There is no one in the United States with relevant

11   knowledge of the topics noticed in the deposition.

12        **THE COURT:**  So who is -- she is the Director of Supply

13   Chain Management.  I don't know.  How do you test that,

14   Mr. Black?

15        **MR. BLACK:**  How do you test whether or not she is, in

16   fact --

17        **THE COURT:**  No.  How do you find out whether she is

18   right or wrong?

19        **MR. BLACK:**  So Hon Hai has all of that information.

20   Mr. Herrera just mentioned the MPS reports.  He said that they

21   have offered to produce them.  They can produce them now.

22        It is a limited number of documents.  They won't share

23   them with us, so we have no ability to investigate or even

24   fact-check the claims he has made.

25        **THE COURT:**  Well, but here is what is going to happen:

You are going to get more information through these documents.
You are going to produce the MPS reports; right?

      **MR. HERRERA:**  Yes, Your Honor.

      **MR. BLACK:**  Can we ask when?

      **THE COURT:**  No, you can't because we are going to get
to these things.  I don't -- this is not an opportunity for
people to fight.

    This is an opportunity for me to make rulings and for you
to work things out, but I don't want it this way.

    So my -- on the -- what I want you to do is get the
documents including -- including the MPS reports, and then to
meet and confer on whether or not there is appropriate person
to be a 30(b)(6) witness.

    And you know what I will say is:  If there is some dispute
as to whether or not there is somebody in the United States who
has the knowledge, Plaintiffs can take a deposition on that
subject; take a deposition of people -- of somebody who knows
all the various facilities that Hon Hai operates in the United
States, who all the employees are.  You take a 30(b)(6) on that
and figure out who it is.

    So it's in everyone's interest to work this out because
one way or another, we are going to do it.  And I think it is
just -- you know, the Defendants -- Hon Hai's suggestion is a
possibility, but it would be much better if there was just
someone who had some information in the United States who can

1  be educated.  It would be cheaper for everybody including for

2  Hon Hai.  So that's what I want you to do on that.

3      Let me go back to where I was.  So, I know I still haven't

4  answered your question about dollars yet.

5      The remaining issue I think is dollars; is that right?

6          **MR. HERRERA:**  Yes, Your Honor.

7          **THE COURT:**  On dollars I really can't make a decision

8  unless I know what it is going to cost.  And I don't know if

9  you have -- what your idea is about the range of what this

10  might cost?

11          **MR. HERRERA:**  Your Honor, I think for every custodian,

12  it would be about $15,000 in costs.

13          **THE COURT:**  Okay.

14          **MR. BLACK:**  Your Honor, we have tried to work with

15  them to minimize the burden.  We are willing to continue to do

16  so.

17          **THE COURT:**  Well, okay.  That's great but -- and my

18  suggestion is you try to work this out.  My -- I think maybe

19  there is -- you can do it in tranches.  You can have the first

20  X thousands of dollars -- and I'm not wetted to the 15, by the

21  way.  It is very specific to the case.  There are lots of

22  third-party witnesses in this and in other high-tech cases that

23  are spending, I guarantee you, much more than $15,000 to do

24  their -- and I'm not encouraged by the fact that you were

25  willing to increase the cost by deep into the weeds on your --

1  on the contractors and figuring out which e-mail was about just

2  implementation and which one wasn't.

3      So, you know, I want you to meet and confer on this.  I'm

4  inclined to have some level -- to have some portion of this

5  paid for by the Plaintiffs.  It won't be at the $15,000, but it

6  might be at some other level.

7      And it might be that the first whatever that is will be

8  borne by Hon Hai and then the next X will be borne by the

9  Plaintiff.  And then after that, give everybody incentives to

10  minimize it.

11      I want you to meet and confer on this because I think

12  it's -- and Plaintiffs can bear this in mind.  If they want

13  more custodians, it is going to be more expensive; and they may

14  have to pay some.

15      You know, certainly based on the idea that there is one

16  custodian, I wouldn't shift fees or costs.  But, you know, if

17  there is more, maybe that is a possibility.  I will ask you to

18  meet and confer on the dollar.

19      So you are going to meet and confer on custodians first.

20  I guess that's a predicate to getting this stuff done.

21      You can produce the stuff you can produce without

22  custodians right away, the MPS reports, et cetera.  Let's

23  produce those immediately.

24      With respect to -- you are going to meet and confer on the

25  custodians, let's give a timeframe for you to work on that

 1    issue because I want to get that done.

 2        Let's have you meet and confer on the custodians, you

 3    know, the cost shifting, and the date for production of the

 4    documents, all of that over the next 30 days.

 5                         (Pause in proceedings.)

 6        **THE COURT:**  And if there is anything left, then you

 7    can give me a short letter; but there really shouldn't be

 8    anything left.

 9        Do you want to talk about the other docket number while I

10    have got you here?

11        **MR. BLACK:**  Sorry, the other docket number?

12        **THE COURT:**  Oh, we don't have the other party for

13    that.  All right.  Okay.  Great.

14        **MR. PFEFFERBAUM:**  May I make just one clarification so

15    we don't have a --

16        **THE COURT:**  Yeah, sure.

17        **MR. PFEFFERBAUM:**  I think I heard you say with respect

18    to the MPS reports, that those should be produced immediately.

19        **THE COURT:**  Right.

20        **MR. PFEFFERBAUM:**  And that does not depend on an

21    agreement of costs or is that --

22        **THE COURT:**  Those are not expensive to produce.

23        **MR. PFEFFERBAUM:**  Okay.

24        **MR. BLACK:**  They will help inform our discussions

25    going forward.

1          THE COURT:  Yeah.

2          MR. BLACK:  If those are available.

3          THE COURT:  Yep.  Thank you.  All right.  Anything

4     else I haven't covered?

5        Sorry for the fits and starts.  I pulled up the wrong

6     document.

7          MR. BLACK:  No.  Thank you, Your Honor.

8          THE COURT:  Thank you.

9          MR. HERRERA:  Have a good weekend.

10         MR. PFEFFERBAUM:  Thank you, Your Honor.

11         THE COURT:  Thanks.

12              (Proceedings adjourned at 11:25 a.m.)

13                        ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25

<u>**CERTIFICATE OF REPORTER**</u>

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Tuesday, June 8, 2021

_____

Marla F. Knox, RPR, CRR, RMR
U.S. Court Reporter