1   JAMES N. KRAMER (SBN 154709)
    jkramer@orrick.com
2   ALEXANDER K. TALARIDES (SBN 268068)
    atalarides@orrick.com
3   ORRICK, HERRINGTON & SUTCLIFFE LLP
    The Orrick Building
4   405 Howard Street
    San Francisco, CA  94105-2669
5   Telephone:    (415) 773-5700
    Facsimile:    (415) 773-5759
6
    Attorneys for Defendants Apple Inc.,
7   Timothy Cook, and Luca Maestri

8

9                   UNITED STATES DISTRICT COURT

10                NORTHERN DISTRICT OF CALIFORNIA

11                       OAKLAND DIVISION

12

13  IN RE APPLE INC. SECURITIES          Civil Action No. 4:19-cv-02033-YGR
    LITIGATION
14                                       **DEFENDANTS' OPPOSITION TO
                                         MOTION FOR CLASS CERTIFICATION**
15
                                         <u>Hearing</u>
16                                       Date:    September 14, 2021
                                         Time:   2:00 p.m.
17                                       Ctrm:   1, 14th Floor
                                         Judge:   Honorable Yvonne Gonzalez Rogers
18

19

20

21

22          <u>**REDACTED VERSION**</u>

23
             **(CONDITIONALLY FILED UNDER SEAL)**
24

25

26

27

28

1

2

## **TABLE OF CONTENTS**

I.      INTRODUCTION ....................................................................................... 1

II.     BACKGROUND ......................................................................................... 2

        A.      Relevant Procedural Background......................................................... 2

        B.      The Remaining Challenged Statement.................................................. 3

        C.      The Allegedly "Corrective" Disclosures.............................................. 7

                1.      The November 5, 2018 Purportedly Corrective Disclosures ...................... 7

                2.      The November 12, 2018 Purportedly Corrective Disclosure...................... 8

                3.      The January 2, 2019 Purportedly Corrective Disclosures.......................... 9

III.    CLASS CERTIFICATION STANDARDS ....................................................... 11

IV.     ARGUMENT ............................................................................................. 12

        A.      Plaintiff Is Not An Adequate Representative For the Class................................ 12

        B.      The Class Should Not Be Certified Because the Evidence Rebuts the
                Presumption of Classwide Reliance on the Challenged Statement....................... 14

        C.      Even If the Court Were to Certify a Class, It Should Not Include Option-
                Holders, As Plaintiff Has Not Proven That Options On Apple's Stock
                Trade In An Efficient Market............................................................. 19

        D.      The Motion Should Be Denied Because Plaintiff's Damages Model
                Includes Damages That Did Not Result From the Alleged Wrongdoing ............ 23

V.      CONCLUSION ........................................................................................... 25

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                      **Page(s)**

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ............................................................................... *passim*

*Bhojwani v. Pistiolis*,
    2007 WL 9228588 (S.D.N.Y. July 31, 2007) ........................................ 14

*In re Boeing Co. Aircraft Sec. Litig.*,
    2020 WL 476658 (N.D. Ill. Jan. 28, 2020) ............................................ 12

*Brown v. China Integrated Energy, Inc.*,
    2014 WL 12576643 (C.D. Cal. Aug. 4, 2014) ....................................... 22

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989): (1) ............................................. 20, 21

*Camp v. Qualcomm Inc.*,
    2019 WL 277360 (S.D. Cal. Jan. 22, 2019) ..................................... 12, 13

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ................................................... 11, 18, 23, 24

*In re Cutera Sec. Litig.*,
    610 F.3d 1103 (9th Cir. 2010) ................................................................. 3

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ................................................................................ 18

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011) ................................................................................ 15

*FindWhat Inv'r Grp. v. FindWhat.com*,
    658 F.3d 1282 (11th Cir. 2011) ......................................................... 8, 17

*In re Glob. Brokerage, Inc.*,
    2021 WL 1160056 (S.D.N.Y. Mar. 18, 2021) ....................................... 21

*In re Grupo Televisa Sec. Litig.*,
    2021 WL 2000005 (S.D.N.Y. May 19, 2021) ........................................ 14

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    573 U.S. 258 (2014) ........................................................... 11, 15, 17

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992) ................................................................. 15

*In re Initial Pub. Offering Sec. Litig.*,
   399 F. Supp. 2d 261 (S.D.N.Y. 2005) ...................................................................... 17

*Jones v. Dep't of Health & Human Servs.*,
   834 F.3d 1361 (Fed. Cir. 2016) ............................................................................. 16

*Leyva v. Medline Indus. Inc.*,
   716 F.3d 510 (9th Cir. 2013) ................................................................................. 23

*Metro. Stevedore Co. v. Rambo*,
   521 U.S. 121 (1997) .............................................................................................. 16

*Parko v. Shell Oil Co.*,
   739 F.3d 1083 (7th Cir. 2014) ......................................................................... 15, 16

*Plaut v. Goldman Sachs Grp., Inc.*,
   2019 WL 4512774 (S.D.N.Y. Sept. 19, 2019) ...................................................... 12

*Silverberg v. Dryships Inc.*,
   2021 WL 2198701 (E.D.N.Y. May 28, 2021) ...................................................... 14

*Tomaszewski v. Trevena, Inc.*,
   383 F. Supp. 3d 409 (E.D. Pa. 2019) ................................................................... 14

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ......................................................................................... 11, 12

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
   208 F.3d 288 (1st Cir. 2000) ................................................................................. 15

*In re Williams Sec. Litigation-WCG Subclass*,
   558 F.3d 1130 (10th Cir. 2009) .............................................................................. 7

**Statutes and Rules**

17 C.F.R.
   § 240.10b5–1(c) .................................................................................................... 24

Fed. R. Civ. P.
   Rule 23 .................................................................................................................. 11
   Rule 23(a) .............................................................................................................. 11
   Rule 23(a)(4) ......................................................................................................... 12
   Rule 23(b)(3) ............................................................................................ 11, 18, 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    I.     **INTRODUCTION**

2         Defendants acknowledge that class certification is often granted in putative securities class

3    actions.  This case, however, presents a situation where the facts make clear that a different result

4    is warranted.  As explained below, discovery has revealed four independently dispositive reasons

5    why Plaintiff's Motion for Class Certification (the "Motion") should be rejected.

6         First, Plaintiff is not an adequate representative of the class.  At Plaintiff's 30(b)(6)

7    deposition taken in connection with the Motion, its representative admitted that the stock loss

8    figures Plaintiff submitted to the Court as part of its June 2019 lead plaintiff motion (and certified

9    as being accurate under penalty of perjury) were in fact misstated, and caused Plaintiff's claimed

10   losses to be overstated by *more than 40%*.  After the deposition Plaintiff filed an errata purporting

11   to "update" the misstated figures, but the errata offers no explanation for the two-year old

12   misstatements, and in fact reveals there were even more errors in Plaintiff's stock loss disclosures

13   than Plaintiff identified under oath.  Since the deposition, Plaintiff has also served Defendants

14   with additional documents regarding its Apple stock holdings—again without any explanation of

15   why the documents were not provided previously—and those documents raise still further doubts

16   about the veracity of Plaintiff's alleged stock sales.  Even if inadvertent, these repeated, self-

17   serving mistakes demonstrate that Plaintiff is not an adequate class representative, and that its

18   Motion should be denied.

19        Second, and furthermore, while Plaintiff claims that classwide reliance on the alleged

20   misstatement can be established through the "fraud on the market" presumption set forth in *Basic

21   Inc. v. Levinson*, 485 U.S. 224 (1988), the evidence proves that the alleged misstatement in this

22   case ("I would not put China in that category") did not impact Apple's stock price, and thus could

23   not have caused Plaintiff's claimed losses.  Plaintiff insists the alleged misstatement's impact on

24   Apple's stock price can simply be inferred from later stock price declines, but the Supreme Court

25   recently reiterated that where, as here, there is a "mismatch between the contents of the

26   misrepresentation and the corrective disclosure[s]," a stock price connection should not be

27   presumed.  *See Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret.* Sys., 141 S. Ct. 1951, 1961 (2021).

