# EXHIBIT 4

```
1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                     OAKLAND DIVISION

4   IN RE APPLE INC. SECURITIES   ) Civil Action No.

    LITIGATION                    ) 4:19-cv-02033-YGR

5   _____)

                                   )

6   This Document Relates To:     )

    ALL ACTIONS.                   )

7   _____)

8                       - - -

9               WEDNESDAY, JUNE 16, 2021

10                      - - -

11

12       Remote Video Deposition of STEVEN P. FEINSTEIN,

13   PH.D., beginning at 10:02 a.m., before Nancy J.

14   Martin, a Registered Merit Reporter, Certified

15   Shorthand Reporter.  All parties appeared remotely.

16

17

18

19

20

21

22

23

24

25

                                              Page 1
```

```
 1   A P P E A R A N C E S :
 2   SHAWN A. WILLIAMS, ESQ.
     HADIYA K. DESHMUKH, ATTORNEY AT LAW
 3   JOHN GEORGE, ESQ.
     ROBBINS GELLER RUDMAN & DOWD LLP
 4   One Montgomery Street
     Suite 1800
 5   San Francisco, California  94104
     (415) 288-4545
 6   shawnw@rgrdlaw.com
     Counsel for Plaintiffs
 7
     -and-
 8
     CHRISTINE M. FOX, ATTORNEY AT LAW
 9   LABATON SUCHAROW
     140 Broadway
10   34th Floor
     New York, New York  10005
11   (212) 907-0700
     cfox@labaton.com
12   Counsel for Plaintiffs
13   WILLIAM J. FOLEY, ESQ.
     TRISTAN KONSTANTIN ALLEN, ESQ.
14   JIM KRAMER, ESQ.
     ORRICK HERRINGTON & SUTCLIFFE
15   51 West 52nd Street
     New York, New York  10019
16   (212) 506-5124
     wfoley@orrick.com
17   Counsel for Defendants
18
19   ALSO PRESENT:
20   STEPHANIE FINE, APPLE INC.
21   ALLIE SCHWARTZ, CORNERSTONE RESEARCH
22
23
24
25
```

Page  2

```
 1                         I N D E X
 2   EXAMINATION OF STEVEN P. FEINSTEIN, PH.D.        PAGE
 3   BY MR. FOLEY                                       5
 4
 5                     E X H I B I T S
     NUMBER                  DESCRIPTION             PAGE
 6
 7   Exhibit 1            REPORT ON MARKET              6
                          EFFICIENCY/PROFESSOR STEVEN
 8                        P. FEINSTEIN, PH.D.,
                          CFA/May 5, 2021, 124 pages
 9
     Exhibit 2            REVISED CONSOLIDATED         65
10                        CLASS ACTION COMPLAINT FOR
                          VIOLATION OF THE FEDERAL
11                        SECURITIES LAWS, 46 pages
12   Exhibit 3            Option Data Excel            76
                          Spreadsheet, 1 page
13
     Exhibit 4            COMPLAINT FOR VIOLATIONS OF  145
14                        THE FEDERAL SECURITIES
                          LAWS, 25 pages
15
     Exhibit 5            When Hedges Fail:  The Put   158
16                        Paradox and Its Solution,
                          4 pages
17
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions
866 299-5127

1    ticker symbol for Apple?

2         A.  Right.

3         Q.  And then it's got -- I'm just looking at

4    Row 2 here that defines that.

5         A.  Okay.

6         Q.  It has numbers 171229.  Do you know what that

7    refers to?

8         A.  Yes.

9         Q.  Can you tell me what that is.

10        A.  This option expires in 2017, in the 12th

11   month on the 29th day.

12        Q.  Okay.  So that corresponds to Column F, the

13   expiration?

14        A.  It does.

15        Q.  The letter "C," does that refer to call?

16        A.  It does.

17        Q.  And the remaining digits, which are 00100000,

18   what does that refer to?

19        A.  Well, the strike price.

20        Q.  Which is?

21        A.  It's easier -- the second one down would be

22   easier.  Do you see the 105 in the second --

23        Q.  Yeah.

24        A.  And notice in Column G, the strike price is

25   105-.

Page 79

1      Q.  Thank you.  So do you agree that each option

2  in your data has a unique identifier?

3      A.  Yes.

4      Q.  And the calls and puts are identified

5  separately?

6      A.  Yes.

7      Q.  And you agree that the options with different

8  strikes and maturity dates are identified separately?

9      A.  They're identified.  I mean what's identified

10  is what the strikes and maturities are.

11      Q.  Is each option on this spreadsheet its own

12  security?

13      A.  It's a unique contract.  It's a unique

14  security, but all of these securities trade in Apple's

15  exchange traded options market.  They have more in

16  common than what they don't have in common.

17      Q.  Do you know how many unique option

18  identifiers there are in your data?

19      A.  Not offhand.  I did at one time.

20      Q.  Would it surprise you to learn that there are

21  more than 3,600 unique identifiers for both the calls

22  and the puts in this data?

23      A.  Not at all, because Apple's option market is

24  extremely active.

25      Q.  Do you know the range of the maturity dates

Veritext Legal Solutions
866 299-5127

1    and the strikes in this data?

2         A.   I know that investors want a wide range of

3    maturity dates and they want a wide range of strike

4    prices.  So it doesn't surprise me that it's numerous.

5    But they're all options on Apple.

6         Q.   What would be a wide range for strike prices,

7    in your view?

