EXHIBIT 7

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

In re APPLE INC. SECURITIES
LITIGATION

Case No. 4:19-cv-02033-YGR

REPLY REPORT OF

PROFESSOR STEVEN P. FEINSTEIN, PH.D., CFA

August 24, 2021

**TABLE OF CONTENTS**

I.      SCOPE OF PROJECT AND REPORT ...........................................................................1

II.     CONCLUSIONS.........................................................................................................3

III.    CRITIQUE OF THE GRENADIER REPORT.................................................................9

        A.      Areas of Agreement .......................................................................................9

        B.      The Feinstein Report Describes a Damage Methodology for Purchasers of
                Apple Common Stock That Can Be Computed Commonly for All Class
                Members and Is Consistent with Plaintiff's Theory of Liability ............................9

                1.      The Out-of-Pocket Damage Methodology Was Fully Specified and
                        Articulated in the Feinstein Report...........................................................11

                2.      All of the Valuation Complexities That Dr. Grenadier Raises Can
                        Be Accommodated by Standard Tools of Valuation ..................................15

                        a.      Confounding Information ...............................................................16

                        b.      Time-Varying Inflation..................................................................18

                        c.      Qualitative and Quantitative Information .......................................21

        C.      The Out-Of-Pocket Damage Methodology is Similarly Appropriate and
                Common for Apple Option Investors and Writers.................................................23

                1.      Options Volatility Estimate Under Full Disclosure ...................................23

        D.      The Feinstein Report Demonstrates that Apple Options Traded in An
                Efficient Market During the Class Period.............................................................25

                1.      Apple Options Can Be Analyzed Collectively Due to Their Similar
                        Characteristics........................................................................................26

                2.      The Synthetic Stock Event Study Demonstrates the Efficiency of
                        the Market for Apple Options ..................................................................28

                        a.      The Synthetic Stock Event Study Methodology is
                                Supported by the Finance and Statistics Literatures.......................29

                        b.      The Synthetic Stock Event Study Methodology in the
                                Feinstein Report Applies to Both American Options and
                                European Options............................................................................31

IV.     LIMITING FACTORS AND OTHER ASSUMPTIONS....................................................34

## I.    SCOPE OF PROJECT AND REPORT

1.    On 5 May 2021, I submitted a report in this matter (the "Feinstein Report").[1] Based on the analyses presented in the Feinstein Report, I concluded that the markets for Apple stock and the Apple options were efficient during the period from 2 November 2018 through 2 January 2019, inclusive (the "Class Period").[2] I further concluded that Section 10(b) damages can be computed for all Class members and for all securities using a common methodology that is consistent with the Lead Plaintiff's theory of liability, and I described that methodology.[3]

2.    In the Feinstein Report, I showed that each of the *Cammer* and *Krogman* factors supports a finding that the market for Apple stock was efficient over the course of the Class Period.[4] The analysis included a statistical test that compared the price behavior of Apple stock on a set of high information flow dates to the stock price movements on ordinary non- or lesser-news dates. This test proved that Apple stock responded to new, Company-specific information and thereby demonstrated market efficiency during the Class Period.[5]

3.    The Feinstein Report also showed that each of the *Cammer* and *Krogman* factors, aside from the bid-ask spread factor, which results were mixed, supports a finding that the market for the Apple options was efficient over the course of the Class Period.[6] The options market analysis included the same collective event study empirical test that was used for Apple stock. This test examined the price behavior of Apple options, combined into synthetic stock, and in this way compared option price movements on the high information flow days to the option price movements on ordinary non- or lesser-news dates. The Apple options

---

[1] Unless otherwise indicated, capitalized terms used herein have the same definition and meaning ascribed to them in the Feinstein Report.

[2] Feinstein Report, ¶¶17-23.

[3] Feinstein Report, ¶¶17-23 and ¶¶178-189.

[4] Feinstein Report, ¶¶56-142.

[5] Feinstein Report, ¶¶132-136.

[6] Feinstein Report, ¶¶143-177.

demonstrated market efficiency during the Class Period, observably reacting to information, and thus satisfied the fifth *Cammer* factor. In fact, the Apple option prices moved by statistically significant amounts in response to the same earnings announcements that elicited statistically significant movements in the Apple common stock price.

4.   Following submission of the Feinstein Report, on 16 June 2021 I provided deposition testimony in this case (the "Feinstein Deposition").

5.   Subsequently, I was asked by Robbins Geller Rudman & Dowd LLP, Counsel for the Lead Plaintiff ("Plaintiff"), to consider and evaluate the arguments and conclusions in the Expert Report of Professor Steven Grenadier, dated 9 July 2021 (the "Grenadier Report"), submitted by Defendants in this matter. To that end, I read and analyzed the Grenadier Report.

6.   According to Dr. Grenadier, he was asked to "review and respond" to the Feinstein Report, specifically to "(i) assess the purported damages methodology provided by Dr. Feinstein, and (ii) assess the option market efficiency analysis conducted by Dr. Feinstein."[7] The Grenadier Report questions the damage methodology provided in the Feinstein Report for Apple stock and the Apple options. Dr. Grenadier also challenges my market efficiency analysis and conclusions for the Apple options. Dr. Grenadier does not dispute that the market for Apple stock was efficient throughout the Class Period.

7.   This rebuttal report presents my analysis and conclusions relating to the Grenadier Report. As of this juncture, I have not been asked to conduct an analysis of loss causation or to compute damages. I consequently do not offer a loss causation opinion or damage quantification in this report. Should I be asked to do so, I will comprehensively address loss causation and damages at the appropriate stage in this litigation.

8.   Documents that I reviewed and relied upon in preparing this report in addition to those already cited in the Feinstein Report are listed in Exhibit-1 of this report. My credentials and compensation are presented in the Feinstein Report, as is a list of testimony I provided during the four years preceding that report. Testimony I have provided since the Feinstein Report is identified in Exhibit-2 of this report.

---

[7] Grenadier Report, ¶4.

9.      My work in this matter is ongoing, and I reserve the right to amend, refine, or supplement my analyses and opinions in the event that I become aware of additional information, evidence, arguments, or analyses that bear on my work in this matter.

## II.    CONCLUSIONS

10.     Dr. Grenadier disputes neither my conclusion presented in the Feinstein Report that Apple stock traded in an efficient market throughout the Class Period, nor my empirical analyses and findings supporting that conclusion. In fact, Dr. Grenadier cites to my event study analysis and findings for Apple stock.[8] Dr. Grenadier provides no reason to revise my conclusion that the common stock of Apple traded in an efficient market over the course of the Class Period. The efficiency of the market for Apple stock is undisputed.

11.     Dr. Grenadier does not dispute that the generally accepted and widely used out-of-pocket damage methodology exists and is consistent with Plaintiff's theory of liability. Nor does he dispute that an inflation ribbon can be constructed to determine how much artificial inflation caused by the alleged misrepresentations and omissions was in the price of Apple stock on each day during the Class Period, if any. Rather, Dr. Grenadier's opinions on the damage methodology are limited to the following assertions: (i) that my description of the out-of-pocket damage model does not detail all the valuation tools that might be employed to compute the but-for stock prices and in turn the inflation ribbon throughout the Class Period;[9] (ii) that certain "difficulties of measuring damages" may potentially be encountered;[10] and (iii) that the eventual construction of an inflation ribbon in this case

---

[8] Grenadier Report, ¶59 and FN74: "According to Dr. Feinstein's event study regression analysis, Apple's stock price experienced a statistically significant decline of 7.03% following the alleged revelation of the truth on January 2, 2019, after accounting for market and industry movements. … I use the term 'event study regression' to refer to the statistical regression analysis that Dr. Feinstein performs in Exhibit 6 of his report. For the purposes of my report, I am not critiquing his event study regression for Apple stock."

[9] Grenadier Report, ¶¶47-53.

[10] Grenadier Report, ¶47 and ¶¶54-153.

may be computed incorrectly if it does not account for the potential valuation complexities he identifies. None of the potential issues highlighted by Dr. Grenadier provides reason to revise my conclusion that damages can be computed using a common methodology that is consistent with Plaintiff's theory of liability.

12.    First, while a damage model can be fully articulated *a priori*, as I did, the degree of specificity Dr. Grenadier desires about hypothetical complexities that potentially may be encountered cannot be provided until damages are actually computed. If potential complexities are encountered during the damage computation, the standard valuation tools that I described in the Feinstein Report would accommodate them. Valuations under alternative scenarios, of the sort necessary to compute artificial inflation, are routinely conducted every day, by legions of financial analysts, for virtually every publicly traded security. Dr. Grenadier is wrong to suggest that valuation under the but-for scenario of full disclosure is unusual or might be impossible. Dr. Grenadier apparently would be unsatisfied with any description of the damage model that is unaccompanied by the completed analysis, which is premature at this stage.

