# EXHIBIT 13

Insights on...
# TRANSITION MANAGEMENT

## TRANSITIONING POOLED FUNDS



As institutions seek to take advantage of the economies of scale and associated benefits that can be derived from asset pooling, pooled funds are taking a larger role in restructured portfolios. However, using pooled funds instead of segregated accounts creates a number of challenges for both institutional investors and transition managers.

These challenges can be separated into the following areas, all of which should be seriously considered when planning a transition that involves pooled funds:

- Planning the transition
- The investment or disinvestment method (cash or stock)
- The threat of increased costs
- The likelihood of increased operational complexity

### PLANNING THE TRANSITION

A crucial part of any transition is the establishment of a detailed project management approach, including setting out a thorough timeline of events, highlighting critical dates, outlining the steps to be undertaken and defining areas of responsibility for each stage. Deficiencies here can affect the success of the transition and ultimately may significantly increase levels of cost and risk to the client.

While this planning stage is important for any project, it takes on even more relevance where pooled funds are involved, as these vehicles have defined dealing dates where clients can either invest (subscribe) or disinvest (redeem). Similarly, a decision needs to be taken at an early stage as to whether the subscription or redemption will be either in cash or stock (in-specie transfer).

The frequency of dealing dates is generally set out in the fund's prospectus and can vary amongst funds. Some funds will deal daily, whereas others may only deal once every three months. A settlement cycle will determine when the subscription or redemption settles and may be different for both cash and stock transactions. Unlike equity transactions, which settle on a more standard basis, pooled funds may settle with dates of between one and five days after the dealing date.

Many pooled fund managers also require a notification period for any subscription or redemption for stock in-species transfers (transferring ownership of a security to another party rather than selling it and deriving a cash payment). This can be as early as six weeks before the proposed transfer date.

When making cash subscriptions, many pooled fund managers require the cash to be in their account on the dealing date or potentially a day or two earlier. This may require the liquidation of part or all of your legacy holdings earlier than intended, leaving the portfolio un-invested for a time and bringing additional risk to the transition.



> Your transition manager should liaise with the pooled fund manager(s) directly to ensure they fully understand the fund's requirements, to ensure as smooth a transition as possible and to minimise any potential out of market exposure. This can be done by either subscribing or investing in stock or aligning the dealing dates of the pooled funds to the trade date and to other activity in the transition.
>
> If either of these options is not possible, one further option would be to use futures or exchange-traded funds (ETFs) to gain market exposure for the period the funds are to be out of the market. However, it is worth noting that this method requires some cash for margin purposes if futures are to be used.
>
> Some pooled funds may allow for pre-investment to prevent the aforementioned out-of-market exposure occurring; however, this will likely involve funding costs and may require additional documentation from the client to guarantee the cash will arrive in the pooled fund manager's account on the settlement date. Your transition manager will discuss the different options with you to ensure the best possible solution is implemented.

### INVESTMENT/DISINVESTMENT METHOD – CASH OR STOCK?

Maintaining market exposure wherever possible is a key requirement for transition managers to manage the risk and overall cost of a transition. When a restructure involves pooled funds, the best way of doing so is to subscribe or redeem with a stock in-specie transfer. This involves transferring stock into or out of the pooled fund in place of a normal cash transfer. However, when a subscription or redemption is made in this way, there are a number of considerations that will have an impact on the cost and success of the transition:

#### *Will the pooled fund manager allow a stock in-specie transfer?*

If the investment is too small, the pooled fund manager may not allow an in-specie transfer. Although it will vary across funds and strategies, the minimum value of an investment for an in-specie transfer is generally around US$5m.

#### *Do market regulations allow for a change of beneficial owner of assets?*

In the case of a pooled fund, the client owns units of the fund, whilst the fund, a legal entity in its own right, legally owns the underlying assets. Therefore, any transfer of assets into or out of a pooled fund will typically give rise to a change of beneficial ownership. Certain markets, particularly emerging ones, often do not permit changes in beneficial ownership of assets. In this instance, the stocks are often replaced with cash.

