# EXHIBIT D

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3              OAKLAND DIVISION

4

5  IN RE APPLE INC. SECURITIES LITIGATION

   _____

6  This Document Relates To:

   ALL ACTIONS.

7

8

9

10

11    ***CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER***

12

13             TUESDAY, JUNE 22, 2021

14                  - - -

15

16

17     Videotaped Remote Deposition of

18  ALEXANDER YOUNGER, beginning at 3:09 P.M., before

19  Nancy J. Martin, a Registered Merit Reporter,

20  Certified Shorthand Reporter.

21

22

23

24

25

                              Page  1

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1    A P P E A R A N C E S :
 2

      TODD SCOTT, ESQ.
 3    TRISTAN ALLEN, ESQ.
      ORRICK HERRINGTON & SUTCLIFFE
 4    405 Howard Street
      San Francisco, California  94105
 5    (415) 773-5992
      tscott@orrick.com
 6    Counsel for Defendants
 7

 8    MARK SOLOMON, ESQ
      JOHN GEORGE, ESQ.
 9    HADIYA DESHMUKH, ESQ.
      SHAWN WILLIAMS, ESQ.
10    ROBBINS GELLER RUDMAN & DOWD LLP
      655 West Broadway
11    Suite 1900
      San Diego, California 92101
12    marks@rgrdlaw.com
      Counsel for Northern Pension Fund and the witness,
13    Alex Younger
14

      CHRISTINE M. FOX, ATTORNEY AT LAW
15    LABATON SUCHAROW
      140 Broadway
16    34th Floor
      New York, New York 10005
17    (212) 907-0700
      cfox@labaton.com
18    Counsel for Plaintiffs
19

20    ALSO PRESENT:
21    ANDREW FARTHING, APPLE INC.
22

23

24

25
```

Page  2

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
1                      I N D E X
2   TESTIMONY OF ALEXANDER YOUNGER              PAGE
3   BY MR. SCOTT                                7
4   BY MR. SOLOMON                              143
5
                    E X H I B I T S
6
    NUMBER               DESCRIPTION           MARKED
7
    Exhibit 1            DEFENDANTS AMENDED NOTICE    19
8                        OF DEPOSITION OF LEAD
                         PLAINTIFF NORFOLK COUNTY
9                        COUNCIL AS ADMINISTERING
                         AUTHORITY OF THE NORFOLK
10                       PENSION FUND PURSUANT TO
                         FEDERAL RULE OF CIVIL
11                       PROCEDURE 30(b)(6), 8 pages
12  Exhibit 2            E-mail dated April 15,       84
                         2019, Conversation with
13                       George Simon, 1 page
14  Exhibit 3            Investment Strategy          98
                         Statement, 48 pages
15
    Exhibit 4            Investment Management        106
16                       Agreement, August 12, 1998,
                         72 pages
17
    Exhibit 5            Investment Management        109
18                       Agreement between Norfolk
                         County Council as
19                       administering authority for
                         Norfolk Pension Fund and
20                       Capital International
                         Limited, 54 pages
21
    Exhibit 6            Movant's Purchases and       113
22                       Losses, 3 pages
23  Exhibit 7            HSBC Fund Services,          118
                         Transactions Listings,
24                       35 pages
25


                                            Page 3
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
1              THE WITNESS:  I could be terribly English and
2    get another cup of tea if that was okay.  I'm very
3    grateful for that.  Thank you.
4              MR. SOLOMON:  Alex, I'll take a break as
5    well.
6              MR. SCOTT:  Let's take 10 minutes so
7    everybody can do what they need to do, and we'll come
8    back and try to finish it up.
9              THE WITNESS:  I appreciate that.  Thank you.
10             THE VIDEOGRAPHER:  We're going off the record
11   at 4:59 p.m.  This is the end of Media 2.
12             (Recess taken from 4:59 p.m. to 5:12 p.m.)
13             THE VIDEOGRAPHER:  We are on the record at
14   5:12 p.m.  This is the beginning of Media 3 in the
15   deposition of Alexander Younger.
16             REPORTER MARTIN:  You're on mute, Todd.
17   There you go.
18   BY MR. SCOTT:
19        Q.  I was asking if you could hear me, and you
20   could not.  Can you hear me now?
21        A.  I can, yes.
22        Q.  Okay.  Thank you.  I'm going to ask -- I'd
23   like to ask just a few more questions about how the
24   Fund initiates and maintains litigation.  I think some
25   of this might overlap with what we've discussed.  So I
```

Page 74

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1   apologize if I happen to repeat myself.

