UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE APPLE INC. SECURITIES
LITIGATION

Civil Action No. 4:19-cv-02033-YGR-JCS

Hon. Joseph C. Spero

## LETTER OF REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE PURSUANT TO THE HAGUE CONVENTION ON THE TAKING OF EVIDENCE ABROAD

To:     The Senior Master of the Queen's Bench Division of the High Court, Royal Courts of Justice, Strand, London, WC2A 2LL, United Kingdom

From:   Hon. Joseph C. Spero, Chief Magistrate Judge of the United States District Court for the Northern District of California, San Francisco Courthouse, Courtroom F – 15th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102

The United States District Court for the Northern District of California (the "Court") presents its compliments and requests assistance in obtaining evidence to be used in civil proceedings before the Court. This request is made pursuant to Rule 28(b) of the Federal Rules of Civil Procedure and in conformity with Article 3 of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters (the "Hague Evidence Convention"), to which both the United States and the United Kingdom are parties. Specifically, the Court requests international judicial assistance in obtaining testimony pertinent to the claims and defenses of the above-referenced civil action from Capital International Limited ("Capital International"), a company located in England.

<u>SECTION I</u>

1.      **SENDER:**

The Honorable Joseph C. Spero
Chief Magistrate Judge
United States District Court for the Northern District of California
San Francisco Courthouse, Courtroom F – 15th Floor
450 Golden Gate Avenue, San Francisco, CA 94102
United States of America

2.      **CENTRAL AUTHORITY OF REQUESTED STATE:**

The Senior Master of the Royal Courts of Justice
Strand
London WC2A 2LL
United Kingdom
Switchboard: +44 207 947 6000
Tel: +44 207 947 7772

3.      **PERSON TO WHOM THE EXECUTED REQUEST IS TO BE RETURNED:**

James N. Kramer, Esq.
*jkramer@orrick.com*
Alex K. Talarides, Esq.
*atalarides@orrick.com*
Tristan K. Allen, Esq.
*tallen@orrick.com*
Orrick, Herrington & Sutcliffe LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
United States of America
Telephone: (415) 773-5700
Facsimile: (415) 773-5759

4.      **SPECIFICATION OF THE DATE BY WHICH THE REQUESTING AUTHORITY REQUIRES RECEIPT OF THE RESPONSE TO THE LETTER OF REQUEST**.

It is requested that the oral testimony be taken as soon as possible, preferably within 75 days of your receipt of this Letter of Request.  The deadline for discovery of this information is March 16, 2022, when fact discovery is scheduled to close.

<u>SECTION II</u>

**IN COMFORMITY WITH ARTICLE 3 OF THE CONVENTION, THE UNDERSIGNED APPLICANT HAS THE HONOR TO SUBMIT THE FOLLOWING INFORMATION REGARDING THE INSTANT REQUEST:**

**5.     <u>ARTICLE 3(a)</u>**

**a.     Requesting judicial authority:**

The Honorable Joseph C. Spero
Chief Magistrate Judge
United States District Court for the Northern District of California
San Francisco Courthouse, Courtroom F – 15th Floor
450 Golden Gate Avenue, San Francisco, CA 94102
United States of America

**b.     To the competent authority of:**

England, United Kingdom

**c.     Names of the case and any identifying number:**

*In re Apple Inc. Securities Litigation*
Case No. 4:19-cv-02033-YGR-JCS
United States District Court for the Northern District of California

**6.     <u>ARTICLE 3(b) – NAMES AND ADDRESSES OF THE PARTIES AND THEIR REPRESENTATIVES</u>**

**a.     Plaintiff:**

Plaintiff is Norfolk County Council as Administering Authority of the Norfolk Pension Fund ("Plaintiff").  Plaintiff is the lead plaintiff in this action and purports to represent all persons who purchased or otherwise acquired the publicly traded securities of Apple Inc. between November 2, 2018 and January 2, 2019 (the "Class Period").

Plaintiff is located at County Hall, Martineau Lane, Norwich, NR1 2DH, United Kingdom.

Plaintiff is represented by Robbins Geller Rudman & Dowd LLP.  Robbins Geller is located at Post Montgomery Center, One Montgomery Street, Suite 1800, San Francisco, California, 94104, United States of America.

**b.**     **Defendants:**

Defendants are Apple Inc. ("Apple"), Timothy Cook, and Luca Maestri (collectively "Defendants").  Defendants are located at One Apple Park Way, Cupertino, California, 95014, United States of America.

Defendants are represented by Orrick, Herrington & Sutcliffe LLP.  Orrick is located at the Orrick Building, 405 Howard Street, San Francisco, California, 94105, United States of America.

**c.**     **Other parties:**

Other named plaintiffs in this action are City of Roseville Employees' Retirement System ("Roseville") and Employees' Retirement System of the State of Rhode Island ("Rhode Island").

Roseville is located at 29777 Gratiot Avenue, Roseville, Michigan, 48066, United States of America.

Roseville is represented by Robbins Geller Rudman & Dowd LLP. Robbins Geller is located at Post Montgomery Center, One Montgomery Street, Suite 1800, San Francisco, California, 94104, United States of America.

Rhode Island is located at One Capitol Hill, Fourth Floor, Providence, Rhode Island, 02908, United States of America.

Rhode Island is represented by Labaton Sucharow LLP.  Labaton is located at 140 Broadway New York, New York, 10005, United States of America.

**7.**     <u>**ARTICLE 3(c)**</u>

**a.**     **Nature of the proceedings:**

This is a federal securities class action filed against Apple and two of its executive officers for violations of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder.

**b.**     **Summary of complaint:**

Plaintiff's Revised Consolidated Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint"), filed on June 23, 2020, alleges that on a November 1, 2018 earnings call, Apple's CEO Tim Cook made an actionably false or misleading statement concerning Apple's business in China.  Plaintiff alleges that "in reliance on the integrity of the market," it and the class suffered damages by paying "artificially inflated prices" for Apple stock.  A copy of the Complaint is attached as **Exhibit 1**.

c.      **Summary of defenses and counterclaims:**

In response to Plaintiff's Complaint, Defendants filed an Answer that denied liability and asserted affirmative defenses to Plaintiff's allegations, including that Plaintiff did not rely on the alleged misstatement, that the alleged misstatement was not material, and that Plaintiff cannot show transaction or loss causation.  To date, Defendants have not asserted any counterclaims against Plaintiff.  A copy of Defendants' Answer is attached as **Exhibit 2**.

d.      **Other necessary information or documents:**

On March 4, 2021, the Court entered a Protective Order governing the production and disclosure of confidential information in connection with this legal proceeding.  Under this Protective Order, a non-party can designate documents or testimony as confidential or highly confidential, thereby limiting its disclosure.  A copy of the Protective Order is attached as **Exhibit 3**.

8.      <u>**ARTICLE 3(d)**</u>

a.      **Evidence to be obtained or other judicial act to be performed:**

It is requested that the appropriate judicial authority of the United Kingdom order:

(i) **Stephen Gosztony**, Managing Director at Capital International; or, in the alternative,

(ii) such other representative of Capital International with greater knowledge of the matters set out in **Schedule A** that Capital International may nominate and Apple agrees,

to be deposed regarding the specific subject matters set forth in the attached **Schedule A**.

b.      **Purpose of the evidence or judicial act sought:**

The evidence sought by this request is relevant to claims and defenses in the above-referenced civil action.  Plaintiff contends that its securities "transactions are carried out by [its] respective investment managers without [Plaintiff's] direct involvement." **Exhibit 4** (Letter from Plaintiff's Counsel) at 2.  Its investment managers are charged with "analyz[ing] [the companies in which it invests] and monitor[ing] them as part of its decision-making process." **Exhibit 5** (Deposition of Plaintiff's Representative) at 111:17-19.  Accordingly, as one of Plaintiff's investment managers that invested in Apple securities on Plaintiff's behalf during the relevant period, Capital International has information regarding the decision to invest in Apple that Plaintiff does not have. Stephen Gosztony signed investment management agreement amendments with Plaintiff on Capital International's behalf during the relevant period, and therefore has knowledge of these transactions.  Mr. Gosztony's oral testimony is relevant to (a) whether Plaintiff (or Capital International) relied on Defendants' alleged misstatement in purchasing Apple securities during the Class Period; (b) whether the information that Defendants allegedly omitted to disclose was already known to the market; and (c) whether Plaintiff suffered actual losses from its trading in Apple securities.  Apple intends to present this evidence for summary judgment and/or at trial. Thus, justice demands that Apple be given access to this important information.

## SECTION III

9.   **ARTICLE 3(e) – IDENTITY AND ADDRESS OF ANY PERSON TO BE EXAMINED**

The name and address of the witness from whom oral testimony is sought is listed below.

**Stephen Gosztony**
Capital International Limited
Capital Group
40 Grosvenor Place
London SW1X 7GG
United Kingdom
Tel: +44 (0) 20 7864 5845
Email: sg@capitalgroup.com; Stephen_Gosztony@capitalgroup.com

During the relevant time period, **Stephen Gosztony**, a Managing Director of Institutional at Capital International, signed investment management agreement amendments between Plaintiff and Capital International.  Mr. Gosztony was also listed as Plaintiff's contact at Capital International on investment reports.  Accordingly, Mr. Gosztony possesses knowledge of Capital International's investments on Plaintiff's behalf.

In the alternative, Capital International may nominate a representative with greater knowledge of the matters set out in **Schedule A**.  During the relevant time period, Capital International (a subsidiary of Capital Group) was Plaintiff's investment manager and transacted in Apple securities on Plaintiff's behalf.  Capital International's name and address is listed below:

**Capital International Limited**
Capital Group
40 Grosvenor Place
London SW1X 7GG
United Kingdom
Tel: +44 207 864 5000

10.   **ARTICLE 3(f) – QUESTIONS TO BE PUT TO THE PERSONS TO BE EXAMINED OR STATEMENT OF THE SUBJECT MATTER ABOUT WHICH THEY ARE TO BE EXAMINED**

It is requested that questions in regard to the topics set forth in the attached **Schedule A** be put to either Stephen Gosztony or, in the alternative, such other representative of Capital International's with greater knowledge of the matters set out in Schedule A that Capital International may nominate and Apple agrees.

**11.**      **ARTICLE 3(g) – DOCUMENTS OR OTHER PROPERTY TO BE INSPECTED**

No documents are requested at this time.

**12.**      **ARTICLE 3(h) – ANY REQUIREMENT THAT THE EVIDENCE BE GIVEN ON OATH OR AFFIRMATION AND SPECIFIC FORM TO BE USED**

It is requested that the witness should be examined under oath. If the evidence cannot be taken in the manner requested, it is to be taken in such manner as provided by the applicable law of the United Kingdom for the formal taking of testimonial evidence.

**13.**      **ARTICLES 3(i) & 9 – SPECIAL METHODS OR PROCEDURES TO BE FOLLOWED**

The Court respectfully requests that the witness should be given an oath before providing oral testimony, the testimony should be transcribed verbatim by a stenographer with an interactive real-time transcription, and the testimony should be recorded on video by a videographer.  It is further requested that the parties be permitted to arrange, at their expense, for the attendance of a privately employed stenographer and videographer.

The Court respectfully requests that the attorneys for the parties in this action should be permitted to be present and to conduct examination and cross-examination of the witness.  It is further requested that the parties be permitted to attend the proceedings remotely by video or audio teleconference, if not able to attend in person.  If the examination is to proceed in person, it is proposed that the examination take place at the offices of Orrick, Herrington & Sutcliffe (UK) LLP, 107 Cheapside, London, EC2V 6DN, United Kingdom.

The Court respectfully requests the evidence of the witness to be reduced into writing, all documents produced on such examination to be duly marked for identification, and copies of the documents to be made.  It is further requested that unless specified otherwise, the examination should be taken in accordance with the Federal Rules of Civil Procedure of the United States.

If the evidence cannot be taken according to some or all of the procedures described above, this Court requests that it be taken in such manner as provided by the applicable law of the United Kingdom for the formal taking of testimonial evidence.

14. **ARTICLE 7 – REQUEST FOR NOTIFICATION OF THE TIME AND PLACE FOR THE EXECUTION OF THE REQUEST AND IDENTITY AND ADDRESS OF ANY PERSON TO BE NOTIFIED**

It is requested that counsel for Apple (at the address below) be notified of the date, time, and place for the examination. It is further requested that, should Capital International nominate a more knowledgeable representative in lieu of Mr. Gosztony, counsel for Apple be notified of the name of the individual at least ten days prior to commencement of the deposition.

James N. Kramer, Esq.
*jkramer@orrick.com*
Alex K. Talarides, Esq.
*atalarides@orrick.com*
Tristan K. Allen, Esq.
*tallen@orrick.com*
Orrick, Herrington & Sutcliffe LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
United States of America
Telephone: (415) 773-5700
Facsimile: (415) 773-5759

15. **ARTICLE 8 – REQUEST FOR ATTENDANCE OR PARTICIPATION OF JUDICIAL PERSONNEL OF THE REQUESTING AUTHORITY AT THE EXECUTION OF THE LETTER OF REQUEST**

No attendance or participation of judicial personnel of the requesting authority is requested.

16. **ARTICLE 11(b) – SPECIFICATION OF PRIVILEGE OR DUTY TO REFUSE TO GIVE EVIDENCE UNDER THE LAW OF THE STATE OF ORIGIN**

Under the laws of the United States, a witness has a privilege to refuse to give evidence if to do so would disclose a confidential communication between the witness and his attorney that was communicated specifically for the purpose of obtaining legal advice and which privilege has not been waived. United States law also recognizes a privilege against self-incrimination. Certain limited immunities are also recognized outside the strict definition of privilege, such as the limited protection of work product created by attorneys during or in anticipation of litigation.

17. **THE FEES AND COSTS INCURRED WHICH ARE REIMBURSABLE UNDER THE SECOND PARAGRAPH OF ARTICLE 14 OR UNDER ARTICLE 26 OF THE CONVENTION WILL BE BORNE BY:**

The fees and costs incurred that are reimbursable under the second paragraph of Article 14 or under Article 26 of the Convention will be borne by Apple.

<u>**SECTION IV**</u>

The Court expresses its gratitude to the judicial authorities of United Kingdom for their assistance and courtesy under the terms of the Hague Evidence Convention.

Dated: <u>November 29</u>   , 2021



HON.                                SPERO
UNITED                              TE JUDGE

## SCHEDULE A

## DEFINITIONS

1.        The term "Apple" as used herein means Apple Inc.

2.        The term "Apple Personnel" means any current or former directors, officers, employees, agents, representatives, or any other person acting or purporting to act on behalf of Apple.

3.        The term "Apple Securities" means any and all Securities of Apple.

4.        The term "Capital International" means Capital International Limited and its current or former directors, officers, employees, agents, representatives, or any other person acting or purporting to act on behalf of Capital International.

5.        The term "Complaint" as used herein means the Revised Consolidated Class Action Complaint, filed on June 23, 2020 and attached as Exhibit 1.

6.        The term "Litigation" means the above-captioned case, *In re Apple Inc. Securities Litigation*, Case No. 4:19-cv-02033-YGR-JCS (N.D. Cal.).

7.        The term "Norfolk" means Norfolk County Council as Administering Authority of the Norfolk Pension Fund, including its predecessors, successors, subsidiaries, divisions, and affiliates.

8.        The term "Securities" as used herein shall mean any common stock, preferred stock, debenture, option, or other debt or equity interest and any direct or indirect, legal or beneficial interest in any limited partnership.

## DEPOSITION SUBJECT MATTERS

## TOPIC NO. 1:

Apple Securities owned, purchased, sold, transferred, or otherwise traded by Capital International on behalf of or for the benefit of Norfolk between August 1, 2018 through April 2, 2019.

**TOPIC NO. 2:**

      Capital International's decisions to enter into transactions relating to Apple Securities on behalf of or for the benefit of Norfolk on November 12, 2018, December 17, 2018, and December 20, 2018.

**TOPIC NO. 3:**

      Capital International's investment policies, practices, or strategies utilized for the transactions Capital International made or entered into on behalf of or for the benefit of Norfolk between August 1, 2018 through April 2, 2019.

**TOPIC NO. 4:**

      Capital International's analysis, evaluation, report, recommendation, or research regarding Apple or Apple Securities, including Apple's business conditions in China, between August 1, 2018 through April 2, 2019.

**TOPIC NO. 5:**

      Capital International's knowledge of or reliance on any misrepresentations and/or omissions alleged in the Complaint in connection with any investment decisions concerning Apple Securities.

**TOPIC NO. 6:**

      Communications, meetings, or other correspondence between Capital International or its affiliates and Apple Personnel from August 1, 2018 through January 31, 2019.

**TOPIC NO. 7:**

      Communications, meetings, or other correspondence between Capital International or its affiliates and securities analysts or reporters, concerning Apple, Apple Securities, or this Litigation from August 1, 2018 through January 31, 2019.

**TOPIC NO. 8:**

Communications, meetings, or other correspondence between Capital International and Norfolk concerning Apple, Apple Securities, or this Litigation between August 1, 2018 and April 2, 2019.

# EXHIBIT 1

1  ROBBINS GELLER RUDMAN
     & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   DANIEL J. PFEFFERBAUM (248631)
3  KENNETH J. BLACK (248631)
   Post Montgomery Center
4  One Montgomery Street, Suite 1800
   San Francisco, CA 94104
5  Telephone: 415/288-4545
   415/288-4534 (fax)
6  shawnw@rgrdlaw.com
   dpfefferbaum@rgrdlaw.com
7  kennyb@rgrdlaw.com
            – and –
8  MARK SOLOMON (151949)
   DANIELLE S. MYERS (259916)
9  JUAN CARLOS SANCHEZ (301834)
   655 West Broadway, Suite 1900
10 San Diego, CA 92101
   Telephone: 619/231-1058
11 619/231-7423 (fax)
   marks@rgrdlaw.com
12 dmyers@rgrdlaw.com
   jsanchez@rgrdlaw.com
13
   Counsel to Lead Plaintiff Norfolk County Council
14 as Administering Authority of the Norfolk Pension Fund

15 Additional Counsel Appear on Signature Page

16              UNITED STATES DISTRICT COURT

17             NORTHERN DISTRICT OF CALIFORNIA

18                    OAKLAND DIVISION

19 In re APPLE INC. SECURITIES        )  Case No. 4:19-cv-02033-YGR
   LITIGATION                         )
20 _____)  CLASS ACTION
                                      )
21 This Document Relates To:          )  REVISED CONSOLIDATED CLASS
                                      )  ACTION COMPLAINT FOR VIOLATION
22      ALL ACTIONS.                  )  OF THE FEDERAL SECURITIES LAWS
                                      )
23 _____)  DEMAND FOR JURY TRIAL

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................................1

II.     BACKGROUND AND SUMMARY ..................................................................2

        A.      The iPhone Is Apple's Most Important Product .....................................3

        B.      Greater China Is a Significant Geographic Revenue and Growth Region...............3

        C.      Prior to the Class Period, Trade Tensions Build Between the United States and China as Economic Conditions Deteriorate ......................................4

        D.      Apple Announces a New Iteration of Very Expensive iPhones .............6

        E.      The Start of the Class Period: Defendants Misrepresent Business Conditions in China, Demand for New iPhone Offerings ......................7

        F.      Just Four Days After the November 1, 2018 Financial Results, Reports Emerged from China that Apple Reduced iPhone Production at Its Largest Manufacturers by Up to 100,000 Units per Day..................10

        G.      For the First Time in More Than 15 Years, Apple Preannounces Massive Earnings Shortfall; Blames Poor Performance in China...........................11

III.    JURISDICTION AND VENUE .......................................................................13

IV.     PARTIES TO THE ACTION ...........................................................................13

V.      THE INDIVIDUAL DEFENDANTS CONTROLLED APPLE........................14

VI.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD .......................................15

        A.      Material Misrepresentations and Omissions in Connection with the Reporting of 4Q18 and FY18 Financial Results.....................................15

        B.      Reports Emerge from China that Apple Slashed iPhone Production by 100,000 Units per Day ..........................................................................21

        C.      Apple Discloses True Financial Condition, Pre-Announces Huge Quarterly Earnings Miss ......................................................................26

        D.      Post Class Period, Further Details of the iPhone's Poor China Performance Emerge .............................................................................30

VII.    LOSS CAUSATION/ECONOMIC LOSS .......................................................32

VIII.   APPLICABILITY OF THE FRAUD ON THE MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE ........................................................37

IX.     CLASS ACTION ALLEGATIONS .................................................................37

**Page**

X.    COUNT I .................................................................................................................39

      A.    For Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated
            Thereunder Against Defendants Apple and Cook ..................................................39

XI.    COUNT II ................................................................................................................39

      A.    For Violation of §20(a) of the Exchange Act Against All Defendants..................39

XII.    PRAYER FOR RELIEF ...........................................................................................40

XIII.    JURY DEMAND ......................................................................................................40

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS - 4:19-cv-02033-YGR
4839-0622-0480.v1-6/23/20

- ii -

## I.    INTRODUCTION

1.    This is a federal securities class action on behalf of all persons and entities who purchased or otherwise acquired the publicly traded securities of Apple Inc. ("Apple" or the "Company") during the period from November 2, 2018 through January 2, 2019, inclusive (the "Class Period"), who suffered damages as a result of the conduct alleged herein.1   The action is brought against Apple and certain of its executive officers for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.    Pursuant to the Court's June 2, 2020 Order Granting in Part and Denying in Part Defendant's Motion to Dismiss (ECF No. 110) ("June 2, 2020 Order"), Plaintiff Norfolk County Council as Administering Authority of the Norfolk Pension Fund ("Lead Plaintiff") submits this Revised Consolidated Class Action Complaint for Violation of the Federal Securities Laws which, as directed, is consistent with the Court's June 2, 2020 Order.2   The Court previously analyzed in detail the allegations in the Corrected Consolidated and Amended Class Action Complaint for Violation of the Federal Securities Laws (ECF No. 98) ("Corrected Consolidated Complaint") and found the following two statements made by Defendant Timothy D. Cook ("Cook"), on behalf of Apple, to be actionable under the Exchange Act and the Private Securities Litigation Reform Act of 1995:

- The XS and XS Max got off to a really great start, and we've only been selling for a few weeks.  The XR, we've only got out there for, I guess, 5 – 5 days or so at this point and so that it's – we have very, very little data there.  Usually, there is some amount of wait until a product shows – another product shows up in look, but in – that – in looking at the data, on the sales data for XS and XS Max, there's not obvious evidence of that in the data as I see it.

- In relation to China specifically, I would not put China in that category.  Our business in China was very strong last quarter.  We grew 16%, which we're very happy with.  iPhone, in particular, was very strong double-digit growth there.3

---

1    Apple's fiscal year ends in September of each calendar year.  Apple's 2018 fiscal year began on October 1, 2017 and ended on September 29, 2018 ("FY18").

2    On June 19, 2020, the Court issued an Order Regarding Transition of Leadership and Appointment of Lead Plaintiff and Lead Counsel (ECF No. 113) appointing Norfolk County Council as Administering Authority of the Norfolk Pension Fund as Lead Plaintiff in this action.

3    *See* June 2, 2020 Order.

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS - 4:19-cv-02033-YGR
4839-0622-0480.v1-6/23/20

- 1 -

3.      Accordingly, pursuant to directive that Lead Plaintiff file a revised complaint consistent with the June 2, 2020 Order, this Revised Consolidated Complaint asserts as actionable only those material misrepresentations and omissions which the Court previously found adequately pleaded, and those facts and allegations which support each element of Lead Plaintiff's claim under the Exchange Act including falsity, materiality, scienter, and loss causation.[4]  Pursuant to the Court's June 2, 2020 Order, Lead Plaintiff has not re-alleged certain statements or omissions made prior to November 1, 2018, which the Court found to be false and misleading but inactionable.  In the event that discovery reveals new facts supporting the actionability of these misrepresentations or omissions, Lead Plaintiff may seek leave to amend, accordingly.

4.      Lead Plaintiff individually, and on behalf of all others similarly situated, by Lead Plaintiff's undersigned counsel, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiff's counsel, which included, among other things, a review of United States Securities and Exchange Commission ("SEC") filings by Apple, as well as media and analyst reports about the Company.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II.      BACKGROUND AND SUMMARY

5.      Apple is a multinational technology company headquartered in Cupertino, California that designs, develops, and sells consumer electronics, computer software, and online services.  Apple is the world's largest information technology company by revenue and the world's third-largest mobile phone developer by units sold.  The Company's best known products include its

---

[4]    Because the two alleged false statements found to be actionable by this Court were both made by Defendant Cook, on behalf of Defendant Apple, Lead Plaintiff no longer asserts that Defendant Luca Maestri ("Maestri") is primarily liable under §10(b) of the Exchange Act.  To the extent Lead Plaintiff later discovers facts to support claims of primary liability against Maestri, Lead Plaintiff may seek leave to amend, accordingly.  Lead Plaintiff continues to assert claims under §20(a) of the Exchange Act against Maestri which the Court found to be sufficiently alleged.  June 2, 2020 Order at 46.

iPhone smartphones, iPad tablet computers, Mac personal computers, iPod portable media players, and Apple Watch smartwatches.

**A. The iPhone Is Apple's Most Important Product**

6.     During the Class Period, the iPhone served as the Company's flagship product, utilizing Apple's iOS operating system, powering applications including Siri (an intelligent assistant), Apple Pay, Touch ID, and Face ID on qualifying devices, generating more revenue and profit than any other Apple hardware product. For the past five years, the iPhone has accounted for more than 60% of Apple's net sales, generating approximately 62% of net sales in FY17 and 63% of net sales in FY18. Since its launch in 2007, generally the Company released new and updated iPhone models once a year, typically to great fanfare and strong demand. With each new release, Apple aggressively increased the price of its iPhones from the $99-$399 range maintained through 2013, to a top offering price of $1,449 for the Apple XS Max in September 2018.

7.     The following is a chart of Apple's recent iPhone models, their release dates, and each iPhone's respective price point:

| iPhone Model | Release Date | Pricing |
|---|---|---|
| iPhone 6S / 6S Plus | September 25, 2015 | $649/$749/$849 (Plus: $749/$849/$949) |
| iPhone SE | March 31, 2016 | $399/$499 |
| iPhone 7 / 7 Plus | September 16, 2016 | $649/$749/$849 (Plus: $769/$869/$969) |
| iPhone 8 / 8 Plus | September 22, 2017 | $699/$849 (Plus: $799/$949) |
| iPhone X | November 3, 2017 | $999/$1149 |
| iPhone XS / XS Max | September 21, 2018 | $999/$1149/$1349 (Max: $1099/$1249/$1449) |
| iPhone XR | October 26, 2018 | $749/$799/$899 |

**B. Greater China Is a Significant Geographic Revenue and Growth Region**

8.     Greater China, a region that includes mainland China, Hong Kong, and Taiwan, is Apple's third-largest market after the United States and Europe, and the Company's most important growth market.[5] For example, from 4Q14 to 4Q15, Apple's revenue from China grew 99% from

---

[5]     Throughout the Revised Consolidated Complaint, references to both Greater China and China refer to the region Apple identifies as Greater China in its SEC filings, which, unless otherwise noted, includes Hong Kong, Taiwan, and mainland China.

