**Pages 1 - 39**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

```
                                )
                                )
In Re Apple Inc. Securities     )    NO. CV 19-02033-YGR
Litigation.                     )
                                )
                                )
_____ )
```

Oakland, California
Tuesday, January 18, 2022

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

ROBBINS GELLER RUDMAN & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
BY: **SHAWN A. WILLIAMS, ESQUIRE**
**DANIEL PFEFFERBAUM, ESQUIRE**

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway
San Diego, CA  92101
BY: **MARK SOLOMON, ESQUIRE**

For Defendants:

ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105
BY: **JAMES N. KRAMER, ESQUIRE**
**TRISTAN ALLEN, ESQUIRE**
**ARIEL WINAWER, ESQUIRE**

Reported By:      Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
Official Reporter

| | |
|---|---|
| 1 | **<u>Tuesday - January 18, 2022</u>**          **<u>2:00 p.m.</u>** |

<u>Tuesday - January 18, 2022</u>                                        <u>2:00 p.m.</u>

                    P R O C E E D I N G S

                         ---000---

        THE CLERK:  We are now calling CV 19-2033, In Re Apple

Inc. Securities Litigation.

     Counsel, starting with the Plaintiff, please state your

appearances for the record.

        MR. WILLIAMS:  Good afternoon, Your Honor.  Shawn

Williams, Robbins Geller Rudman & Dowd -- on behalf of lead

Plaintiff and the putative class.  With me I have Mark Solomon

and Daniel Pfefferbaum, both from my firm, and Alex Younger

from the Norfolk Pension Fund.

        THE COURT:  Okay.  Good afternoon.

        MR. KRAMER:  Good afternoon, Your Honor.  It's James

Kramer from Orrick Herrington & Sutcliffe on behalf of Apple

Inc., Timothy Cook, and Luca Maestri, and with me are my

colleagues Ariel Winawer and Tristan Allen.

        THE COURT:  Good afternoon.

     Who is going to be doing the argument?

        MR. WILLIAMS:  For Plaintiffs it will be me, Shawn

Williams.

        MR. KRAMER:  And for the Defendants, it will be

myself, Your Honor, James Kramer.

        THE COURT:  All right.  If the rest of you will turn

off your videos, it makes it easier on the court reporter.

1       Okay.  We are here on a motion for class certification.  I

2   will allow you some measure of time to just provide what you

3   want me to focus on in your own view.

4       I would like to hear argument primarily on the options

5   subclass.  Most of the other arguments -- not that I

6   particularly agree with you, Mr. Kramer, I understand them, but

7   in terms of the options issue, that's of particular interest.

8       So you may proceed.

9       **MR. KRAMER:**  Thank you, Your Honor.  Your Honor, would

10  you like Mr. Williams to go first?

11      **THE COURT:**  I would like Mr. Kramer to go first.  He's

12  the one who's proposing no class certification on that basis.

13      **MR. KRAMER:**  Thank you, Your Honor.  James Kramer for

14  the Defendants.

15      Your Honor, I think as Your Honor knows from other cases,

16  the Plaintiffs have the burden here to demonstrate the market

17  for Apple options was efficient applying the Cammer factors,

18  and they pretend to do that, Your Honor, through an expert

19  declaration and some work that expert did.

20      The problem is, Your Honor, that work does not establish

21  under *Cammer* that the market for Apple options was sufficient.

22  And I just want to talk about at least four of the five factors

23  are not met and I want to go into some detail in answering some

24  questions the Court may have.

25      So the first factor -- before I get to the factors, I

1    should back up.  As Your Honor saw in the papers, there are

2    2,282 distinct third-party option contracts that traded during

3    this period.  And the Plaintiffs purport to establish *Cammer* by

4    creating a synthetic measure of how those options traded in

5    saying that they responded to news and therefore the market is

6    sufficient.  But, Your Honor, if you even spend a little bit of

7    time looking at what the Plaintiffs did, you'll see that that's

8    not accurate.

9        So, first, the daily trading volume, the first Cammer

10   factor, Apple call options did not trade at all -- at all --

11   zero, on 35 percent of the trading days in the putative class

12   period.  And the put options did not trade on 31 percent of

13   those days.  In addition, the least liquid call options did not

14   trade on 86 percent of the days and the least liquid put

15   options did not trade on 90 percent of the days.

16           **THE COURT:**  Mr. Kramer --

17           **MR. KRAMER:**  Yes, ma'am.

18           **THE COURT:**  -- can you get closer to your mic?  You

19   seem to be a little bit --

20           **MR. KRAMER:**  I will try.  Is that better, Your Honor?

21           **THE COURT:**  A little bit.  A little bit.

22           **MR. KRAMER:**  I will try to project my voice to help

23   out.  My apologies.  I did test this before, and it seemed to

24   work okay.

25       So, Your Honor, what I was saying is a full 86 percent of

1   the call options and 90 percent of the put options did not

2   trade at all on any days during the class period.  And the cite

3   for that is we have a declaration from Professor Grenadier, and

4   I would direct the Court to paragraphs 181 to 186 of his

5   declaration.

6       The second factor, which is analyst coverage, here, too,

7   the Plaintiffs can offer nothing.  While the Plaintiffs' expert

8   identified the fact that there were 28 analysts that followed

9   Apple stock, he admitted that he could not identify any

10  analysts that covered the options.

11      Similarly, market makers.  The Plaintiffs' expert could

12  not identify a single market maker who made a market in Apple

13  options.

14      And the final one, the final factor I would point out,

15  Your Honor, is did Apple options move in response to

16  information in the market.  And what the Plaintiffs' purported

17  expert, Dr. Feinstein, did here is he created a synthetic

18  measure of Apple options by taking a subset of options and

19  looking at whether those options moved in response to four

20  different sets of information, four different moments of

21  information he said was important.

