United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

IN RE APPLE INC. SECURITIES LITIGATION,

Case No. 4:19-cv-2033-YGR

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR CLASS CERTIFICATION**

Re: Dkt. Nos. 165, 206

Lead Plaintiff Norfolk County Council as Administering Authority of the Norfolk Pension Fund ("Norfolk") brings this putative securities fraud class action against defendants Apple, Inc., Timothy Cook, and Luca Maestri for alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder. The Court initially appointed Employees' Retirement System of the State of Rhode Island as lead plaintiff, Labaton Sucharow LLP as lead counsel, and Wagstaffe, Von Loewenfeldt, Busch & Radwick LLP as liaison counsel. (Dkt. No. 72.) Subsequently, the Court approved the transition of Norfolk as lead plaintiff and Robbins Geller Rudman & Dowd LLP as lead counsel. (Dkt. No. 113.)

Currently pending before the Court is plaintiff's motion for (1) certification of a class defined, with exclusions, as: "[a]ll persons and entities who purchased or otherwise acquired the publicly traded securities of Apple Inc. during the period from November 2, 2018 through January 2, 2019, inclusive (the 'Class Period'), and who suffered damages by [d]efendants' alleged violations of [Sections] 10(b) and 20(a) of the Exchange Act"; (2) appointment of Norfolk as class representative; and (3) appointment of Robbins Geller as class counsel. (Dkt. No. 165.) Having carefully considered the briefing and the arguments submitted at the January 18, 2022 hearing, and for the reasons set forth more fully below, the Court **GRANTS IN PART** the motion except as to the inclusion of option holders in the class. In that regard, the motion is **DENIED WITHOUT PREJUDICE**.

## I. BACKGROUND

Plaintiff alleges that in late 2018, defendants misrepresented the state of Apple's business in Greater China, the company's most important growth market at the time.  (Revised Consolidated Class Action Complaint ("Compl."), Dkt. No. 114, ¶¶ 8–10, 18.)[1]  Specifically, on November 1, 2018, following a press release announcing the financial results for its fourth quarter of 2018 and setting revenue expectations for the next quarter, Apple held a conference call for analysts and investors to discuss the same.  (*Id.* ¶¶ 17–18.)[2]  After analysts expressed concerns about "deceleration" in emerging markets, Cook, Apple's chief executive officer, responded that "[t]he emerging markets that we're seeing pressure in are markets like Turkey, India, Brazil, Russia, these are markets where currencies have weakened over the recent period."  (*Id.* ¶ 56; Shareholder/Analyst Call Transcript ("Call Tr."), Dkt. No. 119-1 at 11.)  However, he "d[id]n't see it as some sort of issue that is common" among all emerging markets, as "each one of the emerging markets has a bit of a different story":

> In relation to China specifically, I would not put China in that category.  Our business in China was very strong last quarter.  We grew 16%, which we're very happy with.  iPhone, in particular, was very strong double-digit growth there.  Our other products category was also stronger, in fact, a bit stronger than even the . . . overall company number.

(Call Tr. at 11.)

Notwithstanding making these statements, defendants allegedly knew facts indicating otherwise, particularly, the facts that "the U.S.-China trade tensions and economic conditions in China were negatively impacting sales and demand for Apple products, particularly iPhones"; Apple "had already begun to see declining traffic in [its] retail stores and those of its channel partner stores in Greater China, and reports of an overall contraction of the smartphone industry"; and Apple "had already, or was preparing to, cut iPhone production at multiple manufacturers and reduce orders

---

[1]  Apple identifies Greater China as including Hong Kong, Taiwan, and mainland China.  (Compl. ¶ 8 n.5.)

[2]  Apple's fiscal fourth quarter covers July, August, September.  (*See* Compl. ¶ 1 n.1.)

United States District Court
Northern District of California

from its largest suppliers of iPhone components for the current quarter and holiday season."
(Compl. ¶ 24.)

Days after the alleged misrepresentations, on November 5, reports emerged that Apple had instructed its top smartphone assemblers to "halt plans for additional production lines" for the recently released iPhone XR.  (*Id.* ¶¶ 27–28.)  Then, on November 12, Wells Fargo issued a report estimating that Apple had reduced iPhone production by "as much as . . . 30%" based on a negative earnings preannouncement by a key supplier of iPhone components disclosing that one of its largest customers (presumed to be Apple) directed it to "materially reduce shipments . . . ."  (*Id.* ¶ 29.)  Further, on December 4, Bloomberg reported that in October 2018, Apple shifted marketing staff and increased trade-in discounts to boost sales of its most recently released iPhones in what was described as a "fire drill" response to poor iPhone sales.  (*Id.* ¶ 31.)  After each of the foregoing reports, Apple's stock price declined but "continued to trade at artificially inflated prices."  (*Id.* ¶¶ 28, 30, 32.)

Finally, on January 2, 2019, the full truth was allegedly revealed when Apple preannounced its first earnings shortfall in more than 15 years.  (*Id.* ¶ 33.)  In a letter to investors, Cook stated that revenue for the first quarter of 2019 was expected to be $84 billion, contrary to Apple's guidance range of $89 to $93 billion announced on November 1.  (*Id.* ¶ 34.)  The letter cited challenges to emerging markets:

> While we anticipated some challenges to key emerging markets, we did not foresee the magnitude of the economic deceleration, particularly in Greater China. In fact, most of our revenue shortfall to our guidance, and over 100 percent of our year-over-year worldwide revenue decline, occurred in Greater China across iPhone, Mac and iPad.
>
> China's economy began to slow in the second half of 2018.  The government-reported GDP growth during the September quarter was the second lowest in the last 25 years.  We believe the economic environment in China has been further impacted by rising trade tensions with the United States.

(*Id.* ¶ 35.)  With respect to the iPhone business in particular, the letter explained: "Lower than anticipated iPhone revenue, primarily in Greater China, accounts for all of our revenue shortfall to our guidance and for much more than our entire year-over-year revenue decline."  (*Id.* ¶ 36.)

