# EXHIBIT 1

**EXPERT REPORT OF DON CHANCE**

*In re Apple Inc. Securities Litigation*, No. 4:19-cv-02033-YGR (N.D. Cal.)

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ........................................................... 1

II.  MY ASSIGNMENT ....................................................... 2

III.  SUMMARY OF OPINIONS............................................. 3

IV.  MATERIAL RELIED UPON............................................ 3

V.  FUNDAMENTAL PRINCIPLES AND CHARACTERISTICS OF OPTIONS......... 4

VI.  USING OPTIONS ....................................................... 7

VII.  OPTION VALUES AND STOCK PRICES PRIOR TO THE OPTION
EXPIRATION............................................................ 10

VIII.  OPTION DELTA:  A MEASURE OF THE EFFECT OF STOCK PRICE
ON OPTION VALUE ..................................................... 14

IX.  ON THE LEGAL REQUIREMENTS FOR "EFFICIENCY" OF OPTIONS
MARKETS................................................................ 16

X.  ACADEMIC RESEARCH ON OPTIONS MARKET EFFICIENCY ..................... 18

XI.  HOW OPTION HOLDERS CAN BE DAMAGED BY AN ARTIFICIALLY
INFLATED STOCK PRICE ............................................... 22

XII.  MULTIPLE OPTIONS OF VARYING TERMS AND TRADING ACTIVITY ........ 23

XIII.  APPLE'S MISCHARACTERIZATION OF TRADING VOLUME IN APPLE
OPTIONS ................................................................ 24

XIV.  ESTIMATING THE LOSS TO AN OPTION HOLDER WITH A COMMON
METHODOLOGY ......................................................... 27

XV.  THE INVESTOR'S TOTAL POSITION................................. 30

XVI.  CONCLUSIONS ........................................................ 30

## I.  INTRODUCTION

1.     My name is Don Chance, and I am a professor of finance at Louisiana State University as well as holder of the James C. Flores Endowed Chair of MBA Studies.  I hold a PhD in finance from Louisiana State University, which I received in 1980.  I taught at Virginia Tech from 1980-2003 and have been at Louisiana State since 2003.  I also hold the designation of CFA (Chartered Financial Analyst).[1]

2.     My primary area of specialization is derivatives and risk management.  Derivatives are a class of financial instruments that include forwards, futures, options, and swaps.  They are said to *derive* their values from the value of something else.  Risk management is the process of monitoring an organization's financial and non-financial risks to align the risk taken with the risk desired.  In addition, I also have considerable expertise in asset management, indexing, corporate finance, probability, statistics, and analytics.

3.     I am a recognized expert in derivatives.  I have published more than 100 articles in academic and practitioner journals and have written five books.  The first book, currently titled *An Introduction to Derivatives and Risk Management* with Robert Brooks, is in its 10th edition and is one of the most successful textbooks ever published on derivatives.[2]  The second book, *Essays on Derivatives*, was published in 1998 and revised in 2008.  In 2003 I published *Analysis of Derivatives for the CFA Program*, which was commissioned by the CFA Institute for use in its global examination program.  In 2019, I published *Financial Risk Management:  An End User Perspective.*  I am currently working on a new book, *Foundations of the Pricing of Financial Derivatives*, with Robert Brooks.  In addition, I have published four monographs, three of which are on derivatives.

4.     I have also been the primary authority on the subject of derivatives for the CFA Institute.  I helped develop the current curriculum.  I have written several articles for the curriculum and directed the writing of several more.  Prior to that time I taught CFA exam prep courses for 11 years, which includes courses in the United States plus short

---

[1]   The CFA certification program is administered by the CFA Institute, a global association of professional financial analysts, headquartered in Charlottesville, Virginia.  It has over 180,000 members, most of whom hold the charter.  The three-year CFA examination program is currently taken by about 200,000 candidates each year over all three levels.  The topical areas are economics, accounting, ethics and professional standards, equity and fixed income analysis, portfolio management, corporate finance, quantitative methods, alternative investments, and derivatives.

[2]   This book was based on class notes developed in the mid-1980's for what was one of the first college-level courses in derivatives.  The original edition of the book was called *An Introduction to Options and Futures.*  It later morphed into *An Introduction to Derivatives* and then to its current title, which adds the concept of risk management.  Plans are underway for an 11th edition to be published later this year or early 2023.  This book has remained in demand for more than three decades.

stints in Thailand and Austria, and 10 years for UBS in Switzerland. I also taught derivatives for seven years for the International Federation of banking in Luxembourg. I have taught the subject to undergraduate, masters, and PhD students for almost 40 years. It is possible that I have more experience teaching derivatives than anyone else.

5.      I have made more than 100 presentations at universities, conferences and regulatory agencies. I have been quoted, interviewed, or my research cited by the media more than 180 times. I have conducted derivatives training programs for such organizations as Goldman Sachs and the World Bank, and I have been a visiting scholar in the US, Scotland, Korea, Australia, Hong Kong, and Singapore.

6.      My expert witness and some other consulting work is done through my LLC, Omega Risk Advisors. I have served as an expert witness in 11 court cases. My hourly rate is $950, and $1,300 while testifying under oath. My C.V. is included.

7.      I am required by my employer to state that what I write or testify is my opinion only and should not be construed to represent the opinion of my employer, Louisiana State University, or the state of Louisiana.

8.      This report is furnished for the purpose of court proceedings in the above-referenced matter and may not be used or referred to for any other purpose. The analysis and opinions contained in this report are based on information available as of the date of the report. I reserve the right to amend, refine, or supplement this report in the event that I become aware of additional information, evidence, arguments or analyses that bear to my work.

## II.   MY ASSIGNMENT

9.      I have been asked by the attorneys of Robbins, Geller, Rudman, & Dowd LLP, representing Plaintiffs in the above-referenced action, to opine on the matter of whether Apple option contracts trade in an efficient market and to discuss the academic literature on options market efficiency. I have also been asked to address the question of whether a common methodology can be used to estimate the damages to a class of Apple option holders.

10.      I understand that on February 4, 2022, the court issued an order granting class certification in part finding that Apple, Inc. common stock traded in an efficient market.[3] I have reviewed the expert reports of Steven Feinstein, and I am familiar with Apple, as it is one of the largest and most actively traded companies in the world, and believe that the conclusion that Apple stock traded in an efficient market is an absolute.

---

[3]   I understand on the issue of market efficiency that the parties to the case and the Court are substantially guided by opinions issued by the United States Supreme Court including Basic v. Levinson, 485 U.S. 224 (1988), Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258 (2014)

Also, I understand Apple did not take the position that its common stock did not trade in an efficient market.

11.     In the same order, I understand that the Court denied certification without prejudice of a class of Apple options buyers and sellers.  The Court has asked that further evidence, including academic literature, be provided to support the position that Apple options trade in an efficient market and that damages can be calculated with a common methodology for all options holders.  The Court also asked Plaintiff to address whether the factors stated in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) apply to the analysis of whether the options trade in an efficient market.[4]

## III.    SUMMARY OF OPINIONS

12.     In this expert report I offer the following opinions:

(a)     Apple options are derivatives, and their valuations are driven by the price of Apple common stock which has been already found, for purposes of this case, to trade in at efficient market.  Apple options trade in an efficient market in that their prices rapidly reflects all publicly available information.

(b)     The existence of various combinations of Apple puts and calls with different expirations and exercise prices traded during the Class Period[5] does not affect the efficiency of the market for Apple options.  The market for Apple options is an integrated market that is unified by one critical factor: the underlying stock price.

(c)     A common methodology can be applied to determine out of pocket damages for all of the call option buyers and put option sellers that accounts for every combination of expiration and exercise price traded during the Class Period.

(d)     The academic literature on options market efficiency strongly supports that options react rapidly to public information about the underlying company and that option prices move consistent with the underlying stock price movement.

## IV.    MATERIAL RELIED UPON

13.     I have relied on my knowledge and my reading of the following documents:

- Revised Consolidated Complaint, dated June 23, 2020

- Report of Plaintiff's expert, Dr. Steven Feinstein, dated May 5, 2021

---

[4]     The "*Cammer*" factors refer to a set of criteria identified in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

[5]     Primarily, I understand that the above-referenced action pertains to a time frame of November 2, 2018 through January 2, 2019.

- Transcript of Dr. Steven Feinstein's deposition, dated June 16, 2021

- Defendant's Opposition to Plaintiff's Motion for Class Certification, dated July 9, 2021

- Report of defendant's expert, Dr. Steven Grenadier, dated July 9, 2021

- Reply report of Dr. Feinstein, dated August 24, 2021

- Class Certification Hearing Transcript, dated January 18, 2022

- Class Certification Order, dated February 4, 2022

## V.   FUNDAMENTAL PRINCIPLES AND CHARACTERISTICS OF OPTIONS

14.    Let me first state emphatically that exchange-listed options, such as those that trade in markets like the Chicago Board Options Exchange, the New York Stock Exchange or Nasdaq, are heavily and rapidly influenced by the price of the stock on which the options are written.  This is not an assumption or academic theory.  While there was some modest academic literature in the 1970's through the early 1990's that studied options market efficiency, and this literature will be reviewed in a later section, the issue is essentially settled and academics rarely, if ever, test this matter anymore.  Simply stated, the options market must reflect the information provided in the price of the stock, and it must do it rapidly.  Otherwise, traders doing transactions at stale prices will lose money.  Option traders who do not price the option correctly and rapidly absorb new information into the price will be exploited.  This exploitation, referred to as arbitrage, is the glue that connects the options market to the stock market.[6]

15.    In order to understand this key issue, it is important to discuss certain foundational principles of options.  Hence, I will start my opinion by providing a background explanation of options.  I know some of this will be repetitive, but since virtually none of the key parties in this litigation is an options expert, some repetition, perhaps phrased a little differently, should be salutary.  In my experience in teaching the subject to undergraduate, masters, and doctoral students and professional investment managers trying to obtain their CFA charters, options are the most difficult subject they have to learn.  Therefore, I take a basic and instructional approach.

16.    An option is a contract between two parties, a buyer and a seller, that provides the buyer with the right to either buy or sell an underlying asset at a fixed price

---

[6]    Arbitrage is the process by which prices in one market that are misaligned with prices in another market are quickly exploited and eradicated.  There will be more on this concept later.

either at a specific date or any time up to a specific date.[7]  An option that provides the right to buy the underlying asset is referred to as a *call* or *call option*, while an option to sell the underlying asset is referred to as a *put* or *put option*.

17.     The party referred to as the buyer is also sometimes called the holder and occasionally the long.  "Long" is a term that describes a position of ownership and refers to being long something, a common expression in the world of finance.  People who are long something benefit when it increases in price.  Note also that this party is occasionally referred to as the owner of the option.  The other party, referred to as the seller, is also sometimes called the writer or the short.  People who are short something will benefit if it goes down in value.  They have sold it at one price and if it falls to a lower price, they can buy it back at that lower price, which is called covering their short position, thereby making a profit.

18.     As noted, all options are either calls or puts.  That terminology references the action taken when the option is used or exercised by the buyer or holder.  When that party exercises a call, it is said to be "calling" the underlying asset from the seller.  When that party exercises a put, it is said to be "putting" or selling the underlying asset to the seller of the option.  It is important to note that one can be a buyer of an option to sell or a seller of an option to buy.  Thus, it is critical to remember that first and foremost, an option is either an option to buy the underlying asset (a call) or sell the underlying asset (a put).  Whether it be a call or a put, it has a buyer, the person who acquires that option, and a seller, the person who grants that option.

19.     As it relates to this case, the underlying asset is the common stock of Apple, Inc., but there are many other types of underlying assets, such as currencies, stock indexes, and commodities.  Also, note that in a somewhat crude corruption of the English language, the expression "underlying" asset is often just referred to as the "underlying, " turning the word "underlying" from a participle into a noun.

20.     As I discussed above, an option grants the right to buy or sell at a fixed price.  This fixed price is referred to as the strike, strike price, striking price, or exercise price.  I tend to use "strike" and sometimes "exercise price."

21.     The definition also noted that an option can be exercised either at a specific point in time or until a specific point in time.  The type of option that can be exercised at a specific point in time is called a European or European-style option, and the type that can be exercised at any time until a specific point in time is called an American or

---

[7]   All of the material herein that explains the principles of options and a great deal of the pricing material that occurs later in this report is covered in my book, *An Introduction to Derivatives and Risk Management*, 10th ed, co-authored with Robert Brooks, Cengage: Mason, OH, 2015.  *See* Chapters 2 and 3 for the basic characteristics and principles of options, Chapter 4 for the binomial model, and Chapter 5 for the Black-Sholes-Merton model.

American-style option.  These terms have nothing to do with where these options trade, as both European and American options trade in both Europe and America.[8]  As an example, suppose it is January 15 and an option expires on April 20.  If it is a European option, it can be exercised only when it expires at the end of the day on April 20.  If it is an American option, it can be exercised any day until the end of the day on April 20.

22.    Naturally, options are not free.  Buyers of options must pay money to the sellers.  This amount of money is referred to as the price or premium.  The price is negotiable between buyer and seller.  The seller receives the premium and can be thought of as being paid to be willing to execute the exercise when the buyer orders it.  In the case of a call, the seller is paid to be ready to sell the underlying at the strike to the buyer.  In the case of a put, the seller is being paid to be ready to buy the underlying from the option buyer at the strike.

23.    When the option holder decides to use the option to buy or sell the underlying asset, the process is called exercising the option.  If the option is a call, the holder pays the exercise price to the seller and receives the underlying asset.  If the option is a put, the put holder delivers the underlying asset to the seller and receives the exercise price.  Some options specify that exercise is done through a process called cash settlement, in which the two parties simply exchange the net monetary difference between the underlying asset price and the exercise price.  The standard procedure for options on common stocks in the United States is settlement by actual transfer of the shares through electronic entry.  Of course, the holder of the option has the right to not exercise it and will not do so if it is not in its best interest.

24.    An important characteristic of the options in this case is that they are standardized contracts traded on various options exchanges.  The first options exchange was the Chicago Board Options Exchange, created in 1973.  It remains one of the world's largest exchanges and it owns many subsidiaries that also trade options and other financial products.  Options trading also exists at subsidiaries of Nasdaq, the New York Stock Exchange, and various other exchanges.

25.    The notion of being standardized means that the exchange determines the terms except the premium, which is negotiated between buyer and seller.  These standard terms adopted by the exchanges mean that the options are all the same type of contract, differing only by expiration, exercise price, underlying, and premium.  It is also important to note that while an option is described as a contract, it is not a contract in the sense of being a piece of paper customized to the needs of the two parties and signed by each.  There is no written document.  Details of option contracts are available from the

---

[8]    These terms were used at least as far back as the early 1900's, where they did indicate where these options traded, but that is no longer the case.  For the record, there are also Asian options and Bermuda options, and those names have nothing to do with where they trade.

exchange, but they are not issued to the parties who might file them away like most other legal contracts.

26.     All of these fundamental facts about options are well documented in options books.  In my own previously cited 10th edition book, they make up much of Chapter 3.

27.     In my opinion this characteristic of being a standardized contract is important in this case.  As I interpret the Court's comments at the January 18, 2022, class certification hearing and in the February 4, 2022 class certification order, the Court appeared to express concern that there are many quite different contracts with varying terms[9] and, therefore, it might not be appropriate to treat them as substantially similar.  I want to make clear however, that an exchange-listed option is a standard contract.

## VI.   USING OPTIONS

28.     Holders of call options buy them for hedging and speculative purposes.  For example, let us say that a party believes that a company's stock price will increase sharply over the next two months.[10]  To act on this belief, this party could buy the stock, or it could buy the call option, or it could sell the put option.

29.     We take a simple example of a person who is optimistic about the prospects of a stock.  One way of acting on that optimism is buying a call option.  Let this person buy a European call option on January 15 of a given year, and the option expires on April 20.  Assume the underlying is a hypothetical company MNO Corporation.  The stock price when the option is purchased is $48 and the buyer and seller choose a strike of $50.  This option grants the buyer the right to buy a share of MNO at a price of $50 on April 20.[11]  Let us say the buyer and seller negotiate a price for the call option of $7.  At the end of the day on April 20, the buyer has a decision to make.  Should it exercise the option or not?  That depends on the price of the stock at that time.  The option is the right to buy the stock at $50.  Hence, if the stock is selling for more than $50, the option should be exercised.  If the stock is selling for less than $50, the option should not be exercised, in which case it simply expires.  Consider two cases, one with the stock above $50 and one below $50 on April 20.

30.     **Example A**: Stock is selling for $53 on April 20.  This outcome is an example in which the stock price at the expiration is above the strike.  The option is worth exercising, because it is worth it to buy a $53 stock for $50.  The option holder gains $3 by exercising.  Note that just because the option is exercised, it does not mean the option

---

[9]   February 4, 2022, Class Certification Order at 20.

[10]   It should be noted that this motivation for buying an option is indicative of the fact that the option is driven by the value of the stock.

[11]   While most option contracts actually are in lots of 100, we will just use a single option for illustrative purposes.

holder made money.  Indeed, there was a loss of $4, as it paid $7 for this right and ended up exercising it for only a $3 gain.

31.     **Example B**:  Stock is selling for $46 on April 20.  In this example the stock price on April 20 is below the strike.  In this case, it is not worth exercising and buying the stock at $50 when it is selling for only $46, as the option holder could simply buy it in the market for $46.  The option holder allows the option to expire unexercised.  The loss is the full premium of $7.

32.     Now consider what happened to the seller of the option.  The seller's gains or losses are the opposite of the buyer's gains or losses.  So in Example A, the buyer lost $4, and the seller gained $4.  In Example B, the buyer lost $7, so the seller gained $7.

33.     Note by comparison what happened to someone who bought the stock at $48 instead of buying the call option.  In the Example A, the buyer of the stock gained $5, resulting from a movement from $48 to $53, and in Example B the buyer of the stock lost $2, resulting from a movement of $48 to $46.

34.     Let us look at what has to happen for buyers to make money.  Remember that the buyer paid $7 to acquire the option.  Hence, to make money, the stock price on April 20 must exceed $57.  That is, the call has to get exercised for a gain of at least $7.  Let us say the price on April 20 is $60.  Then the buyer exercises, paying $50 and acquiring a stock worth $60, thereby netting a $10 gain, which more than covers the $7 paid for the option.  It is also important to note that while the stock price increased about 20%, the option holder paid $7 and earned a profit of $3, which is a gain of over 40%.

35.     Now let us consider put options.  Buyers purchase puts to gain if the underlying stock goes down in price. This purchase can occur as a form of speculation on a decline in the price of the underlying.  Or it can be to protect a stock ownership position in the underlying.  The latter case is a form of insurance, amounting to owning an asset and paying a premium to acquire a put option that will gain if the value of the asset falls, thereby offsetting some of the loss in the value of the asset.

36.     Consider the same example used above.  We set the put price at $9.  Remember that the stock price is $48 and the strike is $50.  Thus, it gives the buyer the right to sell the stock at $50 on April 20.

37.     **Example C**:  Stock is selling for $53 on April 20.  The holder of the put has the right to sell the stock for $50, but it is selling in the market for $53.  He is better off selling in the open market, so the put is not worth exercising.  The loss is the full $9.

38.     **Example D**:  Stock is selling for $46 on April 20.  The option holder has the right to sell a $46 stock for $50, so it is worth exercising.  Doing so nets a gain of $4, but that still is not enough to cover the price paid for the put, so the net loss is $5.

39.     Put holders make money if the stock price drops below the exercise price by more than the premium.  Thus, in Examples C and D, the stock price would have to

drop below $41 for a put buyer to make money by exercising it at expiration. Of course, the buyer's gain or loss is the seller's loss or gain.

40.   The amounts the buyer of the call should have paid or the seller should have received   can be determined by option pricing models, such as the binomial model or Black-Scholes-Merton model. The binomial model is largely credited to J. C. Cox, S. A. Ross, and M. Rubinstein, "Option Pricing: A Simplified Approach." *Journal of Financial Economics* (1979), 7:229-263. The Black-Scholes model is from F. Black and M. Scholes, "The Pricing of Options and Corporate Liabilities." *The Journal of Political Economy* (1973), 81:637-654 and R.C. Merton, "Theory of Rational Option Pricing." *The Bell Journal of Economics and Management Science* (1973) 4:141-183. As my objective at this juncture is to demonstrate that Apple options trade in an efficient market and the price of an option rapidly reflects all publicly available information, it is not necessary to present those models at this point.[12]

41.   There is some terminology used with options that is best seen after understanding the above examples. For calls, when the underlying price is above the strike, the call is said to be *in-the-money*. When the underlying price is below the strike, the call is said to be *out-of-the-money*. When the underlying price is equal to the strike, it is said to be *at-the-money*. For puts, when the underlying price is below the strike, the put is said to be *in-the-money*. When the underlying price is above the strike, the put is said to be *out-of-the-money*. When the underlying price is equal to the strike, the put is said to be *at-the-money*. As the price of the underlying moves, the *moneyness* of an option may change. For example, a call may move from out-of-the money, to at-the-money, to in-the-money as the price of the underlying rises.

