Pages 1 - 51

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Joseph C. Spero, Magistrate Judge

IN RE APPLE INC. SECURITIES       )
LITIGATION,                        )   NO. C 19-02033-YGR (JCS)
_____)

                        San Francisco, California
                        Friday, April 15, 2022

          **TRANSCRIPT OF REMOTE VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**: (Appearances via Zoom videoconference.)

For Plaintiffs:
                        ROBBINS, GELLER, RUDMAN & DOWD LLP
                        Post-Montgomery Center
                        One Montgomery Street - Suite 1800
                        San Francisco, California  94104
                  BY:   **SHAWN A. WILLIAMS, ATTORNEY AT LAW**
                        **KENNETH J. BLACK, ATTORNEY AT LAW**
                        **DANIEL J. PFEFFERBAUM, ATTORNEY AT LAW**


For Defendants:
                        ORRICK, HERRINGTON & SUTCLIFFE LLP
                        The Orrick Building
                        405 Howard Street
                        San Francisco, California  94105
                  BY:   **JAMES N. KRAMER, ATTORNEY AT LAW**
                        **ARIEL B. WINAWER, ATTORNEY AT LAW**


Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No. 12219

PROCEEDINGS

1   **Friday - April 15, 2022**                    **10:38 a.m.**

2                    P R O C E E D I N G S

3                         ---o0o---

4        **THE CLERK:**  We're resuming session with the

5   Honorable Joseph C. Spero presiding.

6        The next matter we're calling is 19-CV-2033, In Re:

7   Apple, Inc. Securities Litigation.

8        Counsel, could you please raise your hands.

9        Good morning.  Appearances, please, I guess, starting with

10  the plaintiff, then the defendant.

11       **MR. WILLIAMS:**  Good morning, Your Honor.

12  Shawn Williams, Robbins Geller Rudman & Dowd, on behalf of

13  plaintiffs.

14       **THE COURT:**  Good morning, Mr. Williams.

15       **MR. BLACK:**  Good morning.  Kenneth Black, Robbins

16  Geller Rudman & Dowd, also on behalf of plaintiffs and the

17  class.

18       **THE COURT:**  Good morning.

19       **MR. PFEFFERBAUM:**  Good morning, Your Honor.

20  Dan Pfefferbaum, Robbins Geller Rudman & Dowd, also on behalf

21  of plaintiffs and the class.

22       **MR. KRAMER:**  Good morning, Your Honor.  James Kramer.

23  And with me is my colleague, Ariel Winawer, at Orrick

24  Herrington & Sutcliffe, for Apple, Inc., Tim Cook, and Luca

25  Maestri.

**PROCEEDINGS**

 1          **THE COURT:**  Good morning.

 2      So I have a couple of preliminary issues I want to talk to

 3  you about before we get into the details.

 4      On the sealing issue, just sorting through it, I take it

 5  that it is Apple's position that of all these papers, the only

 6  things that need to be sealed are Exhibits 7 and 8 to the Black

 7  reply declaration?

 8          **MR. KRAMER:**  That's correct.

 9          **THE COURT:**  So I can't hear you for some reason.

10          **MR. KRAMER:**  Yes, Your Honor, you're correct on the

11  sealing issue.

12          **THE COURT:**  I know Mr. Kramer is very soft-spoken, so

13  we'll try to remedy that.

14      Okay.  So 7 and 8 are the only things that need to be

15  sealed.  So the second is, we're pretty late in the day, and I

16  wanted to figure out how late in the day we are.

17      What is the timing here?  What's going on in the case

18  that's coming up?

19          **MR. KRAMER:**  Yes, Your Honor.  Discovery closed last

20  month.  We have expert -- initial expert reports are due,

21  I believe, on the 27th of April.  And we have a schedule for

22  expert discovery through the summer.  And Judge

23  Gonzalez Rogers, as you may know, Your Honor, has a process

24  where you file a letter requesting to file a motion for summary

25  judgment, and we have a deadline for that in the fall.  That's

**PROCEEDINGS**

 1    the extent of our schedule.

 2           **THE COURT:**  So in terms of the deadline in the fall,

 3    is for her -- is for the applications to file a summary

 4    judgment motion?

 5           **MR. KRAMER:**  That's correct, Your Honor.  Then

 6    I believe there is -- 30 days thereafter is when the motion is

 7    due.  That's correct.  We do not have a trial date.

 8           **THE COURT:**  So the reason I asked this is because I'm

 9    trying to figure out how fast we need to move on this stuff.

10        It is -- it strikes -- and it strikes me that you may or

11    may not need these for your summary judgment motions, but I'm

12    not sure that they're particularly critical before then.  So

13    that any plaintiff counsel want to disagree with that?

14           **MR. WILLIAMS:**  Good morning, Your Honor.

15    Shawn Williams.

16        Just very quickly.  Number one, Mr. Black is going to be

17    doing the substantive argument today, but just to answer your

18    question, it's just not -- I'm not sure whether the documents

19    will be critical for the upcoming expert disclosures and the

20    depositions that will be taken of the potential experts.  We're

21    just not certain, obviously, because there are a lot of

22    documents that we don't know if we're going to receive.  And we

23    obviously don't know --

24           **THE COURT:**  Well, they won't be critical for your

25    disclosures next week.  I think that's fair.  That would be

1   fair to say.

2           **MR. WILLIAMS:**  I don't think so.

3           **THE COURT:**  And well, I -- I'm going to, you know, I'm

4   going to -- I think that by and large that means the answer is

5   we need these for the case.  We're not really sure that we need

6   them for any particular experts, but you're disclosing your

7   experts next week, so I'm not really sure what the -- how they

8   could possibly be critical for that.  So I'm going to treat

9   them like we have a little time.  That's probably in

10  everybody's interest to treat this like we have a little time.

11          So I'm -- I want to divide these up the way the plaintiffs

12  did in terms of our discussion.  The first group of documents

13  is documents related to the January 2nd, 2019 investor letter.

14  It seems to me indisputable that one purpose of the letter, and

15  therefore, one purpose of the drafting process was certainly

16  business, not legal.  And so I think it is -- in that context,

17  sort of naked assertions don't work.

18          Naked assertions that the document contained legal advice

19  or the document sought legal advice or the drafting process was

20  overseen by in-house counsel or that the in-house counsel, in

21  general, was looking to make sure the disclosure complied with

22  the law, those are not sufficient to sustain the burden of

23  showing that the primary purpose of the particular documents

24  involved were for -- to solicit or to give legal advice,

25  neither the actual entries in a particular schedule of

1   privileged documents or, you know, Mr. Whittington's, for

2   example, general, one-paragraph assertions in his declaration;

3   they're just woefully inadequate.  There's not -- it doesn't

4   address and the defendants don't address any specific documents

5   at all, and that's just not going to work.

6       Second, if -- since this is a drafting process for a

7   document that has, at least among its purposes, business

8   purposes, you can't just not produce the entireties of

9   documents going into that drafting process because some part of

10  it will be -- may be privileged and some part of it won't.  So

11  I would have expected, with respect to that kind of a process,

12  there to be a production with redactions, if there are, indeed,

13  portions that are actual privileged communications.

14      Third, just because some staff prepared some document at

15  the request of in-house counsel who was supervising the

16  production of this essentially press release, does not show

17  that -- the each primary purpose of any such document was

18  privileged.  This is largely some of the attachments, I

19  suppose.  But -- and I particularly can't glean the actual

20  purpose of the -- those kinds of documents just from that

21  generalized description.  And you have to do better than that

22  if you want to sustain your burden.

23      Many of them, you know, clearly don't have -- don't sound

24  like a thing that would be privileged.  There is one, you know,

25  Number 453 is, "iPhone activation terms."  I mean, perhaps

**PROCEEDINGS**

1   there is a way in which disclosure of the information contained

2   in that discloses some privileged information; you haven't

3   shown it.

