1   JAMES N. KRAMER (SBN 154709)
    jkramer@orrick.com
2   ALEXANDER K. TALARIDES (SBN 268068)
    atalarides@orrick.com
3   ORRICK, HERRINGTON & SUTCLIFFE LLP
    The Orrick Building
4   405 Howard Street
    San Francisco, CA  94105-2669
5   Telephone:    (415) 773-5700
    Facsimile:    (415) 773-5759
6
    Attorneys for Defendants Apple Inc.,
7   Timothy Cook, and Luca Maestri

8

9                        UNITED STATES DISTRICT COURT

10                      NORTHERN DISTRICT OF CALIFORNIA

11                              OAKLAND DIVISION

12

13   IN RE APPLE INC. SECURITIES        Civil Action No. 4:19-cv-02033-YGR
     LITIGATION
14                                      **DEFENDANTS' OPPOSITION TO
                                        PLAINTIFF'S SUPPLEMENTAL MOTION
15                                      FOR CLASS CERTIFICATION**

16                                      <u>Hearing</u>
                                        Date:   TBD
17                                      Time:   2:00 p.m.
                                        Ctrm:   1, 14th Floor
18                                      Judge:  Honorable Yvonne Gonzalez Rogers

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................ 1

II.     RELEVANT PROCEDURAL BACKGROUND .................................................... 2

        A.     Plaintiff's Initial Class Certification Motion ............................................. 2

        B.     Plaintiff's Supplemental Motion for Class Certification ......................... 4

III.    ARGUMENT ............................................................................................................ 5

        A.     Plaintiff Has Not Established That Options on Apple Stock Traded
               Efficiently During the Relevant Period ....................................................... 5

               1.     Plaintiff's Argument That Options on Apple Stock Trade
                      Efficiently Because The Underlying Common Stock Trades
                      Efficiently Has Already Been Rejected By The Court .................... 5

               2.     Plaintiff's New Expert Report Is Inadequate To Establish Options
                      Market Efficiency ............................................................................... 7

               3.     Plaintiff Concedes That The *Cammer* And *Krogman* Factors Do
                      Not Support A Finding Of Market Efficiency For Options On
                      Apple Stock ......................................................................................... 10

        B.     Plaintiff's Options Damages Model Does Not Establish A Method Capable
               Of Calculating Damages Across The Entire Class ................................... 14

IV.     CONCLUSION ...................................................................................................... 17

1

## TABLE OF AUTHORITIES

2

**Cases**                                                                                    **Page(s)**

3

*In re Apple iPhone Antitrust Litig.*,

4

    2022 WL 1284104 (N.D. Cal. Mar. 29, 2022) ........................................................................ 15

5

*Basic Inc. v. Levinson*,

    485 U.S. 224 (1988) .................................................................................................... 1, 4, 5, 6

6

*In re BP p.l.c. Sec. Litig.*,

7

    2014 WL 2112823 (S.D. Tex. May 20, 2014), *aff'd sub nom. Ludlow v. BP, P.L.C.*,

8

    800 F.3d 674 (5th Cir. 2015) ............................................................................................... 16

9

*Cammer v. Bloom*,

    711 F. Supp. 1264 (D.N.J. 1989) ................................................................................ *passim*

10

*Comcast Corp. v. Behrend*,

11

    569 U.S. 27 (2013) ................................................................................................... 5, 14, 15

12

*In re Countrywide Fin. Corp. Sec. Litig.*,

13

    273 F.R.D. 586 (C.D. Cal. 2009) ....................................................................................... 12

14

*In re Diamond Foods, Inc., Sec. Litig.*,

    295 F.R.D. 240 (N.D. Cal. 2013) ......................................................................................... 5

15

*Erica P. John Fund, Inc. v. Halliburton Co.*,

16

    563 U.S. 804 (2011) ............................................................................................................. 5

17

*Hamilton Partners, Ltd. v. Sunbeam Corp.*,

    2001 WL 34556527 (S.D. Fla. July 3, 2001) .................................................................... 6, 7

18

*Krogman v. Sterritt*,

19

    202 F.R.D. 467 (N.D. Tex. 2001) ............................................................................... *passim*

20

*Petrie v. Elec. Game Card, Inc.*,

21

    308 F.R.D. 336 (C.D. Cal. 2015) ....................................................................................... 12

22

*Scheller v. Nutanix, Inc.*,

    2021 WL 2410832 (N.D. Cal. June 10, 2021) ...................................................................... 6

23

*In re Scientific-Atlanta, Inc. Sec. Litig.*,

24

    2007 WL 2683729 (N.D. Ga. Sept. 7, 2007) ....................................................................... 6

25

*In re Vale S.A. Sec. Litig.*,

26

    2022 WL 969724 (E.D.N.Y. Mar. 31, 2022) ..................................................................... 12

27

*Wal-Mart Stores, Inc. v. Dukes*,

    564 U.S. 338 (2011) ............................................................................................................. 5

28

**Rules**

Fed. R. Civ. P.
    Rule 23 ................................................................................................................................. 5

iii

1    I.    **INTRODUCTION**

2          In denying Plaintiff's original motion to certify a class of optionholders, the Court plainly

3    indicated that it was not persuaded by Plaintiff's argument that "assumed, without analysis, that

4    market efficiency with respect to the common stock translates to market efficiency with respect to

5    options on the same."  Dkt. No. 224 ("Order") at 20, n.11.  The Court instructed that, should

6    Plaintiff try again, "it would behoove" Plaintiff to substantively address "the issues raised by

7    defendants regarding market efficiency for purposes of invoking the *Basic* presumption of

8    reliance." *Id.*

9          Plaintiff has ignored that instruction.   Plaintiff's supplemental motion for class

10   certification of optionholders on Apple stock (the "Supplemental Motion") begins by making the

11   very same argument that the Court has already deemed unpersuasive—i.e., that options "trade in

12   an efficient market when the underlying common stock trades in an efficient market."  Supp. Mot.

