# EXHIBIT B

*In re APPLE INC. SECURITIES LITIGATION*

**Expert Report of Professor Steven Grenadier**

**June 24, 2022**

# Table of Contents

I.      Qualifications ..................................................................................................... 1

II.     Assignment ........................................................................................................ 2

III.    Summary of Opinions ........................................................................................ 3

IV.     Background on Options and Market Efficiency ................................................. 9

        A.      Overview of Equity Options ................................................................... 9

        B.      Arbitrage Opportunities, the Law of One Price, and Market Frictions ............... 13

        C.      Market Efficiency of Equity Options .................................................... 15

        D.      Summary of Dr. Chance's Options Efficiency Opinion ........................ 18

V.      The Academic Articles Cited by Dr. Chance Do Not Support His Assertion That All
        Apple Options Traded in Efficient Markets throughout the Class Period ....................... 20

        A.      Dr. Chance Fails to Address That Most of the Articles That He Cites Exclude
                Broad Categories of Options, Limiting Their Applicability to Assessing Market
                Efficiency of All Apple Option Series .................................................. 22

        B.      Dr. Chance Fails to Acknowledge Important Limitations to the Conclusions of the
                Studies He Cites ................................................................................... 27

                1.      Articles Cited by Dr. Chance That Do Not Address Market Efficiency of
                        Option Markets ........................................................................... 27

                2.      Articles Cited by Dr. Chance That Document Inefficiencies in Option
                        Markets ...................................................................................... 30

        C.      Dr. Chance Overlooks Literature on Market Frictions and Efficiency in Option
                Markets, Including More Recent Articles ............................................. 32

VI.     Dr. Chance Fails to Provide Any Empirical Analysis Demonstrating That All Apple
        Options Traded in Efficient Markets throughout the Class Period ................................ 37

        A.      Dr. Chance's Opinion That the *Cammer* and *Krogman* Factors Cannot Be Applied
                to Apple Options Contradicts Both Dr. Feinstein's Analysis and His Own
                Assumptions Regarding Arbitrage ....................................................... 39

        B.      Dr. Chance Fails to Address My Finding That Trading in Many of the Individual
                Apple Option Series Was Low ............................................................. 41

        C.      Dr. Chance Fails to Assess Whether Impediments to Arbitrage Existed in the
                Apple Option Markets in Light of Market Frictions Such as High Bid-Ask
                Spreads and Low Trading Volumes...................................................... 45

        D.      Dr. Feinstein's Analysis of *Cammer* Factor 5, Which Dr. Chance References,
                Fails to Demonstrate a Cause and Effect Relationship between New, Value-
                Relevant Information and Prices of Individual Option Series ............... 47

VII.    Dr. Chance Fails to Provide a Reliable Damages Methodology for All Apple Options that Measures Damages Attributable to Plaintiff's Theory of Liability ...................................48

     A.    Dr. Chance Does Not Present a Methodology Capable of Showing that the Transaction Prices of Any Particular Option Series Were Affected by the Alleged Misrepresentation or Changed in Response to the Alleged Corrective Disclosures .......................................................................................................................... 49

     B.    Dr. Chance Fails to Provide a Methodology that Can Assess Damages for Investors Who May Have Traded Different Apple Options or Who May Have Not Traded Apple Options at All Had There Been a But-For Disclosure .................. 51

     C.    Dr. Chance Fails to Provide a Methodology to Determine the Appropriate But-For Implied Volatilities that Would Reliably Measure Damages for Investors in the Apple Options ..................................................................................................... 53

## I.      Qualifications

1.      I, Steven R. Grenadier, Ph.D., am the William F. Sharpe Professor of Financial Economics at the Graduate School of Business at Stanford University.  I have been a member of the Stanford faculty since 1992 and served as the Chair of the Finance Department for over ten years.  My teaching and research focus on the area of investment analysis, including, among other topics, portfolios, performance evaluation, and benchmarking.  While at Stanford, I have taught graduate-level courses in Investment Modeling, Portfolio Management, Real Estate Investment, and Finance Theory.  In 1987, I graduated Phi Beta Kappa and *summa cum laude* from the University of California at Berkeley with a B.S. in Business Administration.  In 1992, I received my Ph.D. in Business Economics (Finance) from Harvard University.

2.      I have published numerous articles in finance and economics journals and have spoken at numerous academic and business conferences about my research.  I am the co-editor of the *Journal of Real Estate Finance and Economics*, a leading academic real estate journal.  My research focuses on sophisticated valuation models of complicated financial structures and their empirical implications.  This research includes significant analysis of options.  I am a former Trustee of E*Trade Funds, Nicholas Applegate Institutional Funds, and AQR Funds.  I have also served as a Senior Consultant to Financial Engines, Inc., an online investment advisor.  I currently serve as a Senior Advisor to Cornerstone Research and as a member of the Investment Committee of Vise, an investment management platform.

3.      I am being compensated at my standard billing rate of $975 per hour.  I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.

4.      I previously submitted an expert report in this matter on June 10, 2022 (the "Grenadier Merits Report")[1] in response to an expert report filed by Dr. Steven Feinstein on April 27, 2022 (the "Feinstein Merits Report").[2]  I also submitted an expert report in this matter on July 9, 2021 (the "Grenadier Class Certification Report") in response to an expert report filed by Dr. Feinstein on May 5, 2021 (the "Feinstein Class Certification Opening Report").[3]  My curriculum vitae, which includes a list of the publications I have authored, is included as **Appendix A**.  A list of my deposition and trial testimony over the last four years is included as **Appendix B**.  A complete list of the documents that I have considered in forming my opinions is attached as **Appendix C**.

5.      My work in this matter is ongoing.  The opinions presented in this report are the result of the information available to me as of the report date.  I reserve the right to supplement or modify my opinions if new information comes to light and to respond to any additional report(s) or opinions offered by other experts.


## II.      Assignment


6.      I have been asked by counsel for Apple Inc. ("Apple" or "the Company") to review and respond to the report of Dr. Don Chance (the "Chance Report"),[4] who was retained by Lead Plaintiff Norfolk County Council as Administering Authority of the Norfolk Pension Fund.[5]  Specifically, counsel has asked me to (i) assess the market efficiency analysis conducted by Dr. Chance for exchange-traded call and put options on Apple stock ("Apple options"), and (ii) assess the damages methodology pertaining to Apple options proposed by Dr. Chance.

---

[1] Expert Report of Professor Steven Grenadier, June 10, 2022.
[2] Expert Report of Steven P. Feinstein, Ph.D., CFA, April 27, 2022.
[3] Expert Report of Steven P. Feinstein, Ph.D., CFA, May 5, 2021.  Dr. Feinstein also submitted a reply report on August 24, 2021 (the "Feinstein Class Certification Reply Report").  Reply Expert Report of Steven P. Feinstein, Ph.D., CFA, August 24, 2021.
[4] Expert Report of Don Chance, April 15, 2022.
[5] *In re Apple Inc. Securities Litigation*, Revised Consolidated Class Action Complaint for Violation of the Federal Securities Laws, June 23, 2020 ("Complaint").

### III.    Summary of Opinions

7.      Below is a summary of my opinions.  The bases for these opinions are detailed in the sections that follow.

8.      **Opinion 1**:  The academic articles cited by Dr. Chance do not support his assertion that all Apple options traded in efficient markets throughout the Class Period.[6]

9.      Dr. Chance cites select academic articles from the 1970s through the early 1990s to reach a conclusion that "the academic literature on options market efficiency strongly supports that options react rapidly to public information about the underlying company and that option prices move consistent with the underlying stock price movement."[7]  He further asserts that "an options market that was deemed efficient by the 1980's can hardly be less efficient today."[8]  He then concludes that "because this case involves Apple options, the most actively traded options on the Chicago Board Options [E]xchange [("CBOE")] during the time frame encompassed in this case, the efficiency of the market for these instruments is unquestionable."[9]  However, the articles cited by Dr. Chance do not support the notion that all options traded on the CBOE traded in efficient markets.  Therefore, Dr. Chance's conclusion that the academic literature shows that the "efficiency of [the Apple options] is unquestionable" is unfounded.[10]

10.      First, Dr. Chance fails to address that most of the articles that he cites exclude broad categories of options, limiting the applicability of these studies to assessing market efficiency of all Apple option series.  In particular, the academic articles cited by Dr. Chance focus on studying the actively traded portion of the option markets.  Most of the articles that Dr. Chance cites are based on samples that exclude deep in-the-money options, deep out-of-the-money options, or options that do not meet certain trading frequency criteria.[11]  Furthermore, some of these articles simply discard from consideration those observations with the most egregious

---

[6] I use "Class Period" to refer to the period from November 2, 2018 through January 2, 2019.  I analyze the set of Apple options that, I understand, could potentially be eligible to be a part of the class in this matter.  These are Apple options that expired after the first alleged corrective disclosure date, November 5, 2018, and had trading volume greater than zero during the Class Period (the "Relevant Options" or, by option type, "Relevant Call Options" and "Relevant Put Options").

[7] Chance Report, ¶ 12.

[8] Chance Report, ¶ 86.

[9] Chance Report, ¶ 86.

[10] Chance Report, ¶ 86.

[11] Additionally, most of these articles only analyze call options and do not analyze put options.  See **Exhibit 1**.

examples of inefficiency, arbitrage violations. From an academic perspective, it may be meaningful to study a subset of the option markets such as the most actively traded part. My understanding is that for purposes of class certification, the relevant question is whether all putative class members, including those that traded less active option series, can be presumed to have relied on the alleged misrepresentation because the option markets were efficient. As such, Dr. Chance cannot assume that market efficiency held for all Apple option series throughout the Class Period without testing this proposition for each Apple option series. I also document that many of the Apple option series at issue in this case would meet certain of the exclusion criteria applied by the authors of the articles cited by Dr. Chance, which raises questions regarding the applicability of these articles to all Apple options.

11.     Second, Dr. Chance fails to acknowledge important limitations to the conclusions of the articles that he cites. Dr. Chance claims that his review of the academic literature on option market efficiency "strongly supports that options react rapidly to public information about the underlying company and that option prices move consistent with the underlying stock price movement."[12] However, many of the academic articles Dr. Chance cites do not test market efficiency for options at all. In addition, other articles cited by Dr. Chance, or articles by the same authors, find evidence of *inefficiencies* in the option markets, including on the CBOE, which Dr. Chance does not acknowledge or address.

12.     Third, Dr. Chance overlooks literature on market frictions and efficiency in option markets, including more recent articles, in making his claim that "the issue [of market efficiency] is essentially settled and academics rarely, if ever, test this matter anymore."[13] I discuss one strand of literature that is particularly relevant here, which studies how market frictions, more specifically transaction costs, can impede arbitrage and prevent option prices from incorporating new, value-relevant information quickly and fully. Academic literature has documented that options typically have high transaction costs. Bid-ask spreads for options are an order of magnitude higher than bid-ask spreads for stocks. The academic literature has attributed the higher bid-ask spreads for options to various costs and risks faced by market makers and has identified examples of mispricing that were not arbitraged away because of the high transaction

---

[12] Chance Report, ¶ 12.
[13] Chance Report, ¶ 14.

costs in these markets.  The academic literature finds that high transaction costs such as bid-ask spreads can impede investors' ability to take advantage of mispricing in option markets.  Thus, a reliable assessment of market efficiency for the Apple options would require assessing whether such frictions impeded the incorporation of new, value-relevant information into the option prices, an assessment that Dr. Chance has not conducted.

13.     **Opinion 2**: Dr. Chance fails to provide any empirical analysis demonstrating that all Apple options traded in efficient markets throughout the Class Period.

14.     Dr. Chance does not analyze any option pricing data in his report.  The only data that he references is aggregate trading volume across all Apple options.  Dr. Chance conducts no analysis with that data other than pointing to the fact that total volume was large.  Such an approach is incapable of demonstrating that all Apple options traded in efficient markets throughout the Class Period, and contrasts with the approach in the very studies that Dr. Chance cites.  Every one of the articles that he claims supports a finding of market efficiency for options implements an empirical methodology to test a hypothesis and reach conclusions regarding market efficiency, arbitrage opportunities, or other issues.  None of these articles reach a conclusion regarding market efficiency based solely on aggregate trading volume.

15.     Dr. Chance fails to address my finding that trading in many of the individual Apple option series was low.  He claims that the trading volume estimates presented in the Grenadier Class Certification Report are "meaningless and distorted."[14]  Such a claim is simply incorrect. Dr. Chance never claims that I made any errors in my calculations, nor does he dispute my finding that many of the individual Apple option series had low trading volumes and traded infrequently throughout the Class Period.  Instead, the difference in our approaches is that Dr. Chance looks at trading volume across all of the Apple options in *aggregate*, while I examine trading volume in the Apple option series *individually*.  Dr. Chance provides no explanation for why aggregate trading volume—which as I document masks differences in trading volume across option series—is the right metric to use in assessing whether each of the Apple option series traded in an efficient market.

---

[14] Chance Report, ¶ 102.

16.     Dr. Chance makes a number of assertions about how Apple option prices "must" behave.[15]  However, he does not conduct any empirical tests to determine if these assertions actually hold.  He does not test whether the prices of individual Apple option series "conformed to pricing rules and models that would prohibit investors from earning easy profits via arbitrage [in Apple options],"[16] empirically "address[] the speed at which [Apple] options incorporate new information about the underlying company,"[17] or empirically "address[] the integration of [Apple] options markets with [the Apple] stock market[]."[18]  In fact, Dr. Chance conceded in deposition that he did not do "any data analysis of individual options in connection with this matter."[19]

17.     Dr. Chance emphasizes that "arbitrage … is the glue that connects the options market to the stock market."[20]  At the same time, he fails to analyze whether there were frictions such as transaction costs preventing option prices from fully reflecting new, value-relevant information, as the definition of market efficiency requires.[21]  Dr. Chance's claim that many of the *Cammer* and *Krogman* factors "cannot be applied to options"[22] directly contradicts Dr. Feinstein's application of *Cammer* and *Krogman* factors to options in his class certification report.[23]  Furthermore, bid-ask spreads are studied in the academic literature in the context of exploring market efficiency of options and are highly relevant for Dr. Chance's claims about market participants' ability to take advantage of arbitrage opportunities in the option markets.  However, Dr. Chance fails to make the link between certain of these factors (which indicate high trading costs for most Apple option series) and the ability to exploit arbitrage opportunities.

---

[15] Chance Report, ¶¶ 14, 46, 48, 106.

[16] Chance Report, ¶ 74.

[17] Chance Report, ¶ 75.

[18] Chance Report, ¶ 80.

[19] Deposition of Don M. Chance, June 8, 2022 ("Chance Deposition") (36:19–36:21).

[20] Chance Report, ¶ 14.

[21] A standard investment textbook explains:  "[t]he semistrong-form [efficient market hypothesis] asserts that security prices adjust rapidly to the release of all public information; that is, current security prices fully reflect all public information."  Reilly, Frank K. and Keith C. Brown, *Investment Analysis and Portfolio Management*, 10th ed., South-Western Cengage Learning, Mason, OH, 2012, p. 152.

[22] Chance Report, ¶ 71.

[23] Feinstein Class Certification Opening Report, ¶ 148 (claiming that "the Apple options satisfy all of the *Cammer* and *Krogman* factors, aside from the bid-ask spread factor, which results were mixed, indicating market efficiency.").

18.     While the Chance Report dismisses the relevance of the *Cammer* and *Krogman* factors to options,[24] Dr. Chance stated at his deposition that *Cammer* factor 5, a cause and effect relationship between the arrival of new, value-relevant information regarding a company and a stock price movement, was "highly relevant."[25]  He further stated that the reason he did not conduct an analysis of *Cammer* factor 5 was that he was "satisfied" with Dr. Feinstein's analysis.[26]  To the extent that Dr. Chance relies on Dr. Feinstein's analysis of *Cammer* factor 5, the criticisms I raise in the Grenadier Class Certification Report about Dr. Feinstein's analysis still apply.  These include that Dr. Feinstein does not present any support in the academic literature for such a methodology; he uses "synthetic" stock prices constructed from bid and ask prices of individual put and call option series and averages these "synthetic" stock prices across all option series, which does not allow him to test whether any *specific* option series reacted to new, value-relevant information; and he fails to address that the majority of the Apple option series did not trade on any of the earnings announcement dates that Dr. Feinstein considers as part of his test.[27]

19.     **Opinion 3**: Dr. Chance fails to provide a reliable damages methodology for all Apple options that measures damages attributable to Plaintiff's theory of liability.

20.     First, Dr. Chance has not conducted any analysis of the reactions of option prices to new, value-relevant information.  Because of this, Dr. Chance fails to demonstrate, and cannot assume, that all Apple option series incorporated new, value-relevant information, including information contained in the stock price, quickly and fully.  Therefore, Dr. Chance does not present a methodology capable of estimating how much the transaction prices of any particular call option series were inflated, if at all, or how much the transaction prices of any particular put option series were deflated, if at all, by the alleged misrepresentation or changed in response to the alleged corrective disclosures.

21.     Second, Dr. Chance's proposed damages methodology for the Apple options assumes that an investor would have chosen to trade the same specific option series (i.e., would have traded the option with the same type (call vs. put), strike price, and maturity date) regardless of

---

[24] See Chance Report, ¶¶ 69, 71.
[25] Chance Deposition (84:7–84:8).
[26] Chance Deposition (84:12–84:13).
[27] See Grenadier Class Certification Report, Section VIII.E.

how stock price inflation may have impacted the investor's preference for that option or the suitability of that option for the investor's strategy. However, such an assumption contradicts Dr. Chance's own testimony that investors choose which options to trade based on option characteristics such as the strike price relative to the underlying stock price, which would have been different following a but-for disclosure according to Plaintiff's allegations.[28] Consistent with this, Dr. Chance testified at deposition that an investor might have bought a different option had the stock not been inflated.[29]

22.    Third, option prices depend not only on the underlying stock price and the option contract terms, but also on volatility—a key determinant of the value of options.[30] Failing to correctly model the appropriate but-for implied volatilities taking into account the impact of a but-for disclosure would lead to an unreliable measure of damages for investors in Apple options. In his report, Dr. Chance assumes that the but-for implied volatilities would be the same as actual implied volatilities, but at deposition he caveated that this was only an "illustration" and recognized that volatilities could change in response to a but-for disclosure.[31] At deposition, he also appeared to suggest that one could determine but-for implied volatilities by looking at the change in implied volatilities before and after an alleged corrective disclosure.[32] However, Dr. Chance does not put forth a reliable methodology to measure how volatilities would have changed in response to a but-for disclosure. In particular:

a.    Dr. Chance has not explained how he would isolate only the change in volatilities that are causally linked to the alleged misrepresentation instead of being driven by confounding information.

---

[28] As discussed in the Grenadier Merits Report, a but-for disclosure refers to the information that allegedly could and should have been disclosed in order to make the alleged misrepresentation not misleading. See Grenadier Merits Report, ¶ 51. I understand that according to Plaintiff's theory, the but-for disclosure that could and should have been made was that Apple was facing "pressure" in Greater China. However, my criticisms of Dr. Chance's damages methodology do not depend on the specific nature of the but-for disclosure.

[29] "[Q] You said had the market price of the stock not been inflated, he might still have bought the option. [A] Well, I said he might. I didn't say he would. He might have bought that [same] option; he might have bought a different option. You can't say exactly what a person would or would not do. In fact, on a different day, he might do something entirely differently. It just depends on how he feels." (Chance Deposition (175:1–175:8)).

[30] Volatility refers to the volatility of the underlying stock price over the life of the option. The volatility over the life of the option can be constant, as in the Black-Scholes model, or time-varying, as in other option pricing models. Implied volatility is an estimate of the true volatility. Implied volatility depends on the option pricing model used to estimate it. See Hull, John C., *Options, Futures, and Other Derivatives*, 8th ed., Prentice Hall, Hoboken, NJ, 2012 ("Hull"), pp. 318–319, 517, 599–626.

[31] Chance Deposition (183:14).

[32] Chance Deposition (190:7–190:15).

    b.    There would not necessarily be transactions relevant for estimating changes in volatilities for Dr. Chance to use in his calculation.

    c.    To the extent that Dr. Chance attempts to use quote prices in the absence of actual transaction prices, this will introduce other problems into his methodology. Bid-ask spreads for the option series are high on average and in some option series, they are very high, leading to a range of potential prices (and implied volatilities).

## IV.    Background on Options and Market Efficiency

### A.    Overview of Equity Options

23.    As I discuss in the Grenadier Class Certification Report, call and put options are derivative securities that give the option purchaser the right to buy or sell a particular underlying asset at a pre-specified price ("strike price" or "exercise price") during a particular period in time, in exchange for an upfront payment.[33] The option purchaser is not obligated to buy or sell the underlying asset and can choose not to exercise the right to buy or sell if it is not advantageous.[34] The option seller takes the other side of the transaction, receives the upfront payment, and is obligated to sell or buy the asset at the pre-specified price if the purchaser chooses to exercise the option.[35] Often, the underlying asset is a share of a particular common stock, such as Apple in this instance.[36] For the Apple options at issue here, one option contract confers the right to buy or sell 100 shares of Apple stock.[37]

24.    Options can be distinguished by whether there would be a positive payoff if the purchaser exercised the option at the current level of the underlying stock price. A call option is in-the-money if the underlying stock price is greater than the strike price, at-the-money if the stock

---

[33] Hull, p. 194.
[34] Hull, p. 194.
[35] Hull, p. 196.
[36] Throughout the remainder of my report, I use "options" to refer to equity options, unless otherwise specified.
[37] According to the CBOE, an underlying equity option product generally represents "100 shares of the underlying equity security." See "Equity Options Product Specifications," *CBOE*, available at https://www.cboe.com/exchange_traded_stock/equity_options_spec/.

price is equal to the strike price, and out-of-the-money if the stock price is less than the strike price.[38]  By contrast, a put option is in-the-money when the underlying stock price is less than the strike price, at-the-money if the stock price is equal to the strike price, and out-of-the-money if the stock price is greater than the strike price.[39]  The extent to which an option is in or out-of-the-money is sometimes referred to as the option's "moneyness."[40]

25.     Options have an "expiration date" or "maturity date" which defines when the option can be exercised.[41]  An option's "time to expiration" or "time to maturity" is the difference between the trading or valuation date and the maturity date.  The two most common types of equity options are "European" and "American" options.  European options can only be exercised on the maturity date, whereas American options can be exercised at any time up to or on the maturity date.[42]  The Apple options in this matter are American options.[43]

26.     The theoretical value of an American call or put option depends on six factors:  the current price of the underlying stock, the strike price of the option, the time to maturity, the volatility of the underlying stock price, the risk-free rate, and any expected dividends.[44]  Volatility refers to the volatility of the underlying stock price over the life of the option.  Option pricing models allow investors to value options using these inputs.

