Pages 1 - 27

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Joseph C. Spero, Magistrate Judge

IN RE: APPLE INC. SECURITIES   )
LITIGATION,                    )
                               )
                               )  **NO. C 19-02033-YGR(JCS)**
_____)

                         San Francisco, California
                         Friday, July 29, 2022

**TRANSCRIPT OF REMOTE PROCEEDINGS**

**APPEARANCES**: (Via Zoom videoconference.)

For Plaintiffs:
                    ROBBINS, GELLER, RUDMAN & DOWD LLP
                    Post-Montgomery Center
                    One Montgomery Street - Suite 1800
                    San Francisco, California  94104
               BY:  **SHAUN A. WILLIAMS, ATTORNEY AT LAW**
                    **DANIEL J. PFEFFERBAUM, ATTORNEY AT LAW**
                    **KENNETH J. BLACK, ATTORNEY AT LAW**

For Defendants:
                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    The Orrick Building
                    405 Howard Street
                    San Francisco, California  94105
               BY:  **JAMES N. KRAMER, ATTORNEY AT LAW**

                    ORRICK, HERRINGTON & SUTCLIFFE LLP
                    777 South Figueroa Street - Suite 3200
                    Los Angeles, California  90017
               BY:  **KEVIN M. ASKEW, ATTORNEY AT LAW**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No. 12219

PROCEEDINGS

1    <u>Friday - July 29, 2022</u>                          <u>9:34 a.m.</u>

2                    P R O C E E D I N G S

3                         ---o0o---

4         **THE CLERK:**  The first matter we are calling is

5    19-CV-2033, In Re: Apple Inc. Securities Litigation.

6         Counsel, could you please raise your hands?

7         Hold on, Judge.  You have one more.  Okay.

8                    (Pause in proceedings.)

9         **THE CLERK:**  Okay.  I believe that's everybody.

10        **THE COURT:**  All right.  Appearances, please, starting

11   with the plaintiff.

12        **MR. WILLIAMS:**  Good morning, Your Honor.  Shawn

13   Williams, Robbins Geller Rudman & Dowd, on behalf of the

14   plaintiffs.

15        **THE COURT:**  Good morning.

16        **MR. PFEFFERBAUM:**  Good morning, Your Honor.  Dan

17   Pfefferbaum, Robbins Geller Rudman & Dowd, also on behalf of

18   plaintiffs.

19        **MR. BLACK:**  Good morning, Your Honor.  Kenneth Black,

20   also on behalf of the plaintiffs and the class, from Robbins

21   Geller Rudman & Dowd.

22        **MR. KRAMER:**  Good morning, Your Honor.  James Kramer,

23   Orrick Herrigton & Sutcliffe, on behalf of defendants Apple,

24   Inc.; Timothy Cook; and Luca Maestri.

25        **THE COURT:**  Good morning.

**PROCEEDINGS**

1          **MR. ASKEW:**  Good morning, Your Honor.  Kevin Askew,

2     also of Orrick Herrigton & Sutcliffe, on behalf of Defendants.

3          **THE COURT:**  Good morning.

4     So thank you for all the work you did on these -- this

5     motion.

6          What I think I'm going to do today -- let me get this frog

7     out of my throat -- is go through, with respect to each

8     category of documents, the documents that I have -- I have

9     reviewed some in camera -- give you some guidance based on

10     those.  We'll actually write it up -- the guidance -- too.  It

11     will be in an order.

12          And the outline of what comes next is, once we get

13     through, I get out this order, I would have the defendants go

14     through their privilege log again with this guidance and,

15     you know, obviously produce the ones that I order, produce ones

16     that fall within that same line of reasoning, produce

17     additional declarations and a more detailed privilege log where

18     I think it's necessary, and then have further discussion among

19     counsel to see if there's any issues that still remain.

20          That's the sort of outline of this -- of the process I

21     think we need to go through.  Happy to talk about, you know,

22     what makes sense.  Just that's my, at least, initial thought

23     about it; and maybe as we get further into the discussion this

24     morning, we could address whether that continues to make sense.

25          So I divided up the issues -- the documents the way you've

**PROCEEDINGS**

 1    all -- or some of you have divided up the documents.  The first

 2    is the set of documents regarding the communications regarding

 3    the investor letter.

