1  ROBBINS GELLER RUDMAN
      & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   DANIEL J. PFEFFERBAUM (248631)
3  KENNETH J. BLACK (291871)
   HADIYA K. DESHMUKH (328118)
4  Post Montgomery Center
   One Montgomery Street, Suite 1800
5  San Francisco, CA  94104
   Telephone:  415/288-4545
6  415/288-4534 (fax)
   shawnw@rgrdlaw.com
7  dpfefferbaum@rgrdlaw.com
   kennyb@rgrdlaw.com
8  hdeshmukh@rgrdlaw.com
           – and –
9  MARK SOLOMON (151949)
   JASON A. FORGE (181542)
10 RAPHAELLA FRIEDMAN (323324)
   655 West Broadway, Suite 1900
11 San Diego, CA  92101
   Telephone:  619/231-1058
12 619/231-7423 (fax)
   marks@rgrdlaw.com
13 jforge@rgrdlaw.com
   rfriedman@rgrdlaw.com
14
   Lead Counsel for Lead Plaintiff
15
   [Additional counsel appear on signature page.]

16

                UNITED STATES DISTRICT COURT

17

              NORTHERN DISTRICT OF CALIFORNIA

18

                      OAKLAND DIVISION

19

| | | |
|---|---|---|
| In re APPLE INC. SECURITIES LITIGATION | ) ) ) | Case No. 4:19-cv-02033-YGR |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) | REPLY IN SUPPORT OF LEAD PLAINTIFF'S SUPPLEMENTAL MOTION TO CERTIFY CLASS OF APPLE OPTIONS INVESTORS |
| ALL ACTIONS. | ) ) ) ) | |

20

21

22

23

DATE:      TBD
TIME:      2:00 p.m.
CTRM:      1, 4th Floor
JUDGE:     Hon. Yvonne Gonzalez Rogers

24

25

26

27

28

4885-2744-1712.v1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ...................................................................................................1

II.  ARGUMENT .........................................................................................................2

    A.  Plaintiff Has Met Its Burden to Establish that the Market for Apple Options Is Efficient .......................................................................................2

        1.  Apple Options Trade in an Efficient Market Because the Underlying Common Stock Trades in an Efficient Market ........................3

        2.  The Academic Literature Strongly Supports the Efficiency of the Options Market .........................................................................................5

        3.  The Evidence Submitted Establishes Apple Options Trade in a Single Efficient Unified Market................................................................7

        4.  Empirical Evidence Confirms that Apple Options Trade in an Efficient Market ......................................................................................10

        5.  The *Cammer* Factors Are Not Meaningful Metrics of Options Market Efficiency ...................................................................................11

        6.  Delta Is an Extremely Strong Indicator of Efficiency Unaddressed by Defendants ......................................................................................12

    B.  Plaintiff Has Proposed a Common Methodology for the Calculation of Damages for the Options Class...............................................................13

III.  CONCLUSION.....................................................................................................15

1

## TABLE OF AUTHORITIES

2

Page

3

**CASES**

4

5
*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) .................................................................................................3

6

*Cammer v. Bloom*,
7
    711 F. Supp. 1264 (D.N.J. 1989) ...........................................................4, 10, 11, 12

8
*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
    _ U.S. _, 141 S. Ct. 1951 (2021) ..........................................................................2

9

*Hamilton Partners, Ltd. v. Sunbeam Corp.*,
10
    2001 WL 34556527 (S.D. Fla. July 3, 2001) ..........................................................9

11
*Hatamian v. Advanced Micro Devices, Inc.*,
    2016 WL 1042502 (N.D. Cal. Mar. 16, 2016).......................................................13
12

13
*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
    2016 WL 1598666 (N.D. Cal. Apr. 21, 2016).......................................................12

14
*Levya v. Medline Indus., Inc.*,
15
    716 F.3d 510 (9th Cir. 2013) .................................................................................13

16
*Mulderrig v. Amyris, Inc.*,
    340 F.R.D. 575 (N.D. Cal. 2021)...........................................................................14
17

18
*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
    2018 WL 4931543 (N.D. Cal. Oct. 11, 2018)........................................................13

19
*Scheller v. Nutanix, Inc.*,
20
    2021 WL 2410832 (N.D. Cal. June 10, 2021) .........................................................5

21

22

23

24

25

26

27

28

Lead Plaintiff and Class Representative Norfolk County Council as Administering Authority of the Norfolk Pension Fund ("Plaintiff") hereby submits this reply brief in support of the Supplemental Motion to Certify Class of Apple Options Investors (ECF 239) ("Motion or "Mot.").[1]

## I.      INTRODUCTION

In its Motion, Plaintiff set forth evidence in support of the efficiency of the Apple options market specifically requested by the Court – including academic literature and an options damages model – supported by the Expert Report of Don Chance (ECF 239-2) ("Chance I"), indisputably one of the country's foremost experts on options markets and trading.  Dr. Chance explained that the efficiency of options markets is an accepted fact within the academic community, demonstrated by both theoretical and real world examples, and supported by the literature.  He also explained how, despite there being many different Apple options contracts, the proposed binomial damages model applies to all of them.  Unsurprisingly, in their opposition (ECF 247) ("Opposition" or "Opp."), Defendants claimed that this evidence was still not enough to meet the applicable preponderance standard and demanded empirical proof that the market for Apple options was efficient.  While the Court did not request it, and it is not necessary, Plaintiff delivers such proof, as set forth in the accompanying Reply Report of Professor Don Chance, Ph.D, CFA (Ex. 3), ("Chance II").[2]

First, academic research specifically addressing the Apple options market demonstrates that the market updates bid and ask quotes *226 million times per day, or eight times per second, for every Apple option regardless of trading volume*.  Thus, Defendants' demands that Plaintiff demonstrate separately that each option traded in an efficient market is wholly undermined by how the market actually functions.  More than 675,000 Apple options contracts (representing more than

---

[1]   The "Parties" are collectively, Plaintiff and "Defendants" Apple Inc. ("Apple" or the "Company"), Timothy D. Cook, and Luca Maestri.  All terms not defined herein have the same meaning as defined in the Motion.

