EXHIBIT 3

**REPLY REPORT OF**

**PROFESSOR DON CHANCE, PHD, CFA**

**AUGUST 26, 2022**

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ............................................................................................... 1

II.  SUMMARY OF REPLY OPINIONS ................................................................ 2

III. FACTORS RELEVANT (OR NOT) TO OPTIONS MARKET EFFICIENCY ................................. 3

     A.   Cammer-Krogman Factors .................................................................. 3

     B.   The Academic Literature and Efficiency ............................................ 4

     C.   Volume and Efficiency ........................................................................ 8

     D.   Prices and Efficiency .......................................................................... 10

     E.   Delta and Efficiency ........................................................................... 18

IV.  THE COMMON METHODOLOGY FOR CALCULATING DAMAGES ...................................... 19

## I.      INTRODUCTION

1.      This report is my reply to the report of Dr. Steven Grenadier, submitted June 24, 2022, which was his response to my original report of April 15, 2022 and my deposition of June 8, 2022.

2.      I will not re-state my qualifications, as they are presented in my original report (Section I).  I will also not re-state the basic principles of stock options, as they too are covered in my original report (Sections V and VI).

3.      I will briefly re-state the facts of the case that are relevant to this report.  Plaintiffs allege that Apple CEO Tim Cook made statements on November 1, 2018 that misrepresented the current business and financial position of Apple, which caused the value of the Company's stock to be higher than it otherwise would have been.  Corrective disclosures over the next two months caused the stock price to decline accordingly.  Plaintiffs have filed a securities class action lawsuit and a class of common stock purchasers has already been certified by the Court.  Plaintiffs are petitioning the Court to include the buyers of call options and sellers of put options in the certified class, who respectively paid too much or received too little, if the stock price was inflated by Mr. Cook's statement.

4.      To certify option investors as a class, I understand that the court requires that it be demonstrated that options traded in an efficient market.  The legal requirement of efficiency is what is referred to in the academic world as informational efficiency, meaning that public information is rapidly reflected in the option price.  In addition, I understand that plaintiffs are required to demonstrate to the court that a common methodology for calculating damages exists for all members of the proposed class of options buyers and sellers.

5.      Plaintiffs originally engaged the services of Dr. Steven Feinstein, whose report of May 5, 2021 opined that both the stock and options trade in an efficient market.  In a ruling dated February 4, 2022, a class of stock purchasers  was certified, but the options class was not certified, without prejudice.  The Court's February 4 opinion identified two areas that it was interested in further information if the plaintiff chose to file a supplemental motion for class certification: first, what the academic literature says on the efficiency of options and, second, whether a common methodology was suitable for calculating damages for Apple options.  I submitted my initial report, as noted, on April 15, 2022.  I also provided deposition testimony on June 8, 2022.  Defendants have challenged my written and oral testimony, to which I provide this response.

6.      The remainder of this document is divided into Parts II, III, and IV.  Part II summarizes my opinion.  Part III discusses factors used to assess common stock that may or may not be relevant to options market efficiency.  Part IV provides my response to Dr. Grenadier's comments on my proposed common methodology.

## II.      SUMMARY OF REPLY OPINIONS

7.      In addition to those opinions set forth in my opening report, dated April 15, 2022, and my deposition testimony, of June 8, 2022, I hereby offer the following reply opinions in response to the expert report of Dr. Grenadier.  A summary of my opinions in response to Dr. Grenadier's purported criticisms of my opinions concerning, and evidence supporting, the efficiency of the Apple options market is as follows:

(a)      The Cammer-Krogman factors were designed to assess common stock efficiency and they mostly point to characteristics of large companies.   Contrary to Dr. Grenadier's report, I do not disagree with how Dr. Feinstein applied these factors to the options market, only that these factors should not be considered determinative of efficiency because of fundamental differences between the stock market and options market.   Notably, a demonstration of Cammer Factor 5, the connection between information and security price movement, is not necessary for options efficiency as options are derivatives and inherently take their values from their underlying stock prices.  (Section IIIA)

(b)      The academic literature referenced in my opening report overwhelmingly supports the efficiency of the options market.  Dr. Grenadier points to certain theories that appeared subsequent to the studies that I cite that argue that there are factors that *could* affect the ability of the markets to engage in arbitrage, but he points to no single study, let alone a strand of corroborative literature, that reverses the conclusion of the extant literature that options markets are efficient.  The studies on which he relies heavily are simply theoretical conjectures about potential inefficiencies that have no connection to this matter.  (Section IIIB)

(c)      Volume can support efficiency but is not required.  Trades occur only when people want to trade, and a large number of Apple options generate few (or no) trades on a daily basis.  This is normal and expected in options markets where the vast majority of trading occurs in options near the money.  Critically, the absence of volume in thinly traded options does not suggest inefficiency because options prices are always derivative of the current common stock price and the markets constantly update quotes on all options regardless of volume.  (Section IIIC)

(d)      Options efficiency is irrefutably confirmed by recent academic work demonstrating that bid and ask quotes are updated on all Apple options, regardless of trading volume, multiple times per second.  Hence, any suggestion that different Apple options should be treated as trading in different markets is inconsistent with how these markets actually function.  Further, while I do not believe it is necessary to demonstrate efficiency, I nonetheless provide empirical analysis of a very large data set of bid and ask price changes and find overwhelming evidence that option prices change correctly as stock prices change.  I also showed that the Apple synthetic stock price series generated for Apple using option price data has a 0.99 correlation with the actual stock price, showing that the options market reflects the information in the stock market to an extremely high degree.  It is also notable that Dr. Grenadier admitted twice that the stock price is one of the drivers of the value of an option, and he also stated that the relationship of the stock price to the exercise price determines how much one would pay for

the option.  His statements, therefore, confirm that option prices reflect their underlying stock prices.  (Section IIID)

(e)  Delta, a measure of the degree to which option prices respond to stock prices, is a critical concept in the options market.  It appears virtually everywhere options are discussed and is used in managing the risk of option portfolios.  As I previously opined, the mere existence of delta is proof positive that options respond to stock price changes.  Notably, Dr. Grenadier does not include the word delta anywhere in his response to my report. (Section IIIE)

8.  In addition, Dr. Grenadier questions whether I have provided a common methodology for calculating options damages.  Dr. Grenadier's remarks seem not to challenge my proposed methodology but rather the implementation of that methodology.  I understand that the details of the implementation procedure are not necessary at this stage and critical inputs will be determined by further developments in the litigation.  Nonetheless, herein I provide some further details and show that the questions he poses about hypotheticals that may arise later in this case can be easily addressed by experts who work with options data either as a researcher or practitioner, and there are standard and simple methods for handling them. (Section IV)

9.  In short Dr. Grenadier's report reads as an attempt to deny the obvious, the fact that Apple option prices are driven by Apple common stock prices, which is the reason options exist, and that flexible option pricing models exist and can easily be used to re-price options given different circumstances, such as an inflated stock price.

