# EXHIBIT 4

```
 1                UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                      OAKLAND DIVISION
 4
 5
 6   IN RE APPLE INC. SECURITIES
     LITIGATION.                         No. 4:19-cv-02033-YGR
 7
     _____/
 8
 9
10
11
12
13       VIDEOTAPED DEPOSITION OF DON M. CHANCE, PH.D.
14                  Remote Zoom Proceedings
15                  Baton Rouge, Louisiana
16                  Wednesday, June 8, 2022
17
18
19
20
21
22
23   REPORTED BY:
24   LESLIE ROCKWOOD ROSAS, RPR, CSR 3462
25   Pages 1 - 194                          Job No. 5262235

                                                      Page 1
```

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3                    OAKLAND DIVISION
 4
 5
 6   IN RE APPLE INC. SECURITIES
     LITIGATION.              No. 4:19-cv-02033-YGR
 7   _____/
 8
 9
10        Videotaped deposition of DON M. CHANCE, PH.D.,
11   taken on behalf of Defendants, Remote Zoom Proceedings
12   from Baton Rouge, Louisiana, beginning at 9:15 a.m.
13   Central Daylight Time and ending at 3:32 p.m. Central
14   Daylight Time, on Wednesday, June 8, 2022, before
15   Leslie Rockwood Rosas, RPR, Certified Shorthand Reporter
16   No. 3462.
17
```
Page 2

```
 1   APPEARANCES:
 2
 3   FOR THE CLASS REPRESENTATIVE, NORFOLK COUNTY, THE CLASS,
 4   AND THE WITNESS:
 5       ROBBINS GELLER RUDMAN & DOWD LLP
 6       BY: DANIEL J. PFEFFERBAUM, ESQ.
 7           SHAWN A. WILLIAMS, ESQ.
 8           KENNETH J. BLACK, ESQ.
 9           JACOB G. GELMAN, ESQ.
10       One Montgomery Street, Suite 1800
11       San Francisco, California 94104
12       (415) 288-4545
13       dpfefferbaum@rgrdlaw.com
14       shawnw@rgrdlaw.com
15       kblack@rgrdlaw.com
16       jgelman@rgrdlaw.com
17
18       LABATON SUCHAROW LLP
19       BY: CHRISTINE M. FOX, ESQ.
20       140 Broadway
21       New York, New York 10005
22       (212) 907-0784
23       cfox@labaton.com
```
Page 3

```
 1   APPEARANCES (Continued):
 2
 3   FOR THE DEFENDANTS:
 4       ORRICK HERRINGTON & SUTCLIFFE LLP
 5       BY: WILLIAM J. FOLEY, ESQ.
 6       51 West 52nd Street
 7       New York, New York 10019-6142
 8       (212) 506-5124
 9       wfoley@orrick.com
10         -and-
11       BY: JAMES N. KRAMER, ESQ.
12           TRISTAN KONSTANTIN ALLEN, ESQ.
13       405 Howard Street
14       San Francisco, California 94105-2669
15       (415) 773-5700
16       tallen@orrick.com
17       jkramer@orrick.com
18
19
20   Also Present:
21       John Pokorny, Cornerstone Research
22       Allie Schwartz, Cornerstone Research
23       Jill Warren, Videographer
```
Page 4

