# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

|  |  |  |
|---|---|---|
| In re APPLE INC. SECURITIES LITIGATION | )<br>)<br>)<br>) | Case No. 4:19-cv-02033-YGR |

**REBUTTAL EXPERT REPORT OF PROFESSOR FRANK PARTNOY**

June 10, 2022

**HIGHLY CONFIDENTIAL PURSUANT TO STIPULATED PROTECTIVE ORDER**

## I.    Background and Qualifications

1.      I am the Adrian A. Kragen Professor of Law at the UC Berkeley School of Law, where I have been co-chair of the UC Berkeley Center for Law and Business since 2018. I also hold an Affiliated Faculty position at the UC Berkeley Haas School of Business and the Simons Institute for the Theory of Computing, and am an International Research Fellow at Oxford University. Before joining UC Berkeley in 2018, I was a Professor of Law and Finance at the University of San Diego, where I taught continuously beginning in 1997 and was the founding director of the Center for Corporate and Securities Law. I am a graduate of Yale Law School, and I have degrees in mathematics and economics from the University of Kansas.

2.      My areas of teaching and research include securities markets and regulation, finance, and accounting, and I am the author or co-author of several dozen articles and six books in these areas. I regularly teach and study various aspects of these topics, and I have published peer-reviewed articles in leading journals in both finance and accounting. I have supervised graduate students in accounting, finance, and computer science, and I have taught, researched,

and written about the role of securities analysts and analyst reports, including in my academic research and publications.[1]

3.     Before 1997, I worked as an investment banker at Morgan Stanley and CS First Boston, where I held Series 3, 7, and 63 registered securities, options, and futures licenses and worked on a variety of securities offerings and financial transactions that involved securities analysts. I also practiced law at Covington & Burling, where my practice included issues related to securities analysts and the examination of analyst reports. I am a member of the New York and District of Columbia bars, and have served as Chair of the Business Associations Section of the Association of American Law Schools and as Co-Chair of the American Bar Association Securities Litigation Subcommittee on Futures and Derivatives Litigation. A copy of my resume is attached as Exhibit A.

4.     I have submitted reports as an expert on various corporate and securities matters in the past, and I have given sworn expert testimony on securities and financial matters before committees of both the United States Senate and House of Representatives. My testimony before the United States Senate included testimony about the role of securities analysts, focused on the collapse of Enron Corp.

5.     During the previous four years, I have testified at deposition in *Washtenaw County Employees' Retirement System v. Walgreen Co., et al.*, Case No. 15-cv-3187 (Northern District of Illinois); *Malapit v. Kona Community Hospital, et al.*, Case No. 19-1-185 (Hawai'i Circuit Court); *In re Twitter Sec. Litig.*, Case No. 16-cv-05314 (Northern District of California);

---

[1] *See, e.g.*, Alan R. Palmiter, Frank Partnoy & Elizabeth Pollman, Business Organizations: A Contemporary Approach, ch. 11 (2019) (discussing how securities analysts interpret financial statements and accounting information); *see also id.*, ch. 20 (discussing the role of securities analysts in evaluating information).

*Lopez v. Luquin*, Case No. 37-2017-00022184-CU-NP-CTL (San Diego Superior Court); and

*Xiang v. Inovalon Holdings, Inc., et al.*, Case No. 16-cv-04923 (Southern District of New York).


## II.   Assignment and Summary of Opinions

6.      I have been retained as an expert in this matter by Robbins Geller Rudman &
Dowd LLP, and I am being compensated at my standard rate of $1,500 per hour. My
compensation is not contingent on the content of my opinions or the outcome of this matter. A
list of documents that were made available to me in this matter is attached as Exhibit B. I have
personal knowledge of the facts stated in this declaration, and if called as a witness could testify
competently to them. I was assisted by personnel from Integra FEC, a consulting firm where I
am a senior advisor. My work on this matter is ongoing, and I reserve the right to modify or
expand my opinions based on additional information that becomes available to me during this
litigation.

7.      My assignment was to review the Expert Reports of Alex Gauna and Brett
Trueman and the documents set forth in Exhibit B. Mr. Gauna discusses the role of securities
analysts and analyst reports[2] and disclosures from Defendants, Apple, Tim Cook, and Luca
Maestri,[3] and then opines that "professional analysts clearly understood the risks captured in the
guidance provided by the company,"[4] and that "[t]he market did not hear Mr. Cook to say or
imply there was no pressure or risks related to Apple's business in China."[5]

---

[2] *See* Gauna Rep. at ¶¶ 12-34.
[3] *See* Gauna Rep. at ¶¶ 12, 35-58.
[4] *See* Gauna Rep. at ¶¶ 12, 59-62.
[5] *See* Gauna Rep. at ¶¶ 12, 63-65. Mr. Gauna also states: "My conclusions are further supported by the statistical realities presented in Professor Trueman's report, which show that the overwhelming majority of the analysts understood Mr. Cook's statements to be addressing the prior quarter's results." Gauna Rep. at ¶ 66. Mr. Gauna does not describe what these "statistical realities" might be, or what the basis is for concluding that information presented in Professor Trueman's report is either "statistical" or "realities."

8.      Professor Trueman discusses his expertise and background information,[6] and then opines about three factual conclusions regarding what securities analysts, and therefore the market, "understood" from Cook and Maestri's statements during Apple's November 1, 2018 conference call.[7] First, Professor Trueman opines that "analysts, and by extension the market, did not understand Mr. Cook's challenged statement to say there was no pressure on Apple's business in China."[8] Second, he opines that "subsequent to the November 1, 2018 Conference Call, analysts, and by extension the market, understood that Apple faced pressure in China."[9] Third, he opines that "analysts, and by extension, the market did not understand Mr. Cook to be offering an intra-quarter update or forward-looking guidance, but rather that he was merely discussing the FQ42018 results that were the subject of the conference call."[10]

9.      In my opinion, both reports are flawed, in at least three ways. First, Mr. Gauna and Professor Trueman do not describe any reliable methodology, or reliable principles and methods, that they applied in forming their opinions and conclusions, or any principles and methods that another expert could follow to test or replicate their opinions. Second, Mr. Gauna and Professor Trueman do not reference or discuss academic literature that undermines and contradicts their opinions, including research on the bias of analysts.[11] Third, Mr. Gauna and Professor Trueman do not address certain facts, including analyst reports and analyst discussion about Apple's business in China, as well as evidence produced in discovery, that is inconsistent with their opinions. The bases for my opinions are set forth below.

---

[6] *See* Trueman Rep. at ¶¶ 1-14.
[7] *See* Trueman Rep. at ¶ 27.
[8] *See* Trueman Rep. at ¶ 27a.
[9] *See* Trueman Rep. at ¶27b.
[10] *See* Trueman Rep. at ¶ 27c.
[11] Indeed, as I describe below, Professor Trueman's own research contains many of these findings, which he does not mention in his Report.

### III.   **Methodology**

10.     First, neither Mr. Gauna nor Professor Trueman describe any methodology used to reach their opinions. Instead, they describe the aspects of their educational or professional background that they believe qualify them to draw factual conclusions about the mental states of stock analysts, reasonable investors, or the "market."[12]

11.     For example, Professor Trueman repeatedly uses the word "understand" and "understood" in his report to refer to both analysts and the market, and states "I could instead have used the term 'heard' or 'interpreted.'"[13] But these terms and concepts are fundamentally different, particularly in the context of analyst reports. The terms "understand" and "interpreted" are similar, and connote the subjective perception by an analyst of the intended meaning of Mr. Cook's words, whereas "heard" connotes simply which of Mr. Cook's words an analyst perceived.[14] Moreover, although Professor Trueman opines that "I am not suggesting that I can read the minds of the analysts, but rather that I am concluding from the carefully crafted language of their reports what I believe they understood, heard, and interpreted Mr. Cook to mean,"[15] attempting to read their minds is what he does.

12.     Specifically, both experts opine with respect to how stock analysts and therefore the "market" understood certain of Apple CEO Tim Cook's statements made during a November 1, 2018 investor conference call. For example, Professor Trueman discusses what he believes to have been stock analysts' and investors' interpretations of Mr. Cook's description of a category

---

[12] *See* Trueman Rep. at ¶¶ 1-14; *see also* Gauna Rep. at ¶¶ 4-7.
[13] *See* Trueman Rep. at ¶ 26.
[14] *See, e.g.*, Oxford Languages, languages.oup.com (primary definitions of "understand" as "perceive the intended meaning of (words, a language, or a speaker)" and "interpret" as "explain the meaning of (information, words, or actions")" in contrast to "hear" as "perceive with the ear the sound made by (someone or something)".
[15] *See* Trueman Rep. at ¶ 26.

of several countries where Apple was seeing "pressure" and markets which "were not growing the way we would like to see."[16] Professor Trueman further quotes, with emphasis added, Mr. Cook's November 1, 2018 statement that "In relation to China specifically, I would not put China in that category."[17] Mr. Gauna does not reference or discuss this alleged false and misleading statement, and instead focuses on Tim Cook's use of "present tense" verbs in the conference call "as referring to the prior quarter," Apple's revenue guidance, and a statement by Luca Maestri in response to a question about that guidance.[18]

13.     Both experts opine about how analysts, reasonable investors, or "the market" understood Mr. Cook's statements. But neither describes any reliable methodology, or reliable principles and methods, that they applied in reaching their opinions, or any principles and methods that another expert could follow to test or replicate their opinions.

14.     Professor Trueman distinguishes between the "many" analysts who explicitly discussed pressure on Apple's business in China prior to the conference call versus commentary by Bernstein that "Surprisingly, Apple executives did not appear uniquely concerned about China" and that "management was adamant about differentiating between these weaker markets and China, which still grew +16% year-over-year– including 'strong double digit' iPhone revenue growth."[19] Professor Trueman distinguishes these statements by opining about what different analysts "heard": "none of the analyst's comments indicate that they heard Cook's comment about business conditioned in China to be based on anything other than historical (FQ42018) results or that it contradicted the analysts' prior finding of the pressure to Apple's

---

[16] *See* Trueman Rep. at ¶ 16.
[17] *See, e.g.*, Trueman Rep. at ¶ 16 (highlighting this statement).
[18] *See* Gauna Rep. at ¶¶ 57-58.
[19] *See* Bernstein, "AAPL: Q4 18 Debrief - How much might iPhone units decline in FY19? The world may never know," November 2, 2018, APL-SECLIT_00001993, at 1, 3-5.

business in China, including 'macroeconomic headwinds' and tariffs."[20] He further concludes

that "none of the reports after the November 1, 2018 Conference Call can be interpreted to

suggest that their views had changed in light of anything Mr. Cook said." Although Professor

Trueman uses the passive voice in that sentence, the subject doing the "interpreting" is him, and

he does not articulate any reliable basis for this interpretation, except to refer generally to

selected portions of the reports he reviewed.

15.     In addition, both Mr. Gauna and Professor Trueman provide opinions interpreting

analysts' understanding of the alleged false statement made by Mr. Cook during Apple's

November 1, 2018 conference call.[21] Mr. Gauna states that both historically, and in this instance,

he understands Tim Cook's use of the words "we're seeing pressure" (in the present tense) to

refer to the past, in this case the prior quarter which ended a month before the present tense

statement.[22] Professor Trueman similarly describes Mr. Cook's November 1, 2018 comments,

and analysts' interpretation of his comments, as "historical."[23]

16.     In reaching their respective conclusions that Mr. Cook's statement was historical,

neither expert analyzes the **question** that prompted Mr. Cook's alleged false statement.[24] Nor does

either expert discuss evidence regarding what Mr. Cook knew about this question in advance of

the November 1, 2018 conference call. The question was as follows (emphasis added):

**Wamsi Mohan** – BofA Merrill Lynch, Research Division – Director

***Tim, there has been some real deceleration in some of these emerging markets***, partly
driven by some concerns around some of the rules the administration is contemplating
and ***partly driven by things that are more specific to China,*** for instance, like some of

---

[20] *See* Trueman Rep. at ¶ 58 n.82.
[21] Professor Trueman identifies the "Challenged Statement" as a single sentence without the relevant context,
including that it was an answer to a question Mr. Cook was asked.
[22] Gauna Report at ¶¶ 61, 65.
[23] *See, e.g.*, Trueman Report at ¶¶ 27(c), 58 n.82, 62, 62 nn.87-88.
[24] Mr. Gauna acknowledges that Mr. Cook's alleged misrepresentation was in response to a question but does not
analyze or discuss the question. *See* Gauna Rep. at ¶ 65.

the regulations around gaming. ***So can you talk about how you see the trajectory there for the business*** and what you think of the initiatives of some companies like Netflix and Fortnite trying to bypass the App Store around subscriptions?[25]

17.      Mr. Gauna claims that "Apple's management generally does not address guidance" "***unless asked a specific question***."[26] But neither Mr. Gauna nor Professor Trueman discuss this specific question from Mr. Mohan in opining that Mr. Cook's allegedly false statement was "historical," or that analysts covering Apple interpreted Mr. Cook's response as "historical." Here, in full, is Mr. Cook's answer:

**Timothy D. Cook** - Apple Inc. - CEO & Director

Sure. ***Great question***. Starting with emerging markets. The emerging markets ***that we're seeing pressure*** in are markets like Turkey, India, Brazil, Russia, these are markets where currencies have weakened over the recent period. In some cases, that resulted in us raising prices, ***and those markets are not growing the way we would like to see.*** To give you a perspective in -- at some detail, our business at India in Q4 was flat. Obviously, we would like to see that be a huge growth. Brazil was down somewhat compared to the previous year. And so I think -- or at least the way that I see these is each one of the emerging markets has a bit of a different story. And I don't see it as some sort of issue that is common between those for the most part. ***In relation to China specifically, I would not put China in that category. Our business in China was very strong last quarter. We grew 16%, which we're very happy with. iPhone, in particular, was very strong double-digit growth there.***[27]

18.      Neither Mr. Gauna nor Professor Trueman describes any methodology that would reliably isolate and analyze a few words of Mr. Cook's response,[28] without also analyzing the relevant context, including the question asked. Professor Trueman limits his analysis to the

---

[25] Apple Q4 2018 Earnings Call Transcript (emphasis added).
[26] Gauna Rep. at ¶ 48.
[27] Apple Q4 2018 Earnings Call Transcript (emphasis added).
[28] I understand that the Court rejected the limitation of the alleged misrepresentation to a few words in its February 4, 2022 Order re Class Certification. *See* Class Certification Order, at 15 (refusing to accept Defendants' "attempt to re-frame the misrepresentation by zeroing in on a single phrase in the complaint," noting that the complaint alleges "not merely that Cook misrepresented *how* poorly Apple was performing in China, but that it was, in fact, performing poorly at all"); *see also* Motion to Dismiss Order (November 2, 2020), at 8 (discussing context of alleged misstatement).

words he defines as the "Challenged Statement."[29] They do not address how and whether the meaning of the "Challenged Statement" relates to the question it is in response to.

