1  JAMES N. KRAMER (SBN 154709)
   jkramer@orrick.com
2  MICHAEL D. TORPEY (SBN 79424)
   mtorpey@orrick.com
3  ALEXANDER K. TALARIDES (SBN 268068)
   atalarides@orrick.com
4  ORRICK, HERRINGTON & SUTCLIFFE LLP
   The Orrick Building
5  405 Howard Street
   San Francisco, CA  94105-2669
6  Telephone:      +1 (415) 773-5700
   Facsimile:      +1 (415) 773-5759
7
8  Attorneys for Defendants Apple Inc.,
   Timothy Cook, and Luca Maestri
9

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12                   OAKLAND DIVISION

13

14 | IN RE APPLE INC. SECURITIES | Lead Case No. 4:19-cv-02033-YGR
   | LITIGATION |
15 | | **DEFENDANTS' NOTICE OF MOTION**
   | | **AND MOTION FOR SUMMARY**
16 | | **JUDGMENT; MEMORANDUM OF**
   | _____ | **POINTS AND AUTHORITIES IN**
17 | This Document Relates To: | **SUPPORT THEREOF**
   |
18 | ALL ACTIONS. | Hearing
   | | Date:    TBD
19 | | Time:    2:00 p.m.
   | | Ctrm:    1, 14th Floor
20 | | Judge:  Honorable Yvonne Gonzalez Rogers
21

22

23

24

25

26

27

28

1

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

2

TO THE COURT, THE PARTIES, AND ALL COUNSEL OF RECORD:

3

PLEASE TAKE NOTICE that on a date and time to be set by this Court, Defendants

4 Apple Inc., Timothy Cook, and Luca Maestri will and hereby do move under Fed. R. Civ. P. 56

5 for summary judgment in their favor on all claims asserted against them in Plaintiff's Revised

6 Consolidated Class Action Complaint for Violation of the Federal Securities Laws; specifically,

7 the claim against Mr. Cook and Apple under 17 C.F.R. § 240.10b-5 and 15 U.S.C. § 78j(b)

8 ("Section 10(b)"), and the claim against all Defendants under 15 U.S.C. § 78t(a)

9 ("Section 20(a)").   Defendants' motion is based on this Notice of Motion and Motion for

10 Summary Judgment, the Memorandum of Points and Authorities below and materials cited

11 therein, the pleadings and papers filed in this case, oral argument, and other materials and

12 argument as may be presented.

13

**STATEMENT OF RELIEF SOUGHT**

14

Defendants seek an order dismissing all causes of action against them with prejudice.

15

**STATEMENT OF ISSUES TO BE DECIDED**

16

Whether:

17

(1) The Court should grant summary judgment in Defendants' favor on all claims because

18 there is no evidence from which a rational jury could conclude that the challenged statement at

19 issue, made by Mr. Cook on November 1, 2018, was materially false or misleading when made.

20

(2) The Court should grant summary judgment in Defendants' favor on all claims because

21 there is no evidence from which a rational jury could conclude that Mr. Cook made the

22 challenged statement with the requisite scienter.

23

(3) The Court should grant summary judgment in Defendants' favor on all claims because

24 there is no evidence from which a rational jury could conclude that the challenged statement

25 proximately caused Plaintiff's alleged losses.

26

(4) The Court should grant summary judgment in Mr. Maestri's favor on the Section 20(a)

27 claim for the additional reason that the undisputed evidence shows that he did not induce the

28 challenged statement and acted in good faith.

i

## **TABLE OF CONTENTS**

GLOSSARY OF TERMS USED ............................................................................................ v

I.      INTRODUCTION ................................................................................................... 1

II.     FACTUAL BACKGROUND ................................................................................... 5

        A.      Apple, Mr. Cook, and Mr. Maestri.............................................................. 5

        B.      Apple's Business in Emerging Markets in FY 2018.................................... 5

                1.      Apple's Business in China in FY 2018 ............................................ 6

                2.      Apple's Business in Turkey, India, Brazil, and Russia in FY
                        2018.................................................................................................. 6

        C.      Apple's FQ4 2018 Call ............................................................................... 7

                1.      Apple's Preparation for the FQ4 2018 Call ..................................... 7

                2.      The Challenged Statement ............................................................... 8

                3.      The Market's Interpretation of the Challenged Statement.............. 9

        D.      Apple's Undisputedly Accurate-When-Made FQ1 2019 Guidance ......... 10

        E.      Apple's FQ1 2019 Performance After the FQ4 2018 Call ...................... 11

III.    ARGUMENT ........................................................................................................ 13

        A.      Mr. Cook's Challenged Statement Was Not False or Misleading ........... 13

                1.      The Challenged Statement Was an Objectively True Opinion
                        Supported by Accurate and Undisputed Historical Facts ........... 13

                2.      Mr. Cook's Objectively True Opinion Did Not Affirmatively
                        Create a Misleading Impression of Apple's Business as of
                        November 1, 2018 ......................................................................... 16

                3.      The Challenged Statement Did Not Represent That Apple Was
                        Not Experiencing Any Deceleration or Pressure on Its Business
                        in China ......................................................................................... 19

        B.      Plaintiff Cannot Create a Triable Issue with Respect to Scienter ......... 21

        C.      Plaintiff Cannot Prove Loss Causation ................................................... 24

        D.      Mr. Maestri Is Independently Entitled to Summary Judgment.............. 25

IV.     CONCLUSION ..................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                    **Page(s)**

*In re Adobe Sys., Inc. Sec. Litig.*,
   787 F. Supp. 912 (N.D. Cal. 1992), *aff'd*, 5 F.3d 535 (9th Cir. 1993)................................... 13

*In re Apple Computer Sec. Litig.*,
   886 F.2d 1109 (9th Cir. 1989)................................................................................5, 20, 21, 24

*Brody v. Transitional Hospitals Corp.*,
   280 F.3d 997 (9th Cir. 2002)........................................................................................3, 13, 18

*In re Caere Corp. Sec. Litig.*,
   837 F. Supp. 1054 (N.D. Cal. 1993) ................................................................................... 14

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017)..................................................................................*passim*

*In re Convergent Techs. Sec. Litig.*,
   948 F.2d 507 (9th Cir. 1991)............................................................................................... 16

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   563 U.S. 804 (2011)................................................................................................... 5, 24

*Fisher v. Acuson Corp.*,
   1995 WL 261439 (N.D. Cal. Apr. 26, 1995) ..................................................................... 14

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*,
   998 F.3d 397 (9th Cir. 2021)............................................................................................... 24

*Jedrejczyk v. Skillz Inc.*,
   2022 WL 2441563 (N.D. Cal. July 5, 2022)...................................................................... 22

*Kang v. PayPal Holdings, Inc.*,
   2022 WL 3155241 (N.D. Cal. Aug. 8, 2022)..................................................................... 22

*Kaplan v. Rose*,
   49 F.3d 1363 (9th Cir. 1994)......................................................................................23, 25

*Mathews v. Centex Telemanagement, Inc.*,
   1994 WL 269734 (N.D. Cal. June 8, 1994) ....................................................................... 21

*In re Oracle Corp. Sec. Litig.*,
   2009 WL 1709050 (N.D. Cal. June 19, 2009), *aff'd*, 627 F.3d 376 (9th Cir.
   2010) ................................................................................................................................... 23

*In re Oracle Corp. Sec. Litig.*,
   627 F.3d 376 (9th Cir. 2010)...................................................................................13, 14, 16

iii

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001)................................................................................................... 15

*Schuster v. Symmetricom, Inc.*,
    2000 WL 33115909 (N.D. Cal. Aug. 1, 2000)....................................................................... 21

*In re Stac Elecs. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996).................................................................................................. 14

*In re Symbol Tech. Sec. Class Action Litig.*,
    950 F. Supp. 1237 (E.D.N.Y. 1997)...................................................................................... 16

*In re Twitter, Inc. Sec. Litig.*,
    506 F. Supp. 3d 867 (N.D. Cal. 2020), *aff'd*, 29 F.4th 611 (9th Cir. 2022) .......................... 21

*In re Vantive Corp. Sec. Litig.*,
    283 F.3d 1079 (9th Cir. 2002)................................................................................................ 15

*Vaughn v. Teledyne, Inc.*,
    628 F.2d 1214 (9th Cir. 1980)................................................................................................ 21

*In re Worlds of Wonder Sec. Litig.*,
    35 F.3d 1407 (9th Cir. 1994).................................................................................................. 15

**Rules**

Fed. R. Civ. P.
    Rule 56(a)................................................................................................................................. 13

