# EXHIBIT 85

```
 1            UNITED STATES DISTRICT COURT

 2          NORTHERN DISTRICT OF CALIFORNIA

 3                 OAKLAND DIVISION

 4
   In re APPLE INC.              )
 5 SECURITIES LITIGATION         )
                                 )
 6 _____   ) Case No.
                                 ) 4:19-cv-02033-YGR
 7 This Document Relates To:     )
   ALL ACTIONS.                  )
 8                               )
            Defendants.          )
 9                               )

10

11

                 HIGHLY CONFIDENTIAL
12

13        REMOTE VIDEOTAPED DEPOSITION OF

14              TIMOTHY D. COOK

15     _____

16          Wednesday, February 9, 2022

17

18

19

20

21

22

23

24 REPORTED BY:
   ANGELA KOTT, CSR 7811
25 JOB NO: 10094756
```

```
 1                 UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                      OAKLAND DIVISION

 4  In re APPLE INC.              )
    SECURITIES LITIGATION         )
 5                                )
    _____) Case No.
 6                                ) 4:19-cv-02033-YGR
    This Document Relates To:     )
 7  ALL ACTIONS.                  )
                                  )
 8                                )

 9

10          BE IT REMEMBERED THAT, pursuant to Notice

11   of Taking Deposition, and on Wednesday,

12   February 9, 2022, commencing at the hour of 8:03

13   a.m., thereof, before me, ANGELA KOTT, a Certified

14   Shorthand Reporter, there remotely appeared

15                    TIMOTHY D. COOK,

16   called as a witness by the Plaintiffs, who, being by

17   me first duly sworn, was thereupon examined and

18   interrogated as is hereinafter set forth.

19

20                      ---oOo---

21

22

23

24

25
```

```
 1          R E M O T E   A P P E A R A N C E S

 2
      FOR THE LEAD PLAINTIFF:
 3
            ROBBINS GELLER RUDMAN & DOWD LLP
 4          BY:   SHAWN A. WILLIAMS, Attorney at Law
                  DANIEL J. PFEFFERBAUM, Attorney at Law
 5                KENNETH J. BLACK, Attorney at Law
                  MARK SOLOMON, Attorney at Law
 6                JASON FORGE, Attorney at Law
                  HADIYA DESHMUKH, Attorney at Law
 7          One Montgomery Street, Suite 1800
            San Francisco, California 94104
 8          415.288.4545
            dpfefferbaum@rgrdlaw.com
 9          Kennyb@rgrdlaw.com
            Shawnw@rgrdlaw.com
10          Marks@rgrdlaw.com
            Jforge@rgrdlaw.com
11
      FOR EMPLOYEES' RETIREMENT SYSTEM OF THE STATE OF
12    RHODE ISLAND:

13          LABATON SUCHAROW
            BY:   CHRISTINE FOX, Attorney at Law
14          140 Broadway
            New York, New York 10005
15          212.907.0700
            Cfox@labaton.com
16
      FOR APPLE INC.:
17
            ORRICK, HERRINGTON & SUTCLIFFE LLP
18          BY:   JAMES N. KRAMER, Attorney at Law
                  TRISTAN ALLEN, Attorney at Law
19          405 Howard Street
            San Francisco, California 94105
20          415.773.5700
            jkramer@orrick.com
21          Tallen@orrick.com

22    ALSO PRESENT:

23          HEATHER GRENIER, Apple Counsel
            ANDREW FARTHING, Apple Counsel
24          KATE ADAMS, Apple Counsel
            LORENZO FERNANDEZ-KOPEC, Aptus Video
25          Technician
                         ---oOo---
```

```
 1      Q.  We'll take a break -- I expect to take
 2   breaks at least every hour or so, but if there's any
 3   point in time where you need to take a break that is
 4   sort of off schedule, just let me know and we can do
 5   that.
 6          I'd only say that if I'm in the middle of a
 7   question or in the middle of a line of questioning,
 8   I'm going to want to finish that before we take a
 9   break.  Okay?
10      A.  All right.
11      Q.  Any reason why you can't give your full and
12   complete testimony today?
13          Are you on any medication that might impact
14   your ability to recall facts?
15      A.  No.
16      Q.  And are you alone in that room today?
17      A.  Yes.
18      Q.  And do you have any other devices there
19   other than the two that I can see?
20          I think I can see two laptops, maybe a
21   laptop and an iPad?
22      A.  I have the iPad, the laptop.  There's a
23   device that allows the -- for volume change and
24   camera change on the table that's out of your
25   vision.  There's a printer in the room.  And I have
```