28   Here, the subject matter of the first two purported "corrective" statements—decreased iPhone

production—does not "relate back" to the subject matter of the alleged misstatement, which concerned Apple's overall business in Greater China; and the third allegedly "corrective" statement disclosed information that could not have been known or disclosed at the time the alleged misstatement was made.  Those "mismatches" sever any presumption of price connection, and with it, any showing of classwide reliance.

Third, even if the Court were to certify a class, it should not include option-holders, because there is no evidence to show that the thousands of individually distinct types of options for Apple stock trade in an efficient market.  Plaintiff has wildly overreached in trying to fold option-holders into the class, and can present no evidence to show they should be included. Plaintiff's expert's conclusions about the market efficiency for options are also demonstrably wrong.

Fourth, Plaintiff does not present a model for calculating damages attributable only to its theory of liability.  In fact, Plaintiff's expert does not present a model for calculating damages at all, but merely provides a conclusory definition of damages under Rule 10(b) that does not account for the specific facts of this case or even *attempt* to demonstrate how damages would actually be computed.  Plaintiff's damages model also incorporates option-holders, who are not part of the class, without even attempting to describe how their complicated, highly individual damages could ever be computed on a classwide basis.

Plaintiff's claim that Apple's CEO sought to defraud investors by saying he "would not put China in that category" has zero basis in fact.  Plaintiff's Motion for class certification is equally failing, and proffers an unproven and overbroad class that should be rejected.

## II.     **BACKGROUND**

### A.     **Relevant Procedural Background**

When this case was first filed, plaintiffs alleged over 80 misstatements regarding purported iPhone "throttling," demand in China, and the effects of a battery replacement program. Dkt. No. 85.  On June 2, 2020, the Court "dismissed the majority of those allegations because they were based on inactionable statements."  Dkt. No. 123, Nov. 4, 2020 Motion to Dismiss Order ("11/4/20 MTD Order") at 4 (citing Dkt. No. 110).  Plaintiff's June 23, 2020 Revised

Amended Complaint (the "Complaint") subsequently alleged that on November 1, 2018, Apple's CEO Tim Cook made two groups of statements on "behalf of Apple, [that were] actionable under the Exchange Act"—one regarding (i) the "great start" for the launch of Apple's new iPhone models, and another addressing (ii) Apple's overall business in Greater China.  Compl. ¶ 2. Defendants moved to dismiss those allegations, as well, and on November 4, 2020 the Court dismissed the "alleged misrepresentations concerning the launch of the [new] iPhone" models as legally inactionable puffery (*see* Motion at 3 n. 5 (citing 11/4/20 MTD Order at 11)), leaving only a *single* alleged misstatement ("I would not put China in that category" ) at issue.

Defendants raise this point only because Plaintiff's Motion repeatedly refers to alleged "misrepresentation*s*," plural (*see*, *e.g.*, Motion at 2-3, 7-9, 12, 17), as if the Court's November 4, 2020 order did not dismiss the statements regarding the "great start" for Apple's new iPhone models.  As Plaintiff would have it, "*Despite* the Court's dismissal of the[] statements [regarding the "great start" for iPhones] as inactionable, *they [nonetheless] contributed to the false impression*" at issue in this case.  Motion at 3, n. 5 (emphasis added).  But that is legally baseless—the Court dismissed the "great start" statements because they "are puffery and do not address the specific areas that defendants allegedly knew to be doing poorly" (11/4/20 MTD Order at 11), which is to say they are not misleading as a matter of law.  *See In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("[I]nvestors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers . . . Indeed, 'professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives.'") (citations omitted).

Importantly for this discussion, after the Court's November 4, 2020 order dismissed the Complaint in part, Plaintiff was not required to file an amended complaint, which is to say the Complaint is still the operative complaint, and still contains the "great start" allegations that were dismissed, as well as other related allegations that were mooted by their dismissal.

### B.    The Remaining Challenged Statement

As alleged, on a November 1, 2018 analyst call regarding Apple's financial results for the fourth quarter of its fiscal 2018 (which ended September 29, 2018), an analyst from Bank of

America Merrill Lynch asked Mr. Cook to "talk about how [he] see[s] the trajectory [in China] for [Apple's] business," given the "deceleration in some of these emerging markets, partly driven by some concerns around some of the rules [the Trump] administration is contemplating and . . . by things that are more specific to China, for instance, like some of the regulations around gaming." Ex. 1 at 10.[1]  Mr. Cook responded by saying that "emerging markets . . . like Turkey, India, Brazil, [and] Russia . . . are markets where currencies have weakened over the recent period," and "are not growing the way we would like to see." *Id*.  Mr. Cook continued, saying that Apple's "business in India in Q4 was flat," and "Brazil was down somewhat compared to the previous year," but

> . . . [i]n relation to China specifically, *I would not put China in that category.* Our business in China was very strong last quarter. We grew 16%, which we're very happy with. iPhone in particular was very strong. Very strong double-digit growth there.

Compl. ¶ 56 (emphasis added).  Those eight emphasized words—Mr. Cook's statement of opinion about Apple's overall business in Greater China (the "Challenged Statement")—form the basis of Plaintiff's class action claim.

Plaintiff alleges Mr. Cook's statement about Apple's business in Greater China was materially misleading because it failed to disclose three "true facts":

> (i) "that the U.S.-China trade tensions and economic conditions in China were negatively impacting sales and demand for Apple products, particularly iPhones," (ii) "the Company had already begun to see declining traffic in Apple's retail stores and those of its channel partner stores in Greater China, and reports of an overall contraction of the smartphone industry," and (iii) "the Company had already, or was preparing to, cut iPhone production at multiple manufacturers and reduce orders from its largest suppliers of iPhone components for the current quarter and holiday season." *Id*. ¶ 24.

Plainly, the third of those "true facts" is a holdover from before the Court dismissed the statements regarding the "great start" for Apple's new iPhone models, and Plaintiff does not and

---

[1] All references to "Ex. __" are to the Declaration of James N. Kramer in support of Defendants' Opposition to Motion for Class Certification.

cannot explain how the remaining Challenged Statement—"I would not put China is that category"—would be rendered false by a failure to disclose decreased worldwide iPhone production.  In other words, there is an obvious *mismatch* in the subject-matter of the Challenged Statement and the third purported "true fact."