8         A.   Well, it depends on the history of the stock.

9    I mean you know a stock -- or rather, an option whose

10   strike price is essentially the same as the current

11   stock price is called at the money --

12        Q.   Uh-huh.

13        A.   -- and if the strike price is -- if the stock

14   price is -- if the strike price is well above the

15   stock price, it's called "out of the money."  And if

16   the strike price -- for call options, I'm talking.

17             If the strike price is well below -- or below

18   the stock price, that's "in the money."  And for more

19   thinly traded options, you'd expect to see, I don't

20   know, 10 or 20 percent in and out of the money

21   options, you know, a range between 20 percent out of

22   the money to 20 percent in the money.

23             But what happens is as the stock price

24   changes, they add new contracts because investors --

25   there's more interest generally.  There's more

Page 81

1    investing interest than the at the money option.  So

2    as the stock price changes, the exchange and the

3    market makers will introduce new contracts that are at

4    the money at the current stock price.

5             So given there was a wide range of movement

6    in Apple stock over this period, I'd expect to see a

7    very wide range of strike prices.

8        Q.  If you look at Column L in the data.

9    Column L says, "Volume."

10       A.  Right.

11       Q.  And Column M says, "Open Interest."

12            Can you explain to me what volume and open

13   interests are?

14       A.  So volume is how many of that particular

15   contract traded that day.  Zero means they didn't

16   trade that day, that particular contract.

17            So there's no potential member of the class

18   who bought this contract on that day because there was

19   no trading in that contract on that day.

20            "Open interest" means how many contracts that

21   were open previously that might have traded on a

22   previous day and are still alive or still active,

23   waiting for their expiration date.

24       Q.  And you see that there are -- that the data

25   shows options with zero daily trading volume and zero

Veritext Legal Solutions
866 299-5127

1   open interest; right?

2        A.  Well, no.  The first says zero volume with

3   30 open interest.  Some others have zero and zero, but

4   not the first one.

5        Q.  Right.  Yeah.  I'm just asking you to confirm

6   that there are options contracts in this data that

7   have zero volume and there are options contract in

8   this data that have zero open interest.

9        A.  That's right, and if they never traded, so

10  that there's never an open interest, they're not in

11  the case.  I mean they're in the database but they're

12  not in the case.

13       Q.  How many different markets do Apple options

14  trade in?

15       A.  Well, these are exchange traded.  These are

16  NASDAQ exchange traded options.  NASDAQ has an

17  electronic system -- has an electronic

18  over-the-counter system of linked market makers.

19       Q.  So is your answer that it's just one market

20  for all of these options?

21       A.  I would call it the market for Apple options.

22  I mean it's facilitated by numerous platforms, but

23  primarily, it's NASDAQ.  But it's the options market

24  for Apple.  Just as a stock could trade on the

25  New York Stock Exchange, but it could also trade

Page 83

1   between two NASDAQ traders.  It's a market for a stock

2   facilitated by abundant infrastructure.

3        Q.  You would agree that different options could

4   have different payouts depending on the strike price,

5   maturity date, and the option type; correct?

6        A.  Yes.  That's -- yes.

7        Q.  Do you think that investors would consider a

8   call with a strike price of 120 versus a call with a

9   strike price of 130 versus a call with a strike price

10  of 140 substitutable for one another?

11       A.  For certain purposes, yes, and other

12  purposes, no.

13       Q.  What purposes would they be substitutable for

14  each other?

15       A.  Well, for constructing synthetic stock, for

16  example, they could be substitutes.  You could do

17  what's called "delta hedging" to construct portfolios

18  that have the same price dynamics, one as the other.

19  Those are two examples.

20       Q.  Do you have any others?

21       A.  There's a lot of applications for options.

22  Let me think for a second.  Well, even speculative

23  purposes.  You know, if someone is -- I don't mean

24  speculative in a pejorative sense.  I mean like, you

25  know, if someone has information on their belief they

Page 84

1    think the stock is going to go up, you know, they may

2    consider two options with different strike prices to

3    be close substitutes in the short run, for short run

4    movements.

5        Q.  What about calls and puts?  Are they

6    substitutable for one another?

7        A.  In some sense and for some purposes yes, and

8    other purposes no.

9        Q.  In what sense are they substitutable?

10       A.  Well, let me address the other part real

11   quick.  If someone's objective is to hold them to

12   expiration, they clearly have different payoff

13   diagrams, different payoff amounts, but in the short

14   run, they might have identical -- depending on how

15   many you buy and what else you buy, they can have

16   identical profit and loss potential.

17           So, for example, there's something called

18   "delta."  Delta is sort of a gearing ratio between the

19   price movement of the option and the price movement of

20   the stock.  At the money options, whether it's a put

21   or a call, it tends to have a delta close to

22   50 percent, .5, which means that if the stock goes up

23   $1, the call will rise 50 cents, roughly, and the put

24   will fall 50 cents.

25           So an investor might be completely

Veritext Legal Solutions
866 299-5127

1    indifferent between whether he or she buys the call or

2    sells the put if they're anticipating a $1 rise in

3    price in the very near future, like the next day or

4    the next two days.

5         Q.   I guess what I'm trying to understand is

6    given the variation in options contracts, how you can

7    consider that they're being traded on a single market.

8              MR. WILLIAMS:  Objection.  Form.  Is that a

9    question?

10             MR. FOLEY:  Yes.

11        Q.   I'm trying to understand -- here, let me put

12   it in the form of a question.