13.    Second, none of the potential valuation issues that Dr. Grenadier raises are insurmountable, and he does not contend that they are insurmountable. Dr. Grenadier identifies several potential valuation complexities that he believes may complicate the measure of inflation at the loss causation and damages stage, including confounding information on the corrective disclosures,[11] differences in the valuation of qualitative and quantitative misrepresentations, omissions, and disclosures,[12] and potential time-varying inflation attributed to the market's changing expectations and the Company's possibly deteriorating condition during the Class Period.[13] Dr. Grenadier overlooks that these computational issues are common and routinely encountered and addressed in class action securities cases. These computational issues are more about the execution of the common damage model rather than the existence of the common damage model.

---

[11] Grenadier Report, ¶55 and ¶¶71-77.

[12] Grenadier Report, ¶¶79-86.

[13] Grenadier Report, ¶¶57, 62-70, 99-121, and 124-152.

14.     If anything, Dr. Grenadier's concerns for the potential adjustments to the inflation ribbon to accommodate valuation complexities acknowledge the existence of the damage model and that it would be commonly applied for all Class members. The value computations and adjustments that Dr. Grenadier opines may be necessary would not be necessary for just select Class members, but rather would apply to all Class members. Therefore, the damage model and the financial and quantitative analysis for implementing it are common for all Class members.

15.     Finally, many of Dr. Grenadier's concerns regarding the damage methodology provided in the Feinstein Report rely on his mischaracterization of my report. Dr. Grenadier asserts that an event study **by itself** is not enough to accommodate the potential valuation complexities he identifies, should they be encountered.[14] But, I never stated that event study analysis alone and in isolation would resolve all potential valuation issues, so his criticism is misguided. The Feinstein Report explains that but-for prices and inflation would be computed using event study analysis in combination with standard valuation tools. Valuation tools have been developed for precisely the sorts of valuation issues Dr. Grenadier raises.[15]

16.     The common damage model I presented for the Apple options is essentially the same as the model for the Apple stock – the holding period decline in artificial inflation precipitated by corrective disclosure, subject to certain statutory and case law prescriptions. Similarly, and apparently recognizing this fact, most of Dr. Grenadier's criticisms of my description of the out-of-pocket damage methodology for the Apple options are the same criticisms he levies against the stock damage model. Accordingly, my responses to Dr. Grenadier's concerns and criticisms addressed above and detailed later in this report apply to the option damage model as well as the stock damage model, the models being essentially the same.

---

[14] See, Grenadier Report, ¶87 and ¶90. Grenadier Report, ¶87: "An event study *alone* is not sufficient to measure the change in inflation introduced by an alleged misstatement or an alleged omission"; and ¶90: "Dr. Feinstein's event study regression, *on its own*, would fail to show that the statement inflated the stock price."

[15] Feinstein Report, ¶¶182-186.

17.     Dr. Grenadier raises one damage model concern unique to the options. Dr. Grenadier asserts that full disclosure would impact Apple stock volatility, which would have an impact on the Apple option values according to generally accepted option pricing formulas.[16] Importantly, in raising this concern, Dr. Grenadier implicitly accepts the informational efficiency of the Apple options, acknowledging that option values are governed by generally accepted valuation formulas and positing that the market prices of the Apple options would indeed react to the information disclosures accordingly. Moreover, this particular criticism is emblematic of all of Dr. Grenadier's damage model criticisms and highlights the flaw within his criticisms. Dr. Grenadier speculates about what facts the discovery and the development of the record in this case might reveal, and he surmises that possible facts may have valuation impact. He then wrongly avers that these potential information effects may be incorrectly disregarded when damages are ultimately computed. But he has no valid basis for speculating that information effects compelled by established facts and generally accepted valuation principles will be disregarded in the computation of but-for prices, artificial inflation, and, in turn, damages. If evidence of changing volatility is encountered, for example, standard valuation tools will account for it, and the out-of-pocket damage methodology would neatly and commonly accommodate it.

18.     In sum, Dr. Grenadier provides no reason to revise my conclusion that damages in this matter can be computed for all Class members and for all securities using a common methodology that is consistent with Plaintiff's theory of liability. He levies no valid challenge.

19.     Dr. Grenadier is wrong to assume that each option series must be analyzed individually for the purposes of testing market efficiency. As explained in the Feinstein Report and in my deposition, all Apple options have similar structure and characteristics, are governed by the same valuation principles and formulas, and are frequently substituted for one another by investors. Contrary to Dr. Grenadier's contention, there are not 2,282 separate Apple option markets, one for each unique combination of strike price and maturity date. There are not separate markets for the puts and calls. Information sources are common for all of

---

[16] Grenadier Report, ¶217.

the option contracts, as are the market makers and trading platforms. The analysis of the market for the Apple options establishes that there are no information or trading impediments that could hamper efficiency in the market for the Apple options. It is not practical to run 2,282 separate empirical tests, but neither is it necessary. The tests I ran and presented in the Feinstein Report prove that the Apple options react to information and thus demonstrated informational efficiency during the Class Period.

20.    Furthermore, while Dr. Grenadier says on the one hand that the Apple options are so different that they must be treated and tested individually, when he raises his volatility argument, he treats them collectively, recognizing that their valuations are functions of the same formulas and information.[17] Dr. Grenadier writes, "[T]he price of an option depends not just on the stock price, but also on the volatility of the underlying stock price (along with other factors such as time to maturity and the risk-free interest rate). … [E]ven if stock price inflation were constant throughout the Putative Class Period, option inflation would have varied over time with volatility."[18] That is, Dr. Grenadier goes so far as to concede that option values move together, and would move together under alternative disclosure scenarios, underscoring that the Apple options can and should be treated collectively.

21.    Dr. Grenadier's criticisms of the option event study are erroneous. As explained in the Feinstein Report, "individual options can be combined into a portfolio that, consistent with option valuation principles, should have stationary price dynamics and behave the same as the underlying stock in an efficient market."[19] The academic literature supports variable transformations to provide stationary price dynamics for the purposes of running event studies, similar to the construction of synthetic stock prices in the Feinstein Report.

22.    Dr. Grenadier is wrong to suggest that a synthetic stock event study cannot be conducted with American options that allow for early exercise. The synthetic stock event study is valid for both European and American options and demonstrates that Apple options reacted to information. Not only is the value of the early-exercise feature of American options

---

[17] Grenadier Report, ¶¶217-218 and Exhibit-8.

[18] Grenadier Report, ¶217.

[19] Feinstein Report, ¶161.

small when compared to an option's value,[20] but the even smaller difference between the value of the call's early exercise feature and the value of the put's early exercise feature is what is reflected in a synthetic stock price. Additionally, it is not even this small difference between early exercise feature values that is reflected in event study residual returns, but rather the day-to-day changes in this very small difference. Quantitatively, the early exercise feature of American options has no consequential effect on the residual returns of synthetic stock in an event study, and Dr. Grenadier did not present any calculations to suggest otherwise.

23.    Furthermore, any difference in synthetic stock returns due to inclusion or exclusion of the value of the early-exercise feature is so small that it would be accommodated by and incorporated into the noise component of the regression. The proof of this fact is that even with this potential additional noise component, the Apple synthetic stock exhibited significant returns on three of Apple's four earnings announcements during the Examination Period, exactly the same frequency as for the actual stock. If anything, an additional noise component would have biased the test result away from finding that the synthetic stock observably reacted to information in the same manner as the stock. The fact that the significance result was strong nonetheless proves that quantitatively, the early exercise feature had no consequential effect.

24.    Dr. Grenadier provides no reason to revise my conclusion that the market for Apple options was efficient throughout the Class Period. Dr. Grenadier provides no reason to revise any of the conclusions or opinions proffered in the Feinstein Report. None of his criticism is valid.

---

[20] "Directly Measuring Early Exercise Premiums Using American and European S&P 500 Index Options," by Michael Dueker and Thomas W. Miller, Jr., *The Journal of Futures Markets*, vol. 23, no. 3, 2003, pp. 287-288. ("[W]e find average early exercise premiums ranging from 5.04 to 5.90% for calls, and from 7.97 to 10.86% for puts.").