#### *Does the client have a segregated custodian account to be used as a transition account?*

If the stock cannot be transferred directly from the original pooled fund into the new pooled fund, a segregated custodian account will be required.

> As an experienced transition manager, Northern Trust has generally found investing and redeeming in stock to be the most effective way of maintaining market exposure and minimising overall transition risk. However, each transition will have its own unique set of considerations, so it is vital that your transition manager investigates all of the points detailed above to determine whether a stock transfer is possible and to consider the potential costs involved with a stock and a cash transfer.
>
> If a stock transfer is not possible and a cash subscription or redemption is required, there are a number of alternative methods through which your transition manager can maintain market exposure for your portfolio such as by purchasing futures or ETFs until the cash is fully invested. These positions can then be unwound in line with the pooled fund transaction.

### THREAT OF INCREASED COSTS

As mentioned earlier, there are potentially additional costs when dealing with pooled funds, over and above those normally associated with a transition. These costs can be substantial, are not always easily visible and can often be hidden in the form of a spread on the subscription or redemption price. These costs include, but are not limited to:

**Spread costs –** A spread cost will likely be associated with cash subscriptions into or out of a pooled fund. This could be a fixed cost or could be dependent on the number of other investors who are purchasing or selling units of the fund on that particular day.

**Anti-dilution levies –** The fund may charge an anti-dilution levy to cover the transaction costs of cash subscriptions or redemptions. This can either be charged directly to the client via a unit adjustment or built into any spread on the price.

**Taxes –** When making a stock in-specie transfer into or out of the fund, the beneficial owner of the assets will change. Certain countries charge a potentially prohibitive stamp duty tax for such activity that ranges from 10 to 100 basis points of the value of the stocks. Note that, while the United Kingdom charges such a tax, certain pooled funds may meet the regulatory requirements to allow an in-specie transfer without incurring stamp duty.

**Ticket fees –** When making a stock in-specie transfer in or out of the fund, the pooled fund manager and the custodian may charge a small processing fee. This can become a significant amount if a large number of securities are to be transferred.

> These costs can be a large part of the overall cost of a transition. Your transition manager should investigate and highlight them at the pre-trade stage so that you can make informed decisions when selecting a stock or cash investment or disinvestment.
>
> Depending on benchmark differences between the legacy and target manager, most investment managers will have some exposure to the major indices. The overlap of stocks between the original portfolio and the target portfolio may be a large proportion of the investment and if a cash subscription or redemption is selected, it is very likely the legacy fund manager will be selling some stocks only for the new fund manager to re-purchase the same stocks at a later date.
>
> In this case, two costs will be passed on to the client: the transaction costs of these sales and purchases and the associated out of market risk involved with cash. By using stock to redeem or subscribe, your transition manager can prevent the unnecessary sale and repurchase of stocks, maintain market exposure and reduce transaction costs.

### LIKELIHOOD OF INCREASED OPERATIONAL COMPLEXITY

Achieving operational efficiency is an essential component of transition management that becomes even more important when pooled funds are involved. Frequently, a pooled fund and the client will use different custodians. Therefore, when transferring assets between pooled funds and your existing custodian, the transfer will have a trade and settlement date in a similar way as an equity trade.

Any resulting errors could delay settlement of the transfer, which could stall the implementation of the restructure and create additional opportunity costs. Similarly, any delay in the settlement of purchases could delay funding to the new manager, while any pause in the settlement of sales could result in costly overdraft charges.

As an additional requirement, a transition manager will generally require your custodian to have a segregated account in which to manage a restructure. If you do not have an existing relationship with a custodian, this could prevent many transition managers from assisting in any planned restructure.

> To minimise stock settlement issues, the transition manager must ensure that all parties involved in the transition – including the pooled fund manager, the custodian and the transition manager itself – have a clear understanding of their responsibilities and of the key dates within the transition. The absence of an existing custodian relationship could prevent many transition managers from assisting with any planned restructure. At Northern Trust, we are able to help arrange a temporary custody account if required.