2            I think you already answered this, but do

3   you -- does the Fund have any formal policies or

4   procedures that govern the filing of a securities

5   lawsuit?  I think you said no to that previously.

6        A.  No, not specific to a securities lawsuit.

7        Q.  So the securities lawsuits where you have

8   served as lead plaintiff -- where the Funds have

9   served as lead plaintiff, did you make the decision to

10  file the lawsuit -- scratch that.

11           Did you identify the wrongdoing about which

12  the lawsuit was filed, or did your attorneys bring

13  that claim to you?

14           MR. SOLOMON:  Objection.  Form.

15           THE WITNESS:  The attorney --

16           MR. SOLOMON:  Go ahead, Alex.

17           THE WITNESS:  Sorry.  The attorneys bring the

18  claim to us for consideration and discussion.

19  BY MR. SCOTT:

20       Q.  So no one at Norfolk, for example, during the

21  2018 time frame, was monitoring Apple disclosures

22  looking for potential misstatements?

23       A.  No, because individual monitoring is a

24  responsibility of our investment managers.

25       Q.  So no one at the Fund monitors individual

Page 75

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1  investments?  That's all delegated to the investment

2  managers?

3      A.  The investment managers are making stock

4  selection decisions.  As we've discussed, we have the

5  monitoring services engaged from the two law firms to

6  ensure we've covered the bases around potential fraud

7  emerging as a retrospective event.

8      Q.  Let me ask you this question:  What about

9  managing the lawsuits that you serve as lead

10  plaintiff -- where you serve as lead plaintiff?  Does

11  the Fund have any written policies or procedures for

12  litigation management?

13      A.  No, they are managed through, usually, our

14  management structures.

15      Q.  Can you describe how the litigation

16  management process works from a high level?

17      A.  Yeah.  So essentially -- sorry.  So the

18  day-to-day management of the litigation is brought

19  into my area of responsibility.  I will do that at all

20  times, and I work very closely with Glenn anyway, but

21  in consultation with Glenn.  Where any additional

22  decision making is required and is deemed appropriate

23  for that to fall to Section 151 in particular, we

24  would do that.

25      Q.  And what do you do in terms of managing a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    particular lawsuit?

2              MR. SOLOMON:  Objection.  Vague.

3              Answer if you can, Alex.

4              THE WITNESS:  Yeah, of course.

5              So we will review filings, pleadings, and

6    briefings from the lawyers.  We will have pretty

7    regular contact to discuss and be sure of our

8    understanding, make sure that we've asked appropriate

9    questions on those documents.

10   BY MR. SCOTT:

11        Q.  And but for the below-the-line update that

12   you said the committee members receive regarding

13   ongoing litigation, do you provide any other updates

14   to the committee with regards to ongoing litigation?

15        A.  There's not any regular update.  We have, on

16   occasions, provided some additional material to the

17   chair where that's been requested.

18             MR. SCOTT:  Okay.  Let's see.  Excuse me just

19   one moment.

20             (Pause in proceedings.)

21   BY MR. SCOTT:

22        Q.  Do you maintain a separate file for each

23   lawsuit that's ongoing?

24        A.  Yes.

25        Q.  And you personally keep that?

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      Q.  Okay.  Can your lawyers file Amended

2   Complaints, for example, without your prior approval?

3      A.  No, I don't believe so.

4      Q.  Can your lawyers send out discovery without

5   your prior approval?

6      A.  We are managing that process, so discussing

7   how that process is developing.  So I would say no.

8      Q.  Okay.  Can you schedule depositions without

9   your prior approval?

10      A.  So the mechanics of scheduling a date for a

11   deposition other than my own?