$5.7 billion to $12.5 billion year-over-year.  On October 27, 2015, *The Verge* published an article titled "China is becoming Apple's most important market" reporting as follows:

> [W]ith its rapidly growing middle class, Chinese carriers continued investment into LTE penetration – which is at 10 percent and growing – and Apple's continued retail expansion in the country, China [was] becoming the key to sustaining the iPhone's remarkable growth.
>
> Apple brought in $58.7 billion in revenue in China alone in fiscal 2015, a 96 percent increase from $29.8 billion in fiscal 2014.  Given the fact that just about half of China's population has reliable access to the internet, the potential for sustained long-term iPhone growth lies directly within China's borders.

9.      In FY18, ended September 29, 2018, Greater China accounted for $52 billion in sales – nearly 20% of Apple's total annual sales of $266 billion.[6]  In addition to representing nearly 20% of Apple's total revenue in FY18 (hardware and services), China is also a high-margin market (38%) for Apple, second only to Japan (44%).

10.     While China represents the Company's highest growth market, China is also among its most competitive.  At the same time Apple's iPhone sales revenues were growing in China (in part due to Apple's significant price increases), Chinese manufacturers including Huawei, Xiaomi, and Oppo were launching scores of lower-priced smartphones more technologically advanced with in-demand features tailored for the Chinese market, thus competing with Apple's iPhone offerings and diminishing Apple's pricing power.

**C.      Prior to the Class Period, Trade Tensions Build Between the United States and China as Economic Conditions Deteriorate**

11.     Apple's business in China is susceptible to geopolitical trade maneuvers, and in the summer of 2018, tariffs imposed by the United States threatened Apple's sales in Greater China.  On April 3, 2018, the Trump Administration published a $50 billion list of Chinese products under consideration for a 25% tariff and, on July 6, 2018, the Administration implemented $34 billion of those import tariffs.  On July 10, 2018, the Trump Administration announced another $200 billion list of Chinese products that would be subject to a 10% tariff.  On July 20, 2018, President Trump announced that his Administration was prepared to impose tariffs on all United States imports from

---

[6]   Almost all of Apple's Research & Development is conducted in the United States, while components for its products are manufactured around the world.  The Company's iPhones are assembled predominantly in China.

China, totaling $504 billion in products in 2017.  On August 7, 2018, the Trump Administration subjected the remaining $16 billion of the original $50 billion list of Chinese products to the 25% tariff, effective August 23, 2018.  On September 17, 2018, the Trump Administration published another $200 billion list of Chinese products that would be subject to a 10% tariff, which went into effect on September 24, 2018.

12.     On June 14, 2018, *The New York Times* published an article titled "As China Curbs Borrowing Growth Shows Signs of Faltering" reporting that "the Chinese economy show[s] signs of slowing," in part driven by China's "ever-rising debt."  On June 20, 2018, these general concerns were echoed when *CNN Business* published an article titled "China's economy shows signs of slowing.  A trade war won't help," which stated that "[i]n recent weeks, concerns have been mounting that growth in the world's second-biggest economy is cooling faster than previously expected."  The article explained further: "Official economic data for last month showed that growth in important areas like exports, investments by companies and consumer spending all declined compared with the same month a year ago."  The article also reported analysts believed: "'Economic growth [in China] appears likely to weaken further over the second half of the year,'" attributing the slowdown to the "Chinese government's push to rein in the huge levels of debt in the country, which have risen sharply since the global financial crisis a decade ago."

13.     On August 22, 2018, *The New York Times* published an article titled "China's Consumption Downgrade: Skip Avocados, Cocktails and Kids," which highlighted a growing cultural trend in China whereby consumers began to cut back on spending: "Welcome to China's 'consumption downgrade' culture, a potentially worrisome development for Beijing and the world. . . .  China's consumer culture has by no means ground to a halt.  But in the streets and on the Chinese internet, the talk is about cutting back in ways big and small."  The article continued:

> A Chinese consumption downgrade could be felt around the world.  Chinese spenders have been a key driver of their country's economic growth in recent years.  China, in turn, has played a major role in global growth.  Chinese consumers help global companies like Apple, General Motors, Volkswagen and many others.  A consumption downgrade could also embolden Mr. Trump in his trade fight with China, as he gambles that Beijing can't take much more economic damage.
>
> On paper, the Chinese economy looks strong.  Look closer, and the cracks begin to show.  Retail sales this year have grown at their slowest pace in more than a

decade.  Wages in the private sector are growing at their slowest pace since the global financial crisis.  The stock market has fallen by one-fifth.[7]

**D.    Apple Announces a New Iteration of Very Expensive iPhones**

14.    On September 12, 2018, in the midst of the ongoing trade war between the United States and China, Apple introduced three new iPhones which updated the prior year's models, but were not considered new or revolutionary in design: the iPhone XR (priced at $749/$799/$899); the iPhone XS (priced at $999/$1149/$1349); and the iPhone XS Max (priced at $1099/$1249/$1449). Unlike the prior year's iPhone X release in late 2017 (priced at $999/$1149), the 2018 iPhones were, at least relative to previous iterations, not significant technological advancements.  The more budget-friendly iPhone XR came in multiple bright colors, utilized a less-advanced LCD display and camera, and had a slower processor.  The premium iPhone XS and XS Max featured a Super Retina OLED display, an all-screen stainless steel and glass design, faster processors, and enhanced cameras.  The most expensive version in the 2018 line-up (the iPhone XS Max (512GB)), launched at $1,449 – $300 more than the most expensive 2017 offering (the iPhone X (256GB) at $1,149). While all three iPhones were announced on the same day, pre-orders for the XS and XS Max went live on September 14, 2018, and on sale on September 21, 2018.  Pre-orders for the XR went live on October 19, 2018, and on sale on October 26, 2018.

15.    At the same time Apple announced its 2018 iPhones, Chinese manufacturers like Huawei, Oppo, and Xiaomi, were offering arguably more innovative features for hundreds of dollars less per phone.  For instance, Huawei's P20 Pro sold for approximately $800 in China, and Xiaomi's MIX 2S sold for approximately $500 in China.  Huawei, Oppo, and Xiaomi had commandeered 24.6%, 20.5%, and 13.6% of the Chinese market, respectively, and were reportedly slashing Apple's Chinese market share to 7.5%.[8]

---

[7]    On September 24, 2018, *The Wall Street Journal* published an article titled "Are China's Consumers in Trouble?" highlighting that disappointing retail sales have analysts debating whether consumption is heading for a bigger slowdown.

[8]    In 2018 alone, Huawei reportedly introduced 26 new phones, many of which cost less than $400. Likewise in 2018, Oppo reportedly released 19 new phones, many of which cost less than $400.  In 2018, Vivo and Xiaomi also offered a number of new products at similar and competitive price points.

16.     Some analysts were bearish on the launch of the XS and XS Max.  For example, on September 24, 2018, *AppleInsider* posted an article titled "iPhone XS and XS Max sales are 'weak' says historically bearish Apple analyst" which stated that Rosenblatt Securities issued a report concluding that: "'Overall, we believe iPhone XS and iPhone XS Max weekend sales were weak.'" According to the report:

> "[O]ur research suggests the iPhone XS order pipeline is very weak, resulting in leftover inventory of the iPhone XS.  We continue to believe total iPhone XS and iPhone XS Max sales will be lower than total iPhone X sales over a two-month period."

**E.      The Start of the Class Period: Defendants Misrepresent Business Conditions in China, Demand for New iPhone Offerings**

17.     On November 1, 2018, Apple issued a press release announcing its financial results for its 4Q18 and FY18, the period ended September 29, 2018, which boasted: "'Over the past two months, [Apple had] delivered huge advancements for [its] customers through new versions of iPhone, Apple Watch, iPad and Mac as well as [its] four operating systems,'" and that as a result, the Company had "'enter[ed] the holiday season with [its] strongest lineup of products and services ever.'"  Already one-third of the way through the current quarter (1Q19), and purportedly based on the strength of its "ramping" product lineup, Apple set its 1Q19 revenue expectations in a range of $89 billion to $93 billion – "a new all-time record" – and its gross profit margins between 38% and 38.5%.

18.     Later that evening, during a conference call for analysts and investors, Apple issued a series of materially false and misleading statements and omissions about the current condition of its business, in particular, demand for the Company's new iPhone XS, XS Max, and XR, and the strength of its business conditions in China.  When asked whether the U.S.-China trade tariffs and trade tariff threats were having any impact on demand for the iPhones in China, Cook assured investors that the only "emerging markets that [Apple was] seeing pressure in [were] markets like Turkey, India, Brazil, [and] Russia . . . where currencies ha[d] weakened." Cook explicitly excluded China from the category of emerging markets experiencing these negative economic pressures and emphasized growth in the prior quarter (4Q18):

[Cook:] *[I]n relation to China specifically, I would not put China in that category*. *Our business in China was very strong last quarter*. *We grew 16%, which we're very happy with*. *iPhone, in particular, was very strong double-digit growth there*.

19.    Asked about the strength of demand for the two new iPhones that started shipping in September 2018 – the more expensive iPhone XS and XS Max – and specifically whether Apple had seen purchasers hold off pending the rollout of the cheaper iPhone XR in October 2018, Cook falsely stated that to date the XS and XS Max had, in fact, gotten off to a really great start, but that the Company lacked data on the performance of the XR:

[Cook:] *The Xs and Xs Max got off to a really great start*, and we've only been selling for a few weeks. *The XR, we've only got out there for, I guess, 5 – 5 days or so at this point and so that it's – we have very, very little data there*. Usually, there is some amount of wait until a product shows – another product shows up in look, but in – that – *in looking at the data, on the sales data for Xs and Xs Max, there's not obvious evidence of that in the data as I see it*.

20.    During the call, the Company also surprised investors by announcing that Apple would no longer disclose unit sales for iPhones and other hardware, asserting that such data was no longer relevant for investors to evaluate the Company's financial performance, all the while assuring investors that despite the decision to withhold unit sales data, as in the past, the Company would still experience strong performance:

[Maestri:] [S]tarting with the December quarter, we will no longer be providing unit sales data for iPhone, iPad and Mac. . . .  As we accomplish these objectives, strong financial results follow.

As demonstrated by our financial performance in recent years, the number of units sold in any 90-day period is not necessarily representative of the underlying strength of our business.

21.    On November 1, 2018, Canaccord Genuity issued a report stating that its "long-term positive thesis [remained] intact" and emphasized that solid demand trends existed for the iPhone XS, XS Max, and XR and Apple's installed base would drive earnings.

*We believe demand trends are solid for the three new iPhone models and anticipate strong ASPs and margin trends for the iPhone franchise going forward*.

22.    On November 2, 2018, investment analysts reiterated Defendants' statements concerning the Company's performance, in particular referencing continuing growth in China, and that China was not being affected by issues impacting performance in emerging markets.  For example, J.P. Morgan issued a report stating as follows:

*Apple cited pressures in emerging markets including Turkey, Brazil, India and Russia* and challenges in growth following price increases. *Separately, while Apple continues to see solid growth in EM countries like China (+16% y/y in F4Q)*, it is facing regulatory hurdles relative to growth for the App Store.

23.     On November 2, 2018, Argus also issued a report stating that the Company's business in China was driven by "high-end appetite" for the XS, XS Max and XR iPhones:

*Despite mounting concerns over tariffs, Apple's China business continues to recover, based on high-end appetite for the new phones; China revenue rose 16%.*

\*          \*          \*

Based on new features, we believe the new phones could prompt a strong upgrade cycle worldwide.  We also believe the wide range of price points *enhances Apple's ability to compete in emerging and frontier markets and in China* . . . .

24.     Each of Defendants' statements set forth in ¶¶18-19 concerning: (i) the purported successful launch of, and status of demand for, the newly released iPhone XS, XS Max, and XR; and (ii) the current state of Apple's business in Greater China and the impact of macroeconomic trends on the Company's sales in Greater China, was materially false and misleading when made as Defendants knew or deliberately disregarded and failed to disclose the following true facts:

(a)     that the U.S.-China trade tensions and economic conditions in China were negatively impacting sales and demand for Apple products, particularly iPhones;

(b)     the Company had already begun to see declining traffic in Apple's retail stores and those of its channel partner stores in Greater China, and reports of an overall contraction of the smartphone industry; and

(c)     the Company had already, or was preparing to, cut iPhone production at multiple manufacturers and reduce orders from its largest suppliers of iPhone components for the current quarter and holiday season.

25.     In addition to the undisclosed facts stated above, the Company knew or deliberately disregarded that unit sales for iPhones and other hardware was relevant to investors and the Company's financial performance, and withholding such unit sales would mask declines in unit sales of the Company's flagship product.

26.     Following the Company's November 1, 2018 financial results and conference call, Apple's stock price traded at artificially inflated prices as high as $213.65 on November 2, 2018.

**F.    Just Four Days After the November 1, 2018 Financial Results, Reports Emerged from China that Apple Reduced iPhone Production at Its Largest Manufacturers by Up to 100,000 Units per Day**

27.    On November 5, 2018, before the market opened, the *Nikkei Asian Review* published an article titled "Apple cancels Production boost for budget iPhone XR: sources," (the "Nikkei Article") reporting that Apple had instructed its top smartphone assemblers, Chinese manufacturers Foxconn and Pegatron, to "halt plans for additional production lines" for the recently released iPhone XR – which indicated a reduction in expected sales by 20-25%:

> That means Foxconn . . . would ***produce around 100,000 fewer units daily to reflect the new demand outlook – down 20% to 25% from the original optimistic outlook***, this person said.

> Fellow Taiwanese manufacturer Pegatron faces a similar situation, ***suspending plans to ramp up production and awaiting further instructions from Apple*** . . . .

> \*        \*        \*

> Apple also had asked smaller iPhone assembler Wistron to stand by for rush orders, but supply chain sources say the company will receive ***no orders*** for the iPhone XR this holiday season.

28.    On the same day, RBC Capital Market issued a report indicating that the production suspensions at Foxconn and Pegatron noted in the Nikkei Article "could indicate muted unit demand."   The news of production slowdown and falling demand for Apple's latest iPhone, published only four days after the November 1, 2018 earnings release and positive demand statements, caused a $5.89 decline in Apple's stock price, from a close of $207.48 per share on November 2, 2018, to a close of $201.59 per share on November 5, 2018, but it continued to trade at artificially inflated prices.

29.    On November 12, 2018, Wells Fargo issued a report titled "AAPL: Lumentum Cuts Revenue Outlook by 17%+ (Midpoint) on Apple Order Cuts" estimating that Apple had reduced iPhone production by "as much as . . . 30%" and the stock price was under pressure as a result.   The report was based on the negative earnings preannouncement by a key supplier of iPhone components, Lumentum, which disclosed one of its largest customers (presumed to be Apple) told it to materially reduce shipments:

> ***Apple shares are under pressure this morning (11/12) following a negative preannouncement by key supplier, Lumentum (LITE)***.

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 4:19-cv-02033-YGR
4839-0622-0480.v1-6/23/20

- 10 -

\* \* \*

Lumentum's preannouncement notes that the company has ". . . *[r]ecently received a request from one of our largest Industrial and Consumer customers for laser diodes for 3D sensing to materially reduce shipments to them during our fiscal second quarter for previously placed orders* that were originally scheduled for delivery during the quarter." . . . *We think investors could consider Lumentum's updated guide as reflecting as much as a 30% cut in Apple orders*.

30.     Following the disclosures on Monday, November 12, 2018, Apple's stock price declined from a close of $204.47 per share on Friday, November 9, 2018, to a close of $194.17 per share on Monday, November 12, 2018, but continued to trade at artificially inflated prices.

31.     On December 4, 2018, *Bloomberg* published an article titled "Apple Resorts to Promo Deals, Trade-Ins to Boost iPhone Sales" which revealed that in October 2018, Apple shifted marketing staff and increased trade-in discounts to boost sales of the iPhone XS, XS Max, and XR in what was described as a "'fire drill'" response to poor iPhone sales:

> *Company executives moved some marketing staff from other projects to work on bolstering sales of the latest handsets in October, about a month after the iPhone XS went on sale and in the days around the launch of the iPhone XR, according to a person familiar with the situation.  This person described it as a "fire drill," and a possible admission that the devices may have been selling below some expectations*.

32.     On December 4, 2018, Apple's stock price declined from a close of $184.82 per share on December 3, 2018, to a close of $176.69 per share on December 4, 2018, but still continued to trade at artificially inflated prices.

### G.     For the First Time in More Than 15 Years, Apple Preannounces Massive Earnings Shortfall; Blames Poor Performance in China

33.     Then, on January 2, 2019, after the close of trading, Apple disclosed the true condition of its business, including the impact of deteriorating economic conditions in China, among its largest growth markets, and demand for the iPhone.  For the first time in more than 15 years, Apple preannounced that its financial results would miss public revenue projections, and the miss would be by a wide margin – up to $9 billion.

34.     In a "Letter from Tim Cook to Apple Investors," Defendants reported revenue for 1Q19 was expected to be $84 billion, far below the guidance range of $89 to $93 billion the Company had announced on November 1, 2018, just eight weeks earlier.  Contrary to the

Company's prior assurances regarding the strength of its business in Greater China, the Company put the blame squarely on poor performance in Greater China:

- *"Most" of the revenue shortfall to guidance occurred in Greater China*.

- *"Over 100%" of the quarter-over-quarter worldwide revenue decline occurred in Greater China*.

- *iPhone revenue accounted for all of the revenue shortfall and was "primarily" due to poor sales in Greater China*.

35. The "Letter from Tim Cook to Apple Investors" stated in relevant part:

**Emerging Market Challenges**

While we anticipated some challenges in key emerging markets, ***we did not foresee the magnitude of the economic deceleration, particularly in Greater China. In fact, most of our revenue shortfall to our guidance, and over 100 percent of our year-over-year worldwide revenue decline, occurred in Greater China*** across iPhone, Mac and iPad.

***China's economy began to slow in the second half of 2018***.   The government-reported GDP growth during the September quarter was the second lowest in the last 25 years.  We believe the economic environment in China has been further impacted by rising trade tensions with the United States.

\*     \*     \*

**iPhone**

Lower than anticipated iPhone revenue, ***primarily in Greater China, accounts for all of our revenue shortfall to our guidance and for much more than our entire year-over-year revenue decline***.

36. Following the publication of the "Letter from Tim Cook to Apple Investors," Cook appeared on CNBC for an interview.  Cook explained the impact that the slowing economy in China had on the Company's 1Q19 sales and admitted facts indicating that the Company had, in fact, been seeing declines in and before November 2018, including in traffic in the Company's retail stores, its channel partner stores, and reports of the contraction in the smartphone industry:

[A]s we look at what's going on in China – ***it's clear that the economy begins to slow there for the second half***.  And what I believe to be the case is the trade tensions between the United States and China put additional pressure on their economy.

And so ***we saw, as the quarter went on, things like traffic in our retail stores, traffic in our channel partner stores, the reports of the smartphone industry contracting, particularly bad in November*** – I haven't seen the December number yet, but I would guess that would not be good either.  And so that's what we've seen.

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 4:19-cv-02033-YGR
4839-0622-0480.v1-6/23/20

- 12 -

37. These disclosures from the Company were in stark contrast to the assurances Defendants made to investors on November 1, 2018, and caused Apple's stock price to decline from a close of $157.92 per share on January 2, 2019, to a close of $142.19 per share on January 3, 2019, on unusually heavy trading volume.

## III. JURISDICTION AND VENUE

38. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

39. Jurisdiction is conferred by 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

40. Venue is proper in this district pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act, 15 U.S.C. §78aa. Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this district.

41. In connection with the acts alleged in this Revised Consolidated Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV. PARTIES TO THE ACTION

42. Lead Plaintiff Norfolk County Council as Administering Authority of the Norfolk Pension Fund purchased or otherwise acquired Apple common stock during the Class Period and suffered damages as a result of the conduct alleged herein.

43. Plaintiff City of Roseville Employees' Retirement System purchased or otherwise acquired Apple common stock during the Class Period and suffered damages as a result of the conduct alleged herein.

44. Plaintiff Employees' Retirement System of the State of Rhode Island purchased or otherwise acquired Apple common stock during the Class Period and suffered damages as a result of the conduct alleged herein.

45. Defendant Apple, Inc. is a tech company based in Cupertino, California. Apple common stock is listed and trades on the NASDAQ, an efficient market, under the ticker symbol

1    "AAPL."  As of January 2, 2019, the Company had approximately 4.73 billion shares issued and

2    outstanding.

3          46.    Defendant Timothy D. Cook is, and was at all relevant times, Chief Executive Officer

4    ("CEO") of Apple and a member of Apple's Board of Directors.

5          47.    Defendant Luca Maestri is, and was at all relevant times, Senior Vice President and

6    Chief Financial Officer ("CFO") of Apple.

7          48.    Defendants Cook and Maestri are referred to herein as the "Individual Defendants."

8    Apple and the Individual Defendants are collectively referred to herein as "Defendants."

9    **V.    THE INDIVIDUAL DEFENDANTS CONTROLLED APPLE**

10         49.    As officers and/or directors and controlling persons of a publicly held company

11   whose common stock is traded on the NASDAQ and governed by the provisions of the federal

12   securities laws, the Defendants had a duty to promptly disseminate accurate and truthful information

13   with respect to the Company's financial condition, performance, growth, operations, financial

14   statements, business, markets, management, earnings, and present and future business prospects; not

15   to make material misrepresentations with respect thereto or to omit material facts necessary to make

16   the statements contained therein not misleading; and to correct any previously issued statements that

17   had become materially misleading or untrue so that the market price of the Company's common

18   stock would be based upon truthful and accurate information.   The Individual Defendants'

19   misrepresentations and omissions during the Class Period violated these specific requirements and

20   obligations.

21         50.    Defendants participated in the drafting, preparation, and/or approval of the various

22   public shareholder and investor reports, and other communications complained of herein, and were

23   aware of, or deliberately disregarded, the misstatements contained therein and omissions therefrom

24   and their materially false and misleading nature.  Because of their membership(s) on Apple's Board

25   of Directors and/or executive and managerial positions within Apple, the Individual Defendants had

26   access to the adverse undisclosed information about the Company's financial condition and

27   performance as particularized herein, and knew (or deliberately disregarded), that these adverse facts

28

1  rendered the positive representations made by or about Apple and its business, or adopted by the

2  Company, materially false and misleading.[9]

3        51.    The Individual Defendants, because of their positions of control and authority as

4  officers and/or directors of the Company, were able to and did control the content of the various SEC

5  filings, press releases, and other public statements pertaining to the Company during the Class

6  Period. Defendants were provided with copies of the documents or scripts of statements alleged

7  herein to be misleading prior to or shortly after issuance, and/or had the ability and/or opportunity to

8  prevent issuance of those statements, or cause them to be corrected. Accordingly, Defendants are

9  responsible for the accuracy of the public reports and releases detailed herein.

10        52.    The Company and the Individual Defendants, by disseminating materially false and

11  misleading statements and/or concealing material adverse facts, are liable as participants in a

12  fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Apple

13  common stock. The scheme: (i) deceived the investing public regarding Apple's business,

14  operations, management, and the intrinsic value of Apple common stock; and (ii) caused Lead

15  Plaintiff and other members of the Class (as defined below) to purchase Apple common stock at

16  artificially inflated prices.

17  **VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING
        STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD**

18

19      **A.    Material Misrepresentations and Omissions in Connection with the
             Reporting of 4Q18 and FY18 Financial Results**

20        53.    On November 1, 2018, after the market closed, and more than one-third of the way

21  through 1Q19 (ended December 29, 2018), Apple filed a Form 8-K attaching a press release

22  containing the Company's financial results for FY18 (ended September 29, 2018). iPhone unit sales

23  fell below consensus estimates, however, average selling prices ("ASPs") were higher. In the

24  _____

25  [9]    Cook and Maestri closely monitored and publicly discussed the Chinese smartphone market and
        Apple's iPhone business there. Moreover, Cook frequently traveled to China and closely tracked

26  Apple's business there. One article characterizes him as "a frequent flyer to China to both monitor a
        market that is critical to the U.S. tech giant's success and to undertake board director duties at

27  Tsinghua University School of Economics and Management." Jason Tars, *Apple Boss Tim Cook
        Stays Low-Key in Busy Visit to China*, Caixin Global (Oct. 11, 2018 5:33 PM),

28  https://tinyurl.com/y89c7k9v.

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS - 4:19-cv-02033-YGR
4839-0622-0480.v1-6/23/20

- 15 -

accompanying press release, Cook emphasized that "'[o]ver the past two months, [Apple had] delivered huge advancements for [its] customers through new versions of iPhone, Apple Watch, iPad and Mac as well as [its] four operating systems, and [that it was] enter[ing] the holiday season with [its] strongest lineup of products and services ever.'" Defendants also provided revenue guidance of $89 billion to $93 billion for 1Q19, the upcoming and all-important holiday quarter – a revenue range below what analysts were expecting.

54.     Following the November 1, 2018 press release, Apple held a conference call for analysts and investors to discuss the results and financial guidance for 1Q19. The call was hosted by Cook and Maestri. During the call, Defendants boasted of the strength of its business, including what they called the strongest lineup of products heading into the holiday season and the Company's "all-time record" revenue guidance:

> [Maestri:] We have the strongest lineup ever as we enter the holiday season, and we expect revenue to be between $89 billion and $93 billion, a new all-time record. This range reflects a number of factors to be considered: First, we consider the effect on Q4 and Q1 of the launch timing of our new iPhones this year versus last year; Second, we expect almost $2 billion of foreign exchange headwinds; Third, we had an unprecedented number of products ramping, and while our ramps are going fairly well, we have uncertainty around supply and demand balance; and fourth, we also face some macroeconomic uncertainty, particularly in emerging markets.

55.     In response to a question from an analyst about the variables affecting revenue guidance for 1Q19, including geopolitical trade and macroeconomic issues, Maestri responded as follows:

> [Maestri:] [I]n the last 6 weeks, we've launched an unprecedented number of new products. They're all ramping right now. The ramps are going fairly well, but obviously, we have some uncertainty around supply-demand balance for some of these products. And then finally, the last point that we've taken into account is what Tim's talked about in terms of some level of uncertainty at the macroeconomic level in some emerging markets, where, clearly, consumer confidence is not as high as it was 12 months ago. So take that into account, and that's how we got to the range.

56.     In addition, analysts concerned about economic conditions in emerging markets and issues related to China asked about "deceleration in some of these emerging markets." Cook falsely maintained that, to the extent there were risks of volatility and deceleration effecting emerging market countries, they were not affecting the Company's current performance or outlook in China, emphasizing directly that China – and particularly iPhone sales in China – were very strong:

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 4:19-cv-02033-YGR
4839-0622-0480.v1-6/23/20

- 16 -

1   [Cook:]  To give you a perspective in – at some detail, our business at India in Q4

2   was flat.  Obviously, we would like to see that be a huge growth.  Brazil was down

    somewhat compared to the previous year.  And so I think – or at least the way that I

3   see these is each one of the emerging markets has a bit of a different story.  And I

    don't see it as some sort of issue that is common between those for the most part.