22      But what we see is on 98.4 percent of the dates, the

23  options he looked at did not trade on all four days.  And, in

24  fact, 1. -- only 1.6 percent traded on all four days, to look

25  at it another way.  So what Professor Feinstein did is he took

those 1.6 that did trade, he created a synthetic option,

measured the movement at those 1.6 percent, and said, "Look,

the 1.6 percent that traded, that establishes efficiency."

    But, Your Honor, by definition, if Dr. Feinstein or

Professor Feinstein introduces information that he said should

have affected the stock price or the Apple option prices and on

98.4 percent of the days there was no trading of those options,

how could it establish market efficiency?

    In fact, 62 --

        **THE COURT:**  So the class period here is relatively

short.

        **MR. KRAMER:**  That's correct, Your Honor.

        **THE COURT:**  And what I didn't see from either side is

any kind of non-litigation -- unless you can point it to me in

the record, either one of you.  I didn't see any non-litigation

economic articles or thoughts about whether options in general

operate in an efficient market.  Was there something there that

I missed?

        **MR. KRAMER:**  Your Honor, no.

        **THE COURT:**  I mean, how does the academic community --

what does the academic community outside of litigation think

about this issue; that is, why should I disaggregate it -- why

should I even think about disaggregating it?  It appears to me

that some of the factors are satisfied, some of the factors are

not, and so I'm trying to see if there is anything -- again,

1    outside of the litigation context -- that can illuminate the

2    issue.

3         **MR. KRAMER:**  Thank you, Your Honor.  The answer is

4    nothing was submitted, but the Plaintiffs have the burden of

5    establishing efficiency.  What we did was we responded to their

6    submission, and we responded by pointing out that they had not

7    established the Cammer factors.

8         **THE COURT:**  Your expert doesn't opine on that either.

9    He is a Stanford professor; right?  He doesn't say, "All of us

10   Stanford economic professors in this area all believe that they

11   do not trade in an efficient way according to market

12   information."

13        **MR. KRAMER:**  Yes.  I think that's fair, Your Honor.

14   But what he did point out was the work Plaintiffs did and not

15   establish their burden of showing market efficiency.  And he

16   also pointed out that there were 2,282 unique options that

17   traded.

18        And so is it possible that some of those options were

19   efficient?  So take, for example, a call option that was priced

20   at $2.50.  That option would trade likely somewhat in

21   connection with the Apple stock price.  If you had an option at

22   $440 a share, which was an option class during the class

23   period, that option would not trade anywhere in connection with

24   the stock price because that would only trade up if the Apple

25   stock price was a set amount.

1    **THE COURT:**  Right.  I saw exhibit -- I believe it was

2    Exhibit 7 which showed the deviation of the individual option

3    synthetic prices from the actual stock price.  That chart

4    seemed to suggest that there were some outliers.  I mean,

5    outliers don't -- you know, don't control the -- don't control

6    the analysis.

7    **MR. KRAMER:**  Right, Your Honor.  But you're

8    starting -- respectfully, you're starting from a point that the

9    Plaintiffs want you to start from, which is not accurate.  The

10   synthetic option only tracked those options that traded on each

11   of the four days the Plaintiffs measured.  That's only 1.6

12   percent of the 2,282 options.  Only 1.6 percent.  If they had

13   applied that analysis to all of the options, there would be no

14   correlation.

15   So what they did was say okay, 98.4 percent of the option

16   classes did not trade on all four days.  Right?  So, first of

17   all, if they didn't trade on all four days, then by definition,

18   information that went to the market did not impact the trading.

19   People didn't trade up, people didn't trade down.  It just sat.

20   Nothing happened.

21   So what the Plaintiffs did is say, "Okay, let's cherrypick

22   those options classes that did trade."  Again, only 1.6 percent

23   of the class.  "And then what we're going to do is measure how

24   that 1.6 percent responded."

25   What they should do is not do a synthetic option of only

1    those that traded.  They should look at all of the option

2    classes or at a minimum some statistically consistent and

3    relevant analysis that picked up those that traded on one of

4    the four days, those that traded on two or three of the four

5    days, and those that traded on zero of the four days.

6         Of course, if you picked the four that moved, which again

7    is less than two percent of all the options, you can come up

8    with some -- you know, some data that says, "Oh, maybe this

9    must be efficient," but that's not what the law requires.

10   That's not what the law requires.

11        They need to drill down.  They need to be honest

12   intellectually.  They need to look at all the options, and

13   that's what they're supposed to do, and they didn't do that.

14        And, Your Honor, that's why -- that's, of course, only one

15   of the factors, but that's a key reason because I -- believe

16   me, Your Honor, if Dr. Feinstein -- if he could do that, if he

17   could look at all of the options and do a statistical study, it

18   would be in front of you.  Right?

19        The fact that the best they can do is say, "Okay, I'm

20   going to look at 1.6 percent and measure those," that speaks

21   volumes over what they can do.  Volumes over what they can do

22   here, Your Honor.

23        The options should not be part of the class.  They simply

24   shouldn't be.  The Plaintiffs have a burden.  They didn't meet

25   it.  We rebutted it, and that should be the end of the

1    analysis, Your Honor, respectfully.

2          **THE COURT:**  Mr. Williams, your response.

3          **MR. WILLIAMS:**  I'm going to be somewhat limited here

4    because a lot of this I'm hearing for the first time.  Most of

5    the argument I'm hearing today was not in the Defendants'

6    papers.

7          But what Mr. Feinstein did do was in addition to

8    recognizing and doing an analysis to demonstrate that the

9    common stock was -- did trade in an efficient market, he also

10   applied the same Cammer factors to the options, to the extent

11   that they are applicable.  Typically the Cammer and Krogman

12   factors were not really designed or intended to apply to

13   options, and so -- but he applied them anyway.  And all of

14   those factors, except for the bid-ask ratio, actually met all

15   of the Cammer factors.