Later that day, Cook appeared on CNBC for an interview, further shedding light on the company's situation in China:

> [A]s we look at what's going on in China – it's clear that the economy begins to slow there for the second half.  And what I believe to be the case is the trade tensions between the United States and China put additional pressure on their economy.
>
> And so we saw, as the quarter went out, things like traffic in our retail stores, traffic in our channel partner stores, the reports of the smartphone industry contracting, particularly bad in November – I haven't seen the December number yet, but I would guess that would not be good either.  And so that's what we've seen.

(*Id.* ¶ 36.)  Apple's stock price thereafter declined from a close of $157.92 per share on January 2 to a close of $142.19 per share on January 3 on unusually heavy trading volume.[3]

Plaintiff now seeks certification of the following class: "All persons and entities who purchased or otherwise acquired the publicly traded securities of Apple Inc. during the period from November 2, 2018 through January 2, 2019, inclusive (the 'Class Period'), and who suffered damages by [d]efendants' alleged violations of [Sections] 10(b) and 20(a) of the Exchange Act." (Motion for Class Certification ("Mtn."), Dkt. No. 165, at 1–2.)[4]  Plaintiff also requests appointment as class representative and appointment of Robbins Geller, its selected counsel, as class counsel. Defendants oppose certification on four grounds: (1) plaintiff is not an adequate class representative; (2) evidence rebuts the presumption of classwide reliance; (3) even if a class were to be certified, it should not include Apple option holders; and (4) the proposed damages model includes damages that did not result from the alleged wrongdoing.

//

//

---

[3]  In its order dated June 23, 2020, the Court granted in part and denied in part defendants' motion to dismiss the revised consolidated class action complaint, dismissing the claims predicated on Cook's statement that the then-recently released iPhone XS and XS Max "got off to a really great start . . . ."  (Dkt. No. 123 at 10–11.)

[4]  Excluded from the class are (i) Apple and the individual defendants; (ii) members of the families of each individual defendant; (iii) officers and directors of Apple; and (iv) the legal representatives, heirs, successors or assigns of any such excluded party.

United States District Court
Northern District of California

## II. Legal Framework

Rule 23, which governs class certification, contains two sets of distinct requirements plaintiffs must meet before the Court may certify the proposed class. First, "Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate. The Rule's four requirements—numerosity, commonality, typicality, and adequate representation—effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (internal quotation marks and citations omitted). "Class certification is proper only if the trial court has concluded, after a 'rigorous analysis,' that Rule 23(a) has been satisfied." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 542–43 (9th Cir. 2013) (quoting *Dukes*, 564 U.S. at 351). Second, "[w]here a putative class satisfies all four requirements of 23(a), it still must meet at least one of the three additional requirements outlined in 23(b)." *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union AFL-CIO, CLC v. ConocoPhillips Co.*, 597 F.3d 802, 806 (9th Cir. 2010).

The party seeking class certification bears the burden of demonstrating by a preponderance of the evidence that all four requirements of Rule 23(a) and at least one of the three bases for certification under Rule 23(b) are established. *See Dukes*, 564 U.S. at 350. On a motion for class certification, the Court is required to "examine the merits of the underlying claim . . . only inasmuch as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 n.8 (9th Cir. 2011) (citations omitted). A trial court has broad discretion in deciding whether to grant or deny a class certification motion. *See Bateman v. Am. Multi-Cenima, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010).

## III. Analysis

### A. Rule 23(a)

Plaintiff submits that it has satisfied each of the Rule 23(a) requirements. In particular, plaintiff asserts that (1) the class consists of thousands of members; (2) virtually all of the questions of law or fact at issue are common to all class members; (3) its claims are typical of the proposed class; and (4) for purposes of adequacy, it has no conflicts of interest, it has a substantial financial

United States District Court
Northern District of California

stake in the case, it has demonstrated its willingness and ability to take an active role in this litigation to protect the interests of the class, and it has retained attorneys with considerable experience in securities class actions.

Defendants only contest plaintiff's showing under the adequacy requirement.  Rule 23(a)(4) requires that a class representative be able to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  "In making this determination, courts must consider two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir. 2012) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998), *overruled on other grounds by Dukes*, 564 U.S. at 338).

Here, despite those parameters, defendants challenge plaintiff's adequacy as a class representative on the ground that plaintiff made errors in its certification to the Court filed in support of its earlier motion for appointment as lead plaintiff.  Specifically, defendants highlight plaintiff's notice of errata, which corrected the share price used in calculating its sale of stock on February 11, 2019 (from $158.39 to $169.45), the date of its one its purchases (from November 13, 2018 to November 12, 2018), and the share price used in calculating that purchase (from $193.23 to $204.42).  (Dkt. No. 194.)  Defendants emphasize that plaintiff waited two years to correct this revised trading history and did so without explanation.  Moreover, defendants contend that the revised trade history contains two additional errors, namely, that plaintiff actually sold 36,934 shares on February 11, 2019, not 32,147 shares, and that Apple's shares never traded above $200 on November 12, 2018.  Further, defendants argue that plaintiff's November 12, 2018 acquisition of Apple shares was not a purchase but rather a transfer between plaintiff's accounts.

Plaintiff responds that "the amended loss chart correct[s] the date and price of one transaction based upon updated information and substitute[s] the realized sale price for the average price which had been mistakenly entered by counsel." (Reply at 12.)  However, plaintiff disputes the other alleged errors, arguing that, under the first-in-first-out accounting method, its pre-class period holding of 4,787 shares were matched against the first of the 36,934 shares sold on February 12,

United States District Court
Northern District of California

yielding the 32,147 shares listed in the chart.  In addition, plaintiff submits that its records show that it acquired Apple shares on November 12 at $204.42 per share.  Finally, plaintiff explains that it acquired the 14,012 Apple shares on November 12 in exchange for its investment in a pooled fund by way of an *in specie* redemption.[5]

The Court declines to find that the discrepancies corrected in plaintiff's notice of errata, without more, preclude a finding of adequacy here.  An error in claimed losses may render a movant inadequate if there is "evidence of bad faith or intent to deceive the court or the parties."  *See In re SLM Corp. Sec. Litig.*, No.08-cv-1029 (WHP), 2012 WL 209095, at *8 (S.D.N.Y. Jan. 24, 2012),  However, defendants do not make such a showing.[6]  Plaintiff already corrected its inadvertent errors on the certification (albeit two years after the fact).