42.   At-the-money and out-of-the-money options would not be exercised while they are *at-* or *out-of-the-money*. If it is prior to expiration, they could become *in-the-money* before expiration. And note, an American option that is *in-the-money* before expiration could be exercised at this point or at any time before expiration, but in all likelihood, the holder will wait, because it is costly to abandon the potential for later favorable stock price moves in order to capture the exercise value now. Option pricing models show the optimal time to exercise and it is usually but not always at expiration. But the point is that only in-the-money options are exercised and at-the-money and out-of-the-money options are not exercised.

43.   When the call option expires, the amount captured by the holder of the option is the greater of either zero or the underlying price at the expiration minus the strike. This value is referred to as the option's *payoff* or *exercise value*. It is the value of that option at the point at which it expires. For a put, the payoff or exercise value is the greater of either zero or the exercise price minus the underlying price at expiration.

---

[12]   Detailed treatments of these two models are in Chapters 4 and 5 of my previously cited book, *An Introduction to Derivatives and Risk Management*, 10th ed.

44.     For a call option, its value is greater the higher the stock price at expiration. In the above Example A, where the stock was at $53 at expiration, the option payoff was, thus, $3.  If the stock were at $56, the option payoff would be $6.  If the stock were at $62, the option payoff would be $12. The option payoff is directly related to the stock price at expiration.  Thus, the call option payoff at expiration is determined by the underlying stock price in relation to the strike.  The higher the stock price, the more valuable the call option.  This point illustrates that the value of an option is derived from the underlying stock price.  The stock price determines whether an option expires out-of-the-money and is not exercised or in-the-money and is exercised, and the exact amount of the payoff.

45.     The same applies for puts.  In the above Example D in which the stock price at expiration was $46, the put payoff was $4.  If the stock price was $38 at expiration, the put payoff would be $12.  If the stock price were above $50, the put payoff would be zero. So, the payoff of a put option is likewise determined by the performance of the underlying stock price.

## VII.   OPTION VALUES AND STOCK PRICES PRIOR TO THE OPTION EXPIRATION

46.     Just as the option price at expiration is driven or determined by the stock price, so too is the option price prior to expiration.  Thus, if the stock price changes, the option price must adjust quickly in response.  Traders who are slow to adjust will be exploited.  In support of this statement, I provide here two quotes from widely used published material on options.  The first is from John Hull, *Options, Futures, and Other Derivatives*, 9th ed., Pearson, 2015.  This is one of the leading academic textbooks on options.

> A derivative can be defined as a financial instrument whose value depends on (or derives from) the values of other, more basic, underlying variables. Very often the variables underlying derivatives are the prices of traded assets.  A stock option, for example, is a derivative whose value is dependent on the price of a stock." (p.1).

47.     The following comes from Robert Brooks and David Gentle, "The Valuation of Contingent Claims," in *Fixed Income and Derivatives*, CFA Program Curriculum, Level II, Volume 5, 2020.  This is a required article in the CFA examination program mentioned earlier.

> The value of a call option is positively related to the value of the underlying. That is, they both move up or down together.  Hence, by writing a call option, the trader will lose money if the underlying goes up and make money if the underlying falls.  (p.390).

48.     It is extremely rare and virtually impossible to purchase an option at the instant at which it expires.  Thus, almost every option purchase is made before the option expiration.  It is the value before expiration that reflects the price at which the option trades.  In the previous section, I explained that the option value at expiration is

determined by the stock price relative to the strike.  At this point, if the reader were taking a course in options, he would then learn through some relatively straightforward mathematical and financial principles that an option with a payoff determined by the stock price must have its current value determined by the stock price.  Because this report, however, is not written for a mathematical or financial expert, I shall take a heuristic approach to demonstrate why the option price quickly reacts to changes in the underlying stock price.[13]

49.     Consider a stock selling for $100 today.  Assume in this example, that if a bull market occurs, the stock will go up to $115 and if a bear market occurs, the stock will go down to $90.  In reality these two outcomes do not compose the full range of possibilities, which are infinite, but it is more than enough to show how option payoffs are determined from what the underlying stock price does.

50.     So, we said that the stock price can move from $100 to $115, which is an increase of 15%, or from $100 down to $90, a decrease of 10%.  These two movements of 15% and -10% capture the important concept of volatility, which is a critical factor in determining the value of an option.  For our purposes here, the objective of understanding why option values are driven by stock prices is easily seen without worrying about volatility.  All we have to do is to ensure we hold the volatility constant.  That is, we will make sure that in all cases, the stock can go up 15% or down 10% and not change these percentages.

51.     Now consider a call option that permits the buyer to purchase the stock at $100, which is the strike.  This option expires one period later, that is, when the stock makes is upward or downward move.

52.     If the stock goes to $115, the option would have a payoff of $15, as it would allow the owner to buy a $115 stock at $100.  If the stock goes to $90, the payoff of the option would be $0, as it would not be worth exercising to pay $100 to acquire a $90 stock.  So, observe the diagram below.

Scenario A.  Call buyer when stock is at $100

| Today | When the Option Expires |
|---|---|
|  | Stock goes to $115 (call pays off $15) |
| Stock price is $100 |  |
|  | Stock goes to $90 (call pays off $0) |

---

[13]   A heuristic approach is a pedagogical tool in which learners are presented information that will enable them to discover the desired knowledge themselves.  They will identify the correct answer, because no other answer will make sense.

53.     Now let us assume that instead of the stock currently being at $100, it is at $105.  We reconstruct the table.  If the stock is now $105 and can go up by 15% or down by 10%, the two stock prices when the option expires will be $105 x 1.15 = $120.75 and $105 x 0.90 = $94.5.[14]  If the stock goes up to $120.75, the option payoff will be $20.75. If the stock goes down to $94.5, the option will still have a payoff of $0.[15]

Scenario B.  Call buyer when stock is at $105

| Today | When the Option Expires |
|---|---|
|  | Stock goes to $120.75 (call pays off $20.75) |
| Stock price is $105 |  |
|  | Stock goes to $94.50 (call pays off $0) |

54.     Now we start our heuristic approach.  As the buyer of the option.  Which of the two scenarios, A or B, do you find more desirable?  In A, you will get either $15 or $0. In B, you will get either $20.75 or $0.  The answer should be heuristically obvious:  you prefer B.  Clearly the desirability of the option is driven by the price of the stock.  An option with a stock priced at $105 is more desirable than one at which the stock is $100.  In the context of this case, if the stock price were $105, but because, if as alleged, certain material information was misrepresented or not revealed, the stock ought to be $100, the option is clearly impacted in a negative way.  The option is far less desirable when the stock is $100 than when it is $105.

55.     If the option is more desirable in B than in A, the buyer of an option would be willing to pay more in B than in A.  But let us look at it from the point of view of the seller.  The seller will receive the option premium at the start and will pay out $15 or $0 in A, and in B, he will receive the premium at the start and will pay out either $20.75 or $0. It should be obvious that the seller will demand more money at the start in B than in A and will not hesitate to do so.  The seller is watching the stock market, and he will quickly observe the price of the stock and how it changes.  It is inconceivable that a seller would ignore the underlying stock price, for the seller could lose a lot of money by not adjusting his price.  Let me demonstrate why that does not happen.

---

[14]  When you raise something by 15%, the easiest way to do so is to multiply by 1 plus 15% or 1.15.  When you lower it by 10%, the easiest way is to multiply it by 1 minus 10% or 0.9.

[15]  We said nothing direct about the probabilities of the two outcomes, but we said that the volatility must be held constant.  This requires that we do not change the likelihoods of the two outcomes.  We have to hold everything constant except the stock price.

56.     In the world of options, market efficiency is driven by the possibility of engaging in arbitrage against anyone who fails to understand the most fundamental rule: *the law of one price*.[16]  Consider someone in the market who sees the option priced off of a stock price of $100.  The stock price then quickly increases to $105.  An options market participant that is late to adjust his assessment of the value of the option will immediately see strong demand for the option at the stale price.  This excessive demand will, like a cattle prod, force him to increase his price.  When he finally adjusts his price, people will sell it to him at the higher price.  He will lose massive amounts of money and if he survives, it will be the last time he makes that mistake.

57.     Clearly the price of the option at the start will be higher in B than A, which shows that the value of the option is directly driven by the price of the underlying stock.  That is the essence of market efficiency in the options market.  When information causes the stock price to change, the options market has to adjust quickly.

58.     Put option sellers will be similarly affected.  Let us work that same problem using puts with a strike of $100.  We will now call the scenarios C and D, though C is just A applied to puts and D is just B applied to puts.  The put seller will receive money at the start and will pay out $0 if the stock goes up to $115 and will pay out $10 if the stock goes down to $90.

Scenario C.  Put seller when stock is at $100

| Today | When the Option Expires |
|---|---|
|  | Stock goes to $115 (put seller pays out $0) |
| Stock price is $100 |  |
|  | Stock goes to $90 (put seller pays out $10) |

Scenario D.  Put seller when stock is at $105

| Today | When the Option Expires |
|---|---|
|  | Stock goes to $120.75 (put seller pays out $0) |
| Stock price is $105 |  |
|  | Stock goes to $94.50 (put seller pays out $5.50) |

---

[16]   The law of one price says that the same financial instrument or package of equivalent financial instruments cannot sell for more than one price.  See my previously cited book, 10th edition, p. 12 for further discussion.

59.    So, in Scenario C the put seller either pays out $0 or $10.  In Scenario D, the put seller either pays out $0 or $5.50.  The put seller will find Scenario C more undesirable, as he will have to pay either $0 or $10, while in Scenario D, he will have to pay either $0 or $5.50.  He will demand to be paid a higher premium in Scenario C.  Note how this is opposite that of calls.  Higher stock prices are more desirable to buyers of calls.  To buyers of puts, lower stock prices are more desirable and hence they are less desirable to sellers of puts.

60.    In the context of this case, if Apple's stock is priced at a level that is too high, deriving from the alleged material misrepresentation by management or failure of management to disclose material information, buyers of calls will pay too much and sellers of puts will receive too little.

61.    All of the options on a given stock have a major factor in common:  the price of the stock.  As a result of the relationship between an option and the price of a stock, traders are able to use one option as a substitute for another option.  For example, a certain number of units of one option can be shown to be equivalent to a different number of units of another option.  As such, the options market is an integrated market.  If one option were mispriced, another option could be used to arbitrage that pricing error.  This arbitrage, as noted earlier, is the glue that ties the options in a market to their common element:  the price of the stock.  The factor that makes this connection is the option's delta.

## VIII.   OPTION DELTA:  A MEASURE OF THE EFFECT OF STOCK PRICE ON OPTION VALUE

62.    In the previous section, I demonstrated that option prices are driven by the price of the underlying stock.  Below I explain how option traders measure the strength of this relationship between the stock price and the option price.  They do this using a concept called *delta*.  Delta measures the change in the price of an option given a change in the price of the stock.  Delta is a critically important and widely-used measure in the options market and provides strong support for the efficiency of the options market.  If the options market were not efficient, delta would be meaningless.[17]

63.    The values of deltas come from option pricing models such as the binomial or Black-Scholes-Merton model.  Call deltas range from zero to 1, while put deltas run from zero to -1.  Consider calls first.  Let us say a call delta is 0.65. This means that a call would be expected to change in value by 65% of the change in the price of the stock.[18]

---

[17]   The material in this section is supported by the 10th edition of my previously cited book, *An Introduction to Derivatives and Risk Management,* Chapters 4 and 5.

[18]   In the language of the trading floor, this call would be described as a 65 delta call. Decimals and percentages are implied but not explicitly stated.  And put deltas, which are negative, are rarely stated with reference to their being negative.  It is just simply

Knowledge of a call's delta enables a party trading the option to manage its risk.  For example, some of the key participants in options markets are *dealers*, sometimes called *market makers*, meaning that they willingly buy and sell options to meet the needs of investors in the market.  These dealers do not speculate on the options.  Rather, they hedge their positions.  For example, if a dealer such as Goldman Sachs sells a call option on Microsoft, it will lose money if the Microsoft stock price increases.  So it hedges by purchasing shares of Microsoft stock.  How many shares it purchases is determined by the delta.  Say the delta is 0.65.  If it has sold 1,000 call options, a hedge will require 650 shares, the product of the number of options times the delta.  If the stock price goes up $1, the 650 shares will gain $650, while the 1,000 options will go up by 65% of $1, or $650 in total.  Since Goldman is short the options, it loses $650 and the stock and option offset each other.  As an alternative way to hedge, it could buy a different Microsoft option in proportion to the ratio of the deltas of the two options.

64.     The point is that option dealers or market makers and most professional option traders use the delta as a measure of the strength of the relationship between the value of an option and the price of the underlying stock.  If options were untethered to the price of the underlying stock, the whole concept of delta would be meaningless.  And delta hedging would be virtually impossible if the option price did not adjust quickly to the stock price.[19]

65.     There is one situation in which option prices are largely unaffected by the price of the underlying stock, meaning a near-zero delta, though this is not a sign of inefficiency of the market.  In fact, it is completely consistent with market efficiency.  This is when the option is very deep-out-of-the-money.  For example, if we refer back to Scenario A, suppose the exercise price were $200.  With the stock price going up to either $115 or down to $90, there is no possibility that the option will have a positive payoff.  The option value would be $0.  In Scenario B, the change in the stock price to $105 would clearly not have an effect on the option value of $0 since it would still pay off $0 in both outcomes.  These situations are indicative of a delta of zero.  There is, however, some point where the option is only somewhat out-of-the-money, but the stock price change could create a possibility of expiring with a positive payoff. In that case, we would be back to a scenario in which the option is affected by the stock price.  A similar argument can be made for very deep-out-of-the-money puts.  In a real-world situation, where there are far more than two possible outcomes, a small stock price increase has no material effect on the likelihood of exercise, but one cannot strictly say there is zero possibility of exercise at $100 or $105.  The delta would be very small but not precisely zero.  This does not

---

understood on a trading floor that a put delta is negative and does not have to be stated as such.

[19]   If the reader would like to see some real live deltas, for example, say on Apple, Inc., go to https://www.cboe.com/delayed_quotes/aapl/quote_table.  Look to your right and in one of the columns will be the deltas of these options.  If options did not respond to stock prices and in a rapid manner, which is what it means to say a market is efficient, these deltas would be essentially meaningless.

mean that the market for these options is not efficient.  It simply means that small stock price movements have no material effect on the option price in these long-shot, deep out-of-the-money options.

66.    Deep out-of-the-money options certainly exist, but they have little trading volume given the long-shot nature of such options.  They are also priced inexpensively because they are essentially lottery tickets that have only a slim possibility of paying off.  Over time, however, the stock price can gradually move to a point where they do have more trading volume.  In the context of this case, there will be little effect on very deep-out-of-the-money options from the alleged misrepresentation or concealment of material information, and they will represent only a small number of the trades in a case like this action which considers only about a two month time period.

## IX.    ON THE LEGAL ANALYSIS FOR "EFFICIENCY" OF OPTIONS MARKETS

67.    I want to start this section with a reminder that in an efficient market for a common stock like Apple, investors purchased the option under the presumption that the stock price reflects all relevant information and was, thus, an accurate representation of the current value of the company.  The premium paid for the option was determined from that stock price.  This fundamental premise that option prices are driven by their corresponding stock prices is not subject to dispute and is extremely important to remember, as in this section we shall discuss the factors that courts often look to when evaluating market efficiency for an issuer's common stock.

68.    The Class Certification Order states that: (p.20)

Moreover, the parties did not fully address whether the factors outlined in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989), and *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tx. 2001), typically used to evaluate market efficiency of common stock, are even applicable to the determination of market efficiency of stock options.

69.    I understand that courts have found it helpful to use certain factors identified in these legal case opinions, *Cammer v. Bloom* and *Krogman v. Sterrit* to assess the efficiency of the market for common stock.  Option markets are derivative of stock markets and as derivatives, they trade based upon the prices of the underlying stocks.  It is not, however, appropriate to evaluate the efficiency of the derivative market with the same standards courts use to evaluate efficiency of the market for common stock.  In other words, one would not apply the same standard used to evaluate the primary market to derivative markets.

70.    The price of an option on a stock is determined by six factors.  Two are specifications that are defined by the parties and written into the contract: the strike and the expiration.  One is a macro-economic factor, the risk-free interest rate, but it has only a very small impact.  The other three are characteristics of the stock: its current price, the dividends paid by the company during the life of the option and the volatility of the stock.

Were participants in the options markets not following the stock price closely, there is nothing else they would be following.  The screens that sit on their desks are tied to the options and stock markets.  They execute trades rapidly in both markets.  The option quickly responds to new information. And most importantly, option traders rely on the stock price as an accurate statement of the current market valuation of the stock.  They trust that the stock price reflects all public information.

71.    I will take each of these *Cammer* factors and explain why they cannot be applied to options in the same way they are applied to common stock.

(a)    Number of  Market Makers: The options markets are highly liquid, and each option has multiple market makers, but the exact number of them for a given option is not easily determined or publicly available like it is for common stocks.  The options exchanges, however, guarantee that there will be market makers willing to buy or sell at any time during trading hours.

(b)    Eligibility to File an SEC form S-3: The notion that an issuer had been authorized by the Securities and Exchange Commission to use a Form S-3 Registration Statement to issue its stock has no direct relevance to the options market.

(c)    Market Capitalization: A Company's market capitalization, while important for many evaluation purposes, means nothing in the context of options, other than the fact that large and well-known companies, such as Apple, will almost as a given have very active options markets.  A casual look at the most actively traded options will always show the high profile stocks near the top of the list.[20]

(d)    Public Float:  The concept of public float, the number of shares of a company's common stock available to trade, applies only to stocks.  Options  do not have a public float. Options can be created in unlimited quantities.  Also, the concept of float for stocks excludes shares that are held by insiders and do not trade.  There is no such concept for options.

(e)    Stock Analysts Coverage:  Stock analysts compose a cohort group that are typically highly-trained professionals who study companies, write reports on these companies, forecast sales and earnings, and make buy and sell recommendations based upon their analysis.  These professionals are sometimes referred to as stock analysts, financial analysts, and securities analysts.  Options traders are made up of the people who work at trading desks of financial institutions and follow the market, execute hedge, speculative, and arbitrage trades, monitor and manage the risks.  They do not publish what are often referred to as analyst research reports the way stock analysts do because those reports would be outdated almost instantaneously.  The options market moves too

---

[20]  Exhibit 1, which I will formally introduce later, shows the top ten companies in terms of options volume on the Chicago Board Options Exchange during the class period.  The list is a set of large, well-known companies.

fast for reports.  So, analyst coverage of the options market is not a meaningful indicator of efficiency.

(f)     Bid Ask Spread: Bid-ask spreads can be indicative of the number of public investors.  Narrow bid-ask spreads suggest a competitive and efficient market. Options bid-ask spreads are larger than those of stocks because market makers have certain fixed costs of providing that service.  Options are priced lower than stocks so the same bid-ask spread on the option and on the stock would be larger as a percentage of the option price.  Moreover, options do not trade as often as stocks, which tends to make the bid-ask spread higher for options, as it is more costly for a market maker to hedge his risk when there are fewer market participants.  Thus, one cannot judge an options bid-ask spread with the same standards as a stock bid-ask spread.  Moreover, while low bid-ask spreads can be suggestive of market efficiency, high bid-ask spreads do not automatically mean inefficiency.  I will discuss this point later, as it fits in better with a subsequent section.

## X.     ACADEMIC RESEARCH ON OPTIONS MARKET EFFICIENCY

72.     I understand that the District Court, in the context of evaluating whether stock option should be treated as a group in connection with class certification, is interested in what the academic community outside of the litigation context thinks about whether options trade in an efficient market (Class Certification Hearing Transcript, p.6):

The Court: "I didn't see any non-litigation economic articles or thoughts about whether options in general operate in an efficient market.  Was there something there that I missed?  (line 15).