4        So I would say, so far, you have not sustained your

5   burden, and it's a high burden.

6        On the other hand, you know, just because counsel,

7   in-house and out-house, completely dropped the ball on

8   sustaining their burden, doesn't mean I'm just going to order,

9   willy-nilly, all these documents produced because I won't do

10  that.  With respect -- and these are really -- this is -- I

11  treat this category first because it seems the most important

12  one.  It's at the core of the issues in this case.  The others

13  are secondary, but these are the most important.

14       I have two things I want to discuss with respect to these.

15       Number one is:  What would be legal and what would be

16  nonlegal advice in this context?

17       I don't buy either side's description of the general state

18  of the law with respect to advising on regulatory compliance.

19       It is neither the case that advice regarding regulatory

20  compliance is always legal, nor is it the case that advice

21  regarding regulatory compliance is always business.  It's very

22  specific.

23       So what I really want is sort of some real-world examples

24  about what advice would be that was given about in this

25  drafting process, that is contained in these -- the kind of

**PROCEEDINGS**

1   advice that might be contained in these documents that would be

2   business advice or legal advice.  That's for both sides.

3       Second, I don't see a way through -- I see a couple of

4   ways through this, other than just denying or overruling the

5   privilege assertion.  One is, I could order the production of

6   the documents with whatever is the legal advice redacted.  I

7   might do that anyways, in conjunction with the second

8   possibility is, I can take a look at a small number of these

9   documents and give them to -- my rulings on them, and you could

10  work from there.  And by "small," I mean, like, 10.  I don't

11  mean dozens.  Some sampling, maybe each side picks five

12  documents they want me to do that will help them.  And then you

13  guys meet and confer on the rest.

14      It's, you know -- it's the kind of thing that I would

15  expect that if you had a guidance from the Court on all these

16  things, you could work out.  I could be wrong, but we'd have to

17  do it rather rapidly.

18      So that's my thoughts on the first category of documents.

19  Let me hear first from the defendants.

20          **MR. KRAMER:**  Thank you, Your Honor.

21      On the -- with regard to questions Your Honor raised, I'll

22  start with those first.

23      In terms of differentiating between legal and business

24  advice, some of the legal advice, I think, is inherent in this

25  process here is, first:  Is there an obligation to the letter?

**PROCEEDINGS**

1    Is there an obligation of prerelease?

2        Second --

3        Can you hear me, Madam Court Reporter?

4        Okay.  I'll try to speak louder, Your Honor.

5        **THE COURT:**  So some of these documents have in it

6    advice about whether or not you have to at all issue the

7    letter?

8        **MR. KRAMER:**  Yes, Your Honor, whether you should or

9    should not.

10       As Your Honor knows, under the securities laws, there is

11   no obligation to prerelease.  And there is always a balance you

12   go through, and that happened here.  Should we or should we not

13   send the letter.  And, of course, the next issue is --

14       **THE COURT:**  Why is that a legal issue?  If there is no

15   obligation to prerelease, isn't this entirely a business issue?

16       **MR. KRAMER:**  No, Your Honor.  Because there is legal

17   risk from prereleasing or not prereleasing.  So, for example --

18       **THE COURT:**  So it's not -- the reason I'm saying that

19   is because you said the issue was, is this -- is there a legal

20   obligation to prerelease.  That's not the legal issue you mean.

21       The legal issue is what?

22       **MR. KRAMER:**  The legal is -- is it, from a risk

23   perspective under the securities laws, is it better to

24   prerelease, or is it better to wait until the normal day when

25   you're going to report your earnings, and which creates the

1    least amount of risk from a litigation perspective?

2        That's always an issue that I deal with regularly with

3    clients.  And that is an issue that came up here as well --

4    right? -- knowing that if its stock price declines, you're

5    going to get sued.

6        **THE COURT:**  And the -- I don't know that I need a

7    lawyer to tell me that, but that's almost like a business

8    issue.  It's -- why is that -- I guess that's -- it's an

9    interesting question whether or not that's legal advice within

10   the meaning of this -- of the privilege laws.

11       Because, you know, any senior vice president at Apple

12   talking to another senior vice president knows that if they say

13   something and there's a stock drop, they're going to get sued.

14       So I'm not quite sure -- the securities law risks,

15   you know, could be something different.  If you don't disclose

16   this, then you are at risk for actually having been found to

17   have not timely disclosed some adverse event or something like

18   that.

19       I'm not -- why is it the case that if you don't disclose

20   it -- if you disclose it now, there will be a stock drop?

21       Why is that a legal issue?

22       **MR. KRAMER:**  Because there is, as you just pointed

23   out, do you need to prerelease?  You just said there is --

24   could be a disclosure issue.

25       In order to make that assessment -- right? -- there is no

 1    duty to update the market.  You need to look at the company's

 2    statements, historic statements, and say, Did you say or do

 3    anything which led the market to believe that you would provide

 4    an update if things change?

 5         That's always the first legal issue.  You have to --

 6         **THE COURT:**  And if you conclude that you did say

 7    something to the market that indicated you would provide an

 8    update, then what do securities laws mandate?

 9         **MR. KRAMER:**  Then when you have -- when you have

10    information, you need to provide some disclosure.  But, of

11    course, the issue is you need to have full and complete

12    information; any time you speak, you have to have that

13    information.

14         So -- but once you've gone through that process of saying

15    "Do I have a duty to update," then the question is, from a

16    legal matter, "Do I -- as a legal matter and from a risk

17    management perspective, is it better for me to prerelease and

18    go to the market early at a time that the market might not be

19    expecting news, or is it better for me to wait until my

20    ordinary day, my ordinary cycle of disclosure?"

21         And, Your Honor, I deal with this all the time with public

22    companies where they say, What are the benefits?  What are the

23    downsides from a litigation perspective?

24         And I help them analyze this.  And this is part of their

25    world gestalt.  And then, of course, the issue is:  If you're

**PROCEEDINGS**

1  going to prerelease, what do you say?  How much detail do you

2  give?  How confident are you that all of the information you're

3  giving is fully complete?  Are the facts still evolving?

4      Because you don't want a situation where you release

5  information and then, a few weeks later, new information comes

6  in.

7      This is all under the context of Rule 10b-5.  So this

8  is --

9          THE COURT:  Well, it's not just all in the Rule 10b-5.

10  It's also a business issue -- is it not? -- that you want to --

11          MR. KRAMER:  Absolutely, Your Honor.  Absolutely, it

12  is a business issue.

13          THE COURT:  Okay.  But that's -- so I'm -- okay.  So

14  I'm trying to figure out which predominates eventually.

15      And, you know, the -- and so that's my question.  So go

16  ahead.  You were saying how much detail you give, whether it's

17  complete.  You think those are -- those are both business and

18  legal issues, I assume.

19          MR. KRAMER:  So I will tell you that from my

20  perspective as a securities lawyer, these are certainly legal

21  issues.  And Your Honor, everything is in the context of

22  business.

23          THE COURT:  No.  So that's not -- you're not answering

24  my question.  It is both a business and a legal issue.

25      So the question about whether or not you've given complete

1   information, okay, there is a securities law angle on that, I

2   assume.  But it's also a business law, business issue.  Have we

3   told them everything that we're going to tell them about this,

4   or are we leaving something out that's going to come bite us in

5   the ass later?

6          MR. KRAMER:  Or is something likely to happen in the

7   future?  The question I get asked is, Jim, if I disclose X and

8   that's all we know today but then Y happens next week, do we

9   wait for Y to occur?  Under the securities laws, are we better

10  to wait?

11         THE COURT:  Why -- why -- so why would it be better

12  under the securities law to wait?