13   at 5.  Not only does Plaintiff double-down on the same caselaw from its initial class certification

14   motion, but its new expert on options market efficiency, Dr. Don Chance, echoes the same

15   superficial analysis in his report.  Indeed, Chance's report is devoid of any analysis concerning

16   individual option series on Apple stock, the alleged cause-and-effect relationship between new

17   information and option prices, or whether the markets for options on Apple stock actually

18   reflected information contained in the stock price.  The entirety of Chance's data analysis is two

19   exhibits (totaling less than four pages) that provide a snapshot of trading volume figures for

20   options on Apple stock **in the aggregate**—a meaningless measure when the goal is to determine

21   whether each option traded efficiently.  And when asked about the lack of analysis at his

22   deposition, Chance suggested that he relied primarily on a gut feeling:  "I know the markets.  I

23   have a pretty good feel for the markets. . . . And to me, [efficiency of the Apple options markets]

24   just follows." Ex. A, Don Chance Deposition ("Chance Dep.") at 60:17-19.

25         In response to the Court's request for input from the "academic community" concerning

26   options market efficiency, Chance cherry-picks a handful of decades-old journal articles to

27   support his proposition that options markets, in general, are efficient.  Many of the academic

28   studies cited by Chance, however, expressly exclude the least liquid options and options with

potential mispricing from the analysis (tilting the findings in favor of efficiency), and are thus irrelevant to Plaintiff's task here, which is to establish that **all** options on Apple stock traded in efficient markets.  Other articles cited by Chance actually find inefficiencies in options markets, further undermining Plaintiff's position.  Most notably, Chance overlooks numerous academic studies documenting market frictions in the options markets that prevent option prices from incorporating new value-relevant information quickly and fully.

The Supplemental Motion also advances arguments that are inconsistent with positions Plaintiff took in its original class certification motion.  For example, while Plaintiff's original market efficiency expert, Dr. Steven Feinstein, analyzed the efficiency of options on Apple stock under the factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001), Chance has abruptly jettisoned this analysis, opining that it is "not . . . appropriate to evaluate the efficiency of the [options] market" under these standards.  Dkt. No. 239-2 ("Chance Report"), ¶ 69.  Plaintiff provides no explanation for this about-face.

Finally, Plaintiff has failed to articulate a classwide damages methodology for optionholders that is consistent with its theory of liability.  In contrast with Feinstein, who proposed using the Black-Scholes model in his report last year, Chance now proposes a different option damages model:  the "discrete-dividend binomial model."  However, this model once again fails to address the "individualized issues pertaining to damages" in light of "the varying characteristics of the 2,282 distinct Apple stock options that were available for trading during the relevant period."  Order at 20.

For these reasons, and as further detailed below, individual questions of reliance and damages will predominate over questions common to the class, and the Court should deny the Supplemental Motion.

## II.   RELEVANT PROCEDURAL BACKGROUND

### A.   Plaintiff's Initial Class Certification Motion

On May 5, 2021, Plaintiff moved to certify a class of both Apple common stock purchasers and optionholders in this securities class action, which concerns a single alleged

misstatement from Apple's Chief Executive Officer, Timothy Cook, on Apple's earnings call for its fiscal fourth quarter of 2018.  Dkt. No. 165.  In support of its motion, Plaintiff submitted an expert report on market efficiency from Feinstein, who opined, among other things, that both Apple stock and options on Apple stock traded in efficient markets and that damages in this matter could be calculated for the entire class using a common methodology.  Dkt. No. 165-3 (the "Feinstein Report").  In concluding that both the common stock and options traded efficiently, Feinstein applied the factors set forth in *Cammer* and *Krogman*.  *See id.* at ¶¶ 146-174.

On July 9, 2021, Defendants opposed Plaintiff's motion for class certification.  While conceding that Apple stock traded efficiently, Defendants argued that a class of optionholders should not be certified because Plaintiff failed to establish that options on Apple stock traded in efficient markets or that damages associated with Apple optionholders could be calculated on a classwide basis.  Dkt. No. 196.  In support of their opposition, Defendants filed an expert report from Dr. Steven Grenadier.  Dkt. No. 197-2 ("Grenadier Report I").

On August 24, 2021, Plaintiff filed a reply in support of its motion, which attached a second report from Feinstein.  Dkt. Nos. 202 and 202-4 (the "Feinstein Reply").  In its reply, Plaintiff argued that "market efficiency for Apple stock options" should be assumed "where . . . the common stock linked to the options is efficiently traded."  Dkt. No. 202 at 1.