27.     The volatility of the underlying stock price used in the option valuation formulas cannot be directly observed and must be estimated.[45]  Volatility that is estimated based on observed option prices using an option pricing model is referred to as an "implied volatility."  An implied volatility can be estimated as constant or changing over time, depending on the option pricing model being used.  For instance, while the Black-Scholes model assumes a constant volatility for

---

[38] Hull, p. 201.
[39] Hull, p. 201.
[40] Hull, p. 417.
[41] Hull, p. 194.
[42] Hull, p. 194.
[43] See *IVolatility*.
[44] Hull, pp. 214–218.
[45] Hull, p. 318.

the underlying stock, other models use different assumptions.[46]  Dr. Chance proposes to estimate implied volatilities of Apple options using the binomial model.[47]

28.     A unique combination of option type (call or put), strike price, and maturity date defines an "option series."[48]  Options can provide a wide range of payoffs to investors, depending on whether the option is a call or a put, the strike price of the option, and the option's maturity date. As a result, different investors can choose to trade in different option series based on the nature of the payoffs and the investors' investment goals and trading strategies.

29.     For example, suppose the current stock price is $100, and consider a call option with a strike price of $150 and a maturity of one month.  This call option allows an investor to bet that the stock price will increase substantially in the near future, as the call option only pays out if the stock price rises above $150, a 50% increase, in the next month, which is typically unlikely. Because it is unlikely that the stock price will rise that quickly, the investor will be able to purchase the option for a low price and will realize a substantial return in the event that the stock price does exceed $150.  If the stock price does not exceed $150, then the call option expires worthless and the investor loses the entirety of the option's purchase price.

30.     Suppose instead that the stock price is $100 and the investor purchases a call option with a strike price of $100 and a maturity of one month.  Because the stock price is at the strike price, it is more likely that the option will end up in-the-money and will be exercisable at a gain.  This means that the call option has more value when the strike price is $100 than when the strike price is $150, and the investor will pay more to purchase the option with a strike price of $100.  The higher cost is justified because the option provides a greater payoff to the investor in the event that the stock price increases from its current level.

31.     The value of the option will also depend on the volatility of the underlying stock.  In the example in ¶ 29 above, if the volatility of the underlying stock is low enough such that it would be highly unlikely for the stock price to increase from $100 to $150 in the next month, the option value should be low.  If, on the other hand, volatility is high so that there is a higher chance of

---

[46] See, for example, Cox, John C. et al., "Option Pricing: A Simplified Approach," *Journal of Financial Economics*, Vol. 7, No. 3, 1979, pp. 229–263; Heston, Steven L., "A Closed-Form Solution for Options with Stochastic Volatility with Applications to Bond and Currency Options," *The Review of Financial Studies*, Vol. 6, No. 2, 1993, pp. 327–343.
[47] Chance Report, ¶ 118.
[48] Hull, p. 201.

the stock price reaching $150 in the next month, the value of the option should theoretically be higher.  Therefore, the stock price and stock price volatility both affect the value of the option.

32.     Academic literature has found that the implied volatilities calculated from option prices are different for in-the-money options vs. out-of-the-money options and for long maturity options vs. short maturity options, using either the Black-Scholes model or the binomial model.[49] The combination of volatilities implied by the option prices for different degrees of moneyness and different maturities is called the "volatility surface."[50]  The volatility surface captures the notion that the implied volatility derived from the Black-Scholes and binomial models can vary by the option's strike price and time to expiration.[51]  For example, the literature has documented that a deep in-the-money call option will typically be expected to have a higher implied volatility compared to one at-the-money.[52]  Academic research has also shown that implied volatilities can vary over time.[53]  Furthermore, calculation of implied volatility will depend on the option pricing model being used.  For instance, while the Black-Scholes model assumes a constant volatility for the underlying stock, other models build in different assumptions.[54]

33.     As I discuss in the Grenadier Class Certification Report, "put-call parity" refers to a theoretical relationship between the prices of call and put options with a given strike price and maturity and the price of the underlying stock.[55]  In the case of European options, which can only be exercised at maturity, a combination of a long position in a call option, a short position in a put option with the same maturity and strike price, and a cash position equivalent in value to the strike price at the maturity date will lead to a payoff structure that exactly matches that of the underlying stock.[56]  If put-call parity does not hold and trading costs are low, it is possible for

---

[49] Hull, pp. 409–420.
[50] Hull, pp. 416–417.
[51] Hull, pp. 416–417.
[52] Hull, pp. 414–417.
[53] Hull, pp. 498–512.
[54] Hull, pp. 599–626.
[55] Grenadier Class Certification Report, ¶¶ 163–164.
[56] Hull, pp. 221–222.  This assumes that the stock does not pay dividends prior to the options' maturity date.  In the case of a dividend-paying stock, the cash position also reflects the value of the dividends expected to be paid during the options' life.

investors to make a risk-free profit by a combination of buying and selling the call option, the put option, and the underlying stock and borrowing or lending cash.[57]

34.     For American options, which can be exercised at any point up to the maturity date instead of only at the maturity date, the same put-call parity relationship as described for European options no longer applies.  Instead, put-call parity for American options implies a range of valid prices for the call and put options.[58]  This range provides an upper and lower bound on a combination of the call and put prices such that there are no opportunities to make risk-free profits from buying and selling the call option, the put option, and the underlying stock.[59]

### B.     Arbitrage Opportunities, the Law of One Price, and Market Frictions

35.     The concept of arbitrage is widely used in finance to value securities, which include derivative instruments such as call and put options.[60]  An arbitrage opportunity arises when it is possible to conduct a "transaction involving no cash outlay that results in a sure profit."[61]  In a *frictionless* market, securities that offer the same payoff must have the same price; otherwise, arbitrageurs will construct costless transactions that result in risk-free profits by taking advantage of the price differential.[62]  This is known as the "law of one price."[63]

---

[57] Hull, pp. 222–223.

[58] Hull, p. 224.

[59] For put-call parity for American options on a stock that pays dividends, such as Apple, the call price less the put price must be greater than or equal to the stock price less the strike price less the present value of dividends paid during the options' life, and the call price less the put price must also be less than or equal to the stock price less the present value of the strike price.  See Hull, pp. 224–225, 229–231.

[60] For example, the *Principles of Financial Economics* textbook written by Leroy and Werner states that "[t]he principle that there cannot be arbitrage opportunities in security markets is one of the most basic ideas of financial economics" and that "[t]he absence of arbitrage implies that the law of one price holds.  If there exist redundant securities, then their prices must equal the prices of the portfolios of other securities that have equal payoffs."  See LeRoy, Stephen and Jan Werner, *Principles of Financial Economics*, 2nd ed., Cambridge University Press, Cambridge, UK, 2014, pp. 24, 31.

[61] Varian, Hal R., "The Arbitrage Principle in Financial Economics," *Journal of Economic Perspectives*, Vol. 1, No. 2, 1987, pp. 55–72, at p. 55.

[62] "Arbitrage opportunities … cannot last for long.  As arbitrageurs buy the stock … the forces of supply and demand will cause the dollar price to rise. … Very quickly, the two prices will become equivalent at the current exchange rate.  Indeed, the existence of profit-hungry arbitrageurs makes it unlikely that a major disparity between [prices] could ever exist in the first place."  Hull, pp. 15–16.

[63] Lamont, Owen A. and Richard H. Thaler, "Anomalies: The Law of One Price in Financial Markets," *Journal of Economic Perspectives*, Vol. 17, No. 4, 2003, pp. 191–202.

36.     To illustrate the concept of arbitrage and the law of one price, consider a stock that is traded on both the New York Stock Exchange and the London Stock Exchange.  Suppose that the stock price is $120 in New York and £98 in London at a time when both markets are open, and that the exchange rate is $1.25 per pound.  An arbitrageur could simultaneously buy one share of the stock in New York and sell it in London to obtain a risk-free profit of $2.50.[64]  As long as there are no frictions, the arbitrageur would continue to exploit this mispricing, which would force prices on both exchanges to converge.[65]

37.     The previous example holds when there are *no* market frictions.  For instance, the arbitrageur does not face transaction costs, markets are liquid, transactions are instantaneous, and the share could be easily bought on one exchange and sold on the other.  However, the presence of market frictions, such as illiquidity or transaction costs in the form of bid-ask spreads, can limit the ability of the arbitrageur to exploit the apparent mispricing and prevent prices from converging.[66]

38.     To illustrate the impact of transaction costs, suppose instead that there are costs to converting currencies so that the arbitrageur is able to buy pounds at $1.31 per pound and sell pounds at $1.19 per pound, so that the bid-ask spread in the currency market that the investor has access to is $0.12, or 9.6% of the $1.25 mid price (the midpoint between the bid and ask prices).[67]  In this example where there is a bid-ask spread, buying a share in New York and selling it in London is no longer profitable.[68]  As a result, the arbitrageur does not attempt to

---

[64] The arbitrageur would spend $120 to buy the stock on the New York Stock Exchange and could sell the stock on the London Stock Exchange to receive £98.  The £98 is the equivalent of $122.50 at an exchange rate of $1.25 per pound, yielding a risk-free profit of $2.50.

[65] Hull, pp. 15–16.

[66] "Implementation costs. Well-understood transaction costs such as commissions, bid–ask spreads and price impact can make it less attractive to exploit a mispricing."  Barberis, Nicholas and Richard H. Thaler, "A Survey of Behavioral Finance," in *Handbook of the Economics of Finance*, Volume 1B, North Holland, Amsterdam, Netherlands, Chapter 18, 2003, pp. 1053–1128 ("Barberis and Thaler") at p. 1057.

[67] The bid-ask spread in this example is smaller than Dr. Feinstein's weighted average bid-ask spread for the Apple options of 12.9% during the Class Period.  See Feinstein Class Certification Opening Report, ¶ 157.

[68] In this scenario, the arbitrageur could purchase the stock in New York for $120.00, and sell it in London for £98.00.  But that £98.00 is the equivalent of only $116.62 when selling pounds at the exchange rate of $1.19 per pound, thus generating a loss of $3.38.  Note that inverting the trade (i.e., buying the stock in London and selling it in New York) is also not profitable since buying pounds at the exchange rate of $1.31 per pound means the $120.00 from selling in New York is the equivalent of £91.60 pounds, thus generating a loss of £6.40.

exploit the arbitrage opportunity, the mispricing between both exchanges persists, and the law of one price no longer holds.  When there are market frictions that impede arbitrage, the share price in New York may react to new, value-relevant information, while the share price in London may not, or vice versa, because the prices in both markets are not forced to move in tandem by arbitrage.  Relatedly, if there are transaction costs, the absence of arbitrage opportunities may not determine a unique price.  Instead, a range of prices can exist—in the example above, a price of $120 in New York and £98 in London are both consistent with no arbitrage.  In fact, any price between £91.60 and £100.84 in London would be consistent with no arbitrage.[69]

39.     As this example shows, it is possible for market frictions, such as transaction costs, to impede the ability of market participants to exploit arbitrage opportunities.  As a result, the prices of even identical securities can deviate from each other, security prices may fail to react to new, value-relevant information, and such mispricing can persist in the market because of the inability for market participants to arbitrage it away.

## C.     Market Efficiency of Equity Options

40.     I understand that plaintiffs in a securities class action under Rule 10b-5 have the burden to prove that the security at issue traded in an efficient market throughout the class period in order to invoke the "fraud-on-the-market" theory of reliance.  This theory holds that trading prices of a security in an efficient market reflect all publicly available information, including the alleged misrepresentations.  Therefore, investors implicitly relied on the alleged misrepresentations when they purchased or sold the security because they relied on the integrity of the trading prices in an efficient market when making the transactions.

41.     In an efficient market, a security price responds quickly and fully to new, value-relevant information once it is publicly announced.  There are different forms of the efficient market hypothesis.  I understand that the semi-strong form, which holds that a security price in an

---

[69] If the stock price in London were £91.60, the arbitrageur selling the stock in New York for $120 and buying pounds at $1.31 per pound would receive £91.60, and thus there would be no arbitrage opportunity.  Conversely, if the stock price in London were £100.84, the arbitrageur selling the stock in London and selling pounds for dollars at $1.19 per pound would receive $120, and again there would be no arbitrage opportunity.

efficient market always fully reflects all publicly available information, is the form on which the fraud-on-the-market theory of reliance is based.[70]

42.    The fundamental basis for the efficient market hypothesis is that competition among sophisticated investors quickly eliminates opportunities to trade and profit based on public information.  That competition causes security prices to react nearly instantaneously to new, value-relevant public information.

43.    It is important to emphasize that markets that are informationally efficient do not allow traders to earn abnormal profits based on publicly available information because all such opportunities are competed away.  The reverse is not true.  Some markets are so illiquid or have such high transaction costs that they do not provide traders with opportunities to earn abnormal profits *even though* prices in these markets do not quickly and fully react to new, value-relevant information, i.e., these markets are not informationally efficient.[71]  For example, as discussed in the exchange rate example above, in the presence of transaction costs, if the stock price was $120 in the US, then any price between £91.60 and £100.84 in London would be consistent with no arbitrage.  Because the arbitrage bounds in this example are wide, this means that the price of the security in the US market could react quickly and fully to new, value-relevant information while the price in London may not without the arbitrage bounds being violated.  For example, the share price of $120 in the US could have fully reflected negative news after a 4% decline from $125, while the share price in London could have remained constant at £98, could have increased 1% from £97 to £98, or could have decreased 1% from £99 to £98 over the same period, any of which would not have prompted profitable trading by arbitrageurs.[72]

44.    Efficiency is not an inherent characteristic of markets.  Rather, efficient markets arise when there is a sufficiently large number of competing investors—particularly market professionals, such as institutional investors and arbitrageurs—so that any new information

---

[70] See, e.g., *In re Federal Home Loan Mortgage Corp. (Freddie Mac) Securities Litigation*, 281 F.R.D. 174 (2012) at p. 177.  A standard investment textbook explains:  "[t]he semistrong-form [efficient market hypothesis] asserts that security prices adjust rapidly to the release of all public information; that is, current security prices fully reflect all public information."  Reilly, Frank K. and Keith C. Brown, *Investment Analysis and Portfolio Management*, 10th ed., South-Western Cengage Learning, Mason, OH, 2012, p. 152.

[71] For instance, in "A Survey of Behavioral Finance," Barberis and Thaler make the link between high transaction costs and inability to exploit mispricing: "Well-understood transaction costs such as commissions, bid–ask spreads and price impact can make it less attractive to exploit a mispricing."  Barberis and Thaler, p. 1057.

[72] In this stylized example, I assume, for simplicity, that the New York and the London markets operate on the same trading hours.

concerning a security is reviewed immediately, assessed for its implications for the security price, and fully impounded in the price through active trading by competing investors.

45.      The concept of market efficiency described above applies equally to Apple stock and to each Apple option series.  In other words, the market for an option is efficient if the price of the option rapidly and fully reflects new, value-relevant information as a result of investor competition to take advantage of perceived mispricing.  As described above in Section IV.A, options are securities with different characteristics, such as different payouts and riskiness. Furthermore, because options are derivative securities, their value is dependent on other factors, such as stock price volatility and interest rates, in addition to the price of the underlying common stock.[73]  Moreover, there is nothing inherent in the characteristics of options that automatically ensures that all options are as inexpensive to trade as the underlying stock.  There is also nothing inherent in the characteristics of options that ensures that prices at which investors buy or sell all options will always automatically line up with some theoretical model, whether it is the Black-Scholes model, the binomial model, or any other model.

46.      Consequently, because of these differences between options and stock, market efficiency for the Apple stock does not automatically translate into market efficiency for the option markets.  It is possible that the market for a stock is efficient, while markets for options on the stock are not.  Furthermore, there can be thousands of unique option series for a particular company (as is the case for Apple throughout the Class Period), and while some of those option series may have traded efficiently, others may have not.

47.      Highlighting this point, Dr. Chance writes in his textbook on options that "[a] few profitable arbitrage opportunities exist, however, *even in markets that are usually efficient*.  The presence of these opportunities means that the prices of some assets are temporarily out of line with what they should be."[74]  Thus, efficiency is not always guaranteed.  As a result, it is important to analyze whether each individual Apple option series traded in an efficient market throughout the Class Period.  As discussed below, Dr. Chance fails to perform this analysis.

---

[73] See Section IV.A; Hull, p. 214.
[74] Chance, Don M. and Robert Brooks, *An Introduction to Derivatives and Risk Management*, 10th ed., Cengage, Boston, MA, 2016 ("Chance and Brooks"), p. 16, emphasis added.

### D.    Summary of Dr. Chance's Options Efficiency Opinion

48.     Dr. Chance opines that "Apple options trade in an efficient market in that their prices rapidly reflects [*sic*] all publicly available information."[75]  Dr. Chance supports this conclusion in two ways.[76]

49.     First, Dr. Chance provides an overview of select academic literature on option market efficiency spanning the 1970s to early 1990s[77] and claims that "the academic literature on options market efficiency strongly supports that options react rapidly to public information about the underlying company and that option prices move consistent with the underlying stock price movement."[78]  According to Dr. Chance, the academic articles that he cites look at "whether exchange-listed options conformed to pricing rules and models that would prohibit investors from earning easy profits via arbitrage,"[79] the "speed at which options incorporate[d] new information about the underlying company,"[80] and "whether the existence of options markets benefit[ed] or hurt[] the stock market."[81]

50.     Second, he makes *theoretical* claims about how an option price *should* behave.  He states that an option with a payoff determined by the underlying stock price "must" have its current trading price determined by the stock price.[82]  Otherwise, he claims, market participants will take advantage of any mispricing or arbitrage opportunities.[83]  Dr. Chance states that arbitrage "is the glue that connects the options market to the stock market."[84]  He further claims that the "options market must reflect the information provided in the price of the stock and it must do it rapidly.

---

[75] Chance Report, ¶ 12.
[76] "[Q] What analysis did you perform to support your opinion that Apple options traded in an efficient market?  [A] Well, I was asked to look at the academic literature, and I did that. And then I also presented a logical, rational, heuristic approach to why options have to reflect the efficiency of the market.  Or reflect what's in the stock market, which has been deemed to be efficient."  (Chance Deposition (32:23–33:5)).
[77] Chance Report, Section X.
[78] Chance Report, ¶ 12.
[79] Chance Report, ¶ 74.
[80] Chance Report, ¶ 75.
[81] Chance Report, ¶ 80.
[82] Chance Report, ¶¶ 48, 62–64, 67, 70.  He also notes that "[t]he price of an option on a stock is determined by six factors," one of which is the underlying stock price.  Chance Report, ¶ 70.
[83] Chance Report, ¶ 14.
[84] Chance Report, ¶ 14.

Otherwise, traders transacting at stale prices will lose money.  Option traders who do not price the option correctly and rapidly absorb new information into the price will be exploited."[85] However, while Dr. Chance claims that these relationships "must" hold as a matter of theory, he does not empirically evaluate whether these statements are true for the prices at which each Apple option series *actually traded*.[86]

51.     Finally, in contrast to Dr. Feinstein, Dr. Chance claims that the *Cammer* and *Krogman* factors are not generally applicable to options.[87]  Dr. Chance asserts that the *Cammer* and *Krogman* factors "cannot be applied to options in the same way they are applied to common stock" and discusses purported reasons why certain factors are not relevant for options.[88]  Dr.

---

[85] Chance Report, ¶ 14.

[86] "[A] So, yeah, it's got to. It's got to reflect.  And one other thing that's really important is that stock price is an extremely obvious piece of information. You can't miss it. People trade options, they're not just sitting there surfing the web and all that. I mean they're paying attention to the underlying stock. So, yeah, that's what I mean. They've got to. [Q] And you did not do any empirical analysis to confirm this statement, did you? [A] I don't need to. But no, I didn't." (Chance Deposition (98:14–98:23)).

[87] Chance Report, ¶ 69 ("I understand that courts have found it helpful to use certain factors identified in these legal case opinions, *Cammer v. Bloom* and *Krogman v. Sterrit* [sic] to assess the efficiency of the market for common stock. Option markets are derivative of stock markets and as derivatives, they trade based upon the prices of the underlying stocks. It is not, however, appropriate to evaluate the efficiency of the derivative market with the same standards courts use to evaluate efficiency of the market for common stock").  In contrast, Dr. Feinstein claims that "the Apple options satisfy all of the *Cammer* and *Krogman* factors, aside from the bid-ask spread factor, which results were mixed, indicating market efficiency."  Feinstein Class Certification Opening Report, ¶ 148.