 4         And the baseline for my views about that are that the

 5    investor letter clearly has a business purpose.  And so, in

 6    addition to any other legal purpose that may be present with

 7    respect to advice on the investor letter, there's no question

 8    that it has a business purpose.

 9         You know, it's -- it is -- and then looking at the

10    categories of documents within the investor letter subcategory,

11    there's the subcategory rule of documents that explicitly ask

12    for legal advice.  And I don't think there's any dispute as to

13    those, that something in them is privileged.  The only ruling I

14    would be making is their only privilege is to the portion that

15    directly relates to the advice that's being sought.

16         So, you know, it's a -- you know, just because there's

17    some giant draft of an investor letter, if there's -- that's

18    not privileged, in my view.  But if part of the e-mail says,

19    "And, on this paragraph, we want X; please give us your advice

20    with respect to why," well, that obviously would be privileged.

21    So it's privileged only as to the portion relating to the

22    seeking of legal advice.

23         As to those that -- I think that the declaration from

24    in-house counsel says, implicitly, "Seek legal advice," those

25    are a little more challenging.

1        I have reviewed Document 363, which is a cover e-mail from

2   Dowling, who I think is a nonlawyer, to the CFO, who is also a

3   nonlawyer, and also to the general counsel and to others,

4   seeking feedback.

5        That document doesn't have anything particular to do with

6   legal advice, so its predominant purpose is not primarily --

7   primary purpose is not for seeking legal advice.  That would

8   need to be produced.

9        So what I'm going to do is I'm going to go through a whole

10  category of documents; then we'll stop for a second, and we can

11  talk about what I've just said, and you can give me feedback on

12  it; and then we'll go on to the next category.

13       So I'm going to go through the investor letter

14  communications category right now.

15       364 is the draft of the investment letter with comments

16  from Dowling on what are primarily business concerns, which

17  are -- what are business concerns, not primarily for legal

18  advice.  You know, the fact that some of the recipients are

19  lawyers doesn't change this calculus.  And I would -- with

20  respect to documents like this, I would require the disclosure

21  of these two documents, 363 and 364, and a review of the

22  remaining documents in the category to disclose those that

23  would fall under this kind of reasoning.

24       There is a set of documents which in-house counsel

25  described as having been -- counsel had, and is making

1    extensive comments and edits on.  There is a citation to 366,

2    which has some comments, but it's not clear if any of them were

3    actually from Adams.  There is no Adams declaration on them.

4    There is some probably from Dowling, who is not a lawyer.

5        And there's 365, which clearly has some comments from

6    Adams, but none of those comments are addressing legal

7    concerns.  They are focusing on how to make business points.

8    So they're not primarily for legal advice.  So I will order

9    those two documents produced.

10       And, if there's others that fall into this category, they

11   need to be reviewed with that test in mind.

12       There is e-mails from a group of in-house counsel, a

13   number of in-house counsel, about drafts of the investor

14   letter.  And the one that I reviewed is 389, which I do believe

15   largely concerns advice on legal obligations, and the primary

16   purpose is offering legal advice.  You know, some of the

17   comments are, not strictly speaking or even generally speaking,

18   legal; but I would not order production of 389 or documents

19   similar to that one.

20       Communications relating to the gathering of backup

21   documentation:  There are documents in this category that

22   contain legal's explicit instructions regarding the collection

23   of information.  I would say the primary purpose of that --

24   those is to provide legal advice.  So those would be

25   privileged.

**PROCEEDINGS**

1          I've reviewed 449, and that document does flag issues on

2     which counsel thought factual support was needed.  And, while

3     the underlying facts -- and I don't mean the underlying facts

4     as contained in a particular document or even in this

5     document -- are not privileged.  I mean the underlying facts,

6     like, if you wanted to ask what was the, you know, return per

7     share for this particular quarter, you could ask that question

8     of someone.

9          But the underlying facts may not be privileged, but the

10     communications about those facts in this context is, and I

11     would apply that here.  And I would not order production of 449

12     or similar documents that flags issues on which counsel thought

13     they needed factual support to comply with their obligations

14     under the securities and other laws.