[2]   All "Ex. __" citations herein are to the Declaration of Daniel J. Pfefferbaum in Support of Reply in Support of Lead Plaintiff's Supplemental Motion to Certify Class of Apple Options Investors, filed concurrently herewith.

1    67.5 million shares) traded each day during the Class Period in a highly efficient market operating

2    as a unitary whole and constantly reacting to new information.

3         Second, Plaintiff provides empirical evidence that Apple options move in response to

4    changes in the underlying common stock price.  Specifically, Dr. Chance demonstrates that the

5    synthetic option price returns are nearly perfectly correlated with the common stock price returns

6    for every day from January 2, 2018, to January 3, 2019.  Then, using a data set of more than

7    190,000 end-of-day Apple option records, Dr. Chance proves with an extremely high degree of

8    statistical significance that the daily bid-ask quotes react in the proper direction relative to the

9    underlying Apple stock price.  Finally, Dr. Chance empirically demonstrates how a set of low

10   volume Apple options moves consistently with an efficient market, thus refuting Defendants'

11   arguments that low volume is indicative of inefficiency.

12        Defendants have now filed three briefs and two expert reports, spanning two motions for

13   class certification, attempting to refute strong evidence that the market for Apple's options is

14   efficient.  Yet, Defendants have failed to present any relevant academic support or case law finding

15   the options market for any company – let alone Apple, whose options are the most heavily traded

16   – is inefficient and does not reflect new information.  Indeed, Defendants have failed to identify a

17   single instance of inefficiency in the Apple options market at all, and certainly not sufficient

18   evidence of inefficiency to outweigh the evidence put forward by Plaintiff.  Because Plaintiff has

19   met its burden, the options Class should be certified.

20   **II.    ARGUMENT**

21        **A.    Plaintiff Has Met Its Burden to Establish that the Market for Apple**
             **Options Is Efficient**

22

23        Plaintiff has met its burden to demonstrate by a preponderance of the evidence that the

24   market for Apple options was efficient during the Class Period.  *See Goldman Sachs Grp., Inc. v.*

25   *Ark. Tchr. Ret. Sys.*, _ U.S. _, 141 S. Ct. 1951, 1962 (2021).[3]  Plaintiff has put forth substantial and

26   mutually reinforcing evidence in the form of: (i) two expert reports of Dr. Steven Feinstein; (ii)

27   _____

28   [3]    All citations and footnotes omitted and emphasis added unless otherwise indicated.

two expert reports of Dr. Don Chance; (iii) Apple options trading data showing that Apple options are the most heavily traded options of any company; (iv) multiple empirical analyses of Class Period options trading data supporting efficiency at statistically significant levels of confidence; and (v) foundational and recent academic literature on the efficiency of options markets, including a recent analysis of Apple options trading.  This is strong, comprehensive evidence of the efficiency of options markets generally, and the efficiency of the Apple options market during the Class Period, in particular.  And, even Defendants appear to concede the efficiency of certain Apple options which "'traded every single day and in high volume.'"  Opp. at 8.

Defendants' primary response is that because some Apple options traded infrequently, that alone establishes inefficiency of the entire market, and they demand that Plaintiff prove efficiency for every permutation of Apple option separately.  This novel argument finds no support in the academic literature or the case law, and is inconsistent with how the options market actually functions.  The academic literature Defendants rely upon addresses only **possible** or **potential** inefficiencies in options markets generally, but does not identify any options market as inefficient, nor do Defendants connect this literature to the Apple options market.  In fact, Defendants have not identified **any** evidence of inefficiency in the market for Apple options, let alone the necessary body of evidence required to refute the evidence adduced by Plaintiff.  In sum, Plaintiff has put forth more than enough evidence to carry its burden while Defendants have responded with unsupported argument and speculation.

### 1.    Apple Options Trade in an Efficient Market Because the Underlying Common Stock Trades in an Efficient Market

Options are derivative financial instruments, meaning that their price is determined by the current price of the underlying common stock.  Therefore, because the common stock of Apple reflects all publicly available information, *i.e.*, trades in an efficient market, the option price incorporates the same information.  *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988) ("the market price of shares traded on well-developed markets reflects all publicly available information").  As Dr. Chance explains:

Apple options are derivatives, and their valuations are driven by the price of Apple common stock which has been already found, for purposes of this case, to trade in

at efficient market. ***Apple options trade in an efficient market in that their prices rapidly reflects all publicly available information***.