## III.  FACTORS RELEVANT (OR NOT) TO OPTIONS MARKET EFFICIENCY

10.  This section is divided into five parts.  Part IIIA discusses the Cammer-Krogman factors and whether they are relevant to options market efficiency.  Part IIIB discusses the academic literature on options market efficiency.  Part IIIC discusses the relationship between volume and option market efficiency.  Part IIID covers the connection between prices and efficiency.  Part IIIE discusses the concept of delta and efficiency.  With a few exceptions I do not repeat my original opinions, which I fully stand by and which are not undermined by Dr. Grenadier's opinions.  Here I respond to what Dr. Grenadier has stated in response to my original written and oral remarks.

### A.  Cammer-Krogman Factors

11.  In Dr. Feinstein's original report, he addressed the point of whether the Cammer-Krogman factors were satisfied by Apple options.  I understand these factors have a long precedent of being used by courts to assess the market efficiency of stocks.  When the court denied certification for options, it raised the question of whether these factors were applicable for options.

12.  In my original report, I expressed the opinion that the factors were designed for stocks and cannot be meaningfully applied to assess the efficiency of derivative securities like

options.   Defendants have taken this as an opportunity to suggest that I disagree with Dr. Feinstein's attempt to fit these factors into the options question.  That is incorrect.  In my opinion, Dr. Feinstein made a good faith effort to address these factors.  In my view, applying these factors to options is like putting a square peg into a round hole, and the outcome of this analysis should not be considered determinative of whether options trade in an efficient market.

13.     It appears that defendants are focused on applying Cammer factor 5 to the options market to assess efficiency.  But defendants' attempt to directly apply this factor to options misses the entire notion of what derivative markets are.   In an efficient stock market, when corporations release new and relevant information, such as quarterly earnings, that information is quickly absorbed into the stock price as evidenced by the rapidly reacting stock prices of completed transactions.  The options market, being a derivative market, determines options prices based upon the prices in the underlying stock market.  As such, the options market reflects corporate information in a different manner from the way in which the stock market reflects that information.  Nonetheless, because options react to changes in the underlying stock price, and the underlying stock price is reacting to new corporate information, the options market can and does indirectly react to new and relevant corporate information.

14.     While the options market is intended to indirectly incorporate new information via the underlying stock price, some studies, cited in my original report (starting with 75) show that options markets can sometimes pick up information *faster* than stock markets.  They are not, however, designed to do so in the way that the stock market is.  Forcing Cammer factor 5 into a judgment process for class certification of options is not appropriate.  Derivative markets require a different analysis as they reflect corporate information indirectly.  Nonetheless, as I demonstrate later with empirical data, it is beyond question that Apple options react to changes in the underlying Apple common stock price.

15.     Understanding this point is critical, as it defines the nature of the efficiency required by the court to certify options.  Ultimately the question is simple:  *do option prices incorporate stock prices where the relevant stock trades in an efficient market?*  If they do, then the options market is informationally efficient, and artificial inflation in the stock price, leads to an inflated call price and deflated put price.

B.     The Academic Literature and Efficiency

16.     When the court denied certification of options as a class, it indicated that it wanted to see the academic literature on option market efficiency.  I provided a review of that literature, which Dr. Grenadier has criticized.  Before responding to his criticisms, however, I would like to re-state an important point.

17.     The standard of efficiency required by the court is, as I noted above, whether public information is reflected in the option price.  As I understand it, the court has not demanded a showing of whether option or stock prices conform to any specific pricing models.  Nor has it demanded, for example, that arbitrage opportunities be completely non-existent.  It has imposed a simple and reasonable standard.  If, for example, the stock price increases, does the call price

increase? Does the put price decrease? And vice versa. Because the court has never demanded that a stock price rise or fall to a specific level as indicated by a particular model, there is no reason why it would expect an option price to do so as well. In contrast, the academic literature has imposed a much higher standard. If the academic standard is met, then the legal standard is met, but the reverse is not necessarily true.

18.    Inasmuch as Dr. Grenadier has chosen to take a thread within the literature and state the obvious fact that every study ever done can be criticized, a response is appropriate. It is the nature of the scientific method to recognize that no single study establishes a fact because no study is perfect. For every issue there is a body of literature that reaches a conclusion based on similar studies and sometimes replication. I presented a number of studies that provide evidence consistent with efficiency for options. Yet, Dr. Grenadier attempts to pick apart these studies because the authors acknowledge that not every single data point is consistent with efficiency, even accounting for the higher-than-necessary standard imposed by researchers in the academic field.

19.    As any researcher who uses data knows, a conclusion that may be drawn from a single study does not mean that every data point supports the conclusion. Statistical significance, which accounts for sample size and variability in the data, leads to the conclusion. And even then, there is typically a small probability that the conclusion is incorrect - i.e. even at the 95% confidence level, there remains a 5% probability the conclusion is the product of random chance alone. The findings of numerous researchers studying the same or a similar problem and drawing the same or a similar conclusion establishes scientific consensus. Dr. Grenadier seeks to hold up a standard of perfection, one that no study can reach. This is a well-known point to any empirical researcher who employs the scientific method.

20.    As I indicated in my original report, the study of options market efficiency largely ended in the 1990s, because the efficiency result was established as a fact. Dr. Grenadier apparently believes that it is not a fact. He argues that more recent studies provide contradictory evidence. They do not. The studies relied on by Dr. Grenadier merely assert possible criticisms in the direction of the conclusion of market efficiency, but they do not produce a single subsequent study that concludes that the options market is not efficient, and particularly not the Apple options market. They are rife with expressions about how limits to arbitrage *might, could, can, or may* impede efficiency, but none provide evidence or conclude that these academic suppositions actually do for certain discredit the longstanding body of research that concludes that options markets are efficient. Moreover, Dr. Grenadier completely fails to connect any of these hypothetical occurrences to the Apple options at issue in this case.

21.    For example, starting on p. 32, Dr. Grenadier says that I overlook a strand of literature that he apparently believes has relevance to this case. It is notable, however, his judicious use of certain key words that point toward a possibility of discrediting arbitrage studies. But only a possibility. For example, in ¶76, he says

I discuss one particularly applicable strand of academic literature, which discusses market frictions that *can* impede arbitrage and prevent option prices from incorporating new, value-relevant information quickly and fully. [italics added]

22.    In ¶77, Dr. Grenadier goes on to say:

Academic research has long recognized that market frictions such as high transaction costs *can* limit market participants' ability to exploit arbitrage opportunities and result in departures from market efficiency. [italics added]

If high transaction costs make it expensive to take advantage of an arbitrage opportunity, this *may* result in a lack of informational efficiency in one market even if the other market is informationally efficient. [italic's added]

23.    In other words, Dr. Grenadier points to academic literature that hypothesizes about potential inefficiencies that may exist in options markets and from this he appears to suggest that the Court cannot conclude that the Apple options market is efficient.  This is a leap too far, even if these potential inefficiencies were to exist, the literature does not suggest they lead to an inefficient market and Dr. Grenadier has failed to identify any such actual inefficiencies present in this case.