```
 1                      I N D E X
 2
 3
 4   WEDNESDAY, JUNE 8, 2022
 5
 6   WITNESS                          EXAMINATION
 7   DON M. CHANCE, PH.D.
 8
 9     BY MR. FOLEY                        9
10
11
12
13
14     QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
15           (NONE)
```
Page 5

2 (Pages 2 - 5)

**Page 22**

1  Upon," and it says: "I have relied on my knowledge and
2  my reading of the following documents." And then I
3  believe there are eight documents that have been
4  identified here.
5     A. Is that a question?                          09:36:53
6     Q. No. Just making sure I --
7     A. Okay. Sorry. You left it hanging.
8     Q. Yeah. How did you identify these eight
9  documents to consider in forming your opinions in this
10 report?                                             09:37:06
11        MR. PFEFFERBAUM: Objection to form.
12        THE WITNESS: I'm not sure what you mean, how
13 did I identify. I mean, they have opinions on them.
14    Q. BY MR. FOLEY: Yeah. So did you identify these
15 eight specific documents?                           09:37:18
16    A. Well, they sent me the documents, and I looked
17 at them, and I put down what I thought were the proper
18 names. They may have said, well, this is something else.
19 But that was only maybe a word or two. I'm really not
20 aware, but these are the eight documents.           09:37:37
21    Q. Sure. And when you say "they," you mean Robbins
22 Geller?
23    A. Yes.
24    Q. In addition to these documents and your
25 knowledge, did you consider anything else in forming your  09:37:58

**Page 23**

1  opinions?
2     A. No.
3        MR. PFEFFERBAUM: Objection to form.
4        THE WITNESS: But I didn't.
5     Q. BY MR. FOLEY: So you indicated that you've    09:38:12
6  been deposed five times in the past. Were those
7  depositions -- withdrawn.
8        Were that -- were those depositions in your
9  capacity as an expert witness?
10    A. Yes.                                          09:38:34
11    Q. In each of those five?
12    A. Yes. I mean, I wasn't a plaintiff or defendant,
13 if that's what you mean.
14    Q. Yeah. No, I just want to make sure that --
15    A. Right.                                        09:38:48
16    Q. I want to make sure that we're talking about
17 expert depositions.
18    A. Yes, they were.
19    Q. All right. Have you ever been deposed in
20 connection with a securities class action lawsuit?  09:38:58
21    A. No.
22    Q. Have you ever written an expert report on market
23 efficiency?
24    A. No.
25    Q. Have any of your prior expert opinions been   09:39:22

**Page 24**

1  excluded by a court for any reason?
2     A. No.
3     Q. Can you please define "market efficiency" for
4  me.
5     A. Okay. Well, you're going to have to make that  09:39:51
6  question a lot clearer because there are a variety of
7  forms and degrees of market efficiency, and you're going
8  to have to tell me to what extent you're talking about
9  market efficiency.
10        It's not just market efficiency. It encompasses  09:40:09
11 everything. So what do you mean -- what is the scope of
12 your reference to market efficiency?
13    Q. Well, in this matter you made a determination
14 regarding the market efficiency of certain options;
15 correct?                                            09:40:28
16    A. Correct.
17    Q. So I guess that's the sort of market efficiency
18 that I'm talking about, the market efficiency that you
19 used in connection with this report.
20    A. Okay. Well, I was guided by what I read about  09:40:39
21 what the law thinks about market efficiency, which is
22 information efficiency. Does information move a price.
23 Now there are academic definitions of efficiency that go
24 beyond that, have a much higher threshold.
25        But the question that appears to me to be that  09:41:02

**Page 25**

1  the law is interested in, and I base that on having read
2  all these documents -- and I also read the Supreme
3  Court's opinion on the Haliburton case -- that market
4  efficiency means that information that is relevant that
5  gets out into the public gets into the price. It moves  09:41:20
6  the price.
7         And I know in -- let me add one more thing. I
8  know when we start off defining market efficiency in a
9  classroom, we say the price incorporates public
10 information. That's kind of the first level and simplest  09:41:37
11 definition of efficiency.
12        I'm finished.
13    Q. When you say "the law thinks," what are we
14 talking about here, "the law"?
15    A. Well, I think you all operate on legal          09:41:52
16 precedent, and from what I've read, it looks like this is
17 what the law is interested in, the Court is interested
18 in. And it made sense to me because in this case, the
19 issue at question is a possible violation of Rule
20 10(b)(5).                                            09:42:10
21        Mr. Cook allegedly made a statement that was not
22 true. So it appears to me, based on everything that I've
23 heard, that if he had made the statement that plaintiffs
24 believe he should have made, the Court needs to know if
25 it would move the price.                             09:42:30

7 (Pages 22 - 25)

**Page 30**

1  Q. Yeah, no. I'm specifically speaking about
2  options here. And the question is: Is an efficient
3  market one in which prices always fully reflect available
4  information?
5      MR. PFEFFERBAUM: Objection. Form.    09:50:04
6      THE WITNESS: I think that's the same question
7  you just asked, and I want to know what you mean by
8  "always."
9  Q. BY MR. FOLEY: Well, let me ask you this: Is it
10 possible for a security to trade in an efficient market   09:50:16
11 at some point in time but not trade in an efficient
12 market at another point in time?
13 A. Well, could you just restate that?
14 Q. Sure.
15     Is it possible for a security to trade in an    09:50:33
16 efficient market at some point in time but not trade in
17 an efficient market at another point in time?
18 A. Well, if the points in time were pretty far
19 apart, like maybe the market wasn't efficient years ago
20 and then became efficient, that might depend on the point   09:50:54
21 in time. Efficient markets don't -- I mean, they don't
22 flip-flop. I mean, we do test and we define standards
23 for market efficiency, and no one is saying that at every
24 single instant in time there is perfect efficiency for
25 every security. But we do tend to conclude that either   09:51:17

**Page 31**

1  it's an efficient market, which has been concluded with
2  options, or it's an inefficient market.
3      Now maybe years later, someone updates a study
4  or something and maybe something that looked inefficient
5  might become efficient. But efficiency is a general    09:51:35
6  concept, and it doesn't mean at some point in time that
7  some stock may not reflect a piece of information as
8  rapidly. But generally speaking, it's doing it. It is
9  doing it if they conclude that it's an efficient market.
10 Generally speaking, it is processing information rapidly   09:52:00
11 and getting it into the price.
12     And it's doing it even more so today because we
13 have such easy access to information that we didn't have
14 years ago.
15 Q. You would agree that it is possible for a    09:52:12
16 company to have one security that trades in an efficient
17 market, but have another security that does not trade in
18 an efficient market; isn't that --
19     MR. PFEFFERBAUM: Objection to form. Vague.
20     THE WITNESS: It is pretty vague, but I'd be    09:52:29
21 hard-pressed to agree -- you said do you agree like, you
22 know, I should say "yes." But I'd be hard-pressed to
23 agree that, say, the stock is efficient and the option
24 isn't or the other way around. You know, that might
25 occur in a third-world market where there are impediments   09:52:51

**Page 32**

1  to information, but not in these market.
2  Q. BY MR. FOLEY: Is it possible that a company's
3  common stock trades in an efficient market but one of its
4  bonds does not?
5  A. Well, I don't know anything about bond market    09:53:03
6  efficiency. Bonds operate in a really different type of
7  market than stocks and options. Individual investors
8  don't typically go buy bonds the way they buy stocks and
9  options. So I just don't know if I could say or make any
10 comparison to bonds. It is a different type of market.   09:53:23
11 Q. It's a different type of market than options?
12 A. Yeah. There's no -- to my knowledge, there's
13 nothing called the bond exchange or whatever you might
14 call it. I do know they trade, yes. They trade between
15 institutions and all, but you know, stocks and options    09:53:43
16 trade on public exchanges, with very, very visible public
17 exchanges. I could go right now and see what the price
18 of a stock or an option is. It's a little harder for
19 bonds.
20     So I just don't think I could opine on any    09:54:00
21 comparison to bonds, and I haven't done any study or
22 reading or anything like that.
23 Q. What analysis did you perform to support your
24 opinion that Apple options traded in an efficient market?
25 A. Well, I was asked to look at the academic    09:54:45

**Page 33**

1  literature, and I did that. And then I also presented a
2  logical, rational, heuristic approach to why options have
3  to reflect the efficiency of the market. Or reflect
4  what's in the stock market, which has been deemed to be
5  efficient.                            09:55:07
6  Q. So you analyzed the literature and you --
7  A. Right.
8  Q. Let me just make sure I've got this right. You
9  analyzed the literature and you presented a logical,
10 rational, heuristic approach as to why options have to    09:55:24
11 reflect the efficiency of the market?
12 A. I -- okay. I thought you were finished.
13 Q. Did you do any other analysis to support your
14 opinion that Apple options traded in an efficient market?
15 A. I don't think there was any other analysis. It    09:55:40
16 kind of depends maybe on what you call analysis.
17 Q. When you say you don't think that there was any
18 other analysis, just expand on that a little bit.
19 A. Well, I mean I thought about it. I looked at
20 Dr. Feinstein's work. I looked at your expert's work. I    09:56:00
21 made a lot of comments on their work.
22     I was asked to -- the Judge asked whether the
23 Cammer factors were applicable. So I opined on that.
24 You're probably going to ask me some questions about that
25 later. But I guess you'd call that analysis.    09:56:21

### Page 34

1  I also put some references in there where it is
2  a fact that one of the six determinants of the option
3  price is the stock price. That is in books everywhere,
4  widely accepted. Your expert even had it in his report.
5  So if you want to call that additional analysis,    09:56:46
6  you know, I guess I did it.
7      MR. PFEFFERBAUM: Bill, I didn't get my
8  objection in. And I'm sorry. Just so we have a clear
9  record, were you asking Dr. Chance if he did any analysis
10 that doesn't appear in his report or were you -- I just   09:56:58
11 wanted us to be clear. I didn't know if you were asking
12 him that.
13     MR. FOLEY: No.
14     MR. PFEFFERBAUM: Okay.
15     MR. FOLEY: Yeah. Dan, the question was did he   09:57:09
16 perform any other analysis aside from the two things that
17 he had identified earlier in his response.
18     MR. PFEFFERBAUM: Okay.
19     THE WITNESS: And I'm saying I'm not really
20 clear on what you mean by "analysis." If that means a   09:57:22
21 thought process, yeah. I mean, I thought about a lot of
22 things. I thought about your expert's report. I thought
23 about Dr. Feinstein's report. I thought about what books
24 say.
25     That's analysis, I suppose. In my profession,   09:57:38

### Page 35

1  analysis usually means you crunch numbers and all. So I
2  don't know what you mean by "analysis." But I think I've
3  told you everything I did.
4      Q. BY MR. FOLEY: Thank you.
5      Was there any other analysis that you considered   09:57:54
6  performing in connection with this report but opted not
7  to?
8      A. No.
9      Q. The only data analysis in your report examines
10 aggregate trading in Apple options; is that correct?   09:58:11
11     A. That's correct.
12     Q. You did not do any data analysis of individual
13 options to assess where they individually traded in
14 efficient markets, did you?
15     MR. PFEFFERBAUM: Objection to form.   09:58:31
16     THE WITNESS: Yeah. I'm not really comfortable
17 answering that question because it says I'm supposed to
18 presume that options -- these individual options trade in
19 their own markets, and I can't make that presumption
20 because I don't see that as being true.   09:58:45
21     Q. BY MR. FOLEY: Well, look, the question is not
22 saying anything about what you're supposed to presume. I
23 think my only question is: Did you -- we established
24 that you did a data analyst -- analysis of aggregate
25 trading in Apple options. And I'm just confirming that   09:59:08

### Page 36

1  you did not do a data analysis of individual options to
2  determine whether they individually traded in an
3  efficient way.
4      MR. PFEFFERBAUM: Same objection.
5      THE WITNESS: Absolutely. Same objection for   09:59:26
6  me. I know I can't object, but that last thing you said
7  to whether they individually traded in an efficient
8  market, you said did I do an analysis to determine if
9  they individually traded in an efficient market. No, I
10 can't answer that question. My "no" is in reference that   09:59:42
11 I can't answer that question because I wouldn't do
12 something to determine if they individually trade in an
13 efficient market because I don't see them as a separate
14 market.
15     Now your question was okay until that very last   09:59:52
16 part.
17     Q. BY MR. FOLEY: Okay. Let me ask the question
18 without that part that you're objecting to.
19     Did you do any data analysis of individual
20 options in connection with this matter?   10:00:02
21     A. Okay, I'm good with that. No.
22     Q. Okay. Are you aware of any study that concludes
23 that options were traded in an efficient market by
24 examining trading volumes only?
25     A. I don't know of any. I mean, I put the   10:00:32

### Page 37

1  literature out there. The Judge asked to see the
2  literature. The literature looks at a lot of things.
3  And Dr. Feinstein also did an efficiency analysis.
4      But what I was trying to do by putting those
5  volumes out there was to point out that your expert had   10:00:48
6  distorted the volume numbers. And I also wanted to show
7  that Apple was the most heavily traded stock option.
8  That's not an insignificant fact, but it's not the sole
9  basis for my conclusions.
10     I'm finished. Thank you.   10:01:07
11     Q. In your view, does every option for every stock
12 trade in an efficient market?
13     A. Well, let's say that you're looking at a major
14 options exchange. And there are 16 exchanges in the US.
15 I'm not familiar with all of them. I'm pretty familiar   10:02:00
16 with the CBOE. And I have no reason to doubt that
17 they're traded in an efficient market.
18     You know, the CBOE monitors their market makers,
19 and they're supposed to quote good prices, correct,
20 reasonable prices. And I just can't see any market   10:02:17
21 inefficiency in a market like that when there is so much
22 information out there, and the only issue at question
23 here is whether the stock price is getting into the
24 option price.
25     And this is -- this has been said repeatedly in   10:02:42

**Page 38**

books. Academics don't even debate it because it's a no-brainer. But it's there in books. And whenever you teach somebody how to price an option, it's like the most important thing. And if you -- you know, if you look at an options-trading desk -- which I've visited options trading firms; I've visited the floor of the exchange -- there is so much information there, and the stock price is the most obvious piece of information.

So I can't accept the fact that in a market like that -- CBOE traded three billion contracts last year -- that bad prices are out there, and if any of them are out there, they're not predominating, and they're not going to stay out there very long.

I know that's a long answer to a short question, but that's...

Q. That is a long answer. But let me just ask: The question was: Does every option for every stock trade in an efficient market, and it sounded like your answer was "yes," but can you just confirm that for me?

MR. PFEFFERBAUM: Objection. Objection to form.

THE WITNESS: Yeah. I would say that it is largely yes, but we said this earlier. Efficiency does not mean every stock, every option, at every single point in time is always perfectly efficient.

What I'm saying is -- and I'm sorry I have to

**Page 39**

elaborate on my answer -- most of your questions are not "yes" or "no" questions. But what I'm saying is all that has to happen for me to answer that question correctly with respect to informational efficiency is the stock price has to get into the option price. And I'd say it does at the CBOE, and certainly NASDAQ and probably many of the other exchanges.

By the way, I want to add one other thing. When I said many of the other exchanges, something popped in my head here. I've never seen this in any of these court documents. There are 16 exchanges. I did see that. But that information goes through a central authority. It's called OPRA -- some people call it Oprah, some call it opera -- the Option Pricing Reporting Authority. That information is consolidated from all of those exchanges, and it's part of what you call the National Market System.

If I go to trade an option, I'm supposed to be getting the best bid and offer. So I have a hard time believing that if a price anywhere on any option were wrong, somebody else wouldn't beat it.

So yes, it's a long answer, but the system works extremely well. It consolidates information. It gets it out there. And the competition level between exchanges and the market makers is like nothing you would believe,

**Page 40**

it is so phenomenal. So that gives me confidence these markets work. They give you good prices.

Okay, I'm finished.

Q. The beginning of your response to my question you said, "Largely, yes," in response to my question does every option for every stock trade in an efficient market.

Can you think of options that do not trade in an efficient market?

A. Well, I can't name any one option in particular, but I could say maybe on some occasions, an option or two somewhere, some stock might not react as rapidly as it should. But over time that tends to get eradicated.

Because, you know, if you ignore the stock price, which is the most important piece of information. You know, it's always first on the list.

Someone coughed.

MR. PFEFFERBAUM: Apologies. That was me.

THE WITNESS: Okay. Now I've got to go back a sentence or two.

If we're thinking about the stock price getting into the option price, somewhere maybe the stock price is a little slow getting into the option price, and if it doesn't, I think it's going to be eradicated pretty quickly. Because the competition level is so high and

**Page 41**

everybody is looking at the price. It is the easiest piece of information to get, except maybe the exercise price and so forth. So it's an obvious piece of information.

Again, I mentioned third-world markets. There might be some third-world markets where things break down, but I just can't see that happening at the CBOE, NASDAQ, and really all of the other exchanges, given that the reporting goes through a central system and gets out there.

So could it happen? Yes, on occasion. Could it stick around very long? I don't see how it could.

Okay. I'm finished.

Q. BY MR. FOLEY: Okay. Thanks.

As part of that response you said: Maybe on some occasions, an option or two might not react as rapidly as it should." And then you provided the example of third-world markets.

Are there any other examples you can think of?

A. Well, I'm not going to rule out the possibility that every single option on US markets is at all times efficient. Could a price get out of line on occasion? Yes, it could. What I'm saying is it can't stay out of line. There are too many people watching this. Too many people paying attention and seeing profit opportunities.