19.     Moreover, Professor Trueman and Mr. Gauna do not discuss the materials Tim Cook used to prepare for the questions asked during the November 1, 2018 conference call in reaching their conclusions about the "historical" nature of Mr. Cook's alleged misstatement. For example, on November 1, 2018, Apple's head of Investor Relations, Nancy Paxton, and Mr. Maestri provided Tim Cook with "Potential questions by analysts," including the order that questions were expected to be asked on the conference call. Mr. Gauna presumes (without citation) that "[a]nalysts also know that the purpose of a quarter-end earnings call is to discuss prior quarter results."[30] He does not analyze the internal Apple preparation materials in reaching this conclusion.

20.     Specifically, Mr. Cook was provided in advance with a question that was expected to be asked in the present tense. Wamsi Mohan, of Bank of America, whom Ms. Paxton noted "Recently cut estimates and price objective on concerns of broader China," was expected to ask: "there *is* broader concern about the economic situation in China, how *is* your business performing there?"[31] Similarly, the "Q4'18 Q&A" materials Cook and Maestri used to prepare for analysts' questions during the November 1, 2018 conference call included planned answers about the Company's current view of business in China under the heading "Future Market Opportunities[:] E[merging ]M[arkets]"; the draft answer stated: "Greater China continues to grow strong double digits".[32] Professor Trueman and Mr. Guana do not discuss these documents,

---

[29] *See* Trueman Rep. at ¶ 16.
[30] *See* Gauna Rep. at ¶ 65.
[31] APL-SECLIT 00308488 (emphasis added).
[32] APL-SECLIT 00160101 (internal page 58 of 72) (underline in original).

including their use of the present tense. They do not explain how their opinions can be reliably replicated without referencing the question and the relevant context.

21.     Instead of simply opining about factual conclusions based solely on their backgrounds, the experts could have used one or more reliable methodologies. For example, the experts could have used text analytics to compare analyst reactions to language used by the same analyst or other analysts in response to statements by Apple and its executives, or language used by the same analyst or other analysts in similar contexts.[33] Alternatively, they could have used a "discounted cash flow" analysis (DCF) to assess the extent to which analyst estimates were revised, or should have been revised, to reflect the relationship between certain of Mr. Cook's statements and analysts' expected cash flow and discount rate assumptions.[34] Instead of applying a reliable methodology, the experts simply opine on factual conclusions based on their experience. Their opinions with respect to these factual conclusions are not testable or replicable based on any reliable principles or methods.

## IV.     Academic Literature on the Bias of Securities Analysts

22.     Professor Trueman and Mr. Gauna discuss and rely on information and conclusions about the role and functions of securities analysts in covering Apple and other companies. But neither expert acknowledges the academic literature finding that securities analysts tend to be biased toward the companies they cover.[35] This literature is particularly

---

[33] *See, e.g.*, Allen H. Huang. Reuven Lehavy, Amy Y. Zang & Rong Zheng, Analyst Information Discovery and Interpretation Roles: A Topic Modeling Approach, 64 Management Science 2833 (2018).
[34] The DCF methodology is widely known as the "gold standard" for use in the kinds of assessment and valuations made by analysts. See Palmiter, Partnoy & Pollman, Business Organizations, at 288. Mr. Gauna discusses DCF methodology (at ¶¶ 21-22) yet does not address the methodology in his analysis nor explain why he has "more frequently" utilized other less-reliable forms of valuation. *See* Gauna Rep. at ¶¶ 21-22.
[35] *See* Frank Partnoy, Barbarians at the Gatekeepers: A Proposal for a Modified Strict Liability Regime, 79 Washington University Law Review 491, 525 (2001).

focused on large companies with wide media coverage; Enron was rated a "strong buy" by sixteen of the seventeen securities analysts covering the company as late as October 2001.[36] Securities analysts often face a serious conflict of interest: they are supposed to provide objective advice regarding companies, but what they say has a dramatic effect on whether the company they are covering will hire them in the future.[37] Studies show that securities analysts who issue more optimistic forecasts have better career outcomes.[38]

23.     Mr. Gauna was a securities analyst who covered Apple, and he relies upon on his own "years of experience as an analyst covering Apple" as a basis for his opinion concerning what a "reasonable investor" did or did not understand Mr. Cook to "say or imply" on November 1, 2018.[39] In other words, Mr. Gauna was the kind of securities analyst assessed in this literature. Mr. Gauna does not address whether his own bias is reflected in this literature, or whether it influenced his opinions.

24.     Professor Trueman's failure to address analyst bias is notable, because he has written about bias among analysts, including analysts who engage in strategic herding behavior meaning that analysts do not "differ greatly from prior expectations, even though their private information justifies more extreme earnings forecasts."[40] Professor Trueman's research shows that analyst bias extends to herding where analysts "release forecasts similar to those previously

---

[36] *See* Testimony of Frank Partnoy before the United States Senate Committee on Governmental Affairs, Enron and the Derivatives World,  (Jan. 24, 2002), *available at* https://www.hsgac.senate.gov/imo/media/doc/partnoy.pdf (last visited June 10, 2022).

[37] *See* Partnoy, Gatekeepers, at 525.

[38] *See* Harrison Hong & Jeffrey D. Kubik, Analyzing the Analysts: Career Concerns and Biased Earnings Forecasts, 58 Journal of Finance 313 (2003).

[39] Gauna Rep. at ¶ 63.

[40] *See* Brett Trueman, Analyst Forecasts and Herding Behavior, 7 Review of Financial Studies 97, 115 (1994); *see also* Ivo Welch, Herding among Security Analysts, 58 Journal of Financial Economics 369 (2000); Harrison Hong, Jeffrey D. Kubik & Amit Solomon, Security Analysts' Career Concerns and Herding of Earnings Forecasts, 31 Rand Journal of Economics 121 (2000); David Hirshleifer, Yaron Levi, Ben Lourie & Siew Hong Teoh, Decision Fatigue and Heuristic Analyst Forecasts, 133 Journal of Financial Economics 83 (2019); Brett Trueman, On the Incentives for Security Analysts to Revise Their Earnings Forecasts, 7 Contemporary Accounting Research 203 (1990).

announced by other analysts, even when this is not justified by their information."[41] Professor Trueman's research also strongly suggests that analysts do not strictly abide by formal ratings definitions when issuing recommendations (bolstering the position that analyst recommendations do not accurately reflect their investment opinions).[42] Professor Trueman fails to account for herding behavior in his review of 38 analyst reports.[43] He does not mention his own findings regarding analyst bias.

## V.   **Facts Not Addressed**

25.     Finally, Professor Trueman and Mr. Gauna do not address certain facts, including analyst reports and statements, that are inconsistent with their opinions.[44] These facts include analyst reports that are not addressed, the use of present tense in analyst reports that are not addressed, and facts related to the "private research efforts" of analysts, as described below.

### A.     Analyst Reports Not Addressed

---

[41] Trueman, Analyst Forecasts and Herding Behavior, 7 Review of Financial Studies at 115.

[42] *See* Brad M. Barber, Reuven Lehavy & Brett Trueman, Ratings Changes, Ratings Level, and the Predictive Value of Analysts' Recommendations, 39 Financial Management 533, 537 (2010); *see also* Brad M. Barber, Reuven Lehavy & Brett Trueman, Comparing the Stock Recommendation Performance of Investment Banks and Independent Research Firms, 85 Journal of Financial Economics 490 (2007) ("the results of our analysis suggest that some of the research issued by investment banking analysts was biased, our findings must be approached cautiously, given that they hold for a relatively narrow window, coinciding with a period of time that has been the subject of intense media and regulatory attention").

[43] Trueman Rep. at ¶ 35.

[44] *See, e.g.,* Gauna Rep. at ¶¶ 65-66 (referencing Professor Trueman's conclusion that "the overwhelming majority of the analysts understood Mr. Cook's statements to be addressing the prior quarter's results"). Professor Trueman limited his report to discussing fewer than four days following the November 1, 2018 conference call, introducing a temporal bias to his analysis that he does not explain in his report. *See* Trueman Rep. at ¶ 35 ("I reviewed thirty-eight analyst reports that were issued after the Conference Call from November 1 through November 4, 2018."). Although his "Materials Considered" section lists many additional reports over a longer time period, he does not discuss them in his report and provides no basis for failing to do so.

26.     For example, neither Professor Trueman nor Mr. Gauna discuss the November 1, 2018 Morgan Stanley Tech report's emphasis on Mr. Cook's statement "\*not\*" including China among a category of weaker emerging markets countries:

> •\*\*\*\*\*\*\* Emerging Market Weakness: Surprisingly, AAPL blamed Turkey, India, Brazil and Russia, but \*not\* China, which is constructive from a demand standpoint but could also represent another shoe to drop. Management said that EM currency weakness resulted in raising prices in certain markets that are not growing the way they would like to see. India was flat in the Q vs what should be a 'huge growth' market. Brazil was down somewhat y/y. In general, management said that 'clearly consumer confidence is not as high as it was 12-months ago' in some emerging markets.

> •\*\*\*\*\*\*\* China + App Store: AAPL would \*not\* put China in the weaker EM bucket above given very strong growth +16% last Q, including double digit iPhone growth and strong 'Other' growth. AAPL did acknowledge a moratorium on new game approvals that's hurting Tencent, but they view this as a domestic issue and not a factor of trade war.[45]

27.     Professor Trueman and Mr. Gauna do not discuss the November 2, 2018 Nomura report, which stated that while certain emerging markets had experienced "[p]ressures… **China however has not been impacted**."[46]

28.     Professor Trueman and Mr. Gauna do not discuss the November 18, 2018 J.P. Morgan report, "Apple: Trim Volume Estimates on Softer EM and XR," which reported "China comprises for roughly 50% of Apple's iPhone shipments to EMs, but **management affirmed** [*i.e.* on the November 1, 2018 conference call] **that it is not seeing any material change** in volume trends till [sic] date in the region."[47]

29.     Professor Trueman and Mr. Gauna do not discuss the January 2, 2019 *Bloomberg* article, quoted in the Complaint (¶86),[48] which reported:

---

[45] APL-SECLIT_00587555 .
[46] APL-SECLIT_00588254 (emphasis added).
[47] APL-SECLIT_00002330-42 (emphasis added).
[48] "Complaint" refers to the Revised Consolidated Class Action Complaint for Violation of the Federal Securities Laws, Case No. 4:19-cv-02033-YGR, filed on June 23, 2020.

**Apple's iPhone Warning Comes Years Too Late – The company has reached the end of its denial phase**

\* \* \*

Cook said two months ago that Apple's China business was "very strong," even amid signs of an economic slowdown and months of headlines about trade tensions with the U.S. He consistently told investors that he thought the U.S. and China would resolve their trade dispute amicably and didn't give any indications that consumers were on edge or reluctant to shop because of the geopolitical fracas. It's possible that the last couple of months of economic circumstances in China, Taiwan and Hong Kong caught Apple by surprise, but executives failed to give any hints of red flags in the region. It's possible conditions in China changed quickly, but the broad trends in smartphone activity are not new. Why didn't Cook make any of these admissions before now?

\* \* \*

Apple failed in the No. 1 mission of being a public company: being honest with investors about its business. The company simply denied the reality that was staring it in the face, until denial was no longer an option.

30.     Similarly, Professor Trueman and Mr. Gauna do not discuss the January 3, 2019

*Yahoo! Finance* article, quoted in the Complaint (¶89), which reported:

**Apple's mind-blowing warning means CEO Tim Cook now has a major credibility problem**

\* \* \*

They failed to keep it real with investors on what they were seeing in iPhone demand data late in 2018. Simply no longer providing unit sales data wasn't enough of a signal to investors that something was wrong, bottom line.