## GLOSSARY OF TERMS USED

| | |
|---|---|
| Apple: | Apple Inc. |
| ASP: | Average Selling Price |
| BofA: | Bank of America, Merrill Lynch |
| China: | Apple's "Greater China" region of China, Hong Kong, and Taiwan |
| Company: | Apple Inc. |
| Complaint or Compl.: | Revised Consolidated Class Action Complaint for Violation of the Federal Securities Laws, dated June 23, 2020, Dkt. No. 114 |
| Cook Decl.: | Declaration of Timothy Cook in Support of Defendants' Motion for Summary Judgment |
| FP&A: | Financial Planning and Analysis |
| FQ4 2017: | Apple's Fourth Fiscal Quarter of 2017, ended September 30, 2017 |
| FQ1 2018: | Apple's First Fiscal Quarter of 2018, ended December 30, 2017 |
| FQ2 2018: | Apple's Second Fiscal Quarter of 2018, ended March 31, 2018 |
| FQ3 2018: | Apple's Third Fiscal Quarter of 2018, ended June 30, 2018 |
| FQ4 2018: | Apple's Fourth Fiscal Quarter of 2018, ended September 29, 2018 |
| FQ4 2018 Call: | Apple's FQ4 2018 Earnings Conference Call, held on November 1, 2018 |
| FY 2018: | Apple's Fiscal Year of 2018, ended September 29, 2018 |
| FQ1 2019: | Apple's First Fiscal Quarter of 2019, ended December 29, 2018 |
| FX: | Foreign Exchange, a shorthand for the effects of currency exchange rates |
| Huawei: | Huawei Technologies Co., Ltd. |
| Maestri Decl.: | Declaration of Luca Maestri in Support of Defendants' Motion for Summary Judgment |
| MTD Order: | Order Granting in Part and Denying in Part Defendants' Motion to Dismiss the Revised Consolidated Complaint, dated November 4, 2020, Dkt. No. 123 |

v

| | | |
|---|---|---|
| Parekh Decl.: | Declaration of Kevan Parekh in Support of Defendants' Motion for Summary Judgment | |
| PMI: | Purchasing Managers' Index | |
| SEC: | U.S. Securities and Exchange Commission | |
| UF: | Undisputed Fact listed in the Separate Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment | |
| Unbricking(s): | End-user activations of Apple devices | |
| YoY: | Year-over-Year | |

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3    Plaintiff alleges that Apple CEO Tim Cook made a misleading statement in response to a

4  securities analyst's question during Apple's November 1, 2018 FQ4 2018 earnings call.  The

5  undisputed evidence, however, establishes that Mr. Cook's statement was true, accurate, and

6  made in good faith.  Mr. Cook and the other Defendants—Apple and its CFO Luca Maestri—are

7  entitled to judgment in their favor and this baseless lawsuit should finally be dismissed.

8    On the FQ4 2018 Call, an analyst observed that "there has been some real deceleration in

9  some of these emerging markets," and asked Mr. Cook to "talk about how you see the trajectory

10  there for [Apple's] business."  In response, Mr. Cook explained that "the emerging markets that

11  we're seeing pressure in are markets like Turkey, India, Brazil, Russia.  These are markets where

12  currencies have weakened over the recent period.  In some cases, that resulted in us raising prices,

13  and those markets are not growing the way we would like to see."  After illustrating how those

14  markets underperformed in FQ4 2018, Mr. Cook went on to say that "in relation to China

15  specifically, I would not put China in that category," and noted that "our business in China was

16  very strong last quarter" given that Apple's revenue there grew 16% YoY in FQ4 2018.  Plaintiff

17  alleges that Mr. Cook's answer (the "Challenged Statement") misled investors into thinking that

18  as of November 1, 2018, Apple's business in China was doing great without any headwinds,

19  while its business there was actually experiencing "pressure and deceleration," which ultimately

20  caused Apple to miss the FQ1 2019 revenue guidance it provided on the same day.  As Plaintiff

21  would have it, Mr. Cook's statement that he "would not put China in that category" constituted a

22  false statement that Apple was not experiencing "any pressure or deceleration in China," at all.

23    The Court allowed Plaintiff to proceed on this theory of fraud, concluding at the pleading

24  stage that Plaintiff "plausibly" alleged that Mr. Cook misrepresented that Apple was not

25  experiencing any pressure in China as of November 1, 2018, and recklessly did so despite having

26  access to data suggesting otherwise and knowing that investors may be misled.  But the evidence

27  in the record disproves Plaintiff's theory and Defendants are now entitled to summary judgment.

28  There is no evidence creating a triable issue as to the falsity, scienter, or loss causation elements

of Plaintiff's Section 10(b) claim.  And because that claim fails, Plaintiff's Section 20(a) claim likewise fails.

On falsity, the Challenged Statement was an accurate opinion, grounded in undisputed historical facts, about Apple's business in emerging markets in FQ4 2018.  Weakened currencies in Turkey, India, Brazil, and Russia caused a material deceleration of Apple's revenue growth in those countries in FQ4 2018, whereas China's currency was stable and did not adversely affect Apple's revenue in China in FQ4 2018, which grew by 16% YoY.  Apple expected analysts to ask about how the strong U.S. dollar was affecting Apple's business in emerging markets, including China, and included relevant data about Apple's FQ4 2018 results in Mr. Cook's preparation materials to guide his answer.  Mr. Cook's undisputed testimony is that he made the Challenged Statement with reference to the accurate FQ4 2018 data in his preparation materials and was offering his opinion that China was not "in that category" of markets where a weakened currency had caused Apple's revenue to decelerate in FQ4 2018.  The evidence establishes that Mr. Cook's opinion was true—China was, in fact, *not* in the "same category" as Turkey, India, Brazil, and Russia, where currency fluctuations were adversely affecting Apple.

Despite the accuracy of Mr. Cook's opinion, Plaintiff claims that investors were misled because Mr. Cook failed to disclose certain adverse facts about Apple's business as of November 1, 2018, and because investors understood Mr. Cook to be giving a mid-quarter update on Apple's business in China as of November 1, 2018.  According to Plaintiff, Mr. Cook's supposed mid-quarter update falsely represented that there was not "any pressure or deceleration on Apple's business in China" *at all*.

But it is well-settled that accurate statements about historical performance are not actionable and do not give rise to a duty to disclose facts about present or future performance, even if the accurately reported historical facts are unrepresentative of present or future performance.  Thus, Mr. Cook's alleged failure to disclose various purportedly adverse data about Apple's business as of November 1, 2018 does not render his accurate reporting of Apple's historical performance in emerging markets actionably misleading.  Mr. Cook's alleged failure to disclose is also not actionable because the adverse data that he allegedly concealed was not, in

1    any event, contrary to or inconsistent with the contents of his Challenged Statement.

2           Moreover, securities analyst reports are objective indicators of how reasonable investors

3    interpret corporate disclosures, and the 38 analyst reports about Apple that were issued between

4    November 1-4, 2018 reported the Challenged Statement, if at all, just as Mr. Cook had intended

5    it—as a statement about Apple's performance in certain emerging markets in FQ4 2018.  *None of*

6    the analysts reported Mr. Cook as giving an intra-quarter update on Apple's business in China as

7    of November 1, 2018; and *none* of them reported that Mr. Cook said there was no pressure on

8    Apple's business in China, which would have been newsworthy given that analysts had been

9    discussing the pressures on Apple's business in China for months.  In fact, on November 2, 2018,

10   the analyst who asked the question of Mr. Cook published a report saying that, while "China was

11   strong in [FQ4 2018], emerging signs of weakness could *pressure* the next few quarters" and "we

12   expect meaningful *deceleration* [in China] heading into [FQ1 2019]."  On the same day, Apple's

13   stock price declined substantially, and thirteen analysts lowered their price targets on Apple.

14   Thus, market professionals following Apple and listening to the Challenged Statement

15   overwhelmingly came away from the call more *pessimistic* about Apple's prospects in FQ1 2019,

16   which is the opposite reaction one would expect if Plaintiff's theory of fraud were valid.

17          The absence of fraud here is further confirmed by the fact that Plaintiff now disavows any

18   allegation that Apple's FQ1 2019 revenue "guidance is actionable, materially false, or

19   misleading."  Dkt. No. 279 at 9.  This means that it is *undisputed* that: (i) the guidance was

20   accurate as of November 1, 2018, and incorporated all of the internal adverse data that Plaintiff

21   asserts rendered the Challenged Statement misleading; (ii) Apple was on pace to meet the

22   guidance as of November 1, 2018, notwithstanding whatever pressure its business may have been

23   experiencing in China at the time; and (iii) the deceleration in Apple's business in China that

24   ultimately caused the guidance miss necessarily did not exist on November 1, 2018, but only

25   arose *after* Mr. Cook made the Challenged Statement.  Against this undisputed backdrop, the

26   Challenged Statement could not have "*affirmatively* create[d] an impression of a state of affairs

27   that differ[ed] in a material way from the one that actually exist[ed]."  *Brody v. Transitional*

28   *Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (emphasis added).