Timothy D. Cook

```
 1   my iPhone.
 2       Q.  And do you -- in your normal course of
 3   work, when you receive documents from your
 4   colleagues, do you typically read them on your
 5   phone, your computer or your iPad?
 6       A.  All of the above.
 7       Q.  Which one would you say you do more often
 8   than the others?
 9       A.  Probably my phone.
10       Q.  And do you respond to e-mails on your
11   phone?
12       A.  I do.
13       Q.  You have a printer there, too.
14           Do you typically print e-mails before you
15   read them?
16       A.  It depends upon the length of the e-mail
17   and whether there are attachments involved, and so
18   forth.
19       Q.  So when there are -- when it's a long
20   e-mail or when there are attachments, are you unable
21   to read them on a screen?
22       A.  I sometimes want to print them because you
23   have to go back to where the e-mail started in order
24   to get a feeling of the entire e-mail.
25       Q.  The context of it all?
```

Timothy D. Cook

```
 1      A.  Correct.

 2      Q.  And but that's not always the case, is it?

 3      A.  It is not always the case.

 4      Q.  So the reason I'm asking you this question

 5  is I want to make sure that there are documents that

 6  I show you today that you can actually read either

 7  on your iPad or on your computer that we don't need

 8  to take time for you to actually print them.

 9      A.  I'll do my best to do it in the most

10  efficient way.

11      Q.  Very good.  I appreciate that.

12          And so you received a college degree from

13  Auburn University; is that right?

14      A.  I did.

15      Q.  MBA from Duke University?

16      A.  I do.

17      Q.  And you joined Apple in 1998, right?

18      A.  Yes.

19      Q.  And you've been the CEO since 2011?

20      A.  That's correct.

21      Q.  Are you familiar with the allegations of

22  the complaint that brings us together today?

23      A.  I believe so.

24      Q.  And what is your understanding of those

25  allegations generally?
```

Timothy D. Cook

```
 1        A.   My understanding is the -- there -- that

 2   you or your party is alleging that I made some

 3   comments about China that were inaccurate.

 4        Q.   Is that the full breadth of your general

 5   understanding?

 6        A.   It is my general understanding.

 7        Q.   And do you have an opinion about the merits

 8   of that allegation?

 9        A.   Of course.

10        Q.   And what is that opinion?

11        A.   That it is without merit.

12        Q.   And what is the basis of that opinion?

13        A.   My comments were made in regards to China's

14   performance in Q4.  And for clarity, I'm talking

15   about fiscal Q4, which ended for us in September.

16             And they were accurate when I made those,

17   which was that the business had grown 60 percent

18   during the quarter.  And so the China performance

19   was quite good in Q4.

20        Q.   And are there any other allegations of the

21   complaint that you dispute?

22             MR. KRAMER:  Objection to form.

23   BY MR. WILLIAMS:

24        Q.   I'll withdraw.  I'll withdraw that

25   question, Mr. Cook.
```

Timothy D. Cook

1          Are there any other allegations of the

2    complaint that you believe to be without merit?

3          MR. KRAMER:  Objection to form.

4          THE WITNESS:  Perhaps you could ask me

5    about specific allegations, and I'd be very happy to

6    answer.

7    BY MR. WILLIAMS:

8      Q.  Well, I was asking you about your general

9    understanding.  And so -- and I asked you if that

10   was the entirety of your understanding.

11          And I think that you testified "yes."

12     A.  Yeah, my general understanding is you're

13   talking about a statement about whether it's

14   accurate or not.

15          And then so I've given you that

16   information.

17     Q.  Have you read the complaint in this action?

18     A.  I haven't read the entire complaint, I

19   don't believe.