As to the first two alleged "true facts," the evidence establishes that at the time the Challenged Statement was made on November 1, 2018, the market was already well-aware that Apple was facing headwinds in China, particularly with regard to iPhone sales.  For example, as Defendants' expert Dr. Steven Grenadier catalogues more fully in his attached opinion (*see* Ex. 2 at 41-45, ¶¶ 99-108), an October 15, 2018 article on *The Verge* stated that "the smartphone market in China is only going to slump further," and that "there are 'multiple signs of rapidly slowing consumer demand in China which we believe could easily affect Apple's demand there this fall'"; an October 16, 2018 article on *AppleInsider* stated "[p]arts of the supply chain are tempering their expectations on iPhone sales for the remainder of 2018 . . . with weak sales said to be feared by suppliers based in Taiwan," and "shipments in the fourth quarter of 2018 already said to be decelerating"; an October 22, 2018 *Rosenblatt* report stated that "we believe iPhone XR demand may be lower than our previous estimates"; an October 24, 2019 article in *Theflyonthewall.com* stated that 20 of the 44 participants surveyed by OTR Global indicated that they expected Apple's market share to be down, "especially in China"; an October 25, 2018 *Barrons* article stated that "[m]acro data points out of China continued to weaken in October," with "the cheaper iPhone XR model … performing slightly worse than their expectations"; and an October 29, 2018 *South China Morning Post* article stated that Apple "failed to attract public attention with its flagship iPhone XS debut in China last month" and was "caught in the middle of the trade war between the US and China which has prompted some Chinese buyers to turn to local brands in a patriotic show of support."  *Id.* at 128-129, 130-132, 142, 147, 185-186, 187.[2]

---

[2] Plaintiff may argue that by citing prior disclosure of the allegedly undisclosed "true facts," Defendants are impermissibly seeking to offer a "truth on the market" defense.  To the contrary, the fact that the first two allegedly undisclosed "true facts" were already known to the market establishes that the purported "corrective disclosures," which cumulatively disclosed the same information, could not have affected Apple's stock price.

In fact, just two days before Mr. Cook made the Challenged Statement, on October 29, 2018, Bank of America Merrill Lynch issued a report on Apple titled "*Lowering estimates to account for China risk, FX headwinds*," where it "lower[ed] [its] iPhone estimates for the Dec quarter and for F19 to account for a slowdown in China (double digit unit decline although ASP drives rev growth) and for broader FX headwinds." Ex. 2 at 45-46, ¶¶ 110-111 (emphasis added); *id.* at 189-206.[3]

Plaintiff insists, without any evidence, that the Challenged Statement "artificially inflated" the price of Apple's stock at the time it was made. Compl. ¶ 26. But when the Challenged Statement was made, Apple's stock price in fact *declined* by nearly 10%, from a close of $222.24 on November 1, 2018, the day before Mr. Cook made the Challenged Statement, to $207.48 on November 2, the day after. Ex. 3.[4] While Plaintiff's expert notes that "Plaintiff *alleges* the stock would have fallen more but for misrepresentations and omissions that concealed the full extent of negative developments," Dkt. No. 165-3, ¶ 32 (emphasis added), neither Plaintiff nor its expert offer any *evidence* from November 2, 2018 to support that allegation. Indeed, Plaintiff's expert conceded that he did not delve "into the merits" of Plaintiff's price-maintenance allegations at all. *See* Ex. 4 at 138:4–9.

At most, Plaintiff's expert opines that "[t]here was a cause-and-effect relationship between the release of new information and changes in Apple's stock price," Dkt. No. 165-3, ¶

---

[3] Apple's slowing iPhone business in China continued to be widely discussed in the market leading up to the January 2, 2019 purported revelation of the corrective truth, including in a November 12, 2018 *Dow Jones Institutional News* article noting that "J.P. Morgan cut its earnings estimates on [Apple], citing new forecasts for modest declines in iPhone shipments for this year and next" and "a weaker macro-economic environment in emerging markets, such as China"; a November 12, 2018 article on *AppleInsider* noting that "Ming-Chi Kuo has cut expectations for sales of the iPhone XR for the next year by 30 percent to 70 million, based on a possibility of a trade war with China, and other factors possibly weighing on sales"; a December 12, 2018, a *South China Morning Post* noting "the ongoing US-China trade war and rising nationalist sentiment among mainland consumers, with more turning to local smartphone brands such as Huawei"; a December 23, 2018 article on *Digit* noting that "companies in China are offering incentives to those employees who choose to buy Huawei smartphones instead of iPhones, and that "[i]t was inevitable that the trade war between the United States and China would come to impact Apple." Ex. 2 at 52-54, ¶¶ 130-35; *id.* at 412, 422, 509, 510.

[4] This exhibit provides Apple's historical stock prices after adjusting for a 4:1 stock split in 2020, and therefore the prices shown on the exhibit must be multiplied by four to reflect their nominal share price in 2018.

97, but he does not and cannot offer any evidence to show the *direction* of the purported stock price reaction to the Challenged Statement.  In other words, the evidence proves that Apple's stock price declined when the Challenged Statement was made (together with numerous other statements and the announcement of Apple's Q4 2018 earnings), and Plaintiff can only speculate that the Challenged Statement somehow artificially "inflated" or "maintained" Apple's stock price from declining further.  *See* Ex. 2 at 38, ¶¶ 90-91.

### C.    The Allegedly "Corrective" Disclosures

Plaintiff alleges that the purported price inflation or maintenance caused by the Challenged Statement was dissipated by three allegedly corrective disclosures, on November 5, 2018, November 12, 2018, and January 2, 2019.  Compl. ¶¶ 98-99, 103, 105-106.  But Plaintiff has nothing more than conjecture to show any of those later disclosures "corrected" the Challenged Statement at all.

### 1.    The November 5, 2018 Purportedly Corrective Disclosures

The first allegedly corrective disclosures occurred on November 5, 2018, when the *Nikkei Asian Review* published an article claiming "that Apple told its top smartphone assemblers, Foxconn and Pegatron, to reduce iPhone XR production, and that Wistron, previously on standby for rush orders, would receive none, indicating a reduction in demand by 20-25%," *id*. ¶ 98, and that later that day, "RBC Capital Market issued a report . . . stating Apple's production suspensions could indicate 'muted' iPhone demand," *id.* ¶ 99.  Plaintiff alleges that "[a]s a result of this new information concerning production cuts at Apple manufacturers, and reports reiterating the news, Apple's stock price declined from a close of $207.48 per share on November 2, 2018, to a close of $201.59 per share on November 5, 2018, a decline of $5.89 on more than 66.1 million shares traded."  *Id.* ¶ 102.

But Plaintiff does not and cannot explain how disclosures regarding decreased iPhone production purportedly "corrected" the Challenged Statement, which concerned Apple's overall business in Greater China ("I would not put China in that category").  "To be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but it *must at least relate back to the misrepresentation* and not to some other negative information about the company." *In re*

*Williams Sec. Litigation-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009) (emphasis added); *see also FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1311 n.28 (11th Cir. 2011) (quoting *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005)) (to be corrective, "the disclosure must share the *same subject matter* as the prior misstatement; only then can the disclosure be said to have a 'corrective effect,' rather than merely a 'negative effect.'") (emphasis added)).  Plaintiff asks the Court to simply infer that the November 5, 2018 stock price decline proves that Apple's stock price had been artificially inflated by the November 1, 2018 Challenged Statement, but that "inference—that the back-end price drop equals front-end inflation . . . break[s] down when there is a *mismatch between the contents of the misrepresentation and the corrective disclosure*." *Goldman Sachs*, 141 S. Ct. at 1961 (emphasis added).  Put simply, while Plaintiff insists the disclosure of decreased iPhone production "corrected" misstatements about Apple's overall business in Greater China, there is no evidence to support that conclusion, and thus "less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." *Id.*[5]

Even if the November 5, 2018 disclosures about decreased iPhone production could be said to "correct" the Challenged Statement about Apple's overall business in Greater China, as discussed above, the fact of Apple's slowing smartphone business in China was then known to the market, *see* Ex. 2 at 41-45, ¶¶ 99-108 (collecting sources).  Accordingly, still-further cumulative disclosure could not have "dissipated" the alleged price inflation caused or maintained by the Challenged Statement.