13             Can you explain that to me?

14        A.   Sure.  All of the calls, regardless of

15   whether -- what the strike price is or what the

16   expiration is are functions of Apple stock price, and

17   all of the calls have a payoff diagram of the same

18   form, that the payoff diagram -- or the payoff formula

19   exercised is the maximum of the stock price minus the

20   strike price or zero.  All of them.

21             All of the puts have the exact, same payoff

22   function at their expiration.  At their respective

23   expirations their payoff is the stock price minus the

24   strike price or zero.  So they all have the same

25   functional form.  They differ in the specifics as to

Page 86

1   what that "X" is, the "X" is the strike price or what

2   day they expire, but they all have the exact, same

3   functional form.

4           The markets are made by the same market

5   makers.  They're all functions of Apple stock.  And

6   for a reasonable extent, for reasons we just talked

7   about, they're reasonable substitutes, one for the

8   other.  Someone looking to buy into Apple by buying

9   call options might consider the "at the money" call,

10  the "just out of the money" call, the "just in the

11  money call," and look to see where they think they get

12  the best pricing or the most liquidity or the --

13  depending if they want to hold it to expiration, the

14  best profit potential.  So they have more in common

15  than differences.

16      Q.  You've given a few examples of where

17  different options might be substitutable, but there

18  are plenty of instances in which they are not

19  substitutable; correct?

20      A.  There's some -- well, I don't know if you can

21  say, "plenty."  Yeah, I think a good analogy would be,

22  you know, if someone wants to analyze how successful a

23  car dealer is, you know, one car dealer can sell a

24  variety of different makes of Toyotas.  I mean there's

25  big Toyotas and small Toyotas, and you can look to see

Page 87

1    you wouldn't be able to run the test on those days,

2    but it's irrelevant that you can because no one is

3    buying the security that day anyway.

4             I just want to add one more thing here.  The

5    fact that the trading and the volume tends to follow

6    and track along where the stock is, meaning that

7    whichever strike price is -- whichever strike prices

8    are at or near the money are the ones where the

9    trading takes place is another indicator that it's one

10   market, not fragmented, individual markets.  The

11   traders draw -- move their attention to the strike

12   prices that are near the money.

13       Q.  Let's turn to Page 41 of your report.

14       A.  Okay.

15       Q.  We're looking at Paragraph 146.

16       A.  Got it.

17       Q.  It says, "The factors that indicate the

18   efficiency of the market for Apple common stock

19   examined above are relevant to assessing the

20   efficiency of the market for Apple options.  The

21   market infrastructure that provides visibility,

22   information about the Company, and ease of trading,

23   which promotes the efficiency of the market for Apple

24   stock also promotes efficiency in the market for Apple

25   options."

```
 1              Why are these -- are you referring to the
 2    Cammer and Krogman factors here?
 3         A.   Yes, and the specifics of the Apple company
 4    as well as they pertain to the Cammer and Krogman
 5    factors.  The fact that Apple being a huge, big,
 6    well-known company makes the option market efficient
 7    just as it made the stock market efficient for Apple.
 8         Q.   Why are these factors relevant for options?
 9         A.   Because the factors focused on what could
10    make a market inefficient.  Are there impediments to,
11    trading, no.  Are there impediments to information
12    flow, no.
13              So just as these factors show that there's no
14    impediments in flow and trading for the stock, they
15    also show that there's no such impediments for the
16    options.
17         Q.   Is there a general mechanism that insures
18    market efficiency for options?
19              MR. WILLIAMS:  Objection.  Form.
20              THE WITNESS:  Same mechanism that drives any
21    other market towards efficiency.  It's that capital
22    markets are competitive, and if an efficiency -- in an
23    inefficiency or a mispricing pops up, there's money to
24    be made by someone to jump in and trade, you know, buy
25    the undervalued security or sell the overvalued
```

Veritext Legal Solutions
866 299-5127

1    security.

2          So as long as there's no impediments to

3    information flow and no impediments to trading and

4    investors are rationale and markets are competitive

5    and investors and market participants are profit

6    motivated, you know, that's the combination.  That's

7    the recipe for eliminating inefficiencies.  We see

8    that happening here.

9    BY MR. FOLEY:

10         Q.  How does the options market derive efficiency

11   from the efficiency of the equity market?

12         A.  I didn't say it derives efficiency from the

13   efficiency of the equity market.  I said the same

14   factors that make the equity market for Apple stock

15   efficient also have that effect on the options market.

16   It's not a secret, well-known -- it's not a secret,

17   unknown back water of a market.

18         If there was an inefficiency in the Apple

19   market, there's thousands of investors and

20   professional investors and traders that would jump on

21   it and make that money.  If they saw something out

22   there for sale that was too cheap, they'd buy it.  If

23   they saw something that was too expensive, they'd sell

24   it.

25         If they saw information that was being

Veritext Legal Solutions
866 299-5127

1    ignored and that made the price either too high or too

2    low, they'd execute the trade.  So that would push

3    that information into the price.

4         Q.  In your view, is there a level of trading

5    volume or open interest that may indicate efficiency

6    in options markets?

7         A.  Again, there might be.  I don't know where

8    the bright line is.  I know my published paper looks

9    at common stock and tries to develop -- or tries to

10   test for common stock what threshold of volume is most

11   probative.  You know, what gives you the most powerful

12   test.  That paper is about common stock.  It's not

13   about options.  What I can tell you is that the option

14   volume that we saw, that you see, that we see, that

15   anyone would see in the Apple option market is well

16   past any reasonable bright line.