### III.    CRITIQUE OF THE GRENADIER REPORT

#### A.    Areas of Agreement

25.    Dr. Grenadier agrees with or does not dispute the elements of my market efficiency analysis for Apple stock or the conclusion that Apple stock traded in an efficient market throughout the Class Period. Dr. Grenadier takes no issue with the econometric analysis presented in the Feinstein Report for Apple stock. In fact, Dr. Grenadier accepts and cites to my event study analysis and findings for Apple stock.[21]

26.    Dr. Grenadier does not dispute that allegation-related information was released to the market on 5 November 2018, 12 November 2018, and 2 January 2019 (after the close of trading). Dr. Grenadier takes issue with how much of that information was known to Defendants before the disclosures, and therefore what could have been disclosed earlier, but that is a case merits question, not a criticism of market efficiency or the damage model.

27.    Dr. Grenadier does not dispute that Apple stock declined by statistically significant amounts following the alleged corrective disclosures on 5 November 2018, 12 November 2018, and 2 January 2019 (after the close of trading).[22]

#### B.    The Feinstein Report Describes a Damage Methodology for Purchasers of Apple Common Stock That Can Be Computed Commonly for All Class Members and Is Consistent with Plaintiff's Theory of Liability

28.    Dr. Grenadier opines that I have "not shown that there is a damages methodology for Apple's stock ('Apple stock' or 'stock') that measures damages consistent with Plaintiff's theory of liability."[23] Dr. Grenadier's opinion relies on two main points of contention. First,

---

[21] Grenadier Report, ¶59 and FN74: "According to Dr. Feinstein's event study regression analysis, Apple's stock price experienced a statistically significant decline of 7.03% following the alleged revelation of the truth on January 2, 2019, after accounting for market and industry movements. … I use the term 'event study regression' to refer to the statistical regression analysis that Dr. Feinstein performs in Exhibit 6 of his report. For the purposes of my report, I am not critiquing his event study regression for Apple stock."

[22] As the corrective disclosure occurred after the close of trading on 2 January 2019, the reaction date for Apple stock was 3 January 2019. Apple stock price declined 10.49% on 3 January 2019 (on a logarithmic basis), which was statistically significant at the 95% confidence level. In ¶59 of his report, Dr. Grenadier acknowledges that the 3 January 2019 Apple price decline was statistically significant.

[23] Grenadier Report, ¶14.

he argues that I have provided only "a general definition of damages" and "not a methodology" because I have not cited specifically the entire catalogue of valuation tools that I might utilize in the course of executing the damage model computations.[24] Second, Dr. Grenadier raises a number of "difficulties of measuring damages" that may complicate the measurement of the artificial inflation ribbon in this case.

29.   Dr. Grenadier's criticisms are erroneous. I did fully articulate a damage methodology that is consistent with Plaintiff's theory of liability and can be applied commonly for all Class members. The methodology is the out-of-pocket model, which is used to compute damages in virtually all class action securities cases, and which is acknowledged as the appropriate model in governing statutes,[25] numerous legal cases,[26] numerous plans of allocation agreed to by both plaintiffs and defendants, and in published legal scholarship.[27]

30.   The degree of granularity in the identification of every valuation tool that may or may not be used in the construction of an inflation ribbon, for which Dr. Grenadier advocates, cannot be provided until the damages analysis is actually undertaken. No expert or forensic financial analyst can state with specificity what valuation tools and techniques will definitely be used to accommodate potential valuation complexities until the record is developed and one can see which specific valuation complexities do arise, if any.

---

[24] Grenadier Report, ¶¶48-50.

[25] See, for example, Private Securities Litigation Reform Act of 1995 (the "PSLRA") (15 U.S.C. § 78u-4(e)).

[26] See, e.g., *City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*, No. 17-cv-00554-YGR, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) ("Courts regularly reaffirm that the out-of-pocket, or event study, method matches plaintiffs' theory of liability under Section 10(b) of the Securities Exchange Act, making it the standard method for calculating damages in virtually every Section 10(b) class action.").

[27] See, e.g., "Securities fraud decisions rarely address damages. When they do, they describe recoverable damages as the plaintiff's 'out-of-pocket' loss. As the Supreme Court explained in 1900, out-of-pocket loss is 'the difference between the real value of the stock *at the time of the sale*, and the fictitious value at which the buyer was induced to purchase.' Similarly, the Court in *Randall v. Loftsgaarden* described the normal measure of damages in a 10b-5 case as the plaintiff's 'out-of-pocket' loss—that is, the 'difference between the fair value of all that the [plaintiff] received and the fair value of what he would have received had there been no fraudulent conduct.'" ("Cause for Concern: Causation and Federal Securities Fraud," by Jill E. Fisch, *Iowa Law Review*, vol. 94, no. 3, 2009, p. 844); and "Isolating the effect of the alleged misconduct on the firm's stock price is required by the out-of-pocket measure of damages, the traditional method for computing damages in open market trading cases under the rule 10b-5, which limits recovery to the difference between the price paid or received, and the 'real' value of the security at the time of the purchase/sale. *In re* LTV Securities Litigation, 88 F.R.D. 134, 148-49 (N.D. Tex. 1980)." ("Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," by Daniel R. Fischel, *The Business Lawyer*, 38 Bus. Law. 1, 1982, p. 7, n25).

31.     Nonetheless, the potential valuation complexities that Dr. Grenadier identifies, which may
or may not be encountered when the inflation ribbon is constructed, can most assuredly be
accommodated by standard tools of valuation. Analysts and investors value virtually all
publicly traded securities continuously, reacting to changing information and also positing
likely future values under a wide variety of alternative possible scenarios. Valuation is
rarely impossible.

32.     With respect to the time-varying inflation and confounding information issues that Dr.
Grenadier raises, the very evidence of such valuation complexities would directly inform
the forensic analyst of the very valuation tools that would be used to resolve such issues,
should they arise. That is, if evidence is encountered that does indicate that the valuation
effect of certain information has changed, the evidence would not be ignored, but rather
would indicate a necessary valuation adjustment. Dr. Grenadier's criticisms seem to be the
baseless conjecture that the valuation component of the damage model may be
implemented incorrectly, not that the damage model does not exist. He also overlooks the
fact that such valuation adjustments, if necessary, would be common for all Class members.

## 1.     The Out-of-Pocket Damage Methodology Was Fully Specified and Articulated in the Feinstein Report

33.     In the Feinstein Report, I described the methodology for calculating 10(b) damages that I
would use in this case – the out-of-pocket damage methodology.[28] This method is the
appropriate damage computation methodology commonly applied in virtually all federal
class action securities cases alleging misrepresentations and omissions. This damage model
fits the facts, circumstances, and theory of liability of the instant case. I explained that the
calculation of each Class member's damages would be a mechanical arithmetic exercise,
conducted the same way for all Class members, applying the results of the Class-wide
analyses described in the Feinstein Report to each Class member's trading data.[29]

---

[28] Feinstein Report, ¶¶178-189.

[29] Feinstein Report, ¶186.

34.  The out-of-pocket methodology is fully consistent with Plaintiff's theory of liability in the instant matter. It measures what compensation would place investors in a position commensurate to the economic condition that they would have been in had there been no alleged fraud. In the instant case, Plaintiff alleges that misrepresentations and omissions artificially inflated the price of Apple stock and call options and artificially depressed the price of Apple put options, and corrective disclosures later dissipated this artificial inflation and depression causing investor losses. The out-of-pocket damage methodology measures the loss caused by the introduction, and subsequent dissipation, of artificial inflation, and it does so commonly for all investors. The methodology therefore measures the compensation that would put Class members in the economic position they would have been in had they not suffered losses stemming from the alleged fraud.

35.  Dr. Grenadier neither disputes that the out-of-pocket damage methodology is appropriate in the instant case, nor disagrees that an inflation ribbon can be used to compute damages commonly for all Class members. Rather, Dr. Grenadier argues that my description of the out-of-pocket damage methodology is insufficient because it does not cite the entire catalogue of valuation tools that I might utilize in the course of executing the damage model computations and because it does not explain with specificity how every single potential valuation issue would be overcome, should they be encountered in the implementation of the damage methodology.