### Managing the challenges – and minimising their impact

While significant useful benefits can be derived from the use of pooled funds in the right circumstances, their involvement in a transition can increase its cost, complexity and difficulty. Transition managers have the relevant knowledge and expertise to help clients manage the risks, costs and operational issues associated with moving assets to and from pooled funds – and ensure they have minimal impact on your portfolio.

### FOR MORE INFORMATION

### Transition Management Group
**London:** +44 (0)20 7982 3419
**Chicago:** +1 312 557 5173
nt_tm_global@ntrs.com

Northern Trust Corporation, Head Office: 50 South La Salle Street, Chicago, Illinois 60603 U.S.A., incorporated with limited liability in the U.S.

The Northern Trust Company, London Branch (reg. no. BR001960), Northern Trust Global Investments Limited (reg. no. 03929218) and Northern Trust Global Services Limited (reg. no. 04795756) are authorised and regulated by the Financial Services Authority.

The material within and any linked material accessed via this communication is directed to eligible counterparties and professional clients only and should not be distributed to or relied upon by retail investors. For Asia Pacific markets, it is directed to institutional investors, expert investors and professional investors only and should not be relied upon by retail investors.

Northern Trust (Guernsey) Limited, Northern Trust Fiduciary Services (Guernsey) Limited, and Northern Trust International Fund Administration Services (Guernsey) Limited are licensed by the Guernsey Financial Services Commission. Northern Trust International Fund Administrators (Jersey) Limited and Northern Trust Fiduciary Services (Jersey) Limited are regulated by the Jersey Financial Services Commission. Northern Trust International Fund Administration Services (Ireland) Limited, Northern Trust Securities Services (Ireland) Limited and Northern Trust Fiduciary Services (Ireland) Limited are regulated by the Central Bank of Ireland. Northern Trust Global Services Limited has a Luxembourg Branch, which is authorised and regulated by the Commission de Surveillance du Secteur Financier (CSSF). Northern Trust Luxembourg Management Company S.A. is regulated by the Commission de Surveillance du Secteur Financier (CSSF). Northern Trust Global Investments Limited has a Netherlands branch, which is authorised by the Financial Services Authority and subject to regulation in the Netherlands by the Autoriteit Financiële Markten. Northern Trust Global Services Limited has a Netherlands Branch, which is authorised and regulated in the Netherlands by De Nederlandsche Bank. Northern Trust Global Investments Limited has a Sweden branch, which is authorised by the Financial Services Authority and subject to regulation in Sweden by the Finansinspektionen. Northern Trust Global Services Ltd (UK) Sweden Filial is authorised by the Financial Services Authority and subject to regulation by the Finansinspektionen. Northern Trust Global Services Limited operates in Abu Dhabi as a Representative Office. Our registered office is authorised and regulated by the Central Bank of the United Arab Emirates. The Northern Trust Company operates in Australia as a foreign authorised deposit-taking institution (foreign ADI) and is regulated by the Australian Prudential Regulation Authority. The Northern Trust Company has a branch in China regulated by the China Banking Regulatory Commission. The Northern Trust Company of Hong Kong Limited is regulated by the Hong Kong Securities and Futures Commission. Northern Trust Global Investments Japan, K.K. is regulated by the Japan Financial Services Agency. The Northern Trust Company has a Singapore Branch, which is a foreign wholesale bank regulated by the Monetary Authority of Singapore. The Northern Trust Company operates in Canada as The Northern Trust Company, Canada Branch, which is an authorised foreign bank branch under the Bank Act (Canada). Trustee related services in Canada are provided by the wholly owned subsidiary The Northern Trust Company, Canada, an authorised trust company under the Trust & Loans Companies Act (Canada). Deposits with The Northern Trust Company and its affiliates and subsidiaries are not insured by the Canada Deposit Insurance Corporation.