12      Q.  Yes.

13      A.  Obviously we're interested in who they're

14   deposing.  Whether they do that on a Friday or a

15   Monday, we'd say that's housekeeping, and indeed, it's

16   part of the negotiations with you guys as well.  We'd

17   acknowledge that.  So if it's simply the mechanics of

18   scheduling, yes, they can.  If it's who is being

19   deposed, then that's part of the conversation we have

20   as part of case management.

21      Q.  Understood.  Understood.  You've been very

22   forthright in your prior answers.  So I'm able to skip

23   past some of this questioning.

24          I'd like to just now discuss, if we can,

25   Norfolk's investment process generally.  We've covered

Page  94

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1  some of them, but it's important to understand who

2  controls the investment and who makes the decisions

3  about the investments.  So, again, I do apologize if I

4  re-cover some territory we've previously tread, but I

5  just want to get this in one place.

6       Does Norfolk ever pick any of its specific

7  investments itself?

8       A.  Would you define an "investment" for me.  If

9  you mean a line of common stock, no is the answer to

10 that question.

11      Q.  Okay.  Never -- never picks a line of common

12 stock on its own?

13      A.  Has never done that in the history of the

14 pension fund from 1974.

15      Q.  And I think I know the answer to this, but

16 why do you not pick your own stock to invest in?  Why

17 doesn't the committee make investment decisions?

18      A.  Because the investment strategy is always to

19 use third-party experts in the running of individual

20 mandates to make those decisions as part of their

21 mandate management.

22      Q.  Is that also to shield management and the

23 committee from potential liability claims by the

24 members for, say, choosing the wrong stock?

25      A.   I think the board's clarified the committee

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    would not have liability because their status is quasi

2    trustee under the Local Government Act.  So there

3    wouldn't be a motivation in that sense.

4         And there wouldn't be -- there essentially

5    wouldn't be something to sue about because the

6    members' benefits are payable in statute regardless of

7    a stock selection decision which we haven't made.  So

8    I think the answer to that is no, but the reason is

9    because I think it's pretty much a non-applicable.

10        Q.  It's more about hiring the best person to do

11   the job rather than shielding yourselves from any

12   accusations of being bad at the job?

13        A.  In all circumstances we hire third parties

14   because we think they are best placed to undertake the

15   job for us, be that running an equity mandate,

16   preparing legal statements in relations to work with

17   data employers or, indeed, a Fund actuary.  But it's

18   about governance and control of those relationships.

19        Q.  So the investment decisions with regards to

20   individual stocks are always left to the managers, the

21   Fund managers; correct?

22        A.  Within the investment guidelines and

23   parameters of their investment management agreements,

24   yes.

25        Q.  And where do those guidelines come from that

Page 96

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1  they're given?

2       A.   They're part of the -- sorry.  When I talked

3  to you earlier, we go through a procurement process or

4  a manager, say, to run a global equity mandate.  That

5  global equity mandate is then appointed.  So the

6  headline will be, "You will run a global mandate

7  relative to whichever benchmark we have selected."

8            So MSCI World Countries Index, for example.

9  The INA will then contain more specific, more

10  risk-type guidelines upon which we will take legal

11  advice as the appropriateness of those risk

12  guidelines.  Sometimes that would involve taking more

13  investment advice, but typically, it's something that

14  comes from a law firm skilled and familiar in the

15  preparation of investment management agreements.

16           And those agreements are then executed and

17  managed.  So the strategic policy, which would be to

18  have a portfolio linked to the index, and then the

19  more underlying constraints within the IMA itself,

20  which is a high-risk management.

21           MR. SCOTT:  Let's look quickly at a document

22  that I think will help us put some meat on these

23  bones.

24           Tristan, can you please introduce the Norfolk

25  2009, Investment Strategy Report, please.

Page 97

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1              (Deposition Exhibit 003 was marked for

2              identification.)

3              (Pause in proceedings.)

4         MR. SCOTT:  While we're waiting on this,

5    maybe I can just ask a couple of questions, and

6    Tristan, you can let us know when it's up there, just

7    so I don't waste your time here, Mr. Younger.

8         Q.  If I could, just so I understand, at the time

9    that the alleged misstatements were made in the case,

10   which was in November of 2018, were you aware of the

11   alleged misstatements at the time they were made?