4   ***In relation to China specifically, I would not put China in that category.  Our***

    ***business in China was very strong last quarter.  We grew 16%, which we're very***

5   ***happy with.  iPhone, in particular, was very strong double-digit growth there.  Our***

    ***other products category was also stronger, in fact, a bit stronger than even the . . .***

6   ***overall company number***.

7   57.   During the call, Defendants were also asked about the strength of demand for the new

8   iPhones that started shipping in September 2018 – the premium iPhone XS and XS Max – and

9   specifically whether Apple had seen buyers hold off on XS or XS Max purchases for the rollout of

10  the cheaper iPhone XR in October.  Cook falsely indicated that to date, XS and XS Max demand was

11  strong based on a really good start to sales but claimed that Defendants lacked sufficient data to

12  judge the performance of the XR, which went live for pre-orders on October 19, 2018, and officially

13  on sale on October 26, 2018:

14  [Analyst:]  With the staggered iPhone launch, were you able to discern any
    impact on the Xs and Xs Max from buyers potentially waiting for the XR?  And
15  what, if anything, can we take away from the December quarter guidance related to
    what you're seeing for early demand on the XR? . . .

16
    . . . [Cook:]  ***The Xs and Xs Max got off to a really great start***, and we've
17  only been selling for a few weeks.  ***The XR, we've only got out there for, I guess, 5***
    ***– 5 days or so at this point and so that it's – we have very, very little data there***.
18  ***Usually, there is some amount of wait until a product shows – another product***
    ***shows up in look, but in – that – in looking at the data, on the sales data for Xs and***
19  ***Xs Max, there's not obvious evidence of that in the data as I see it***.

20  58.   Finally, the Company surprised investors with the announcement that, going forward,

21  Apple would no longer report iPhone unit sales, purportedly on the basis that unit sales were no

22  longer relevant as ASPs increased.[10]  Calling on the Company's historical financial performance,

23  Maestri added that the Company would nevertheless achieve strong results because it was focused

24  on products that customers wanted:

25

26  [10]   Analysts and journalists have used unit sales numbers to calculate iPhone's average selling price
    and "provide insight into how well different iPhone models are selling, as newer iPhones like the
27  XS, XS Max, and XR are priced higher than older models like the now-discontinued SE, 6S, and 6."
    *See* Natt Garun, *Apple will no longer reveal how many iPhones, iPads, and Macs it sells*, The
28  Verge.com (Nov. 1, 2018 5:54 PM), https://tinyurl.com/y7unwykf.

[Maestri:] [S]tarting with the December quarter, we will no longer be providing unit sales data for iPhone, iPad and Mac. As we have stated many times, our objective is to make great products and services that enrich people's lives and to provide an unparalleled customer experience so that our users are highly satisfied, loyal and engaged. As we accomplish these objectives, strong financial results follow.

As demonstrated by our financial performance in recent years, the number of units sold in any 90-day period is not necessarily representative of the underlying strength of our business. Furthermore, our unit of sale is less relevant for us today than it was in the past given the breadth of our portfolio and the wider sales price dispersion within any given product line.

59. Questioned by one analyst whether the reason for withholding iPhone unit data was because "iPhone units are going to start going negative" and Defendants would prefer to "not show the details of things that are not going so great," both Maestri and Cook rejected the suggestion of such motivation and insisted that the 1Q19 revenue and profit margin guidance being provided was all investors should focus on, and that demand was still strong for Apple's more expensive iPhone offerings. Defendants stated in pertinent part:

[Analyst]: [A]nd then for Luca, there'd probably be a lot of pushback about not giving iPhone unit data. It sounds like you're still going to give revenue data if I heard that correctly. But some people may fear that this now means that the iPhone units are going to start going negative year-over-year because it's easy to talk about great things and not show the details of things that aren't so great.

\* \* \*

[Maestri:] Given the rationale on why we do not believe that providing unit sales is particularly relevant for our company at this point, I can reassure you that it is our objective to grow unit sales for every product category that we have. But as I said earlier, a unit of sale is less relevant today than it was in the past. To give you an example, the unit sales of iPhone at the top end of the line have been very strong during the September quarter. And that's very important because we are attracting customers to the most recent technologies and features and innovation that we bring into the lineup, but you don't necessarily see that in the number that is reported. And so therefore, we will – as I said, we'll provide the qualitative commentary when it is important and relevant, but at the end of the day, we make our decisions to – from a financial standpoint, to try and optimize our revenue and our gross margin dollars. And that, we think, is the focus that is in the best interest of our investors.

[Cook:] Jim, let me just add a couple things to that for color. Our installed base is growing at double digit, and so there's no – and that's probably a much more significant metric for us from an ecosystem point of view and customer loyalty, et cetera. The second thing is this is a little bit like if you go to the market and you push your cart up to the cashier and she says or he says, "How many units you have in there?", it sort of – it doesn't matter a lot how many units there are in there in terms of the overall value of what's in the cart.

60.     Following the Company's November 1, 2018 earnings release and conference call, several securities analysts issued reports indicating that the 4Q18 financial results and Defendants' commentary had been favorably received by investors.  Despite the reported slowing and uncertain economic conditions, analysts reported that Apple was continuing to experience strong demand trends in Greater China – particularly for the iPhones – and the uncertainty in emerging markets was not affecting Greater China.  Analysts also appeared to accept Apple's reasoning for withholding unit sales.

61.     On November 1, 2018, Canaccord Genuity issued a report titled "Solid Q4/F18; long-term positive thesis intact – reiterate BUY and $250 PT" emphasizing that solid demand trends existed for the iPhone XS, XS Max, and XR and Apple's installed base would drive earnings:

> We believe Apple continues to grow its leading market share of the premium-tier smartphone market with double-digit growth of its installed base and believe the iPhone installed base of new iPhone consumers will exceed 700M exiting C2018. ***This impressive installed base should drive strong iPhone replacement sales and earnings***, as well as cash flow generation to fund strong long-term capital returns. We maintain our BUY rating and $250 price target.
>
> . . . ***We believe demand trends are solid for the three new iPhone models and anticipate strong ASPs and margin trends for the iPhone franchise going forward***.

62.     On November 2, 2018, Argus issued a report titled "Analyst's Notes," consistent with Defendants' statements that the Company's performance in China was strong, and that Apple's business in China was being driven by "high-end appetite" for the iPhones:

> Geographically, Apple delivered double-digit annual revenue growth in every region. The best growth came in Japan (8% of revenue) where sales grew over 30%. Americas revenue (44% of total) was up 19% annually.  Revenue in Europe (25% of total) grew at an 18% rate.  Despite mounting concerns over tariffs, ***Apple's China business continues to recover, based on high-end appetite for the new phones; China revenue rose 16%***.
>
> *            *            *
>
> We also believe the ***wide range of price points enhances Apple's ability to compete in emerging and frontier markets and in China***, where the iPhone in recent years has lost ground to high-quality, low-price rivals such as Xiaomi and Oppo.

63.     On November 2, 2018, J.P. Morgan issued a report titled "Growth Fundamentals Intact, Despite Softer Revenue Guide on FX Headwind and Conservatism Related to Macro Risks" reflecting Defendants' representations that in China, Apple was not seeing the negative effects

occurring in emerging markets.  Rather, analysts reported, consistent with the impressions given by the Company, that Apple continued to see solid growth in China:

> While we believe that there is not much of a shortfall relative to guidance when it comes to F1Q, it is important to remember that the firm has to navigate and execute amidst higher macro risks, particularly as relates to a softer outlook for emerging market growth, weakening EM currencies necessitating price increases, as well as softening consumer confidence in that backdrop.  For example, ***Apple cited pressures in emerging markets including Turkey, Brazil, India and Russia*** and challenges in growth following price increases.
>
> ***Separately, while Apple continues to see solid growth in EM countries like China (+16% y/y in F4Q)***, it is facing regulatory hurdles relative to growth for the App Store.

64.    On November 2, 2018, *Wedbush* issued a report titled "Cook Pulls the Plug on Metrics in a Houdini Like Move; Bullish Thesis Unchanged" noting that Apple beat street estimates, but "slightly missed iPhone unit shipments."  The report stated that the iPhone XS and XR product cycle was "the linchpin of the Apple story for FY19."

> Last night Apple delivered FY4Q (Sept.) results which beat the Street from a headline number but slightly missed iPhone unit shipments which was the focus of investors.  However the quarter itself took a back seat to the modestly softer December guidance that Cook & Co. gave on the heels of its ***much anticipated XS/XR iPhone product cycle which remains the linchpin of the Apple story for FY19***.  That said, the "jaw dropper" last night was when Apple announced it will stop providing units/ASPs for iPhones, Macs and its other product lines. . . .
>
> ***As explained on the conference call we understand the logic of not providing these metrics anymore given that ASPs are all over the map and a slew of new smartphone releases has catalyzed Apple to focus more on overall segment revenue rather than myopic quarterly unit sales***.  However, the skeptics will point to Apple doing this right at the critical juncture where higher ASPs are making up for slower unit sales which remains the worry and the stock will get hit accordingly this morning.  That said, . . . ***our core bull thesis does not change on the story and to some extent is emboldened by the ~$800 ASP story*** and a robust services business poised to hit $50 billion+ in FY20. . . .  While last night's "Houdini-like metrics move" was a stunner, our core bullish thesis on Apple remains unchanged despite the noise this morning.  ***We maintain our OUTPERFORM rating and $310 price target***.

65.    While Apple's revenue guidance range for 1Q19 provided on November 1, 2018, was below what the market expected, Defendants' materially false and misleading statements and omissions served to prop up the market price of Apple stock which continued to trade at artificially inflated levels as high as $213.65 on November 2, 2018.

66.     Each of Defendants' statements set forth in ¶¶56-57 concerning: (i) the purported successful launch of, and status of demand for, the newly released iPhone XS, XS Max, and XR; and (ii) the current state of Apple's business in Greater China and the impact of macroeconomic trends on the Company's sales in Greater China, was materially false and misleading when made as Defendants knew or deliberately disregarded and failed to disclose the following true facts:

(a)     that the U.S.-China trade tensions and economic conditions in China were negatively impacting sales and demand for Apple products, particularly iPhones;

(b)     the Company had already begun to see declining traffic in Apple's retail stores and those of its channel partner stores in Greater China, and reports of an overall contraction of the smartphone industry; and

(c)     the Company had already, or was preparing to, cut iPhone production at multiple manufacturers and reduce orders from its largest suppliers of iPhone components for the current quarter and holiday season.[11]

67.     In addition to the undisclosed facts stated above, the Company knew or deliberately disregarded that unit sales for iPhones and other hardware was relevant to investors and the Company's financial performance, and withholding such unit sales would mask declines in unit sales of the Company's flagship product.

## B.     Reports Emerge from China that Apple Slashed iPhone Production by 100,000 Units per Day

68.     On November 5, 2018, before the market opened, the *Nikkei Asian Review* published the Nikkei Article reporting that Apple told its top smartphone manufacturers, Foxconn and Pegatron, to "halt plans for additional production lines" reducing daily iPhone production by

---

[11]     In addition to: (i) the critical importance of sales in China; (ii) the temporal proximity of the relevant disclosures to the November 1, 2018 misrepresentations; (iii) the abrupt stoppage of reporting iPhone unit sales; and (iv) Defendants' admissions on January 2-3, 2019, the June 2, 2020 Order referenced in a footnote, news reports and confidential witness ("CW") accounts, both indicating that iPhone sales and preorders were weaker than expected. *Id.* at 41 n.15. However, the June 2, 2020 Order did not cite any CW allegations when assessing the falsity of the November 1, 2018 statements (*Id.* at 24), and specifically concluded that the CW allegations did not support scienter (*Id.* at. 37). Accordingly, consistent with the June 2, 2020 Order, the Revised Consolidated Complaint does not rely on the accounts of the CWs.

1    100,000 units, and standby producer Wistron was informed it would receive no orders for the

2    holiday season.  Specifically, the article stated:

3          ***Apple has signaled disappointing demand for the new iPhone XR, telling its
          top smartphone assemblers Foxconn and Pegatron to halt plans for additional
          production lines*** dedicated to the relatively cost-effective model that hit shelves in
4          late October, sources say.

5          "For the Foxconn side, it first prepared nearly 60 assembly lines for Apple's
6          XR model, but recently uses only around 45 production lines as its top customer said
          it does not need to manufacture that many by now," a source familiar with the
7          situation said.

8          That means Foxconn, the Taiwanese company traded as Hon Hai Precision
          Industry, would ***produce around 100,000 fewer units daily to reflect the new
9          demand outlook – down 20% to 25% from the original optimistic outlook***, this
          person said.

10
          Fellow Taiwanese manufacturer Pegatron faces a similar situation,
11          suspending plans to ramp up production and awaiting further instructions from
          Apple, a supply chain source said.

12                               *       *       *

13
          Apple also had asked smaller iPhone assembler Wistron to stand by for rush
14          orders, ***but supply chain sources say the company will receive no orders for the
          iPhone XR this holiday season***.

15
16    69.    On the same day, RBC Capital Market issued a report titled "10-K Review: High Off-

17    balance Sheet Commitments Indicating Multiple Ramps" stating Apple's production suspensions

18    described in the Nikkei Article could indicate "muted" iPhone demand:

19          ***News Reports of Supply Chain Cuts***: An unconfirmed Nikkei [Article] stated
          that AAPL has asked supply chain partners Foxconn and Pegatron to stop preparing
20          additional production lines for iPhone XR.  While ***this could indicate muted unit
          demand***, we note that similar reports have been seen in past product cycles and
21          AAPL has managed to navigate those relatively well, partially through ASP uplift.
          However, ***investors are likely to remain cautious about supply chain data points
22          intra-quarter***.

23    70.    Also on the same day, November 5, 2018, *Barron's* published an article titled "Apple

24    Stock Is Tanking Amid Questions About Demand for the iPhone XR" discussing the impact of the

25    Nikkei Article and reiterated the expected reduction in demand by 20-25%:

26          The Nikkei Asian Review, citing an unnamed person familiar with the matter,
          reported on Monday that Foxconn initially prepared to have almost 60 assembly lines
27          for the iPhone XR, but is now using only around 45 lines because Apple said it didn't
          need the extra production.  The new outlook for demand for the iPhone XR is down
28          20% to 25% from the original, more optimistic level, according to Nikkei Asian
          Review.

*Apple stock was down almost 4% in Monday morning trading, to about $199 per share, representing a loss in market capitalization of about $40 billion*.

71.     Similarly on the same day, November 5, 2018, *Reuters* published an article titled "US STOCKS-Oil stocks lift S&P 500; Apple pushes Nasdaq lower" which reported that:

*\*Apple falls on report of iPhone XR production stand down*.

\*       \*       \*

The iPhone maker's shares fell 3.7 percent to a 3-month low after a Nikkei report that the company had told its smartphone assemblers to halt plans for additional production lines dedicated to the iPhone XR.

72.     In addition on the same day, November 5, 2018, *RTT News* published an article titled "Apple Climbs Off Worst Levels But Remains Notably Lower" reporting that:

Shares of Apple Inc. (AAPL) have climbed off their worst levels of the day but remain firmly in negative territory in afternoon trading on Monday. After hitting a three-month intraday low, Apple is currently down by 3 percent.

*Apple initially extended the sell-off seen in the previous session after a report from Japan's Nikkei newspaper said demand for the company's iPhone XR appears to be disappointing*.

73.     In response to the news concerning production cuts at Apple's supply chain partners and the potential negative implications for iPhone demand, Apple's stock price declined $5.89 from a close of $207.48 per share on November 2, 2019, to a close of $201.59 per share on November 5, 2018, but continued to trade at artificially inflated prices.

74.     On November 12, 2018, Wells Fargo issued a report titled "AAPL: Lumentum Cuts Revenue Outlook by 17%+ (Midpoint) on Apple Order Cuts" following a negative preannouncement made by one of Apple's key iPhone suppliers, Lumentum.  The Wells Fargo report stated that Lumentum had received a request from one of its largest customers – presumed to be Apple, which accounted for 30% of Lumentum's revenues – to materially reduce shipments during the quarter. The report concluded that investors could infer *as much as a 30% reduction* in orders by Apple:

News: *Apple shares are under pressure this morning* (11/12) following a negative preannouncement by key supplier, Lumentum (LITE).  Lumentum is a provider of 3D sensing solutions (VCSELs and edge emitting lasers) for mobile devices – most notably Apple's iPhone. *Lumentum has disclosed that Apple accounted for ~30% of total revenue in the company's recent FY ending June 2018*.  We would also note that Lumentum's 10-Q disclosures highlight that *Customer A* (presumably Apple) accounted for 30.5% of total revenue in the September quarter – compared to 19.4% and 16.3% of total revenue in the prior and

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 4:19-cv-02033-YGR
4839-0622-0480.v1-6/23/20

- 23 -

year ago quarters, respectively.  *Customer A* accounted for 49.8% of Lumentum's December 2017 quarter revenue.

Lumentum's preannouncement notes that the company has ". . . ***recently received a request from one of our largest Industrial and Consumer customers for laser diodes for 3D sensing to materially reduce shipments to them during our fiscal second quarter for previously placed orders that were originally scheduled for delivery during the quarter.***"  The company has updated its F2Q19 revenue guide from $405-$430M to $335-$355M – a 17%+ reduction at the guide midpoint. ***We think investors could consider Lumentum's updated guide as reflecting as much as a 30% cut in Apple orders***.

75.     Following the November 12, 2018 disclosures, Apple's stock price declined $9.83 from a close of $204.47 per share on Friday, November 9, 2018, to a close of $194.17 per share on Monday, November 12, 2018, on high trading volume, but Apple's stock price continued to trade at artificially inflated prices.

76.     On November 14, 2108, Guggenheim issued a report titled "AAPL – Downgrade to NEUTRAL as ASPs No Longer Enough" which downgraded Apple stock from "Buy" to "Neutral" under the view that iPhone unit sales would drop substantially in FY19, in part based upon the negative earnings and order reductions announced by suppliers like Lumentum.  The report stated, in pertinent part:

Following early supply-chain cuts, exemplified by Corning's (GLW) softer Q4E Gorilla Glass guide back in Oct, ***and now 3D sensing laser supplier Lumentum (LITE)*** and LCD supplier Japan Display (6740-TKS) ***both warning just this week***, we now estimate iPhone units -5%Y/Y in FY19E vs. flat Y/Y in FY18, BUT unlike last year do NOT see ASP increases providing enough offset, with our forecast that blended iPhone ASPs increase only +3%Y/Y, leaving iPhone revenues -2%Y/Y. ***Moreover, we see growing risk of even softer iPhone unit demand, with downside in China***, India and other emerging markets, where Apple may need to start considering lower price points.

77.     As the negative news continued to enter the market, Apple's stock price declined from a close of $192.23 per share on November 13, 2018, to a close of $186.80 per share on November 14, 2018, a decline of $5.43 on more than 60.8 million shares traded.

78.     On December 4, 2018, at approximately 1:00 a.m. PST, *Bloomberg* published an article titled "Apple Resorts to Promo Deals, Trade-Ins to Boost iPhone Sales."  The article reported that in ***October 2018***, shortly after the iPhone XS and XS Max went on sale and again around the launch of the iPhone XR, Apple shifted marketing staff to "work on bolstering sales of the latest handsets," in what was described as a "'fire drill'" response to poor iPhone sales.  The report also

identified Greg Joswiak, an Apple executive, as speaking with CNET and specifically stating that the

iPhone XR was the Company's best-selling iPhone, hoping to quell investor concerns about weak

sales:

> Apple Inc. is experimenting with iPhone marketing strategies it rarely uses – such as discount promotions via generous device buyback terms – to help goose sales of its flagship product.
>
> ***Company executives moved some marketing staff from other projects to work on bolstering sales of the latest handsets in October, about a month after the iPhone XS went on sale and in the days around the launch of the iPhone XR, according to a person familiar with the situation. This person described it as a "fire drill," and a possible admission that the devices may have been selling below some expectations***. The person asked not to be identified discussing private strategy changes.
>
> Since then, Apple has embarked on a series of aggressive trade-in offers that have temporarily reduced the cost of some of its latest iPhones, a rare step for a company that's been raising device prices in recent years to lift revenue and profit. Apple spokeswoman Trudy Muller declined to comment.
>
> On Sunday evening, Apple kicked these efforts into high gear, adding a new banner to the top of its website advertising the iPhone XR for $449, $300 less than its official sticker price. The deal, noted with an asterisk and described at the bottom of the page, requires customers to trade in an iPhone 7 Plus, a high-end handset from two years ago.

*      *      *

> Apple marketing executive Greg Joswiak tried to quell concern about sales by telling CNET last week that the iPhone XR has been the company's best seller since it went on sale at the end of October.

79.     On December 4, 2018, Apple's stock price declined from a close of $184.82 per share

on December 3, 2018, to a close of $176.69 per share on December 4, 2018, but continued to trade at

artificially inflated prices.

80.     On December 6, 2018, *Forbes* published an article titled "Why 40% iPhone Discount

is Bad For Apple" reiterating many of the points in the December 4, 2018 *Bloomberg* article, and

adding that the price reduction would have substantial impact on the Company's gross margin,

concluding that slashing hardware costs was "strategic suicide" for the Company:

> Apple's iPhone X[R] bill of materials cost is $390, according to IHS Markit – so reducing the price from $749 to $449 sends its gross margin plummeting from 48% to 13%.

*      *      *

1
2

> ***In the meantime, taking 40% of [sic] the iPhone price is strategic suicide for a company that has defined its strategy for its entire history as the high-priced spread***.

3      81.    On December 6, 2018, Apple's stock price declined from a close of $176.69 per share

4    on December 4, 2018, to a close of $174.72 per share on December 6, 2018, but continued to trade at

5    artificially inflated prices.

6    **C.    Apple Discloses True Financial Condition, Pre-Announces Huge Quarterly Earnings Miss**

7

8      82.    On January 2, 2019, after the close of trading, Apple disclosed its true financial

9    condition.  For the first time in more than 15 years, Apple pre-announced its earnings results,

10   slashing quarterly revenue forecast for 1Q19, ended December 29, 2018, due to plummeting iPhone

11   demand, particularly in China.  In a "Letter from Tim Cook to Apple Investors," Apple reported that

12   its revenue for 1Q19 was approximately $84 billion, far below the guidance range of $89 billion to

13   $93 billion the Company had announced on November 1, 2018, just eight weeks earlier.  In contrast

14   to the November 1, 2018 assurances that business in China remained strong and was not

15   experiencing economic uncertainty or deterioration like certain emerging markets, Cook's letter

16   admitted that the Company's guidance miss was due almost entirely to slowing iPhone sales in

17   China.  In fact, "***most***" of the total revenue shortfall occurred in China, "***over 100 percent***" of the

18   quarter-over-quarter worldwide revenue decline occurred in China, and iPhone revenue "***primarily***"

19   in China accounted for ***all*** of the Company's iPhone revenue shortfall against guidance:

20   **Emerging Market Challenges**

21   > While we anticipated some challenges in key emerging markets, ***we did not foresee the magnitude of the economic deceleration, particularly in Greater China. In fact, most of our revenue shortfall to our guidance, and over 100 percent of our year-over-year worldwide revenue decline, occurred in Greater China*** across iPhone, Mac and iPad.

22
23

> ***China's economy began to slow in the second half of 2018***.  The government-reported GDP growth during the September quarter was the second lowest in the last 25 years.  We believe the economic environment in China has been further impacted by rising trade tensions with the United States.  As the climate of mounting uncertainty weighed on financial markets, the effects appeared to reach consumers as well, with traffic to our retail stores and our channel partners in China declining as the quarter progressed. And ***market data has shown that the contraction in Greater China's smartphone market has been particularly sharp***.

24
25
26
27

28              *       *       *

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS - 4:19-cv-02033-YGR                                                    - 26 -
4839-0622-0480.v1-6/23/20

**iPhone**

Lower than anticipated iPhone revenue, ***primarily in Greater China, accounts for all of our revenue shortfall to our guidance and for much more than our entire year-over-year revenue decline***. In fact, categories outside of iPhone (Services, Mac, iPad, Wearables/Home/Accessories) combined to grow almost 19 percent year-over-year.

***While Greater China and other emerging markets accounted for the vast majority of the year-over-year iPhone revenue decline***, in some developed markets, iPhone upgrades also were not as strong as we thought they would be. While macroeconomic challenges in some markets were a key contributor to this trend, we believe there are other factors broadly impacting our iPhone performance, including consumers adapting to a world with fewer carrier subsidies, US dollar strength-related price increases, and some customers taking advantage of significantly reduced pricing for iPhone battery replacements.

83.     Though Apple did not conduct a conference call on January 2, 2019, Cook appeared on CNBC that evening for an interview. In the context of "rising trade tensions," Cook discussed the impact that the slowing economy had on the Company's FY19 sales. Cook admitted Defendants' contemporaneous knowledge of facts directly contradicting their November 1, 2018 statement that China was not experiencing the macroeconomic issues plaguing other emerging markets. In fact, according to Cook, it was clear during the second half of 2018, that China's slowing economy was impacting the Company and prior to, and during the Class Period, Defendants "***saw***" declines in the Company's retail store traffic and its channel partner store traffic, and reports of contraction in the smartphone industry:

[A]s we look at what's going on in China – ***it's clear that the economy begins to slow there for the second half***. And what I believe to be the case is the trade tensions between the United States and China put additional pressure on their economy. . . .

***[W]e saw, as the quarter went on, things like traffic in our retail stores, traffic in our channel partner stores, the reports of the smartphone industry contracting, particularly bad in November*** – I haven't seen the December number yet, but I would guess that would not be good either. And so that's what we've seen.

*          *          *

***[M]y sense is the much larger issue is the slowing of the economy and then this – the trade tension that's further pressured***.

84.     In the wake of Apple's earnings preannouncement, a slew of analysts and media outlets expressed shock at the magnitude and severity of the Company's negative performance in

China – which accounted for the entire guidance miss – and commented that Defendants had failed to be honest with investors, damaging their credibility.