16         In addition, he did create a synthetic option to mimic the

17   performance of the -- the -- mimic the performance of the

18   common, which was efficient.  All of this was detailed in his

19   declaration and in his rebuttal which actually addressed Mr.--

20   Mr. Kramer's and Mr. Grenadier's -- their criticisms of his

21   analysis, and Mr. Kramer just doesn't -- won't acknowledge the

22   fact that the law in this area consistently --

23         **THE COURT:**  Well, there is no Ninth Circuit law on

24   this.

25         **MR. WILLIAMS:**  No, no Ninth Circuit.

1    **THE COURT:**  Right.  There is no Ninth Circuit law.

2    There is one Third Circuit case, and that case did no analysis.

3    And all the district court cases that you provided me did no

4    analysis.

5    **MR. WILLIAMS:**  Correct.

6    **THE COURT:**  So I've got no analysis from any court on

7    this topic.  And options are distinctly different, right, than

8    shares?

9    **MR. WILLIAMS:**  That's fair, Your Honor.  And it's true

10   that the Circuit has not opined on it, and we did provide you

11   with district court opinions on it --

12   **THE COURT:**  And none of them did any analysis.  They

13   just said, "Yeah, they're the same."

14   What court case gave the best analysis of why options

15   should be treated the same?

16   **MR. WILLIAMS:**  I think it's fair to say that the

17   district courts that have actually addressed the issue really

18   focused on the fact that in large corporations with common

19   stock that is efficient -- traded in an efficient market

20   accepted that analysis as applicable to --

21   **THE COURT:**  They just assumed.  They assumed.

22   **MR. WILLIAMS:**  Well, I think -- I think they did a

23   little bit more than assume simply because --

24   **THE COURT:**  So tell me the theoretical basis for it

25   because I'm not seeing it in the court cases and I'm not seeing

1   it in the academic literature that hasn't been provided to me.

2        **MR. WILLIAMS:**  What I was going to add, Your Honor,

3   was that it's true that the district court opinions that we

4   provided to you do not provide the analytical basis, but what

5   they do address is the burden for Plaintiffs and those cases

6   where the Defendants did not suggest or provide any analysis,

7   particularly any event studies, to conclude that the options

8   did not trade in an efficient market.  But you're correct, and

9   I'm not --

10        **THE COURT:**  Mr. Williams, then you explain it to me.

11   I mean, I think about -- right?  I think about options -- or at

12   least the motive for having options and exercising options as

13   being somewhat distinct and unique to the holder, to the

14   holder's portfolio, to the timing.  I mean, there seem to be

15   other issues going on in the exercise of options that aren't

16   as, one could say, pure as what might be happening with shares,

17   that is, pure to market circumstances.

18        **MR. WILLIAMS:**  Well, I think that they are -- I'm not

19   certain what Your Honor is referring to in terms of "pure," but

20   they all are dependent upon the market circumstances and

21   dependent upon the performance of the common stock.  So if

22   you're asking, Your Honor, to explain why a -- why an investor

23   would buy an option or a put option or why an investor would

24   buy a call option, each of those determinations is based on the

25   expectation of -- the expectation of what will occur with the

1   performance of the common stock.

2           THE COURT:  Right.  But let's say -- well, I don't

3   know that you're right.  But what about the timing of the

4   exercising of the options?  Most options, right, get exercised

5   towards the end of their term and they get exercised.  It's

6   not -- it's not as if -- either they get exercised or not;

7   right?  People are making determinations about what to do at

8   that time, but there's a contractual component which is

9   requiring a response that is not market-driven.  It's

10  contract-driven.  So how is that -- how does that play into the

11  efficiency arguments?

12          MR. WILLIAMS:  I don't -- I don't think that the

13  contract timing or the timing of the expiration of the contract

14  actually affects whether or not it is dependent on the

15  performance of the common stock.  It's true that there may be a

16  contractual obligation to perform consistent with the option

17  contract, you know, by the expiration date, but I don't know

18  that that actually has an effect on whether the -- whether the

19  purchaser of a put or a call option is going -- is -- is not

20  tied -- is or is not tied to the performance of the common

21  stock which is trading in an efficient market.

22          THE COURT:  All right.  So I still haven't heard you

23  articulate why I should treat them the same in a theoretical

24  way.

25          MR. WILLIAMS:  Well, they -- the options trade in the

1   same way or consistent with the common stock, and that's what

2   Mr. Feinstein actually opined upon.  It's an informational

3   efficiency.  So if the common stock rises on information, the

4   options tend to rise on that information as well.  And so is

5   the --

6           **THE COURT:**  Is that just call options as opposed to

7   put options?

8       So the interesting thing, right -- if you've got a put

9   option and the -- well, yeah.  Is the reaction the same

10  depending on the nature of the option?

11          **MR. WILLIAMS:**  Well, the action would be reversed

12  depending on the option.

13          **THE COURT:**  So should I exclude put options?

14          **MR. WILLIAMS:**  There are some -- I would say no

15  because our -- at least Mr. Feinstein's analysis actually

16  suggests that all of the options are trading in an efficient

17  market.  There is some case law --

18          **THE COURT:**  If people who have put options benefit

19  from a decrease in stock, do they have to pay the company back?

20          **MR. WILLIAMS:**  Well, no, because they're not actually

21  trading with the contract -- the option contract isn't

22  typically with the company.  The option contract is with, you

23  know, a person or entity typically not the company on the other

24  side of the contract.

25          **THE COURT:**  Okay.  But, you see -- I mean, kind of

1    adds an interesting perspective, depending on the nature of the

2    contract.

3            MR. WILLIAMS:  It does.  And, Your Honor, if the --

4    if -- if -- better understanding the sort of outside of

5    litigation economic theory behind the way that options perform

6    and whether they perform in an efficient market, and I don't

7    want to dig through my materials to see if Mr. Feinstein

8    actually cited to economic literature.  I think he did, but I

9    don't want to represent that.

10           THE COURT:  Yeah.  When I read his rebuttal report, I

11   didn't see any references to outside economic analysis.