Nevertheless, defendants contend that even such inadvertent misstatements show a lack of diligence inconsistent with adequate representation of the class.  Although plaintiff's errors in its trade certification may demonstrate carelessness, they are not the types of errors that would normally preclude a finding of adequacy to represent the class.  *See*, *e.g., In re Solar City Corp. Sec. Litig.*, No. 16-cv-4686 (LHK), 2017 WL 363274, at *6 (N.D. Cal. Jan. 25, 2017) ("Multiple district courts have held that minor or inadvertent mistakes made in a sworn certification do not strike at the heart of Rule 23's adequacy requirement.") (quotation marks omitted) (collecting cases).  The errors do not demonstrate a conflict with the class, nor do they make plaintiff's claims atypical of the class.  Nor is a computational error the type of credibility issue that would "divert the fact finders' attention

---

[5]  In its proposed surreply, defendants further quibble that plaintiff's November 12 acquisition of shares was not a purchase and that its February 11 disposition of shares was a non-cash transaction.  (Dkt. No. 206.)  While the Court **Grants** defendants' motion for leave to file a surreply, for the reasons stated below, the Court finds that the purported problems with plaintiff's claimed loss, which plaintiff essentially argues are disputes over accounting, are insufficient to render plaintiff inadequate as a class representative.

[6]  Furthermore, defendants claim that these errors result in plaintiff inflating its losses by more than $350,000 nominally.  (Opp. at 13.)  However, by the Court's math, plaintiff's total loss was revised from $1,166,648.47 to $982,082.52, a difference of $184,565.95.  (*Compare* Dkt. No. 37-9 *with* Dkt. 194.)  While not insignificant, it hardly amounts to plaintiff overstating its losses by more than 40%, as defendants contend.  (Opp. at 12.)

United States District Court
Northern District of California

1  from the merits and thus infect the claims of the class as a whole." *Dubin v. Miller,* 132 F.R.D. 269,

2  272 (D. Colo. 1990).

3      Defendants' other complaints are equally peripheral to the suit, irrelevant to the factual

4  predicate of the class's claims, and may themselves be in error. If anything, defendants' arguments

5  concern the amount of damages suffered by plaintiff, rather than being meaningfully indicative of

6  inadequacy. Thus, none of the issues defendants raise persuade the Court that plaintiff would be

7  unable to adequately serve as class representative.

8      Notwithstanding defendants' objections, the record supports a finding that plaintiff is an

9  adequate class representative. Defendants have not shown that plaintiff and its selected counsel,

10  Robbins Geller, have conflicts or that plaintiff will not prosecute the action vigorously. Plaintiff is

11  knowledgeable of the litigation, has provided its assistance, and assures the Court it will represent

12  the class diligently. Moreover, Robbins Geller has significant experience with securities fraud class

13  actions and demonstrates a thorough understanding of the applicable law. The Court therefore finds

14  plaintiff to be an adequate class representative under Rule 23(a)(4) and Robbins Geller to be

15  adequate class counsel under Rule 23(g).

16      In sum, because plaintiff is an adequate class representative and defendants do not dispute

17  the other requirements, the Court concludes that plaintiff has satisfied Rule 23(a).

18      **B.  RULE 23(B)**

19      Plaintiff seeks certification under Rule 23(b)(3), which requires that "questions of law or fact

20  common to class members predominate over any questions affecting only individual members, and

21  that a class action is superior to other available methods for fairly and efficiently adjudicating the

22  controversy." Fed. R. Civ. P. 23(b)(3). Defendants do not dispute, and the Court agrees, that the

23  superiority requirement is met. However, defendants challenge plaintiff's showing of predominance.

24      Under Rule 23(b)(3), courts must consider whether questions capable of resolution with

25  "generalized, class-wide proof" predominate over individualized ones. *See Tyson Foods, Inc. v.*

26  *Bouaphakeo*, 577 U.S. 442, 453 (2016); *see also Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125,

27  1134 (9th Cir. 2016) ("The Rule 23(b)(3) predominance inquiry asks the court to make a global

28  determination of whether common questions prevail over individualized ones."); *Wang*, 737 F.3d at

545 ("The predominance analysis under Rule 23(b)(3) focuses on 'the relationship between the common and individual issues' in the case and 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'") (quoting *Hanlon*, 150 F.3d at 1022). "Predominance is not, however, a matter of nose-counting. Rather, more important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 557 (9th Cir. 2019) (quoting *Torres*, 835 F.3d at 1134). "Class certification under Rule 23(b)(3) is proper when common questions represent a significant portion of the case and can be resolved for all members of the class in a single adjudication." *In re Diamond Foods, Inc. Sec. Litig.*, 295 F.R.D. 240, 246 (N.D. Cal. 2013) (citing *Hanlon*, 150 F.3d at 1022).

The Court's predominance inquiry begins with the elements of a Section 10(b) securities fraud claim, which are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017). "Most of these elements are clearly susceptible to classwide proof, particularly the alleged misrepresentations made by the defendants, scienter, and loss. Furthermore, a plaintiff is not required to prove materiality or loss causation at the class certification." *Milbeck v. TrueCar, Inc.*, No. 18-cv-2612 (SVW), 2019 WL 2353010, at *4 (C.D. Cal. May 24, 2019) (internal quotation marks, citations, and alterations omitted). However, defendants contend that plaintiff cannot satisfy Rule 23(b)'s predominance requirement with respect to questions of reliance and damages. The Court considers each set of challenges in turn.