The Court: I mean, how does the academic community – what does the academic community outside of litigation think about this issue; that is, why should I disaggregate it – why should I even think about disaggregating it? It appears to me that some of the factors are satisfied, some of the factors are not, and so I'm trying to see if there is anything – again.  (line 20).

73.     To that point, there is a stream of academic literature on options market efficiency.  The question was of interest many years ago, particularly right after the Chicago Board Options Exchange created the first public market for options on stocks in 1973.  This literature has three threads.

74.     The first thread consists of a spate of studies from the 70's through early 90's that looked at whether exchange-listed options conformed to pricing rules and models that would prohibit investors from earning easy profits via arbitrage, the existence of which would suggest inefficiency if they covered the cost of trading.  Many of the models and rules did not apply to American options, and data were not quite of the granularity needed.  Nonetheless, the studies generally support the notion of efficiency of

the market for stock options.  These articles include Galai (1977),[21] Macbeth and Merville (1979),[22] Klemkosky and Resnick (1979, 1980),[23] Whaley (1982),[24] Bhattarcharya (1983),[25] and Rubinstein (1985).[26]   While each of these studies did address market efficiency, the issues of efficiency studied in these articles focus on the fact that arbitrage profits cannot be made, which is not the notion of efficiency I understand is necessary for class certification in the present case.   Nonetheless, I include references to these studies to show that I am indeed aware of this thread of literature and that it does provide some support for efficiency here.   But, it is my opinion that this research does not directly address the concern articulated by the Court in this case, which I understand is about whether option prices absorb information rapidly.   While these studies are quite old, this is a result of the fact that the issue of market efficiency in the options market is no longer of much interest to scholars.

75.     There is a second thread of research that directly relates to the issues on which the court inquired addressing the speed at which options incorporate new information about the underlying company.   This is the question of whether information gets absorbed into options markets before, simultaneously, or after it is absorbed into stock prices.   These studies include Patell and Wolfson (1981),[27] Manaster and

---

[21]  D. Galai, "Tests of Market Efficiency of the Chicago Board Options Exchange," *The Journal of Business* 50 (1977), 167-107.

[22]  J. D. Macbeth and L. J. Merville, "An Empirical Examination of the Black-Scholes Call Option Pricing Model," *The Journal of Finance* 34 (1979), 1173-1186.

[23]  R.C. Klemkosky and B.G. Resnick, "Put-Call Parity and Market Efficiency," *The Journal of Finance* 34 (1979), 1141-1151 and "An Ex-Ante Analysis of Put-Call parity," *Journal of Financial Economics* 8 (1980), 363-378.

[24]  R.E. Whaley, "On the Valuation of American Call Options on Dividend Paying Stocks: Empirical Tests," *Journal of Financial Economics* 19 (1982), 29-58.

[25]  M. Bhattacharya, "Transaction Data Tests of Efficiency of the Chicago Board Options Exchange," *Journal of Financial Economics* 12 (1983), 161-185.

[26]  M Rubinstein, "Nonparametric Tests of Alternative Option Pricing Models Using All Reported Trades and Quotes on the 30 Most Active CBOE Option Classes from August 23, 1976 through August 31, 1978," *The Journal of Finance* 40 (1984), 453-480.

[27]  J.M. Patell and M.A. Wolfson, "The Ex Ante and Ex Post Effects of Quarterly Earnings Announcements Reflected in Option and Stock Prices," *Journal of Accounting Research* 19 (1981), 434-458.

Rendleman (1982),[28] and Anthony (1988).[29]  Patell-Wolfson is particularly relevant in that they show that options markets begin to reflect earnings announcement information very rapidly.  They conclude that options markets do an excellent job of anticipating corporate earnings announcements (p. 454):

> The empirical test results are consistent with the hypothesis that call option prices reflect investors' anticipation of forthcoming earnings announcements.  Prior research had indicated that quarterly earnings reports are, on average, accompanied by increases in stock price variability, and this finding is corroborated by our ex post tests.  Our ex ante experiments indicate that the average standard deviations to expiration implied by preannouncement option prices exhibit a time-series profile which anticipates the stock price behavior.

76.    Manaster and Rendleman (p. 1043) find that options markets pick up information before the stock market, which is powerful evidence of market efficiency.  They state that:

> A comparison of the implied stock prices with observed stock prices reveals that the implied stock prices contain information regarding equilibrium stock prices that is not fully reflected in observed stock prices.

77.    Anthony (p. 949) concludes that options markets often trade ahead of the stock market, which further points to market efficiency:

> Results indicate that trading in call options leads trading in the underlying shares, with a one-day lag.

78.    One study, Stephen and Whaley (1990)[30] finds that information is absorbed into stock prices about 15 minutes ahead of option prices.  This is still reasonably quick and still fairly indicative of the rapid absorption of information by options. Moreover, Chan, Chung, and Johnson (1993)[31] find that the Stephen and Whaley results can be explained by the fact that options do not trade as often as stocks.  Stephen and Whaley used transaction prices.  Chan, Chung, and Johnson look at bid-ask prices, which are

---

[28]  S. Manaster and R.J. Rendleman, Jr., "Option Prices as Predictors of Equilibrium Stock Prices," *The Journal of Finance* 37 (1982), 1043-1057.

[29]  J.H. Anthony, "The Interrelation of Stock and Options Market Trading-Volume Data," *The Journal of Finance* 43 (1988), 949-964.

[30]  J. Stephen and R.E. Whaley "Intraday Price Change and Trading Volume Relations in the Stock and Stock Options Markets," *The Journal of Finance* 45 (1990), 191-220.

[31]  K. Chan, P Chung, and H. Johnson, "Why Option Prices Lag Stock Prices:  A Trading-Based Explanation," *The Journal of Finance* 48 91993), 1957-1967.

indicators of the prices at which market makers will trade, and find that option bid and ask prices do adjust without delay.  To be specific, they state the following at (p. 1957):

> We show that the stock lead disappears when the average of the bid and ask prices is used instead of transaction prices. Hence, we find no evidence of arbitrage opportunities associated with the stock lead.

79.     This adjustment of bid and ask prices to new information is strongly indicative of market efficiency.

80.     Finally, there is a line of research that addresses the integration of options markets with stock markets.  The principal question raised and discussed there is whether the existence of options markets benefits or hurts the stock market.  That is, could options destabilize the stock market or make it less efficient?  The answer here is universal.  Options actually help the stock market by making it more efficient.  *See* the papers of Jennings and Starks (1986),[32] Bhattarcharya (1987),[33] Figlewski and Webb (1993),[34] and Kumar, Sarin, and Shastri (1998).[35]

81.     For example, Jennings and Starks (p. 107) state that:

> As an alternative, we examine the stock price adjustment to the release of quarterly earnings using samples of firms with and without listed options. We find the two samples exhibit different adjustment processes, with the nonoption firms requiring substantially more time to adjust.

82.     Bhattacharya (p. 1) finds that option prices incorporate some information in them that stock prices do not.  Academics often went on to test whether that information can be used to generate trading profits.  When they cannot, the hypothesis of efficient markets is more strongly supported.  And indeed that is the case in his study:

> The evidence suggests that the magnitude of anticipation of stock prices by option prices insufficient to overcome the bid/ask spread for intra-day holding periods.

---

[32]  R. Jennings and L. Starks, "Earnings Announcements, Stock Price Adjustments, and the Existence of Options Markets," *The Journal of Finance* 41 (1086), 107-125.

[33]  M. Bhattarcharya, "Price Changes of Related Securities:  The Case of Call Options and Stocks," *Journal of Financial and Quantitative Analysis* 22 (1987), 1-15.

[34]  S. Figlewski and G. P. Webb, "Options, Short Sales, and market Completeness," *The Journal of Finance* 48 (1993), 761-777.

[35]  R. Kumar, A. Sarin, and K. Shastri, "The Impact of Options Trading on the Market Quality of the Underlying Security:  An Empirical Analysis," *The Journal of Finance* 53 (1998), 717-732.

83.     Figlewski and Webb (p. 761) conclude that:

This paper presents empirical evidence that trading in options contributes to both transactional and informational efficiency of the stock market by reducing the effect of constraints on short sales.

84.     Kumar, Sarin, and Shastri (p. 717) find that:

Overall, our results suggest that option listings improve the market quality of the underlying stocks.

85.     Options markets could not improve the quality of the stock market if they themselves were inefficient.

86.     While these studies are old, that does not make them invalid.  Indeed, an options market that was deemed efficient by the 1980's can hardly be less efficient today.  Given that today anyone can use a cellphone and rapidly obtain information that was very hard to get when these studies were done makes clear that options markets are unquestionably of a high degree of efficiency today.  And because this case involves Apple options, the most actively traded options on the Chicago Board Options exchange during the time frame encompassed in this case, the efficiency of the market for these instruments is unquestionable.

## XI.   HOW OPTION HOLDERS CAN BE DAMAGED BY AN ARTIFICIALLY INFLATED STOCK PRICE

87.     The following example shows how the option holders would be damaged if, as alleged, Apple's stock price were inflated by the alleged fraud.  Suppose an investor decides to buy an option, not necessarily on Apple.  It can be on any stock.  Suppose the stock price is $100.  The investor has a range of possible option strikes from which to choose.  Let us say the strikes start at $60 and are available in $5 increments, up to $140.  Let us fix the expiration at say two months.

88.     Suppose the investor chooses an option with a strike of $105.  The option is $5 out-of-the-money.  It is a bet that the stock will get to at least $105.  It will, of course, have to get higher to cover the premium paid to make a profit, but for sure, it has to get to $105 to even exercise it.  Think of buying this option as a choice to start five points behind.  The investor will pay a premium to the seller for this option.

89.     As an alternative the investor could have chosen a $110 strike, thereby starting 10 points behind.  That option would have cost less.  And a 20-points-behind option (strike = $120) would have cost even less.  Let the investor choose a $105 strike – five points behind - and the premium paid is based on this starting point. Let us also assume that at some time after the investor purchased this option but before it expires, the investor finds out that the stock price was inflated.  The CEO had made a public material misrepresentation about the company's financial status or failed to reveal some material information he was obligated to reveal, and instead of the stock being worth $100, it was really worth $95.  How is the investor affected?  The investor purchased a

five-point-behind option but unknowingly received a ten-point-behind option. The investor bought an object that was of lesser value than the one the investor thought he was buying and one on which the premium was determined by the stock price. Had the market price of the stock not been inflated, he might still have bought the option, but he would have paid less.

## XII.   MULTIPLE OPTIONS OF VARYING TERMS AND TRADING ACTIVITY

90.     The options exchanges always offer a wide range of options for trading to individuals and institutions. A licensed exchange does not have to apply to add a particular combination of exercise price and expiration. Given the large number of such combinations, it is clearly not very costly for them to do so.

91.     The most active options will be the ones that are not too far in- or out-of-the-money and have fairly short expirations. Such options on a huge company like Apple will trade in relatively heavy volume. During the months of November and December of 2018, Apple options were the most actively traded options on the Chicago Board Options Exchange.[36] There were about 2,900 different companies' options on the CBOE during that time. It is not necessary to show all of the other companies, but Exhibit 1 shows this data as directly obtained from the CBOE's site for the 10 most active options. Note that Apple is at the top of the list both months.

92.     Most options trading volume comes from the near-the-money short-term options. There are other options that trade little. I understand that Apple has argued that because there were some Apple options that did not trade in heavy volume, that plaintiff has failed to show that all Apple options relevant to the case traded in an efficient market. See, e.g., Class Cert. Opposition to Motion for Class certification at 20; Class Certification Hearing Transcript at P. 5-7. Below I address this question by examining the diversity of options that are listed in the market

93.     Deep out-of-the-money options, particularly those with short expirations, are like lottery tickets. For very little premium, one can buy such a call, thereby making a short-term bet that the stock will make a large jump in a short period of time. These options will tend not to trade much. Not a large number of people will take such bets.[37] These options will have low prices and any impact on their prices from the alleged misrepresentation will be small compared to options that are closer to at-the-money with shorter expirations.

---

[36]  https://www.cboe.com/us/options/market_statistics/historical_data/2018/#archive-downloads

[37]  I once observed a very long-shot call on Apple that virtually defied any notion that it would expire in-the-money. The stock was around $158 and the strike was $250. The option had just two days to go before expiring. Thus, it needed to rise 58% in two days. Yet, one contract traded. The price was $0.01. Since one contract covers 100 calls, the total cost to the investor was $1. For the record, the investor lost his $1.

94.     Deep in-the-money options will behave much like their underlying stocks. For example, a one-week option with a strike of $150 and a stock price of $200 is almost certainly going to exercise and convert into the stock.  So, it will behave very much like the stock, moving almost one-for-one in value.  This implies its delta is close to 1.

95.     These deep out-of-the-money options and deep-in-the-money options have little speculative value and do not trade in heavy volume.  Betting on the former is like betting on a team in a sporting event that is a heavy underdog.  It is a very long shot. Betting on the latter is like betting on a team that is heavily favored.  The bet will be costly and it will not pay much of a return.  The game is far more interesting when the teams are more evenly matched.  That is the nature of options as well.  And that is why near or close to the money options will trade more heavily. This does not imply an inefficient market. Indeed, the full slate of Apple options is, as I have explained, tethered to each other through the price of the stock.

## XIII.   APPLE'S MISCHARACTERIZATION OF TRADING VOLUME IN APPLE OPTIONS

96.     In the reports of Dr. Feinstein and Dr. Grenadier, there was considerable discussion of options trading volume as used somewhat as an indicator of market efficiency.  Trading volume is a statistic reported by the options exchanges to indicate how active they are.  It is often a competitive measure an exchange uses to present itself in comparison to other exchanges.  It is much like market share of a product.

97.     I understand that in their court submissions challenging the efficiency of the market for options, Apple Defendants used the concept of average daily trading volume across both the actively and inactively traded options to undermine the efficiency of the overall market for Apple options. See, e.g., Class Cert. Opposition to Motion for Class certification at 20; Class Certification Hearing Transcript at 5-7.  In response, first I will demonstrate that Defendants have grossly distorted the notion of average daily trading volume and second, I discuss why the existence of thinly traded options are not evidence of inefficiency.

98.     Apple options are the most heavily traded options in the entire options market.  Dr. Grenadier's calculation wildly distorted the volume measure for Apple options (*see* Grenadier Report, Exhibit 5).  On p. 70, paragraph 182, Dr. Grenadier states that:

> As Exhibit 5 shows, trading volume for many of the individual relevant options on Apple during the putative Class Period was low.  Overall, the average daily trading volume for call options was 691 contracts, while for put options, it was 573 contracts, where each contract represents 100 shares of stock of Apple.

99.     The second sentence is completely incorrect and appears to result from either failing to understand the simple concept of average daily trading volume or just an attempt to obfuscate this extremely basic measure of activity.  Let us contrast the above

statement with Dr. Feinstein's statement in his original report, dated May 5, 2021, p. 42, paragraph 151.

> Apple options traded regularly and actively during the Class Period. According to data from iVolatility, an average of 675,640 contracts traded each day during the class period.

Just to put that number in perspective, if trading was over the full 24-hours of a day, that level of volume amounts to almost eight contracts a second.

100.    So, Dr. Feinstein testified that the average daily volume was 675,640 and Dr. Grenadier testified that it was 691 (calls) plus 573 (puts), a total of only 1,264 per day. This is a very wide difference. That difference is explained by the fact that Dr. Grenadier's submission of average daily volume is absolutely wrong and the methodology he used to reaching his conclusion is unsupportable.

101.    The average daily trading volume for Apple options was substantially more than the figure quoted by Dr. Grenadier. I verified this fact by downloading volume data for puts and calls for Apple from the Chicago Board Options Exchange for November and December of 2018. Referring back to my Exhibit 1, we see that for November, the average daily volume was 119,363 and for December it was 94,673.[38]  Dr. Feinstein covered all exchanges. I looked at just one exchange, and our results are consistent and much higher than the number reported by Dr. Grenadier.[39]

102.    In my opinion Dr. Grenadier created a non-standard definition of the concept of average daily volume to reach his 1,264 figure as follows. For a given day, take the 2,200 or so Apple options and determine the average volume of options for that day. Then average these daily averages across all days in the relevant period and report that figure as the average daily trading volume. I cannot overemphasize how completely meaningless and distorted this figure is from the true average daily volume of Apple options. The correct average daily volume of Apple options takes the total amount of trading in all Apple options for a given day. Add this figure for each day of the relevant period and divide by the number of days. That is average daily trading volume. As noted above, the CBOE even reports that number (*see* Exhibit 1 again, ADV) so one does not have to do the addition and division themselves. Dr. Grenadier makes an egregious misrepresentation of a standard, incredibly simple, and commonly used measure of activity in the options markets.

---

[38]  https://www.cboe.com/us/options/market_statistics/historical_data/2018/#archive-downloads

[39]  There is no question that the Chicago Board Options Exchange is a worthy representative exchange from which to collect a sample of data, it reported in 2021 that its total volume was about three billion contracts. *See* https://ir.cboe.com/news-and-events/2022/01-05-2022/cboe-global-markets-reports-trading-volume-december-and-full-year-2021

103.    Moreover in Dr. Grenadier's Exhibit 5, he calculates that the average Apple option traded on only about a third of trading days.  This is a meaningless concept, as it applies an average to all of the options regardless of how often it traded.  This notion of an average of a so-called average option, as constructed by Dr. Grenadier, is not used in practice.  It appears only to have been created to mislead the reader of his report.

104.    What Dr. Grenadier did led to the next misrepresentation by Apple.  In the January 18, 2022 hearing, Mr. Kramer stated the following:

> So, first, the daily trading volume, the first *Cammer* factor, Apple call options did not trade at all on – at all – zero, on 35 percent of the trading days in the putative class period.  And the put options did not trade on 31 percent of those days.  (January 18, 2022 Hearing Transcript at 4:10-13)

105.    Mr. Kramer's statement is completely incorrect and not even particularly close to what Dr. Grenadier had concluded which was independently irrelevant and distorted.  Dr. Grenadier did not conclude that Apple call options did not trade at all on a third of the trading days as Mr. Kramer stated.  In fact, the CBOE data, cited above, show that Apple options traded every single day and in high volume.  This fact is shown in my Exhibit 2.[40]

106.    Now, the low trading volume in *some* options does not mean that the market for Apple options in which they were included was not efficient.  The bid and ask prices must bracket the correct value of the option and reflect the publicly available information as incorporated into the efficiently priced stock.  If they do not, a trader can earn an arbitrage profit off of the market maker.  But the market maker is not naïve.  He may quote a wide bid-ask spread to reflect the fact that there are not many others trading this option, but that does not mean he would quote a price that would suggest inefficiency.  For sure, there will not be much trading volume in some options.  But one cannot simply lump lower volume options in together with the active options to make it sound like the entire market for the most actively traded option is inefficient.

107.    Finally, it is not at all logical that these low-volume options would cause the market for Apple options as a whole to be inefficient.  Imagine an options exchange that allows trading only in short-term options that are near-the-money.  Such an exchange is unquestionably an efficient market.  Efficiency is a desirable property for exchanges.  An efficient market is one that reflects all public information and is highly competitive.  Why, then, would it dilute its product – an efficient market for options – by adding options that were not efficient?  It simply makes no sense.

108.    Options trade in a single, integrated market that relies on the price of the stock to reflect all public information.  Apple options were the most active of all during that

---

[40]  https://www.cboe.com/us/options/market_statistics/historical_data/2018/#archive-downloads

time period.   With efficiency firmly established, I now turn to the methodology for calculating damages.

## XIV.   ESTIMATING THE LOSS TO AN OPTION HOLDER WITH A COMMON METHODOLOGY

109.    By my interpretation of the following from pp. 10-11 of the Class Certification Order, there are questions about whether damages can be calculated using a common methodology:

> "the Court finds that plaintiff fails to show that common questions of damages predominate with respect to option holders."

110.    In the Class Certification Order, the Court found that Dr. Feinstein did not adequately explain how damages to option holders can be calculated on a class wide basis.  On p. 19 and 20 of that order it states that:

> By contrast, turning to defendants' concerns about the applicability of the proposed damages model, the Court is persuaded.  Defendants submit that the proposed damages model does not provide any method for calculating the alleged damages to Apple option holders.  Even if option holders are properly part of the class, which defendants also dispute, the Court finds that Dr. Feinstein does not adequately explain how damages to option holders could be calculated on a classwide basis.
>
> *     *     *
>
> However, given the varying characteristics of the 2,282 distinct Apple stock options that were available for trading during the relevant period, Dr. Feinstein offers nothing in either of his reports to satisfy the Court that individualized issues pertaining to damages to option holders will not predominate.