13         MR. KRAMER:  Because you need to make sure when you

14  speak on a topic you are complete and accurate.  And we deal

15  with this in the context of a plaintiff's bar that sometimes

16  take very aggressive positions on what is complete and

17  accurate.  So that is the legal advice I bring to bare in that

18  context.  And we try to look at it from what we know today,

19  play out scenarios, and then look at in hindsight.  And so we

20  make decisions on, Do we prerelease?  If we do, what do we say?

21  And then what's the timing; right?

22         So do you prerelease -- so Apple's -- Mr. Cook's letter

23  went out on January 2nd.  It could have gone out on

24  January 10th -- right? -- it could have gone out on

25  January 17th.  That's all part of the legal.

1          But, Your Honor, I understand the point.  There are

2    business aspects here, and we did not log each of the -- we

3    didn't provide a declaration on each of the documents because

4    the dispute was about the category.

5          We're here, Your Honor.  We are happy to go back and go

6    document by document, and provide the backup.  I'm confident we

7    can do it.

8          And we also heard, Your Honor, on the redaction piece --

9    and we will take a harder look at this, a second time, and do

10   our best to redact and provide those.

11         That's what we can do, Your Honor.  I heard you.  I heard

12   you.

13         THE COURT:  Well, so -- but I'm -- you know, all of

14   the things you're talking about are -- at least the first

15   couple -- are pretty general.

16         Is now the time?  Is the risk that you'll wait -- do it

17   later, create a greater risk than doing it now, or is the

18   greater risk to actually come to the market now?

19         Is it full and complete?

20         You know, those are -- well, I don't know, full and

21   complete, maybe not.

22         But there are lots of commentary on drafts here, for

23   example.  I'm not understanding why the categories that you've

24   talked about -- which you can go over in a board meeting or

25   meeting with an executive, you know, and talk about -- would be

1  contained in these dozens and dozens of documents.

2        **MR. KRAMER:**  Well, Your Honor, all I can tell you is

3  that per the declaration of Mr. Whittington, he was deeply

4  involved, as was the general counsel in all of these -- in

5  these discussions.  He was involved in the process from day

6  one.

7        This is not like the typical process where the company

8  issues its K or Q on a given day.  This is a process where

9  Apple's legal was at the starting line on day one.  And when

10  the discussion happened, We feel like we are not going to hit

11  our guidance.  What should we do?  What are we legally

12  obligated to do?  When do we do it?  And what do we say?

13        That's this category here.  And that's the process.  And

14  we provided Mr. Whittington's declaration that says:  I was

15  there at the beginning.

16        It's not the normal process.  He was there, as was legal,

17  on day one.

18        **THE COURT:**  So what?  So what?

19        You know, the problem is this is a document that has a

20  tremendous and obvious business purpose.  You know, you want to

21  get ahead of things.  You want to be the one to disclose it.

22  You've got this article out there that is trashing the way the

23  company has done its disclosures, and you want to get out ahead

24  of this.  And that is -- there is a market and business reason

25  for doing that, in addition to whatever the securities law

**PROCEEDINGS**

1    reasons would be.

2         The fact that you have it headed up by somebody in -- or

3    even involved in many of the drafts and decisions by a lawyer,

4    doesn't cloak that in attorney/client privilege.  It simply

5    doesn't do it.

6         Of course --

7              **MR. KRAMER:**  I have to disagree with you, Your Honor.

8              **THE COURT:**  Of course.

9         So it doesn't answer the question that he was involved in

10   every part, or that he was in it from the beginning.  It

11   doesn't answer the question.  It doesn't begin to answer the

12   question.

13        The question is:  How do I decide, when he says, "No,

14   change it to 'and/or,' or change it to 'edit this way,'"

15   whether that's legal or business advice?

16             **MR. KRAMER:**  Fair question, Your Honor.

17        From a pragmatic perspective, what I think we should do is

18   provide you specific information on specific documents that

19   will allow you to make -- to balance the approach.  I think

20   that's what we need to do.  Because I understand the pragmatic

21   issue the Court has to address.  And I'm confident that it

22   wasn't just "and/or."

23        And if it was just "and/or," I'm pretty confident I know

24   that Your Honor would say that's not privileged.  But we're

25   going beyond "and/or."  And I'm confident we can make that

**PROCEEDINGS**

1   showing and show -- as you pointed out at the beginning, we

2   have time.

3       We're happy to come up with a process.  We can work with

4   the Court or work with opposing counsel to come up with a

5   process to give the Court more granularity on a privilege log

6   or on a declaration to help the Court draw some lines on where

7   privilege would be appropriate.

8       **THE COURT:**  Okay.  Let me hear from the other side on

9   this category.

10       **MR. BLACK:**  Thank you, Your Honor.  Let me respond to

11   two quick things.

12       First, Mr. Kramer just spoke entirely in hypotheticals.

13   He talked about what he advises other clients on.  This is what

14   we've been doing for months and months.  Defendants phrase

15   hypotheticals, and then they won't give us any of the

16   information about specific documents, which we can do.

17       So, for example, I'd opposed Matt Blake.  Matt Blake wears

18   two hats.  He was in both investor relations and in the finance

19   department, or team.  He testified that they had meetings about

20   the investor -- not just the investor letter, but whether or

21   not to preannounce.  And they involved a number of people,

22   mostly nonlawyers.

23       And they brought in more people for the second meeting

24   they had that were nonlawyers because they needed to talk about

25   all the different issues that were involved.

**PROCEEDINGS**

1      So that doesn't mean that no legal issues came up or that

2  no lawyers were present for this entire process.  But it does

3  mean that, just as Your Honor pointed out, these are

4  dual-purpose business and legal -- or at least purportedly

5  legal -- documents that they've withheld, hundreds of documents

6  over.

7      The second point I'll make is that they can raise these

8  hypothetical points, but they contradict what they've already

9  said; in particular in their log, but elsewhere.  So we have

10  these seven documents that are in Category 4 that also go to

11  Category 1, the investor letter.

12      They said all of those are drafts of the investor letter.

13  But according to the privilege log, they are not.

14      For example, the one that comes from --

15      **THE COURT:**  No.  No.  I'm going to step back.  I don't

16  want this kind of an argument.

17      Both sides did a terrible job of briefing this.  I'm not

18  very interested in the way you're arguing it.

19      I know it's obvious they missed, you know, four of the

20  seven documents on Category 4; they just blew right by them.

21  But I'm actually not addressing that.  I'm addressing the

22  issues that I gave you.  So I need to know what would be --

23  what would you agree would be legal advice in this context that

24  would be with respect to this drafting process, and what would

25  you say would be business advice?

**PROCEEDINGS**

1        **MR. BLACK:**  Fair enough.  I think we would agree that

2  there could be legal advice concerning the decision, you know,

3  the disclosure and meeting any requirements, legal

4  requirements.  We just haven't seen any descriptions of that.

5        **THE COURT:**  Like what?

6        **MR. BLACK:**  Like, for example?

7        **THE COURT:**  Yeah.  Give me an example.

8        **MR. BLACK:**  So if you had something explicitly saying,

9  "We think you're going to get sued if you say the following,"

10 that would be legal advice, and that type of line could be

11 easily redacted.

12       **THE COURT:**  So they have to explicitly tie it to a

13 securities law risk in order for it to be legal advice?

14    They can't just say, "My advice would be that you not say

15 that"?

16       **MR. BLACK:**  I think that would be an example, yeah.

17    I think it has to be tied to a specific risk, rather than

18 just saying, Well, securities are involved, and there's always

19 risk, therefore, there is securities law risk.

20    And that's what Mr. Whittington's was advising on

21 generally.