The Court held a hearing on Plaintiff's motion for class certification on January 18, 2022.  Dkt. No. 219.  At this hearing, the Court expressed doubt concerning Plaintiff's argument that options markets are efficient merely by virtue of a company's common stock trading efficiently.  The Court observed that "options are distinctly different [] than shares" because, among other reasons, options have a contractual component based on the timing of the expiration of the option's contract that is "distinct and unique to the holder" and requires a "response that is not market-driven."  *Id.* at 11:7-8, 12:13, 13:9.  The Court found Plaintiff's caselaw on options market efficiency to be unpersuasive, primarily because "none of [the courts] did any analysis.  They just said, 'Yeah, they're the same.'"  *Id.* at 11:12-13.  The Court also observed that a number of the *Cammer* and *Krogman* factors were not satisfied for the purposes of establishing the efficiency of the Apple options markets.  *Id.* at 6:23-25.  Finally, the Court indicated on several

occasions that it was interested in the conclusions of the "academic community" concerning options market efficiency.  *See*, *e.g.*, *id.* at 6:15-22.

On February 4, 2022, the Court granted Plaintiff's motion for class certification with respect to Apple stockholders but declined to certify a class of optionholders.  Order at 20.  In denying the certification of an options class, the Court observed that while other courts "have assumed, without analysis, that market efficiency with respect to the common stock translates to market efficiency with respect to options on the same," Defendants' expert "raises legitimate questions as to whether that assumption is valid and also whether aggregation of all Apple stock options is appropriate for analysis purposes given their varying characteristics." *Id.* at 20 n.11.

The Court also found that Plaintiff's expert "offer[ed] nothing in either of his reports to satisfy the Court that individualized issues pertaining to damages to option holders will not predominate." *Id.* at 20.  The Court permitted Plaintiff to try again, but emphasized that should it do so, "it would behoove plaintiff to address the concerns not only pertaining to its ability to calculate classwide damages but also the issues raised by defendants regarding market efficiency for purposes of invoking the *Basic* presumption of reliance." *Id.* at 20 n.11.

## B.    Plaintiff's Supplemental Motion for Class Certification

On April 15, 2022, Plaintiff filed the Supplemental Motion, which was accompanied by a report from a new expert, Dr. Don Chance.  Dkt. Nos. 239 and 239-2.[1]  In contrast to Feinstein, the Chance Report takes the position that the *Cammer* and *Krogman* factors are not instructive for the purposes of evaluating options market efficiency.  Chance Report ¶¶ 67-71.  Instead, Chance opines that Apple options are efficient simply because they are derivative instruments on Apple stock.  *See*, *e.g.*, *id.* ¶ 12(a).

---

[1] At his deposition, Chance confirmed that he has never before served as an expert on market efficiency in a securities class action or any other legal matter.  Chance Dep. at 23:19-24.

III.     **ARGUMENT**

A.     **Plaintiff Has Not Established That Options on Apple Stock Traded Efficiently During the Relevant Period**

To certify a class under Rule 23, the "party seeking class certification must affirmatively demonstrate his compliance with the Rule." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "Rule 23 does not set forth a mere pleading standard," but instead requires a "rigorous analysis." *Id.* at 350-51. The movant must, among other things, satisfy through evidentiary proof that "questions of law or fact common to class members predominate over any questions affecting only individual members." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013).

To overcome individual questions regarding each optionholder's reliance on Mr. Cook's alleged misstatement—which would preclude class certification under Rule 23—Plaintiff attempts to avail itself of the fraud-on-the-market presumption, which posits that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988). To invoke this presumption, Plaintiff must demonstrate by a preponderance of the evidence that, among other things, the security at issue "traded in an efficient market." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 811 (2011). "The majority of courts in this circuit agree that, for purposes of the fraud-on-the-market theory, market 'efficiency' means that prices will 'reflect all relevant information.'" *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 247 (N.D. Cal. 2013) (citations omitted). "Market efficiency is a fact-specific inquiry." *Id.*

1.     **Plaintiff's Argument That Options on Apple Stock Trade Efficiently Because The Underlying Common Stock Trades Efficiently Has Already Been Rejected By The Court**

In its initial class certification motion, Plaintiff asked the Court to certify a class of optionholders, in large part, because Apple's **stock** is efficient. Dkt. No. 165 at 16 ("[C]ourts have concluded that a finding of market efficiency for common stock also applies to options, because the price for the option is derivative of the price of the stock.").

As noted above, the Court was not persuaded by this argument. At oral argument and again in its order denying the certification of a class of Apple optionholders, the Court declined to

follow the decisions cited by Plaintiff because they lacked any analysis concerning options market efficiency.  *See* Order at 20 n.11; *see also* Dkt. No. 219 at 11:6-8, 21.  However, rather than address the Court's stated concerns, Plaintiff has opted to double-down on the very same rationale.  *See* Supp. Mot. at 5-6 ("Where a company's underlying common stock trades in an efficient market, its derivative stock options also trade in an efficient market.").  Indeed, **nine of the ten cases** that Plaintiff cites for this point were recycled from its initial briefing or the Court's Order—cases that, again, were criticized by this Court on account of their lack of analysis.  These cases offer no more analysis than they did six months ago; they assume, without any inquiry, that options markets are efficient if the underlying stock market is efficient, without accounting for the differences between the two distinct instruments.