[88] Dr. Chance discusses the applicability of the following factors:  number of market makers, eligibility to file an SEC Form S-3, market capitalization, public float, stock analyst coverage, and bid-ask spread.  First, Dr. Chance claims that the number of market makers cannot be applied because the exact number of market makers is not easily determined but that option markets are highly liquid and "options exchanges … guarantee that there will be market makers willing to buy or sell at any time during trading hours."  Second, Dr. Chance asserts that the eligibility to file an SEC form S-3 is not applicable because the form has no "direct relevance to the options market."  Third, Dr. Chance claims that "market capitalization, while important for many evaluation purposes, means nothing in the context of options."  Fourth, Dr. Chance states that "[t]he concept of public float, the number of shares of a company's common stock available to trade, applies only to stocks. Options do not have a public float. Options can be created in unlimited quantities."  Fifth, Dr. Chance claims that analyst coverage is not applicable because options traders "do not publish what are often referred to as analyst research reports the way stock analysts do."  According to Dr. Chance, those reports would be outdated almost instantaneously as the "options market moves too fast for reports."  Lastly, Dr. Chance claims "one cannot judge an options bid-ask spread with the same standards as a stock bid-ask spread" because "[o]ptions are priced lower than stocks so the same bid-ask spread on the option and on the stock would be larger as a percentage of the option price.  Moreover, options do not trade as often as stocks, which tends to make the bid-ask spread higher for options, as it is more costly for a market maker to hedge his risk when there are fewer market participants."  He further asserts that "while low bid-ask spreads can be suggestive of market efficiency, high bid-ask spreads do not automatically mean inefficiency."  Chance Report, ¶ 71.

Chance does report the aggregate trading volume of Apple options, but this analysis is not put forth in the context of the relevant *Cammer* factor or as a test of market efficiency.[89]

## V. The Academic Articles Cited by Dr. Chance Do Not Support His Assertion That All Apple Options Traded in Efficient Markets throughout the Class Period

52.    In this section, I address Dr. Chance's discussion of academic articles on option market efficiency.  In his report, Dr. Chance cites academic articles from the 1970s through the early 1990s and states that "the academic literature on options market efficiency strongly supports that options react rapidly to public information about the underlying company and that option prices move consistent with the underlying stock price movement."[90]  He further asserts that "an options market that was deemed efficient by the 1980's can hardly be less efficient today."[91]  Based on the articles that he cites, Dr. Chance concludes that "because this case involves Apple options, the most actively traded options on the Chicago Board Options [E]xchange [(CBOE)] during the time frame encompassed in this case, the efficiency of the market for these instruments is unquestionable."[92]

53.    As I discuss below, the articles cited by Dr. Chance do not support the notion that all option series that traded on the CBOE traded in efficient markets or that all Apple option series traded in efficient markets throughout the Class Period.  The academic articles cited by Dr. Chance focus on studying the actively traded portion of the option markets.  Specifically, most of the articles cited by Dr. Chance are based on samples that exclude deep in-the-money options, deep out-of-the-money options, or options that do not meet certain trading frequency criteria.[93]

---

[89] Chance Report, ¶¶ 91, 101–102, 105, Exhibits 1–2.

[90] Chance Report, ¶ 12.

[91] Chance Report, Section X, ¶ 86.

[92] Chance Report, ¶ 86.

[93] A number of the articles also exclude shorter-dated options.  Some exclude options with 30 or fewer days to maturity, others exclude options with 20 days or fewer to maturity, and still others exclude options with fewer than 10 days to maturity.  For example, Manaster and Rendleman (1982) excludes options with fewer than 30 days to maturity because "the [Black-Scholes] model is quite sensitive to violations of its underlying assumptions for options which are close to expiration. Also, the influence of measurement errors on the calculated values of option prices from the [Black-Scholes] formula is increased dramatically for short term to maturity options."  See Manaster, Steven and Richard J. Rendleman Jr., "Option Prices as Predictors of Equilibrium Stock Prices," *Journal*

Furthermore, some of these articles simply discard from consideration those observations with the most egregious examples of inefficiency, arbitrage violations.[94]  From an academic perspective, it may be meaningful to study a subset of the option markets, such as the most actively traded part.  My understanding is that for purposes of class certification, the relevant question is whether all putative class members, including those that traded less active option series, can be presumed to have relied on the alleged misrepresentation because the option markets were efficient.  As such, Dr. Chance cannot assume that market efficiency held for all Apple option series throughout the Class Period without testing this proposition for each Apple option series.

54.      In Section V.A below, I begin by discussing the articles cited by Dr. Chance as evidence of option market efficiency.  I show that Dr. Chance fails to address the fact that most of the articles he discusses limit their analysis to the most liquid subset of options, and in some cases, these articles exclude from their analysis options where there is evidence of mispricing, including violations of arbitrage bounds.

55.      In Section V.B below, I show that Dr. Chance fails to acknowledge important limitations to conclusions in the articles that he cites.  In particular, some of the articles cited by Dr. Chance do not address the issue of market efficiency of options at all, contrary to Dr. Chance's claim.  Other articles that do test market efficiency also document *inefficiencies* in option markets in the form of mispricing, something that Dr. Chance has failed to acknowledge or address.

---

*of Finance*, Vol. 37, No. 4, 1982, pp. 1043–1057 at p. 1046.  Similarly, Bhattacharya (1983) drops "[o]ptions of maturities of three weeks or less because the call values for such options are insensitive to σ."  Bhattacharya, Mihir, "Transactions Data Tests of Efficiency of the Chicago Board Options Exchange," *Journal of Financial Economics*, Vol. 12, No. 2, 1983, pp. 161–185 ("Bhattacharya (1983)") at p. 173.  Moreover, Patell and Wolfson (1981) exclude option pairs with 20 or fewer days to expiration because of "the explosive growth in implied standard deviation during the last 15 days of the option's life."  See Patell, James M. and Mark A. Wolfson, "The Ex Ante and Ex Post Price Effects of Quarterly Earnings Announcements Reflected in Option and Stock Prices," *Journal of Accounting Research*, Vol. 19, No. 2, 1981, pp. 434–458, at p. 452.  As another example, Figlewski and Webb (1993) restrict their sample to "all pairs with options that were between 15 percent in-the-money and 15 percent out-of-the-money, and from 10 to 150 days to expiration," thus excluding options with fewer than 10 days to maturity.  See Figlewski, Stephen and Gwendolyn P. Webb, "Options, Short Sales, and Market Completeness," *Journal of Finance*, Vol. 48, No. 2, 1993, pp. 761–777 ("Figlewski and Webb (1993)") at p. 767.

[94] Most of these articles only analyze call options and do not analyze put options.  See **Exhibit 1**.

56.     In Section V.C below, I discuss literature on market frictions and market efficiency in option markets, including more recent articles.  I show that in contrast to Dr. Chance's claim that "the issue [of option market efficiency] is essentially settled and academics rarely, if ever, test this matter anymore,"[95] a number of studies document market frictions that can impede arbitrage and prevent prices from incorporating new, value-relevant information quickly and fully.

### A.     Dr. Chance Fails to Address That Most of the Articles That He Cites Exclude Broad Categories of Options, Limiting Their Applicability to Assessing Market Efficiency of All Apple Option Series

57.     In deposition, Dr. Chance acknowledged that research "tends to want to be focused on the most active options" and that options that are not "active" are "not being directly tested."[96] Consistent with this statement, most of the articles that Dr. Chance cites in his report analyze *only* the most liquid options, options that do not have long time to maturity, or options that are not deep in- or out-of-the-money.[97]  Furthermore, some of these studies explicitly exclude from their analysis options with evidence of mispricing, including violations of arbitrage bounds. While these restrictions are sensible in the context of the studies, the restrictions limit the applicability of the findings of these studies to a conclusion about all Apple option series, for instance, the less liquid option series, deep in-the-money or out-of-the-money option series, or option series with long time to maturity.[98]

58.     I summarize the restrictions imposed by the various articles in **Exhibit 1** and discuss specific examples below.  I also note that many of the Apple option series at issue in this case would meet certain of these exclusion criteria applied in these studies.

---

[95] Chance Report, ¶ 14.
[96] Chance Deposition (151:24–152:2).
[97] Additionally, most of these articles only study call options, and not put options.  See **Exhibit 1**.
[98] As noted above (fn. 93), a number of the articles also exclude shorter-dated options, which some articles define as 30 or fewer days to maturity, others define as 20 days or fewer, and still others define as 10 days or fewer.

59.     Dr. Chance cites a study by Stephan and Whaley (1990)[99] as being supportive of "rapid absorption of information by options."[100]  This study only uses call options in its sample and *excludes* from the analysis call options that violate arbitrage boundary conditions,[101] options that are deep in-the-money and that are deep out-of-the-money,[102] and "options with fewer than 144 transactions in a given day."[103]  The authors are explicit in calling the remaining transactions the "active option sample."  In their findings, the authors further state that they investigate "a sample of firms whose options were *actively* traded" on the CBOE.[104]

60.     As I demonstrate in my Class Certification Report, most of the Apple option series were not actively traded.  For example, the median call option series had an average daily volume of 45 contracts,[105] which means that the median call option series would have had an average number of transactions well below the 144 transaction restriction used in the Stephan and Whaley (1990) study.[106]  Furthermore, 37.6% of the Relevant Call Option series do not have a

---

[99] Stephan, Jens A. and Robert E. Whaley, "Intraday Price Change and Trading Volume Relations in the Stock and Stock Options Markets," *Journal of Finance*, Vol. 45, No. 1, 1990, pp. 191–220 ("Stephan and Whaley (1990)") at pp. 195, 199.

[100] Chance Report, ¶ 78.  The authors use transaction prices in the stock and option markets in this study.

[101] "Prior to implementing the volatility estimation procedure, the option transactions were carefully scrutinized to identify values that violate basic rationality conditions.  An American call option on a stock with two known dividends paid during the option's life has three important lower price bounds.  These bounds are implied by early exercise of the call just prior to each of the two ex-dividend instants and by normal exercise at expiration. … Expression (a) is the lower price bound of a European call whose time to expiration equals the time to the first ex-dividend instant; expression (b) is the lower price bound of a European call whose time to expiration equals the time to the second ex-dividend instant; and expression (c) is the lower price bound of a European call option with the specific time to expiration.  If the observed call option transaction price is below any one of these three values, no volatility estimate is possible.  For this reason, all such option transactions were eliminated from the sample." Stephan and Whaley (1990), p. 195.

[102] "Deep in-the-[money] and deep out-of-the-[money] options also pose a problem in volatility estimation.  Such options are priced at approximately their intrinsic values and contain little, if any, information about the level of the stock's volatility. To filter these option transactions from the sample, upper and lower bounds on the moneyness of the option were defined."  Stephan and Whaley (1990), p. 195.

[103] Stephan and Whaley (1990), p. 199.  The sample in this article also excludes any option with more than two dividend payments during the time period studied (first quarter of 1986).  The authors state: "The model is limited to a maximum of two dividend payments on the underlying stock during the option's life so transactions on options with more than two dividends are excluded from the sample."  Stephan and Whaley (1990), p. 195.

[104] Stephan and Whaley (1990), p. 191.

[105] Grenadier Class Certification Report, Exhibit 5.  **Appendix D** reproduces Exhibit 5 from the Grenadier Class Certification Report.

[106] In my Class Certification Report, I utilized data from *IVolatility*, the data source used by Dr. Feinstein in his class certification analysis.  These data do not report the number of transactions for each option series for each date, only the number of contracts traded.  However, if the number of contracts traded in a day is 45, then 45 is the maximum

*single day* during the Class Period with a daily volume of 144 contracts or more.[107]  This means that at least this many call option series would not have a *single day* during the Class Period that meets the Stephan and Whaley (1990) restrictions.[108]  Considering all observations across the Relevant Call Option series during the Class Period, 77.0% of the option-day pairs would be excluded under the Stephan and Whaley (1990) restrictions.[109]

61.     Similarly, Dr. Chance discusses a study by Figlewski and Webb (1993) in the context of "the integration of options markets with stock markets."[110]  However, Figlewski and Webb (1993) limits its analysis "to the *most heavily traded* option classes."[111]  The authors explain that they limit their sample in this way to focus on options that are "less prone to distortions associated with market thinness."[112]  Thus, the authors recognize the potential for distortions for less liquid options and proactively exclude the options that may be affected by these distortions. Out of 2,282 Relevant Option series for Apple,[113] 1,240 (54.3%) meet the exclusion criteria defined by Figlewski and Webb (1993), which, again limits Dr. Chance's ability to draw an inference about all Apple options.[114]

---

number of transactions that could have occurred on that day.  45 contracts could theoretically represent 45 transactions of one contract each, or one transaction of 45 contracts, or some number in between.

[107] There are 1,185 Relevant Call Option series.  See *IVolatility*.

[108] In addition to the exclusions listed above, Stephan and Whaley (1990) also excludes all put option series.  This would further increase the percentage of the overall Apple option data excluded under their criteria.  For example, the 77.0% of option-day pairs excluded would become 87.8% of option-day pairs excluded if all put options are excluded.

[109] These observations represent all observations that appear in the *IVolatility* data for the Relevant Call Option series throughout the Class Period.  I note that 77.0% is found when applying only the restriction on number of transactions from Stephan and Whaley (1990).  This number would be larger if the restrictions on arbitrage boundary violations and moneyness were also applied.  See Stephan and Whaley (1990), p. 195.

[110] Chance Report, ¶ 80.

[111] Figlewski and Webb (1993), p. 767, emphasis added.

[112] Figlewski and Webb (1993), p. 767.

[113] As defined in ¶ 8, the Relevant Options are those that expired after the first alleged corrective disclosure date, November 5, 2018, and had trading volume greater than zero during the Class Period.

[114] Figlewski and Webb (1993) "selected at-the-money, intermediate-term pairs of puts and calls with the same strike price and expiration to limit the analysis to the most heavily traded option classes, that are less prone to distortions associated with market thinness."  The exclusion criteria would have affected Apple option series throughout the Class Period in the following ways.  First, out of the 2,282 Apple option series, 218 met these exclusion criteria as the matching call or put with the same strike price and expiration for these series had no trading volume during the Class Period.  Second, out of the remaining 2,064 Apple option series (or 1,032 call/put option pairs), Figlewski and Webb (1993) requires "both the put and the call price [to] exceed[] 1/16 ($0.0625)," option pairs to be "between 15 percent in-the-money and 15 percent out-of-the-money, and from 10 to 150 days to expiration."  Figlewski and Webb (1993), p. 767.  This results in 1,022 Apple option series (or 511 call/put option

62.     As another example, Dr. Chance discusses an article by Bhattacharya (1983) as one of the articles that "focus on the fact that arbitrage profits cannot be made."[115]  However, the article makes a sequence of data exclusions and other data-related decisions that the author acknowledges biases the data *in favor of* the hypothesis of market efficiency:

> [T]o avoid selecting transaction prices as sell prices when they could in fact have been initiated by buy orders, or vice versa, the lowest bid price at which a transaction occurred is assumed to be the bid price and the highest ask price at which trade occurred is assumed to be the ask price, for the given level of stock price.  Only such unambiguous prices are used in tests of hypotheses in this paper.  ***Evidently, this causes the tests to be biased in favor of the maintained hypotheses of well-synchronized option markets and option-market efficiency.***
>
> Before concluding, the shortcomings of the paper need to be discussed.  ***By working only with the widest band of the available bid/ask spread the tests have been biased in favor of the null hypotheses [of well-synchronized option markets and option-market efficiency].***  Not doing so would have meant working with trades inside the bid/ask spread without unambiguously knowing whether a trade was initiated by a buy order or a sell order, resulting in ambiguous conclusions.  ***In limiting trades to next available prices rather than at the mispricing signals themselves, the time taken to execute a hedge may be overstated, thereby biasing the tests in favor of the null hypotheses***.  It is conceivable that a market maker recognizes a mispriced option and trades immediately.  For a researcher studying past data to do so would imply an ex-post selection bias.[116]

63.     **Exhibit 1** summarizes the data restrictions for each of the articles discussed by Dr. Chance in his Section X titled "Academic research on options market efficiency."  Out of 16 articles discussed by Dr. Chance, 13 articles analyze prices in the option markets.[117]  All 13

---

pairs) having met these exclusion criteria.  Altogether, 1,240 Apple option series (1,022 plus 218 Apple option series without a call/put pair that traded over the Class Period), which corresponds to 54.3% of the relevant Apple option series, met the exclusion criteria of Figlewski and Webb (1993) throughout the Class Period.  See *IVolatility*.

[115] Chance Report, ¶ 74.

[116] Bhattacharya (1983), at pp. 168–169, 182, emphasis added.

[117] As discussed in Section V.B below, three of the articles cited by Dr. Chance do not analyze prices in the option markets.  These include Anthony (1988), which analyzes volumes in the option markets, Jennings and Starks (1986) and Kumar et al. (1998), which analyze whether stocks of companies that have trading in the option markets tend to incorporate certain information faster than stocks of companies that do not have publicly traded options.  See Anthony, Joseph H., "The Interrelation of Stock and Options Market Trading-Volume Data," *Journal of Finance*, Vol. 43, No. 4, 1988, pp. 949–964 ("Anthony (1988)"); Jennings, Robert and Laura Starks, "Earnings

describe excluding options data based on certain criteria.  Of these, six articles exclude from the sample certain mispriced options, including those that violate arbitrage relationships, nine exclude options based on trading frequency, and six exclude options based on them being deep in- or out-of-the-money.[118]

64.      In deposition, Dr. Chance claimed that these data exclusions are valid because the articles he cites are from top-tier journals and have been peer-refereed.[119]  His response misses the point of my criticism of his application of academic literature to draw a conclusion about the efficiency of all Apple options throughout the Class Period.  I do not dispute the validity of the data sample adjustments made by the authors *for the purposes of their academic studies*.  Some of the exclusions were made due to data availability or due to the specific questions being addressed by the authors.  However, any conclusion based on these articles about option series *other than* the option series studied in these articles must take the sample data composition into account.[120]  For example, if an academic study examines a subset of options that are the most liquid, Dr. Chance cannot claim that the conclusions of the academic study based on that particular subset of options are automatically applicable to all options, including the less liquid ones that are excluded from the analysis of the study.  Dr. Chance has failed to address this limitation in his discussion of the academic literature and its applicability to all Apple options in this matter.

---

Announcements, Stock Price Adjustment, and the Existence of Option Markets," *Journal of Finance*, Vol. 41, No. 1, 1986, pp. 107–125 ("Jennings and Starks (1986)"); Kumar, Raman et al., "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance*, Vol. 53, No. 2, 1998, pp. 717–732 ("Kumar et al. (1998)").

[118] I note that many of the articles cited by Dr. Chance also exclude options based on dividend payment restrictions.

[119] "This is a journal with very high standards, and they don't let you get away with anything.  I'm not -- you know, I've not refereed the article.  And I know and respect Professor Whaley, and I can't imagine that imposed a bias that wouldn't have been caught by him and he would have addressed it.  And I would think the referees would have addressed it."  (Chance Deposition (133:22–134:4)).

[120] "Threats to external validity compromise the ability to generalize the results of the study to other populations and settings. Two such threats are when the experimental sample is not representative of the population of interest and when the treatment being studied is not representative of the treatment that would be implemented more broadly." See Stock, James H., and Mark W. Watson, *Introduction to Econometrics*, 3rd ed., Pearson Education, Inc., London, UK, 2015, pp. 483–484.

**B.    Dr. Chance Fails to Acknowledge Important Limitations to the Conclusions of the Studies He Cites**

65.    Dr. Chance claims that his review of the academic articles on option market efficiency "strongly supports that options react rapidly to public information about the underlying company and that option prices move consistent with the underlying stock price movement."[121]  He describes the following three categories of academic articles as supporting this view:

    a.   The first category "look[s] at whether exchange-listed options conformed to pricing rules and models that would prohibit investors from earning easy profits via arbitrage, the existence of which would suggest inefficiency if they covered the cost of trading."[122]

    b.   The second category "address[es] the speed at which options incorporate new information about the underlying company."[123]

    c.   The third category "addresses the integration of options markets with stock markets."[124]

In Section V.B.1 below, I show that some of the articles cited by Dr. Chance do not address the issue of market efficiency of option markets at all, contrary to Dr. Chance's claim.  In Section V.B.2, I discuss articles that provide evidence of *inefficiency* in option markets, which Dr. Chance has failed to acknowledge in his discussion of the academic literature.

**1.    Articles Cited by Dr. Chance That Do Not Address Market Efficiency of Option Markets**

66.    As described above, Dr. Chance discusses articles that he claims "address[] the integration of options markets with stock markets."[125]  However, the articles that Dr. Chance discusses in this category do not address market efficiency of the option markets at all.  Instead,

---

[121] Chance Report, ¶ 12.
[122] Chance Report, ¶ 74.
[123] Chance Report, ¶ 75.
[124] Chance Report, ¶ 80.
[125] Chance Report, ¶ 80.

these articles focus on properties of markets for *stocks* and how these stock markets are affected when there are options traded on the stocks.  For example, Jennings and Starks (1986) explores whether *stocks* of companies with listed options tend to incorporate certain information faster than other stocks.[126]  Kumar et al. (1998) compares characteristics of stocks (e.g., bid-ask spreads, sensitivity of price to order flow) that have listed options to characteristics of stocks without listed options.[127]  Figlewski and Webb (1993) compares the informational efficiency of *stocks* in the presence of short sale constraints depending on whether there was trading in options.[128]  In fact, Dr. Chance acknowledged in his deposition that Figlewski and Webb (1993) does not test for market efficiency of options.[129]

67.      Dr. Chance attempts to make the connection between efficiency of stocks and options by claiming that "[o]ptions markets could not improve the quality of the stock market if they themselves were inefficient."[130]  However, the assertion that if option markets made a stock market more efficient then they must have also been efficient is speculative and has no support in the academic literature cited by Dr. Chance.