15          There are other documents that in-house counsel

16     Whittington identifies to -- that his understanding was they

17     were created for legal purposes, primarily produced by Nancy

18     Paxton and Sarah Casey.  I don't -- you know, in general, I'm

19     not -- that's not a sufficient showing to show they're

20     primarily created for a legal purpose.  It's for -- to seek

21     legal advice.

22          The communications are often between and from

23     nonattorneys.  I've reviewed 329 as an example, and that

24     doesn't reveal any advice of counsel or that it was created in

25     response to that advice or that any advice was given in

**PROCEEDINGS**

1   response to that.

2        So I would say that those documents, I'm -- 329 would be

3   produced, and the documents that Mr. Whittington says his

4   understanding was they were created for legal purposes is

5   certainly insufficient showing.  And those should be produced.

6        The last group of documents in this subgroup of documents

7   in this category are e-mails that are communications in which

8   Mr. Cook asks Adams -- is an attorney -- and Mr. Maestri for

9   feedback on the topics planned for board of directors meetings.

10       I've reviewed 288.  That's just a generic request from

11   Mr. Cook from both a lawyer and a nonlawyer.  It doesn't

12   reference legal advice.  It's not primarily for legal advice.

13   It will be produced.

14       I've reviewed 285 and 287.  I think those are privileged

15   because they contain Adams's responses to Mr. Cook to

16   specifically address topics that are protected by the

17   privilege, legal topics.

18       I've reviewed 290, which is an e-mail exchange between

19   Mr. Cook and Mr. Maestri, which is copied to Adams.  That's not

20   primarily for seeking legal advice; it doesn't include any

21   legal advice; it doesn't reveal any legal advice.  It's merely

22   copied to in-house counsel, and that's not enough.

23       So, you know, with respect to this group of documents on

24   e-mail communications, if there's any others, I would ask the

25   defendant to review them with this in mind and produce based on

1 that guidance.

2     Maybe we should pause here, you know, and I could ask

3 counsel, you know, starting with the plaintiff, and then going

4 to the defense, if they have any comments or thoughts on that

5 category of communications regarding the investor letter.

6     **MR. BLACK:**  From plaintiffs, I don't think we have any

7 questions or comments.  Thank you.

8     **MR. KRAMER:**  Your Honor, James Kramer for Defendants.

9     Thank you for the feedback.  The only thing I would add is

10 we would like the opportunity to, where appropriate, supplement

11 our declarations.  You know, the privilege protections are, of

12 course, paramount under our system, and to the extent you

13 believe that our showing wasn't sufficient, with the guidance

14 you've given, we would like to have a chance to supplement it

15 or to not.

16     So, for example, as it relates to Mr. Whittington, you

17 identified references to his declaration where he said his

18 understanding.

19     We'd like the opportunity to have the lawyers who were

20 involved to provide a supplemental declaration.  We provided

21 five.  As you saw from the papers, Your Honor, we worked very

22 hard.  We heard you.  We worked hard with opposing counsel.  We

23 significantly narrowed the scope of the dispute.

24     We submitted a lot of paper, and if there's a situation

25 where simply because a declaration you didn't think was

**PROCEEDINGS**

1    detailed enough, I think the fair thing to do is give us a

2    chance to try to supplement it.

3        Of course, we will only supplement with your thoughts in

4    mind as it relates more generally to the stuff you've reviewed.

5    Our goal here would not be to supplement simply to have you

6    say, "I've already given you principles that apply" --

7            **THE COURT:**  I'm not going to fight you on this.  I

8    think it's completely appropriate.

9            **MR. KRAMER:**  Okay.  Thank you, Your Honor.

10           **THE COURT:**  You know, it's -- and I think your caveat

11   is the right caveat.  Where my reasoning is, this is about -- I

12   read it *in camera*, and this isn't about legal matters, then

13   that's one thing.  There is no supplementation that's useful on

14   that.

15       Where I said, well, you know, the fact that there is some

16   understanding, by itself doesn't show that it's for a legal

17   purpose, you know, that's a different matter.

18       But what I tried to do -- and you could see -- is try to

19   review, in each of these groups, some of the *in camera* -- at

20   least one or two of them -- so that I could call out what to do

21   with them without -- they probably wouldn't benefit from

22   supplementation.