Chance I, ¶12(a). Dr. Chance illustrates exactly this principle by logically explaining and empirically demonstrating that movement in the price of the underlying stock drives the price of put and call options in response. Chance I, ¶¶46-61, 66, 74-86.[4]

Defendants claim the Court previously deemed this argument "unpersuasive" – but they provide no evidence that would contradict it, and their Opposition ignores the substantial body of evidence that Plaintiff has now put forward showing that movement in the price of an underlying stock drives the price of options. Opp. at 5-6; *see also id.* at 1, 3, 7. Indeed, Defendants' expert, Dr. Steven Grenadier, does not deny that that the current price of the underlying common stock is integrated into the price of the option. *See, e.g.*, ECF 197-2 ("Grenadier I"), ¶217; ECF 247-3 ("Grenadier II"), ¶45. In fact, in listing the six factors used to determine the current price of an option, Dr. Grenadier identifies the current price of the underlying stock as the ***first*** factor in both of his reports: "An option's value depends on six factors: ***the current price of the underlying stock***" (Grenadier I, ¶159) and "[t]he theoretical value of an American call or put option [*i.e.*, the price] depends on six factors: ***the current price of the underlying stock***."[5] (Grenadier II, ¶26); *see also* Ex. 4 ("Chance Tr.") at 34:1-4 (explaining that Dr. Grenadier had recognized that stock price is one of the determinants of the option price).

Every court to analyze the issue of whether options on common stock trade in an efficient market when the underlying common stock trades in an efficient market has concluded that they

---

4    Plaintiff notes that Defendants grossly misrepresent Dr. Chance's testimony that "'I know the markets. I have a pretty good feel for the markets. I follow the markets and all. And to me, it just follows.'" Opp. at 7. Literally, the next words of Dr. Chance's testimony were: "But I know that's not enough. So I had to write more, and I had to, you know go through the *Cammer* factors and all that kind of stuff." Chance Tr. at 60:19-22; *see also id.* at 62:7-9 ("But I know inconceivable to me is not something I could put in a one-page report and expect the Court to accept it.").

5    Dr. Grenadier uses the term value instead of price. But as Dr. Chance notes, he inadvertently acknowledges their connection: "It is also noteworthy that in the previous two statements where he argues that the *value* of an option depends on six factors, he cleverly avoids saying that the *price* depends on these factors. In the above statement, however, he completes the linkage by stating that because the value increases, the investor *will pay more*. Again, Dr. Grenadier makes the plaintiffs' case for them." Chance II, ¶60.

do.  Mot at 5-6.  Defendants have not identified a single case that held otherwise.  And, while the Court previously found this case law lacking in analysis, the evidence presented, including Dr. Chance's two reports and supporting analysis, confirms that these opinions arrived at the correct conclusion.[6]

### 2.   The Academic Literature Strongly Supports the Efficiency of the Options Market

As suggested by the Court, Plaintiff has submitted academic literature on the topic of options market efficiency, which demonstrates that options markets are efficient in that they rapidly react to new information, they make the stock markets more efficient, and they conform to pricing rules and models that prohibit investors from earning easy profits via arbitrage.  ECF 224 at 20 n.11; *see* Chance I, ¶¶73-85.  The literature supports the conclusion that an option price is driven by the price of the underlying stock, and if the stock price changes, the option price must adjust quickly.  Chance I, ¶¶73-85.  Academic studies have universally concluded that options markets rapidly incorporate new information.  Chance I, ¶¶75-79.  Academic research also demonstrates that the options market also makes the common stock market more efficient, which cannot be the case unless the options market itself is efficient.  Chance I, ¶83; Chance Tr. at 85:20-87:11.

Defendants criticize the academic sources referenced by Dr. Chance as being old, as if the securities markets over the last 58 years have become less efficient, despite a technology revolution that makes virtually any piece of news or data available anywhere in real-time.  Chance I, ¶86; *see also* Chance Tr. at 31:12-14 ("And it's doing it even more so today because we have such easy access to information that we didn't have years ago.").  Of course, Defendants ignore that Dr. Chance explicitly stated the age of this literature is a function of the settled nature of the inquiry into the efficiency of the options market and no academic studies suggest as a matter of general

---

[6]   Defendants' attempt to distinguish *Scheller v. Nutanix, Inc.*, 2021 WL 2410832, at *5 (N.D. Cal. June 10, 2021), as the one case not previously cited, also fails.  Opp. at 6.  The Motion cited *Scheller* for the unremarkable proposition that "the sale of put option contracts relies on market price."  Mot. at 5-6.  Again, Defendants offer no rebuttal to the proposition that the price of an underlying stock drives the price of options.

proposition that the options market is not efficient.  Chance I, ¶14 ("the issue is essentially settled and academics rarely, if ever, test this matter anymore.").  Notably, Dr. Chance's rebuttal report includes a 2021 academic analysis in his reply that confirms the accuracy of the foundational literature he relied upon in his first report.  For example, that article states:

> "***Through the tight connection between option and underlying stock prices***, intraday data provide a more comprehensive view of the realized and expected asset price dynamics, offering potential insights for short-term asset return predictability, intraday risk management, price discovery, information processing, and the role of liquidity."

Chance II, ¶48.