24.    Dr. Grenadier goes on to cite a completely irrelevant article to further support his position.  In 85, he states[1]

Academic articles have identified examples of mispricing that were not arbitraged away because of high transaction costs.  These examples empirically confirm that option prices *sometimes* deviate from the theoretical levels predicted by no-arbitrage relationships because of high transaction costs.  For example, Santa-Clara and Saretto (2009) analyzes American options on S&P 500 futures traded at the Chicago Mercantile Exchange during 1985–2001.  The article finds high expected returns on certain option strategies, notes that "[t]rading options can be quite expensive, not only because of the high commissions charged by brokers, but, most importantly, because of the large bid-ask spreads at which options are quoted," and concludes that exchange margin requirements and transaction costs prevent arbitrageurs from taking advantage of the mispricing.  [italics added]

25.    I italicize the word "sometimes" to further remind the court that every study at least shows some deviations from the norm on occasion.  I further add that the article has no relevance to this case, because it deals with options on *stock index futures*, which do not trade in the same kind of environment as stock options.  The option underlying is a futures, which is a derivative itself, and has a stock index as its underlying.  In addition, margins, which Dr. Grenadier

---

[1]    Pedro Santa-Clara and Alessio Saretto, "Option Strategies:  Good Deals and Margin Calls," *Journal of Financial Markets* 12 (2009), 391-417.

specifically mentions, are completely different for futures options and futures than they are for equity options and equities.  In short, there is no useful relationship between the point referenced in this article and the issues in this case.  Citing a study from an entirely different market is a distraction and is non-probative.

26.    In 86, Dr. Grenadier states:

In sum, the academic literature finds that high transaction costs such as bid-ask spreads *can* impede investors' ability to take advantage of mispricing in option markets. [italics added]

27.    There are many possibilities that *can* happen.  There are many things that *sometimes* happen.  It sometimes rains heavily in the desert.  It sometimes freezes in Miami.  If the "cans" and "sometimes" events change the body of knowledge, why is there not a strand of literature or even a relevant study finding that the options market is not efficient?[2]  Instead, Dr. Grenadier needlessly distracts the court to theoretical musings of these possibilities.

28.    One article that Dr. Grenadier leans heavily on is by Shleifer and Vishny, which describes limits to arbitrage.[3]  It is of note that this article is strictly theoretical and presents no data.  Hence, the authors propose something but prove nothing.  They state that

We show that such specialized performance-based arbitrage *may* not be fully effective in bringing security prices to fundamental values, especially in extreme circumstances. [italics added]

29.    Again, I emphasize the word "may."  They provide no proof using data.  And if anyone else pursuant to the publication of this article had provided proof, surely Dr. Grenadier would have found it.  It is also extremely noteworthy that this article never mentions anything about options, let alone Apple options.  The word "option" appears only three times in the article and always in the more general context of a choice.  The words "call" and "put" do not appear at all.  Shleifer and Vishny may be talking about arbitrage, but they pay no specific attention to the characteristics of options markets.  In fact, option traders take arbitrage positions of long one option and short another routinely.

---

[2]    Dr. Grenadier cites a 1978 paper by D. Chiras and S. Manaster ("The Information Content of Option Prices and a Test of Market Efficiency." *Journal of Financial Economics* 6 (1978), 213-234) that presents evidence that the options market was inefficient, but this paper has no relevance to this case.  The paper studied only the first two years of the CBOE, which was the first exchange-listed options market, where it is not surprising that some prices suggested inefficiency.  In addition, their standard for efficiency was the Black-Scholes model, which is not appropriate for American-style options.

[3]    A. Shleifer and R. W. Vishny, "The Limits of Arbitrage," *The Journal of Finance* 52 (1997), 35-55.

30.     Dr. Grenadier seems to argue repeatedly that plaintiffs must show that every one of the 2,242 Apple option contracts that were listed during the class period traded in their own efficient market.  And, because most academic studies include all but the lowest volume options, Dr. Grenadier claims that eliminating these options limits the general applicability of the studies that find the options market is efficient.  I disagree.  These articles do not limit their conclusions to only portions of the options markets and are properly considered to be generally applicable.  Because so many of those studies use transaction prices, naturally one cannot get much from thinly traded options.  It is notable, nonetheless, that the studies do not conclude that some options are efficient with a caveat that others are not.  Any options expert knows that all options are linked through the stock price.  I have more to say on this later, and I will demonstrate that all options trade in a single market and reflect the information in the stock price.

31.     In sum, Dr. Grenadier's criticisms of the academic literature simply recognize that no one study is perfect.  Yet, he cannot produce a single relevant study that concludes that current options markets are not efficient, he cannot identify a single instance of inefficiency in the Apple options market, and he cannot find support for the conclusion that the Apple options market was not efficient during the Class Period.  He can only cite studies that say that there are limits to arbitrage that could impede efficiency.  He cites not one relevant study that shows definitively that the large body of literature I have put forward is wrong, nor does he conduct a study himself.  He provides no evidence that limits to arbitrage do actually impede efficiency.  Dr. Grenadier is simply speculating and it does nothing to refute my opinions.

32.     To repeat my primary point here, the academic literature I have presented imposes a much higher standard than required by the courts, yet it shows strong evidence that leads the authors and journal editors to conclude that it supports efficiency.  That not every data point in every study supports efficiency is common and immaterial.  It is the weight of the evidence, as measured by statistical methods, that leads to the authors' conclusions.  Dr. Grenadier's hurling of possibilities without producing a single article that concludes with a discrediting of the large body of literature on efficiency is a powerful piece of evidence in and of itself in support of the efficiency of the Apple options market.

33.     Finally, on this point I would like to stress that academics do not directly study the simple question that must be addressed in this case: do option prices reflect stock prices?  That answer is a foregone conclusion.  Academics study more complex questions.  They have no interest in proving something universally accepted as whether an option, the sole existence of which is to respond to its underlying stock price, actually does respond to its underlying stock price.