```
 1      I walked through it.  I showed the option payoff
 2  is determined by the stock price.  The stock price has to
 3  be in the option price, and it is cited in every book.  I
 4  don't really know why that has to be so much a standard.
 5  Like I said, a lot of academics kind of think that why      10:46:47
 6  are we asking that question, and I say, well, I
 7  understand, you know, you and the law are not options
 8  experts.  You have to ask the question.
 9      But we think, well, of course it is.  Of course
10  the stock price gets into the option price.  So if that's   10:47:01
11  a standard or not a standard, I don't know, but you can't
12  take these factors.  Okay, I'll stop at this point.
13   Q.  Is it your view that any option is efficient if
14  the underlying common stock is found to be efficient?
15   A.  I think if the option is trading in a public          10:47:21
16  market, I can't imagine an exception to that.  Again,
17  maybe a third-world market.  It might be possible when a
18  new options market was established, but in the US, you'd
19  have to go back to 1973.
20      I think probably the first few months, maybe          10:47:41
21  even a year of trading.  A lot of people didn't know what
22  they were doing and all.  But we're not -- we're not
23  concerned with what was happening then, and the empirical
24  studies generally started later than that.
25      So I think it largely follows for sort of             10:47:56
```
Page 58

```
 1  developed markets.  It's not a high level of efficiency.
 2  It's just does the stock price get into the options
 3  price.  Why would we put this in every textbook?  There
 4  are -- and also in your expert's report.  There are six
 5  factors.  And why would we list stock price and list it    10:48:14
 6  first?  Because it goes into the calculus.  I'm using
 7  that term, just your thought process, your computations,
 8  of how you determine the value of the option?  It's the
 9  most obvious piece of information.
10      So largely yes.                                       10:48:33
11   Q.  And in your view, no further analysis is
12  necessary?
13      MR. PFEFFERBAUM:  Objection to form.
14      THE WITNESS:  Well, my first thought when --
15  when I was approached and asked to determine if options   10:48:46
16  markets for efficient -- typically Apple options, I first
17  thought that's going to be about a one-page report.  But
18  I have come to learn, after reading the Judge's order
19  that -- and I've come to appreciate a lot more what lay
20  people don't understand about options markets, and that   10:49:07
21  is why I took you so carefully through the basic
22  definitions and the payoffs and so forth.
23      So now I'm sort of forgetting your question.
24  But, I mean, to me as an academic and to other academics,
25  it's not even really a question.  And I guess -- and I    10:49:28
```
Page 59

```
 1  could have said to -- to Mr. Pfefferbaum and
 2  Mr. Williams, you know, this is going to be about a
 3  one-page report.  But then I got to realize, the law does
 4  need to see a little bit more.  And then I did determine
 5  that the Judge said I want to see the academic           10:49:47
 6  literature.
 7      So, yeah, I had to do a lot more that what I
 8  needed to do, but I appreciate that, you know, you all
 9  don't know.
10   Q.  BY MR. FOLEY:  Did you think it was going to be    10:49:59
11  a one-page report because in your mind, the only analysis
12  that's relevant is whether the underlying common stock
13  trades efficiently?
14      MR. PFEFFERBAUM:  Objection to form.
15      THE WITNESS:  Well, I know that Apple options       10:50:13
16  trade in NASDAQ and the CBOE and a handful of other
17  exchanges.  I mean, I know the markets.  I have a pretty
18  good feel for the markets.  I follow the markets and all.
19      And to me, it just follows.  But I know that's
20  not enough.  So I had to write more, and I had to, you   10:50:34
21  know, go through the Cammer factors and all that kind of
22  stuff.
23      So I'm sorry if I'm not quite answering your
24  question, but, you know, it first hit me as like, duh.
25  Sorry about that, but that is what I thought.  And this 10:50:48
```
Page 60