As a result, Apple's stock could be "broken" until credibility is restored.

\* \* \*

Cook cited "macroeconomic" issues holding back results three times in his new letter. That isn't exactly on par with Maestri's "some level of uncertainty" expressed in November.

Tim Cook: "To give you a perspective in of some detail, our business in India in Q4 was flat. Obviously, we would like to see that be a huge growth. Brazil was down somewhat compared to the previous year. And so I think, or at least the way that I see these, is each one of the emerging markets has a bit of a different story, and I don't see it as some sort of issue that is common between those for the most part.

In relation to China specifically, I would not put China in that category. Our business in China was very strong last quarter. We grew 16%, which we're very

happy with. iPhone in particular was very strong, very strong double-digit growth there. Our other products category was also stronger, in fact, a bit stronger than even the overall company number."

Nothing here from Cook indicates China would be mostly blamed as the culprit for a nasty financial warning some two months later.

31.     Professor Trueman and Mr. Gauna do not discuss the January 6, 2019 RBC report, which stated "AAPL ***during their EPS call on 11/1 stressed that China wasn't seeing softer demand***. However, during their pre-announcement on Jan 2nd, AAPL squarely attributed revenue miss to China."[49]


B.     Analyst Reports Using Present Tense

32.     As noted above, Professor Trueman asserts that nearly all of the analyst reports mention as "historical" the information in what he defines as the Challenged Statement.[50] Mr. Gauna claims that analysts understood Mr. Cook's comment as reflecting the prior quarter.[51] But both experts fail to discuss facts that contradict their opinions.

33.     For example, Professor Trueman quotes the analyst report from DA Davidson stating that greater China revenue grew 16% YOY and noting that "results suggest that Apple's management **is doing an amazing job** of walking the tight rope – managing its supply chain…"[52] Neither expert addresses whether the use of the phrase "is doing" is historical in this context.

34.     Professor Trueman quotes the analyst report from FBN as stating "although many investors **are concerned about AAPL's China business**, the Greater China segment grew by

---

[49] APL-SECLIT_00592137 (emphasis added).
[50] Trueman Rep. at ¶ 62.
[51] Gauna Rep. at ¶ 61.
[52] *See* Trueman Rep. ¶ 62 (citing DA Davidson report).

16% Y/Y."[53] Neither expert addresses whether the words "are concerned" are historical, or instead reflect concerns about future performance.

35.     Professor Trueman quotes Argus citing Mr. Cook's "16%" statistic when interpreting China's contribution to Apple, stating "**Apple's China business continues to recover.**"[54] Neither expert addresses whether "continues to recover" is "historical."

36.     Professor Trueman cites Baird's statement about Apple's outlook on China: "**China solid.** Greater China revenue of $11.4 billion grew 16% YOY" and also the statement that company "doesn't believe trade rhetoric has had any meaningful impact."[55] He does not address the fact that Baird's further statement is in a section called *Investment Thesis* ("**China improving.** Greater China revenue grew 16% YOY in FQ4 and the full fiscal year.") Nor does he describe how these statements overall are historical, or how an "Investment Thesis" is only historical.

### C.     Information Inside Apple vs. "Private Research Efforts"

37.     Neither Professor Trueman nor Mr. Gauna address findings in the academic literature that analysts provide value to investors through "private research efforts" to uncover information not readily available in public company disclosures (though Professor Trueman cites this literature).[56] Professor Trueman claims that "one of the most important roles of analysts is to provide an interpretation of information in corporate disclosures."[57] He opines that "analysts, and by extension the market, did not hear Mr. Cook say that Apple's business in China was not

---

[53] *See* Trueman Rep. ¶ 62 (citing FBN).
[54] *See* Trueman Rep. ¶ 62 (citing Argus).
[55] *See* Trueman Rep. at ¶ 62 (citing Baird).
[56] Huang, Lehavy, Zang & Zheng, Analyst Information Discovery, 64 Management Science at 2834.
[57] Trueman Rep. at ¶¶ 23-24, 40.

facing pressure."[58] Mr. Gauna recognizes that "analysts and investors do not rely solely on company reports and executives' commentary during conference calls to evaluate stock."[59] Neither expert report discusses "private research efforts," or distinguishes between internal analyst research and interpreting public information. For example, Professor Trueman quotes an analyst report stating, "That said *we* still see China as representing the single greatest risk to shares and will be monitoring tariffs closely…",[60] yet his report doesn't discuss whether the analyst is "interpreting managerial disclosures" as he assumes they do[61] or commenting based on their "private research efforts" as the academic literature acknowledges is common.[62]

38.     Professor Trueman further asserts that analyst reports "distinguish China from other emerging markets with regard to currency issues,"[63] but does not address other factors mentioned in the analyst reports he cites in his report. For example, consider Professor Trueman's discussion of November 2, 2018 JP Morgan analyst report. The relevant text from JP Morgan's report is below, with its original bolding:[64]

> ***That said, macro risks are noteworthy at this time for a global business, driving greater conservatism than usual in F1Q guidance.*** *While we believe that there is not much of a shortfall relative to guidance when it comes to F1Q, it is important to remember that the firm has to navigate and execute amidst higher macro risks, particularly as relates to a softer outlook for emerging market growth, weakening EM currencies necessitating price increases, as well as softening consumer confidence in that backdrop. For example, Apple cited pressures in emerging markets including Turkey, Brazil, India and Russia and challenges in growth following price increases. Separately, while Apple continues to see solid growth in EM countries like China (+16% y/y in F4Q), it is facing regulatory hurdles relative to growth for the App Store. Net, we believe the F1Q guidance embeds a higher degree of conservatism relative to headwinds from emerging risks, which are hard to quantify, and thus an unusually wide range for the F1Q revenue outlook.*

---

[58] Trueman Rep. at ¶¶ 34-37.
[59] Gauna Rep. at ¶ 12b.
[60] Trueman Rep. at ¶ 36 (citing DA Davidson).
[61] Trueman Rep. at ¶ 23.
[62] Huang. Lehavy, Zang & Zheng, Analyst Information Discovery, 64 Management Science at 2834.
[63] Trueman Rep. at ¶¶ 41-42.
[64] *See* JP Morgan Report, Nov. 2, 2018, APL-SECLIT_00001749

Professor Trueman does not address the extent to which this language can be interpreted as reflecting not only currency risk, but also "softening consumer confidence" and a "softer outlook for emerging market growth."[65]

39.     Professor Trueman cites Cross Research in a paragraph entitled "Understanding China" that "China revenue was up 16% y/y including strong double-digit growth in iPhone and Other revenue" and "Regarding macro headwinds, management did not call out any specific impact in the quarter or next quarter…"[66] He includes a statement from Guggenheim that "China held solid at +16%Y/Y" and noted that "Apple did, however, call out macro weakness it now sees in some other emerging markets, including Turkey, Brazil, Russia, and India (e.g., where revs were just flat Y/Y), compounded by the stronger USD."[67] He does not address how this quote is consistent with his opinion that "many analysts distinguished China from other emerging markets due to foreign currency issues."[68]

40.     Finally, Mr. Gauna speculates that "[h]ad Mr. Cook said that there is no pressure on Apple's business in China, the analysts on the conference call would have immediately requested additional elaborations, details, and clarifications."[69] But Mr. Gauna does not address the immediate response to Mr. Cook's alleged false statement, or discuss what likely would have occurred if Mr. Cook had accurately informed investors about the pressure Apple was facing in China, in particular with respect to the newly launched iPhone XR. Specifically, neither expert addresses evidence that on November 5, 2018, just days after the alleged false statement, the

---

[65] *See* Trueman Rep. ¶ 62 (citing JP Morgan).
[66] Trueman Rep. at ¶ 62 (citing Cross Research).
[67] Trueman Rep. at ¶ 62 (citing Guggenheim).
[68] Trueman Rep. at ¶ 43.
[69] Gauna Rep. at ¶ 65.

Nikkei Asian Review reported that Apple had instructed its Chinese iPhone assemblers to "halt plans for additional production lines" for the new iPhone XR, indicating a reduction in expected sales of 20-25%.[70] The same day, RBC Capital Market issued a report indicating that the production suspensions noted in the Nikkei Article "could indicate muted unit demand."[71] Apple's stock declined $5.89 that day (approximately 2.8%), after the disclosure of this negative information.[72] Neither expert addresses this disclosure, its impact, or the analyst statements in response.

Frank Partnoy
June 10, 2022

---

[70] Complaint at ¶ 27.
[71] Id. at ¶ 28.
[72] Id. at ¶ 28.

## Exhibit A – Professor Frank Partnoy

UC Berkeley, Simon Hall Room 790, Berkeley, CA 94720, fpartnoy@berkeley.edu

### Education

| | |
|---|---|
| Yale Law School | J.D. 1992. |
| | Thurman Arnold Prize, Potter Stewart Prize. |
| | |
| University of Kansas | B.A. mathematics, 1989, *summa cum laude.* |
| | B.S. economics, 1989, *summa cum laude.* |

### Employment

University of California, Berkeley, School of Law, Berkeley, CA, 2018-.
    Adrian A. Kragen Professor of Law, 2018-.
    Affiliated Faculty, Hass School of Business, 2018-.
    Affiliated Faculty, Simons Institute for the Theory of Computing, 2020-.
    Co-Director, Berkeley Center for Law and Business, 2018-.

    Courses:    Business Associations; Law, Accounting, and Business; Law, Economics, and Business; Law and Cryptography; Understanding Financial Crises; Economic Expert Witnesses: Depositions and Testimony.

University of San Diego School of Law, San Diego, CA, 1997-2018.
    George E. Barrett Professor of Law and Finance, 2009-2018.
    Professor, 2001-18; Assoc. Professor, 1999-2001; Ass't Professor, 1997-99.
    Founding Director, Center for Corporate and Securities Law.

    Courses:    Advanced Corporate Transactional Skills; Corporations; Corporate Finance; Deals; Emerging Financial Markets; Innovation, Markets, and Financial Regulation; International Finance (at University of Paris I); Latin American Financial Markets; Securities Litigation; White Collar Offenses.

    Awards:    Thorsnes Prize for Excellence in Teaching.
            1998-99, 2008-09, 2012-13.
            Thorsnes Prize for Outstanding Legal Scholarship.
            2008-09, 2013-14.
            Herzog Endowed Scholar, 2003-04.
            University Professor, 2010-11.

Oxford University, Oxford, UK, 2010-. International Research Fellow.

University of Sydney Law School, Sydney, Australia, 2014-17. Visiting Professor.

Rady School of Management, University of California, San Diego, San Diego, CA
      Visiting Professor, 2005. Course: Regulation and Innovation.

Covington & Burling, Washington, DC, 1995-97.

Derivative Products Group, Morgan Stanley & Co., New York, NY, 1994-95.

Emerging Markets Derivatives Group, CS First Boston, New York, NY, 1993-94.

Law Clerk, Hon. Michael B. Mukasey, U.S. District Judge, SDNY, New York, NY, 1992-93.


**<u>Publications</u>**

<u>BOOKS</u>

WAIT: THE ART AND SCIENCE OF DELAY (PublicAffairs 2012).
| | |
|---|---|
| Editions: | Brazil, China, Japan, Korea, Russia, Taiwan, U.K. |
| Reviews: | The Economist, The Wall Street Journal, Financial Times, Washington Post, Minneapolis Star-Tribune, several dozen others. |

THE MATCH KING: IVAR KREUGER, THE FINANCIAL GENIUS BEHIND A CENTURY OF WALL STREET SCANDALS (PublicAffairs 2009).
| | |
|---|---|
| Editions: | U.K. (Profile Books 2009), Swedish, Chinese, German. |
| Awards: | Finalist, Financial Times/Goldman Sachs Business Book of the Year, 2009; Financial Times Best Books of the Year, 2009; Inc. Magazine Best Books for Business Owners of 2009. |
| Reviews: | The Economist, The New Yorker, New York Times Book Review, Wall Street Journal, Financial Times, Business Week, Washington Post, several dozen others. |

INFECTIOUS GREED: HOW DECEIT AND RISK CORRUPTED THE FINANCIAL MARKETS (Henry Holt/Times Books 2003).
| | |
|---|---|
| Reissue: | PublicAffairs 2009. |
| Editions: | Paperback (Henry Holt/Owl Books 2004); Australian, British, Hong Kong. |
| Translations: | Korean, Spanish. |
| Reviews: | New York Times Book Review, Wall Street Journal, Financial Times, Washington Post, London Times, several dozen others. |

F.I.A.S.C.O.: BLOOD IN THE WATER ON WALL STREET (W.W. Norton 1997).
| | |
|---|---|
| Reissue: | W.W. Norton 2009. |
| Editions: | Paperback (Penguin 1999); Australian, British, Hong Kong. |
| Translations: | Chinese, Japanese, German, Korean, Portuguese, Russian. |
| Awards: | Finalist, Financial Times/Booz-Allen Global Business Book Award, 1997. |

San Diego Union Tribune Author of the Year, 1997.
Reviews: New York Times Book Review, Los Angeles Times Book Review, London Times, Financial Times, several dozen others.