As to scienter, there is no evidence that Mr. Cook made the Challenged Statement with an "intent to deceive, manipulate, or defraud," or with "deliberate recklessness." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017). Mr. Cook's testimony is that he acted in good faith, and there is zero contrary evidence of an intent to deceive.  Mr. Cook did not sell any Apple stock during the class period and suffered massive losses himself when Apple's stock price declined, and Apple repurchased nearly two billion dollars of its own stock at allegedly inflated prices in the days following the FQ4 2018 Call.  Moreover, Mr. Cook and Apple did not wait until the release of Apple's audited FQ1 2019 financial results on January 29, 2019 to inform the market about the Company's revenue shortfall, as they were permitted to do under SEC rules; instead, they chose to proactively inform the market about the lower-than-expected revenue almost a month early, on January 2, 2019.  In short, their conduct was entirely inconsistent with fraudulent intent.

There is also no evidence that Mr. Cook acted with deliberate recklessness, as Plaintiff cannot point to anything in the record showing that the Challenged Statement constituted an "*extreme* departure" from the standards of ordinary care and "present[ed] a danger of misleading" that was "*so obvious*" that Mr. Cook must have known it. *Id.*  None of the analyst reports issued in the days after the FQ4 2018 Call support Plaintiff's theory of what Mr. Cook conveyed to the market—in fact, the reports *disprove* that theory—so it cannot be said that the Challenged Statement was so obviously misleading that Mr. Cook must have been aware of any danger to mislead.  *At worst*, Mr. Cook used a combination of past- and present-tense language that opened the door at the pleading stage to Plaintiff's "plausible"—yet erroneous—competing interpretation of what he said.  Now, however, Plaintiff cannot rely on a statement that is merely subject to competing plausible interpretations to underpin a finding of scienter.  Given that it is undisputed that Apple's FQ1 2019 guidance was accurate as of November 1, 2018 and incorporated whatever allegedly concealed pressure Apple may have been experiencing in China at the time, and given that analysts did not report the Challenged Statement in the way that Plaintiff alleges it was understood by investors, the notion that Mr. Cook's Challenged Statement was highly unreasonable and involved an extreme departure from the standards of ordinary care does not

1  withstand scrutiny.  Since Apple was on track to meet its guidance as of November 1, 2018

2  notwithstanding any allegedly concealed pressure in China, there is no basis from which to find

3  that Mr. Cook acted with deliberate recklessness when he made the Challenged Statement.

4        Finally, the fact that Apple was on track to meet its FQ1 2019 revenue guidance as of

5  November 1, 2018 notwithstanding whatever allegedly concealed pressure Apple may have been

6  experiencing in China at the time also means that Plaintiff cannot prove loss causation.  If Apple

7  was on pace to meet its guidance, as Plaintiff tacitly concedes, then Apple's subsequent revenue

8  shortfall, which caused the stock price decline that precipitated this lawsuit, was necessarily "the

9  result of other intervening causes, [rather than fraud,] such as 'changed economic circumstances,

10  changed investor expectations, new industry-specific or firm-specific facts, conditions, or other

11  events.'"  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812-13 (2011).

12        For these reasons, as further detailed below, the Court should dismiss this lawsuit.

13  **II.**     **FACTUAL BACKGROUND**[1]

14       **A.**     **Apple, Mr. Cook, and Mr. Maestri**

15        Apple designs, manufactures, and markets smartphones, personal computers, tablets,

16  wearables, and accessories, and sells related services worldwide.  Ex. 5 at 1.  Apple has

17  revolutionized the personal technology industry with constant innovation and has consistently

18  ranked first in *Fortune*'s list of the world's most admired companies.  Ex. 84 at 1.  Tim Cook has

19  been its CEO since 2011, and under his leadership Apple has grown its market value to over $2.5

20  trillion.  Ex. 85 at 13:19-20; Ex. 86 at 1.  Mr. Cook has been named the "World's Greatest

21  Leader" by *Fortune*, and the "Most Successful Successor CEO Ever" by *The Economist*.  Exs. 87-

22  88.  Luca Maestri, Apple's CFO, joined Apple in 2013 and has been named the "Most Admired

23  CFO" of all Fortune 500 companies.  Maestri Decl. ¶ 1; Ex. 89.

24       **B.**     **Apple's Business in Emerging Markets in FY 2018**

25        Apple considers China, Turkey, India, Brazil, and Russia, among others, to be emerging

26  markets.  Maestri Decl. ¶ 12.  Altogether, emerging markets accounted for 28% of Apple's FQ4

27
28
---
[1] All "Ex." citations are to exhibits attached to the declarations filed in support of this motion.  A sequential list of the exhibits, which shows where each may be found, is attached as Appendix A to the Declaration of James N. Kramer in support of Defendants' Motion for Summary Judgment.

1    2018 revenue.  Ex. 9 at 6.

2                    **1.     Apple's Business in China in FY 2018**

3          In FY 2018, Apple faced difficult market conditions in China.  Throughout the year,

4    reports emerged that the smartphone market in China was shrinking after years of growth.  Ex. 91

5    ¶¶ 73-76; Ex. 90 ¶¶ 73-74.  Competition from Chinese smartphone manufacturers was intense,

6    with companies like Huawei and Xiaomi introducing copycat products at lower price points.  Ex.

7    90 ¶¶ 80-83, 91.  Macroeconomic indicators showed signs of a slowing Chinese economy, and

8    geopolitical trade tensions between the United States and China presented a threat to consumer

9    sentiment, even where Apple's products were not directly implicated.  Ex. 91 ¶¶ 18-22, 38, 45,

10   50-52; Ex. 90 ¶¶ 64-67.  In August 2018, the Chinese government issued an industry-wide freeze

11   on video game license approvals.  Ex. 92 at 1.  The market was well-aware of these headwinds.

12   Ex. 90 ¶¶ 52-53; Ex. 96 ¶ 8.

13         Despite difficult market conditions, however, Apple delivered double-digit YoY revenue

14   growth in China in every quarter of FY 2018.  UF #5.  It achieved that growth in China even

15   though it sold fewer iPhones YoY in FQ1, FQ3, and FQ4 2018, in part because iPhone ASPs in

16   China grew, meaning Apple generated more revenue off fewer sales.  Cook Decl. ¶ 16; Ex. 95 ¶

17   16.  Apple was also helped by a stable Chinese renminbi, which devalued only 1% against the

18   U.S. dollar during FY 2018.  Ex. 2 at 13; Ex. 91 ¶¶ 91-95.

19               **2.     Apple's Business in Turkey, India, Brazil, and Russia in FY 2018**

20         In FY 2018, Apple faced a different set of challenges in other emerging markets like

21   Turkey, India, Brazil, and Russia.  The currencies in these markets devalued against the U.S.

22   dollar considerably.  Compared to FQ4 2017, by FQ4 2018 the Turkish lira devalued by 34%, the

23   Indian rupee by 7%, the Brazilian real by 18%, and the Russian ruble by 8%.  Ex. 2 at 13.

24         Apple is adversely affected by devalued foreign currencies.  Ex. 91 ¶ 90.  For example, in

25   FQ4 2018, Apple's revenue in Turkey declined 26% YoY, but revenue would have been flat if

26   Turkey's currency had held constant, which is to say the currency devaluation had a negative

27   26% impact on Apple's revenue from its business in Turkey.  UF #4.  For the same period,

28   India's revenue declined 1% YoY, but would have grown 6% if its currency had held constant (a

negative 7% impact); Brazil's revenue declined 7% YoY but would have grown 9% if its currency had held constant (a negative 16% impact); and even Russia, which grew 25% YoY in FQ4 2018, would have grown 35% if its currency had held constant (a negative 11% impact). *Id.* By contrast, in FQ4 2018 Apple's revenue in China grew 16% YoY and would have grown 17% if its currency had held constant—that is, currency devaluation had only a negative 1% impact on Apple's revenue from its business in China. *Id.*; *see also* Ex. 94 ¶ 52. In total, in FY 2018, foreign currency issues negatively affected Apple's global revenue by approximately 1%, causing Apple to recognize around $630 million less revenue than it would have if the U.S. dollar had not been as strong. Cook Decl. ¶ 12.

### C. Apple's FQ4 2018 Call

#### 1. Apple's Preparation for the FQ4 2018 Call

Apple prepares extensively for its earnings calls with securities analysts. Maestri Decl. ¶ 4. In advance of the FQ4 2018 Call, Mr. Cook, Mr. Maestri, and members of Apple's investor relations and FP&A teams worked to finalize the FQ4 2018 information that would be shared on the call. UF #1. As part of that process, they prepared a 74-page document that contained detailed information about Apple's FQ4 2018 financial results (and forward-looking guidance), as well as talking points for potential questions from analysts (the "Q&A Prep Document"). *Id.*; *see* Ex. 2. The team also compiled a list of questions analysts might ask on the call. Ex. 1.

Apple recognized that the analyst community was focused on its business in China. UF #1. Seventeen analyst reports issued in October of 2018 had referenced Apple's business in China, and fifteen of them expressed concerns about the Company's business there. UF #7. Apple also knew analysts were interested in how the strengthening U.S. dollar would exacerbate FX issues, including Wamsi Mohan, who published a report for BofA on October 29, 2018, noting that "[d]uring the past cycle of a strengthening dollar (2015-2016), China iPhone units declined 20% and overall Apple China sales declined 24% y/y," and observed that a "similar unit decline would impact EPS today by $0.30." Ex. 1 at 1; Ex. 28 at 1. Given analysts' concerns, Apple's team predicted that on the FQ4 2018 Call the analysts might ask questions like "[d]o you believe currency rates have impacted demand?" and given the "broader concern about the

economic situation in China, how is your business performing there?"  Ex. 1 at 1-2.  The Q&A

Prep Document contained detailed data from FQ4 2018 that Messrs. Cook and Maestri could use

to answer such questions.  Ex. 2 at 13, 20-21, 23.