20     Q.  So then, if you haven't read the entire

21   complaint, you don't -- is it fair to say you don't

22   have an opinion about the merits of the sections

23   which you did not read?

24          MR. KRAMER:  Objection as to form.

25          You may answer, Mr. Cook.

1   number of different things that occur, including a

2   reassessment of the manufacturing plan.

3   BY MR. WILLIAMS:

4       **Q.  Right.  So it's true, isn't it, that by the**

5   **28th your supply chain management team was already**

6   **discussing cutting the MPS plans for the iPhone XR?**

7       A.  I can't see that from this e-mail.  But I

8   would guess that they were because we cut the

9   forecast.  And if you cut the forecast you would

10  clearly align the MPS.

11          The MPS would always be more than the

12  forecast because we would want to be able to protect

13  the high side of the case.  But it would result in a

14  decrease, clearly.

15          MR. WILLIAMS:  So let's take a break and

16  come back in ten.

17          MR. KRAMER:  Ten minutes.

18          MR. WILLIAMS:  Yeah.

19          APTUS VIDEO TECHNICIAN:  The time is 3:25.

20  We're going off the record.

21          (Recess taken)

22          APTUS VIDEO TECHNICIAN:  The time is 3:44.

23  We're back on the record.

24          MR. KRAMER:  Okay.  And as I understand it,

25  we have -- we've got six hours and 11 minutes on the

Timothy D. Cook

1  record, which means we have 49 minutes remaining; is

2  that correct, Mr. Videographer?

3          APTUS VIDEO TECHNICIAN:  Yes.  Correct.

4          MR. KRAMER:  Okay.

5          MR. WILLIAMS:  Can you give me 55?  Thanks.

6          This is Cook 20.  It is Bates number

7  APL-SECLIT_0047913.

8          (Whereupon, Exhibit 20 was marked for

9          identification)

10  BY MR. WILLIAMS:

11      Q.  Let me know when you've had a chance to

12  look at it.

13      A.  Yes, I've looked at it.

14      Q.  The e-mail dated October 31st, 2018, from

15  Kaiann Drance to yeewee@apple, Angie Wong, and Kevan

16  Parekh.  And the subject line is "China feedback,"

17  right?

18      A.  Yes.

19      Q.  And Kaiann writes to YeeWee and Angie, "Do

20  you guys have any feedback on how the launch is

21  going?  We are looking at ways to help with

22  performance via fast marketing actions.  We saw

23  unbrickings from China again and are very

24  concerned."

25          Do you see that?

1    A.   Yes.

2    Q.   **And so you would agree that your teams**

3   **were -- had some of the same concerns that you did**

4   **about China, right?**

5         MR. KRAMER:   Objection as to form.

6         THE WITNESS:   My concerns here were on the

7   total revenue falling from 96.5 to 93, as we had

8   talked about.

9         So I was concerned that the total portfolio

10  wasn't rolling up to where our objectives are.

11  BY MR. WILLIAMS:

12   Q.   **You knew -- sorry.   Go ahead.**

13   A.   And if you look at it, which I think we

14  looked at together, that XR was below expectation

15  kind of in every geo.   And so that's the way that I

16  look at it.

17   Q.   **You knew that investors were concerned**

18  **about both the performance of the new iPhones and**

19  **the performance in China, though, right?**

20         MR. KRAMER:   Objection as to form.

21         THE WITNESS:   Certainly in the second half

22  of -- my recollection is in the second half of

23  calendar 2018, the Chinese economy was under

24  pressure.   But we had obviously bucked that trend in

25  the fiscal Q4 by growing 16 percent.

1    And so despite the economy not doing as

2  well and not growing the way that most people wanted

3  to see the Chinese economy growing, we had done

4  well.

5       So you have to really separate market from

6  how Apple is doing within the market.

7  BY MR. WILLIAMS:

8    Q.  What I was talking about was investors.

9  You knew leading into the November 1st earnings

10  announcement that the investment community was

11  interested in and concerned about economic

12  conditions in China and whether that was affecting

13  Apple and the performance of the new iPhones and

14  specifically the XR, right?

15       MR. KRAMER:  Objection as to form.

16       THE WITNESS:  There's a lot there to unpack

17  in there.