### 2.    The November 12, 2018 Purportedly Corrective Disclosure

That same analysis holds true for the November 12, 2018 allegedly "corrective" disclosure, which again addresses decreased iPhone production, and *not* Apple's overall business

---

[5] As with the third alleged "true fact," it would seem that Plaintiff's allegations about the November 2018 purportedly "corrective" disclosures are holdovers from when Plaintiff was alleging misstatements regarding the "great start" of Apple's new iPhone lines.  11/4/20 MTD Order at 11.  Those misstatements have been dismissed from the case, *id.*, creating an obvious "mismatch" between the contents of the Challenged Statement, which concerns Apple's business in Greater China, and the November 2018 purportedly corrective statements, which address decreased iPhone production.

in Greater China.  As alleged, on November 12, 2018 Wells Fargo issued a report titled "AAPL: Lumentum Cuts Revenue Outlook by 17%+ (Midpoint) on Apple Order Cuts," which disclosed that Lumentum, a single "supplier of iPhone components," had experienced "as much as a 30% cut in Apple orders."  Compl. ¶ 103.  Plaintiff alleges that as a result of this "new information, Apple's stock price declined from a close of $204.47 per share on November 9, 2018, to a close of $194.17 per share on November 12, 2018, a decline of $10.30."  *Id.* ¶ 104.

But as with the November 5 allegedly corrective disclosures, there is a "mismatch between the contents of the misrepresentation and the corrective disclosure," *Goldman Sachs*, 141 S. Ct. at 1961, and Plaintiff does not explain how a disclosure about decreased production at a single iPhone component supplier "relates back" to the Challenged Statement regarding Apple's overall business in Greater China.  Nor, as before, can Plaintiff explain how a November 12, 2018 disclosure about decreased iPhone production is "new information" (Compl. ¶ 104), when the market was already informed of slowing iPhone business in China.  *See* Ex. 2 at 41-45, ¶¶ 99-108 (collecting sources).  Again, Plaintiff concludes the November 12, 2018 disclosure dissipated the Challenged Statement's purported stock price inflation, but other than the fact of the stock price decline, there is zero evidence to support that conclusion.

### 3.    The January 2, 2019 Purportedly Corrective Disclosures

The third purportedly corrective disclosure allegedly occurred on "January 2, 2019, after the close of trading, [when] Apple disclosed the true state of its declining iPhone sales."  Compl. ¶ 105.  Specifically, Plaintiff alleges that in a letter to Apple investors, the Company disclosed that its revenue for Q1 2019 would come in below the guidance provided on November 1, 2018 and that part of the reason for the lower revenue was due to business declines in China.  *Id.* ¶¶ 105-106.  As alleged, "[o]n the shocking news of January 2, 2019, when the true financial condition of the Company was disclosed, Apple's stock price declined precipitously by more than $15.00 per share, or approximately 10%, to a close of $142.19 per share on January 3, 2019."  *Id.* ¶ 111.

Plaintiff claims the Court can rely on the January 3, 2019 stock price decline and pull it backward in time to the Challenged Statement to find artificial inflation throughout the Class

Period.  *See* Dkt. No. 165-3, ¶ 186 (Plaintiff's expert admittedly works "chronologically backwards from the final corrective disclosure to the start of the Class Period, accounting for alleged fraud-related residual price declines as they occurred.").  As Plaintiff would have it, the stock price decline on January 3, 2019 was the result of the market realizing that the Challenged Statement—"I would not put China in that category"—was false, and that China was, in fact, "in that category" of emerging markets referenced by the Statement.

But again, the market was well aware of Apple's slowing business in China long before January 2, 2019.  The "new information" disclosed on January 2, 2019 that caused "analysts and media outlets [to] express[] shock [was] the *magnitude and severity* of the Company's negative performance" in China.  Compl. ¶ 84 (emphasis added).  For example, on January 2, 2019 the Bank of America Merrill Lynch wrote that its "downgrade late last year was predicated on a weaker China, but demand seems to have *deteriorated materially over the past two months*."  *See* Ex. 2 at 524 (emphasis added).  On January 3, 2019 BMO wrote that it "had been cautious on the new iPhone products as well as on Apple's China business, but the *weakness is much more pronounced than [it] expected*."  *Id.* at 536.  In short, the market knew Apple's business in China was slowing, and what it learned on January 2, 2019 was just how much it had slowed.

Importantly, at the time Mr. Cook made the Challenged Statement on November 1, 2018, Apple was only one month into the financial quarter, and only weeks into the launch of a new iPhone line, which is to say Mr. Cook could not have then known or disclosed the "magnitude and severity" of the quarter-end drop in iPhone revenue and Apple's business in China.[6]  The Challenged Statement therefore cannot be said to be misleading with regard to quarter-end results, or to have caused the stock price decline that occurred from the release of that information.  *See* Ex. 2 at 26-29, ¶¶ 63-68.  Plaintiff also fails to explain how Mr. Cook's *qualitative opinion* statement that he "would not put China in that category" (of emerging

---

[6] Obviously, Mr. Cook was also not omniscient, so "[e]ven if Mr. Cook may have had more insight into Apple's expected future performance in China than the market did on November 1, 2018, [Plaintiff] has not explained how Mr. Cook could have perfectly predicted how the economy and trade war would affect iPhone sales in China over the following two months."  Ex. 2 at 27-28, ¶ 65.

markets) matches up with the allegedly corrective January 2, 2019 *quantitative* disclosure that Apple's revenue came in $5 to $9 billion below guidance, such that the Challenged Statement could be said to have been "corrected." *Id.* at 34-37, ¶¶ 80-86.

While Plaintiff claims the January 3, 2019 decline in Apple's stock price was caused by the dissipation of inflation purportedly caused by the Challenged Statement, Plaintiff's expert admitted that the decline was also caused by "non-fraud related information" being released to the market. *See* Dkt. No. 165-3, ¶ 186. That confounding information included (i) Mr. Cook's January 2, 2019 letter to investors disclosing that in Q1'19 Apple had experienced slowing upgrade of iPhones in developed economies that contributed to the reduced revenue guidance (*see* Ex. 5) and, (ii) as plaintiffs in this case have previously alleged, Mr. Cook's January 2, 2019 statement that "emphasized the negative impact the battery replacement program had had on the pace of phone replacements during 1Q19" (Dkt. No. 1, ¶¶ 37–38), which analysts specifically referenced with regard to Apple's disappointing results (Ex. 2 at 30-32, ¶¶ 71-75).

At bottom, Plaintiff demands the Court conclude that the stock drop on January 3, 2019 was the result of the Challenged Statement's artificial inflation being dissipated, but there is no evidence to show it is true.

## III.   <u>CLASS CERTIFICATION STANDARDS</u>

"Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). To the contrary, the Supreme Court has "made clear that plaintiffs wishing to proceed through a class action must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) ("*Halliburton II*"). "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)," *Comcast Corp. v. Behrend,* 569 U.S. 27, 34 (2013), and requires Plaintiff to demonstrate through "evidentiary proof" that "questions of law or fact common to class members predominate over any questions affecting only individual members.'" *Id.* at 33 (quoting Fed. R. Civ. P. 23(b)(3)).

In deciding whether to certify a class, the Court must conduct a "rigorous analysis," which

1   requires it "to probe behind the pleadings before coming to rest on the certification question."