17        I mean what I report in this paper is that

18   the amount of stock control that was changing hands in

19   the option market was actually greater than the amount

20   of stock control that was changing hands in the

21   underlying Apple stock market.  It's in Paragraph 152.

22   You got $6.6 billion worth of Apple stock trading

23   every day.  I'm sorry.  That's not right.  That's the

24   open interest.

25        Paragraph 151.  You've got the options

Page 108

1   market, the Apple options market, its volume -- one

2   moment.

3          It's daily volume represented change in

4   control of 67.6 million shares of Apple stock, and the

5   Apple stock market that would change hands was 46

6   million shares.  So in that sense, the Apple options

7   market is bigger than the Apple stock market in terms

8   of volume.

9       Q.  Can you go back to Page 41 of your report.

10      A.  Okay.

11      Q.  Paragraph 149.

12      A.  Got it.

13      Q.  You write, "The 28 analyst firms that covered

14  the Company and published analyst reports served the

15  Apple options market by disseminating and digesting

16  Company information, just as they did to help make the

17  market for Apple common stock efficient."

18          Did any of the analyst reports that you

19  reviewed or cited in your report cover Apple options?

20      A.  They come as a company.  So they're relevant

21  for all the company's securities.  I don't recall any

22  of them specifically making recommendations in terms

23  of options, though, if that's what you mean.

24      Q.  Do you recall any of them even referencing

25  Apple options?

Page 109

1        A.   I don't recall one way or the other, as I sit

2    here now.   Options are derivatives, and the word

3    "derivative" means they derive their value from the

4    underlying stock.   So any report that's about the

5    stock is also about the options.

6        Q.   You found that the weighted average

7    percentage bid ask spread for Apple options was

8    12.9 percent; is that correct?

9        A.   Yes.

10       Q.   And you found that the bid ask spreads for

11   Apple options were large relative to the bid ask

12   spreads observed for all common stocks during the

13   class period; right?

14       A.   Measured that way.   I mean if you measure it

15   relative to the value of the contract, it looks large.

16   If you measure it relative to the value of the

17   underlying stock, it looked in line with other stocks.

18       Q.   Why would you measure a relative to the stock

19   rather than the contract itself?

20       A.   Because buying the option is a substitute for

21   buying the stock.   So, you know, you'd have to put

22   down $200, let's say, here in this case, $176.82 to

23   buy a share of Apple stock.   You probably only have to

24   put down 5 percent of that, depending on the strike

25   price, to buy an option.

Page 110

1          So that's actually an advantage.  That's an

2    advantage to traders trading in the options market.

3    It means that trading options is actually an

4    economical way of getting exposure to the stock.  It

5    shows up as a higher bid ask spread because now

6    you're -- you know, the market makers take that spread

7    between the bid and the ask price relative to the

8    small amount you have to put down to gain that control

9    looks like a big percent, 12.9.

10          But what's really going on is that you're

11    describing a market in which it's really economical to

12    trade the securities.  You gain a lot of control for

13    very little money down.

14        Q.  Do you agree that high bid ask spreads would

15    limit the ability for arbitragers and other informed

16    traders to correct mispricing in the options market?

17          MR. WILLIAMS:  Objection.  Form.

18          THE WITNESS:  Potentially, depending on how

19    big the -- I mean -- I mean it's -- potentially,

20    depending on the size of the mispricing.  You know,

21    very, very small mispricings that are inconsequential

22    to the question of informational efficiency, you know,

23    might be too small to warrant trading given the bid

24    ask spread.  But other mispricings of information

25    perhaps not being impounded would be profitable to

                                        Page 111

1   trade on.  So it really depends on how much mispricing

2   we're talking about.

3         And it says here the weighted average, you

4   know, in dollar terms we're talking 31 cents.  So it's

5   possible that, you know, you could have a mispricing

6   of less than that that isn't profitable to arbitrage

7   anyway.  That doesn't mean that the market is ignoring

8   information, and if information has a significant

9   impact on the stock, it will have a significant impact

10  on the options, and that's what I tested for

11  empirically and found to be the case.

12  BY MR. FOLEY:

13      Q.  In Paragraphs 94 and 95 of your report, which

14  on Page 24, I believe, you cited a recent decision

15  finding that "the empirical fifth Cammer factor is not

16  necessary to establish market efficiency, especially

17  when the other factors are satisfied and circumstances

18  are not unusual."

19        Are you aware of any such authority finding

20  that the fifth Cammer factor is not necessary to

21  determine the efficiency of a market for options?

22      A.  Well, actually, I'll get to your question in

23  a second, but I just want to amend something back on

24  Paragraph 157.

25        The 31 cents is the bid ask spread that

1  retail investors have to pay.  Institutional

2  investors, especially the market makers themselves,

3  they don't have to pay that 31 cents if they're the

4  ones that are making the 31 cents on a round trip.

5  Their bid ask spread for a market maker is going to be

6  much, much less than that.

7        So this 31 cents is the quoted bid ask spread

8  for retail investors.  Institutions and market makers

9  themselves, it will be far narrower than that.  They

10  don't have to pay.  The point is they don't have to

11  pay.  So they'll be able to do arbitrage without

12  having to -- they'll be able to do arbitrages that

13  are -- have profits of less than 31 cents per option.