> "Dr. Feinstein's 'out-of-pocket damage methodology' is simply a definition of damages, and Dr. Feinstein does not provide a methodology that could calculate damages on a class-wide basis in this case. … However, this 'methodology' is nothing more than a general definition of damages under Rule 10b-5."
> **Grenadier Report, ¶48.**

> "Dr. Feinstein provides a generic description of how 'per share damages can be measured.' As a first step in his generic description, Dr. Feinstein proposes to use an event study and 'potentially other empirical analyses if necessary' to determine if 'the alleged misrepresentations and omissions had caused the stock price to be artificially inflated, and if corrective disclosures caused the inflation to dissipate.'"
> **Grenadier Report, ¶50.**

36.    In the Feinstein Report, I explained that if potential valuation complexities were encountered in the implementation of the damage methodology or in the quantification of per-share inflation, standard valuation tools could accommodate such potential complexities.[30] I also provided a lengthy but non-exhaustive list of valuation tools and techniques that could accommodate potential complexities.[31,32]

> "To the extent that there may be specific issues complicating the quantification of artificial inflation encountered in the execution of the out-of-pocket damage methodology due to potentially unique facts and circumstances of this case, the standard tools of valuation analysis can be applied as needed. Valuation tools can be applied to measure what the price of Apple stock would have been but for the alleged misrepresentations and omissions. Valuation analysis is undertaken continuously, every day, for virtually every publicly-traded security, and these tools address the very complexities that could potentially be encountered in the course of computing inflation and damages in this case. Valuations assuming alternative scenarios are commonly conducted by analysts and investors."
> **Feinstein Report, ¶¶183-184.**

> "Among the commonly used valuation tools that are available to investors and analysts in real time, and to forensic analysts when computing damages, are, for example: valuation multiple models, such as those based on earnings, earnings before interest, tax, depreciation and amortization (EBITDA), revenue, book value, and cash flow; discounted cash flow (DCF) models; scenario analysis, and the literature regarding valuation effects of factors such as reputation and quality of accounting. In addition, forensic analysts have the added benefit of being able to use event study analysis, which quantifies the price effects that occurred when information did reach the market."
> **Feinstein Report, ¶185.**

---

[30] Feinstein Report, ¶¶184-189.

[31] Feinstein Report, ¶185.

[32] Dr. Grenadier contests the applicability in this case of "the literature regarding valuation effects of factors such as reputation and quality accounting," which was among the available valuation tools I listed in the Feinstein Report. He does not dispute the usefulness of the any of the other tools mentioned in the Feinstein Report to measure inflation in the instant matter. See, Grenadier Report, ¶52.

37.     Dr. Grenadier's objection is not that the out-of-pocket damage methodology is inappropriate, nor that it cannot be applied commonly for all Class members, nor that an inflation ribbon cannot be computed commonly for all Class members, nor that I have not provided a list of valuation tools that can be used to augment event study analysis in the construction of an inflation ribbon. Rather, his contention is that I have not identified every single valuation tool I might or might not utilize in the course of executing the damage model computations, and that I have not explained with specificity how the tools would be used to overcome every possible valuation complexity that might be encountered.

38.     Essentially, Dr. Grenadier contends that at the current stage, every potential valuation complexity that may be encountered at the damage computation stage must be identified now and matched with a specific valuation tool. He apparently would not be satisfied with any description of the model that is unaccompanied by the completed analysis, which is premature at this stage.

39.     Dr. Grenadier is incorrect to contend that I must describe in granular detail precisely which valuation tools I would use when constructing the inflation ribbon. I am unaware of any expert report submitted at the class certification stage in a case alleging violations of the securities laws that describes to the degree of detail that Dr. Grenadier requires all of the valuation tools that will be used in the construction of the inflation ribbon.

40.     There is good reason for a reservation of flexibility. It is my understanding that discovery is ongoing in this case. Development of the record will inform the forensic analyst of the nature of the but-for full disclosure scenario – what Defendants knew and when they knew it. Dr. Grenadier explicitly expresses that he believes these issues are not yet resolved.[33] Determinations of what allegations, misrepresentations, omissions, and corrective disclosures are or are not sustained are also relevant to the computation of damages. Consequently, the detail Dr. Grenadier demands is premature and inappropriate at the current stage.

41.     Dr. Grenadier opines that the record of what Defendants knew and when they knew it is not yet clear. But he contradicts himself as to whether resolution of these facts is necessary to compute damages. On the one hand, he expresses skepticism that "a loss causation and

---

[33] See, e.g., Grenadier Report, ¶¶64-65.

damages analysis in this matter 'requires the full development of the record.'"[34] On the other hand, he states that an inflation ribbon cannot be correctly computed without data that showed "how the quarter transpired."[35] Apparently, Dr. Grenadier accepts the damage model, but submits that the quantification of damages by the model will depend on what the evidence ultimately indicates was known or concealed by the Company. I agree, but this is not a criticism of the damages model at all. Without Dr. Grenadier's muddle, the message is clear – the damage model is fully articulated, but the precise computations depend on what data and documents become available and what they show.

### 2. All of the Valuation Complexities That Dr. Grenadier Raises Can Be Accommodated by Standard Tools of Valuation

42. In his report, Dr. Grenadier raises a number of "difficulties of measuring damages" that, with incomplete analysis and an incomplete development of the evidentiary record, may arise in this case.[36] Specifically, Dr. Grenadier suggests the following issues may create "difficulties" when constructing the inflation ribbon: confounding information on the final corrective disclosure date;[37] potential changes in artificial inflation caused by changing investor expectations and the Company's purportedly changing condition during the Class Period;[38] and the qualitative as opposed to quantitative nature of the misrepresentations, which were ultimately corrected by quantitative disclosures.[39]

43. Notably, Dr. Grenadier does not contend that it is impossible to accommodate these potential valuation issues when constructing an inflation ribbon, or that there are no valuation tools, which, in concert with event study analysis, could handle these issues. For example, Dr. Grenadier never asserts that investors or forensic analysts are unable to

---

[34] Grenadier Report, ¶51.

[35] Grenadier Report, ¶¶60 and 64: "Dr. Feinstein cannot assume that the Q1'19 revenue guidance provided on January 2, 2019 could have been predicted by Mr. Cook two months earlier, without having seen how the quarter transpired."

[36] Grenadier Report, ¶47.

[37] Grenadier Report, ¶55 and ¶¶71-77.

[38] Grenadier Report, ¶¶57, 62-70, 99-121, and 124-152.

[39] Grenadier Report, ¶¶79-86.

evaluate the effects of qualitative company pronouncements. Rather, Dr. Grenadier states that it may be "difficult" to accommodate these potential valuation issues.

44.   Notably, the valuation concerns raised by Dr. Grenadier do not deny the existence of the common out-of-pocket damage model. If anything, they acknowledge the existence of the damage model and that it can be commonly applied for all Class members, so long as the "difficulties of measuring damages" that Dr. Grenadier highlights are accounted for properly.

45.   Further, many of the "difficulties" that Dr. Grenadier highlights rely on his mistaken reading of the Feinstein Report.[40] I never stated that event study analysis alone and in isolation would produce the artificial inflation ribbon. The Feinstein Report states that the inflation ribbon could be constructed using event study analysis in combination with standard valuation tools.[41] Valuation tools and the vast valuation literature address a wide variety of valuation complexities, including the sorts of issues Dr. Grenadier mentions.

### a.   Confounding Information

46.   Dr. Grenadier contends that confounding information could complicate the measurement of artificial inflation dissipation on the disclosure dates in this case. Confounding information is valuation-relevant information unrelated to the alleged fraud that emerges simultaneously with a fraud-related disclosure. If material negative non-fraud-related information is revealed to the market at the same time that material fraud-related disclosures are made, an observed decline in the security price may combine the effects of the fraud-related information and the non-fraud-related information. The valuation effect of the confounding news should be accounted for and removed when quantifying the impact of the fraud-related corrective disclosures.

---

[40] See, Grenadier Report, ¶87 and ¶90. Grenadier Report, ¶87: "An event study *alone* is not sufficient to measure the change in inflation introduced by an alleged misstatement or an alleged omission"; and ¶90: "Dr. Feinstein's event study regression, *on its own*, would fail to show that the statement inflated the stock price."

[41] Feinstein Report, ¶¶182-186.

47.    Dr. Grenadier cites as potentially confounding information in this case announcements about battery replacements,[42] longer phone replacement cycles,[43] and poor performance outside of China.[44]

48.    The issue of confounding information is common in securities class actions, and Dr. Grenadier does not claim otherwise. Standard valuation tools are routinely applied to isolate and remove the impact of confounding information when implementing the common out-of-pocket damage model. As an example of how this is often accomplished, suppose a company announces disappointing financial results, with earnings falling $1.00 per share below consensus expectations. Suppose the event study shows that the company's stock price falls as a result. The event study regression separates out the price movements caused by market-wide and sector effects, leaving the residual stock price decline attributable to the Company's disappointing earnings announcements. Suppose the available evidence (including internal company documentation obtained via discovery) indicates that $0.50 of the earnings miss was caused by non-allegation-related developments, while the other $0.50 of the surprise is attributable to fraudulent misrepresentations and omissions. Based on a price/earnings multiple valuation model, one may attribute 50% of the stock price decline to the allegation-related disclosure, commensurate with the 50% of the earnings miss attributable to that same information, and exclude the other 50% as unrelated to the fraud. That is, the price-earnings multiple valuation model can be applied to disaggregate the effects of the fraud-related and confounding information. Depending on what the data, documents, and other evidence ultimately show, it may be determined that a forward price/earnings multiple valuation model or a discounted cash flow valuation model provide a more precise disaggregation of effects. If certain factors responsible for the earnings miss are identified as non-recurring while others are expected to be persistent, the valuation literature dictates that greater valuation attribution be given to the persistent factors. Should it be determined that the

---

[42] Grenadier Report, ¶71.