12        A.  So was I listening to those statements on the

13   2nd of November, no.

14        Q.  Did you read anything about them on the 2nd

15   of November?

16        A.  Not that I recall.

17        Q.  So any investment decisions that were made on

18   behalf of the Fund after November 2 were not made on

19   the basis of your reliance on the statements; is that

20   correct?

21        A.  No, because those investment decisions are

22   made by the Fund managers.

23        Q.  And at the time, did you review -- in

24   November of 2018, did you or anyone at the Fund review

25   the Apple disclosures that are at issue in this case?

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1        A.   No, we did not.

2             MR. ALLEN:   The exhibit should be up.

3             MR. SCOTT:   Okay.   Let's refresh and see if

4   we can get the exhibit.

5             (Pause in proceedings.)

6   BY MR. SCOTT:

7        Q.   Okay.   I see it there.

8        A.   It's just opening.

9        Q.   Just let me know when you have the document

10  open.   Mine is taking a while as well.   I'll direct

11  you to a specific page.

12       A.   Okay.   I've got that document out, which is

13  our investment strategy.

14       Q.   Yes.   This document is entitled "Investment

15  Strategy Statement" for the Norfolk Pension Fund.

16  It's dated July of 2019.

17            How often is this investment strategy

18  statement updated by the Fund?

19       A.   When necessary to do so.

20       Q.   Okay.

21       A.   So, for example, we have, going to our next

22  committee, a slight refresh, which is primarily around

23  climate monitoring.   So -- because that's something

24  that we've agreed to bring in for a type of wording

25  change on the strategy statement.

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1        Q.  Understood.  If I could ask you to please

2    turn down to Section 3.3.2.

3        A.  It will have to catch up with itself.  You'll

4    have to forgive me.

5             MR. SCOTT:  Take your time.  Just let me know

6    when you have that section available and you've read

7    it.

8             THE WITNESS:  Okay.  I'm just reading it now.

9             (The witness reviewed Exhibit 0003.)

10            THE WITNESS:  Okay.  I've read that

11   statement.

12   BY MR. SCOTT:

13        Q.  I think this is what we were just talking

14   about.  Let me read just a little bit of it, and I'll

15   ask you a few follow-up questions.  It says, "The

16   Committee, after seeking appropriate investment

17   advice, has agreed to specific benchmarks with each

18   manager so that they reflect the Fund's strategic

19   objectives."

20            And I think this is the process you were just

21   describing where, when the Fund hired a manager, they

22   provide specific benchmarks to that manager; is that

23   correct?

24        A.  That's correct, yes.

25        Q.  And those specific benchmarks, I think I

                                            Page 100

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    understood you to say are driven by the particular

2    investment that you're trying to make.

3              Is that a fair summary?

4        A.   Yes.  So global equity portfolio will have a

5    global equity benchmark.

6        Q.   The second sentence says, "The Investment

7    Managers are given discretion over the management of

8    their portfolio against the specified benchmark but

9    within agreed investment guidelines."

10             Where do those investment guidelines come

11   from?  Are those different from the benchmarks

12   referred to in the prior sentence?

13       A.   The guidelines would be within the IMA and

14   are more specific risk measures so they could refer to

15   maximum position sizing.  It may refer to maximum

16   off-benchmark positions you could hold.  So, for

17   example, a UK equity portfolio may have a

18   discretion -- or indeed, does have a discretion to

19   hold up to 10 percent of those assets in overseas

20   companies that it believes reflects some UK exposure,

21   but no more than 10 percent.

22             So there will be -- it will depend on the

23   individual IMA, but there will be more specific

24   guidelines around controlling some of the risks that

25   might otherwise arise in a portfolio.

Page 101

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1       Q.   Does the particular manager have any input

2    into the benchmarks that they're given?

3       A.   Well, in their request for proposal would

4    have provided them with what we're looking for, which

5    would include a benchmark.  So they're bidding for

6    business on -- against a certain set of agreed terms

7    at most.  What will happen laterally is if a mandate

8    evolves over time, then we will do that in discussion

9    with the manager, but ultimately, it will be for the

10   committee to make that decision as to whether --

11      Q.   Is that --

12      A.   -- might be appropriate.  Sorry.

13      Q.   I'm sorry.  I interrupted you.

14           What happens if an investment manager, you

15   know, violates the investment guidelines you've given

16   him?