85.   On January 2, 2019, Wells Fargo issued a report titled "AAPL: Neg. F1Q19 Prean[nouncement] – iPhone Rev[enue] -15%+ Y/Y; A Multi-Quarter Challenge" which reiterated Defendants' statements that poor performance in China was the driver of the earnings miss:

> APPLE <u>NEGATIVELY</u> PREANNOUCNES [sic] F1Q19 RESULTS; MORE THAN A ONE QUARTER ISSUE: Apple has preannounced negative F1Q19 results – revenue now estimated at ~$84B vs. initial $89-$93B guide. . . .
>
> *Apple's greater-than-expected weakness in emerging markets, most notably driven by weakness in Greater China.*
>
> *Apple notes that over 100% of Apple's y/y revenue decline was generated by weakness in Greater China across iPhone, iPad, and Mac (leaving us / investors to question the impact of the US-China trade situation).*

86.   The same day, *Bloomberg* published an article titled, "Apple's iPhone Warning Comes Years Too Late – The company has reached the end of its denial phase." The article emphasized that Apple and Cook had consistently assured investors business in China was strong and did not give any hints of red flags in the region:

> In an extraordinary letter to Apple investors, CEO Tim Cook also told stockholders what he should have been saying for years: The company's iPhone business has shifted into a lower gear because of changes in the smartphone market and consumer behavior. This should have been absolutely predictable to anyone who was able to peer outside of Apple's bubble. *Executives have failed in their duty to warn investors ahead of time about all this, and reality is finally and all at once catching up to Apple.*
>
> In his letter, Cook said in some established markets *outside of China*, iPhone "upgrades also were not as strong as we thought they would be." (Upgrades are people with older-model iPhones opting to buy new models.)
>
>                   *            *            *
>
> *Cook said two months ago that Apple's China business was "very strong," even amid signs of an economic slowdown and months of headlines about trade tensions with the U.S.* He consistently told investors that he thought the U.S. and China would resolve their trade dispute amicably and didn't give any indications that consumers were on edge or reluctant to shop because of the geopolitical fracas. It's possible that the last couple of months of economic circumstances in China, Taiwan and Hong Kong caught Apple by surprise, *but executives failed to give any hints of red flags in the region.*
>
> It's possible conditions in China changed quickly, but the broader trends in smartphone activity are not new. Why didn't Cook make any of these admissions before now?

1                                    *      *      *

2          ***Apple failed in the No. 1 mission of being a public company: being honest
      with investors about its business***.  The company simply denied the reality that was
3     staring it in the face, until denial was no longer an option.

4          87.     On January 3, 2019, Wedbush issued a report titled "Apple's Darkest Day in the

5     iPhone Era; Massive Negative Dec Results on China" in which it referred to the preannouncement

6     variously as "Apple's Darkest Day," a "bombshell," a "'black eye,'" and a "defining moment for

7     Cook & Co."  The report stated in relevant part:

8               Last night Apple delivered a ***bombshell negative preannouncement that will
          be a defining moment for Cook & Co. for years to come***.  While the Street had been
9         anticipating softness in the December quarter and around March guidance given a
          slew of negative iPhone XS/XR data points coming out of the Asia supply chain over
10        the past few months, ***the magnitude of the top-line miss (~8%) with China demand
          the culprit was jaw dropping in our opinion and will heavily weigh on shares
11        accordingly***. . . .

12        While emerging markets and US/Europe remain softer than expected, ***China remains
          Apple's Achilles heel*** as with roughly 20% of all iPhones in a window of an upgrade
13        opportunity out of the China region it appears of the 60 million to 70 million in the
          region less than 20 million have upgraded to an X/XS/XR to date.
14
15         88.     On January 3, 2019, Morgan Stanley issued a report titled "Weak China More than

16    Offsets Revenue Strength Outside of iPhone; Lowering Estimates" which stated that this was the

17    Company's first negative preannouncement in 15 years and reduced FY19 iPhone sales estimates by

      17%:
18
19              ***Weak Greater China iPhone sales largely to blame for Apple's first
          negative preannouncement in 15 years***.  As we highlighted in early December,
20        China is following in the footsteps of the US market with lengthening smartphone
          replacement cycles slowing overall market growth.   A weakening economy
21        combined with improved smartphone product quality (i.e. higher quality components
          and assembly leading to longer useful lives), smartphone ASPs that are up 22% over
22        the past two years (per IDC) and a lack of carrier subsidies contributed to weaker
          China iPhone sales in the December quarter.
23
           89.     On January 3, 2019, *Yahoo! Finance* published an article titled "Apple's mind-
24
      blowing warning means CEO Tim Cook now has a major credibility problem," stating that Apple
25
      did a "poor job" with 1Q19 guidance and investors would be questioning whether to trust Apple
26
      management.  The article reported in relevant part:
27
                ***They failed to keep it real with investors on what they were seeing in iPhone
28        demand data late in 2018.  Simply no longer providing unit sales data wasn't
          enough of a signal to investors that something was wrong, bottom line***.

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS - 4:19-cv-02033-YGR                                                    - 29 -
4839-0622-0480.v1-6/23/20

*As a result, Apple's stock could be "broken" until credibility is restored*.

\* \* \*

**A poor job done with guidance**.

Apple said in a filing released after market close Wednesday that it now sees first quarter revenue of about $84 billion. It previously anticipated $89 billion to $91 billion. In the filing, ***Cook attributed the reduced guidance to weakness in emerging markets and in Greater China as well as supply constraints on new products***. Cook also hinted strongly that Apple felt resistance from consumers to the new $1,000 plus iPhone XS line.

90. On January 3, 2019, *The Wall Street Journal* published an article titled "Apple iPhone Loses Ground to China's Homegrown Rivals" which stated that Apple was "sputtering" in China and noted that Apple's Chinese competitors had been able to "win over consumers by offering similar designs and features at far lower prices." The article reported that Apple had overestimated demand in China for the iPhone XR in particular, winding up with excess inventory, noting that a comparable phone from Huawei was approximately two-thirds the price.

91. On January 3, 2019, *BBC News* published an article titled "Apple's China warning 'deflects deeper problems' for firm," which reported that Apple had been buoying revenues in China in recent years by raising prices. However, given the general downward macroeconomic trend in China, that practice "has become more difficult as consumers curb spending."

92. On this news, Apple's stock price declined precipitously by more than $15 per share, or approximately 10%, from a close of $157.92 per share on January 2, 2019, to a close of $142.19 per share on January 3, 2019, on unusually high volume of more than 91.1 million shares traded, the highest one-day trading volume experienced by the Company in nearly two years.

**D.    Post Class Period, Further Details of the iPhone's Poor China Performance Emerge**

93. On January 6, 2019, *The Guardian* published an article titled "To woo China, Apple must learn that it's not in California anymore," noting the myriad issues Apple faced in China throughout the Class Period, including a lack of innovation and high prices relative to its competitors. Despite these difficulties, Apple continually assured the market that all was well. Further, the article discussed that Apple's service revenues were "overwhelmingly reli[ant] on the iPhone as the conduit," and that Apple "must seek to extend sales as much as possible," noting that

1   iPhone sales were "critical for [Apple] to maintain its current 1.3-billion-plus user base if services

2   are to become the main driver of revenue."

3       94.     On January 14, 2019, Wedbush issued a report titled "Price Cuts in China and

4   Content M&A Will Lay the Groundwork for Apple's Future" which discussed the reasons for the

5   poor performance of the iPhone XS, XS Max, and XR in China:

6          **China installed base is key for success going forward**.  However if the
           installed base declines in China, Apple will face an uphill battle in the region for
7          years and thus speaks to challenges worldwide around this latest upgrade cycle with
           the main culprit being weak China demand. . . .  The next trifecta of smartphones
8          coming out of Apple slated for September 2019 will be another attempt to catalyze
           pent-up upgrades worldwide and especially in China, with many customers
9          approaching 32-33 months since their last iPhone upgrade as high price points,
           battery replacements, and a lack of hardware innovation has kept customers on the
10         sideline during this latest XS/XR cycle.

11      95.     On January 29, 2019, Apple released its results for 1Q19, ended December 29, 2018.

12  That same day, during the conference call held with analysts and investors, Cook again attributed the

13  drop in iPhone sales to weak macroeconomic conditions, especially in China.  Specifically, 100% of

14  the Company's worldwide year-over-year revenue decline was driven by poor performance in

15  Greater China.  Cook stated in pertinent part:

16         [Cook:] As you know, our December quarter revenue was below our original
           expectations coming in at $84.3 billion.  That's down 5% from a year ago or down
17         3% adjusting for foreign exchange.  We noted 4 factors that would impact our results
           when we provided guidance in November: different iPhone launch timing from a
18         year ago, FX headwinds, supply constraints on certain products and macroeconomic
           conditions in emerging markets.

19
           One of those factors, *weak macro conditions in some emerging markets, was*
20         *significantly more severe than we originally foresaw, especially in Greater China*.
           As our letter noted, that challenge was compounded by quarterly iPhone upgrades
21         that were lower than we anticipated.  We'll return to upgrades in a moment, but *I*
           *first want to say a bit more about our business in Greater China.  Our revenue*
22         *there was down by $4.8 billion from last year with declines across iPhone, Mac and*
           *iPad.  Most of the shortfall relative to our original guidance and over 100% of our*
23         *worldwide year-over-year revenue decline was driven by our performance in*
           *Greater China*.
24
                            *       *       *
25
           Now our customers are holding on to their older iPhones a bit longer than in
26         the past.  When you pair this with the macroeconomic factors, particularly in
           emerging markets, it resulted in iPhone revenue that was down 15% from last year.
27         Our iPhone results accounted for significantly more than our entire year-over-year
           revenue decline. In fact, outside of iPhone, our business grew strongly by 19%.
28

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS - 4:19-cv-02033-YGR                                                      - 31 -
4839-0622-0480.v1-6/23/20

96.     Maestri noted that iPhone revenues declined 15% year-over-year and were not expected to rebound in the 2Q19.  Maestri stated, in pertinent part:

> [Maestri:] iPhone revenue was $52 billion.  On a geographic basis, most of the decline from last year came from Greater China and other emerging markets, where difficult macro and foreign exchange conditions affected our results.  We also believe that the reduction of carrier subsidies and our battery replacement program had an impact in a number of countries around the world.  And as Tim mentioned, we had a lower number of upgrades than we had anticipated at the beginning of the quarter.

*     *     *

> [W]e expect that the key factors that Tim mentioned during the call affecting iPhone performance in Q1 will also have an effect on Q2 starting with the strong U.S. dollar environment.  On a year-over-year basis, the negative impact from currency is going to be about $1.3 billion, so that's about – a bit more than 2 points versus last year's revenue. And so that obviously plays a role.  And the macroeconomic environment, particularly in emerging markets, will continue to be there.  On the positive side, we expect that we will continue to grow revenue nicely from the rest of the business, which is not iPhone.

## VII.    LOSS CAUSATION/ECONOMIC LOSS

97.     As detailed herein, the Company issued materially false and misleading statements and omissions concerning positive sales of the latest iPhone models and the strength of the Company's business in China.  *See* ¶¶56-57.  These material misrepresentations and omissions caused Apple's stock price to trade at artificially inflated prices throughout the Class Period, including a Class Period high of $213.65 per share on November 2, 2018.  When the truth regarding Defendants' misrepresentations and omissions became generally known, the price declined as the artificial inflation dissipated and Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.  These disclosures of the truth include, but are not limited to, the following:

98.     On November 5, 2018, at 4:27 a.m. ET, before the market opened, the *Nikkei Asian Review* published the Nikkei Article reporting that Apple told its top smartphone assemblers, Foxconn and Pegatron, to reduce iPhone XR production, and that Wistron, previously on standby for rush orders, would receive none, indicating a reduction in demand by 20-25%:

> "For the Foxconn side, it first prepared nearly 60 assembly lines for Apple's XR model, but recently uses only around 45 production lines as its top customer said it does not need to manufacture that many by now," a source familiar with the situation said.

1
2

That means Foxconn . . . would **produce around 100,000 fewer units daily to reflect the new demand outlook – down 20% to 25% from the original optimistic outlook**, this person said.

3
4

Fellow Taiwanese manufacturer Pegatron faces a similar situation, **suspending plans to ramp up production and awaiting further instructions from Apple**, a supply chain source said.

5

*       *       *

6
7

Apple also had asked smaller iPhone assembler Wistron to stand by for rush orders, but supply chain sources say the company will receive **no orders** for the iPhone XR this holiday season.

8

*See* ¶68.

9

99.     On the same day, RBC Capital Market issued a report titled "10-K Review: High Off-

10

balance Sheet Commitments Indicating Multiple Ramps" stating Apple's production suspensions

11

could indicate "muted" iPhone demand:

12
13

**News Reports of Supply Chain Cuts**: An unconfirmed Nikkei [Article] stated that AAPL has asked supply chain partners Foxconn and Pegatron to stop preparing additional production lines for iPhone XR.  **While this could indicate muted unit demand** . . . .

14

*See* ¶69.

15

100.    On November 5, 2018, *Barron's* published an article at 10:09 a.m. ET titled "Apple

16

Stock Is Tanking Amid Questions About Demand for the iPhone XR" discussing the impact of the

17

Nikkei Article which reiterated the expected reduction in demand by 20-25%:

18
19

The new outlook for demand for the iPhone XR is down 20% to 25% from the original, more optimistic level, according to Nikkei Asian Review.

20
21

**Apple stock was down almost 4% in Monday morning trading, to about $199 per share, representing a loss in market capitalization of about $40 billion**. Apple didn't immediately respond to an email request for comment.

22

*See* ¶70.

23

101.    On November 5, 2018, *Reuters* published an article titled "US STOCKS-Oil stocks

24

lift S&P 500; Apple pushes Nasdaq lower" reporting that the Company's stock price was declining

25

because of disclosures in the Nikkei Article:

26

***Apple falls on report of iPhone XR production stand down***.

27
28

The iPhone maker's shares fell 3.7 percent to a 3-month low after a Nikkei report that the company had told its smartphone assemblers to halt plans for additional production lines dedicated to the iPhone XR.

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS - 4:19-cv-02033-YGR

- 33 -

4839-0622-0480.v1-6/23/20

1    *See* ¶71.

2        102.    As a result of this new information concerning production cuts at Apple

3    manufacturers, and reports reiterating the news, Apple's stock price declined from a close of $207.48

4    per share on November 2, 2018, to a close of $201.59 per share on November 5, 2018, a decline of

5    $5.89 on more than 66.1 million shares traded.  However, the Company's stock price continued to

6    trade at artificially inflated prices as the truth concerning the Company's financial condition was yet

7    to be fully revealed.

8        103.    On November 12, 2018, Wells Fargo issued a report titled "AAPL: Lumentum Cuts

9    Revenue Outlook by 17%+ (Midpoint) on Apple Order Cuts."  Lumentum, a supplier of iPhone

10   components, issued a negative preannouncement due to a reduction by one of its largest customers –

11   identified as Apple.  The report inferred that the reduction in Lumentum earnings indicated a 30%

12   reduction in Apple orders and Apple's stock price would be "under pressure" – *i.e.*, decline – as a

13   result:

14       ***Apple shares are under pressure this morning (11/12) following a negative***
         ***preannouncement by key supplier, Lumentum (LITE).***

15                               *    *    *

16
17       Lumentum's preannouncement notes that the company has ". . . recently
         received a request from one of our largest Industrial and Consumer customers for
         laser diodes for 3D sensing to ***materially reduce shipments to them during our***
18       ***fiscal second quarter for previously placed orders that were originally scheduled***
         ***for delivery during the quarter.***" . . . We think investors could consider Lumentum's
19       updated guide as reflecting ***as much as a 30% cut in Apple orders.***

20   *See* ¶74.

21       104.    As a result of this new information, Apple's stock price declined from a close of

22   $204.47 per share on November 9, 2018, to a close of $194.17 per share on November 12, 2018, a

23   decline of $10.30 on more than 51.1 million shares traded.  However, the Company's stock price

24   continued to trade at artificially inflated prices as the truth concerning the Company's financial

25   condition was yet to be fully revealed.

26       105.    On January 2, 2019, after the close of trading, Apple disclosed the true state of its

27   declining iPhone sales.  In a "Letter from Tim Cook to Apple Investors" Apple reported that its

28   revenue for 1Q19 was approximately $84 billion, far below the guidance range of $89 billion to $93

1    billion the Company had provided on November 1, 2018, just eight weeks earlier.  Cook's letter

2    attributed the miss almost entirely to slowing iPhone sales in China, noting that most of the revenue

3    shortfall occurred in Greater China, that 100% of the year-over-year worldwide revenue decline

4    occurred in Greater China, and iPhone revenue missed primarily due to Greater China.  ¶82.

5          106.    During an interview with CNBC that evening, Cook admitted it was clear that

6    China's economy began to slow in the second half of 2018 and had been further impacted by rising

7    trade tensions with the United States, including Cook's statements indicating that, prior to and

8    during the Class Period, Defendants saw declines in traffic in the Company's retail stores and its

9    channel partner stores, and reports of the contraction of the smartphone industry:

10         [A]s we look at what's going on in China – ***it's clear that the economy begins to
           slow there for the second half***.  And what I believe to be the case is the trade
11         tensions between the United States and China put additional pressure on their
           economy. . . .  ***[W]e saw, as the quarter went on, things like traffic in our retail
12         stores, traffic in our channel partner stores, the reports of the smartphone industry
           contracting***, particularly bad in November – I haven't seen the December number
13         yet, but I would guess that would not be good either.  And so that's what we've seen.

14   ¶83.

15         107.    On January 2, 2019, Wells Fargo issued a report titled "AAPL: Neg. F1Q19

16   Prean[nouncement] – iPhone Rev[enue] -15%+ Y/Y; A Multi-Quarter Challenge" which attributed

17   the earnings miss to the poor performance in China:

18         Apple has preannounced negative F1Q19 results – revenue now estimated at ~$84B
           vs. initial $89-$93B guide.  We would expect investors to most notably focus on: (1)
19         Apple's implied iPhone revenue at ~$52-$53B given the company's disclosure that
           non-iPhone revenue in total grew ~19% y/y in F1Q19. With a blended ASP ($/unit)
20         at ~$795 (vs. $793 in F4Q18), we would arrive at a low/mid-teens y/y iPhone unit
           ship decline. ***(2) Apple's greater-than-expected weakness in emerging markets,
21         most notably driven by weakness in Greater China. Apple notes that over 100% of
           Apple's y/y revenue decline was generated by weakness in Greater China across
22         iPhone, iPad, and Mac (leaving us / investors to question the impact of the US-
           China trade situation)***.

23
     *See* ¶85.
24
           108.    On January 2, 2019, *Bloomberg* published an article titled "Apple's iPhone Warning
25
     Comes Years Too Late – The company has reached the end of its denial phase" reporting that just
26
     "two months ago" Cook had been calling performance in China "very strong" and it was unlikely
27
     that there had been any sudden change which caused the earnings miss:
28

1    Cook said two months ago that Apple's China business was "very strong,"
2  even amid signs of an economic slowdown and months of headlines about trade
   tensions with the U.S. ***He consistently told investors that he thought the U.S. and***
3  ***China would resolve their trade dispute amicably and didn't give any indications***
   ***that consumers were on edge or reluctant to shop because of the geopolitical***
4  ***fracas***.  It's possible that the last couple of months of economic circumstances in
   China, Taiwan and Hong Kong caught Apple by surprise, ***but executives failed to***
5  ***give any hints of red flags in the region***.

6    It's possible conditions in China changed quickly, but the broader trends in
   smartphone activity are not new.  Why didn't Cook make any of these admissions
7  before now?

   *See* ¶86.
8
9    109.    On January 3, 2019, Wedbush issued a report titled "Apple's Darkest Day in the

10 iPhone Era; Massive Negative Dec Results on China" in which it referred to the pre-announcement

11 variously as "Apple's Darkest Day," a "bombshell," a "'black eye,'" and a "defining moment for

12 Cook & Co."  The report stated in relevant part:

13    Last night Apple delivered a ***bombshell negative preannouncement that will***
   ***be a defining moment for Cook & Co. for years to come***.  While the Street had been
14 anticipating softness in the December quarter and around March guidance given a
   slew of negative iPhone XS/XR data points coming out of the Asia supply chain over
15 the past few months, ***the magnitude of the top-line miss (~8%) with China demand***
   ***the culprit was jaw dropping in our opinion and will heavily weigh on shares***
16 ***accordingly***.

17 *See* ¶87.

18    110.    On January 3, 2019, Morgan Stanley issued a report titled "Weak China More than

19 Offsets Revenue Strength Outside of iPhone; Lowering Estimates" stating this was the Company's

20 first negative preannouncement in 15 years:

21    ***Weak Greater China iPhone sales largely to blame for Apple's first***
   ***negative preannouncement in 15 years***.  As we highlighted in early December,
22 China is following in the footsteps of the US market with lengthening smartphone
   replacement cycles slowing overall market growth.   A weakening economy
23 combined with improved smartphone product quality (i.e. higher quality components
   and assembly leading to longer useful lives), smartphone ASPs that are up 22% over
24 the past two years (per IDC) and a lack of carrier subsidies contributed to weaker
   China iPhone sales in the December quarter.

25 *See* ¶88.

26    111.    On the shocking news of January 2, 2019, when the true financial condition of the

27 Company was disclosed, Apple's stock price declined precipitously by more than $15.00 per share,

28 or approximately 10%, to a close of $142.19 per share on January 3, 2019, on unusually high volume

of more than 91.1 million shares traded, the highest one-day trading volume experienced by the Company in nearly two years.

## VIII.    APPLICABILITY OF THE FRAUD ON THE MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE

112.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's common stock traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Lead Plaintiff and other members of the Class purchased Apple common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

113.    At all relevant times, the market for Apple common stock was efficient for the following reasons, among others:

(a)    as a regulated issuer, Apple filed periodic public reports with the SEC; and

(b)    Apple regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

114.    Lead Plaintiff will also rely upon the presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

## IX.    CLASS ACTION ALLEGATIONS

115.    Lead Plaintiff brings this action as a Class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all purchasers of Apple common stock

1   during the Class Period (the "Class"). Excluded from the Class are Defendants and their families,

2   the officers and directors of the Company, at all relevant times, members of their immediate families

3   and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have

4   or had a controlling interest.

5         116.   The members of the Class are so numerous that joinder of all members is

6   impracticable. Throughout the Class Period, Apple common stock was actively traded on the

7   NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and

8   can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are

9   hundreds of thousands of members in the proposed Class. Record owners and other members of the

10   Class may be identified from records maintained by Apple and/or its transfer agent and may be

11   notified of the pendency of this action by mail, using the form of notice similar to that customarily

12   used in securities class actions.

13         117.   Lead Plaintiff's claims are typical of the claims of the members of the Class as all

14   members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal

15   law that is complained of herein.

16         118.   Lead Plaintiff will fairly and adequately protect the interests of the members of the

17   Class and has retained counsel competent and experienced in class and securities litigation.

18         119.   Common questions of law and fact exist as to all members of the Class and

19   predominate over any questions solely affecting individual members of the Class. Among the

20   questions of law and fact common to the Class are:

21             (a)   whether the Exchange Act was violated by Defendants as alleged herein;

22             (b)   whether statements made by Defendants misrepresented material facts about

23   the business and prospects of Apple; and

24             (c)   to what extent the members of the Class have sustained damages and the

25   proper measure of damages.

26         120.   A class action is superior to all other available methods for the fair and efficient

27   adjudication of this controversy since joinder of all Class members is impracticable. Furthermore, as

28   the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a Class action.

## X.   COUNT I

### A.   For Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants Apple and Cook

121.   Lead Plaintiff incorporates ¶¶1-120 by reference.

122.   During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

123.   Defendants violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Apple common stock during the Class Period.

124.   Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Apple common stock.  Lead Plaintiff and the Class would not have purchased Apple common stock at the prices they paid, or at all, if had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## XI.   COUNT II

### A.   For Violation of §20(a) of the Exchange Act Against All Defendants

125.   Lead Plaintiff incorporates ¶¶1-124 by reference.

126.   The Individual Defendants acted as controlling persons of Apple within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, and their ownership of Apple common stock, the Individual Defendants had the power and authority to cause Apple to

1  engage in the wrongful conduct complained of herein.  Apple controlled the Individual Defendants

2  and all of its employees.  By reason of such conduct, Defendants are liable pursuant to §20(a) of the

3  Exchange Act.

4  **XII.   PRAYER FOR RELIEF**

5          WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

6                  (i)      determining that this action is a proper Class action, having designated

7  plaintiff as Lead Plaintiff and certifying Lead Plaintiff as a Class representative under Rule 23 of the

8  Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

9                  (ii)     awarding compensatory damages in favor of Lead Plaintiff and the

10  other Class members against all Defendants, jointly and severally, for all damages sustained as a

11  result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

12                  (iii)    awarding Lead Plaintiff and the Class their reasonable costs and

13  expenses incurred in this action, including counsel fees and expert fees; and

14                  (iv)    awarding such equitable/injunctive or other relief as deemed

15  appropriate by the Court.

16  **XIII.   JURY DEMAND**

17          Plaintiff demands a trial by jury.

18  DATED:  June 23, 2020                    ROBBINS GELLER RUDMAN
                                               & DOWD LLP
19                                          SHAWN A. WILLIAMS
                                            DANIEL J. PFEFFERBAUM
20                                          KENNETH J. BLACK

21

22                                                  s/ Shawn A. Williams
                                            SHAWN A. WILLIAMS
23
                                            Post Montgomery Center
24                                          One Montgomery Street, Suite 1800
                                            San Francisco, CA  94104
25                                          Telephone:  415/288-4545
                                            415/288-4534 (fax)
26                                          shawnw@rgrdlaw.com
                                            dpfefferbaum@rgrdlaw.com
27                                          kennyb@rgrdlaw.com

28

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS - 4:19-cv-02033-YGR                                                    - 40 -
4839-0622-0480.v1-6/23/20

1
2
3
4
5
6
7

ROBBINS GELLER RUDMAN
   & DOWD LLP
MARK SOLOMON
DANIELLE S. MYERS
JUAN CARLOS SANCHEZ
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
marks@rgrdlaw.com
dmyers@rgrdlaw.com
jsanchez@rgrdlaw.com

8
9

Counsel to Lead Plaintiff Norfolk County Council
as Administering Authority of the Norfolk
Pension Fund

10
11
12
13

LABATON SUCHAROW
CAROL C. VILLEGAS
140 Broadway
New York, NY 10005
Telephone:  212/907-0700
212/883-7524 (fax)
cvillegas@labaton.com

14
15

Counsel to Employees' Retirement System of the
State of Rhode Island

16
17
18
19
20
21
22
23
24
25
26
27
28

REVISED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL
SECURITIES LAWS - 4:19-cv-02033-YGR
4839-0622-0480.v1-6/23/20

- 41 -

1

CERTIFICATE OF SERVICE

2      I hereby certify under penalty of perjury that on June 23, 2020, I authorized the electronic

3 filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

4 notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I

5 hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the

6 non-CM/ECF participants indicated on the attached Manual Notice List.