12           MR. WILLIAMS:  And if it would be helpful, we can

13   provide that to you to the extent that it exists.

14           THE COURT:  How is it that I can -- is it right that

15   we're only looking at -- the synthetic experiment was only

16   based on 1.6 percent, and if so, is that a

17   statistically-relevant sample?  And where do I find that in

18   your submission?

19           MR. WILLIAMS:  I don't want to dig through it, but

20   Mr. Feinstein did indicate that it was a sufficient sample

21   to --

22           THE COURT:  Well, "sufficient" and "statistically

23   significant" are two different issues, and I need -- typically

24   I would make decisions based upon statistically significant.

25           MR. WILLIAMS:  Well, he didn't -- statistical

1    significance was not a measure which he actually used to

2    determine the amount of shares that he was using to create his

3    synthetic option.  So -- and I don't know that that's

4    necessary.  And I don't -- and it wasn't an issue that was

5    addressed during his deposition or contested in -- at least in

6    his deposition.

7         **THE COURT:**  I can understand, Mr. Williams, from your

8    perspective when all of the court cases are just saying, "Yeah,

9    they're the same, go forward," you know, I might not think that

10   I have a judge who thinks it's kind of an interesting

11   theoretical question and asking for a little bit more

12   information.  But, like I said, I think that they are -- they

13   are different instruments.

14        **MR. WILLIAMS:**  They are.

15        **THE COURT:**  And so because they're different

16   instruments, I've got questions about whether or not we really

17   should be treating them the same, and even if I'd had, you

18   know -- even if the Third Circuit had done some analysis that I

19   could read and understand or even if I had something outside of

20   this litigation context that I could refer to, I do have

21   questions about whether or not it's appropriate to be treating

22   them the same.

23        **MR. WILLIAMS:**  Well, the only thing that I would add

24   to that is in some of the case law, particularly in *Countrywide*

25   and *Enron* that we provided for the Court, the court actually

1  compared them and the performance of the options to debt

2  securities, and the debt securities were such that, you know,

3  there typically is not an efficient way or a reliable way to

4  determine whether or not they actually do trade in an efficient

5  market because they tend to react to information differently.

6  And I think that that does -- that is the extent of the

7  analysis that the Court has seen in the case law which

8  ultimately concludes with courts suggesting that to the extent

9  that there is less information about the way in which debt

10  securities are traded, there is sufficient information to --

11  there is sufficient information to believe that the options are

12  sufficiently tied to the common when the common is traded in an

13  efficient market to conclude that the common is trading in --

14  to conclude that the options are trading in an efficient market

15  as well.

16      But I want to be as helpful as possible.  I feel like I'm

17  not being as helpful as I could be for Your Honor, and, you

18  know, to the extent that we can do more to answer your

19  questions specifically concerning literature outside of the

20  litigation context, we'd be happy to do so.

21          **THE COURT:**  Okay.  That was --

22      **MR. KRAMER:**  May I have a quick rebuttal to that,

23  Your Honor?

24          **THE COURT:**  You may.  Go ahead.

25      **MR. KRAMER:**  Thank you, Your Honor.

1    So, first, I did hear Mr. Williams say that we have an

2   informational efficiency and that's important.  The challenge

3   here is we don't have any work that was done to establish that

4   informational efficiency:  1.6 percent, 98.4 percent not

5   tested, and by definition, the 98.4 percent did not trade on

6   all four days.  That is not informational efficiency.

7    Your Honor, they have the burden.  They need to show that

8   each of these options trades in an efficient market.  They've

9   tested 1.6 percent.  They cherry-picked only those options that

10   traded on the four days that they chose to test.

11    And also, Your Honor, they used something called a

12   put-call parity, which you probably saw in the papers.  That

13   only exists in European options which are options that you have

14   to hold, by definition, until they expire.  Right?  You can't

15   trade them early.

16    The options here we're talking about are American options.

17   In other words, Your Honor, I can buy a put option or a call

18   option that might expire in June, and depending on what the

19   stock price does, I could trade it next week if the price goes

20   up or down.  That's a different option altogether.

21    So not only have we only tested 1.6 percent of the

22   options, we've employed a key foundational assumption which

23   relates to an option class that is not even at issue here,

24   Your Honor.

25    And, Your Honor, to the point of does efficiency in Apple

stock mean efficiency in Apple options, as the Court pointed out, the strike price matters, the time of the expiration matters.  And Your Honor may have heard of a concept called "Triple Witching Friday."  Triple Witching Friday is when put and call options expire on a Friday, the last Friday of the month, and it occurs every quarter.  And we see all the time that the company's stock price reacts erratically because people have a contract and they're getting closed out and they got to cover it, and if they buy a put and the stock price has gone up and they're being squeezed, they've got to buy stock to cover that put.  Similarly, if you have a call and you're out the money, you have to go ahead and figure out how to get stock to cover the call.

So there is behavior surrounding the put and call options here that is not just tied to did Apple stock price go up or down.  The strike price matters.  The time to expiration matters.  If I wanted to buy an Apple option today at market price that expired in a year, I'm going to pay a bunch of money because then I have the right, right -- I've got an option that is good for a year, and that matters.  So it's more than just what's just happening to the price.

But at the end of the day, Your Honor, they haven't met their burden.  1.6 percent of only those shares that traded on all four days does not get them there, and if it did, Mr. Feinstein would say, "Hey, this is enough.  Here is some

1    peer-reviewed articles that tell you this is enough.  This is

2    statistically significant."  But instead we're trading -- we're

3    looking at a very small sample and, again, using European

4    options as a foundational fact, not American options.

5        **THE COURT:**  Okay.  I'll think about it.

6        So I'll give you a few minutes if there are other issues

7    that you want me to hear oral argument on.

8        You know, Mr. Kramer, I'm not persuaded by your attack on

9    adequacy.  Those are going to be good issues for

10   cross-examination, but I don't think that ultimately the issues

11   that you raise will change the focus of the litigation which is

12   really the test that I have to determine in order to decide

13   whether or not the class reps here are inadequate.