### 1. PREDOMINANCE OF COMMON QUESTIONS OF RELIANCE

The Supreme Court has held that plaintiffs can invoke a rebuttable presumption of reliance based on the "'fraud-on-the-market' theory, which holds that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations.'" *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258,

United States District Court
Northern District of California

268 (2014) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988)).  The presumption allows a plaintiff to substitute reliance on a company's stock price for actual reliance on a company's false statement so long as a company's stock traded in an efficient manner.  *Basic*, 485 U.S. at 246–47.  Application of the *Basic* presumption dispenses with the requirement that each class member prove individual reliance on defendants' alleged misstatements or omissions.

To invoke the presumption of reliance, a plaintiff must show: (1) the alleged misrepresentations were publicly known; (2) they were material; (3) the stock traded in an efficient market; and (4) the plaintiff traded stock between the time the misrepresentations were made and when the truth was revealed.  *Halliburton II*, 573 U.S. at 268 (citing *Basic*, 485 U.S. at 248 n. 27).  Here, defendants acknowledge two categories of investors in the putative class: (1) holders of Apple stock and (2) holders of options on Apple stock.  With respect to the former, defendants do not dispute that the publicity and market timing prerequisites have been satisfied or that materiality need not be proven at the class certification stage.  *See Amgen v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 459 (2013).  Nor do defendants challenge the findings of plaintiff's expert, Professor Steven P. Feinstein, Ph.D., CFA, demonstrating that Apple stock, specifically, traded in an efficient market over the course of the class period.  (Report of Professor Steven P. Feinstein, Ph.D., CFA ("Feinstein Report"), Dkt. No. 165-3, ¶¶ 56–142.)  Therefore, the Court finds that plaintiff makes a prima facie showing sufficient to invoke the *Basic* presumption as to holders of Apple stock.[7]

With respect to the latter, defendants argue that Dr. Feinstein fails to show that *options* on Apple stock traded in an efficient market, and therefore, that option holders should be excluded from the class if certification is granted.  For the reasons stated in Section III.B.2, *infra*, the Court finds

---

[7]  Plaintiff also relies on the presumption of reliance recognized in *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54 (1972).  Because the Court ultimately finds that defendants fail to rebut the *Basic* presumption with respect to Apple stockholders, the Court need not address whether plaintiff is entitled to a presumption of reliance under *Affiliated Ute*, which "allows the element of reliance to be presumed in cases involving primarily omissions, rather than affirmative misstatements."  *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 (2d Cir. 2017).  Nevertheless, it appears that the *Affiliate Ute* presumption would actually not apply in this case, as that doctrine is inapplicable where "the [p]laintiff['s] complaint alleges numerous affirmative misstatements by the [d]efendants."  *Id*. at 96.  Here, the thrust of plaintiff's allegations is that defendants affirmatively misrepresented the state of Apple's business in China, and thus it is "not in a situation in which it is impossible for [it] to point to affirmative misstatements."  *Id*.

10

United States District Court
Northern District of California

that plaintiff fails to show that common questions of damages predominate with respect to option holders.  Because Apple option holders are therefore excluded on that basis, the Court need not decide whether plaintiff adequately proved that Apple stock options trade in an efficient market.

Although defendants do not challenge the proof of the elements giving rise to the *Basic* presumption with respect to Apple stockholders, they do seek to rebut it.  A "defendant may rebut the [*Basic*] presumption through '[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price.'"  *Goldman Sachs Grp., Inc. v. Arkansas Teacher Ret. Sys.*, 141 S. Ct. 1951, 1958 (2021) (quoting *Basic*, 485 U.S. at 248).  Here, defendants argue that the alleged misrepresentations had no price impact.  If true, "then *Basic*'s fundamental premise 'completely collapses, rendering class certification inappropriate.'"  *Id.* at 1959 (quoting *Halliburton II*, 573 U.S. at 283); *see Halliburton II*, 573 U.S. at 279 ("[*Basic*] affords defendants an opportunity to rebut the presumption by showing, among other things, that the particular misrepresentation at issue did not affect the stock's market price.").

The defendant bears the burden of proving a lack of price impact by a preponderance of the evidence.  *Goldman*, 141 S. Ct. at 1963.[8]  "The district court's task is simply to assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact."  *Id.*  The analysis is "qualitative as well as quantitative—aided by a good dose of common sense."  *Id.* at 1960.

"[P]rice impact can be observed on the 'front-end' (*i.e.*, misstatements causing or maintaining inflation) or on the 'back-end' (*i.e.*, a decline in price caused by the corrective disclosures) . . . ."  *Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*, No. 18-cv-871 (MJD), 2020 WL 5757695, at *11 (D. Minn. Sept. 28, 2020).  As the Supreme Court explained:

> Plaintiffs typically try to prove the amount of inflation indirectly. They point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation.

---

[8] Thus, defendants misstate the law when they assert that "the Court [ ] determin[es] whether [p]laintiff has met its burden to show price impact."  (Opp. at 15.)

United States District Court
Northern District of California

> But that final inference—that the back-end price drop equals front-end inflation—
> starts to break down when there is a mismatch between the contents of the
> misrepresentation and the corrective disclosure.  That may occur when the earlier
> misrepresentation is general (*e.g.*, "we have faith in our business model") and the
> later corrective disclosure is specific (*e.g.*, "our fourth quarter earnings did not
> meet expectations").  Under those circumstances, it is less likely that the specific
> disclosure actually corrected the general misrepresentation, which means that
> there is less reason to infer front-end price inflation—that is, price impact—from
> the back-end price drop.

*Goldman*, 141 S. Ct. at 1961 (citations omitted); *see also Glickenhaus & Co. v. Household Int'l, Inc.*,

787 F.3d 408, 415 (7th Cir. 2015) ("The best way to determine the impact of a false statement is to

observe what happens when the truth is finally disclosed and use that to work backward, on the

assumption that the lie's positive impact on the share price is equal to the additive inverse of the

truth's negative effect.  (Put more simply: what goes up, must come down.)").