111.    In this section, I will explain in greater detail how damages can be calculated relatively easily using a common methodology.  Before starting, however, I want to remind the reader of a fact I stated near the start of this report.  Exchange-listed options are standardized contracts.  We are not dealing with a set of over 2,000 contracts with customized terms.  The exchange determines the terms (exercise price, expiration), offers a set of options for trading, and investors choose which ones they will trade.  The only customized variable is the price.

112.    I want to start with an analogous example to which most lay people can relate: their mortgages.  Suppose a mortgage lender were the defendant in a class-action suit that claimed that the lender had embedded hidden fees in everyone's monthly payments.  The members of the class took out different mortgages on different days, had different rates, and different amounts of money were borrowed.  To determine the monthly payment that each should have made is an easy process.  One would simply plug in each borrower's terms into a mortgage payment calculator.  The actual payment less the

calculated payment would be the damage per month to a given borrower. In the current litigation, defendants have stated that there are over 2,000 options with different terms. There could easily be more than 2,000 mortgages each with different terms. But the calculations could clearly be done. The procedure for doing the calculations in this case is not more challenging than in the mortgage situation.

113.   Assume an options class is certified, plaintiff prevails at trial, and option holders submit their claims. Let us take for example, the person described earlier who bought a $105 strike option when the stock price was quoted as $100. Now, let us say he paid $8 for the option. This information is easily determined from his brokerage statement.

114.   Dr. Feinstein made reference to how damages on options could be calculated on a class-wide basis. In his May 5, 2021 report (p. 55, paragraph 87), he mentioned models such as Black-Scholes, a model I tend to call Black-Scholes-Merton, as Merton received the Nobel Prize for it.[41]   In his deposition, Dr. Feinstein also acknowledged that there are models that add the early exercise feature that exists as part of an American option.[42]  Either model could be used, but the Apple options are American options. An American option pricing model would be the most appropriate. In addition, an American option pricing model would reveal the full extent of the damage, as I explain below.

115.   A European option permits exercise at expiration only. An American option permits exercise at expiration plus at any time prior to expiration. Thus, an American option is a European option plus the right to exercise early. So, the price of an American option is the price of a European option plus an extra amount called the early exercise premium. The Black-Scholes-Merton model will provide the value of the European component of the option price. An American option pricing model will add to that the value of the right to exercise early.

116.   The relevance for this case is that both the European option value and the early exercise premium are both directly related to the stock price. If the stock price is distorted, then both elements of the option value will be distorted. To be more precise, if the stock price is inflated, both the European option price and the early exercise premium are inflated. By my reading of various comments of the Apple Defendants' arguments, they seem to suggest that Plaintiffs should use an American option pricing model (*see e.g.*, Feinstein deposition transcript, p. 155, starting line 17). As I explain here, this will lead to a more accurate estimate of damages and will yield a higher number.

117.   The options at issue are American-style options, meaning that they can be exercised early. The famous Black-Scholes-Merton model does not handle early exercise. An approach that does, however, is a discrete-dividend binomial model with

---

[41]  Feinstein report, p. 52.

[42]  Feinstein deposition, p. 155, lines 17-24.

the early exercise feature embedded into the software.  Thus, it prices American options.  This model is widely known and used, and it is easily programmable.  I have done it myself many times.  The methodological steps are set forth below.

118.   Before starting, one would determine the appropriate short-term risk-free interest rates and dividends over the lives of the options.  These inputs are required of all option pricing models that are commonly used on trading desks.  I also understand that an amount of inflation in the stock price attributable to the alleged fraud for every day during the Class Period will be determined later or at trial.

Step 1:   Determine the terms of the purchased option (exercise price, expiration) and the price paid by the option buyer as submitted on a claim form.

Step 2.  Use the dividend-adjusted binomial American option pricing model to infer the volatility parameter that was used by the market based upon the price at which the option traded.

Step 3.  Take the dollar amount by which the stock price was inflated as determined at trial to determine the price the stock should have been trading absent the alleged misstatements.

Step 4.  Insert this new adjusted stock price and the volatility obtained in Step 2 back into the dividend adjusted binomial American option pricing model to obtain what the option price would have been if the stock price had not been inflated by the alleged misstatements.

Step 5.  The difference in the option price as determined in Step 4 and the price paid by the option holder is the amount by which the option was inflated due to the alleged misstatements.  Multiply this amount by the number of contracts purchased times 100, as each contract covers 100 options.

119.   If the purchased option was subsequently traded during the class period this procedure can also be applied to reprice the option to account for any corrective disclosures on subsequent days during the class period.  A similar method would be applied for put sellers.  In all cases, for each option transaction, all that would be necessary is the stock price, the option price paid or received, and the stock price inflation on each day of the Class Period.

120.   I will demonstrate this procedure for a call buyer who holds through expiration.  Consider a stock priced at $100.  An investor buys a two-month call option with a strike of $105 for $5.04 (Step 1).  We need to know what volatility was used to determine that price, which requires that we gather some additional inputs, which include a 3% risk-free rate and the fact that the stock pays a dividend of $1 in one month.  Using the binomial American option pricing model with 2,000 time steps, we find the volatility that produced a price of $5.04.  This volatility would be 45% (Step 2).  We then are told the amount by which the stock price was inflated.  Let us say that is $10 (Step 3).  We

reprice the option using a price of $90 and would obtain $1.87 (Step 4).  So, he paid $5.04 for the call and should have paid $1.87, a difference of $3.17.  If the investor bought 10 contracts, each of which covers 100 options, his total damages would be 10 x 100 x $3.17 = $3,170 (Step 5).  It would be easy to create similar examples for puts and options with different terms.

121.    This approach applies a *common methodology* that can be easily used with every option.  It accommodates the different terms of the options.  The calculation necessary to establish the loss to any given option holder is easy to do for an options expert.

## XV.    THE INVESTOR'S TOTAL POSITION

122.    Dr. Grenadier raised the point that some option investors take offsetting positions.  For example, one might hedge a long call with a short call with the same expiration but a different strike, a strategy known as a strike spread, or short position in the stock.  A long call could also be accompanied by a position in a long put with the same strike and expiration, a strategy known as a straddle.  A long call at a given strike and expiration might be paired with a position in a long call with the same strike but a different expiration, a position known as a time spread.[43]  I understand that whether or not damages on one investment are offset by gains on another investment will be decided by the Court.  , If that is the case, however, the net damages to an investor can be easily determined from the claim forms submitted by investors utilizing the same methodology I set forth above.

## XVI.    CONCLUSIONS

123.    The court has asked about what the academic literature says about options market efficiency.  Let us be sure we understand the notion of efficiency as it applies in this case. Here efficiency is a simple question.  Does the option market rapidly reflect all of the information contained in the stock price?

124.    The options market for Apple is efficient.  Apple is one of, and often, *the* most active group of all options, those on Apple common stock.  The options market is derivative of the stock market.  The options follow the movements in the stock market and react accordingly and rapidly.

125.    Moreover, the body of relevant academic literature, sparse and old though it be, supports options market efficiency during an era when information was not nearly as readily and freely available as it is today.

---

[43]   All of these strategies are covered in most options books such as my own, Chapters 6 and 7.

126.   The academic literature even shows that options make the stock market more efficient.  An options market can make a stock market more efficient only if it is efficient itself.

127.   Apple options traded in heavy volume on every single day during the relevant period.  That some options are far more active than others does not mean all Apple options are inactive.  Nor that the market for Apple options is not efficient.

128.   A common methodology can easily be used to estimate the damage to each participant in the class.

*Don M. Chance*

DATED:  April 15, 2022                    _____
                                                         DON M. CHANCE

**EXHIBIT 1**

**CBOE Options Ranked by Volume (top 10 only)**

https://www.cboe.com/us/options/market_statistics/historical_data/2018/#archive-downloads

| Nov-18 | | | | | | | | |
|--------|------|------|------|------|------|------------|-------------|------------|
| Symbol | Name | Call | Put | Tot | Days | Tot ADV | Call ADV | Put ADV |
| AAPL | Apple Inc | 1,447,701 | 1,058,913 | 2,506,614 | 21 | 119,363 | 68,938 | 50,424 |
| GE | General Electric Co | 701,998 | 557,147 | 1,259,145 | 21 | 59,959 | 33,428 | 26,531 |
| AMZN | Amazon.com Inc | 510,312 | 467,824 | 978,136 | 21 | 46,578 | 24,301 | 22,277 |
| FB | Facebook Inc | 541,040 | 400,194 | 941,234 | 21 | 44,821 | 25,764 | 19,057 |
| AMD | Advanced Micro Devices Inc | 470,228 | 307,579 | 777,807 | 21 | 37,038 | 22,392 | 14,647 |
| BAC | Bank of America Corp | 517,569 | 198,411 | 715,980 | 21 | 34,094 | 24,646 | 9,448 |
| BABA | Alibaba Group Holding Ltd | 419,163 | 288,073 | 707,236 | 21 | 33,678 | 19,960 | 13,718 |
| NFLX | Netflix Inc | 367,957 | 321,988 | 689,945 | 21 | 32,855 | 17,522 | 15,333 |
| NVDA | NVIDIA Corp | 351,707 | 285,254 | 636,961 | 21 | 30,331 | 16,748 | 13,584 |
| TSLA | Tesla Inc | 314,252 | 306,663 | 620,915 | 21 | 29,567 | 14,964 | 14,603 |
| MSFT | Microsoft Corp | 318,688 | 239,156 | 557,844 | 21 | 26,564 | 15,176 | 11,388 |
| MU | Micron Technology Inc | 232,578 | 178,122 | 410,700 | 21 | 19,557 | 11,075 | 8,482 |
| | | | | | | | | |
| Dec-18 | | | | | | | | |
| Symbol | Name | Call | Put | Tot | Days | Tot ADV | Call ADV | Put ADV |
| AAPL | Apple Inc | 1,046,354 | 752,430 | 1,798,784 | 19 | 94,673 | 55,071 | 39,602 |
| BAC | Bank of America Corp | 1,095,208 | 270,250 | 1,365,458 | 19 | 71,866 | 57,643 | 14,224 |

| AMZN | Amazon.com Inc | 460,933 | 420,700 | 881,633 | 19 | 46,402 | 24,260 | 22,142 |
|------|----------------|---------|---------|---------|----|--------|--------|--------|
| FB | Facebook Inc | 443,302 | 406,990 | 850,292 | 19 | 44,752 | 23,332 | 21,421 |
| TSLA | Tesla Inc | 350,910 | 321,081 | 671,991 | 19 | 35,368 | 18,469 | 16,899 |
| GE | General Electric Co | 400,839 | 244,379 | 645,218 | 19 | 33,959 | 21,097 | 12,862 |
| AMD | Advanced Micro Devices Inc | 351,277 | 274,933 | 626,210 | 19 | 32,958 | 18,488 | 14,470 |
| MSFT | Microsoft Corp | 343,988 | 225,534 | 569,522 | 19 | 29,975 | 18,105 | 11,870 |
| NFLX | Netflix Inc | 275,082 | 260,089 | 535,171 | 19 | 28,167 | 14,478 | 13,689 |
| MU | Micron Technology Inc | 217,351 | 312,888 | 530,239 | 19 | 27,907 | 11,440 | 16,468 |

**EXHIBIT 2**

**Daily Apple Volume on CBOE in November-December 2018**

https://www.cboe.com/us/options/market_statistics/historical_data/2018/#archive-downloads

| Trade Date | Options Class | Underlying | Product Type | Exchange | Volume |
|---|---|---|---|---|---|
| 11/1/2018 | AAPL | AAPL | S | CBOE | 137379 |
| 11/2/2018 | AAPL | AAPL | S | CBOE | 281045 |
| 11/5/2018 | AAPL | AAPL | S | CBOE | 181985 |
| 11/6/2018 | AAPL | AAPL | S | CBOE | 70832 |
| 11/7/2018 | AAPL | AAPL | S | CBOE | 114060 |
| 11/8/2018 | AAPL | AAPL | S | CBOE | 66670 |
| 11/9/2018 | AAPL | AAPL | S | CBOE | 88195 |
| 11/12/2018 | AAPL | AAPL | S | CBOE | 131122 |
| 11/13/2018 | AAPL | AAPL | S | CBOE | 95861 |
| 11/14/2018 | AAPL | AAPL | S | CBOE | 163110 |
| 11/15/2018 | AAPL | AAPL | S | CBOE | 109277 |
| 11/16/2018 | AAPL | AAPL | S | CBOE | 99503 |
| 11/19/2018 | AAPL | AAPL | S | CBOE | 108762 |
| 11/20/2018 | AAPL | AAPL | S | CBOE | 187511 |
| 11/21/2018 | AAPL | AAPL | S | CBOE | 98259 |
| 11/23/2018 | AAPL | AAPL | S | CBOE | 71646 |
| 11/26/2018 | AAPL | AAPL | S | CBOE | 111015 |
| 11/27/2018 | AAPL | AAPL | S | CBOE | 82881 |
| 11/28/2018 | AAPL | AAPL | S | CBOE | 124244 |
| 11/29/2018 | AAPL | AAPL | S | CBOE | 101767 |
| 11/30/2018 | AAPL | AAPL | S | CBOE | 81332 |
|  |  |  |  |  |  |
| Trade Date | Options Class | Underlying | Product Type | Exchange | Volume |
| 12/3/2018 | AAPL | AAPL | S | CBOE | 103007 |
| 12/4/2018 | AAPL | AAPL | S | CBOE | 106123 |
| 12/6/2018 | AAPL | AAPL | S | CBOE | 125915 |
| 12/7/2018 | AAPL | AAPL | S | CBOE | 120166 |
| 12/10/2018 | AAPL | AAPL | S | CBOE | 159469 |
| 12/11/2018 | AAPL | AAPL | S | CBOE | 70369 |
| 12/12/2018 | AAPL | AAPL | S | CBOE | 55036 |
| 12/13/2018 | AAPL | AAPL | S | CBOE | 55304 |
| 12/14/2018 | AAPL | AAPL | S | CBOE | 82604 |
| 12/17/2018 | AAPL | AAPL | S | CBOE | 63188 |
| 12/18/2018 | AAPL | AAPL | S | CBOE | 53135 |

| 12/19/2018 | AAPL | AAPL | S | CBOE | 83815 |
|---|---|---|---|---|---|
| 12/20/2018 | AAPL | AAPL | S | CBOE | 127498 |
| 12/21/2018 | AAPL | AAPL | S | CBOE | 127791 |
| 12/24/2018 | AAPL | AAPL | S | CBOE | 86454 |
| 12/26/2018 | AAPL | AAPL | S | CBOE | 99392 |
| 12/27/2018 | AAPL | AAPL | S | CBOE | 115746 |
| 12/28/2018 | AAPL | AAPL | S | CBOE | 103922 |
| 12/31/2018 | AAPL | AAPL | S | CBOE | 58650 |

# EXHIBIT 3

**Don M. Chance**
**James C. Flores Endowed Chair of MBA Studies**
**& Professor of Finance**
dchance@lsu.edu
www.donchance.com
April 3, 2022

## COORDINATES

Department of Finance
2909 Business Education Complex
E. J. Ourso College of Business
Louisiana State University
Baton Rouge, LA 70803-6308
225-578-0372, 225-578-6366 (fax)

833 Grand Lakes Drive
Baton Rouge, LA 70810
225-763-6343 (home)
225-803-6904 (cell)

## EDUCATION

Ph.D., 1980    Louisiana State University, Baton Rouge, Louisiana
          Major: Finance; Minor: Quantitative Methods
          Dissertation: *Theory and Tests of the Effect of Financial Leverage on Valuation of the Banking Firm*;
            Advisor: Prof. C. G. Martin
M.B.A., 1973    University of Mississippi, Oxford, Mississippi
B.S., 1972    University of Montevallo, Montevallo, Alabama
          Major: Business Administration; Minor: Economics

## PROFESSIONAL CERTIFICATION

CFA, 1986      CFA Institute, Charlottesville, Virginia

## BUSINESS EXPERIENCE

1973-1977      First National Bank of Birmingham, Birmingham, Alabama.
          Last position: Assistant Cashier and Corporate Services Manager.

## ACADEMIC EXPERIENCE

2003-      Louisiana State University
          James C. Flores Endowed Chair of MBA Studies, 2009-
          William H. Wright, Jr. Endowed Chair for Financial Services, 2003-2009
          Professor of Finance, 2003-
1980-2003      Virginia Tech, Blacksburg, Virginia
          First Union Professor of Financial Risk Management, 1996-2003.
          Professor of Finance, 1989-2003
          Associate Professor of Finance, 1983-1989
          Assistant Professor of Finance, 1980-1983
1999 (fall)      Virginia Tech Northern Virginia Graduate Center, Falls Church, Virginia
1978-1980      Louisiana State University, Baton Rouge, Louisiana
          Graduate Teaching Assistant
1975      Jefferson State Junior College, Birmingham, Alabama
          Instructor

## VISITING ACADEMIC POSITIONS

2015      Hong Kong Polytechnic University, Visiting Scholar

| 2014 | Macquarie University, Sydney, Australia, Visiting Scholar |
| 2014 | National University of Singapore, Visiting Scholar |
| 2013 | University of Adelaide, Adelaide, Australia, Visiting Scholar |
| 2006 | Korea Advanced Institute for Science and Technology, Seoul, South Korea, MBA Distinguished Lecturer |
| 2002 | Aquila/University of Missouri at Kansas City, Kansas City, Missouri, Visiting Lecturer |
| 1999 | University of Strathclyde, Glasgow, Scotland, Visiting Scholar |
| 1994 | University of North Carolina, Chapel Hill, North Carolina, Visiting Scholar |

## PUBLISHED AND FORTHCOMING ARTICLES

*Journal Articles:*

"Bragging Rights:  Does Corporate Boasting Imply Value Creation." **The Journal of Corporate Finance** 67 (2021).  Co-authors:  P. Kothari and S. Ferris.  https://doi.org/10.1016/j.jcorpfin.2020.101863

"Conditional Probability and the Length of a Championship Series in Baseball, Basketball, and Hockey," **Journal of Sports Analytics**, 6:2 (2020), 111-127..

"FI-nance or Fi-NANCE:  How 100 Experts Pronounce the Word." **The Journal of Financial Education** 45 (2019) 294-309.

"Does the Choice of Exchange Listing Matter?  An Examination of Firms that Voluntarily Move from the NYSE to Nasdaq." **Journal of Accounting and Finance** Vol. 19 (2019), 18-48.  Co-authors:  Y. Bui and C. Stephens.

"Covered Calls on the S&P 500:  Rethinking an Anomaly." **The Journal of Derivatives** 27 (Winter, 2019), 50-61.  Co-authors:  R. Brooks and M. Hemler.

"An Option Pricing Approach to Corporate Dividends and the Capital Investment Financing Decision." **Review of Financial Economics** 37 (2019), 541-553.

"An Empirical Analysis of Corporate Currency Risk Management Policies and Practices." **Pacific-Basin Finance Journal** 47 (2018), 109-128.  Co-author: S. Kim.

"A Bias in the Volatility Smile." **Review of Derivatives Research** 20 (2017), 47-90.  Co-authors:  T. Hanson, W. Li, and J. Muthuswamy.

"The Alphas of Asset Allocators." **The Journal of Investing** 25 (Winter, 2016), 34-50.

"Poor Performance and the Value of Corporate Honesty." **Journal of Corporate Finance** 33 (2015), 1-18.  Co-authors:  J. Cicon and S. Ferris.

"Some Subtle Relationships and Results in Option Pricing." **Journal of Applied Finance** 24 (2014), 94-110.  Co-author:  R. Brooks.

"The Price-Taker Effect on the Valuation of Executive Stock Options." **The Journal of Financial Research** 37 (Spring, 2014), 27-54.  Co-author:  T.-H. Yang.

"Private Information and the Exercise of Executive Stock Option." **Financial Management** 41 (Autumn, 2012), pp. 733-764.  Co-author:  B. Cline and R. Brooks.

"The Tradeoff between Compensation and Incentives in Executive Stock Options." **Quarterly Journal of Finance** 1 (2011), 733-766. Co-author:  T.-H. Yang.

"Fatal Flaws of the Sharpe Ratio or How to Make Yourself Look Good." **Journal of Performance Measurement** 16 (Fall, 2011), 20-28.