22       **THE COURT:**  Well, but so that means that every lawyer

23 whenever they talk to their client, every in-house lawyer,

24 whenever they talk to their client and they're giving legal

25 advice on whether or not something might present a risk of

**PROCEEDINGS**

1   being sued because of doing it this way instead of that way,

2   and it goes through this drafting process and there is a

3   hundred things they comment, every time they comment they have

4   to say:  And, by the way, I'm saying this because there is an

5   additional risk of your being sued.

6       They can't just be a lawyer and say:  My advice is as a

7   lawyer -- which is, by the way, implicitly to keep you from

8   being sued -- is that you not say it that way.

9       They can't do it that way?

10      **MR. BLACK:**  There is no bright-line rule for the

11  manner in which a lawyer must phrase his advice.

12      **THE COURT:**  Okay.  So if they gave advice and that

13  advice was based in -- even if it isn't explicit -- their view

14  that they were at greater legal risk if they drafted it X

15  instead of Y, or did it on such date instead of this date, or

16  did it not at all as opposed to doing it, those would be --

17  that would be legal advice.

18      **MR. BLACK:**  So this is why I think declarations are

19  required in this type of situation.  Because if say

20  Mr. Whittington said, "I think January 2nd is better than

21  January 7th," without any context, that could be legal or it

22  could be nonlegal.  Right?  It could be a good business

23  decision to do it on the 7th rather than the 2nd.  You don't

24  know.  That's why you need Mr. Whittington to say, "For the

25  following five documents, I was advising in a legal manner for

1    the following reasons," or whatever he might say.

2          THE COURT:  So the actual advice itself doesn't

3    necessarily have to be couched in terms of they're going to get

4    sued more.  So if they advise to take an action.

5          MR. BLACK:  If Mr. Whittington says in a declaration,

6    "I advised them to announce on this date because I was worried

7    about -- I thought there was a legal risk to getting sued on

8    that date but not this date," that would give you exactly the

9    information you need here, even if the advice was phrased in

10   the general sense at the time.

11         THE COURT:  Right.  Of course, they can't put that in

12   the public record or even the record you can see; right?

13         MR. BLACK:  It would depend on -- I'm giving a

14   hypothetical scenario.

15         THE COURT:  I understand.  But what I'm trying to

16   figure out what it is.

17       So Mr. Whittington gets in there and he says:  I want you

18   to do it on the second, not the fourth because we -- because we

19   need to get out there sooner rather than later.  And if you let

20   the market absorb this information for two more days, that's

21   two more days you're likely to get sued on.

22       What does he have to say in a declaration without giving

23   away the legal advice to satisfy you that that was done because

24   of the legal risk?

25         MR. BLACK:  So I think the key thing is it needs to be

**PROCEEDINGS**

1  tied to the specific document.

2      **THE COURT:**  So if he says, "I advised in these

3  specific documents for changes to be made because of the legal

4  risk with regards to being -- legal exposure under the

5  securities laws," that would be sufficient?

6      **MR. BLACK:**  So I think it depends.

7      If we're using the hypothetical we were just using about

8  the timing of the announcement, then I think he needs to say,

9  "I was giving advice about the timing in the following five

10  e-mails," or whatever it is.

11      **THE COURT:**  Well, that's getting pretty close to

12  giving his legal advice -- right? -- because if he's giving

13  advice on the timing and they did it on the 2nd, you know he

14  advised, likely, that it was done on the second.  So I'm not

15  really sure that -- you're not really suggesting that he has to

16  give a public declaration with that level of detail.

17      That's why I'm wondering whether or not what you're

18  ultimately saying is if he gives a declaration that says in

19  this specific document -- you know, whoever the lawyer was that

20  was giving the document, giving the advice for those documents

21  that are lawyer-drafted, you want the lawyer to say, "I gave my

22  comments that are contained in this document that aren't --

23  that are redacted" -- and go through that process -- "based on

24  the need to advise the company regarding the legal risk under

25  the securities laws," or something like that.

1        Is that what you're talking about?

2            **MR. BLACK:**  Depending on the context, that might work.

3        Right now what we have is generic descriptions about the

4   things that are related to the investor letter, and so we don't

5   even know what key issues are involved or whether we even want

6   the document, whether it's relevant.  If it's just between, you

7   know, noon and --

8            **THE COURT:**  Well --

9            **MR. BLACK:**  -- 5:00 p.m. one day, we don't need that

10  level of detail.

11           **THE COURT:**  Well, I understand that.  You know,

12  that's -- but I don't see how you get into that level of detail

13  without disclosing the legal advice.

14       How would you propose they give you that -- satisfy what

15  you just said without actually exposing the legal advice?

16           **MR. BLACK:**  So I think you could generally describe,

17  "I was giving advice about the nature of the contents of the

18  disclosure or the timing of the disclosure," without saying

19  anything about which days or times you were specifically

20  advising for or against.

21           **THE COURT:**  You know, if they say, "I was giving

22  advising about the timing of the disclosure," that's getting

23  pretty close to it.

24       If they say something like, "I was giving advice about the

25  nature of -- you know, nature, timing and content of the

1  disclosure with respect to the legal risks under the securities

2  laws," that's a little more general.  It contains a -- sort of

3  the list of all the possible things one gave advice about.

4       But, you know, it also seems to me that it exposes --

5  maybe it's general enough, but is that what you're talking

6  about?

7       I'm worried about one where you say, "Well, on this

8  document, I was talking about timing and it was because of

9  this.  On this document, I was talking about whether or not we

10 should do it at all."

11      And it was this --

12      **MR. BLACK:**  My concern is, *In Re Grand Jury* and other

13 cases say you can't just add layers of lawyers.  And that looks

14 like what they've done.

15      I don't particularly want to read 286 declarations going

16 to, you know, the 286 documents in our Category 1.  But if

17 that's what they're going to do, I think that's what they need

18 to do.

19      **THE COURT:**  So you're not answering my question.

20      How is what you've just asked for consistent with the rule

21 that they can't and don't have to expose the legal advice?

22      **MR. BLACK:**  Okay.  So it's correct that they don't

23 have to expose the legal advice, but you do have to say

24 something about the nature of the legal advice.  And I think it

25 depends on the content.  So I haven't seen these documents

1  saying that it was advice about, you know, a securities

2  litigation risk, might be sufficient in some cases.

3       **THE COURT:**  It's probably all of them.  You know, it's

4  going to be some risk under the securities laws.

5       **MR. BLACK:**  So that's right.  But you can't have a

6  blanket -- you know, for 286 different documents, you can't

7  have the same description.

8       **THE COURT:**  Why not?  I mean, so it's -- I mean, I'm

9  not disagreeing with you, but I am asking why not.

10       So, for example, what Mr. Kramer would probably say is:

11  That's exactly what we did, is that -- is for each of these

12  documents the lawyer's advice was whether or not -- was advice

13  that was based on the lawyer's opinion about the securities

14  litigation risk.

15       **MR. BLACK:**  So we know the documents were different

16  enough that that can't be the case.  And I can give you an

17  example if you'd like.

18       **THE COURT:**  Give me an example.

19       **MR. BLACK:**  Okay.  So in our papers, we objected to

20  attachments 465 through 468, which are all attachments to an

21  e-mail, 464.  The attachments are all different.  So 465 is a

22  document from 2013.  We don't know what 466 or 467 are because

23  there's no file name or other information.  We don't know what

24  468 is, but the file name is "Paste Graphic."  And from

25  reviewing their other documents, those are usually charts.

**PROCEEDINGS**

1      Those are all going to be different documents, and they

2  should have individualized privilege descriptions.

3      **THE COURT:**  Okay.  And the individualized privilege

4  description for them is going to be something like -- and we

5  can get to this issue -- Well, I had my staff collect

6  particular information in order to advise on whether or not

7  there was a securities litigation risk in the course of action

8  and what should be done about it.

9      Then what do you do?

10     **MR. BLACK:**  If it is, in fact, to assess the

11 litigation risk, that would be good to know, and maybe that

12 would be enough.