The Supplemental Motion cites only one new case on this point, *Scheller v. Nutanix, Inc.*, 2021 WL 2410832, at *5 (N.D. Cal. June 10, 2021), which does not even analyze options market efficiency.[2]  *Scheller* is a decision concerning a lead plaintiff appointment in which the court, in evaluating the typicality and adequacy of one of the movants, noted that sellers of put options, like buyers of common stock, "transact with the expectation that the price of the stock will increase."  *Id.* at *5 (internal citation omitted).  Based on the movant's declaration, the court concluded that he "relied on the market price when selling the put contracts," and therefore was atypical from the putative class, which only included stockholders.  *Id.* at *5-6.  This conclusion says nothing of whether optionholders on the defendant's stock as a class relied on market prices of the underlying stock, or whether option markets in general are efficient.  If anything, *Scheller* reinforces that it is irregular for optionholders to be included in a putative class with stockholders.[3]

---

[2] The one reference to options market efficiency in *Scheller* is a parenthetical citation from *In re Scientific-Atlanta, Inc. Sec. Litig.*, 2007 WL 2683729, at *8 (N.D. Ga. Sept. 7, 2007), which this Court has already found lacks the necessary analysis.  *Id.*; *see* Order at 20 n.11.

[3] Plaintiff fails to grasp the fact that though an infinite number of instruments could be created that derive value from Apple's stock price, it does not follow that the market for each of those instruments is sufficiently "well-developed" such that it "reflects all publicly available information."  *See Basic*, 485 U.S. at 246.  For example, in *Hamilton Partners, Ltd. v. Sunbeam Corp.*, 2001 WL 34556527 (S.D. Fla. July 3, 2001), the court concluded that the primary market and secondary aftermarket for the defendant's convertible debenture coupons were not efficient.  *Id.* at *11.  The plaintiffs, like Plaintiff here, tried to argue that "because of the influence of

2.   **Plaintiff's New Expert Report Is Inadequate To Establish Options Market Efficiency**

In his report, Chance asserts that he was engaged "to opine on the matter of whether Apple option contracts trade in an efficient market and to discuss the academic literature on options market efficiency." Chance Report ¶ 9.  As detailed below, Chance's exploration of both options market efficiency and the prevailing academic literature is superficial and does not support a conclusion that options on Apple stock traded efficiently during the class period.

a.   **Chance provides no analysis of individual option series on Apple stock; rather his conclusions are based on aggregate trading volume.**

In concluding that "Apple options trade in an efficient market," Chance Report ¶ 12(a), Chance relies on the same reasoning that was deemed unpersuasive by this Court—i.e., that "Apple options are derivatives, and their valuations are driven by the price of Apple common stock which has been already found, for [the] purposes of this case, to trade in a[n] efficient market." *See id*.  When asked at his deposition whether he had done anything to "test the efficiency of the Apple options market," Chance confirmed that he had not performed a "formal statistical test" on Apple options, but rather "dr[ew] conclusions that were based on logical reasoning." Chance Dep. at 99:6-9.  He went on to posit that substantive analysis of the options on Apple stock was unnecessary because he simply "knows" that options trade in efficient markets. *See id.* at 60:17-19 ("I know the markets.  I have a pretty good feel for the markets.  I follow the markets and all.  And to me, it just follows."); *see also id.* at 92:22-93:6 ("I don't know that I need an analysis . . . I know because I'm an expert.").

In other words, while Chance's theory is premised on theoretical arguments regarding options, he did nothing at all to test whether options on Apple stock **in fact** traded in accordance with his theory:

Sunbeam's common stock prices . . . on [trading of debentures,] an efficient primary and secondary debenture market existed." *See id.* at *9.  The court rejected this argument and, after applying the *Cammer* factors, concluded that "neither the primary market nor aftermarket [for debentures] is an efficient market." *Id.*

Q:  Dr. Chance, you write in paragraph 14 of your report: "Simply stated, the options market must reflect the information provided in the price of the stock and it must do it rapidly."

What do you mean by [that] statement[?]

A: [. . .] People trade options, they're not just sitting there surfing the web and all that. I mean, they're paying attention to the underlying stock. So, yeah, that's what I mean. They've got to.

Q: And you did not do any empirical analysis to confirm this statement, did you?

A: I don't need to. **But no, I didn't**.

*Id.* at 97:18-98:23 (emphasis added).

Among other things, Chance confirmed that he did not conduct any analysis of individual option series on Apple stock (*see*, *e.g.*, *id.* at 36:19-21); he did not test whether there was a cause-and-effect relationship between new information and option prices (*id.* at 84:9-13); and he did not test whether the markets for Apple options actually reflected information contained in the stock price (*id.* at 98:24-99:10).  *See also* Ex. B, Professor Steven Grenadier Expert Report ("Grenadier Report II") ¶ 91.  Indeed, the full extent of Chance's data "analysis" of Apple options was in the form of two exhibits appended to his report (totaling less than four pages), which snapshotted aggregate trading volume figures for options on Apple stock in November and December 2018 according to the Chicago Board Options Exchange ("CBOE").  *See* Exs. 1 and 2 of Chance Report; *see also* Chance Dep. at 35:9-11.

But Chance's use of trading volumes in aggregate across all 2,282 available Apple stock options presents a completely distorted picture.  Grenadier Report II ¶ 99.  As Grenadier explains in his report, Chance's measurement gives substantially greater weight to the most heavily traded option contracts and hides option series with lower trading volumes.  *Id.* ¶¶ 101-102.  Indeed, the only conclusion that one could draw from Chance's analysis is that **some** options on Apple stock (and not necessarily the same ones) "traded every single day and in high volume."  *See id.*

b.    **The academic literature selectively presented by Chance does not support a finding of market efficiency here.**

In response to the Court's request for non-litigation academic research on the efficiency of options markets, *see* Dkt. No. 219 at 6:15-7:7, Chance proffers a handful of journal articles from the 1970s, 1980s, and 1990s, which, he claims, support his conclusion that "options react rapidly to public information about the underlying company and that option prices move consistent with the underlying stock price movement."  *See* Chance Report ¶¶ 12, 74-86.  These decades-old articles, however, do not remotely support the notion that all Apple option series traded efficiently during the class period.