68.      Dr. Chance also discusses articles that he claims "address[] the speed at which options incorporate new information about the underlying company."[131]  One of the articles Dr. Chance cites in this category is Anthony (1988).[132]  Dr. Chance claims that this article "concludes that options markets often trade ahead of the stock market, which further points to market efficiency."[133]  However, this article does not address market efficiency at all because it does not analyze option or stock *prices*, but looks at *trading volumes* across the two markets.[134]  Anthony (1988) explicitly states that the article does not discuss market efficiency because prices are not

---

[126] Jennings and Starks (1986), p. 107.
[127] Kumar et al. (1998), p. 717.
[128] Figlewski and Webb (1993), p. 761.
[129] "[Q] What I'm asking is:  Does the Figlewski and Webb article show that options markets themselves are efficient? A.  Well, to my understanding, that's not what they were testing, and I don't think they needed to test it because I think it was well established even by that time."  (Chance Deposition (154:5–154:11)).
[130] Chance Report, ¶ 85.
[131] Chance Report, ¶ 75.
[132] Chance Report, ¶ 75.
[133] Chance Report, ¶ 77.
[134] The study focuses on volume and only uses closing prices to identify at-the-money options.  See Anthony (1988), p. 952.

being examined: "This paper does not address the market-inefficiency issue. Tests of market efficiency would require the addition of market prices to the volume data employed here. The efficiency question would appear to present a useful area for future research."[135]

69.     Finally, Dr. Chance discusses articles that he claims "look[] at whether exchange-listed options conformed to pricing rules and models that would prohibit investors from earning easy profits via arbitrage."[136]  While some of the articles in this category analyze market efficiency, others do not.  The articles that do not analyze market efficiency instead analyze whether option prices follow the theoretical values predicted by the Black-Scholes model, not whether options trade in efficient markets.  To the extent that Dr. Chance interprets these studies as tests of market efficiency, under this interpretation these studies would indicate instances of market inefficiency, as they find many deviations of option prices from the values predicted by the Black-Scholes model.  For example, Macbeth and Merville (1979) states that the article is "a *descriptive analysis* of how market prices of call options compare with prices predicted by the Black and Scholes … option pricing model."[137]  Contrary to Dr. Chance's statement that "each of these studies … address[es] market efficiency,"[138] the article does not motivate the comparison of market prices and Black-Scholes model prices as related to market efficiency and, in fact, does not mention market efficiency at all.  The article finds persistent mispricing in options relative to the Black-Scholes model prices:  "The [Black-Scholes] model predicted prices are on average less (greater) than market prices for in the money (out of the money) options."[139]

70.     Similarly, Rubinstein (1985) examines pricing of call options by explicitly *assuming* that deviations in prices from the Black-Scholes model are not driven by systematic inefficiencies.[140]

---

[135] Anthony (1988), p. 961.

[136] Chance Report, ¶ 74.

[137] Macbeth, James D. and Larry J. Merville, "An Empirical Examination of the Black-Scholes Call Option Pricing Model," *Journal of Finance*, Vol. 34, No. 5, 1979, pp. 1173–1186 ("Macbeth and Merville (1979)") at p. 1173, emphasis added.

[138] Chance Report, ¶ 74.

[139] Macbeth and Merville (1979), p. 1185.

[140] "If, further, we suppose that the options market, although possibly sporadically inefficient, exhibits no systematic inefficiencies over periods of several months, then we will be forced to conclude that the trouble lies with the form of the Black-Scholes formula."  Rubinstein, Mark, "Nonparametric Tests of Alternative Option Pricing Models Using All Reported Trades and Quotes on the 30 Most Active CBOE Option Classes from August 23, 1976 through August 31, 1978," *Journal of Finance*, Vol. 40, No. 2, 1985, pp. 455–480 ("Rubinstein (1985)") at p. 457.

The article states that "although widely used among option traders, the Black-Scholes option pricing formula is often reported to produce model values which differ in systematic ways from market prices."[141]   Therefore, the article notes systematic deviations from the Black-Scholes model and tries to explain them by using alternative option pricing models.

## 2.      Articles Cited by Dr. Chance That Document Inefficiencies in Option Markets

71.      While many of the articles cited by Dr. Chance do not address the issue of efficiency for option markets at all, some of the articles he cites do test market efficiency.  However, Dr. Chance has failed to acknowledge that many of the articles that test market efficiency also document *inefficiencies* in the option markets.  I describe these articles and their takeaways below.

72.      Galai (1977) finds evidence of inefficiencies on the CBOE.[142]  Specifically, the article claims that "the CBOE might not have been perfectly efficient during the period investigated and abnormal profit opportunities did exist.  Also the profits did not seem to go down as time progressed."[143]  The article finds that "similar options that differ by maturity only were not fully synchronized.  Even on an ex ante basis, some above-normal profits could have been made."[144]  The "abnormal profit opportunities" and "above-normal profits" described in Galai (1977) are inconsistent with market efficiency.[145]

73.      Though not cited in his report, an article by the same authors that Dr. Chance cited in his report is even more explicit about market inefficiencies in exchange-traded options.  Chiras and Manaster (1978) finds that "contrary to the efficient market hypothesis, 'underpriced' and

---

[141] Rubinstein (1985), p. 455.  The article tests whether five alternative models can explain the differences between observed and predicted prices and concludes that "[n]o one model seems to capture them all." See Rubinstein (1985), p. 478.

[142] Galai, Dan, "Tests of Market Efficiency of the Chicago Board Options Exchange," *Journal of Business*, Vol. 50, No. 2, 1977, pp. 167–107 ("Galai (1977)") at p. 195.

[143] Galai (1977), p. 189.

[144] Galai (1977), p. 195.

[145] Galai (1977) also notes that the abnormal profit opportunities the article finds would be lower if taxes and transaction costs were taken into account.  See Galai (1977), p. 195.

'overpriced' options can be identified," and conclude that "the CBOE was inefficient during the observation period" they analyzed.[146]

74.    Bhattacharya (1983) finds multiple instances of mispricing in the sample of options studied in the paper:  "More than half [of] the call pairs violated these tighter bounds and the average mispricing magnitude seemed large enough to overcome the transaction costs for trading in calls alone."[147]   The article nevertheless suggests that the observed mispricing may be lower than the costs associated with executing an arbitrage strategy:  "[T]he question remains whether increased transaction costs due to more frequent revisions, search costs, opportunity cost of market makers' seat and time are smaller than the indicated average mispricing magnitude."[148] Klemkosky and Resnick (1979, 1980) test the put-call parity relationship and find instances of mispricing of put options relative to call options on the same underlying stock.[149]   These articles note that the profitability of strategies aimed at exploiting these instances of mispricing is sensitive to the level of transaction costs.[150]   I discuss transaction costs as an issue in the assessment of market efficiency in Section V.C below.

75.    In conclusion, many of the academic articles cited by Dr. Chance do not test market efficiency for options.  Furthermore, many of the articles that do analyze efficiency of option markets find instances of market inefficiencies.  Thus, without showing market efficiency for all options, Dr. Chance has no basis to claim, without conducting any empirical analysis, that the markets for all Apple options were efficient throughout the Class Period.

---

[146] Chiras, Donald P. and Steven Manaster, "The Information Content of Option Prices and a Test of Market Efficiency," *Journal of Financial Economics*, Vol. 6, No. 2–3, pp. 213–234 ("Chiras and Manaster (1978)") at pp. 214, 233.

[147] Bhattacharya (1983), p. 182.

[148] Bhattacharya (1983), p. 183.

[149] Klemkosky, Robert C. and Bruce G. Resnick, "Put-Call Parity and Market Efficiency," *Journal of Finance,* Vol. 34, No. 5, 1979, pp. 1141-1151 ("Klemkosky and Resnick (1979)"); Klemkosky, Robert C. and Bruce G. Resnick, "An Ex Ante Analysis of Put-Call Parity," *Journal of Financial Economics*, Vol. 8, No. 4, 1980, pp. 363–378 ("Klemkosky and Resnick (1980)") at p. 363.

[150] See Table 1 and Table 2 of Klemkosky and Resnick (1980).

**C.    Dr. Chance Overlooks Literature on Market Frictions and Efficiency in Option Markets, Including More Recent Articles**

76.    Dr. Chance's overview of academic articles on option market efficiency covers select studies from the 1970s through early 1990s.  Dr. Chance claimed in deposition that, regarding more recent literature, he "tried to find out if there was anything recent and [he] couldn't find anything."[151]  In this section, I discuss one particularly applicable strand of academic literature, which discusses market frictions that can impede arbitrage and prevent option prices from incorporating new, value-relevant information quickly and fully.

77.    Academic research has long recognized that market frictions such as high transaction costs can limit market participants' ability to exploit arbitrage opportunities and result in departures from market efficiency.  A seminal article by Shleifer and Vishny (1997) discusses investors' limitations in being able to exploit such departures from market efficiency because of various frictions and restrictions in the markets.[152]  These limitations are commonly known as limits to arbitrage.  One type of friction discussed in the options pricing literature has to do with risks and costs to the market maker, which increase the cost of trading in these markets.[153]  If high transaction costs make it expensive to take advantage of an arbitrage opportunity, this may result in a lack of informational efficiency in one market even if the other market is informationally efficient.  Below I discuss examples of academic articles exploring trading costs and their implications on mispricing of options and the ability of market participants to exploit arbitrage opportunities.

78.    Figlewski (1989) explores the impact of market frictions on the ability to arbitrage away mispricing in options.  The article considers what happens to arbitrage opportunities under

---

[151] Chance Deposition (123:16 –123:18).

[152] Shleifer, Andrei and Robert W. Vishny, "The Limits of Arbitrage," *Journal of Finance*, Vol. 52, No. 1, 1997, pp. 35–55.

[153] Dr. Chance recognizes that the risks and costs faced by market makers increase the cost of trading.  "Options bid-ask spreads are larger than those of stocks because market makers have certain fixed costs of providing that service. Options are priced lower than stocks so the same bid-ask spread on the option and on the stock would be larger as a percentage of the option price.  Moreover, options do not trade as often as stocks, which tends to make the bid-ask spread higher for options, as it is more costly for a market maker to hedge his risk when there are fewer market participants."  Chance Report, ¶ 71.

various cost assumptions and finds that "the arbitrage mechanism assumed in deriving the theory cannot work in a real options market in the same way that it does in a frictionless market."[154] The article finds that "while empirical research has shown that option valuation theory plays a very important role in determining prices in real options markets, ***the impact of market imperfections is also large, and probably larger than many researchers have realized.*** … ***Under these conditions, the standard arbitrage cited in the literature as the basis of valuation models becomes a weak force to drive actual option prices toward their theoretical values***."[155] This observation is relevant in the context of this case because both as an academic matter and, as I understand, as a legal matter, the relevant question for assessing informational efficiency is whether new, value-relevant information was quickly and fully incorporated in *actual option prices* rather than in their theoretical values.

79.   Academic literature has documented that options typically have high transaction costs. Bid-ask spreads on options are an order of magnitude higher than bid-ask spreads of stocks.[156] Dr. Feinstein has similarly found that the weighted average bid-ask spread for the Apple options was 12.9% during the Class Period, far exceeding the average bid-ask spread of Apple stock (0.01%) or the average bid-ask spread across US exchange-traded stocks (0.7%).[157]  Furthermore, in the Grenadier Class Certification Report, I show that the bid-ask spreads on some Apple option series were even higher.  For example, 10% of the call option series had average bid-ask spreads that exceeded 74% over the Class Period.[158]  Muravyev (2016) describes the high bid-ask spreads on options as "one of the biggest puzzles in the options literature."[159]

80.   Academic literature has attributed the high option bid-ask spreads to various costs and risks faced by market makers.  For example, Vijh (1990) attributes the high bid-ask spread to the

---

[154] Figlewski, Stephen, "Options Arbitrage in Imperfect Markets," *Journal of Finance*, Vol. 44, No. 5, 1989, pp. 1289–1311 ("Figlewski (1989)") at p. 1289.
[155] Figlewski (1989), p. 1310, emphasis added.
[156] See, for example, Huh, Sahn-Wook et al., "Options Market Makers' Hedging and Informed Trading: Theory and Evidence," *Journal of Financial Markets*, Vol. 23, 2015, pp. 26–58 ("Huh et al. (2015)") at p. 46.
[157] Feinstein Class Certification Opening Report, ¶¶ 90, 157.
[158] Grenadier Class Certification Report, ¶ 198.  **Appendix D** reproduces Exhibit 6 from the Grenadier Class Certification Report.
[159] Muravyev, Dmitriy, "Order Flow and Expected Option Returns," *Journal of Finance*, Vol. 71, No. 2, 2016, pp. 673–707 at p. 696.

cost of market making, citing to multiple dealers, "higher fixed costs (opportunity cost of dealers' time) and higher variable costs (reduced ability to balance inventory)."[160]   Vijh (1990) further states that the "heterogeneity of options compounds these costs because it forces dealers to monitor the prices and inventories of several related yet different options on a stock."[161]   The statement about heterogeneity of options is notable as both Dr. Feinstein and Dr. Chance opine that all Apple options traded in one homogenous market.[162]

81.     Jameson and Wilhelm (1992) shows that market makers trading options face certain undiversifiable risk in managing their inventory and because of this risk, they charge higher bid-ask spreads.[163]   The authors state that their result "offer[s] further explanation for the relatively large percentage spreads in the options markets" and "is consistent with Figlewski's (1989) conclusion that arbitrage considerations impose only relatively wide bounds on option prices."[164]

82.     Green and Figlewski (1999) shows that the inventory risk faced by market makers cannot be minimized using arbitrage strategies because doing so would require knowledge of future volatility of the underlying stock, which is only measured with error.[165]

83.     Huh et al. (2015) discusses another dimension to the undiversifiable risk faced by market makers, the risk of encountering informed trading.[166]

---

[160] Vijh, Anand M., "Liquidity of the CBOE Equity Options," *Journal of Finance*, Vol. 45, No. 4, 1990, pp. 1157–1179 ("Vijh (1990)") at pp. 1177–1178.

[161] Vijh (1990), p. 1171.

[162] Chance Report, ¶ 12 ("The existence of various combinations of Apple puts and calls with different expirations and exercise prices traded throughout the Class Period does not affect the efficiency of the market for Apple options. The market for Apple options is an integrated market that is unified by one critical factor: the underlying stock price.").  See also Feinstein Class Certification Reply Report, ¶ 69 ("While [Professor Grenadier] highlights that the options series differed in terms of strike prices and expiration dates, he disregards that they are all tied to the same underlying stock.").

[163] Jameson, Mel and William Wilhelm, "Market Making in the Options Markets and the Costs of Discrete Hedge Rebalancing," *Journal of Finance*, Vol. 47, No. 2, 1992, pp. 765–779 ("Jameson and Wilhelm (1992)").

[164] Jameson and Wilhelm (1992), pp. 767, 777.

[165] Green, T. Clifton, and Stephen Figlewski, "Market Risk and Model Risk for a Financial Institution Writing Options," *Journal of Finance*, Vol. 54, No. 4, 1999, pp. 1465–1499 at p. 1472 ("One of the most important and obvious sources of model risk with options is that even a correct model requires a value for the unknown volatility of the underlying from the present through expiration day. Model error from using a forecasted value in place of the true volatility produces mispricing of derivatives and also inaccurate hedging [risk management] calculations.").

[166] Huh et al. (2015).  Informed trading refers to a situation when a subset of market participants has information that other participants—for example, market makers—do not have, and can therefore put the other market participants at a trading disadvantage.  The authors show that informed trading in the stock market leads to higher bid-ask spreads

84.     Dr. Chance also acknowledged in deposition that bid-ask spreads are higher for options than for stocks and attributed this difference to lower trading volumes and prices of options relative to stock, and to the opportunity cost of market making (i.e., the value of market makers' time):

> Options markets don't have the volume that stock markets have …. [P]retty much everybody knows what a stock is, but not everybody knows what an option is .… So it doesn't have as much market participation, much volume, and the market maker's got to adjust the bid-ask spread to reflect that fact. He doesn't get as much business. He's … there doing his job for six-and-a-half hours a day. He's got to make a decent rate of return.  If he can't make the kind of return he can make in the stock market, maybe he should go over and be a stock market maker. So he's got to adjust that bid-ask spread to cover his cost and make a return. Another factor is the option price is a lot lower than the stock price.[167]

However, while he recognized the difference in trading costs between options and stocks due to differences in bid-ask spreads, Dr. Chance has failed to acknowledge the consequences of this difference for his statement that "arbitrage … is the glue that connects the options market to the stock market."[168]  If transaction costs are high, market participants' ability to take advantage of mispricing through arbitrage becomes more limited.

85.     Academic articles have identified examples of mispricing that were not arbitraged away because of high transaction costs.  These examples empirically confirm that option prices sometimes deviate from the theoretical levels predicted by no-arbitrage relationships because of high transaction costs.[169]  For example, Santa-Clara and Saretto (2009) analyzes American

---

in both the stock and in call options markets, as market makers are hedging against the risk of encountering an informed trader.

[167] Chance Deposition (77:15–78:17).

[168] Chance Report, ¶ 14.

[169] There is also a related strand of academic literature that documents mispricing in options due to over and under-reaction by market participants to information about expected stock volatility.  For example, Stein (1989) finds that implied volatilities in long maturity options tend to move too much with changes in implied volatilities of short term options.  Similarly, Poteshman (2001) finds that investors tend to underreact to short-term changes in volatility, but overreact to longer-term changes in volatility.  See Poteshman, Allen M., "Underreaction, Overreaction, and Increasing Misreaction to Information in the Options Market," *Journal of Finance*, Vol. 56, No. 3, 2001, pp. 851–876; Stein, Jeremy, "Overreactions in the Options Market," *Journal of Finance*, Vol. 44, No. 4, 1989, pp. 1011–1023.

options on S&P 500 futures traded at the Chicago Mercantile Exchange during 1985–2001.[170] The article finds high expected returns on certain option strategies, notes that "[t]rading options can be quite expensive, not only because of the high commissions charged by brokers, but, most importantly, because of the large bid-ask spreads at which options are quoted," and concludes that exchange margin requirements and transaction costs prevent arbitrageurs from taking advantage of the mispricing:

> Consistent with the arguments of Shleifer and Vishny (1997), Duffie et al. (2002), and Liu and Longstaff (2004) about the limits to arbitrage, our findings could help explain why the good deals in options prices might be difficult to arbitrage away and why speculative investors do not compete with market-makers to provide liquidity by taking the short side of the trade in index options.[171]

86.     As another example, Cao and Han (2013) documents profitable trading strategies, which constitute evidence of mispricing in options on individual stocks during 1996–2009, and finds that the presence of these trading strategies is positively associated with proxies for transaction costs in the option markets.[172]  The profitability of the article's trading strategies goes away once transaction costs are taken into account.  The article explains that "[t]here are limits to arbitrage between options and stocks, and the no-arbitrage approach can only establish very wide bounds on equilibrium option prices."[173]

87.     In sum, the academic literature finds that high transaction costs such as bid-ask spreads can impede investors' ability to take advantage of mispricing in option markets.  Thus, a reliable assessment of market efficiency for all Apple options would require assessing whether such frictions impeded the incorporation of information into the option prices throughout the Class Period, which, as I discuss in Section VI below, Dr. Chance has failed to do.

---

[170] Santa-Clara, Pedro and Alessio Saretto, "Option Strategies: Good Deals and Margin Calls," *Journal of Financial Markets*, Vol. 12, No. 3, 2009, pp. 391–417 ("Santa-Clara and Saretto (2009)").
[171] Santa-Clara and Saretto (2009), pp. 394, 398.
[172] Cao, Jie and Bing Han, "Cross Section of Option Returns and Idiosyncratic Stock Volatility," *Journal of Financial Economics*, Vol. 108, No. 1, 2013, pp. 231–249 ("Cao and Han (2013)").
[173] Cao and Han (2013), p. 231.

**VI.    Dr. Chance Fails to Provide Any Empirical Analysis Demonstrating That All Apple Options Traded in Efficient Markets throughout the Class Period**

88.    As explained in Section V above, the academic articles cited by Dr. Chance do not support the notion that all options that are traded on the CBOE traded in efficient markets. Further, I discussed academic literature documenting various market frictions that can impede arbitrage and prevent option prices from incorporating new, value-relevant information quickly and fully.  Given this evidence, it is important to empirically assess market efficiency on a case-by-case basis.

89.    The Chance Report rejects the relevance of the *Cammer* and *Krogman* factors to evaluate market efficiency of options.[174]  This contrasts with Dr. Feinstein's approach to analyzing market efficiency, which involved a review of the *Cammer* and *Krogman* factors for the Apple options.[175]  Dr. Chance does not propose any alternative tests, and does not conduct any empirical analysis demonstrating that all Apple options traded in efficient markets throughout the Class Period.  In fact, he does not analyze any option pricing data in his report.  The only data that he references is aggregate trading volume across all Apple options, and he conducts no analysis with that data other than pointing to the fact that total volume was large.[176]

90.    Such an approach is incapable of demonstrating that all Apple options traded in efficient markets throughout the Class Period, and contrasts with the approach in the very studies that Dr. Chance cites.  He references 16 articles that he claims support a finding of market efficiency for options (which I discuss in Sections V.A and V.B above).  Each of these articles sets out a hypothesis and an empirical methodology to test the hypothesis.  The authors of these articles then perform data analysis and based on that data analysis, reach conclusions regarding market

---

[174] While the Chance Report dismisses the relevance of the *Cammer* and *Krogman* factors to options, Dr. Chance stated at his deposition that *Cammer* factor 5, a cause and effect relationship between the arrival of new, value-relevant information regarding a company and a stock price movement, was "highly relevant."  Chance Report, ¶¶ 69, 71, Chance Deposition (84:7–84:8).
[175] Feinstein Class Certification Opening Report, Section VII.
[176] Chance Report, ¶ 101.

efficiency, arbitrage opportunities, and other related issues.[177, 178]  None of these articles reach a conclusion regarding market efficiency based solely on aggregate trading volume.[179]

91.    Dr. Chance makes a number of assertions about how Apple option prices "must" behave.[180]  However, he does not conduct any empirical tests to determine if these assertions actually hold.  He does not test whether the prices of individual Apple option series "conformed to pricing rules and models that would prohibit investors from earning easy profits via arbitrage [in Apple options],"[181] empirically "address[] the speed at which [Apple] options incorporate new information about the underlying company,"[182] or empirically "address[] the integration of [Apple] options markets with [Apple] stock market[]."[183]  In fact, Dr. Chance conceded in deposition that he did not do "any data analysis of individual options in connection with this matter."[184]

92.    Below in Section VI.A, I address Dr. Chance's dismissal of the relevance of the *Cammer* and *Krogman* factors to assessing market efficiency for options.  In subsequent sections, I discuss the empirical evidence regarding market efficiency for Apple options.  In Section VI.B, I address Dr. Chance's limited analysis of aggregate trading volume and explain how his analysis overlooks the fact that trading in many of the individual Apple option series was low throughout the Class Period.  In Section VI.C, I demonstrate that empirical analysis of Apple options shows

---

[177] For example, Jennings and Starks (1986) hypothesizes that "a researcher could detect differences in the adjustment of stock prices to information releases, depending on whether or not an exchange-listed option existed for the stock."  To test this hypothesis, the authors "use a control portfolio methodology" to "examine the stock price adjustment process initiated by quarterly earnings announcements with two samples of firms: one having exchange-listed options and another without exchange-listed options" and find that "the adjustment processes differ between the two groups."  See Jennings and Starks (1986), pp. 107–108.