23       So if you're judicious about it, I'm not opposed to that.

24   We will certainly give you that opportunity.  And maybe I

25   should have described it in my first description of this.

**PROCEEDINGS**

1    I think part of -- when you produce a new privilege log is

2   produce supplemental declarations; to the extent that they're

3   useful, given this guidance, I agree with that.

4        **MR. KRAMER:**  Thank you, Your Honor.

5        **THE COURT:**  The next group of documents is --

6   Category 2 is the documents related to the Nikkei article.

7   There is only two of them:  1263 and 1264.  I think those

8   are -- as to the redacted portion, that's primarily related to

9   legal advice on these contractual remedies.  I would hold that

10  those are privileged.

11       Anyone want to comment on that?  That's a small category.

12       **MR. BLACK:**  No.

13       **THE COURT:**  Okay.  All right.

14       On the group e-mails to the disclosure committee, I think

15  I am right, now that you've narrowed it, that we're only

16  talking about e-mails to the disclosure committee as a whole,

17  not some e-mail back from Whittington that contains advice and

18  that sort of thing.

19       Am I right?

20       **MR. BLACK:**  Yes, that's correct.

21       **THE COURT:**  We've narrowed it to that category.  We

22  went through it, and that's what I could glean.

23       You know, my view is that, just because it's sent to the

24  disclosure committee isn't enough.  The disclosure committee

25  has lawyers and nonlawyers on it.  I think predominantly

 1   nonlawyers.

 2        And the reason why one reviews these disclosures is -- why

 3   you have these disclosures is, you know, it's business, and

 4   it's legal.

 5        So I think the fact that it's been sent to the disclosure

 6   committee -- general requests to the disclosure committee --

 7   doesn't make it primarily for a legal purpose.

 8        And so I reviewed, just to get a test of this, Number 290,

 9   which is just a general request to the disclosure committee to

10   review something -- I can't remember what the specific document

11   was; we can pull it up if we want for accuracy.  No specific

12   legal issues are identified.

13        I don't think the primary purpose -- anyone can say the

14   primary purpose of just that kind of general request to the

15   disclosure committee is for legal advice.

16        **MR. KRAMER:**  I'm sorry, Your Honor.  You said 290.

17   290 is one you mentioned earlier in Group 1.  I don't see that

18   it's going to the disclosure committee.  I want to make sure

19   I'm tracking --

20        **THE COURT:**  Oh, yeah.  Maybe I'm getting the wrong --

21   maybe I wrote down the wrong number.  Hang on a second.  Let me

22   look.  Let me just look at my notes.

23        Let's see.  Bear with me a second.

24                       (Pause in proceedings.)

25        **THE COURT:**  Did I say 290 before?  I don't think I

**PROCEEDINGS**

 1  meant --

 2          **MR. KRAMER:**  If it helps, Your Honor, 290 is an e-mail

 3  involving Mr. Cook, Ms. Adams, Mr. Maestri --

 4          **THE COURT:**  Oh, yes, that's right.  I've gotten the

 5  wrong one.  Let me just look at what I put down here.

 6                      (Pause in proceedings.)

 7          **THE COURT:**  Okay.  That's the Maestri letter stuff.

 8      Okay.  Group e-mails.

 9      Yeah, I'm going to have to -- I can't figure out which

10  that is.  Let me just look at -- yeah.  It's not 290.  All

11  right.  I'll get --

12          **MR. KRAMER:**  Your Honor, may I speak to that category,

13  just more --

14          **THE COURT:**  Yeah.

15          **MR. KRAMER:**  -- at a general level.

16      So as Your Honor probably knows, virtually every public

17  company that I've worked with has a disclosure committee.  And

18  that's because disclosures are required by law under the SEC

19  rules.  And, you know, there are different ways you can satisfy

20  your legal responsibilities, your legal requirements, under the

21  SEC rules, to file Ks and Qs:  8-Ks, 10-Ks, 10-Qs.

22      And lawyers are deeply involved in that.  What complies

23  with the law is, of course, a -- you know, it's a legal

24  requirement you're complying with with a disclosure.