Second, Defendants wrongly assert that Dr. Chance omitted studies that cut against the efficiency of the options market.  But all of the literature cited by Defendants refers only to potential or hypothetical instances of inefficiencies speculated about by researchers.  Chance II, ¶¶20-29.  None of these articles conclude that the possible or potential inefficiencies discussed actually make options markets inefficient. As Dr. Chance explained, these articles "are rife with expressions about how limits to arbitrage ***might, could, can, or may*** impede efficiency, but none provide evidence or conclude that these academic suppositions actually do for certain discredit the longstanding body of research that concludes that options markets are efficient."  Chance II, ¶20; *see* Chance Tr. at 31:24-32:1; 37:11-40:2 (explaining that while there could be instances where a stock market is efficient, but the bond market is not, such concerns are not applicable in relevant options markets because of the free-flow of information).  And, one article relied on by Dr. Grenadier addresses options on "stock index futures," which have no relevance to this case.  Chance II, ¶¶24-25.  More importantly, Defendants fail to connect any of the potential or actual inefficiencies in the literature to the Apple options market during the Class Period, let alone inefficiencies of such magnitude to deem the entire market inefficient.[7]

---

[7]   Defendants argue that a 1978 article deemed the CBOE inefficient for a two year period from 1973-1975 *i.e.*, the first two years of operation of the CBOE and the first two years of any registered options exchange.  While this result from the infancy of the options exchange is not meaningful, and is fully refuted by the later literature presented by Dr. Chance, it should also be noted that the article utilized the Black Scholes model applied to American options, which fails to account for the early exercise right of American options.  Chance II, ¶27 n.2.

Finally, Defendants' efforts to portray the articles Dr. Chance cites as inapplicable because some of the authors excluded deep-out-of-the-money options is grossly misleading.  *See, e.g.*, Opp. at 10 ("if Chance were to exclude options on Apple stock by the same criteria . . . that would be **54%** of the 2,282 options available during the relevant period").  Defendants are simply wrong to liken these studies to excluding "77% of the **relevant call option data**."  *Id.* at 10.  Defendants continue to improperly conflate Apple options series with options trades.  The impact of excluding many options series is *de minimis* as the vast majority of Apple option trades are concentrated in near the money options:  "51% of calls and 52% of puts . . . account[] for 97% of call volume and 95% of put volume."  Chance II, ¶75.[8]  Put another way, Defendants' focus on the half of option series that make up less than 5% of the trading volume – is the proverbial tail wagging the dog.[9]

### 3.    The Evidence Submitted Establishes Apple Options Trade in a Single Efficient Unified Market

All Apple options trade in a single efficient market regardless of their distinct trading volume.  By SEC rule, options market makers must provide continuously updated two-sided quotes throughout the trading day for all options, including those that trade infrequently – or not at all.  Chance II, ¶50.  In other words, there is a constantly updating market in which all options can be bought and sold at updated bid and ask prices reflecting the latest changes in underlying common stock price.  As explained in recent academic journal:

> "***As the price on the underlying asset fluctuates, option prices change as well, necessitating adjustments to a wide range of quotes.***  Hence, if the exchanges maintain a menu of options with similar characteristics across the period, the frequency of their quote updates is naturally aligned with the volatility of the underlying asset, ***irrespective of the actual transactions they facilitate***."

Chance II, ¶51.

---

[8]   Defendants offer no basis for their contention that all permutations of Apple options must trade on the same days and/or in the same volume to qualify as a single market (Opp. at 10), and the Court should reject this unsupported argument, for the reasons further discussed below.  *Infra*, §II.A.3.

[9]   Moreover, as Dr. Chance explained in his written and oral testimony, legal and academic inquiries into market efficiency are different, another reason why Defendants' simplistic application of journal articles does not disturb Dr. Chance's opinions.  *See, e.g.*, Chance Tr. at 24:17-24; Chance II, ¶17.

1    With respect to Apple options, which are the most heavily traded options on the CBOE,

2  Dr. Chance demonstrates that the speed and volume of the market is staggering.  A recent study of

3  Apple options examining data for the period from January to August 2015 found that there were

4  more than ***226 million options quotes per day***, or more than 9,000 quotes per second, across all

5  Apple options, whether traded or not.  Chance II, ¶54.  ***This translates into roughly eight quotes***

6  ***per second for every Apple option regardless of trading volume***.  *Id.*, ¶55.  In other words, an

7  enormous, rapidly adjusting, highly automated market is constantly reacting to new information

8  and adjusting the market for all Apple options all the time.  This is a paradigm of efficiency for

9  the entire Apple options market.

10    The evidence showing that the Apple options market operates as a single, highly efficient

11  marketplace for all options exposes the fallacy in Defendants' arguments.  First, Defendants' desire

12  to challenge only the least-traded (or not-traded-at-all options) has always been improper because

13  it seeks to treat outlier data points – deep-in or deep-out-of-the-money options – as the focus of

14  the inquiry, as opposed to the options closer to the money, where the vast amount of trading is

15  concentrated.  Chance II, ¶75 (more than 95% of the trading volume occurs in options within 25%

16  of at-the-money).

17    Second, as set forth in Dr. Chance's second report, quoting recent research, option prices

18  for all options, regardless of trading frequency, are updated multiple times per second, meaning

19  that the market is correctly treated as a unitary whole.  Defendants' repeated claims that every

20  option must be treated independently is a manufactured concern unrelated to how the options

21  market actually works.  Chance II, ¶¶51-52.

22    Third, the fact that the Apple options market operates as a single, highly efficient

23  marketplace confirms that Defendants arguments rely on misleading and irrelevant statistical

24  claims that grossly distort the actual options market.  For example, Dr. Chance previously pointed

25  out how Dr. Grenadier manufactured a calculation for average daily trading volume which was

26  inconsistent with accepted industry practice clearly for the effect of misleading the reader.[10]

27  _____

28  [10]   Assume ten different Apple option contracts were for sale, one which sold 1,000 times per day
and the other nine which sold zero times a day.  This repeated for ten days.  According to Dr.