## C.     Volume and Efficiency

34.     Dr. Grenadier has placed considerable emphasis on the fact that there are a substantial number of Apple options that traded with low volume during the Class Period or did not trade at all and that these options are not traded in an efficient market.  As I will show later, they are traded in a highly efficient market in which quotes on all Apple options are updated multiple times per second.  These options tend to be fairly deep-out-of-the-money or fairly deep-

8

in-the-money. The former are like lottery tickets. They are very low cost but very long shots, and they do not generate much trading interest. The latter are like the stock itself in that they are so likely to be exercised that they tend to behave like the underlying stock. They too are not particularly appealing to option speculators. In other words, both of these types of options are less interesting to investors, because they do not retain much speculative value.

35.     Dr. Grenadier's emphasis on volume has also led him to make a self-contradictory statement. In 68, he references my remarks about the article by Anthony on trading volume.[4] As I opined in my original report, this paper, which is widely cited in the efficiency literature, shows that options markets often trade ahead of stock markets. I indicated that this *points* to efficiency. I did not present it as concrete proof, and it certainly was not the only basis for my conclusion. It is puzzling, however, that Dr. Grenadier believes that a study of volume cannot point to efficiency, while presenting a contradictory argument that low volume options are indicative of inefficiency.

36.     Dr. Grenadier also shows an apparent failure to understand information flow and efficiency in derivative markets. He criticizes my reference to a body of literature that shows that derivatives make the stock market more efficient. In ¶67, he says

> Dr. Chance attempts to make the connection between efficiency of stocks and options by claiming that "[o]ptions markets could not improve the quality of the stock market if they themselves were inefficient." However, the assertion that if option markets made a stock market more efficient then they must have also been efficient is speculative and has no support in the academic literature cited by Dr. Chance.

37.     I had not anticipated the need to explain the fact that options cannot make the stock market more efficient if they are themselves inefficient, but now I shall do so. Consider a stock market that receives a piece of new and relevant information. Doing what markets do best - converting information to prices - the stock market reacts. Let us assume that it takes ten minutes for this information to manifest in the stock price. If, however, an options market exists, these studies argue that information flows so rapidly between these two tightly connected markets that the stock market will begin to incorporate the information more rapidly, and its response time might be cut to say five minutes. This *cannot* happen if the option market is slow to absorb the information and is, therefore, inefficient. This is not an abstract academic thought. It is simple logic.

38.     It also appears that Dr. Grenadier may be conceding that the high volume options traded in an efficient market. This begs the obvious question of why an exchange such as those on which Apple options trade, like the CBOE or Nasdaq, would pursue such an irrational business strategy of offering many options that do not trade efficiently as compared to the smaller number

---

[4]     J. H. Anthony, "The Interrelation between Stock and Options Market Trading Volume Data," *The Journal of Finance* 43 (1988), 49-64.

that do.  It defies logic and business sense.  Exchanges certainly want their markets to be completely efficient.  It is inconceivable that such a successful business as listed options exchanges could exist if options did not reflect the information in stock prices.  Alas, Dr. Grenadier continues to demand proof using data, which I provide later.

39.     It is also important to note that the pattern of high volume in some options and low volume in certain others is not unique to Apple.  It is a typical pattern that looks somewhat like a bell curve.  The reader can go to the link in the footnote, insert the ticker symbol of other stocks and indexes and the same pattern will be seen.[5]

40.     It is also important to understand that while high options volume can point to efficiency low volume does not necessarily imply inefficiency.  In instances of lower trading volume, it is important to look to bid and ask prices.  If bid and ask prices respond to new information, then the market is converting the information in stock prices into option prices even if no transaction occurs.  As I show later in this report, this is precisely what happens.

41.     Let us now turn to price.  It is the most important factor in determining efficiency. After all, efficiency in this legal context means whether option prices reflect stock prices.

### D.     Prices and Efficiency

42.     There are many factors that can point to efficiency.  The Cammer-Krogman factors have been used by the courts in cases involving stock, but as I noted, they are not designed for options.  Factors such as being a large, highly visible corporation can point to efficiency.  Trading volume can suggest efficiency, but how much volume is enough for options?  Can a market be efficient with low volume?  The ultimate test of efficiency is whether prices respond to new information.  But even studies of efficiency that involve prices can be overkill by imposing a higher standard than is necessary.

43.     As noted above, the court asked for literature on efficiency, and I provided that literature.  That literature is consistent with efficiency and is remarkable in the absence of much literature after the mid-1990s as the issue was considered settled within the academic field.  And yet, these academic studies go far beyond the requirements of the law.

44.     My task is to address whether if a new and informative statement exists, would it affect prices?  The answer is unequivocally yes, as I show here.

45.     Much has been made by Dr. Grenadier about the low trading volume of some of the Apple options.   But it is ultimately not trading volume that addresses the question of

---

[5]     See https://www.cboe.com/delayed_quotes/aapl/quote_table for Apple, but other symbols can be inserted.  Various menu choices allow one to see all options and various expirations.  In particular, one should check the extremely active S&P 500 index option (SPX) and another high volume equity option such as Alphabet (GOOG) or Amazon (AMZN).

efficiency of options.[6]  Whether someone does a trade or not is up to them.  Deep out-of-the-money (OTM) options are like lottery tickets, and deep in-the-money (ITM) options behave like the stock.  The lack of volume alone is not indicative of efficiency or inefficiency.  What indicates the efficiency of these low volume options are the bid and ask prices.  These are the prices quoted by the market makers and are the prices at which investors can sell or buy the options.  The market makers are the entities that are authorized by the exchange to make the markets.  They stand ready to buy and sell at any time.

46.    There are several major market-making firms, the most prominent being Chicago Trading, Citadel, and Susquehanna.  They generally make markets in all options.  It is doubtful that a single transaction is done without a market maker.  With billions of contracts being traded every year on thousands of companies, market makers manage their quotes using computerized automation and these quotes are distributed via software.  Manual overrides are permitted, but human beings are not updating thousands of option quotes for thousands of companies in nearly infinitesimal time intervals at all times.

47.    It is also important to understand that market makers are required to update their quotes on all options regardless of volume.  A very compelling piece of research on this point is provided by Andersen et al (2021).[7]  In this paper, Andersen et al utilize a massive data base of more than 256 *billion* records from the Options Price Reporting Authority (OPRA), the central repository for options data in the U.S.  This data contains quotes and trades timed to the millisecond for the period of January to August, 2015.  They limit their study to 17 different options, which includes individual companies and some indexes and an ETF.  Apple is one of a small handful of companies' options they study.

48.    There are several important findings made by the authors.  For example, on p. 129, they state that

> *Through the tight connection between option and underlying stock prices*, intraday data provide a more comprehensive view of the realized and expected asset price dynamics, offering potential insights for short-term asset return predictability, intraday risk management, price discovery, information processing, and the role of liquidity. [italics added]

---

[6]   I remind the reader that this pattern of low trading volume in many options, particularly those deep in-the-money and deep out-of-the-money options, is not unique to Apple.  It exists in all options.  It is noteworthy that Dr. Grenadier's questioning of the efficiency of the market for Apple options is tantamount to questioning the efficiency of the entire market for all options.