```
 1  is a foregone conclusion.
 2      So there's no way I would have submitted a
 3  one-page report, but my first thought was do I need to
 4  say more.  No, the information is publicly available,
 5  easily accessible.  It's right here at my fingertips.    10:51:03
 6      If I want to know what Apple is doing or what
 7  Apple options are doing, I just pick up my iPhone,
 8  coincidentally and all.  So to me, it just follows.  But
 9  I know you needed more.  I understand that.
10   Q.  BY MR. FOLEY:  I'm just -- I'm asking about it     10:51:22
11  follows, in your view, because Apple's common stock
12  trades efficiently.  Is that -- is that what you're
13  saying?
14   A.  Yes.  The factors that make the common stock
15  trade efficiently as that information gets out there.   10:51:36
16  It's not missed by anybody.  It's a huge number of people
17  in the market.  Those factors are in common with the
18  options market.  It's a giant financial market loaded
19  with a plethora of low-cost information.
20      So those factors do drive the option price, and   10:51:54
21  in the stock market and the options market are connected.
22  In fact, that's why they call it a derivative market.
23  They are connected.
24      Option traders are looking at the stock market.
25  If the stock market is reflecting information, then     10:52:08
```
Page 61

16 (Pages 58 - 61)

## Page 62

1 they're picking it up by virtue of looking at the stock
2 price.
3     They sit there and they look at screens, and the
4 ones on the trading floor are being fed information, and
5 it's inconceivable to me that they could miss something    10:52:21
6 so obvious as a move in the stock price. That is
7 inconceivable. But I know inconceivable to me is not
8 something I could put in a one-page report and expect the
9 Court to accept it.
10    Q. And despite what you did, you obviously    10:52:43
11 submitted more than a one-page report. In your view, the
12 remainder was icing on the cake. Nothing was -- was
13 necessary above the fact that you have determined that
14 Apple's stock trades efficiently; is that correct?
15    MR. PFEFFERBAUM: Objection to form.    10:53:09
16    THE WITNESS: Well, sort of. I mean, I know
17 that Apple's stock and Apple options trade in an
18 efficient market, but I know I can't just say that. You
19 guys are going to need more.
20    I could have said it if I were writing this to    10:53:24
21 an academic, you know. I think I could have said it.
22    Q. BY MR. FOLEY: Just to get back to Cammer and
23 Krogman for a moment, are you aware that Dr. Feinstein
24 submitted a report applying the Cammer and Krogman
25 factors to the Apple options?    10:53:43

## Page 63

1    A. Yes. I've read his report.
2    Q. Are you aware that he concluded that the Cammer
3 and Krogman factors similarly indicate that the Apple
4 options traded in an efficient market?
5    A. Yes, although I might add that I read that the    10:54:03
6 Judge said her interpretation was that some seem to fit,
7 some seemed to not fit, and some weren't clear. So I had
8 to use what Dr. Feinstein said and what the Judge said.
9    Q. Was your analysis of the applicability of Cammer
10 and Krogman influenced by the Judge's order?    10:54:29
11    MR. PFEFFERBAUM: Objection to form.
12    THE WITNESS: There was a specific term the
13 Judge used, and I actually thought this was very astute
14 because no one else had brought this up. She said
15 whether the Cammer and Krogman factors are even    10:54:49
16 applicable. So to me, that sort of opened the door to
17 raise that question, and I certainly would have raised
18 it, anyway. But I read that as you need to address
19 whether they are even applicable. And I think that's
20 what I said, is that I don't feel they're applicable.    10:55:05
21    Q. BY MR. FOLEY: Suffice it to say that you
22 disagree with Dr. Feinstein's application of these
23 factors to Apple options?
24    MR. PFEFFERBAUM: Objection to form.
25    THE WITNESS: I think that he felt he had to try    10:55:22

## Page 64

1 to address the question. And I would agree that the
2 first go-around, that's standard in securities litigation
3 cases, and we're kind of treading in new territory here.
4 And I guess he felt he had to address them. You know,
5 but it looked to me like a matter of putting a square peg    10:55:43
6 into a round hole. And I think he did the best job he
7 possibly could.
8    That's why I came along and said, look, I don't
9 think they're even applicable. And it's pretty obvious
10 that the Judge had a few doubts herself.    10:55:57
11    Q. BY MR. FOLEY: Why do you think that
12 Dr. Feinstein felt he had to address Cammer and Krogman
13 in his report?
14    MR. PFEFFERBAUM: Objection to form.
15    MR. FOLEY: What's the basis for that objection?    10:56:09
16    THE WITNESS: Oh, sorry.
17    MR. PFEFFERBAUM: Calls for speculation, lacks
18 foundation.
19    Q. BY MR. FOLEY: Go ahead.
20    A. I can't get into his brain as to why he did it,    10:56:20
21 but it's a securities litigation case. I guess this kind
22 of thing is expected. I don't know. I mean, you'll have
23 to ask him. But I can't speculate on what reason he had.
24    Q. Well, you know, all I can say is that he
25 submitted a report applying those factors and -- and his    10:56:44

## Page 65

1 report concluded that those factors indicated that the
2 Apple options traded in an efficient market. It sounds
3 like you're suggesting that he didn't really believe
4 that.
5    MR. PFEFFERBAUM: Objection to form.    10:57:07
6    THE WITNESS: I don't know whether he believed
7 that or not. I really don't. You'll have to ask him,
8 "Dr. Feinstein, are you being disingenuous here?" I
9 don't know.
10    But, yeah, I mean, I just can't say. I can't    10:57:20
11 get inside his brain on this. But I was guided by what
12 the Judge said whether these factors are even -- are
13 applicable.
14    Q. BY MR. FOLEY: And just tell me again how you
15 were guided by what the Judge said in -- in how you    10:57:36
16 drafted your report.
17    A. Well, when the Judge passed down the order
18 denying certification for options, she raised several
19 points. I know she passed down the order without
20 prejudice, and she made several points. I want to see    10:57:57
21 the academic literature. I want you to address -- I
22 should rephrase that a little bit because she wasn't
23 saying they had to -- to, you know, reapply for
24 certification, but she said you do need to show me the
25 academic literature, and I want to know whether these    10:58:18

**Page 78**

1  got to adjust the bid-ask spread to reflect that fact.
2  He doesn't get as much business. He's -- he's there
3  doing his job for six-and-a-half hours a day. He's got
4  to make a decent rate of return. If he can't make the
5  kind of return he can make in the stock market, maybe he  11:16:28
6  should go over and be a stock market maker. So he's got
7  to adjust that bid-ask spread to cover his cost and make
8  a return.
9      Another factor is the option price is a lot
10 lower than the stock price. So if you think of a stock  11:16:36
11 that's $50, let's say, the option to be $50. It has to
12 be $50 in the money. But the option price, you know, may
13 be, I don't know, $10 or $8 or something like that, he's
14 got to adjust for that. So he's got to make a decent
15 rate of return on his investment of his knowledge and his  11:16:57
16 time and also his money. So he's got to adjust that
17 bid-ask spread upward.
18     Q. I think a few minutes ago you mentioned that
19 Dr. Feinstein's report was creative regarding the
20 analysis of options; is that right?  11:17:27
21     A. Yeah, that was the word I used, yeah.
22     Q. Can you tell me in what way Dr. Feinstein was
23 creative in the options?
24     A. Sure. I'm happy to do so.
25        We are shifting the subject a little bit. I  11:17:41

**Page 79**

1  don't know, are you okay with that? Because I'm going to
2  shift to the put call parity analysis he did.
3      Q. Sure. Go ahead.
4      A. Okay. So Dr. Feinstein had done an event study
5  with the stock, I think it was, and I think he felt like  11:17:57
6  he needed to show that the options market was reacting to
7  the same information. Because he was getting it through
8  the stock market.
9         So he created a synthetic share of stock based
10 on the options, the put call parity. And I know you or  11:18:13
11 somebody actually said, well, has that ever been done
12 before? And again -- like in academia. And again, I
13 turn -- I go back to what is said a little bit earlier.
14 Academics don't even ask this question.
15        When academics studied market efficiency years  11:18:35
16 ago -- and, you know, I cited about 15 or so papers on
17 that -- they take large samples. They don't take a
18 single -- nobody cares in academia whether one stock is
19 efficient. But you all care. I get it. You need to
20 know about Apple. And you don't care whether Facebook is  11:18:51
21 efficient or IBM or whatever. You care about Apple.
22        So you've got to do something with Apple. And
23 that's not easy to do. You don't have as much
24 flexibility with one stock as you do with a large sample.
25        So I had -- I thought about this and I said,  11:19:07

**Page 80**

1  that's pretty creative to use put-call parity to come up
2  with an implied stock price and then do an event study
3  with the implied stock price. And the more I thought
4  about it, the more I liked it.
5         Now you guys criticized it a bit, you know, when  11:19:27
6  you said it hadn't been done before. And someone said,
7  well, isn't that a European option pricing model?
8  Actually, I want to say a couple things about that
9  criticism. Because it is obvious thing I'm sure popped
10 in the head of whoever's advising you.  11:19:47
11        The price of an American option has two
12 components. It has its price as a European option, which
13 it is, and it also has a premium. It's called early
14 exercise premium. You can't get that with put-call
15 parity. But that early exercise premium is driven by the  11:20:05
16 stock price.
17        It's my opinion if he had been able to do it --
18 and he couldn't do it, but he had been able to do it,
19 he'd have probably got stronger results.
20        So he put that out there and did an event study,  11:20:15
21 and he got just about the same results.
22        By the way, one other thing I meant to say about
23 the European options, because you all were criticizing
24 European options. I just saw this. European options do
25 trade every day. They cannot be exercised until  11:20:34

**Page 81**

1  expiration.
2         Mr. Kramer told the Judge they don't even trade
3  to expiration. So I just want to get that on the record.
4         Now I don't actually think it's a huge factor
5  here in what I'm saying right here, but I did want to get  11:20:46
6  it on the record. They do trade every day. They're
7  European options. S&P 500 is an European option. Okay.
8      Q. Apple options are not European, though; right?
9      A. Right, right.
10     Q. And you would agree that American options do not  11:21:02
11 necessarily satisfy the European put-call parity format?
12     A. Well, they -- a European option is subsumed
13 within an American option. It is going to account for
14 most of the value of the option. And Dr. Feinstein was
15 asked this question, and he commented on it, and I agree  11:21:22
16 with what he said. It's a second-order effect.
17        But you know something, he got -- you know, he
18 set up a test that was actually pretty hard to find the
19 result that I know he wanted. For one, remember he did
20 four earnings announcements? Earnings announcement --  11:21:43
21 let me finish here. Earnings announcements don't
22 automatically result in a stock price jump. It depends
23 on whether the -- the earnings are, you know, different
24 from what people affected.
25        So he set up a pretty high threshold for whether  11:22:01

**Page 82**

1 he could get the result that I know he wanted, which was
2 the implied stock price is doing almost exactly what the
3 actual stock price is doing. It is picking up the
4 response.
5     So I thought that was pretty creative, and I    11:22:20
6 liked the fact that he -- he established a tough test,
7 and it passed the test. The more I think about that, I
8 like it.
9     Q. Do you know what result Dr. Feinstein wanted?
10    MR. PFEFFERBAUM: Objection to form.    11:22:35
11    THE WITNESS: I didn't hear all of it. What did
12 you say?
13    Q. BY MR. FOLEY: How do you know what -- what
14 result Dr. Feinstein wanted?
15    MR. PFEFFERBAUM: Same objection.    11:22:45
16    THE WITNESS: Well, I would assume Dr. Feinstein
17 wanted to find evidence the stock price was moving and
18 that the synthetic stock price was moving. It doesn't
19 really matter what he wanted. It's just what he found.
20 It is what it is. He found that the stock price was    11:23:02
21 responding and the synthetic stock price was responding.
22 Whether it's what he wanted or not, that doesn't even
23 matter. But I would just assume he wants to demonstrate
24 that the market is efficient.
25    Because he, like other academics, we know it's    11:23:15

**Page 83**

1 efficient. We just need to put something out there in
2 front of you that proves our point, but we know it. It's
3 a no-brainer.
4     Q. BY MR. FOLEY: I'm just -- I'm just trying to
5 figure out why you assume he -- why you assume he wanted    11:23:31
6 to demonstrate that the market was efficient.
7     A. Well, I don't necessarily know. I'm just going
8 to give you the same answer I said. But his task was to
9 show the market was efficient, and he knew the market was
10 efficient because he's an academic.    11:23:54
11    So I would assume that he would believe this
12 test should show the market is efficient, and it will do
13 what you all want to see. I don't know whether his --
14 internally he said, gosh, I hope we get this result. He
15 probably didn't. We don't tend to do that, but it    11:24:13
16 doesn't even matter. He put up a very high hurdle to
17 pass, and it passed.
18    Q. Are you familiar with Cammer Factor 5?
19    A. I don't know them by their numbers so you'll
20 have to tell me what that is.    11:24:45
21    Q. It's that prices react to new value relevant
22 information.
23    A. Well, that's the whole usual issue.
24    Q. Usually in an event study?
25    MR. PFEFFERBAUM: Object to form.    11:24:57

**Page 84**

1     THE WITNESS: I mean, that's our -- our
2 definition of efficiency for this -- you know, for this
3 procedure. For this trial, I guess I should say.
4     Q. BY MR. FOLEY: Is it your opinion that that
5 factor does not apply to options?    11:25:15
6     MR. PFEFFERBAUM: Objection to form.
7     THE WITNESS: Well, that factor is relevant,
8 highly relevant.
9     Q. BY MR. FOLEY: Okay. But you did not test
10 whether there was a cause-and-effect relationship between    11:25:30
11 new information and option prices; right?
12    A. No, no. I was satisfied that Dr. Feinstein had
13 done that. There was nothing I could add to it.
14    Q. Okay. And if you had wanted to go about doing
15 so, how would you have done it?    11:25:49
16    A. That's pretty speculative. I don't know. I
17 mean, nobody asked me to do it. Nobody asked me to check
18 what he had done. I'm not sure. I know he pointed out
19 correctly that you can't do a traditional event study
20 with options, you know, where you -- he said that the    11:26:05
21 parameters of the option, the -- it's the parameters of
22 the distribution, this changes constantly so you can't do
23 a traditional event study.
24    And if I had been asked -- if I had been hired
25 instead of Dr. Feinstein, I don't know, but I would have    11:26:21

**Page 85**

1 thought about it. And I'm not sure what I would have
2 done, but I probably would have come up with something.
3 There might be some other ways to do it. I don't know.
4     But you know what he did, I think, worked very
5 well. You know, the R squared -- that's a measure of    11:26:38
6 your regression statistic -- that he got was very similar
7 in the option regression to what it was in the stock
8 regression. I'm not actually sure that was pointed out
9 earlier. And I thought, well, that looks like you're
10 picking up the same thing.    11:26:54
11    Q. I'm going to point out two partial quotes from
12 your report. And obviously, I'm happy to point you to
13 them if you think that's necessary. And by the way, that
14 is continuing. If at any point, if I quote you, just let
15 me know if you'd like to see it, and we'll pull it up.    11:27:16
16    A. Sure. If it's not too long, you can read it.
17 If it is, I'll let you know.
18    Q. These are fairly short.
19    You opined that options markets -- sorry.
20    You opined that options make the stock market    11:27:28
21 more efficient and that an options market can make a
22 stock market more efficient only if it is efficient
23 itself.
24    Does that sound right to you?
25    A. Yeah, that sounds right.    11:27:43

22 (Pages 82 - 85)

**Page 86**

Q. Okay. What is your basis for the notion that options can only make a market more efficient if they are efficient themselves?

A. Well, I think I've got -- you raised two points. I think you made two quotes. I need to go back to the first quote in order to answer your question, but I will do it.

Options markets can make the stock market more efficient. They can process information faster than the stock market. I know there was some academic studies that I cited on this, but they can process information faster than stock markets because we don't take as much capital to, you know -- to invest in an option. That's always been the theory.

And when information gets into a market, a derivative market, before a primary market, that's not unusual. They have a term for it, by the way, kind of a humorous term. It's called the tail wagging the dog.

But if the options market is -- is not efficient itself, it can't help the stock market become more efficient. That was the second quote. If the options market is not picking up the information, then it can't help the stock market.

If it is picking up that information, stock market investors could, if they're paying attention to

**Page 87**

the options market, they could see, hey, the options market has moved before the stock has moved. Hey, something's going on. So that can happen.

I would say -- you know, those studies go back a lot of years. I would say it's difficult today for that to happen because we're just, you know, bombarded with information. It's hard for anybody to miss information.

But back then, you know, some of the papers said that the option can make the stock more -- it can make it react. I don't know if it can do it. In fact, I know it can't do it if it's not reacting itself. All right.

Q. And so -- so your view is that the options market's quicker reaction to value relevant information is what makes the stock market more efficient?

MR. PFEFFERBAUM: Objection to form.

THE WITNESS: It could. It could if that happens.

Q. BY MR. FOLEY: If that happens?

A. Yeah. And that -- there is some evidence of that happening. There's some evidence that it could go the other way. The delays -- and they're not all that much. It wouldn't matter much to people like us.

But I just -- I have a hard time believing there's much of a difference in this day and age because of the way information flows and is right here at our

**Page 88**

fingertips. But yeah, it could make the stock market more -- by "more efficient" just means make it react a little bit faster.

Q. Is -- is the speed of the reaction the primary driver of efficiency?

MR. PFEFFERBAUM: Objection to form.

THE WITNESS: Yeah. Like I don't know that there's any definition, and I know the law hasn't said anything from what I've read about how fast something has to react to be efficient.

There are some traders who can execute trades so fast that, you know, they might be able to take advantage of -- of a little bit of slowness, but there's no formal definition of how fast something has to be to be efficient.

That's another problem, which is -- you know, I've criticized some of the standards that have been applied as, you know, what's the cutoff? And that's hard to say. The cutoff has got to be a little shorter today than it used to be years ago. Because, boy, information was really slow getting out years ago.

Q. BY MR. FOLEY: So in your report, you state that the market for Apple options is an integrated market that is unified by one critical factor, the underlying stock price.

**Page 89**

And so my question is: What does it mean for a market to be integrated?

MR. PFEFFERBAUM: Bill, can you just point me to the paragraph that you were referencing?

MR. FOLEY: Yeah, sure, Dan. Paragraph 12. It's the summary of opinions.

MR. PFEFFERBAUM: Thank you.

THE WITNESS: Is there an option? Should I proceed?

MR. PFEFFERBAUM: You can proceed. I just wanted to make sure I was following along in your report.

THE WITNESS: Okay.

When I say the options market is an integrated market, it's a term that gets used a lot in the financial world. Integrated markets are markets that are connected. All these options are connected not only to each other, but they are connected to the stock. The stock is the common factor in every option. I know that got pointed out many times by Dr. Feinstein, that they have this all in common.

And I want to point out -- kind of give you an example of integration within the market. And I'll have to explain how market makers work.

So, let's say, Mr. Foley, I'm going to make you a market maker here. You're a market maker in an option,