<u>CASEBOOKS</u>

BUSINESS ORGANIZATIONS: A CONTEMPORARY APPROACH (with Alan R. Palmiter and Elizabeth Pollman) (West Academic 2019).

CORPORATIONS: A CONTEMPORARY APPROACH (with Alan R. Palmiter) (Thomson 1st Ed. 2010; 2nd Ed. 2014).

BUSINESS ORGANIZATION AND FINANCE, LEGAL AND ECONOMIC PRINCIPLES (with John C. Coffee, Jr. and William A. Klein) (Thomson 2010).

CORPORATIONS LAW AND POLICY: MATERIALS AND PROBLEMS (Thomson West 2005 Supp. and 2006 Supp., 6th Ed. 2007, with Jeffrey D. Bauman and Alan R. Palmiter).

<u>BOOK CHAPTERS</u>

*Shareholder Primacy Is Illogical*, in RESEARCH HANDBOOK ON CORPORATE PURPOSE AND PERSONHOOD (Edward Elgar Publishing 2021) (Elizabeth Pollman and Robert Thompson, eds.).

*Delaware and Financial Risk*, in THE CORPORATE CONTRACT IN CHANGE TIMES: IS THE LAW KEEPING UP? (University of Chicago Press 2018) (Steven Davidoff Solomon and Randall Thomas, eds.).

*Financial Systems, Crises, and Regulation*, in OXFORD HANDBOOK OF FINANCIAL REGULATION (Oxford University Press 2015) (Niamh Moloney, Eilis Ferran, and Jennifer Payne, eds.).

*U.S. Hedge Fund Activism*, in RESEARCH HANDBOOK ON SHAREHOLDER POWER (Elgar Press 2015) (Jennifer Hill and Randall Thomas, eds.).

*Credit Rating Agencies and Regulatory Reform*, in RESEARCH HANDBOOK ON THE ECONOMICS OF CORPORATION LAW (Elgar Press 2012) (with Aline Darbellay).

*Patents as Options*, in PERSPECTIVES ON COMMERCIALIZING INNOVATION (F. Scott Keefe, ed.) (with Shaun P. Martin) (Cambridge University Press 2011).

*How Financial Regulation Might Harness the Power of Markets,* in RULES FOR GROWTH: PROMOTING INNOVATION AND GROWTH THROUGH LEGAL REFORM (Ewing Marion Kauffman Foundation 2011)).

*Overdependence on Credit Ratings Was a Primary Cause of the Crisis*, in THE PANIC OF 2008: CAUSES, CONSEQUENCES, AND IMPLICATIONS FOR REFORM (Edward Elgar Press 2010, Lawrence Mitchell and Arthur Wilmarth, eds.).

*Gap Filling, Hedge Funds, and Financial Innovation*, in NEW FINANCIAL INSTRUMENTS AND INSTITUTIONS: OPPORTUNITIES AND POLICY CHALLENGES (Brookings Institution Press 2007, Yasuyuki Fuchita and Robert E. Litan, eds.) (with Randall Thomas).

*How and Why Credit Rating Agencies Are Not Like Other Gatekeepers*, in FINANCIAL GATEKEEPERS: CAN THEY PROTECT INVESTORS? (Brookings Institution Press 2006, Yasuyuki Fuchita and Robert E. Litan, eds.).

*Enron and the Derivatives World*, in ENRON: CORPORATE FIASCOS AND THEIR IMPLICATIONS (Foundation Press 2004, Nancy B. Rapoport and Bala G. Dharan, eds.).

*ISDA, NASD, CFMA, and SDNY: The Four Horsemen of Derivatives Regulation?*, in BROOKINGS-WHARTON PAPERS ON FINANCIAL SERVICES (Brookings Institution Press 2002, Robert E. Litan and Richard Herring, eds.).

*The Paradox of Credit Ratings*, in THE ROLE OF CREDIT REPORTING SYSTEMS IN THE INTERNATIONAL ECONOMY (Kluwer Academic Publishers 2002, Richard M. Levitch, Giovanni Majnoni, and Carmen Reinhart, eds.).

PUBLISHED ARTICLES

*Market Prices vs. Fundamental Value: The Case for Using Discounted Cash Flow Analysis in Securities Class Actions*, THE BUSINESS LAWYER (forthcoming 2022).

*Social Good and Litigation Risk*, HARVARD BUSINESS LAW REVIEW (forthcoming 2022, with Adam Badawi).

*The Long-Term Effects of Negative Activism*, 2022 UNIVERSITY OF ILLINOIS LAW REVIEW 1 (2022) (with Peter Molk).

*The Misuse of Tobin's Q*, 73 VANDERBILT LAW REVIEW 353 (2020) (with Robert Bartlett).

*Negative Activism*, 97 WASHINGTON UNIVERSITY LAW REVIEW 1333 (2020) (with Barbara Bliss and Peter Molk).

*Professor Randall Thomas's Depolarizing and Neutral Approach to Shareholder Rights*, 72 VANDERBILT LAW REVIEW 1755 (2019) (with Jim Cox).

*Institutional Investors as Short Sellers*, 99 BOSTON UNIVERSITY LAW REVIEW 837 (2019) (with Peter Molk).

*The Law of Two Prices: Regulatory Arbitrage, Revisited*, 107 GEORGETOWN LAW JOURNAL 1017 (2019).

*Webber's Best Weapon: Working-Class Shareholders as David to Corporate Management's Goliath*, 99 BOSTON UNIVERSITY LAW REVIEW 291 (2019).

*Information Bundling and Securities Litigation*, 65 JOURNAL OF ACCOUNTING AND ECONOMICS 61 (2018) (with Barbara Bliss and Michael Furchtgott).

*Specificity and Time Horizons*, 41 SEATTLE UNIVERSITY LAW REVIEW 525 (2018).

*What's (Still) Wrong with Credit Ratings*, 92 WASHINGTON LAW REVIEW 1407 (2017).

*Corporations and Human Life*, 40 SEATTLE UNIVERSITY LAW REVIEW 399 (2017).

*The Second Wave of Hedge Fund Activism: The Importance of Reputation, Clout, and Expertise*, 40 JOURNAL OF CORPORATE FINANCE 296 (2016) (with C.N.V. Krishnan and Randall Thomas).

*Law and the Theory of Fields*, 39 SEATTLE UNIVERSITY LAW REVIEW 579 (2016).

*Review Essay: The Unaccountable and Ungovernable Corporation*, 90 THE ACCOUNTING REVIEW 1241 (2015).

*The Timing and Source of Regulation*, 37 SEATTLE UNIVERSITY LAW REVIEW 423 (2014).

*Six Shades of Grey: A Legal Perspective on Reputation*, 12 SOCIO-ECONOMIC REVIEW 195 (2014).

*The Right Way to Regulate from Behind*, 18 NORTH CAROLINA BANKING INSTITUTE JOURNAL 113 (2013).

*The Abraham L. Pomerantz Lecture: Don't Blink: Snap Decisions and Securities Regulation*, 77 BROOKLYN LAW REVIEW 151 (2011).

*Credit Rating Agencies under the Dodd-Frank Act*, 30 BANKING & FINANCIAL SERVICES POLICY REPORT 1 (Dec. 2011) (with Aline Darbellay).

*Credit Default Swap Spreads as Viable Substitutes for Credit Ratings*, 158 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 2085 (2010) (with Mark J. Flannery and Joel F. Houston).

*Bring Transparency to Off-Balance Sheet Accounting*, Roosevelt Institute White Paper, Mar. 2010 (with Lynn E. Turner).

*Historical Perspectives on the Financial Crisis: Ivar Kreuger, the Credit Rating Agencies, and Two Theories about the Function, and Dysfunction, of Markets*, 26 YALE JOURNAL ON REGULATION 431 (2009).

*Shapeshifting Corporations*, 76 UNIVERSITY OF CHICAGO LAW REVIEW 261 (2009).

*Rethinking Regulation of Credit Rating Agencies: An Institutional Investor Perspective*, Council of Institutional Investors White Paper, Apr. 2009.

*The Match King, Chapter 9: The Author's Cut*, 2009 MICHIGAN STATE LAW REVIEW 1207 (2009).

*The Returns to Hedge Fund Activism*, 64 FINANCIAL ANALYSTS JOURNAL 27 (2008) (with Alon Brav, Wei Jiang, and Randall Thomas).

*Hedge Fund Activism, Corporate Governance, and Firm Performance,* 63 JOURNAL OF FINANCE 1729 (2008) (with Alon Brav, Wei Jiang, and Randall Thomas).

*The Promise and Perils of Credit Derivatives*, 75 UNIVERSITY OF CINCINNATI LAW REVIEW 1019 (2007) (invited symposium) (with David A. Skeel, Jr.).

*Second-Order Benefits from Standards*, 47 BOSTON COLLEGE LAW REVIEW 169 (2007) (invited symposium).

*Alternative Structures and Strategies for Investors*, 1 JOURNAL OF BUSINESS & TECHNOLOGY LAW 84 (2006) (invited symposium).

*Financial Innovation and Corporate Law*, 36 JOURNAL OF CORPORATION LAW 799 (2006) (invited symposium).

*Encumbered Shares*, 2005 UNIVERSITY OF ILLINOIS LAW REVIEW 775 (2005) (with Shaun P. Martin).

*Synthetic Common Law*, 53 UNIVERSITY OF KANSAS LAW REVIEW 281 (2005).

*Strict Liability for Gatekeepers: A Reply to Professor Coffee*, 84 BOSTON UNIVERSITY LAW REVIEW 365 (2004) (invited symposium).

*A Revisionist View of Enron and the Sudden Death of "May,"* 48 VILLANOVA LAW REVIEW 1245 (2003) (invited symposium), reprinted in ENRON AND WORLD FINANCE: A CASE STUDY IN ETHICS (2006).

*Multinational Regulatory Competition and Single-Stock Futures,* 21 NORTHWESTERN JOURNAL OF LAW AND INTERNATIONAL BUSINESS 641 (2001) (invited symposium).

*Barbarians at the Gatekeepers?: A Proposal for a Modified Strict Liability Regime*, 79 WASHINGTON UNIVERSITY LAW QUARTERLY  491 (2001) (invited symposium).

*The Shifting Contours of Global Derivatives Regulation*, 22 UNIVERSITY OF PENNSYLVANIA JOURNAL OF INTERNATIONAL ECONOMIC LAW 421 (2001) (invited symposium).

*Why Markets Crash and What Law Can Do About It*, 61 UNIVERSITY OF PITTSBURGH LAW REVIEW 741 (2000).

*Adding Derivatives to the Corporate Law Mix*, 34 GEORGIA LAW REVIEW 599 (2000) (invited symposium).

*The Siskel and Ebert of Financial Markets: Two Thumbs Down for the Credit Rating Agencies,* 77 WASHINGTON UNIVERSITY LAW QUARTERLY 619 (1999), reprinted at 33 SECURITIES LAW REVIEW 161 (2001).

*Financial Derivatives and the Costs of Regulatory Arbitrage*, 22 JOURNAL OF CORPORATION LAW 211 (1997).


## WORKING PAPERS

*The Ratio Problem* (with Robert Bartlett)

*Omitted Variable Bias When Using Log-Transformed Ratios as Outcome Variables: An Example from COVID-19 Research* (with Robert Bartlett)


## ESSAYS AND OTHER PUBLICATIONS

*My Wild Crypto Ride*, FINANCIAL TIMES, Jul. 17, 2021.

*The Worst Worst Case*, THE ATLANTIC, Jul./Aug. 2020.

*Stock Picks from Space*, THE ATLANTIC, May 2019.

*The Death of the IPO*, THE ATLANTIC, Nov. 2018.

*The Secrets in Your Inbox*, THE ATLANTIC, Sep. 2018.

*An SAT for CEOs*, THE ATLANTIC, Jun. 2018.

*What CEOs Get Wrong about Activist Investors*, HARVARD BUSINESS REVIEW, May 1, 2018 (with Steven Davidoff Solomon).

*Are Index Funds Evil?*, THE ATLANTIC, Sep. 2017.

*The Sequel to the Global Financial Crisis Is Here*, FINANCIAL TIMES, Jul. 31, 2017.

*Frank and Steven's Excellent Corporate-Raiding Adventure*, THE ATLANTIC, May 2017 (with Steven Davidoff Solomon).

*Bad Deeds*, THE NEW YORK TIMES BOOK REVIEW, May 15, 2016 (review of "Chain of Title").

*Few Traders Are Likely to Be Deterred by Verdict on Tom Hayes*, FINANCIAL TIMES, Aug. 4, 2015.

*Societal Bonds*, THE NEW YORK TIMES BOOK REVIEW, May 8, 2015 (review of "Smart Money").

*The Fed's Magic Tricks Will Not Make Risk Disappear*, FINANCIAL TIMES, Mar. 4, 2015.

*Is Herbalife a Pyramid Scheme?*, THE ATLANTIC, Jun. 2014.

*How Reputations are Won and Lost in Modern Information Markets: A White Paper for Policy-Makers, Practitioners, and Academics*, Apr. 2014.

*Five Years After Lehman's Collapse, Bankers Still Haven't Confronted Their Biases*, HARVARD BUSINESS REVIEW, Sep. 16, 2013.