## 2.    The Challenged Statement

Apple held its FQ4 2018 Call on November 1, 2018.  Ex. 93.  During the question-and-

answer portion of the call, Mr. Mohan of BofA said:

> Tim, there has been some real deceleration in some of these emerging markets,
> partly driven by some concerns around some of the rules the administration is
> contemplating and partly driven by things that are more specific to China, for
> instance, like some of the regulations around gaming. So can you talk about how
> you see the trajectory there for the business and what you think of the initiatives
> of some companies like Netflix and Fortnite trying to bypass the App Store
> around subscriptions and I have a follow-up.

Ex. 3 at 7. Mr. Cook responded:

> Sure. Great question. Starting with emerging markets. The emerging markets that
> we're seeing pressure in are markets like Turkey, India, Brazil, Russia. These are
> markets where currencies have weakened over the recent period. In some cases,
> that resulted in us raising prices and those markets are not growing the way we
> would like to see. To give you a perspective in some detail, our business in
> India in Q4 was flat. Obviously, we would like to see that be a huge growth.
> Brazil was down somewhat compared to the previous year. And so I think, or at
> least the way that I see these, is each one of the emerging markets has a bit of a
> different story, and I don't see it as some sort of issue that is common between
> those for the most part. In relation to China specifically, I would not put China in
> that category. Our business in China was very strong last quarter. We grew 16%,
> which we're very happy with. iPhone in particular was very strong, very strong
> double-digit growth there. Our other products category was also stronger, in fact,
> a bit stronger than even the overall company number.
>
> The App Store in China, we have seen a slowdown or a moratorium, to be more
> accurate, on new game approvals. There is a new regulatory setup in China, and
> there things are not moving the way they were moving previously. We did see a
> few games approved recently, but it's very far below the historic pace.

*Id.*  Mr. Cook's answer to Mr. Mohan, including his opinion that China did not belong in the

same category as the other emerging markets, was made with reference to the FQ4 2018 data in

the Q&A Prep Document.  UF #3.  On a page titled "Currency," a chart listed the countries where

currencies had weakened the most during FY 2018, and the top four were Turkey, Brazil, Russia,

and India.  Ex. 2 at 13.  Lower down that same page, a chart listed the countries whose FQ4 2018

revenue was most impacted by adverse currency movements—Turkey, Brazil, Russia, and India

were on the list, but China was not.  *Id.*  Another page titled "Emerging Markets" detailed each

emerging market's—including China's—revenue in FQ4 2018, with data and commentary exactly in line with what Mr. Cook reported on the FQ4 2018 Call. *Id.* at 23. And in a third section titled "China Results," the FQ4 2018 data and talking points almost exactly mirrored the Challenged Statement: China revenue grew 16%, iPhone revenue "grew strong double digits," Other Products had "[v]ery strong double-digit growth," and with respect to the gaming issue in China, there was "a moratorium on new game approvals, and although we have seen a few games get approved recently, it is far below the historic pace." *Id.* at 20-21. All of the information Mr. Cook cited in his response to Mr. Mohan concerned Apple's FQ4 2018 results, and none of it referenced Apple's results as of the date of the FQ4 2018 Call, which was one month into Apple's FQ1 2019. UF #3; *see also* Ex. 94 ¶¶ 47-53.

When Mr. Cook said, "I would not put China in that category," he was giving his opinion on how he understood the impact of currency fluctuations on Apple's FQ4 2018 revenue growth in each emerging market, distinguishing China from Turkey, Brazil, Russia, and India. UF #2.

### 3.    The Market's Interpretation of the Challenged Statement

Between November 1-4, 2018, 38 securities analysts issued reports regarding Apple, 22 of which referenced the Challenged Statement. UF #8-9. Those that referenced the Challenged Statement reported it just as Mr. Cook had intended it—as a statement about Apple's performance in certain emerging markets in FQ4 2018. UF #10. For example, Mr. Mohan's November 2, 2018 report for BofA reported "[w]eaker growth in emerging markets including India, Brazil, Russia and Turkey given currency moves," while revenue growth in China "increased 16% year over year." Ex. 49 at 3, 7. Other analysts likewise reported that "Apple indicated China was fine in FQ4 to Sept for them," Ex. 60 at 3; that "[w]hile Apple reported continued strong growth in China (+16% y/y in F4Q18; iPhone +DD%), the company's commentary was relatively cautious on emerging market demand given the strengthening U.S. Dollar," Ex. 82 at 1; and that revenue grew in "China 16% . . . but there was weakness in Turkey, Russia, India and Brazil," and "[p]art of the issue is the movement in FX," Ex. 58 at 1.

Not one analyst reported that Mr. Cook said, or otherwise conveyed the impression, that there was no pressure on Apple's business in China in FQ1 2019. UF #11-13. To the contrary,

after the call, eighteen analysts explicitly flagged concerns about pressures that Apple faced in China for FQ1 2019.  UF #14; Ex. 72 at 8 ("Although greater China reported double digit growth in [FQ4 2018], risks to AAPL in China appear to be rising."); Ex. 57 at 1 ("[W]e still see China as representing the single greatest risk to shares."); Ex 60 at 3 ("[W]e believe the company likely sees some demand risk [in China] in the December quarter.").  Indeed, Mr. Mohan, who asked the question that prompted the Challenged Statement, stated one day after the FQ4 2018 Call that while "China was strong in [FQ4 2018], emerging signs of weakness could *pressure* the next few quarters" and "we expect meaningful *deceleration* [in China] heading into [FQ1 2019]."  Ex. 49 at 1, 7 (emphases added).

### D.    Apple's Undisputedly Accurate-When-Made FQ1 2019 Guidance

In addition to discussing its FQ4 2018 results on the FQ4 2018 Call, Apple disclosed that it expected its revenue in FQ1 2019 to be between $89-$93 billion.  Ex. 3 at 6.  Plaintiff does not dispute that Apple's guidance range incorporated all available, relevant information about the Company's performance through October 2018 and presented an accurate, up-to-date view of its forecast as of November 1, 2018, or that the guidance was accurate as of November 1, 2018 and was consistent with contemporaneous internal data and projections, where Apple forecasted a low scenario of $88.8 billion and a high scenario of $93.4 billion.  UF #21-22; Ex. 7 at 5.

In prepared remarks at the beginning of the FQ4 2018 Call, Mr. Maestri explained that Apple's guidance "range reflects a number of factors," including that "we expect almost $2 billion of foreign exchange headwinds" and "we also face some macroeconomic uncertainty, particularly in emerging markets."  UF #25.  The midpoint of Apple's guidance range, $91 billion, came in below analyst consensus expectations of $93 billion, and the $4 billion range reflected the widest range Apple had ever provided, both of which signaled caution and uncertainty.  Ex. 101 at 1; Maestri Decl. ¶ 13; Ex. 100 ¶¶ 51-58.  This signal was not lost on investors.  Indeed, just as Mr. Cook had predicted ahead of the FQ4 2018 Call in an email to members of Apple's board of directors, the market's overall reaction to Apple's FQ1 2019 revenue guidance was negative: over a dozen analysts lowered their price targets on Apple and Apple's stock price declined significantly on November 2, 2018.  UF #16; Ex. 98; Ex. 99 at 8.

Part of the information that Apple factored into its guidance was the limited data available on its new smartphone, the iPhone XR, which had launched in stores on October 26, 2018. Parekh Decl. ¶¶ 7-17.  Early indicators of the XR's performance were below Apple's expectations across the globe and taking this and other available data into account, Apple lowered its FQ1 2019 revenue guidance range from $93-$97 billion to $89-$93 billion in the days ahead of the FQ4 2018 Call.  *Id.*  Yet it was still very early in the XR's launch, so Apple remained optimistic that demand for the product would build once consumers had more time to see it in person.  *Id.* ¶¶ 17-18; Ex. 102 at 1.  Major sales events like Singles' Day in China (November 11) were on the horizon and reviews for the product were strong.  Parekh Decl. ¶ 18; Ex. 101 at 1.  Ultimately, the XR became Apple's best-selling iPhone in Q1 2019, and news reports indicated that it was also the world's top-selling smartphone in 2019.  Parekh Decl. ¶ 19.