18       I don't recall what I knew about what

19  investors thought about China.  But sitting here

20  today, it seems likely that if the Chinese economy

21  is under pressure, then at least in the second half

22  of calendar 2018, as my memory recalls, that they

23  were probably concerned how we were going to do in

24  Q4.

25       And so when we grew by 16 percent, we sort

Timothy D. Cook

1  of proved that we could buck the trend, if you will.

2  BY MR. WILLIAMS:

3      **Q.  You testified earlier that at times you do**

4  **get a preview of what the analysts may be interested**

5  **in in any particular earnings announcement, right?**

6      A.  What we try to do is, you know, try to put

7  ourselves in their shoes and try to come up with

8  questions that we think they are going to ask so

9  that we're prepared.

10         And so you can do that by, you know, having

11  somebody from the investor relations area look at

12  the analysts' reports.  You can do that just by a

13  feel for what is in the -- what's in the popular

14  press or what's going on in the company at that

15  particular point in time.

16     **Q.  So you know -- withdrawn.**

17         **You've heard of Wamsi Mohan?**

18     A.  Yes.

19     **Q.  And you've talked to him before?**

20     A.  I don't think I've ever had a dialogue with

21  him outside of the earnings call.  But on an

22  earnings call, he will ask questions sometimes of

23  me, sometimes of Luca, and he -- and he's a regular

24  on those earnings calls dating back some time.

25     **Q.  So I'm going to read to you an e-mail of --**

Timothy D. Cook

1   from Luca Maestri to you, and he's forwarding an

2   e-mail from Nancy Paxton on November 1st, 2018,

3   describing, quote, the potential questions by

4   analysts, and that would be on the November 1st,

5   2018, conference call.

6           And she writes to Luca, "Here's the list of

7   analysts we are likely to hear from on the call in

8   the order we discussed with some predictions of

9   questions based on their recent reports.  Tony S and

10  Rod H are added at the bottom as you will have

11  call-backs with them."

12          Does that sound familiar to you?

13          MR. KRAMER:  Objection to form.  Are you

14  going to mark a document?

15  BY MR. WILLIAMS:

16      Q.  Does that sound familiar to you, sir?

17      A.  Could I see the document?

18      Q.  Well, I think I want to just work through

19  it.  I'm asking you if it sounds familiar.  If it

20  doesn't, then you can say it doesn't.

21      A.  I don't remember any such e-mail.

22      Q.  Okay.

23      A.  But if you'll allow me to look at it, I'd

24  be glad to comment on it.

25      Q.  But I'll make sure that you can -- you'll

Timothy D. Cook

1  transcript to remind myself of what was said in the

2  call.

3  BY MR. WILLIAMS:

4      **Q.  Right?**

5      A.  If you'll point me to the transcript, I'd

6  be glad to read it and give you a response.

7      **Q.  And you're not saying, are you, that the**

8  **one document that we looked at that referenced**

9  **traffic was the only information that you had**

10 **concerning traffic at your Chinese retail stores or**

11 **your Chinese partners, are you?**

12         MR. KRAMER:  Objection as to form.

13         THE WITNESS:  If you could refresh my

14 memory with another document that have different

15 material than that one did, I'd be glad to answer

16 your question.

17 BY MR. WILLIAMS:

18     **Q.  So are you saying that you can't answer my**

19 **question as it is asked?**

20     A.  I'm saying that in -- during this

21 deposition you've presented to me one chart with

22 traffic across our retail footprint across the

23 world.  And on that chart it was clear that there

24 were traffic deltas across the board because we were

25 comparing a consumer product to a pro product.