2   *Wal–Mart Stores*, 564 U.S. at 350–351.  "Frequently that 'rigorous analysis' will entail some

3   overlap with the merits of the plaintiff's underlying claim.  That cannot be helped." *Id.* at 351.

4   **IV.   ARGUMENT**

5       **A.   Plaintiff Is Not An Adequate Representative For the Class**

6         Rule 23(a)(4) permits the certification of a class only if "the representative parties will

7   fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  When a plaintiff

8   certifies erroneous information, and especially when those errors are significant, courts have

9   repeatedly found that plaintiff to be an inadequate class representative.  *See, e.g., In re Boeing Co.*

10  *Aircraft Sec. Litig.*, 2020 WL 476658, at *5 (N.D. Ill. Jan. 28, 2020) ("[F]ailure to discover these

11  obvious [loss chart] errors independently warrants a determination that the [plaintiffs] will not be

12  adequate representatives of the class.") (collecting cases); *Plaut v. Goldman Sachs Grp., Inc.*,

13  2019 WL 4512774, at *5 (S.D.N.Y. Sept. 19, 2019) ("[C]ertification errors in [plaintiff's]

14  submissions militate against appointment and render it inadequate to serve as lead plaintiff under

15  Rule 23's adequacy requirement.") (internal citation, brackets, and quotation marks omitted);

16  *Camp v. Qualcomm Inc.*, 2019 WL 277360, at *3 (S.D. Cal. Jan. 22, 2019) (highlighting "doubts

17  about [plaintiff's] ability to serve as the class representative because of 'significant errors in the

18  transaction records and loss calculations accompanying [plaintiff's] motion.'").

19  ████████████████████████████████████████████████████████████████

20  ██████████████ the stock loss information Plaintiff submitted as part of its June 2019 lead

21  plaintiff motion was misstated.  ████████████████████████████████████

22  █████████████████████████████████ the "Trading History Exhibit" attached to Plaintiff's lead

23  plaintiff motion claimed losses that were *over 40%* higher than Plaintiff's actual losses.  *See* Ex. 6

24  at 114:24-115:5; Dkt. No. 37-9 (the "Trading History Exhibit"); Ex. 7 at NORFOLK_0000445.[7]

25  [7] The Trading History Exhibit submitted to the Court in June of 2019 stated that on February 11,
    2019, Plaintiff sold 32,147 shares at $158.39, yielding proceeds of $5,091,776.19. *See* Dkt. No.

26  37-9.

27  

28  ██████████████████████ *See* Ex. 6 at 114:24-115:5.

Inflating losses by such a material amount, *more than $350,000* nominally, is exactly the sort of error that disqualifies a party as class representative.  *See Camp*, 2019 WL 277360, at *3-4 (finding plaintiff inadequate due to misstated loss calculations that overstated losses by 30%). That is particularly true given that Plaintiff allowed the false information to stand for more than two years.

After Plaintiff was called out on its misrepresentation at deposition, it filed an errata with the Court that purported to "update" the two-year old false information Plaintiff submitted in the Trading History Exhibit.  Dkt. No. 194.  But ████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████ (*see* Ex. 6 at 115:7-14), the errata identifies *two* additional  misstatements in the Exhibit ████████████████████████████ (*see* Dkt. No. 194, discussing mistakes in the date *and* price of November 12, 2018 stock purchase).

And  Plaintiff's  stock  loss  numbers  are  *still*  wrong.  Plaintiff's revised trading history exhibit claims that Plaintiff sold 32,147 shares of Apple stock on February 11, 2019 (Dkt. No. 194-1), but its account statements show that in fact it sold ████ shares on that date (Ex. 7 at NORFOLK_0000445, NORFOLK_0000619). Likewise, Plaintiff's revised exhibit claims that it acquired 14,012 shares of Apple stock on November 12, 2018 for $204.42 (Dkt. No. 194-1), but the historical stock price chart shows Apple's shares *never traded above $200 that day* (Ex. 8) (showing an intraday high of $49.96, which is $199.84 after readjusting for the stock split).

Most egregiously, ████████████████████████████████ Plaintiff did not in fact "acquire" 14,012 Apple shares on November 12, 2018 *at all*, for any price, ████████ ████████████████████████████████████████████████████████ *See* Ex. 6 at 141:9-10 ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████ *See* Ex. 9 at NORFOLK_0002301 ████████ ████████████████████████████████████████████████████████████████████████

1   ███████████████████████████████████████████████████

2   ███████████████   (emphasis added).   With that additional error on Plaintiff's errata

3   corrected, Plaintiff's stock loss representations to the Court are shown to be overstated by over

4   *$650,000*, or more than *double* what they really were.[8]

5         At best, Plaintiff's repeated, self-serving errors "speak to a level of carelessness" that

6   renders Plaintiff an inadequate class representative.   *See Tomaszewski v. Trevena, Inc.*, 383 F.

7   Supp. 3d 409, 414 (E.D. Pa. 2019).   At worst, if Plaintiff overstated its losses to secure the lead

8   plaintiff appointment, "that is a definition of fraud."   *See In re Grupo Televisa Sec. Litig.*, 2021

9   WL 2000005, at *3 (S.D.N.Y. May 19, 2021) (noting that "Robbins Geller omitted to state

10  material facts necessary in order to make the statements in its memorandum . . . not misleading");

11  *Silverberg v. Dryships Inc.*, 2021 WL 2198701, at *5 n.5 (E.D.N.Y. May 28, 2021) ("This is not

12  the first time that a Court has criticized Robbins Geller for making false statements in a securities

13  class action. In fact, it's not the first time this month.").

14        Irrespective of Plaintiff's intent in making the errors, the fact that Plaintiff (i) allowed the

15  misstatements to stand for more than two years, (ii) continues to change its story and provide

16  purportedly "updated" information without any explanation for the change, and (iii) *still* has not

17  corrected all of its misstatements about its stock losses demonstrates that Plaintiff is not an

18  adequate representative of the class, and that its Motion should be denied.   *See Bhojwani v.*

19  *Pistiolis*, 2007 WL 9228588, at *3 (S.D.N.Y. July 31, 2007) ("[T]he fact that the data *still* do not

20  quite add up . . .  undermines the adequacy of [the party] as a lead plaintiff.") (emphasis added).

21   **B.      The Class Should Not Be Certified Because the Evidence Rebuts the**
         **Presumption of Classwide Reliance on the Challenged Statement**
22

23        In order to bring a claim under Section 10(b), "the plaintiff must show individual reliance

24  on a material misstatement."   *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 506 (9th Cir. 1992).

25  ───────────────────────────────
    [8] Defendants note that the transaction code used by Plaintiff's broker to evidence the November
26  12, 2018 incoming *transfer* of shares between its accounts, ███████ (*see* Ex. 7 at
    NORFOLK_0000510), is similar to the ███████ code used in connection with the alleged
27  February 11, 2019 sale of Apple stock (*see id.* at NORFOLK_0000445).   Unlike Plaintiff's other
    stock sales, which are given the code ███████ the February 11, 2019 alleged sale is coded
28  ███████ begging the question of whether those shares were merely transferred between
    Plaintiff's accounts, as well.

In *Basic*, 485 U.S. 224, the Supreme Court held that securities fraud plaintiffs can invoke the "fraud on the market" presumption of classwide reliance and thus avoid the need to prove direct reliance by each class member by showing: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 268 (citing *Basic*, 485 U.S. at 248 n.27). "*Basic*'s fundamental premise [is] that an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011) ("*Halliburton I*").