14        All right.  So your other question is asking

15  about, you know, how much proof do you need to

16  conclude that a market is efficient.  Numerous courts

17  have said, "We don't need the empirical factor,"

18  especially given that's the one that plaintiff and

19  defense experts spend so much time fighting about.

20  The other ones are usually very, very clear and

21  objective -- more objective -- more obviously

22  objective.

23        Yeah.  I mean I think that what the empirical

24  literature shows, the academic literature shows is

25  that every one of these factors, whether it's for an

Page 113

1    to put-call parity, but it's looking at information

2    absorption, which is informational efficiency rather

3    than a price standing on a single dollar amount which

4    is presumed to be the correct price.

5         Q.   Does the relationship that you describe in

6    your report apply to -- let me withdraw that.

7              Does the relationship that you describe in

8    your report in Paragraph -- well, in the 160's of your

9    report under the computation of synthetic stock

10   prices, does it apply to American options which can be

11   exercised prior to expiration?

12             MR. WILLIAMS:  Object to form.

13             THE WITNESS:  Does what apply to American

14   options?

15   BY MR. FOLEY:

16        Q.   The relationship -- the stock option

17   relationship that you described in your report in

18   connection with the synthetic stock price.

19        A.   Well, for purposes of testing whether or not

20   the synthetic security is absorbing information, it

21   could apply to both European and American options.  I

22   mean that's one of the advantages of this approach

23   over the fundamental efficiency put-call parity test.

24   This test can examine -- there may be some small

25   slippage owing to the value of the American feature,

1    but it would be small compared to the value of the

2    synthetic stock, and therefore, doesn't affect the

3    reliability of this kind of event study to determine

4    whether the options are absorbing information or

5    ignoring information.

6              So I guess that's a long way of saying my

7    test works with American or European options.  Either

8    way.

9         Q.  Does a put-call parity apply to American

10   options?

11        A.  You're asking adjustments.  Not without an

12   judgement.

13        Q.  Okay.  And what adjustments have you made to

14   the standard put-call parity to apply it to American

15   options here?

16        A.  Like I said, I didn't need to.  If there's

17   some small deviation from the measured synthetic stock

18   price in this methodology, that will decay at a fairly

19   constant rate, and therefore, be accounted for or

20   appropriately addressed and eliminated in the

21   regression analysis.  So there's no adjustment

22   necessary.

23        Q.  Do you expect that the relationship between

24   options and stock inherent in your synthetic stock

25   price, do you expect that relationship to hold for

Page 122

 1   every single option pairing?

 2           MR. WILLIAMS:  Objection.  Form.

 3           THE WITNESS:  I didn't understand the

 4   question.

 5   BY MR. FOLEY:

 6       Q.  Let me try it this way.  Can you look at

 7   Paragraph 166 of your report.  It's on Page 46.

 8       A.  Okay.

 9       Q.  You wrote, "I used every option contract on

10   each respective day for which there was a positive

11   trading volume."

12           If an option contract does not have a

13   positive trading volume on an earnings announcement

14   date that you examined, does that mean that you can't

15   infer efficiency for that option contract?

16       A.  Well, if nobody is trading the option, why

17   does it matter?  I mean if there's no volume in it, it

18   reasonably should be excluded.  It's not part of the

19   case.  That's not -- no one -- if no one bought it and

20   no one sold it, then there's no allegation someone

21   bought an inflated price or sold at a deflated price.

22           So you would want to eliminate securities for

23   which there's no volume, and you wouldn't be concerned

24   about whether it trades in an efficient market for

25   that day because nobody traded it.  Nobody bought it.

Veritext Legal Solutions
866 299-5127

1     Q.  So later on in that paragraph you wrote, "On

2  each day, I averaged all computed synthetic stock bid

3  prices to arrive at that day's synthetic stock bid

4  price.  On each day, I averaged all computed synthetic

5  stock ask prices to arrive at that day's synthetic

6  stock ask price."

7          Why did you use quotes instead of actual

8  option transaction buy and sell prices in your

9  analysis?

10     A.  Well, because -- I guess to eliminate noise.

11  I mean if you're just using the price and you don't

12  know whether it's a bid or an ask and there's going to

13  be some vibration between the bid and the ask that's

14  not accounted for, but doing it this way you know

15  which quotes are bids and which puts are asks.  And by

16  taking the midpoint you eliminate that vibration

17  between the bid and the ask.

18     Q.  Could you have used the transaction buy and

19  sell prices instead?

20     A.  I'd have to think about it.  I think you

21  could.  I'd have to study the properties of that test.

22          Also, you have an issue with synchroneity.

23  If we use end of day bids and end of day asks, we know

24  the price the sell is to the market and we know it's

25  an end of day price.  If we use actual trading price,

Page 124

1   the last trading price, the last trading price might

2   be earlier in the day before some information came

3   out, and you wouldn't want to do that.

4        Q.  As part of your analysis, you tested an

5   average synthetic stock price rather than individual

6   synthetic stock prices; right?

7        A.  Yes.

8        Q.  How does the test of the average price

9   provide any evidence that there's the reactions of

10  individual options -- that's the question.

11       A.  It's a test of the market.  I mean if you

12  take the average price that's prevailing in the

13  marketplace and the average price that's reflecting

14  all available information or it's moving -- it's

15  moving when there's big information, and it's not

16  moving as much when there's no information, that tells

17  that you this market is structured such that it's

18  efficient and absorbs and processes and reflects

19  information.