[43] Grenadier Report, ¶¶72-74.

[44] Grenadier Report, ¶¶75-77.

fraud-related disclosure had reputation effects, which can be ascertained by commentary from analysts or from a comparison of the character of the fraud-related disclosures with disclosures addressed in the finance literature on reputation effects, the proportion of the stock price decline attributable to the fraud can be scaled upward, consistent with weights presented in that literature, which were determined from empirical research on numerous cases.[45] It is important to note that this and all such attribution analysis would apply on a class-wide basis for all investors.

49.     The kinds of confounding items Dr. Grenadier mentions are not at all unusual, and just as in other cases, the "difficulties" they pose are not particularly complex and are not insurmountable. Dr. Grenadier does not say they are. If valuation-relevant confounding information is indeed present on the corrective disclosure dates in this case, valuation tools can be applied to separate out its effects.

### b.     Time-Varying Inflation

50.     Without reliable analysis and examination of a complete evidentiary record, Dr. Grenadier also surmises that time-varying inflation may complicate the computation of damages in this case. Time-varying inflation means that artificial inflation in the Apple securities changed to some extent over the course of the Class Period. Time-varying inflation, however, is common in class action securities cases. It is not at all unusual, and it does not pose insurmountable difficulties. Dr. Grenadier does not contend otherwise.

51.     The level of artificial inflation may change for a number of reasons. Additional misrepresentations or omissions may maintain or add inflation, while corrective disclosures generally dissipate inflation. In his report, Dr. Grenadier posits that inflation may have varied over time because the but-for price may have changed as the Company's condition and analysts' opinions changed. While it is premature to agree or disagree with this conjecture, this possibility is one of the reasons that damage computation prior to the completion of discovery and the full development of the record is premature.

---

[45] See, e.g., "The Cost to Firms of Cooking the Books," by Jonathan M. Karpoff et al., *Journal of Financial and Quantitative Analysis*, vol. 43, no. 3, 2008, pp. 581-612.

52.   Dr. Grenadier surmises that what could have constituted full disclosure may have changed throughout the Class Period as the initial misrepresentations in this case were made on 2 November 2018, when Apple was only one month into Q1 2019,[46] and that the Company's position may have improved or deteriorated between the initial misrepresentation and the final disclosure. Again, Dr. Grenadier herein implicitly acknowledges that further development of the record, such that one may ascertain what was known and when it was known, is necessary before damages can be computed. In the instant case, internal Company documents may provide information about potential intra-quarter changes to the Company's financial condition, which Dr. Grenadier maintains is an essential element impacting the quantification of damages. Dr. Grenadier's criticism is more of an admonition that discovery is important, not that there is any deficiency in the damage model. Detailing precisely what the evidence will show and what valuation tools will be used to evaluate it (e.g., discounted cash flow, price/earnings multiples, varying inputs in analysts' valuation models, etc.) is premature until the evidentiary record is complete. The criticism that the description of the methodology is incomplete because it does not detail how currently unavailable documents and information will be evaluated is an improper criticism.

53.   Dr. Grenadier is wrong if his contention is that the valuation of Apple stock in the but-for scenario of full disclosure will be unusually difficult or exceptionally complex on account of time-varying inflation. Artificial inflation on any particular day is the difference between the observed stock price prevailing in the market that day and the but-for price under the alternative scenario of full disclosure. There is no question about actually observed market prices. The but-for price is determined by valuing the security at issue under the alternative but-for scenario. Such security valuation under alternative scenarios and different as-of dates is conducted by valuation analysts every day for virtually all publicly traded securities. It is also a regular part of applying the out-of-pocket damage methodology in securities fraud class actions.

---

[46] Grenadier Report, ¶64.

54.     Further, any empirical evidence that may be produced showing that the Company's performance in China improved or deteriorated over the course of the Class Period in a manner unknown and unpredictable to Defendants, if such evidence does exist and becomes available, can be incorporated into the valuation analysis to appropriately scale down the artificial inflation attributable to the alleged misrepresentations and omissions. That is, the very evidence that might indicate that inflation did vary due to changing conditions can be incorporated into the damage analysis in a straightforward and class-wide common manner to inform how much inflation varied. If no such evidence exists, then Dr. Grenadier's criticism is baseless and moot.

55.     As an example of how unpredictable changes in condition can be accounted for, consider the same scenario described above where a $1.00 per share earnings miss causes a stock price decline. The portion of the stock price decline caused by company information rather than market and sector effects is determined by the regression analysis in the usual manner. These portions are removed to quantify the residual stock price decline attributable only to company information. If the evidence indicates that 20% of the earnings miss was unknown and unknowable to the company, and would have been a surprise to investors even if there had been full disclosure, and therefore was completely unrelated to the alleged misrepresentations and omissions, then a 20% portion of the surprise can be deemed confounding information, and the corresponding 20% of the residual stock price decline should be attributable to the non-fraud factors. That is, while Dr. Grenadier is only speculating at this juncture, if Company documents or other evidence do in fact indicate that there was some truly unanticipated deterioration in the Company's performance during the quarter such that some portion of the subsequently disappointing results would have been equally surprising to investors regardless of whether or not there were alleged misrepresentations and omissions, the proportionate amount of the residual stock price decline can be treated as non-fraud-related and excluded from damages. Such adjustments are neither unusual nor exceptionally complex, but they do require full development and a complete examination of the evidentiary record.

56.    It is possible, however, that Apple's position improved throughout the quarter, thereby compensating for and essentially covering up the adverse conditions concealed at the start of the Class Period by the alleged misrepresentations. Under that scenario, inflation earlier in the Class Period would actually have been greater than the stock price decline elicited by the corrective disclosure. Had the truth been learned before conditions improved, the stock price would have fallen more than it did when the truth was actually later learned. In either scenario, the very evidence of improvement or deterioration for the Company throughout the Class Period would directly inform the precise computation necessary to estimate the but-for prices and measure artificial inflation during the Class Period.

57.    The same principles address Dr. Grenadier's argument that market expectations about the Company's business in China changed throughout the Class Period and thereby caused the but-for price and artificial inflation to change.[47] Any empirical evidence that demonstrates that analysts were revising their estimates for the Company's China business during the quarter can be incorporated into the estimation of the but-for stock price and thus the computation of artificial inflation. At this juncture however, Dr. Grenadier's suggestion that artificial inflation varied on account of changing analyst expectations is unproved and purely speculative.

### c.    Qualitative and Quantitative Information

58.    Dr. Grenadier further asserts that there is a "mismatch between the alleged True Facts that could and should have been disclosed and the content of the disclosures."[48] He offers that the non-mirror-image nature of the disclosures may complicate the measurement of artificial inflation and thus damages.[49] Specifically, Dr. Grenadier highlights that CEO Cook's explicit exclusion of China "from the category of emerging markets experiencing

---

[47] Grenadier Report, ¶¶99-121 and ¶¶124-152.

[48] Grenadier Report, ¶80.

[49] Grenadier Report, ¶86.

these negative economic pressures," which Plaintiff alleges was false and misleading, was primarily a qualitative statement, while the alleged corrective disclosures on 5 November 2018, 12 November 2018, and 2 January 2019 comprised both qualitative and quantitative statements.[50]

59. While Dr. Grenadier claims that it will be "difficult" to accommodate a "mismatch" between qualitative misrepresentations and quantitative disclosures, he does not claim that it is impossible. Moreover, Dr. Grenadier fails to consider that it may have been entirely due to the qualitative misrepresentation that analysts and investors were surprised by the quantitative results. It follows from fundamental principles of financial valuation that had investors not been deceived about conditions facing Apple in China, such that they would not have been surprised by the quantitative results later announced, the stock price would not have fallen significantly upon the ultimate disclosure.