17      A.   Well, as regulated businesses I would say

18   typically they do not.  They tend to have very high

19   standards and control where we -- sometimes we would

20   see a temporary breach.  So a good example of that

21   within guidelines would be the performance of Tesla,

22   say, in the last year or so really resulted in outside

23   stock positions.  So it was quite difficult to settle

24   down particularly quickly within guidelines.

25           So there may have been one or two days when

Page 102

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    they were saying, "We are overweight but taking steps

2    to address."

3            That specific particular example we would

4    say, "Thank you very much.  We've recorded that the

5    breach has occurred, but we know what it's going to

6    take to rectify, and frankly, we know why it's

7    occurred and why, therefore, rectification is

8    required."

9        Q.  Is there a mechanism -- so if each individual

10   investment manager has discretion about which

11   individual stocks to purchase, that's in their

12   discretion.  Is there a mechanism by which all of the

13   investment managers are surveyed to make sure that

14   they have not accidentally overloaded one particular

15   stock?  Does that question make sense?

16       A.  Yeah.  So in my Tesla example, they all

17   bought Tesla, and we've got an awful lot of Tesla.

18       Q.  Right.

19       A.  No, we don't perform analysis at that level

20   because the constraints individually with the IMAs

21   should maintain that position, encompass it anyway.

22   So if nobody can hold more than 5 percent of that

23   portfolio in Tesla, our aggregate position -- I'm

24   sorry.  I apologize for picking on Tesla.

25            Our aggregate position is 5 percent of Tesla

Page 103

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1   across the portfolio.  So within our risk constraints
 2   overall.  So we would not, therefore, have to then do
 3   a dive in.  And, indeed, it would be undesirable to do
 4   so because then we might be saying to somebody, who
 5   perhaps isn't outside, "You need to manage the
 6   portfolio," and we would then be making a
 7   stock-specific instruction, which as I've said we
 8   don't do.
 9        Q.  Interesting.  Okay.  I like that.
10             Does this document that we're looking at now,
11   to the best of your knowledge, discuss the financial
12   benefits of filing securities litigation?
13        A.  I don't know if it discusses financial
14   benefits.
15        Q.  Does it discuss filing securities litigation
16   as part of the investment strategy generally?
17        A.  I take it we describe that as part of
18   investment strategy.  That's part of stewardship and
19   management of the Fund.
20             MR. SCOTT:  Understood.  Okay.  We can put
21   this document away.
22             I'd like to just quickly look at the
23   management agreement for Fidelity and Capital, and I'm
24   getting -- I would say I'm probably not more than 25,
25   30 minutes until I'm done.  Actually, maybe 30
```

Page 104

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1   minutes.
 2           Would you like to have another break now or
 3   would you like to power through?  We're at the top of
 4   the hour again.
 5           THE WITNESS:  I'd quite like a break.  I'm
 6   listening to my voice a lot.  But if that's okay with
 7   you...
 8           MR. SCOTT:  Completely up to you.
 9           THE WITNESS:  Yeah.  Is that okay?
10           THE VIDEOGRAPHER:  We're going off the record
11   at 5:58 p.m.  This is the end of Media 3.
12           (A recess was taken from 5:58 p.m.
13           to 6:08 p.m.)
14           THE VIDEOGRAPHER:  We're on the record.  It's
15   6:08 p.m.  This is the beginning of Media 4 in the
16   deposition of Alexander Younger.
17           MR. SCOTT:  Thank you.
18           If we can, we uploaded some of the exhibits
19   in your absence.  So hopefully we don't have to wait
20   on them.  If you could please go to the Veritext
21   Exhibit Share and refresh it.
22           THE WITNESS:  Okay.  Let me get to that page
23   and refresh it.  Yeah.  Right.  So I can see a
24   Fidelity Management Agreement and a Capital Management
25   Agreement.  Which one would you like me to go to
```