7
                                                        s/ Shawn A. Williams
8                                                       SHAWN A. WILLIAMS
                                                        ROBBINS GELLER RUDMAN
9                                                           & DOWD LLP
                                                        Post Montgomery Center
10                                                      One Montgomery Street, Suite 1800
                                                        San Francisco, CA  94104
11                                                      Telephone:  415/288-4545
                                                        415/288-4534 (fax)
12                                                      E-mail:  shawnw@rgrdlaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 4:19-cv-02033-YGR IN RE APPLE INC. SECURITIES LITIGATION

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Adam Marc Apton**
  aapton@zlk.com

- **Mary K. Blasy**
  mblasy@rgrdlaw.com

- **Frank H. Busch**
  busch@wvbrlaw.com,pallister@wvbrlaw.com,barnes@wvbrlaw.com

- **Christine M. Fox**
  cfox@labaton.com,ndonlon@labaton.com,lpina@labaton.com,electroniccasefilings@labaton.com,fmalonzo@labaton.com,6312349420@filings.docketbird.com

- **Melinda Haag**
  mhaag@orrick.com

- **J Alexander Hood , II**
  ahood@pomlaw.com,tcrockett@pomlaw.com,abarbosa@pomlaw.com

- **James Neil Kramer**
  jkramer@orrick.com,lpatts@orrick.com,mwatkins@orrick.com,vmorse@orrick.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,tcrockett@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com,lpvega@pomlaw.com

- **Francis P. McConville**
  fmcconville@labaton.com,HChang@labaton.com,lpina@labaton.com,9849246420@filings.docketbird.com,electroniccasefiling@labaton.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,jalieberman@pomlaw.com,ahood@pomlaw.com,egoodman@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Samuel H. Rudman**
  srudman@rgrdlaw.com

- **Juan Carlos Sanchez**
  jsanchez@rgrdlaw.com

- **Mark Solomon**
  marks@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

- **Alexander K. Talarides**
  atalarides@orrick.com,lpatts@orrick.com,casestream@ecf.courtdrive.com

- **Carol C. Villegas**
  cvillegas@labaton.com,ndonlon@labaton.com,5739893420@filings.docketbird.com,lpina@labaton.com,jchristie@labaton.com,acoquin@labaton.com,fmalonzo@lab

- **James Matthew Wagstaffe**
  wagstaffe@wvbrlaw.com

- **Steven Ray Wedeking , II**
  swedeking@robbinsllp.com,notice@robbinsllp.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,ShawnW@ecf.courtdrive.com,smorris@rgrdlaw.com,kennyb@rgrdlaw.com,e_file_sd@rgrdlaw.com,smorris@ecf.courtdrive.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

# EXHIBIT 2

1   MELINDA L. HAAG (SBN 132612)
   mhaag@orrick.com
2   JAMES N. KRAMER (SBN 154709)
   jkramer@orrick.com
3   ALEXANDER K. TALARIDES (SBN 268068)
   atalarides@orrick.com
4   ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
5   405 Howard Street
   San Francisco, CA  94105-2669
6   Telephone:    (415) 773-5700
   Facsimile:    (415) 773-5759
7

8   Attorneys for Defendants Apple Inc.,
   Timothy Cook, and Luca Maestri

9

10               UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12                  OAKLAND DIVISION

13

| 14 | IN RE APPLE INC. SECURITIES LITIGATION | Case No. 4:19-cv-02033-YGR |
|----|----|----|
| 15 | | **DEFENDANTS' ANSWER TO THE REVISED CONSOLIDATED CLASS ACTION COMPLAINT** |
| 16 | | |
| 17 | | Judge:   Honorable Yvonne Gonzalez Rogers |
| 18 | | Ctrm:   1, 4th Floor |

19

20

21

22

23

24

25

26

27

28

Defendants Apple Inc., Timothy Cook, and Luca Maestri (collectively "Defendants"), by and through their undersigned counsel, hereby answer and assert defenses to the Revised Consolidated Class Action Complaint (the "Complaint") filed by Lead Plaintiff Norfolk County Council ("Plaintiff").

## RESPONSES TO INDIVIDUAL PARAGRAPHS

Numbered paragraphs below correspond to the like-numbered paragraphs in the Complaint. Except as specifically admitted, Defendants deny the allegations in the Complaint, including without limitation the Table of Contents, headings, subheadings, and footnotes contained within the Complaint. Plaintiff's Complaint contains 11 footnotes. Any allegations contained therein do not comply with Federal Rule of Civil Procedure 10(b), providing that allegations be stated "in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b); *see, e.g., Bernath v. YouTube LLC,* 2017 WL 1050070, at *2 (M.D. Fla. Mar. 20, 2017) ("Plaintiff also alleges facts in various and lengthy footnotes that will not be considered as they are not properly stated in numbered paragraphs pursuant to Fed. R. Civ. P. 10(b)."); *Holmes v. Gates,* 2010 WL 956412, at *1 n.1 (M.D. Pa. Mar. 11, 2010) ("[T]he use of . . . footnotes run counter to the pleading requirements set forth by Federal Rule of Civil Procedure 10(b)."). No response is therefore required to the Complaint's footnotes. In any event, except as expressly admitted, Defendants deny any and all allegations contained in footnotes 1 through 11.

1. Defendants admit that Paragraph 1 purports to describe Plaintiff's claims. Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 1.

2. Defendants aver that the Court's orders referenced in Paragraph 2 speak for themselves. Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 2.

3. Defendants aver that the Court's June 2, 2020 order speaks for itself. Defendants admit that Paragraph 3 purports to describe Plaintiff's claims and intentions. Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 3.

4. Defendants admit that Paragraph 4 purports to describe Plaintiff's claims and

purported investigation.  Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 4.

5.      Defendants admit that Apple is a multinational technology company headquartered in Cupertino, California that designs, develops, and sells consumer electronics, computer software, and online services.  Defendants admit that Apple's products include iPhones, iPads, Macs, iPods, and Apple Watches.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 5, and, on that basis, deny them.

6.      Defendants admit that the iPhone uses Apple's iOS operating system and that various models of the iPhone have included Siri, an intelligent assistant, and Apple Pay, Touch ID, and Face ID on qualifying devices.  Defendants admit that the iPhone generated approximately 62% of Apple's net sales in FY17 and approximately 63% of net sales in FY18.  Defendants admit that since the iPhone's launch in 2007, the Company has generally released new and updated iPhone models once a year, and that the price of iPhones has generally increased during that time.  Defendants deny the characterization of iPhone price increases as "aggressive."  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 6, and, on that basis, deny them.

7.      Defendants admit that the chart set forth in Paragraph 7 reflects release dates and U.S. pricing (without taking into account any carrier promotions or contract pricing) for various iPhone models released between 2015 and 2018.  Except as expressly admitted, Defendants deny the allegations in Paragraph 7.

8.      Defendants admit that Greater China, as the term is used in certain Apple SEC filings, is a region that includes mainland China, Hong Kong, and Taiwan.  Defendants admit that in FY20, Greater China was Apple's third-largest reportable segment after the Americas and Europe.  Defendants admit that Plaintiff selectively quotes from an October 27, 2015 article in *The Verge*, which speaks for itself.  Except as expressly admitted, Defendants deny the allegations in Paragraph 8.

9.      Defendants admit that in FY18, ended September 29, 2018, Greater China accounted for approximately $52 billion in net sales, which was nearly 20% of Apple's total

1    annual net sales.  Except as expressly admitted, Defendants deny the allegations in Paragraph 9.

2           10.    Defendants lack knowledge or information sufficient to form a belief as to the

3    truth of the allegations in Paragraph 10, and, on that basis, deny them.

4           11.    Defendants admit that Paragraph 11 references various actions taken by the United

5    States government, which speak for themselves.  Except as expressly admitted, Defendants deny

6    the allegations in Paragraph 11.

7           12.    Defendants admit that Plaintiff selectively quotes from a *New York Times* article

8    published on June 14, 2018, and a *CNN Business* article published on June 20, 2018, which speak

9    for themselves.   Except to the extent expressly admitted, Defendants deny the allegations in

10   Paragraph 12.

11          13.    Defendants admit that Plaintiff selectively quotes from a *New York Times* article

12   published on August 22, 2018, which speaks for itself.  Except to the extent expressly admitted,

13   Defendants deny the allegations in Paragraph 13.

14          14.    Defendants admit that Apple introduced three new iPhones on September 12,

15   2018: the iPhone XR (priced in the U.S. at $749/$799/$899, not taking into account carrier

16   promotions or contract pricing); the iPhone XS (priced in the U.S. at $999/$1149/$1349, not

17   taking into account carrier promotions or contract pricing); and the iPhone XS Max (priced in the

18   U.S. at $1099/$1249/$1449, not taking into account carrier promotions or contract pricing).

19   Defendants admit that pre-orders for the XS and XS Max went live on September 14, 2018, and

20   those models went on sale on September 21, 2018.  Defendants admit that pre-orders for the XR

21   went live on October 19, 2018, and the XR went on sale on October 26, 2018.  Defendants admit

22   that the least expensive of the three models, the iPhone XR, came in multiple bright colors and

23   utilized a Liquid Retina Display.  Defendants admit that the iPhone XS and XS Max featured a

24   Super Retina OLED display, an all-screen stainless steel and glass design, faster processors, and

25   enhanced cameras.  Except as expressly admitted, Defendants deny the allegations in Paragraph

26   14.

27          15.    Defendants lack knowledge or information sufficient to form a belief as to the

28   truth of the allegations in Paragraph 15 and, on that basis, deny them.

16.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 16 and, on that basis, deny them. Defendants admit that Plaintiff selectively quotes from an article published on September 24, 2018 in *AppleInsider*, which speaks for itself.   Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 16.

17.     Defendants admit that Plaintiff references and selectively quotes from a November 1, 2018 press release, which speaks for itself.   Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 17.

18.     Defendants admit that Apple held an earnings call on November 1, 2018. Defendants admit that Plaintiff references and selectively quotes from the transcript of the November 1, 2018 call, which speaks for itself.   Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 18.

19.     Defendants admit that Plaintiff references and selectively quotes from the transcript of the November 1, 2018 call, which speaks for itself.   Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 19.

20.     Defendants admit that Plaintiff references and selectively quotes from the transcript of the November 1, 2018 call, which speaks for itself.   Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 20.

21.     Defendants admit that Plaintiff selectively quotes from a November 1, 2018 report from Canaccord Genuity, which speaks for itself.   Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 21.

22.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 22 and, on that basis, deny them. Defendants admit that Plaintiff selectively quotes from a J.P. Morgan report, which speaks for itself.  Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 22.

23.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23, and, on that basis, deny them.

24.     Defendants deny the allegations in Paragraph 24.

1    25.    Defendants deny the allegations in Paragraph 25.

2    26.    Defendants admit that Apple's stock price reached $213.65 on November 2, 2018.

3    Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 26.

4    27.    Defendants admit that Plaintiff selectively quotes from a November 5, 2018 *Nikkei*

5    *Asian Review* article, which speaks for itself.  Except to the extent expressly admitted, Defendants

6    deny the allegations in Paragraph 27.

7    28.    Defendants admit that Plaintiff selectively quotes from a November 5, 2018 RBC

8    Capital Market report, which speaks for itself.  Defendants admit that Apple's share price closed

9    at $207.48 on November 2, 2018 and at $201.59 on November 5, 2018.  Except to the extent

10   expressly admitted, Defendants deny the allegations in Paragraph 28.

11   29.    Defendants admit that Plaintiff selectively quotes from a November 12, 2018

12   Wells Fargo report, which speaks for itself.  Except to the extent expressly admitted, Defendants

13   deny the allegations in Paragraph 29.

14   30.    Defendants admit that Apple's share price closed at $204.47 on Friday, November

15   9, 2018 and at $194.17 on Monday, November 12, 2018.  Except to the extent expressly admitted,

16   Defendants deny the allegations in Paragraph 30.

17   31.    Defendants admit that Plaintiff selectively quotes from a December 4, 2018

18   *Bloomberg* article, which speaks for itself.  Except to the extent expressly admitted, Defendants

19   deny the allegations in Paragraph 31.

20   32.    Defendants admit that Apple's share price closed at $184.82 on December 3, 2018

21   and at $176.69 on December 4, 2018.  Except to the extent expressly admitted, Defendants deny

22   the allegations in Paragraph 32.

23   33.    Defendants admit that Apple issued a "Letter from Tim Cook to Apple Investors"

24   on January 2, 2019, in which Apple announced revised guidance for its fiscal 2019 first quarter.

25   Defendants aver that the January 2, 2019 "Letter from Tim Cook to Apple Investors" speaks for

26   itself, and refer to said letter for a full and accurate statement of its contents.  Defendants deny

27   any characterizations of statements in the January 2, 2019 "Letter from Tim Cook to Apple

28   Investors" that are inconsistent with the letter's contents.

34.     Defendants admit that Plaintiff selectively quotes from the "Letter from Tim Cook to Apple Investors," which speaks for itself.  Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 34.

35.     Defendants admit that Plaintiff selectively quotes from the "Letter from Tim Cook to Apple Investors," which speaks for itself.  Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 35.

36.     Defendants admit Mr. Cook appeared on CNBC for an interview on January 2, 2019.  Defendants admit that Plaintiff selectively quotes from a transcript of the interview, which speaks for itself.  Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 36.

37.     Defendants admit that Apple's share price closed at $157.92 on January 2, 2019 and at $142.19 on January 3, 2019.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37 regarding "unusually heavy trading volume," and, on that basis, deny them.  Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 37.

38.     To the extent the allegations in Paragraph 38 are legal conclusions and characterizations, no responsive pleading is required.  Insofar as a response is required, Defendants admit that Plaintiff purports to assert claims arising under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.  Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 38.

39.     To the extent the allegations in Paragraph 39 are legal conclusions and characterizations, no responsive pleading is required.  Insofar as a response is required, Defendants admit that Plaintiff purports to plead jurisdiction pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.  Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 39.

40.     To the extent the allegations in Paragraph 40 are legal conclusions and characterizations, no responsive pleading is required.  Insofar as a response is required,

1    Defendants admit that Plaintiff purports to plead venue pursuant to 28 U.S.C. §1391(b) and §27

2    of the Exchange Act, 15 U.S.C. §78aa.  Except to the extent expressly admitted, Defendants deny

3    the allegations in Paragraph 40.

4          41.    Paragraph 41 states a legal conclusion to which no response is required.  To the

5    extent a response is deemed required, Defendants deny the allegations in Paragraph 41.

6          42.    Defendants lack knowledge or information sufficient to form a belief as to the

7    truth of the allegations in Paragraph 42 regarding Plaintiff's purchase or acquisition of Apple

8    stock, and, on that basis, deny them.  Except to the extent expressly admitted, Defendants deny

9    the allegations in Paragraph 42.

10         43.    Defendants lack knowledge or information sufficient to form a belief as to the

11   truth of the allegations in Paragraph 43 regarding the purchase or acquisition of Apple stock by

12   City of Roseville Employees' Retirement System, and, on that basis, deny them.  Except to the

13   extent expressly admitted, Defendants deny the allegations in Paragraph 43.

14         44.    Defendants lack knowledge or information sufficient to form a belief as to the

15   truth of the allegations in Paragraph 44 regarding the purchase or acquisition of Apple stock by

16   Employees' Retirement System of the State of Rhode Island, and, on that basis, deny them.

17   Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 44.

18         45.    Defendants admit the allegations in the first sentence of Paragraph 45.  Defendants

19   admit that Apple common stock is listed and trades on the NASDAQ under the ticker symbol

20   "AAPL."  To the extent the allegation in Paragraph 45 that the NASDAQ is an "efficient market"

21   is a legal conclusion and characterization, no responsive pleading is required.  Except to the

22   extent expressly admitted, Defendants deny the allegations in Paragraph 45.

23         46.    Defendants admit the allegations in Paragraph 46.

24         47.    Defendants admit the allegations in Paragraph 47.

25         48.    Paragraph 48 contains no substantive allegations and does not require a response.

26   Insofar as a response is required, Defendants admit that Paragraph 48 sets forth defined terms

27   used by Plaintiff in the Complaint.

28         49.    The first sentence of Paragraph 49 states legal conclusions to which no response is

1    required.  Defendants deny the remaining allegations in Paragraph 49.

2         50.    Defendants deny the allegations in Paragraph 50.

3         51.    To the extent the allegations are legal conclusions and characterizations, no

4    responsive pleading is required.  Insofar as a response is required, Defendants deny the

5    allegations in Paragraph 51.

6         52.    Defendants deny the allegations in Paragraph 52.

7         53.    Defendants admit that Plaintiff references and selectively quotes from a November

8    1, 2018 Form 8-K and attached press release regarding the Company's financial results for FY18,

9    which speak for themselves.  Except to the extent expressly admitted, Defendants deny the

10   allegations in Paragraph 53.

11        54.    Defendants admit that Apple held a conference call on November 1, 2018, during

12   which Mr. Cook and Mr. Maestri spoke.  Defendants admit that Plaintiff selectively quotes from

13   the transcript of that call, which speaks for itself.  Except to the extent expressly admitted,

14   Defendants deny the allegations in Paragraph 54.

15        55.    Defendants admit that Plaintiff selectively quotes from the transcript of the

16   November 1, 2018 call, which speaks for itself.  Except to the extent expressly admitted,

17   Defendants deny the allegations in Paragraph 55.

18        56.    Defendants admit that Plaintiff selectively quotes from the transcript of the

19   November 1, 2018 call, which speaks for itself.  Except to the extent expressly admitted,

20   Defendants deny the allegations in Paragraph 56.

21        57.    Defendants admit that Plaintiff selectively quotes from the transcript of the

22   November 1, 2018 call, which speaks for itself.  Except to the extent expressly admitted,

23   Defendants deny the allegations in Paragraph 57.

24        58.    Defendants admit that Plaintiff references and selectively quotes from a transcript

25   of the November 1, 2018 conference call, which speaks for itself.  Except to the extent expressly

26   admitted, Defendants deny the allegations in Paragraph 58.

27        59.    Defendants admit that Plaintiff selectively quotes from a transcript of the

28   November 1, 2018 conference call, which speaks for itself.  Except to the extent expressly

8

admitted, Defendants deny the allegations in Paragraph 59.

60.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 60, and, on that basis, deny them.

61.     Defendants admit that Plaintiff selectively quotes from a November 1, 2018 report from Canaccord Genuity, which speaks for itself.   Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 61.

62.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 62, and, on that basis, deny them.

63.     Defendants admit that Plaintiff selectively quotes from a November 2, 2018 J.P. Morgan report, which speaks for itself.  Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 63.

64.     Defendants admit that Plaintiff selectively quotes from a November 2, 2018 Wedbush report, which speaks for itself.  Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 64.

65.     Defendants deny the allegations in Paragraph 65.

66.     Defendants deny the allegations in Paragraph 66.

67.     Defendants deny the allegations in Paragraph 67.

68.     Defendants admit that Plaintiff references and selectively quotes from a November 5, 2018 *Nikkei Asian Review* article, which speaks for itself.   Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 68.

69.     Defendants admit that Plaintiff selectively quotes from a November 5, 2018 RBC Capital Market report, which speaks for itself.   Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 69.

70.     Defendants admit that Plaintiff selectively quotes from a November 5, 2018 *Barron's* article, which speaks for itself.  Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 70.

71.     Defendants admit that Plaintiff selectively quotes from a November 5, 2018 *Reuters* article, which speaks for itself.  Except to the extent expressly admitted, Defendants deny

the allegations in Paragraph 71.

72.     Defendants admit that Plaintiff selectively quotes from a November 5, 2018 *RTT News* article, which speaks for itself.  Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 72.

73.     Defendants admit that Apple's share price closed at $207.48 on November 2, 2018, not 2019 as Paragraph 73 states, and at $201.59 on November 5, 2018.  Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 73.

74.     Defendants admit that Plaintiff references and selectively quotes from a November 12, 2018 Wells Fargo report, which speaks for itself.  Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 74.

75.     Defendants admit that Apple's share price closed at $204.47 on Friday, November 9, 2018 and at $194.17 on Monday, November 12, 2018.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 75 regarding "high trading volume," and, on that basis, deny them.  Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 75.

76.     Defendants admit that Plaintiff references and selectively quotes from a November 14, 2018 Guggenheim report, which speaks for itself.  Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 76.

77.     Defendants admit that Apple's share price closed at $192.23 on November 13, 2018 and at $186.80 on November 14, 2018.  Except as expressly admitted, Defendants deny the allegations in Paragraph 77.

78.     Defendants admit that Plaintiff references and selectively quotes from a December 4, 2018 *Bloomberg* article, which speaks for itself.  Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 78.

79.     Defendants admit that Apple's share price closed at $184.82 on December 3, 2018 and at $176.69 on December 4, 2018.  Except as expressly admitted, Defendants deny the allegations in Paragraph 79.

80.     Defendants admit that Plaintiff references and selectively quotes from a December

6, 2018 *Forbes* article, which speaks for itself. Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 80.

81.    Defendants admit that Apple's share price closed at $176.69 on December 4, 2018 and at $174.72 on December 6, 2018. Except as expressly admitted, Defendants deny the allegations in Paragraph 81.

82.    Defendants admit that Plaintiff references and selectively quotes from the January 2, 2019 "Letter from Tim Cook to Apple Investors," which speaks for itself. Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 82.

83.    Defendants admit Mr. Cook appeared on CNBC for an interview on January 2, 2019. Defendants admit that Plaintiff selectively quotes from a transcript of the interview, which speaks for itself. Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 83.

84.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 84, and, on that basis, deny them.

85.    Defendants admit that Plaintiff selectively quotes from a January 2, 2019 Wells Fargo report, which speaks for itself. Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 85.

86.    Defendants admit that Plaintiff selectively quotes from a January 2, 2019 *Bloomberg* article, which speaks for itself. Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 86.

87.    Defendants admit that Plaintiff selectively quotes from a January 3, 2019 Wedbush report, which speaks for itself. Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 87.

88.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 88, and, on that basis, deny them.

89.    Defendants admit that Plaintiff selectively quotes from a January 3, 2019 *Yahoo! Finance* article, which speaks for itself. Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 89.

90.     Defendants admit that Plaintiff references and selectively quotes from a January 3, 2019 *Wall Street Journal* article, which speaks for itself.  Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 90.

91.     Defendants admit that Plaintiff references and selectively quotes from a January 3, 2019 *BBC News* article, which speaks for itself.  Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 91.

92.     Defendants admit that Apple's share price closed at $157.92 on January 2, 2019 and at $142.19 on January 3, 2019.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 92, and, on that basis, deny them.

93.     Defendants admit that Plaintiff references and selectively quotes from a January 6, 2019 article in *The Guardian*, which speaks for itself.  Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 93.

94.     Defendants admit that Plaintiff references and selectively quotes from a January 14, 2019 Wedbush report, which speaks for itself.  Except to the extent expressly admitted, Defendants deny the allegations in Paragraph 94.

95.     Defendants admit that on January 29, 2019, Apple released its results for 1Q19, ended December 29, 2018, and held a conference call.  Defendants admit that Plaintiff selectively quotes from the transcript of the January 29, 2019 conference call, which speaks for itself. Except as expressly admitted, Defendants deny the allegations in Paragraph 95.

96.     Defendants admit that Plaintiff selectively quotes from the transcript of the January 29, 2019 conference call, which speaks for itself.  Except as expressly admitted, Defendants deny the allegations in Paragraph 96.

97.     Defendants deny the allegations in Paragraph 97.

98.     Defendants admit that Plaintiff references and selectively quotes from a November 5, 2018 *Nikkei Asian Review* article, which speaks for itself.  Except as expressly admitted, Defendants deny the allegations in Paragraph 98.

99.     Defendants admit that Plaintiff references and selectively quotes from a November 5, 2018 RBC Capital Market report, which speaks for itself.  Except as expressly admitted,

1    Defendants deny the allegations in Paragraph 99.

2        100.    Defendants admit that Plaintiff references and selectively quotes from a November

3    5, 2018 *Barron's* article, which speaks for itself.  Except as expressly admitted, Defendants deny

4    the allegations in Paragraph 100.

5        101.    Defendants admit that Plaintiff references and selectively quotes from a November

6    5, 2018 *Reuters* article, which speaks for itself.  Except as expressly admitted, Defendants deny

7    the allegations in Paragraph 101.

8        102.    Defendants admit that Apple's share price closed at $207.48 on November 2,

9    2018, and at $201.59 on November 5, 2018.  Defendants lack knowledge or information

10   sufficient to form a belief as to the truth of the allegations in Paragraph 102 regarding trading

11   volume and, on that basis, deny them.  Except as expressly admitted, Defendants deny the

12   allegations in Paragraph 102.

13       103.    Defendants admit that Plaintiff references and selectively quotes from a November

14   12, 2018 Wells Fargo report, which speaks for itself.  Except as expressly admitted, Defendants

15   deny the allegations in Paragraph 103.

16       104.    Defendants admit that Apple's share price closed at $204.47 on November 9,

17   2018, and at $194.17 on November 12, 2018.  Defendants lack knowledge or information

18   sufficient to form a belief as to the truth of the allegations in Paragraph 104 regarding trading

19   volume and, on that basis, deny them.  Except as expressly admitted, Defendants deny the

20   allegations in Paragraph 104.

21       105.    Defendants admit that Plaintiff references and selectively quotes from the January

22   2, 2019 "Letter from Tim Cook to Apple Investors," which speaks for itself.  Except as expressly

23   admitted, Defendants deny the allegations in Paragraph 105.

24       106.    Defendants admit Mr. Cook appeared on CNBC for an interview on January 2,

25   2019.  Defendants admit that Plaintiff selectively quotes from a transcript of the interview, which

26   speaks for itself.  Except to the extent expressly admitted, Defendants deny the allegations in

27   Paragraph 106.

28       107.    Defendants admit that Plaintiff references and selectively quotes from a January 2,

2019 Wells Fargo report, which speaks for itself.  Except as expressly admitted, Defendants deny the allegations in Paragraph 107.

108.   Defendants admit that Plaintiff references and selectively quotes from a January 2, 2019 *Bloomberg* article, which speaks for itself.  Except as expressly admitted, Defendants deny the allegations in Paragraph 108.

109.   Defendants admit that Plaintiff references and selectively quotes from a January 3, 2019 Wedbush report, which speaks for itself.  Except as expressly admitted, Defendants deny the allegations in Paragraph 109.

110.   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 110, and, on that basis, deny them.

111.   Defendants admit that Apple's share price closed at $142.19 per share on January 3, 2019.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 111 regarding trading volume and, on that basis, deny them.  Except as expressly admitted, Defendants deny the allegations in Paragraph 111.

112.   To the extent the allegations in Paragraph 112 are legal conclusions and characterizations, no responsive pleading is required.  Insofar as a response is required, Defendants admit that Plaintiff purports to rely upon the presumption of reliance established by the fraud-on-the-market doctrine.  Except as expressly admitted, Defendants deny the allegations in Paragraph 112.

113.   To the extent the allegations in Paragraph 113 are legal conclusions and characterizations, no responsive pleading is required.  Insofar as a response is required, Defendants admit that Apple files periodic public reports with the SEC, and that Apple communicates with public investors through press releases and other means.  Except as expressly admitted, Defendants deny the allegations in Paragraph 113.

114.   To the extent the allegations in Paragraph 114 are legal conclusions and characterizations, no responsive pleading is required.  Insofar as a response is required, Defendants admit that Plaintiff purports to rely upon the presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).  Except as expressly admitted, Defendants

deny the allegations in Paragraph 114.