14       The question is do they have conflicts of interest?  I

15   don't think that they do.  Will counsel prosecute vigorously?

16   I think that they will.  There are times when the class rep has

17   been -- when there are so many issues with the class rep that

18   it will, in fact, change the focus of the litigation.  Pretty

19   rarely have I not found adequacy on that front, but -- so I'm

20   not really persuaded by what you indicated here.

21       But, in any event, you have a few minutes if you want to

22   make some additional arguments.

23       **MR. KRAMER:**  Thank you, Your Honor.

24       I think we did make a compelling argument on adequacy,

25   particularly as it related to this in-specie transfer, and let

me just spend 30 seconds on that, and then I want to talk about *Goldman II*.

So we have a transaction.  If it's helpful to the Court, I'm looking at Document 194-1.  This is November 12, 2018, where purportedly Norfolk acquired 14,012 shares.  We know that they didn't actually go out and buy the shares, even though this Document 194-1 in the upper left corner says "Movant's Purchases and Losses."  They didn't buy the stock.

What they did was they had shares being held in a fund. That fund went ahead and transferred those shares to Norfolk and any cash, which is fine.  The challenge is that wasn't disclosed, but more importantly, Your Honor, we don't know when the fund bought those shares.

So we do know from Document No. 202-9, which is Mr. Younger's declaration, that Norfolk invested in the fund that held Apple shares before the class period.  So at some point before the class period, Norfolk gave money to a fund and the fund bought Apple stock.  And --

**THE COURT:**  So let me ask you, Mr. Kramer, that wasn't the only purchase made.  There were multiple purchases.  The Plaintiffs indicate that the phrase or the term "purchase" under the statute includes any contract -- plain language; right?  "Any contract to buy, purchase, or otherwise acquire," and they're holding their hat on "otherwise acquire."

What case says -- or is there a case that says that this

```
1   kind of transfer that occurred is not -- does not come within

2   the purview of a purchase?

3         MR. KRAMER:  No, Your Honor.  We're not disagreeing

4   that that was the purchase.  What we're saying is we don't know

5   when the fund that Norfolk had an investment interest in bought

6   the stock.  So hypothetically, let's assume -- Norfolk we know

7   invested the --

8         THE COURT:  You need to slow down, Mr. Kramer.

9         MR. KRAMER:  I'm sorry.

10   Norfolk invested in the fund before the class period.  We

11   know that from Document No. 202-9, paragraph 14.

12   Let's assume they invested in the fund in the summer of

13   2018, before the class period.  They invested, and that week in

14   the summer of '18, the fund went out and bought 14,012 shares

15   of Apple stock, and the fund held those shares through the

16   beginning of the class period.  And then on November 12th, the

17   fund gave those shares to Norfolk at -- $204.42 was the trading

18   price.

19   By definition -- by definition -- those shares were not

20   purchased.  The economic reality is Norfolk did not purchase

21   those shares during the class period.  The value of the shares

22   were purchased before the class period, and that's our

23   argument.

24   We still don't know, despite our motion for leave for a

25   surreply and the opposition -- we don't know when the fund
```

1   bought those shares.  If they were bought on November 12th and

2   then Norfolk said, "Okay, Fund, give me those shares," I get

3   it.  But it's very, very possible, very possible because

4   Norfolk doesn't help us to know when those shares were bought

5   by the fund.  And so if they owned 14,012 shares before the

6   class period and they were bought by the fund before the class

7   period and all that happened is they got those shares, as an

8   economic perspective, there's been no purchase.  They had the

9   same value they did pre-class period.

10          Now, we obviously deposed Norfolk.  They weren't able to

11  answer the question, and so we have moved to take discovery in

12  the UK from the investment advisors at Fidelity.  We asked

13  Judge Spero, and he granted us the right to do this through the

14  Hague Convention, and we're scheduled to take these depositions

15  the first week in February, subject to counsel's availability.

16  The Court set it, and we're waiting to work with counsel to

17  find a date.

18          Let's assume we find that these -- this fund took the

19  money from Norfolk and bought the Apple stock pre-class period,

20  that would be important because then this would not be a

21  purchase of the stock.  And that's really what we're getting

22  at, Your Honor.

23          We think the facts I just described should be in their

24  certification.  There should be a footnote describing with

25  great clarity what happened.  When we present documents to

1   Your Honor, we know that we've got to be accurate, but more

2   importantly, we can't create ambiguity, and nowhere, nowhere

3   in their --

4        **THE COURT:**  Okay.  But does that change who has the

5   largest share of stocks in the class period?

6        **MR. KRAMER:**  So great question, Your Honor.  We don't

7   know and here's why.  We looked at this.  As Your Honor knows,

8   when a party applies for lead plaintiff, often what you see are

9   other lawyers not apply because they see the documentation

10  which they take at face value.

11       So we don't know, if we take this out, if it would have an

12  impact on whether or not Norfolk would still be the lead dog

13  here.  We just don't know.

14       We do think there were a number of other errors that bring

15  their losses down by over $500,000, but we don't know because

16  we don't know if there are plaintiffs out there who looked at

17  the submission, said, "Oh, Norfolk had a big purchase at a big

18  price.  We don't have the largest financial interest, so we're

19  done."  We just don't know.  So one --

20       **THE COURT:**  Well, isn't this the case -- I have a lot

21  of securities cases --

22       **MR. KRAMER:**  I know you do, Your Honor.

23       **THE COURT:**  -- but I thought this was the case where

24  there was a fight between two different plaintiffs' groups, and

25  I actually allowed another plaintiffs' group to proceed first,

1   and then after making a decision on a motion to dismiss, I

2   switched; right?

3           **MR. KRAMER:**  That's correct.

4           **THE COURT:**  So this isn't really a case where it was

5   known at the outset who was going to be the lead plaintiff, and

6   there were -- my memory -- and I could be wrong -- but my

7   memory is there were a number of plaintiffs firms out there

8   that had filed.