Defendants' arguments focus on back-end price impact.[9]  Dr. Feinstein conducted a robust

event study, the findings of which show a statistically significant share price decline following the

January 2, 2019 disclosure date.  (Feinstein Report ¶¶ 137–39.)  Defendants do not rebut this back-

end evidence with their own event study or other means.  Instead, defendants cite various

mismatches between the alleged misrepresentation and the corrective disclosures as well as other

---

[9]  Despite criticizing plaintiff for failing to "adduce any front-end evidence" that the alleged
misrepresentation inflated Apple's stock price, defendants acknowledge that plaintiff is proceeding
on a price inflation-maintenance theory.  (Opp. at 16.)   Under this theory, a misrepresentation
"cause[s] the stock price to remain higher than it would have been had the statements been truthful."
*Glickenhaus*, 787 F.3d at 419; *see also Goldman*, 141 S. Ct. at 1961.  Thus, "[t]he stock price may
even decline after a false statement, but be inflated nonetheless 'because the price might have fallen
even more' if the full extent of the bad news were known."  *In re Allstate Corp. Sec. Litig.*, 966 F.3d
595, 612 (7th Cir. 2020) (quoting *Glickenhaus*, 787 F.3d at 415); *see also In re Vivendi, S.A. Sec.
Litig.*, 838 F.3d 223, 260 (2d Cir. 2016) (rejecting notion that price impact requirement means a
"misstatement must be associated with an increase in inflation to have any effect on a company's
stock price"); *Hatamian v. Advanced Micro Devices, Inc.*, No. 14-cv-226 (YGR), 2016 WL 104502,
at \*7 (N.D. Cal. Mar. 16, 2016) ("Price impact in securities fraud cases is not measured solely by
price increase on the date of a misstatement; it can be quantified by decline in price when the truth is
revealed.") (citing *Halliburton II*, 573 U.S. at 279–80).  Therefore, the absence of front-end price
impact is not necessarily dispositive.

United States District Court
Northern District of California

1    potential causes for the stock price drop.[10]  Plaintiff counters that defendants' arguments speak to

2    materiality and loss causation, issues that are inappropriate for resolution at the class certification

3    stage.  *See Amgen*, 568 U.S. at 470; *Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"),

4    563 U.S. 804, 815 (2011).

5             The Court disagrees, even though overlap may exist.  "'[A] district court may not use the

6    overlap to refuse to consider the evidence.'  Instead, the district court must use the evidence to

7    decide the price impact issue 'while resisting the temptation to draw what may be obvious inferences

8    for the closely related issues that must be left for the merits . . . .'"  *See Goldman*, 141 S. Ct. at 1961

9    n.2 (quoting *In re Allstate*, 966 F.3d at 608); *see, e.g., Allstate*, 966 F.3d at 613–14 ("[S]eparating

10   this argument from the kind of truth-on-the-market defense proscribed by *Amgen*'s holding on

11   materiality cuts extraordinarily fine."); *Pearlstein v. BlackBerry Limited*, No. 13-cv-7060 (CM),

12   2021 WL 253453, at *18 (S.D.N.Y. Jan. 26, 2021) (stating that, despite impropriety of loss causation

13   arguments at the class certification stage, "the Court must nevertheless consider Defendants'

14   evidence that 'an alleged misrepresentation did not, for whatever reason, actually affect the market

15   price of defendant's stock.'") (citation omitted); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,

16   No. 17-cv-1580 (LGS), 2020 WL 1329354, at *5–6 (S.D.N.Y. Mar. 23, 2020) (an "inquiry into

17   whether a disclosure is actually corrective is proper on a motion for class certification").

18            In analyzing whether defendants have severed the link between the alleged misrepresentation

19   and the stock price, it bears repeating what this case is about.  Plaintiff's theory is that defendants

---

21        [10]  More specifically, defendants argue that (1) the two November disclosures regarding
22   reduced iPhone production do not relate back to the alleged misrepresentation regarding Apple's
     iPhone business in Greater China; (2) by November 5, the market already knew of Apple's slowing
23   iPhone business in Greater China; (3) the revelation regarding the extent of Apple's poor
     performance in Greater China had been known at the time of the alleged misrepresentations; (4)
24   Cook's qualitative statement that China is not experiencing pressure like other emerging markets does
     not match with the January 2 quantitative revelation that earnings would fall short of the guidance by
25   five to nine billion dollars; and (5) other non-fraud-related information could have impacted the
     January 3 decline in Apple's stock price.  (Opp. at 16–18.)

27        Defendants also argue, in apparent response to plaintiff's reliance on the *Affiliated Ute*
     presumption of reliance, that the allegedly omitted fact that Apple had already cut iPhone production
28   at the time the challenged statement was made does not relate back to the subject matter of the
     challenged statement, that is, Apple's overall business in China.

misrepresented the state of Apple's performance in China, *including its iPhone business*, towards the end of 2018.  Although the Court previously held that plaintiff failed to adequately plead a misrepresentation with respect to defendants' statements regarding the launch of Apple's then-new iPhones (the XS, XS Max, and XR) (Dkt. No. 123 at 10–11), that holding does not mean that disclosures regarding reduced iPhone demand are wholly irrelevant to the remaining China-related statements.  Defendants repeatedly attempt to divorce these topics despite the connection Cook makes about the two.  Thus, as discussed below, the Court finds that four of the five arguments raised by defendants fundamentally misconstrue plaintiff's theory, while the fifth argument similarly distracts from the relevant price impact inquiry.