"Experimental Evidence on Portfolio Size and Diversification:  Human Biases in Naïve Security Selection and Portfolio Construction." **The Financial Review** 46 (August, 2011), 427-457. Co-author:  A. Shynkevich and T.-H. Yang.

"The Human Side of Risk Management:  Part II." **Risk Professional** (October, 2011), pp. 36-38.

"The Human Side of Risk Management:  Part I." **Risk Professional** (August, 2011), pp. 37-40.

"Patterns in Asset Management Returns:  Evidence of Fraud in the Stanford Group Scandal?" **Journal of Alternative Investments** 13 (Spring, 2011), 73-79. Co-author:  A. Schexnaildre.

"Liquidity and Employee Options:  An Empirical Analysis of the Microsoft Experience." **Journal of Corporate Finance** 15 (2009), 469-487.

"The Subprime Crisis," **National Safety & Security Crisis Management Magazine**.  Special Issue:  Mega-Crises in the 21st Century (October, 2009), 24-25.

"What are the Odds?  Another Look at DiMaggio's Streak." **Chance** 22 (June, 2009), 33-42.

"Pricing Options on Film Revenue." **Risk** 22 (May, 2009), 80-86. Co-authors:  J. E. Hilliard and E. Hillebrand.

"A Synthesis of Binomial Option Pricing Models for Lognormally Distributed Assets." **Journal of Applied Finance** 18 (2008), 38-56.

"Competition and Innovation in U. S. Futures Markets." **Journal of Alternative Investments** 11 (Summer, 2008), 97-109.

"Pricing an Option on Revenue from an Innovation:  An Application to Movie Box Office Revenue." **Management Science** 54 (May, 2008), 1015-1028. Co-authors:  J. E. Hilliard and E. Hillebrand.

"Six One Way, Half a Dozen the Other:  A Fresh Perspective on Some Issues in the Indexing Debate." **Journal of Indexes** (May-June, 2008), 11-15, 57.

"Taxation without Replication:  A Look at a Problem in Synthetic Indexing." **The Journal of Portfolio Management** 34 (Fall 2007), 73-83.

"Black-Scholes-Merton, Liquidity, and the Valuation of Executive Stock Options." **Advances in Financial Economics:  Issues in Corporate Governance and Finance** 12 (2007), 271-310. Co-author:  T.-H. Yang.

"Reply to 'A Hedging Deficiency in Eurodollar Futures.' " **The Journal of Futures Markets** 27 (2007), 195-201.

"A Hedging Deficiency in Eurodollar Futures." **The Journal of Futures Markets** 26 (February, 2006), 189-207.

"The Utility-Based Valuation and Cost of Executive Stock Options in a Binomial Framework:  Issues and Methodologies." **Journal of Derivatives Accounting** 9 (September, 2005), 165-188.  Co-author:  T.-H. Yang.

"Discretionary Trading and the Search for Alpha."  **The Journal of Asset Management** 6 (August, 2005), 117-135.

"Mathematical Probability Theory and Finance:  Connecting the Dots." **Journal of Financial Education** 31 (Summer, 2005), 1-14.

"Two Extensions for Fitting Discrete Time Term Structure Models with Normally Distributed Factors," **Applied Mathematical Finance** 18 (September, 2004), 187-205.  Co-author:  S. Agça.

"Equity Swaps and Equity Investing," **Journal of Alternative Investments** 7 (Summer, 2004), 75-97.

"Speed and Accuracy Comparison of Bivariate Normal Distribution Approximations for Option Pricing." **The Journal of Computational Finance** 6 (Summer, 2003), 61-96.  Co-author: S. Agça.

"Swaptions and Options." **The Journal of Risk** 5 (Spring, 2003), 67-90.

"The (In)Stability of the Relationship Between Stocks, Bonds and Managed Futures."  **Journal of Applied Business Research** 19 (2003), 75-93.

"Rethinking Implied Volatility." **Financial Engineering News** (January-February, 2003), 7, 20.

"A Simple Proof of European Option Pricing with Discrete Stochastic Dividends."  **The Journal of Derivatives** 9 (Spring, 2002), 39-45.  Co-authors: R. Kumar and D. Rich.

"The Performance of Professional Market Timers: Daily Evidence from Executed Strategies."  **Journal of Financial Economics** 62 (November, 2001), 377-411.  Co-author: M. L. Hemler.

"The False Teachings of the Unbiased Expectations Hypothesis."  **The Journal of Portfolio Management** 27 (Summer, 2001), 83-95.  Co-author: D. Rich.

"Dividend Forecast Biases in Index Option Valuation."  **Review of Derivatives Research** 4 (2000), 285-303.  Co-authors: R. Kumar and D. Rich.

"The 'Repricing' of Executive Stock Options."  **Journal of Financial Economics** 57 (July, 2000), 129-154.  Co-authors: R. Kumar and R. B. Todd.  Abstracted in **Economic Intuition** (Fall, 2000), 2-3.

"Research Trends in Derivatives and Risk Management Since Black-Scholes."  **The Journal of Portfolio Management Special 25th Anniversary Issue** 25 (May, 1999), 35-46.  Abstracted in **The CFA Digest** 29 (Fall 1999), 89-91.

"The New Science of Finance." **American Scientist** 87 (May-June, 1999), 256-263.  Co-author: P. P. Peterson. Reprinted in **Academic Communities/Disciplinary Conventions** by B. Beedles and M Petracca. Prentice-Hall: Upper Saddle River, New Jersey (2001).

"Implied Standard Deviations and Put-Call Parity Relations Around Primary Security Offerings." **The Journal of Applied Business Research** 15 (Winter, 1998-99), 1-12.  Co-authors: J. B. Broughton and D. M. Smith.

"Some Computational Problems in the Pedagogy of the Black-Scholes Model." **The Journal of Financial Education** 24 (Fall, 1998), 61-70.  Co-author: H. E. Fredericks.

"The Pricing of Equity Swaps and Swaptions." **The Journal of Derivatives** 5 (Summer, 1998), 19-31.  Co-author: D. Rich.

"A Theory of the Value of Active Investment Management and Its Implications for Closed-End Funds and Investment Management Contracts." **Advances in Financial Economics** 3 (1997), 81-115.

"Guest Speaker: A Derivative Alternative as Executive Compensation." **Financial Analysts Journal** 53 (March-April, 1997), 6-8.

"Price the Average." **Energy and Power Risk Management** 1 (December, 1996-January, 1997), 22-25.  Co-author: D. Rich.

"On Disclosing the Risk of Derivatives: Unfair, Inappropriate and Inconsistent." **Derivatives Quarterly** 3 (Winter, 1996), 24-26.

"The Benefits and Limits of Diversification Among Commodity Trading Advisors." **Journal of Portfolio Management** 23 (Fall, 1996), 65-80.  Co-author: R. S. Billingsley.

"A Generalized Simple Formula to Compute the Implied Volatility." **The Financial Review** 31 (November, 1996), 859-867.

"Duration, Convexity and Time as Components of Bond Return." **The Journal of Fixed Income** 6 (September, 1996), 88-96.  Co-author: J. V. Jordan.  Abstracted in **The CFA Digest** 27 (Spring, 1997), 14-16.

"Executive Equity Swaps and Corporate Insider Holdings." **Financial Management** 25 (Summer, 1996), 14-24.  Co-authors: P. W. Bolster and D. R. Rich.  Abstracted in **The CFA Digest** 27 (Spring, 1997), 69-70.

"Asset Swaps with Asian-Style Payoffs." **The Journal of Derivatives** 3 (Summer, 1996), 64-77.  Co-author: D. R. Rich.

"Comparison of Two Low Cost S&P 500 Index Funds." **Derivatives Quarterly** 2 (Spring, 1996), 32-38.  Co-authors: J. J. Angel, J. C. Francis, and G. L. Gastineau.

"A Chronology of Derivatives." **Derivatives Quarterly** 2 (Winter, 1995), 1-8.

"The Impact of Equity Option Expirations on the Prices of Non-Expiring Options." **Review of Financial Economics** 4 (May, 1995), 109-123.  Co-authors:  J. B. Broughton and D. M. Smith.

"The ABCs of Geometric Brownian Motion." **Derivatives Quarterly** 1 (Winter, 1994), 41-47.

"Translating the Greek:  The Real Meaning of Call Option Derivatives." **Financial Analysts Journal** 50 (July-August, 1994), 43-49.  Abstracted in **The CFA Digest** 25 (Winter 1995), 57-59.

"Futures Pricing and the Cost of Carry Under Price Limits."  **The Journal of Futures Markets** 14 (October, 1994), 813-836.

"The Pricing and Hedging of Limited Exercise Caps and Spreads."  **The Journal of Financial Research** 17 (Winter, 1994), 561-584.

"An Alternative Approach to the Pricing of Options on Multiple Assets."  **The Journal of Financial Engineering** 2 (September, 1993), 271-285.  Co-author:  D. R. Rich.

"The Value Line Enigma Extended:  An Examination of the Performance of Option Recommendations."  **The Journal of Business** 66 (October, 1993), 541-569.  Co-author:  J. B. Broughton.

"Quick Valuation of the 'Bermuda' Capped Option."  **The Journal of Portfolio Management** 20 (Fall, 1993), 93-99.  Co-author:  R. R. Trippi.

"Leap Into the Unknown."  **Risk** 6 (May, 1993), 60-62, 64, 66.  Reprinted in **Over the Rainbow: New Developments in Exotic Options and Complex Swaps**, ed. R. A. Jarrow.  London: Risk (1996), Ch. 37, 251-256.

"The Impact of Delivery Options on Futures Prices:  A Survey."  **The Journal of Futures Markets** 13 (April, 1993), 127-155.  Co-author:  M. L. Hemler.

"Is Federal Regulation of Stock Index Futures Margins Necessary?"  **The Journal of Financial Engineering** 2 (March, 1993), 1-13.

"Options Analysts' Recommendations and Market Efficiency."  **International Review of Financial Analysis** 1 (1992), 131-148.  Co-author:  R. Kumar.

"The Impact on Shareholders of Mutual Fund Distribution Expenses."  **The Journal of Law and Commerce** 11 (Fall, 1991), 15-38.  Co-authors:  D. J. Haskell and S. P. Ferris.

"The Differential Impact of Federal Reserve Margin Requirements on Stock Market Volatility."  **The Financial Review** 3 (August, 1991), 343-366.   Co-authors:  S. P. Ferris and R. Kumar.

"Mutual Fund Distribution Fees:  An Empirical Analysis of the Impact of Deregulation."  **Journal of Financial Services Research** 5 (March, 1991), 25-42.  Co-author:  S. P. Ferris

"A Transaction Data Study of Stock Returns and Trading Activity During Option Expiration Periods."  **Advances in Futures and Options Research** 5 (1991), 149-174.  Co-authors:  S. P. Ferris and G. A. Wolfe.

"Option Volume and Stock Market Performance."  **The Journal of Portfolio Management** 16 (Summer 1990), 42-51.  Abstracted in **The CFA Digest** 21 (Winter, 1991), 44-45.

"Default Risk and the Duration of Zero Coupon Bonds."  **The Journal of Finance** 45 (March, 1990), 265-274.  Abstracted in **Journal of Economic Literature** 28 (September, 1990), 1541.

"Market Index Depository Liabilities:  Analysis, Interpretation and Performance."  **Journal of Financial Services Research** 1 (1988), 335-352.  Co-author:  J. B. Broughton.

"Margin Requirements and Stock Market Volatility." **Economics Letters** 28 (1988), 251-254.  Co-author:  S. P. Ferris.

"Put-Call Ratios and Market Timing Effectiveness." **The Journal of Portfolio Management** 15 (Fall, 1988), 25-28.  Co-author:  R. S. Billingsley.

"The Pricing and Performance of Stock Index Futures Spreads." **The Journal of Futures Markets** 8 (June, 1988), 303-318.  Co-author:  R. S. Billingsley.

"The Effect of 12b-1 Plans on Mutual Fund Expense Ratios:  A Note." **The Journal of Finance** 42 (September, 1987), 1077-1082.  Co-author:  S. P. Ferris.

"Boundary Condition Tests of Bid and Ask Prices of Index Call Options." **The Journal of Financial Research** 11 (Spring, 1988), 21-31.

"A Guide to Index Arbitrage." **Wall Street Micro Investor** 5 (May, 1987), 2-4.

"The Effect of Aviation Disasters on the Air Transport Industry:  A Financial Market Perspective." **Journal of Transport Economics and Policy** 21 (May, 1987), 151-165.  Co-author:  S. P. Ferris.  Abstracted in **Journal of Economic Literature** 26 (March, 1988), 512.

"Trading Time Effects in Financial and Commodity Futures Markets." **The Financial Review** 22 (May, 1987), 281-294.  Co-author:  S. P. Ferris.

"Parity Tests of Index Options." **Advances in Futures and Options Research** 2 (1987), 47-64.

"Futures Contracts and Immunization." **Review of Research in Futures Markets** 5 (1986), 124-140.

"Empirical Tests of the Pricing of Index Call Options." **Advances in Futures and Options Research** 1, Part A (1986), 141-166.

"A Spreadsheet Approach to Analyzing Options." **Wall Street Micro Investor** 4 (December, 1986), 2-6.

"Listed Stock Options and Managerial Strategy." **Strategy and Executive Action** (Fall, 1986), 17-20, 28.  Co-author:  R. S. Billingsley.

"Should Investors Bet on Summer Rally?" **Media General Financial Weekly** 16 (August 18, 1986).  Co-author:  S. P. Ferris.

"Hedging Shelf Registrations." **The Journal of Futures Markets** 6 (Spring, 1986), 11-27.  Co-authors:  M. W. Marr and G. R. Thompson.

"Reevaluating Mortgage Refinancing 'Rules of Thumb'." **Journal of the Institute of Certified Financial Planners** 7 (Spring, 1986), 37-45.  Co-author:  R. S. Billingsley.

"Summer Rallies." **Financial Analysts Journal** 42 (January-February, 1986), 6-9.  Co-author:  S. P. Ferris.

"Options Market Efficiency and the Box Spread Strategy." **The Financial Review** 20 (November, 1985), 287-301.  Co-author:  R. S. Billingsley.  Reprinted in **CFA Readings in Derivative Securities**, ed. M. A. Berry

and K. F. Sherrerd.  Charlottesville, Virginia:  The Institute of Chartered Financial Analysts (1988), 217-230.

"A Semi-Strong Form Test of the Efficiency of the Treasury Bond Futures Markets."  **The Journal of Futures Markets** 5 (Fall, 1985), 385-405.

"The CBOE Call Option Index:  A Historical Record."  **The Journal of Portfolio Management** 12 (Fall, 1985), 75-83.  Co-author:  S. P. Ferris.

"Managing Your Portfolios with Index Options."  **Futures** 9 (September, 1985), 70-73.  Co-author:  R. S. Billingsley.

"The Reaction of the Chicago Board of Trade GNMA Futures Contract to the Announcement of Inflation Rates:  A Study of Market Efficiency."  **Review of Research in Futures Markets** 4 (1985), 132-154.

"Indexed Bonds:  A Comparative Analysis."  **Journal of Economics and Business** 36 (May, 1984), 207-216. Co-author:  P. J. Bolster.

"Floating Rate Notes and Immunization."  **Journal of Financial and Quantitative Analysis** 18 (September, 1983), 365-380.

"An Immunized-Hedge Procedure for Bond Futures."  **The Journal of Futures Markets** 2 (Fall, 1982), 231-242.  Reprinted in **Readings in Futures Markets, Book V:  Selected Writings on Futures Markets: Explorations in Financial Futures Markets**, ed. A. E. Peck.  Chicago:  Board of Trade of the City of Chicago (1985), 119-131.

"Evidence on a Simplified Model of Systematic Risk."  **Financial Management** 11 (Autumn, 1982), 53-63.

"Interest Sensitivity and Dividend Yields."  **The Journal of Portfolio Management** 8 (Winter, 1982), 69-75.

"New Tax Rule on Zero Coupon Bonds Will Favor Investors."  **Bond Week** 11 (July 5, 1982), p. 8.

"Empirical Estimates of Equivalent Risk Classes and the Effect of Financial Leverage on Systematic Risk." **The Financial Review** 16 (Fall, 1981), 12-29.

"Progress in Modeling Utility Stock Holding Period Returns."  **Public Utilities Fortnightly** 107 (May 7, 1981), 34-36.

"Leverage and the Valuation of Risk Assets:  A Comment."  **The Quarterly Review of Economics and Business** 21 (Spring, 1981), 125-127.

"A Re-Examination of Interest Rate Sensitivity in the Common Stocks of Financial Institutions."  **The Journal of Financial Research** 2 (Spring, 1980), 49-56. Co-author:  W. R. Lane.

"Comment:  A Test of Stone's Two-Index Model of Returns."  **Journal of Financial and Quantitative Analysis** 14 (September, 1979), 641-644.

*Contributed Articles or Readings:*
"Derivatives Exchanges."  **The Professional Risk Managers Handbook:  Financial Markets**, Vol. 1, Book 3, E. Sheedy, eds.  PRMIA (2015).

"A Financial Analysis of the Decision to Purchase a Hybrid Vehicle." **Energy Finance and Economics: Analysis and Valuation, Risk Management, and the Future of Energy**, ed. B. Simkins and R. Simkins. Kolb Series in Finance.  New York: Wiley (2013).  Co-authors:  B. Simkins and P. Dhar.

"The Subprime Crisis." **Megacrises:  Understanding the Prospects, Nature, Characteristics, and the Effect of Cataclysmic Events**, ed. Ira Helsloot, Arjen Boin, Brian Jacobs, and Louise K. Comfort. Springfield, Illinois:  Charles C. Thomas (2012).

"Valuing Forward Contracts." **The Professional Risk Manager's Guide to Finance Theory and Application**, ed. Carol Alexander and Elizabeth Sheedy.  New York: McGraw-Hill (2008).  Previously published as **The Professional Risk Manager's Handbook:  A Comprehensive Guide to Current Theory and Best Practices**, ed. Carol Alexander and Elizabeth Sheedy.  Professional Risk Managers International Association.  Wilmington, DE:  PRMIA Publishers (2004).

Chapter 9, "Risk Management" (with Kenneth Grant and John R. Marsland).  **Managing Investment Portfolios:  A Dynamic Process**, 3rd. ed., edited by John Maginn, Donald L. Tuttle, Jerald E. Pinto, and Dennis W. McLeavey.  New York:  John Wiley (2007).

"What Are Derivatives?  A Comparison of Instrument Structures and Their Risks for the Internal Audit Team." Chapter 2 in **Derivatives and the Internal Auditor**.  London: Risk Publications (1999).

Chapter 9, "An Introduction to Derivative Markets and Securities"; Chapter 20, "Stock Options"; Chapter 21, "Warrants and Convertible Securities"; Chapter 22, "Futures"; Chapter 23, "Advanced Topics on Options and Futures." **Investment Analysis and Portfolio Management**, 4th ed., F. Reilly, Fort Worth: The Dryden Press (1994).

"Index Futures." **The New Palgrave Dictionary of Money and Finance**, ed. J. Eatwell, M. Milgate and P. Newman, London:  Stockton House (1992).

"Risk-Return Characteristics of Stock Index Futures and Options." **The Handbook of Stock Index Futures and Options**, ed. F. Fabozzi. Homewood, Illinois:  Irwin (1989).

"Immunization of Floating Rate Notes." **Floating Rate Instruments:  Characteristics, Valuation and Strategies**, ed. F. Fabozzi.  Chicago:  Probus (1986), 295-306. Co-author:  G. E. Morgan.

## BOOKS
*Texts and Academic Books*
**Foundations of the Pricing of Financial Derivatives:  A Primer for Graduate Students in Finance** (with R. Brooks; completed e-book, undergoing edits)

**Financial Risk Management:  An End User Perspective** (2019) (World Scientific Press, Singapore); includes ancillary PowerPoints and solutions.

**An Introduction to Derivatives and Risk Management**, 10th ed. (2015), 583 pp.; 9th ed. (2013), 667 pp., co-authored with R. Brooks; 8th ed. Mason, Ohio: Cengage (2010), 652 pp., co-authored with Robert Brooks; 7th ed. Mason, Ohio:  Thomson South-Western (2007), 653 pp., co-authored with Robert Brooks; 6th ed., Mason, Ohio: Thomson South-Western (2004), 675 pp.; 5th ed., Fort Worth: Harcourt, Inc. (2001), 822 pp. Previously published as **An Introduction to Derivatives**, 3rd ed., Fort Worth: The Dryden Press (1995),

625 pp.; 4th ed., (1998), 785 pp.  Previously published as **An Introduction to Options and Futures**, Hinsdale, Illinois:  The Dryden Press (1989), 560 pp; 2nd ed. (1992), 605 pp.