13     Here, it looks like they're collecting support for

14 different assertions they're going to make in the investor

15 letter, most likely; although, that's speculation because we

16 don't have enough information about these.

17     And so I think you need something a little bit more

18 specific saying, you know, why they were collected, and why

19 disclosure of documents that look to be just supporter data

20 would necessarily reveal the privileged communications between

21 a lawyer and a client.

22     **THE COURT:**  Well, so the hypothetical is that the

23 lawyer looks at a particular piece of the document and says to

24 his staff:  I need to make sure that we don't get sued because

25 we're saying that there were 247 widgets sold.  Can you get me

PROCEEDINGS

1    the data for that?

2         They go out and do it, and they provide it.

3         Or is that privileged?

4              **MR. BLACK:**  No.

5              **THE COURT:**  It's not?  I see.

6              **MR. BLACK:**  The attachment is not, no.

7              **THE COURT:**  So they generate a document that collects

8    a bunch of data to verify -- so that they don't run afoul of

9    the securities laws -- the statement made in the letter.

10        That's not privileged?

11             **MR. BLACK:**  No.

12             **THE COURT:**  So if the lawyer said in the e-mail to the

13   client, "I've looked at all these numbers myself, and they

14   confirmed that blah, blah, blah, blah, blah, so there is no

15   securities law risk in saying that," that would be privileged?

16             **MR. BLACK:**  That e-mail would be most likely be

17   privileged.

18             **THE COURT:**  But the underlying data that the lawyer

19   looked at, collected, to figure it out?

20             **MR. BLACK:**  Not unless it's tied to something that has

21   as its primary purpose, you know --

22             **THE COURT:**  Well, the primary purpose of the lawyer

23   collecting this, as opposed to someone else collecting this, is

24   to verify that the number of the disclosures are accurate so

25   that they don't have a securities law risk -- as opposed to

1    coming up with the numbers in the first place.

2           **MR. BLACK:**  So underlying facts are not privileged

3    unless they have their own unique claim of privilege.  So if we

4    just -- the number we sold, X number of widgets, that would not

5    be privileged.

6        The lawyer's interpretation or advice based on that data

7    could be.  But unless the lawyer is writing in the margins of a

8    spreadsheet or something like that, there is no reason -- or if

9    the document is -- will necessarily reveal the contents of the

10   privileged communication -- which is not the case with,

11   you know, we sold X number of widgets -- then the attachment is

12   not privileged.  The e-mail might be.

13          **THE COURT:**  Hang on a second.

14                  (Pause in proceedings.)

15          **THE COURT:**  So maybe I'll get Mr. Kramer to comment on

16   that particular issue while we're on it, because it was one

17   that concerned me.  There were a number of attachments here

18   that were just data, I mean, from their description.  Some of

19   them not current data, actually, that somebody at the direction

20   of general counsel went out and got.

21       I guess -- and Mr. Black's point is a couple of points.

22   One is that, obviously, the data itself, regardless who

23   gathered it, is not privileged.  And it's not obvious to me

24   why.  And, obviously, if the data was gathered to put a number

25   in or to write a disclosure of business data, I'm not sure that

PROCEEDINGS

1  would be privileged.

2       But maybe you should respond to what he says.

3       **MR. KRAMER:**  Thank you, Your Honor.

4       If a lawyer -- so first, corporate lawyers buy legal

5  advice, not just litigators -- right? -- and corporate lawyers

6  are deeply involved in all company disclosures, first.

7       Second, if a corporate lawyer said, "I want specific

8  information pulled" -- and I'm just talking about the situation

9  where it doesn't already exist -- but I ask that someone runs a

10 report or pulls information so I can check something, I can

11 confirm, I can make an assessment of whether or not the

12 document complies with the law," that -- that communication

13 would be privileged.

14      Now the data, if it otherwise exists in a report, I agree,

15 you can't take -- if there is a report out there -- after the

16 fact, the lawyer can't say, "Give me that report from last

17 quarter, and I'm going to look at it," and now all versions of

18 that report is privileged.

19      But we're not taking that position.  In fact, one of

20 documents that has been produced in this case involves what the

21 company sales were as of the time that the -- Mr. Cook's letter

22 went out.

23      You will see in the privilege log that that information is

24 something that is identified as being part of an

25 attorney/client communication.  We did not withhold all

1   versions of that document simply because a lawyer said, "I'd

2   like to see it."

3        What we did do is when a lawyer said, "In order for me to

4   provide legal advice, I would like to confirm the following

5   information," or "I would like the client to confirm and pull

6   this information," in that situation, when it was specifically

7   requested by a lawyer and not otherwise exist, we did put that

8   on the log, Your Honor.  So that's why we draw the line; if

9   that makes sense.

10       **THE COURT:**  To a certain extent.

11       So if -- I guess you're -- I mean, there are sort of two

12  kinds of things, two questions that occur.

13       One is:  None of these documents are ones in which the

14  lawyer wrote in the disclosure that was based on the documents

15  that are attached or that he had pulled together.

16       None of them; right?

17       **MR. KRAMER:**  I'm sorry.  I'm not understanding.

18       So some of these documents do, they do have comments from

19  the lawyer typed in.  We do have some handwritten comments.

20       I just want to make sure I'm understanding your question.

21       **THE COURT:**  My question is this:  You used the word

22  "confirm."  So that suggests that somebody other than the

23  lawyer wrote the aspects that needed to be confirmed, and the

24  lawyer wanted to check them and make sure that there was

25  justification for them; and they said, "Pull together this for

**PROCEEDINGS**

1   me so I can confirm that."

2       It would be a different story if, for example, the

3   disclosure in the investor letter about how many widgets were

4   sold was written by the lawyer in the first instance.  Then

5   there might have been a harder argument that it is not a

6   business decision instead of a securities laws decision.

7       So that's my question.  Is it always the case in these

8   that to the extent that the lawyers are asking for backup, and

9   all these documents that you say the generic description of the

10  privilege log is something like, you know, "information

11  gathered at the request of counsel in order to give legal

12  advice," in all of those cases, they are not to -- they are to

13  confirm a disclosure that someone else has written.

14      **MR. KRAMER:**  That is not always the case, Your Honor.

15      **THE COURT:**  So sometimes the lawyer did this to come

16  up with the numbers on their own?

17      **MR. KRAMER:**  Well, as to a number, the numbers are

18  what the numbers are.  But as to the -- we're talking about a

19  document as a whole -- right? -- the letter includes lots of

20  information.  That letter is five-pages and includes lots of

21  information, and lawyers were involved in drafting portions of

22  that letter.

23      **THE COURT:**  I'm not saying they didn't draft portions

24  of it.

25      I guess I'm trying to understand the backup data, the lots

1   of attachments.  There's lots of documents that say:  We

2   gathered this information in order to give legal advice.

3        What's that about?  Is that about the confirmation

4   process, or is that about, in the first instance, drafting part

5   of the disclosure?

6        **MR. KRAMER:**  So both.  And I'd like to be able to

7   answer it one way or the other, but it is both, Your Honor.  We

8   didn't differentiate -- and this is why I said we'd be happy to

9   do so -- we didn't differentiate in our log those two scenarios

10  that you've identified.

11       One is, "I'm going to reconfirm some statement or some

12  data that someone else put in," versus, "I'm going to do the

13  first draft of something or suggest some verbiage for the

14  letter."  We did not differentiate in our log, so I can't tell

15  you one or the other; but I can tell you it does cover both

16  situations, Your Honor.

17       **THE COURT:**  So in the -- and I guess that goes to

18  Mr. Black on that one.

19       So the lawyer says; "I've got to insert something here,

20  because I think that if we don't insert something here, there

21  is going to be a securities law risk, so I'm going to draft

22  something for you to insert because of a securities law risk,

23  and here is what it is." And in order to do that, he has the

24  staff get together A, B, and C.