First, Chance's survey of academic literature conspicuously omits the studies that cut against his premise that options markets are efficient.  Grenadier Report II ¶ 76.  As Grenadier notes, "[a]cademic research has long recognized that market frictions such as high transaction costs can limit market participants' ability to exploit arbitrage opportunities and result in departures from market efficiency."  *Id.* ¶ 77; *see also* ¶¶ 77-87 (collecting the academic literature exploring trading costs in options markets and implications on mispricing and the ability to exploit arbitrage opportunities).  For example, in a study titled "Options Arbitrage in Imperfect Markets," author Stephen Figlewski concluded that "the impact of market imperfections is . . . large" and "[u]nder these conditions, the standard arbitrage cited in the literature as the basis of valuation models becomes a weak force to drive actual options prices toward their theoretical values."  *Id.* ¶ 78.  Because actual options prices do not necessarily comport with their theoretical values, Chance's theory of efficiency unravels.  Indeed, these articles entirely undermine the key premise for Chance's "integrated market" theory—that "arbitrage . . . is the glue that ties the options in a market to their common element:  the price of the stock."  Chance Report ¶ 61; *see also* Grenadier Report II ¶¶ 84, 87.

Second, the articles cited by Chance exclude from their analyses broad categories of options, which substantially limits the applicability of those articles in assessing market efficiency of all Apple option series.  Grenadier Report II ¶¶ 57-64 and Ex. 1.  For example, most of Chance's articles analyze only the actively traded portion of the options markets and exclude

OPPOSITION TO SUPPLEMENTAL MOTION FOR CLASS
CERTIFICATION, C.A. NO. 4:19-CV-02033-YGR

deep-in-the-money options, deep-out-of-the-money options, and long-dated options. *Id.* ¶ 57. These exclusions significantly limit the relevance of these articles in addressing the question of whether **all** of the options on Apple stock traded in efficient markets. *Id.* Indeed, if Chance were to exclude options on Apple stock by the same criteria that the Figlewski and Webb (1993) study did, that would be **54%** of the 2,282 options available during the relevant period. *Id.* ¶ 61. Or if Chance were to exclude options with fewer than 144 transactions on a given day, as the Stephan and Whaley (1990) study did, that would represent **77%** of the relevant call option data. *Id.* ¶ 60. Each of these studies, through these exclusions, refutes Chance's position that all "[o]ptions trade in a single, integrated market" (Chance Report ¶ 108) and limits his ability to draw inferences about **all** options on Apple stock.

Third, several of the studies cited by Chance either did not in fact test the market efficiency of options or themselves found evidence of inefficiencies. Grenadier Report II ¶¶ 66-75. For example, the Galai study from 1977 finds that "the CBOE might not have been perfectly efficient during the period investigated and abnormal profit opportunities did exist." *Id.* ¶ 72; *see also id.* ¶¶ 66-70 (noting studies cited by Chance that did not test for market efficiency of **options**). Another study by two of the authors cited in the Chance Report explicitly found that "contrary to the efficient market hypothesis, 'underpriced' and 'overpriced' options can be identified," and concluded that "the CBOE was **inefficient** during the observation period." *Id.* ¶ 73 (emphasis added).[4]

### 3.    Plaintiff Concedes That The *Cammer* And *Krogman* Factors Do Not Support A Finding Of Market Efficiency For Options On Apple Stock

In its original class certification briefing, Plaintiff argued that the market for options on Apple stock is efficient because the *Cammer* and *Krogman* factors[5] supported such a finding.

---

[4] Notably, the literature cited by Chance also highlights the substantial shortcomings of his own analysis. Indeed, in contrast to Chance's report, every one of the articles he cites implemented an empirical methodology to test its hypothesis and reached conclusions regarding market efficiency, arbitrage opportunities, and other related issues. Grenadier Report II ¶¶ 89-90. Likewise, none of these papers reached a conclusion regarding market efficiency based solely on aggregate trading volume, as Chance has done here. *Id.*; *see also* Chance Dep. at 122:23-123:11.

[5] The five factors set forth in *Cammer* are: (1) the average weekly trading volume; (2) the volume of analysts following and reporting on the security; (3) the number of market makers; (4)

OPPOSITION TO SUPPLEMENTAL MOTION FOR CLASS
CERTIFICATION, C.A. NO. 4:19-CV-02033-YGR

*See*, *e.g.*, Dkt. No. 201 at 3.   Indeed, Feinstein spent more than **forty paragraphs** in his two reports detailing how these factors supposedly supported the efficiency of the markets for options on Apple stock.  *See* Feinstein Report ¶¶ 146-174; Feinstein Reply ¶¶ 3, 75-87.

In their opposition briefing, Defendants agreed that the *Cammer* and *Krogman* factors were relevant to the determination of options market efficiency, but explained that they did not support a conclusion that Apple's stock options traded in efficient markets.  *See generally* Dkt. No. 196 at 19-23, 23 n.14; *see*, *e.g.*, *id.* at 20 ("As to Apple's stock *options*, Plaintiff's expert cannot demonstrate efficiency through *any* of the five *Cammer* factors.") (emphasis in original).