[178] Dr. Chance conceded at deposition that every one of these articles included an empirical analysis. "[Q] Do any of the studies reach a conclusion about market efficiency without conducting an empirical analysis?  [A] Well, those are all empirical papers.  [Q] Right.  So the answer is 'no.'  Each of the ones that you cited conducted an empirical analysis?  [A] They do."  (Chance Deposition (122:23–123:4)).

[179] "[Q] Do any of the studies reach a conclusion that a market was efficient by looking solely at the total trading volume of options?  [A] You asked me that earlier, you know.  None of them looked solely at trading volume."  (Chance Deposition (123:7–123:11)).

[180] See Chance Report, ¶¶ 14, 46, 48, 106.

[181] Chance Report, ¶ 74.

[182] Chance Report, ¶ 75.

[183] Chance Report, ¶ 80.

[184] Chance Deposition (36:19–36:21).

that there were frictions, such as high bid-ask spreads, which could impede the ability of market participants to take advantage of any mispricing or arbitrage opportunities. Dr. Chance bases his opinion of market efficiency on the assumption that traders would quickly take advantage of any such arbitrage opportunities, but does not empirically assess whether this assumption holds for Apple options, despite evidence of these frictions. Finally, although he did not mention this in his report or conduct any relevant analysis, in deposition Dr. Chance stated that *Cammer* factor 5, a cause and effect relationship between the arrival of new, value-relevant information regarding a company and a stock price movement, was "highly relevant."[185] In Section VI.D, I briefly discuss the empirical evidence that Dr. Feinstein previously put forth with respect to *Cammer* factor 5, and reiterate why his test does not provide reliable evidence of market efficiency for all Apple options.

### A. Dr. Chance's Opinion That the *Cammer* and *Krogman* Factors Cannot Be Applied to Apple Options Contradicts Both Dr. Feinstein's Analysis and His Own Assumptions Regarding Arbitrage

93. As I explain in my Class Certification Report, I understand that courts have discussed a number of characteristics of an efficient market for a stock, in particular, the *Cammer*[186] and *Krogman*[187] factors.[188] Factors such as trading volume and bid-ask spreads provide evidence of the type of open and developed market that could facilitate efficient trading of a stock.

---

[185] Chance Deposition (84:7–84:8), Chance Report, ¶¶ 69, 71.

[186] *Cammer* factors include (1) the average weekly trading volume of the stock, (2) the number of securities analysts following and reporting on the stock, (3) the extent to which market makers and arbitrageurs trade in the stock, (4) the issuer's eligibility to file an SEC registration Form S-3, and (5) "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." See *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) at pp. 1286–1287.

[187] *Krogman* factors include (1) the company's market capitalization, (2) the size of the bid-ask spread, and (3) the percentage of shares available to the public (i.e., the public float). See, e.g., *In re Initial Pub. Offering Securities Litigation*, 260 F.R.D. at 94–95 (citing *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D.Tex.2001)).

[188] As I discuss in the Grenadier Class Certification Report, ¶¶ 39–40, while the other *Cammer* and *Krogman* factors provide evidence of the type of open and developed market that could facilitate efficient trading of a stock, academics agree that the most important test of market efficiency is a cause and effect relationship between the arrival of new, value-relevant information regarding the company and its stock price movement—*Cammer* factor 5 (i.e., "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price"). See *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) at p. 1287. See also Fama, Eugene F., "Efficient Capital Markets II," *Journal of Finance*, Vol. 46, No. 5, 1991, pp. 1575–1617 ("Fama (1991)"), at p. 1607 ("The cleanest evidence on market efficiency comes from event studies,

94.     The Chance Report rejects the relevance of the *Cammer* and *Krogman* factors for the evaluation of market efficiency of options, claiming that "[i]t is not … appropriate to evaluate the efficiency of the derivative market with the same standards courts use to evaluate efficiency of the market for common stock."[189]  This statement contradicts Dr. Feinstein's approach to analyzing market efficiency, which involved a review of the *Cammer* and *Krogman* factors for the Apple options.[190]

95.     Furthermore, failure to evaluate *Cammer* and *Krogman* factors such as bid-ask spreads and trading volumes conflicts with Dr. Chance's statement that "arbitrage … is the glue that connects the options market to the stock market."[191]  Trading volumes and bid-ask spreads are highly relevant for Dr. Chance's claims about market participants' ability to take advantage of arbitrage opportunities in the option markets.  For example, as discussed in Section V.C above, academic literature finds that high transaction costs can limit market participants' ability to exploit arbitrage opportunities and result in departures from market efficiency in the option markets.  However, Dr. Chance fails to make the link between these factors and the ability to exploit arbitrage opportunities for Apple options.

96.     Instead, he insists without conducting any empirical tests that "the options market must reflect the information provided in the price of the stock, and it must do it rapidly … Option traders who do not price the option correctly and rapidly absorb new information into the price will be exploited.  This exploitation, referred to as arbitrage, is the glue that connects the options market to the stock market."[192]  In making this statement, Dr. Chance is assuming market

---

especially event studies on daily returns.  When an information event can be dated precisely and the event has a large effect on prices, the way one abstracts from expected returns to measure abnormal daily returns is a second-order consideration.  As a result, event studies can give a clear picture of the speed of adjustment of prices to information.")  See also Fama (1991) at p. 1601 ("When the announcement of an event can be dated to the day, daily data allow precise measurement of the speed of the stock-price response—the central issue for market efficiency.").

[189] Chance Report, ¶ 69.
[190] See Feinstein Class Certification Opening Report, Section VII.  In the Grenadier Class Certification Report, I explain that Dr. Feinstein's flawed application of *Cammer* factors 1-4 and the *Krogman* factors to the Apple options does not support a conclusion of market efficiency and fails to consider the actual characteristics of the options.  Grenadier Class Certification Report, Section VIII.D.
[191] Chance Report, ¶ 14.
[192] Chance Report, ¶ 14.

frictions, such as high transaction costs, do not exist.[193]  At the same time, Dr. Chance admits that these costs and frictions do exist in the option markets and to a greater extent than in stocks: "options do not trade as often as stocks, which tends to make the bid-ask spread higher for options, as it is *more costly* for a market maker to hedge his risk when there are fewer market participants."[194]  It is perplexing that although Dr. Chance explicitly recognizes these impediments, he fails to connect them to the ability (or inability) to exploit arbitrage opportunities.

### B. Dr. Chance Fails to Address My Finding That Trading in Many of the Individual Apple Option Series Was Low

97.     In the Grenadier Class Certification Report, I point out deficiencies in Dr. Feinstein's application of the *Cammer* and *Krogman* factors to the Apple options.[195]  I further explain that there were 2,282 relevant Apple option series with different characteristics, such as option type (call vs. put options), strike price, and maturity.[196]  In that report, I provide additional empirical analyses of trading volume and bid-ask spreads in the individual Apple option series, which I briefly summarize below:[197]

> a.  Trading volume for many of the individual Apple option series was low throughout the Class Period.  As shown in Grenadier Class Certification Report Exhibit 5,[198] the average daily trading volume for an individual call (put) option series was 691 (573) contracts throughout the Class Period.  Beyond the average

---

[193] Alternatively, Dr. Chance makes a logical error in assuming that the lack of exploitable arbitrage opportunities implies market efficiency.  However, as discussed in ¶¶ 41–43 above, while it is true that markets that are informationally efficient do not allow traders to earn abnormal profits based on publicly available information because all such opportunities are competed away, the reverse is *not* true.  Some markets are so illiquid or have such high transaction costs that they do not provide traders with opportunities to earn abnormal profits *even though* prices in these markets do not quickly and fully react to new, value-relevant information, i.e., these markets are not informationally efficient.

[194] Chance Report, ¶ 71, emphasis added.

[195] Grenadier Class Certification Report, ¶¶ 173–213.

[196] Grenadier Class Certification Report, ¶¶ 173–174, Exhibit 4.  **Appendix D** reproduces Exhibit 4 from the Grenadier Class Certification Report.

[197] Grenadier Class Certification Report, ¶¶ 182–183, Exhibits 5 and 6.  **Appendix D** reproduces Exhibits 5 and 6 from the Grenadier Class Certification Report.

[198] **Appendix D** reproduces Exhibit 5 from the Grenadier Class Certification Report.

volume, many of the Apple option series had very little trading.  For instance, 75% of the Apple call (put) option series had daily trading volume of 297 (283) contracts or fewer throughout the Class Period, and daily trading volume for the median call (put) option series was 45 (52) contracts.

b.  Not only were trading volumes low for many option series, many option series traded infrequently throughout the Class Period.  As shown in Grenadier Class Certification Report Exhibit 5,[199] across all call (put) option series, on average, a call (put) option series did not trade at all on 35% (31%) of trading days in the Class Period.  In addition, the least liquid 10% of call (put) option series did not trade on 86% (90%) or more of trading days throughout the Class Period.

c.  Regarding bid-ask spreads in the Apple option series, Dr. Feinstein finds that the weighted average bid-ask spread for the Apple options was 12.9%, far exceeding the average bid-ask spread of Apple stock (0.01%) or the average bid-ask spread across US exchange-traded stocks (0.7%).[200]  Furthermore, I document in Grenadier Class Certification Report Exhibit 6 that the bid-ask spreads on some Apple option series were even higher:  10% of the call option series had bid-ask spreads exceeding 74%, 10% of the put option series had bid-ask spreads exceeding 62%, and some option series had bid-ask spreads above 100%.[201]

98.    Dr. Chance does not address the implications of these empirical findings.  Instead of engaging with the evidence of illiquidity of Apple options, he mischaracterizes my analysis of trading volume in individual option series as "meaningless and distorted."[202]  He is simply incorrect.  My analysis is neither meaningless nor distorted—it is directly relevant to an assessment of whether each of the Apple option series traded in an efficient market.

---

[199] **Appendix D** reproduces Exhibit 5 from the Grenadier Class Certification Report.
[200] Feinstein Class Certification Opening Report, ¶¶ 90, 157.
[201] Grenadier Class Certification Report, ¶ 198, Exhibit 6.  **Appendix D** reproduces Exhibit 6 from the Grenadier Class Certification Report.
[202] Chance Report, ¶ 102.

99.     Importantly, Dr. Chance never claims that I made any errors in my calculations, nor does he dispute my finding that many individual Apple option series have low trading volumes and traded infrequently.[203]  Instead, the difference in our approaches is that Dr. Chance looks at trading volume across all of the Apple options *in aggregate*, while I examine trading volume in the Apple option series *individually*.  Dr. Chance provides no explanation for why aggregate trading volume—which, as I document, can mask differences in trading volume across option series—is the right metric to use in assessing efficiency of each of the individual Apple option series, some of which may have traded in efficient markets and some of which may have not. Dr. Chance states that "one cannot simply lump lower volume options in together with the active options to make it sound like the entire market for the most actively traded option is inefficient,"[204] but that is precisely what he does by focusing on aggregate trading volume.  He "lump[s] lower volume options with the active options," thereby masking that many option series had low volumes.

100.    As I explain in detail in the Grenadier Class Certification Report, my metric for the average trading volume in individual Apple option series is calculated by (i) finding the average daily trading volume (as measured by total number of contracts traded) for each individual option series (i.e., combination of option type, strike price, and maturity), and (ii) averaging this figure across option series.[205]  Therefore, my average measure assigns equal weight to each option series' average daily trading volume and reflects the fact that a sizable fraction of the Apple option series exhibited low trading volumes.  I also report the distribution of trading volumes in individual option series to show that many of the individual Apple option series exhibited low trading volume.[206]  In contrast, Dr. Chance reports the *aggregate* daily trading volume in Apple options, which does not take into account the number of different Apple option series available for trading.[207]

---

[203] Indeed, Dr. Chance concedes that "[f]or sure, there will not be much trading volume in some options."  Chance Report, ¶ 106.  Dr. Feinstein also did not dispute the results of my analysis of trading volume in his Class Certification Reply Report.

[204] Chance Report, ¶ 106.

[205] Grenadier Class Certification Report, Exhibit 5.  **Appendix D** reproduces Exhibit 5 from the Grenadier Class Certification Report.

[206] Grenadier Class Certification Report, Exhibit 5.  **Appendix D** reproduces Exhibit 5 from the Grenadier Class Certification Report.

[207] Dr. Chance states, based on data on Apple options trading on the CBOE in November and December 2018, "for November, the average daily volume was 119,363 and for December it was 94,673."  See Chance Report, ¶ 101.

101.    To illustrate the difference between these two approaches, consider a simple example of a company with two option series, A and B.  Option A traded 10,000 contracts each day between Monday and Friday (i.e., 50,000 that week) and option B traded 50 contracts on Monday and did not trade again that week.  Under my approach, option A's average daily trading was 10,000 contracts, while option B's average daily trading volume was 10 contracts.  Thus, in my approach the average option series traded 5,005 contracts per day (the average of 10,000 and 10), which takes into account that there were two option series available to trade, one of which was more liquid and the other was not.  In Dr. Chance's approach, the average daily trading volume was 10,010 contracts in aggregate.[208]  In this simple example, option A is more liquid while option B is less liquid.  My statistic of 5,005 contracts captures this, while Dr. Chance's statistic of 10,010 is almost entirely driven by the trading volume of the liquid option.  This example shows that Dr. Chance's method does not account for the number of individual option series, which hides option series with lower trading volume—precisely the situation found in the Apple options.[209]

102.    While Dr. Chance claims that "Apple options traded every single day and in high volume,"[210] a more appropriate conclusion is that *some* Apple options traded every day (and not necessarily the same Apple options), and *in aggregate* the trading volume was large.  Dr. Chance's statement completely disregards the fact that, as shown in the Grenadier Class Certification Report, many individual Apple options had low trading volumes and did not trade at all on many days throughout the Class Period.[211]  This conclusion is directly relevant for assessing whether all Apple options traded in efficient markets throughout the Class Period.  Indeed, Dr. Chance acknowledges differences in trading volume across options in his report,

---

[208] Dr. Chance's approach calculates an average daily trading volume of 10,010 contracts by adding Option A's total volume of 50,000 contracts with option B's total volume of 50 contracts for a sum of 50,050 across both options, then divides that by the five days that week.

[209] Dr. Chance's disregard of individual option characteristics is evident in his belief that "[t]he existence of various combinations of Apple puts and calls with different expirations and exercise prices traded throughout the Class Period does not affect the efficiency of the market for Apple options.  The market for Apple options is an integrated market that is unified by one critical factor: the underlying stock price."  Chance Report, ¶ 12.

[210] Chance Report, ¶ 105.

[211] See Grenadier Class Certification Report, ¶¶ 182–183, Exhibit 5.  **Appendix D** reproduces Exhibit 5 from the Grenadier Class Certification Report.

stating that "most options trading volume comes from the near-the-money short-term options ....
[D]eep out-of-the-money options and deep in-the-money options have little speculative value
and do not trade in heavy volume."[212]

103.    Thus, Dr. Chance's criticism of my analysis of trading volume as "meaningless and
distorted" is unfounded and incorrect.[213]  My approach is premised on the notion that market
efficiency needs to be determined at the individual option series level because, as I stated in the
Grenadier Class Certification Report:

> [T]here can be hundreds of unique option series for a particular company (as is
> the case for Apple during the Putative Class Period), and while some of those
> options may have traded efficiently, others may not. Therefore, it is important
> for Plaintiff to demonstrate that each individual Apple option traded in an
> efficient market throughout the Putative Class Period.[214]

**C.    Dr. Chance Fails to Assess Whether Impediments to Arbitrage Existed in the
Apple Option Markets in Light of Market Frictions Such as High Bid-Ask
Spreads and Low Trading Volumes**

104.    Dr. Chance fails to analyze whether there were frictions in the markets for Apple options
that could limit market participants' ability to exploit arbitrage opportunities and could result in
departures from market efficiency.  As discussed in Section V.C, academic studies have
identified limits to arbitrage in option markets due to the presence of market frictions, such as
high bid-ask spreads, which can render arbitrage transactions unprofitable and thus prevent
arbitrageurs from correcting the prices of mispriced securities that fail to incorporate information

---

[212] Chance Report, ¶¶ 92, 95.
[213] Chance Report, ¶ 102.
[214] Grenadier Class Certification Report, ¶ 167.

contained in the stock price, despite Dr. Chance's claim that it is "an extremely obvious piece of information … [y]ou can't miss it."[215, 216]

105.    Furthermore, given the high bid-ask spreads discussed in Section VI.B, Dr. Chance's statement that "bid and ask prices must bracket the correct value of the option," has little relevance for an assessment of market efficiency.[217]  For example, Dr. Chance's claim is that the "correct value" of an option with a bid price of $0.50 and an ask price of $1.00 (reflecting a 66.7% bid-ask spread relative to the midpoint) can be *anywhere* between $0.50 and $1.00.  It is difficult to understand how this provides Dr. Chance any comfort that all Apple options traded in efficient markets during the Class Period.[218]

106.    I previously documented that many of the Apple options exhibited high bid-ask spreads throughout the Class Period, limiting the applicability of arbitrage as a theoretical argument.  As I explained in the Grenadier Class Certification Report, "[h]igh bid-ask spreads can also make it challenging for investors to take advantage of arbitrage opportunities resulting from incorrect option prices because high transaction costs reduce the profitability of the arbitrage."[219]

107.    Similarly, my findings that trading volume was low for many of the Apple option series and that many of the Apple option series traded infrequently also present issues for a theoretical argument based on arbitrage.  As I discussed in the Grenadier Class Certification Report:

> The low trading volume observed for individual Apple options implies that it may be difficult for market participants to take advantage of option prices that do not fully reflect publicly available information or differences between the prices of Apple stock and options.  Arbitrageurs may not be able to take

---

[215] "[A] So, yeah, it's got to. It's got to reflect. And one other thing that's really important is that stock price is an extremely obvious piece of information. You can't miss it. People trade options they're not just sitting there surfing the web and all that. I mean they're paying attention to the underlying stock. So, yeah, that's what I mean. They've got to. [Q] And you did not do any empirical analysis to confirm this statement, did you?  [A] I don't need to. But no, I didn't."  (Chance Deposition (98:14–98:23)).

[216] One of the studies cited by Dr. Chance similarly notes that "[t]ransactions costs are either ignored or dismissed as being insignificant when, in fact, they can be quite substantial."  See Bhattacharya (1983), p. 162.

[217] Chance Report, ¶ 106.

[218] The median bid-ask spread of Relevant Option series was 10% for calls and 9% for puts during the Class Period. (See p. 3 of **Appendix D**.)  Asserting that the "correct value" of the median Apple option can be anywhere within that 9% or 10% range does not provide any comfort that all Apple options traded in efficient markets during the Class Period.

[219] Grenadier Class Certification Report, ¶ 195.

advantage of the mispricing if the market is not liquid enough for them to trade quickly in and out of positions, when faced with the risk of adverse price movement.  This could present an impediment to the market efficiency of the Apple options because potential arbitrageurs may be deterred by this risk and would not trade to reduce the mispricing in the market.[220]

108.    In sum, Dr. Chance provides no empirical analysis of arbitrage opportunities in his report, and his theoretical arguments about arbitrage in option markets do not necessarily apply in the presence of market frictions such as high bid-ask spreads and low liquidity.