25      So rather than have you decide that the entire category --

1   and it's not clear you are, but in case you are, rather than

2   have you decide that the entire category's not -- one greater

3   primary purpose was for legal purposes, I'd like to opportunity

4   to try to address your concerns, because I do think these are

5   legal requirements proposed on Apple as a company.

6        Lawyers and others at the company who know the underlying

7   facts are involved trying to satisfy the SEC rules on legal

8   requirements.  So I do think it's primarily for a legal purpose

9   and would like the opportunity to try to supplement

10  declarations on that.

11       **THE COURT:**  So I'm not going to be willing to do it

12  the way you talked about.

13       **MR. KRAMER:**  Okay.

14       **THE COURT:**  I'm not going to agree that -- because it

15  proves too much.  That means any communication ever with anyone

16  about the materials that are going to be put -- while we're

17  putting together a 10-Q is privileged, and that's not -- that

18  sweeps way too broad.

19       If this is -- yes, it goes into the SEC, and it's filed;

20  but it's an investor communication as well.  It's a mixed bag.

21  It's not just for legal purposes that one reviews this.

22       And you can tell from the correspondence that that's not

23  right.  They want -- it's a document that tries to not just be

24  completely accurate so that it complies with securities laws

25  and check all the boxes.  It's one that when it gets into the

1    market you think is going to have -- not have a negative

2    effect, the way you don't want to have a negative effect, to

3    have a positive effect the way you want to have a positive

4    effect.

5         But whatever -- so it's an investor communication.  So I'm

6    not buying the idea that just because there's a disclosure

7    committee and it's being reviewed by the disclosure community

8    and sent to them, that it's primarily for a legal purpose.  I'm

9    rejecting that, and I won't take more declarations on that

10   subject.

11        However, there may be particular instances where the fact

12   that this particular communication is for a more narrow purpose

13   than the disclosure committee usually serves, that it is

14   strictly for a legal purpose or primarily for a legal purpose,

15   if there's something like that, then, sure, have at it;

16   supplemental declaration, it's appropriate.

17        But I don't -- I'm not going to -- but I'm rejecting the

18   notion at the outset that the disclosure committees are

19   primarily for a legal purpose.  They are for mixed purposes.

20   And, as to any particular document, you're going to have to

21   show that it is primarily for a legal purpose, because it

22   addresses only a subset of the kinds of things that disclosure

23   committee members will be concerned about.

24        When you send it, you know, to the various people on the

25   disclosure committee, they're not just looking "Is that number

1    correct," even though they're a businessperson.  They're

2    looking, you know, "Do I like the way you're characterizing

3    this?"

4         So if you want to get -- I'm just going to take a note of

5    what I just told you so that I remember that I said it, but,

6    you know, not the supplemental declaration in general on

7    disclosure committee communications.

8         And this says nothing about communications back; right?

9         And it says it's about communications to.  And this

10   particular one that I reviewed, by the way, is 101:  A cover

11   e-mail regarding a quarterly report.  It covers 100.

12        I think I'll put that up on my screen.  So --

13             **MR. KRAMER:**  I have it here, Your Honor.

14             **THE COURT:**  Yeah, I just want to put it up on my

15   screen so I have it, too.

16        Yeah.  It's, you know, here is the review of the Q3 10-Q.

17   We've got these changes.  Everybody is supposed to review it.

18   Make sure they're complete and accurate, blah, blah, blah,

19   bring your comments, et cetera.

20        You know, I just think that's a mixed document.

21        But --

22             **MR. KRAMER:**  I hear you, Your Honor.  And we will --

23   to the extent we identify documents where we believe the

24   primary purpose -- we will supplement, but we will take what

25   you said -- we understand your comments, and we'll be very

**PROCEEDINGS**

1  thoughtful about which documents in this category we decide we

2  want to try to stand on in our group.

3      **THE COURT:**  Okay.  That makes sense to me.

4      Okay.  So that's the disclosure -- the e-mails --

5  disclosure committee group e-mails is really to the disclosure

6  committee.

7      So there are documents that were from nonattorney files as

8  internal drafts of the investor letter, really.  There are two

9  documents left in this category, I think.

10      **MR. KRAMER:**  Yes, sir.

11      **THE COURT:**  And my view of that is that drafts of the

12  investor letter themselves are -- and redrafts of the investor

13  letter are drafted and redrafted for a mixed set of reasons.