Chance I, ¶¶96-105.  Defendants have now doubled-down on this approach, again concocting various misleading numerical claims that options generally trade infrequently.  *See* Grenadier II, 97.  However, the incontrovertible facts are that: (i) during the Class Period there was an average of ***675,640 option contracts traded every day*** (covering 67,564,000 shares of stock); and (ii) deep-in or deep-out-of-the-money options trade infrequently, which is both normal in an options market and not a sign of inefficiency.  Chance I, ¶99; Chance II, ¶75.

Defendants' reliance on *Hamilton Partners, Ltd. v. Sunbeam Corp*., 2001 WL 34556527, (S.D. Fla. July 3, 2001), demonstrates exactly why this Court should find the market for Apple options to be efficient.  Opp. at 6 n.2.  In *Hamilton Partners*, the court found the market for Sunbeam's convertible debentures not efficient and the attributes it identified provide dramatic contrast to this action.  In *Hamilton Partners*, the convertible debentures "never were marketed or sold to ordinary members of the public" but only "restricted to 'qualified purchasers'" and "were available only through private offerings, resales, and trading through brokers authorized . . . to trade unregistered securities."  2001 WL 34556527, at *9.  The Court continued:

> [T]he marketing and pricing of the debentures were characteristic of an undeveloped market.  In the initial offering, the underwriter's agents and sales representatives pitched the debentures directly to individual clients through face-to-face meetings and telephone calls. . . . .  After these non-binding "indications of interest" were received, Morgan Stanley then used its own proprietary computer model to analyze a host of different factors, in arriving at a price at which it would sell the debentures to particular clients.  Moreover, even during the aftermarket period, the debentures were not priced efficiently.  Representatives of both Froley Revy and Hamilton Partners acknowledged that the only way to obtain pricing information in the aftermarket was by "calling around," ***rather than relying on a market where bids, asks, and transactions are quoted publicly and accurate transaction data and information is available***.

*Id.* at *10.  The differences between the market described in *Hamilton Partners* and in this action could not be more stark: All of the Apple options were available to trade at all times via market makers' constantly updated public bid and ask quotes.  The fact that Defendants liken trading in Apple options – the most heavily traded options in the world – to that of Sunbeam convertible

---

Chance (and common sense) the average daily trading volume was 1,000 options contracts.  Yet under Dr. Grenadier's approach, the "average daily trading volume" was just 100 option contracts.  Chance I, ¶¶98-102; Grenadier I, ¶182.

1  debentures demonstrates their lack of credibility.  Indeed, if the market for Apple options is not

2  efficient for the reasons Defendants claim, then no options market is or ever could be.

### 4. Empirical Evidence Confirms that Apple Options Trade in an Efficient Market

4   Empirical evidence of a cause and effect relationship, often referred to as *Cammer* Factor

5  No. 5, offers very strong evidence of an efficient market for common stock.  *Cammer v. Bloom*,

6  711 F. Supp. 1264 (D.N.J. 1989).  But, as Dr. Chance explained, based on the way the options

7  market incorporates the price of the underlying common stock (which has already been established

8  to have traded in an efficient market), such a showing is not also necessary to demonstrate

9  efficiency of the options market.  Chance I, ¶71.  Moreover, the Court did not previously indicate

10  that it was seeking empirical data.  Nonetheless, Dr. Chance provides overwhelming, statistically

11  significant evidence of a cause and effect relationship between option prices and the underlying

12  common stock price, thus confirming beyond doubt that the options market rapidly incorporates

13  new information.

14   First, Dr. Chance performed a correlation test between the daily rate of return for Apple

15  common stock and for the Apple synthetic option price.  Chance II, ¶¶65-74.[11]  While Defendants

16  previously criticized Dr. Feinstein for only testing four earnings-release days, Dr. Chance assesses

17  every day from January 2, 2018 to January 3, 2019.  Chance II, ¶67.  Dr. Chance opines:

19  > The correlation between the synthetic stock price and the actual price is 0.9984,
> which is about as ***close to perfectly correlated*** as one can get.  This result provides
> strong empirical evidence that the synthetic series, which derives from information
> in the options market, contemporaneously reflects the information in the stock
> market, ***or in other words Apple options react to new information at the same time
> as the underlying common stock***.

22  Chance II, ¶66.

23   Second, Dr. Chance utilized a database of over 190,000 end-of-day records for Apple put

24  and call options series, including the bid-ask spread, to determine if the options price quotes

25  reacted to changes in the underlying stock price.  *Id.*, ¶¶67-74.  Dr. Chance found that "[m]ore than

---

27  [11]  As Dr. Chance opines, and as Defendants do not dispute, the synthetic option price, as
28  calculated by Dr. Feinstein, is "legitimate."  Chance II, ¶64.

80% of the time the call moved in the correct direction, and more than 79% of the time, the put moved in the correct direction.  If one considers that volatility changes make it harder for the option to move in the correct direction, this is an extremely strong finding." *Id.*, ¶71.  Applying a binomial test to this massive sample of Apple option quotes, Dr. Chance concluded:

> ***This is overwhelming empirical evidence of efficiency at the 99% confidence level that the entire sample of option price changes are responding to stock price changes and in the correct direction.***  This result is well beyond the confidence level typically demanded in empirical research.