[7]   T. Andersen, I. Archakov, L. Grund, N. Hautsch, Y. Li, S. Nasekin, I. Nolte, M. Pham, S. Taylor, and V. Todorov, "A Descriptive Study of High-Frequency Trade and Quote Option data," *Journal of Financial Econometrics* 19 (2021), 128-177.

49.     Note that a prominent options researcher (Andersen) and his cohorts aver that the option and stock prices are tightly linked, which is consistent with my opinions and the academic consensus.

50.     On p. 136, Andersen et al state that market makers are required to post updated quotes.

There are several market-wide obligations for option market makers.  First, in February 2001, the SEC introduced a market-wide firm quote obligation through an amendment of the Quote Rule (Securities and Exchange Act Rule 11AC1-1), which was previously applied only to the equity market.

…

By the quote rule, market makers must provide continuously updated two-sided quotes throughout the trading day.

51.     On p. 157, Andersen et al speak directly to the efficiency of the options market:

As the price on the underlying asset fluctuates, option prices change as well, necessitating adjustments to a wide range of quotes.  Hence, if the exchanges maintain a menu of options with similar characteristics across the period, the frequency of their quote updates is naturally aligned with the volatility of the underlying asset, irrespective of the actual transactions they facilitate.

52.     This confirms that quotes are constantly being updated to reflect new information for all options regardless of the trading volume of a particular option.  Therefore Dr. Grenadier is wrong to draw conclusions about efficiency from a lack of trading volume and he is wrong to suggest that each of the 2,242 options that existed during the class period must be analyzed as separate markets.  All of these options trade in a unified, constantly updating, and efficient market.

53.     Dr. Grenadier has also made a needlessly repetitive point about the size of the bid-ask spread of Apple options relative to stocks, trying to claim this is indicative of inefficiency.  It is not.  As I set forth in my opening report, larger bid-ask spreads are inherent in options markets and are not indicative of inefficiency.  Notably Andersen et al on p. 162 finds that Apple had the smallest bid-ask spread of the stocks in their study:

Apple is also noteworthy by having the smallest relative option spread, by far, among all the underlying securities in our sample, followed by the SPY ETF.

54.     Andersen et al show, in Table 3, p. 142, the mind-boggling degree to which option market making systems update and disseminate quotes.  For Apple the authors show an average of 226,822,053 quotes per day.  The market trades for 6 ½ hours per day.  The number of seconds in 6 ½ hours is 23,400 (6.5 x 60 x 60).  These figures mean that there are 9,693 quote updates per second.  This number is consistent with another number in their table, MPS, messages per

second.  A message is sent when there is any new information.  For Apple, there are 9,697 messages per second.  Each message conveys new information to the quote system.

55.     The table also shows that there are 1,169 Apple options per day on average, so there are more than eight quotes per second for *each Apple option*.  The speed and degree of updating is almost beyond human comprehension.  In other words, the options market is updating the prices of all the available options contracts - regardless of their trading volume - multiple times per second to reflect movement in the underlying stock price.  This updating reflects new information, and it shows a high degree of efficiency.

56.     Dr. Grenadier has also repeatedly criticized the fact that I had not empirically proven the obvious - that options incorporate stock price information.  But on multiple occasions, Dr. Grenadier practically states my case for me.  For example, in 159 of his original report, he says

> An option's value depends on six factors: *the current price of the underlying stock*, the strike price of the option, the time to maturity, the volatility of the underlying stock price, the risk-free rate, and any expected dividends.  Changes in any of these factors over time can affect the value of an option.  All else equal, an option (either a call or a put) becomes more valuable when the volatility of the underlying stock price increases because the option is more likely to end up in the money when volatility is higher. [italics added]

57.     In his rebuttal report, he states in ¶26,

> The theoretical value of an American call or put option depends on six factors: *the current price of the underlying stock*, the strike price of the option, the time to maturity, the volatility of the underlying stock price, the risk-free rate, and any expected dividends. [italics added]

58.     Could anyone conceivably believe there is a complete disconnect between the value of an option and the price at which it trades?  And in what may be a Freudian slip, Dr. Grenadier explains in his rebuttal on ¶30 why the investor will take into account the stock price and its relationship to the strike price in deciding on what he will pay:

> "Suppose instead that the stock price is $100 and the investor purchases a call option with a strike price of $100 and a maturity of one month.  Because the stock price is at the strike price, it is more likely that the option will end up in-the-money and will be exercisable at a gain.  This means that the call option has more value when the strike price is $100 than when the strike price is $150, and the investor will pay more to purchase the option with a strike price of $100.  The higher cost is justified because the option provides a greater payoff to the investor in the event that the stock price increases from its current level."

59.     This statement is a clear indication that Dr. Grenadier knows that the stock price is incorporated into the option price and that when circumstances are different, the investor will

take that into account. Dr. Grenadier has, with this statement, made plaintiffs' case for efficiency of the options market.

60.     It is also noteworthy that in the previous two statements where he argues that the *value* of an option depends on six factors, he cleverly avoids saying that the *price* depends on these factors. In the above statement, however, he completes the linkage by stating that because the value increases, the investor *will pay more*. Again, Dr. Grenadier makes the plaintiffs' case for them.

61.     While I believe the evidence I presented in support of efficiency, and as confirmed by Dr. Grenadier, is overwhelming, I will now provide empirical evidence of the reaction of option prices despite the fact that the Court did not request it. Notably, Dr. Feinstein already did an empirical analysis. He used the Apple option prices and the principle of put-call parity to infer the price of the stock. This price, which is typically referred to as the synthetic stock price, is a measure of what the options market implies is the stock price. If option prices reflect the information in stock prices, the synthetic stock price will behave like the actual stock price. Dr. Feinstein conducted an event study using Apple earnings announcements. The results were statistically significant. Defendants criticized this analysis, however, because there were only four events in a year, these being the four annual earnings announcements and because it utilized a model for European-style options. While the Court did not find this study sufficiently persuasive, I find Dr. Feinstein's event study to be highly probative and the purported critiques offered by defendants to not diminish the power and significance of the outcome.

62.     To be specific, Dr. Feinstein's synthetic stock price was criticized for using a European model when these are American options and for not being able to use all options in the sample. On the first point, it is not possible to use an American model, as the relationships are inequalities, not equalities. Thus, one would not be able to produce an exact synthetic stock price using the American model. A European model can produce an exact stock price. The difference between an American and a European model is called the early exercise premium. It is typically a very small amount, but it is directly related to the stock price for calls and inversely related for puts. What this means is that this small factor that Dr. Feinstein's methodology was unable to capture biases his result in the direction of finding no relationship between the stock price and option price. In other words, it simply made his test harder to pass. And yet it still passed.