```
 1  explanation.  I didn't just throw that out there without
 2  support.
 3        Options markets trade off of the stock market,
 4  and the value of the option is driven by the price of the
 5  stock.  And if they're not reflecting the stock market,                12:01:45
 6  as I pointed out, somebody's going to take advantage of
 7  an options trader.
 8        These options trader -- and it's really anybody
 9  in the options market that wants to put a bid or an offer
10  out there, they've got to be up to date on the stock                   12:01:59
11  market.  Somebody is going to take advantage of them.
12  And it's the kind of mistake that when you make it, you
13  lose money and you learn real fast from those mistakes.
14        So, yeah, it's got to.  It's got to reflect.
15  And one other thing that's really important is that stock              12:02:14
16  price is an extremely obvious piece of information.  You
17  can't miss it.  People trade options, they're not just
18  sitting there surfing the web and all that.  I mean,
19  they're paying attention to the underlying stock.  So,
20  yeah, that's what I mean.  They've got to.                             12:02:38
21     Q.  And you did not do any empirical analysis to
22  confirm this statement, did you?
23     A.  I don't need to.  But no, I didn't.
24     Q.  In connection with your report, did you actually
25  test whether the market for Apple options reflected                    12:02:56
                                                                          Page 98
```

```
 1  information in the stock price?
 2     A.  You asked me earlier if the report contained
 3  everything, and I said it contained everything that I
 4  did.
 5     Q.  And so the answer to that question is "no"?                     12:03:10
 6     A.  Did I directly test the efficiency of the Apple
 7  options market?  In some sense, I did, in that I drew
 8  conclusions that were based on logical reasoning, but I
 9  didn't do an independent formal statistical test.  That's
10  already been done.                                                     12:03:30
11     Q.  And when you say it's already been done, it's
12  already been done by Dr. Feinstein?
13     A.  Well, I'm also including the academic
14  literature.
15     Q.  Does the market for a long shot                                 12:04:21
16  far-out-of-the-money option rapidly reflect the
17  information provided in the price of the stock?
18     A.  Well, I think it does, but I think you've got to
19  make sure you understand that these long-shot options
20  have very, very low deltas.  So they're not going to                   12:04:37
21  react very much, but that's consistent with what they're
22  supposed to do.
23        It's kind of like -- to give you analogy, it's
24  kind of like a sporting event, a long-shot option is like
25  a team that's way behind or favored to lose a lot, so if               12:04:53
                                                                          Page 99
```