*Inside Men*, THE NEW YORK TIMES BOOK REVIEW, Jun. 30, 2013 (cover story, review of "The Billionaire's Apprentice").

*What's Inside America's Banks*, THE ATLANTIC, January/February 2013 (cover story, with Jesse Eisinger).

*Why a Long Presidential Race Is Good for Democracy*, WASHINGTON POST, Oct. 5, 2012.

*Should Lunch Breaks Be Mandatory?*, BBC NEWS MAGAZINE, Sep. 6, 2012.

*Who Are the True Villains of the StanChart Tragedy?*, FINANCIAL TIMES, Aug. 8, 2012.

*Make Banks Pay If They Cheat on Libor*, FINANCIAL TIMES, Jul. 15, 2012.

*Act Fast, but Not Necessarily First*, HARVARD BUSINESS REVIEW, Jul. 13, 2012.

*Beyond the Blink*, THE NEW YORK TIMES, Jul. 6, 2012.

*Waiting Game*, FINANCIAL TIMES, Jun. 22, 2012.

*Rebuild the Pillars of 1930s Wall Street*, FINANCIAL TIMES, May 13, 2012.

*Goldman's "Muppets" Need Treating Like True Clients*, FINANCIAL TIMES, Mar. 15, 2012.

*Did Fannie Cause the Disaster?*, THE NEW YORK REVIEW OF BOOKS, Oct. 27, 2011 (with Jeff Madrick).

*Should Some Bankers Be Prosecuted?*, THE NEW YORK REVIEW OF BOOKS, Nov. 10, 2011 (with Jeff Madrick).

*Waiting Game: Taking the Long View*, FINANCIAL TIMES, Sep. 30, 2011.

*On Rogues, Risk-Taking, and Restoring Trust in Banks*, FINANCIAL TIMES, Sep. 22, 2011.

*The Coming World of Smaller Banks*, FINANCIAL TIMES, Aug. 10, 2011.

*The Real Insider Tip from the Galleon Verdict*, FINANCIAL TIMES, May 11, 2011.

*Grubby Lessons from a Life of Serial Fraud*, FINANCIAL TIMES, Apr. 8, 2011.

*Washington's Financial Disaster*, THE NEW YORK TIMES, Jan. 29, 2011.

*Crash Tests*, FINANCIAL TIMES, Dec. 24, 2010.

*Sunlight Shows Cracks in Crisis Rescue Story*, FINANCIAL TIMES, Dec. 3, 2010.

*Friends in High Finance*, FINANCIAL TIMES, Nov. 20, 2010.

*High Financier*, FINANCIAL TIMES, Jul. 3, 2010.

*Downgrade the Rating Agencies*, THE NEW YORK TIMES, Jun. 6, 2010.

*Goldman Is Wrong Target for Official Censure*, FINANCIAL TIMES, May 11, 2010.

*Do CDOs Have Social Value?*, THE NEW YORK TIMES, Opinion, Apr. 27, 2010.

*The Dodd Wall Street Charade*, THE DAILY BEAST, Apr. 24, 2010.

*Wall Street Beware*, FINANCIAL TIMES, Apr. 18, 2010.

*Show Us the Email*, THE NEW YORK TIMES, Dec. 19, 2009.

*Financial Reform: Lessons from 1929*, BUSINESSWEEK, Oct. 1, 2009.

*Top 5 Books on Financial Schemes*, THE WALL STREET JOURNAL, May 23, 2009.

*Danger in Wall Street's Shadows*, THE NEW YORK TIMES, May 15, 2009.

*Geithner's Stress Test Sham*, THE DAILY BEAST, May 7, 2009.

*Rated F for Failure*, NEW YORK TIMES, Mar. 16, 2009 (with Jerome Fons).

*Prepare to Bury the Fatally Wounded Big Banks*, FINANCIAL TIMES, Jan. 19, 2009.

*Citigroup Bailout Is Smart But Not Risk-free*, FINANCIAL TIMES, Nov. 27, 2008.

*Hedge Fund Managers Are the Heroes of this Crisis*, THE DAILY BEAST, Nov. 18, 2008.

*Buy the Loans*, NEW YORK TIMES, Sep. 26, 2008.

*Hubris – Is Thy Name Richard Fuld?,* FINANCIAL TIMES, Sep. 14, 2008.

*Do Investors Have a Right to Know about a CEO's Illness?*, FINANCIAL TIMES, Jul. 30, 2008.

*Do Away with Rating-Based Rules*, FINANCIAL TIMES, Jul. 9, 2008.

*The Gamble of Short-Term Pain for Long-Term Gain*, FINANCIAL TIMES, Feb. 4, 2008.

*Kerviel Is Just Part of a Global Rogues' Gallery*, FINANCIAL TIMES, Jan. 28, 2008.

*Markets Abhor the Vacuum Left by Derivatives*, FINANCIAL TIMES, Aug. 10, 2007.

*A Gamekeeper Turns to the Poachers*, FINANCIAL TIMES, Jun. 6, 2007.

*Credit Derivatives Play a Dangerous Game*, FINANCIAL TIMES, Jul. 17, 2006.

*The Malignant Side of Corporate Voting Culture*, FINANCIAL TIMES, May 17, 2006.

*Take Away the Credit Rating Agencies' Licenses*, FINANCIAL TIMES, Mar. 13, 2006.

*When Disney Wishes upon a Pixar …*, FINANCIAL TIMES, Jan. 24, 2006.

*Investing in Fantasy Land*, FINANCIAL TIMES, Dec. 28, 2005.

*The Case against Alan Greenspan*, EUROMONEY, Sept. 1, 2005.

*Must-Reads for Budding Fraudsters*, FINANCIAL TIMES, Aug. 10, 2005.

*A Serious Question for All the Overpaid Bankers*, FINANCIAL TIMES, Aug. 4, 2005.

*Congress Should Open Up Credit Ratings to Competition*, FINANCIAL TIMES, Jun. 29, 2005.

*Wall Street's Franchise Is Fading*, FINANCIAL TIMES, Apr. 6, 2005.

*Cautionary Tales of Internet Stocks*, FINANCIAL TIMES, Feb. 14, 2005.

*Road Rules for Hedge Funds*, THE NEW YORK TIMES, Dec. 14, 2004.

*Financial Engineering and Law*, FINANCIAL ENGINEERING NEWS, Nov./Dec. 2004.

*Why Nobody Mentioned Markets*, FINANCIAL TIMES, Oct. 20, 2004.

*A Man's Game in Need of Women*, FINANCIAL TIMES, Jul. 26, 2004.

*The Way to a Politician's Heart*, FINANCIAL TIMES, Jun. 14, 2004.

*The Case for Smarter Prosecutions*, FINANCIAL TIMES, Mar. 11, 2004.

*The Real Mutual Fund Problem*, SAN DIEGO UNION-TRIBUNE, Dec. 5, 2003.

*Financial Risk Management*, TREASURY & RISK MANAGEMENT, Jul./Aug. 2003.

*Want to Vote?  Answer This …*, THE NEW YORK TIMES, Jul. 28, 2003.

*The Wrong Way to Prosecute Fraud*, SAN DIEGO UNION-TRIBUNE, May 11, 2003.

*A Comparative Political History of the CFMA and Sarbanes-Oxley,* FUTURES & DERIVATIVES LAW REPORT, Apr. 2003, at 4.

*Reaping a Bitter Harvest from the Years of Greed*, EVENING STANDARD, Apr. 23, 2003.

*Building a Library: Finance*, INDEPENDENT ON SUNDAY (LONDON), Apr. 20, 2003.

*Unsound Advice from the Sage of Omaha,* FINANCIAL TIMES, Apr. 3, 2003.

*The Rating Agency Paradox,* TREASURY & RISK MANAGEMENT, Dec./Jan. 2003.

*Enron and Derivatives*, FUTURES & DERIVATIVES LAW REPORT, 2002.

*Tracing the Roots of Enron's Downfall*, SAN DIEGO UNION-TRIBUNE, Jan. 27, 2002.

*What Dogs Can Teach Us About Securities Regulation: Why Fining Two Mutual Funds For "Window Dressing" Was A Mistake*, FINDLAW, Aug. 20, 2001, <http://writ.news.findlaw.com/commentary/ >.

*Some Policy Implications of Single-Stock Futures,* FUTURES & DERIVATIVES LAW REPORT, Mar. 2001, at 8.

*Derivatives on TV: A Tale of Two Derivatives Debacles in Prime-Time,* GREENBAG (2001) (with Kimberly D. Krawiec and Peter H. Huang), reprinted at 2 DERIVATIVES REP. 15 (2001).

*Stock Gambling on the Cheap*, THE NEW YORK TIMES, Dec. 21, 2000.

*Harassment on "The Street,"* THE READ, Jun. 22, 2000, <http://www.oxygen.com/read/>.

*Beating Regis: How to Win on "Who Wants to Be a Millionaire,"* FINDLAW, June 19, 2000, <http://writ.news.findlaw.com/commentary/ >.

*Strange New Math of Palm Inc.*, NEW YORK TIMES, Mar. 15, 2000.

*Decoding Greenspan*, OPEN COURT, AMERICAN LAWYER MEDIA, Apr. 1999 <http://www.lawnewsnetwork.com/opencourt/>.

*Comments on Proposed Bulgarian Pass-Through Bonds and Mortgage Bonds Act*, CENTRAL AND EAST EUROPEAN LAW INITIATIVE (CEELI), Feb. 9, 1999.

*Betting on Suing*, OPEN COURT, AMERICAN LAWYER MEDIA, Dec. 1998. <http://www.lawnewsnetwork.com/opencourt/>.

*Do You Know Where Your Money Is Now?*, MAIL ON SUNDAY, Oct. 25, 1998.

*Playing Roulette with the Global Economy*, THE NEW YORK TIMES, Sep. 30, 1998.

*High-Finance Fiction*, LOS ANGELES TIMES BOOK REVIEW, Feb. 8, 1998.

*Riding the Rap*, WORTH, Feb. 1998.


**Selected Invited Talks and Panels**

*Expert Valuations in Securities Class Actions after* Goldman Sachs: *Some Reliable Methodologies for Assessing "Mismatch"*, Tulane Corporate and Securities Roundtable, Tulane Law School, New Orleans, LA, Mar. 19, 2022.

*Shareholder Primacy Is Illogical*, Conference on Reconstructing the Corporation: Workplace Democracy and the Future of Corporate Governance, Mar. 9, 2022 (virtual).

*Social Good and Litigation Risk*, Workshop in Business Law and Economics, The University of Texas School of Law, Austin, TX, Feb. 7, 2022.

*The Long-Term Effects of Short Selling and Negative Activism*, Institute for Law and Economic Policy Annual Conference, Jan. 28, 2022 (virtual).

*The Long-Term Effects of Short Selling and Negative Activism*, American Law and Economics Association Annual Conference, Oct. 22, 2021 (virtual).

*Financial Innovation and Regulation*, Fiscal Sociology Seminar, Dartmouth College, Oct. 13, 2022 (virtual).

*The Match King*, Yale School of Management, Yale University, New Haven, CT, Apr. 5, 2021 (virtual).

*Consumer Protection Law vs. Markets*, Consumer Law Scholars Conference, Mar. 5, 2021 (virtual).

*Empirical Research on Shareholder Activism*, University of Pennsylvania Carey Law School, Mar. 2, 2021 (virtual).

*Questioning Modern Portfolio Theory: A Review*, University of California, Berkeley School of Law, Apr. 20, 2021 (virtual).

*Boards as Worst Case Overseers*, Keynote Address, Directors Forum, San Diego, CA, Jan. 19, 2021 (virtual).

*Comments on Conscious Credit: Can Private Debt Serve Public Good?*, AALS/Boston College Financial Regulation and Corporate Governance Workshop, Jan. 6, 2021 (virtual).

*ESG Metrics and Securities Litigation*, Organizations and Social Impact Workshop, Nov. 6, 2020 (virtual).

*ESG and Litigation*, TruValue Labs Academic Roundtable, Oct. 26, 2020 (virtual).

*The Ratio Problem*, NYU School of Law, Oct. 14, 2020 (virtual).

*Sustainable Finance*, NYU Economic Policy Conference, Oct. 1, 2020 (virtual).

*Credit Rating Agencies: What Have We Learned?*, SEC Investor Advisory Committee, May 21, 2020 (virtual).

*Perspectives on Financial Fraud*, Yale School of Management, Yale University, New Haven, CT, Apr. 6, 2020 (virtual).

*The Misuse of Tobin's Q*, Cardozo School of Law, New York, NY, Feb. 26, 2020.

*The Ratio Problem*, Stanford Graduate School of Business, Palo Alto, CA, Feb. 20, 2020.

*Perspectives on WeWork*, UC Berkeley Spring M&A Forum, San Francisco, CA, Feb. 6, 2020.

*Telling Your ESG Story*, Directors Forum, San Diego, CA, Jan. 16, 2020.

*The Ratio Problem*, Financial Risk Seminar, UC Berkeley, Berkeley, CA, Nov. 19, 2019.

*The Misuse of Tobin's Q*, UNAM-UC Berkeley Exchange, Berkeley, CA, Sep. 20, 2019.

*Negative Activism*, National Business Law Scholars Conference, UC Berkeley, Berkeley, CA, Jun. 20, 2019.