Because Apple lowered its internal sales forecasts (and public revenue guidance) for FQ1 2019, it also cut its supply forecasts.  Ex. 85 at 232:10-17.  On November 2, 2018, Apple notified its suppliers of its lowered production targets on some of its iPhone models, including the XR.  Ex. 104; Ex. 105 at 1.  These "production cuts" were fully incorporated and factored into the revenue guidance that was disclosed to investors on November 1, 2018.  UF #24.  On November 5, 2018, a Nikkei article reported news of these production cuts, and Apple's stock declined $5.89, or 2.8%.  Compl. ¶ 28.  On November 12, 2018, one of Apple's suppliers announced that it would miss its guidance due to lowered orders from "one of its largest customers" and Apple's stock declined $10.32, or 5%.  *Id.* ¶ 29.

## E.   Apple's FQ1 2019 Performance After the FQ4 2018 Call

As of November 1, 2018, Apple was on track to meet the FQ1 2019 revenue guidance it gave to the market on that date.  UF #23.  Indeed, as of November 1, YoY iPhone unbrickings in China were higher than they were in FQ4 2018, a quarter in which Apple posted 27% YoY iPhone revenue growth in China.  Parekh Decl. ¶ 6.  While Apple does not calculate its revenue on an intra-quarter basis, a reasonable estimate of China iPhone revenue in October 2018 showed 31% growth from October 2017.  Ex. 95 ¶ 13.  Customer traffic at Apple retail and reseller stores also grew on a YoY basis in October 2018.  *Id.* ¶¶ 20, 23.  In his email to Apple's board of

1   directors in advance of the FQ4 2018 Call, Mr. Cook noted that "we are concerned with what we

2   are seeing in the emerging markets, particularly Turkey, India, Russia, and Brazil"; he did not put

3   China on that list.  UF #17.

4       By mid-November, *global* iPhone demand had declined below Apple's November 1

5   forecast.  Parekh Decl. ¶ 23; Ex. 94 ¶¶ 37-44.  But even as of mid-November, iPhone demand *in*

6   *China* remained on track and consistent with Apple's November 1 forecast.  Parekh Decl. ¶¶ 21-

7   22; Ex. 94 ¶¶ 37-44.  Apple's China team reported to Mr. Cook that Apple did well during

8   Singles' Day on November 11 and iPhone XR sales exceeded expectations.  Ex. 19.  As of

9   November 17, iPhone unbrickings in China were only down 1% compared to Apple's November

10  1 forecast, whereas global iPhone unbrickings were down 12%, excluding China.  Parekh Decl.

11  ¶¶ 22-23, Ex. 94 ¶ 43.  In a November 17 email, Mr. Cook noted that Apple's quarter-to-date

12  YoY decline in iPhone performance was "entirely split between US [] and Japan []."  Ex. 20 at 1.

13      It was not until late November that Apple's iPhone performance in China started to fall off

14  dramatically and unexpectedly.  Parekh Decl. ¶ 25; Ex. 94 ¶¶ 37-44.  On November 24, Mr. Cook

15  was informed that China was "performing below plan post 11/11 [Singles' Day]," and he emailed

16  his team about China, asking "what [is] happening and what are we doing about it?"  Ex. 23 at 1;

17  Ex. 24.  Indeed, after beating its China forecast for the week ending November 17, Apple missed

18  every subsequent week's forecast.  Parekh Decl. ¶¶ 25-27; Ex. 94 ¶ 42.  From its rolling forecast

19  as of November 26, forecasted iPhone unbrickings in China declined another 1.2 million units, or

20  10%, by the end of December.  Ex. 94 ¶¶ 45-46.  Conversely, forecasted iPhone unbrickings in

21  the rest of the world, excluding China, improved from mid-November and December forecasts

22  and were largely in line with actual results.  *Id.* ¶¶ 42, 45-46; Parekh Decl. ¶¶ 26-27.

23      Macroeconomic conditions in China worsened unexpectedly in November and December

24  2018. Ex. 91 ¶¶ 13-57.  After the smartphone market in China grew 1.3% in October, smartphone

25  sales declined 17.5% and 17% in November and December, respectively.  *Id.* ¶¶ 71-77.

26  Likewise, while manufacturing PMI figures indicated a stable manufacturing sector in September,

27  October, and November, the December numbers were decisively worse, meaning the

28  manufacturing sector was contracting.  *Id.* ¶¶ 50-52.  To add to this, the CFO of Huawei, one of

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:19-CV-02033-YGR

1    Apple's Chinese competitors, was arrested on December 1, 2018 on charges of violating U.S.

2    sanctions, which resulted in an unexpected change in consumer sentiment away from Apple and

3    towards Huawei. *Id.* ¶¶ 78-84.

4         By mid-December, it became clear that Apple would not meet its revenue guidance.  On

5    December 17, Mr. Cook informed Apple's board that Apple expected revenue for FQ1 2019 to be

6    approximately $84 billion.  Cook Decl. ¶ 37; Ex 6 at 1.  Mr. Cook noted that while there was "no

7    legal requirement to pre-announce[, he] want[ed] to do it."  Ex. 6 at 2.  On January 2, 2019, Apple

8    pre-announced its guidance miss in a letter from Mr. Cook to investors.  Ex. 26.  Mr. Cook wrote

9    that "[w]hile we anticipated some challenges in key emerging markets, we did not foresee the

10   magnitude of the economic deceleration, particularly in Greater China," which accounted for

11   "most of [Apple's] revenue shortfall to our guidance."  *Id.* at 2.  The next day, on January 3,

12   Apple's stock declined by $15.72, or 10%.  Compl. ¶ 37.

13   **III.    ARGUMENT[2]**

14        **A.    Mr. Cook's Challenged Statement Was Not False or Misleading**

15        To prevail on its Section 10(b) claim, Plaintiff must prove that the Challenged Statement

16   was inconsistent with the underlying facts and affirmatively created an impression of a state of

17   affairs that differed in a material way from the one that actually existed on November 1, 2018.

18   *See Brody*, 280 F.3d at 1006.  Plaintiff has no evidence to make such a showing.

19               **1.    The Challenged Statement Was an Objectively True Opinion
20                   Supported by Accurate and Undisputed Historical Facts**

21        The evidence summarized above shows that Mr. Cook's Challenged Statement concerned

22   Apple's business results—specifically the impact of currency fluctuations on revenue growth—in

23   certain emerging markets, including China, in FQ4 2018, and was *not* an intra-quarter update

24   _____
     [2] Defendants are entitled to summary judgment when they show "that there is no genuine dispute
25   as to any material fact" and are "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).
     Defendants must either negate with evidence an essential element of Plaintiff's claims or show
26   that Plaintiff lacks enough evidence to create a triable issue as to any essential element. *In re
     Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  The Court must conduct a "rigorous
27   scrutiny of evidence offered in opposition to a motion for summary judgment." *In re Adobe Sys.,
     Inc. Sec. Litig.*, 787 F. Supp. 912, 918 (N.D. Cal. 1992), *aff'd*, 5 F.3d 535 (9th Cir. 1993).
28   Plaintiff must show more than a scintilla of evidence or some "metaphysical doubt" as to the
     material facts at issue. *In re Oracle*, 627 F.3d at 387.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:19-CV-02033-YGR

about Apple's business in China as of November 1, 2018.  Mr. Cook's statements about Apple's historical performance in China and the other identified emerging markets were undisputedly accurate.   And Apple's undisputed financial results in FQ4 2018 show that China, when compared to Turkey, India, Brazil, and Russia, was, in fact, *not* in the same category of emerging markets where a weakened currency had caused Apple's revenue growth to materially decelerate in FQ4 2018.   Thus, Mr. Cook's opinion that he "would not put China in that category" was grounded in fact, had a reasonable basis, and was consistent with the data available to him.  This defeats Plaintiff's claim as a matter of law and entitles Defendants to summary judgment.  *See In re Oracle*, 627 F.3d at 390-91 (granting summary judgment where there was no evidence that defendants had "no reasonable basis" for their "belief in the statement's accuracy," or that they were "aware of undisclosed facts tending seriously to undermine the statement's accuracy").

Despite its historical accuracy, Plaintiff asserts that the Challenged Statement was false and misleading because as of November 1, 2018, Mr. Cook knew that Apple's "growth trajectory [in China] had turned negative" and failed to disclose:

> (i) Apple's Chinese iPhone resellers told Apple that consumer demand for the iPhone XR was weak and to stop shipping the phones; (ii) Apple began drastically cutting production for the iPhone XR by millions of units; (iii) Apple slashed its internal 1Q19 revenue outlook by nearly $6 billion; (iv) Apple reduced its internal 1Q19 iPhone sales expectation by 6 million units; and (v) Apple cut its 1Q19 internal growth outlook for Greater China from 4% to (-1%).

Dkt. No. 275 at 1.  These alleged omissions are inactionable for three reasons.

First, as a matter of law, accurate statements of historical performance are not actionable, even if internal forecasts paint a less rosy picture going forward.  *See In re Caere Corp. Sec. Litig.*, 837 F. Supp. 1054, 1058 (N.D. Cal. 1993) (citing *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 513 (9th Cir. 1991)).   Indeed, accurate statements about past performance are not actionable even if the accurately reported historical data is "unrepresentative of what was actually occurring currently at the Company."  *Fisher v. Acuson Corp.*, 1995 WL 261439, *9 (N.D. Cal. Apr. 26, 1995).   Nor are companies required to disclose internal forecasts, to forecast future events, or to caution that future performance may not be as bright as past performance.  *See In re Oracle*, 627 F.3d at 391; *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1406, 1411 (9th Cir. 1996).