**Page 227**

Timothy D. Cook

1      Q.  Okay.  And each of the factors that you
2  didn't mention during the call were known to you
3  on -- or known to you and the company as of
4  November 1st.  For example, that your Chinese
5  resellers or partners had asked you to stop shipping
6  the XR, right?
7          MR. KRAMER:  Objection to form.  What's the
8  question?
9  BY MR. WILLIAMS:
10     Q.  It was known to you, wasn't it, as of
11 November 1st, that your Chinese partners had asked
12 Apple to stop shipping the iPhone XR?
13         MR. KRAMER:  Objection as to form.
14         THE WITNESS:  As we had talked before on
15 that, you're trying to continue to twist it.
16         What -- according to the document that they
17 had done was, that we had slightly overshipped the
18 number of units that they had previously ordered for
19 that particular window of time.  And they said they
20 didn't want additional units beyond that.
21 BY MR. WILLIAMS:
22     Q.  And it was known to you and Apple that you
23 had begun to reduce or cancel production plans for
24 the iPhone XR as of November 1st, wasn't it?
25         MR. KRAMER:  Objection as to form.

Highly Confidential In re Apple Inc. Securities Litigation vs.

1      THE WITNESS:  As I've said probably many

2  times now, the forecast changed from 96.5 to 93.

3  When the forecast changed, obviously we would reduce

4  the manufacturing orders on suppliers as well.

5  BY MR. WILLIAMS:

6      **Q.  When asked how what demand looks like for**

7  **the iPhone XR, do you think that it would not be**

8  **important to investors to communicate to them that**

9  **you knew that you had begun to cancel production**

10  **orders for XR?**

11      MR. KRAMER:  Objection to form.

12      THE WITNESS:  When we do a conference call,

13  we talk about the results from the previous quarter

14  and then we give guidance on the -- or some sort of

15  color, if you will, on the results for the current

16  quarter.

17      We don't give an update on what's going on

18  between the end of the quarter, end of the previous

19  quarter and the conference call.  And we don't give

20  guidance at the product level generally speaking or

21  the geographic area generally speaking.

22      And so what we did do was we did the

23  material thing, which was the material thing was the

24  company we believed on November 1st would achieve a

25  revenue of 89 to 93.

**Page 229**

Highly Confidential In re Apple Inc. Securities Litigation vs.

Timothy D. Cook

1          That was the relevant forward-looking

2   comment.  And that disappointed the investors, and

3   we knew it would going into the call, as you can see

4   from the e-mail in front of you.

5   BY MR. WILLIAMS:

6       Q.  It would have disappointed investors as

7   well had you told them that the experience in China

8   to date on the XR was weak demand such that Chinese

9   resellers were asking you to stop shipping the

10  phone, and that it was a main -- a key driver in the

11  weak Q1 outlook, wouldn't it?

12          MR. KRAMER:  Objection to form.

13          THE WITNESS:  I'm not sure there's a

14  question there.  It sounds like you're trying to

15  testify instead of ask a question.

16  BY MR. WILLIAMS:

17      Q.  I asked you a question.  It's a leading

18  question, though.

19          MR. KRAMER:  Well, maybe you can rephrase

20  it for Mr. Cook.

21          MR. WILLIAMS:  Can you read the question

22  back, please?

23          (Record read by the reporter as follows:

24          "Q.  It would have disappointed investors

25          as well had you told them that the

Page 230

1          experience in China to date on the XR was

2          weak demand such that Chinese resellers

3          were asking you to stop shipping the phone,

4          and that it was a main -- a key driver in

5          the weak Q1 outlook, wouldn't it?")

6          MR. KRAMER:  I agree with Mr. Cook.  I

7    don't think it's a question.  I think it's you

8    testifying.

9          Maybe you can ask a question.

10   BY MR. WILLIAMS:

11       **Q.  Don't you think that information would have**

12   **disappointed investors as well?**

13          MR. KRAMER:  Objection to form.

14          THE WITNESS:  I think the investors knowing

15   all of the conference calls that took place before

16   that know that we put our best thoughts into our

17   guidance.

18          And so it's the guidance that people on the

19   forward-looking side are weighing in addition to how

20   we actually performed during the quarter.

21          And if you look at how we performed during

22   the quarter, despite the economic pressures in

23   China, we grew the business by 16 percent.

24          We were really proud of that, of doing

25   something very different than how the market was

Timothy D. Cook

 1  doing.

 2  BY MR. WILLIAMS:

 3       Q.   On November 5th of 2018, you recall, don't

 4  you, that there was a report that indicated that

 5  Apple had cancelled or reduced their production

 6  plans for the iPhone XR, right?