A defendant can rebut the *Basic* presumption in opposing class certification by introducing evidence to show, as here, that "the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock," that is, "that *the misrepresentation had no 'price impact.*'" *Halliburton II*, 573 U.S. at 264, 280 (emphasis added); *see id.* at 278 ("In the absence of price impact, *Basic*'s fraud-on-the-market theory and presumption of reliance collapse."). "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic,* 485 U.S. at 248.  For example, "evidence that the misrepresentation did not in fact affect the stock price" may be sufficient to rebut the presumption at the class certification stage.  *Halliburton II*, 573 U.S. at 278.

Importantly, when the Court is determining whether Plaintiff has met its burden to show price impact, the "[m]ere assertion by class counsel" that the challenged statements inflated the price, or "maintained" an already inflated stock price, "is not enough." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014); *see Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000) ("[A]rguments woven entirely out of gossamer strands of speculation and surmise [cannot] tip the decisional scales in a class certification ruling.").   Under the preponderance of the evidence standard, the Court must determine whether Defendants' evidence is "more convincing than the evidence which is offered in opposition to it." *Jones v. Dep't of Health & Human Servs.*, 834 F.3d 1361, 1367 (Fed. Cir. 2016); *see Metro. Stevedore Co. v.*

*Rambo*, 521 U.S. 121, 137 n.9 (1997) ("[T]he preponderance standard goes to how convincing the evidence in favor of a fact must be in comparison with the evidence against it before that fact may be found.").

Those standards require the Motion to be denied, because Plaintiff here offers only a conclusory tautology in an attempt to show the alleged misstatement inflated Apple's stock price ('the price dropped so it must have been artificially inflated'), and cannot adduce any evidence to counter Defendants' showing that the Challenged Statement could not have affected Apple's stock price.

As an initial matter, Plaintiff does not and cannot adduce any front-end evidence—that is, evidence as of November 1, 2018—to show that the Challenged Statement inflated or "maintained" Apple's stock price, which in fact *declined* by more than 6% after the Challenged Statement was made.  Instead, Plaintiff purports to work backwards from the alleged "corrective" disclosures, asserting that the stock price declines on each of those days must have been caused by revelation of the "true facts" allegedly misstated by the Challenged Statement.  According to Plaintiff, Apple's stock price decline could only have resulted from the Challenged Statement's artificial inflation or "maintenance" being dissipated.

But Plaintiff cannot adduce any evidence to support that claim, and in fact Plaintiff's expert admits he did not delve "into the merits" of Plaintiff's allegation that the Challenged Statement somehow "maintained" Apple's stock price.  *See* Ex. 4 at 138:4–9.  As noted, the "[m]ere assertion by class counsel" that the Challenged Statement inflated the price, or "maintained" an already inflated stock price, "is not enough" to certify a class, *Parko*, 739 F.3d at 1085, particularly where, as here, there is "direct, . . . salient evidence showing that *the alleged misrepresentation did not actually affect the stock's market price,*" and "thus the *Basic* presumption does not apply." *Halliburton II*, 573 U.S. at 282.

For example, as discussed above, the two November 2018 allegedly corrective disclosures (Compl. ¶¶ 98-99, 103) cannot be said to have dissipated the Challenged Statement's purported price inflation, because they do not "relate back" to the subject matter of the Challenged Statement. The November 2018 allegedly corrective disclosures concerned reduced iPhone

16

production, *not* Apple's overall business in Greater China (as referenced by the Challenged Statement), and a disclosure that does not "share the same subject matter as the prior misstatement" cannot, as a matter of law, be said to have a "corrective effect." *FindWhat*, 658 F.3d at 1311 n.28 (quoting *In re Initial Pub. Offering*, 399 F. Supp. 2d at 266); *see also Goldman Sachs*, 141 S. Ct. at 1961 (where "there is a mismatch between the contents of the misrepresentation and the corrective disclosure . . . there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop").[9]

Even if the disclosure of reduced iPhone production could be said to "correct" the Challenged Statement's purported misrepresentation of Apple's business in China, and it cannot, by November 5, 2018 the market was already appraised of Apple's slowing iPhone business in Greater China (Ex. 2 at 41-45, ¶¶ 99-108) (collecting sources), and thus cumulative disclosure of that information could not have affected Apple stock price in any event.

The market's knowledge of slowing iPhone business in China also proves that the "new information" that purportedly "shocked" analysts on January 2, 2019 was *not* that China was actually "in that category" Mr. Cook would not put it in before, but rather "the magnitude and severity" of the Company's negative performance in China at quarter's end. Compl. ¶ 84. That "new information" did not exist at the time the Challenged Statement was made two months prior, and thus a resulting price effect cannot be inferred—there is another "mismatch" in that regard. *See* Ex. 2 at 26-27, ¶ 64 ("there is no basis for [Plaintiff] to assume that disclosure on January 2, 2019 based on three months of actual sales data could be equivalent to the disclosure of the alleged True Facts early in the quarter during the November 1, 2018 earnings announcement" ). Further, Plaintiff does not and cannot meet its burden to demonstrate how Mr. Cook's *qualitative opinion* statement that he "would not put China in that category" (of emerging markets) matches up with the allegedly corrective January 2, 2019 *quantitative* disclosure that

---

[9] The alleged November 2018 "corrective" disclosures about decreased iPhone production made more sense when Plaintiff was alleging misstatements about the "great start" to Apple's new iPhone lines (Compl. ¶ 2), but as discussed above, those allegations were dismissed from the case, and the November 2018 disclosures cannot be said to "correct" the Challenged Statement that remains.

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
C.A. No. 4:19-cv-02033-YGR

Apple's revenue was $5 to $9 billion below guidance, such that the Challenged Statement could be said to have been "corrected."

Plaintiff also fails to account for the "non-fraud related information" that Plaintiff's expert conceded was in the market and could have impacted the January 3, 2019 decline in Apple's stock price. *See* Dkt. No. 165-3, ¶ 186. That confounding information included (i) Apple's disclosure to investors that in Q1'19 it had experienced slowing upgrade of iPhones in developed economies that contributed to the reduced revenue guidance (*see* Ex. 5), and (ii) Mr. Cook's statement that "emphasized the negative impact the battery replacement program had had on the pace of phone replacements during 1Q19" (Dkt. No. 1, ¶¶ 37–38), which analysts specifically referenced with regard to Apple's disappointing results (*see* Ex. 2 at 30-32, ¶¶ 71-75). Plaintiff bears "the burden of proving" that the Challenged Statement "caused the loss for which the plaintiff seeks to recover," *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345-346 (2005), citing 15 U.S.C. § 78u–4(b)(4), yet Plaintiff does not even attempt to demonstrate that any part of Apple's stock price decline was the result of the allegedly fraudulent Challenged Statement. Nor can it, for as Plaintiff's own expert testified, he did not look "into the merits" of the issue. *See* Ex. 4 at 138:4–9.

As a last-ditch effort, Plaintiff argues that "because the Complaint alleges material omissions," the requirement that Plaintiff must establish reliance under Rule 23(b)(3) is waived. Motion at 16 (citation omitted). But even if that statement of law were correct, and as explained above, it is not (*see*, *e.g.*, *Comcast*, 569 U.S. at 33 (Plaintiff must demonstrate through "evidentiary proof" that common questions predominate)), the only purported omission the Motion can cite is Defendants' failure to disclose the third alleged "true fact," which is that Apple had purportedly already "cut iPhone production at multiple manufacturers and reduced orders from its largest suppliers of iPhone components" at the time the Challenged Statement was made. Motion at 16, citing Compl. ¶ 66(c). As discussed above, that alleged "true fact" is held over from when Plaintiff was alleging Defendants misstated the "great start" for new iPhone models, and does not "relate back" to the subject matter of the Challenged Statement—Apple's overall business in Greater China—such that failure to disclose it can be called an "omission."