20       Q.  And then --

21       A.  I'm sorry.

22       Q.  No, that's fine.

23       A.  The average price -- the average price is

24  reflective of the market.

25       Q.  And that response assumes a single market for

Veritext Legal Solutions
866 299-5127

1   Apple options?

2        A.  Well, I'd characterize the market as being a

3   market in which the options are trading.

4        Q.  It's not like you're going to go to a

5   different broker if you want to trade a put instead of

6   a call.  If you go to a different broker or if you

7   want to trade the June contract instead of the July

8   contract, you go to the same broker and tell them,

9   "Okay.  Let me buy the June.  No.  I changed my mind.

10  I'll buy the July."  You can do that because it's one

11  market.

12            If they're trading the July, they'll trade

13  the June.  If they're trading the 175 price, they'll

14  trade the 180 strike price.  In that sense, it's one

15  market.

16       Q.  You would agree that the average synthetic

17  stock price represents a value of portfolio of options

18  in itself is not an option; correct?

19       A.  Well, the portfolio is comprised -- comprises

20  options.  It's composed of options.  And if that

21  portfolio's value is changing in response to

22  information, you know that the components are changing

23  in response to the information.  So yes, the portfolio

24  itself is not a single option.  The portfolio is a

25  portfolio of options.

Page 126

1        Q.   But a portfolio of options is not an

2    instrument that could be traded by any investor given

3    the number of underlying options involved in its

4    construction.   Isn't that right?

5        A.   No, it can be traded.   Certainly.

6        Q.   It can be traded?

7        A.   Yeah.

8        Q.   Okay.   Can you tell me how?

9        A.   The infrastructure for the market is that

10   people can trade lots of options, even different

11   designs very quickly.   These are listed on NASDAQ,

12   these securities.   You can place an order with NASDAQ

13   for a combination of securities.   It's done all the

14   time.

15       Q.   For a synthetic stock, like you constructed

16   in your report?

17       A.   There's three legs to a synthetic stock.

18   Three pieces, three components.   You can trade all of

19   them virtually simultaneously.

20       Q.   If you look at Paragraph 173, which is on

21   Page 48.

22       A.   Okay.

23       Q.   You write that "Apple options reacted to

24   information and its market therefore demonstrated

25   informational efficiency."   Does your analysis

Page 127

1   establish whether every single option price reacted to

2   new value-relevant information?

3       A.  Where's the sentence you read?  Oh, the last

4   sentence.  "The conclusion is that Apple options

5   reacted to information and its market therefore

6   demonstrated informational efficiency."

7           This test is a demonstration.  This test

8   provides -- before you run the test, you don't know

9   whether it's going to provide that evidence or not.  I

10  ran the test.  The test provided a demonstration of

11  informational efficiency.  I didn't draw the

12  conclusion based on just that test.  So your question

13  kind of presumed that it did -- or that I did.  I

14  didn't.

15      Q.  Well, we're specifically talking about the

16  event study portion of your analysis.

17      A.  The event study examines whether or not the

18  securities demonstrated efficiency.  They did.  I

19  didn't draw my conclusion about efficiency just from

20  the event study.

21      Q.  But your event study analysis does not

22  establish whether every single option price reacted to

23  new value, relevant information.  Isn't that right?

24      A.  That's right.  It demonstrates that all of

25  the securities traded that day, examined collectively,

Veritext Legal Solutions
866 299-5127

1   reflected the new available information.

2       Q.  If you were to run an event study analysis on

3   Russell 2000 index and find that the index reacted to

4   news, could you conclude that the market for every

5   stock in the index was efficient?

6           MR. WILLIAMS:  Objection.  Form.  Outside of

7   the scope of his report.

8           THE WITNESS:  Well, in the context of -- I

9   mean we're talking about company-specific information.

10  So what kind of -- the test that I ran tested to see

11  whether these securities reacted to company-specific

12  information and factored out market information.

13          I hear what you're saying.  So you're saying

14  that you're not focused on any particular company's

15  information.  You must be looking at marketwide

16  information -- is that right? -- in your hypothetical?

17  BY MR. FOLEY:

18      Q.  Yeah.  That's right.

19      A.  Well, I think it would tell you that that's

20  evidence that stocks trade efficiently.

21      Q.  That each individual stock in the Russell

22  2000 trade efficiently if the average does?

23      A.  If the average does, it tells you that

24  efficiency is more the rule than the exception.

25      Q.  And that's basically what you've done here;

                                        Page 129

1   correct?

2        A.   No, because there's much more similarity

3   among Apple options that might differ by dollar -- you

4   know, a couple dollars in strike price or by a month

5   in expiration date.  That all trade derivative with

6   respect to Apple stock, there's much more commonality

7   among these components than there is among the diverse

8   Russell 2000.

9             MR. FOLEY:  Why don't we go ahead and take a

10  break, if that's okay with everybody.

11            MR. WILLIAMS:  How long?

12            MR. FOLEY:  I don't know.  5, 10 minutes.

13            MR. WILLIAMS:  Okay.

14            THE VIDEOGRAPHER:  We're going off the record

15  at 2:24 p.m.  This is the end of Media 4.

16            (A recess was taken from 2:24 p.m.

17            to 2:37 p.m.)