60. In his non-mirror-image disclosure argument, Dr. Grenadier again misreads the Feinstein Report. He mischaracterizes the damage methodology as relying exclusively on the event study to measure artificial inflation. Dr. Grenadier overlooks that the Feinstein Report explained that event study analysis *and* standard tools of valuation would be used, in concert, to construct the inflation ribbon and account for potential valuation complexities.[51]

61. Dr. Grenadier also fails to appreciate that the finance literature addresses how investors react to information gaps, in particular the knowledge that a company may know how poor conditions are but declines to provide data and details. Had Apple informed the market that it was experiencing "negative economic pressures" in China but declined to provide any quantitative detail (the scenario Dr. Grenadier suggests would portray a full corrective disclosure), the market would still be able to value Apple stock. How investors respond to information gaps has been intensively studied by economists. The applicable literature and valuation principles, which addressed precisely this question, include the seminal work of Nobel Laureates George Akerlof, Michael Spence, and Joseph Stiglitz.

---

[50] Grenadier Report, ¶8 and ¶¶79-86.

[51] Feinstein Report, ¶¶182-186.

"For more than two decades, research on incentives and market equilibrium in situations with asymmetric information has been a prolific part of economic theory. ... The modern theory of markets with asymmetric information rests firmly on the work of this year's [Nobel] prizewinners: George Akerlof (University of California, Berkeley), Michael Spence (Stanford University) and Joseph Stiglitz (Columbia University)."
**"Markets with Asymmetric Information: The Contributions of George Akerlof, Michael Spence and Joseph Stiglitz," by Karl-Gustaf Lofgren et al., *The Scandinavian Journal of Economics*, vol. 104, no. 2, 2002, p. 195.**

"Akerlof showed how informational asymmetries can produce adverse selection in markets. When lenders or car buyers have imperfect information, borrowers with weak repayment prospects or sellers of low-quality cars may thus crowd out everyone else from their side of the market, stifling mutually advantageous transactions."
**"Markets with Asymmetric Information: The Contributions of George Akerlof, Michael Spence and Joseph Stiglitz," by Karl-Gustaf Lofgren et al., *The Scandinavian Journal of Economics*, vol. 104, no. 2, 2002, p. 196.**

### C.    The Out-Of-Pocket Damage Methodology is Similarly Appropriate and Common for Apple Option Investors and Writers

62.    Most of Dr. Grenadier's criticisms of my description of the out-of-pocket damage methodology for the Apple options are the same criticisms he has about my description of the damage methodology for Apple stock.[52] As such, my responses presented above apply equally with respect to the damage methodology for the Apple options. It is the same damage methodology. However, Dr. Grenadier raises one additional criticism that applies only to the damage methodology for Apple options.

### 1.    Options Volatility Estimate Under Full Disclosure

63.    Dr. Grenadier speculates that full and timely disclosure in this case would have changed not only the prevailing price of Apple stock but may also have changed the volatility of Apple stock, the forecast of which is a determinant of option prices. He criticizes that I did not specify how I would estimate what volatility forecast investors would have used to value Apple's options in the but-for scenario of full and timely disclosure.[53]

---

[52] Grenadier Report, ¶¶214-216.

[53] Grenadier Report, ¶218.

64.     As an initial matter, Dr. Grenadier's understanding that investors would take note of disclosed information and change the inputs in their option valuation models, such that the market prices of the options would change accordingly, implicitly acknowledges the efficiency of the market for Apple options.

> "As described above in Section VIII.A.1, the price of an option depends not just on the stock price, but also on the volatility of the underlying stock price (along with other factors such as time to maturity and the risk-free interest rate). The volatility of the underlying stock price is a key input in the valuation of options, because the payoff of an option depends on how much the underlying stock price moves. If volatility of the stock price increases, it is more likely that an option will end up in the money, so the price of the option will also increase."
> **Grenadier Report, ¶217.**

65.     However, Dr. Grenadier performs no analysis to confirm that either Apple's volatility or investors' estimate of it would have been different had full disclosure been made at earlier points in the Class Period. Rather, he notes that "the volatility of Apple stock changed considerably throughout the Putative Class Period"[54] and surmises that "the volatility of Apple stock *could* also have been different under a hypothetical earlier disclosure."[55]

66.     Dr. Grenadier only speculates that the volatility input used by investors to price Apple's options would have changed significantly with full disclosure, or that it would have been different from the volatility input implicit in the option prices when full disclosure did occur. I have not yet confirmed Dr. Grenadier's conjecture one way or the other. However, if evidence of changing volatility under full disclosure is encountered during the implementation of the out-of-pocket damage methodology, that evidence would inform what volatility level to use.

67.     Dr. Grenadier overlooks the fact that the market's estimate of Apple's volatility that prevailed when there was ultimately full disclosure is observable. For this purpose, one can use the observable implied volatilities, similar to the data that Dr. Grenadier presented in

---

[54] Grenadier Report, ¶217.

[55] Grenadier Report, ¶218.

his Exhibit-8. Alternatively, one can apply a volatility forecasting model to replicate what investors would have forecasted. Volatility forecasting models are widely used and presented in authoritative texts.[56]

### D. The Feinstein Report Demonstrates that Apple Options Traded in An Efficient Market During the Class Period

68.   Dr. Grenadier opines that "Dr. Feinstein has failed to demonstrate that each Apple option traded in an efficient market during the Putative Class Period."[57] Dr. Grenadier's opinion is premised on his mistaken belief that every Apple option trades in its own distinct market and therefore must be analyzed individually. He attributes his opinion to what he classifies as "substantial heterogeneity in the characteristics of the options."[58] He points out that there were "2,282 distinct options."[59] He therefore maintains that there were 2,282 distinct Apple option markets, which each must be evaluated for efficiency separately.

69.   Dr. Grenadier is wrong. While he highlights that the option series differed in terms of strike prices and expiration dates, he disregards that they all are tied to the same underlying stock, have identical functional forms (payoff formulas), are tradeable on the same Nasdaq platform, are valued using the same Company data, benefit from the same Company information sources, have valuations informed by the same analyst coverage, have valuations informed by the same Company filings, are all highly visible on account of Apple's market capitalization and float, and are frequently substituted for one another by investors. The homogeneity among the option series far exceeds their heterogenous distinguishing characteristics (strike price and expiration date).

---

[56] See, e.g., *Options, Futures, and Other Derivatives*, 9th Edition, by John C. Hull, Pearson, 2015, pp. 325-329, 431-439, 521-540.

[57] Grenadier Report, ¶20.

[58] Grenadier Report, ¶174.

[59] Grenadier Report, ¶174.

70.   Dr. Grenadier changes his tune when he attacks the damage methodology for options. There, he treats all of the options monolithically. He acknowledges that all of their values depend on the price of Apple stock and on the market's forecast of Apple volatility. Dr. Grenadier presents one single implied volatility derived from just the one at-the-money call option each day to represent the volatility input applicable for all Apple options.[60]

### 1.   Apple Options Can Be Analyzed Collectively Due to Their Similar Characteristics

71.   As explained in the Feinstein Report, the options for Apple stock have similar characteristics and payoff formulas at expiration.[61] I further explained that Apple call options and put options will each, respectively, react similarly to new information.

> "By virtue of their design and mechanics, call option prices tend to increase when the price of the underlying stock increases, and fall when the underlying stock decreases, holding all other relevant variables constant. Put options tend to decrease in value when the price of the underlying stock increases, and rise when the underlying stock falls, holding all other relevant variables constant."
> **Feinstein Report, ¶144.**

72.   In my deposition, I elaborated on the similarities across Apple options of the same type and how investors often treat options with different strike prices as substitutes for one another.

> "[Question]: What purposes would they [call options with different strike prices] be substitutable for each other?
> [Answer]: Well, for constructing synthetic stock, for example, they could be substitutes. You could do what's called 'delta hedging' to construct portfolios that have the same price dynamics, one as the other. Those are two examples.
> [Question]: Do you have any others?
> [Answer]: There's a lot of applications for options. Let me think for a second. Well, even speculative purposes. You know, if someone is -- I don't

---

[60] Grenadier Report, ¶¶217-218 and Exhibit-8.

[61] Feinstein Report, ¶143.

mean speculative in a pejorative sense. I mean like, you know, if someone has information on their belief they think the stock is going to go up, you know, they may consider two options with different strike prices to be close substitutes in the short run, for short run movements."
**Feinstein Deposition at 84:13-85:4.**

"[Answer]: All of the calls, regardless of whether -- what the strike price is or what the expiration is are functions of Apple stock price, and all of the calls have a payoff diagram of the same form, that the payoff diagram -- or the payoff formula exercised is the maximum of the stock price minus the strike price or zero. All of them. All of the puts have the exact, same payoff function at their expiration. At their respective expirations their payoff is the stock price minus the strike price or zero. So they all have the same functional form. They differ in the specifics as to what that 'X' is, the 'X' is the strike price or what day they expire, but they all have the exact, same functional form. The markets are made by the same market makers. They're all functions of Apple stock. And for a reasonable extent, for reasons we just talked about, they're reasonable substitutes, one for the other. Someone looking to buy into Apple by buying call options might consider the 'at the money' call, the 'just out of the money' call, the 'just in the money call,' and look to see where they think they get the best pricing or the most liquidity or the -- depending if they want to hold it to expiration, the best profit potential. So they have more in common than differences."
**Feinstein Deposition at 86:14-87:15.**

73.  Dr. Grenadier is wrong to maintain that one must conduct 2,282 separate examinations of market efficiency to establish that the market for Apple's options was an efficient market. Such separate analyses are not only impractical, but they are also unnecessary due to the substantial similarities among the option series and the formulaic link between option values and the value of the underlying stock.