Page 105

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1   first?
 2            MR. SCOTT:  The Fidelity.
 3            (Deposition Exhibit 004 was marked for
 4            identification.)
 5            THE WITNESS:  Thank you.
 6   BY MR. SCOTT:
 7       Q.  And I'll give you just a minute to look at
 8   it, and see what it is.
 9       A.  Sorry.  It's just opening up, and I'm there
10   with it.  So which -- it's a 72-page document.  Which
11   one would you like me to go through?
12       Q.  Well, just as a general matter, can you
13   describe what this document is, please.
14       A.  It's an "INVESTMENT MANAGEMENT AGREEMENT,"
15   and this one dates from the original inception of this
16   mandate.  Dated on the first page, it's the 1998, and
17   I believe as well -- I haven't scrolled through, but
18   we did provide side letter amendments to it, which
19   are --
20       Q.  I see those amendments.  Thank you.
21       A.  Which are most typically -- you know, seen
22   most typically around fees as generally investment
23   management fees have come down throughout the industry
24   and as a consequence of the increasing AUN with
25   individual mandates.
```

Page 106

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    Q.  I understood you to say previously that each

2  investment manager is hired to pursue a particular

3  area of investment.  Can you help me understand why

4  you hired Fidelity in particular to be an investment

5  manager?

6    A.  I can't, actually, because I wasn't with the

7  Fund in 1998.  So I don't have the specifics of that

8  process.

9    Q.  So you don't know, for example, what section

10  of the industry Fidelity targets on behalf of the

11  Fund?

12    A.  I'm sorry.  The question was why we hired

13  them, and I didn't make that decision.  If the

14  question is why did Fidelity run money for you --

15  sorry.

16    Q.  I think that's a better question.

17    A.  I don't want to give you an answer because I

18  can't -- the process would have been followed.  They

19  would have come through what we call an AG process as

20  the best option.  That's why they would have been --

21    Q.  That's my --

22    A.  I wasn't involved in that process, full

23  disclosure.  So why Fidelity?

24    Q.  Yes.

25    A.  So partly it would have been about why we

Page 107

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1  have to now be there, long-term performance, that they

2  have achieved for the pension funds.  In terms of

3  their management of pension fund assets, it's their

4  scale and expertise.

5       Obviously, in terms of their ability to

6  identify and manage entity portfolios, recognizing

7  that that business will also run investments in other

8  parts of capital structured companies, but our

9  specific appointment is for equity.

10     Q.  How does Fidelity communicate with the Fund

11  about their work?

12     A.  So Fidelity will provide monthly accounting

13  statements and a quarterly report.

14     Q.  Do they ever give you oral updates?  Do they

15  give anyone at the firm oral updates?

16     A.  We will typically have a call with them,

17  generally once a quarter.  Not always.  It will depend

18  on practicalities, but generally, once a quarter.

19  Always, if things are bad or not quite working out for

20  a period of underperformance, we will perhaps have

21  more regular interaction with them.

22     So they will provide oral update in that

23  sense, and they will, when required, from time to time

24  present to the pensions committee.  That would

25  typically be -- they'll be presenting because things

Page 108

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    aren't working out.  If you look to the performance of

2    Fidelity mandate overall, they have been on line or

3    ahead of their targets.  That hasn't been the case

4    recently.

5        Q.  Do you ever communicate -- does anyone at the

6    Fund ever communicate with Fidelity about the purchase

7    or sale of specific stock?

8        A.  We don't, no.

9        Q.  Is it part of Fidelity's mandate to monitor

10   individual stocks as part of their investment

11   decisions?

12       A.  We would expect Fidelity to be analyzing and

13   monitoring publicly available information for their

14   holdings.

15       Q.  Do you know if Fidelity researched Apple in

16   November of 2018, for example?

17       A.  I don't know the specifics of that research.

18           (Deposition Exhibit 005 was marked for

19           identification.)

20   BY MR. SCOTT:

21       Q.  Okay.  Let's go back to our exhibit list and

22   now look at the Capital Management Agreement.  I'd

23   just like to run through some of the same questions.

24       A.  Okay.  Sorry.  Let me just scroll back.

25   That's just opened up.