115.    To the extent the allegations in Paragraph 115 are legal conclusions and characterizations, no responsive pleading is required.    Insofar as a response is required, Defendants admit that this Paragraph purports to set forth Plaintiff's proposed class definition.

116.    To the extent the allegations in Paragraph 116 are legal conclusions and characterizations, no responsive pleading is required.    Insofar as a response is required, Defendants admit that Apple's common stock is traded on the NASDAQ.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 116, and, on that basis, deny them.

117.    To the extent the allegations in Paragraph 117 are legal conclusions and characterizations, no responsive pleading is required.    Insofar as a response is required, Defendants deny the allegations in Paragraph 117.

118.    To the extent the allegations in Paragraph 118 are legal conclusions and characterizations, no responsive pleading is required.    Insofar as a response is required, Defendants deny the allegations in Paragraph 118.

119.    To the extent the allegations in Paragraph 119 are legal conclusions and characterizations, no responsive pleading is required.    Insofar as a response is required, Defendants deny the allegations in Paragraph 119.

120.    To the extent the allegations in Paragraph 120 are legal conclusions and characterizations, no responsive pleading is required.    Insofar as a response is required, Defendants deny the allegations in Paragraph 120.

121.    Defendants reassert and hereby incorporate by reference their responses to each Paragraph of Plaintiff's Complaint, as though fully set forth herein.

122.    Defendants deny the allegations in Paragraph 122.

123.    To the extent the allegations in Paragraph 123 are legal conclusions and characterizations, no responsive pleading is required.    Insofar as a response is required, Defendants deny the allegations in Paragraph 123.

124.    To the extent the allegations in Paragraph 124 are legal conclusions and

1   characterizations, no responsive pleading is required. Insofar as a response is required,

2   Defendants deny the allegations in Paragraph 124.

3       125.    Defendants reassert and hereby incorporate by reference their responses to each

4   Paragraph of Plaintiff's Complaint, as though fully set forth herein.

5       126.    To the extent the allegations in Paragraph 126 are legal conclusions and

6   characterizations, no responsive pleading is required. Insofar as a response is required,

7   Defendants deny the allegations in Paragraph 126.

8       The remainder of the Complaint consists of Plaintiff's prayer for relief to which no

9   response is required. To the extent a response is required, Defendants deny that Plaintiff is

10  entitled to the relief sought in the Complaint or to any relief whatsoever.

11                                  **DEFENSES**

12      Pursuant to Federal Rule of Civil Procedure 8(c), Defendants, without waiver, limitation,

13  or prejudice, and without conceding that they bear the burden of proof or production, hereby

14  assert the following defenses:

15                          **FIRST AFFIRMATIVE DEFENSE**

16      Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are barred

17  in whole or in part because the Complaint and the purported causes of action contained therein

18  fail, in whole or in part, to state a claim for which relief can be granted.

19                          **SECOND AFFIRMATIVE DEFENSE**

20      Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are

21  barred in whole or in part because, to the extent their allegations sound in fraud, they are not

22  pleaded with particularity, as required by statute, including but not limited to the Private

23  Securities Litigation Reform Act of 1995, and the Federal Rules of Civil Procedure.

24                          **THIRD AFFIRMATIVE DEFENSE**

25      Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are

26  barred in whole or in part because no statement allegedly made by Defendants contains any

27  material misrepresentation or omission, considered either alone or in the context of the total mix

28  of available information.

**FOURTH AFFIRMATIVE DEFENSE**

Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are barred in whole or in part because Defendants did not know of the alleged inaccuracy of any material misrepresentation or omission allegedly made by them, and they could not have become aware of any alleged inaccuracies in those statements through the exercise of reasonable care.

**FIFTH AFFIRMATIVE DEFENSE**

Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are barred in whole or in part because Defendants, after reasonable investigation, due diligence, and/or consultation with expert(s), had reasonable grounds to believe, and did believe, that statements allegedly made by them were true and contained all material facts necessary to make those statements not misleading.

**SIXTH AFFIRMATIVE DEFENSE**

Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are barred in whole or in part because Defendants acted at all times in good faith, with reasonable care, and with due diligence in carrying out their responsibilities and did not directly or indirectly control or induce any wrongful acts or omissions.

**SEVENTH AFFIRMATIVE DEFENSE**

Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are barred in whole or in part because Defendants acted at all times in good faith and without knowledge or intent to commit any violations of law.

**EIGHTH AFFIRMATIVE DEFENSE**

Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are barred in whole or in part because Plaintiff, and the class that Plaintiff purports to represent, have not sufficiently alleged, and cannot prove, that Plaintiff, or the class that Plaintiff purports to represent, relied upon any material misrepresentation or omission allegedly made by Defendants.

**NINTH AFFIRMATIVE DEFENSE**

Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are barred in whole or in part because Plaintiff, and the class that Plaintiff purports to represent, would have

1   purchased Apple shares as they did, even with full knowledge of the facts Plaintiff, and the class

2   that Plaintiff purport to represent, have now alleged were misrepresented or omitted by

3   Defendants.

4                          **TENTH AFFIRMATIVE DEFENSE**

5          Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are barred

6   in whole or in part because Plaintiff, and the class that Plaintiff purports to represent, have not

7   sufficiently alleged, and cannot prove, that Plaintiff's alleged injuries, or the injuries of the class

8   that Plaintiff purports to represent, were directly or proximately caused by any material

9   misrepresentation or omission allegedly made by Defendants.

10                         **ELEVENTH AFFIRMATIVE DEFENSE**

11         Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are barred

12  because they cannot show transaction or loss causation.

13                         **TWELFTH AFFIRMATIVE DEFENSE**

14         Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are barred

15  in whole or in part because other events or disclosures unrelated to Defendants' alleged material

16  misrepresentations or omissions are responsible for any decline in Apple's share value alleged to

17  form the basis of Plaintiff's claims, and the claims of the class that Plaintiff purports to represent.

18                         **THIRTEENTH AFFIRMATIVE DEFENSE**

19         Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are barred

20  in whole or in part because any alleged damages that Plaintiff, or the class that Plaintiffs purports

21  to represent, suffered, were caused by independent, intervening, and/or superseding events beyond

22  Defendants' conduct, control, policies, acts, or alleged material misrepresentations or omissions.

23                         **FOURTEENTH AFFIRMATIVE DEFENSE**

24         Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are

25  barred in whole or in part because Plaintiff, and the class that Plaintiff purports to represent, have

26  not sufficiently alleged, and cannot prove, that Plaintiff, or the class that Plaintiff purports to

27  represent, suffered any cognizable injury, and further, the damages alleged by Plaintiff, and the

28

1   class that Plaintiff purports to represent, if any, are speculative, uncertain, and/or contingent in

2   violation of applicable law.

3                          **FIFTEENTH AFFIRMATIVE DEFENSE**

4        Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are

5   barred in whole or in part because Plaintiff, and the class that Plaintiff purports to represent, have

6   failed to take reasonable actions to mitigate damages, if any, allegedly suffered as a result of

7   Defendants' alleged material misstatements and omissions.

8                          **SIXTEENTH AFFIRMATIVE DEFENSE**

9        Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are

10  barred in whole or in part to the extent that Plaintiff, or the class that Plaintiff purports to

11  represent, sold their Apple shares for a greater price than the price at which they purchased them,

12  and therefore suffered no losses from their purchase of Apple shares.

13                        **SEVENTEENTH AFFIRMATIVE DEFENSE**

14       Any recovery for damages allegedly incurred by Plaintiff, or the class that Plaintiff

15  purports to represent, should be offset in the amount of any tax benefits or other benefits

16  received by Plaintiff, or the class that Plaintiff purports to represent, in connection with their

17  ownership of Apple shares.

18                         **EIGHTEENTH AFFIRMATIVE DEFENSE**

19       Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are barred

20  in whole or in part because Plaintiff, and the class that Plaintiff purports to represent, knew or

21  reasonably should have known of the alleged acts and omissions complained of.

22                         **NINETEENTH AFFIRMATIVE DEFENSE**

23       Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are

24  barred in whole or in part because Plaintiff, and the class that Plaintiff purports to represent, have

25  not sufficiently alleged, and cannot prove, a lack of awareness of the facts that formed the basis

26  of the alleged material representations and omissions.

27

28

**TWENTIETH AFFIRMATIVE DEFENSE**

Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are barred in whole or in part because the alleged material misrepresentations or omissions were in fact known to and had entered the securities market through credible sources prior to Plaintiff's purchase, or the purchases by the class that Plaintiff purports to represent, of Apple shares.

**TWENTY-FIRST AFFIRMATIVE DEFENSE**

Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are barred in whole or in part to the extent that Defendants' alleged material misrepresentations or omissions would not have been material to a reasonable investor.

**TWENTY-SECOND AFFIRMATIVE DEFENSE**

Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are barred in whole or in part to the extent that Plaintiff, and the class that Plaintiff purports to represent, purchased stock pursuant to a pre-existing contract, instruction, or plan under 17 C.F.R. § 240.10b5-1.

**TWENTY-THIRD AFFIRMATIVE DEFENSE**

Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are barred in whole or in part because individual issues including but not limited to those relating to causation, reliance, privity, timing, and knowledge predominate over those common to the putative class.

**TWENTY-FOURTH AFFIRMATIVE DEFENSE**

Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are barred in whole or in part because this action may not be maintained as a class action under the Federal Rules of Civil Procedure.

**TWENTY-FIFTH AFFIRMATIVE DEFENSE**

Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are barred in whole or in part because Plaintiff cannot fairly and adequately represent the class it purports to represent.

**TWENTY-SIXTH AFFIRMATIVE DEFENSE**

Class certification fails to provide adequate due process protections and would violate the Rules Enabling Act, 28 U.S.C. § 2072, and the United States Constitution inasmuch as it constitutes trial by formula and would unfairly restrict Defendants' right to litigate affirmative defenses to the individual claims of Plaintiff, and the class that Plaintiff purports to represent.

**TWENTY-SEVENTH AFFIRMATIVE DEFENSE**

Without conceding liability, Plaintiff's requests, and the requests of the class that Plaintiff purports to represent, for equitable relief are improper because Plaintiff, and the class that Plaintiff purports to represent, have an adequate remedy at law.

**TWENTY-EIGHTH AFFIRMATIVE DEFENSE**

Without conceding liability, Plaintiff's requests, and the requests of the class that Plaintiff purports to represent, for equitable relief are improper because Plaintiff, and the class that Plaintiff purports to represent, have not suffered injury or harm and will not suffer imminent and irreparable injury as a result of any action or conduct by Defendants.

**TWENTY-NINTH AFFIRMATIVE DEFENSE**

Without conceding liability, Plaintiff's requests, and the requests of the class that Plaintiff purports to represent, for interest are improper because equity dictates against such an award, and further, any such award would be unjust, arbitrary, oppressive, and confiscatory.

**THIRTIETH AFFIRMATIVE DEFENSE**

Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are barred, in whole or in part, to the extent the damages sought exceed those permitted under the Private Securities Litigation Reform Act, the common law, or any other applicable statute, rule, or regulation.

**THIRTY-FIRST AFFIRMATIVE DEFENSE**

Plaintiff, and the class that Plaintiff purports to represent, are precluded from recovering attorneys' fees, experts' fees, and/or costs under applicable provisions of law.

**THIRTY-SECOND AFFIRMATIVE DEFENSE**

Plaintiff's claims, and the claims of the class that Plaintiff purports to represent, are barred in whole or in part by the equitable doctrines of laches, estoppel, unclean hands, and/or waiver.

**ADDITIONAL DEFENSES**

Defendants presently have insufficient knowledge or information to determine whether they may have additional, as yet unstated defenses. Defendants have not knowingly and intentionally waived any applicable defenses and reserve the right to assert additional defenses as they become known to them through discovery in this matter. Defendants reserve the right to amend this Answer to add, delete, or modify defenses based upon legal theories that may be or will be divulged through clarification of Plaintiff's Complaint, through discovery, or through further legal analysis of Plaintiff's position in this litigation.

**PRAYER FOR RELIEF**

WHEREFORE, Defendants pray for relief and judgment as set forth below.

1. For judgment in their favor;

2. That Plaintiff takes nothing by means of its Complaint;

3. That Defendants be awarded costs to the maximum extent allowable by law; and

4. For such other further relief as the Court deems just and proper.


Dated: November 18, 2020                    ORRICK, HERRINGTON & SUTCLIFFE LLP


                                            _/s/ James N. Kramer_
                                            JAMES N. KRAMER

                                            Attorneys for Defendants Apple Inc.,
                                            Timothy Cook, and Luca Maestri

# EXHIBIT 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Apple Inc. Securities Litigation | Case No. 4:19-cv-02033 (N.D. Cal.) |
| | [~~PROPOSED~~] STIPULATED PROTECTIVE ORDER |

1. PURPOSES AND LIMITATIONS

      Disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted. Accordingly, the parties hereby stipulate to and petition the court to enter the following Stipulated Protective Order. The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles. The parties further acknowledge, as set forth in Section 12.3, below, that this Stipulated Protective Order does not entitle them to file confidential information under seal; Civil Local Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal.

2. DEFINITIONS

      2.1    Challenging Party: a Party or Non-Party that challenges the designation of information or items under this Order.

      2.2    "CONFIDENTIAL" Information or Items: information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c) or that are (i) prohibited from disclosure by statute; (ii) trade secrets; (iii)

confidential research, development, proprietary, or commercial information, the disclosure of which would cause competitive harm; or (iv) private individual identificatory information such as Social Security numbers, home telephone numbers and addresses, tax returns (including attached schedules and forms), W-2s, 1099s, and banking or credit information.

2.3     Counsel (without qualifier):  Outside Counsel of Record and House Counsel (as well as their support staff).

2.4     Designating Party:  a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL" Or "HIGHLY CONFIDENTIAL"

2.5     Disclosure or Discovery Material:  all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

2.6     Expert:  a person with specialized knowledge or experience in a matter pertinent to the litigation who (1) has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action, (2) is not a current employee of a Party or of a Party's competitor, (3) was not a past employee of a Party within the 18 months preceding the Expert's retention, and (4) at the time of retention, is not anticipated to become an employee of a Party or of a Party's competitor.

2.7     "HIGHLY CONFIDENTIAL" Information or Items:  extremely sensitive "Confidential Information or Items," disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.8     House Counsel:  attorneys who are employees of a party to this action. House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.9     Non-Party:  any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

2.10     Outside Counsel of Record:  attorneys who are not employees of a party to this action but are retained to represent or advise a party to this action and have appeared in this action on

2

behalf of that party or are affiliated with a law firm which has appeared on behalf of that party.

2.11    Party:  any party to this action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel of Record (and their support staffs).

2.12    Producing Party:  a Party or Non-Party that produces Disclosure or Discovery Material in this action.

2.13    Professional Vendors:  persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing, storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.14    Protected Material:  any Disclosure or Discovery Material that is designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL"

2.15    Receiving Party:  a Party that receives Disclosure or Discovery Material from a Producing Party.

3.    SCOPE

The protections conferred by this Stipulation and Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material. However, the protections conferred by this Stipulation and Order do not cover the following information: (a) any information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and (b) any information known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party. Any use of Protected Material at trial shall be governed by a separate agreement or order.

4.    DURATION

3

Even after final disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs. Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this action, with or without prejudice; and (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

5.     DESIGNATING PROTECTED MATERIAL

5.1     Exercise of Restraint and Care in Designating Material for Protection. Each Party or Non-Party that designates information or items for protection under this Order must take care to limit any such designation to specific material that qualifies under the appropriate standards. To the extent it is practical to do so, the Designating Party must designate for protection only those parts of material, documents, items, or oral or written communications that qualify – so that other portions of the material, documents, items, or communications for which protection is not warranted are not swept unjustifiably within the ambit of this Order.

Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily encumber or retard the case development process or to impose unnecessary expenses and burdens on other parties) expose the Designating Party to sanctions.

If it comes to a Designating Party's attention that information or items that it designated for protection do not qualify for protection, that Designating Party must promptly notify all other Parties that it is withdrawing the mistaken designation.

5.2     Manner and Timing of Designations.  Except as otherwise provided in this Order (see, e.g., second paragraph of section 5.2(a) below), or as otherwise stipulated or ordered, Disclosure or Discovery Material that qualifies for protection under this Order must be clearly so designated before the material is disclosed or produced.

Designation in conformity with this Order requires:

(a)  for information in documentary form (e.g., paper or electronic documents, but

4

excluding transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" to each page that contains protected material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins) and must specify, for each portion, the level of protection being asserted. A Party or Non-Party that makes original documents or materials available for inspection need not designate them for protection until after the inspecting Party has indicated which material it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "HIGHLY CONFIDENTIAL." After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the appropriate legend ("CONFIDENTIAL" or "HIGHLY CONFIDENTIAL") to each page that contains Protected Material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins) and must specify, for each portion, the level of protection being asserted.

(b)  for testimony given in deposition or in other pretrial or trial proceedings, that the Designating Party identify on the record, before the close of the deposition, hearing, or other proceeding, all protected testimony and specify the level of protection being asserted.  When it is impractical to identify separately each portion of testimony that is entitled to protection and it appears that substantial portions of the testimony may qualify for protection, the Designating Party may invoke on the record (before the deposition, hearing, or other proceeding is concluded) a right to have up to 21 days to identify the specific portions of the testimony as to which protection is sought and to specify the level of protection being asserted. Only those portions of the testimony that are appropriately designated for protection within the 21 days shall be covered by the provisions of this Stipulated Protective Order. Alternatively, a Designating Party may specify, at the deposition or up to 21 days afterwards if that period is properly invoked, that the entire transcript shall be treated

4812-8335-7404.v1

as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL"

Parties shall give the other parties notice if they reasonably expect a deposition, hearing or other proceeding to include Protected Material so that the other parties can ensure that only authorized individuals who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A) are present at those proceedings. The use of a document as an exhibit at a deposition shall not in any way affect its designation as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL."

Transcripts containing Protected Material shall have an obvious legend on the title page that the transcript contains Protected Material, and the title page shall be followed by a list of all pages (including line numbers as appropriate) that have been designated as Protected Material and the level of protection being asserted by the Designating Party. The Designating Party shall inform the court reporter of these requirements. Any transcript that is prepared before the expiration of a 21-day period for designation shall be treated during that period as if it had been designated "HIGHLY CONFIDENTIAL" in its entirety unless otherwise agreed. After the expiration of that period, the transcript shall be treated only as actually designated.

(c) for information produced in some form other than documentary and for any other tangible items, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL."  If only a portion or portions of the information or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected portion(s) and specify the level of protection being asserted.

5.3     Inadvertent Failures to Designate.  If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

6.     CHALLENGING CONFIDENTIALITY DESIGNATIONS

6.1     Timing of Challenges.  Any Party or Non-Party may challenge a designation of

6

4812-8335-7404.v1

confidentiality at any time. Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

6.2    Meet and Confer.  The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific paragraph of the Protective Order. The parties shall attempt to resolve each challenge in good faith and must begin the process by conferring directly (in voice to voice dialogue; other forms of communication are not sufficient) within 14 days of the date of service of notice. In conferring, the Challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an opportunity to review the designated material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation. A Challenging Party may proceed to the next stage of the challenge process only if it has engaged in this meet and confer process first or establishes that the Designating Party is unwilling to participate in the meet and confer process in a timely manner.

6.3    Judicial Intervention.  If the Parties cannot resolve a challenge without court intervention, the parties shall follow the Court's Standing Order in Civil Cases regarding Discovery and Discovery Motions. The parties may file a joint letter brief regarding retaining confidentiality within 21 days of the initial notice of challenge or within 14 days of the parties agreeing that the meet and confer process will not resolve their dispute, whichever is earlier. Failure by a Designating Party to file such discovery dispute letter within the applicable 21- or 14-day period (set forth above) with the Court shall automatically waive the confidentiality designation for each challenged designation. If, after submitting a joint letter brief, the Court allows that a motion may be filed, any such motion must be accompanied by a competent declaration affirming that the movant has

7

4812-8335-7404.v1

complied with the meet and confer requirements imposed in the preceding paragraph. The Court, in its discretion, may elect to transfer the discovery matter to a Magistrate Judge.

In addition, the parties may file a joint letter brief regarding a challenge to a confidentiality designation at any time if there is good cause for doing so, including a challenge to the designation of a deposition transcript or any portions thereof. If, after submitting a joint letter brief, the Court allows that a motion may be filed, any motion brought pursuant to this provision must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed by the preceding paragraph. The Court, in its discretion, may elect to refer the discovery matter to a Magistrate Judge.

The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges, and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the Designating Party has waived the confidentiality designation by failing to file a letter brief to retain confidentiality as described above, all parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the court rules on the challenge.

7.      ACCESS TO AND USE OF PROTECTED MATERIAL

7.1     Basic Principles. A Receiving Party may use Protected Material that is disclosed or produced by another Party or by a Non-Party in connection with this case only for prosecuting, defending, or attempting to settle this litigation. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the litigation has been terminated, a Receiving Party must comply with the provisions of section 13 below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order.

7.2     Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may disclose any

8

4812-8335-7404.v1

information or item designated "CONFIDENTIAL" only to:

(a)  the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A;

(b)  the officers, directors, and employees (including House Counsel) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c)  Experts (as defined in this Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(d)  the court and its personnel;

(e)  court reporters and their staff, professional jury or trial consultants, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(f)  mock jurors who have signed an Undertaking, the content of which shall be agreed upon by the Parties; and

(g)  during their depositions, witnesses in the action to whom disclosure is reasonably necessary and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the Parties or ordered by the court.  Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order; and

(h)  the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

7.3.    Disclosure of "HIGHLY CONFIDENTIAL" Information or Items.  Unless otherwise ordered by the Court or permitted in writing by the Designating Party, a Receiving Party

4812-8335-7404.v1

may disclose any information or item designated "HIGHLY CONFIDENTIAL" only to:

(a)     the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A;

(b)  House Counsel of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(c)     Experts (as defined in the Order) of the Receiving Party to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A),

(d)     the Court and its personnel;

(e)     court reporters and their staff, professional jury or trial consultants, and Professional Vendors to whom disclosure is reasonably necessary for the litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(f)     mock jurors who have signed an Undertaking, the content of which shall be agreed upon by the Parties; and

(g)     during their depositions, witnesses in the action to whom disclosure is reasonably necessary and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the Parties or ordered by the court.  Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order; and

(h)     the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information.

8.     <u>PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER
       LITIGATION</u>

4812-8335-7404.v1

If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" that Party must:

(a) promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

(b) promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Stipulated Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material – and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

9. **A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION**

(a) The terms of this Order are applicable to information produced by a Non-Party in this action and designated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(b) In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

11

4812-8335-7404.v1

1    (1)  promptly notify in writing the Requesting Party and the Non-Party that some or

2    all of the information requested is subject to a confidentiality agreement with a Non-Party;

3    (2)  promptly provide the Non-Party with a copy of the Stipulated Protective Order in

4    this litigation, the relevant discovery request(s), and a reasonably specific description of the

5    information requested; and

6    (3)  make the information requested available for inspection by the Non-Party.

7    (c)  If the Non-Party fails to object or seek a protective order from this court within 14

8    days of receiving the notice and accompanying information, the Receiving Party may produce the

9    Non-Party's confidential information responsive to the discovery request. If the Non-Party timely

10   seeks a protective order, the Receiving Party shall not produce any information in its possession or

11   control that is subject to the confidentiality agreement with the Non-Party before a determination by

12   the court.  Absent a court order to the contrary, the Non-Party shall bear the burden and expense of

13   seeking protection in this court of its Protected Material.

14   10.    UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL

15   If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected

16   Material to any person or in any circumstance not authorized under this Stipulated Protective Order,

17   the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized

18   disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c)

19   inform the person or persons to whom unauthorized disclosures were made of all the terms of this

20   Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to

21   Be Bound" that is attached hereto as Exhibit A.

22   11.    INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED

23          MATERIAL

24   When a Producing Party gives notice to Receiving Parties that certain inadvertently produced

25   material is subject to a claim of privilege or other protection, the obligations of the Receiving Parties

26   are those set forth in Federal Rule of Civil Procedure 26(b)(5)(B). This provision is not intended to

27   modify whatever procedure may be established in an e-discovery order that provides for production

28

12

without prior privilege review. Pursuant to Federal Rule of Evidence 502(d) and (e), insofar as the parties reach an agreement on the effect of disclosure of a communication or information covered by the attorney-client privilege or work product protection, the parties may incorporate their agreement in the stipulated protective order submitted to the court.

12.    MISCELLANEOUS

      12.1    Right to Further Relief. Nothing in this Order abridges the right of any person to seek its modification by the court in the future.

      12.2    Right to Assert Other Objections. By stipulating to the entry of this Protective Order no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Stipulated Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

      12.3    Filing Protected Material. Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Material. A Party that seeks to file under seal any Protected Material must comply with Civil Local Rule 79-5. Protected Material may only be filed under seal pursuant to a court order authorizing the sealing of the specific Protected Material at issue. Pursuant to Civil Local Rule 79-5, a sealing order will issue only upon a request establishing that the Protected Material at issue is privileged, protectable as a trade secret, or otherwise entitled to protection under the law. If a Receiving Party's request to file Protected Material under seal pursuant to Civil Local Rule 79-5(d) is denied by the court, then the Receiving Party may file the information in the public record pursuant to Civil Local Rule 79-5(e) unless otherwise instructed by the court.

13.    FINAL DISPOSITION

      Within 60 days after the final disposition of this action, as defined in paragraph 4, each Receiving Party must return all Protected Material to the Producing Party or destroy such material. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether

13

4812-8335-7404.v1

the Protected Material is returned or destroyed, the Receiving Party must submit a written

certification to the Producing Party (and, if not the same person or entity, to the Designating Party)

by the 60 day deadline that (1) identifies (by category, where appropriate) all the Protected Material

that was returned or destroyed and (2) affirms that the Receiving Party has not retained any copies,

abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected

Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all

pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda,

correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant

and expert work product, even if such materials contain Protected Material. Any such archival copies

that contain or constitute Protected Material remain subject to this Protective Order as set forth in

Section 4 (DURATION).

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.