9           **MR. KRAMER:**  So on the broader class period,

10  Your Honor, you may recall the case originally included

11  allegations that went back several years relating to battery

12  and relating to iOS, totally different class period.  So we

13  don't know.

14      So I anticipated this question might come up, and what I

15  would suggest is the following.  We will know within the next

16  30 days based on the discovery we're taking in the UK what

17  happened.  Right?  Not only will we know what happened, but we

18  will find out whether it was knowable to the lead plaintiff,

19  and we would submit that you should hold your class cert

20  decision and we should do respective submissions on this issue.

21      This is a very important issue to this case, and we could

22  do those submissions.  We can set a briefing schedule, and if

23  Your Honor is convinced that this class should be certified

24  with this lead plaintiff, so be it, and if you think it

25  shouldn't be, then we can decide what to do, including opening

the door to other movants on the narrower class period.

Because, again, we did have lead plaintiff submissions, but

that was on a very broad class period which, respectfully, Your

Honor, I think was suspect from the beginning.  Your Honor was

certainly concerned that that wasn't a real class period.

So that's what I think should happen here.  We don't know

what the sample size is for this 60-day class period, this

one-statement case, which is what we have now, Your Honor.

**THE COURT:**  Okay.  Other issues you'd like --

**MR. KRAMER:**  The only other issue I'd want to make,

Your Honor, is on *Goldman II*.  There has to be -- as the Court

will recall -- and this is from your order on the motion to

dismiss, which is Docket 123 at page 9.  This is a

one-statement case, eight words.  "I would not put China in

that category."

The two key issues are was that statement historic --

remember, it came up during Apple's Q4 earnings call -- or was

it as of that moment in time, November 1st, one month into the

quarter, and whether or not Mr. Cook, who was the speaker,

acted with scienter.

We think summary judgment is going to resolve those

issues, but at this stage, the Plaintiffs have the burden of

connecting that statement to the stock price decline, and,

importantly, after that earnings call on November 1st, Apple

stock price did not go up.  Analysts didn't say, "Mr. Cook has

updated the market one month into the quarter.  Everything is
great in China."  To the contrary.  Analysts downgraded the
stock, and the stock price, most importantly, declined from 224
to $207.48.  $14.76 decline, over 7 percent.

So what Plaintiffs have got to do under *Goldman II* is say
okay, on January 2nd, Apple announced it was going to do lower
guidance, and it said one of the reasons we missed was we had
decline of sales in China.  But if you look to your motion to
dismiss order, Your Honor, the statement "I would not put China
in that category" related to a question regarding emerging
markets where Mr. Cook said, "We are not seeing issues like
currency devaluation in emerging markets," which was accurate.
The currency -- the currency had devalued in Turkey, India, and
Brazil.  It had not devalued in China.

And, of course, Your Honor if the currency devalues, you
have to raise the price of your product to the consumer in
those countries.

That's what the statement was about.  It was historical.
It was about specific -- specific conditions in emerging
markets, and that doesn't line up with what caused the stock
price to decline on January 2nd.

Now, they've got the burden again under *Goldman II* to come
in and say that's what happened, but if you look at the
corrective disclosure, the Plaintiffs' alleged corrective
disclosure, the company does not say anything that ties back to

1    this November 1st statement, Your Honor.

2              **THE COURT:**  All right.

3        Mr. Williams.

4              **MR. WILLIAMS:**  Thank you, Your Honor.

5        First on the trading issue -- and I appreciate that

6    Your Honor is not persuaded by what -- the accusations that

7    were made in the Defendants' papers, but Mr. Kramer made a

8    number of arguments, and I just feel like I have to address

9    them.

10       Number one, there is no evidence in the record that the --

11   that Norfolk Pension Fund did not purchase shares on

12   November 12th.  The Fidelity trading records specifically say

13   so.  The HSBC trading records specifically say so.  And the

14   only thing that is speculative here is Defendants'

15   characterizations and hypotheticals around what the

16   possibilities were.

17       We -- they asked certain questions of us and they asked

18   certain questions of Norfolk.  They asked what the

19   circumstances of the purchases were, particularly what the

20   relationship between Norfolk and the purchase from the Fidelity

21   Fund.  And it was explained in detail by Mr.-- by Mr. Younger.

22   It was explained in further detail by Fidelity and HSBC in

23   emails that were responsive to Mr. Younger simply because we

24   were asking the question to satisfy the Defendants.

25       The question of whether the fund actually owned Apple

shares and when they purchased Apple shares is entirely
irrelevant to the issues here.  The issue is whether or not the
lead Plaintiff purchased shares during the class period.  They
absolutely did.  Even without the November 12th transaction,
they bought 25 -- more than 25,000 shares of Apple stock during
the class period.

     The shares that were purchased on November 12th were
actually purchases, designated as purchases by the investment
managers and the banks that were responsible for reconciling
them.

     To suggest that there is some additional data about those
purchases that needs to be discovered before the Court can
certify the class, particularly when the issue is with respect
to adequacy, whether there are any conflicts with the remainder
of the class, whether the Plaintiff or the class representative
and their lawyers are going to vigorously prosecute the
allegations in the Complaint, those questions are largely
answered, and I think the Court recognized as much.

     With respect to whether or not the losses would have been
different if the November 12th purchases were not purchases
first assumes that they were not, which is incorrect, but we
did look at that, Your Honor.  And so with respect to the
losses, Norfolk County still would have had the largest losses.
It is also in the testimony of -- Rhode Island actually
acknowledged as much.

1       But what you had at the lead plaintiff stage was Rhode

2   Island with 31,000 in losses in this relevant class period and

3   you had the Apple investor group, which consisted of two

4   individuals, one who had 195,000 and another who had $210,000.

5       So even if we removed that November 12th purchase -- and

6   you can't because it's a purchase; there is no evidence in the

7   record that suggests that it was not a purchase -- Norfolk

8   would still have the largest losses.