First, defendants assert that "[t]he November 2018 allegedly corrective disclosures concerned reduced iPhone production, *not* Apple's overall business in Greater China[.]"  (Opp. at 17.)  Thus, defendants seek to establish that alleged corrective disclosures had no price impact because they were not actually corrective.  Plaintiff responds that "[t]he partial disclosures concerning reductions in iPhone manufacturing were directly related to the subject matter of [d]efendants' false assurance – *i.e.*, the performance of Apple's iPhone business in China."  (Reply at 2.)  The Court agrees.  Cook stated: "Our business in China was very strong last quarter.  We grew 16%, which we're very happy with.  *iPhone, in particular, was very strong double-digit growth there*. . . . "  (Call Tr. at 11 (emphasis supplied).)  Defendants' effort to restrict the challenged statement to Cook's discussion about emerging markets is not well taken.  Accordingly, the first argument against back-end price impact fails.

Second, defendants argue that "[b]y November 5, 2018[,] the market was already appraised of Apple's slowing iPhone business in Greater China . . . , and thus cumulative disclosure of that information could not have affected Apple's stock price in any event."  (Opp. at 17 (citing Expert of Professor Steven Grenadier, Ph.D. ("Grenadier Report"), Dkt. No. 197-2, ¶¶ 99–108 (collecting sources)).)  Defendants imply that the November 5 disclosures regarding reduced iPhone production completely cured the alleged misrepresentations that Apple's business in China was thriving, such that the back-end price drop on January 2 cannot be attributed to the alleged fraud.  The Court is not convinced.  At face value, the January 2 disclosure reveals much more about the iPhone's

United States District Court
Northern District of California

performance in China than the November 5 disclosures.  *See supra* Section I.  Accordingly, the second argument against back-end price impact does not persuade.

Third, defendants contend that what "purportedly 'shocked' analysts on January 2" was "'the magnitude and severity' of [Apple's] negative performance in China at quarter's end."  (Opp. at 17 (citing Compl. ¶ 84).)  Defendants argue that this information did not exist at the time the challenged statement was made and therefore "a resulting price effect cannot be inferred."  (*Id.*)  Defendants again attempt to re-frame the misrepresentation, this time, by zeroing in on a single phrase in the complaint.  However, they ignore the thrust of plaintiff's complaint, which is not merely that Cook misrepresented *how* poorly Apple was performing in China, but that it was, in fact, performing poorly at all.  "This Court is not persuaded by arguments that 'this disclosure only mentioned [one thing]; discussion of that one thing in no way indicates or reveals a problem with this other thing [ ]; ergo, no revelation of fraud."  *Pearlstein*, 2021 WL 253453, at \*18 (quoting *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16-cv-6728 (CJM), 2019 WL 3001084, at \*14 (S.D.N.Y. July 10, 2019), *appeal withdrawn sub nom. Pub. Emps. Ret. Sys. of Mississippi v. Signet Jewelers Ltd.*, No. 19-3837, 2020 WL 773018 (2d Cir. Jan. 16, 2020)).  Accordingly, the third argument against back-end price impact fails.

Fourth, defendants submit that Cook's *qualitative* statement that he "would not put China in th[e same] category" as the underperforming emerging markets does not match the January 2 *quantitative* disclosure that earnings would miss guidance by five to nine billion dollars.  This is yet another distortion by defendants, this time, of the allegedly corrective disclosure, which is not about the earnings shortfall but rather the true state of Apple's business in China.  Accordingly, the Court rejects the fourth argument against back-end impact.

Finally, defendants argue that plaintiff fails to account for other information that could have impacted the stock price on January 3.  Specifically, defendants cite "Apple's disclosure to investors that in [1Q19] it had experienced slowing upgrade of iPhones in developed economies that contributed to the reduced revenue guidance," as well as "Mr. Cook's statement that 'emphasized the negative impact the battery program had had on the pace of phone replacements during 1Q19,' . . . which analysts specifically referenced with regard to Apple's disappointing results."  (Opp. at 18

United States District Court
Northern District of California

1    (citing Dkt. No. 1, ¶¶ 37–38 and Grenadier Report, ¶¶ 71–75).)  Claims that other factors also

2    contributed in part to the price drop are insufficient to rebut the *Basic* presumption.  *See*, *e.g.*,

3    *Waggoner*, 875 F.3d at 105 ("[M]erely suggesting that another factor also contributed to an impact

4    on a security's price does not establish that the fraudulent conduct complained of did not also impact

5    the price of the security.").  Instead, "it is [d]efendants' burden to show the *absence* of price impact

6    – not merely to challenge [p]laintiff on the persuasiveness of its own price impact claim –

7    once *Basic*'s presumption of reliance attaches."  *Signet*, 2019 WL 3001084, at *17.  Accordingly, the

8    fifth argument against back-end price impact does not persuade.

9            As defendants have failed to prove by a preponderance of evidence that the January 2

10   disclosure was *not* associated with a negative price impact, they have failed in rebutting

11   the *Basic* presumption of reliance.  This aspect of the predominance inquiry is therefore met.

12                   **2.  PREDOMINANCE OF COMMON QUESTIONS OF DAMAGES**

13           Defendants also challenge plaintiff's showing of predominance with respect to damages.  To

14   meet the predominance requirement under Rule 23(b)(3), "plaintiffs must show that their damages

15   stemmed from the defendant's actions that created the legal liability" under the proposed damages

16   model.  *Levya v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (citing *Comcast v. Corp. v.*

17   *Behrend*, 569 U.S. 27, 39 (2013)).  The Court must conduct a "rigorous analysis" to determine

18   whether the damages model is consistent with the plaintiffs' theory of liability, although

19   "[c]alculations need not be exact."  *Comcast*, 569 U.S. at 35 (citation omitted).  "[U]ncertainty

20   regarding class members' damages does not prevent certification of a class as long as a valid method

21   has been proposed for calculating those damages."  *Nguyen v. Nissa N. Am., Inc.*, 932 F.3d 811, 817

22   (9th Cir. 2019) (quoting *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017), *rev'd*

23   *on other grounds*, 139 S. Ct. 710 (2019)).