**Solutions Review Manual:  An Introduction to Derivatives and Risk Management**, 8th and 9th eds. (electronic), Mason, Ohio:  Cengage (2010), 126 pp., co-authored with Robert Brooks; 7th ed. Mason, Ohio: Thomson South-Western (2007), 126 pp.-co-authored with Robert Brooks;  **Test Bank: An Introduction to Derivatives and Risk Management**, 8th ed., Mason, Ohio:  Cengage (2010), 235 pp., co-authored with Robert Brooks; 7th ed. (2007), 94 pp, co-authored with Robert Brooks; Previously published as **Instructor's Manual:  An Introduction to Derivatives and Risk Management**, 6th ed., Mason, Ohio:  Thomson South-Western (2004), 229 pp.; 5th ed., Fort Worth: Harcourt, Inc. (2001), 242 pp;   Previously published as **Instructor's Manual: An Introduction to Derivatives**, 3rd ed., Fort Worth: The Dryden Press (1995), 252 pp.; 4th ed. (1998), 208 pp.  Previously published as **Instructor's Manual:  An Introduction to Options and Futures**, Hinsdale, Illinois:  The Dryden Press (1989), 200 pp; 2nd ed. (1992), 259 pp.

*Practitioner Books*

**Essays in Derivatives:  Risk Transfer Tools and Topics Made Easy**, 2nd. ed.  New York:  John Wiley (2008), 414 pp.  1st ed. published as **Essays in Derivatives**.  New York:  John Wiley (1998), 323 pp. Collection of 70 essays on various topics in derivatives; various chapters reprinted in **Financial Engineering News**, (January/February 2005), pp. 21-22.  See "Other Publications and Writings."

**Analysis of Derivatives for the CFA Program**.  Charlottesville, Virginia:  Association for Investment Management and Research (2003), 656 pp.

*Works of Fiction*

**The Assignment**.  Amazon Kindle Directing Publishing (2019), 359 pp.

## OTHER PUBLICATIONS AND WRITINGS

*CFA Examination Readings*

"Measuring and Managing Market Risk," Level II, with M. McCarthy (2016)
"Risk Management:  An Introduction," Level I, with M. Edleson (2015)
"Credit Default Swaps," Level II, with B. Rose (2014)
"Basics of Derivative Pricing and Valuation," Level I (2014)
"Derivative Markets and Instruments," Level I (2013)

*Regular Writings and Columns*

**Financial Engineering News**, Teaching Notes.  "Option Prices and State Prices," March/April, 2003, pp. 8-10; "Convergence of the Binomial to the Black-Scholes Model," May/June, 2003, pp. 8-9, 12; "Linear Homogeneity, Euler's Rule, The Black-Scholes Model, and an Application to Forward Start Options," September/October, 2003, pp. 10-11; "Concepts of Discrete and Continuous Time Models," November/December, 2003, pp. 15-16, 22; "Default Risk as an Option," January/February, 2004, pp. 15, 22; "The Local Expectations Hypothesis," March/April, 2004, pp. 13, 17; "The Volatility Smile," May/June, 2004, pp. 13, 16-17, 19; "A Nontechnical Introduction to Brownian Motion," March/April, 2005, pp. 21-22; "No Arbitrage Models of the Term Structure:  Ho-Lee and Heath-Jarrow-Morton," May/June, 2005, pp. 21-22; "The Strange Relationship Between Academics and Practitioners in Derivatives and Risk Management," July/August 2005, pp. 19, 22; "Risk Neutral Pricing of Derivatives," September/October 2005, pp. 25-26;

**Financial Engineering News**, Technical Notes.   "A Generalization of the Cost of Carry Forward/Futures Pricing Model.  Part One." March/April 2006, pp. 33-34; "A Generalization of the Cost of Carry Forward/Futures Pricing Model.  Part Two." May/June 2006, pp. 23-24, 26; "The Pricing and

Interest Rate Sensitivity of Floating-Rate Securities," September/October, 2006, pp. 17, 35-36, 38; "The Bivariate Normal Probability Density," November/December, 2006, pp. 31, 42.

*Miscellaneous Writings*
"The Idiocy of Promotion-and-Tenure Letters." **The Chronicle of Higher Education** (online). November 14, 2012

Letter to Editor, *The Wall Street Journal*, July 16, 2012, p. A12.

## WORKING PAPERS
"Dividends on Unearned Shares and Corporate Payout Policy:  An Analysis of Dividend Equivalent Rights" (with Z. Jia)
 "The Cross-Section of Option Returns" (with M. Shafaati and R. Brooks)
 "Decomposing the Systematic and Idiosyncratic Components of the Diffusive and Tail Risks in Individual Equity Options" (with M. Shafaati and R. Brooks)
The Batting Hand Factor in Baseball:  The Impact of Pitcher Quality in Resolving a Symmetry  Puzzle (with P. Maymin)

## RESEARCH IN PROGRESS
"Exact Specification of Type I Error in Portfolio Performance Measurement:  How Conventional Market Indexes Overstate Results." (with P. Kothari and R. Kumar)
"Option Value Increases with Volatility:  Or Does It? (with M. Shafaati and R. Brooks)
"Multivariate Analysis of the Covid Death Rate" (with Z. Jia, B. Marx, and B. Li)

## MONOGRAPHS
**Expensing Executive Stock Options:  Sorting Out the Issues**.  Charlottesville:  CFA Institute Centre for Financial Market Integrity (2006).  Co-author:  R. T. McEnally.

**Real Options and Investment Valuation**.  Charlottesville: Association for Investment Management and Research (2002), 114 pp.  Co-author: P. Peterson.  Abstracted in **The CFA Digest** 32 (August 2002), pp. 40-43.  Reprinted in **Investment Valuation: Discounted Cash Flow, Earnings Quality, Measures of Value Added, and Real Options**.  New York:  Wiley and Research Foundation of the CFA Institute, ed. David T. Larrabee and Jason A. Voss (2013)

**Managed Futures and Their Role in Investment Portfolios**.  Charlottesville:  Research Foundation of the Institute of Chartered Financial Analysts (1994), 78 pp.  Distributed by AIMR to all 23,000 members.

"The Effect of Margins on the Volatility of Stock and Derivative Markets:  A Review of the Evidence." **Monograph Series in Finance and Economics** (No. 1990-2).  Salomon Brothers Center for the Study of Financial Institutions, New York University.  Reprinted in **Intermarket Coordination Report to Congress Required by the Market Reform Act of 1990**, United States Commodity Futures Trading Commission, May 31, 1991.

## EDITED WORKS
**Advances in Futures and Options Research**, Vol 6 (1993), collection of 22 research papers, 422 pp.; Vol. 7 (1994), collection of 17 research papers, 335 pp.  Co-edited with R. R. Trippi.

## CASES
**State of Wisconsin Investment Board**.   International Thomson Publishing CaseNet (1998); http://casenet.thomson.com/casenet/abstracts/swib.html

**Second City Options** (unpublished) (originally, 1998).  With M. Hemler (2009).

## PRESENTATIONS AND PARTICIPATION IN CONFERENCES AND PROGRAMS
*Presentations at faculty seminars and programs*

Louisiana State University, Eric Voegelin Institute (September, 2021)
Florida State University (December, 2017)
University of Cincinnati (April, 2017)
Southeastern Louisiana University (April, 2016)
Hong Kong Polytechnic University (October, 2015)
Kent State University (April, 2015)
York University, Toronto (March, 2015)
Macquarie University, Sydney, Australia (November, 2014)
National University of Singapore (September, 2014)
University at Albany (October, 2014)
University of Arkansas (February, 2014)
Mississippi State University (January, 2014)
University of Adelaide, Australia (October, 2013)
University of Maine (September, 2013)
University of Saskatchewan (April, 2013)
Oklahoma State University (November 2011)
Loyola University of Chicago (March 2010)
University of Oklahoma (February 2009)
University of Missouri (October 2008)
Syracuse University (October 2008)
National Chung Hsing University, Taichung, Taiwan (April 2008)
National Chaio Tung University, Hsinchu, Taiwan (April 2008)
University of Mississippi (February 2008; November 2002)
Louisiana State University (October 2016; February 2014; April 2013; March 2011; January, 2010; February, 2008; April 2005; May 2002)
York University (March 2007)
West Virginia University (March 2007)
Korea Advanced Institute for Science and Technology (September 2006)
George Washington University (April 2006)
Virginia Tech (April 2006; September 2002; March 1997; November 1996; April 1996)
University of Laval (October 2005)
University of Massachusetts-Amherst (September 2005; April 1995)
Auburn University (March 2005)
University of Southern Mississippi (April 2004)
Rutgers University-Camden (February 2004)
Ohio State University (May 2002)
University of Georgia (December 2001)
Oklahoma State University (February 2000)
University of Strathclyde, Glasgow, Scotland, UK (May 1999)
University of Utah (May 1998)
University of Vienna (April 1998)
Virginia Tech Department of Mathematics (November 1997)

University of New Mexico (May 1997)
Rice University (November 1996)
University of Tennessee (October 1996)
University of South Carolina (February 1996)
Northeastern University (April 1995)
University of Lausanne (January 1995)
Virginia Tech Department of Physics (August 1994)
University of Missouri (November 1993, October 2008)
University of North Carolina at Chapel Hill (October 1993)
University of Waterloo (October 1993)
City Polytechnic University of Hong Kong (April 1993)
University of Notre Dame (March 1993)
Erasmus University (September 1992)
College of William and Mary (February 1992)
ESSEC (May 1991)
University of New Orleans (February 1984)
Emory University (November 1983)
University of Alabama (October 1999; March 1998; January 1981)

*Presentations at Regulatory Agencies*
Commodity Futures Trading Commission (Washington, October 1999; November 1991)
Federal Reserve Bank of Atlanta (Atlanta, March 1989)
Securities and Exchange Commission (Washington, November 1988)

*Presentations at Academic Conferences*
(Keynote speaker) Southwestern Finance Association (New Orleans, March 2022)
(Keynote speaker) International Conference on Economics, Business, and Management (Osaka – virtual, December 2021)
The 6th International Conference on Business, Marketing, and Trade (virtual, Tokyo, January 2021)
Irish Academy of Finance (Dublin, November 2018)
Southern Finance Association (Asheville, November 2018)
International Risk Management Conference (Turin, Italy, October 2018)
German Finance Association (Trier, September 2018)
World Finance and Banking Symposium (Bangkok, December 2017)
16th Financial Risk & Accounting Perspectives (Cambridge, UK, September 2017)
Magnolia Finance Conference (Starkville, Mississippi, March 2016; April 2017; March 2018)
Australasian Finance and Banking Conference (Sydney, Australia, December 2016)
Portsmouth-Fordham Conference on Banking and Finance (Portsmouth, UK, September 2016)
Korean-American Finance Association (Seoul, June 2016)
World Finance Conference (Buenos Aires, July 2015)
Vietnam International Conference in Finance (Ho Chi Minh City, June 2015)
Paris Financial Management Conference (Paris, December 2014)
Financial Management Association Europe (Maastricht, Netherlands, June 2014)
Southern Finance Association (Fajardo, Puerto Rico, November 2013)
Financial Management Association Europe (Luxembourg, June 2013)
German Finance Association (Hannover, Germany, October 2012)
Financial Management Association Europe (Istanbul, June 2012)
Midwest Finance Association, New Orleans, February, 2012)
Northern Finance Association (Vancouver, British Columbia, September 2011)
Edwards Corporate Governance Symposium (Moose Jaw, Saskatchewan, August 2010)
Megacrises (The Hague, June 2009)

Southern Finance Association (Key West, November 2008; Charleston, November 2007; Key West, November 2005; New Orleans, November 1981)

Contemporary Issues on Finance Academic Symposium, Taichung, Taiwan (April 2008)

Enterprise Risk Management Initiative Research Conference, North Carolina State University (Raleigh, April 2008)

Northern Finance Association (Toronto, September 2007)

Eastern Finance Association (New Orleans, April 2007; Charleston, April 2001; New York, April 1983)

Hofstra University Conference on Managing Risk in Financial Institutions (Hempstead, NY, April 2006)

FDIC/Cornell/Houston Derivatives Securities Conference (Arlington, VA, April 2006)

Northern Finance Association (Vancouver, October 2005)

Portuguese Finance Network (Lisbon, July 2004)

Washington Area Finance Association (Washington, November 2002; April 1999)

Western Finance Association (Santa Monica, June 1999)

International Association of Financial Engineers (New York, November 1995; September 1998)

French Finance Association (Paris, June 1992)

AMEX Options Colloquium (New York, March 1991)

Canadian Futures Research Seminar (October 1986; published in Proceedings, Vol. 1, 1986, pp. 37-55)

Chicago Board of Trade Research Seminar (Chicago, May 1984)

Financial Management Association (Prague, June 2008; Copenhagen, June 2002; San Francisco, October 1992; Las Vegas, October 1987; Toronto, October 1984; New Orleans, October 1981)

*Other Academic Conference Participation*

Irish Academy of Finance, discussant (Dublin, Ireland, November 2018)

Southern Finance Association, session chair (Asheville, North Carolina, November 2018)

Magnolia Finance Conference, panel moderator (Starkville, Mississippi, April 2017, April 2018)

World Finance and Banking Symposium, discussant & session chair  (Bangkok, December 2017)

Florida State-SunTrust Beach Conference, discussant (Sandestin, Florida, April 2017)

Australasian Finance and Banking Conference, discussant & session chair (Sydney, Australia, December 2016)

Eastern Finance Association, session chair (New Orleans, March, 2015)

Paris Financial Management Conference, discussant (Paris, December, 2014)

Financial Management Association Europe, discussant (Maastricht, June, 2014)

Financial Management Association Europe, discussant (Luxembourg, June, 2013)

German Finance Association, discussant (Hannover, Germany, October, 2012)

Financial Management Association Europe, discussant and session chair (Istanbul, June, 2012)

Midwest Finance Association, discussant and session chair (New Orleans, February 2012)

Oklahoma State University Master of Science in Quantitative Finance Conference Keynote Speaker (Stillwater, Oklahoma, November, 2011)

Financial Management Association, discussant and session chair (Denver, October 2011)

Northern Finance Association, discussant (Vancouver, British Columbia, September 2011)

Financial Management Association, discussant and session chair (New York, October 2010)

Edwards Corporate Governance Symposium, discussant, (Moose Jaw, Saskatchewan, August 2010)

Southern Finance Association, discussant and session chair (Key West, November 2008)

State of the Art in Early Warning Systems, Syracuse University (October 2008)

Contemporary Issues on Finance Academic Symposium, session chair, Taichung, Taiwan (April 2008)

Faculty Derivatives Workshop, commentator, National Chung Hsing University, Taichung, Taiwan (April 2008)

Southern Finance Association, discussant and session chair (Charleston, November 2007)

Financial Management Association, discussant and session chair (Orlando, October 2007)

Eastern Finance Association, discussant, panelist, and session chair (New Orleans, April 2007)

Advances in Econometrics:  The Econometrics of Risk Management Conference, panelist, Baton Rouge, Louisiana (November 2006)

Southern Finance Association, discussant and session chair (November 2005)

Portuguese Finance Network, discussant (Lisbon, July 2004)

Financial Management Association, panel moderator and organizer (San Antonio, October 2002)

Washington Area Finance Association, discussant (December 1999)

Chicago Board of Trade, panel moderator and organizer (Chicago, December 1996)

Chicago Board of Trade European Research Seminar, discussant (Marseilles, September 1998; Barcelona, September 1995)

French Finance Association, discussant (Paris, June 1992)

Hofstra University Symposium on Innovative Financial Instruments (Hempstead, March 1991)

Virginia Tech Conference on Holding and Trading Stock Index Risk, discussant (Washington, February 1990)

Financial Management Association, session chair (San Antonio, October 2002; Toronto, October 2001; Seattle, October 2000; Toronto, October 1993; Boston, October 1989)

Chicago Board of Trade Seminar, discussant (May 1990; May 1988; May 1987; May 1986)

Southern Finance Association, discussant (Washington, November 1983)

Eastern Finance Association, discussant (Charleston, April 2001; Philadelphia, April 1989; New York, April 1983)

Financial Management Association, discussant (Salt Lake City, October 2006; Chicago, October 2005; New Orleans, October 2004; Denver, October 2003; San Antonio, October 2002; Copenhagen, June 2002; Toronto, October 2001; St. Louis, October 1994; Toronto, October 1993; New Orleans, October 1988; Las Vegas, October 1987; New York, October 1986; Denver, October 1985)

*Publications in Academic Conference Proceedings (not presented or presented by co-author)*

Southwestern Finance Association (Houston, March 1979); two papers

American Institute for Decision Sciences (Boston, November 1973)

*Presentations at Practitioner Conferences and Programs*

CFA Mississippi (Jackson, October 2018)

CFA Society of Louisiana (New Orleans, May 2017)

Cantor Fitzgerald Conference on Investment Revolution (keynote speaker) (Sacramento, CA, December 2016)

Financial News Seoul, 14th Seoul International Derivatives & Alternative Investments Conference, keynote speaker (Seoul, August 2016)

Cantor Fitzgerald Conference on Investment Revolution (keynote speaker) (Washington, DC, April 2016)

Cantor Fitzgerald Conference on ETF Evolution:  A Comprehensive Investment and Risk Management Workshop (keynote speaker) (Austin, TX, October 2015)

Portfolio Management Institute (New Orleans, May 2015)

CFA Society of Mississippi (Jackson, December 2014)

Financial Services Institute of Australasia-KPMG-CFA Society Sydney-Macquarie Applied Finance Center (November 2014)

CFA Society of Maine (Portland, ME, September 2013)

CFA Society of South Florida (Fort Lauderdale and West Palm Beach, May 2012)

Virginia Tech SEED 20 Year Reunion (Arlington, VA, April 2012)

CFA Society of Detroit (Detroit, February 2012)

CFA Society of Vancouver (Vancouver, October 2010)

CFA Society of Cleveland (Cleveland, October 2010)

CFA Alaska Society (Anchorage, June 2010)

CFA Society of Mississippi (Jackson, June 2010)

CFA Society of Virginia (Richmond, February 2010)

CFA Society of Austin (Austin, October 2009)

CFA Society of South Africa Investment Conference (Johannesburg, September 2009)
CFA Society of United Arab Emirates (Dubai, August 2009)
Stars and Stripes National Public Employees Retirement Funds Summit (Miami, April 2009)
CFA Society of Oklahoma (Tulsa, Oklahoma City, February 2009)
CFA Society of Rochester (Rochester, NY, February 2009)
CFA Society of New Orleans (New Orleans, November 2008; February 2006)
CFA Society of San Diego (San Diego, August 2008)
Ballentine Investment Institute, Syracuse University (September 2008)
The Seoul International Derivatives Securities Conference (Seoul, South Korea, August 2008, 2007, 2006, 2005, 2004)
East Coast Municipal Derivatives Conference (Naples, FL, December 2007)
Plan Sponsor and Consultant Circle (San Francisco, October 2007)
Newport Cup of Indexing (Newport, July 2007; Newport, July 2006)
Southeast PERS (Atlanta, February 2007)
Super Bowl of Indexing (Phoenix, December 2006).
The Art of Indexing (Washington, DC, September 2006)
Risk-Management and Governance Conference, World Bank and Central Bank of Brazil (Sao Paulo, Brazil, April 2006)
Derivatives-Based Investments, (New York, December 2005)
Society of Financial Examiners, (New Orleans, August 2003)
Asset Allocation Summit (Williamsburg, Virginia, April 2002)
Canada Cup of Indexing and Related Products (Montreal, April 2002)
Aquila/University of Missouri at Kansas City (Kansas City, March 2002)
Society of Asset Allocators and Fund Timers (Atlanta, February 2002)
Pro Bowl of Investment Risk Management (Lake Tahoe, April 2001)
ICBI Risk Management Forum (Geneva, December 2000)
Financial Analysts Seminar (Evanston, July 2000)
Pro Bowl of Derivatives Risk Management (Vail, March 2000)
Association for Investment Management and Research (Chicago, March 2000)
Scottish Institute for Research in Investment and Finance (May 1999)
Association for Investment Management and Research (Chicago, November 1997)
Knoxville Society of Financial Analysts (Knoxville, October 1996)
Pensions and Investments Risk Management Symposium (New York, November 1995)
Managed Accounts Reports Mid-Year Conference on Alternative Investment Strategies (Chicago, June 1995)
State of Wisconsin Investment Board (Madison, May 1994)
Union Bank of Switzerland (Zurich, May 1996; Zurich, May 1994)
Chicago Mercantile Exchange Risk Management Symposium (Chicago, October 1995; Chicago, August 1993)
Chicago Board of Trade/Chicago Board Options Exchange Conference for Current and Potential Users of Futures and Options (Scottsdale, February 1989)