25       A, B and C are privileged or not privileged?

1          **MR. BLACK:**  Not privileged.

2          **THE COURT:**  Why?

3          **MR. BLACK:**  So, again, the underlying facts are not

4    privileged, as long as they're facts.  If defendants had

5    produced these documents, these attachments, we would not have

6    known that they were -- what the lawyer wanted them for in any

7    way whatsoever.  No privileged would have been revealed.

8          **THE COURT:**  Well, if you -- I mean, it's an

9    interesting question.

10         But assuming that the advice that is based on those

11   attachments is privileged -- we'll get to that; that's the

12   first step.  But assuming the advice that's based on these

13   attachments is privileged, why doesn't the disclosure of the

14   particular information that the lawyer wanted in order to give

15   that advice also necessarily disclose something about what the

16   lawyer's advice was?

17         **MR. BLACK:**  So I think it's black letter law that

18   unless it necessarily reveals the advice -- so if you knew that

19   the lawyer was asking for a specific piece of information and

20   you got that specific piece of information, then, arguably, the

21   attachment would be entitled to protection.

22         But it is not if the attachment itself does not itself on

23   its face reveal the advice or the nature of the advice.  So we

24   would not seek --

25         **THE COURT:**  Well -- the nature of the advice?  The

1   nature of the advice?

2        You should include something in this about -- because of

3   everything else you've done.  You should include something in

4   this that discloses that in the last quarter you sold 37

5   widgets because otherwise you've got a securities law risk, and

6   the attachment is:  How many widgets did we sell last quarter?

7        You don't think that necessarily discloses that the lawyer

8   was advising on disclosure of that particular sales number.

9        **MR. BLACK:**  Absolutely not.  Apple collects this

10  information and broadly distributes it all the time.  So just

11  getting the underlying --

12       **THE COURT:**  Okay.  Well, okay.  Getting the -- but

13  these attachments are attachments to documents that we spoke --

14  hypothetically, are privileged regarding the January 2nd

15  letter.  So it's not:  We collect this all the time.

16       So it's:  We're collecting an attachment here that was

17  used in connection with the drafting of presumptive -- of

18  something that we're -- for purposes of this argument, at

19  least -- are assuming are privileged.

20       Why doesn't that disclose that information, privileged

21  information?

22       **MR. BLACK:**  So if the attorney produced to us a

23  document, say, that was produced or collected or -- you know,

24  the data was assembled in some way on December 30th, 2018, and

25  we just got that document.  We could only speculate, at most,

1   that it was related in any way to the --

2          THE COURT:  But they've already told you that these

3   are attachments.

4          MR. BLACK:  Right.

5          THE COURT:  Right?

6          MR. BLACK:  They could be attached to anything.

7          THE COURT:  No.  But we have had already -- well, I

8   don't know.  But they've already disclosed the parent document,

9   who their parent's document is; right?  I mean, now you know.

10         MR. BLACK:  Well, looking at the log now we know.

11         THE COURT:  Okay.  So now you know.  So we are where

12  we are.  So they've disclosed to you that they're in

13  connection -- if you get that document, don't you know

14  something about their advice?

15         MR. BLACK:  I mean, we know that they collected data

16  about iPhone sales.  I think we already know that.

17         THE COURT:  Well --

18         MR. BLACK:  And as Mr. Kramer said, they've already

19  disclosed some of this information anyway.

20         THE COURT:  Well, what he said was they've disclosed

21  this information in other contexts.

22         MR. BLACK:  Right.

23         THE COURT:  That's different from saying that this

24  lawyer, in drafting this letter, thought it was important to

25  have this data before he drafted or she drafted something to go

PROCEEDINGS

1   into the letter.

2       I mean, I don't know why these attachments make a hill of

3   beans worth of difference to you, because it is the underlying

4   data that matters mostly.  And it's -- it's -- if they're not

5   asserting advice of counsel, why it matters that the lawyer

6   knew X or the lawyer knew Y, I'm not really sure why it matters

7   to you.

8           MR. BLACK:  What's happened is they've shifted the

9   burden to us.  So if they had just produced these documents, we

10  wouldn't have known what they were attached to or if they

11  involved legal advice in any way, and we wouldn't be here

12  months later --

13          THE COURT:  Okay.  But we are where we are.  And,

14  you know, it's hard to argue with them for saying that these

15  are -- for giving the association of these documents with a

16  parent document.  You know, I'm not going to criticize that.

17      But so why don't want them now?

18          MR. BLACK:  Well, so what we really want --

19          THE COURT:  Why is it helpful to you?  You want the

20  underlying -- you want the main documents, but why do you

21  really want --

22          MR. BLACK:  I think that's right.  So we haven't seen

23  these documents, so we don't know which the key ones are,

24  although we can guess in some instances.

25      But we don't know what we don't have.  And they haven't

1   given us the information to allow us to be more focused.  And

2   that's what I mean by it's important to us.

3           THE COURT:  But you may not be.  That's not shifting

4   the burden to you.  It's the burden -- it's what privileged

5   log -- privilege logs necessarily involve that.  All they have

6   to do is disclose enough to disclose -- so that we can tell

7   whether it's privileged, not whether it's important.

8           MR. BLACK:  So that may be right.  But under the law,

9   you are not allowed to withhold attachments simply by virtue of

10  being attached to a privileged communication.

11          THE COURT:  Well, and then they'll say they didn't.

12  So we'll make them justify it, but I'm just not -- but given

13  where we are, do you want to narrow the scope of what you

14  really want?

15          MR. BLACK:  We're unable to.

16          THE COURT:  Yeah.  Okay.  Well, I think everybody

17  taking -- I mean, both sides are taking these sort of quite

18  extreme positions, in my view; and people are going to get shot

19  in the foot if they continue to do this.  And you're welcome to

20  do it.  And Mr. Kramer is taking extreme position, in my view,

21  and he is welcome to do it.  But, you know, that's fine.

22      Well, okay.  So what to do with respect to these is go

23  through another, you know -- I don't know that -- well, what do

24  you think about the -- Mr. Black, about the two choices about

25  how to approach this, I think, the first instance that -- on

1  this first category that to the extent there are -- that they

2  should be produced with redactions?

3          **MR. BLACK:**  I don't disagree.  I would only add that

4  we've dealt with defendants for months and we've been in front

5  of Your Honor before, and we trust Your Honor more than

6  defendants.  But I would agree with --

7          **THE COURT:**  Well, they're on the other side.  It's --

8          **MR. BLACK:**  Right.

9          **THE COURT:**  And I am not on the other side.  Because

10  nobody is on my side.

11      The -- so we produced them, first category, with

12  redactions.  Then there is the choice of -- or maybe a

13  combination.  We could have -- take Mr. Kramer up on providing

14  chapter and verse declarations for each document including,

15  you know, all these attachments that you're talking about that

16  are on Exhibit 1 to your declaration, telling us what the,

17  you know, the more detailed justification is for why these are

18  advice on laws that needed to be given at the time, or

19  necessarily disclosed advice.

20      The other thing is I could -- if there was a -- which is

21  simpler, but may not work as well and we may get to anyways --

22  is I can look at 10 documents, tell you:  Here is what I think.

23      And I wouldn't do very much other than to say, "With

24  respect to the redaction on page 7, sustained, overruled," that

25  sort of thing.  And then you all take that and use it to --

1    you know, in the first instance, Apple goes through and takes

2    that to produce the equivalent ones that I've overruled the

3    privilege rule on, and not as to the others.

4         And then you could meet and confer to make sure you're

5    satisfied that that was done properly.  That's another

6    possibility.