Now, apparently acknowledging that options on Apple stock do not satisfy the *Cammer*/*Krogman* analyses, Plaintiff changes its tune and asks the Court to disregard these factors.  *See* Supp. Mot. at 11-12 ("In sum, the criteria used to assess the efficiency of the common stock market do not map to the options market.").  Plaintiff's new expert now proclaims that it is "not . . . appropriate to evaluate the efficiency of the [options] market with the same standards courts use to evaluate efficiency of the market for common stock."  Chance Report ¶ 69.  At his deposition, Chance was even more definitive, asserting that "[y]ou can't apply [the *Cammer*/*Krogman* factors] to options markets."  *See* Chance Dep. at 57:9-10.  But rather than propose an alternative method to evaluate options market efficiency in lieu of the *Cammer* and *Krogman* factors, Plaintiff simply ends its "analysis" right there.  *See id.*[6]  As Plaintiff would have it, if a stock market is determined to be efficient, then no additional analysis is necessary to determine whether the markets for options, entirely separate and distinct securities, are efficient.

In their opposition to Plaintiff's initial class certification motion, Defendants argued that an application of the *Cammer* and *Krogman* factors demonstrated that the Court should not certify

_____

a company's entitlement to file an S-3 Registration Statement in connection with public offerings; and (5) empirical facts showing a cause-and-effect relationship between unexpected corporate events or financial releases and an immediate response in the security's price. *Cammer*, 711 F. Supp. at 1286-87.  The three additional factors set forth in *Krogman* are:  (1) the company's market capitalization; (2) the security's bid-ask spread, and (3) the company's public float. *Krogman*, 202 F.R.D. at 478.

[6] *See* Chance Dep. at 57:18-20 (Q: "Are you proposing an alternative standard for assessing market efficiency for options?" A: "I'm not proposing a specific standard.").

a class that includes optionholders. *See*, *e.g.*, Dkt. No. 196 at 19-23, n.14.[7]  Defendants need not repeat those arguments here.  However, there are two *Cammer*/*Krogman* factors that are worthy of emphasis.

First, the bid-ask spread for options on Apple stock (*Krogman* factor 2) was extremely high during the relevant period.  Indeed, Feinstein calculated that the weighted average bid-ask spread on Apple options was **12.9%**, which far exceeded the bid-ask spread on Apple stock (0.01%) or the average bid-ask spread across all stocks traded on U.S. exchanges (0.7%).  Grenadier Report II ¶ 97(c).  Some bid-ask spreads on Apple stock options were even larger: 10% of the call option series had bid-ask spreads exceeding 74%, 10% of the put option series had bid-ask spreads exceeding 62%, and some option series had bid-ask spreads above 100%.  *Id.*  These sky-high bid-ask spreads strongly cut against a finding of market efficiency under *Krogman*, as Plaintiff's original expert conceded.  Feinstein Report ¶ 158 (admitting that Apple options "average dollar and percentage bid-ask spreads are large relative to the bid-ask spreads observed for all common stocks" and therefore "do[] not support a finding of market efficiency"); *see also* Chance Dep. at 72:11-13 ("[I]f the bid-ask spreads were so high and the prices were not moving and no one was trading, I suppose it could lead to some temporary inefficiency.").

"A large bid-ask spread is indicative of an inefficient market, because it suggests that the [security] is too expensive to trade." *Krogman*, 202 F.R.D. at 478.  In *Krogman*, the court held that a bid-ask spread of 5.6% showed market inefficiency, *see id.*, and the "the vast majority of [cases finding market efficiency] involved companies with a bid-ask spread of lower than 1%," *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 356 (C.D. Cal. 2015).

---

[7] While it is true that *Cammer* and *Krogman* dealt specifically with the question of common stock market efficiency, it remains appropriate to apply these factors for the purposes of analyzing the efficiency of derivative markets.  *See*, *e.g.*, *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 617 (C.D. Cal. 2009) (concluding that market efficiency on defendant's options was established only after "the *Cammer* factors (and additional factors approved by courts)" each favored efficiency).  Plaintiff cites a decision finding that *Cammer* and *Krogman* are "less instructive" in the context of evaluating "debt securities," but options are not debt securities.  *See In re Vale S.A. Sec. Litig.*, 2022 WL 969724, at *5 (E.D.N.Y. Mar. 31, 2022).

The high bid-ask spread in options on Apple stock not only leaves this *Krogman* factor unsatisfied, but also undermines a key premise in Chance's report, i.e., that the possibility of arbitrage is what drives the market efficiency for options:

> Simply stated, the options market must reflect the information provided in the price of the stock, and it must do it rapidly. Otherwise, traders doing transactions at stale prices will lose money. Option traders who do not price the option correctly and rapidly absorb new information into the price will be exploited. This exploitation, referred to as arbitrage, is the glue that connects the options market to the stock market.