### D.    Dr. Feinstein's Analysis of *Cammer* Factor 5, Which Dr. Chance References, Fails to Demonstrate a Cause and Effect Relationship between New, Value-Relevant Information and Prices of Individual Option Series

109.    As noted above, Dr. Chance does not conduct any empirical test of option market efficiency and claims that the *Cammer* and *Krogman* factors are not generally applicable to options.[221]  While the Chance Report does not specifically address the relevance of *Cammer* factor 5 (*i.e.*, the test for a cause-and-effect relationship between the arrival of new, value-relevant information regarding a company and its stock price movement),[222] Dr. Chance stated at his deposition that this factor was "highly relevant."[223]  He further stated that the reason he did not conduct an analysis of *Cammer* factor 5 was that he was "satisfied" with Dr. Feinstein's analysis and that "there was nothing [he] could add to it."[224]  To the extent that Dr. Chance relies on Dr. Feinstein's analysis of *Cammer* factor 5, my criticisms in the Grenadier Class Certification Report of Dr. Feinstein's analysis still apply.  These include that Dr. Feinstein does

---

[220] Grenadier Class Certification Report, ¶ 184.
[221] Chance Report, ¶ 71.
[222] *Cammer v. Bloom*, 711 F. Supp at 1287 ("empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price").
[223] "[Q] Are you familiar with *Cammer* Factor 5? [A] I don't know them by their numbers so you'll have to tell me what that is. [Q] It's that prices react to new value relevant information. [A] Well, that's the whole usual issue … [Q] Is it your opinion that that factor does not apply to options? … [A] Well, that factor is relevant, highly relevant." (Chance Deposition (83:18–84:8)).
[224] "[Q] But you did not test whether there was a cause-and-effect relationship between new information and option prices; right? [A] No, no. I was satisfied that Dr. Feinstein had done that. There was nothing I could add to it." (Chance Deposition (84:9–84:13)).

not present any support in the academic literature for such a methodology;[225] that he uses "synthetic" stock prices constructed from bid and ask prices of individual put and call option series and averages these "synthetic" stock prices across all option series, which does not allow him to test whether any specific option series reacted to new, value-relevant information;[226] and that he fails to address that the majority of Apple option series never traded on any of the earnings announcement dates that Dr. Feinstein considers as part of his test.[227]

## VII. Dr. Chance Fails to Provide a Reliable Damages Methodology for All Apple Options that Measures Damages Attributable to Plaintiff's Theory of Liability

110.    Dr. Chance states that "a discrete-dividend binomial model" can be used to calculate damages for all Apple options.[228]  The methodology for calculating damages for each option series outlined in his report includes the following steps:

a. To determine the applicable measure of stock price volatility for each option series, Dr. Chance proposes using "the dividend-adjusted binomial American option pricing model to infer the volatility parameter that was used by the market based upon the price at which the option traded."[229]  This parameter is called the "implied volatility" because it is inferred or implied from the observed option price via a model.[230]  Using this method, the implied volatility can vary for different option series depending on the type of option (call or put), how far the strike price of the option is from the exercise price, and time to maturity.  As discussed below, at deposition, Dr. Chance stated that he could further adjust these implied volatilities to account for changes in volatilities due to a "but-for" disclosure.[231]

---

[225] See Grenadier Class Certification Report, Section VIII.E.1.
[226] See Grenadier Class Certification Report, Section VIII.E.2.
[227] See Grenadier Class Certification Report, Section VIII.E.3.
[228] Chance Report, ¶ 117.
[229] Chance Report, ¶ 118.
[230] Hull, p. 318.
[231] Chance Deposition (181:17–183:3).

    b.  Dr. Chance then proposes to take these implied volatilities along with "the price the stock should have been trading absent the alleged misstatements" (the "but-for" stock price) and revalue each option series using the binomial pricing model to derive each option's "but-for" price.[232]

    c.  Dr. Chance would then measure price inflation in a given option series as the difference between the actual price paid for the option and the but-for option price.[233]

111.    Dr. Chance's proposed damages methodology is flawed and unreliable for three main reasons.  First, Dr. Chance fails to analyze whether Apple option prices reacted to new, value-relevant information.  Because of this, he cannot assume that all Apple option series incorporated new, value-relevant information, including information contained in the stock price, quickly and fully.  Therefore, he does not present a methodology capable of showing that the transaction prices of any particular option series were affected by the alleged misrepresentation or changed in response to the alleged corrective disclosures.  Second, Dr. Chance fails to provide a methodology that can assess damages for investors who may have traded different options or would have not traded Apple options at all following a but-for disclosure, an issue that Dr. Chance raises in his report and in deposition but does not address as part of his damages methodology.  Third, Dr. Chance fails to provide a reliable methodology to determine the appropriate but-for implied volatilities for each Apple option series.

    **A.**    **Dr. Chance Does Not Present a Methodology Capable of Showing that the Transaction Prices of Any Particular Option Series Were Affected by the Alleged Misrepresentation or Changed in Response to the Alleged Corrective Disclosures**

112.    I understand that plaintiffs typically establish economic loss in a securities matter by demonstrating that putative class members purchased the stock or call option at a price that was artificially inflated due to alleged misstatements or omissions and held the stock or call option

---

[232] Chance Report, ¶ 118.
[233] Chance Report, ¶ 118.

when the stock or call prices declined following disclosure of the truth.[234]  I understand that, as a matter of law and economics, the economic loss caused by the defendants' alleged fraud could be, at most, the price decline of the security attributable to the revelation of the defendants' alleged fraud.  Additionally, I understand that plaintiffs do not need to compute damages or assess loss causation for the purposes of class certification, but have to show that there is a damages methodology for this matter that would apply class-wide and that this damages methodology is capable of isolating damages due to their theory of liability.

113.    As discussed in Section VI.D above, Dr. Chance has not conducted any analysis of the reactions of option prices to new, value-relevant information.  In fact, he has not conducted any empirical analysis of Apple option prices at all.  Instead, he claimed in deposition that he was "satisfied that Dr. Feinstein had done that," referring to Dr. Feinstein's cause-and-effect analysis.[235]  However, Dr. Feinstein's methodology does not include an event study for individual Apple options.  Instead, Dr. Feinstein constructs "synthetic" stock prices from call and put option bid and ask prices.  Then, he takes an average of these "synthetic" stock prices across all option pairs.  Thus, he is not able to test whether any specific option series reacted to new, value-relevant information.[236]  Because he has not conducted any empirical analysis of Apple option prices at all, and instead relies on Dr. Feinstein's flawed event study of the average "synthetic" stock price, Dr. Chance fails to demonstrate, and cannot assume, that all Apple option series incorporated new, value-relevant information, including information contained in the stock price, quickly and fully.  Therefore, Dr. Chance does not present a methodology capable of estimating how much the transaction prices of any particular call option series were inflated, if at all, or how much the transaction prices of any particular put option series were deflated, if at all, by the alleged misrepresentation or changed in response to the alleged corrective disclosures.

---

[234] In the case of a put option, plaintiffs typically establish economic loss by demonstrating that putative class members wrote the option at a price that was artificially deflated due to alleged misstatements or omissions and that the option position was still outstanding when the option price increased following disclosure of the truth.
[235] Chance Deposition (84:12–84:13).
[236] See Grenadier Class Certification Report, Section VIII.E.2.

**B.     Dr. Chance Fails to Provide a Methodology that Can Assess Damages for Investors Who May Have Traded Different Apple Options or Who May Have Not Traded Apple Options at All Had There Been a But-For Disclosure**

114.    Dr. Chance's proposed methodology assumes that investors in Apple options would have necessarily traded the same Apple options regardless of how stock price inflation may have impacted an investor's preference for that option series or the suitability of that option series for an investor's strategy.  In other words, even if the price of the underlying stock would have been different in response to a but-for disclosure, Dr. Chance assumes that each investor would have nevertheless chosen to trade exactly the same option series with the same strike price and maturity.

115.    However, Dr. Chance himself questions this assumption when he states that "[h]ad the market price of the stock not been inflated, [an investor] *might* still have bought the option, but he would have paid less."[237]  Further, at deposition he stated that if the stock was not inflated, an investor "might have bought that [same] option; he might have bought a different option.  You can't say exactly what a person would or would not do.  In fact, on a different day, he might do something entirely differently.  It just depends on how he feels."[238]  Accordingly, Dr. Chance explicitly allows for, but does not provide a methodology capable of addressing, the possibility that an investor could have chosen to trade a different option series, and as a result could have lost the same amount of money (or even more money) had there been a but-for disclosure, resulting in no (or negative) damages.

116.    According to Dr. Chance, options with different characteristics could appeal to different investors.  In particular, Dr. Chance notes that the option's strike price, and the strike price's proximity to the underlying stock price, can be an important factor for investors choosing an option series in which to invest:

> Most options trading volume comes from the near-the-money short-term options. … [D]eep out-of-the-money options and deep-in-the-money options have little speculative value and do not trade in heavy volume.  Betting on the

---

[237] Chance Report, ¶ 89, emphasis added.
[238] Chance Deposition (175:3–175:8).

> former is like betting on a team in a sporting event that is a heavy underdog.  It
> is a very long shot.  Betting on the latter is like betting on a team that is heavily
> favored.  The bet will be costly and it will not pay much of a return.  The game
> is far more interesting when the teams are more evenly matched.  That is the
> nature of options as well.  And that is why near or close to the money options
> will trade more heavily.[239]

Whether options are out-of-the-money or at-the-money depends on the underlying stock price and its proximity to the strike price.  In his textbook, Dr. Chance points out that an investor's decision of the strike price to choose when purchasing a call option "is not easy and depends on how confident the call buyer is about the market outlook."[240]

117.    There are also more complex option trading strategies where the choice of options can depend on the underlying stock price.  One example is a strategy called a "straddle," which involves the purchase of both a call and a put option with the same strike price to take advantage of large changes in the stock price.  The strike price of the options is often set to be close to the underlying stock price to take advantage of stock price movements in either direction.[241]  Thus, the fact that the stock price could be different following a but-for disclosure may affect which options investors seek to trade.

118.    Dr. Feinstein claims that Apple stock would have traded at a price as much as $20.12 lower absent the alleged misrepresentation, which is approximately 10% of Apple's stock price of $207.48 on November 2, 2018.[242]  If Apple's stock price was lower, this would affect the moneyness of Apple options and, as Dr. Chance discusses, could affect which options investors would choose to trade.[243]

119.    For example, consider an investor who on November 2, 2018 purchased a call option with a strike price of $220 and a maturity date of November 16, 2018.  This option would be

---

[239] Chance Report, ¶¶ 92, 95.

[240] Chance and Brooks, p. 209.

[241] Hull, pp. 246–247.

[242] Dr. Feinstein claims that artificial stock price inflation in Apple's stock price was $20.12 per share at the beginning of the Class Period and the closing price of Apple's stock on November 2, 2018 was $207.48; thus, Dr. Feinstein's claim is that Apple's stock price would have been approximately 10% lower absent the alleged misrepresentation.  See Feinstein Merits Report, ¶ 179.

[243] "Now you would agree that investors may choose what option to trade in based on the moneyness of the option; correct? [A] Yes."  (Chance Deposition (172:22–172:25)).

5.7% out-of-the-money when the price was $207.48, and would pay out if Apple's stock price increased by at least $12.52 before its maturity date.  According to Dr. Feinstein, absent the alleged misrepresentation, Apple's stock price would have been $20.12 lower (or $187.36).  Dr. Chance's damages model assumes that the investor would still have purchased a call with a strike price of $220, which would now be 14.8% out-of-the-money following a but-for disclosure, and which would now require Apple's stock price to increase by at least $32.64 in the next two weeks in order to pay out.[244]  Therefore, Dr. Chance assumes that the same investor who meant to purchase the call that was out-of-the-money by just 5.7% would now purchase a much deeper out-of-the-money call that would be 14.8% out-of-the-money with two weeks to expiration.  At the same time, Dr. Chance states in his report that "[d]eep out-of-the-money options, particularly those with short expirations, are like lottery tickets" and that "[n]ot a large number of people will take such bets."[245]  Yet the damages methodology Dr. Chance is proposing requires the investor to take precisely such a bet following a but-for disclosure.  This assumption contradicts Dr. Chance's acknowledgement at deposition that, but for the stock price inflation, an investor "might have bought that [same] option; he might have bought a different option.  You can't say exactly what a person would or would not do."[246]

## C.   Dr. Chance Fails to Provide a Methodology to Determine the Appropriate But-For Implied Volatilities that Would Reliably Measure Damages for Investors in the Apple Options

120.    When calculating damages, failing to correctly model the appropriate but-for implied volatilities taking into account the impact of a but-for disclosure would lead to an unreliable measure of damages.  As described below, the implied volatilities of Apple options changed over time.  Further, they changed in different ways for different options—for example, the volatilities of some options increased following the January 2, 2019 disclosure, while the volatilities of others decreased, and by different amounts.  This suggests that these implied volatilities could also change in response to a but-for disclosure.  For example, it is possible that a but-for

---

[244] According to Dr. Feinstein, the but-for stock price on November 2, 2018 would be $187.36 ($207.48 minus $20.12).  This stock price would be $32.64 below the strike price of $220, or 14.8% out-of-the-money.  See Feinstein Merits Report, ¶ 179.
[245] Chance Report, ¶ 93.
[246] Chance Deposition (175:4–175:6).

disclosure could have increased uncertainty about Apple's future stock price, leading to the market perceiving higher volatilities for the Apple options.  However, Dr. Chance fails to provide a reliable approach to measure how volatilities may have changed in response to a but-for disclosure.  Below I describe the specific shortcomings of Dr. Chance's discussion of damages for the Apple options.

121.    First, a methodology must be able to assess the appropriate but-for implied volatility for *each* of the Apple options because the data show that the implied volatilities of the Apple options vary both across different option series depending on the strike price and maturity date, and over time.[247]  Importantly, Dr. Chance's methodology for deriving the implied volatilities from options prices can potentially yield a different implied volatility for each combination of option type (call/put), strike price, and option expiration.  That is because, although Apple's underlying stock price has a single volatility, implied volatility—using the Binomial model—is calculated *for each option series* by deriving the volatility such that the pricing model matches the observed option price.  Empirically, this can lead to different implied volatilities for different option series and even for different transactions in the same option series on a given day.  **Exhibit 2** plots the implied volatilities of individual Apple options on each date throughout the Class Period, and shows that there can be a wide range of implied volatilities across options on a particular date.[248]

122.    To provide an illustration of the range of implied volatilities for just one date, the implied volatilities for call options with a maturity date of February 1, 2019 were 49.19% at a strike price of $125 and 40.49% at a strike price of $150 on January 3, 2019.  For call options with the same two strike prices ($125 and $150) but with a maturity date of April 18, 2019, the implied volatilities were 39.60% and 34.89% respectively, on January 3, 2019.[249]  Option implied

---

[247] The implied volatilities inferred from option prices using the binomial model can vary based on the option's strike price and time to maturity because the assumptions of the binomial model do not fully capture the dynamics of stock price movements.  See Hull, pp. 416–417.

[248] The implied volatilities in the exhibit are as reported by *IVolatility*.  *IVolatility* uses a similar methodology to the one proposed by Dr. Chance that infers the implied volatility that is consistent with observed option prices when the option series are valued using a binomial model.  *IVolatility* uses quoted prices as an input, and its methodology could provide different implied volatility estimates if transaction prices were used.  See "IVolatility.com Methodology Guide," *IVolatility*.

[249] See *IVolatility*.

volatilities can also change over time.  For example, the implied volatility of an Apple call option with a strike price of $190 and a maturity date of January 18, 2019 increased from 37.60% on January 2, 2019 to 49.98% on January 3, 2019, an increase of 12 percentage points.[250]

123.    In addition, the implied volatilities estimated from option prices using the binomial model do not always change by the same amount, or even in the same direction, following the alleged corrective disclosures.  **Exhibit 3** shows the distribution of changes in the implied volatilities of Apple options on November 5, 2018, November 12, 2018, and January 3, 2019. The exhibit demonstrates that the magnitude of the changes in implied volatilities can be large (up to 69 percentage points).  Notably, the implied volatilities of some options with the same strike price and option type (call or put) but different maturities increased while others decreased.  The same is true for options with the same strike price but different maturities and for options with different option types, but the same strike price and maturity.

124.    For example, following January 2, 2019, the implied volatility of a call option with a strike of $125 and maturity of April 18, 2019 decreased by 1.01 percentage points while the implied volatility of a call option with the same strike price and a maturity of January 15, 2021 increased by 2.25 percentage points.  As another example, following January 2, 2019, the implied volatility of a put option with a strike price of $150 and maturity date of April 18, 2019 decreased by 0.48 percentage points while the implied volatility of a put option with a strike price of $200 and the same maturity increased by 3.06 percentage points.[251]

125.    If the but-for implied volatility of a call option were to increase following a but-for disclosure, failing to account for that change would overstate damages for investors who purchased call options.  This is because an increase in volatility increases the call price (all else equal), which would partially offset the decrease in call value due to the stock price decline.[252] Conversely, if the but-for implied volatility of a put option were to decrease following a but-for disclosure, failing to account for that change would overstate damages for investors who sold put options.  Thus, in order to provide a reliable methodology for calculating damages for each of the Apple option series, Dr. Chance would need to specify how the implied volatility of *each* Apple

---

[250] The implied volatility of this call option is obtained from *IVolatility*, the data source used by Dr. Feinstein in his class certification analysis. See *IVolatility*.
[251] See *IVolatility*.
[252] See, e.g., Hull, pp. 215–216.

option series would have changed following a but-for disclosure.  Unless the appropriate but-for implied volatility is specified for each option series, price inflation will be incorrectly measured for all investors in the Apple option series and may be overstated.

126.    Second, Dr. Chance does not put forth a reliable methodology to measure how implied volatilities may have changed in response to a but-for disclosure.  In the damages methodology and example outlined in his expert report, Dr. Chance assumes that the but-for implied volatility for each option series would be the same as the actual implied volatility.  At deposition, he recognized that volatilities could have changed in response to a but-for disclosure, and stated that the example in his report was an "illustration" and that the "application of the illustration can be adjusted" to accommodate a change in volatilities.[253]  He did not specify how he would implement such an "adjustment" other than suggesting to look at the change in volatility for each option series around the alleged corrective disclosures.[254]  Such an approach would not reliably measure how implied volatilities would have changed in response to a but-for disclosure.

127.    One reason for this is confounding news.  I document in the Grenadier Merits Report that confounding news was released on each of the three alleged corrective disclosure days that Dr. Feinstein proposes including in his damages analysis.[255]  Dr. Chance has not provided a methodology that is capable of accounting for the fact that the November 5, 2018 and November 12, 2018 alleged corrective disclosures involves information about Apple's business *globally*, not just in *Greater China*.[256]  Therefore, any changes in implied volatilities on these dates may be due to changes in investor perceptions about *global* demand rather than perceptions about demand in Greater China.

---

[253] "[Q] Do you agree that it's possible that Apple's stock price volatility could have changed in response to the but-for disclosure?  [A] It could have changed, and the model can accommodate that."  (Chance Deposition (181:17–21, 183:14–183:17)).

[254] "But what you could do is look at the volatility when it changed … we're talking about the corrective disclosures.  The data will show before and after what the applied [*sic*] volatilities of near the money options are and any other options.  It will show you what the implied volatilities were before and what the implied volatilities were after."  (Chance Deposition (189:23–189:24, 191:13–191:18)).

[255] Grenadier Merits Report, ¶¶ 64–102.

[256] Grenadier Merits Report, ¶¶ 68, 77.

128.     Additionally, I explain that Dr. Feinstein has not shown that the January 2, 2019 disclosure represents the information that allegedly could and should have been disclosed at the start of the Class Period, as opposed to new information that Apple only learned between November 1, 2018 and January 2, 2019.[257]  I also explain that there was other confounding news, such as information about a weaker than expected iPhone upgrade cycle, revealed on this day.[258] Dr. Chance has not provided a methodology that could account for this confounding information and isolate only changes in implied volatilities on the alleged corrective disclosure days that are causally linked to the alleged misrepresentation.

129.     Further, Dr. Chance bases his damages methodology on actual transaction prices.  He proposes to calculate implied volatilities based on "the price at which the option traded."[259] However, to calculate the change in implied volatilities on the alleged corrective disclosure dates he would need transaction prices on both the day prior to and the day of each alleged corrective disclosure.  **Exhibit 4** shows that many Apple option series do not have sufficient transactions on these dates to perform such a calculation.

130.     Moreover, as described in Section IV.A, the volatility surface captures the notion that implied volatilities derived from option prices can vary for different option series depending on their type (put or call), time to maturity, and strike price relative to the stock price.[260]  If the underlying Apple stock price was different in response to a but-for disclosure, this means each individual option series would have a different strike price relative to the stock price, and thus would be at a different point on the volatility surface, *even* if the implied volatilities comprising the surface would not have changed in response to a but-for disclosure.

131.     For a given option series, there would not necessarily be a transaction at the option's new position on the volatility surface corresponding to the but-for price.  For example, on January 3,

---

[257] Grenadier Merits Report, ¶¶ 25, 84.

[258] Grenadier Merits Report, ¶¶ 25, 100.

[259] Chance Report, ¶ 118; "[Q] So but specifically what option prices are you proposing to use in your methodology? Are we talking about closing prices, trade prices, something else?  [A] … So it is the actual price at which the investor traded.  It would be absolutely wrong to use any other price because that's what the person actually paid." (Chance Deposition (180:3–180:17)).

[260] See, for example, Hull, pp. 416–417.

2019 there were 74 Relevant Call Option series with a maturity date of April 18, 2019, with strike prices ranging from $2.50 to $425.  Of these 74 call option series, there were 33 which did not have any traded volume on January 3, 2019.  Therefore, Dr. Chance would not have a transaction price to use to determine implied volatility for 33 positions along the volatility surface.[261]

132.    To the extent that Dr. Chance attempts to use quote prices in the absence of actual transaction prices, despite stating that he would use "the price at which the option traded,"[262] this would introduce additional problems to his methodology.  As described in Section VI.B above, bid-ask spreads for the typical Apple option series are high, leading to a range of potential prices and implied volatilities depending on what point within the bid-ask spread is used to calculate implied volatility.

133.    In conclusion, Dr. Chance's review of academic articles does not support his assertion that all Apple options traded in efficient markets.  Dr. Chance also fails to provide any empirical analysis demonstrating that all Apple options traded in efficient markets.

134.    Dr. Chance's proposed damages methodology is also flawed and unreliable.  First, he fails to demonstrate that all Apple option series incorporated new, value-relevant information fully and quickly, and therefore does not present a methodology capable of estimating how much the transaction prices of any particular call option series were inflated, if at all, or how much the transaction prices of any particular put option series were deflated, if at all, by the alleged misrepresentation or changed in response to the alleged corrective disclosures.  Second, he fails to provide a methodology that can assess damages for investors who may have traded different options or would have not traded Apple options at all had there been a but-for disclosure.  Finally, he fails to provide a reliable methodology to determine the appropriate but-for implied volatilities for each Apple option series.

Executed this 24th of June, 2022

_Steven Grenadier_

_____

Steven Grenadier

---

[261] See *IVolatility.*
[262] Chance Report, ¶ 118.