14      The timing suggests that it's not just -- is that it's in

15  response to an article that came out.  It's certainly a

16  communication with investors to inform the market of things,

17  to -- et cetera, et cetera.  Some of it may have legal reasons,

18  but it's a business communication at bottom.

19      So the burden for each draft is to show that the

20  particular draft or the particular changes to the draft were

21  for the primary purpose of receiving legal advice.

22      And I reviewed Exhibit 31 and 32.  32 is just a draft of

23  the letter with no comments on it, no edits -- at least none

24  that are apparent.  It's not primarily for legal advice.  You

25  would have to produce that.

1   31 has got no attorney comments.  I think it's got

2   Dowling's comments on it.  No legal advice or comments

3   reflected.  It was not primarily for legal advice.  And I would

4   order that produced as well.

5           **MR. KRAMER:**  If I might -- I'm sorry.  I'll let

6   Plaintiffs go first, Your Honor.

7           **THE COURT:**  Okay.  Anything from Plaintiff?

8           **MR. BLACK:**  No.  Thank you, Your Honor.

9           **THE COURT:**  Okay.  So Category 4, Mr. Kramer?

10          **MR. KRAMER:**  Yes.  Thank you, Your Honor.

11   So, first, just -- you referenced that this is in response

12   to an article, just as a preface matter.

13   Your Honor, this was dated December 23rd, so it's not a

14   response.  The article that came out was on November 5th.  So

15   this was -- just for clarification, it wasn't in response to

16   any article.

17   This is about whether --

18          **THE COURT:**  Well, I'm not sure that's entirely

19   correct, but I understand the timeline.  Yes.

20          **MR. KRAMER:**  Yeah.  There is nothing in here that

21   speaks to Nikkei or that article.  This is about whether the

22   company is going to reach out to the market on its revised

23   guidance or not.

24   The issue I'd like to address is on 31.  To the extent

25   Ms. Dowling -- she has comments in here.  You can see in the

1   document you have, Your Honor, there's, I think, eight

2   different questions or suggestions she has.

3        To the extent we circle back to Ms. Dowling and she says,

4   "Those were for the lawyers" or "Some of those were for the

5   lawyers," we'd like the opportunity to at least visit with her.

6   And, if that's the case, that would show that her comments were

7   primarily for a legal purpose.

8        And I'd like the opportunity to show that to you.  You may

9   disagree, but along the lines we discussed earlier, I'd like to

10  have the opportunity to do that.

11       It may be that when we go to her, we can't back that up.

12  I think that's what was going on.  But if she says, "I can't

13  give you a declaration" or lawyers can't give us a declaration,

14  fine.  But I'd at least like the opportunity again to

15  supplement here as well.

16       **THE COURT:**  I don't have a problem with that.

17       I think that it's extremely unlikely you're going to

18  convince me, given the nature of the comments.

19       So I would be very judicious about getting into that.

20       **MR. KRAMER:**  Fair enough.

21       **THE COURT:**  You know, if there is, you know, some

22  history where she asks about this because we talked about this

23  with counsel and then I was following up -- you know, some

24  series of things that make it -- suggest that it's other than

25  what it appears on its face, you know, that's fine.

 1          But -- because the nature of the comments does not seem

 2     like legal advice.  It seems like business advice.

 3          And the fact that she changes something, even if she wants

 4     the lawyers to see it and that's who she's aiming at, that's

 5     not for legal advice, if it's a business comment on how it

 6     should be drafted.

 7               MR. KRAMER:  Very good.

 8          And, Your Honor, I should clarify.  I said "she."  It's

 9     "he."

10               THE COURT:  He.

11               MR. KRAMER:  I think I misled you.  I used the wrong

12     pronoun earlier.

13               THE COURT:  And I don't remember the first name, so

14     I'm just following along.

15               MR. KRAMER:  Fair enough, Your Honor.

16               THE COURT:  And happy to follow your lead wherever it

17     goes on that.

18               MR. BLACK:  Your Honor?

19               THE COURT:  Yes.

20               MR. BLACK:  If I can make one request related to that:

21     In the most recent round of briefing, defendants indicated

22     that -- or at least Mr. Whittington indicated that those

23     documents had been sent by e-mail, which was not our

24     understanding until we received that declaration.