*Id.*, ¶74.

Third, specifically in response to Defendants' repeated arguments that low-volume options are indicative of inefficiency of the entire market, Dr. Chance demonstrates that even thinly traded options move exactly as expected in an efficient market.  *Id.*, ¶¶75-80.  Analyzing quote data on more than 46,000 deep-in-the-money ("deep ITM") puts and calls which are "only lightly traded," Dr. Chance demonstrates that the quotes on these options still move exactly as expected in an efficient market:

> For calls, more than 97% of the time, the bid and ask prices of these thinly traded deep ITM options moved in the correct direction.  For puts, almost 98% of the time, the bid and ask prices of these thinly traded options moved in the correct direction.  As indicated by the empirical delta being so close to 1 for calls and -1 for puts, these lightly traded options moved almost one-for-one with the stock, which is exactly what they are supposed to do.  In addition, ***these deep ITM calls accounted for less than 1% of all trading volume, and the deep ITM puts accounted for less than 2% of all trading volume.  And yet, their bid and ask prices responded exactly as they should have.  This is a clear indication that it does not take volume for the market to properly respond to information***.

*Id.*, ¶79.  This empirical evidence more than satisfies Plaintiff's burden and demonstrates that Apple options trade in an efficient market.  According to Dr. Chance:

> ***The empirical evidence Dr. Grenadier demands is overwhelming.  The market makers appropriately adjust the quotes for all calls and puts in response to changes in stock prices with or without trading volume***.

Chance II, ¶82.

## 5.  The *Cammer* Factors Are Not Meaningful Metrics of Options Market Efficiency

It is indisputable that the *Cammer* factors were designed to assess efficiency for common stock markets, not derivative markets and thus do not map precisely to the latter.  Dr. Chance

1    explained why, in detail, these factors are not appropriate for assessing the Apple options market.

2    Chance I, ¶71.   Defendants argue that Plaintiff "acknowledges" that options do not meet the

3    *Cammer* factors.   Opp. at 11.   This is wrong.   As set forth in Dr. Feinstein's reports, the options

4    meet four of the five factors, to the extent that they can even be applied to options.   ECF 165-3,

5    ¶148.   For example, the daily trading volume of options is larger than the daily trading volume for

6    common stock (Factor 1); Apple is followed by 28 analysts (Factor 2); Apple files a Form S-3

7    (Factor 4); and, as demonstrated by both Dr. Feinstein and Dr. Chance, both Apple stock and Apple

8    options react to new information (Factor 5).   *Id.*   This leaves only the relative bid-ask spread unmet,

9    which is an expected result because options are much less expensive than the underlying common

10   stock.   Chance I, ¶71(f); Chance Tr. at 78:9-17.   Thus, even if one were to rigorously apply the

11   *Cammer* factors to options, which one should not, courts find efficiency where four of five factors

12   are met.   *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 2016 WL 1598666, at *8 (N.D. Cal. Apr. 21,

13   2016) ("the presence or absence of any one *Cammer* factor is not determinative of market

14   efficiency").

15              **6.     Delta Is an Extremely Strong Indicator of Efficiency
                         Unaddressed by Defendants**

16

17              As discussed in Chance I, delta measures the amount by which an option should move for

18   a given change in the underlying stock price and is publicly available for current options.   Delta is

19   a concept covered extensively in option textbooks and is widely used in industry for measuring

20   and managing risk.   Chance I, ¶¶62-66.   For example, when an option dealer takes on option

21   positions to serve a client, they take on that client's risk.   Dealers then purchase corresponding

22   securities to achieve delta neutrality and maintain a risk-free position.[12]   Dr. Chance notes that

23   delta hedging would not be possible if options prices did not respond to stock prices.   The mere

24   existence of the concept of delta and its ubiquity in the options literature and in practice

25

26   ─────────────────────
     [12]   Hence, if a dealer sold 100,000 call options at a delta of 0.40, one way to hedge would be to
27   buy 40,000 units of the underlying common stock.   The underlying common stock has a delta of
     1.0, so 40,000 long units of the underlying at a delta of 1.0 balances 100,000 short options at a
28   delta of 0.40.   This creates delta neutrality.

demonstrates that options reflect stock prices to a very accurate degree.  It is noteworthy that neither the Opposition nor Dr. Grenadier's reply report contains the word "delta."

    **B.**    **Plaintiff Has Proposed a Common Methodology for the Calculation of Damages for the Options Class**

    Damages in this action for both buyers of Apple calls and sellers of Apple puts can be computed with a single damages methodology which takes into account each permutation of option traded during the Class Period.  Chance I, ¶111.  Calculation of out-of-pocket damages for options holders will build upon the out-of-pocket damages methodology this Court has already recognized as appropriate for the common stock class in this and other cases.  CC Order at 17-18 (citing *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) (collecting cases)).  The binomial model used to calculate options damages – one for the buyers of puts, and one for the seller of calls – may be more complex than the model used to compute damages for common stock.[13]  But, with readily available computing power, it will function in exactly the same way: For each option transaction, the model will accept the trade specifics – purchase price, quantity, strike price, expiration, and sale price and date (if sold) – and it will return a damages figure in dollars.  *See* Chance Tr. at 111:20-112:9 (explaining that use of the binomial model was previously limited by computing power, but that was no longer the case).  This is consistent with the methodology used for common stock, in which the inputs for that model are purchase price, quantity, and sale price and date (if sold).  "The ultimate question . . . is whether 'damages could feasibly and efficiently be calculated once the common liability questions are adjudicated,'" and there is no doubt that is the case here.  *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *8 (N.D. Cal. Mar. 16, 2016) (quoting *Levya v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)).