63.     Dr. Feinstein was also criticized for using only options that traded during a given day. Defendants pointed out that the traded options on the four earnings announcement dates represented only a small percentage of all Apple options. As Dr. Feinstein pointed out, this was done because these announcement dates are days involving the release of very important information. In the next few paragraphs, however, I will use *all* of the information in the entire year of 2018 to see if Dr. Feinstein's method produces a synthetic stock price that behaves like the actual stock price.

64.     In addition, defendants have claimed that the options used in much of Dr. Feinstein's analysis, such as his event study, in general do not span the entire options market.

14

Dr. Feinstein required that there be some trading volume in an option to use it. This results in the use of a third of all observations available. This is a sufficiently large enough sample, because as I have attested multiple times, the options market is integrated. It does not require trading volume for efficiency. I presented numerous quotes from the Andersen et al study to show that the market is not just integrated by accident; it is mandatory. Thus, I strongly believe that Dr. Feinstein's synthetic stock price is legitimate. I will next present evidence on how accurate it is.

65.    As defendants continue to demand further empirical evidence of efficiency, I have conducted a very powerful, and easily understood, correlation test between the synthetic stock price and the actual stock price. I utilized the synthetic stock price and, out of an abundance of caution I used the actual stock price obtained from a completely independent source: Yahoo! Finance. For each date during the period from January 2, 2018 to January 3, 2019, not just earnings dates, I calculated the rate of return from the synthetic stock price and the rate of return from the actual stock price.[8]

66.    Two series that are positively correlated have a correlation between 0 and 1. Two series that are negatively correlated have a correlation between 0 and -1. The correlation between the synthetic stock price and the actual price is 0.9984, which is about as close to perfectly correlated as one can get. This result provides strong empirical evidence that the synthetic series, which derives from information in the options market, contemporaneously reflects the information in the stock market, or in other words Apple options react to new information at the same time as the underlying common stock.

67.    I will now provide further and highly probative empirical evidence demonstrating that when the stock price changes the option price changes and in the correct direction to an extremely high degree of statistical confidence. I utilize a database of over 190,000 Apple call and put end-of-day records, which include the closing bid-ask spread for the period from December 29, 2017 to January 4, 2019 . This is the iVolatility database used by Dr. Feinstein and also by Dr. Grenadier. Each record represents one option series for one day.

68.    For a given Apple option series, over every possible one-day period, I calculate the stock price change and the option price change. The stock price change is the closing stock price change. The option price change is the change in the mid-point of the closing bid and ask prices. Each option price change is compared to the corresponding stock price change and becomes a data point which is classified in one of three ways:  the option changes in the correct direction, the incorrect direction, or did not change at all. The correct direction is that a call moves in the same direction as the stock, and a put moves in the opposite direction to the stock.

69.    Now, it is important to first understand what factors can cause the option price to change. First, there is the obvious, the stock price. In addition, there is the market's perception

---

[8]    The rate of return is the percentage change in the stock price. Researchers never correlate stock prices, because those correlations by definition are unstable. Rate of return correlations are generally stable.

that there has been a volatility change from one day to the next.  A volatility change makes it more difficult to detect whether the option price change came from the stock price change, but this only makes the test harder to pass.  Third, there is time value decay.  Fortunately, time value decay is negligible over a one-day period.

70.     The table below shows the results.

|  | Correct | No Change | Incorrect | Total |
|---|---|---|---|---|
| Calls | 153,915 | 14,567 | 23,311 | 191,793 |
| Puts | 152,198 | 18,942 | 20,653 | 191,793 |

71.     More than 80% of the time the call moved in the correct direction, and more than 79% of the time, the put moved in the correct direction.  If one considers that volatility changes make it harder for the option to move in the correct direction, this is an extremely strong finding as confirmed by a binomial test.

72.     The binomial test, as with all statistical tests, starts with a null hypothesis i.e. a statement that you assume is true, and then you let the data tell you whether there is sufficient evidence to reject it or not.  I will give Dr. Grenadier the benefit of the doubt by stating my null hypothesis as:

> The option price is as likely to either not change or change in the wrong direction given a stock price change as it is to move in the correct direction.

73.     In other words, I assume that the option price just reacts randomly to the arrival of new information, which would be indicative of inefficiency.

74.     Calculating the test statistic is called the normal approximation to the binomial, which is appropriate given the massive sample size.[9]  This test statistic is then compared to a critical value to reveal whether the null is to be rejected.  The critical value is about 2.33 to give 99% confidence.  The test statistics obtained from this data are 264.96 for calls and 257.12 for puts.  This is overwhelming empirical evidence of efficiency at the 99% confidence level that the entire sample of option price changes are responding to stock price changes and in the correct direction.  This result is well beyond the confidence level typically demanded in empirical research.

---

[9]     The binomial distribution converges to the normal distribution with large samples, of which this sample size is well beyond any question of adequacy, a result known as the *DeMoivre-LaPlace Limit Theorem*.  In general, the averages of all probability distributions converge to the normal distribution with large sample sizes through a mathematical result known as the *Central Limit Theorem*.  Here we are testing the average, and the choice of the normal approximation to the binomial is highly appropriate.

75.     In light of defendants' apparently singular focus on low volume options, I also provide empirical data demonstrating their efficiency by showing how quote prices, as opposed to transaction prices, indicate a high degree of efficiency.  Deep in-the-money (ITM) and deep out-of-the-money (OTM) options are typically very low volume options.  As noted earlier, they generate the least interest among the types of speculators to whom options appeal.  In fact, more than 97% of the volume of calls and 95% of the volume of puts is in options within 25% of at-the-money.  These options that are within 25% of at-the-money comprise 51% of calls and 52% of puts while accounting for 97% of call volume and 95% of put volume.

76.     Deep ITM options are also only lightly traded, but they have high deltas near 1.0 (calls) and -1.0 (puts).  Hence, their bid and ask prices should move almost lockstep with the stock price.  We can easily determine if they do.  Let us define deep ITM as being at least 50% ITM.  Measuring moneyness as the stock price divided by the strike price, this means that deep ITM calls have a ratio of at least 1.5 and deep ITM puts have a ratio of no greater than 0.5.