```
 1  you're watching the game and they score and they're still
 2  way behind, well, that didn't really change your
 3  perception of what's ultimately going to happen.
 4        So they're efficient oftentimes by not reacting
 5  very much.                                                             12:05:10
 6     Q.  Explain that, that last sentence, they're
 7  efficient by not reacting very much.
 8     A.  Yeah, yeah.  And I go back to the sports analogy
 9  that your perception of who's going to win the game, a
10  team is way behind and they score, they're just a little              12:05:26
11  bit closer.  Your perception didn't change.  That option
12  has got to have value based on expectations of what's
13  going to happen over the remaining life of the option and
14  the likelihood that it's going to expire in the money.
15        And that likelihood did not change notably -- if                12:05:44
16  it didn't change notably, like if the piece of
17  information -- like if the stock moved a lot, which it
18  rarely does, but if it moved a lot, that might be
19  different, and the option will move accordingly.  But
20  these deep out-of-the-money options are not going to move             12:06:03
21  very much until they get a lot closer to being near the
22  money.
23        And that's efficient.  If they were moving, that
24  would be -- that would be wrong.  They have -- those
25  deltas are very, very low for a reason because these                  12:06:18
                                                                         Page 100
```

```
 1  movements in the stock aren't materially affecting the
 2  likelihood that the person who buys that option is going
 3  to end up with some money, you know, exercising it for
 4  value.
 5     Q.  So if a lack of movement for a                                  12:06:34
 6  far-out-of-the-money option is consistent with
 7  efficiency, how could you establish inefficiency for a
 8  far-out-of-the-money option?
 9     A.  Well, I think I just said if they did move by a
10  lot, that would be an example of inefficiency.  Like if               12:06:52
11  they moved inconsistent with their deltas and gammas,
12  that would be indicative of inefficiency.  They'd be
13  behaving a bit irrationally.
14     Q.  So in near-to-the-money option -- so let's
15  consider a nearer-to-the-money option, in order to                    12:07:13
16  establish that such an option reflected information in
17  the stock price, you would look for movement; is that
18  correct?
19        MR. PFEFFERBAUM:  Objection to form.
20        THE WITNESS:  I'm not sure I understand the                     12:07:33
21  question.  They have larger deltas, you know.  An
22  at-the-money option, sort of -- there's sort of a rule of
23  thumb that you think of these deltas at point five.  In
24  the market, by the way, that's called 50, 50 delta.
25     Q.  BY MR. FOLEY:  Right.                                          12:07:51
                                                                         Page 101
```

26 (Pages 98 - 101)

**Page 110**

1  options?
2      A.  Yeah, I have, yeah.  In fact, we used it a few
3  years ago in a paper.  It's fairly recent.
4      Q.  Do you recall the name of the paper?
5      A.  I don't recall the name, but it's on my CV.   12:19:52
6  Goes back just a few years.  And it was pricing options
7  on -- it was testing covered call strategies on the SPY.
8  Now I need to explain what that is.
9          The SPY is the option on the SPDR -- and I've
10 got to explain what that is -- ETF.  And by SPDR, by the  12:20:15
11 way, is spelled S-P-D-R.
12     Q.  Uh-huh.
13     A.  Yeah.  And that's the ETF, which is the Exchange
14 Traded Fund on the S&P 500.  And those options are
15 American options.  The actual options on the S&P 500 are  12:20:32
16 European options.
17         But the paper on the SPDR options.  And yeah, we
18 used the binomial model.  I wouldn't try to use anything
19 else.
20     Q.  Just you said it was a few years ago.  Do you    12:20:50
21 have -- can you give me a rough estimate of the date of
22 the publication of this one?  Because I'm looking at your
23 published articles and nothing is jumping out to me.
24     A.  Okay, look -- look for The Journal of
25 Derivatives.  Journal of Derivatives.                    12:21:06

**Page 111**

1      Q.  Uh-huh.
2      A.  And it probably goes back two years or something
3  like that.
4      Q.  Okay.  Was it covered calls on the S&P 500?
5  Were you thinking an anomaly?                            12:21:19
6      A.  Yeah, that's it.
7      Q.  Okay.  Thank you for that.
8          Have you used the binomial model to price
9  options in connection with other published research,
10 aside from that article that we just discussed?          12:21:28
11     A.  Well -- bless you.  I can't really remember.  I
12 do a lot of research in a lot of areas, and I've been
13 doing it for 40 years.  But I do know that any time I get
14 a situation where it's an American option, that's my
15 go-to model.  And I just wouldn't do it another way, you  12:21:46
16 know.
17         And if I saw someone else doing it that -- you
18 know, some other way, I would try to stop them because
19 it's not that hard to use the binomial model.
20         I will say one other thing.  Back in the -- I    12:22:05
21 want to call it the olden days of the '80s and '90s when
22 computers were slow, a lot of people using the binomial
23 would -- model would find out this is just taking too
24 long to do computations so somebody would try to cut
25 corners, use the Black-Scholes model, and could have used  12:22:24

**Page 112**

1  the binomial model.
2          But nowadays, the computer power that you have
3  even on your phone is just amazing.  So, you know, when I
4  review papers -- you know, we referee papers, you know,
5  submitted journals and all, and if they don't use the    12:22:40
6  binomial model for American option pricing, I'm going to
7  ding them.  I'm going to say, look, I'm not going to
8  accept this paper, but you know, I'll reject it without
9  prejudice perhaps.  You can go back and fix this.
10     Q.  Have you ever done that before?                  12:22:56
11     A.  Yeah.  I don't think it's been recent, but yeah,
12 I've told people you're using the wrong model.  I mean,
13 I've been refereeing papers for 40 years.  I couldn't
14 pinpoint when I said that, but it seems like I have.
15 I've seen people try to do that.                         12:23:14
16         Now sometimes I might -- you know, if I'm
17 teaching or something, I need to teach the Black-Scholes
18 model.  I need to show a point that the early exercise is
19 irrelevant.  You know, I might cut a corner there just
20 for instructional purposes, but I always give them the    12:23:26
21 admonishment that, look, you can't go out and do this.
22 You can't take this without making an adjustment.
23     Q.  And just to be clear, we're talking about
24 published research by academics; correct?  When you're
25 talking about dinging folks where you're refereeing.     12:23:42

**Page 113**

1  We're not talking about students here; we're talking
2  about peers?
3      A.  Yeah.  It's like if an article is submitted to
4  me to review.  So, I mean, I wouldn't say it's published
5  research because it's not published yet, but that's the  12:23:58
6  objective, is to -- to get it published and all.
7          So I have that standard that if you're going to
8  publish research on option prices, then I would expect
9  you'd use the binomial model.
10     Q.  Have academics created other option pricing      12:24:15
11 models that are more complex or realistic than the
12 binomial model?
13         MR. PFEFFERBAUM:  Objection to form.
14         THE WITNESS:  Well, they have definitely created
15 more complex models.  Whether they're more realistic or   12:24:29
16 not is hard to say.  And I mentioned this a little bit
17 earlier.  I know we talked about the model a little bit
18 earlier for obvious reasons.
19         What I'm looking for here is something that has
20 emerged, is widely understood and widely accepted.  So a  12:24:47
21 lot of academics going off and building models that have
22 a variety of features.  And the prob -- and they've been
23 doing it for years.  The problem is I don't think any one
24 model has emerged.  Like this is the dominant model.
25         And the problem with some of these other models  12:25:06

**Page 114**

1  is they require additional parameters, you know, to try
2  to capture other effects, and that introduces a lot of
3  other noise and judgment in the process.
4      And I know that I could have gone off and
5  recommended a far more sophisticated model. I think that  12:25:21
6  would look suspicious. I don't want the Court to think
7  I'm trying to pull a fast one and try to get the damages
8  number up -- I don't know whether they would be higher or
9  lower. I just don't.
10     What I look to be what I believe to be the  12:25:36
11 industry standard model, that when you see numbers on a
12 screen or you buy data or whatever, we know what model
13 they're using because it is widely accepted. That
14 doesn't mean academics aren't off trying to topple it,
15 but nobody's been able to do it.  12:25:52
16     Q. BY MR. FOLEY: You said that you could have
17 recommended a far more sophisticated model for this case,
18 but you didn't do so. What other sophisticated models
19 could you have proposed for this case?
20     A. Well, like I said, there's a lot of research out  12:26:13
21 there, been going on for a lot of years, that have looked
22 at a lot of other features. Like, say, there's
23 non-normal distributions. Or it's really log normal, I
24 should say.
25     But things like stochastic volatility, tail  12:26:28

**Page 115**

1  risk, jump risk. They've used models that have
2  incorporated the gamma distributions and plus zone
3  distributions. And I know these things sound way over
4  everybody's head, except maybe some of the Cornerstone
5  experts and all.  12:26:46
6      But, yeah, they've been working on them for
7  years and years. So there's all sorts of features you
8  can tweak these models with, but like I said, nothing is
9  really emerging and it's nothing that the industry has
10 appears to have adopted. And I just know if I tried to  12:27:02
11 do something like that, that would look so suspicious.
12     Q. Would there have been any benefits to using the
13 more sophisticated pricing models?
14     MR. PFEFFERBAUM: Objection to form.
15     THE WITNESS: What do you mean by "benefit"?  12:27:16
16     Q. BY MR. FOLEY: Well, you talked about how you
17 considered or you could have used a more sophisticated
18 model and ultimately opted not to. And so my question
19 is: Would there have been any sort of -- would there
20 have been any benefits to using a different model instead  12:27:44
21 of the binomial model?
22     A. I don't think so. It would been a lot more
23 complicated. You know, when you question or when you
24 think about benefits, you think about cost. I didn't
25 spend much time thinking about this because I believe the  12:28:01

**Page 116**

1  Court needed to see a relatively standard model.
2      So I'm not suggesting that I, you know, pulled
3  up a bunch of models and said, you know, you could have
4  used this, I could have used this, I could have used
5  this.  12:28:19
6      I just -- you know, if there's a model that has
7  emerged, I don't know what it is. And I'm pretty sure no
8  single model has emerged. And they're all so much harder
9  to use, they require so much more judgment that to me,
10 those are costs that if there are any benefits, they  12:28:34
11 outweigh the benefits.
12     Q. What is the basis for your belief that the Court
13 needed to see a relatively standard model?
14     A. That's kind of hard. I think the question
15 almost answers itself. A standard model means what the  12:29:12
16 industry views as kind of the -- it's hard to describe
17 the standard without using the word "standard," but
18 relatively widely used, accepted.
19     I can't imagine the Court would want something
20 that's not relatively widely used and accepted. I keep  12:29:30
21 coming back and saying the same thing. But I could