*Negative Activism*, American Law and Economics Association Conference, NYU, New York, NY, May 17, 2019.

*Shareholder Activism and ESG*, UC Berkeley-Kirkland & Ellis M&A Roundtable, New York, NY, May 17, 2019.

*Depolarizing Shareholder Rights*, Institute for Law and Economic Policy, San Juan, Puerto Rico, Apr. 19, 2019.

*Fraud in the Bull Market*, UC Berkeley Center for Law and Business Financial Fraud Conference, San Francisco, CA, Apr. 10, 2019.

*The Match King*, Yale School of Management, Yale University, New Haven, CT, Apr. 8, 2019.

*Comments on Engineered Credit Default Swaps*, Maurer School of Law, Indiana University, Bloomington, IN, Apr. 5, 2019.

*The Ratio Problem in Empirical Finance*, UC Berkeley, Berkeley, CA, Mar. 21, 2019.

*Financial Derivatives, Theories of Speculation, and the Scholarship of Lynn Stout*, Cornell Club, New York, NY, Feb. 1, 2019.

*The Misuse of Tobin's Q*, University of Toronto Faculty of Law, Toronto, Canada, Jan. 29, 2019.

*Negative Activism*, The Wharton School of the University of Pennsylvania, Philadelphia, PA, Jan. 31, 2019.

*Perspectives on Bad Blood*, Directors Forum, San Diego, CA, Jan. 15, 2019.

*Institutional Investors as Short Sellers?*, Boston University School of Law, Boston, MA, Nov. 16, 2018.

*The Role of Delay in Investing*, CLSA Annual Conference, Hong Kong, Sep. 14, 2018.

*Filling the Void in Protecting Portfolios*, Public Funds Forum, Laguna Beach, CA, Sep. 5, 2018.

*The Activist Manifesto*, Oxford University, Oxford, UK, Aug. 28, 2018.

*The Law of Two Prices: Regulatory Arbitrage Revisited*, Berkeley Center for Business Law, Half Moon Bay, CA, May 26, 2018.

*One-on-One with Bill Ackman*, Berkeley Mergers and Acquisitions Roundtable, New York, NY, May 23, 2018.

*Everything Old Is New Again: Berle and Corporate Finance*, Berle X Symposium, Seattle University School of Law, Seattle, WA, May 17, 2018.

*The Misuse of Tobin's Q*, American Law and Economics Association Annual Conference, Boston, MA, May 11, 2018 (with Robert Bartlett).

*"Keynote Interrupted" with Andy Fastow*, The Future of Financial Fraud Conference, New York, NY, May 2, 2018.

*The Law of Two Prices: Regulatory Arbitrage Revisted*, Institute for Law and Economic Policy Annual Conference, Bal Harbour, FL, Apr. 20, 2018.

*Some Perspectives on The Rise of the Working-Class Shareholder*, Boston University School of Law, Boston, MA, Apr. 9, 2018.

*A Holmesian View of Innovation and the State*, Peter A. Allard School of Law, The University of British Columbia, Vancouver, BC Canada, Mar. 15, 2018.

*Transformation in our Capital Markets*, Corporate Directors Forum, San Diego, CA, Jan. 23, 2018.

*The Misuse of Tobin's Q*, Loyola Law School, Los Angeles, CA, Jan. 19, 2018.

*What's Wrong with Credit Ratings*, AALS Banking Section Keynote Address, San Diego, CA, Jan. 6, 2018.

*Institutional Investors and Corporate Governance*, AALS Business Associations Panel, San Diego, CA, Jan. 5, 2018.

*Delaware and Financial Risk*, Vanderbilt University Law School, Nashville, TN, Nov. 3, 2017.

*Corporations and Human Life*, Shanghai University of Finance and Economics School of Law, Oct. 21, 2017.

*The Misuse of Tobin's Q*, The Wharton School of the University of Pennsylvania, Philadelphia, PA, Oct. 12, 2017.

*Public Companies: An Endangered Species?*, Council of Institutional Investors Fall Conference, San Diego, CA, Sep. 13, 2017.

*What's (Still) Wrong with Credit Ratings*, University of Utah, Salt Lake, City, UT, Jun. 8, 2017.

*Optimal Time Horizons*, Berle IX Symposium, Georgia State, Atlanta, GA, Jun. 5, 2017.

*Shareholder Activism*, Berkeley BCLBE, Palo Alto, CA, May 24, 2017.

*Law and Finance Policy*, Georgia State, Atlanta, GA, Apr. 5, 2017

*What's (Still) Wrong with Credit Rating Agencies*, USD-Berkeley Business Law Conference, Las Vegas, NV, Mar. 24, 2017.

*What's (Still) Wrong with Credit Rating Agencies*, UC Berkeley School of Law, Berkeley, CA, Feb. 9, 2017.

*What's (Still) Wrong with Credit Rating Agencies*, Vanderbilt University Law School, Nashville, TN, Feb. 6, 2017.

*Can We Really Govern for the Long-Term vs. the Quarterly Fixation?*, Corporate Directors Forum, San Diego, CA, Jan. 23, 2017.

*What's (Still) Wrong with Credit Rating Agencies*, University of California Irvine, School of Law, Irvine, CA, Jan. 13, 2017.

*Why [Transactional] Law Matters*, AALS Annual Meeting, San Francisco, CA, Jan. 6, 2017.

*What's (Still) Wrong with Credit Rating Agencies*, Graduate School of Business: Finance, Stanford University, Stanford, CA, Dec. 2, 2016.

*Information Bundling and Securities Litigation*, Graduate School of Business: Accounting, Stanford University, Stanford, CA, Nov. 30, 2016.

*Corporations and Human Life*, Stanford Law School, Stanford, CA, Nov. 28, 2016.

16

*Hedge Fund Activism*, Sydney Law School, Sydney, Australia, Sep. 26, 2016.

*Emerging Issues in Governance and Investing*, Public Funds Forum, Park City, UT, Sep. 8, 2016.

*Activist Investors*, Oxford University, UK, Sep. 1, 2016.

*Corporations and Human Life*, Berle VIII Symposium, Seattle University School of Law, Seattle, WA, Jun. 27, 2016.

*The Second Wave of Hedge Fund Activism*, American Law and Economics Association Annual Meeting, Harvard Law School, Cambridge, MA, May 21, 2016.

*The Second Wave of Hedge Fund Activism*, Fordham Law School, New York, NY, Apr. 28, 2016.

*Delaware and Financial Institutions*, University of California, Berkeley, Berkeley, CA, Apr. 14, 2016.

*The Second Wave of Hedge Fund Activism*, Notre Dame Law School, Notre Dame, IN, Apr. 8, 2016.

*The Second Wave of Hedge Fund Activism*, USC Gould School of Law, Los Angeles, CA, Jan. 28, 2016.

*Whatever Happened to Maximizing Shareholder Value?*, Corporate Directors Forum, San Diego, CA, Jan. 25, 2016.

*Top Hedge Funds: The Importance of Reputation in Shareholder Activism*, BYU Law School, Provo, UT, Nov. 13, 2015.

*The Effects of Hedge Fund Activism,* Conference on the Future of Research on Hedge Fund Activism, University of San Diego, San Diego, CA, Oct. 23, 2015.

*Top Hedge Funds: The Importance of Reputation in Shareholder Activism*, Vanderbilt University Law School, Nashville, TN, Oct. 12, 2015.

*Corporate Innovation and Regulation*, Sydney Law School, Sydney, NSW, Australia, Sep. 16, 2015.

*The New Credit Rating Regime*, University of Hong Kong, Hong Kong, Sep. 11, 2015.

*Bank Reputation*, Centre for Corporate Reputation, Said Business School, Oxford University, Sep. 3, 2015.

*Regulating Financial Innovation: Of Credit Ratings and Hedge Fund Activism*, Center for Advanced Studies, LMU, Munich, Germany, Jul. 2, 2015.

*Credit Ratings and Regulatory License Theory*, World Credit Rating Forum, Beijing, China, Jun. 29, 2015.

*Top Hedge Funds: The Importance of Reputation in Shareholder Activism*, Corporate Law Conference: University of San Diego/Berkeley, Las Vegas, NV, Jun. 6, 2015.

*Law and the Theory of Fields*, Berle VII Conference, Seattle University School of Law, Seattle, WA, May 27, 2015.

*Should Delaware Dictate Corporate Conduct?*, ABA Litigation Section Annual Meeting, New Orleans, Apr. 17, 2015.

*Recent Evidence about Hedge Fund Activism: Preliminary Results*, Stanford Law School, Feb. 19, 2015.

*Finance Innovation and Society*, Stanford Business School, Stanford, CA, Feb. 20, 2015.

*Recent Evidence about Hedge Fund Activism: Preliminary Results*, Duke Law School, Durham, NC, Feb. 6, 2015.

*Why Do Boards Do What They Do?: How Good Directors Make Bad Decisions*, Directors Forum 2015, University of San Diego, San Diego, CA, Jan. 27, 2015.

*Quantifying Reasonable Doubt*, American Business Trial Lawyers Annual Conference, Honolulu, HI, Oct. 17, 2014.

*Keynote Address: Strategic Decision Making, The Art of Delay and Influencing Decisions*, American Business Trial Lawyers Annual Conference, Honolulu, HI, Oct. 16, 2014.

*Options and Team Production Theory*, Berle VI Symposium, Seattle University, Seattle, WA, Jun. 24, 2014.

*Keynote Address, Who Is Our Audience and How Confident Are We? (with an application to pyramid schemes)*, National Business Law Scholars Conference, Loyola Law School, Los Angeles, CA, Jun. 19, 2014.

*Hedge Fund Activism and Issues in Market Manipulation*, University of Sydney Law School, Sydney, NSW, Australia, Jun. 7, 2014.

*Corporate Innovation and Abuse*, University of Sydney Law School, Sydney, NSW, Australia, Jun. 2, 2014.

18

*Keynote Address, Procrastination and Success*, Phi Beta Kappa, University of San Diego, San Diego, CA, May 23, 2014.

*A Look Inside the Supreme Court Argument in Halliburton*, University of San Diego School of Law, San Diego, CA, Mar. 19, 2014.

*Keynote Address: Financial Crises and Corruption through the Lens of Probability and the Law*, Business History Conference 2014, Frankfurt, Germany, Mar. 13, 2014.

*The Law and Finance of Hedge Fund Activism*, University of British Columbia Faculty of Law, Vancouver, Canada, Feb. 4, 2014.

*The Art and Science of Procrastination in Decision Making*, National Centre for Business Law, Vancouver, Canada, Feb. 4, 2014.

*Finance and Society*, Stanford Business School, Stanford, CA, Feb. 3, 2014.

*Keynote Chat with Securities and Exchange Commission Chair Mary Schapiro*, Directors Forum, San Diego, CA, Jan. 28, 2014.

*How Reputations Are Won and Lost in Modern Information Markets*, University of San Diego-Oxford University Conference on Media and Markets, San Diego, CA, Jan. 17, 2014.

*Comments on How Pervasive Is Corporate Fraud?*, American Economics Association Annual Conference, Philadelphia, PA, Jan. 4, 2014.

*Images of the Shareholder*, Vanderbilt University Law School, Nashville, TN, Sep. 26, 2013.

*The Role of Delay in Modern Mortgage Markets* , McCarthy Holthus, San Diego, CA, Sep. 23, 2013.

*The Value of Values*, GMI Annual Conference, Newport, CA, Sep. 18, 2013.

*Shades of Grey: A Legal Perspective on Reputation*, Oxford University, Oxford, UK, Sep. 6, 2013.

*Do Reputational Penalties Still Apply in the City and on Wall Street?*, Oxford University, Oxford, UK, Sep. 4, 2013.

*Critical Public Policy Issues for SRI Investors,* US SIF: The Forum for Sustainable and Responsible Investment, Chicago, IL, May 22, 2013.

*The Ex Ante Problem and the Ex Post Solution*, Berle V Symposium, Sydney, Australia, May 13, 2013.

*Be Afraid and Go Slow*, Institutional Investor, Roundtable for Public & Taft Hartley Plans, Los Angeles, CA, Apr. 25, 2013.

*Leadership and Managing Delay*, School of Leadership and Education Sciences, University of San Diego, San Diego, CA, Apr. 22, 2013.

*Science: Behave Your Self*, LA Times Festival of Books, University of Southern California, Los Angeles, CA, Apr. 20, 2013.

*The Role of Delay in Modern Markets*, Francis Parker School, San Diego, CA, Apr. 16, 2013.

*Ethical Leadership: From the Board Room to the Mail Room*, Federal Bar Association and Investment Company Institute Conference, Palm Desert, CA, Mar. 20, 2013.

*Keynote Address: Cost-Benefit Analysis*, University of California, Irvine School of Law, Irvine, CA, Mar. 15, 2013.

*The Economic Crisis: Causes, Consequences, and What's Next*, Center for Social Theory and Comparative History, UCLA, Los Angeles, CA, Feb. 25, 2013.

*Comments on Soft Shareholder Activism,* NYU/Penn Law and Finance Conference, NYU Stern School of Business, New York, NY, Feb. 9, 2013.

*The Political Economy of Financial Regulation*, George Washington University Law School, Washington, DC, Feb. 8, 2013.