And it is well-settled that companies and their executives have no duty to report intra-quarter data or results.  *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) (no duty to disclose data for quarter that "was not yet complete").  Thus, as a matter of law, the alleged omissions of which Plaintiff complains did not render Mr. Cook's accurate reporting of Apple's *historical* performance in emerging markets actionably misleading.

Second, the Challenged Statement was also an opinion, which is actionable only if Plaintiff can demonstrate both "that 'the speaker did not hold the belief [he] professed' and that the belief is objectively untrue." *Align*, 856 F.3d at 615-16.  Mr. Cook's undisputed testimony is that when he said, "I would not put China in that category," he was "offer[ing] [his] informed opinion that currency pressures set China apart from those other emerging markets in terms of revenue growth in FQ4 2018."  Cook Decl. ¶ 24.  As Mr. Cook notes, "[m]acroeconomic forces can be difficult to parse," *id.*, and so on the FQ4 2018 Call he used language that made clear he was providing his opinion, saying "the *way that I see these*[] is [that] each one of the emerging markets has a bit of a different story" for why revenue grew (or did not), "*I don't see it* as some sort of issue that is common between [them] for the most part," and "*I would not put* China in that category," Ex. 3 at 7 (emphases added).  It is obvious from the italicized words of Mr. Cook's answer that he was offering his opinion regarding the impact of currencies on Apple's revenue growth in emerging markets.  And Plaintiff cannot point to *any* evidence that Mr. Cook did not genuinely believe his opinion that China was in a different category than the other identified emerging markets, or that this opinion was objectively untrue.

Finally, the allegedly omitted adverse facts that Plaintiff complains about could not have rendered the Challenged Statement false or misleading because those facts were not "inconsistent with" what Mr. Cook said.  *See Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001).  That is, weaker than expected initial demand for the iPhone XR, lowered production targets for the XR, or lower internal forecasts for China sales in FQ1 2019, do not in any way contradict or undermine Mr. Cook's opinion about the impact of currency fluctuations on Apple's revenue growth in China and other emerging markets in FQ4 2018.  *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1087 n.7 (9th Cir. 2002) (statement was not misleading as it was "not necessarily

1    inconsistent with the underlying true facts").

2            **2.    Mr. Cook's Objectively True Opinion Did Not Affirmatively Create a
             Misleading Impression of Apple's Business as of November 1, 2018**

3

4            Plaintiff also asserts that investors heard Mr. Cook's Challenged Statement to (i) disclose

5    information about "the current state" of Apple's business in China, effectively giving an interim

6    business update for the first month of FQ1 2019; and (ii) communicate that Apple's business in

7    China was not "then currently experiencing [*any*] deceleration [or] pressure."  Ex. 4 at 4-5.  At

8    the pleading stage, the Court held that Plaintiff "plausibly alleges" that Mr. Cook was giving an

9    intra-quarter update and "represented that Apple was not experiencing pressure in China" as of

10   November 1, 2018.  *See* MTD Order at 8-9.  In reaching this conclusion, the Court relied on

11   Plaintiff's *allegation* that analysts "interpreted the statement in just this way."  *Id.* at 9.  But the

12   *evidence* shows that analysts did no such thing, and proves Plaintiff wrong.

13           Courts regularly rely on analyst reports as objective evidence of how investors interpreted

14   corporate disclosures.  *See, e.g.*, *In re Oracle*, 627 F.3d at 393 (affirming summary judgment, and

15   relying on "numerous analyst reports" in reaching its holding on how "the market understood

16   Oracle's earnings miss"); *In re Convergent*, 948 F.2d at 512-13 (no liability where analyst reports

17   showed "the market clearly understood" what plaintiffs alleged investors were misled about); *In*

18   *re Symbol Tech. Sec. Class Action Litig.*, 950 F. Supp. 1237, 1244 (E.D.N.Y. 1997) (granting

19   summary judgment because "analysts' interpretations of the statement all suggest that the

20   statement was limited to assessing" prior earnings rather than providing an intra-quarter update).

21   Here, the 38 analyst reports that were issued from November 1-4, 2018, referenced the

22   Challenged Statement, if at all, as Mr. Cook had intended it—as a comparison of Apple's

23   business in certain emerging markets in FQ4 2018.  UF #9-10.

24           For example, Mr. Mohan of BofA reported "[w]eaker growth in emerging markets

25   including India, Brazil, Russia and Turkey given currency moves," while revenue growth in

26   China "increased 16% year over year."  Ex. 49 at 3, 7.  Likewise, Wells Fargo reported that

27   "[w]hile Apple reported continued strong growth in China (+16% y/y in F4Q18; iPhone +DD%),

28   the company's commentary was relatively cautious on emerging market demand given the

                                               16                  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
                                                                   CASE NO. 4:19-CV-02033-YGR

strengthening U.S. Dollar." Ex. 82 at 1.  Still other analysts reported that: "[d]riven in part by FX, the company called out pressure in several emerging markets, including India, Brazil and Turkey," Ex. 48 at 1; revenue grew in "China 16% . . . but there was weakness in Turkey, Russia, India and Brazil," and "[p]art of the issue is the movement in FX," Ex. 58 at 1; "[c]ountries such as Turkey, India, Brazil, and Russia saw weakened currencies" but "China however has not been impacted," Ex. 73 at 5; Apple is "seeing pressure in [] markets like Turkey, India, Brazil, and Russia, where currencies have weakened over the recent period," Ex. 67 at 3; and Apple referenced "softness in emerging markets that have seen severe currency weakness against a strong dollar over recent quarters," citing "Turkey, India, Brazil and Russia specifically, but emphasized that China is not in the same category," Ex. 54 at 1.

The analyst reports issued from November 1-4, 2018 that referenced the Challenged Statement also reported it, in word or context, as concerning Apple's FQ4 2018—not as a mid-quarter update.  UF #10.  They discussed Mr. Cook's statement in terms of how "Apple indicated China was fine in FQ4 to Sept for them," Ex. 60 at 3, "revenue rose 16%," Ex. 46 at 2, "revenue grew 16% YOY in FQ4," Ex. 48 at 3, "China was strong in C3Q," Ex. 49 at 1, "China held solid at +16%Y/Y," Ex. 61 at 1, and "Greater China revenue grew 16% to $11.4B," Ex. 67 at 3.  They even commended Apple's ability to grow its China revenue in FQ4 2018 despite the difficult market conditions there.  *See, e.g.*, Ex. 57 at 1 ("We also consider the 16.4% revenue growth for its greater China region as also remarkable given some investors were concerned about slowing growth for that region").  *Not one* analyst report issued from November 1-4, 2018 referenced Apple's revenue or "strength" in China "at present," or as of November 1, 2018, or "in FQ1 2019," or otherwise made any reference to Apple's mid-quarter performance in China.  UF #11.

This is not surprising given Mr. Cook's undisputed testimony that he did not intend to convey any impression about Apple's mid-quarter performance in China.  UF #2, 15.  As he notes in his sworn declaration, "the purpose" of the FQ4 2018 Call "was to discuss Apple's results for the fourth quarter of fiscal 2018 and fiscal 2018 year-end," and so his answer to Mr. Mohan's question referenced "markets where currencies have weakened *over the recent period*," "our business in India *in Q4*," the fact that "Brazil *was* down somewhat compared to the previous

1  year," the fact that "[o]ur business in China *was* very strong *last quarter*" when we "*grew* 16%,"

2  and that "iPhone in particular *was very strong*."   Cook Decl. ¶ 25 (emphases added).   Those

3  statements are all about Apple's FQ4 2018 and the fiscal year that had just ended.  *Id.*

4      In any event, even as of November 1, 2018, the Challenged Statement was objectively true

5  and not misleading in any way.   The evidence shows that the Chinese renminbi had remained

6  stable against the dollar in October 2018, devaluing only 2% on a quarter-to-date basis by the

7  time of the FQ4 2018 Call.  Ex. 2 at 13.  In other words, as of November 1, 2018, China was still

8  not "in that category" of emerging markets where weakened currencies had adversely and

9  significantly impacted Apple's revenue.  Moreover, as of November 1, 2018, Apple was on track

10  to meet the FQ1 2019 revenue guidance it gave to the market that day, notwithstanding whatever

11  pressure its business may have been experiencing in China at the time.  UF #23.

12      Indeed, Plaintiff has disavowed any allegation that Apple's FQ1 2019 revenue guidance

13  was false or misleading.  *See* Dkt. No. 279 at 9.  In other words, it is *undisputed* that: (i) the

14  guidance was accurate as of November 1, 2018, and incorporated all of the internal adverse data

15  that Plaintiff asserts rendered the Challenged Statement misleading[3]; (ii) Apple was on pace to

16  meet the guidance as of November 1, 2018, notwithstanding whatever pressure its business may

17  have been experiencing in China at the time; and (iii) the deceleration in Apple's business in

18  China that ultimately caused the guidance miss necessarily arose *after* Mr. Cook made the

19  Challenged Statement.  Against this undisputed backdrop, the Challenged Statement could not

20  have "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way

21  from the one that actually exist[ed]."  *Brody*, 280 F.3d at 1006.