 7       A.   Could you show me a document?

 8       Q.   If you don't remember, then it's fine.   You

 9  can just say you don't remember.

10       A.   It's as I've testified.   With lowering the

11  forecast, one of the things that happens with a

12  lowered forecast is a lowering of the orders on

13  manufacturers.   And so one leads to the other.

14            And so it's not surprising that there was a

15  reduction in the number of units we would order from

16  suppliers because we no longer believed we could hit

17  96.5.

18       Q.   But you didn't tell investors that, though,

19  did you?

20       A.   We did tell investors what we thought we

21  could do, which was 89 to 93.

22       Q.   So are you saying that investors would just

23  sort of infer that you were cancelling orders for

24  the XR?

25       A.   I don't think --

```
 1              MR. KRAMER:  Objection to form.

 2              THE WITNESS:  I don't think investors, for

 3   the most part, understand that an MPS is generally

 4   set higher than what our guidance is set up.

 5              And so because we never announced what the

 6   MPS is, it's not something that has a -- it's not

 7   something that people can link dots together on.

 8              MR. KRAMER:  Hold on a second.  Lorenzo,

 9   how much time do we have left on the record?

10              APTUS VIDEO TECHNICIAN:  We are at

11   40 minutes into the session.  So about nine minutes

12   left.

13              MR. KRAMER:  Nine minutes, okay.  So got

14   it.  4:33.  Okay.  Go ahead, Mr. Williams, sorry.

15   BY MR. WILLIAMS:

16        Q.  When you were asked about what people could

17   take from your -- withdrawn.

18              When you were asked on the conference call

19   about demand or early demand for the XR, you told

20   investors that you didn't have much information, but

21   you had enough information to, as you testified, to

22   substantially reduce your outlook, didn't you?

23              MR. KRAMER:  Objection to form.

24              THE WITNESS:  We had limited data because

25   the phone had only been on sale from the previous
```

Timothy D. Cook

1  Friday the 26th.

2        And so we had a few data points on a phone

3  that we felt would not have an early adopter curve,

4  and we had a set of robust actions that we were

5  undertaking to change the demand on the -- not only

6  the XR but across the product line.

7  BY MR. WILLIAMS:

8     **Q.  But the demand for the phone was weak, as**

9  **you've acknowledged today?**

10        MR. KRAMER:  Objection.

11        THE WITNESS:  Demand for the phone was

12  weaker than our expectation, and partly due to a mix

13  shift to other products.

14  BY MR. WILLIAMS:

15     **Q.  And at the time you had enough information**

16  **to instruct your team to take extraordinary action,**

17  **as we talked about, on October 27th and 28th?**

18        MR. KRAMER:  Objection to form.

19        Sorry.  Go ahead, Mr. Williams.

20        THE WITNESS:  I wouldn't call the actions

21  extraordinary.  They were actions to do with selling

22  more product and marketing the product better.

23  BY MR. WILLIAMS:

24     **Q.  You were shocked by the difference between**

25  **what you believed was the outlook prior to**

**Page 234**

Timothy D. Cook

```
 1              CERTIFICATE OF REPORTER
 2         I, ANGELA T. KOTT, Certified Shorthand
 3  Reporter, hereby certify that the witness in the
 4  forgoing deposition was duly sworn to tell the
 5  truth, the whole truth and nothing but the truth in
 6  the within-entitled cause;
 7         That said deposition was taken down in
 8  shorthand by me, a disinterested person, at the time
 9  and place therein stated, and that the testimony of
10  the said witness was thereafter reduced to
11  typewriting, by computer, under my direction and
12  supervision;
13         That before completion of the deposition,
14  review of the transcript [ ] was [X] was not
15  requested.  If requested, any changes made by the
16  deponent (and provided to the reporter) during the
17  period allowed are appended hereto.
18         I further certify that I am not of counsel
19  or attorney for either or any of the parties to the
20  said deposition, nor in any way interested in the
21  event of this cause, and that I am not related to
22  any of the parties thereto.
23              Dated: February 11, 2022.
24         _____
25              ANGELA T. KOTT, CSR 7811
```