As the Supreme Court recently held, the Court must "assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Goldman Sachs*, 141 S. Ct. at 1963.   Here, the preponderance of the evidence demonstrates that the Challenged Statement did not artificially inflate or maintain Apple's stock price.   Plaintiff therefore cannot avail itself of the *Basic* presumption of classwide reliance, and the proposed class should be rejected.

C. **Even If the Court Were to Certify a Class, It Should Not Include Option-Holders, As Plaintiff Has Not Proven That Options On Apple's Stock Trade In An Efficient Market**

Unlike in the overwhelming majority of securities class actions, which are initiated on behalf a class of stockholders, Plaintiff here has overreached, and asks the Court to certify option-holders to be part of the class as well.[10]   In support of this request, Plaintiff claims that its expert analyzed "Apple's publicly-traded options and *concluded* that like Apple common stock, they too traded in an efficient market during the Class Period."  Motion at 16 (emphasis added).

But even if the Court were to certify a class in this case, it must deny Plaintiff's request to include option-holders in the class, because Plaintiff has not *proven* that third-party options on Apple's stock traded in an efficient market.  To the contrary, Plaintiff's claim that options traded in an efficient market fails at the outset because it depends on a presumption that these options trade in a *single market*.  Ex. 4 at 83:19-23.  Apple's common stock trades in a single market, because all of the shares are identical, but there were *nearly 2,300* distinct third-party option contracts for Apple stock trading during the period at issue, with *1,250 individually unique combinations* of strike prices (ranging from $2.50 to $440 per share) and expiration dates (ranging from 2018 to 2021).[11]   Such a wide range of strike prices and maturities demonstrates

---

[10] To be clear, the options at issue here are not the sort of stock options that a company might issue to its employees as compensation under a stockholder-approved equity incentive plan, but rather contracts to buy and sell stock sold by third-party brokers-dealers, so-called "put" and "call" options.

[11] Given the substantial differences between stock and options, one cannot simply assume, as Plaintiff's expert does, that market efficiency for common stock translates into market efficiency for options.  *See* Ex. 2 at 63-64, ¶¶ 165-167.  Indeed, it is entirely possible that the market for a

that the options had a vast range of payoffs, and Plaintiff's expert completely ignores these differences in order to conclude that options on Apple's stock traded in a single market.  (Ex. 2 at 66-69, ¶¶ 173-179).  The "market" for a call option with a $5 strike price is obviously entirely different than the "market" for a put option with a $440 strike price.[12]

Plaintiff's failure to prove an efficient market for these options is further demonstrated by examining the five factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989):  (1) the average weekly trading volume; (2) the volume of securities analysts following and reporting on a company's stock; (3) the number of market makers; (4) a company's entitlement to file an S-3 Registration Statement in connection with public offerings; and (5) empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price.  As to Apple's stock *options*, Plaintiff's expert cannot demonstrate efficiency through *any* of the five *Cammer* factors.

First, Plaintiff's expert claims that the "daily trading volume in the Apple options market" supports a finding of efficiency because options "traded regularly and actively during the Class Period."  Dkt. No. 165-3, ¶ 151.  But, on average, call options did not trade *at all on 35% of trading days* in the putative class period, and the least liquid 10% of call options did not trade *86% of the time* (for put options, these percentages were 31% and 90%, respectively).  Ex. 2 at 70, ¶ 183.  Obviously, Plaintiff should not be allowed to assume an option is traded in an efficient market when the option traded on less than 10% of days during the putative class period.

On the second factor, Plaintiff's expert opines that "28 analyst firms that covered the Company and published analyst reports served the Apple options market by disseminating and digesting Company information" (Dkt. No. 165-3, ¶ 149), but analyst reports typically do not reach options, *i.e.*, they do not provide specific analysis of option markets or the factors that influence option prices.  Ex. 2 at 71-72, ¶ 187.  Here, Plaintiff's expert admitted that he could not

_____

[12] stock could be efficient while the markets for options are not, and that some options could trade efficiently while others do not.  *See id.*

[12] Plaintiff's theory of market efficiency for options on Apple's stock is also flawed because it assumes that because "you go to the same broker" to buy the various options, their array of strike prices and expiration dates can be waived away, and they can be analyzed collectively.  *See* Ex. 4 at 125:25-126:11.

1    recall if *any* of the Apple analyst reports he reviewed "specifically ma[de] recommendations in

2    terms of options."  Ex. 4 at 109:18-23.  "For purposes of *Cammer* Factor 2, 'courts tend to look at

3    the number of analysts *following a given security*," *e.g.*, options, "as opposed to the company as a

4    whole," and "if there are no analysts specifically following a given . . . security, *Cammer* Factor 2

5    'provides little support' for market efficiency."  *In re Glob. Brokerage, Inc.*, 2021 WL 1160056,

6    at *14 (S.D.N.Y. Mar. 18, 2021) (emphasis added).

7           On the third factor, as to whether Apple has market makers, Plaintiff's expert conceded

8    that he was "unable to locate information quantifying the number of market makers who traded

9    Apple options," and could only speculate that "the large number of market makers identified for

10   the common stock suggest a high number of market makers for the options."  Dkt. No. 165-3,

11   ¶ 154.  Obviously, Plaintiff's speculation cannot be used to show there are, in fact, a "high

12   number of market makers for the options."  *See In re Glob. Brokerage*, 2021 WL 1160056, at *15

13   (finding that the third *Cammer* factor did not support a finding of efficiency when plaintiff's

14   expert could not "identify any market makers" for the security in question).

15          As to the fourth factor, a company's eligibility to raise capital using a "short-form" S-3

16   registration, Plaintiff's expert includes only one, conclusory sentence:  "just as S-3 registration

17   eligibility indicates stock market efficiency . . . so too does this factor indicate efficiency of the

18   Apple options market, as options investors and writers were provided with the same financial

19   information via the Company's regular filings."  Dkt. No. 165-3, ¶ 150.  However, options are

20   plainly different securities than stock, and their prices depend on far more than just the stock

21   price.  It is thus unclear how S-3 eligibility applies to options markets (and Plaintiff's expert

22   makes no effort to identify any such connection).  Ex. 2 at 72, ¶ 189.