18            THE VIDEOGRAPHER:  We are on the record at

19  2:37 p.m.  This is the beginning of Media 5 in the

20  deposition of Dr. Steven Feinstein.

21  BY MR. FOLEY:

22        Q.   Dr. Feinstein, in Paragraph 2, which is on

23  Page 1 of your report, you wrote that you were asked

24  "to determine if Section 10(b) damages in this matter

25  can be computed for all Class members using a common

Page 130

```
 1              THE WITNESS:  Yes.  In the context that this
 2     statement was made, those are things the judge
 3     considered, the statement and the context in which it
 4     was made.  And I understand -- I mean I'm not a
 5     lawyer, but there's always the possibility that there
 6     will be -- I think I read something to this effect in
 7     the Complaint that, you know, should discovery uncover
 8     the basis for more allegations of misrepresentations
 9     and omissions, that plaintiffs essentially reserve the
10     right to plead those.
11     BY MR. FOLEY:
12         Q.  But as the case is currently constituted,
13     that's the lone omission -- sorry.
14              That's the lone misrepresentation?
15         A.  Well, I'm not sure what you mean by
16     "currently constituted."  But my understanding is that
17     this is the statement the judge pointed to in
18     upholding the pleadings and -- and denying the motion
19     to dismiss.
20         Q.  Under plaintiffs' theory was Tim Cook's
21     statement, "I would not put China in that category,"
22     was it better than what the market had expected before
23     its statements?
24              MR. WILLIAMS:  Objection.  Form.
25              THE WITNESS:  Well, again, I want to
```

Page 134

1   reiterate that I have not done a loss causation and

2   damages analysis.  The scope of my engagement was to

3   express market efficiency and determine whether there

4   was a damage model that exists that could be commonly

5   applied that's consistent with plaintiffs' theory of

6   liability.  But in the details, beyond what I've

7   already articulated, I don't think they are really

8   necessary to support that opinion.

9        I don't think I need to delve deep.  Look, I

10  could think about it and give you an answer, but I'm

11  tempted just to say that it's not in my report, the

12  answer to your question.  And I'd have to think about

13  it to give you an answer that I feel comfortable with.

14  BY MR. FOLEY:

15      Q.  But it does say in your report that it's your

16  opinion that damages can be calculated consistent with

17  plaintiffs' theory of liability.  So that suggests to

18  me that you have an understanding of what plaintiffs'

19  theory of liability is.

20      A.  Yes.  And I do.  The theory of liability is

21  that this statement caused the stock price to be

22  inflated.  When I'm calculating damages or assessing

23  loss causation, I'll evaluate that.

24      Q.  And I guess my specific question is:  Is it

25  your understanding that plaintiffs' theory is that Tim

Page 135

1    Cook's statement, "I would not put China in that
2    category," was better than what the market had
3    expected?
4              MR. WILLIAMS:  Objection.  Form.
5              THE WITNESS:  It's my understanding that
6    plaintiffs' theory of liability is that this statement
7    and Tim Cook's statement on that day inflated --
8    caused the stock price to be artificially inflated and
9    had a derivative effect on the derivatives.
10   BY MR. FOLEY:
11        Q.  You have not done any analysis to determine
12   whether Tim Cook's statement on that day actually
13   inflated the stock price?
14        A.  Right.  I didn't delve into the merits yet.
15   I'm not sure I will ever, but as of yet, I haven't.
16        Q.  Is it your understanding that Tim Cook's
17   statement that he would not put China in that category
18   was referring to past performance or future
19   performance?
20             MR. WILLIAMS:  Objection.  Form.  Far outside
21   of the scope of his report.
22             THE WITNESS:  I read the judge's order, and
23   the judge devoted some pages to that question.  I
24   don't have an independent opinion yet on that.
25   BY MR. FOLEY:

                                        Page 136

1          Q.  Do you know what plaintiffs' theory about

2    that is?

3          A.  Well --

4               MR. WILLIAMS:  Objection.  Form.

5               About what is?

6    BY MR. FOLEY:

7          Q.  About whether or not it refers to past or

8    future performance.

9               MR. WILLIAMS:  Objection.  Form.

10               THE WITNESS:  The theory is that the

11    statement inflated the stock price, caused there to be

12    fraudulent artificial inflation in the stock price as

13    of the start of the class period.  I haven't evaluated

14    whether they're right or wrong about that.

15    BY MR. FOLEY:

16          Q.  Do you know whether plaintiffs' theory is

17    that Tim Cook's statement was referring to past

18    performance or future performance?

19               MR. WILLIAMS:  Objection.  Form.

20               THE WITNESS:  I know what the judge said, but

21    I haven't -- you're asking me what I think Tim Cook's

22    statement referred to or what I think plaintiffs think

23    it referred to?

24    BY MR. FOLEY:

25          Q.  Look, your report says that you have an

                                        Page 137

1    understanding of plaintiffs' theory of liability.  I'm

2    trying to determine what that understanding is.  So

3    it's specifically as to what plaintiffs' theory is.

4         A.  Well, I understand the plaintiffs' theory is

5    that the statement is a misrepresentation and there

6    are also omissions that caused the security price to

7    be inflated, artificially inflated.  I haven't

8    developed into the merits to see if they're right or

9    wrong.  I can do that at the appropriate time.

10        Q.  Well, I understand, and just -- look, if the

11   answer is "I don't know," that's fine, but do you have

12   an understanding of what plaintiffs' theory is as to

13   whether Tim Cook's statement was prospective or

14   retrospective.