74.  Interestingly, when it suits his purposes, Dr. Grenadier treats all of the Apple options collectively rather than as 2,282 separate securities. For his damage model argument, Dr. Grenadier plots "for each day, the implied volatility of the 30-day at-the-money call option." [62] That is, Dr. Grenadier looks at the implied volatility from a single call option at each point in time and presumes that that one option is representative of all Apple options collectively.

---

[62] Grenadier Report, ¶¶217-218 and Exhibit-8.

## 2. The Synthetic Stock Event Study Demonstrates the Efficiency of the Market for Apple Options

75.     One component of the option market efficiency analysis that I conducted and presented in the Feinstein Report was an event study on the synthetic stock constructed from Apple options. This event study proved that the Apple options responded to Company information and thereby demonstrated market efficiency.

76.     While the *Cammer* court noted that a demonstration of market efficiency "would be helpful" and "convincing,"[63] in a recent case in the Ninth Circuit, the district court ruled that the empirical fifth *Cammer* factor is not necessary to establish market efficiency.[64] Nonetheless, the synthetic stock event study does provide such a demonstration for the Apple options.

77.     The results of the options test in the Feinstein Report demonstrate that the portfolio of options (synthetic stocks) did indeed behave the same as the underlying stock. The collective tests for both Apple stock and Apple options had identical incidence frequencies of statistically significant returns for both news dates and non-news dates. For both tests, three of four of news events (75.0%) were statistically significant, and 14 of 248 non-news events (5.6%) were statistically significant.[65] In fact, all three of the statistically significant earnings announcements for Apple common stock were also significant for Apple options.[66]

---

[63] *Cammer*, 711 F. Supp. 1264 at 1287.

[64] *Di Donato v. Insys Therapeutics*, No. CV-16-00302-PHX-NVW, 20 September 2019, pp. 12-13: "The Second, Fourth, Fifth, and Eleventh Circuits have instructed that the *Cammer* factors serve only as a guide for determining market efficiency to be applied in a case-by-case basis in addition to other considerations and that, while important in certain cases, the fifth *Cammer* factor is not a mandatory prerequisite in every case for finding market efficiency. *Waggoner v. Barclays PLC*, 875 F.3d 79, 97-98 (2d Cir. 2017); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 368 (4th Cir. 2004); *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005); *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 313, 316 (5th Cir. 2005); *Local 703, I.B. of T. Grocery & Food Employees Welfare Fund v. Regions Financial Corp.*, 762 F.3d 1248, 1255-56 (11th Cir. 2014). Although these circuit courts require proof and thorough analysis of market efficiency in context, they disclaim rigid adherence to a bright line test. The parties have not cited, and the Court has not found, contrary authority."

[65] Feinstein Report, ¶¶133-135 and ¶172.

[66] Feinstein Report, Exhibit-8 and Exhibit-13.

78.   Given that the efficiency of the market for Apple stock is undisputed in this case, the identical collective test results for the Apple options are a demonstration of market efficiency and compelling evidence of the efficiency of the market for Apple options.

79.   Dr. Grenadier objects to the options event study test. He contends that one should not test the options collectively, but rather must test all 2,282 option series separately. He incorrectly claims that the "methodology for testing *Cammer* factor 5 has no support in peer-reviewed literature."[67] He also asserts that I have not adequately explained why the early exercise feature of American options has no consequential effect on the event study results or any implications for my conclusion.

### a.   The Synthetic Stock Event Study Methodology is Supported by the Finance and Statistics Literatures

80.   Combining Apple options to construct synthetic stock, so that the returns have stationary dynamics, is an example of the generally accepted variable transformation technique that is widely used to construct variables on which regression analysis can be conducted. Dr. Grenadier's criticism overlooks that the academic literature supports variable transformations to provide stationary price dynamics for the purposes of running event studies. Explanations for the necessity of variable transformation and examples of the approach abound in the finance literature. For example:

> "What is the practical implication of these issues? *We cannot use standard regression analysis on a time series that is a random walk.* We can, however, attempt to convert the data to a covariance-stationary time series if we suspect that the time series is a random walk. In statistical terms, we can difference it. We difference a time series by creating a new time series, say $y_t$, that in each period is equal to the difference between $x_t$ and $x_{t-1}$. This transformation is called **first-differencing** because it subtracts the value of the time series in the first prior period from the current value of the time series. Sometimes the first difference of $x_t$ is written as $\Delta x_t = x_t - x_{t-1}$."
> **"Time-Series Analysis," by Richard A. DeFusco et al., *Ethical and Professional Standards, Quantitative Methods, and Economics*, CFA Program Curriculum 2017 Level II Volume 1, CFA Institute, 2016, pp. 429-430 (emphasis in original).**

---

[67] Grenadier Report, ¶200. See, also in ¶200: "I am not aware of any support for this purported test of market efficiency of individual option series in peer-reviewed academic literature."

"There are data sets that violate one or more of underlying premises 2, 3, and 4 for which a *transformation* of the data from their original values (X) to values (call them X′) that constitute a data set more closely satisfying the assumptions. … Many authors provided early recommendations on the use of data transformations that have become commonly used (e.g., Bartlett, 1947; Box and Cox, 1964; Kendall and Stuart, 1966: 87-96; Thöni, 1967). This chapter will concentrate on three of those transformations: The logarithmic transformation (Section 13.1) is applicable when there is heterogeneity of variances among groups and the group standard deviations are directly proportional to the means, and in cases where two or more factors have a multiplicative (instead of an additive) effect. The square-root transformation (Section 13.2) applies to heteroscedastic data where the group variances are directly proportional to the means, a situation often displayed when the data come from a population of randomly distributed counts. The arcsine transformation (Section 13.3) is germane when the data come from binomial distributions, such as when the data consist of percentages within the limits of 0 and 100% (or, equivalently, proportions within the range of 0 to 1)."
**Biostatistical Analysis, by Jerrold H. Zar, 5th Edition, Prentice Hall, 2010, pp. 286-287 (emphasis in original).**

"If by transforming one or more variables a nonlinear function can be translated into a linear function in the transformed variables, OLS estimation procedures can be applied to the transformed data."
**A Guide to Econometrics, by Peter Kennedy, 6th Edition, Blackwell Publishing, 2008, p. 95.**

"Transformations of variables can be employed frequently to make the data conform to the linear regression model (19.1). When the regression relation is not linear, for instance, it is often possible to linearize it by transforming the independent variable. In other cases, lack of linearity and nonconstant error variance are both found to be present. In those cases, a transformation of the dependent variable may be helpful. In still other cases, both the dependent and the independent variables may need to be transformed."
**Applied Statistics, 4th Edition, by John Neter et al., Simon & Schuster, 1993, p. 586.**

81. In the Feinstein Report, I explained this methodology and its support. In my deposition, I further explained and elaborated on its grounding in the scientific literature. Dr. Grenadier ignored the literature and my explanation that undercut his criticism.

"As a result of time decay and the impact of the other relevant variables, the price dynamics of an option price continuously change. This changing price dynamics makes it impossible to conduct an event study on the returns of an individual options contract with a valid *t*-test for statistical significance.

> However, individual options can be combined into a portfolio that,
> consistent with option valuation principles, should have stationary price
> dynamics and behave the same as the underlying stock in an efficient
> market."
> **Feinstein Report, ¶161.**

> "Well, the price dynamics of individual options changes from day to day,
> making it impossible to run the regression on an individual option the way
> you would run a regression on a stock. But by combining the options in the
> way I described in the report, you create essentially a portfolio that has
> stationary price dynamics on which you can run a regression, and therefore,
> you can run the event study."
> **Feinstein Deposition at 92:19-93:2.**

#### b. The Synthetic Stock Event Study Methodology in the Feinstein Report Applies to Both American Options and European Options

82.     Dr. Grenadier writes that "Dr. Feinstein has not explained what basis he has for making the assumption that treating Apple options as European options, even though they are American, will not meaningfully impact his ability to extrapolate his results to each Apple option series."[68] As explained in my deposition, the early-exercise feature of American options would not sufficiently impact the synthetic stock prices such that the qualitative results of the collective event study in the Feinstein Report would change.