                                              Page 109

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1     Q.   Okay.  So take a moment to see what this is,

2  and then if you can please describe to me what this

3  document is from a high level.

4     A.   This is the Investment Management Agreement

5  from the date of appointment back in October of 2004

6  for Capital International.

7     Q.   And this is for them to serve as an

8  investment manager to the Fund; right?

9     A.   That's right.  So the other contracting party

10  is Norfolk County Council in its capacity as the

11  administering authority.

12     Q.   How is the services that Capital provides

13  different from what Fidelity provides?

14     A.   Well, they are -- they are common in that

15  they are a manager of global equities, but they

16  achieve a slightly -- they have a slightly different

17  benchmark.  So the Fidelity benchmark excludes the UK.

18  So it's just an overseas equity portfolio.

19        The Capital benchmark is an all countries

20  portfolio.  Therefore, it's including the UK market.

21  So there is a difference of benchmarks, but, in

22  essence, they are targeting equity benchmarks and

23  equity returns.

24     Q.   So they have different benchmarks, but

25  inasmuch as they overlap, that is the reason why the

Page 110

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1  two different managers both purchase Apple stock in

2  this case on behalf of the Fund?

3      A.  So Apple is a United States listed company.

4  The United States is in the ACWI Index and is also in

5  the UK overseas indices that Fidelity managed to.

6      Q.  So if I understand correctly, it's Fidelity

7  and Capital that purchased the Apple stock on behalf

8  of the Fund in this lawsuit?

9      A.  That's correct.

10     Q.  Were there any other investment managers who

11  purchased Apple stock on behalf of the Fund during the

12  relevant period?

13     A.  During the class period, no, they weren't.

14     Q.  Like Fidelity, is Capital charged with

15  investing -- I'm sorry, with investigating the

16  companies in which it invests?

17     A.  It will analyze those companies and monitor

18  them as part of its investment decision-making

19  process.

20     Q.  Do you know approximately how much of the

21  Fund's money that Capital managed in 2018 just on a

22  percentage basis?

23     A.  Back in 2018 the -- sorry.  It would be, give

24  or take -- and this is give or take around about

25  10 percent of assets under management, I believe.

Page 111

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      Q.   Is that true for Fidelity also, or do they

2   have a different percentage?

3      A.   Fidelity has a higher percentage, closer to

4   the mid-teens.

5      Q.   And is that because of their past success in

6   managing funds?

7      A.   It's more -- it's part of the organic

8   evolution of the investment strategy, frankly.  So

9   that on occasions mandates have been increased.

10  They've been reduced.  They've been used to fund other

11  mandates when we looked for the construction of

12  complimentary portfolios.

13     Q.   And are the Funds' communication with Capital

14  similar to what you just described with Fidelity where

15  they provide monthly and quarterly updates?

16     A.   Yeah.  Those statements that I described

17  would be common to both, and indeed, the sort of

18  overall meetings and on occasion participation in

19  pension committee.

20     Q.   And has anyone at Norfolk ever communicated

21  with Capital about the purchase or sale of specific

22  stocks?

23     A.   No.

24          MR. SCOTT:  Okay.  Well, let's move off of

25  this exhibit.

Page 112

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1              C E R T I F I C A T E

 2        I do hereby certify that the aforesaid testimony

 3   was taken before me, pursuant to notice, at the time

 4   and place indicated; that said deponent was by me duly

 5   sworn to tell the truth, the whole truth, and nothing

 6   but the truth; that the testimony of said deponent was

 7   correctly recorded in machine shorthand by me and

 8   thereafter transcribed under my supervision with

 9   computer-aided transcription; that the deposition is a

10   true and correct record of the testimony given by the

11   witness; and that I am neither of counsel nor kin to

12   any party in said action, nor interested in the

13   outcome thereof.

14

15

              Nancy J. Martin, RMR, CSR

16

17   Dated:  June 28, 2021

18

19

20   (The foregoing certification of this transcript does

21   not apply to any reproduction of the same by any

22   means, unless under the direct control and/or

23   supervision of the certifying shorthand reporter.)

24

25

                                          Page 146
```