DATED:  February 12, 2021               ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                    SHAWN A. WILLIAMS
                                    DANIEL J. PFEFFERBAUM
                                    KENNETH J. BLACK
                                    HADIYA K. DESHMUKH


                                              s/ Shawn A. Williams
                                       SHAWN A. WILLIAMS

                                   Post Montgomery Center
                                   One Montgomery Street, Suite 1800
                                   San Francisco, CA  94104
                                   Telephone:  415/288-4545
                                   415/288-4534 (fax)
                                   shawnw@rgrdlaw.com
                                   dpfefferbaum@rgrdlaw.com
                                   kennyb@rgrdlaw.com
                                   hdeshmukh@rgrdlaw.com

14

1                                                                   ROBBINS GELLER RUDMAN
2                                                                       &DOWD LLP

MARK SOLOMON
TOR GRONBORG
DANIELLE S. MYERS
JUAN CARLOS SANCHEZ
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
marks@rgrdlaw.com
torg@rgrdlaw.com
dmyers@rgrdlaw.com
jsanchez@rgrdlaw.com

Lead Counsel for Lead Plaintiff

LABATON SUCHAROW LLP
CAROL VILLEGAS
140 Broadway
New York, NY 10005
Telephone: 212/907-0700

Counsel for Employees' Retirement System of the State of Rhode Island

DATED: February 12, 2021    ORRICK, HERRINGTON & SUTCLIFFE LLP
JAMES N. KRAMER
ALEXANDER K. TALARIDES

s/ James N. Kramer
JAMES N. KRAMER

The Orrick Building
405 Howard Street
San Francisco, CA 94105
Telephone: 415/773-5700
jkramer@orrick.com
atalarides@orrick.com

Counsel for Defendants

15

4812-8335-7404.v1

CERTIFICATE PURSUANT TO LOCAL RULE 5-1(i)(3)

I, Shawn A. Williams, am the ECF user whose identification and password are being used to file the [Proposed] Stipulated Protective Order.  In compliance with Local Rule 5-1(i)(3), I hereby attest that James N. Kramer has concurred in this filing.

s/ Shawn A. Williams
_____

SHAWN A. WILLIAMS

\*        \*        \*

**O R D E R**

PURSUANT TO STIPULATION, IT IS SO ORDERED.

DATED: March 4, 2021

THE HONORABLE YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT JUDGE

16

4812-8335-7404.v1

EXHIBIT A

ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of _____ [print or type full address], declare under penalty of perjury that I have read in its entirety and understand the Stipulated Protective Order that was issued by the United States District Court for the Northern District of California on _____ [date] in the case of *In re Apple Inc. Sec. Litig.*, No. 4:19-cv-02033-YGR, (N.D. Cal.). I agree to comply with and to be bound by all the terms of this Stipulated Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to this Stipulated Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the Northern District of California for the purpose of enforcing the terms of this Stipulated Protective Order, even if such enforcement proceedings occur after termination of this action.

I hereby appoint _____ [print or type full name] of

_____ [print or type full address and telephone number] as my California agent for service of process in connection with this action or any proceedings related to enforcement of this Stipulated Protective Order.

Date: _____

City and State where sworn and signed: _____

Printed name: _____

Signature: _____

17

4812-8335-7404.v1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on February 12, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Shawn A. Williams

SHAWN A. WILLIAMS
ROBBINS GELLER RUDMAN
   & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
E-mail: shawnw@rgrdlaw.com

# EXHIBIT 4

## Robbins Geller
## Rudman & Dowd LLP

| | | |
|---|---|---|
| Boca Raton | Melville | San Diego |
| Chicago | Nashville | San Francisco |
| Manhattan | Philadelphia | Washington, D.C. |

John H. George
jgeorge@rgrdlaw.com

March 17, 2021

<u>VIA EMAIL</u>

William J. Foley
Orrick, Herrington & Sutcliffe LLP
51 W. 52nd St.
New York, NY 10019
wfoley@orrick.com

M. Todd Scott
Orrick, Herrington & Sutcliffe LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105
tscott@orrick.com

Re:   *In re Apple Inc. Sec. Litig.*, No. 4:19-cv-02033-YGR (N.D. Cal.)

Dear Bill and Todd:

We write on behalf of Lead Plaintiff Norfolk County[1], Named Plaintiff City of Roseville[2] and Named Plaintiff Rhode Island[3] (collectively, "Plaintiffs") to summarize the parties' telephonic meet and confer held on March 8, 2021 and March 11, 2021 concerning Plaintiffs' Objections and Responses[4] to Defendants'[5] First Requests for Production of Documents to Lead Plaintiff Norfolk County Council as Administering Authority of the Norfolk Pension Fund, Plaintiff Employees' Retirement System of the State of Rhode Island and Plaintiff City of Roseville Employees' Retirement System ("RFPs").

---

[1]   "Lead Plaintiff" and "Norfolk County" refer to Lead Plaintiff Norfolk County Council as Administering Authority of the Norfolk Pension Fund.

[2]   "City of Roseville" refers to Plaintiff City of Roseville Employees' Retirement System.

[3]   "Rhode Island" refers to Plaintiff Employees' Retirement System of the State of Rhode Island.

[4]   "Objections and Responses" refers, collectively, to:  (1) Lead Plaintiff Norfolk County Council as Administering Authority of the Norfolk Pension Fund's Objections and Responses to Defendants' First Requests for Production of Documents to Lead Plaintiff Norfolk County Council as Administering Authority of the Norfolk Pension Fund, Plaintiff Employees' Retirement System of the State of Rhode Island and Plaintiff City of Roseville Employees' Retirement System; (2) Named Plaintiff City of Roseville Employees' Retirement System's Objections and Responses to Defendants' First Requests for Production of Documents to Lead Plaintiff Norfolk County Council as Administering Authority of the Norfolk Pension Fund, Plaintiff Employees' Retirement System of the State of Rhode Island and Plaintiff City of Roseville Employees' Retirement System; and (3) Named Plaintiff Employees' Retirement System of the State of Rhode Island's Objections and Responses to Defendants' First Requests for Production of Documents to Lead Plaintiff Norfolk County Council as Administering Authority of the Norfolk Pension Fund, Plaintiff Employees' Retirement System of the State of Rhode Island and Plaintiff City of Roseville Employees' Retirement System.

[5]   "Defendants' are Apple, Inc., Timothy D. Cook and Luca Maestri.

# Robbins Geller
# Rudman & Dowd LLP

William J. Foley
M. Todd Scott
March 17, 2021
Page 2

## Relevant Time Period

We began by discussing the relevant time period for the RFPs, which was not defined by the RFPs. You proposed a "default" time period of April 1, 2018 through April 1, 2019, and stated that it applied to each RFP unless you informed us otherwise. Presumably Defendants have selected that default time period because it is the agreed-upon time period for Defendants' production of documents requested by Plaintiffs. However, Defendants' proposed time period is neither relevant nor reasonable for Plaintiffs' productions under the circumstances. The Class Period runs from November 2, 2018 through January 2, 2019, inclusive, and you have offered no explanation regarding how Plaintiffs' documents from seven months before the Class Period begins and three months after it ends are relevant to the claims or defenses in this action. Instead, Plaintiffs will apply the time period August 1, 2018 through January 31, 2019, which more than encompasses Plaintiffs' relevant transactions in Apple securities and the disclosures leading to their losses at issue.

## RFP No. 1

You stated that Defendants' requested time period for RFP No. 1 is April 1, 2018 ***to the present day***. When asked how this period, which goes beyond the end of the Class Period by more than two years, could possibly be relevant, you stated that recent purchases could establish unique defenses. This is incorrect. As numerous courts have recognized, post-disclosure purchases do not render a proposed class representative atypical due to the existence of a unique defense. *See, e.g.*, *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 577 (N.D. Cal. 2009) (holding post-disclosure purchases do not defeat typicality or present unique defenses); *Children's Hosp. & Med. Ctr. Found. of Omaha v. Countrywide Fin. Corp.*, 2011 U.S. Dist. LEXIS 166291, at *19 (C.D. Cal. Aug. 22, 2011) ("[C]ourts are nearly unanimous that post-disclosure purchases do not rebut a presumption of reliance for shares purchased before the disclosure."). As for the seven months preceding the start of the Class Period, you offered no explanation for why that period is relevant. As explained above, Plaintiffs will apply a relevant time period of August 1, 2018 through January 31, 2019 for RFP No. 1.

At the beginning of our March 11 call, you agreed to limit RFA No. 1 to the Plaintiffs' account statements, investment management agreements and related contracts with their respective managers and communications between Plaintiffs and their respective managers regarding transactions in Apple securities. This limitation followed our explanation that Plaintiffs' transactions are carried out by their respective investment managers without Plaintiffs' direct involvement and that the vast majority of the requested documents are not within Plaintiffs' possession, custody or control or, as with trade confirmation slips, are merely duplicative and cumulative of other trading records. Your statement that some of the investment managers are in other countries (which is only accurate as to Norfolk County's managers), does not change Plaintiffs' lack of control over their managers' documents, which Defendants may seek directly from the managers, even those outside the United States *See Villella v. Chem. & Mining Co. of Chile Inc.*, 2018 U.S. Dist. LEXIS 99151 (S.D.N.Y. June 13, 2018)

Robbins Geller
Rudman & Dowd LLP

William J. Foley
M. Todd Scott
March 17, 2021
Page 3

(granting motion to seek discovery under Hague Convention from plaintiff's British investment manager).

In response to RFP No. 1, Plaintiffs will conduct a reasonable search for and produce their respective investment guidelines or policies, investment management agreements (and/or related contracts), accounting statements and communications with their respective investment managers concerning transactions in Apple securities for the time period August 1, 2018 through January 31, 2019.

**RFP No. 2**

RFP No. 2 seeks all documents regarding transactions in the securities of consumer electronics, software and technology companies and you stated that time period is April 1, 2018 through April 1, 2019. As set out above, this time period is over broad. When asked about how transactions in other securities could be relevant to the parties' claims or defenses, you stated that Defendants were attempting to discover whether Plaintiffs' transactions in Apple securities were part of an "industry block" purchase. As we stated on the call, transactions in the securities of other companies are not relevant. *See In re New Century*, 2009 U.S. Dist. LEXIS 144557, at *13 (C.D. Cal. Dec. 7, 2009) ("in securities class actions, courts routinely deny general discovery into a plaintiff's trading and investment strategy in other securities"); *In re Northfield Labs. Sec. Litig.*, 264 F.R.D. 407, 410 (N.D. Ill. 2009) (denying motion to compel "trading history in securities other than [defendant's]"). To the extent that documents reflecting Plaintiffs' transactions in Apple securities also show transactions in securities of other companies, Plaintiffs will not redact that information, but they will not search for or produce documents related to non-Apple securities transactions in response to this Request.

**RFP No. 3**

As we explained, RFP No. 3, as written, is limited to documents reviewed, considered or relied on in connection with Plaintiffs' "decision" to buy or sell Apple securities, but the decision to purchase a particular security is made by Plaintiffs' investment managers. The documents sought by RFP No. 3, to the extent they exist, are therefore within the investment managers' possession, custody and control. Moreover, even if Plaintiffs had possession, custody or control of a particular document that an investment manager considered in its decision to purchase Apple securities, Plaintiffs are not able to identify it as having been relied on by the investment manager because Plaintiffs were not involved in making the investment decisions.

You stated that the applicable time period for RFP No. 3 is April 1, 2018 through the date of the last transaction in Apple securities for each Plaintiff, which, could conceivably mean *to the present day*. Defendants' proposed time period is unreasonably broad. Transactions in Apple securities that occurred months before or months or even years after the end of the Class Period (assuming such transactions occurred) have no bearing on the claims or defenses in this litigation.

4836-5125-9617.v1

**Robbins Geller**
**Rudman & Dowd LLP**

William J. Foley
M. Todd Scott
March 17, 2021
Page 4

## RFP No. 4

As discussed, and based upon our investigation to date, Plaintiffs delegate investment authority to investment managers and do not perform their own research or investigations to determine which securities to purchase. And, as set out above, Plaintiffs' investments in securities or companies other than Apple, and any research or investigations regarding them, are irrelevant to the claims or defenses in this action. As we explained on the call, RFP No. 4 is drafted so broadly (*e.g.*, all research, however informal, about any consumer electronics company or the consumer electronics industry untethered to any securities transaction) that it would necessarily include plainly irrelevant documents like, for example, an article in a magazine or online about any company or industry involved at all in technology or electronics. You agreed that reading a magazine with an article about a tech company was not what Defendants intended to request by RFP No. 4.

Although they are unlikely to possess such documents, Plaintiffs will conduct a reasonable search for and produce, to the extent they are within their possession, custody or control and can be identified, non-privileged documents regarding research or investigations of Apple related to any transactions in Apple securities for the time period August 1, 2018 through January 31, 2019.

## RFP No. 5

During our call, you stated that RFP No. 5 is related to RFP Nos. 3 and 4 in seeking the "universe" of documents Plaintiffs relied on when making their decision to purchase Apple securities. You also clarified that RFP No. 5 is limited to documents related to Plaintiffs' transactions in Apple securities, although this limitation was not clear from the text of RFP No. 5, which, as drafted, is exceptionally overbroad. As with RFP Nos. 3 and 4, the documents Defendants seek with RFP No. 5 (even as narrowed) are likely not within Plaintiffs' possession, custody or control as they delegate specific investment decisions to others. Additionally, RFP No. 5 seeks documents that Plaintiffs cannot possibly identify, and are plainly irrelevant, including, for example, all documents "acquired from any source at any time" regarding Apple's current and former unidentified "employees, shareholders, agents, independent contractors, attorneys, or representatives." This would likely encompass hundreds of thousands of individuals and entities. Plaintiffs have no way of knowing who these people are, let alone how information to, from or about them is relevant to the case.

Although they are unlikely to possess such documents, Plaintiffs will conduct a reasonable search for and produce, to the extent they are within their possession, custody or control, non-privileged documents they received or acquired regarding Apple's business or the value of Apple's securities related to any transactions in Apple securities for the time period August 1, 2018 through January 31, 2019.

Robbins Geller
Rudman & Dowd LLP

William J. Foley
M. Todd Scott
March 17, 2021
Page 5

**RFP No. 6**

You explained that RFP No. 6 seeks promises of monetary or non-monetary compensation made to Plaintiffs for participating in litigation and that the time period was unlimited. We inquired as to whether this applied to all litigation ever, as the request is written, and you said Defendants were "interested in *this* litigation." There are no promises of monetary or non-monetary compensation made to Plaintiffs for participating in this litigation, as Plaintiffs certified in their respective certifications filed in this action. ECF Nos. 1 at 21-22; 27-1 at 2-3; 37-8 at 2-3.

**RFP No. 7**

We inquired as to the relevance of the documents sought by RFP No. 7, which requests "[a]ll documents regarding any lawsuit, arbitration, or administrative proceeding in which [Plaintiffs] have been, are, or sought to be a party or class member" under the securities laws. You responded that you did not know, but they could be related to Class certification. This is plainly insufficient. You also stated that Defendants are seeking transcripts of every deposition Plaintiffs' representatives have given in other cases. As you know, such transcripts are nearly universally protected by confidentiality orders. Such transcripts also are not relevant to the claims or defenses at issue in this action, and you offered no explanation as to how they could be. Tellingly, you were also unwilling to respond to our inquiry as to whether Defendants were willing to waive confidentiality and produce transcripts of every deposition that they have ever given.

As we explained, Plaintiffs' filings related to the lead plaintiff motions all disclose, pursuant to the PSLRA, the cases in which each Plaintiff has sought to serve as representative in the 3-year period preceding the filings. In response to our explanation that Plaintiffs have been class members in many cases in which they have no role as a named party, you agreed to limit RFP No. 7 to securities actions where Plaintiffs were involved in a "representative capacity."

As discussed with respect to RFP No. 13, the main relevant information sought by RFP No. 7 – the securities actions in which Plaintiffs have served in representative capacities – is typically sought by interrogatory as that method is far more efficient than producing documents that simply identify each action. Plaintiffs propose, in satisfaction of this Request, to send Defendants a list of each federal securities action filed within the previous five years in which they served as a court-appointed lead plaintiff or class representative.

**RFP No. 8**

RFP No. 8 requests "[a]ll Documents regarding any Communications," unlimited by topic, between Plaintiffs and any potential Class members. In addition to requesting plainly irrelevant documents and communications, RFP No. 8 seeks documents that Plaintiffs cannot possibly identify as they are unaware of the identities of every potential Class member. Your statement that Defendants were most interested in communications by the Plaintiffs' themselves with other Apple investors

Robbins Geller
Rudman & Dowd LLP

William J. Foley
M. Todd Scott
March 17, 2021
Page 6

about Apple or this litigation does not cure the deficiencies. Plaintiffs do not know the identity of every Apple investor for your proposed time period of April 1, 2018 through April 1, 2019. Nor are communications between Plaintiffs and other Apple investors about this litigation relevant to any claim or defense at issue.

## RFP No. 9

As with RFP No. 5, Plaintiffs have no way to readily identify Apple's "current or former . . . employees, independent contractors, or agents." RFP No. 9 also is not limited to any topic and therefore seeks documents irrelevant to this litigation. You stated that Defendants only seek "relevant" communications, but that offers no meaningful way of searching for or identifying such communications. Additionally, to the extent communications exist, Apple already has them. Because RFP No. 9 seeks Plaintiffs' communications with Defendants and Apple's employees and agents, Apple should search its communications for whatever communications with Plaintiffs it believes exist.

## RFP No. 10

You stated that the time period for RFP No. 10 is April 1, 2018 until the date the suit was filed. This time period, which begins nearly seven months before the first alleged misstatements giving rise to the action is not reasonable or relevant. In response to our request for examples of what documents RFP No. 10 requested that were not covered by prior requests, you stated that Defendants were requesting, for example, documents relating to a process for monitoring lawsuits or investments. Because this Request seeks documents regarding Plaintiffs' decision to bring suit, most, if not all, of those documents will be protected by the attorney-client privilege or work product doctrine. Accordingly, Plaintiffs will conduct a reasonable search for and produce non-privileged documents relating to its decision to file this action.

## RFP No. 11

You stated that RFP No. 11 seeks communications within the Plaintiff Funds regarding choice of counsel, communications with law firms regarding representation and documents regarding research of law firms. You stated that the requested documents are potentially relevant to Plaintiffs' adequacy because they relate to "whether the Funds are driving the bus." In addition to seeking obviously privileged communications with counsel, the documents are not relevant to Plaintiffs' adequacy. Adequacy turns on whether a proposed class representative has a serious, actual conflict of interest with other class members, not the Plaintiffs' deliberations about selecting counsel. *See In re Twitter Inc. Sec. Litig.*, 326 F.R.D. 619, 626 (N.D. Cal. 2018) (class representatives are adequate where they have no "conflicts of interest with other class members" and will "prosecute the action vigorously on behalf of the class"); *In re Static Random Access Memory Antitrust Litig.*, 264 F.R.D. 603, 609 (N.D. Cal. 2009) ("[t]he mere potential for a conflict of interest is not sufficient to defeat

# Robbins Geller
# Rudman & Dowd LLP

William J. Foley
M. Todd Scott
March 17, 2021
Page 7

class certification; the conflict must be actual.").  While an inappropriate financial incentive between a proposed class representative and counsel can bear on adequacy, that is the subject of RFP No. 6.

## RFP No. 12

You stated that RFP No. 12 seeks documents regarding any business or social relationship, apart from this litigation and the attorney-client relationship, between Norfolk County or City of Roseville and Robbins Geller Rudman & Dowd LLP or between Rhode Island and Labaton Sucharow LLP.  When asked what was meant by "social relationship," you did not provide examples or definitions, instead stating that derivative litigation should provide a definition.  Nor could you provide examples of what types of *documents* were sought that would pertain to a social relationship. As with many other requests, you merely stated that RFP No. 12 was relevant to "adequacy" without attempting to provide an explanation as to how such documents would bear on whether Plaintiffs have an actual conflict of interest with other Class members.  In fact, courts have held that even close friendships between a class representative and his or her attorney does not create the actual conflict required to show inadequacy.  *See, e.g.*, *Zeisel v. Diamond Foods*, *Inc.*, 2011 U.S. Dist. LEXIS 60608, at *29 (N.D. Cal. June 7, 2011).

## RFP No. 13

You clarified that RFP No. 13 seeks documents sufficient to identify the previous actions in which Plaintiffs were represented by the law firms in this action.  We explained that this information is more easily sought by an interrogatory or informal request, as opposed to production of documents identifying any previous actions.  Moreover, pursuant to the PSLRA, Plaintiffs identified the actions in which they sought to be representative plaintiffs during the 3-year period in the certifications filed with the lead plaintiff motions.  ECF Nos. 1 at 21; 27-1 at 2; 37-8 at 2.

Per our discussion, Plaintiffs propose, in satisfaction of this Request, sending Defendants a list of each federal securities action filed within the previous five years in which they served as a court-appointed lead plaintiff or class representative.

## RFP No. 14

In response to our inquiry as to how RFP No. 14 differed from RFP No. 11, you acknowledged that they sought similar information and substantially overlapped.  As with RFP No. 11, the documents sought by RFP No. 14 have no relevance to adequacy, that is, whether Plaintiffs have

**Robbins Geller**
**Rudman & Dowd** LLP

William J. Foley
M. Todd Scott
March 17, 2021
Page 8

actual conflicts of interest with other Class members. The only conceivable relevance, an improper
financial arrangement, is the subject of RFP No. 6.

## RFP No. 15

While the parties did not meet and confer regarding RFP No. 15, it seeks Plaintiffs' fee
agreements with counsel. As many courts have held, such agreements are not relevant or
discoverable. *See, e.g.*, *Clark v. Berkshire Med. Ctr., Inc.*, 2019 U.S. Dist. LEXIS 376, at *11 (D.
Mass. Jan. 2, 2019); (denying motion to compel engagement letters between proposed class
representative and counsel); *In re Riddell Concussion Reduction Litig.*, 2016 U.S. Dist. LEXIS
193654, at *8 (D.N.J. Jan. 19, 2016) ("Fee agreements are generally not discoverable unless the party
seeking the discovery makes a preliminary showing of a relevant conflict or a *prima facie* challenge
to the class representatives' adequacy to act as a class representative."); *Piazza v. First Am. Title Ins.
Co.*, 2007 U.S. Dist. LEXIS 89319, at *3 (D. Conn. Dec. 5, 2007) ("several leading cases and treatises
have held that the fee arrangements between a plaintiff and her counsel are not relevant to certification
issues").

## RFP No. 16

You acknowledged that RFP No. 16 is a "catch-all" Request and that Defendants want to
ensure there is no non-public information supporting the Complaint's[6] allegations that they are
unaware of. We explained that the information supporting the allegations in the Complaint, which
the RFPs define as the Revised Consolidated Class Action Complaint, is all public information
accessible to Defendants.

## RFP No. 17

RFP No. 17 seeks documents related to any investigation undertaken concerning this action.
You stated that RFP No. 17, as well as every other RFP, only applies to Plaintiffs' documents and
not Plaintiffs' counsels' documents. Plaintiffs will conduct a reasonable inquiry into whether non-
privileged documents regarding an investigation undertaken by Plaintiffs concerning the allegations
in the Complaint.

## RFP No. 18

We explained that the Complaint, as defined by the RFPs, does not rely on any confidential
witnesses and directed your attention to footnote 11 of the Complaint, which specifically states,

---

[6]   Revised Consolidated Class Action Complaint for Violation of the Federal Securities Laws (ECF No. 114)
("Complaint").

**Robbins Geller**
**Rudman & Dowd** LLP

William J. Foley
M. Todd Scott
March 17, 2021
Page 9

"consistent with the June 2, 2020 Order, the Revised Consolidated Complaint does not rely on the accounts of the CWs." Complaint, ¶66(c) n.11. You also confirmed that, as with other RFPs, RFP No. 18 was not seeking Plaintiffs' counsels' communications with witnesses, just Plaintiffs' (or as you put it, "the clients'") communications with potential witnesses. With that clarification, we represented that Plaintiffs did not have communications with any witnesses.

**RFP No. 19**

Damages in this case will be the subject of expert testimony, which is not due to be disclosed until April 27, 2022. RFP No. 19, which requests documents regarding Plaintiffs' and Class members' damages or losses, is therefore premature. Defendants have already sought, pursuant to other RFPs, documents sufficient to show Plaintiffs' transactions in Apple securities. When the time for expert disclosures comes, Plaintiffs will provide the required report and related documents pursuant to Rule 26. To the extent RFP No. 19 seeks records showing Plaintiffs' transactions in Apple securities, it is duplicative of RFP No. 1.

**RFP Nos. 20-24**

RFP Nos. 20 through 24 all concern documents supporting Plaintiffs' motion for class certification, which has not been filed and is not due before May 5, 2021. When Plaintiffs' motion to certify the proposed Class is filed, which Plaintiffs have the burden of supporting with evidence, Plaintiffs will provide the documents and any expert reports, and underlying data, supporting the motion. Until then, Defendants' request for such documents is premature.

**RFP No. 25**

As with our discussion of RFP No. 18, we pointed out that the Complaint does not rely on or contain allegations from any confidential witnesses. You made clear that, as for the other RFPs, Defendants were not seeking Plaintiffs' counsels' documents or communications regarding witnesses and instead were only seeking the clients' communications with or documents from potential witnesses. With that limitation, we represented that Plaintiffs were not involved in identifying or communicating with any witnesses and therefore have no documents responsive to this Request.

Very truly yours,

JOHN H. GEORGE

JHG:rb

4836-5125-9617.v1

# EXHIBIT 5

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                   OAKLAND DIVISION

4

5    IN RE APPLE INC. SECURITIES LITIGATION

     _____

6    This Document Relates To:

     ALL ACTIONS.