9       With respect to *Goldman*, *Goldman II*, I do want to address

10  that because I -- it's not clear to me that Mr. Kramer or

11  Defendants are suggesting that they actually followed the

12  procedures that are required by Rule 23 and rebutting the

13  presumption of reliance with evidence of the absence of price

14  impact -- absence of price impact and that evidence being by a

15  preponderance of the evidence.

16      What I think I heard was Mr. Kramer rearguing his motion

17  to dismiss brief, which they lost twice.  However, here,

18  Defendants have not submitted anything to rebut the presumption

19  of reliance.  What we've seen is they argue that the market

20  knew about some of the economic issues plaguing China prior to

21  the class period, and, in fact, we alleged it.  We alleged that

22  it was Tim Cook that rejected what the market had been saying

23  about the problems that were occurring in China, and that it

24  was his rejection of those issues that were false and

25  misleading in light of what he knew about the actual sales and

1   the business conditions there.  With respect to -- so that

2   truth on the market argument, apart from not being applicable

3   at the class certification stage, is just factually incorrect.

4       With respect to the disclosures at the end of the class

5   period, again, Defendants don't provide any evidence

6   demonstrating the lack of price impact.  They're arguing loss

7   causation, another issue which is not applicable at or can't be

8   decided at the class certification stage.  But in this case,

9   even if it were, the disclosure at the end of the class period

10  was in fact that the iPhone sales in China were dismal due to

11  the economic and sales issues there.  It's almost a mirror

12  image of the misrepresentations that gave rise to the

13  allegations in the first place.

14      So I appreciate that Mr. Kramer talked for a very long

15  time, but what Mr. Kramer said is similar to what's in their

16  opposition papers.  There is nothing that can be credited there

17  other than argument.  There is no evidence that Norfolk did not

18  purchase shares on November 12th.  In fact, all of the

19  evidence, which is objective -- it's not judgmental and you can

20  see it from Exhibit 3 of our opening papers -- they purchased

21  the shares.

22      With respect to whether or not they have rebutted the

23  presumption, they're not suggesting that we did not invoke it.

24  Whether they rebutted the presumption -- there is nothing in

25  the record that suggests that they've rebutted the presumption

of reliance with evidence of the absence of price impact.

So the submission is sufficient, Your Honor.  Barring Your Honor's questions concerning the options, Plaintiffs have met all of the prerequisites for class certification under Rule 23(a) through -- 23(a)(1) through (4) and 23(b)(3).

We're happy to submit additional data for the Court on the options; nevertheless, we believe, based on the case law, that we have actually met our burden with respect to demonstrating that the options traded in an efficient market as well.

So I would submit on that -- on that, Your Honor, unless you have additional questions for me.

THE COURT:  No.  I'm just trying to decide -- and I'll probably do it in the context of an order -- whether or not supplemental briefing on the options issue will be helpful. I'm not sure that it will.  It wasn't clear to me that the kind of bigger-picture arguments have actually been litigated, that is -- yeah.  I don't know that you've taken the -- you know, your respective experts' deposition on kind of options generally as opposed to -- which is kind of some of where my questions were coming from.  So I'm not exactly sure -- I mean, I could ask you for academic articles, but then if I did, I would probably only do it -- say submit them, you can't argue because your experts haven't opined on these things, so I'm not exactly sure where I'm going to go with this.  I'm still thinking about it.  If you have any thoughts, happy to hear it.

1        **MR. KRAMER:**  Your Honor, I guess I would point out

2    again the Plaintiffs had asked for options to be part of the

3    class from the beginning.  You heard Mr. Williams.  They've

4    rested on the cases, which you're right, Your Honor, there is

5    no analysis.  We looked hard to see if courts looked at this to

6    see if there is a roadmap, and we couldn't find any.

7        We established in our expert why the synthetic option

8    approach that the Plaintiff used, the 1.6 percent discussion,

9    doesn't get you there.  So I feel like we've properly

10   responded.  We've rebutted what they put up.  We've explained

11   why it wasn't sufficient.  And I think that should honestly,

12   Your Honor, be the end of the discussion.  This is -- the

13   option thing has been part of the Plaintiffs' theory of the

14   case from day one.  And I'm --

15       **THE COURT:**  Can I ask, in ten years, this is the first

16   time that this question has been presented to me.  Are

17   options -- is the option class or subclass typically not part

18   of a securities action?  Is this something that was distinctly

19   put out there in a way that was different?  Because, really,

20   it's the first time -- it's the first time I've seen it.

21       **MR. WILLIAMS:**  I was just going to say, Your Honor, at

22   the lead plaintiff stage, there was one movant that had very --

23   very small losses but wanted the Court to create a subclass for

24   options because I think that their client actually had options.

25   And presumably that was their interest in getting involved in

1    the case.

2        And so as a practical matter, we wanted to be sure that we

3    were advancing the action as broadly as possible to protect the

4    interests of all of the investors that may have an interest in

5    the case, particularly since an options holder was not

6    appointed as a lead plaintiff.  And the initial Complaint,

7    which we had not filed, it was -- you know, the prior lead

8    plaintiff had brought claims on behalf of all securities

9    holders.

10       So when the case was transitioned to Norfolk and Robbins

11   Geller, to be consistent with Your Honor's motion to dismiss

12   order -- we wanted to maintain the appropriate scope of the

13   action, and that's one of the reasons why the options holders

14   are included here.

15       To answer your question more -- a little bit, you know,

16   kind of -- as a practical matter, there are times when at the

17   end of the case that there are option holders that are part of

18   plans of allocation.  I can't really talk in detail about that

19   because every case is a little bit different.  I wanted to be

20   somewhat informative or provide the Court with some of our

21   thinking behind it.

22       In most securities actions or -- in most securities

23   actions, there are options holders out there.  They aren't

24   always represented in the action.