24           Here, plaintiff's expert Dr. Feinstein describes in his report the so-called "out-of-pocket"

25   damages methodology plaintiff plans to use to calculate damages on a classwide basis.  (Feinstein

26   Report ¶¶ 178–89.)  Generally speaking, "out-of-pocket damages are measured as the difference

27   between the amount of stock price inflation at purchase and the amount of inflation in the stock price

28   at sale or, if held, at the end of the Class Period . . . ."  (*Id.* ¶ 181.)  Dr. Feinstein explains that

"[v]aluation tools can be applied to measure what the price of Apple stock would have been but for the alleged misrepresentations and omissions." (*Id.* ¶ 183; *see also id.* ¶ 185 (listing commonly used valuation tools).)  Dr. Feinstein then outlines the steps of this methodology:

    i.    First, valuation tools, which would include event study analysis such as that described herein, and potentially other empirical analyses if necessary, would be used to establish if the disclosures, correcting the alleged misrepresentations and omissions, caused the prices of Apple stock to fall. This analysis, after controlling for potentially non-fraud related information, would establish if the alleged misrepresentations and omissions had caused the stock price to be artificially inflated, and if corrective disclosures caused the inflation to dissipate, in turn causing investor losses.  This analysis would apply on a class-wide basis.

    ii.    Second, an inflation ribbon would be constructed, using generally accepted empirical analysis and valuation tools, indicating how much artificial inflation caused by the alleged misrepresentations and omissions was in the prices of Apple stock on each day during the Class Period, if any.  An inflation ribbon is a time series of the difference between a stock's actual price observed in the marketplace, and the estimated price that the stock would have traded at each day had there been full disclosure.  Construction of the inflation ribbon generally employs event study analysis, combined with widely used and generally accepted valuation tools.  The inflation ribbon is often constructed by working chronologically backwards from the final corrective disclosure to the start of the Class Period, accounting for alleged fraud-related residual price declines as they occurred.  Inflation prior to a corrective disclosure that dissipated inflation is greater than the inflation afterward by the amount of inflation that dissipated.  The full array of generally accepted and widely used valuation tools can be applied, if necessary, to calculate the but-for stock prices under the assumption of prior full disclosure.  This analysis would also apply on a class-wide basis.

    iii.    Third, the measure of per share damages generally applied in Section 10(b) cases is the reduction in the inflation ribbon over an investor's holding period (the economic/inflation loss).  That is, per share damages would be calculated as the difference between the inflation on the date the shares were purchased and the inflation on the date those same shares were subsequently sold, or, if held, at the end of the Class Period.

    iv.    Per share damages are limited, however, to be no greater than the decline in the share price over the investor's holding period, which is the investment loss actually sustained.

United States District Court
Northern District of California

v.    Pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA") (15 U.S.C. § 78u-4(e)), for purposes of computing the investment loss limitation on damages, for any shares sold during the 90-day period after the end of the Class Period, the investment loss is computed as if the selling price was the greater of the actual selling price or the average price from the final corrective disclosure date to the sale date.  For any shares held 90 days or more beyond the final corrective disclosure, the investment loss is computed as if the shares were sold for the average price over the 90 days following the final corrective disclosure.

vi.    The calculation of each Class member's per share damages would be a mechanical arithmetic exercise for all Class members who bought Apple stock during the Class Period, applying the results of the class-wide analyses described above to each Class member's stock trading data.

(*Id.* ¶ 186.)  Thus, Dr. Feinstein opines, "class-wide damages in response to the specific misrepresentations and omissions ultimately established by the Lead Plaintiff can be calculated in a straightforward manner common to all Class members."  (*Id.* ¶ 182.)

The out-of-pocket method is "widely considered an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation."  *In re Intuitive Surgical Sec. Litig.*, No. 13-cv-1920 (EJD), 2016 WL 7425926, at *17 (internal quotation marks and citation omitted).  "Courts regularly reaffirm that the out-of-pocket, or event study, method matches plaintiffs' theory of liability under Section 10(b) of the Securities Exchange Act, making it the standard method for calculating damages in virtually every Section 10(b) class action."  *City of Miami General Employees' & Sanitation Employees Retirement Trust v. RH, Inc.*, No. 17-cv-554 (YGR), 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) (collecting cases).

Nonetheless, defendants challenge the proposed damages model on multiple grounds.  First, defendants argue that what Dr. Feinstein proposes "is not a functional model that one could actually use to calculate damages for this proposed class, but instead is merely a general definition of damages under Rule 10b-6."  (Opp. at 23.)  The Court disagrees.  Defendants' expert improperly focuses on a single line in Dr. Feinstein's report while dismissing the foregoing step-by-step method. (Grenadier Report, ¶ 48.)  Second, defendants contend that Dr. Feinstein "does not explain how the identified valuation tools should be applied here with regard to Apple's stock, let alone actually apply them."  (Opp. at 23–24.)  The Ninth Circuit has stated that *Comcast* demands only that plaintiffs "be able to show that their damages stemmed from the defendant's actions that created the

18

United States District Court
Northern District of California

1   legal liability." *Leyva*, 716 F.3d at 514.  There is only one theory of liability here, namely, that

2   defendants' misrepresentation inflated the stock price and corrective disclosures removed such

3   inflation.  Plaintiff has proposed a standard method of calculating damages that is consistent with

4   this theory of liability and can be applied classwide.  At the class certification, plaintiff is not

5   required to do more.