*Participation in Practitioner Conferences and Programs*
Global Indexing and ETF Conference (Scottsdale, AZ, December 2013, 2014, 2015)
Global Indexing and ETF Conference (Phoenix, December 2012)
Chicago Trading Corporation Academic Outreach Day (Chicago, August, 2012)
Super Bowl of Indexing, Panel Moderator (Phoenix, December 2011)
Ourso College of Business International Business Forum, Panel Moderator (Baton Rouge, March 2011)
Super Bowl of Indexing, Panel Moderator (Phoenix, December 2010)
Inside ETFs, Panel Moderator (Boca Raton, January 2010)
Super Bowl of Indexing, Panel Moderator (Phoenix, December 2009)

CFA Society of South Africa Investment Conference, Panel Moderator (Johannesburg, September 2009)

CFA Society of Louisiana Annual Forecast Dinner (New Orleans, January 2009)

Super Bowl of Indexing, Panel Moderator (Phoenix, December 2008; Phoenix, December 2007; Scottsdale, December 2006, December 2005)

Plan Sponsors and Consultants' Circle, panel moderator (Chantilly, VA, October 2008)

The Art of Indexing, panelist (Washington, September 2008)

Inside ETFs, panel moderator (West Palm Beach, FL, January 2008)

Sweat the Details, Dow Jones Indexes (Baton Rouge, April 2007)

Derivatives-Based Investments, panelist (New York, December, 2005)

Pro Bowl of Investment Risk Management, panelist (Lake Tahoe, April 2001)

Pro Bowl of Investment Risk Management, panel moderator (Lake Tahoe, April 2001)

Pro Bowl of Derivatives Risk Management, panel moderator (Vail, March 2000)

Association for Investment Management and Research conference on Derivatives in Equity Portfolio Management, conference moderator (Chicago, March 2000)

Virginia Tech Luncheon program on the Chicago Board of Trade vs. the SEC, panel moderator (Washington, September 1999)

Scottish Institute for Research in Investment and Finance, panel moderator (Edinburgh, May 1999)

Virginia Tech-Georgia State-Federal Reserve Bank of Atlanta Conference on Derivatives and Systemic Risk (Washington, April 1995)

Association for Investment Management and Research conference on Derivative Strategies for Managing Portfolio Risk, conference moderator (Marina del Rey, April 1993)

International Swaps Association North American Regional Conference, session chair (Washington, November 1992)

*Presentations before Local and Community Groups*

LSU Faculty Senate presentation on retirement investing (Baton Rouge, March 2019)

LSU Ourso College of Business Alumni Networking event (Baton Rouge, December 2018)

LSU Faculty Senate presentation on retirement investing (Baton Rouge, November 2018)

LSU Cox Communications Academic Center for Student-Athletes, presentation on retirement investing (Baton Rouge, April 2018)

St. Thomas More Catholic School, presentation on probability to 4th grade class (Baton Rouge, April 2018)

LSU Graduate School, Faculty Senate, and LSUUnited, presentation on retirement investing (Baton Rouge, April 2018)

LSU Graduate School Associate Professor Network, expectations for promotion & tenure (Baton Rouge, April 2018 & November 2018)

LSU Paul Hebert Law Center, presentation on retirement investing (Baton Rouge, March 2018)

LSU Kiwanis Club, presentation on retirement investing (Baton Rouge, March 2018)

LSU College of Science, presentation on retirement investing (Baton Rouge, February 2018)

LSU College of Engineering, presentation non retirement investing (Baton Rouge, February 2018)

LSU College of Human Sciences and Education, presentation on retirement investing (Baton Rouge, January 2018)

LSU Manship School of Mass Communications, presentation on retirement investing (Baton Rouge, November 2017)

LSU Ourso College of Business, presentation on retirement investing (Baton Rouge, November 2017)

LSU Faculty Senate, presentation on retirement investing (Baton Rouge, April 2016)

Southwest Virginia Chapter of the Institute of Management Accountants (Roanoke April 2002)

First National Student Portfolio Conference (Blacksburg, March 1998)

Virginia Tech Conference on Emerging Market Economies (Blacksburg, April 1995)

Roanoke Chapter, Institute of Management Accounting (Roanoke, December 1994)

Virginia Tech Math Club (Blacksburg, January 1993)

Virginia Tech Computer Users Conference (Blacksburg, May 1988)

Blacksburg Lions Club (Blacksburg, April 1984)
New River Community College (Dublin, Virginia, March 1984)

*Other Conferences Attended*

Dilip K. Shome Research Conference, Virginia Tech (Blacksburg, Virginia, September 2019)
Florida State-SunTrust Beach Conference (Sandestin, Florida, April 2018)
University of Oklahoma Energy Finance Conference (Norman, OK, September 2015)
CFA Institute Annual Meeting (New York, May 2007)
The ABCs of Exchange-Traded and Over-the-Counter Derivatives (New York, December 2005)
American Finance Association (New Orleans, January 2008; San Diego, January 2004)
Finance 2000, Boston University (April 2000).
Virginia Tech Financial Innovation Study Committee/Weird Instruments Study Committee Workshop on
    the Group of 30 Report (Washington, March 1994)
Eastern Finance Association (Hot Springs, Virginia, April 1991)
Virginia Tech-American Bar Association Conference on Market Manipulation:   Law, Economics and
    Public Policy (Washington, November 1990)
Society of Asset Allocators and Fund Timers (Newport Beach, August 1990)
AMEX Options Colloquium, New York University (New York, March 1990)
Chicago Board of Trade European Research Seminar (Leuven, Belgium, September 1992; The Hague,
    Netherlands, October, 1990; Jouy-en-Josas, France, September 1989)
Chicago Board of Trade Regulatory Issues in Futures Markets (Washington, November 1988)
Canadian International Futures Research Seminar (Toronto, Canada, October 1988)
Chicago Board of Trade Research Seminar (Houston, December 1995; Nashville, December 1990;
    Chicago, December 1997, December 1996, December 1994, December 1993, December 1991, May
    1991, May 1989, November 1986, May 1986, May 1985; Durham, December 1989)
Chicago Board of Trade Industry Research Seminar (Chicago, December 1984)
Chicago Board of Trade Summer Intern Program (Chicago, June 1983)
Chicago Board of Trade Educators Seminar (Chicago, March 1982)
Financial Management Association (Boston, October 1979)

**AWARDS, HONORS, AND RECOGNITIONS**

Honorable mention, 2018 Hillcrest Behavioral Finance Award for "Bragging Rights:  Does Corporate Boasting
    Imply Value Creation?" (with P. Kothari and S. Ferris)
Featured Faculty Member, LSU Graduate School Newsletter, December 2017
C. Stewart Sheppard Award, CFA Institute, for outstanding contribution to CFA Institute Education Programs,
    2015
Fifteen Year Certificate of Achievement for Continuing Education, CFA Institute, 2015
LSU Distinguished Faculty Award, 2014
LSU Rainmakers (outstanding 100 faculty), 2008
Risk Who's Who.  www.riskwhoswho.com (web site removed)
Erich and Lea Sternberg Foundation Excellence in Teaching Award, Ourso College of Business, LSU, 2007-
    2008
LSU Flagship Faculty, LSU Today, April 13, 2007
University Certificate of Teaching Excellence, Virginia Tech, 1999
Distinguished Alumnus of the Year, University of Montevallo, 1999
Pamplin College of Business Teaching Excellence Award, Spring, 1995, 1999
Outstanding Paper in Investments, Financial Management Association Meeting, 1990, for "Evidence on the
    Performance of Value Line Options:  The Enigma Extended"
Award of Merit, 1989 International Technical Publications Competition of the Society for Technical
    Communication for **An Introduction to Options and Futures**, 1st ed

Best of Show, 1988 Literature and Art Competition of the Chicago Chapter of the Society for Technical Communication for **An Introduction to Options and Futures**, 1st ed

## RESEARCH GRANTS, FINANCIAL SUPPORT, AND RELATED

Canadian Derivatives Institute, 2019
LSU Faculty International Travel Grant, 2004, 2006, 2008, 2011,2013, 2017, 2018
Chancellor's Distinguished Lectureship Series, 2004
Research Foundation of the Association for Investment Management and Research, 2000
Research Foundation of the Institute for Chartered Financial Analysts, 1993
Virginia Tech, International Programs Office, 1992
Virginia Tech Center for the Study of Futures and Options Markets, 1997, 1995, 1992, 1990
Virginia Tech, Department of Finance, 1988, 1987
Chicago Board of Trade Foundation, 1984

## CONSULTING

*Expert Witness Work*
Katsky Korins, Attorneys, New York, 2014-2015.
Alix Partners, 2013-2014.
Vincent, Lopez, Serafino, and Jenevein, Dallas, 2012-2013.
Fulbright and Jaworski, attorneys, Houston, 2011
Morris, Manning, and Martin, attorneys, Atlanta, 2011
Chicoine and Hallet, attorneys, Seattle, 2010-2013
International Securities Exchange and DLA Piper, attorneys, New York, 2009-
Sonnenschein, Nath, and Rosenthal, Attorneys, Dallas, 2008-2010
Bank of America & Lloyd Clareman, attorney, New York, 2009-2010
Bank of America & Davis, Wright, Tremaine, attorneys, Seattle, 2008
Meadows Collier, attorneys, Dallas, 2005-2010
Catanzarite Law Corporation, Los Angeles, 2000-2002, 2006-2009
Bank of America & Davis, Polk, Wardwell, attorneys, 2005-2006
Dickinson, Wright, attorneys, 2004
Strobl, Cunningham, Sharp, attorneys, 2004
Epstein, Cole, attorneys, 1999
Mayer, Brown & Platt, attorneys, 1993-1994
Capital Economics, Washington, D. C., 1992
Kostel, Watson, Snyder & Stevenson, attorneys, Covington, Virginia, 1987

*Education and Training*
CFA Institute, External Director of Curriculum Projects, 2012-2017
CFA Institute, 2005
Patpatia Associates, 2002
Institute of Chartered Financial Analysts, 1987-88

*Miscellaneous*
2ndVote, Oversight Committee & 2ndVote Adviseres, Advisory Board, January 2021
Cantor Fitzgerald, New York and Los Angeles, 2010
Lowenstein, Sandler, attorneys, New York, 2008
Index IQ, Rye Brook, New York, 2008-2011
The Governance Fund, Minneapolis, 2009-2011
Council of Institutional Investors, 2005
Champion Capital Corporation, San Francisco, California, 1989-1994

DSTCatalyst, 1998
Money magazine, 1987
FX Concepts, 1996
Wyatt Investment Consultants, 1994
Association for Investment Management and Research, 2000, 1995, 1993
MBM, 1992

**WEBCASTS**
Gerson Lehrman Group, "Credit Default Swaps" (August, 2017)
Gerson Lehrman Group, "Fundamentals of Options" (February 2016; August 2016; October 2016)
Gerson Lehrman Group, "Misunderstanding Risk" (October 2015; October 2016; January 2017)

**EXECUTIVE AND PROFESSIONAL DEVELOPMENT INSTRUCTION**
LSU Executive Education Breakfast to Business, February 2018, Baton Rouge
LSU Ourso College of Business, Executive Development Program, February, 2014, Baton Rouge
Financial Services Institute of Australasia-CFA Sydney-Macquarie Applied Finance Center, Sydney, Australia, November 2014.
Goldman Sachs, Fixed Income & Credit Derivatives Courses, July 2007, New York.
PRMIA and the World Bank, PRM Exam Review Course, May and October, 2006, Washington, D.C.
Institute de Formation Bancaire de Luxembourg (IFBL), 1999-2005. Derivatives Valuation and Analysis
EATEL, 2004. Interest Rate Risk Management, Gonzalez, Louisiana
Association for Investment Management and Research, "Valuing Executive Stock Options," webcast presentation with CD-ROM. Consultant to overall project entitled "Derivatives Analysis: Executive Stock Options and Short Sales Alternatives." 2004
Aquila/University of Missouri at Kansas City, 2002
Thomson Financial Corporation, 2000. Swaps: Applications and Pricing, Boston
Frank J. Fabozzi Associates, 1999. Swaps: Applications and Pricing: Washington, D.C
Frank J. Fabozzi Associates, 1998. Introduction to Swaps, New York
ICM Conferences, 1998, Equity Derivatives I, New York
German Society of Financial Analysts, 1998-99. CFA review course in derivatives, Vienna, Austria
Association for Investment Management and Research, 1995. Organizer of "Basics of Derivatives" workshop; presentation of "Introduction to Derivative Markets and Instruments" and "Basic Principles of Option Valuation," Chicago
Association for Investment Management and Research, 1995. Presentation of "Derivative Strategies and Their Widespread Applications," Orlando
Association for Investment Management and Research, 1994. CFA refresher course taught in Charlottesville and Los Angeles. Instruction in applications of derivative contracts in portfolio management
Financial Analysts Review of the United States, 1989-2000. CFA review course taught in Raleigh, North Carolina, Bangkok, Thailand and Zurich, Switzerland (for Union Bank of Switzerland). Instruction in fixed-income securities, derivative securities and quantitative techniques
Potomac Foundation, Falls Church, Virginia, 1991. Lectures on basic investment principles, portfolio performance evaluation and efficient market theory
"Contemporary Investment Opportunities." Virginia Tech Reynolds Homestead Continuing Education Center, Critz, Virginia, 1989
"Managing Interest Rate Risk with Financial Futures." Virginia Tech Continuing Education Program, Roanoke and Williamsburg, Virginia, 1984

**COURSES TAUGHT**
*Current*
(graduate, full time and online MBA) Financial Risk Management

(graduate PhD) Seminar in Options, Futures, and Derivatives
(undergraduate) Special Topics:  Risk and the Psychology of Finance

*Previous*
(Undergraduate) Principles of Finance, Financial Markets and Institutions, Advanced Financial Management, Investments, Financial Derivatives, Financial Theory, Finance and Society:  Images and Reality, (Graduate) Financial Policy, Investments, Portfolio Theory, Financial Assets and Markets, Financial Derivatives, Fixed Income Markets, Seminar in Derivatives

## BOOK REVIEWS & ABSTRACTS
Abstract of "An Empirical Comparison of Forward-Rate and Spot-Rate Models for Valuing Interest-Rate Options."  (W. Bühler, M. U. Walter, T. Weber) **Contemporary Finance Digest** (Winter 1999)
Review of *Black-Scholes and Beyond: Option Pricing Models* (N. Chriss), **Risk** (March 1997)
Review of *Investment Management* (S. Huang), **Journal of Finance** (December 1982)
Miscellaneous reviews for Blackwell, Wiley, Dryden, Little-Brown, Houghton-Mifflin, R. D. Irwin, Allyn-Bacon, McGraw-Hill, Prentice-Hall, Columbia Business School Press

## COMMITTEES AND SERVICE
*General Service*
Creator/organizer, Ourso College "Open for Business" Webinar Series, Spring, 2021-
Judge, LSU Discover Undergraduate Research Award Program, 2018
Faculty Co-Lead, MBA Study Abroad:  International Management Challenges:  Panama and Peru, 2016-2017.
Faculty representative, visit with Warren Buffett at Berkshire Hathaway, Omaha, Nebraska, March, 2014
Author of Faculty Senate Resolution 11-20, "A Plus and Minus Grading System for LSU."  Resolution approved by Faculty Senate, October, 2012.
Faculty Lead, MBA Study Abroad:  Doing Business in Brazil, Sao Paulo and Rio de Janeiro, Brazil, April, 2012.
ACG Cup Judge, LSU Competition, 2012-2013, 2015, 2016.
Founder and Faculty Advisor, SEED (Student-managed Endowment for Educational Development), $3.5 million student-managed portfolio, 1992-2002
Faculty Advisor, MBA Association, 1987-1989
Founding Co-Advisor, Finance Club, 1982-1984
Career Advisor, Department of Finance, 1982-1989
Honors Program Advisor, Department of Finance, 1982-1983
College Representative to Graduate Honor System, 1982-1983

*Graduate Student Research*
Doctoral Consortium Panelist and Workshop Leader, Financial Management Association Europe (Istanbul, June 2012)
Director of Graduate Programs, Department of Finance, Virginia Tech, 1999-2003.
Doctoral Dissertation Chair:
  M. Shafaati (Louisiana State University).  "Essays on the Role of Systematic and Idiosyncratic Volatility in Pricing Individual Equity Options."  2019.
  Z. Jia (Louisiana State University).  "Essays on Dividend Equivalent Rights and CEO Compensation."  2014.  Placed at University of Arkansas at Little Rock.
  S. Kim (Louisiana State University).  "Two Essays on Foreign Exchange Hedging." 2011.  Article published in *Pacific-Basin Finance Journal.*  Placed at Gardner-Webb University.
  A. Shynkevich (Louisiana State University).  "Three Essays on the Forward-Futures Differential." 2009.  Placed at Kent State University.
  T.-H. Yang (Louisiana State University).  "Managerial Ability and the Valuation of Executive Stock Options."  2007.  Placed at National Chung Hsing University, Taiwan.

S. Agça (Virginia Tech). "The Performance of Alternative Interest Rate Risk Measures and Immunization Strategies under Heath-Jarrow-Morton Framework." 2002. Article published in Journal of Financial and Quantitative Analysis. Placed at George Washington University and article published in *Journal of Financial and Quantitative Analysis*.

D. R. Rich (Virginia Tech). "Incorporating Default Risk into the Black-Scholes Model Using Stochastic Barrier Option Pricing Theory." 1993. Article published in *Review of Derivatives Research*. Placed at Northeastern University.

J. B. Broughton (Virginia Tech). "An Empirical Examination of Value Line Options," 1989. Article published in *The Journal of Business*. Placed at Florida State University.

Doctoral Dissertation Committee Member:

F. Zhang (Louisiana State University, School of Renewable Natural Resources), "Role of Risk Preferences in Forest Management and Valuation," 2018-.

T. Zhang (Louisiana State University), "Manager Uncertainty and the Cross-Section of Stock Returns." 2020-2021

P. Kothari (University of Missouri), "Essays on Return Predictability and Asset Management," 2018-2019

M. Lastner (Louisiana State University, Department of Marketing), "Rescuing Relationships: Toward an Understanding of Exchange Relationship Disruption and Recovery," 2017

K. Hesary (Louisiana State University, Department of Mechanical Engineering), "Hybrid Atomistic-Continuum Simulation Methodology for Handling Nanoparticle-Wall Interaction," 2015-2017.

B. Dribus (Louisiana State University, Department of Mathematics), "On the Infinitesimal Theory of Chow Groups," 2014

R. Hogan (Louisiana State University, Department of Accounting), "The Effect of Earnings Persistence and the Market's Reaction to the Alignment of Customer Relations with Corporate Strategy," 2013

H. Hwang (Louisiana State University), "Essays on Institutional Trading Behavior with Conflicts of Interest and Information Sharing," 2013.