7         I don't know.  Do you have a view -- and I'm thinking out

8    loud a little bit, Mr. Black -- about how we approach that?

9         **MR. BLACK:**  The key thing we would want from those

10   options is getting redacted versions of the documents, because

11   they will largely speak for themselves once you can see at

12   least portions of them.

13        **THE COURT:**  Okay.  Well, Mr. Kramer offered the

14   services to do that.

15        **MR. KRAMER:**  Yes, Your Honor.

16        If I might, I think if -- I, too, have struggled with why

17   these are important to the case, which I appreciate is not at

18   issue.  I struggled, and I do look for ways to narrow this.

19        Fact discovery is closed.  Expert reports are coming out

20   in 10 days.  What I was going to suggest is, why don't we

21   declarations, because that I think we can do in a more

22   timely -- more efficient than going through and trying to

23   redact 289 documents.  Let us provide declarations, meet and

24   confer, and see if we can narrow the universe of dispute.

25        We have, since our last time with you, Your Honor, you

1    may -- well, not hopefully it's apparent.  We have worked hard.

2    Both sides have --

3            THE COURT:  Everybody works hard, of course.

4            MR. KRAMER:  But we've been successful.  And we did

5    come back to -- except for this situation, which I appreciate

6    is challenging.  But if we provide declarations, we can -- I

7    can talk with my colleagues, we can get back to counsel by

8    Monday with a date.  My guess is two to four weeks will

9    probably be plenty of time.  We just need to make sure people

10   like Mr. Whittington are available and in town.  And we will

11   meet and confer and see if we can resolve the issues, either in

12   whole or at least narrow them.

13       And at that point, we can decide whether we should go down

14   the path of redactions or some sort of in camera review.  I

15   just feel like that might help narrow the universe.

16       We can also try to identify to the extent that attachments

17   which were specifically part of legal advice, we can do our

18   best to try to identify if they were produced elsewhere, or if

19   the data was produced elsewhere, which, again, might help

20   narrow the dispute.

21           THE COURT:  Mr. Black, your view?

22           MR. BLACK:  Two things:  One, they've already had a

23   chance to provide declarations, and the declarations were

24   useless; so we don't really want to go down that road again.

25       And two, I'll point you to your own standing orders which

1    say that you have to provide the information that they still

2    have not provided at the time of the assertion, otherwise it

3    results in a waiver, so --

4        **THE COURT:**  Okay.  So that's a useless response, I've

5    got to say.  I mean, it's just an annoying response.

6        I'm trying to come up with a practical solution here,

7    Mr. Black.  I'm not trying to have people fight.  And that is

8    not a practical solution.

9        So here's what I'm going to do:  Since you won't respond

10   to me, I'm not going to agree to anything you just said.  It's

11   just that -- you know, it's just -- here is my concern,

12   Mr. Black.

13       We go through this and I decide that 95 percent of these

14   are privileged, and everyone will have gone through an

15   incredible amount of work to get there.  That's fine.  We'll

16   all do the work.  Mostly, counsel will do the work, and we'll

17   do a little work here.  But I'm trying to come up with a

18   practical solution to how to actually decide these things, not

19   say:  Well, they haven't done this, and we shouldn't do that

20   because we've already tried, and their declaration was

21   inadequate.

22       We're talking about different declarations than the type

23   that we have just gotten; right?  We're talking about document

24   by document, explaining that the particular information that

25   was provided by counsel with respect to those or that was

**PROCEEDINGS**

1  sought from counsel with respect to those was based on the need

2  to avoid a securities law risk or whatever it is.

3      So I think I'm going to -- you know, I'm also concerned

4  about the timing because while we appear to have some time,

5  you know, I'm not altogether sure that there isn't some urgency

6  to this.

7      So I'm not going to go on the assumption that the

8  documents aren't going to be needed until, like, September or

9  October.

10     I'm going to try to get it done way before that.

11     It's -- and there may be -- because I don't want to -- I

12  don't want what we do here to slow up anything in

13  Judge Gonzalez Rogers' case.

14     So I think, as a first step, I'm going to do something

15  that you'll like and something you won't like, Mr. Kramer.  So

16  I am going to ask for the first category of documents to be

17  produced in redacted form with only redactions for the portions

18  that you say are the legal advice or the solicitations of legal

19  advice, whatever that is.

20     And second, at the same time produce declarations

21  demonstrating for each document that that, you know, was legal

22  advice; that is, to say it was -- whatever it was, was

23  specifically for some basis that qualifies as legal advice that

24  we've been talking about.

25     Now, my guess is, after we do that, they won't like -- and

1   maybe I won't -- enough of your declarations to sort of solve

2   the problem.  But it may be combined, those two things and the

3   other things you were talking about.  I think the disclosure of

4   where the information otherwise was, if it's -- if it's

5   duplicated elsewhere, great.  If it's -- or anything you can do

6   to meet and confer and narrow the scope of this, that would be

7   very helpful.

8        But I wanted to go through this first before we get to any

9   kind of in camera review, if we're going to have one.

10       I'm not entirely happy with waiting a month for this

11   information.  Think you can do it in two weeks?

12           MR. KRAMER:  No, Your Honor.  I was just looking at my

13  calendar.  We have expert disclosures happening in 10 days, and

14  we have people working diligently on expert issues.  And so

15  two weeks is not -- is going to be not only internal people at

16  Apple, but outside counsel.

17       I would propose May 13th as the day.  Friday, May 13th as

18  the day.  We're talking about 289 documents, which have to be

19  gone through, of course, page by page to redact, with counsel's

20  involvement because, of course, we need -- you need real

21  lawyers to go through and analyze each declaration.

22           THE COURT:  No, of course.  Of course.

23           MR. KRAMER:  Of course.

24       So I'm just -- I think Your Honor would create an unfair

25  burden on us to have do to do this at the same time we're

**PROCEEDINGS**

 1   preparing expert reports.  Of course, we're going to have the

 2   other side's expert reports.  I have no idea if there is going

 3   to be one or 20.  And it's going to be a busy time.  But I

 4   understand no one can control that.  But I think it's only

 5   reasonable to give us fair time to do it the right way,

 6   May 13th.

 7          **THE COURT:**  Mr. Black, did you want to comment on

 8   that?

 9          **MR. BLACK:**  I don't have a comment on that.

10          **THE COURT:**  Okay.  May 13th it is.

11      So we're going to -- we're going to -- the other stuff is

12   going to flow largely what from we've been talking about.  Some

13   of it may not.  But I want to take a five-minute break and then

14   we'll go back on the record.

15                  (Recess taken at 11:42 a.m.)

16               (Proceedings resumed at 11:49 a.m.)

17          **THE CLERK:**  Okay.  We're resuming 19-CV-2033, In Re:

18   Apple Securities litigation.

19      Judge, you're on mute.

20          **THE COURT:**  Probably some people would like that.

21      Why doesn't this solution work for the other categories of

22   documents too?

23      I mean, the attachments -- those attachments we discussed

24   there are a little -- you know, there is a slightly different

25   showing.  It's got to be that the attachments themselves would

**PROCEEDINGS**

 1   reveal the legal advice.

 2        But why not go through this process for the other

 3   categories of documents too, and then see where -- what that --

 4   whether that's sufficient or whether there's still disputes

 5   that we need to resolve?

 6        **THE COURT:**  Start with the plaintiff.

 7        Go ahead, Mr. Black.

 8        **MR. BLACK:**  The two documents in Category 2 are

 9   already redacted, but I would suggest that this process or

10   means of proceeding would work for the other categories.

11        **THE COURT:**  Okay.

12        Mr. Kramer?

13        **MR. KRAMER:**  I agree with Mr. Black as to Category 2.

14   And just to be clear, Your Honor, we redacted one paragraph of

15   that document which refers specifically to legal advice.