Chance Report ¶ 14. As Grenadier explains, "[h]igh bid-ask spreads . . . make it challenging for investors to take advantage of arbitrage opportunities resulting from incorrect option prices because high transaction costs reduce the profitability of the arbitrage." Grenadier Report II ¶ 106; *see also id.* ¶¶ 38-39. With the purchase prices of Apple options on average 13% higher than what a seller is willing to sell for, and in some cases more than **double** the price, Chance's "glue" no longer holds. *Id.* ¶¶ 95-96.[8]

Second, the average trading volume (*Cammer* factor 1) for options on Apple stock provides strong additional evidence of the inefficiency of these markets. While a high average trading volume would support a finding of efficiency on the ground that it demonstrates "that many investors are executing trades on the basis of newly available or disseminated corporate information," *Cammer*, 711 F. Supp. at 1286, the average daily trading volume across all Apple options series was quite low, *see* Grenadier Report II ¶ 97(a). For call options on Apple stock, average daily trading volume was just 691 contracts, and for 75% of call options on Apple stock, the daily trading volume was 297 contracts or fewer. *Id.* For put options, the trading volume was even lower. *Id.* In fact, "across all call (put) options, on average, a call (put) option series did not

---

[8] Plaintiff's attempt to minimize the significance of this data only reiterates the unique issues facing the efficiency of option markets. *See* Supp. Mot. at 11-12 (citing Chance Report ¶ 71(f)). As Chance explains, bid-ask spreads for options are driven up because options market makers have certain fixed costs not present with stocks and options also do not trade as often as stocks, which makes it "more costly for a market maker to hedge his risk." Chance Report ¶ 71(f). This is exactly what makes arbitrage more difficult in the options markets and can render them inefficient. *See also* Grenadier Report II ¶¶ 84, 87.

trade at all on 35% (31%) of trading days in the Class Period." *Id.* ¶ 97(b).[9]  While Plaintiff ignores this data and continues to assert that options on Apple stock trade in a "single, integrated market," *see* Chance Report ¶ 108, there is no dispute that each option series has unique characteristics and distinct trading patterns, *see Cammer*, 711 F. Supp. at 1281 ("It would be illogical to apply a presumption of reliance merely because a security is traded within a certain 'whole market,' without considering the trading characteristics of the individual [security] itself."). *See also* Dkt. No. 196 at 20.[10]

In sum, Plaintiff fails to provide a compelling justification to depart from years of court precedent (or its own expert's initial opinion) regarding the application of *Cammer* and *Krogman* to determine market efficiency.  Because Plaintiff cannot establish the efficiency of the market for options on Apple stock under *Cammer* or *Krogman*, reliance cannot be presumed and a class of optionholders should not be certified.

### B.   Plaintiff's Options Damages Model Does Not Establish A Method Capable Of Calculating Damages Across The Entire Class

In addition to failing to establish that common questions of reliance predominate over individual questions, Plaintiff is unable to show a classwide method for calculating damages. *See*, *e.g.*, *Comcast*, 569 U.S. at 35.  Because Plaintiff is "entitled only to damages resulting from"

---

[9] Plaintiff and Chance attack the average trading volume figures used by Defendants' expert as "wholly inaccurate" and "wildly distorted" (*see* Supplemental Motion at 9-10; Chance Report ¶¶ 99-102) merely because they account for the vast number of different options on Apple stock available for trading during the class period.  Grenadier Report II ¶ 99.  But as explained above (*see supra* at III.A.2.a), Defendants' method is the only one capable of determining whether the first *Cammer* factor was satisfied for **each** of the Apple options, as opposed to a select few of the most liquid ones.  *See also id.* ¶¶ 101-103.

[10] Additionally, at his deposition, Chance contended that Feinstein's event study (which was run pursuant to *Cammer* factor 5), was "highly relevant" to the Court's inquiry into the efficiency of Apple's stock options.  Chance Dep. at 84:7-8.  However, as set forth in Defendants' opposition to the original motion, Feinstein's event study was significantly flawed.  *See* Grenadier Report II ¶ 109; Dkt. No. 196 at 21-23.  Among other things, Feinstein's use of average prices across all of the disparate option series prevented him from determining whether any specific option series reacted to new information, whether that reaction was statistically significant, or whether any statistically significant reaction was motivated by the non-market driven, contractual component of a given option.  *Id.*; *see also* Dkt. No. 219 at 13:7-10 (Court: "People are making determinations about what to do at that time [toward the end of each option's term], but there's a contractual component which is requiring a response that is not market-driven.  It's contract-driven.").

its theory of liability, its proposed model "must measure **only those damages attributable to that theory**." *Id.* (emphasis added). Moreover, courts are required to "conduct a 'rigorous analysis' to determine whether that is so," which includes an inquiry into "whether the methodology [is] a just and reasonable inference or speculative." *Id.* (internal quotation marks and citations omitted).

In its Order, the Court held that Plaintiff's original expert "offer[ed] nothing in either of his reports to satisfy the Court that individualized issues pertaining to damages to option holders will not predominate" given "the varying characteristics of the 2,282 distinct Apple stock options that were available for trading during the relevant period." Order at 20. Plaintiff's new expert proposes a new model, the binomial model, but still does not address the Court's concerns. In fact, Chance confirms that for certain options series (including those that are far out-of-the-money), "there will be little effect . . . from the alleged misrepresentation or concealment of material information." Chance Report ¶ 66. This assertion, of course, raises the question of why these options should be included in the class at all. Chance speculates that these types of options series "will represent only a small number of the trades in a case like this" because these options "have little trading volume," but he examines the issue no further. *Id.*; *see also* Grenadier Report II ¶ 113. As Grenadier demonstrates, however, **half** of the Apple call options during the relevant period had an average daily trading volume of 45 contracts or fewer, and half of the Apple call options did not trade **at all** on 26% of the class period's trading days. *See* Ex. 5 of Grenadier Report I. Plaintiff offers no methodology to exclude these options, rendering its damages model inadequate. *See*, *e.g.*, *In re Apple iPhone Antitrust Litig.*, 2022 WL 1284104, at *16 (N.D. Cal. Mar. 29, 2022) (denying class certification where the plaintiffs "rely on an unsound methodology [that] cannot reliably demonstrate which members, and how many, were injured.").