**APPENDIX A**

# Curriculum Vitae
# Steven Grenadier

Graduate School of Business
Stanford University
Tel:   (650) 725-0706
Email: sgren@stanford.edu

## CURRENT POSITIONS

William F. Sharpe Professor of Financial Economics, Graduate School of Business, Stanford University

## FIELDS OF SPECIALIZATION

Corporate Finance
Asset Pricing
Portfolio Management
Options
Real Estate

## DOCTORAL STUDIES

**Harvard Business School/Harvard Graduate School of Arts and Science**

Ph.D. in Business Economics, November 1992
Concentration in Capital Markets and Corporate Finance

**Dissertation:**  Real Estate Markets
Committee Chairman:  Robert C. Merton

## UNDERGRADUATE EDUCATION

**University of California at Berkeley**

B.S. 1987 - Summa cum laude

## HONORS

The article "The Strategic Exercise of Options:  Development Cascades and Overbuilding in Real Estate Markets," was nominated for the Smith Breeden Prize of the Journal of Finance in 1997

1994 Best Paper Award from the American Real Estate and Urban Economics Association and the American Institute of Individual Investors

1993 Best Dissertation Award from the American Real Estate and Urban Economics Association

National Doctoral Fellowship Recipient: American Assembly of Collegiate Schools of Business

Phi Beta Kappa

**APPENDIX A**

**PUBLICATIONS**

Grenadier, Steven, Lin William Cong and Yunzhi Hu (2020), "Dynamic Intervention and Informational Linkages," *Journal of Financial Economics*, 135 (1), 1-15.

Grenadier, Steven and Samuel Antill (2019), "Optimal Capital Structure and Bankruptcy Choice: Dynamic Bargaining vs Liquidation," *Journal of Financial Economics*, 133 (1), 198-224.

Grenadier, Steven, Andrey Malenko and Nadya Malenko (2016), "Timing Decisions in Organizations: Communication and Authority in a Dynamic Environment," *American Economic Review*, 106(9), 2552-2581.

Grenadier, Steven, Ilya Strebulaev, and Andrey Malenko (2013), "Investment Busts, Reputation, and the Temptation to Blend in with the Crowd," *Journal of Financial Economics*, 111(1), 137-157.

Grenadier, Steven and Andrey Malenko (2011), "Real Options Signaling Games with Applications to Corporate Finance," *Review of Financial Studies*, 24(12), 3993-4036.

Bekaert, Geert, Eric Engstrom, and Steven Grenadier (2010), "Stock and Bond Returns with Moody Investors," *Journal of Empirical Finance*, 17 (5), 867-894.

Grenadier, Steven and Andrey Malenko (2010), "Irreversible Investment in a Bayesian Framework: The Case of Distinguishing Between Temporary and Permanent Shocks," *Journal of Finance*, 65 (5), 1949-1986.

Grenadier, Steven and Neng Wang (2007), "Investment Under Uncertainty and Time-Inconsistent Preferences," *Journal of Financial Economics*, 84 (1), 2-39 (lead article).

Grenadier, Steven and Neng Wang (2005), "Investment Timing, Agency and Information," *Journal of Financial Economics*, 75 (3), 493-533 (lead article).

Grenadier, Steven (2005), "An Equilibrium Analysis of Real Estate Leases," *Journal of Business,* 78 (4), 1173-1214.

Grenadier, Steven (2002), "Option Exercise Games: An Application to the Equilibrium Investment Strategies of Firms," *Review of Financial Studies,* 15 (3), 691-721 (lead article).

Grenadier, Steven (2000), "Option Exercise Games: The Intersection of Real Options and Game Theory", *Journal of Applied Corporate Finance*, 13 (2), 99-107.

Grenadier, Steven (2000), "Game Choices: The Intersection of Real Options and Game Theory," Editor, Risk Books, London.

**APPENDIX A**

Grenadier, Steven (2000), "Equilibrium with Time-to-Build:  A Real-Options Approach," Michael J. Brennan and Lenos Trigeorgis, eds, *Project Flexibility, Agency, and Competition:  New Developments in the Theory and Applications of Real Options*, Oxford University Press, 275-296.

Grenadier, Steven (1999) "Information Revelation Through Option Exercise," *Review of Financial Studies,* 12 (1), 95-130.

Grenadier, Steven and Allen Weiss (1997), "Investment in Technological Innovations: An Option Pricing Approach", *Journal of Financial Economics,* 44 (3), 397-416.

Grenadier, Steven (1996), "The Strategic Exercise of Options:  Development Cascades and Overbuilding in Real Estate Markets," *Journal of Finance,* 51 (5), 1653-1680.

Grenadier, Steven (1996), "Leasing and Credit Risk," *Journal of Financial Economics,* 42 (3), 333-364.

Grenadier, Steven (1995), "Valuing Lease Contracts:  A Real-Options Approach," *Journal of Financial Economics,* 38 (3), 297-331.

Grenadier, Steven (1995), "The Persistence of Real Estate Cycles," *Journal of Real Estate Finance and Economics,* 10 (2), 95-119.

Grenadier, Steven (1995), "Flexibility and Tenant Mix in Real Estate Projects," *Journal of Urban Economics,* 38 (3), 357-378.

Grenadier, Steven (1995), "Local and National Determinants of Office Vacancies," *Journal of Urban Economics,* 37 (1), 57-71.

Grenadier, Steven and Brian Hall (1996), "Risk-Based Capital Standards and the Riskiness of Bank Portfolios:  Credit and Factor Risks," *Regional Science and Urban Economics,* 26 (June), 433-464.

**WORKING PAPERS**
 "Capital budgeting and Real Options: The Case of Concealed Investment Projects," with Andrey Malenko.

"Sandbagging Real Options," with William Cong.

**EDITORIAL RESPONSIBILITIES**
Editor, *Journal of Real Estate Finance and Economics*, 1996-
Associate Editor, *Journal of Economic Dynamics and Control*, 2003-2010

**PROFESSIONAL ACTIVITIES**
Chairman of the Finance Department, Graduate School of Business, Stanford University: 2003-2006, 2011-2019

**APPENDIX A**

Trustee of AQR Funds: 2008-2011
Trustee of E*Trade Funds:  1999-2009
Senior Consultant:  Financial Engines, Inc.: 1997-2019
Trustee of Nicholas Applegate Institutional Funds:  2007-2010
Member of the Stanford University Retirement Program Investment Committee, 2005-2011
Consultant to Applied Materials
Consultant to Shell Capital
Consultant to Zevenbergen Capital

**TEACHING EXPERIENCE**
Private Equity & Investment Seminar: 2018-
Investment Management and Entrepreneurial Finance: 2018-
Modeling for Investment Management: 2009-
Critical Analytical Thinking: 2010-2012
Portfolio Management:  1992-2006
Essentials of Real Estate Investment:  1994-2009
Foundations of Financial Economics:  1995-1997, 2006-
Finance Core:  1993

**PRESENTATIONS**
Brigham Young University
Carnegie Mellon University
Columbia University (2 seminars)
Harvard Business School (2 seminars)
Massachusetts Institute of Technology
Northwestern University (2 seminars)
Ohio State University
Southern Methodist University
Stanford University
University of British Columbia (2 seminars)
University of California at Berkeley (3 seminars)
University of California at Los Angeles (3 seminars)
University of Chicago (2 seminars)
University of Connecticut (3 seminars)
University of Illinois
University of Minnesota
University of Oregon
University of Pennsylvania (3 seminars)
University of Rochester
University of Southern California
University of Texas at Austin
University of Utah
University of Wisconsin (2 seminars)
Yale University (2 seminars)

# Steven Grenadier
# Prior Testimony in Previous Four Years

*Mary Bell, Janice Grider, Cindy Prokish, John A. Hoffman, and Pamela M. Leinonen v. ATH Holding Company, LLC, Board of Directors of ATH Holding Company, LLC, and Pension Committee of ATH Holding Company, LLC*, Case No. 1:15-cv-02062-TWP-MPB (U.S. District Court Southern District of Indiana, Indianapolis Division).  Deposition: September 2018.

*Move, Inc. v. Citigroup Global Markets, Inc.*, Case No. 08-0335 (State of California, LA Division). FINRA Dispute Resolution Testimony: December 2018.

*Duane & Virginia Lanier Trust, et al., v. SandRidge Mississippian Trust I, et al.*, Case No. 5:15-cv-00634-G (U.S. District Court Western District of Oklahoma). Deposition: June 2019.

*In re SandRidge Energy, Inc. Securities Litigation*, Case No.: 5:12-cv-01341-G (U.S. District Court Western District of Oklahoma). Deposition: June 2019.

*MBIA Insurance Corporation v. Credit Suisse Securities (USA) LLC, DLJ Mortgage Capital, Inc. and Select Portfolio Servicing, Inc.*, Case No. 603751/2009 (Supreme Court of The State Of New York County Of New York). Trial Testimony: August 2019.

*Benjamin Reetz v. Lowe's Companies, Inc., et al.*, Case No.: 5:18-cv-00075-KDB-DCK (U.S. District Court Western District Of North Carolina, Statesville Division). Deposition: November 2020.

*Fredric A. Guenther, et al. vs. BP Retirement Accumulation Plan, et al.*, Case No.: 4:16-cv-00995 (U.S. District Court Southern District of Texas, Houston Division). Deposition: December 2020.

*Ambac Assurance Corporation v. U.S. Bank National Association*, Case No. 17-cv-2614-PAE (U.S. District Court Southern District of New York). Deposition: August 2021.

*Commerzbank AG v. U.S. Bank National Association*, Case No. 16-CV-04569-DLC (U.S. District Court Southern District of New York). Deposition: November 2021.

# Documents Considered

**Academic Articles**

- Anthony, Joseph H., "The Interrelation of Stock and Options Market Trading-Volume Data," *Journal of Finance,* Vol. 43, No. 4, 1988, pp. 949–964.

- Bhattacharya, Mihir, "Transactions Data Tests of Efficiency of the Chicago Board Options Exchange," *Journal of Financial Economics*, Vol. 12, No. 2, 1983, pp. 161–185.

- Bhattacharya, Mihir, "Price Changes of Related Securities: The Case of Call Options and Stocks," *Journal of Financial and Quantitative Analysis*, Vol. 22, No. 1, 1987, pp. 1–15.

- Cao, Jie and Bing Han, "Cross Section of Option Returns and Idiosyncratic Stock Volatility," *Journal of Financial Economics*, Vol. 108, No. 1, 2013, pp. 231–249.

- Chan, Kalok et al., "Why Option Prices Lag Stock Prices: A Trading-based Explanation," *Journal of Finance*, Vol. 48, No. 5, 1993, pp. 1957–1967.

- Chiras, Donald P. and Steven Manaster, "The Information Content of Option Prices and a Test of Market Efficiency," *Journal of Financial Economics,* Vol. 6, No. 2–3, 1978, pp. 213–234.

- Cox, John C. et al., "Option Pricing: A Simplified Approach," *Journal of Financial Economics*, Vol. 7, No. 3, 1979, pp. 229–263.

- Fama, Eugene F., "Efficient Capital Markets II," *Journal of Finance*, Vol. 46, No. 5, 1991, pp. 1575–1617.

- Figlewski, Stephen and Gwendolyn P. Webb, "Options, Short Sales, and Market Completeness," *Journal of Finance*, Vol. 48, No. 2, 1993, pp. 761–777.

- Figlewski, Stephen, "Options Arbitrage in Imperfect Markets," *Journal of Finance,* Vol. 44, No. 5, 1989, pp. 1289–1311.

- Galai, Dan, "Tests of Market Efficiency of the Chicago Board Options Exchange," *Journal of Business*, Vol. 50, No. 2, 1977, pp. 167–197.

- Green, T. Clifton, and Stephen Figlewski, "Market Risk and Model Risk for a Financial Institution Writing Options," *Journal of Finance,* Vol. 54, No. 4, 1999, pp. 1465–1499.

- Heston, Steven L., "A Closed-Form Solution for Options with Stochastic Volatility with Applications to Bond and Currency Options," *The Review of Financial Studies*, Vol. 6, No. 2, 1993, pp. 327–343.

- Huh, Sahn-Wook et al., "Options Market Makers' Hedging and Informed Trading: Theory and Evidence," *Journal of Financial Markets*, Vol. 23, 2015, pp. 26–58.

- Jameson, Mel and William Wilhelm, "Market Making in the Options Markets and the Costs of Discrete Hedge Rebalancing," *Journal of Finance*, Vol. 47, No. 2, 1992, pp. 765–779.

**APPENDIX C**

- Jennings, Robert and Laura Starks, "Earnings Announcements, Stock Price Adjustment, and the Existence of Option Markets," *Journal of Finance*, Vol. 41, No. 1, 1986, pp. 107–125.

- Klemkosky, Robert C. and Bruce G. Resnick, "An Ex Ante Analysis of Put-Call Parity," *Journal of Financial Economics,* Vol. 8, No. 4, 1980, pp. 363–378.

- Klemkosky, Robert C. and Bruce G. Resnick, "Put-Call Parity and Market Efficiency," *Journal of Finance,* Vol. 34, No. 5, 1979, pp. 1141–1155.

- Kumar, Raman et al., "The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis," *Journal of Finance*, Vol. 53, No. 2, 1998, pp. 717–732.

- Lamont, Owen A. and Richard H. Thaler, "Anomalies: The Law of One Price in Financial Markets," *Journal of Economic Perspectives*, Vol. 17, No. 4, 2003, pp. 191–202.

- Macbeth, James D. and Larry J. Merville, "An Empirical Examination of the Black-Scholes Call Option Pricing Model," *Journal of Finance*, Vol. 34, No. 5, 1979, pp. 1173–1186.

- Manaster, Steven and Richard J. Rendleman Jr., "Option Prices as Predictors of Equilibrium Stock Prices," *Journal of Finance*, Vol. 37, No. 4, 1982, pp. 1043–1057.

- Muravyev, Dmitriy, "Order Flow and Expected Option Returns," *Journal of Finance*, Vol. 71, No. 2, 2016, pp. 673–707.

- Patell, James M. and Mark A. Wolfson, "The Ex Ante and Ex Post Price Effects of Quarterly Earnings Announcements Reflected in Option and Stock Prices," *Journal of Accounting Research*, Vol. 19, No. 2, 1981, pp. 434–458.

- Poteshman, Allen M., "Underreaction, Overreaction, and Increasing Misreaction to Information in the Options Market," *Journal of Finance*, Vol. 56, No. 3, 2001, pp. 851–876.

- Rubinstein, Mark, "Nonparametric Tests of Alternative Option Pricing Models Using All Reported Trades and Quotes on the 30 Most Active CBOE Option Classes from August 23, 1976 through August 31, 1978," *Journal of Finance*, Vol. 40, No. 2, 1985, pp. 455–480.

- Santa-Clara, Pedro and Alessio Saretto, "Option Strategies: Good Deals and Margin Calls," *Journal of Financial Markets*, Vol. 12, No. 3, 2009, pp. 391–417.

- Shleifer, Andrei and Robert W. Vishny, "The Limits of Arbitrage," *Journal of Finance*, Vol. 52, No. 1, 1997, pp. 35–55.

- Stein, Jeremy, "Overreactions in the Options Market," *Journal of Finance*, Vol. 44, No. 4, 1989, pp. 1011–1023.

- Stephan, Jens A. and Robert E. Whaley, "Intraday Price Change and Trading Volume Relations in the Stock and Stock Options Markets," *Journal of Finance*, Vol. 45, No. 1, 1990, pp. 191–220.

- Varian, Hal R., "The Arbitrage Principle in Financial Economics," *Journal of Economic Perspectives*, Vol. 1, No. 2, 1987, pp. 55–72.

- Vijh, Anand M., "Liquidity of the CBOE Equity Options," *Journal of Finance*, Vol. 45, No. 4, 1990, pp. 1157–1179.

**APPENDIX C**

- Whaley, Robert E., "Valuation of American Call Options on Dividend-Paying Stocks: Empirical Tests," *Journal of Financial Economics*, Vol. 10, No. 1, 1982, pp. 29–58.

## Books and Book Chapters

- Barberis, Nicholas and Richard H. Thaler, "A Survey of Behavioral Finance," in *Handbook of the Economics of Finance*, Volume 1B, North Holland, Amsterdam, Netherlands, Chapter 18, 2003, pp. 1053–1128.

- Chance, Don M. and Robert Brooks, *An Introduction to Derivatives and Risk Management*, 10th ed., Cengage, Boston, MA, 2016.

- Hull, John C., *Options, Futures, and Other Derivatives*, 8th ed., Prentice Hall, Hoboken, NJ, 2012.

- LeRoy, Stephen and Jan Werner, *Principles of Financial Economics*, 2nd ed., Cambridge University Press, Cambridge, UK, 2014.

- Reilly, Frank K. and Keith C. Brown, *Investment Analysis and Portfolio Management*, 10th ed., South-Western Cengage Learning, Mason, OH, 2012.

- Stock, James H., and Mark W. Watson, *Introduction to Econometrics*, 3rd ed., Pearson Education, Inc., London, UK, 2015.

## Case Documents

- *In re Apple Inc. Securities Litigation*, Revised Consolidated Class Action Complaint for Violation of the Federal Securities Laws, June 23, 2020.

## Data

- *IVolatility*

## Depositions

- Deposition of Don M. Chance, June 8, 2022.

## Expert Reports

- Expert Report of Professor Steven P. Feinstein, Ph.D., CFA, *In re Apple Inc. Securities Litigation*, May 5, 2021, including material produced by Dr. Feinstein and all documents considered therein.

**APPENDIX C**

- Expert Report of Professor Steven Grenadier, *In re Apple Inc. Securities Litigation*, July 9, 2021, including all documents considered therein.

- Reply Expert Report of Professor Steven P. Feinstein, Ph.D., CFA, *In Re Apple Inc. Securities Litigation*, August 24, 2021, including material produced by Dr. Feinstein and all documents considered therein.

- Expert Report of Don Chance, *In re Apple Inc. Securities Litigation*, April 15, 2022, including material produced by Dr. Chance and all documents considered therein.

- Expert Report of Steven P. Feinstein, Ph.D., CFA, *In re Apple Inc. Securities Litigation*, April 27, 2022, including material produced by Dr. Feinstein and all documents considered therein.

- Expert Report of Professor Steven Grenadier, *In re Apple Inc. Securities Litigation*, June 10, 2022, including all documents considered therein.

**Legal Opinions**

- *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

- *In re Federal Home Loan Mortgage Corp. (Freddie Mac) Securities Litigation*, 281 F.R.D. 174 (2012).

- *In re Initial Pub. Offering Securities Litigation*, **260 F.R.D.**

- *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D.Tex.2001).

**Miscellaneous Documents**

- "IVolatility.com Methodology Guide," *IVolatility*.

**Websites**

- "Equity Options Product Specifications," *CBOE*, available at https://www.cboe.com/exchange_traded_stock/equity_options_spec.

**All other materials cited in this report and exhibits to this report.**

# Exhibit 4
# Apple Inc.
# Summary Statistics for Relevant Options[1]
## 11/2/18 – 1/2/19

| | |
|---|---|
| Number of Relevant Options[2] | 2,282 |
| Unique Strike Price-Expiration Combinations[3] | 1,250 |
| Number of Unique Strike Prices | 148 |
| Option Strike Price Range | $2.50 – $440.00 |
| Apple Stock Price Range | $146.83 – $209.95 |
| Number of Unique Expiration Dates | 22 |
| Option Expiration Date Range | 11/9/18 – 1/15/21 |
| Average Daily Open Interest per Relevant Option[4] | 2,605 |
| Median Daily Open Interest per Relevant Option[4] | 412 |

Source:  Complaint dated 6/23/20; EXP_FEINSTEIN0000001.xlsx

Note:
[1] Statistics are based on the set of Relevant Options, which are those with (1) expiration date on or after 11/5/18, the first alleged corrective disclosure date, and (2) positive trading volume on at least one day during the Putative Class Period (11/2/18 – 1/2/19).
[2] Call and put options with the same strike price and expiration are counted separately.
[3] Call and put options with the same strike price and expiration are counted together.
[4] Calculated across all options and trading dates.

**APPENDIX D**

# Exhibit 5
# Apple Inc.
# Trading Summary Statistics for Relevant Options[1]
## 11/2/18 – 1/2/19

| | Min | Mean | Max | 10% | 25% | 50% | 75% | 90% |
|---|---|---|---|---|---|---|---|---|
| **Average Daily Trading Volume (Option Contracts)** | | | | | | | | |
| Call | 0 | 691 | 31,296 | 1 | 6 | 45 | 297 | 1,673 |
| Put | 0 | 573 | 18,245 | 1 | 7 | 52 | 283 | 1,403 |
| **Percent of Days with No Trading** | | | | | | | | |
| Call | 0% | 35% | 98% | 0% | 0% | 26% | 66% | 86% |
| Put | 0% | 31% | 98% | 0% | 0% | 15% | 62% | 90% |

Source:  Complaint dated 6/23/20; EXP_FEINSTEIN0000001.xlsx

Note:
[1] Statistics are based on the set of Relevant Options, which are those with (1) expiration date on or after 11/5/18, the first alleged corrective disclosure date, and (2) positive trading volume on at least one day during the Putative Class Period (11/2/18 – 1/2/19).  For each option, the start of the analysis period is the earliest day between 11/2/18 and 1/2/19 for which there is a non-zero bid or ask price in EXP_FEINSTEIN0000001.xlsx, and the end of the analysis period is the earlier of the option expiration date and 1/2/19.