25               THE COURT:  Yeah.

PROCEEDINGS

 1          **MR. BLACK:**  To the extent you're not going to order

 2    those documents produced and are going to give defendants an

 3    additional opportunity to provide a declaration, we'd ask that

 4    we also get the cover e-mails, or at least a redacted version.

 5          **THE COURT:**  Well, I'm not going to talk about that.

 6    You can meet and confer on that.  That just came up.  You can

 7    talk to him about it.

 8          I'm clearly ordering production of one of those documents.

 9    What counsel has asked for is an opportunity to -- on the draft

10    on which Mr. Dowling had some comments to supplement, if

11    that -- if that's appropriate -- or produce it.

12          And then you can meet and confer about what evidence --

13    they have -- obviously, have some evidence that was connected

14    to an e-mail.  You guys can talk about what that is.

15          On attachments to e-mails, this is a -- so I did my best

16    to go through a bunch of things in this to give you some

17    guidance, but they're all over the map.  And I'm hoping that

18    I've reviewed enough that it will be -- it will cover the kinds

19    of categories and things that you think about when you think

20    about this larger category.

21          But my question at the end of this category is:  Am I

22    missing something?  Is there some, you know, document that's

23    submitted *in camera* that I should be reviewing that I haven't

24    that would give you additional guidance that you need to work

25    on this category?

**PROCEEDINGS**

1      So as to the fifth category of attachments, I've reviewed

2   84 and 85.   85 is a draft 8-K.   It's attached to an e-mail with

3   comments about the draft.   You know, those comments are, I've

4   got to say, nonlegal.

5      You know, whether to put one symbol or another symbol in a

6   particular form, there's no evidence that that's legal advice

7   sought or given.   Copying those documents to in-house counsel

8   doesn't make it for legal purposes.

9      I've reviewed 107, which is attached to 106.   107 is a

10  draft 10-Q that reflects legal advice from counsel, and I would

11  say that's privileged.

12     I've reviewed 141 and 142.   142 is an attachment.   It's a

13  draft Q3 data sheet which is attached to a generic e-mail to

14  the entire disclosure committee for review.   Again, I don't

15  think that's primarily for legal advice.   There's no legal

16  issue flagged.   The main document and attachment are not

17  privileged.

18     I've reviewed 174, which is an e-mail from Mr. Cook to

19  Jackson with comments on a presentation.   175 is a draft

20  presentation for the board prepared by Lisa Jackson for

21  Mr. Cook addressing foreign trade issues.

22     These documents don't reference any legal concerns.

23  They're almost entirely focused on international business

24  environment and trade policy.   They're not primarily for legal

25  advice, despite Adams's statement that they were sent to

1  solicit input on legal implications of foreign trade issues

2  addressed in the presentation.

3      This particular attachment doesn't have anything to do

4  with the legal issues.

5      270 is a chart showing earnings per share.  It's attached

6  from an e-mail from a nonlawyer to Matt Blake and Sam

7  Whittington.  Whittington is a lawyer.

8      Is Mr. Blake a lawyer?

9          **MR. KRAMER:**  Mr. Blake is not a lawyer, Your Honor.

10          **THE COURT:**  So it's to a nonlawyer and a lawyer.

11      And -- just write that down . . .

12          **MR. KRAMER:**  Yeah.  And, as Mr. Whittington says, Your

13  Honor, he asked for this as part of a broader legal advice.

14          **THE COURT:**  Yeah, I understand that.  You know,

15  there's no mention in the document that it's being sought by

16  legal.  There's no statement by Whittington of any legal advice

17  related to this information.

18      He doesn't say he sought it to provide legal advice.  He

19  says he sought it -- that's all he says.  So that showing is

20  insufficient.

21      You know, if there was a more detailed showing, perhaps

22  one could say, you know, I sought this because I was going to

23  formulate legal advice on this subject, and I needed this

24  information to do it.  You know, that might be a showing

25  that -- this might be one where you want to supplement.

1    But I don't think -- but the current state of play doesn't

2  show any of the necessary elements to show this was primarily

3  for -- provided for the purpose of legal advice, especially

4  because it's -- well, because it's not enough of a showing, and

5  it's going to legal -- a lawyer and a nonlawyer.