---

[13]  Defendants criticize Dr. Chance's use of the binomial model as a departure from Dr. Feinstein's opinion.  Opp. at 15.  But, Dr. Feinstein stated that a "widely used and generally accepted option pricing formulas, such as the Black-Scholes formula can be used," which is precisely what the binomial model is.  ECF 165-3, ¶187; Chance I, ¶115.  And, Dr. Chance selected the binomial model in response to Defendants' criticism that the Black Scholes model did not take into account the early-exercise option of Apple options.  ECF 196 at 24 .  The binomial model is the Black Scholes model with an additional component to evaluate the early-exercise feature.  Chance I,¶¶114-117.

1     Defendants' contentions that Plaintiff's class-wide damages methodology is insufficient

2  are without merit.  Defendants contend that Dr. Chance must propose a methodology that excludes

3  deep-out-of-the-money options from the Class, apparently because (as Dr. Chance previously

4  noted) these options were unlikely to experience significant price inflation (or deflation) as a result

5  of the alleged fraud.  Opp. at 15.  Defendants cite to no case law that proposed Class members who

6  suffer a small amount of damages must be excluded.  And, Plaintiff's proposed methodology will

7  accurately determine these Class members' damages, and Plaintiff does not seek to exclude any

8  potential options class member merely because its damage amount may be small.  Chance Tr. at

9  117-118 ("Q: Does the binomial model price all options well . . . the sort of complete range of

10  options.  Options that are sort of near to the money, options that are far out of the money, options

11  that are at the money?  A: Well, yes.").

12     Defendants also argue that buyers of calls and sellers of puts may have made different

13  investment choices but for the alleged fraud.  Opp. at 15-16.  This is a widely rejected argument

14  when Plaintiff is seeking to recover damages under an out-of-pocket damages theory, as is the case

15  here.  See *Mulderrig v. Amyris, Inc*., 340 F.R.D. 575, 589 (N.D. Cal. 2021) (contrasting the

16  "materialization-of-the-risk theory [which] 'injects individualized inquiries into what is supposed

17  to be a classwide model of recovery'" to the out-of-pocket damages theory which is appropriately

18  resolved on a class-wide basis).  Notably, the same argument could have been made about Apple

19  common stock purchasers – who might have made any myriad of alternative investments had Cook

20  spoken truthfully on November 1, 2018 – but this presented no impediment to certifying that Class.

21     Defendants' argument that Apple options investors should be treated differently from the

22  common stock investors on account of the "moneyness" of options completely misconstrues the

23  out-of-pocket damages methodology.  Opp. at 16.  Using Defendants' example of $20 of fraud-

24  induced inflation, Plaintiff's model determines out-of-pocket damages, in part, by determining the

25  difference in value between what the investor thought they were buying (*e.g.*, an option $12 out of

26  the money) versus what they actually received (an option $32 out of the money).  Opp. at 16.  The

27  fact that options $32 out of the money are less frequently traded than options $12 out of the money

28  does not undermine the proposed damages model.  Opp. at 16.  Defendants' attempt to manufacture

1   conflict between the out-of-pocket model and Dr. Chance's testimony ("This assumption is

2   actually contradicted by Chance"), is meaningless. *Id.* The model does not "assume" that the

3   investors would have purchased a deep-out-of-the-money option absent the fraud, it determines

4   the difference between the value of what the investor intended to purchase and what they actually

5   received due to Defendants' alleged misconduct. Chance I, ¶118.

6          Third, Defendants suggest that Dr. Chance fails to account for implied volatility changes

7   in his methodology. Opp. at 21. But, as Dr. Chance explains (and demonstrates by example), the

8   binomial model can account for this at the appropriate time later in the litigation. Chance II, ¶¶92-

9   100; Chance Tr. at 183:1-5 ("when you all actually get to that point of actually doing damages

10  calculations, that data will tell you if there are adjustments that need to be done, and they can be

11  easily done. But I can't foresee what these adjustments are at this point"). Notably, changes in

12  volatility during the Class Period will have an opposing effect on the damages for puts and calls,

13  and there is no inherent bias as to whether changing volatility would make damages larger or

14  smaller. Chance II, ¶92, Chance Tr. at 183.

15  **III.    CONCLUSION**

16         For the foregoing reasons, Plaintiff respectfully requests that the Court certify a class of

17  Apple call option buyers and Apple put options sellers and modify the Class definition as follows

18  (changes emphasized):

> All persons and entities who purchased or otherwise acquired the publicly traded
> securities of Apple Inc., ***including purchasers of Apple Inc. call options and
> sellers of Apple Inc. put options***, during the period from November 2, 2018 through
> January 2, 2019, ***inclusive***, and who suffered damages by defendants' alleged
> violations of Sections 10(b) and 20(a) of the Exchange Act. Excluded from the
> class are (i) Apple and the individual defendants; (ii) members of the families of
> each individual defendant; (iii) officers and directors of Apple; and (iv) the legal
> representatives, heirs, successors or assigns of any such excluded party.