77.     Using this definition, there are almost 44,000 deep ITM calls and almost 2,000 deep ITM puts.  Each of these records represents one option on one day, not the number of trades per day.  The reason for this large difference is that there is no limit to call moneyness.  It can technically be infinite because the stock price has no upper limit.  On the downside, however, the stock price can go no lower than zero.  Hence, there is far less room for deep ITM puts.  Still, a sample of almost 2,000 observations is a reasonably large size.[10]

78.     The table below shows the analysis of the deep ITM options.  The far right column also shows the empirical delta. This is the actual ratio of the option price change to the stock price change.  As deep ITM options, these numbers should be close to 1.0 for calls and -1.0 for puts.

|  |  |  |  |  | Empirical Delta | |
|---|---|---|---|---|---|---|
|  | Correct | No Change | Incorrect | Total | Average | Median |
| Calls | 42,613 | 191 | 1,016 | 43,820 | 0.960 | 0.992 |
| Puts | 1,870 | 15 | 26 | 1,911 | -0.939 | -0.992 |

79.     For calls, more than 97% of the time, the bid and ask prices of these thinly traded deep ITM options moved in the correct direction.  For puts, almost 98% of the time, the bid and ask prices of these thinly traded options moved in the correct direction.  As indicated by the empirical delta being so close to 1 for calls and -1 for puts, these lightly traded options moved almost one-for-one with the stock, which is exactly what they are supposed to do.  In addition, these deep ITM calls accounted for less than 1% of all trading volume, and the deep ITM puts accounted for less than 2% of all trading volume.  And yet, their bid and ask prices responded

---

[10]   It is of note that Apple stock trended upward over most of 2018, making it hard for puts to go deep ITM.  It then began to trend downward when Apple's China problems surfaced near the end of the year.

exactly as they should have.  This is a clear indication that it does not take volume for the market to properly respond to information.

80.     It is also important to note how the deep ITM calls and deep ITM puts fill in some information we could not glean from deep OTM calls and puts.  Deep OTM options have, by definition low sensitivity to stock price changes.  This is from having a low delta, as I discussed in my original report, and I will return to the subject in the next section.  In addition, deep OTM options have very low prices, many near zero.  For example, the median midpoints of the bid-ask prices for calls and puts at least 50% out-of-the-money is 2.5 cents for calls and 3.0 cents for puts. The midpoint of the bid-ask prices is less than 25 cents for about 85% of the calls and 76% of the puts.  As a result of these factors, these options have inertia in that they do not respond much to price changes in the underlying stock – in many instances the prices of these options are so low there is little room for them to move to a lower price point.  This is not evidence of inefficiency. Rather, this is the way these options are supposed to behave in an efficient market.  They are like a team that is far behind that scores or falls further behind.  The team is still far behind, and one's opinion of whether that team will win the game has almost certainly not changed much at all.

81.     But remember when a call is deep OTM, there are corresponding puts deep ITM. The evidence in the table above shows that these puts respond appropriately to stock price changes.  This shows that when the stock price is well below the strike, the options market is accurately reflecting the stock price.  Likewise, when the stock price is well above the strike, we see above that deep ITM calls respond very accurately to new information in the stock price. Thus, the evidence points overwhelmingly to the fact that the options market responds to new information across a wide range of stock prices.  This is tremendous evidence of efficiency.

82.     The empirical evidence Dr. Grenadier demands is overwhelming.  The market makers appropriately adjust the quotes for all calls and puts in response to changes in stock prices with or without trading volume.

### E.     Delta and Efficiency

83.     In my April 15 report I noted the existence of the concept of an option's delta.  It measures the amount by which an option should move for a given move in the stock price.  Call deltas range from 0.0 to 1.0.  As noted in the previous section, deep ITM call options have deltas close to 1.0, and deep OTM call options have deltas near 0.0.  Deep ITM puts have deltas close to -1.0 and deep OTM puts have deltas near 0.0.  A delta of say 0.40 for a call means that the call would be expected to move about 40% of the move in the stock price.  A delta of say -0.60 for a put means that the put would be expected to move about 60% of the move in the stock price, though in the opposite direction.

84.     As I noted in that report, the concept of delta is covered extensively in option books and is widely used in industry.  Deltas are also available on the CBOE's web site for current options, the link for which I provided.  They serve as a basis for measuring and managing risk, typically through a strategy called delta hedging.  Delta hedging is standard practice for dealers. When they take on option positions to serve the public or a specific client, they take on that

party's risk.  Dealers, however, attempt to maintain a risk-free position, called delta neutrality, thereby to profit from the bid-ask spread.   Hence, if a dealer sold 100,000 call options at a delta of 0.40, one way to hedge would be to buy 40,000 units of the underlying.  The underlying has a delta of 1.0, so 40,000 long units of the underlying at a delta of 1.0 balances 100,000 short options at a delta of 0.40.   That is, 40,000 x 1.0 - 100,000 x 0.40 = 0.0.  This creates delta neutrality.

85.     The concept of delta hedging is not particularly important for this case, but I mentioned it previously and here to stress that if options do not respond to stock prices, it would not be possible to delta hedge.   Dealers could not operate if they could not hedge.  The mere existence of the concept of delta and its ubiquity in the options literature and in practice is proof positive that options reflect stock prices to a very accurate degree.

86.     It is noteworthy that Dr. Grenadier's reply report never even mentions the word "delta" in spite of my extensive discussion of it in my original report.  Clearly there is no way to refute it.

## IV.    THE COMMON METHODOLOGY FOR CALCULATING DAMAGES

87.     In my original report, I showed that a common methodology exists for calculating damages.  Specifically, I proposed the binomial American option pricing model.  I provided a very simple example of the use of that model.  A careful reading of Dr. Grenadier's reply to my report does not seem to suggest an objection to the model, but he does raise objections to the implementation of the model.  This is noteworthy in and of itself.  At this point, I understand the court requires only that it be shown that an applicable methodology exists.  It does not at this point require details, many of which cannot be determined until later in the litigation process.  In fact, I provided considerable details, but I kept the example as simple as possible.  Dr. Grenadier seems to object and raises concerns over matters that are routinely handled by any researcher or practitioner who regularly uses option data and pricing models.

88.     Dr. Grenadier claims that I have not produced a common methodology capable of estimating damages (111). He states this claim based on three points. The first is a repetition of his theory that options are not sensitive to stock prices.  His second reason is the premise that absent the fraud, option investors might have done something else.  His third reason is that I do not account for changes in implied volatility.

89.     His first reason has been thoroughly discredited in the preceding material, and I might remind the court that reflecting the information in stock prices is the very reason for the existence of options.

90.     Turning to the second, getting into the mind of the investor, starting with 114, Dr. Grenadier appears obsessed with the fact that one would need to get into the mind of the option investor to see what he might have done but for the fraud before damages could be calculated. Following his logic, no damages could ever be calculated.  Dr. Grenadier does not believe damages can be calculated without asking every investor what he would have done otherwise. This alternative universe theory of damages is not the standard that I understand courts have

followed, given plaintiffs' theory of liability and thus is not a relevant criticism of my recommended model.