22 imagine if I tried to propose something else, I would
23 open the door to all sorts of criticisms, and they'd
24 probably be valid.
25     Q. What sort of criticisms might -- might you have  12:29:45

**Page 117**

1  opened the door to if you had used a different model?
2      MR. PFEFFERBAUM: Objection to form. Objection
3  to form.
4      THE WITNESS: Using a model that's not widely
5  accepted, not widely agreed on, that requires a lot of  12:29:56
6  additional parameter estimation, which is grounds for --
7  which requires a great deal of judgment and statistical
8  estimation.
9      I cannot imagine the Court and defendants not
10 having a lot of objections to that. I would never try to  12:30:16
11 do something like that, that wasn't reasonably simple,
12 understandable, and fairly widely accepted.
13     Q. BY MR. FOLEY: Does the binomial model price all
14 options well?
15     A. What do you mean by "all options"?  12:30:40
16     Q. Well, the sort of complete range of options.
17 Options that are sort of near to the money, options that
18 are far out of the money, options that are at the money?
19     MR. PFEFFERBAUM: Objection to form.
20     THE WITNESS: Well, yes. Now one of the things  12:30:58
21 that I never got to talk about is the implied volatility.
22 When you use the implied volatility, the market value is
23 the option. When you use the implied volatility, you
24 force the model to price the option correctly.
25     Now that can be done with any model, although  12:31:16

**Page 118**

1 it's more complicated with other models. But you're
2 forcing the model to price the option correctly. There's
3 no reason to believe the binomial model doesn't work
4 well. I mean, it's used by -- you know, I gave you three
5 data providers, and they said they use it, and they        12:31:30
6 provide information on a whole range of options like you
7 said.
8      They don't say, well, hey, we use a different
9 model when it gets deep out of the money. You know, I'm
10 pretty sure they don't because they didn't say that.      12:31:44
11     Q. BY MR. FOLEY: So you're not aware of any
12 problems with using the binomial model for pricing
13 far-out-of-the-money options?
14     MR. PFEFFERBAUM: Objection to form.
15     THE WITNESS: I'm not aware of any problems --   12:32:00
16 and actually, pricing far-out-of-the-money options is
17 pretty simple. I mean, they're pretty close to zero.
18 Likewise, far-in-the-money options, they're pretty close
19 to the difference between the stock price and the
20 exercise price. Some ways, those are easier options to   12:32:15
21 price, with or without a model.
22     Q. BY MR. FOLEY: I'm going to read from your
23 report again, Dr. Chance. Paragraph 14.
24     "Option traders who do not price the option
25 correctly and rapidly absorb new information into the    12:32:48

**Page 119**

1 price will be exploited. This exploitation, referred to
2 as arbitrage, is the glue that connects the options
3 market to the stock market."
4      What does a wide bid-ask spread mean for the
5 ability to take advantage of an arbitrage opportunity?   12:33:11
6      MR. PFEFFERBAUM: Objection to form.
7      THE WITNESS: Yeah. I'm not sure what you mean,
8 either.
9      If the bid-ask spread suggested that somebody
10 like you or I could not -- you know, let me back up a    12:33:27
11 second.
12     Those bid-ask spreads that you see, those are
13 the public quotes, and the OPRA system supposedly is
14 showing you the best quote. That's what it's supposed to
15 do, and I think it does most of the time.                12:33:43
16     If the bid-ask spread -- if you saw an option
17 price that you thought was off, but the bid-ask spread
18 would absorb the cost of exploiting that, then, you know,
19 that couldn't be -- you could not take advantage of it.
20     It is -- this can be hard for people like us to   12:34:02
21 do it. But, you know, market makers can trade inside the
22 bid-ask spread. And there are some institutions that
23 have access to inside quotes. There's like that's the
24 term for it, is inside quotes.
25     And I think if a market maker is quoting prices   12:34:17

**Page 120**

1 that are really bizarre or not realistic, I can't imagine
2 they wouldn't be exploited. But it is hard for people
3 like us to do it because we do have the -- the -- you
4 know, the public quotes. We have to deal with the public
5 quotes. But that's only really going to be on the widest   12:34:40
6 situations and, you know, widest bid-ask spreads and the
7 low volume and so forth.
8     Q. BY MR. FOLEY: As the bid-ask spread gets wider,
9 does it get more difficult to take advantage of an
10 arbitrage opportunity?                                    12:34:59
11    A. Yeah, for public investors, it's definitely
12 harder.
13    Q. So if transaction costs are large, would that
14 mean that some arbitrage opportunities may not be worth
15 exploiting?                                               12:35:18
16    MR. PFEFFERBAUM: Objection to form.
17    THE WITNESS: Again, I want to say for you and
18 me, for the public. But, you know, let me add something
19 to that. I know you're about to say something, but let
20 me add one more thing.                                    12:35:35
21    People like you and me are not arbitragers. The
22 arbitragers are the big institutions. The market makers
23 can even do arbitrage as well. And as I said, they have
24 access to better quotes than we have. You know, those
25 wide bid-ask spreads are a little bit misleading. And I   12:35:50

**Page 121**

1 know you all talked about that. I read about it in, I
2 think, Dr. Feinstein's deposition.
3     So, yeah, but don't expect, you know, us to be
4 arbitragers, but there are plenty of arbitragers out
5 there.                                                    12:36:09
6     Q. BY MR. FOLEY: Do you market makers never face
7 wide bid-ask spreads?
8     A. Well, I don't know. I mean, they're offering
9 bid-ask spreads. They're quoting wide bid-ask spreads.
10 We talked a little bit earlier about why they're doing    12:36:22
11 that. But they do have opportunities to trade within the
12 bid-ask spread. And I -- you know, nobody really knows.
13 Nobody, to my knowledge, is really tracking, okay, here
14 was a bid-ask spread at, you know, what is it? My time,
15 it's, what, 12:38 and 19 seconds, something like that.    12:36:41
16 I'm not aware of data that that's granular. So there's
17 no way to really know that.
18    Q. Now you didn't -- you didn't perform any data
19 analysis to check if there were arbitrage opportunities
20 in the Apple options, did you?                            12:37:22
21    A. Obviously, no.
22    Q. So Dr. Chance, I'm going to ask you a few
23 questions about Section 10 of your report, which begins
24 on page 18. You know, I'll do my best to read the
25 pertinent stuff to you, just so you know, that's where -- 12:38:13

**Page 182**

1  MR. PFEFFERBAUM: Objection to form.
2  THE WITNESS: Yeah. People have different
3  perceptions of the volatility.
4  Q. BY MR. FOLEY: Is that the only -- is that the
5  only --                                              15:05:30
6  A. Well, I mean, yeah. You know, it's 40 percent
7  today, maybe it's 42 percent tomorrow. Things change.
8  Yeah. I mean, you know, there's no question if you
9  looked at the numbers that, you know, implied volatility
10 can and does change.                                  15:05:49
11  Q. Earlier you said that the model can accommodate
12 any change in response to the but -- but-for disclosure.
13 How could the model accommodate that?
14  A. Yeah, anything that might change will be
15 revealed by the market. You can find that out if it does   15:06:17
16 change, and it takes the corrected disclosures, of
17 course, to do that. But if it reveals the volatility has
18 changed -- and I didn't want to make any assumptions in
19 illustrating it, but I said that the model can
20 accommodate it, if you -- you know, an example I gave,   15:06:36
21 you just took the implied volatility. But if it turned
22 out to be that it changed, you could put a different
23 volatility in there.
24  There is -- that's one of the beauties of the
25 model. Actually, most models have that same feature, is   15:06:51

**Page 183**

1  that they're pretty generalizable to these factors, and
2  what happens in the market, you know, can be determined
3  and can be accounted for in the model.
4  Q. Did you -- did you provide any analysis to
5  support your claim that the actual implied volatility is   15:07:27
6  the correct value to use in calculating option inflation?
7  MR. PFEFFERBAUM: Objection to form.
8  THE WITNESS: I want to make sure I got the
9  question right. Did I provide any what support?
10  Q. BY MR. FOLEY: Did you provide any analysis to   15:07:46
11 support your claim that the actual implied volatility is
12 the correct value to use in calculating option inflation?
13  MR. PFEFFERBAUM: Same objection.
14  THE WITNESS: That was an illustration, and I
15 acknowledged that that illustration, that application of   15:08:01
16 the illustration can be adjusted. I just needed an
17 illustration.
18  And by the way, I might point out that if you
19 adjust that implied volatility, it's going to push the
20 numbers in one way for calls and push the numbers in   15:08:17
21 another way for puts. And I didn't actually show puts,
22 but I would assume that would be apparent from there,
23 from what I did.
24  But I acknowledge that the -- excuse me, but
25 I -- yeah. I acknowledged that you can accommodate   15:08:29

**Page 184**

1  anything that the data when you -- when you all actually
2  get to that point of actually doing damages calculations,
3  that data will tell you if there are adjustments that
4  need to be done, and they can be easily done. But I
5  can't foresee what these adjustments are at this point.   15:08:50
6  Q. BY MR. FOLEY: If the but-for disclosure would
7  have led to higher implied volatility, how would that
8  affect option damages?
9  A. There's no way to really tell. That would lower
10 the call damages and raise the put damages. I couldn't   15:09:23
11 say how much. But if you pushed -- you know, pushed in a
12 higher implied volatility, I thought through the process,
13 and I say, well, I think it would lower the call damages
14 because it would offset some of the effect of the stock
15 price inflation, but it would raise the put damages.   15:09:41
16  And so, gosh, there's no way to tell. That's a
17 function of so many things like how many calls were there
18 versus how many puts and, you know, how many participants
19 jumped in on the call side and the put side. So there's
20 just no way to tell, not at this point.                15:09:59
21  I mean, there's obviously a way to tell later
22 on, but not at this point.
23  Q. How would you tell later on?
24  A. Well, you'll have the data. You'll know who --
25 who got -- who jumped in the pool there and became a   15:10:10

**Page 185**

1  member of the class, and as we said earlier, they'll have
2  to provide their brokerage statements, and so then
3  you'll -- then you'll know precisely what happened.
4  You'll also be able to take -- you know, the
5  market information, dig in a little bit further and see,   15:10:26
6  you know, does the volatility look like it changed. And
7  then you can put that into the models and you can see.
8  There's no way to predict the bottom line, but
9  it does look like to me that what would move in one
10 direction for one type of instrument and move in the   15:10:42
11 opposite for the other. I am not implying that is an
12 offset, but I mean, obviously there is some
13 countervailing force going on.
14  Q. How many hours did you spend on this engagement?
15  A. Are we counting up through preparation or just   15:11:03
16 the report?
17  Q. Let's -- let's count through the report.
18  A. Okay. I think probably 100, 110, 120, something
19 like that.
20  Q. And that was all your time; correct?           15:11:19
21  A. Meaning what?
22  Q. You said -- you said earlier that you didn't
23 have any assistance in connection with the report, but I
24 didn't know if that meant with writing the report. I
25 mean did you have any assistance at all with the   15:11:33

#### Page 190