*The Financial Industry: How Has It Performed Since 2008?*, Directors Forum, University of San Diego, San Diego, CA, Jan. 28, 2013.

*What to Expect in Litigation: 2013*, Directors Forum Pre-Session, University of San Diego, San Diego, CA, Jan. 27, 2013.

*WAIT: The Art and Science of Delay*, Torrance Public Library Lecture Series, Torrance, CA, Jan. 23, 2013.

*Keynote Address*, BrandFinance India, Mumbai, India, Jan. 15, 2013.

*WAIT: The Art and Science of Delay*, Skagen, Stockholm, Sweden, Jan. 11, 2013.

*WAIT: The Art and Science of Delay*, Skagen, Oslo, Norway, Jan. 11, 2013.

*WAIT: The Art and Science of Delay*, Skagen, Copenhagen, Denmark, Jan. 11, 2013.

*WAIT: The Art and Science of Delay*, USD Student Affairs Development, San Diego, CA, Dec. 18, 2012.

*WAIT: The Art and Science of Delay*, Sempra, San Diego, CA, Dec. 5, 2012.

*Encumbered Shares in Context*, American Bar Association Section Business Law Section Fall Meeting, Washington, DC, Nov. 17, 2012.

*How Fast Is Too Fast?: High Frequency Trading and the Role of Delay*, Keynote Address, Liquidnet US Conference, New Orleans, LA, Nov. 13, 2012.

*How Fast Is Too Fast?: High Frequency Trading and the Role of Delay*, Keynote Address, Liquidnet EMEA Conference, London, UK, Oct. 25, 2012.

*WAIT: The Art and Science of Delay*, Thomas Jefferson Law School, San Diego, CA, Oct. 15, 2012.

*WAIT: The Art and Science of Delay*, Southern Festival of Books, Nashville, TN, Oct. 12, 2012.

*Keynote Address*, Council of Institutional Investors Conference, Seattle, WA, Oct. 4, 2012.

*Keynote Address*, PIRC Seminar, London, UK, Sep. 13, 2012.

*WAIT: The Art and Science of Delay*, Say: Create Conference, Carmel, CA, Sep. 10, 2012.

*WAIT: The Art and Science of Delay*, Google, Mountain View, CA, Aug. 23, 2012.

*Financial Innovation and Law*, Kauffman Conference, Laguna Niguel, CA, Jul. 25, 2012.

*WAIT: The Art and Science of Delay*, STAR, La Jolla, CA, Jul. 18, 2012.

*WAIT: The Art and Science of Delay*, Warwick's, La Jolla, CA, Jul. 18, 2012.

*WAIT: The Art and Science of Delay*, USD Executive Leadership Program, San Diego, CA, Jul. 17, 2012.

*WAIT: The Art and Science of Delay*, Town Hall, Seattle, WA, Jul. 11, 2012.

*WAIT: The Art and Science of Delay*, Securities and Exchange Commission, Washington, DC, Jul. 9, 2012.

*WAIT: The Art and Science of Delay*, Royal Society for the Arts, London, UK, Jul. 3, 2012.

*WAIT: The Art and Science of Delay*, Cass Business School, London, UK, Jul. 3, 2012.

*Keynote Address*, Behavior Decision Research in Management (BDRM) Conference, Boulder, CO, Jun. 28, 2012.

*WAIT: The Art and Science of Delay*, ProPublica, New York, NY, Jun. 25, 2012.

*WAIT: The Art and Science of Delay*, Council on Foreign Relations, New York, NY, Jun. 25, 2012.

*WAIT: The Art and Science of Delay*, Directors College, Boston College Law School, Boston, MA, Jun. 20, 2012.

*The Future of Finance*, OSHER, University of California, San Diego, La Jolla, CA, May 1, 2012.

*Lawyers and Delay*, Association of Business Trial Lawyers, San Diego, CA, Apr. 30, 2012.

*Disclosure Strategies and Shareholder Litigation Risk: Evidence from Earnings Restatements*, Institute for Law and Economic Policy, San Juan, Puerto Rico, Apr. 27, 2012.

*Progress and Implications of Financial Reform Proposals, Debt, Deficits, and Financial Instability*, Levy Economics Institute 21st Annual Hyman P. Minsky Conference on the State of the US and World Economies, Ford Foundation, New York, NY, Apr. 12, 2012.

*Dodd-Frank's New Regulatory Regime for Derivatives*, George Washington University Law School, Washington, DC, Mar. 2, 2012.

*What's So Bad About Poison Pills, Staggered Boards and Chair/CEOs, Anyway?*, Directors Forum 2012, San Diego, CA, Jan. 23, 2012.

*Are Aggressive Reporting Practices Associated with Other Aggressive Corporate Policies?*, Discussant, NBER Corporate Culture Conference, National Bureau of Economic Research, Cambridge, MA, Dec. 9, 2011.

*Disclosure Strategies and Shareholder Risk*, USC Center in Law, Economics, and Organization, University of Southern California Gould School of Law, Los Angeles, CA, Nov. 14, 2011.

*Some Perspectives on the Financial Crisis*, American Constitution Society, San Diego, CA, Nov. 9, 2011.

*Scandal Enforcement at the SEC: Salience and the Arc of the Option Backdating Investigations*, Discussant, Conference on Empirical Legal Studies, Northwestern University Law School, Chicago, IL, Nov. 4, 2011.

*WAIT: The Art and Science of Delay*, Berle Center Corporate Governance Colloquium, Seattle University School of Law, Seattle, WA, Oct. 21, 2011.

*WAIT: The Art and Science of Delay*, French-American Foundation's Young Leaders Program, San Diego, CA, Oct. 5, 2011.

*A Decade or So of Credit Rating Agency Research*, Oxford University Conference on Corporate Reputation, Oxford, UK, Sep. 15, 2011.

*Meeting Today's Investment Challenges*, The Future of Corporate Reform, GMI 2011 Public Funds Forum, Half Moon Bay, CA, Sep. 7, 2011.

*Don't Blink: Snap Decisions and Securities Regulation:* Abraham L. Pomerantz Lecture, Brooklyn Law School, New York, NY, Mar. 15, 2011.

*Regulatory and Legal Issues in the Year Ahead: What Directors, General Counsel, Managers, and Shareholders Need to Know*, USD Center for Corporate and Securities Law Bonus Session for Directors Forum 2011, San Diego, CA, Jan. 23, 2011.

*Inside Job,* New York Film Festival, New York, NY, Oct. 1, 2010.

*How Financial Regulation Might Harness the Power of Markets*, Kauffman Foundation Conference: Rules for Growth, Laguna Niguel, CA, Jul. 8, 2010.

*It's 1931 Again: Repeating History in Regulatory Reform*, CFO Core Concerns Conference, Baltimore, MD, Jun. 28, 2010.

*Markets for Financial Information*, 2010 Financial Markets Conference, Federal Reserve Bank of Atlanta, Atlanta, GA, May 11, 2010.

*Credit Default Swaps As Viable Substitutes for Credit Ratings*, Institute for Law and Economic Policy, Turks & Caicos, Apr. 22, 2010.

*The Match King: Lessons from Financial History*, Osher Institute, University of California, San Diego, San Diego, CA, Apr. 16, 2010.

*Where Is Corporate and Securities Litigation Headed Post-Crisis*, Center on Corporate and Securities Law, University of San Diego School of Law, Apr. 12, 2010, http://www.sandiego.edu/law/news/webcasts/#ccsl_panel_2010.

*Off-Balance Sheet Transactions*, Roosevelt Institute Conference on Make Markets Be Markets, New York NY, Mar. 3, 2010,  http://vimeo.com/9963640.

23

*How History Repeats: Scandals and the Economic Crisis*, Association of Business Trial Lawyers, San Diego, CA, Mar. 22, 2010.

*Credit Default Swaps As Viable Substitutes for Credit Ratings*, Cleveland-Marshall College of Law, Cleveland, OH, Mar. 11, 2010.

*Lessons from the Match King: Financial Crises and Parallels to the 1920s*, Public Lecture, Cleveland-Marshall College of Law, Cleveland, OH, Mar. 10, 2010.

*What to Do about Credit Rating Agencies*, Maurice R. Greenberg Center for Geoeconomic Studies, Council on Foreign Relations, New York, NY, Mar. 1, 2010.

*The New Role of the State in the Financial Sector*, Thrower Symposium, Emory Law School, Atlanta, GA, Feb. 11, 2010.

*What to Expect in Regulation and Litigation*, Directors Forum, San Diego, CA, Jan. 24, 2010.

*The Financial Crisis and Commercial Real Estate*, Burnham-Moores Center for Real Estate, University of San Diego, San Diego, CA, Jan. 12, 2010.

*Some Historical Perspectives on The Match King*, CalCPA San Diego Tax and Accounting Institute, San Diego, CA, Nov. 18, 2009.

*The Match King, Chapter 9: The Author's Cut*, American Society for Legal History Annual Conference, Dallas, TX, Nov. 13, 2009.

*The Match King, Chapter 9: The Author's Cut*, Developments in Corporate Law Symposium, Indiana University Maurer School of Law, Bloomington, IN, Nov. 9, 2009.

*Some Historical Perspectives on The Match King*, Sempra Lecture Series, San Diego, CA, Nov. 6, 2009.

*Legal Implications of the Financial Meltdown*, Appellate Judicial Attorneys Institute, Long Beach, CA, Nov. 2, 2009.

*What Can We Learn from "The Match King?,"* Public Investors Arbitration Bar Association Annual Meeting, Carlsbad, CA, Oct. 31, 2009.

*What Can We Learn from "The Match King?,"* Council of Institutional Investors Annual Meeting, Los Angeles, CA, Oct. 2, 2009.

*At the Center of the Financial Crisis: Derivatives and Rating Agencies*, Labaton Sucharow Conference on Corporate Governance and Securities Regulation: One Year After the Lehman Brothers Collapse and AIG Bailout, New York, NY, Sep. 25, 2009.

*From Ivar Kreuger to Bernie Madoff: What do Mega-Frauds Tell Us About Our Financial System*, Labaton Sucharow Conference on Corporate Governance and Securities Regulation: One Year After the Lehman Brothers Collapse and AIG Bailout, New York, NY, Sep. 25, 2009.

*Lessons Learned: Looking to History and Looking to the Future*, IMN 3rd Annual Hedge Fund Activism and Shareholder Value Summit, Carlsbad, CA, Sep. 23, 2009.
*What Can We Learn from "The Match King?,"* Institute for Private Investors Fall Forum, San Francisco, CA, Sep. 16, 2009.

*The Match King, Chapter 9: The Author's Cut*, Business Law and Narrative Conference, Michigan State University, East Lansing, MI, Sep. 11, 2009.

*Challenges Facing Public Funds Today*, The Corporate Library Conference on the Future of Corporate Reform, San Diego, CA, Sep. 9, 2009.

*Some Historical Perspectives on The Match King*, Club Altura, La Jolla, CA, Sep. 3, 2009.

*Some Historical Perspectives on The Match King*, CFA Society of San Diego, San Diego, CA, Aug. 26, 2009.

*Financial Innovation and Corporate Governance*, Rady School of Management, University of California, San Diego, San Diego, CA, Jul. 25, 2009.

*Finance in Corporate Law*, American Association of Law Schools Conference on Business Associations, Long Beach, CA, Jun. 8, 2009.

*Modeling Prediction*, American Law and Economics Association, University of San Diego, San Diego, CA, May 15, 2009.

*Some Historical Perspectives on The Match King*, New York University, New York, NY, May 6, 2009.

*Some Historical Perspectives on The Match King*, University of California, San Diego, San Diego, CA, May 1, 2009.

*Dura Fraud*, Institute for Law and Economic Policy, Scottsdale, AZ, Apr. 24, 2009.

*Rethinking Regulation of Credit Rating Agencies*, Credit Rating Agency Roundtable, Securities and Exchange Commission, Washington, DC, Apr. 15, 2009.

*Blame the Match King*, Grant's Interest Rate Observer Spring Investment Conference, New York, NY, Apr. 7, 2009.

*Overdependence on Credit Ratings Was a Primary Cause of the Crisis*, George Washington University, Washington, DC, Apr. 3, 2009.

*Fixing the Global Financial System*, FEEM-Bocconi Financial Regulation Workshop, Milan, Italy, Mar. 27, 2009.

*Some Historical Perspectives on The Match King*, Cambridge University, Cambridge, England, Feb. 25, 2009.

*The Role of the Credit Rating Agencies in the Financial Crisis*, London Business School, London, England, Feb. 24, 2009.

*Some Historical Perspectives on The Match King*, Oxford University, Oxford, England, Feb. 24, 2009.

*What Finance Can Teach Law (and Vice Versa)*, Association of American Law Schools Annual Conference, San Diego, CA, Jan. 10, 2009.

*Enforcement Implications of the Financial Crisis*, North American Securities Administrators Association Annual Conference, San Diego, CA, Jan. 9, 2009.

*Credibility and Financial Markets*, Keynote Address, Conference on Credibility, Shenzhen University, Shenzhen, China, Dec. 18, 2008.

*The Role of Ratings,* Federal Reserve Bank of Chicago International Conference, Chicago, IL, Sep. 25, 2008.