22      Plaintiff's tacit concession that Apple missed its revenue guidance because of events and

23  conditions that arose *after* November 1, 2018 is also borne out by the evidence.  On November 1,

24  2018, Apple's internal revenue forecast was well within the range disclosed in official guidance.

25  Maestri Decl. ¶ 13.  As discussed above, one month into FQ1 2019, YoY iPhone unbrickings in

26

_____

27  [3] As Mr. Cook testifies in his sworn declaration, the "slower than expected start for the iPhone XR had already been factored into the forward-looking revenue guidance [Apple] provided on the FQ4 2018 Call," and he "would not and did not say anything in [his] answer to Mr. Mohan that

28  contradicted the guidance we provided."  Cook Decl. ¶ 31.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:19-CV-02033-YGR

China were higher than they were in FQ4 2018. Parekh Decl. ¶ 6. Estimated China iPhone revenue in October 2018 showed 31% growth from October 2017. Ex. 95 ¶ 13. Customer traffic at Apple retail and reseller stores also grew on a YoY basis in October 2018. *Id.* ¶¶ 20, 23. And while Mr. Cook emailed Apple's board of directors on November 1, noting that "we are concerned with what we are seeing in the emerging markets, particularly Turkey, India, Russia, and Brazil," he did not put China on that list. UF #17. Even as of mid-November 2018, iPhone sales in China remained consistent with Apple's November 1 forecast. Parekh Decl. ¶¶ 21-22. Apple did well during Singles' Day on November 11 and iPhone XR sales exceeded expectations. Ex. 19. As of November 17, iPhone unbrickings in China were only down 1% compared to Apple's November 1 forecast, whereas global iPhone unbrickings were down 12%, excluding China. Parekh Decl. ¶¶ 22-23. In a November 17 email, Mr. Cook noted that Apple's quarter-to-date YoY decline in top-of-the-line iPhone performance was "entirely split between US [] and Japan []." Ex. 20 at 1. As explained above, it was not until the second half of November that macroeconomic conditions and other unforeseen events caused demand in China to deteriorate drastically, and iPhone sales began to materially decline. *Supra* at 12-13.

### 3.     The Challenged Statement Did Not Represent That Apple Was Not Experiencing Any Deceleration or Pressure on Its Business in China

The undisputed evidence also refutes Plaintiff's assertion that investors heard Mr. Cook to falsely represent that Apple was not "experiencing any deceleration or pressure on its business in China" at all. Ex. 4 at 5. Again, while the Court credited Plaintiff's *allegation* that analysts "interpreted the statement in just this way," MTD Order at 9, the *evidence* shows otherwise.

As noted above, public sources throughout FY 2018 had widely reported on the pressures facing Apple's business in China, so if Mr. Cook had said something as bold as there is "not any pressure on China," his statement would have been newsworthy, and would have caused analysts to comment on it. Ex. 96 ¶¶ 9-11; Ex. 100 ¶ 64. Yet of the 38 analyst reports issued from November 1-4, 2018, *not a single one* of them reported Mr. Cook as saying there was "no pressure or deceleration" on Apple's business in China. UF #11-12. On the other hand, eighteen of them specifically warned, notwithstanding the Challenged Statement, that Apple's business in

China was experiencing pressure and deceleration in FQ1 2019.  UF #14.  Mr. Mohan of BofA, for example, downgraded Apple's stock, reporting that "China was strong in [Q4 2018] but emerging signs of weakness could *pressure* the next few quarters," and that BofA "expect[ed] meaningful *deceleration* heading into the December quarter."  Ex. 49 at 1, 7 (emphases added). Goldman Sachs likewise reported that "[w]hile Apple indicated China was fine in FQ4 to Sept for them we believe the company likely sees some demand risk there in the December quarter," and warned of "potential for weaker demand there given ongoing macro uncertainty."  Ex. 60 at 1, 3. Still other analysts reported that "[a]lthough greater China reported double digit growth in FY[4]Q18, risks to AAPL in China appear to be rising," Ex. 72 at 8, that China "represent[ed] the single greatest risk to [Apple's] shares," Ex. 57 at 1, that Apple was at risk of "macro weakness dampening product demand, especially in China," Ex. 80 at 8, and that there were continued "regulatory hurdles relative to growth for the App Store" in China, Ex. 63 at 1.

Indeed, the parties' experts agree that throughout FY 2018 leading up to the FQ4 2018 Call, public sources repeatedly referenced the pressures facing Apple's business in China, including a weakening economy, a maturing smartphone market, a potential trade war between China and the United States, and growing nationalistic sentiment in favor of Chinese brands. *Supra* at 6.  Further, on the call itself, Mr. Cook specifically discussed the pressure facing Apple's billion-dollar App Store business in China, which was suffering from "a slowdown . . . on new game approvals" by the Chinese government, with games being approved "at far below the historic pace."  UF #6.  And Apple's Form 10-K risk factors explicitly warned of "downward pressure on gross margins" from "highly competitive global markets."  Ex. 5 at 8.  In short, both before and during the call, the market was aware that Apple's business in China faced "pressure." *See In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989) (omission is "excused where that information has been made credibly available to the market by other sources").

## B.  **Plaintiff Cannot Create a Triable Issue with Respect to Scienter**

Summary judgment for Defendants is also warranted because there is no evidence from which to conclude that Mr. Cook—and by extension Apple—acted with scienter.[4]  That is, there is no triable issue as to whether Mr. Cook made the Challenged Statement with an "intent to deceive, manipulate, or defraud," or with "deliberate recklessness." *Align*, 856 F.3d at 619.

Plaintiff "must present significant probative evidence relevant to the issue of intent," *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1220 (9th Cir. 1980), but cannot do so.  Mr. Cook did not sell any Apple stock and, as an owner of almost 880,000 shares of Apple stock, suffered massive losses when Apple's stock price declined.  UF #18.  Apple also repurchased nearly two billion dollars of its own stock at allegedly inflated prices in the days following the FQ4 2018 Call.  UF #19.  As courts have held, "undisputed evidence that defendants were actually *harmed* by their alleged fraud often negates an inference of scienter and supports entry of summary judgment for defendants." *Schuster v. Symmetricom, Inc.*, 2000 WL 33115909, at *7 (N.D. Cal. Aug. 1, 2000) (citing *Worlds of Wonder*, 35 F.3d at 1427-28), *aff'd*, 35 F. App'x 705 (9th Cir. 2002); *see also*, *e.g.*, *Mathews v. Centex Telemanagement, Inc.*, 1994 WL 269734, at *8 (N.D. Cal. June 8, 1994) (granting summary judgment where company spent millions buying back its own stock, as "[i]t would have made no sense to purchase that stock if defendants knew the prices to be inflated").  Moreover, Mr. Cook and Apple truthfully disclosed a guidance range on November 1, 2018 that Mr. Cook *knew* would disappoint the market and cause Apple's stock price to drop.  UF #16.  And Mr. Cook and Apple did not wait until the release of Apple's FQ1 2019 financial results on January 29, 2019 to inform the market about the Company's revenue shortfall, as they were permitted to do under SEC rules; instead, they chose to proactively inform the market about Apple's lower-than-expected revenue almost a month early.  UF #20.  In short, Mr. Cook's and Apple's conduct was entirely inconsistent with bad faith or scienter.  *See In re Apple Computer*, 886 F.2d at 1118 (affirming summary judgment for defendants on scienter grounds because "[a]ny remote inference of bad faith . . . [was] completely dispelled by the

---

[4] Apple's alleged scienter is dependent on Mr. Cook's alleged culpability. *See In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 891 n.13 (N.D. Cal. 2020), *aff'd*, 29 F.4th 611 (9th Cir. 2022).

1  defendants' overall pattern of conduct," which was inconsistent with bad faith).

2      Nor is there any evidence that Mr. Cook acted with "deliberate recklessness."  To

3  establish deliberate recklessness, the alleged misstatement must be the product of an "*extreme*

4  departure from the standards of ordinary care" and present "a danger of misleading" investors that

5  "is either known to the defendant or is so *obvious* that the actor must have been aware of it."

6  *Align*, 856 F.3d at 619.  And since deliberate recklessness is a "form of intentional or knowing

7  misconduct," Plaintiff must present evidence that Mr. Cook "subjectively appreciate[d] the

8  gravity of the risk of misleading others and consciously disregarded that risk."  *Kang v. PayPal*

9  *Holdings, Inc.*, 2022 WL 3155241, at *11 (N.D. Cal. Aug. 8, 2022) (internal quotations omitted).

10  Plaintiff cannot point to any such evidence or show that the danger of misleading investors here

11  was so obvious that Mr. Cook knew or must have known about it.