23          As to the fifth factor, which courts have called the "most important" factor, *Brown v.

24   China Integrated Energy, Inc.*, 2014 WL 12576643, at *6 (C.D. Cal. Aug. 4, 2014), Plaintiff's

25   "collective event study" does not test the efficiency of individual Apple options series, but instead

26   analyzes a summary measure of option prices by "creating" a "synthetic stock price" constructed

27   from individual put and call prices.  *See* Dkt. No. 165-3, ¶¶ 159-173.  There is no question that

28   the synthetic stock prices utilized by Plaintiff's expert are not actually equivalent to Apple's

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
C.A. No. 4:19-cv-02033-YGR

common stock price, because the "synthetic stock" model employs a so-called "put-call parity" that is applicable only to "European options," which do not permit exercise prior to the maturity date. Ex. 2 at 77-79, ¶¶ 202-206. Here, *all* of the options at issue are "American options," which allow the owner to exercise at any time prior to the maturity date (*id.* at 78, ¶ 204), which is to say the "synthetic" stock prices calculated by Plaintiff's expert are simply not valid for options during the class period. *Id.*

Compounding the problems with Plaintiff's event study analysis, Plaintiff's expert compiled individual synthetic stock prices into one average price, and thus his test cannot demonstrate whether the prices of *individual* options reacted rapidly to new, value-relevant information during the putative class period. Instead, Plaintiff's expert merely assumes that because the average synthetic stock reacted to new information, the entire market for options on Apple's stock must be efficient. But this falls well-short of what Plaintiff is required to establish under *Basic*, *i.e.*, that *all* of the options traded in well-developed markets that enabled the price to rapidly "reflect[] all publicly available information." *Basic*, 485 U.S. at 246. Relatedly, while Plaintiff's expert claims that he "constructed a timeseries of synthetic stock prices [to] test whether the option prices responded to the release of new Company-specific information" in "earnings announcements" (Dkt. No. 165-3, ¶¶ 162-163), only 1.6% of the options in his synthetic stock price traded on all four earnings announcement days used in his test, and 62.1% of options pairs included in the synthetic stock *never traded on any* of the earnings announcement dates. Ex. 2 at 81-82, ¶ 211. As a result, Plaintiff's expert's slapdash methodology has led him to conclude that *all options* react to new information, despite only testing a minority of options during the relevant event windows. *See id.*[13]

Because Plaintiff has not introduced *evidence* to demonstrate that the diverse array of option contracts trade in an efficient market, it is not entitled to invoke *Basic*'s presumption of reliance as to option-holders, and thus individual issues of reliance will predominate over those

---

[13] Plaintiff's expert also improperly included options in his synthetic stock prices that expired before the putative class period began, and therefore would not be eligible to form part of the class. Ex. 2 at 64 n.216; *see also id.* at 81-82, ¶ 211 n.276.

1    common to the class.[14]

2         **D.    The Motion Should Be Denied Because Plaintiff's Damages Model Includes
             Damages That Did Not Result From the Alleged Wrongdoing**

3

4         To certify the proposed class, Plaintiff must show a classwide method for calculating

5    damages to establish that common questions predominate over individual questions.  *See*, *e.g.*,

6    *Comcast,* 569 U.S. at 35.  Because Plaintiff is "entitled only to damages resulting from" its theory

7    of liability, its proposed "model purporting to serve as evidence of damages in this class action

8    must measure *only those damages attributable to that theory*."  *Id.* (emphasis added).  *See also*

9    *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (under *Comcast*, "plaintiffs must

10   be able to show that their damages stemmed from the defendant's actions that created the legal

11   liability.").  Because Plaintiff's "model does not even attempt to do that, it cannot possibly

12   establish that damages are susceptible of measurement across the entire class for purposes of Rule

13   23(b)(3)."  *Comcast*, 569 U.S. at 35.

14        Indeed, Plaintiff's damages "methodology"—which is largely repeated verbatim from

15   opinions Plaintiff's expert has given in other securities cases (*see* Ex. 2 at 21-23, ¶¶ 51-53)—does

16   not address the specific facts of this case at all, let alone the specific damages purportedly caused

17   by the Challenged Statement, and should thus be rejected for three independent reasons.

18        First, Plaintiff's "out-of-pocket" damages "methodology" is not a functional model that

19   one could actually use to calculate damages for this proposed class, but instead is merely a

20   general definition of damages under Rule 10b-5.  *Id.* at 20-23, ¶¶ 48-53; *see also id.* at 83-84, ¶¶

21   214-18.  Plaintiff's expert lists a number of "standard valuation tools" that *could* purportedly be

22   used to address "specific issues complicating the quantification of artificial inflation" (Dkt. No.

23

---

24   [14] Plaintiff's expert also admits that the evidence shows a weighted average option bid-ask spread
     for Apple options that is very "large relative to the bid-ask spreads observed for all common

25   stocks during the Class Period" and therefore "*does not support a finding of market efficiency*."
     Dkt. No. 165-3, ¶¶ 158, 186 (emphasis added).  His concession that the large bid-ask spread for

26   options does not support a finding of market efficiency, while significant, actually understates the
     significance of the bid-ask spread for Apple options.  In fact, the average bid-ask spread for in-

27   the-money Apple options was approximately *500 times higher* than the bid-ask spread on Apple
     stock and approximately seven times higher than the average bid-ask spread for all stocks traded

28   on U.S. exchanges.  Ex. 2 at 74-76, ¶¶ 195-99.

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
C.A. NO. 4:19-CV-02033-YGR

165-3, ¶ 183), but does not explain how those tools should be applied here with regard to Apple's stock, let alone actually apply them (*see* Ex. 2 at 21-23, ¶¶ 51-53).  Nor does Plaintiff's expert account for the fact that (i) there is a subject-matter "mismatch" between the contents of the Challenged Statement and the November 2018 purportedly corrective disclosures, and thus a "corrective" price decline cannot be assumed, (ii) the qualitative fact of Apple slowing business in China was well known to the market at the time the Challenged Statement was made, and thus the quantitative "corrective" statements could not affect Apple's stock price, (iii) the "new information" disclosed on January 2, 2019 regarding the "magnitude and severity" of the quarter-end drop in Apple's iPhone business in China could not have been known at the time the Challenged Statement was made two months earlier; and (iv) there was non-fraud related information released on January 2, 2019 that caused the Company's stock price to drop. Plaintiff's purported damages "methodology" says nothing of those material issues and should be rejected on that basis.

Second, Plaintiff's damages model improperly includes alleged damages to option-holders.  *See* Dkt. No. 165-3, ¶ 187.  As discussed, because options on Apple's stock have not been proven to trade in an efficient market, option-holders cannot be presumed under *Basic* to have relied on the Challenged Statement, and therefore they are not properly part of the class. Plaintiff's damages model thus includes tens of millions of dollars in purported losses to option-holders "that are not the *certain* result of the wrong," *Comcast*, 569 U.S. at 37 (citation omitted), and for that reason alone the proposed class should be rejected.

Third, even if option-holders were properly considered part of the class, Plaintiff's damages model does not provide any method, at all, for calculating their alleged damages resulting from the Challenged Statement.  Plaintiff's expert speculates that he could translate stock-based damages into options-based damages by using a formula "such as the Black-Scholes formula" (Dkt. No. 165-3, ¶ 187), but he does not offer any evidence to support that claim, or even try to demonstrate how Apple's alleged stock-price inflation *could* be used to determine options-based damages.  *See* Ex. 2 at 83-84, ¶¶ 214-218.  Defendants' expert on the other hand, affirmatively establishes that Plaintiff's assumptions about calculating damages across a class of

OPPOSITION TO MOTION FOR CLASS CERTIFICATION
C.A. No. 4:19-cv-02033-YGR

option-holders are riddled with holes, as discussed above.  *Id.*

**V.    CONCLUSION**

For the reasons addressed above, Plaintiff's Motion for Class Certification should be denied in its entirety.  Should the Court choose to certify a class, it should be defined to exclude option-holders, as their issues do not predominate over the class.

Dated: July 9, 2021                                        ORRICK, HERRINGTON & SUTCLIFFE LLP


                                                                    */s/ James N. Kramer*
                                                                    JAMES N. KRAMER

                                                                Attorneys for Defendants Apple Inc.,
                                                                Timothy Cook, and Luca Maestri