15             MR. WILLIAMS:  Hold on, Steven.  Hold on.

16             Objection.  Form.

17             He answered the question, Bill.  To suggest

18   to him that he doesn't know whether the answer --

19   doesn't know, that's not what he testified to.  I mean

20   it sounds to me like you're trying to get him to

21   answer a fact question that the court addressed in its

22   order, which he testified to.

23             MR. FOLEY:  Shawn, he has not answered my

24   specific question.  I'm not badgering the witness

25   here.  I'm specifically asking a question about his

                                        Page 138

1   understanding of plaintiffs' theory of liability about

2   the sole misrepresentation at issue in this case.

3          MR. WILLIAMS:  I'm not going to -- we don't

4   have to debate it.

5          Objection.  Form.  It's been asked and

6   answered multiple time.

7   BY MR. FOLEY:

8       Q.  Go ahead, Dr. Feinstein.  I think there's a

9   question pending.

10      A.  What is the question?

11      Q.  Is it your understanding that plaintiffs'

12  theory of liability is that Tim Cook's statement

13  regarding "I would not put China in that category"

14  refers to past performance or future performance?

15         MR. WILLIAMS:  Objection to the form of the

16  question, and I think that it's misleading.

17         THE WITNESS:  Well, I -- you know, I have a

18  summary of my opinions, and interpretation of the

19  statement is not among them.  Weighing in on the

20  merits of the case is not among the opinions I've laid

21  out in this report.

22         What I did lay out as an opinion is that

23  there is a methodology for the calculating of damages

24  consistent with the theory of liability.  And so I do

25  have an understanding that the theory of liability

1     sufficient to support my conclusion, which is that the

2     theory of liability is that this statement inflated

3     the stock price artificially and caused the calls to

4     be inflated and the puts to be perturbed downward.

5     BY MR. FOLEY:

6         Q.  Do you know how the market treated this

7     statement, whether it was a statement of past or

8     future performance?

9              MR. WILLIAMS:  Objection.

10             THE WITNESS:  I read analyst reports.  I

11    don't want to say I'm completely ignorant about it,

12    but it's just not an opinion that I came prepared to

13    discuss.  I mean it's not an opinion that's

14    satisfactorily formed at this point in time for me to

15    offer it as an opinion I've arrived at with due

16    diligence and appropriate research and analysis.

17             I know that I can do it at the appropriate

18    time.  I -- I examined the analyst reports and the

19    news reports so that I know that I'll be able to

20    form -- draw conclusions, but as of right now, I'd

21    like to reserve the right to be undecided.

22    BY MR. FOLEY:

23        Q.  And you know that you'll be able to draw that

24    conclusion because it's your understanding that

25    analyst reports -- that the analysts had made a

                                              Page 140

1   determination whether the statement referred to past

2   or future performance?

3            MR. WILLIAMS:  Objection.  Form.

4            You're actually suggesting testimony that he

5   has not provided.  I think you're really close to the

6   line in attempting to mislead the witness.  I

7   understand what you're trying to do.

8            Objection to the form.

9            At some point I'm going to have him not

10  answer any more of these questions.

11           MR. FOLEY:  That's fine, Shawn.

12       Q.  Go ahead, Dr. Feinstein.

13       A.  I'm just saying that I know that the

14  information is out there for me to draw a conclusion

15  at the appropriate time.

16       Q.  Do plaintiffs allege that the revenue

17  guidance provided on November 1, 2018 was incorrect?

18       A.  I didn't see that as a specific allegation.

19  What I saw in the specific allegation is that certain

20  statements were false or misleading.

21       Q.  Do you have any reason to believe that the

22  revenue guidance was incorrect?

23           MR. WILLIAMS:  Objection.  Form.  Far outside

24  of the scope.

25           THE WITNESS:  It certainly turned out to be

                                          Page 141

```
1    incorrect.  We know that.  We know that it turned out
2    to be incorrect.
3    BY MR. FOLEY:
4        Q.  In Paragraph 186, Subparagraph ii you write
5    that to calculate damages you would construct an
6    inflation ribbon, which is a time series of the
7    difference between the stock's actual price observed
8    in the marketplace and the estimated price that the
9    stock would have traded at each day had there been
10   full disclosure.
11           Under plaintiffs' theory of liability, what
12   is the full disclosure that could have been made at
13   the beginning of the class period that would have
14   resulted in zero inflation?
15           MR. WILLIAMS:  Objection.  Form.  Outside the
16   scope.
17           THE WITNESS:  I haven't done the loss
18   causation analysis yet.  That is the determination
19   I'll make when I'm quantifying damages and assessing
20   loss causation.
21   BY MR. FOLEY:
22       Q.  So do you have an understanding of what the
23   full disclosure that plaintiffs are alleging could
24   have been made at the beginning of the class period
25   was?
```

Page 142

```
 1              C E R T I F I C A T E
 2        I do hereby certify that the aforesaid testimony
 3   was taken before me, pursuant to notice, at the time
 4   and place indicated; that said deponent was by me duly
 5   sworn to tell the truth, the whole truth, and nothing
 6   but the truth; that the testimony of said deponent was
 7   correctly recorded in machine shorthand by me and
 8   thereafter transcribed under my supervision with
 9   computer-aided transcription; that the deposition is a
10   true and correct record of the testimony given by the
11   witness; and that I am neither of counsel nor kin to
12   any party in said action, nor interested in the
13   outcome thereof.
14
15   Dated:  June 18, 2021
16
17
18
19
20
21
22
23        Nancy J. Martin, RMR, CSR
24
25
```

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.