> "For purposes of testing whether or not the synthetic security is absorbing
> information, it could apply to both European and American options. I mean
> that's one of the advantages of this approach over the fundamental
> efficiency put-call parity test. This test can examine -- there may be some
> small slippage owing to the value of the American feature, but it would be
> small compared to the value of the synthetic stock, and therefore, doesn't
> affect the reliability of this kind of event study to determine whether the
> options are absorbing information or ignoring information. So I guess that's
> a long way of saying my test works with American or European options.
> Either way."
> **Feinstein Deposition at 121:19-122:8.**

---

[68] Grenadier Report, ¶206.

83.     Not only is the value of the early-exercise feature of American options small when compared to an option's value, but the even smaller difference between the value of the call's early exercise feature and the value of the put's early exercise feature is what is reflected in a synthetic stock price. Additionally, it is not even this small difference between early exercise feature values that is reflected in event study residual returns, but rather the day-to-day changes in this very small difference. Quantitatively, the early exercise feature of American options has no consequential effect on the residual returns of synthetic stock in an event study, and Dr. Grenadier did not present any calculations to suggest otherwise.

84.     Furthermore, any difference in synthetic stock returns due to inclusion or exclusion of the value of the early-exercise feature is so small that it would be accommodated by and incorporated into the noise component of the regression. The proof of this fact is that even with this potential additional noise component, the Apple synthetic stock exhibited significant returns on three of Apple's four earnings announcements during the Examination Period, exactly the same frequency as for the actual stock. If anything, an additional noise component would have biased the test result away from finding that the synthetic stock observably reacted to information in the same manner as the stock. The fact that the significant result was strong nonetheless proves that quantitatively, the early exercise feature had no consequential effect.

85.     Dr. Grenadier is wrong to overlook that deviations from the exact assumptions of option pricing theory are common but generally have small effects. The literature on options valuation, including an article by Fisher Black,[69] one of the originators of modern option pricing, makes exactly this point. The literature discusses the various assumptions in options pricing and how the option valuation models are still accurate when observed option and market factors diverge from the model assumptions.

> "Among all theories in finance, the Black-Scholes option pricing model has perhaps had the biggest impact on the real world of securities trading. Virtually all market participants are aware of the model and use it in their decision making. Academics regularly test the model's valuation on actual

---

[69] "How to Use the Holes in Black-Scholes," by Fischer Black, *Journal of Applied Corporate Finance*, vol. 1, no. 4, 1989, p. 67.

market prices and typically conclude that, ***while not every feature is accounted for, the model works very well in explaining observed option prices***. … Some of the important assumptions made in deriving the Black-Scholes model are the following.

- The price of the underlying asset follows a logarithmic diffusion process that can be written $dP/P = R\,dt + v\,dz$, where $R$ is the drift of the price per unit time, dt denotes an infinitesimal time increment, $v$ is the volatility of proportional price change per unit time, and $dz$ represents Brownian motion, the realization of a random variable distributed as normal with mean 0 $dt$ and variance 1 $dt$.
- The volatility $v$ is known.
- There are no indivisibilities.
- There are no transactions costs.
- Markets are 'perfect' in other ways. There is no limit on borrowing or lending at the same riskless interest rate, and there are no taxes or constraints on short selling with full use of the proceeds.

In fact, none of these assumptions is true of real financial markets, and the arbitrage by which the theoretical pricing relation is supposed to be enforced, i.e., forming a riskless hedge, rebalancing continuously, and holding until option expiration, cannot actually be done with real options." **"Options Arbitrage in Imperfect Markets," by Stephen Figlewski, *The Journal of Finance*, vol. 44, no. 5, 1989, pp. 1289-1290 (emphasis added).**

"The Black-Scholes formula is still around, even though it depends on at least 10 unrealistic assumptions. Making the assumptions more realistic hasn't produced a formula that works better across a wide range of circumstances." **"How to Use the Holes in Black-Scholes," by Fischer Black, *Journal of Applied Corporate Finance*, vol. 1, no. 4, 1989, p. 67.**

86. If Dr. Grenadier's point is alternatively that the value of the early exercise feature in Apple's options reacted ***systematically*** to the information content in Apple's earnings announcements, and thus was ***responsible*** for the finding that Apple's options reacted significantly on the same earnings announcements as the stock, this argument would be tantamount to conceding that the option prices promptly reflected available information and were thus informationally efficient.

87. In sum, the options event study test presented in the Feinstein Report is valid for both European and American options and demonstrates that Apple options reacted to information. This empirical evidence is compelling evidence supporting the conclusion that the Apple options traded in an informationally efficient market.

## IV.   LIMITING FACTORS AND OTHER ASSUMPTIONS

88.   This report is furnished solely for the purpose of court proceedings in the above-referenced matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of the report. I reserve the right to amend, refine, or supplement this report in the event that I become aware of additional information, evidence, arguments, or analyses which bear on my work on this matter.

Steven P. Feinstein, Ph.D., CFA

**Exhibit-1**

**Documents and Other Information Considered
In Addition to Those Cited in the Feinstein Report**

**EXPERT REPORTS**

- Report on Market Efficiency, Professor Steven P. Feinstein, Ph.D., CFA, 5 May 2021.
- Expert Report of Professor Steven Grenadier, 9 July 2021.

**DEPOSITIONS**

- Remote Video Deposition of Steven P. Feinstein, Ph.D., CFA, dated 16 June 2021.

**ACADEMIC AND PROFESSIONAL LITERATURE**

- Black, Fischer, "How to Use the Holes in Black-Scholes," *Journal of Applied Corporate Finance*, vol. 1, no. 4, 1989.
- DeFusco, Richard A., Dennis W. McLeavey, Jerald E. Pinto, and David E. Runkle, "Time-Series Analysis," *Ethical and Professional Standards, Quantitative Methods, and Economics*, CFA Program Curriculum 2017 Level II Volume 1, CFA Institute, 2016.
- Dueker, Michael, and Thomas W. Miller, Jr., "Directly Measuring Early Exercise Premiums Using American and European S&P 500 Index Options," *The Journal of Futures Markets*, vol. 23, Issue 3, 2003.
- Figlewski, Stephen, "Options Arbitrage in Imperfect Markets," *The Journal of Finance*, vol. 44, no. 5, 1989.
- Fisch, Jill E., "Cause for Concern: Causation and Federal Securities Fraud," *Iowa Law Review*, vol. 94, no. 3, 2009.
- Fischel, Daniel R., "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer*, 38 Bus. Law. 1, 1982.
- Hull, John C., *Options, Futures, and Other Derivatives*, 9th Edition, Pearson, 2015.
- Karpoff, Johnathan M., D. Scott Lee, and Gerald S. Martin, "The Cost to Firms of Cooking the Books," *Journal of Financial and Quantitative Analysis*, vol. 43, no. 3, 2008.
- Lofgren, Karl-Gustaf, Torsten Persson, and Jorgen W. Weibull, "Markets with Asymmetric Information: The Contributions of George Akerlof, Michael Spence and Joseph Stiglitz," *The Scandinavian Journal of Economics*, vol. 104, no. 2, 2002.
- Neter, John, William Wasserman, and G.A. Whitmore, *Applied Statistics*, 4th Edition, Simon & Schuster, 1993.
- Zar, Jerrold H., *Biostatistical Analysis*, 5th Edition, Prentice Hall, 2010.

**Exhibit-1**

**Documents and Other Information Considered**
**In Addition to Those Cited in the Feinstein Report**

**LEGAL CASES**

- *City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*, No. 17-cv-00554-YGR (N.D. Cal. Oct. 11, 2018).

**OTHER**

- Other documents cited in my report.

**Exhibit-2**

**Steven P. Feinstein, Ph.D., CFA**
**Testimony Provided Since the Feinstein Report**

In Re EQT Corporation Securities Litigation
Master File No. 2:19-cv-00754-MPK
United States District Court
Western District Of Pennsylvania
Deposition Testimony
May 2021
Deposition Testimony
July 2021

In Re Apple Inc. Securities Litigation
Case No. 4:19-cv-02033-YGR
United States District Court
Northern District of California
Oakland Division
Deposition Testimony
June 2021

In Re Endo International Plc, Securities Litigation
Case No. 2:17-cv-05114-MMB
United States District Court
Eastern District of Pennsylvania
Deposition Testimony
July 2021