7

8

9

10

11      ***CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER***

12

13                 TUESDAY, JUNE 22, 2021

14                      - - -

15

16

17       Videotaped Remote Deposition of

18    ALEXANDER YOUNGER, beginning at 3:09 P.M., before

19    Nancy J. Martin, a Registered Merit Reporter,

20    Certified Shorthand Reporter.

21

22

23

24

25

                                        Page  1

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1    A P P E A R A N C E S :
 2
      TODD SCOTT, ESQ.
 3    TRISTAN ALLEN, ESQ.
      ORRICK HERRINGTON & SUTCLIFFE
 4    405 Howard Street
      San Francisco, California  94105
 5    (415) 773-5992
      tscott@orrick.com
 6    Counsel for Defendants
 7
 8    MARK SOLOMON, ESQ
      JOHN GEORGE, ESQ.
 9    HADIYA DESHMUKH, ESQ.
      SHAWN WILLIAMS, ESQ.
10    ROBBINS GELLER RUDMAN & DOWD LLP
      655 West Broadway
11    Suite 1900
      San Diego, California 92101
12    marks@rgrdlaw.com
      Counsel for Northern Pension Fund and the witness,
13    Alex Younger
14
      CHRISTINE M. FOX, ATTORNEY AT LAW
15    LABATON SUCHAROW
      140 Broadway
16    34th Floor
      New York, New York 10005
17    (212) 907-0700
      cfox@labaton.com
18    Counsel for Plaintiffs
19
20    ALSO PRESENT:
21    ANDREW FARTHING, APPLE INC.
22
23
24
25
```

Page  2

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1                        I N D E X
 2    TESTIMONY OF ALEXANDER YOUNGER              PAGE
 3    BY MR. SCOTT                                7
 4    BY MR. SOLOMON                              143
 5
                        E X H I B I T S
 6
      NUMBER              DESCRIPTION           MARKED
 7
      Exhibit 1           DEFENDANTS AMENDED NOTICE    19
 8                        OF DEPOSITION OF LEAD
                          PLAINTIFF NORFOLK COUNTY
 9                        COUNCIL AS ADMINISTERING
                          AUTHORITY OF THE NORFOLK
10                        PENSION FUND PURSUANT TO
                          FEDERAL RULE OF CIVIL
11                        PROCEDURE 30(b)(6), 8 pages
12    Exhibit 2           E-mail dated April 15,       84
                          2019, Conversation with
13                        George Simon, 1 page
14    Exhibit 3           Investment Strategy          98
                          Statement, 48 pages
15
      Exhibit 4           Investment Management        106
16                        Agreement, August 12, 1998,
                          72 pages
17
      Exhibit 5           Investment Management        109
18                        Agreement between Norfolk
                          County Council as
19                        administering authority for
                          Norfolk Pension Fund and
20                        Capital International
                          Limited, 54 pages
21
      Exhibit 6           Movant's Purchases and       113
22                        Losses, 3 pages
23    Exhibit 7           HSBC Fund Services,          118
                          Transactions Listings,
24                        35 pages
25


                                             Page  3
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1          THE WITNESS:  I could be terribly English and

2    get another cup of tea if that was okay.  I'm very

3    grateful for that.  Thank you.

4          MR. SOLOMON:  Alex, I'll take a break as

5    well.

6          MR. SCOTT:  Let's take 10 minutes so

7    everybody can do what they need to do, and we'll come

8    back and try to finish it up.

9          THE WITNESS:  I appreciate that.  Thank you.

10          THE VIDEOGRAPHER:  We're going off the record

11    at 4:59 p.m.  This is the end of Media 2.

12          (Recess taken from 4:59 p.m. to 5:12 p.m.)

13          THE VIDEOGRAPHER:  We are on the record at

14    5:12 p.m.  This is the beginning of Media 3 in the

15    deposition of Alexander Younger.

16          REPORTER MARTIN:  You're on mute, Todd.

17    There you go.

18    BY MR. SCOTT:

19      Q.  I was asking if you could hear me, and you

20    could not.  Can you hear me now?

21      A.  I can, yes.

22      Q.  Okay.  Thank you.  I'm going to ask -- I'd

23    like to ask just a few more questions about how the

24    Fund initiates and maintains litigation.  I think some

25    of this might overlap with what we've discussed.  So I

                                         Page 74

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1   apologize if I happen to repeat myself.

2           I think you already answered this, but do

3   you -- does the Fund have any formal policies or

4   procedures that govern the filing of a securities

5   lawsuit?  I think you said no to that previously.

6       A.  No, not specific to a securities lawsuit.

7       Q.  So the securities lawsuits where you have

8   served as lead plaintiff -- where the Funds have

9   served as lead plaintiff, did you make the decision to

10  file the lawsuit -- scratch that.

11          Did you identify the wrongdoing about which

12  the lawsuit was filed, or did your attorneys bring

13  that claim to you?

14          MR. SOLOMON:  Objection.  Form.

15          THE WITNESS:  The attorney --

16          MR. SOLOMON:  Go ahead, Alex.

17          THE WITNESS:  Sorry.  The attorneys bring the

18  claim to us for consideration and discussion.

19  BY MR. SCOTT:

20      Q.  So no one at Norfolk, for example, during the

21  2018 time frame, was monitoring Apple disclosures

22  looking for potential misstatements?

23      A.  No, because individual monitoring is a

24  responsibility of our investment managers.

25      Q.  So no one at the Fund monitors individual

Page 75

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    investments?  That's all delegated to the investment

2    managers?

3         A.  The investment managers are making stock

4    selection decisions.  As we've discussed, we have the

5    monitoring services engaged from the two law firms to

6    ensure we've covered the bases around potential fraud

7    emerging as a retrospective event.

8         Q.  Let me ask you this question:  What about

9    managing the lawsuits that you serve as lead

10   plaintiff -- where you serve as lead plaintiff?  Does

11   the Fund have any written policies or procedures for

12   litigation management?

13        A.  No, they are managed through, usually, our

14   management structures.

15        Q.  Can you describe how the litigation

16   management process works from a high level?

17        A.  Yeah.  So essentially -- sorry.  So the

18   day-to-day management of the litigation is brought

19   into my area of responsibility.  I will do that at all

20   times, and I work very closely with Glenn anyway, but

21   in consultation with Glenn.  Where any additional

22   decision making is required and is deemed appropriate

23   for that to fall to Section 151 in particular, we

24   would do that.

25        Q.  And what do you do in terms of managing a

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    particular lawsuit?

2              MR. SOLOMON:  Objection.  Vague.

3              Answer if you can, Alex.

4              THE WITNESS:  Yeah, of course.

5              So we will review filings, pleadings, and

6    briefings from the lawyers.  We will have pretty

7    regular contact to discuss and be sure of our

8    understanding, make sure that we've asked appropriate

9    questions on those documents.

10   BY MR. SCOTT:

11        Q.  And but for the below-the-line update that

12   you said the committee members receive regarding

13   ongoing litigation, do you provide any other updates

14   to the committee with regards to ongoing litigation?

15        A.  There's not any regular update.  We have, on

16   occasions, provided some additional material to the

17   chair where that's been requested.

18             MR. SCOTT:  Okay.  Let's see.  Excuse me just

19   one moment.

20             (Pause in proceedings.)

21   BY MR. SCOTT:

22        Q.  Do you maintain a separate file for each

23   lawsuit that's ongoing?

24        A.  Yes.

25        Q.  And you personally keep that?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      Q.   Okay.  Can your lawyers file Amended

2   Complaints, for example, without your prior approval?

3      A.   No, I don't believe so.

4      Q.   Can your lawyers send out discovery without

5   your prior approval?

6      A.   We are managing that process, so discussing

7   how that process is developing.  So I would say no.

8      Q.   Okay.  Can you schedule depositions without

9   your prior approval?

10      A.   So the mechanics of scheduling a date for a

11   deposition other than my own?

12      Q.   Yes.

13      A.   Obviously we're interested in who they're

14   deposing.  Whether they do that on a Friday or a

15   Monday, we'd say that's housekeeping, and indeed, it's

16   part of the negotiations with you guys as well.  We'd

17   acknowledge that.  So if it's simply the mechanics of

18   scheduling, yes, they can.  If it's who is being

19   deposed, then that's part of the conversation we have

20   as part of case management.

21      Q.   Understood.  Understood.  You've been very

22   forthright in your prior answers.  So I'm able to skip

23   past some of this questioning.

24           I'd like to just now discuss, if we can,

25   Norfolk's investment process generally.  We've covered

Page 94

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    some of them, but it's important to understand who

2    controls the investment and who makes the decisions

3    about the investments.  So, again, I do apologize if I

4    re-cover some territory we've previously tread, but I

5    just want to get this in one place.

6           Does Norfolk ever pick any of its specific

7    investments itself?

8       A.  Would you define an "investment" for me.  If

9    you mean a line of common stock, no is the answer to

10   that question.

11      Q.  Okay.  Never -- never picks a line of common

12   stock on its own?

13      A.  Has never done that in the history of the

14   pension fund from 1974.

15      Q.  And I think I know the answer to this, but

16   why do you not pick your own stock to invest in?  Why

17   doesn't the committee make investment decisions?

18      A.  Because the investment strategy is always to

19   use third-party experts in the running of individual

20   mandates to make those decisions as part of their

21   mandate management.

22      Q.  Is that also to shield management and the

23   committee from potential liability claims by the

24   members for, say, choosing the wrong stock?

25      A.   I think the board's clarified the committee

Page 95

1    would not have liability because their status is quasi
2    trustee under the Local Government Act.  So there
3    wouldn't be a motivation in that sense.
4         And there wouldn't be -- there essentially
5    wouldn't be something to sue about because the
6    members' benefits are payable in statute regardless of
7    a stock selection decision which we haven't made.  So
8    I think the answer to that is no, but the reason is
9    because I think it's pretty much a non-applicable.
10        Q.  It's more about hiring the best person to do
11   the job rather than shielding yourselves from any
12   accusations of being bad at the job?
13        A.  In all circumstances we hire third parties
14   because we think they are best placed to undertake the
15   job for us, be that running an equity mandate,
16   preparing legal statements in relations to work with
17   data employers or, indeed, a Fund actuary.  But it's
18   about governance and control of those relationships.
19        Q.  So the investment decisions with regards to
20   individual stocks are always left to the managers, the
21   Fund managers; correct?
22        A.  Within the investment guidelines and
23   parameters of their investment management agreements,
24   yes.
25        Q.  And where do those guidelines come from that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    they're given?

2         A.  They're part of the -- sorry.  When I talked

3    to you earlier, we go through a procurement process or

4    a manager, say, to run a global equity mandate.  That

5    global equity mandate is then appointed.  So the

6    headline will be, "You will run a global mandate

7    relative to whichever benchmark we have selected."

8              So MSCI World Countries Index, for example.

9    The INA will then contain more specific, more

10   risk-type guidelines upon which we will take legal

11   advice as the appropriateness of those risk

12   guidelines.  Sometimes that would involve taking more

13   investment advice, but typically, it's something that

14   comes from a law firm skilled and familiar in the

15   preparation of investment management agreements.

16             And those agreements are then executed and

17   managed.  So the strategic policy, which would be to

18   have a portfolio linked to the index, and then the

19   more underlying constraints within the IMA itself,

20   which is a high-risk management.

21             MR. SCOTT:  Let's look quickly at a document

22   that I think will help us put some meat on these

23   bones.

24             Tristan, can you please introduce the Norfolk

25   2009, Investment Strategy Report, please.

                                              Page 97

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1              (Deposition Exhibit 003 was marked for

2              identification.)

3              (Pause in proceedings.)

4         MR. SCOTT:  While we're waiting on this,

5    maybe I can just ask a couple of questions, and

6    Tristan, you can let us know when it's up there, just

7    so I don't waste your time here, Mr. Younger.

8         Q.  If I could, just so I understand, at the time

9    that the alleged misstatements were made in the case,

10   which was in November of 2018, were you aware of the

11   alleged misstatements at the time they were made?

12        A.  So was I listening to those statements on the

13   2nd of November, no.

14        Q.  Did you read anything about them on the 2nd

15   of November?

16        A.  Not that I recall.

17        Q.  So any investment decisions that were made on

18   behalf of the Fund after November 2 were not made on

19   the basis of your reliance on the statements; is that

20   correct?

21        A.  No, because those investment decisions are

22   made by the Fund managers.

23        Q.  And at the time, did you review -- in

24   November of 2018, did you or anyone at the Fund review

25   the Apple disclosures that are at issue in this case?

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1        A.   No, we did not.

2             MR. ALLEN:   The exhibit should be up.

3             MR. SCOTT:   Okay.   Let's refresh and see if

4    we can get the exhibit.

5             (Pause in proceedings.)

6    BY MR. SCOTT:

7        Q.   Okay.   I see it there.

8        A.   It's just opening.

9        Q.   Just let me know when you have the document

10   open.   Mine is taking a while as well.   I'll direct

11   you to a specific page.

12       A.   Okay.   I've got that document out, which is

13   our investment strategy.

14       Q.   Yes.   This document is entitled "Investment

15   Strategy Statement" for the Norfolk Pension Fund.

16   It's dated July of 2019.

17            How often is this investment strategy

18   statement updated by the Fund?

19       A.   When necessary to do so.

20       Q.   Okay.

21       A.   So, for example, we have, going to our next

22   committee, a slight refresh, which is primarily around

23   climate monitoring.   So -- because that's something

24   that we've agreed to bring in for a type of wording

25   change on the strategy statement.

Page 99

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      Q.   Understood.  If I could ask you to please

2    turn down to Section 3.3.2.

3      A.   It will have to catch up with itself.  You'll

4    have to forgive me.

5           MR. SCOTT:  Take your time.  Just let me know

6    when you have that section available and you've read

7    it.

8           THE WITNESS:  Okay.  I'm just reading it now.

9           (The witness reviewed Exhibit 0003.)

10          THE WITNESS:  Okay.  I've read that

11   statement.

12   BY MR. SCOTT:

13     Q.   I think this is what we were just talking

14   about.  Let me read just a little bit of it, and I'll

15   ask you a few follow-up questions.  It says, "The

16   Committee, after seeking appropriate investment

17   advice, has agreed to specific benchmarks with each

18   manager so that they reflect the Fund's strategic

19   objectives."

20          And I think this is the process you were just

21   describing where, when the Fund hired a manager, they

22   provide specific benchmarks to that manager; is that

23   correct?

24     A.   That's correct, yes.

25     Q.   And those specific benchmarks, I think I

Page 100

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    understood you to say are driven by the particular

2    investment that you're trying to make.

3            Is that a fair summary?

4        A.   Yes.  So global equity portfolio will have a

5    global equity benchmark.

6        Q.   The second sentence says, "The Investment

7    Managers are given discretion over the management of

8    their portfolio against the specified benchmark but

9    within agreed investment guidelines."

10           Where do those investment guidelines come

11   from?  Are those different from the benchmarks

12   referred to in the prior sentence?

13       A.   The guidelines would be within the IMA and

14   are more specific risk measures so they could refer to

15   maximum position sizing.  It may refer to maximum

16   off-benchmark positions you could hold.  So, for

17   example, a UK equity portfolio may have a

18   discretion -- or indeed, does have a discretion to

19   hold up to 10 percent of those assets in overseas

20   companies that it believes reflects some UK exposure,

21   but no more than 10 percent.

22           So there will be -- it will depend on the

23   individual IMA, but there will be more specific

24   guidelines around controlling some of the risks that

25   might otherwise arise in a portfolio.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    Q.   Does the particular manager have any input

2    into the benchmarks that they're given?

3    A.   Well, in their request for proposal would

4    have provided them with what we're looking for, which

5    would include a benchmark.  So they're bidding for

6    business on -- against a certain set of agreed terms

7    at most.  What will happen laterally is if a mandate

8    evolves over time, then we will do that in discussion

9    with the manager, but ultimately, it will be for the

10   committee to make that decision as to whether --

11   Q.   Is that --

12   A.   -- might be appropriate.  Sorry.

13   Q.   I'm sorry.  I interrupted you.

14        What happens if an investment manager, you

15   know, violates the investment guidelines you've given

16   him?

17   A.   Well, as regulated businesses I would say

18   typically they do not.  They tend to have very high

19   standards and control where we -- sometimes we would

20   see a temporary breach.  So a good example of that

21   within guidelines would be the performance of Tesla,

22   say, in the last year or so really resulted in outside

23   stock positions.  So it was quite difficult to settle

24   down particularly quickly within guidelines.

25        So there may have been one or two days when

Page 102

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    they were saying, "We are overweight but taking steps

2    to address."

3         That specific particular example we would

4    say, "Thank you very much.  We've recorded that the

5    breach has occurred, but we know what it's going to

6    take to rectify, and frankly, we know why it's

7    occurred and why, therefore, rectification is

8    required."

9         Q.  Is there a mechanism -- so if each individual

10   investment manager has discretion about which

11   individual stocks to purchase, that's in their

12   discretion.  Is there a mechanism by which all of the

13   investment managers are surveyed to make sure that

14   they have not accidentally overloaded one particular

15   stock?  Does that question make sense?

16        A.  Yeah.  So in my Tesla example, they all

17   bought Tesla, and we've got an awful lot of Tesla.

18        Q.  Right.

19        A.  No, we don't perform analysis at that level

20   because the constraints individually with the IMAs

21   should maintain that position, encompass it anyway.

22   So if nobody can hold more than 5 percent of that

23   portfolio in Tesla, our aggregate position -- I'm

24   sorry.  I apologize for picking on Tesla.

25        Our aggregate position is 5 percent of Tesla

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    across the portfolio.  So within our risk constraints

2    overall.  So we would not, therefore, have to then do

3    a dive in.  And, indeed, it would be undesirable to do

4    so because then we might be saying to somebody, who

5    perhaps isn't outside, "You need to manage the

6    portfolio," and we would then be making a

7    stock-specific instruction, which as I've said we

8    don't do.

9        Q.  Interesting.  Okay.  I like that.

10            Does this document that we're looking at now,

11   to the best of your knowledge, discuss the financial

12   benefits of filing securities litigation?

13       A.  I don't know if it discusses financial

14   benefits.

15       Q.  Does it discuss filing securities litigation

16   as part of the investment strategy generally?

17       A.  I take it we describe that as part of

18   investment strategy.  That's part of stewardship and

19   management of the Fund.

20            MR. SCOTT:  Understood.  Okay.  We can put

21   this document away.

22            I'd like to just quickly look at the

23   management agreement for Fidelity and Capital, and I'm

24   getting -- I would say I'm probably not more than 25,

25   30 minutes until I'm done.  Actually, maybe 30

Page 104

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    minutes.

2         Would you like to have another break now or

3    would you like to power through?  We're at the top of

4    the hour again.

5         THE WITNESS:  I'd quite like a break.  I'm

6    listening to my voice a lot.  But if that's okay with

7    you...

8         MR. SCOTT:  Completely up to you.

9         THE WITNESS:  Yeah.  Is that okay?

10        THE VIDEOGRAPHER:  We're going off the record

11   at 5:58 p.m.  This is the end of Media 3.

12        (A recess was taken from 5:58 p.m.

13        to 6:08 p.m.)

14        THE VIDEOGRAPHER:  We're on the record.  It's

15   6:08 p.m.  This is the beginning of Media 4 in the

16   deposition of Alexander Younger.

17        MR. SCOTT:  Thank you.

18        If we can, we uploaded some of the exhibits

19   in your absence.  So hopefully we don't have to wait

20   on them.  If you could please go to the Veritext

21   Exhibit Share and refresh it.

22        THE WITNESS:  Okay.  Let me get to that page

23   and refresh it.  Yeah.  Right.  So I can see a

24   Fidelity Management Agreement and a Capital Management

25   Agreement.  Which one would you like me to go to

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1   first?
 2           MR. SCOTT:  The Fidelity.
 3           (Deposition Exhibit 004 was marked for
 4           identification.)
 5           THE WITNESS:  Thank you.
 6   BY MR. SCOTT:
 7      Q.  And I'll give you just a minute to look at
 8   it, and see what it is.
 9      A.  Sorry.  It's just opening up, and I'm there
10   with it.  So which -- it's a 72-page document.  Which
11   one would you like me to go through?
12      Q.  Well, just as a general matter, can you
13   describe what this document is, please.
14      A.  It's an "INVESTMENT MANAGEMENT AGREEMENT,"
15   and this one dates from the original inception of this
16   mandate.  Dated on the first page, it's the 1998, and
17   I believe as well -- I haven't scrolled through, but
18   we did provide side letter amendments to it, which
19   are --
20      Q.  I see those amendments.  Thank you.
21      A.  Which are most typically -- you know, seen
22   most typically around fees as generally investment
23   management fees have come down throughout the industry
24   and as a consequence of the increasing AUN with
25   individual mandates.
```

Page 106

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    Q.  I understood you to say previously that each

2    investment manager is hired to pursue a particular

3    area of investment.  Can you help me understand why

4    you hired Fidelity in particular to be an investment

5    manager?

6    A.  I can't, actually, because I wasn't with the

7    Fund in 1998.  So I don't have the specifics of that

8    process.

9    Q.  So you don't know, for example, what section

10   of the industry Fidelity targets on behalf of the

11   Fund?

12   A.  I'm sorry.  The question was why we hired

13   them, and I didn't make that decision.  If the

14   question is why did Fidelity run money for you --

15   sorry.

16   Q.  I think that's a better question.

17   A.  I don't want to give you an answer because I

18   can't -- the process would have been followed.  They

19   would have come through what we call an AG process as

20   the best option.  That's why they would have been --

21   Q.  That's my --

22   A.  I wasn't involved in that process, full

23   disclosure.  So why Fidelity?

24   Q.  Yes.

25   A.  So partly it would have been about why we

Veritext Legal Solutions
866 299-5127

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1   have to now be there, long-term performance, that they
 2   have achieved for the pension funds.  In terms of
 3   their management of pension fund assets, it's their
 4   scale and expertise.
 5           Obviously, in terms of their ability to
 6   identify and manage entity portfolios, recognizing
 7   that that business will also run investments in other
 8   parts of capital structured companies, but our
 9   specific appointment is for equity.
10       Q.  How does Fidelity communicate with the Fund
11   about their work?
12       A.  So Fidelity will provide monthly accounting
13   statements and a quarterly report.
14       Q.  Do they ever give you oral updates?  Do they
15   give anyone at the firm oral updates?
16       A.  We will typically have a call with them,
17   generally once a quarter.  Not always.  It will depend
18   on practicalities, but generally, once a quarter.
19   Always, if things are bad or not quite working out for
20   a period of underperformance, we will perhaps have
21   more regular interaction with them.
22           So they will provide oral update in that
23   sense, and they will, when required, from time to time
24   present to the pensions committee.  That would
25   typically be -- they'll be presenting because things
```

Page 108

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    aren't working out.  If you look to the performance of
2    Fidelity mandate overall, they have been on line or
3    ahead of their targets.  That hasn't been the case
4    recently.
5        Q.  Do you ever communicate -- does anyone at the
6    Fund ever communicate with Fidelity about the purchase
7    or sale of specific stock?
8        A.  We don't, no.
9        Q.  Is it part of Fidelity's mandate to monitor
10   individual stocks as part of their investment
11   decisions?
12       A.  We would expect Fidelity to be analyzing and
13   monitoring publicly available information for their
14   holdings.
15       Q.  Do you know if Fidelity researched Apple in
16   November of 2018, for example?
17       A.  I don't know the specifics of that research.
18           (Deposition Exhibit 005 was marked for
19           identification.)
20   BY MR. SCOTT:
21       Q.  Okay.  Let's go back to our exhibit list and
22   now look at the Capital Management Agreement.  I'd
23   just like to run through some of the same questions.
24       A.  Okay.  Sorry.  Let me just scroll back.
25   That's just opened up.

Page 109

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1    Q.  Okay.  So take a moment to see what this is,

2    and then if you can please describe to me what this

3    document is from a high level.

4    A.  This is the Investment Management Agreement

5    from the date of appointment back in October of 2004

6    for Capital International.

7    Q.  And this is for them to serve as an

8    investment manager to the Fund; right?

9    A.  That's right.  So the other contracting party

10   is Norfolk County Council in its capacity as the

11   administering authority.

12   Q.  How is the services that Capital provides

13   different from what Fidelity provides?

14   A.  Well, they are -- they are common in that

15   they are a manager of global equities, but they

16   achieve a slightly -- they have a slightly different

17   benchmark.  So the Fidelity benchmark excludes the UK.

18   So it's just an overseas equity portfolio.

19          The Capital benchmark is an all countries

20   portfolio.  Therefore, it's including the UK market.

21   So there is a difference of benchmarks, but, in

22   essence, they are targeting equity benchmarks and

23   equity returns.

24   Q.  So they have different benchmarks, but

25   inasmuch as they overlap, that is the reason why the

Page 110

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1  two different managers both purchase Apple stock in

2  this case on behalf of the Fund?

3      A.  So Apple is a United States listed company.

4  The United States is in the ACWI Index and is also in

5  the UK overseas indices that Fidelity managed to.

6      Q.  So if I understand correctly, it's Fidelity

7  and Capital that purchased the Apple stock on behalf

8  of the Fund in this lawsuit?

9      A.  That's correct.

10      Q.  Were there any other investment managers who

11  purchased Apple stock on behalf of the Fund during the

12  relevant period?

13      A.  During the class period, no, they weren't.

14      Q.  Like Fidelity, is Capital charged with

15  investing -- I'm sorry, with investigating the

16  companies in which it invests?

17      A.  It will analyze those companies and monitor

18  them as part of its investment decision-making

19  process.

20      Q.  Do you know approximately how much of the

21  Fund's money that Capital managed in 2018 just on a

22  percentage basis?

23      A.  Back in 2018 the -- sorry.  It would be, give

24  or take -- and this is give or take around about

25  10 percent of assets under management, I believe.

Page 111

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

1      Q.   Is that true for Fidelity also, or do they

2    have a different percentage?

3      A.   Fidelity has a higher percentage, closer to

4    the mid-teens.

5      Q.   And is that because of their past success in

6    managing funds?

7      A.   It's more -- it's part of the organic

8    evolution of the investment strategy, frankly.  So

9    that on occasions mandates have been increased.

10   They've been reduced.  They've been used to fund other

11   mandates when we looked for the construction of

12   complimentary portfolios.

13     Q.   And are the Funds' communication with Capital

14   similar to what you just described with Fidelity where

15   they provide monthly and quarterly updates?

16     A.   Yeah.  Those statements that I described

17   would be common to both, and indeed, the sort of

18   overall meetings and on occasion participation in

19   pension committee.

20     Q.   And has anyone at Norfolk ever communicated

21   with Capital about the purchase or sale of specific

22   stocks?

23     A.   No.

24          MR. SCOTT:  Okay.  Well, let's move off of

25   this exhibit.

Page 112

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
 1                 C E R T I F I C A T E
 2        I do hereby certify that the aforesaid testimony
 3   was taken before me, pursuant to notice, at the time
 4   and place indicated; that said deponent was by me duly
 5   sworn to tell the truth, the whole truth, and nothing
 6   but the truth; that the testimony of said deponent was
 7   correctly recorded in machine shorthand by me and
 8   thereafter transcribed under my supervision with
 9   computer-aided transcription; that the deposition is a
10   true and correct record of the testimony given by the
11   witness; and that I am neither of counsel nor kin to
12   any party in said action, nor interested in the
13   outcome thereof.
14
15
              Nancy J. Martin, RMR, CSR
16
17   Dated:  June 28, 2021
18
19
20   (The foregoing certification of this transcript does
21   not apply to any reproduction of the same by any
22   means, unless under the direct control and/or
23   supervision of the certifying shorthand reporter.)
24
25
                                        Page 146
```

**TOPIC NO. 2:**

Capital International's decisions to enter into transactions relating to Apple Securities on behalf of or for the benefit of Norfolk on November 12, 2018, December 17, 2018, and December 20, 2018.

**TOPIC NO. 3:**

Capital International's investment policies, practices, or strategies utilized for the transactions Capital International made or entered into on behalf of or for the benefit of Norfolk between August 1, 2018 through April 2, 2019.

**TOPIC NO. 4:**

Capital International's analysis, evaluation, report, recommendation, or research regarding Apple or Apple Securities, including Apple's business conditions in China, between August 1, 2018 through April 2, 2019.

**TOPIC NO. 5:**

Capital International's knowledge of or reliance on any misrepresentations and/or omissions alleged in the Complaint in connection with any investment decisions concerning Apple Securities.

**TOPIC NO. 6:**

Communications, meetings, or other correspondence between Capital International or its affiliates and Apple Personnel from August 1, 2018 through January 31, 2019.

**TOPIC NO. 7:**

Communications, meetings, or other correspondence between Capital International or its affiliates and securities analysts or reporters, concerning Apple, Apple Securities, or this Litigation from August 1, 2018 through January 31, 2019.

**TOPIC NO. 8:**

      Communications, meetings, or other correspondence between Capital International and Norfolk concerning Apple, Apple Securities, or this Litigation between August 1, 2018 and April 2, 2019.