25           **MR. KRAMER:**  Your Honor, James Kramer.

1    I'm embarrassed to say I'm in my 31st year of practice,

2  and this is the first case where I have seen options attempt to

3  be swept into a class, but, honestly, Your Honor, *Cammer* has

4  been out there since 1979.  The Cammer factors have been a

5  framework for every plaintiff's lawyer to try to make options

6  part of a class.  And I think the fact that that hasn't

7  happened is because it's very, very difficult, if not

8  impossible, to do.

9    The Plaintiffs made a big effort here, but you can --

10    **THE COURT:**  But not -- Mr. Kramer, I've got court

11  cases where the options holders were included.

12    **MR. KRAMER:**  Because the Court, Your Honor -- as you

13  pointed out, they collapsed market efficiency for the equities

14  security into the options, which is fine.  You're in Texas,

15  you're in the Third Circuit, okay.  But we're in the Ninth

16  Circuit, and Your Honor is one of the most experienced judges

17  in these types of cases, and we have a framework.  I know this

18  is a question of first impression for Your Honor, but we have a

19  framework that we've had since 1989.  It's a roadmap of how to

20  get there.

21    And I'm not saying that roadmap can never be met, but you

22  can't get there by testing 1.6 percent of the options.  And by

23  definition, only the ones that actually traded on all four

24  days.  You can't get there, Your Honor.  And that's what

25  happened here using some European option parity where you have

1    got to hold the option until the expiration date.

2         So this is not some novel, new issue.  I appreciate it is

3    for the Court, but there is a framework for the Plaintiffs to

4    get there, and they haven't done it, Your Honor.

5         **THE COURT:**  So, Mr. Kramer, let me ask you then, you

6    said 30-plus years.  Do you have cases where -- you or your

7    colleagues -- where the issue was raised and the district

8    courts did not --

9         **MR. KRAMER:**  I don't, Your Honor.  I don't, because it

10   just was never done.  I -- again, I always assume that the

11   Plaintiffs' lawyers, and certainly Robbins Geller, is very

12   vigorous in prosecuting a claim for the class.  I have had

13   many, many cases with Mr. Williams and his colleagues, and they

14   have never done this before.

15        But, again, there is -- we are lawyers.  There is legal

16   analysis.  *Cammer* applies.  There is no dispute.  And they

17   haven't met it.  And I don't think we should say okay, let's

18   have additional briefing, let's go hire some more experts and

19   redo an analysis when everyone's been on notice.  The path to

20   establish market efficiency is *Cammer*, and that hasn't been

21   done here, Your Honor.

22        **MR. WILLIAMS:**  May I just add, Your Honor, Mr. Kramer

23   may never have seen it before, but cases we've put before

24   you -- the *JCPenney* case, that was our case.  *Enron*, that was

25   our case.  So while Mr. Kramer may not have faced the issue

1    before, we have.  It's elucidated in the opinions at least that

2    we've provided for you, but we understand that Your Honor would

3    like a little bit more.

4        We'll wait for your order to the extent that you ask for

5    more, but with respect to the -- Mr. Kramer's request for

6    additional discovery, that's not necessary.  They've had the

7    records with respect to Norfolk's trading since April, at

8    least.  It's -- the papers are sufficient and complete from our

9    perspective.

10       **THE COURT:**  Okay.  One other just quick question, and

11   I haven't gone back to compare it to some of the other class

12   definitions.  I just haven't had a chance yet.

13       But the class definition that is proposed includes the

14   phrase, you know, "All persons or entities," blah, blah, blah,

15   "and who suffered damages."  Does that phrase -- it strikes me

16   as creating a failsafe -- is it traditionally included?  I

17   mean, isn't -- wouldn't it just be "all persons" -- "all

18   persons" -- the class is all persons who purchased during that

19   period, and if they suffered no damages, then they would not

20   receive any compensation at the end of the day.

21       **MR. WILLIAMS:**  That's correct, Your Honor.  And, I

22   mean, there are cases on this generally, but they do go in --

23   it is somewhat traditional.  I mean, if the Court needs to

24   adjust that, we are -- we're fine with it.  There are arguments

25   that it creates a failsafe class, but courts issue orders with

```
1    that language consistently.

2              MR. KRAMER:  And if I might, Your Honor, so the

3    Plaintiffs argued that a put is a security, but if someone

4    bought a put security, under Plaintiffs' theory, they made

5    money.  So --

6              THE COURT:  No.  That's --

7              MR. KRAMER:  Right?

8         So, again, just to come back to the options thing, I think

9    it's just -- they're not the same as stock.

10             THE COURT:  Okay.  But, Mr. Kramer, on the definition,

11   do you have -- is it your view -- assuming that I -- let's put

12   the options aside, but assuming that I certify a class, do you

13   believe that that phrase should be included as just a matter of

14   tradition or practice in this industry?

15             MR. KRAMER:  I do, Your Honor, because if someone

16   bought and sold, they traded within the class, they would not

17   have been damaged.  And so, in other words -- do you see what I

18   mean, Your Honor?

19             THE COURT:  But you aren't concerned that it creates a

20   failsafe definition?

21             MR. KRAMER:  Well, I'm concerned that you pick up

22   people that technically bought but then sold as drafted.  I

23   think the "and suffered damages" has to be in there,

24   Your Honor, because if you --

25             THE COURT:  So you don't object to that phrase?
```

1          **MR. KRAMER:**  I don't, Your Honor.

2          **THE COURT:**  Okay.  All right.

3     Okay.  Well, thank you very much.  I've got some more

4     thinking to do.  And it's submitted.

5          **MR. KRAMER:**  Thank you, Your Honor.

6          **THE COURT:**  Thank you.

7               (Proceedings adjourned at 3:01 p.m.)

1

2

3                    <u>CERTIFICATE OF REPORTER</u>

4        I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:    Thursday, January 20, 2022

8

9   *Pamela Batalo Hebel*

10  _____
    Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11  U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25