6          Next, defendants fault Dr. Feinstein for failing to consider numerous purported facts, namely:

7          the fact[s] that (i) there is a subject-matter 'mismatch' between the contents of the
8          [c]hallenged [s]tatement and the November 2018 purportedly corrective
           disclosures, and thus a 'corrective' price decline cannot be assumed, (ii) the
9          qualitative fact of Apple slowing business in China was well knonw to the market
           at the time the [c]hallenged [s]tatement was made, and thus the quantitative
10         "corrective" statements could not affect Apple's stock price, (iii) the "new
           information" disclosed on January 2, 2019 regarding the 'magnitude and severity'
11         of the quarter-end drop in Apple's iPhone business in China could not have been
           known at the time the [c]hallenged [s]tatement was made two months earlier; and
12         (iv) there was non-fraud related information released on January 2, 2019 that
           caused the [c]ompany's stock price to drop.
13

14

15  (Opp. at 24.)  However, these "attack[s on] the 'fit' between an alleged corrective disclosure and a

16  prior alleged fraudulent statement . . . . [are] nothing more than [ ] attack[s] on loss causation,"

17  which plaintiff need not show as a condition of class certification.  *Hatamian*, 2016 WL 1042502, at

18  *9 (citing *Halliburton I*, 563 U.S. at 813).  "Defendants' arguments are therefore misplaced."  *Id.*

19         By contrast, turning to defendants' concerns about the applicability of the proposed damages

20  model, the Court is persuaded.  Defendants submit that the proposed damages model does not

21  provide any method for calculating the alleged damages to Apple option holders.  Even if option

22  holders are properly part of the class, which defendants also dispute, the Court finds that Dr.

23  Feinstein does not adequately explain how damages to option holders could be calculated on a

24  classwide basis.  Instead, Dr. Feinstein states:

25         Given the inflation ribbon for the common stock, widely used and generally
           accepted option pricing formulas, such as the Black-Scholes formula can be used
26         to determine how much artificial inflation is in each call option on any given day
           and how much each put option price is depressed.  With these results, the out-of-
27         pocket damage methodology can be applied to compute damages sustained by

28

United States District Court
Northern District of California

> Class members who purchased Apple call options or wrote Apple put options during the Class Period.

(Feinstein Report ¶ 187.)  However, given the varying characteristics of the 2,282 distinct Apple stock options that were available for trading during the relevant period, Dr. Feinstein offers nothing in either of his reports to satisfy the Court that individualized issues pertaining to damages to option holders will not predominate.

Accordingly, while the Court is satisfied that the damages model proposed by Dr. Feinstein adequately demonstrates that damages to Apple stockholders are capable of being calculated on a classwide basis, the same cannot be said with respect to Apple option holders.  For this reason, the motion for class certification with respect to the latter is **DENIED WITHOUT PREJUDICE**.[11]

---

[11]  Should plaintiff re-seek certification with respect to this category of investors, it would behoove plaintiff to address the concerns not only pertaining to its ability to calculate classwide damages but also the issues raised by defendants regarding market efficiency for purposes of invoking the *Basic* presumption of reliance.  The Court is aware that other courts deciding whether to extend the *Basic* presumption to option holders have assumed, without analysis, that market efficiency with respect to the common stock translates to market efficiency with respect to options on the same.  *See, e.g.*, *Deutschman v. Beneficial*, 841 F.2d 502, 504 (3rd Cir. 1988) (material misstatements affecting the market price of the stock affect the "necessarily related market price of the option contract");  *In re Scientific–Atlanta, Inc. Sec. Litig.*, No. 01-cv-1950 (RWS), 2007 WL 2683729, *8 (N.D. Ga. Sept. 7, 2007) (finding put options sellers entitled to rebuttable presumption of reliance because put options sellers bet on the integrity of the price of the underlying stock as do stock purchasers); *Levie v. Sears Roebuck & Co.*, 496 F. Supp. 944, 949 (N.D. Ill. 2007) (including put and call options traders because while they might believe there will be fluctuation in the stock price, they also rely on the integrity of the information disseminated); *In re Priceline.com Inc.*, 236 F.R.D. 89, 99 (D. Conn. 2006) ("Option traders . . . may use the fraud-on-the-market presumption of reliance absent special circumstances compelling a different result." ); *In re Enron Corp. Secs.*, 529 F.Supp.2d 644, 754 (S.D. Tex. 2006) (applying fraud-on-the-market presumption to class's § 10(b) claims based on options, reasoning that "[t]he value of these derivative securities depended upon the value of Enron common stock, and all the information about the stock was readily available to investors and factors affecting the price of the stock were incorporated into the determination of the value of the call and put options."); *Tolan v. Computervision Corp.*, 696 F. Supp. 771, 779 (D. Mass. 1988) (options traders "rely on the integrity of information disseminated in the market just as do purchasers and sellers of the underlying security").

Notwithstanding, defendants' expert raises legitimate questions as to whether that assumption is valid and also whether aggregation of all Apple stock options is appropriate for analysis purposes given their varying characteristics.  Moreover, the parties did not fully address whether the factors outlined in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286–87 (D.N.J. 1989), and *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tx. 2001), typically used to evaluate market efficiency of common stock, are even applicable to the determination of market efficiency of stock options.

## IV.  CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** the motion for class certification. Pursuant to Rule 23(a) and Rule 23(b)(3), the Court hereby **CERTIFIES** a class of investors defined as: "All persons and entities who purchased or otherwise acquired the publicly traded securities of Apple Inc. during the period from November 2, 2018 through January 2, 2019, including, and who suffered damages by defendants' alleged violations of [Sections] 10(b) and 20(a) of the Exchange Act."  Excluded from the class are (i) Apple and the individual defendants; (ii) members of the families of each individual defendant; (iii) officers and directors of Apple; and (iv) the legal representatives, heirs, successors or assigns of any such excluded party.  The motion is **DENIED WITHOUT PREJUDICE** with respect to holders of Apple stock options, who are also excluded from the class.  The Court **APPOINTS** Norfolk Pension Fund as class representative and Robbins Geller as class counsel.

In light of this Order, the Court hereby **SETS** a compliance deadline for **March 4, 2022**.  Five (5) business days prior, the parties shall file a joint statement setting forth the parties' position with respect to the scheduling of this case.  If compliance is complete, the compliance deadline will be taken off calendar.

This Order terminates Docket Numbers 165 and 206.

**IT IS SO ORDERED.**

Dated:  **February 4, 2022**

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California

21