C. Meng (Louisiana State University Department of Mathematics), "Correlation and Copula Models for Exit Times," 2008.

Y. Feng (York University). "Three Essays on Executive Compensation and Managerial Incentives," 2008.

J. Hur (Virginia Tech). "Two Essays in Asset Pricing," 2007.

Y. H. Pan (Louisiana State University, School of Music), "The Double Bass Transcription of Selections from 'Suite d'un Goût Etranger' by Martin Marais," 2006

D. Autore (Virginia Tech), "The Revival of Shelf-Registered Corporate Equity Offerings," 2006

B. Cline (Alabama), "Three Essays in Executive Compensation," 2005

V. Sharma (Virginia Tech), "Two Essays on Herding in the Financial Markets," 2004

D. Skaradzinski (Virginia Tech), "An Examination of the Intra-Day Relationship Between Stock Price and Trading Volume," 2003

S. Islam (Virginia Tech), "Investment Cash Flow Sensitivity: International Evidence," 2002

T. Park (Virginia Tech), "Efficiency and Accuracy of Alternative Implementations of No-Arbitrage Term Structure Models of the Heath-Jarrow-Morton Class," 2001

P. Ammermann (Virginia Tech), "Nonlinearity and Overseas Capital Markets: Evidence from the Taiwan Stock Exchange," 1999

S. Priyadarshi (Virginia Tech), "Optimal Bond Refunding: Evidence from the Municipal Bond Market," 1997

C. Valsan (Virginia Tech), "Management and Employee Buyouts in the Context of Romanian Privatization," 1996

W. C. Yun (Virginia Tech, Agricultural Economics), "Tax Treatment of Trade in Live Cattle Futures Using a Mean-Variance Approach: Implications to Market Efficiency and Welfare Changes," 1995. Murphy (Virginia Tech, Agricultural Economics), "The Influence of Specific Trader Groups on Price Discovery in the Live Cattle Futures Market," 1995

J. B. Rowsell (Virginia Tech, Agricultural Economics), "The Role of Mix of Traders in the Price Discovery Process in Live Cattle Futures Markets," 1991

D. M. Smith (Virginia Tech), "An Empirical Analysis of the Choice Among Issuing Straight Debt, Equity and Equity-Linked Debt Securities," 1989

P. T. Torregrosa (Virginia Tech), "An Examination of Tax and Agency Cost Rationales for Long Term Leasing," 1988

S. C. Hudgins (Virginia Tech), "A Theoretical and Empirical Analysis of the Effects of Deregulation in the 1980's on S&L Asset Portfolios," 1987

C. K. Ruff (Virginia Tech), "A Theoretical and Empirical Study of the Usage Levels of Futures Contracts," 1987

W. T. Moore (Virginia Tech), "Agency Theory:  A Model of Investor Equilibrium and a Test of an Agency Cost Rationale for Convertible Bond Financing," 1982

S. K. Perumpral (Virginia Tech), "The Effect of Automatic Dividend Reinvestment Plans on Common Stock Returns:  An Empirical Analysis," 1983

Master's Thesis/Research Paper Committee Member:

H. Rashid (University of Saskatchewan), "Issuances and Repurchases:  An Explanation Based on CEO Risk-Taking Incentives," 2013.

T. Kirrilov (Brock University).  "A Stochastic Dynamic Programming Approach for Pricing Options on Stock Index Futures."  2010.

N. Weber (Virginia Tech), "Reconstructing the Unknown Local Volatility Function."  Virginia Tech Department of Mathematics, 2000

G. F. Sudler (Virginia Tech), "Asian Options," Virginia Tech, Department of Mathematics, 1999

Undergraduate Thesis

C. Silas (LSU), "Is Tesla, Inc.'s Market Value Justified Relative to Its Competitors?," Undergraduate honors thesis, Department of Finance, 2022

J. Breaux (LSU), "Payday Myopia Effects of Income Receipt on Risk-Taking and Decision-Making," undergraduate honors thesis, Department of Psychology, 2021

A. Hebert (LSU), "Strategies for Trading Volatility Using Options," Department of Finance, 2018

*Committees*

Departmental

Promotion and Tenure (LSU), 2003-; Ph.D. program director, 1999-2003; Awards, 2000-2003; Program, 1983-2003; Promotion and Tenure (Virginia Tech), 1983-2003; Ph.D., 1983-2003 (Chairperson, 1992-1993, 1995-1999); Masters in Financial Engineering Proposal Committee, 1993 (Chairperson); Undergraduate Curriculum, 1981-1982, 1988-1989 (Chairperson, 1988-1989); Graduate Curriculum, 1982-1983 (Chairperson); Curriculum, 1981-1982; Summer Research Grant, various years;

College

Ourso Family Distinguished Professor of Information Systems and Decision Sciences Chair Review Committee, 2015; Herman Moyse, Jr./Louisiana Bankers Association Chair of Banking Review Committee, 2013, 2018; William H. Wrightk Jr. Endowed Chair for Financial Services Review Committee, 2020; Promotion and Tenure (LSU), 2003-; Dean's Search Committee, 2007-2008; Distinguished Professorship Chair Review Committee, (Chairperson) 2007; MBA program, 2005-2018-; Flores Chair Review Committee, 2005; Graduate Curriculum, 2003; Honorifics, 1996-2003; International Programs, 1990-1992 (Chairperson, 1990-1992); Promotion and Tenure (Virginia Tech), 1989-1991, 1996-2003 (Virginia Tech); Computer Curriculum, 1985-1986; World Wide Web task force, 1995-1996; Undergraduate Curriculum, 1981-1982; MBA Advisory, 1982-1989

University

LSU Supplemental Retirement Plan Oversight Committee, 2018-; Task Force on Redesign of 403(b) Plan, 2017-2018; Provost Advisory Committee (University P&T), 2013-2019, Chairman, 2016-2019; Graduate Council, 2013-2019; Chair, PS-109 Case, 2013-2014; Task Force on Implementation of the Plus/Minus

Grading System, 2013-; Internal Review Committee, Public Administration Institute, 2011; Technical Advisory Committee, Center for French and Francophone Studies, 2006-2007; Review Committee, Center for the Study of Stochastic Processes in the Sciences and Engineering, 1995-1996

**PROFESSIONAL SERVICE**

Scientific Committee, World Finance Conference, 2019
Guest Web Lecturer, University of Arkansas at Little Rock, April 2017
Doctoral Lecture, University of Macquarie, Sydney, Australia, November 2014
Doctoral Lecture, National University of Singapore, September 2014
Procurer of Best Paper Award in Derivatives from Chicago Trading Company for Financial Management Association, Eastern Finance Association, and Southern Finance Association, 2013.
Journal of Undergraduate Research in Finance Editorial Advisory Board, 2010-
Georgia State University Department of Finance External Review Committee, 2011, 2002 (chair)
University of Oklahoma Finance Division External Review, 2009
PRMIA Academic Advisory Council, 2009-2010;
PRMIA Publications Subcommittee, 2010-2012;
Index Business Association Academic Advisory Board, 2007-2009.
Charlotte Chapter, PRMIA (Professional Risk Managers' International Association), Steering Committee, 2002-2003
New York Mercantile Exchange Institutional Money Management Advisory Committee, 1996-2000.
Associate Editor/Editorial Board,
   Current: **Journal of Derivatives** (since 1993); **Review of Financial Economics** (since 2016)
   Past (various years):  **Journal of Financial Research**; **International Review of Applied Financial Issues and Economics**; **The Journal of Alternative Investments**; **Journal of Derivatives Accounting**; **The Financial Review**; **Journal of Futures Markets**; **Journal of Financial Engineering**; **Review of Futures Markets**
Editorial Advisory Board, **Chicago Board of Trade Research Seminar Series**, 1994-1998**, Journal of Applied Business Research**, 1990-1997.
Referee for **Journal of Investing**, **Journal of Commodity Markets**, **Journal of Risk Model Validation**, **Advances in Pacific Basin Business, Economics and Finance, Business Ethics Quarterly, Chance, The Engineering Economist, European Financial Review, Financial Analysts Journal, Financial Management, Financial Practice and Education, Financial Review, Financial Services Review, Finnish Journal of Business Economics, Journal of Alternative Investments, Journal of Applied Finance, International Journal of Sport Management and Marketing, Journal of Applied Business Research, Journal of Applied Finance, Journal of Banking and Finance, Journal of Business, Journal of Business Research, Journal of Corporate Finance, Journal of Derivatives, Journal of Derivatives Accounting, Journal of Economics and Business, Journal of Finance, Journal of Financial Economics, Journal of Financial Education, Journal of Financial Engineering, Journal of Financial and Quantitative Analysis, Journal of Financial Research, Journal of Financial Services Research, Journal of Futures Markets, Journal of International Money and Finance, Journal of Portfolio Management, Journal of Risk and Insurance, Management Science, Pacific-Basin Finance Journal, Quantitative Finance, Quarterly Journal of Business and Economics, Review of Derivatives Research, Review of Financial Economics, Review of Financial Studies, Review of Futures Markets, Review of Quantitative Finance and Accounting, Review of Research in Futures Markets, Public Administration, International Journal of Sport Management and Marketing, International Review of Applied Financial Issues and Economics, Quantitative Finance and Economics, International Journal of Theoretical and Applied Finance**, Global Finance Journal

International Association of Financial Engineers, 1999.  Compiled a database of financial engineering course syllabi.  http://www.iafe.org/educate/syllabus.html

Grant reviewer, West Virginia University, 1997; Social Sciences and Humanities Research Council, Canada, 1996

Eastern Finance Association.  Program Committee, 2008-2009

Midwest Finance Association.  Program Committee, 2014.

Financial Management Association.  European FMA Program Committee, 2008; secured funding from PRMIA for Competitive Paper Award in Risk Management, 2005; Program Committee, 1986, 1989, 2000-; Competitive Paper Judge, 1989, 1990, 1993, 2005; Ad Hoc Committee to Study the Investment Strategy of the FMA, 1985-1986; Southeast Regional Director, Board of Directors, 1993-1995; Nominating committee, 1994-1995

European Finance Association Program Committee, 2005.

Super Bowl of Indexing, 2005-2008.  Judge for William F. Sharpe Indexing Achievement Awards.

Southern Finance Association Program Committee, 1990

Eastern Finance Association Competitive Paper Judge, 1991

## MEDIA
*Podcasts*

"So Many Ways to be Dishonest."  Interview on Aaron Beam Speaks podcast.  July 3,2020.  Available at:

https://podcasts.apple.com/us/podcast/episode-14-dr-don-chance-so-many-ways-to-be-dishonest/id1502160253?i=1000482408427

*Newspaper and other periodicals opinion/editorial articles*

"Without Flood Insurance, the Risk is all Yours."  **The Advocate**, September 1, 2016, p. 7B.

"Warren Buffett Can Stop Taking Federal Tax Deductions," **Washington Examiner**, October 11, 2011.

"Even the Mere Threat of Drilling Will Bring Down the Price of Oil," **Investor's Business Daily**, August 25, 2008.

"Research and Teaching Go Hand in Hand," **The Roanoke Times and World News**, June 15, 2003, p. Horizon 3

"Lessons from the Corporate Confidence Crisis," **The Virginian Pilot**, August 20, 2002, p. B9

"No Need to Question, Industry Already Open," **Pensions and Investments**, September 18, 1995, p. 14

"A Big Word to Describe a Contract," **Roanoke Times and World News**, February 12, 1995

"A Free Market Look at the Baseball Strike," **Roanoke Times and World News**, February 5, 1995

"Preliminary Study Indicates Optimal Number of Advisors May be 40+," **Managed Account Reports**, July, 1994, p. 13 (with R. S. Billingsley)

"The Flip Side of the Deficit Dollar," **Roanoke Times and World News**, August 29, 1993

"Should Government Subsidize the Arts?" **Roanoke Times and World News**, December 22, 1991

"Some Straight Talk About VRS and Futures,"  **Roanoke Times and World News**, July 10, 1991; **Ledger-Star**, July 11, 1991;  **Virginian Pilot**, July 11, 1991; **The Fauquier Democrat**, July 11, 1991; **York Town Crier**, July 17, 1991

*Radio/Television*

**WAFB News**, Baton Rouge, June 21, 2021; **PippiMama, KIRO Seattle**, December 4, 2018; **WBRZ Television**, September 25, 2008; **WSLS Television**, March 22, 2003; **WFNR Radio**, March 20, 2003; "At Issue," **WBRA Public Television**, November 24, 2002; **WPSK/WFNR Radio**, September 9-13, 2002; "At Issue," **WBRA Public Television**, July 28, 2002; **Metro Radio Network**, June 29, 2002; "The Money Club," **CNBC**, September 18, 1997; "Standpoint," **WSET Television**, Lynchburg, Virginia, November 29, 1987; "Twin County Business Beat," **WBOB Radio**, Galax, Virginia, October 28, 1987; **WVTF Public Radio**, May 28, 1991

*Miscellaneous Commentaries, Interviews, Presentations, Speeches and References*

**WalletHub** (January 18, 2020); **WalletHub** (December 17, 2020); **WalletHub** (October 16, 2019); **Sputnik International** (August 7, 2019**); Sputnik International** (August 12, 2019**); TheRinger.com** (November 15, 2018); **CrainsNewYork** Business (March 13, 2018); **CrainsNewYork Business** (March 22, 2018); **Politico** (February 1, 2018); **WalletHub.com** (November 20, 2017); **The Financial News Seoul** (August 25, 2016); **The Financial News Seoul** (June 6, 2016); **PolitiFact** (February 8, 2016); **CFA Magazine** (July-August, 2015); **PolitiFact Wisconsin** (January, 7, 2015); **FinancialObserver**, Australia (November 17, 2014); **The Daily Telegraph**, Australia (November 11, 2014); **NT News**, Northern Territory, Australia (November 11, 2014); **The Australian**, (November 11, 2014); **The Herald Sun**, Australia (November 11, 2014); **News.com.au**, Australia (November 11, 2014); **The West Australian**, Australia (November 11, 2014); **InvestorDaily**, Australia (November 10, 2014); **FinancialObserver**, Australia (November 7, 2014); **Marketwatch.com**, August 31, 2011; **Northern Trust Wealth: Financial and Lifestyle Perspective from Northern Trust**, Winter, 2010; **PolitiFact.com**, June 28, 2010; **www.learningmarkets.com**, June 15, 2010; **SNL Kagan Media & Communication Report**, May 25, 2010; **Financial Post**, April 10, 2010; **EFinacial Careers**, March 11, 2010; **The New York Times**, March 11, 2010; **The Los Angeles Times**, March 11, 2010; **United Press International**, March 11, 2010; **The Advocate**, February 20, 2010; **Financial News** (Seoul, Republic of Korea), August 29, 2008; **Greater Baton Rouge Business Report**, August 26-September 8, 2008; **Financial News** (Seoul, Republic of Korea), August 29, 2007; **Greater Baton Rouge Business Report**, June 19-July 2, 2007; **The Advocate**, June 16, 2007; **HedgeWorld**, May 24, 2007; **Chicago Business**, December 14, 2006; **The 2006 Indexing Almanac and Directory**, December, 2006; **Hedge World**, December 4, 2006; **Greater Baton Rouge Business Report**, November 21-December 4, 2006; **Bloomberg News**, October 17, 2006; **Greater Baton Rouge Business Report**, September 26-October 9, 2006; **Financial News** (Seoul, Korea), August 31, 2006; **Bloomberg News**, July 31, 2006; **The Daily Reveille**, January 30, 2006; **Risk**, November, 2005; **Financial News** (Seoul, Republic of Korea), September 1, 2005; **Bloomberg News**, August 30, 2005; **Salon.com**, October 11, 2004.; **Financial News** (Seoul, Korea), August 24-25, 2004; **Fortune**, May 31, 2004; **Financial Engineering News**, March/April 2004; **CFA Magazine**, March/April 2004; **Greater Baton Rouge Business Report**, January 22, 2004; **Clearing Quarterly and Directory**, Fall 2003; **Roanoke Times and World News**, May 25, 2003; **Treasury and Risk Management Express**, November 4, 2002; **Kiplinger's Personal Finance**, November, 2002; **The Virginian Pilot**, September 1, 2002; **Fredericksburg Free Lance-Star**, August 8, 2002; **The Daily Record**, February 21, 2002; **CBS Radio**, February 7, 2002; **Forbes.com**, February 7, 2002; **SmartMoney.com**, September 18, 2001; **Best's Insurance News**, May 25, 2001; **Scrap Magazine**, March/April, 2001; **San Francisco Chronicle**, February 23, 2001; **Office.com**, February 2, 2001; **Pensions and Investments**, November 13, 2000; **CBS MarketWatch.com**, September 18, 2000; **Derivatives Strategy**, September, 2000; **Office.com**, March 16, 2000; **Interactive-Week.com**, March 10, 2000; **KnowledgeSpace.com**, February 14, 2000; **Bloomberg News Wire**, September 1/2, 1999; **Virginia Tech Arts & Sciences**, Fall 1999; **SmartMoney.com**, July 7, 1999; **SmartMoney.com**, June 8, 1999; **Montreal Gazette**, April 3, 1999; **Virginian Pilot and Ledger-Star**, March 17, 1999; **SmartMoney.com**, February 3, 1999; **SmartMoney.com**, January 20, 1999; **SmartMoney Interactive**, October 5, 1998; **CBS MarketWatch.com**, July 16, 1998; **New York Times**, July 15, 1998; **Richmond Times-Dispatch**, June 29, 1998; **Bloomberg News Wire**, March 11, 1998; **Andrews Derivatives Litigation Reporter**, February 5, 1998; **Dow Jones News Wire**, December 11, 1997; **ABC News Online**, October 14, 1997; **Virginia Business**, October, 1997; **Institutional Investor**, June, 1997; **Barron's**, May 26, 1997; **AsiaTimes**, April 17, 1997; **Virginian Pilot and Ledger-Star**, November 28, 1996; **Roanoke Times and World News**, November 29, 1996; **Virginian Pilot and Ledger-Star**, August 22, 1996; **Roanoke Times and World News**, September 1, 1996; **Knight-Ridder Financial News Wire**, June 3, 1996; **Roanoke Times and World News**, May 3, 1996; **Derivatives Strategy**, December/January, 1996; **St. Louis Post-Dispatch**, December 17, 1995; **Virginian Pilot and Ledger-Star**, November 9, 1995 and **Roanoke Times and World News**, November 10, 1995; **Futures Industry**, August/September, 1995; **Bloomberg News Wire**, June 14, 1995; **Knight-Ridder Financial News Wire**, April 25, 1995; **Virginian-Pilot and Ledger-Star**,

February 24, 1995; **Virginian-Pilot and Ledger-Star**, February 28, 1995; **Dow Jones Capital Markets Wire**, February 17, 1995; **Roanoke Times and World News**, February 12, 1995; **Roanoke Times and World News**, January 6, 1995; **Richmond Times-Dispatch**, Richmond, Virginia, June 20, 1994; **The Daily Progress**, Charlottesville, Virginia, November 26, 1991; **News Messenger**, Blacksburg, Virginia, January 13, 1991; **Kingsport Times-News**, Kingsport, Virginia, December 11, 1988; **Collegiate Times**, Blacksburg, Virginia, November 3, 1987; **Business Weekly**, Hampton Roads, Virginia, October 26, 1987; **Daily News Record**, Harrisonburg, Virginia, October 20, 1987

*Media Citations of Work*

The **Financial News Seoul** (June 7, 2016); **Business Report**, May 21, 2015; **56: Joe DiMaggio and the Last Magic Number in Sports**, March 2011, pp. 339-340; **MotleyFool.com**, November 24, 2009; **The Wall Street Journal**, November 21, 2009, p. C1; **Futures**, May, 2002, p. 36; **Dow Jones Asset Management**, May/June, 1997, p. 52; **Minerva**, May, 1997, p. 2; **USA Today**, April 29, 1997, p. 12A; **Managed Accounts Report**, February, 1997, p. 6; **Pensions and Investments**, January 6, 1997, p. 29; **Derivatives Strategy**, August, 1996, p. 1; **Derivatives Strategy**, March, 1996, p. 40; **Futures Industry**, October/November, 1995, p. 72; **Pensions & Investments,** June 12, 1995, p. 34; **Futures 1995 Guide to Computerized Trading**, p. 7; **Futures**, June, 1995, p. 52; **Pensions & Investments**, September 19, 1994, p. 55; **Pensions & Investments**, August 22, 1994, p. 9; **Yedioth Ahronoth** (Israel), April 15, 1994; reply, May 25, 1994; **Financial Times Business Reports**, July 1, 1992, p. 16; **Barron's**, August 14, 1989, p. 58; **The Wall Street Journal**, January 17, 1989, p. C1; **Forbes**, October 3, 1988, p. 150; **Wiesenberger's Mutual Funds Investment Report**, July, 1988, p. 6; **USA Today**, January 5, 1988, p. 3B; **Regulation**, 1987, No. 3/4, p. 5

## MEMBERSHIPS

American Finance Association
CFA Institute
Eastern Finance Association

Financial Management Association
Financial Education Association
Society for Financial Studies

## PERSONAL

*Family*

Married two adult daughters; eight grandchildren

*Service activities*

(current) Christ-the-King Parish Finance Council, 2017-

(previous) St. Mary's Catholic Church choir; St. Mary's Catholic School Board, 2000-2001; St. Mary's Catholic School Finance Committee, 2001; Virginia Skyline Girl Scouts Council Financial Management Committee, 1988-1992; Treasurer, Mission Hills Homeowners' Association, 1981-1982; Christ-the-King Parish Advisory Committee, 2014-2016; *Hobbies & interests*

guitar/vocals/music composition; travel; exercise; reading (mostly history and exploration); fiction writing (novels)