16        So -- and then as to the other, we did redact -- this is

17   Category Number 3, the group e-mails.  We did redact -- most of

18   them are redacted.  The only documents withheld there were

19   documents shared with the e-mail disclosure committee.

20   Mr. Whittington did provide a declaration about -- so we've

21   done that already of most Category 3, which is 39 entries.

22        **THE COURT:**  Great.  So you would be on to step two

23   with respect to those already redacted?

24        **MR. KRAMER:**  That's correct, Your Honor.  That's

25   correct.

PROCEEDINGS

1          **THE COURT:**  Okay.

2          **MR. KRAMER:**  We do have a -- and then the Category 4,

3     I'm looking at, and Category 5.  I think Category 5 is

4     largely -- so, Your Honor, I guess I would say -- and thank you

5     for letting me think out loud -- this might be a constructive

6     way to move this forward.

7          **THE COURT:**  Okay.  Good.  So and for the -- let's do

8     that.  But let's figure out what happens next after that.

9          Produce them with redactions.  If they're already produced

10    with redactions, so that's already done.  And you produce

11    declarations that are a more detailed document for each

12    document, for each attachment to make the showing that we

13    talked about making, if you can.

14         Then you all -- then the plaintiffs get a chance to look

15    at that material, see what they think, see what they think.

16    And I take you up on your suggestion about for the attachments

17    that actually exist in duplicate someplace else, you know,

18    without -- if you were comfortable disclosing duplicates that

19    are someplace else, go ahead and do that.

20         Then the plaintiffs will take a look at this, and you all

21    will talk.  Plaintiffs will say their position; you'll go back

22    and forth.  You'll figure out whether you still have a fight.

23    Then you'll come back to me and we'll talk about what the next

24    step is.

25         I don't want -- I want all of that to be done pretty

PROCEEDINGS

1  quickly.  So if Friday, May 13th, you get this information,

2  Mr. Black, what do you think is a reasonable timeline?

3       MR. BLACK:  Speaking for myself at least, as soon as

4  defendants are ready.  We can -- we'd need a week to review it,

5  I guess.

6       THE COURT:  Okay.  Review for a week, then meet and

7  confer.

8       And then what I think I want to do -- because I don't

9  think the joint letter format is particularly useful for this

10 kind of a dispute -- have the plaintiffs file a supplemental

11 brief and the defendants file a supplemental brief.  And if

12 you're doing great on your meet and confer, we can extend

13 those -- the deadlines for those briefs.

14      So we've got May 13th.  By May 20th, the plaintiffs have

15 done their review.  They've started -- you have started a meet

16 and confer.  You're going back and forth.  I'd like you to do

17 as much of this face-to-face as you can in some way.

18 Obviously, there is going to be e-mails and letters because

19 there is a lot of detail here; but I would like there to be at

20 least some face-to-face discussions about it.

21      And then how long for that process before the plaintiff

22 would file a supplemental brief?  Any thoughts on that,

23 Mr. Kramer -- Mr. Black?

24      MR. BLACK:  Two weeks.

25      THE COURT:  Okay.  Two weeks to meet and confer.

**PROCEEDINGS**

 1  Plaintiff files a supplemental brief.

 2      Karen, what's the date two weeks after the 20th of May?

 3          **THE CLERK:**  June 3rd.

 4          **THE COURT:**  That's -- and response a week later,

 5  Mr. Kramer, does that work?

 6          **MR. KRAMER:**  I prefer to have more than a week to make

 7  sure we can fully address.  Can I got 10 days from you,

 8  Your Honor, so June 15th?

 9          **THE COURT:**  Yeah.  But is that when you want to file

10  your brief, Mr. Black, on the 3rd of June?

11          **MR. BLACK:**  The 3rd is fine.  Another date would be

12  fine as well.

13          **THE COURT:**  Okay, 3rd.  And then the defendants'

14  supplemental on the 15th.  And then I'll figure out what I want

15  to do.  I'll tee it up for a hearing or to have further

16  discussions.  Or we'll -- or maybe I'll, if it's the right

17  time, I'll ask for a sampling of a very few people, few number

18  of documents for me to look for -- look through, that that

19  could be done.

20          **MR. KRAMER:**  Your Honor, quick question, if I might.

21          **THE COURT:**  Yeah.

22          **MR. KRAMER:**  Would it be possible to inject some sense

23  of why these documents might be important into the process?

24      And if we can't, I understand that.  But just I -- I feel

25  like we're having a fight.  Obviously, the case is about a

1   public disclosure in the stock price decline.  And I'm having a

2   hard time with -- obviously, we have to do the work, and we're

3   going to do it, and we take it seriously.  And I know there

4   isn't typically a way in the process for you to -- what's

5   important.  But I want to make sure when we narrow the scope,

6   we really should be talking about what matters to the case.

7        And because fact discovery is closed, and we already --

8   we've disclosed experts, we kind of know what's important.  And

9   I can assure Your Honor, we'll not be asking to move for

10  summary judgment based on anything privileged.  I assure you,

11  Your Honor.

12        THE COURT:  I would -- of course.

13        MR. KRAMER:  Of course.

14       But I just want to be clear and open about that.  So if

15  there's a way we can inject, from both sides, some sense of why

16  this matters to the case, I'm struggling to do that.  If you

17  can't, I understand, but I just want to throw that out as a

18  concept.

19        THE COURT:  I don't know that I can.  I assume I will

20  charge the plaintiffs with doing it.

21       Yes, of course.  I want you to ask for things that are

22  important and not ask for things that are unimportant, because

23  you're just making work for everybody if you ask for

24  unimportant things.  I'm not accusing you of doing that.

25       But now that we're going to get a little more information

**PROCEEDINGS**

1   about this, hopefully you can narrow the scope.  But you know,

2   I assume that these kinds of -- this kind of discovery is not

3   aimed at truth or falsity.

4       My guess is that most of the information aimed at truth or

5   falsity lies elsewhere.  But this kind of discovery is aimed at

6   scienter.  But I don't actually know.  But it's whatever -- but

7   that's a judgment for the plaintiffs to make about what they

8   think is important.

9       I don't have a "what if" saying that -- I can tell you

10  that the ones that seem obvious -- there are some obvious

11  categories that are more important.  The first category is

12  clearly the most important.

13      Perhaps the documents out of -- you know, the seven

14  documents out of someone's files, including Mr. Cook's, are

15  perhaps the most -- are important documents regarding the

16  Nikkei Asian Review article are more important.  Then, you

17  know, necessarily just what's in group e-mails or what's in

18  attachments that are not on those other two lists.

19      Having said that, I'm not going to cut it off at that

20  level.  But I'm sure plaintiff can come up with some priority.

21  And they may want to say:  We're only going to restrict it to

22  this sort of thing is what we really want to fight about.

23      Something that, you know, really helps curry favor with

24  the judge, by the way.

25      I think I'm allowed to say that; right?

```
 1            MR. KRAMER:  I heard it.  I definitely heard it,
 2   Your Honor.
 3            THE COURT:  Yes.  Right.
 4       So in any event, so that will be the schedule.  And then
 5   we'll take it from there.  I guess the briefs, if you guys need
 6   extensions because you're doing such a bang-up job meeting and
 7   conferring, just ask and you shall receive it.
 8            MR. KRAMER:  Thank you very much, Your Honor.  We
 9   appreciate your time today.
10            MR. BLACK:  Thank you, Your Honor.
11            THE COURT:  Thank you.
12            (Proceedings adjourned at 12:00 p.m.)
13                         ---o0o---
14                 CERTIFICATE OF REPORTER
15       I certify that the foregoing is a correct transcript
16   from the record of proceedings in the above-entitled matter.
17
18   DATE:   Tuesday, April 26, 2022
19
20
21
22   _____
          Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
23             Official Reporter, U.S. District Court
24
25
```