Chance's model also cannot distinguish between investors who, "but-for" the alleged price inflation, would have elected to purchase or sell the same options contract or a different contract. Unlike common stock, "there [are] an array of options out there," which can be tailored

to options investors' individual preferences.  *See* Chance Dep. at 173:4.[11]  At deposition, Chance readily admitted that if Apple's stock price had not been inflated, an options investor:

> might have bought [the same] option; he might have bought a different option. You can't say exactly what a person would or would not do. In fact, on a different day, he might do something entirely differently. It just depends on how he feels.

*Id.* at 175:4-8.  As Chance suggests, this requires an "individualized inquiry into each investor's subjective motivations," which is "exactly the kind of elision of classwide and individualized questions that can and should be avoided by closely examining [Plaintiff's] proposed damages methodology."  *See In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *12 (S.D. Tex. May 20, 2014), *aff'd sub nom. Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015).  This conceptual flaw in Chance's model has even greater significance when applied to Plaintiff's theory of the case.  In its merits report on damages, Plaintiff's expert opined that Defendants' alleged misrepresentation and omissions introduced $20.12 of inflation into the stock price at the start of the class period.  Grenadier Report II ¶ 118.  This is a substantial amount of inflation; it represents roughly 10% of the $207.48 price that Apple's stock closed at on November 2, 2018.  *Id.*  Plaintiff's options damages model assumes that an Apple options trader who purchased a slightly out-of-the-money call option (for example, one with a strike price of $220) would have, absent the alleged misrepresentation, instead purchased a deeper out-of-the-money call option (i.e., more than $30 out of the money).  *Id.* ¶ 119.  This assumption is actually contradicted by Chance, who opines that "[n]ot a large number of people will take such bets."  *See* Chance Report ¶ 93.  Plaintiff's model offers no method to account for the probability that this options trader would have instead invested in an options contract more in line with the "moneyness" of its actual purchase (e.g., one with a strike price of $200).  *See* Grenadier Report II ¶¶ 115, 118.

---

[11] As Chance explains, given the varying nature of the 2,282 options contracts available to Apple investors during the relevant period, options traders are able to customize their investments according to their risk profiles.  *See id.* at 173:24-174:3 ("[M]oneyness tells [investors] sort of the nature of the odds in the bet, and **it's a huge factor** in [] determining [] what to pay for it and all. They can choose whatever they want, certainly.") (emphasis added); *see also* Grenadier Report II ¶¶ 28, 116.

Relatedly, Plaintiff's model fails to reliably measure a critical element of its damages calculation:  volatility.[12]  *See* Supp. Mot. at 12-13.  The theoretical value of an option is just as dependent on an accurate volatility measure as it is on the underlying stock price.  *See* Grenadier Report II ¶ 31.   But while Chance's model contemplates repricing options according to an inflation correction in the stock price, he makes no similar adjustments for volatility.  *Id.* ¶ 120.  This is despite the fact that, as Chance admits, a "but-for" disclosure[13] could have affected volatility—either it would have increased uncertainty in Apple stock (given the large stock drop) or it would have decreased uncertainty (now that everything was allegedly fully disclosed).  *See* Chance Dep. at 181:20; Grenadier Report II ¶¶ 120, 126.[14]  Under the first scenario, failing to account for that change would overstate damages for call options purchasers and, under the second scenario, damages for put options purchasers would be overstated.  Grenadier Report II ¶ 125.[15]  While Chance claims that his "model can accommodate that," Chance Dep. at 181:20-21, his report lacks any details about how the model would do so on a classwide basis and when asked at deposition, Chance admitted that "there's no way to really tell," without an individualized inquiry into each transaction and each investor's perception of the volatility in Apple stock before and after each alleged corrective disclosure.  *See id.* at 184:9-185:3, 188:23-189:10; *see also id.* at 178:2-3 ("what happens is investors have volatility numbers in their heads"); Grenadier Report II ¶¶ 121-132 (detailing the flaws in Chance's proposed solution).

## IV.    CONCLUSION

For the reasons addressed above, and as set forth in Defendants' July 9, 2021 opposition to Plaintiff's initial class certification motion, Dkt. No. 196, the Supplemental Motion should be denied.

---

[12] Volatility refers to the expected fluctuation in the price of the underlying stock over the life of the option.  Grenadier Report II ¶ 26.

[13] In this context, a "but-for" disclosure refers to the alleged disclosure that, under Plaintiff's theory, Defendants could and should have made on November 1, 2018 so as to make the challenged statement not false or misleading.

[14] In fact, the volatilities of certain options series could decrease at the same time that the volatilities of other options increase.  *See* Grenadier Report II ¶ 124.

[15] *See also* Chance Dep. at 183:19-21 ("[I]t's going to push the numbers in one way for calls and push the numbers in another way for puts.").

17

1   Dated: June 24, 2022        ORRICK, HERRINGTON & SUTCLIFFE LLP

2

3                                   */s/ James N. Kramer*

_____

JAMES N. KRAMER

4                        Attorneys for Defendants Apple Inc.,
Timothy Cook, and Luca Maestri

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28