# Exhibit 6
## Apple Inc.
## Trading Summary Statistics for Relevant Options[1]
### 11/2/18 – 1/2/19

| | Min | Mean | Max | 10% | 25% | 50% | 75% | 90% |
|---|---|---|---|---|---|---|---|---|
| **Average Bid-Ask Spread[2]** | | | | | | | | |
| **Call** | | | | | | | | |
| In-the-Money[3] | 1% | 5% | 35% | 3% | 3% | 4% | 7% | 9% |
| Out-of-the-Money[4] | 1% | 39% | 195% | 6% | 11% | 28% | 57% | 87% |
| Total | 1% | 27% | 195% | 3% | 5% | 10% | 38% | 74% |
| **Put** | | | | | | | | |
| In-the-Money[3] | 1% | 5% | 83% | 3% | 3% | 4% | 6% | 8% |
| Out-of-the-Money[4] | 2% | 32% | 177% | 6% | 11% | 23% | 44% | 75% |
| Total | 1% | 22% | 177% | 3% | 4% | 9% | 30% | 62% |

Source:  Complaint dated 6/23/20; EXP_FEINSTEIN0000001.xlsx

Note:
[1] Statistics are based on the set of Relevant Options, which are those with (1) expiration date on or after 11/5/18, the first alleged corrective disclosure date, and (2) positive trading volume on at least one day during the Putative Class Period (11/2/18 – 1/2/19).  For each option, the start of the analysis period is the earliest day between 11/2/18 and 1/2/19 for which there is a non-zero bid or ask price in EXP_FEINSTEIN0000001.xlsx, and the end of the analysis period is the earlier of the option expiration date and 1/2/19.
[2] Bid-ask spread is calculated as the difference between the ask and bid prices divided by the mid price.  Days with a bid or ask price of zero are excluded from the average calculation.
[3] For option series that alternate between in- and out-of-the-money, summary statistics are calculated based on the days the option series is in-the-money.  At-the-money options are grouped with in-the-money options.
[4] For option series that alternate between in- and out-of-the-money, summary statistics are calculated based on the days the option series is out-of-the-money.  At-the-money options are grouped with in-the-money options.

# Exhibit 1
# Options Data Restrictions in Academic Articles
# Cited by Dr. Chance That Analyze Option Prices[1]

**Category A:  Pricing rules, pricing models, and the existence of arbitrage opportunities**

| Academic Article | Excludes Put Options | Other Data Restrictions | Restriction Categories[2] |
|---|---|---|---|
| Galai (1977), "Tests of Market Efficiency of the Chicago Board Options Exchange" | Yes | "Altogether I have 245 defined options (with more than 3 trading days for each) on 32 underlying stocks." | Liquidity or Trading Frequency |
| Macbeth and Merville (1979), "An Empirical Examination of the Black-Scholes Call Option Pricing Model" | Yes | "On the ex-dividend day and the days following, the option sometimes continues to trade at its exercise value and sometimes trades at a higher value. Fortunately these days of unusual price behavior have been excluded from our sample." | Certain Mispriced Options |
| Klemkosky and Resnick (1979), "Put-Call Parity and Market Efficiency" | No | "The criterion of this study required that the put, call and underlying stock all had to trade within one minute of each other." | Liquidity or Trading Frequency |
| | | "Fourteen of the 606 short hedges were eliminated from further analysis because condition (14) held at inception" and "[i]f condition (14) holds, the arbitrage condition has been violated, and it would be to the put holder's advantage to exercise the put immediately, since the exercise value is greater than the corresponding portfolio value." | Certain Mispriced Options |
| | | "Sixty-six of the 606 long hedges constructed were eliminated from further analysis because sufficient condition (10) failed to hold."  This is a "sufficient condition for no premature exercising." | Optimal Early Exercise |

# Exhibit 1
# Options Data Restrictions in Academic Articles
# Cited by Dr. Chance That Analyze Option Prices[1]

### Category A:  Pricing rules, pricing models, and the existence of arbitrage opportunities

| Academic Article | Excludes Put Options | Other Data Restrictions | Restriction Categories[2] |
|---|---|---|---|
| Klemkosky and Resnick (1980), "An Ex Ante Analysis of Put-Call Parity" | No | Klemkosky and Resnick (1980) builds on the findings of Klemkosky and Resnick (1979) and uses its data and calculations; therefore, it contains the same restrictions. | Liquidity or Trading Frequency; Certain Mispriced Options; Optimal Early Exercise |
| | | "Inequality (6b) held for 14 of the short conversions, and they were eliminated from further analysis" and "[i]f condition (6b) holds, the arbitrage condition has been violated, and it would be to the put holder's advantage to exercise the put immediately." | Certain Mispriced Options |
| Whaley (1982), "Valuation of American Call Options on Dividend Paying Stocks: Empirical Tests" | Yes | "First, the option's underlying stock had to have *exactly* one dividend paid during the option's remaining life." | Dividends |
| | | "[O]ptions with expiration dates before the stock's next ex-dividend date were eliminated." | Dividends |
| | | "[O]ptions with times to expiration including more than one ex-dividend date were, likewise, excluded." | Dividends |
| | | "The second restriction eliminated options whose premia were below fifty cents." | Low Option Price |
| | | "For each cross-section $t$, all options employed were required to have three consecutive weekly prices." | Liquidity or Trading Frequency; Short Time to Maturity |

# Exhibit 1
# Options Data Restrictions in Academic Articles
# Cited by Dr. Chance That Analyze Option Prices[1]

**Category A:  Pricing rules, pricing models, and the existence of arbitrage opportunities**

| Academic Article | Excludes Put Options | Other Data Restrictions | Restriction Categories[2] |
|---|---|---|---|
| Bhattacharya (1983), "Transactions Data Tests of Efficiency of the Chicago Board Options Exchange" | Yes | "All data records which had zero volume at both the bid and the ask prices of the option were discarded, so that mispricing signals would not be flagged at zero volume." | Liquidity or Trading Frequency |
| | | "Further, all options either very deep-in-the-money (where $S_{bid}/K > 1.30$) or very deep-out-of-the-money (where $S_{bid}/K < 0.75$) are discarded because the elasticity of prices for these options with respect to σ is greatly different from the elasticity of those near the money." | Deep In- or Out-of-the-Money |
| | | "Finally, if the stock price remained unchanged for five minutes, or more, the data records were used only if they included at least one bid/ask record on the option in the 4 minutes 57 seconds interval described above." | Liquidity or Trading Frequency |
| Rubinstein (1985), "Nonparametric Tests of Alternative Option Pricing Models Using All Reported Trades and Quotes on the 30 Most Active CBOE Option Classes from August 23, 1976 through August 31, 1978" | Yes | "To put the great frequency of observations to best advantage, a subset of the data was created comprised only of those trades and quotes which indicated: 1. Depth of the market at reported prices[;] 2. Narrow spread between bid and ask[;] 3. Time period one of liquidity and short-run stability of stock price[;] 4. Record was not reported near the beginning or ending of the trading day[;] 5. Record was not the result of a late reported trade or a trade based on a contingency order[;] 6. The corresponding option and stock prices associated in a record were, in fact, contemporaneous." | Liquidity or Trading Frequency; Bid-Ask Spreads |

# Exhibit 1
# Options Data Restrictions in Academic Articles
# Cited by Dr. Chance That Analyze Option Prices[1]

### Category A:  Pricing rules, pricing models, and the existence of arbitrage opportunities

| Academic Article | Excludes Put Options | Other Data Restrictions | Restriction Categories[2] |
|---|---|---|---|
| | | "Records were chosen only if they simultaneously satisfied the following eight criteria: 1. Previous and following different stock prices either both went up or both went down by 1/8[;] 2. Time after the last occurrence of the previous different stock price is less than 500 seconds[;] 3. At least 300 seconds within constant stock price interval[;] 4. Record did not occur in the first 1,000 seconds after 9:00 or in the last 1,000 seconds before 3:00[;] 5. Spread between high and low option prices less than or equal to 1/4[;] 6. Total contract volume at least 3[;] 7. At least one bid-ask raw data record occurred in the first five minutes of constant stock price interval[;] 8. Total number of raw data records consolidated is three or more." | Liquidity or Trading Frequency; Bid-Ask Spreads |
| | | "To handle ambiguities from optimal early exercise, all puts were eliminated from the sample and all calls, for which early exercise (based on perfectly forecasted cash dividends) was likely, were also eliminated." | Optimal Early Exercise |
| | | "Options with less than 21 days to expiration were omitted." | Short Time to Maturity |
| | | "Options with a [underlying stock price to strike price] ratio less than 0.75 were omitted. In addition, deep in-the-money options selling below parity were also eliminated from the sample." | Deep In- or Out-of-the-Money |

# Exhibit 1

# Options Data Restrictions in Academic Articles

# Cited by Dr. Chance That Analyze Option Prices[1]

**Category B:  Speed at which options incorporate new information**

| Academic Article | Excludes Put Options | Other Data Restrictions | Restriction Categories[2] |
|---|---|---|---|
| Patell and Wolfson (1981), "The Ex Ante and Ex Post Effects of Quarterly Earnings Announcements Reflected in Option and Stock Prices" | Yes | "We were still forced to discard approximately 5 percent of the price observations due to apparent arbitrage profit opportunities (ignoring any consideration of transaction costs)." | Certain Mispriced Options |
| | | "It has been noted by Beckers [1981] and Cox and Rubinstein [1981], among others, that the Black and Scholes model seems to be best specified for options trading near the money. Therefore, we restricted attention to the two options whose exercise prices bracket the stock price on the observation date." | Deep In- or Out-of-the-Money |
| | | "We excluded all observation pairs $t_a$ and $t_b$ for which any date between $t_a$ and the announcement date, $t_o$, fell within 20 trading days of expiration." | Short Time to Maturity |
| Manaster and Rendleman (1982), "Option Prices as Predictors of Equilibrium Stock Prices" | Yes | "Therefore, options that have the potential for optimal premature exercise are deleted from the sample. Specifically, an option is excluded on any day from which the present value of the dividends to be paid over the remaining life of the option exceeds the present value of the interest foregone by early exercise." | Optimal Early Exercise |
| | | "In addition to excluding options which could be optimally exercised prior to maturity, options with less than thirty days to maturity are also excluded from the sample." | Short Time to Maturity; Optimal Early Exercise |
| | | "Finally, options are excluded from the sample on any day in which the closing prices imply the existence of arbitrage opportunities." | Certain Mispriced Options |

# Exhibit 1
# Options Data Restrictions in Academic Articles
# Cited by Dr. Chance That Analyze Option Prices[1]

**Category B:  Speed at which options incorporate new information**

| Academic Article | Excludes Put Options | Other Data Restrictions | Restriction Categories[2] |
|---|---|---|---|
| Stephan and Whaley (1990), "Intraday Price Change and Trading Volume Relations in the Stock and Stock Option Markets" | Yes | "The model is limited to a maximum of two dividend payments on the underlying stock during the option's life so transactions on options with more than two dividends are excluded from the sample." | Dividends |
| | | "Prior to implementing the volatility estimation procedure, the option transactions were carefully scrutinized to identify values that violate basic rationality conditions. … If the observed call option transaction price is below any one of these three values, no volatility estimate is possible. For this reason, all such option transactions were eliminated from the sample." | Certain Mispriced Options |
| | | "Deep in-the-[money] and deep out-of-the-[money] options also pose a problem in volatility estimation. Such options are priced at approximately their intrinsic values and contain little, if any, information about the level of the stock's volatility. To filter these option transactions from the sample, upper and lower bounds on the moneyness of the option were defined." | Deep In- or Out-of-the-Money |
| | | "To eliminate options with inactive markets, all options with fewer than 144 transactions in a given day were eliminated." | Liquidity or Trading Frequency |
| Chan et al. (1993), "Why Option Prices Lag Stock Prices: A Trading-Based Explanation" | No | "In the initial sample we follow Stephan and Whaley and use only options that have at least 144 transactions during the day. This restriction greatly reduces the sample."[3] | Liquidity or Trading Frequency |

# Exhibit 1
# Options Data Restrictions in Academic Articles
# Cited by Dr. Chance That Analyze Option Prices[1]

**Category C:  Impact of option markets on stock markets**

| Academic Article | Excludes Put Options | Other Data Restrictions | Restriction Categories[2] |
|---|---|---|---|
| Bhattacharya (1987), "Price Changes of Related Securities: The Case of Call Options and Stocks" | Yes | "The top 32 stocks by option volume, together accounting for about 70 percent of the total volume, were selected for this study because the greater the option volume, the larger the number of intra-day observations and, hence, the greater the reliability of the intra-day-holding period returns used in hypothesis testing." | Liquidity or Trading Frequency |
| | | "Each observation consists of prices of a pair of identical short maturity, near-the-money options whose exercise prices bracket the concurrent stock price. Additionally, each option in the pair must be priced at least at $0.50 and be more than two weeks and no more than 100 days from maturity." | Short Time to Maturity; Long Time to Maturity; Deep In- or Out-of-the-Money; Low Option Price |
| | | "[V]ery short maturity options are excluded due to the relative insensitivity of their prices to changes in the underlying stock variance." | Short Time to Maturity |
| | | "[V]ery low price options that are deep out-of-the-money are discarded due to the potentially large measurement errors induced by rounding option prices to the nearest sixteenth of a dollar. ... Discarding these observations biases the tests in favor of the null hypothesis that stock and option markets are synchronous." | Deep In- or Out-of-the-Money; Low Option Price |

# Exhibit 1
# Options Data Restrictions in Academic Articles
# Cited by Dr. Chance That Analyze Option Prices[1]

**Category C:  Impact of option markets on stock markets**

| Academic Article | Excludes Put Options | Other Data Restrictions | Restriction Categories[2] |
|---|---|---|---|
| | | "Finally, following Beckers [1], who found that implied variances from at- and near-the-money options display the greatest accuracy in predicting future stock variance, only these options are used instead of all available options of the same maturity." | Deep In- or Out-of-the-Money |
| | | "Since trading volume lends credibility to a quoted price, the inclusion criterion imposed here is that an option series must have traded at least at two different prices within the constant stock price interval. Prices without accompanying trading volume are excluded from the study." | Liquidity or Trading Frequency |
| Figlewski and Webb (1993), "Options, Short Sales, and Market Completeness" | No | "We selected at-the-money, intermediate-term pairs of puts and calls with the same strike price and expiration to limit the analysis to the most heavily traded option classes, that are less prone to distortions associated with market thinness. Specifically, the sample includes all pairs with options that were between 15 percent in-the-money and 15 percent out-of-the-money, and from 10 to 150 days to expiration, making a total of 2,125 put-call pairs." | Short Time to Maturity; Long Time to Maturity; Deep In- or Out-of-the-Money |
| | | "We also required that both the put and the call price exceeded 1/16 ($0.0625)." | Low Option Price |

# Exhibit 1
# Options Data Restrictions in Academic Articles
# Cited by Dr. Chance That Analyze Option Prices[1]

Source:  Chance Report, pp. 19–21; Galai, Dan, "Tests of Market Efficiency of the Chicago Board Options Exchange," *Journal of Business*, Vol. 50, No. 2, 1977, pp. 167–197; Macbeth, James D. and Larry J. Merville, "An Empirical Examination of the Black-Scholes Call Option Pricing Model," *Journal of Finance*, Vol. 34, No. 5, 1979, pp. 1173–1186; Klemkosky, Robert C. and Bruce G. Resnick, "Put-Call Parity and Market Efficiency," *Journal of Finance*, Vol. 34, No. 5, 1979, pp. 1141–1155; Klemkosky, Robert C. and Bruce G. Resnick, "An Ex Ante Analysis of Put-Call Parity," *Journal of Financial Economics*, Vol. 8, No. 4, 1980, pp. 363–378; Whaley, Robert E., "Valuation of American Call Options on Dividend Paying Stocks: Empirical Tests," *Journal of Financial Economics*, Vol. 10, No. 1, 1982, pp. 29–58; Bhattacharya, Mihir, "Transactions Data Tests of Efficiency of the Chicago Board Options Exchange," *Journal of Financial Economics*, Vol. 12, No. 2, 1983, pp. 161–185; Rubinstein, Mark, "Nonparametric Tests of Alternative Option Pricing Models Using All Reported Trades and Quotes on the 30 Most Active CBOE Option Classes from August 23, 1976 through August 31, 1978," *Journal of Finance*, Vol. 40, No. 2, 1985, pp. 455–480; Patell, James M. and Mark A. Wolfson, "The Ex Ante and Ex Post Price Effects of Quarterly Earnings Announcements Reflected in Option and Stock Prices," *Journal of Accounting Research*, Vol. 19, No. 2, 1981, pp. 434–458; Manaster, Steven and Richard J. Rendleman Jr., "Option Prices as Predictors of Equilibrium Stock Prices," *Journal of Finance*, Vol. 37, No. 4, 1982, pp. 1043–1057; Stephan, Jens A. and Robert E. Whaley, "Intraday Price Change and Trading Volume Relations in the Stock and Stock Options Markets," *Journal of Finance*, Vol. 45, No. 1, 1990, pp. 191–220; Chan, Kalok et al., "Why Option Prices Lag Stock Prices: A Trading-based Explanation," *Journal of Finance*, Vol. 48, No. 5, 1993, pp. 1957–1967; Bhattacharya, Mihir, "Price Changes of Related Securities: The Case of Call Options and Stocks," *Journal of Financial and Quantitative Analysis*, Vol. 22, No. 1, 1987, pp. 1–15; Figlewski, Stephen and Gwendolyn P. Webb, "Options, Short Sales, and Market Completeness," *Journal of Finance*, Vol. 48, No. 2, 1993, pp. 761–777.

Note:
[1]  This table includes 13 out of the 16 academic articles cited in Section X of the Chance Report.  Anthony (1988), Jennings and Starks (1986), and Kumar et al. (1998) were excluded because they do not analyze option prices.
[2]  "Certain mispriced options" category excludes options with unusual price behaviors, prices that violate rationality conditions, or prices that imply the existence of arbitrage opportunities.  "Optimal early exercise" category excludes options with potential for early exercise because certain traditional pricing models, such as the Black-Scholes model, are not able to account for the early exercise of American options.  "Dividends" category excludes options on dividend-paying stocks or limits the number of dividends paid during the lifetime of each option.  "Option prices" category excludes options below a certain price threshold.  Options that are deep out of the money typically have low prices; therefore, the exclusion of options with low prices also excludes options that are deep out of the money.
[3]  The authors relax this restriction at the end of the article, but provide no corresponding results.

**Exhibit 2**
**Apple Inc.**
**Implied Volatilities for Relevant Options**
11/2/18 − 1/2/19



Source: *IVolatility*
Note: Analysis is based on the set of Relevant Options, which are call and put options with (1) expiration date on or after 11/5/18, the first alleged corrective disclosure date, and (2) positive trading volume on at least one day during the Class Period (11/2/18 –1/2/19).  Implied volatilities are as reported by *IVolatility*.  *IVolatility* uses a similar methodology to the one proposed by Dr. Chance that infers the implied volatility that is consistent with observed option prices when the option series are valued using a binomial model.  *IVolatility* uses quoted prices as an input, and its methodology could provide different implied volatility estimates if transaction prices were used.  Each data point represents the implied volatility of an individual Apple option series on a given date.  Option series on the date of their expiration are excluded.

# Exhibit 3
# Apple Inc.
# Percentage Point Change in Implied Volatilities on Alleged Corrective Disclosure Dates[1][2]

| | Min | Mean | Max | Percentile | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | 10th | 25th | 50th | 75th | 90th |
| **Call** | | | | | | | | |
| 11/5/18 | -54.43 | 1.89 | 36.38 | -6.76 | -0.71 | 0.81 | 5.73 | 11.11 |
| 11/12/18 | -14.35 | 2.96 | 30.11 | -3.76 | 0.41 | 1.91 | 5.47 | 10.20 |
| 1/3/19 | -68.69 | 1.21 | 34.96 | -4.05 | -0.72 | 1.96 | 5.49 | 9.09 |
| **Put** | | | | | | | | |
| 11/5/18 | -50.05 | -4.27 | 21.62 | -12.19 | -5.88 | -2.33 | -0.56 | 3.06 |
| 11/12/18 | -25.91 | 2.25 | 27.19 | -2.05 | 0.06 | 1.89 | 5.29 | 11.33 |
| 1/3/19 | -38.35 | 0.49 | 34.50 | -3.74 | -1.51 | 0.23 | 3.41 | 10.10 |

Source: *IVolatility*; Amended Complaint dated 6/23/20

Note:
[1] Analysis is based on the set of Relevant Options, which are those with (1) an expiration date on or after 11/5/18, the first alleged corrective disclosure date, and (2) positive trading volume on at least one day during the Class Period (11/2/18 – 1/2/19).
[2] Implied volatilities are as reported by *IVolatility*. *IVolatility* uses a similar methodology to the one proposed by Dr. Chance that infers the implied volatility that is consistent with observed option prices when the option series are valued using a binomial model. *IVolatility* uses quoted prices as an input, and its methodology could provide different implied volatility estimates if transaction prices were used. The percentage point change in implied volatility is calculated by subtracting the implied volatility of an option series on the trading day prior to the given alleged corrective disclosure date from the implied volatility of the same option series on the given alleged corrective disclosure date, and then multiplying by 100. Summary statistics are then calculated using these percentage point changes in implied volatility.

## Exhibit 4
## Apple Inc.

## Relevant Options With Insufficient Transactions to Calculate Change in Implied Volatility[1]

|  | Alleged Corrective Disclosure Date | | |
| --- | --- | --- | --- |
|  | **11/5/18** | **11/12/18** | **1/3/19** |
| Number of Option Series Outstanding[2] | 1,342 | 1,364 | 1,408 |
| Number of Option Series With Insufficient Transactions to Calculate Change in Implied Volatility[3] | 446 | 610 | 547 |

Source: *IVolatility*; Amended Complaint dated 6/23/20

Note:
[1]  Analysis is based on the set of Relevant Options, which are those with (1) expiration date on or after 11/5/18, the first alleged corrective disclosure date, and (2) positive trading volume on at least one day during the Class Period (11/2/18 – 1/2/19).
[2]  Number of Option Series Outstanding represents the number of option series that appear in *IVolatility* data on the given alleged corrective disclosure date.
[3]  Number of Option Series With Insufficient Transactions to Calculate Change in Implied Volatility represents the number of option series that have zero trading volume on either the given alleged corrective disclosure date or the previous trading date, or both.