6    You may be able to supplement that, and I don't have an

7  objection to that.

8    462 and 463 is an e-mail with attachments from

9  Mr. Whittington; reflects his legal advice.  So those are

10  privileged.

11    466 is an e-mail string about seeking data on whether the

12  company will hit a certain mark in the marketplace and when

13  that data would be available.  It's clear that this is not

14  primarily for a legal purpose.  This data was needed for --

15  among other things, for Mr. Cook for an interview in January.

16    So I'm not -- this isn't for legal advice.  That would

17  have to be produced.

18    471 is a draft of the investor letter reflecting

19  Whittington's legal advice, some specific evidence that

20  supports its accuracy.  That's privileged.

21    So those are the ones that I went through in this

22  category, and my question for you is:  Any comments on it or

23  any others in this category I ought to review so that you can

24  have a broad enough scope so that if you go back through you

25  can make choices based on this?

PROCEEDINGS

1          **MR. KRAMER:**  Again, I'll let the plaintiffs go first,

2   Your Honor.

3          **THE COURT:**  All right.

4          **MR. BLACK:**  No, Your Honor.  I think that gives us

5   sufficient guidance going forward.  Thank you.

6          **THE COURT:**  Okay.

7          **MR. KRAMER:**  And, Your Honor, I would agree:  That's

8   very helpful.  As you point out, further to my comment earlier,

9   we may try to supplement, but we may not.

10          **THE COURT:**  Thank you.

11          **MR. KRAMER:**  I think you covered a cross-section that

12   will help inform our decisions.

13          **THE COURT:**  All right.  So I'm going to, you know, put

14   pen to paper on all of this so it's in -- hopefully, next week,

15   get out something that has a little more eloquent way of saying

16   the things that I've tried to say here today and maybe even

17   more.

18          And then we'll take the next steps, where you'll produce

19   some, obviously ones that are ordered produced; you'll go

20   through and produce the ones that you think are consistent with

21   the guidance you should produce; you'll come up with a revised

22   privilege log, supplemental declarations where you think

23   appropriate; then you'll meet and confer with the plaintiffs

24   again and see if there's anything left that needs to be decided

25   by the Court.

**PROCEEDINGS**

1    Does that make sense?  Anyone have any other comments they

2  want to go through?

3        **MR. BLACK:**  Not from plaintiffs, Your Honor.  Thank

4  you.

5        **MR. KRAMER:**  Not for defendants, Your Honor, other

6  than it would be very helpful to see your written order to help

7  inform the work we have to do, obviously.

8        **THE COURT:**  I wouldn't expect you to get too far into

9  it before you get the order.

10        **MR. KRAMER:**  Thanks, Your Honor.

11        **THE COURT:**  Yeah.  No problem.  Not a problem.

12    All right.  I hate these motions, not because I don't like

13  deciding the issues, but because in a case like this it often

14  concerns 200 or, in the next case, 3,000 things that are on a

15  privilege log.

16    And I'm always struggling for a methodology where I can

17  make enough rulings so that we actually get through this but I

18  don't have to review several hundred documents each 10 pages

19  and try to figure out the context and all that kind of stuff.

20  It's a struggle.

21    So hopefully this will -- you know, and I also expect

22  counsel to sort of pick their spots, both on the defense and on

23  the plaintiffs' side.  Let's not press where we don't have to

24  and it's not that important and that sort of thing, because you

25  can always make stipulations about privilege, too.  So. . .

**PROCEEDINGS**

1          Okay.  Thank you all very much.

2              **MR. KRAMER:**  Thank you, Your Honor.

3              **MR. BLACK:**  Thank you.

4              **THE COURT:**  Let me just make sure.  Yeah.

5          Okay.  That's great.  Thanks a lot.

6              (Proceedings adjourned at 10:14 a.m.)

7                      ---o0o---

8

9                  **CERTIFICATE OF REPORTER**

10         I certify that the foregoing is a correct transcript

11    from the record of proceedings in the above-entitled matter.

12

13    DATE:   Wednesday, August 3, 2022

14

15

16

17

18    _____
      Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
19              Official Reporter, U.S. District Court

20

21

22

23

24

25