19

20

21

22

23

DATED:  August 26, 2022                    Respectfully submitted,

24                                          ROBBINS GELLER RUDMAN
25                                            & DOWD LLP

26

27                                          _____
                                                  s/ Daniel J. Pfefferbaum
28                                          DANIEL J. PFEFFERBAUM

SHAWN A. WILLIAMS
DANIEL J. PFEFFERBAUM
KENNETH J. BLACK
HADIYA K. DESHMUKH
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
dpfefferbaum@rgrdlaw.com
kennyb@rgrdlaw.com
hdeshmukh@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
MARK SOLOMON
JASON A. FORGE
RAPHAELLA FRIEDMAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
marks@rgrdlaw.com
jforge@rgrdlaw.com
rfriedman@rgrdlaw.com

Lead Counsel for Lead Plaintiff

LABATON SUCHAROW
CAROL C. VILLEGAS
140 Broadway
New York, NY 10005
Telephone: 212/907-0700
212/883-7524 (fax)
cvillegas@labaton.com

Counsel for Employees' Retirement System of the
State of Rhode Island

VANOVERBEKE, MICHAUD & TIMMONY,
P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Additional Counsel

1

<u>CERTIFICATE OF SERVICE</u>

2

     I hereby certify under penalty of perjury that on August 26, 2022, I authorized the

3

electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will

4

send notification of such filing to the email addresses on the attached Electronic Mail Notice List,

5

and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service

6

to the non-CM/ECF participants indicated on the attached Manual Notice List.

7

                         s/ Daniel J. Pfefferbaum

8

                         DANIEL J. PFEFFERBAUM
ROBBINS GELLER RUDMAN

9

                          & DOWD LLP
Post Montgomery Center

10

One Montgomery Street, Suite 1800
San Francisco, CA  94104

11

Telephone:  415/288-4545
415/288-4534 (fax)

12

Email:  dpfefferbaum@rgrdlaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Mailing Information for a Case 4:19-cv-02033-YGR IN RE APPLE INC. SECURITIES LITIGATION

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Tristan Allen**
  tallen@orrick.com

- **Adam Marc Apton**
  aapton@zlk.com,Files@zlk.com

- **Kevin Michael Askew**
  kaskew@orrick.com

- **Kenneth Joseph Black**
  KennyB@rgrdlaw.com,E_File_SD@rgrdlaw.com

- **Mary K. Blasy**
  mblasy@rgrdlaw.com

- **Frank H. Busch**
  busch@wvbrlaw.com,abarca@wvbrlaw.com,pallister@wvbrlaw.com

- **Hadiya Khan Deshmukh**
  hdeshmukh@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **William Joseph Foley**
  wfoley@orrick.com

- **Jason A. Forge**
  jforge@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Christine M. Fox**
  cfox@labaton.com,ndonlon@labaton.com,lpina@labaton.com,electroniccasefilings@labaton.com,6312349420@filings.docketbird.com

- **Raphaella Friedman**
  rfriedman@rgrdlaw.com

- **Tor Gronborg**
  torg@rgrdlaw.com,E_File_SD@rgrdlaw.com

- **Nicomedes Sy Herrera**
  nherrera@herrerakennedy.com

- **J Alexander Hood , II**
  ahood@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Austin Thomas Jackson**
  ajackson@structurelaw.com,cford@structurelaw.com

- **James Neil Kramer**
  jkramer@orrick.com,lpatts@orrick.com,mwatkins@orrick.com,vmorse@orrick.com,tallen@orrick.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,fgravenson@pomlaw.com,ipareja@pomlaw.com

- **Francis P. McConville**
  fmcconville@labaton.com,HChang@labaton.com,lpina@labaton.com,9849246420@filings.docketbird.com,electroniccasefiling@labaton.com

- **Danielle Suzanne Myers**
  dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,dmyers@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,jalieberman@pomlaw.com,ahood@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,abarbosa@pomlaw.com,fgravenson@poml

- **Daniel Jacob Pfefferbaum**
  DPfefferbaum@rgrdlaw.com,jgeorge@rgrdlaw.com,dpfefferbaumRGRD@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,jgeorge@ecf.courtdrive.com,sbloyd@rgrdlaw.c

- **Samuel H. Rudman**
  srudman@rgrdlaw.com

- **Juan Carlos Sanchez**
  jsanchez@rgrdlaw.com,e_file_SD@rgrdlaw.com

- **Craig Wallace Smith**
  notice@robbinsllp.com,noticerobbinsllp@ecf.courtdrive.com,csmith@robbinsllp.com

- **Mark Solomon**
  marks@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Alexander K. Talarides**
  atalarides@orrick.com,lpatts@orrick.com,casestream@ecf.courtdrive.com,tallen@orrick.com

- **Michael David Torpey**
  mtorpey@orrick.com

- **Carol C. Villegas**
  cvillegas@labaton.com,ndonlon@labaton.com,lpina@labaton.com,5739893420@filings.docketbird.com,electroniccasefiling@labaton.com,dsaldamando@labaton.com

- **James Matthew Wagstaffe**
  wagstaffe@wvbrlaw.com,pallister@wvbrlaw.com

- **Steven Ray Wedeking , II**
  swedeking@robbinsllp.com,notice@robbinsllp.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,kennyb@rgrdlaw.com,jgelman@rgrdlaw.com,rfriedman@ecf.courtdrive.com,ShawnW@ecf.courtdrive.com,smorris@rgrdlaw.com,e_file_sd@r

- **Ariel Brianna Winawer**
  awinawer@orrick.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)