91.     It is obvious from case history that this requirement has not been applied to the common stock methodology.  But for the fraud, the stock investor might have not bought the stock.  He might have instead purchased a different stock, an ETF, a mutual fund, a bond, or a treasury security.  Or he might have taken the money and bought lottery tickets or gone on a nice vacation.  The court did not appear to require that we get into the mind of an investor in common stock, and there is no reason why we must treat the option investor differently.  Importantly, both the common stock investor and the option investor bought a security at the market price and received a security of lesser value due to the misstatements alleged by plaintiffs (or in the case of the put seller, received less on the sale of the put than they should have).  Nothing about option investing changes this basic framework.

92.     Regarding his third point, Dr. Grenadier argues that implied volatility changes over time and differs across strikes (starting with his 121 and his Exhibit 3).  He goes on to state (125) that a failure to take these factors into account can raise damages.  Obviously it could also lower damages, though he does not mention this fact.  There is no inherent bias in one direction or another.  And if defendants can identify when volatility changes, clearly so can plaintiffs. I acknowledged this point during my deposition, and I am certain that volatility changes can be taken into account when calculating damages.

93.     I showed that one can use the actual price of the stock, a presumably inflated price, along with the price at which the option traded to infer the implied volatility.  This tells the user what volatility was used by the parties who did the trade.  Given the inflation estimated in the stock price, one can then reprice the option with the new stock price.  In the example I gave, I maintained the same volatility when repricing the option.  This was simply for illustrative purposes, and when asked about it during the deposition, I stated that indeed a different volatility could be used.  Such minutiae were not necessary in my report, but I will provide them here.

94.     In my report, 120, I gave an example in which the stock price is $105 the strike is $100, the option expires in two months, and the risk-free rate is 3%.  I also have the stock pay a $1 dividend in one month.  The option traded at $5.04.  Using a binomial model with 2,000 time steps, I found the implied volatility as 45%.  I then assumed that there was $10 of inflation in the stock price.  I repriced the option at a stock price of $90 and the same volatility, and obtained a call price of $1.87.  The difference in the option price with and without the fraud is $3.17.

95.     Dr. Grenadier faulted me for not showing further details, which I understand are not necessary at this stage.  In the event the court feels it needs to see more details, I provide them here.  With the but-for stock price at $90, the option has a moneyness of $90/$105 = 0.8571.  This is the new moneyness of the option with the fraud removed.  Therefore, one could use the implied volatility of an option with this moneyness and recalculate the new price.  Let us say for example that the implied volatility based on this new moneyness is 40%.  The new calculated price is $1.36, raising the damages to $5.04 - $1.36 = $3.68.  As noted, it could also

lower the damages.  There is no predicting whether the implied volatility would be higher or lower.  In addition, opposite effects would occur for a put seller - a higher implied volatility would raise damages and a lower one would lower damages.

96.     Dr. Grenadier (131) raises the question of what happens if there is not an option with this moneyness to which there is a well-known answer.  The smile is a two-dimensional graph of implied volatility plotted against moneyness.  The surface is a three-dimensional graph of implied volatility plotted against moneyness and time to expiration.  An expert knows that the implied volatility of any option with any degree of moneyness or time to expiration can be obtained by interpolation off of the smile or surface.  All implied volatility curves are smooth curves plotted across discrete points.   Trading firms routinely read implied volatilities by interpolation off of graphs.[11]  If they could not, they could never design trading strategies, as these strategies are often based on anticipated changes in volatility.

97.     Dr. Grenadier also asks another question that is easily addressed by empirical researchers in options.  In 129, he notes that I refer to using the transaction price in my example. I used that price because it is relevant when the person purchased the call or sold the put.  On any other day, he argues that there might not be a transaction price to use.  It is standard practice for researchers who work with option data to use the midpoint of the bid-ask spread.  Options researchers also know that volatility surfaces are generated using bid and ask prices.  They do not require transaction prices.

98.     In 120 Dr. Grenadier mentions that implied volatility could change as a result of the corrective disclosure.  In other words, the disclosure itself could make the company more or less risky.   He apparently believes this fact discredits any attempt to measure the option investor's loss.   Unfortunately, Dr. Grenadier fails to see the bigger picture.   All shareholder lawsuits involving losses due to a violation of Rule 10b-5 require a methodology for estimating damages to the person who bought the stock under false pretenses.  The damage estimation model for stocks is fundamentally no different than the damage estimation model for options, and those models are completely consistent with plaintiffs' theory of liability.  Some investors bought stocks and calls and some sold puts.  These investors expected that the information released by Apple was truthful and reflected in the stock and option prices.  All disclosures can alter the risk of the company and, thereby, change the parameters that go into each model. It is my understanding that the courts do not require an omniscient peek into investors' minds.  Stock

---

[11]   Graph interpolation is one of the most routine practices when using financial data.   For example, a graph of the relationship between the interest rates on a bond and their maturity, which is called either the term structure or a yield curve, is simply a curve fit across discrete points representing the maturities of existing bonds.  Rates for bonds with maturities that do not exist are obtained through interpolation.  In fact, every student of algebra learns that every graph is just a curve drawn through a set of discrete points.  It is not possible to plot an infinite set of points on a horizontal axis in order to produce a vertical axis value for every outcome, even those that do not exist.  This is basic math.  Option trading firms use pretty sophisticated math to provide the best and most accurate volatility smiles and surfaces.  Again, this is routine knowledge among experts.

damages methodology under plaintiffs' theory of liability has been found to be acceptable without consideration of how the inputs to the damages model might later change.  In other words, any stock damages model, which is subject to the same criticism, arrives at some stock price inflation, say $20.  The stock price adjustment is simple.  The new stock price is the old stock price minus the inflation.  An option damages model utilizes the same adjusted stock price and calculates the option damages using a formula appropriate to value options.

99.    Furthermore, the corrective disclosures will reveal if there is a fundamental shift in the risk of the company.  Plaintiffs are able to estimate the volatility surface before and after the corrective disclosures to determine if the risk shifted as a result of revelation of the truth.

100.    Finally, Dr. Grenadier argues, starting in 128, that the corrective disclosures may contain some information unrelated to the fraud.  As Dr. Feinstein has attested, there are ways to remove that effect, if it even is present.  This adjustment is beyond my assignment, but I do know that the volatility can be adjusted in whatever direction to which the data point.

101.    The analysis and opinions contained in this reply report are based on information available as of the date of the report.  I reserve the right to amend, refine, or supplement this report in the event that I become aware of additional information, evidence, arguments, or analyses which bear on my work on this matter.

*Don M. Chance*

DATED:  August 26, 2022

_____
DON M. CHANCE