```
 1  had actual Apple option transaction prices at the times
 2  of these corrected --
 3       THE REPORTER:  What prices?
 4       THE WITNESS:  I'm sorry.  Transaction.
 5       And you could get that.  I mean, that data      15:22:52
 6  exists.  You can get the actual -- all the trades that
 7  existed at the time.  And the only way you can do this is
 8  with corrective disclosures.  Obviously, if something
 9  isn't disclosed, you'll never know.  But you can look at
10  the volatility just before the corrected disclosure.  You 15:23:08
11  know, you can actually take a standard deviation of the
12  transaction cases -- and Apple's a very active stock so
13  you'd have a lot of data -- before the corrective
14  disclosure, and then you could take it after the
15  corrective disclosure, and then you could see it.         15:23:24
16       It's not -- definitely not going to be exactly
17  the same, but you can see if there's any material change.
18       Q.  Would the change in implied volatility be the
19  same for every option?
20       MR. PFEFFERBAUM:  Objection to form.               15:23:39
21       THE WITNESS:  I don't think it would.
22       Q.  BY MR. FOLEY:  What might be the differences be?
23       A.  Oh.
24       MR. PFEFFERBAUM:  Same objection.
25       THE WITNESS:  There is no way to say.  But in     15:23:48
```

#### Page 191

```
 1  any case, you'll have the data to be able to do that.
 2       Q.  BY MR. FOLEY:  What do you mean there's no way
 3  to say?
 4       A.  You're asking me to predict something, what
 5  would be the differences in the implied volatilities of  15:24:04
 6  different options before or after.  I can't predict that.
 7       Q.  Would there be different volatilities for
 8  near-the-money options versus far-out-of-the-money
 9  options?
10       A.  Yeah, it could be, but the data will -- will   15:24:21
11  show that.
12       Q.  And what do you mean, "the data will show that"?
13       A.  Well, again, we're talking about the corrective
14  disclosures.  The data will show before and after what
15  the applied volatilities of near-the-money options are   15:24:39
16  and any other options.  It will show you what the implied
17  volatilities were before and what the implied
18  volatilities were after.
19       So it will -- it will point to what you need to
20  do, you know, if the Court says you need to account for  15:24:55
21  this.
22       MR. FOLEY:  Okay, Dr. Chance, I think that's all
23  I have for you today.  I appreciate your time.
24       THE WITNESS:  Thank you, Mr. Foley.
25       MR. PFEFFERBAUM:  Okay.  Why don't we go off the   15:25:12
```

#### Page 192

```
 1  record for just a second, and we will see if we have any
 2  questions from our side.
 3       THE VIDEOGRAPHER:  This is the end of Media
 4  Number 7.  Off the record at 3:25 p.m.
 5       (Recess.)                                          15:30:07
 6       THE VIDEOGRAPHER:  We are back on the record at
 7  3:31 p.m.  This is the beginning of Media Number 8.
 8       MR. PFEFFERBAUM:  Dr. Chance, I have no
 9  questions for you today.  So thank you very much for your
10  time.                                                    15:31:32
11       THE WITNESS:  All right.  Thank you.
12       MR. FOLEY:  Thank you, Dr. Chance.
13       THE WITNESS:  Thank you, Mr. Foley.
14       THE VIDEOGRAPHER:  This concludes today's
15  testimony given by Don M. Chance.  Eight media were      15:31:38
16  recorded and will be retained by Veritext Legal
17  Solutions.  We are off the record at 3:32 p.m.
18       (Time noted:  3:32 p.m. Central Daylight Time.)
19            --oOo--
20
21
22
23
24
25
```

#### Page 193

```
 1       I declare under the penalty of perjury under the
 2  laws of the State of California that the foregoing is
 3  true and correct.
 4       Executed on _____, 2022, at
 5  _____, _____.
 6
 7
 8
 9
10
11            _____
12            DON M. CHANCE, PH.D.
13
```

## Page 194

1  STATE OF CALIFORNIA   ) ss:
2  COUNTY OF MARIN       )
3
4      I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do
5  hereby certify:
6      That the foregoing deposition testimony was
7  taken before me at the time and place therein set forth
8  and at which time the witness was administered the oath;
9      That testimony of the witness and all objections
10 made by counsel at the time of the examination were
11 recorded stenographically by me, and were thereafter
12 transcribed under my direction and supervision, and that
13 the foregoing pages contain a full, true and accurate
14 record of all proceedings and testimony to the best of my
15 skill and ability.
16     I further certify that I am neither counsel for
17 any party to said action, nor am I related to any party
18 to said action, nor am I in any way interested in the
19 outcome thereof.
20     IN WITNESS WHEREOF, I have subscribed my name
21 this 10th day of June, 2022.
22
23
24
25     LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462

## Page 195

1  DANIEL J. PFEFFERBAUM, ESQ.
2  dpfefferbaum@rgrdlaw.com
3             June 10, 2022
4  RE: In Re: Apple Inc Securities Litigation
5  June 8, 2022-DON M. CHANCE, PH.D.-5262235
6  The above-referenced transcript has been
7  completed by Veritext Legal Solutions and
8  review of the transcript is being handled as follows:
9  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10    to schedule a time to review the original transcript at
11    a Veritext office.
12 __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13    Transcript - The witness should review the transcript and
14    make any necessary corrections on the errata pages included
15    below, noting the page and line number of the corrections.
16    The witness should then sign and date the errata and penalty
17    of perjury pages and return the completed pages to all
18    appearing counsel within the period of time determined at
19    the deposition or provided by the Code of Civil Procedure.
20 __ Waiving the CA Code of Civil Procedure per Stipulation of
21    Counsel - Original transcript to be released for signature
22    as determined at the deposition.
23 __ Signature Waived – Reading & Signature was waived at the
24    time of the deposition.
25

## Page 196

1  _X_ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
2     Transcript - The witness should review the transcript and
3     make any necessary corrections on the errata pages included
4     below, notating the page and line number of the corrections.
5     The witness should then sign and date the errata and penalty
6     of perjury pages and return the completed pages to all
7     appearing counsel within the period of time determined at
8     the deposition or provided by the Federal Rules.
9  __ Federal R&S Not Requested - Reading & Signature was not
10    requested before the completion of the deposition.

## Page 197

1  In Re: Apple Inc Securities Litigation
2  DON M. CHANCE, PH.D.-5262235
3         E R R A T A   S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____   _____
24 WITNESS                          Date
25

50 (Pages 194 - 197)