*Over-the-Counter Derivatives Regulation and Reform*, Derivatives Summit of the Global Fixed Income Institute, London, England, Jul. 8, 2008.

*Credit Ratings Regulation and Policy*, University of Amsterdam, Amsterdam, The Netherlands, Jul. 4, 2008.

*Financial Innovation and the Roots of the Crisis*, Keynote Address, Euromoney Global Borrowers and Investors Forum 2008, London, England, Jun. 25, 2008.

*Re-Modeling Ratings*, Euromoney Global Borrowers and Investors Forum 2008, London, England, Jun. 25, 2008.

*Shapeshifting Corporations*, University of Chicago Law School, Chicago, IL, Jun. 20, 2008.

*How Should Directors Deal with Derivatives and Innovative Structured Financing?*, Directors Forum 2008, San Diego, CA, Jan. 14, 2008.

26

*Perspectives on Private Equity and the Future of Public Shareholders*, Columbia Law School, New York, NY, Dec. 7, 2007.

*Hedge Fund Activism, Corporate Governance, and Firm Performance*, Fordham Law School, New York, NY, Oct. 19, 2007.

*Hedge Fund Activism, Corporate Governance, and Firm Performance*, Brooklyn Law School, New York, NY, Oct. 18, 2007.

*The Promise and Perils of Credit Derivatives*, American Law and Economics Association, Harvard Law School, Cambridge, MA, May 12, 2007.

*Legal and Ethical Issues in Trading*, University of Kansas School of Business, Advanced Portfolio Management Seminar, Lawrence, KS, Mar. 5, 2007.

*Hedge Fund Activism, Corporate Governance, and Firm Performance,* University of Kansas School of Business, Finance Department, Lawrence, KS, Mar. 2, 2007.

*Derivative Investment Risks, Conflicts-of-Interest, and Self-Regulation of the Exchanges*, Directors Forum 2007, San Diego, CA, Jan. 22. 2007.

*Hedge Fund Activism, Corporate Governance, and Firm Performance,* Annual Meeting, Association of American Law Schools, Securities Regulation Section, Washington, DC, Jan. 5, 2007.

*Hedge Fund Activism*, *Corporate Governance, and Firm Performance,* Vanderbilt University Law School, Nashville, TN, Oct. 13, 2006.

*Financial Innovation and Corporate Law*, Georgetown University Law Center, Washington, DC, Oct. 2, 2006.

*Gatekeepers Revisited*, Columbia University School of Law, New York, NY, Sep. 29, 2006.

*Gap Filling, Hedge Funds, and Financial Innovation*, Brookings-Nomura Conference on Financial Services, The Brookings Institution, Washington, DC, Sep. 12, 2006.

*Credit Derivatives and Correlation Risk*, Rady School of Management Finance Department Seminar, University of California, San Diego, May 18, 2006.

*Hedge Funds and Corporate Governance*, University of Illinois Conference on Capital Markets and Corporate Governance, Chicago, IL, Apr. 25, 2006.

*Second-Order Benefits from Standards*, Boston College Law School, Boston, MA, Mar. 31, 2006.

*Corporate Voting and Corporate Governance*, UCLA School of Law, Los Angeles, CA, Mar. 20, 2006.

*Assessing the Current Oversight and Operations of Credit Rating Agencies*, Sworn Testimony before the United States Senate Committee on Banking, Housing, and Urban Affairs, Washington, DC, Mar. 7, 2006.

*Patents as Options*, Washington University in St. Louis Conference on Commercializing Innovation, Washington University School of Law, St. Louis, MO, Nov. 4, 2005.

*An Assessment of the Global Risks Associated with Synthetic Collateralized Debt Obligations*, Bayerische Hypo- und Vereinsbank AG Financial Institutions and Agency Funding Conference, Munich, Germany, Sep. 30, 2005.

*How and Why Credit Rating Agencies are Not Like Other Gatekeepers*, Brookings-Nomura Conference on Financial Services, The Brookings Institution, Washington, DC, Sep. 28, 2005.

*Financial Innovation and Corporate Law*, University of Iowa College of Law, Iowa City, IA, Sep. 9, 2005.

*Legislative Solutions for the Rating Agency Duopoly*, Sworn Testimony before the Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises, U.S. House of Representatives Committee on Financial Services, Washington, DC, Jun. 29, 2005.

*Where Is the Risk?*, Euromoney Global Borrowers & Investors Forum, London, England, Jun. 23, 2005.

*Designing Groups: Voting Preferences and Path Dependence*, The Law and Society Association Annual Meeting, Las Vegas, NV, Jun. 2, 2005.

*Infectious Greed*, Wilson Lecture in Law and Business, Wake Forest University School of Law and Babcock School of Management, Winston-Salem, NC, Mar. 29, 2005.

*Encumbered Shares*, University of Kansas School of Law, Lawrence, KS, Feb. 28, 2005.

*Encumbered Shares*, Boalt Hall School of Law, Berkeley, CA, Jan. 24, 2005.

*Mutual Funds, Financial Innovation, and the Product/Service Distinction*, University of Maryland Law School, Baltimore, MD, Nov. 5, 2004.

*Encumbered Shares*, University of San Diego School of Law, San Diego, CA, Oct. 14, 2004.

*Director Ethics*, Corporate Directors' Forum, San Diego, CA, Oct. 6, 2004.

*Infectious Greed*, UCLA School of Law, Los Angeles, CA, Feb. 2, 2004.

*Are the Markets Out of Control?*, University of San Diego School of Law, San Diego, CA, Nov. 17, 2003.

*Recent Issues in Corporate Governance*, Keynote Address, Society of Actuaries Annual Investment Conference, Toronto, CA, Nov. 11, 2003.

*Corporate Voting and Encumbered Shares*, Washington University School of Law, St. Louis, MO, Oct. 21, 2003.

*Emerging Issues in Structured Finance*, Seoul National University College of Law, Seoul, Republic of Korea, Jun. 20, 2003.

*Structured Financial Products: Regulation, Law, and Policy*, Korean Securities Dealers Association, Seoul, Republic of Korea, Jun. 19, 2003.

*Credit Derivatives: Be Afraid, Be Very Afraid*, Grant's Interest Rate Observer Spring Investment Conference, New York, NY, Apr. 30, 2003.

*Financial Innovation and Accounting*, 57th Annual Conference of Accountants, University of Tulsa, Tulsa, OK, Apr. 29, 2003.

*Credit Derivatives and Insurance Regulation*, National Association of Insurance Commissioners National Meeting, San Diego, CA, Dec. 9, 2002.

*An Economic Reality Standard for Financial Market Regulation*, Goizueta Business School, Emory University, Atlanta, GA, Nov. 19, 2002.

*Research Studies of Individual Companies*, Conference on Field Study Methodologies in Legal Research and Teaching about Business, Georgetown Law School, Washington, D.C., Nov. 1, 2002.

*Enron and Derivatives*, George Washington University School of Law, Washington, D.C., Oct. 7, 2002.

*Enron and Derivatives*, Villanova Law School Symposium on Lessons from Enron, Villanova, PA, Oct. 5, 2002.

*Law and Finance*, Keynote Lecture, Courant Institute for Mathematical Finance, New York University, New York, NY, Oct. 3, 2002.

*Enron, Derivatives, and the Gatekeepers*, Thomas Jefferson School of Law, San Diego, CA, Feb. 26, 2002.

*The Fall of Enron: How Could It Have Happened?*, Sworn Testimony before the U.S. Senate Committee on Governmental Affairs, Washington, D.C., Jan. 24, 2002.

*The Next Stages of Financial Derivatives Regulation*, Brookings-Wharton Papers on Financial Services, Washington, D.C., Jan. 10-11, 2002.

*Terrorist Insider Trading, Enron, and Financial Derivatives*, Heller Ehrman White & McAuliffe, San Diego, CA, Dec. 5, 2001.

*The Paradox of Credit Ratings*, University of California at San Diego, San Diego, CA, Oct. 11, 2001.

*The Gatekeepers of Financial Markets*, Institute for Law and Economic Policy Conference on Corporate Accountability, Scottsdale, AZ, Mar. 10, 2001.

*The Paradox of Credit Ratings*, Conference on the Role of Credit Reporting Systems in the International Economy, Sponsored by The University of Maryland Center for International Economics, New York University Stern School of Business and The World Bank, Washington, D.C., Mar. 2, 2001.

*Financial Derivatives Regulation and Synthetic Common Law*, London Guildhall University Department of Law, London, England, Jan. 23, 2001.

*The Globalization of the Financial Derivatives Markets*, University of Pennsylvania School of Law, Philadelphia, PA, Jan. 19, 2001.

*The Future of Derivatives Regulation*, American Association of Law Schools Annual Conference, Section on Securities Regulation, San Francisco, CA, Jan. 6, 2001.

*Conference on Financial Derivatives* (Host and Moderator), University of San Diego School of Law, San Diego, CA, Nov. 10, 2000.

*Finance Entrepreneurs and Short-Duration Intellectual Property,* Law & Entrepreneurship Conference, Lewis & Clark Northwestern School of Law, Portland, OR, Oct. 20, 2000.

*Synthetic Common Law*, UCLA Second Annual Conference on Corporate Governance, UCLA Law School, Los Angeles, CA, Oct. 13, 2000.

*Synthetic Common Law*, University of North Carolina School of Law, Chapel Hill, NC, Oct. 5, 2000.

*Derivatives Regulation and the U.S. Thrift Industry*, Keynote Address, Office of Thrift Supervision West Region Annual Conference, Rohnert Park, CA, Aug. 29, 2000.

*Financial Derivatives and Popular Culture,* The Law & Society Annual Meeting, Miami, FL, May 27, 2000.

*Why Markets Crash and What Law Can Do About It*, Northeastern University School of Law, Boston, MA, Mar. 23, 2000.

*Rating Agencies: Substitute or Necessary Corollary to the Regulation of Debt Markets?*, Duke University Global Capital Markets Center Conference: Reexamining the Regulation of Capital Markets for Debt Securities, Washington, DC, Oct. 18-19, 1999.

*Adding Derivatives to the Corporate Law Mix*, University of Georgia School of Law Corporate Law Conference, Athens, GA, Oct. 15-16, 1999.

*Mark-to-Market for Publicly Traded Securities and Derivatives*, University of San Diego Tax Conference: Emerging Changes in Our Tax System? Exploring Potential Benefits and Problems, San Diego, CA, Mar. 19, 1999.

*The Siskel and Ebert of Financial Markets: Two Thumbs Down for the Credit Rating Agencies,* University of San Diego School of Law Faculty Colloquium, San Diego, CA, Jan. 15, 1999.

*Information Asymmetry, Suitability, and the Role of Derivatives Dealers*, Derivatives Strategy Derivatives Hall of Fame Conference, New York, NY, Feb. 9, 1998.

*The Culture and Economics of Derivatives Trading*, Keynote Address, North American Securities Administrators Association (NASAA), 80th Annual Conference, San Antonio, TX, Nov. 17, 1997.

## **Media**

60 Minutes (multiple).

The Daily Show with Jon Stewart.

The NewsHour with Jim Lehrer (multiple).

PBS Frontline.

Fresh Air with Terry Gross (multiple).

The Diane Rehm Show (multiple).

Hundreds of other television and radio interviews, including NPR, PBS, Fox, and others.

**Affiliations and Professional Licenses**

Member, New York and District of Columbia bars.

Member, Financial Economists Roundtable.

Co-Chair, American Bar Association, Futures and Derivatives Litigation Subcommittee.

Chair and Board Member, Association of American Law Schools, Section on Business Associations.

Member and Program Committee, American Law and Economics Association.

Board Member and Program Committee, Corporate Directors Forum.

Board Member, Shadow Financial Regulatory Committee.

Reviewer, Journal of Financial Economics.

Advisory Board Member, Consumer Federation of America Research Center.

Planning Committee, Association of American Law Schools Mid-Year 2014 Meeting.

Research Fellow, Corporate Governance Institute.

Education Policy Advisor, San Diego Unified School District.

Co-Chair, Law and Finance Institute.

Board Member, Futures and Derivatives Law Report.

Advisory Board Member, Financial Services Policy Institute.

Directorship 100, People to Watch.

Series 3, 7, and 63 registered securities, options, and futures examinations.

Law School Service. USD (position, years): Appointments (Chair 2, Member 5); Colloquium (Chair 2, Member 10); Law and Finance Speaker Series (1), Junior Faculty Roundtable (Chair 4); Alumni Board (Director 2); Law Alumni Golf League (Treasurer 4); Dean Search (1); Self-Study (1); Evening Program (1); Development (3); Graduate Programs (2); Petitions (3); Faculty Advisor, Business Law Society (3). UC Berkeley (position, years): Berkeley Center for Law and Business (co-chair, 3); Revenue Generation Committee (chair, 2); Faculty Workshop (co-chair, 1).

**EXHIBIT B**
**LIST OF DOCUMENTS CONSIDERED**

- Documents in Appendix II to the Expert Report of Brett Trueman, PhD, which were identified by Bates number and/or produced to Plaintiff
- Documents in Appendix A to the Expert Report of Alex Gauna, MBA, which were identified by Bates number and/or produced to Plaintiff
- APL-SECLIT_00546956
- All documents cited in the Expert Rebuttal Report of Professor Frank Partnoy