12      As discussed, Mr. Cook prepared carefully for the FQ4 2018 Call and, with the

13  Challenged Statement, intended to provide his accurate opinion that Apple's business in China

14  differed from its business in other emerging markets because China's currency had been more

15  stable over the recent period, which resulted in less of an adverse impact to Apple's revenue from

16  China in FQ4 2018.  UF #1-2.  The analyst reports issued between November 1-4, 2018 confirm

17  that the market interpreted the Challenged Statement as Mr. Cook intended it, and not one analyst

18  reported Mr. Cook as having represented that there was "no pressure" on Apple's business in

19  China as of November 1, 2018.  UF #7-13.  *At worst*, Mr. Cook mixed tenses that opened the door

20  at the pleading stage of this case to Plaintiff's "plausible"—yet erroneous—competing

21  interpretation of what he said.  At this stage of the litigation, however, a statement that is merely

22  subject to competing plausible interpretations cannot underpin a finding of scienter—the danger

23  of misleading in such a case is definitionally *not* "so obvious" so as to evince scienter.  *See*

24  *Jedrejczyk v. Skillz Inc.*, 2022 WL 2441563, at *6 (N.D. Cal. July 5, 2022) (holding that even if

25  the challenged statements could be interpreted as plaintiff alleged, the complaint still failed to

26  plead scienter because "[a]t worst, the statements appear to be poorly worded" rather than

27  "statement[s] made with 'a mental state embracing intent to deceive, manipulate, or defraud'").

28

In denying Defendants' motion to dismiss, the Court found that the "inference of innocence or negligence, where the risks did not materialize until November and December [2018], and defendants simply underestimated their eventual impact," was "compelling," but refused to accept it over Plaintiff's competing malicious inference without a developed record. MTD Order at 21.  Now, Plaintiff's concession that Apple's FQ1 2019 revenue guidance was accurate as of November 1, 2018 conclusively establishes as true the inference of innocence that the Court previously found compelling.  UF #21.  Indeed, it is *undisputed* that whatever allegedly concealed "pressure" Apple may have been experiencing in China as of November 1, 2018 *was incorporated into* the FQ1 2019 guidance that Apple issued that same day, and so the guidance was accurate as of that date.[5]  UF #22.  Given that undisputed fact, and the fact that analysts did not report the Challenged Statement in the way that Plaintiff alleges it was understood by investors, UF #11-13, Plaintiff cannot show that Mr. Cook's alleged omissions were an *extreme* departure from the standards of ordinary care.  Since Apple was still on track to meet its guidance as of November 1, 2018 notwithstanding any allegedly concealed pressure in China—and, as explained above, the evidence bears this out, UF #23—there is no basis from which to conclude that Mr. Cook acted with deliberate recklessness when he made the Challenged Statement.

Finally, Mr. Cook's undisputed testimony is that he acted in good faith, and he rejects the notion that he had any intent to defraud, or that he appreciated any risk of misleading investors with the Challenged Statement, which he maintains was accurate.  UF #15.  Given the absence of "obvious" falsity here, or any evidence of an intent to defraud, such as insider trading, Plaintiff cannot avoid summary judgment by arguing that a factfinder must judge Mr. Cook's credibility. The Ninth Circuit has affirmed summary judgment for defendants on scienter grounds in similar circumstances.  *See Kaplan v. Rose*, 49 F.3d 1363, 1380 (9th Cir. 1994) ("Even viewing the evidence in the light most favorable to [plaintiff], these affidavits, uncontradicted by any evidence

---

[5] Even as of November 1, 2018, however, Mr. Cook was not "particularly concerned" about China because Apple had successfully navigated the difficult market conditions there throughout FY 2018.  UF #5, 17; *see In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050, at *32 (N.D. Cal. June 19, 2009) (finding that no "reasonable juror could conclude that [Oracle's CFO] was deliberately reckless" because he "had a basis for believing that Oracle's overall business would be immune from the downturn"), *aff'd*, 627 F.3d 376 (9th Cir. 2010).

of insider trading or other evidence of scienter, are enough to justify granting [defendants] summary judgment on the issue of their scienter."); *In re Apple Computer*, 886 F.2d at 1117-18 (affirming summary judgment where "[e]ach of Apple's officers filed an affidavit stating that he acted in good faith belief that his optimistic statements were accurate and not misleading," and "defendants retained the great bulk of their Apple holdings . . . in the face of a decline in value").

### C.   <u>Plaintiff Cannot Prove Loss Causation</u>

Plaintiff also cannot prove "loss causation," *i.e.*, that Mr. Cook's alleged "misrepresentation was a 'substantial cause' of" Plaintiff's "financial loss." *Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 407 (9th Cir. 2021). The Supreme Court has recognized that, rather than being the result of fraud, a stock price drop could instead be

> the result of other intervening causes, such as changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events. If one of those factors were responsible for the loss or part of it, a plaintiff would not be able to prove loss causation to that extent. This is true even if the investor purchased the stock at a distorted price, and thereby presumptively relied on the misrepresentation reflected in that price.

*Halliburton*, 563 U.S. at 812-13 (internal quotations omitted). That is the case here.

As discussed, Plaintiff has disavowed any allegation that Apple's FQ1 2019 revenue guidance was false or misleading, so it is undisputed (and the evidence also bears out) that: (i) the guidance was accurate as of November 1, 2018, and incorporated all of the internal adverse data that Plaintiff asserts rendered the Challenged Statement misleading, UF #21-22; (ii) Apple was on pace to meet the guidance as of November 1, 2018, notwithstanding whatever pressure its business may have been experiencing in China at the time, UF #23; and (iii) the deceleration in Apple's business in China that ultimately caused the guidance miss and stock price drop that precipitated this lawsuit necessarily arose *after* Mr. Cook made the Challenged Statement, UF #26. In short, the revenue shortfall that underpins Plaintiff's alleged losses was necessarily the result of changed or new conditions—intervening causes—that did *not* exist on November 1, 2018.[6] Thus, Plaintiff cannot show the requisite causal connection and prove loss causation.

---

[6] With respect to the alleged November 5 and 12, 2018 "corrective" disclosures about Apple's production cuts, those cuts were, as discussed above, incorporated into Apple's undisputedly accurate FQ1 2019 revenue guidance. UF #24. In other words, those production cuts were

1

### D.   Mr. Maestri Is Independently Entitled to Summary Judgment

2       Because Mr. Cook and Apple are entitled to summary judgment on Plaintiff's Section

3   10(b) claim, they and Mr. Maestri—who is a defendant solely as an alleged "control person" of

4   Apple—are also entitled to summary judgment on Plaintiff's Section 20(a) claim. *See Align*, 856

5   F.3d at 623. Mr. Maestri is further entitled to summary judgment on the Section 20(a) claim

6   because the undisputed evidence establishes—and Mr. Maestri has thus met his burden to show—

7   that he "acted in good faith and did not induce the primary violation." MTD Order at 23 n.15.

8       Given the nature of the alleged primary violation here and the circumstances that

9   prompted it—an oral statement that Mr. Cook made in response to an analyst's question that was

10  directed specifically to Mr. Cook—Mr. Maestri could not have induced the violation or otherwise

11  acted in bad faith in relation to it. UF #28. Moreover, Mr. Maestri has submitted a sworn

12  declaration testifying that he: (i) believes that the Challenged Statement was factually supported,

13  true, and not misleading, and made in good faith, UF #27; and (ii) did not induce in any way the

14  Challenged Statement or otherwise direct Mr. Cook to make it, UF #29. Plaintiff cannot point to

15  anything in the record that would contradict this evidence of good faith and lack of inducement.

16  And like Mr. Cook, Mr. Maestri did not sell any of his Apple stock and suffered losses himself

17  from Apple's stock price decline. UF #30. Mr. Maestri is entitled to summary judgment for this

18  additional reason. *See Kaplan*, 49 F.3d at 1383 (affirming summary judgment on Section 20(a)

19  claim based on defendant's "uncontroverted statement [in declaration] that he never directed

20  anyone to make statements that he knew to be misleading, and that to his knowledge all the

21  information made public was true").

22  ## IV.   CONCLUSION

23      For these reasons, the Court should grant Defendants' motion for summary judgment.

24

25

26  entirely consistent with what Apple already disclosed on November 1, 2018—that Apple
    expected to generate between $89 and $93 billion in revenue in FQ1 2019. Moreover, the market

27  was aware of the allegedly undisclosed risk that early orders on the iPhone XR were below
    expectations and would likely result in production cuts. *See, e.g.*, Ex. 43 at 1 ("[W]e believe

28  iPhone XR demand [in China] may be lower than our previous estimates [and] Apple will likely
    adjust down its iPhone XR production for November and December[.]").

1

Dated:  September 9, 2022

Respectfully submitted,
ORRICK, HERRINGTON & SUTCLIFFE LLP

2

3

*/s/ James N. Kramer*

JAMES N. KRAMER
Attorneys for Defendants Apple Inc., Timothy
D. Cook, and Luca Maestri

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28