# EXHIBIT 8

# *In re* APPLE INC. SECURITIES LITIGATION
## Expert Report of Professor Steven Grenadier

**Highly Confidential under the Stipulated Protective Order**

## June 10, 2022

# Table of Contents

I.     Qualifications ............................................................................................................1

II.    Assignment ...............................................................................................................2

III.   Summary of Allegations .............................................................................................3

IV.    Summary of Opinions .................................................................................................6

V.     Background on Apple's Business ..............................................................................14

VI.    Overview of Loss Causation and Damages from the Perspective of a Financial
       Economist ..............................................................................................................15

VII.   If Mr. Cook's Statement Was Comparing Currency Trends in China to Other Emerging
       Markets, Then It Could Not Have Caused Plaintiff's Alleged Losses ............................16

VIII.  If Mr. Cook's Statement Was about FQ4'18, Then It Could Not Have Caused Plaintiff's
       Alleged Losses .......................................................................................................17

IX.    If Plaintiff's Theory of Harm Is That Apple Allegedly Misrepresented That It Was Not
       Facing Any "Pressure" in Greater China, and the November 5, 2018 Disclosure Revealed
       That Apple Was Facing "Pressure," Then Mr. Cook's Statement Could Not Have Caused
       Plaintiff's Alleged Losses after November 5, 2018 ......................................................18

X.     Dr. Feinstein's Analysis of the Losses Caused by the Alleged Misrepresentation Is
       Flawed and Unreliable .............................................................................................21

       A.    Dr. Feinstein Fails to Assess the Extent to Which the But-For Disclosure That
             Could and Should Have Been Made Matches the Actual Alleged Corrective
             Disclosures ..................................................................................................... 23

             1.    Dr. Feinstein Is Inconsistent in Specifying the But-For Disclosure That
                   Could and Should Have Been Made .......................................................23

             2.    Dr. Feinstein's Assertion That "Investors Would Not Have Been
                   Surprised" on the Alleged Corrective Disclosure Dates Had the But-For
                   Disclosure Been Made Forms the Core of His Loss Causation and
                   Damages Methodology, Yet Has No Support in His Report or Literature in
                   Financial Economics ...........................................................................26

       B.    Dr. Feinstein Fails to Appropriately Account for Confounding Information Not
             Causally Linked to the Alleged Fraud That Was Revealed on the Alleged
             Corrective Disclosure Dates ............................................................................. 28

             1.    November 5, 2018 ..............................................................................29

             2.    November 12, 2018 .............................................................................33

             3.    January 3, 2019 .................................................................................35

XI.    Dr. Feinstein's Damages Calculation Is Flawed, Unreliable, and Overstates Inflation ....44

A.     Dr. Feinstein Fails to Demonstrate That the Alleged Misrepresentation Introduced Inflation into the Stock Price as of the Start of the Class Period ........................... 44

B.     Dr. Feinstein's Analysis of Inflation Fails to Address That the Hypothetical But-For Disclosure Would Have Been Qualitative in Its Nature While the Alleged Corrective Disclosures Had Important Quantitative Components ....................... 47

C.     Dr. Feinstein Fails to Isolate the Impact of the Alleged Fraud, If Any, from Other Confounding Factors on November 5, 2018 and November 12, 2018 ................. 48

D.     Dr. Feinstein Fails to Isolate the Impact of the Alleged Fraud, If Any, from Other Confounding Factors on January 3, 2019 ............................................................ 49

XII.   Examples to Illustrate Flaws and Errors in Dr. Feinstein's Calculation of Inflation .........50

A.     November 5, 2018 ................................................................................................ 50

B.     November 12, 2018 .............................................................................................. 52

C.     January 3, 2019 ................................................................................................... 53

D.     Inflation Assuming the November 5, 2018 Disclosure Fully Revealed That Apple Was Facing "Pressure" in Greater China .......................................................... 56

XIII.  Options Damages .......................................................................................................... 57

A.     Dr. Feinstein's Methodology Is Based on His Flawed and Unreliable Analysis of Inflation in Apple's Stock Price ......................................................................... 59

B.     Dr. Feinstein Fails to Provide a Methodology to Determine Damages for Investors Who May Have Traded Different Apple Options or May Not Have Traded Apple Options at All in the But-For World ..................................................................... 59

C.     Dr. Feinstein's Methodology for Calculating Option Inflation Fails to Reliably Account for Any Changes in Implied Volatilities That Would Have Occurred Following the Hypothetical But-For Disclosure .................................................. 61

## I.   Qualifications

1.   I, Steven R. Grenadier, Ph.D., am the William F. Sharpe Professor of Financial Economics at the Graduate School of Business at Stanford University.  I have been a member of the Stanford faculty since 1992 and served as the Chair of the Finance Department for over ten years.  My teaching and research focus on the area of investment analysis, including, among other topics, portfolios, performance evaluation, and benchmarking.  While at Stanford, I have taught graduate-level courses in Investment Modeling, Portfolio Management, Real Estate Investment, and Finance Theory.  In 1987, I graduated Phi Beta Kappa and *summa cum laude* from the University of California at Berkeley with a B.S. in Business Administration.  In 1992, I received my Ph.D. in Business Economics (Finance) from Harvard University.

2.   I have published numerous articles in finance and economics journals and have spoken at numerous academic and business conferences about my research.  I am the co-editor of the *Journal of Real Estate Finance and Economics*, a leading academic real estate journal.  My research focuses on sophisticated valuation models of complicated financial structures and their empirical implications.  This research includes significant analysis of options.  I am a former Trustee of E*Trade Funds, Nicholas Applegate Institutional Funds, and AQR Funds.  I have also served as a Senior Consultant to Financial Engines, Inc., an online investment advisor.  I currently serve as a Senior Advisor to Cornerstone Research and as a member of the Investment Committee of Vise, an investment management platform.

3.   I am being compensated at my standard billing rate of $975 per hour.  I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinion or the outcome of this or any other matter.

Highly Confidential

4.      I previously submitted an expert report in this matter on July 9, 2021 (the "Grenadier Class Certification Report")[1] in response to an expert report filed by Dr. Steven Feinstein on May 5, 2021 (the "Feinstein Class Certification Opening Report").[2]  My curriculum vitae, which includes a list of the publications I have authored, is included as **Appendix A**.  A list of my deposition and trial testimony over the past four years is included as **Appendix B**.  I have reviewed reports from four other Defense experts in forming my opinion:  Mr. Eric Poer;[3] Professor Brett Trueman;[4] Professor Dennis Yang;[5] and Mr. Alex Gauna.[6]  I have also reviewed reports by Plaintiff's experts Dr. Oded Shenkar;[7] Dr. Steven Feinstein;[8] and Dr. Don Chance.[9]  A complete list of the documents that I have considered in forming my opinions is attached as **Appendix C**.

5.      My work in this matter is ongoing.  The opinions presented in this report are the result of the information available to me as of the report date.  I reserve the right to supplement or modify my opinions if new information comes to light and to respond to any additional report(s) or opinions offered by other experts.

## II.      Assignment

6.      I have been asked by counsel for Apple Inc. ("Apple" or "the Company") to review and respond to the Merits Report of Dr. Feinstein, who was retained by Lead Plaintiff Norfolk County Council as Administering Authority of the Norfolk Pension Fund.[10]  Additionally,

---

[1] Expert Report of Professor Steven Grenadier, July 9, 2021.

[2] Dr. Feinstein also submitted a reply report on August 24, 2021 ("Feinstein Class Certification Reply Report").

[3] Summary and Expert Report of Eric Poer - Corrected, CPA, CFF, ABV, CFE, May 9, 2022 ("Poer Report").

[4] Expert Report of Professor Brett Trueman, Ph.D., April 27, 2022 ("Trueman Report").

[5] Expert Report of Professor Dennis Yang, Ph.D., April 27, 2022 ("Yang Report").

[6] Corrected Expert Report of Alex Gauna, MBA, May 9, 2022 ("Gauna Report").

[7] Expert Report of Oded Shenkar, April 27, 2022 ("Shenkar Report").

[8] Expert Report of Steven P. Feinstein, Ph.D., CFA, April 27, 2022 ("Feinstein Merits Report").

[9] Expert Report of Don Chance, April 15, 2022 ("Chance Report").

[10] *In re Apple Inc. Securities Litigation*, Revised Consolidated Class Action Complaint for Violation of the Federal Securities Laws, June 23, 2020 ("Complaint").

Highly Confidential

counsel has asked me to (i) assess Plaintiff's alleged losses assuming the alleged misrepresentation was comparing currency trends in China to other emerging markets; (ii) assess Plaintiff's alleged losses assuming the alleged misrepresentation was about FQ4'18; and (iii) assess Plaintiff's alleged losses assuming that the November 5, 2018 disclosure fully revealed that Apple was facing "pressure" in Greater China.[11]

### III.    Summary of Allegations

7.    Plaintiff is bringing a "federal securities class action on behalf of all persons and entities who purchased or otherwise acquired the publicly traded securities of Apple Inc. … during the period from November 2, 2018 through January 2, 2019" ("Class Period").[12]

8.    After market close on November 1, 2018, Apple issued a press release announcing its financial results for the period ending September 29, 2018 and held an earnings call.  The Complaint states:

> When asked whether the U.S.-China trade tariffs and trade tariff threats were having any impact on demand for the iPhones in China, [Apple CEO Tim] Cook assured investors that the only "emerging markets that [Apple was] seeing pressure in [were] markets like Turkey, India, Brazil, [and] Russia … where currencies ha[d] weakened."  Cook explicitly excluded China from the category of emerging markets experiencing these negative economic pressures and emphasized growth in the prior quarter (4Q18):
>
> > [Cook:] *[I]n relation to China specifically, I would not put China in that category.  Our business in China was very strong last quarter.  We*

---

[11] I understand that Plaintiff has claimed that during the November 1, 2018 earnings call, Apple denied it was seeing "any deceleration or pressure" that was impacting its business in Greater China. (*In re Apple Inc. Securities Litigation*, Lead Plaintiff Norfolk County Counsel as Administering Authority of the Norfolk Pension Fund's Objections and Responses to Defendant Apple Inc.'s Second Set of Interrogatories to Lead Plaintiff, March 16, 2022, p. 5).

[12] Complaint, ¶ 1.  For the purposes of this report, I use "Plaintiff" to include members of the class certified by the court.

**Highly Confidential**

> *grew 16%, which we're very happy with.  iPhone, in particular, was very strong double-digit growth there.*[13]

I understand that the only alleged misrepresentation remaining in this case is Mr. Cook's statement on November 1, 2018 that he "would not put China in that category."[14]

9.      Plaintiff alleges that the statement about "the current state of Apple's business in Greater China and the impact of macroeconomic trends on the Company's sales in Greater China[] was materially false and misleading when made as Defendants knew or deliberately disregarded and failed to disclose the following true facts":[15]

> True Fact #1:  "the U.S.-China trade tensions and economic conditions in China were negatively impacting sales and demand for Apple products, particularly iPhones";[16]

> True Fact #2:  "the Company had already begun to see declining traffic in Apple's retail stores and those of its channel partner stores in Greater China, and reports of an overall contraction of the smartphone industry";[17] and

> True Fact #3:  "the Company had already, or was preparing to, cut iPhone production at multiple manufacturers and reduce orders from its largest suppliers of iPhone components for the current quarter and holiday season."[18]

10.      I understand that the alleged True Fact #3 only relates to the challenged statement to the extent it provides information about "the performance of Apple's iPhone business in China."[19] Additionally, I understand that Plaintiff does not allege that the revenue guidance of $89 billion to $93 billion provided by Apple on November 1, 2018 was false or misleading.[20]

---

[13] Complaint, ¶ 18, emphasis in original.

[14] Complaint, ¶ 18; *In re Apple Inc. Securities Litigation*, Order Granting in Part and Denying in Part Defendants' Motion to Dismiss the Revised Consolidated Class Action Complaint, November 4, 2020 ("MTD Ruling"), pp. 8, 23.

[15] Complaint, ¶ 24.

[16] Complaint, ¶ 24.

[17] Complaint, ¶ 24.

[18] Complaint, ¶ 24.

[19] *In re Apple Inc. Securities Litigation*, Order Granting in Part and Denying in Part Motion for Class Certification, February 4, 2022 ("Ruling on Class Certification"), p. 14.

[20] Complaint, ¶¶ 53–57, 66.

Highly Confidential

11.     Dr. Feinstein states that he "identified the following [five] event dates when disclosures incrementally revealed the previously concealed truths, thereby correcting the alleged misrepresentation and omissions":[21]

> **November 5, 2018:**  "On 5 November 2018, *Nikkei* reported that several of Apples [*sic*] suppliers had 'to halt plans for additional production lines' for the iPhone, and that the planned reduction in production would equate to 'around 100,000 fewer units daily to reflect the new demand outlook -- down 20% to 25% from the original optimistic outlook.'"[22]

> **November 12, 2018:**  "On 12 November 2018, Lumentum issued a press release, where it reduced its revenue guidance by 17.4%, explaining that the reduction was due to 'a request from one of [its] largest Industrial and Consumer customers' to reduce component shipments.  That day, Wells Fargo analysts identified Apple as the customer that had requested that Lumentum reduce shipments, and noted that 'investors could consider Lumentum's updated guide as reflecting as much as a 30% cut in Apple orders.'"[23]

> **December 4, 2018:**  "On 4 December 2018, *Bloomberg* published an article discussing demand issues that Apple was facing and the new 'iPhone marketing strategies' to bolster iPhone sales."[24]

> **December 6, 2018:**  "On 6 December 2018, *Forbes* published an article titled 'Why 40% iPhone Discount is Bad for Apple.'  The *Forbes* article discussed the marketing strategies outlined in the *Bloomberg* article and assessed the financial implications for Apple."[25]

---

[21] Feinstein Merits Report, ¶ 91.  The Complaint includes November 5, 2018, November 12, 2018, and January 2, 2019 in the section titled "Loss Causation/Economic Loss." (Complaint, ¶¶ 97–111).  Additionally, in the section titled "Defendants' Materially False and Misleading Statements and Omissions During the Class Period," the Complaint states that "[o]n December 6, 2018, Apple's stock price declined from a close of $176.69 per share on December 4, 2018, to a close of $174.72 per share on December 6, 2018, but continued to trade at artificially inflated prices."  (Complaint, ¶ 81).  Dr. Feinstein states that he "analyzed the Company news and announcements that transpired over the course of the Class Period to identify when disclosures correcting the alleged misrepresentation and omissions occurred" and "identified the following event dates [including December 4, 2018 and December 6, 2018] when disclosures incrementally revealed the previously concealed truths, thereby correcting the alleged misrepresentation and omissions."  (Feinstein Merits Report, ¶¶ 90–91).

[22] Feinstein Merits Report, ¶ 91.

[23] Feinstein Merits Report, ¶ 91.

[24] Feinstein Merits Report, ¶ 91.

[25] Feinstein Merits Report, ¶ 91.

**Highly Confidential**

January 3, 2019:  "On 2 January 2019, after the close of trading, the Company revised its revenue guidance for Q1 2019 downward to $84 billion from a previous range of $89 billion to $93 billion (a reduction of 7.7% at the midpoint).  The Company attributed its decreased revenue guidance to 'challenges in key emerging markets … particularly in Greater China,' and 'lower than anticipated iPhone revenue, primarily in Greater China.'"[26]

## IV.    Summary of Opinions

12.    Below is a summary of my opinions in this matter.  The bases for these opinions are detailed in the sections that follow.

13.    **Opinion 1:**  If the Court determines that Mr. Cook's statement was a factually correct statement that compared currency trends in China to the other emerging markets discussed on the call, and was not a statement about Apple's current business in Greater China or forecasted performance in Greater China, then the statement could not have introduced inflation into the stock price and could not have caused Plaintiff's alleged losses.

14.    **Opinion 2:**  If the Court determines that Mr. Cook's statement was a factually correct historical statement about Apple's performance in FQ4'18, and not a statement about Apple's current business in Greater China or forecasted performance in Greater China, then the statement could not have introduced inflation into the stock price and could not have caused Plaintiff's alleged losses.

15.    **Opinion 3:**  If Plaintiff's theory of harm is that Apple allegedly misrepresented that it was not facing any "pressure" in Greater China as of November 1, 2018, and if the November 5, 2018 disclosure revealed that Apple was facing "pressure," then Mr. Cook's statement could not have caused Plaintiff's alleged losses after November 5, 2018.  Alternatively, if Plaintiff fails to show that the market learned on November 5, 2018 that Apple was facing "pressure" in Greater China, but were able to show that the market learned on November 12, 2018 that Apple was facing "pressure," then Mr. Cook's statement could not have caused Plaintiff's alleged losses on November 5, 2018 or January 3, 2019.

---

[26] Feinstein Merits Report, ¶ 91.

**Highly Confidential**

16.    **Opinion 4:**  Dr. Feinstein's analysis of the losses caused by the alleged misrepresentation is flawed and unreliable.

17.    First, a key step in assessing loss causation is to determine the but-for disclosure, meaning what information could and should have been disclosed in order to make the alleged misrepresentation not misleading, and when this information could and should have been disclosed.  Dr. Feinstein is inconsistent with respect to the but-for disclosure that could and should have been made, which prevents him from reliably evaluating the extent to which the but-for disclosure matches the actual alleged corrective disclosures.  The remaining alleged misrepresentation in this case is the statement by Mr. Cook that he "would not put China in that category."[27]  The Court ruled that "the thrust of plaintiffs complaint [] is not merely that Cook misrepresented *how* poorly Apple was performing in China, but that it was, in fact, performing poorly at all."[28]  Therefore, I understand that according to Plaintiff's theory, the but-for disclosure that could and should have been made was that Apple was facing "pressure" in Greater China, not the severity of such "pressure."[29]

18.    Dr. Feinstein fails to properly address the extent to which the alleged corrective disclosures revealed the but-for disclosure and whether the alleged corrective disclosures caused losses to stockholders.  Dr. Feinstein instead asserts that had "analysts and investors been fully and honestly informed by the Company at the start of the Class Period … they would not have been surprised by the subsequent adverse announcements" and "the stock price would not have fallen significantly upon the ultimate disclosure."  Such a claim is false, unsupported, and has no basis in literature in financial economics.

19.    Second, Dr. Feinstein's empirical assessment of loss causation is an event study regression model conducted on five alleged corrective disclosure dates.  He finds negative and statistically significant returns on three of these dates, November 5, 2018, November 12, 2018, and January 3, 2019, which he considers empirical evidence of loss causation for these dates.

---

[27] Complaint, ¶ 18.
[28] Ruling on Class Certification, p. 15, emphasis in original.
[29] Most of my criticisms of Dr. Feinstein's loss causation and damages analyses do not depend on whether the but-for disclosure would have been about the existence of "pressure" in Greater China or about severity of such "pressure."

Highly Confidential

Dr. Feinstein fails to appropriately account for confounding information not causally linked to the alleged fraud that was revealed on the alleged corrective disclosure dates.

    a.  <u>November 5, 2018</u>:  Dr. Feinstein inappropriately assumes that investors would have foreseen and thus "would not have been surprised" by the November 5, 2018 alleged corrective disclosure had the but-for disclosure been made on November 1, 2018.  He fails to address that the November 5, 2018 disclosure involves information about Apple's business *globally*, not just in *Greater China*.  As a result, he fails to account for confounding information in his analysis of investor losses on November 5, 2018.

    b.  <u>November 12, 2018</u>:  Dr. Feinstein inappropriately assumes that investors would have foreseen and thus "would not have been surprised" by the November 12, 2018 alleged corrective disclosure had the but-for disclosure been made on November 1, 2018.  He fails to address that the November 12, 2018 disclosure involves information about Apple's business *globally*, not just in *Greater China*. As a result, he fails to account for confounding information in his analysis of investor losses on November 12, 2018.

    c.  <u>January 3, 2019</u>:  Dr. Feinstein fails to demonstrate that the information conveyed in Mr. Cook's Letter to Shareholders, which included the guidance reduction to $84 billion, and his subsequent CNBC interview, reflects the but-for disclosure that Apple could and should have made on November 1, 2018, as opposed to reflecting new information about performance and outlook that Apple learned between November 1, 2018 and January 2, 2019.  Dr. Feinstein asserts, without any support, that investors "would not have been surprised" by the disappointing performance in Greater China that Apple disclosed on January 2, 2019 had "investors been fully and honestly informed by the Company at the start of the Class Period."  In contrast, Apple's internal forecasts reflect that it *was* surprised by what ultimately transpired between November 1, 2018 and January 2, 2019. Apple, with the benefit of the information that was allegedly concealed regarding the business outlook and performance in Greater China, had an internal "likely" forecast of FQ1'19 revenue of $90.678 billion and an internal forecast range

Highly Confidential

consistent with its guidance of $89 billion to $93 billion as of November 1, 2018. However, Apple's actual FQ1'19 revenue of $84.310 billion came in over $6 billion below the "likely" revenue forecast from November 1, 2018 after Apple learned how its business was performing in Greater China and elsewhere during the remainder of the quarter.  Dr. Feinstein fails to account for the evolution of Apple's expectations about its performance in Greater China despite emphasizing in his Class Certification Reply Report the need to review internal documents to account for the possibility of such changed internal expectations.  Consistent with Apple lowering its forecasts in response to new information learned after November 1, 2018, there were multiple unexpected headwinds in Greater China that are documented in the Grenadier Class Certification Report, the Yang Report, and the Shenkar Report.  Dr. Feinstein does not provide any analysis demonstrating that had Apple additionally disclosed that it was facing "pressure" in Greater China, the market would have not only lowered its expectations of FQ1'19 revenue but also lowered them much beyond the expectations that Apple developed internally as of November 1, 2018.  Further, there was other negative news, not causally linked to the alleged misrepresentation by Mr. Cook that he "would not put China in that category," that was revealed on January 2, 2019. This includes negative information regarding a weaker than expected iPhone upgrade cycle in the quarter and going forward, which analysts attributed to factors such as the battery replacement program, lack of carrier subsidies, and currency trends driving price increases.  Dr. Feinstein does not reliably account for this negative confounding information as part of his loss causation analysis.

20.    **Opinion 5:**  Dr. Feinstein's damages calculation is flawed, unreliable, and overstates inflation.

21.    First, the starting point of Dr. Feinstein's damages analysis is his assessment of loss causation.  As such, all of the shortcomings in Dr. Feinstein's loss causation analysis described above also apply to his assessment of damages.  Because Dr. Feinstein's analysis of the losses caused by the alleged misrepresentation is flawed and unreliable, he has failed to show that there are any damages to shareholders.

Highly Confidential

22.     Second, Dr. Feinstein does not explain how the alleged misrepresentation introduced inflation into the stock price as of the start of the Class Period considering that analysts noted that Apple faced headwinds in Greater China both before and after the alleged misrepresentation, and that analyst consensus expectations were well within Apple's own guidance range and its range of internal forecasts.

23.     Third, Dr. Feinstein's analysis of inflation fails to address that the hypothetical but-for disclosure would have been qualitative in nature while the alleged corrective disclosures had important quantitative components.  The November 5, 2018 and November 12, 2018 alleged corrective disclosures revealed quantitative information regarding supplier production cuts or supplier revised guidance, with an associated expected reduced demand for Apple's products. The January 2, 2019 alleged corrective disclosure contained quantitative information regarding revised revenue guidance.  Dr. Feinstein fails to account for the mismatch between the qualitative but-for disclosure that Apple was facing "pressure" in Greater China, and this quantitative information, despite claiming in his Class Certification Reply Report that this was a resolvable issue.

24.     Fourth, Dr. Feinstein fails to control for information conveyed about markets other than Greater China when analyzing the November 5, 2018 and November 12, 2018 alleged corrective disclosures.  By failing to account for information about Apple's performance outside of Greater China, Dr. Feinstein's damages analysis fails to isolate only those losses, if any, that were caused by the alleged misrepresentation that Mr. Cook "would not put China in that category."  As a result, Dr. Feinstein's inflation ribbon that incorporates the entire residual stock price declines on November 5, 2018 and November 12, 2018 would inappropriately compensate investors for losses causally linked to production cuts caused by global demand, rather than only those related to Greater China.

25.     Dr. Feinstein also fails to isolate the impact of the alleged fraud on January 3, 2019, if any, from other confounding factors.  First, Dr. Feinstein needs to determine what portion, if any, of Apple's stock price decline on January 3, 2019 was caused by revelation of information that Apple allegedly could and should have disclosed *on November 1, 2018*.  Instead, he inappropriately focuses on trying to attribute a portion of Apple's stock price decline on January 3, 2019 to information that Apple knew about its performance in Greater China *as of January 2,*

Highly Confidential

*2019.* Second, even setting aside Dr. Feinstein's failure to control for the extent to which information that Apple learned after November 1, 2018 drove the January 2, 2019 pre-announcement, Dr. Feinstein fails to substantiate his assertion that the proportion of the price decline on January 3, 2019 that he attributes to the revenue miss in Greater China as of *January 2, 2019* (76%) is "conservative." As a result, Dr. Feinstein's inflation ribbon that incorporates a large portion of the stock price decline on January 3, 2019 would inappropriately compensate investors for losses that were due to adverse developments that Apple experienced after November 1, 2018 and, potentially, for other losses not causally linked to the alleged misrepresentation by Mr. Cook that he "would not put China in that category."

26.     Fifth, even setting aside that Dr. Feinstein's analysis of Plaintiff's alleged losses on November 5, 2018, November 12, 2018, and January 3, 2019 caused by the alleged misrepresentation is flawed and unreliable, examples of what would happen to Dr. Feinstein's calculation of per share inflation if one were to use Dr. Feinstein's own methodology and adjust for the most glaring errors in his inappropriate assumptions show that he overstates inflation.

      a.   <u>November 5, 2018</u>: As discussed above, the November 5, 2018 disclosure conveyed information about worldwide production cuts. Greater China accounted for 19.6% of Apple's total net sales in FY18, and other metrics (such as Greater China's share of forecasted unbrickings in FQ1'19 and Greater China's share of the reduction of unbricking forecasts between the iPhone XR launch and November 1, 2018) indicate a similar proportion. Assuming that the market interpreted the production cuts as conveying information about Apple's global expected revenue, and the market apportioned 19.6% of the revenue impact to Greater China, then apportioning the stock price decline based on revenue contribution (consistent with what Dr. Feinstein does for January 3, 2019) results in $1.41 of the $7.17 residual price decline on November 5, 2018 (or 19.6%) being linked to Greater China.

      b.   <u>November 12, 2018</u>: As discussed above, the November 12, 2018 disclosure conveyed information about worldwide production cuts. Using the same assumptions and methodology as for November 5, 2018 above, results in $0.94 of

**Highly Confidential**

the $4.82 price decline on November 12, 2018 (or 19.6%) being linked to Greater China.

c. <u>January 2, 2019</u>:  For this day, Dr. Feinstein fails to account for new information learned after November 1, 2018 that contributed to Apple's FQ1'19 updated revenue guidance.  In an illustrative example, I assume that in the but-for world, Apple would have stated that it was facing "pressure" in Greater China on November 1, 2018.  I assume that 19.6% of the market's over-optimism in forecasting FQ1'19 revenue relative to Apple's guidance midpoint of $91 billion on November 1, 2018 was attributable to the alleged misrepresentation by Mr. Cook that he "would not put China in that category."  Under these assumptions, the but-for consensus forecast would have been $0.213 billion lower than the actual consensus forecast on November 2, 2018, implying that 3.02% of the $7.068 billion reduction in consensus forecast following the January 2, 2019 disclosure can be causally linked to the alleged misrepresentation by Mr. Cook that he "would not put China in that category."  This corresponds to a residual price decline of $0.32.

d. <u>November 5, 2018 "Full Disclosure"</u>:  If Plaintiff's theory of harm is that Apple allegedly misrepresented that it was not facing any "pressure" in Greater China, and if Plaintiff establishes that the November 5, 2018 disclosure revealed that Apple was facing "pressure" in Greater China, then inflation would be limited to the price decline on November 5, 2018 that can be causally linked to Apple's performance in Greater China, which is the $1.41 in the illustrative example above.  If Plaintiff fails to show that the market learned that Apple was facing "pressure" in Greater China on November 5, 2018, but were able to show that the market learned on November 12, 2018 that Apple was facing "pressure," inflation would be limited to the decline on November 12, 2018 that can be causally linked to Greater China, which is $0.94 in the illustrative example above.

27.    **Opinion 6:**  Dr. Feinstein's proposed damages calculations for the Apple options are flawed and unreliable.

Highly Confidential

28.     First, Dr. Feinstein's proposed measure of inflation in the prices of Apple call options (and deflation in the prices of Apple put options) is derived from his estimate of inflation in Apple's stock price.  As such, his failure to reliably measure inflation, if any, in the stock price also means that he has failed to demonstrate that Apple call options traded at inflated prices (and Apple put options traded at deflated prices), and consequently that investors in Apple options were damaged.

29.     Second, Dr. Feinstein's proposed damages methodology for the Apple options assumes that option holders would have chosen to trade the same specific option series (i.e., would have traded the option with the same type (call vs. put), strike price, and maturity date) regardless of how inflation may have impacted the investor's preference for that option or the suitability of that option for the investor's strategy.  However, such an assumption ignores the testimony by Plaintiff's options expert, Dr. Chance, that investors choose which options to trade based on option characteristics such as the strike price relative to the underlying stock price, which would have been different following the but-for disclosure, according to Plaintiff's allegations.

30.     Third, option prices depend not only on the underlying stock price and the option contract terms, but also on implied volatility—a key determinant of the value of the options.  Dr. Feinstein fails to analyze whether the implied volatility (a model-derived measure of volatility such that the model price matches an observed market price of the option, and which can be different for different options) would have changed as a result of the hypothetical but-for disclosure.  Instead, Dr. Feinstein inappropriately assumes that the implied volatilities would be the same in the actual and the but-for worlds, despite the fact that the implied volatilities changed over time and changed in response to the alleged corrective disclosures.

**Highly Confidential**

## V.   Background on Apple's Business

31.     Apple designs, manufactures, and markets consumer electronics, such as mobile devices and personal computers, and sells related software, services, and accessories.[30]  Apple's FY18 ended in September 2018.[31]  Apple's top-selling product line in FY18, and still today, is the iPhone, which is a line of smartphones created by Apple that uses the iOS operating system.[32]  The iPhone's net sales accounted for 63%, 62%, and 63% of Apple's total net sales for full year FY16, FY17, and FY18 respectively.[33]

32.     Apple is a global company with "reportable segments [] of the Americas, Europe, Greater China, Japan, and Rest of Asia Pacific."[34]  Greater China, which includes China, Hong Kong, and Taiwan, accounted for 22%, 20%, and 20% of total net sales in FY16, FY17, and FY18, respectively.[35]  Greater China was the slowest-growing geography for Apple in FY16 and FY17 with Greater China revenue declining 17% and 8%, respectively.[36]  Greater China revenue increased by 16% year-over-year in FQ4'18,[37] but analyst reports commented that Greater China still had "the slowest growth of the company's major geos"[38] and was "the weakest reported region."[39]

33.     During the relevant period, Apple earned revenue in Greater China by selling a variety of products and services.  For example, in FQ1'19, Apple's iPhone sales in Greater China included not only the newly launched iPhone XS, iPhone XS Max, and iPhone XR, but also previous

---

[30] Apple Inc., Form 10-K for the fiscal year ended September 29, 2018, dated November 5, 2018 ("2018 10-K"), p. 1.

[31] 2018 10-K, p. 1.

[32] 2018 10-K, pp. 1, 23; Apple Inc., Form 10-K for the fiscal year ended September 25, 2021, dated October 29, 2021, p. 21.

[33] 2018 10-K, p. 24.

[34] 2018 10-K, p. 62.

[35] 2018 10-K, pp. 26, 62.

[36] "Building a Valuable Services Business on Top of Apple's Core.  Initiate at Buy," Jefferies, October 29, 2018, p. 28.

[37] Q4 2018 Apple Inc. Earnings Call, "Edited Transcript," November 1, 2018; "Q4'18 Q&A," November 1, 2018, APL-SECLIT_00261104–177 at 122.

[38] "F4Q18 Quick Take; Solid Quarter But Guidance Reflects Uncertainty," Cross Research, November 1, 2018, p. 1.

[39] "Disappointing Dec qtr revenue outlook," Atlantic Equities, November 2, 2018, p. 1.

**Highly Confidential**

iPhone generations such as iPhone X and iPhone 8. Additionally, Apple sold Mac computers, iPads, and watches in Greater China during this time period.[40] Apple also earned revenue from non-hardware products and services in Greater China, such as from the App Store, for which China was the "largest revenue generating country."[41] Together, all these products and offerings constituted Apple's business in Greater China.

## VI.    Overview of Loss Causation and Damages from the Perspective of a Financial Economist

34.    It is my understanding that in securities cases, such as the current matter, plaintiffs must demonstrate economic loss and loss causation—that is, they must demonstrate that they incurred actual "out-of-pocket"[42] damages and that such damages arose from the revelation of the alleged fraud and not from other factors unrelated to defendants' alleged misstatements and/or omissions.[43] Put differently, plaintiffs must demonstrate that they lost money on stock or options and establish a causal connection between defendants' alleged misrepresentation and omissions and plaintiffs' alleged economic loss.

35.    I understand that plaintiffs typically establish economic loss in a securities matter by demonstrating that putative class members purchased the stock or call option at a price that was artificially inflated due to alleged misstatements or omissions and held the stock or call option when its price declined following disclosure of the truth.[44] I understand that, as a matter of law and economics, the economic loss caused by the defendants' alleged fraud could be, at most, the

---

[40] APL-SECLIT_00408660.

[41] "China remains the single largest revenue generating country for the App Store, producing slightly more than $1B in net revenue in the September quarter and accounting for 29% of total App Store net revenue, slightly lower than the T12M average of 31%." ("China a Growing Headwind to App Store Growth Near-term," Morgan Stanley, October 17, 2018, p. 1).

[42] The "out-of-pocket measure" of damages is defined as the "difference between the purchase price and the value of the security at the date of purchase less the difference between the sale price and the value of the security at the date of sale." (Cornell, Bradford and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review*, Vol. 37, 1990, ("Cornell and Morgan (1990)"), pp. 883–924 at p. 885).

[43] I understand that damages are subject to the Private Securities Litigation Reform Act of 1995, and certain limitations on recoverable damages may be applicable. (Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4(e)).

[44] In the case of a put option, plaintiffs typically establish economic loss by demonstrating that putative class members wrote the option at a price that was artificially deflated due to alleged misstatements or omissions and the option position was still outstanding when the option price increased following disclosure of the truth.

Page 15

Highly Confidential

price decline of the security attributable to the revelation of the defendants' alleged fraud.  The measurement of this price reaction must account for—among other things—the potential impact of market and industry effects, the impact of new information learned during the Class Period, and confounding information not causally linked to the allegations.   Accordingly, economic analysis is needed to assess the specific degree to which plaintiffs' alleged losses were in fact caused by the defendants' alleged misrepresentations.

36.     To determine whether there is loss causation using this method, an expert must (i) identify the alleged misrepresentations made by the defendants; (ii) determine what information could have and should have been disclosed in order to make the alleged misrepresentations not misleading and when this information could have and should have been disclosed (i.e., the "but-for" disclosure); (iii) determine whether there were any "corrective disclosures" that revealed to the public some truth (i.e., the "but-for" disclosure) that was previously concealed by the defendants' alleged misrepresentations and not already known to market participants; and (iv) analyze the price reactions of stock and options, if any, to any such corrective disclosures in order to assess whether and to what extent the disclosures caused alleged losses to investors.

## VII.    If Mr. Cook's Statement Was Comparing Currency Trends in China to Other Emerging Markets, Then It Could Not Have Caused Plaintiff's Alleged Losses

37.     During the November 1, 2018 earnings call, Mr. Cook was asked a question by an analyst about deceleration in some emerging markets, such as China.[45]  Mr. Cook responded that Apple was seeing pressure in "markets like Turkey, India, Brazil, [and] Russia," which were markets in which currencies had "weakened over the recent period," but that he "would not put China in that category."  Plaintiff alleges that the bolded portion of Mr. Cook's response was false and misleading:[46]

---

[45] "Tim, there has been some real deceleration in some of these emerging markets, partly driven by some concerns around some of the rules the administration is contemplating and partly driven by things that are more specific to China, for instance, like some of the regulations around gaming.  So can you talk about how you see the trajectory there for the business and what you think of the initiatives of some companies like Netflix and Fortnite trying to bypass the App Store around subscriptions?  And I have a follow-up."  (Q4 2018 Apple Inc. Earnings Call, "Edited Transcript," November 1, 2018).

[46] Complaint, ¶ 18.

**Highly Confidential**

Sure. Great question. Starting with emerging markets. The emerging markets that we're seeing pressure in are markets like Turkey, India, Brazil, Russia, these are markets where currencies have weakened over the recent period. In some cases, that resulted in us raising prices, and those markets are not growing the way we would like to see. To give you a perspective in -- at some detail, our business at India in Q4 was flat. Obviously, we would like to see that be a huge growth. Brazil was down somewhat compared to the previous year. And so I think -- or at least the way that I see these is each one of the emerging markets has a bit of a different story. And I don't see it as some sort of issue that is common between those for the most part. In relation to China specifically, ***I would not put China in that category.*** Our business in China was very strong last quarter. We grew 16%, which we're very happy with. iPhone, in particular, was very strong double-digit growth there.[47]

38.     Mr. Poer analyzed currency fluctuations in the countries referenced in Mr. Cook's statement, and concluded that "[the] currency fluctuations in the emerging markets referenced by Mr. Cook on the Q4 FY2018 Earnings Call had a significantly greater impact on those countries' respective revenues than in Greater China, supporting the statement that China was 'not in that category.'"[48]   If the Court determines that Mr. Cook's statement was a factually correct statement that compared currency trends in China to the other emerging markets discussed on the call, and was not a statement about Apple's current business in Greater China or forecasted performance in Greater China, then the statement could not have introduced inflation into the stock price and could not have caused Plaintiff's alleged losses.

## VIII.   If Mr. Cook's Statement Was about FQ4'18, Then It Could Not Have Caused Plaintiff's Alleged Losses

39.     Plaintiff claims that the bolded portion of the following statement made by Mr. Cook during the November 1, 2018 earnings call was allegedly false and misleading:

---

[47] Q4 2018 Apple Inc. Earnings Call, "Edited Transcript," November 1, 2018, emphasis added.
[48] Poer Report, p. 29.

Highly Confidential

> [I]n relation to China specifically, ***I would not put China in that category.*** Our business in China was very strong last quarter. We grew 16%, which we're very happy with. iPhone, in particular, was very strong double-digit growth there.[49]

40.     I understand that there is no dispute that the statement about Apple's FQ4'18 revenue growth of 16% in Greater China was a factually correct statement. Indeed, the 16% growth rate is consistent with materials prepared by Apple for the FQ4'18 earnings call Q&A session, which showed that Apple's FQ4'18 revenue grew 16% in Greater China year-over-year.[50]

41.     Furthermore, Professor Trueman opines that market participants discussed Mr. Cook's statements about Greater China on the earnings call as referring to Apple's FQ4'18 results.[51] For example, according to Professor Trueman, in the 22 analyst reports that discussed Mr. Cook's statement, "[a]ll or nearly all of the reports that referenced the Challenged Statement mentioned the information contained in the statement as historical."[52]

42.     If the Court determines that Mr. Cook's statement was a factually correct historical statement about Apple's performance in FQ4'18, and not a statement about Apple's current business in Greater China or forecasted performance in Greater China, then the statement could not have introduced inflation into the stock price and could not have caused Plaintiff's alleged losses.

## IX.     If Plaintiff's Theory of Harm Is That Apple Allegedly Misrepresented That It Was Not Facing Any "Pressure" in Greater China, and the November 5, 2018 Disclosure

---

[49] Complaint, ¶ 18, emphasis added.
[50] "Q4'18 Q&A," November 1, 2018, APL-SECLIT_00261104–177 at 126.
[51] Trueman Report, ¶ 61.
[52] Trueman Report, ¶ 62.

**Highly Confidential**

**Revealed That Apple Was Facing "Pressure," Then Mr. Cook's Statement Could Not Have Caused Plaintiff's Alleged Losses after November 5, 2018**

43.     I understand that according to the Ruling on Class Certification the "thrust" of Plaintiff's allegation is that Mr. Cook failed to disclose that Apple was facing "pressure" in Greater China. Specifically, the Court stated:

> [Defendants] ignore the thrust of plaintiff's complaint, which is not merely that Cook misrepresented *how* poorly Apple was performing in China, but that it was, in fact, performing poorly at all.[53]

44.     Additionally, I understand that Plaintiff has claimed that during the November 1, 2018 earnings call Apple denied it was seeing "any deceleration or pressure" that was impacting its business in Greater China.

> As alleged, going into the earnings call, investors were concerned about the potential impact on Apple's business of reports of economic growth deceleration in Greater China and other emerging markets, the threatened U.S. tariffs on Chinese products, and reports that Chinese consumers were reducing spending and the Chinese smartphone market was becoming increasingly competitive.  Defendants sought to quell investor concerns about economic conditions in China and their impact on the Company by ***specifically denying that Apple was experiencing any deceleration or pressure on its business in China***, and by failing to disclose the risk of such pressure from that deceleration and trade tensions in China, like it was experiencing in other emerging markets which were not growing (or in fact shrinking) due to poor economic conditions.[54]

45.     If Plaintiff's theory is that Mr. Cook misrepresented not "how poorly Apple was performing in China" but rather that it was "performing poorly at all,"[55] then according to

---

[53] Ruling on Class Certification, p. 15, emphasis in original.
[54] *In re Apple Inc. Securities Litigation*, Lead Plaintiff Norfolk County Counsel as Administering Authority of the Norfolk Pension Fund's Objections and Responses to Defendant Apple Inc.'s Second Set of Interrogatories to Lead Plaintiff, March 16, 2022, p. 5, emphasis added.
[55] Ruling on Class Certification, p. 15.

Highly Confidential

Plaintiff's theory, the allegedly misrepresented information was fully disclosed on November 5, 2018.

46.     On this date, Plaintiff states that an article by *Nikkei Asia* reported that Apple suppliers had been asked to halt plans for additional production lines, which indicated a less optimistic demand outlook.[56]  Plaintiff alleges that this article revealed the "truth" about "Defendants' misrepresentations and omissions" about "positive sales of the latest iPhone models and the strength of the Company's business in China."[57]  I understand that the Court dismissed the alleged misrepresentation about the "sales of the latest iPhone models," leaving the statement by Mr. Cook that he "would not put China in that category" as the only alleged misrepresentation.[58]  Therefore, if Plaintiff is successful in showing that the November 5, 2018 disclosure revealed that Apple was facing "pressure" in Greater China as of November 1, 2018, then, in an efficient market,[59] any inflation would be removed on that date and the stock price would no longer be inflated after the November 5, 2018 alleged corrective disclosure.  The subsequent alleged corrective disclosures would simply be the reiteration that Apple was facing "pressure" in Greater China as of November 1, 2018.  In an efficient market, repetition of news that has already been disclosed will not cause a stock price reaction, and thus would not cause recoverable loss to investors resulting from the alleged misrepresentation.[60]

47.     If Plaintiff fails to show that the market learned on November 5, 2018 that Apple was facing "pressure" in Greater China, but were able to show that the market learned on November 12, 2018 that Apple was facing "pressure," the same logic outlined above would apply.  The only difference would be that any inflation would be removed on November 12, 2018, and Mr.

---

[56] Complaint, ¶ 98.

[57] Complaint, ¶ 97.

[58] MTD Ruling, p. 23.

[59] I did not challenge market efficiency for Apple stock in my Class Certification Report, and I understand that the Court ruled that Plaintiff demonstrated the market for Apple stock is efficient. (Ruling on Class Certification, pp. 9–10).

[60] Grenadier Class Certification Report, ¶ 33.

Highly Confidential

Cook's statement could not have caused Plaintiff's alleged losses on November 5, 2018 or January 3, 2019.[61]

## X.    Dr. Feinstein's Analysis of the Losses Caused by the Alleged Misrepresentation Is Flawed and Unreliable

48.    Dr. Feinstein concludes that the alleged "misrepresentation and omissions" identified in the Complaint "caused the price of Apple stock to be artificially inflated over the course of the Class Period."[62]  I note that in referring to the alleged "misrepresentation and omissions" in his report, Dr. Feinstein does not explain what specific statement(s) he is referencing in each category.[63]  He further concludes that the alleged corrective disclosures "dissipated the artificial

---

[61] To the extent that Plaintiff is pleading that in addition to the alleged misrepresentation that he "would not put China in that category," Mr. Cook failed to disclose "the *risk* of such pressure from economic deceleration and trade tensions in China when he made the challenged statements" (MTD Ruling, p. 14, emphasis in original), that risk was already disclosed by the Company and commented on by securities analysts by November 5, 2018.  (See **Appendix D**).  I also note that Dr. Feinstein does not provide the trier of fact with tools to estimate damages that are causally linked to allegedly understated risk.  When a negative outcome is disclosed, this disclosure typically results in a larger stock price drop than the stock price drop that would have occurred in response to a hypothetical disclosure of incremental risk (rather than certainty) of this negative outcome.  Consider an investor evaluating a lottery ticket that promises to pay $10,000 with a 1% probability and nothing with a 99% probability in one hour.  A rational investor would pay $100 for this lottery ticket ($100 = 1% * $10,000 + 99% * $0).  Suppose that the likelihood of the $10,000 payoff was in fact only 0.9% and the likelihood of a $0 payoff was 99.1%.  A rational investor would pay $90 for this lottery ticket had she known the true odds ($90 = 0.9% * $10,000 + 99.1% * $0).  The $10 difference represents the difference between what the investor actually paid ($100) and what she would have paid had she known the truth ($90).  Now consider what happens when the lottery ends up not paying anything (i.e., when the understated risk has materialized).  The investor who paid $100 lost her entire investment.  That $100 loss in response to the materialization of understated risk tells nothing about how the investor would have valued the lottery *ex ante* had she known the truth about the lottery odds.  Dr. Feinstein's analysis of the stock price decline on January 3, 2019, and purported inflation associated with this decline, is based on observing what happened when uncertainty about Apple's FQ1'19 performance largely resolved at the end of the Class Period (the analogue of the $100 loss by the investor in the example above) and does not address the potential price drop (i.e., the $10 in the example above) that would have happened had alleged incremental risk been disclosed at the start of the Class Period.

[62] Feinstein Merits Report, ¶ 12.

[63] From the view of an economist, a stock price can potentially become inflated due to a misrepresentation that can take the form of an omission, a misstatement, or both.  I understand that securities law distinguishes between the two possibilities.  First, a misstatement can impact the stock price and introduce inflation by positively changing preexisting expectations.  Second, the misstatement can maintain an already over-optimistic view of the company's business.  Alternatively, an omission can hide problems in a company's business.  Whenever I refer to a "misrepresentation" in this report, I am referring to an "omission" and/or a "misstatement."  My use of "misrepresentation" is equivalent to Dr. Feinstein's use of "misrepresentation and omissions."

**Highly Confidential**

inflation, causing the stock price to decline, in turn causing investors to sustain losses" and therefore that "[t]he alleged misrepresentation and omissions [] caused investor losses."[64]

49.     Dr. Feinstein supports his loss causation opinion in two ways.

    a.   First, he presents qualitative evidence in the form of (i) financial principles, (ii) company statements, (iii) internal company communications, and (iv) analyst statements that purportedly show that "the subject matter of the alleged misrepresentation and omissions is economically material – that is, valuation relevant and important to investors."[65]

    b.   Second, he conducts an event study regression and finds negative and statistically significant returns on three of five alleged corrective disclosure dates.  He considers this empirical evidence of loss causation on these three dates, November 5, 2018, November 12, 2018, and January 3, 2019.[66]  He does not conclude that the stock price declines on the two dates that are not statistically significant, December 4 and 6, 2018, were "caused by the corrective disclosure."[67]

50.     As I discuss below, Dr. Feinstein's assessment of loss causation is flawed and unreliable. First, as I discuss in Section X.A, Dr. Feinstein fails to assess the extent to which the but-for disclosure that could and should have been made matches the actual alleged corrective disclosures.  Second, as I discuss in Section X.B, Dr. Feinstein fails to appropriately account for confounding information not causally linked to the alleged fraud that was revealed on the alleged corrective disclosure dates.

---

[64] Feinstein Merits Report, ¶ 14.
[65] Feinstein Merits Report, ¶¶ 76–85.
[66] Feinstein Merits Report, ¶¶ 86–120.
[67] Feinstein Merits Report, ¶¶ 115, 118.

Highly Confidential

**A.     Dr. Feinstein Fails to Assess the Extent to Which the But-For Disclosure That Could and Should Have Been Made Matches the Actual Alleged Corrective Disclosures**

51.     A key step in assessing loss causation is to determine the but-for disclosure, meaning what information could and should have been disclosed in order to make the alleged misrepresentation not misleading, and when this information could and should have been disclosed.  As described below, Dr. Feinstein is inconsistent with respect to what but-for disclosure could and should have been made, and his discussion of the but-for disclosure fails to reflect information that could and should have been disclosed as of November 1, 2018.  Instead, he asserts, without any analysis, that the market "would not have been surprised"[68] and "[Apple's] stock price would not have fallen significantly upon the ultimate disclosure"[69] had investors been "fully and honestly informed"[70] at the start of the Class Period.  This assertion, which essentially requires investors to have a crystal ball to predict future performance, has no basis in literature in financial economics.[71]

**1.     Dr. Feinstein Is Inconsistent in Specifying the But-For Disclosure That Could and Should Have Been Made**

52.     Dr. Feinstein does not identify what but-for disclosure could and should have been made as of the start of the Class Period.  Instead, at various points in his report, Dr. Feinstein offers inconsistent views on what Apple could and should have disclosed.  By failing to provide a consistent but-for disclosure that reflects "what Defendants knew and when they knew it,"[72] Dr.

---

[68] Feinstein Class Certification Reply Report, ¶ 59.  See also Feinstein Merits Report, ¶ 153.
[69] Feinstein Class Certification Reply Report, ¶ 59.
[70] Feinstein Merits Report, ¶ 153.
[71] See discussion in ¶ 63 and fn. 91 below.
[72] Dr. Feinstein stated in his Class Certification Reply Report that "[i]t is [his] understanding that discovery is ongoing in this case.  Development of the record will inform the forensic analyst of the nature of the but-for full disclosure scenario – what Defendants knew and when they knew it."  (Feinstein Class Certification Reply Report, ¶ 40).

**Highly Confidential**

Feinstein is unable to evaluate the extent to which the but-for disclosure matches the actual alleged corrective disclosures.

53.     In his summary of Plaintiff's allegations, Dr. Feinstein states that "according to Plaintiff, the misrepresentation and omissions concealed the following"[73] three facts:

   a.  True Fact #1:  "that the U.S.-China trade tensions and economic conditions in China were negatively impacting sales and demand for Apple products, particularly iPhones";[74]

   b.  True Fact #2:  "the Company had already begun to see declining traffic in Apple's retail stores and those of its channel partner stores in Greater China, and reports of an overall contraction of the smartphone industry";[75] and

   c.  True Fact #3:  "the Company had already, or was preparing to, cut iPhone production at multiple manufacturers and reduce orders from its largest suppliers of iPhone components for the current quarter and holiday season."[76]

54.     Dr. Feinstein also states that the "[c]orrective disclosures informed the market that, contrary to what the market was previously led to believe, the Company was experiencing negative economic pressures in the Greater China Region … and they elevated the risk that the Company's profitability would suffer as a result."[77]

55.     However, in his discussion of the December 6, 2018 alleged corrective disclosure date, instead of discussing the *existence* of "pressure" Apple was facing in Greater China, Dr. Feinstein discusses that the Company misrepresented the *severity* of that "pressure."  In particular, he states that the "***severity*** of the Company's true performance in China was still concealed and undisclosed to investors."[78]  Given this inconsistency, it is not clear what but-for disclosure Dr. Feinstein evaluates in his loss causation and damages analyses.  It is also not clear

---

[73] Feinstein Merits Report, ¶ 23.
[74] Feinstein Merits Report, ¶ 23, citing Complaint, ¶ 24.
[75] Feinstein Merits Report, ¶ 23, citing Complaint, ¶ 24.
[76] Feinstein Merits Report, ¶ 23, citing Complaint, ¶ 24.
[77] Feinstein Merits Report, ¶ 77.
[78] Feinstein Merits Report, ¶ 65, emphasis added.

Highly Confidential

whether Dr. Feinstein concedes that the market already knew that Apple was facing the *existence* of "pressure" in Greater China as of December 6, 2018.

56.     The remaining alleged misrepresentation in this case is the statement by Mr. Cook that he "would not put China in that category."[79]  The Court ruled that "the thrust of plaintiff's complaint [] is not merely that Cook misrepresented *how* poorly Apple was performing in China, but that it was, in fact, performing poorly at all."[80]  Therefore, I understand that according to Plaintiff's theory, the but-for disclosure that could and should have been made was that Apple was facing "pressure" in Greater China, not the severity of such "pressure."

57.     Given the nature of the but-for disclosure that could and should have been made, it is important to consider what such a disclosure would have conveyed to the market (and as importantly, what would not have been conveyed).  In particular, I understand that the alleged misrepresentation concerns Apple's outlook or performance in Greater China, so information that is not about the outlook or performance in Greater China, such as performance or outlook elsewhere in the world, would not be part of a hypothetical but-for disclosure.  Dr. Feinstein appears to recognize this in his damages analysis for January 3, 2019, where he identifies as confounding news performance of "regions outside of China," and seeks to exclude any impact of such information from his calculation of inflation.[81]

58.     Additionally, my understanding is that the but-for disclosure would not include information that was not Apple's standard practice to disclose.  Luca Maestri stated in his deposition that Apple did not provide a geographical breakdown of forecasts and Apple did not provide intra-quarter forecasts.[82]  I also understand that it is not standard practice for Apple to

---

[79] Complaint, ¶ 18.
[80] Ruling on Class Certification, p. 15, emphasis in original.
[81] Feinstein Merits Report, ¶ 140.
[82] "[A] When we -- when we provide, and this has been consistent over the years, when we provide revenue guidance for the upcoming quarter, we never provide guidance or information related to a specific geography.  We only talk about a revenue range for the entire company."  (Deposition of Luca Maestri, February 25, 2022 ("Maestri Deposition") (75:2–75:7)).  "[A] And when we provide guidance to our investors for the upcoming quarter, we never provide a mid-quarter update about the state of the business during the existing current quarter, and we do not provide information about specific lines of business.  Our revenue range that we disclose to the street is the aggregate amount of revenue that we expect to generate during the quarter.  We don't say we expect to grow our

Highly Confidential

disclose information about its production schedule or production cuts; Apple considered this information confidential.[83]

59.     Finally, the alleged misrepresentation was made on November 1, 2018.  The but-for disclosure can only reflect information that could and should have been disclosed as of that date. The but-for disclosure cannot include information that was only learned subsequently, and not anticipated by the company.

> **2.     Dr. Feinstein's Assertion That "Investors Would Not Have Been Surprised" on the Alleged Corrective Disclosure Dates Had the But-For Disclosure Been Made Forms the Core of His Loss Causation and Damages Methodology, Yet Has No Support in His Report or Literature in Financial Economics**

60.     As I discuss above, the last two steps in a loss causation analysis are that one must (i) determine whether there were any "corrective disclosures" that revealed the "but-for" disclosure, and (ii) analyze whether and to what extent the disclosures caused alleged losses to investors.[84] Dr. Feinstein fails to properly address these two steps and instead asserts that had "analysts and investors been fully and honestly informed by the Company at the start of the Class Period … they would not have been surprised by the subsequent adverse announcements."[85]  As a result, according to Dr. Feinstein, "the stock price would not have fallen significantly upon the ultimate disclosure."[86]  As explained below, this claim is false, unsupported, and has no basis in literature in financial economics.

---

phone by 'x' or provide ranges.  We provide only the total amount of revenue for the quarter."  (Maestri Deposition (144:13–144:24)).

[83] "[Q] And you declined to -- is it accurate that you declined to comment on any production cuts on or around this time?  [A] As I have every year that we've done that.  It's not uncommon, right?  We -- you probably know the story.  I mean, we try to protect for a high case always in our products, and at some point if we're not going to hit the high case we have to make some cuts from what people are expecting.  Clearly, that's what we were doing here. We don't talk about that on the record to anybody any year, and it's happened many, many, many times." (Deposition of Greg Joswiak, March 15, 2022 (119:19–120:6)).

[84] See ¶ 36.

[85] Feinstein Merits Report, ¶ 153.

[86] In the Feinstein Class Certification Reply Report, Dr. Feinstein makes a nearly identical claim, also without any support:  "[i]t follows from fundamental principles of financial valuation that had investors not been deceived about

Highly Confidential

61.     As a starting point, claiming that if investors "would not have been surprised"[87] by the subsequent adverse announcements then "the stock price would not have fallen significantly upon the ultimate disclosure"[88] is a tautology.  By definition, in an efficient market, only new, unexpected ("surprising") information is expected to impact the stock price.[89]

62.     Dr. Feinstein's assertion that had "analysts and investors been fully and honestly informed by the Company at the start of the Class Period … they would not have been surprised by the subsequent adverse announcements"[90] assumes that if Mr. Cook made a but-for disclosure on November 1, 2018, then the market would have been able to predict subsequent negative developments such as the guidance revision on January 2, 2019.  I am not aware of any literature in financial economics that would support a conclusion that "investors would not have been surprised" on later dates had Apple disclosed that it was facing "pressure" in Greater China on November 1, 2018.

63.     The standard economic literature on rational expectations shows that rational investors incorporate the full range of potential future outcomes and the probabilities of those outcomes occurring when valuing assets such as Apple stock.  That literature does not state that investors have a crystal ball such that they "would not have been surprised" when uncertainty about potential outcomes gets resolved in the future.[91]

---

conditions facing Apple in China, such that they would not have been surprised by the quantitative results later announced, the stock price would not have fallen significantly upon the ultimate disclosure." (Feinstein Class Certification Reply Report, ¶ 59).

[87] Feinstein Class Certification Reply Report, ¶ 59.  See also Feinstein Merits Report, ¶ 153.

[88] Feinstein Class Certification Reply Report, ¶ 59.

[89] Grenadier Class Certification Report, ¶¶ 33–36.

[90] Feinstein Merits Report, ¶ 153.

[91] For example, Robert Lucas wrote that the term "rationality of expectations" was coined by John Muth for the hypothesis that prices "fully reflect all available information."  Professor Lucas does not state that the rational investor can perfectly predict the ultimate outcome.  (Lucas, Jr., Robert E., "Asset Prices in an Exchange Economy," *Econometrica*, Vol. 46, No. 6, 1978, pp. 1429–1445 at p. 1429).  John Muth's seminal paper also provides no support for this proposition.  (Muth, John, "Rational Expectations and the Theory of Price Movements," *Econometrica*, Vol. 29, No. 3, 1961, pp. 315–335).  I understand that Dr. Feinstein opined elsewhere that "[b]ased on the fundamental principles of market efficiency and rational expectations, because investors generally do not make systematic errors in forecasting when they are equipped with full truthful information, one can estimate that investors would have centered their forecasts on a valuation that reflected the ultimate outcome."  Dr. Feinstein apparently cited to the articles by Professors Muth and Lucas that I discuss immediately above.  (*Mark Smilovits et*

Highly Confidential

**B.    Dr. Feinstein Fails to Appropriately Account for Confounding Information Not Causally Linked to the Alleged Fraud That Was Revealed on the Alleged Corrective Disclosure Dates**

64.    Dr. Feinstein conducts an event study regression and finds negative and statistically significant returns on three of five alleged corrective disclosure dates.  He considers this empirical evidence of loss causation on the three dates with statistically significant declines in Apple's stock price, November 5, 2018, November 12, 2018, and January 3, 2019.[92]

65.    However, the presence of a negative and statistically significant return on an alleged corrective disclosure date is insufficient by itself to establish that the alleged fraud caused investor losses.  An event study regression measures the value impact of the totality of information revealed on a specific date.[93]  If multiple pieces of information are revealed simultaneously, an event study regression captures the impact of all of that information, and does not allow a researcher to separate the impact of one piece of information from another.[94]  Further, an event study regression measures the impact of the actual information disclosed.  It generally does not allow a researcher to determine the impact of a different set of information.[95]

66.    As described below, both of these limitations to event study analysis apply here.  As a result, Dr. Feinstein's event study fails to reliably demonstrate that the losses that he attributes to the alleged misrepresentation were caused by the alleged misrepresentation.  For all three of the

---

*al. v. First Solar, Inc. et al.*, Order, December 27, 2019, p. 14 and fn. 6).  Rational investors indeed are correct ***on average*** in the sense that they take into account the full range of possible outcomes when valuing stocks, including highly positive outcomes, highly negative outcomes, and anything in between.  For example, rational investors facing two uncertain and equally likely future outcomes of $0 and $100 would forecast a $50 outcome ***on average***.  This does not mean that "investors would have centered their forecasts on a valuation that reflected the ultimate [negative] outcome."  Such pricing would have required a crystal ball with respect to the negative outcome that nobody in financial markets has.  In the simple example above, according to Dr. Feinstein's flawed logic, if the ex post outcome turned out to be $0, then he "can estimate that investors would have centered their [ex ante] forecasts on a valuation that reflected the ultimate outcome" of $0.  This is clearly wrong.

[92] Feinstein Merits Report, ¶¶ 86–120.

[93] For a discussion of event study methodology, see Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, *The Econometrics of Financial Markets*, 2nd ed., Princeton University Press, Princeton, NJ, 1997, Chapter 4.

[94] As I discuss below, Dr. Feinstein acknowledges that a statistically significant stock price decline can be driven by confounding information.  See ¶ 98.

[95] Cornell and Morgan (1990), pp. 889–891.

**Highly Confidential**

alleged corrective disclosure dates, Dr. Feinstein fails to appropriately account for confounding information not causally linked to the alleged fraud that was revealed on these dates. I discuss these issues for each alleged corrective disclosure date below.

### 1.    November 5, 2018

67.    Plaintiff identifies news revealed on November 5, 2018 about production cuts at Apple suppliers as an alleged corrective disclosure. Specifically, Plaintiff states that on November 5, 2018 a *Nikkei Asia* news article reported that "Apple told its top smartphone assemblers, Foxconn and Pegatron, to reduce iPhone XR production … indicating a reduction in demand of 20-25%."[96] Dr. Feinstein concludes that the information disclosed on this date "partially corrected the prior alleged misrepresentation and omissions" and "caused investor losses."[97] He also states that "[a]s there was no material confounding news, [he] conclude[s] that all of the $7.17 residual price decline on 5 November 2018 was caused by the corrective disclosure."[98]

68.    As explained below, Dr. Feinstein inappropriately assumes that investors would have foreseen and thus "would not have been surprised" by the November 5, 2018 alleged corrective disclosure had the but-for disclosure been made on November 1, 2018. In making this assumption, he fails to address that the November 5, 2018 disclosure involves information about Apple's business *globally*, not just in *Greater China*. As a result, he fails to account for confounding information in his analysis of investor losses on November 5, 2018.

69.    As discussed in Section X.A.1, I understand that the but-for disclosure is that Apple was facing "pressure" in Greater China. Additionally, I understand that the but-for disclosure would not have included outlook or performance elsewhere in the world and that the but-for disclosure would not have included production cuts, as it was not Apple's standard practice to disclose such

---

[96] Complaint, ¶ 98. See also "Apple cancels production boost for budget iPhone XR: sources," *Nikkei Asia*, November 5, 2018.
[97] Feinstein Merits Report, ¶ 110.
[98] Feinstein Merits Report, ¶ 128.

Highly Confidential

information.[99]  Dr. Feinstein fails to evaluate the extent to which what was disclosed on November 5, 2018 (news related to *global* excess production cuts) matches the hypothetical but-for disclosure that could and should have been made on November 1, 2018 (that Apple was facing "pressure" in *Greater China*).  He instead asserts that "[h]ad analysts and investors been fully and honestly informed by [Apple] at the start of the Class Period … they would not have been surprised by the subsequent adverse announcements."[100]  It is possible that the market would have been able to infer some portion of production cuts reflecting softness of demand in *Greater China* had Apple made the but-for disclosure on November 1, 2018.  However, Dr. Feinstein's assertion that the *entire* residual stock price decline that took place on November 5, 2018 would have occurred on November 1, 2018 is flawed because he has not demonstrated how the market would have been able to infer *global* production cuts from the but-for disclosure that Apple was facing "pressure" in *Greater China*.

70.     Furthermore, Dr. Feinstein fails to address that Plaintiff points to "pressure" specific to the Chinese market, as opposed to global "pressure," when discussing the headwinds Apple was experiencing in Greater China.  For example, Dr. Feinstein and Plaintiff point to "U.S.–China trade tensions and economic conditions in China," "declining traffic in Apple's retail stores … in Greater China,"[101] and competition from lower-priced Chinese smartphone competitors like Huawei and Oppo.[102]

71.     Moreover, Plaintiff's expert Dr. Shenkar notes pre-Class Period trends in the smartphone market that were specific to Greater China and its competitive landscape.  He states that "[d]uring 2017 to 2018, the growing competition from local Chinese makers was the subject of much media attention."[103]  He also cites articles describing "an overall slowdown in the Chinese smartphone market, as well as the resurgence of Huawei and smaller Chinese startups" as of

---

[99] See ¶¶ 56–58.
[100] Feinstein Merits Report, ¶ 153.
[101] Feinstein Merits Report, ¶ 23.
[102] Complaint, ¶ 10.
[103] Shenkar Report, ¶ 76.

Highly Confidential

January 2018.[104]  Finally, based on an April 2018 article, Dr. Shenkar notes that the trend continued, stating that "Huawei and Xiaomi saw an increase in shipments … [making it] evident that Apple was facing an uphill battle to defend, not to mention buttress, its Chinese market position."[105]  Given that the alleged headwinds in Greater China are specific to Greater China, Dr. Feinstein has not shown how the but-for disclosure that Apple was facing "pressure" in Greater China would imply poor performance globally, and enable the market to perfectly foresee global production cuts.

72.    Dr. Feinstein also fails to address the fact that the Apple suppliers that cut production assemble iPhones sold globally, not just in Greater China.[106]  I understand that Apple's Master Production Schedule ("MPS")[107] reduction for orders from suppliers, and the subsequent production cut announcements, related to products sold globally, not just in Greater China.[108] The reduction in Apple's iPhone forecasts between the iPhone XR launch and November 1, 2018 was predominantly related to production cuts *outside* of Greater China.  Apple cut forecasts of unbrickings[109] both in Greater China and in other regions between October 25, 2018 and

---

[104] Shenkar Report, ¶ 73.

[105] Shenkar Report, ¶ 74, emphasis omitted.

[106] "Currently all iPhones are made in China, split among Foxconn, Pegatron and Wistron.  iPhone shipments to the US therefore are considered exports from China."  ("iPhone XR Cuts; India Production for the US Shipments," JL Warren Capital, November 20, 2018, p. 2).

[107] "And we have -- we send out a weekly signal called the MPS, master production schedule, and I would ask them for the history of the MPS during this period."  (30(b)(6) Deposition of Donal Conroy, March 15, 2021 ("Conroy Deposition") (90:24–91:3)).

[108] "[Q] And you all had, in fact, begun to cancel production plans because of soft demand, particularly in China, right?  [A] We cut the forecast, as we had talked about before.  And when you cut the forecast, generally speaking you also cut the MPS.  And the MPS ... represents the orders on suppliers.  And so ..., you know, two always follows one.  [Q] And during that call, you didn't mention that the traffic trends that you were seeing in China were negative, did you?  [A] As we talked about, the traffic trends that were on that chart were a problem in each geo. … They weren't unique to China."  (Deposition of Timothy D. Cook, February 9, 2022 ("Cook Deposition") (225:16–226:14)).

[109] I understand that Apple used "unbrickings" to measure when an iPhone was activated.  Donal Conroy stated in his deposition that an "unbricking" is measured when a user activates their iPhone.  "[A] In addition, we have reports we look at that shows us -- the terminology I use when end customers are activating our devices, and -- and that is the term we generally use to say that's the true end user demand signal.  [Q] Is that what's referred to as unbricking?  [A] Yes, it -- yes.  Internally we use a phrase 'unbricking' for all activations, correct."  (Conroy Deposition (60:13–60:20)).  I understand that Apple tracked product sales using the "sell-in" metric.  Luca Maestri stated in his deposition that a "sell-in" occurs when a product gets shipped to a partner.  "[A] … The difference between Sell In and unbricks, the reason why the numbers are not the same, is because as we ship our products to

Highly Confidential

November 1, 2018.[110]  The share of Greater China in the change in forecasts was only 21% for iPhone XR[111] and 14% for all iPhone models.[112]  These reductions are consistent with the fact that Greater China was only a fraction of Apple's global revenue, making up 20% of Apple's total revenue in both FY17 and FY18.[113]  Additionally, Mr. Poer's report demonstrates that as of November 1, 2018, Apple forecasted that 20% of the FQ1'19 global iPhone unbrickings would occur in Greater China.[114]

73.     Dr. Feinstein's treatment of news on November 5, 2018 (and November 12, 2018) is internally inconsistent with his treatment of news on January 3, 2019.  When analyzing the stock price decline on January 3, 2019, Dr. Feinstein acknowledges that any price decline caused by Apple's performance outside of Greater China is "non-fraud-related confounding information."[115]  In particular, he states that the revenue shortfall announced on January 2, 2019 that was "attributed to emerging markets outside of Greater China constituted confounding information" and "needs to be controlled for and subtracted from the Company-specific

---

our partners, that is called Sell In, unbricks is when the device gets activated.  In between there is an amount of inventory that remains in the channel so the numbers can be different."  (Maestri Deposition (100:25–101:17)).

[110] I understand that Apple pre-launched the iPhone XR on October 19, 2019, and while Mr. Maestri stated that pre-order results from day one were "softer than what we had expected," he clarified that the pre-launch was small relative to the actual launch:  "[Q] And this is an e-mail providing statistics on the pre-orders for the XR which had just gone live the day before, correct?  [A] Yeah … our iPhone online business, especially at the time, was a very small percentage of our total business, probably less than ten percent.  And so it's a data point.  It's not -- you know, it's not an all-inclusive view of what is happening. … Again, this is six days before the product reaches shelves around the world.  So this is no -- you know, it's a very, very early and partial signal."  (Maestri Deposition (111:25–113:6, 116:20–116:21); "Apple introduces iPhone XR," Apple Inc. Press Release, September 12, 2018).

[111] I understand that as of October 25, 2018, Apple's FQ1'19 unbricking forecast for iPhone XR was 22.233 million globally and 4.970 million in Greater China.  ("Total iPhone Summary," October 25, 2018, APL-SECLIT_00056796–952 at 796, 822).  As of November 1, 2018, Apple's FQ1'19 unbricking forecast for iPhone XR was 14.600 million globally and 3.384 million in Greater China.  ("Total iPhone Summary," November 1, 2018, APL-SECLIT_00057900–8057 at 7900, 7926).

[112] I understand that as of October 25, 2018, Apple's FQ1'19 unbricking forecast for all iPhone models was 70.379 million globally and 13.555 million in Greater China.  ("Total iPhone Summary," October 25, 2018, APL-SECLIT_00056796–952 at 796, 822).  As of November 1, 2018, Apple's FQ1'19 unbricking forecast for all iPhone models was 63.792 million globally and 12.623 million in Greater China.  ("Total iPhone Summary," November 1, 2018, APL-SECLIT_00057900–8057 at 7900, 7926).

[113] 2018 10-K, p. 26.

[114] Mr. Poer's Schedule 9 shows that as of November 1, 2018, Apple was forecasting 12.623 million unbrickings in Greater China in FQ1'19 for all iPhone models, while Apple was forecasting 63.792 million unbrickings worldwide in FQ1'19 for all iPhone models.

[115] Feinstein Merits Report, ¶ 137.

Highly Confidential

residual."[116]  While Dr. Feinstein's approach for January 3, 2019 is flawed and unreliable (as discussed below in Section X.B.3, he nonetheless removes 24.2% of the residual price decline on January 3, 2019 in an attempt to account for markets outside of Greater China.[117]

74.     In contrast, Dr. Feinstein fails to even attempt to control for information conveyed about markets outside of Greater China when analyzing the November 5, 2018 alleged corrective disclosure date.  Instead, he claims, without support, that there "was no material confounding news"[118] and inappropriately uses the entire residual price decline measured by his event study as a measure of loss caused by the alleged misrepresentation.

75.     Therefore, Dr. Feinstein has not shown that the stock price "would have fallen by an additional" amount of $7.17 equal to the residual decline of Apple's stock price on November 5, 2018 had Apple made the but-for disclosure on November 1, 2018.[119]

## 2.     November 12, 2018

76.     Plaintiff identifies news revealed on November 12, 2018 about a revenue guidance reduction from an Apple supplier as an alleged corrective disclosure.  Specifically, Plaintiff states that on November 12, 2018, "Lumentum, a supplier of iPhone components, issued a negative preannouncement due to a reduction by one of its largest customers – identified as Apple."[120]  Dr. Feinstein concludes that the information disclosed on this date "partially corrected the prior alleged misrepresentation and omissions" and "caused investor losses."[121]  He also states that "[a]s there was no material confounding news, [he] conclude[s] that all of the $4.82 residual price decline on 12 November 2018 was caused by the corrective disclosure."[122]

77.     As explained below, Dr. Feinstein inappropriately assumes that investors would have foreseen and thus "would not have been surprised" by the November 12, 2018 alleged corrective

---

[116] Feinstein Merits Report, ¶ 139.
[117] Feinstein Merits Report, ¶ 146.
[118] Feinstein Merits Report, ¶ 128.
[119] Feinstein Merits Report, ¶ 153.
[120] Complaint, ¶ 103.  See also "Lumentum Updates Outlook For Fiscal Second Quarter 2019," Lumentum Press Release, November 12, 2018.
[121] Feinstein Merits Report, ¶ 112.
[122] Feinstein Merits Report, ¶ 131.

Highly Confidential

disclosure had the but-for disclosure been made on November 1, 2018.  In making this assumption, he fails to address that the November 12, 2018 disclosure involves information about Apple's business *globally*, not just in *Greater China*.  As a result, he fails to account for confounding information in his analysis of investor losses on November 12, 2018.

78.     As discussed in Section X.A.1, I understand that the but-for disclosure is that Apple was facing "pressure" in Greater China, that the but-for disclosure would not have included outlook or performance elsewhere in the world, and that the but-for disclosure would not have included production cuts, as it was not Apple's standard practice to disclose such information.[123]  Dr. Feinstein fails to evaluate the extent to which what was disclosed on November 12, 2018 (news related to a revenue guidance reduction from a supplier) matches the hypothetical but-for disclosure that could and should have been made on November 1, 2018 (that Apple was facing "pressure" in Greater China).

79.     The same arguments for the November 5, 2018 alleged corrective disclosure date that I discuss above apply to November 12, 2018 as well, including that Dr. Feinstein has not demonstrated how the market would be able to infer *global* cuts from the but-for disclosure that Apple was facing "pressure" in *Greater China*.

80.     As I discuss in Section X.B.1 above, internal projections show lower than expected demand for iPhone XR both in Greater China and outside of Greater China following the iPhone XR launch.[124]  Dr. Feinstein fails to account for the composition of production cuts in his loss causation analysis.

81.     Furthermore, as I discuss in Section IX above, if Plaintiff's theory of harm is that Apple allegedly misrepresented that it was not facing any "pressure" in Greater China as of November 1, 2018, and if the November 5, 2018 disclosure revealed that Apple was facing "pressure," then Mr. Cook's statement could not have caused Plaintiff's alleged losses on November 12, 2018.

---

[123] See ¶¶ 56–58.
[124] See ¶ 72.

Highly Confidential

### 3.    January 3, 2019

82.    Plaintiff states that on January 2, 2019, after the close of trading, Apple pre-announced its financial results, reporting expected revenue for FQ1'19 of $84 billion, lower than the previous guidance range of $89 billion to $93 billion.[125]  Dr. Feinstein concludes that the information revealed on this date "corrected the prior alleged misrepresentation and omissions" and "caused investor losses on this date."[126]

83.    As discussed below, Dr. Feinstein fails to reliably demonstrate that the losses on January 3, 2019 that he attributes to the alleged misrepresentation were caused by the alleged misrepresentation.  First, Dr. Feinstein fails to demonstrate that the information conveyed in Mr. Cook's Letter to Shareholders, which included the guidance reduction to $84 billion, and his subsequent CNBC interview, reflects the but-for disclosure that Apple could and should have made on November 1, 2018, as opposed to reflecting new information about performance and outlook that Apple learned between November 1, 2018 and January 2, 2019.  As a result, Dr. Feinstein fails to control for the key piece of confounding information on January 3, 2019, new information that Apple learned after November 1, 2018.  Second, while Dr. Feinstein recognizes that there was negative news that "constituted non-allegation related confounding information" on that day, he fails to reliably parse the impact of these additional pieces of confounding information to isolate only the impact on the stock price, if any, due to the alleged misrepresentation, rather than these confounding factors.[127]

>    a)    **Dr. Feinstein Fails to Demonstrate That the Information Revealed on This Date Reflected the But-For Disclosure,**

---

[125] Complaint, ¶¶ 33–34.  See also "Letter from Tim Cook to Apple Investors," Apple Inc. Press Release, January 2, 2019; "CNBC Exclusive: CNBC Transcript: Apple CEO Tim Cook Speaks with CNBC's Josh Lipton Today," *CNBC*, January 2, 2019, available at https://www.cnbc.com/2019/01/02/cnbc-exclusive-cnbc-transcript-apple-ceo-tim-cook-speaks-with-cnbcs-josh-lipton-today.html.
[126] Feinstein Merits Report, ¶ 120.
[127] Feinstein Merits Report, ¶ 140.

Highly Confidential

**Rather Than New Information Learned after November 1, 2018**

84.     As discussed in Section X.A.1 above, I understand that the but-for disclosure is that Apple was facing "pressure" in Greater China and that the but-for disclosure would not have included outlook or performance elsewhere in the world.  Importantly, this disclosure must be based on information that Apple could and should have disclosed as of this date—it should not reflect new information Apple learned after November 1, 2018.

85.     In assessing the January 2, 2019 alleged corrective disclosure date, Dr. Feinstein fails to demonstrate that the updated revenue guidance of $84 billion revealed on this date reflects the but-for disclosure, rather than at least partially reflecting new, confounding information learned between November 1, 2018 and January 2, 2019.  Further, he presents no analysis that the market would have foreseen this result had the but-for disclosure been made on November 1, 2018 that Apple was facing "pressure" in Greater China, particularly given that Apple itself did not.  Thus, Dr. Feinstein's analysis of loss causation fails to account for a critical mismatch between the alleged misrepresentation and the alleged corrective disclosures.

86.     Dr. Feinstein asserts, without any support, that investors "would not have been surprised"[128] by the disappointing performance in Greater China that Apple disclosed on January 2, 2019 had "investors been fully and honestly informed by the Company at the start of the Class Period."[129]  In contrast, Apple's internal forecasts reflect that it *was* surprised by what ultimately transpired between November 1, 2018 and January 2, 2019.

87.     As previously discussed, Apple provided a guidance range of $89 billion to $93 billion on November 1, 2018.  My understanding is that Plaintiff does not allege that this guidance range was false, nor does Plaintiff allege that the guidance did not reflect Apple's then-current understanding incorporating the information Apple knew about its outlook and performance in

---

[128] Feinstein Merits Report, ¶ 153.
[129] Feinstein Merits Report, ¶ 153.

Highly Confidential

Greater China at that time.[130]  As of November 1, 2018, Apple, with the benefit of the information that was allegedly concealed regarding the business outlook and performance in Greater China, had an internal "likely" forecast of $90.678 billion, near the midpoint of the disclosed guidance range.[131]  Apple gave a guidance range of $89 billion to $93 billion, which was consistent with its forecasted high ($93.423 billion) and low ($88.813 billion) for the quarter.[132]

88.     However, Apple's actual FQ1'19 revenue of $84.310 billion[133] came in over $6 billion below the "likely" revenue forecast from November 1, 2018, after Apple learned how its business was performing in Greater China and elsewhere during the remainder of the quarter.[134] Even Apple's "internal low" forecast as of the November 1, 2018 earnings call, $88.813 billion, was still almost $5 billion higher than the updated guidance of $84 billion provided on January 2, 2019.[135]

89.     The Poer Report summarizes Apple's internal iPhone unbricking forecasts, and shows that Apple lowered its forecasts in both Greater China and in worldwide regions excluding Greater China in early November (after the November 1, 2018 call) and then lowered its forecasts of performance in Greater China further in late November and December 2018.[136]  I have presented the same data in **Exhibit 1**.

90.     Dr. Feinstein does not provide any analysis that demonstrates that had Apple additionally disclosed that it was facing "pressure" in Greater China, the market would have not only lowered its expectations of FQ1'19 revenue but also lowered them much beyond the expectations that Apple developed internally as of November 1, 2018.  As I discuss in Section X.A.2 above, there

---

[130] Complaint, ¶¶ 53–57, 66.

[131] "Q1'19 P&L Dashboard Scenarios 11/1 v2," November 2, 2018, 9:39AM, APL-SECLIT_00284951.  Mr. Poer stated:  "These one page spreadsheet P&L Dashboard Reports include multiple scenario forecasts of total Q1 FY2019 Apple income statement components by product.  The reports were generated periodically throughout the quarter and include forecasted amounts in dollars, sales units, unbrickings by product, and year-over-year comparisons."  (Poer Report, ¶ 15).

[132] "Q1'19 P&L Dashboard Scenarios 11/1 v2," November 2, 2018, 9:39AM, APL-SECLIT_00284951.

[133] "Apple Reports First Quarter Results – Consolidated Financial Statements," Apple Inc. Press Release, January 29, 2019.

[134] $90.678 billion - $84.310 billion = $6.368 billion.  As of December 7, 2018, Apple's internal "likely" forecast was $86.322 billion, which reflected forecast reductions that occurred in the first half of the Class Period.  ("Q1'19 P&L Dashboard Scenarios 12/7," December 7, 2018, APL-SECLIT_00361813).

[135] "Q1'19 P&L Dashboard Scenarios 11/1 v2," November 2, 2018, 9:39AM, APL-SECLIT_00284951.

[136] Poer Report, Chart 9.

Highly Confidential

is no support in literature in financial economics for the proposition that the market possesses a crystal ball.

91.     In his Class Certification Reply Report, Dr. Feinstein emphasizes the need to review internal documents to account for Apple's changing expectations of its performance in Greater China during the Class Period:

> Further, any empirical evidence that may be produced showing that the Company's performance in China improved or deteriorated over the course of the Class Period in a manner unknown and unpredictable to Defendants, if such evidence does exist and becomes available, can be incorporated into the valuation analysis to appropriately scale down the artificial inflation attributable to the alleged misrepresentations and omissions.  That is, the very evidence that might indicate that inflation did vary due to changing conditions can be incorporated into the damage analysis in a straightforward and class-wide common manner to inform how much inflation varied.[137]

In the same Class Certification Reply Report, Dr. Feinstein also states that one should remove the stock price effect of information that was "unknown and unknowable" at the start of the Class Period:

> If the evidence indicates that 20% of the earnings miss was unknown and unknowable to the company, and would have been a surprise to investors even if there had been full disclosure, and therefore was completely unrelated to the alleged misrepresentations and omissions, then a 20% portion of the surprise can be deemed confounding information, and the corresponding 20% of the residual stock price decline should be attributable to the non-fraud factors.[138]

In contrast to what he claims in his Class Certification Reply Report, in his Merits Report Dr. Feinstein fails to account for the downward updates to Apple's internal forecasts made after November 1, 2018 and fails to isolate the stock price effect of information that Apple could and

---

[137] Feinstein Class Certification Reply Report, ¶ 54.
[138] Feinstein continues, stating "[I]f Company documents or other evidence do in fact indicate that there was some truly unanticipated deterioration in the Company's performance during the quarter such that some portion of the subsequently disappointing results would have been equally surprising to investors regardless of whether or not there were alleged misrepresentations and omissions, the proportionate amount of the residual stock price decline can be treated as non-fraud-related and excluded from damages.  Such adjustments are neither unusual nor exceptionally complex, but they do require full development and a complete examination of the evidentiary record." (Feinstein Class Certification Reply Report, ¶ 55).

Highly Confidential

should have disclosed at the start of the Class Period.  This renders his approach to analyzing losses on January 3, 2019 caused by the alleged misrepresentation flawed and unreliable.

92.     Consistent with Apple lowering its internal forecasts in response to new information learned after November 1, 2018, there were multiple unexpected headwinds that occurred during this time period.  For example, as I discuss in my Class Certification Report, the trade war between the U.S. and China was pushing some customers to local brands as a result of nationalist sentiment.[139]  Additionally, I demonstrate that the Caixin China General Manufacturing Purchasing Managers' Index ("PMI") survey showed that the economic conditions in China at the end of 2018 were worse than what had been forecasted by economists.[140]

93.     Dr. Yang also describes a number of unexpected headwinds that occurred after November 1, 2018.  For example, Dr. Yang discusses that general "macroeconomic conditions in China's economy worsened unexpectedly in November and December 2018,"[141] the "smartphone market weakened during November and December 2018,"[142] and that "Apple faced unexpected adverse consumer sentiment after the detention of Huawei's CFO" on December 1, 2018.[143]

94.     In his report, Plaintiff's expert Dr. Shenkar also discusses how Chinese consumers can react quickly and aggressively to changes in nationalist sentiment (as they did after the detention of Huawei's CFO, as discussed by Dr. Yang).  Dr. Shenkar emphasizes that when nationalist sentiment turned against Japan in 2012, sales of Japanese cars fell 35%–45% year-over-year, despite the fact that the cars were produced in China.[144]

95.     Finally, as I discuss in Section IX above, if Plaintiff's theory of harm is that Apple allegedly misrepresented that it was not facing any "pressure" in Greater China as of November

---

[139] Grenadier Class Certification Report, ¶¶ 134–135.
[140] Grenadier Class Certification Report, ¶¶ 66–67.
[141] Yang Report, ¶¶ 13–70.
[142] Yang Report, ¶¶ 71–77.
[143] Yang Report, ¶¶ 78–84.
[144] "[D]uring nationalist tension against Japan in the Fall of 2012 (following the purchase by Japan of contested islands in the South China Sea), sales of Japanese cars plunged by roughly 35% to 45% year over year (September 2011 to September 2012).  It did not matter that most of the cars were made in China."  (Shenkar Report, ¶ 65).

Highly Confidential

1, 2018, and if the November 5, 2018 disclosure revealed that Apple was facing "pressure," then Mr. Cook's statement could not have caused Plaintiff's alleged losses on January 3, 2019. Alternatively, if Plaintiff fails to show that the market learned on November 5, 2018 that Apple was facing "pressure" in Greater China but were able to show that the market learned on November 12, 2018 that Apple was facing "pressure," then Mr. Cook's statement could not have caused Plaintiff's alleged losses on January 3, 2019.[145]

> **b)** **Dr. Feinstein Fails to Reliably Account for Other Confounding Information Revealed on This Date That Is Not Causally Linked to the Alleged Fraud**

96.    As discussed above,[146] Dr. Feinstein fails to identify and exclude the portion of the stock price decline on January 3, 2019 that was due to new information about Greater China that Apple did not anticipate on November 1, 2018 and only learned subsequently.

97.    Moreover, Dr. Feinstein concedes that there was other "negative news" revealed on January 2, 2019 that "regions outside of China contributed to the announced revenue shortfall, and this constituted non-allegation related confounding information" and that, therefore, "some of the [] residual stock price decline was not dissipation of allegation-related artificial inflation."[147]  Thus, Dr. Feinstein concedes that he needs to parse out confounding news in order to quantify what portion of the return, if any, on January 3, 2019 is attributable to the correction of the alleged misrepresentation.[148]

98.    Dr. Feinstein claims to remove the confounding information that impacted Apple's stock price on January 3, 2019 as follows:

---

[145] The only scenario where Plaintiff can demonstrate that *any* losses on January 3, 2019 were causally linked to the alleged misrepresentation is the hypothetical scenario where the market learned for the first time on this date that Apple was facing "pressure" in Greater China as of November 1, 2018.
[146] See Section X.B.3.a).
[147] Feinstein Merits Report, ¶ 140.
[148] Feinstein Merits Report, ¶ 140.

**Highly Confidential**

a. First, he calculates the revenue surprise relative to the market's expectation based on the difference between the FQ1'19 mean revenue consensus forecast from I/B/E/S of $91.49 billion as of December 31, 2018[149] and the actual revenue of $84.31 billion reported on January 29, 2019.  Dr. Feinstein determines that the revenue surprise was negative $7.18 billion, and states that he uses this amount "as a proxy for assessing the relative impacts of the fraud-related China disclosures and the confounding factors stemming from other regions."[150]

b. Second, he purports to develop a measure of the market's expectation of revenue for Greater China.  To do so, he starts with Apple's FQ1'18 actual Greater China revenue of $17.96 billion, to which he applies a growth rate.  Based on FQ1'18 actual global revenue and the FQ1'19 consensus forecast, Dr. Feinstein determines that Apple as a whole was expected to grow revenue by 3.6% year-over-year.  Dr. Feinstein claims that one can conservatively assume Greater China was forecasted to grow at 3.6% because "Greater China was expected to perform better than other emerging markets, had previously been one of the Company's fastest growing markets, and was represented to be unaffected by negative economic pressures."[151]  Based on this growth rate, he assumes that the market was anticipating FQ1'19 revenue of $18.61 billion in Greater China.

c. Third, he observes that Apple reported actual FQ1'19 revenue in Greater China of $13.17 billion on January 29, 2019 and assumes that revenue in Greater China was therefore $5.44 billion lower than the market's expectations.  As such, he

---

[149] Dr. Feinstein states that the consensus forecast comes from *Refinitiv Eikon* (Feinstein Merits Report, fn. 103). Based on a review of I/B/E/S data from *Refinitiv Eikon*, it appears that Dr. Feinstein is using the mean consensus forecast.  As I discuss below, it appears that the I/B/E/S FQ1'19 consensus forecast used by Dr. Feinstein contains a forecast that is stale.  (See fn. 198 below).

[150] Feinstein Merits Report, ¶¶ 142, 143.

[151] Feinstein Merits Report, ¶ 144.

**Highly Confidential**

concludes that of the $7.18 billion total revenue shortfall relative to market expectations, $5.44 billion (or 75.7%) was due to Greater China.[152]

99.    Dr. Feinstein asserts that his approach to parsing the January 3, 2019 stock price decline is conservative, "because the revenue surprise was only one element of the negative news disclosed that day and the rest of the negative news comprised corrective information about China."[153]  As an initial matter, Dr. Feinstein fails to control for the extent to which information that Apple learned after November 1, 2018 drove the January 2, 2019 pre-announcement.[154] Even setting this issue aside, Dr. Feinstein fails to substantiate his assertion that the proportion of the price decline on January 3, 2019 that he attributes to the revenue miss in Greater China as of *January 2, 2019* (76%) is "conservative."

100.    Contrary to Dr. Feinstein's unsupported assertion that "the rest of the negative news comprised corrective information about China,"[155] the analyst reports issued following the January 2, 2019 alleged corrective disclosure discussed a number of pieces of confounding news. Some of the confounding information would have affected the FQ1'19 revenue guidance revision, but also may have provided negative information above and beyond the guidance revision that would continue to impact Apple going forward.  For example, as I show in **Exhibit 2**, analysts discussed (i) a weaker than expected iPhone upgrade cycle in the quarter and going forward,[156] which analysts attributed to factors such as the battery replacement program, lack of carrier subsidies, and currency trends driving price increases;[157] (ii) a lack of iPhone pricing

---

[152] Feinstein Merits Report, ¶ 145.
[153] Feinstein Merits Report, ¶ 141.
[154] See Section X.B.3.a).
[155] Feinstein Merits Report, ¶ 141.
[156] "While ***we had anticipated a stronger upgrade cycle heading into 2019 from to the new XS, XS Max and XR models***, we believe the installed iPhone user base remains loyal and ***anticipate lower but stable replacements*** [*sic*] ***rates going forward*** to drive steady iPhone sales through C2020.  Given the higher priced iPhones, we now believe consumers are holding on to their iPhones longer.  Therefore, ***we have lowered our replacement rate upgrades from roughly 23% of the new iPhone user base (excludes refurbished sales) to roughly 20% of iPhone owners will upgrade to a new iPhone in 2019 and 2020***."  ("Weak iPhone sales result in $7B shortfall to Q1/F'19 guidance; lowering estimates and PT to $190," Canaccord Genuity, January 2, 2019, p. 2, emphasis added).
[157] "***In a further negative, Apple noted that developed markets were impacted by a worse than expected iPhone upgrade cycle, driven by weaker macro environment, fewer carrier subsidies, stronger dollar impacting ASPs,***

Highly Confidential

power on a global basis and concerns that iPhone prices were too high;[158] and (iii) disappointing gross margins that were at the low end of the guided range.[159]   While the analyst commentary contained a mix of reactions, with some stating that the information was new and negative, and others stating that the information was expected, Dr. Feinstein has failed to address the specific negative pieces of confounding news, and has failed to analyze the extent to which this new information could impact market expectations going forward and did impact the stock price on January 3, 2019.

101.   Moreover, to the extent that the non-Greater-China-related information had a stronger or longer-lasting impact on expected future cash flows, Dr. Feinstein's estimate could overstate the portion of the price decline attributable to the revenue miss as of January 2, 2019 in Greater China.[160]   For example, Nomura analysts wrote on January 2, 2019:

> **Partly structural, partly cyclical**.  Apple noted fewer carrier subsidies and reduced battery replacement pricing.  These seem but a half step away from recognizing ASPs are structurally too high.  Conversely, trade tensions, product boycotts, and even macro concerns all seem cyclical.[161]

102.   By failing to appropriately account for confounding information in his loss causation analysis, Dr. Feinstein has not shown that any of Plaintiff's alleged losses on January 3, 2019 were caused by the alleged misrepresentation.

---

*and prolonged use of older models given reduced pricing for iPhone battery replacements*." ("Rare neg pre: cut to guide on weak China, iPhones; Services better. PO to $195," Bank of America, January 2, 2019, p. 1, emphasis added).

[158] "*While the deterioration in U.S.-China relations clearly contributed to the weakness in F1Q, we believe the results also reflect a lack of incremental iPhone pricing power on a global basis*, commoditization of iPhone hardware, and App Store monetization that is likely near a medium-term peak. *This is a damaging combination of factors that has no simple fix, in our view, and seems unlikely to moderate in the foreseeable future*." ("Guidance Revision Suggests More Issues Than Just China," KeyBanc, January 2, 2019, p. 2, emphasis added).

[159] "*The incremental challenges were related to*:  a)  Greater China:  Accounted for much of the revenue shortfall (~$7B) and all the y/y revenue decline (5%) was driven by China softness; b) some developed countries saw weaker than expected iPhone upgrades happen; & c)  *GM's* [sic] *are towards the low-end of guide* and surprisingly OPEX remained at $8.7B."  ("From China With Love," RBC, January 2, 2019, p. 1, emphasis added).

[160] In the Feinstein Class Certification Reply Report, Dr. Feinstein concedes:  "If certain factors responsible for the earnings miss are identified as non-recurring while others are expected to be persistent, the valuation literature dictates that greater valuation attribution be given to the persistent factors."  (Feinstein Class Certification Reply Report, ¶ 48).

[161] "Bear in a China Shop:  Severe iPhone Miss Partially Offset by Other Units," Nomura, January 2, 2019, p. 1.

Highly Confidential

**XI.     Dr. Feinstein's Damages Calculation Is Flawed, Unreliable, and Overstates Inflation**

103.    The starting point of Dr. Feinstein's damages analysis is his assessment of loss causation. As such, all shortcomings in Dr. Feinstein's loss causation analysis described in Section X above also apply to his assessment of damages.  Because Dr. Feinstein's analysis of the losses caused by the alleged misrepresentation is flawed and unreliable, he has failed to show that there are any damages to shareholders.

104.    Further, as I discuss in Section XI.A below, by focusing only on the alleged corrective disclosure dates, Dr. Feinstein does not undertake any analysis to demonstrate that the alleged misrepresentation introduced inflation at the start of the Class Period in the first place. Additionally, as I discuss in Section XI.B, Dr. Feinstein's analysis of inflation fails to address that the hypothetical but-for disclosure would have been qualitative in its nature while the alleged corrective disclosures had important quantitative components.

105.    Finally, Dr. Feinstein's attempt to measure the change in inflation on November 5, 2018, November 12, 2018, and January 3, 2019 as a part of his damages analysis is flawed and unreliable.  Specifically, Dr. Feinstein fails to isolate the impact of the alleged fraud, if any, from other confounding factors.  In Sections XI.C and XI.D below, I discuss these shortcomings for each of the three alleged corrective disclosure dates.

**A.      Dr. Feinstein Fails to Demonstrate That the Alleged Misrepresentation Introduced Inflation into the Stock Price as of the Start of the Class Period**

106.    Dr. Feinstein's conclusion that the alleged misrepresentation inflated Apple's stock price, and that the alleged corrective disclosures subsequently dissipated inflation, is based on examining the stock price declines when the alleged corrective disclosures occurred.[162]  Dr. Feinstein does not demonstrate that the alleged misrepresentation introduced inflation at the start of the Class Period, given that analysts discussed that Apple faced headwinds in Greater China both before and after the alleged misrepresentation, and that analyst consensus expectations were

---

[162] Feinstein Merits Report, ¶ 149.

**Highly Confidential**

well within the range of Apple's own internal forecasts and guidance range following the alleged misrepresentation.

107.    The Gauna Report and Trueman Report address the information discussed by market participants regarding headwinds Apple was facing in Greater China prior to November 1, 2018, and whether the information discussed by analysts may have changed following the alleged misrepresentation.  Mr. Gauna opines that Apple's guidance given on November 1, 2018 "reflected slowing business trends and heightened uncertainties in China that were recognized by the market" and further that "the market did not hear Mr. Cook to say or imply there was no pressure or risks related to Apple's business in China."[163]  Professor Trueman opines that "an overwhelming majority of the analysts that discussed China discussed that Apple's business in China was facing pressure prior to the [November 1, 2018] call."[164]  Professor Trueman also opines that "analysts, and by extension the market, understood that Apple faced pressure in China," and "did not understand Mr. Cook's Challenged Statement to say there was no pressure on Apple's business in China."[165]  My Class Certification Report also summarizes analyst commentary on headwinds in Greater China and their potential impact on Apple's business.  I show commentary regarding such headwinds both before and after the November 1, 2018 earnings call.[166]

108.    Further, Apple provided updated guidance of $89 billion to $93 billion on November 1, 2018 that was lower than the guidance analysts were expecting, and had a wider range than typically provided.[167]  My understanding is that Plaintiff is not challenging this guidance as false,

---

[163] Gauna Report, ¶ 12.

[164] Trueman Report, ¶ 54.

[165] Trueman Report, ¶ 27.

[166] Grenadier Class Certification Report, ¶¶ 99–107, 109–116, Exhibit 3.

[167] For example, a Cross Research analyst report stated, "Apple provided revenue guidance for F1Q19 with a $4 billion range, greater than the $2 billion to $3 billion range over the past three years due to a number of factors." ("F4Q18 Review; Focusing Attention On Services, Limiting Hardware Disclosure," Cross Research, November 1, 2018, p. 2).  A Daiwa analyst report stated, "For 1Q19 the mid-point of revenue guidance of $89b-$93b is ~$2b below the street's estimate of $92.9b."  ("Good, above guidance 4Q, but weaker q/q momentum," Daiwa, November 1, 2018, p. 1).  A Nomura analyst report stated, "After a modest F4Q beat, Apple offered disappointing F1Q guide of $91bn (midpoint of a wider range)."  ("More than a Miss; Sustained Downturn Likely," Nomura, November 2, 2018, p. 1).

Highly Confidential

nor is Plaintiff alleging that the guidance did not reflect Apple's then-current understanding incorporating the information Apple knew about its outlook and performance in Greater China at that time.[168]  Mr. Poer confirmed that Apple's most up-to-date information, including the most current forecast of unit unbrickings, was used in generating the $89 billion to $93 billion revenue guidance range provided by Mr. Cook on November 1, 2018.[169]

109.    After November 1, 2018, the consensus forecast for FQ1'19 revenue was $92.088 billion, which was well within Apple's guided range.[170]  Additionally, the guidance range midpoint of $91 billion was near Apple's internal "likely" forecast of $90.678 billion, and the guidance low ($89 billion) and high ($93 billion) were consistent with Apple's internal low/high forecast range of $88.813 billion to $93.423 billion.[171]

110.    Dr. Feinstein does not explain how the alleged misrepresentation introduced inflation considering that analysts stated that Apple faced headwinds in Greater China both before and after the alleged misrepresentation, and that analyst consensus expectations were well within Apple's own guidance range and its range of internal forecasts.

---

[168] Complaint, ¶¶ 53–57, 66.

[169] Poer Report, ¶¶ 34–36.

[170] $92.088 billion is the mean forecast of Apple's FQ1'19 revenue across 33 contributors with reports issued between the earnings call and November 4, 2018.  This includes forecasts from analyst reports tracked by Apple, and is supplemented with analyst reports listed in my **Appendix C**.  Apple calculated that the consensus forecast was $92.071 billion based on the mean of 31 contributors.  (APL-SECLIT_00284232)  I understand that Apple's consensus was prepared on November 2, 2018.  (Email from Tejas Gala to Luca Maestri, et al., "Re: Consensus Update 110218 - Post Earnings," with attachments, November 2, 2018, APL-SECLIT_00284221–8).  I/B/E/S consensus forecast is updated monthly, and an updated analyst consensus is not available until after the November 5, 2018 and November 12, 2018 alleged corrective disclosures.  According to I/B/E/S, the consensus is updated "mid-month [because in the] earlier days when most brokerage research was released by US Mail on the first of the month [t]he two-week lead-time was necessary to process, print and ship the data to clients."  ("The I/B/E/S Glossary," I/B/E/S International, Inc., 2000, p. 7).

[171] "Q1'19 P&L Dashboard Scenarios 11/1 v2," November 2, 2018, 9:39 AM, APL-SECLIT_00284951.

**Highly Confidential**

**B.      Dr. Feinstein's Analysis of Inflation Fails to Address That the Hypothetical But-For Disclosure Would Have Been Qualitative in Its Nature While the Alleged Corrective Disclosures Had Important Quantitative Components**

111.     Dr. Feinstein fails to address that there is a mismatch between the but-for disclosure—that Apple was experiencing "pressure" in Greater China—and the content of the alleged corrective disclosures regarding (i) production cuts, (ii) supplier revised guidance, and (iii) the FQ1'19 revenue guidance revision.  While the but-for disclosure is a qualitative statement, the stock price reactions on November 5, 2018, November 12, 2018, and January 3, 2019 were in response to both quantitative and qualitative information.

112.     Plaintiff alleges that new information disclosed on November 5, 2018 and November 12, 2018 revealed that (i) Apple manufacturers had faced production cuts and a supplier revised guidance, and (ii) that the production cuts indicated a 20%–30% reduction in demand.[172]  The information Plaintiff points to on November 5, 2018 and November 12, 2018 as correcting the alleged misrepresentation contained both a qualitative aspect (that production cuts had occurred) and a quantitative aspect (the size of the production cuts).  Similarly, on January 2, 2019, Plaintiff also points to an aspect of the allegedly corrective information that is qualitative (that Apple experienced disappointing performance in Greater China) and an aspect of the allegedly corrective information that is quantitative (revenue guidance of $84 billion).[173]  However, as I discuss in Section X.A.1 above, the but-for disclosure is purely a qualitative statement that Apple was facing "pressure" in Greater China.  Dr. Feinstein fails to account for the impact of the quantitative information disclosed on the alleged corrective disclosure dates, which results in a flawed and unreliable calculation of inflation.

113.     In his Class Certification Reply Report, Dr. Feinstein claims that the mismatch between the qualitative but-for disclosure and quantitative alleged corrective disclosures is a resolvable issue:

---

[172] Complaint, ¶¶ 98–104.
[173] Complaint, ¶¶ 105–106.

**Highly Confidential**

> Had Apple informed the market that it was experiencing "negative economic
> pressures" in China but declined to provide any quantitative detail (the
> scenario Dr. Grenadier suggests would portray a full corrective disclosure), the
> market would still be able to value Apple stock.  How investors respond to
> information gaps has been intensively studied by economists.[174]

114.    In the same report, Dr. Feinstein also points to academic literature on information gaps
and asymmetric information as the relevant literature that will supposedly guide him in resolving
this issue of mismatch between a qualitative but-for disclosure and quantitative alleged
corrective disclosures.  However, in the Feinstein Merits Report, Dr. Feinstein does not reference
this literature at all, nor does he apply any adjustment that could bridge the mismatch between a
qualitative but-for disclosure and quantitative alleged corrective disclosures.  Furthermore, the
work by Akerlof, Spence, and Stiglitz[175] that Dr. Feinstein cites does not support his false
assumption that investors would have had a crystal ball that would have allowed them to predict
Apple's actual performance based on the qualitative but-for disclosure made earlier.

### C.    Dr. Feinstein Fails to Isolate the Impact of the Alleged Fraud, If Any, from Other Confounding Factors on November 5, 2018 and November 12, 2018

115.    As I discuss in Sections X.B.1 and X.B.2 above, while Dr. Feinstein acknowledges and
purports to parse confounding news about Apple's performance outside of Greater China that
impacted Apple's stock price on January 3, 2019, Dr. Feinstein fails to control for information
conveyed about markets other than Greater China when analyzing the November 5, 2018 and
November 12, 2018 alleged corrective disclosures.  In fact, Dr. Feinstein fails to address that the
production cuts were for Apple's business globally, not just Greater China.

116.    By failing to account for information about Apple's performance outside of Greater
China that was learned by the market on November 5, 2018 and November 12, 2018, Dr.
Feinstein's damages analysis fails to isolate only those losses, if any, that were caused by the
alleged misrepresentation that Mr. Cook "would not put China in that category."  As a result, Dr.
Feinstein's inflation ribbon that incorporates the entire residual stock price declines on

---

[174] Feinstein Class Certification Reply Report, ¶ 61.
[175] Feinstein Class Certification Reply Report, ¶ 61.

Highly Confidential

November 5, 2018 and November 12, 2018 would inappropriately compensate investors for losses causally linked to production cuts caused by global demand, rather than only those related to Greater China.

> **D.    Dr. Feinstein Fails to Isolate the Impact of the Alleged Fraud, If Any, from Other Confounding Factors on January 3, 2019**

117.    For January 3, 2019, Dr. Feinstein identifies "negative non-fraud-related confounding information"[176] due to "revenue shortfall attributed to emerging markets outside of Greater China" and claims to control for this confounding information.[177]  Dr. Feinstein further claims that his approach to determining the portion of the stock price decline on January 3, 2019 attributable to information about Greater China is conservative "because the revenue surprise was only one element of the negative news disclosed that day and the rest of the negative news comprised corrective information about China."[178]

118.    Dr. Feinstein's analysis fails to reliably determine the amount of inflation, if any, removed on this date.  First, as I discuss in Section X.B.3.a) above, Dr. Feinstein needs to determine what portion, if any, of Apple's stock price decline on January 3, 2019 was caused by revelation of information that Apple allegedly could and should have disclosed *on November 1, 2018* (i.e., that it was facing "pressure" in Greater China).  Instead, he inappropriately focuses on trying to attribute a portion of Apple's stock price decline on January 3, 2019 to information that Apple knew about its performance in Greater China *as of January 2, 2019*.[179]  Second, as discussed in Section X.B.3.b), even setting aside Dr. Feinstein's failure to control for the extent to which information that Apple learned after November 1, 2018 drove the January 2, 2019 pre-announcement, Dr. Feinstein fails to substantiate his assertion that the proportion of the price decline on January 3, 2019 that he attributes to the revenue miss in Greater China as of *January 2, 2019* (76%) is "conservative."  As a result, Dr. Feinstein's inflation ribbon that incorporates a large portion of the stock price decline on January 3, 2019 would inappropriately compensate

---

[176] Feinstein Merits Report, ¶ 137.
[177] Feinstein Merits Report, ¶ 139.
[178] Feinstein Merits Report, ¶ 141.
[179] Feinstein Merits Report, ¶ 145.

**Highly Confidential**

investors for losses that were due to adverse developments that Apple experienced after November 1, 2018 and, potentially, for other losses not causally linked to the alleged misrepresentation by Mr. Cook that he "would not put China in that category."

## XII.   Examples to Illustrate Flaws and Errors in Dr. Feinstein's Calculation of Inflation

119.   As discussed in Section X above, Dr. Feinstein's analysis of Plaintiff's alleged losses on November 5, 2018, November 12, 2018, and January 3, 2019 caused by the alleged misrepresentation is flawed and unreliable.  Setting this aside, below I provide examples of what would happen to Dr. Feinstein's calculation of per share inflation if one were to use Dr. Feinstein's own methodology and adjust for the most glaring errors in his inappropriate assumptions.

120.   Dr. Feinstein's damages methodology for the January 2, 2019 alleged corrective disclosure date apportions the stock price decline based on the revenue contribution of different pieces of information.  For the purposes of my illustrative examples, I have adopted Dr. Feinstein's assumption—that a stock price change in response to multiple pieces of information can be apportioned proportionally to the estimated effect of each piece of information on the expected revenue for the current quarter—in order to illustrate the impact of other flaws and errors in Dr. Feinstein's calculation of inflation.

### A.   November 5, 2018

121.   As I discuss above,[180] on November 5, 2018, a *Nikkei Asia* article reported that Apple suppliers were eliminating additional production capacity, and this information "signaled disappointing demand for the new iPhone XR."[181]  In his damages analysis of November 5, 2018, Dr. Feinstein inappropriately attributes the entire residual stock price decline on this date

---

[180] See ¶ 67.
[181] "Apple cancels production boost for budget iPhone XR:  sources," *Nikkei Asia*, November 5, 2018.

Highly Confidential

to the correction of the alleged misrepresentation.[182]  In doing so, Dr. Feinstein fails to control for the fact that the vast majority of Apple's revenue, projected iPhone demand, and change in projected iPhone demand came from regions outside of Greater China.[183]

122.    In particular, Dr. Feinstein notes in his Merits Report that Greater China contributed 19.6% of Apple's total net sales in FY18.[184]  As I discuss above,[185] this geographic breakdown is (i) consistent with Apple's November 1, 2018 forecast that 20% of FQ1'19 unbrickings for all iPhone models would occur in Greater China; (ii) consistent with Greater China's 21% share of the reduction in iPhone XR forecasted unbrickings between the iPhone XR launch and the earnings call on November 1, 2018; and (iii) higher than Greater China's 14% share of the reduction in all iPhone model forecasted unbrickings between the iPhone XR launch and the earnings call on November 1, 2018.

123.    Assuming that the market interpreted the production cuts as conveying information about Apple's global expected revenue, and the market apportioned 19.6% of the revenue impact to Greater China (equivalent to Greater China's share of Apple's global revenue), then apportioning the stock price decline based on revenue contribution (consistent with what Dr. Feinstein does

---

[182] Feinstein Merits Report, ¶ 128.
[183] See ¶ 72.
[184] Feinstein Merits Report, ¶ 29.
[185] See ¶ 72.

Highly Confidential

for January 3, 2019) results in \$1.41 of the \$7.17 residual price decline on November 5, 2018 (or 19.6%) being linked to Greater China.[186, 187, 188]

B.    **November 12, 2018**

124.    As I discuss above,[189] on November 12, 2018, a Wells Fargo analyst report stated that an Apple supplier, Lumentum, had reduced guidance following a request by Apple to reduce shipments, which Wells Fargo stated could reflect reduced iPhone demand.   As I discuss for November 5, 2018 (immediately above), the vast majority of Apple's revenue, projected iPhone demand, and change in projected iPhone demand came from outside of Greater China, and Dr. Feinstein fails to take this into account in his damages analysis.

---

[186] Feinstein Merits Report, Exhibit 8.

[187] Apportioning the price decline by Apple's November 1, 2018 forecast that 20% of FQ1'19 unbrickings for all iPhone models would occur in Greater China would lead to an assumption that only \$1.42 of the \$7.17 residual price decline on November 5, 2018 could be causally linked to Apple's performance in Greater China.   Similarly, apportioning the price decline by Greater China's 21% share of the reduction in iPhone XR forecasted unbrickings between the iPhone XR launch and the earnings call would lead to an assumption that only \$1.49 of the \$7.17 residual price decline on November 5, 2018 could be causally linked to Apple's performance in Greater China. Apportioning the price decline by Greater China's 14% share of the reduction in forecasted unbrickings for all iPhone models between the iPhone XR launch and the earnings call would lead to an assumption that only \$1.01 of the \$7.17 residual price decline on November 5, 2018 could be causally linked to Apple's performance in Greater China.

[188] This approach assumes the market would have been able to link the but-for disclosure that Apple was facing "pressure" in Greater China as of November 1, 2018 to the portion of excess production cuts attributable to Greater China.

[189] See ¶ 76.  See also "AAPL:  Lumentum Cuts Revenue Outlook by 17%+ (Midpoint) on Apple Order Cuts," Wells Fargo, November 12, 2018.

**Highly Confidential**

125.     Using the same assumptions and methodology as for November 5, 2018 above results in $0.94 of the $4.82 residual price decline on November 12, 2018 (or 19.6%) being linked to Greater China.[190, 191, 192]

## C.      January 3, 2019

126.     As I discuss above, while Dr. Feinstein purports to account for the stock price impact of disclosures unrelated to Greater China on January 3, 2019,[193] he fails to account for new information that Apple learned after November 1, 2018 that contributed to its actual FQ1'19 revenue missing the internal "likely" forecast from November 1, 2018 by over $6 billion.[194]  By failing to recognize in his inflation calculation that the vast majority of the revenue surprise in FQ1'19 was based on events that transpired after November 1, 2018, Dr. Feinstein inappropriately assumes that Apple investors would have had a crystal ball on November 1, 2018 that would have allowed them to predict events that transpired later in November and December of 2018.  Below I provide an illustrative example of adjusting Dr. Feinstein's inflation calculation on January 3, 2019 to correct for this key error.

127.     In the illustrative example, I assume that Apple would have provided the same guidance range of $89 billion to $93 billion that it provided in the actual world, but would have

---

[190] Feinstein Merits Report, Exhibit 8.

[191] Apportioning the price decline by Apple's November 1, 2018 forecast that 20% of FQ1'19 unbrickings for all iPhone models would occur in Greater China would lead to an assumption that only $0.95 of the $4.82 residual price decline on November 12, 2018 could be causally linked to Apple's performance in Greater China.  Similarly, apportioning the price decline by Greater China's 21% share of the reduction in iPhone XR forecasted unbrickings between the iPhone XR launch and the earnings call would lead to an assumption that only $1.00 of the $4.82 residual price decline on November 12, 2018 could be causally linked to Apple's performance in Greater China. Apportioning the price decline by Greater China's 14% share of the reduction in forecasted unbrickings for all iPhone models between the iPhone XR launch and the earnings call would lead to an assumption that only $0.68 of the $4.82 residual price decline on November 12, 2018 could be causally linked to Apple's performance in Greater China.

[192] Consistent with analysis for November 5, 2018, this approach assumes that the market would have been able to link the but-for disclosure that Apple was facing "pressure" in Greater China as of November 1, 2018 to the portion of excess production cuts attributable to Greater China.

[193] See ¶ 98.

[194] See ¶ 87–91.

Page 53

additionally stated that it was facing "pressure" in Greater China (which it had built into the guidance range). I also assume that it would not reveal any other information relative to what it disclosed in the actual world. Dr. Feinstein provides no framework and no analysis for quantifying how much Apple's stock price would have fallen, if at all, in response to this but-for disclosure. The market ended up forming a consensus forecast of FQ1'19 revenue of $92.088 billion following the November 1, 2018 earnings call, which was $1.088 billion above the $91 billion midpoint of the guidance range.[195] Neither Dr. Feinstein nor Dr. Shenkar presents any analysis demonstrating that this over-optimism reflected the market's assessment of Apple's business in Greater China rather than the market's assessment of Apple's business overall.

128.     As I discuss above, Dr. Feinstein notes in his report that Greater China contributed 19.6% of Apple's total net sales in FY18.[196] Therefore, I assume that 19.6% of the market's over-optimism in forecasting FQ1'19 revenue relative to the guidance midpoint as of November 1, 2018 was attributable to the alleged misrepresentation by Mr. Cook that he "would not put China in that category." In other words, had Mr. Cook made a statement on the earnings call on November 1, 2018 that Apple was facing "pressure" in Greater China, the consensus forecast would have declined by $0.213 billion,[197] from $92.088 billion to $91.874 billion as of November 1, 2018.

129.     The actual consensus forecast of FQ1'19 revenue declined by $0.981 billion from November 1, 2018 to January 2, 2019, from $92.088 billion to $91.107 billion.[198] In order to be

---

[195] See ¶ 109.

[196] See ¶ 122.

[197] $0.213 billion = $1.088 billion * 19.6%.

[198] The mean FQ1'19 revenue consensus forecast of $91.107 billion includes forecasts from analyst reports tracked by Apple, and is supplemented with analyst reports listed in my **Appendix C** that were released after the November 1, 2018 earnings call and before January 2, 2019. When multiple reports were issued by the same contributor, only the latest forecast is included in the consensus forecast. Apple calculated that the analyst revenue consensus was $91.038 billion based on the mean of 36 contributors. (APL-SECLIT_00284273). As I discuss in fn. 170, I/B/E/S consensus forecast is updated monthly. The most recent mean I/B/E/S analyst consensus prior to the January 2, 2019 alleged corrective disclosure date was $91.495 billion based on 32 contributors (consensus as of December 20, 2018). Based on my review of the I/B/E/S data, it appears that the I/B/E/S FQ1'19 revenue consensus includes a forecast from Elazar Advisors of $100.929 billion that is stale and inconsistent with the forecast provided in the Elazar Advisors report of $91.000 billion on December 25, 2018. ("Apple AAPL:  Neutral Rating," Elazar

**Highly Confidential**

conservative, I assume in this illustrative example that *none* of this decline reflected dissipation of analysts' over-optimism of $0.213 billion attributable to Mr. Cook's statement on November 1, 2018 that he "would not put China in that category."

130.    The consensus forecast of FQ1'19 revenue declined by $7.068 billion, from $91.107 billion to $84.039 billion following Apple's January 2, 2019 disclosure.[199]  In this illustrative example, of the $7.068 billion revision of market expectations of FQ1'19 revenue, only $0.213 billion (or 3.02%) would be due to the alleged misrepresentation.  The remaining 96.98% of the revision was due to new information learned following the November 1, 2018 earnings call that surprised both Apple and the market.

131.    Under Dr. Feinstein's apportionment of stock price drop based on revenue contribution, $0.32 of the $10.74 residual price decline on January 3, 2019 (3.02%) would be causally linked to the alleged misrepresentation as of November 1, 2018 that Mr. Cook "would not put China in that category," instead of the $8.13 stock price decline calculated by Dr. Feinstein.[200, 201, 202]

---

Advisors, December 25, 2018, p. 2).  Additionally, Apple's own consensus calculation excludes the Elazar forecast from their calculation (APL_SECLIT_00284273).

[199] The mean FQ1'19 revenue consensus forecast of $84.039 billion includes forecasts from analyst reports tracked by Apple, and is supplemented with analyst reports listed in my **Appendix C** that were released after the January 2, 2019 alleged corrective disclosure date and before January 8, 2019.  When multiple reports were issued by the same contributor, only the latest forecast is included in the consensus forecast.  Apple calculated that the consensus forecast of FQ1'19 revenue was $84.020 billion based on the mean of 33 contributors.  (APL_SECLIT_00593593).  As I discuss in fn. 170, I/B/E/S consensus forecast is updated monthly.  The first mean I/B/E/S consensus forecast following the January 2, 2019 alleged corrective disclosure date was $84.038 billion based on 30 contributors (consensus as of January 17, 2019).

[200] Feinstein Merits Report, Exhibits 8, 9.

[201] In this illustrative example, I have followed Dr. Feinstein's "backcasting" methodology in order to isolate the part of the stock price decline on January 3, 2019 that is causally linked to Mr. Cook's statement on November 1, 2018 that he "would not put China in that category."  (Feinstein Merits Report, ¶ 149).  I note that the November 1, 2018 earnings announcement contains other information, in addition to Mr. Cook's statement and the announcement of Apple's revenue guidance for FQ1'19.  Importantly, Apple disclosed that it would stop reporting unit sales data.  A Guggenheim analyst report stated that "[s]urprisingly, Apple says it will stop reporting UNIT numbers going forward, which hit the stock after hours, and we think investors will dislike it as it could foreshadow trying to hide unit declines."  ("AAPL – May Want its Growth-via-ASP Strategy to be Less Obvious," Guggenheim, November 1, 2018, p. 1).  As discussed in ¶ 65, if multiple pieces of information are revealed simultaneously, an event study regression captures the impact of all of that information, and does not allow a researcher to separate the impact of one piece of information from another.

[202] Alternatively, the market's consensus forecast of FQ1'19 revenue of $92.088 billion was $1.410 billion above Apple's "likely" forecast of $90.678 billion.  If one were to assume that 19.6% of the market's over-optimism in forecasting FQ1'19 revenue relative to Apple's "likely" forecast as of November 1, 2018 was attributable to the

**Highly Confidential**

### D.   Inflation Assuming the November 5, 2018 Disclosure Fully Revealed That Apple Was Facing "Pressure" in Greater China

132.    As I discuss in Section IX above, if Plaintiff's theory of harm is that Apple allegedly misrepresented that it was not facing any "pressure" in Greater China, then according to Plaintiff's theory, Mr. Cook's statement could not have caused Plaintiff's alleged losses after November 5, 2018.  If Plaintiff prevails in establishing that the November 5, 2018 disclosure revealed that Apple was facing "pressure" in Greater China as of November 1, 2018, then inflation would be limited to the price decline on November 5, 2018 that can be causally linked to Apple's performance in Greater China, which is $1.41 in the illustrative example above.[203] Under this theory, Mr. Cook's statement would not cause Plaintiff's alleged losses after November 5, 2018.

133.    If Plaintiff were to fail to show that the market learned on November 5, 2018 that Apple was facing "pressure" in Greater China as of November 1, 2018 but were able to show that the market learned on November 12, 2018 that Apple was facing "pressure," the same logic would apply, but inflation would be limited to the price decline on November 12, 2018 that can be causally linked to Apple's performance in Greater China, which is $0.94 in the illustrative example above.[204]

---

alleged misrepresentation by Mr. Cook that he "would not put China in that category," then had Mr. Cook made a statement on the earnings call on November 1, 2018 that Apple was facing "pressure" in Greater China, the consensus forecast would have declined by $0.276 billion, from $92.088 billion to $91.830 billion as of November 1, 2018.  In this illustrative example, of the $7.068 billion revision of market expectations of FQ1'19 revenue, only $0.276 billion (or 3.91%) would be due to the alleged misrepresentation.  Under these assumptions and Dr. Feinstein's apportionment of stock price drop based on revenue contribution, $0.42 of the $10.74 residual price decline on January 3, 2019 (3.91%) would be causally linked to the alleged misrepresentation as of November 1, 2018 that Mr. Cook "would not put China in that category," instead of the $8.13 stock price decline calculated by Dr. Feinstein.

[203] See Section XII.A.

[204] Additionally, if Plaintiff were to fail to show that the market learned on November 5, 2018 or November 12, 2018 that Apple was facing "pressure" in Greater China as of November 1, 2018, but was able to show that the market learned for the first time only on January 2, 2019 that Apple was facing "pressure" in Greater China as of November 1, 2018, the same methodology would apply, but inflation would be limited to the price decline on January 3, 2019 that can be causally linked to the alleged misrepresentation that Mr. Cook "would not put China in that category," which is $0.32 in the illustrative example in Section XII.C above.

Highly Confidential

## XIII.   Options Damages

134.    As described in the Grenadier Class Certification Report, call and put option values depend on several factors, including the underlying stock price, the volatility of the underlying stock price, and the option terms (strike price and time to maturity).[205]  All else equal, the value of a call option increases and the value of a put option decreases as the stock price increases.[206] Because of this relationship between option values and the underlying stock price, Dr. Feinstein asserts that if the underlying stock price was inflated, this implies that prices of call options would also be artificially inflated, while prices of put options would be artificially depressed.[207]

135.    To measure "artificial inflation" in the Apple call options and "artificial price depression" in the Apple put options, Dr. Feinstein discusses undertaking the following steps.

>    a.   Dr. Feinstein proposes using his estimate of the per share inflation in Apple stock as a starting point in his calculation.  Then he proposes calculating the "corrected stock price" for Apple on each day of the Class Period "by subtracting the artificial inflation [that he calculated for Apple stock as discussed in Section XI above] from the observed inflated market stock price."[208]

>    b.   He would then input this "corrected stock price" into an option pricing model to "reprice [each] respective option."[209]  Specifically, he proposes using a "dividend-adjusted binomial American option pricing model (the 'Binomial model')."[210]

---

[205] See Grenadier Class Certification Report, ¶ 159.  Option values also depend on the risk-free rate and any dividends expected over the life of the options.

[206] Grenadier Class Certification Report, ¶ 157.

[207] Specifically, he states that "[b]y inflating the stock price, the misrepresentation and omissions inflated the call option prices.  When the corrective disclosures dissipated artificial inflation from the stock price, the same corrective disclosures consequently caused the call option prices to decline, thereby resulting in option investor losses."   Similarly for put options, he asserts that "[b]y inflating the stock price, the misrepresentation and omissions artificially depressed put option prices.  At depressed put option prices, writers received less than fair value when the puts were written.  The corrective disclosures that dissipated the artificial inflation in the stock price, caused the put option prices to rise, requiring put option writers to pay more to close out or settle their written put option positions." (Feinstein Merits Report, ¶¶ 161–171).

[208] Feinstein Merits Report, ¶ 174.

[209] Feinstein Merits Report, ¶ 174.

[210] Feinstein Merits Report, ¶¶ 173–174.

Highly Confidential

c.  As noted above, option values depend on other factors in addition to the stock price, including stock price volatility.  Dr. Feinstein proposes using a measure of volatility that is inferred from the actual "option price observed in the market."[211] To estimate this volatility, which is called the "implied volatility," Dr. Feinstein proposes using the Binomial model and solving for the implied volatility that is consistent with the "option price observed in the market" and all other necessary pricing parameters.[212]  Using this method, the implied volatility can vary for different option series that have different option types (call or put), how far the strike price of the option is from the exercise price, and time to maturity.

d.  Call option inflation and put option deflation on a given day would then be calculated as the difference between the actual option price and a hypothetical option price calculated using the but-for stock price and the implied volatility described above.[213, 214]

136.  Below, I show why Dr. Feinstein's methodology for calculating inflation and damages for Apple options is flawed and unreliable.[215]  First, as I discuss in Section XIII.A, Dr. Feinstein's methodology is based on his flawed and unreliable analysis of inflation in Apple's stock price.  Therefore, all the flaws and errors in his loss causation and damages analysis for

---

[211] Feinstein Merits Report, ¶¶ 175, 180.  More specifically, he states that the "volatility variable for the model can be solved for as an implied volatility using the same Binomial model with observable inputs for stock price, strike price, time to expiration, interest rate, and the option price.  The implied volatility is estimated by iteratively adjusting the volatility input for the Binomial model until the option price determined by the formula is equal to the option price observed in the market."  (Feinstein Merits Report, ¶ 175).

[212] While Dr. Feinstein uses the midpoint of the reported bid and ask prices in his "example of the option damages computation" (Feinstein Merits Report, ¶ 176, fn. 112), it is not clear what price Dr. Feinstein is referring to when he states he will use the "option price observed in the market."  In particular, it is not clear whether he proposes using actual transaction prices, the end of day mid quote (midpoint between bid and ask quotes), or some other measure.  By contrast, Dr. Chance claims he will use "the price paid by the option buyer" and the "price at which the option traded" in his proposed methodology.  (Chance Report, ¶ 118).

[213] Feinstein Merits Report, ¶ 181.

[214] As with the option "price" used to calculate implied volatility, Dr. Feinstein is not clear on what option "price" he will use when comparing the "repriced" option to the "actual [] option price."  (See Feinstein Report, ¶ 181).

[215] In addition to the concerns outlined below, Dr. Feinstein also fails to account for potentially offsetting gains for some shareholders.  As explained in the Grenadier Class Certification report, it is not uncommon for investors to trade options in complex strategies and use options for hedging.  As a result, investors may hold a mix of options that may be both damaged and benefited from any alleged inflation.  Any damages methodology must explain how it will account for investors with multiple, potentially offsetting, positions in the stock and options, which requires assessing an investor's total exposure across all positions that form a particular trading strategy and calculating damages based on that net position.  (Grenadier Class Certification Report, fn. 281).

Apple stock outlined above also apply to his assessment of Apple options.  Second, as I discuss in Section XIII.B, Dr. Feinstein's methodology fails to provide a means to determine damages for investors who may have traded different Apple options or may not have traded Apple options at all in the but-for world.  Finally, as I discuss in Section XIII.C, Dr. Feinstein's methodology fails to adjust the implied volatilities used for pricing different Apple option series on different dates to take into account the hypothetical but-for disclosure.

### A.    Dr. Feinstein's Methodology Is Based on His Flawed and Unreliable Analysis of Inflation in Apple's Stock Price

137.    As discussed above in Sections X and XI, Dr. Feinstein has failed to reliably demonstrate that the losses that he attributes to the alleged misrepresentation were caused by the alleged misrepresentation.  He has also failed to present scientific and reliable estimates of stock price inflation throughout the Class Period.

138.    Because Dr. Feinstein's proposed measure of inflation in the prices of Apple call options (and deflation in the prices of Apple put options) is derived from his estimate of inflation in Apple's stock price,[216] his failure to reliably measure inflation, if any, in the stock price also means that he has failed to demonstrate that the Apple call options traded at inflated prices (and Apple put options traded at deflated prices), and consequently that investors in Apple options were damaged.

### B.    Dr. Feinstein Fails to Provide a Methodology to Determine Damages for Investors Who May Have Traded Different Apple Options or May Not Have Traded Apple Options at All in the But-For World

139.    Dr. Feinstein's proposed damages methodology for the Apple options assumes that option holders would have chosen to trade the same specific option series (i.e., would have traded the option with the same type (call vs. put), strike price, and maturity date) regardless of

---

[216] Feinstein Merits Report, ¶ 174.

Highly Confidential

how inflation may have impacted the investor's preference for that option or the suitability of that option for the investor's strategy. However, such an assumption ignores the testimony by Plaintiff's options expert, Dr. Chance, that investors choose which options to trade based on option characteristics such as the strike price relative to the underlying stock price, which would have been different following the but-for disclosure, according to Plaintiff's allegations.[217]

140.    For example, Dr. Feinstein presents an example options damages calculation in which the investor is assumed to purchase Apple call option contracts with a strike price of $200 and maturity date of January 18, 2019. Dr. Feinstein's proposed damages calculation assumes that the investor would have purchased the same option contracts in the but-for world.[218] However, he provides no analysis demonstrating that the investor would in fact have purchased the same option, rather than purchasing a different option (e.g., one with a lower strike price) or choosing not to trade the Apple options at all.

141.    It is important to assess whether investors would have traded in the same option in the but-for world because option characteristics, such as the strike price relative to the stock price, can be a key factor in an investor's decision regarding which option series to trade. Dr. Chance asserts in his report:

> Most options trading volume comes from the near-the-money short-term options. … [D]eep out-of-the-money options and deep-in-the-money options have little speculative value and do not trade in heavy volume. Betting on the former is like betting on a team in a sporting event that is a heavy underdog. It is a very long shot. Betting on the latter is like betting on a team that is heavily favored. The bet will be costly and it will not pay much of a return. The game is far more interesting when the teams are more evenly matched. That is the nature of options as well. And that is why near or close to the money options will trade more heavily.[219]

---

[217] Chance Report, ¶¶ 92, 95.
[218] Feinstein Merits Report, ¶¶ 176, 184, 186.
[219] Chance Report, ¶¶ 92, 95.

Highly Confidential

According to Dr. Chance, even in the simple situation where an investor is only purchasing a call option, the choice of strike price "is not easy and depends on how confident the call buyer is about the market outlook."[220]  Option investors can also undertake more complicated options strategies, such as purchasing both a call and a put option with the same strike price to take advantage of large changes in the stock price.[221]  The strike price is often chosen to be near the current stock price, which would again have been different in the but-for world.[222]

142.    Dr. Chance stated at deposition that an investor might have bought a different option had the stock not been inflated:

> [Q] But isn't that what you're doing here you said had the [market] price of the stock not been inflated he might still have bought the option?  [A] Well, I said he might I didn't say he would he might have bought that option he might have bought a different option you can't say exactly what person would or would not do in fact on a different day he might do something entirely differently it just depends on how he feels.[223]

143.    Thus, Dr. Feinstein's proposed damages methodology, which fails to account for the possibility that investors may have traded in other options (or not at all) in the but-for world, cannot be used to reliably estimate damages for the Apple options.

### C.    Dr. Feinstein's Methodology for Calculating Option Inflation Fails to Reliably Account for Any Changes in Implied Volatilities That Would Have Occurred Following the Hypothetical But-For Disclosure

144.    Dr. Feinstein's calculation of inflation for the Apple options is flawed and unreliable because he fails to analyze whether the implied volatilities—a key determinant of the value of

---

[220] Chance, Don M. and Robert Brooks, *An Introduction to Derivatives and Risk Management*, 10th ed., Cengage, Boston, MA, 2016 ("Chance and Brooks"), p. 209.
[221] This option strategy is called a "straddle."  See, e.g., Hull, John C., *Options, Futures, and other Derivatives*, 8th ed., Prentice Hall, Hoboken, NJ, 2012 ("Hull"), pp. 246–247.
[222] See, e.g., Hull, p. 247.
[223] Deposition of Don M. Chance (Rough Draft), June 8, 2022 ("Chance Deposition") (164:17–164:25).

Highly Confidential

the options—would have changed as a result of the hypothetical but-for disclosure.[224]  Instead, Dr. Feinstein assumes without providing any basis that the appropriate implied volatility to use in calculating inflation for each option on each date in the Class Period would have been the same as the implied volatility derived from the actual option prices in the market.[225]  This assumption is unsupported and contradicts Dr. Feinstein's own previous statements.

145.    In particular, Dr. Feinstein claims in his Class Certification Reply Report that he "ha[s] not yet confirmed Dr. Grenadier's conjecture [that implied volatilities may have changed with a but-for disclosure] one way or the other.  ***However, if evidence of changing volatility under full disclosure is encountered during the implementation of the out-of-pocket damage methodology, that evidence would inform what volatility level to use***."[226]  In his Merits Report, Dr. Feinstein has failed to address the issue of changing but-for implied volatilities altogether and has instead assumed that the implied volatilities would have remained unchanged in the but-for world.

146.    This assumption is particularly surprising given that Dr. Feinstein provides an example of an option series whose implied volatility did change over time.  Specifically, in Dr. Feinstein's example calculation of inflation, the implied volatility Dr. Feinstein uses to calculate the but-for prices for one option (a call option with a strike price of $200 and an expiration date of January

---

[224] Dr. Chance stated in his deposition that implied volatilities could change in response to the but-for disclosure: "[Q] Okay.  Do you agree that it's possible that Apple's stock price volatility could have changed in response to the but-for disclosure?  [A] It could have changed and the model can accommodate that." (Chance Deposition (171:3–171:7)).  I note that Dr. Chance is silent in his report and is unclear in his deposition regarding how "the model can accommodate that."

[225] Feinstein Merits Report, ¶¶ 175, 180, 184.

[226] Feinstein Class Certification Reply Report, ¶ 66, emphasis added.  Dr. Feinstein further states in his Class Certification Reply Report that "one can use the observable implied volatilities.… Alternatively, one can apply a volatility forecasting model to replicate what investors would have forecasted." (Feinstein Class Certification Reply Report, ¶ 67).  However, in his Merits Report, Dr. Feinstein has failed to demonstrate that *any* of these approaches would reliably estimate the but-for implied volatility for each Apple option.  Moreover, to the extent that Dr. Feinstein proposes to use a "volatility forecasting model," he has failed to explain what specific model he would use, how he would implement the forecasting process, and whether the model would provide a reliable measure of the but-for volatility for each Apple option on each day of the Class Period.

Highly Confidential

18, 2019) increases from 27.47% on November 2, 2018 to 57.52% on January 3, 2019, showing that the implied volatility changed over time as new information came to the market.[227]

147.    It is possible that the but-for disclosure that Apple was facing "pressure" in Greater China may have led the market to be more uncertain about the value of Apple stock, which could lead to the market perceiving higher implied volatilities as a result of the but-for disclosure. Indeed, under Dr. Feinstein's methodology for calculating implied volatilities, the implied volatility of the particular call option described above increased by 15 percentage points between January 2, 2019 and January 3, 2019.[228] Dr. Feinstein has not presented any analysis that the implied volatility of this option would not also have changed in response to the but-for disclosure.

148.    Importantly, as explained above, Dr. Feinstein's methodology for deriving the implied volatilities from options prices can potentially yield a different implied volatility for each combination of option type (call/put), strike price, and option expiration.[229] That is because although Apple's underlying stock price has a single volatility, Dr. Feinstein calculates the implied volatility *for each option* using the Binomial model to match the observed option price. Empirically, this can lead to different implied volatilities for different option series and even for different transactions in the same option series on a given day. To provide an illustration of the range of implied volatilities for just one date, **Exhibit 3** shows that, using Dr. Feinstein's methodology, the implied volatilities for call options with a maturity date of January 18, 2019 were 42.72% at a strike price of $140 and 38.11% at a strike price of $150 on January 3, 2019. For call options with strike prices of $155 and $190 and a maturity date of February 15, 2019, the implied volatilities were 37.51% and 39.78% respectively, on January 3, 2019.

149.    Dr. Feinstein would need to reliably measure the impact, if any, of the hypothetical but-for disclosure on the implied volatility of *each* of the Apple option series at each point in time. Dr. Feinstein has not provided a methodology to do this. Instead, he has assumed without

---

[227] Feinstein Merits Report, ¶¶ 176, 180, 184.

[228] Under Dr. Feinstein's methodology, the implied volatility for the Apple call option with a strike price of $200 and an expiration date of January 18, 2019 is 42.46% on January 2, 2019 and 57.52% on January 3, 2019.

[229] This is called the "volatility surface" and captures the notion that implied volatility derived from option pricing models can vary by the option's strike price and time to expiration. (See, e.g., Hull, pp. 416–417).

**Highly Confidential**

providing any analysis that the but-for implied volatility equals the actual implied volatility of each option for each day of the Class Period.

150.    A further complication in determining but-for implied volatilities is that the implied volatilities for individual options do not necessarily change by the same amount—or even in the same direction—following the release of new information.  If Dr. Feinstein was to attempt to control for changes in implied volatilities in the but-for world, he would need to account for this fact.[230]  **Exhibit 3** provides examples of changes in implied volatilities of different Apple options following the last alleged corrective disclosure on January 2, 2019 using Dr. Feinstein's data and methodology.  Notably, the implied volatilities of some options with the same strike price and option type (call or put) but different maturities increased while others decreased.  The same is true for options with different option types, but the same strike price and maturity, and options with different strike prices, but the same option type and maturity.  For example, following January 2, 2019, the implied volatility of a call option with a strike price of $150 and maturity of January 18, 2019 decreased by 0.79%, while the implied volatility of a call option with the same strike price and a maturity of January 25, 2019 increased by 4.73%.  As another example, following January 2, 2019, the implied volatility of a call option with a strike price of $155 and maturity date of February 15, 2019 decreased by 1.59%, while the implied volatility of a call option with a strike price of $190 and the same maturity increased by 5.37%.  Dr. Feinstein has neither explained why implied volatilities moved in different directions nor taken into account changes in implied volatilities in the but-for world.[231]

151.    Because Dr. Feinstein fails to analyze possible changes in the implied volatilities of Apple options in the but-for world relative to the actual world, his calculation of inflation and

---

[230] Dr. Feinstein would also need to isolate only changes in implied volatilities that are causally linked to the alleged misrepresentation.  Neither Dr. Feinstein nor Dr. Chance proposes a methodology to perform this required analysis.
[231] My concerns about potential changes in implied volatility on estimated damages are not purely theoretical.  The last three columns of **Exhibit 3** show (i) the actual option price as of January 2, 2019; (ii) the option price recalculated based on the stock price as of January 2, 2019 and the implied volatility as of January 3, 2019; and (iii) the differences between these two option prices.  All differences are measurable and some are large.  For example, the option price of a call option with a strike price of $150 and maturity date of January 25, 2019 increases by 6% when using implied volatility as of January 3, 2019 instead of the implied volatility as of January 2, 2019.

Highly Confidential

damages for the Apple options is flawed and unreliable.  If the implied volatilities of Apple call options were to increase as a result of the hypothetical but-for disclosure, Dr. Feinstein's calculation, which assumes no change in the implied volatilities from those actually observed in the market, would overstate inflation for investors who purchased these call options.  This is because an increase in volatility increases the call option price (all else equal), which would partially offset the decrease in call option value due to the stock price decline.[232]  Conversely, if the implied volatilities of Apple put options were to decrease as a result of the hypothetical but-for disclosure, Dr. Feinstein's calculation would overstate inflation for investors who sold these put options.[233]  In other words, unless the appropriate but-for implied volatility is specified for each option, inflation, if any, will be incorrectly measured for all investors in Apple options and may be overstated, even if it were the case that Dr. Feinstein reliably calculated inflation in Apple's stock price.

152.    As such, Dr. Feinstein fails to propose a way to reliably calculate inflation in the prices of Apple options.

Executed this 10th of June, 2022

*Steven Grenadier*

_____

Steven Grenadier

---

[232] See, e.g., Hull, pp. 215–216.
[233] This is because the effect of the decrease in volatility would partially offset the effect of the stock price decline on the put option's price.  (See, e.g., Hull, pp. 215–216.)

Page 65

Highly Confidential

**APPENDIX A**

# Curriculum Vitae
# Steven Grenadier

Graduate School of Business
Stanford University
Tel:   (650) 725-0706
Email: sgren@stanford.edu

## CURRENT POSITIONS
William F. Sharpe Professor of Financial Economics, Graduate School of Business, Stanford University

## FIELDS OF SPECIALIZATION
Corporate Finance
Asset Pricing
Portfolio Management
Options
Real Estate

## DOCTORAL STUDIES
**Harvard Business School/Harvard Graduate School of Arts and Science**
Ph.D. in Business Economics, November 1992
Concentration in Capital Markets and Corporate Finance

**Dissertation:**  Real Estate Markets
Committee Chairman:  Robert C. Merton

## UNDERGRADUATE EDUCATION
**University of California at Berkeley**
B.S. 1987 - Summa cum laude

## HONORS
The article "The Strategic Exercise of Options:  Development Cascades and Overbuilding in Real Estate Markets," was nominated for the Smith Breeden Prize of the Journal of Finance in 1997

1994 Best Paper Award from the American Real Estate and Urban Economics Association and the American Institute of Individual Investors

1993 Best Dissertation Award from the American Real Estate and Urban Economics Association

National Doctoral Fellowship Recipient: American Assembly of Collegiate Schools of Business

Phi Beta Kappa

**Highly Confidential**

**APPENDIX A**

**PUBLICATIONS**

Grenadier, Steven, Lin William Cong and Yunzhi Hu (2020), "Dynamic Intervention and Informational Linkages," *Journal of Financial Economics*, 135 (1), 1-15.

Grenadier, Steven and Samuel Antill (2019), "Optimal Capital Structure and Bankruptcy Choice: Dynamic Bargaining vs Liquidation," *Journal of Financial Economics*, 133 (1), 198-224.

Grenadier, Steven, Andrey Malenko and Nadya Malenko (2016), "Timing Decisions in Organizations: Communication and Authority in a Dynamic Environment," *American Economic Review*, 106(9), 2552-2581.

Grenadier, Steven, Ilya Strebulaev, and Andrey Malenko (2013), "Investment Busts, Reputation, and the Temptation to Blend in with the Crowd," *Journal of Financial Economics*, 111(1), 137-157.

Grenadier, Steven and Andrey Malenko (2011), "Real Options Signaling Games with Applications to Corporate Finance," *Review of Financial Studies*, 24(12), 3993-4036.

Bekaert, Geert, Eric Engstrom, and Steven Grenadier (2010), "Stock and Bond Returns with Moody Investors," *Journal of Empirical Finance*, 17 (5), 867-894.

Grenadier, Steven and Andrey Malenko (2010), "Irreversible Investment in a Bayesian Framework:  The Case of Distinguishing Between Temporary and Permanent Shocks," *Journal of Finance*, 65 (5), 1949-1986.

Grenadier, Steven and Neng Wang (2007), "Investment Under Uncertainty and Time-Inconsistent Preferences," *Journal of Financial Economics*, 84 (1), 2-39 (lead article).

Grenadier, Steven and Neng Wang (2005), "Investment Timing, Agency and Information," *Journal of Financial Economics*, 75 (3), 493-533 (lead article).

Grenadier, Steven (2005), "An Equilibrium Analysis of Real Estate Leases," *Journal of Business,* 78 (4), 1173-1214.

Grenadier, Steven (2002), "Option Exercise Games:  An Application to the Equilibrium Investment Strategies of Firms," *Review of Financial Studies,* 15 (3), 691-721 (lead article).

Grenadier, Steven (2000), "Option Exercise Games:  The Intersection of Real Options and Game Theory", *Journal of Applied Corporate Finance*, 13 (2),  99-107.

Grenadier, Steven (2000), "Game Choices:  The Intersection of Real Options and Game Theory," Editor, Risk Books, London.

**APPENDIX A**

Grenadier, Steven (2000), "Equilibrium with Time-to-Build: A Real-Options Approach," Michael J. Brennan and Lenos Trigeorgis, eds, *Project Flexibility, Agency, and Competition: New Developments in the Theory and Applications of Real Options*, Oxford University Press, 275-296.

Grenadier, Steven (1999) "Information Revelation Through Option Exercise," *Review of Financial Studies,* 12 (1), 95-130.

Grenadier, Steven and Allen Weiss (1997), "Investment in Technological Innovations: An Option Pricing Approach", *Journal of Financial Economics,* 44 (3), 397-416.

Grenadier, Steven (1996), "The Strategic Exercise of Options: Development Cascades and Overbuilding in Real Estate Markets," *Journal of Finance,* 51 (5), 1653-1680.

Grenadier, Steven (1996), "Leasing and Credit Risk," *Journal of Financial Economics,* 42 (3), 333-364.

Grenadier, Steven (1995), "Valuing Lease Contracts: A Real-Options Approach," *Journal of Financial Economics,* 38 (3), 297-331.

Grenadier, Steven (1995), "The Persistence of Real Estate Cycles," *Journal of Real Estate Finance and Economics,* 10 (2), 95-119.

Grenadier, Steven (1995), "Flexibility and Tenant Mix in Real Estate Projects," *Journal of Urban Economics,* 38 (3), 357-378.

Grenadier, Steven (1995), "Local and National Determinants of Office Vacancies," *Journal of Urban Economics,* 37 (1), 57-71.

Grenadier, Steven and Brian Hall (1996), "Risk-Based Capital Standards and the Riskiness of Bank Portfolios: Credit and Factor Risks," *Regional Science and Urban Economics,* 26 (June), 433-464.

**WORKING PAPERS**
 "Capital budgeting and Real Options: The Case of Concealed Investment Projects," with Andrey Malenko.

"Sandbagging Real Options," with William Cong.

**EDITORIAL RESPONSIBILITIES**
Editor, *Journal of Real Estate Finance and Economics*, 1996-
Associate Editor, *Journal of Economic Dynamics and Control*, 2003-2010

**PROFESSIONAL ACTIVITIES**
Chairman of the Finance Department, Graduate School of Business, Stanford University: 2003-2006, 2011-2019

**APPENDIX A**

Trustee of AQR Funds: 2008-2011
Trustee of E*Trade Funds:  1999-2009
Senior Consultant:  Financial Engines, Inc.: 1997-2019
Trustee of Nicholas Applegate Institutional Funds:  2007-2010
Member of the Stanford University Retirement Program Investment Committee, 2005-
2011
Consultant to Applied Materials
Consultant to Shell Capital
Consultant to Zevenbergen Capital

**TEACHING EXPERIENCE**
Private Equity & Investment Seminar: 2018-
Investment Management and Entrepreneurial Finance: 2018-
Modeling for Investment Management: 2009-
Critical Analytical Thinking: 2010-2012
Portfolio Management:  1992-2006
Essentials of Real Estate Investment:  1994-2009
Foundations of Financial Economics:  1995-1997, 2006-
Finance Core:  1993

**PRESENTATIONS**
Brigham Young University
Carnegie Mellon University
Columbia University (2 seminars)
Harvard Business School (2 seminars)
Massachusetts Institute of Technology
Northwestern University (2 seminars)
Ohio State University
Southern Methodist University
Stanford University
University of British Columbia (2 seminars)
University of California at Berkeley (3 seminars)
University of California at Los Angeles (3 seminars)
University of Chicago (2 seminars)
University of Connecticut (3 seminars)
University of Illinois
University of Minnesota
University of Oregon
University of Pennsylvania (3 seminars)
University of Rochester
University of Southern California
University of Texas at Austin
University of Utah
University of Wisconsin (2 seminars)
Yale University (2 seminars)

# Appendix B
# Steven Grenadier
# Prior Testimony in Previous Four Years

*Mary Bell, Janice Grider, Cindy Prokish, John A. Hoffman, and Pamela M. Leinonen v. ATH Holding Company, LLC, Board of Directors of ATH Holding Company, LLC, and Pension Committee of ATH Holding Company, LLC*, Case No. 1:15-cv-02062-TWP-MPB (U.S. District Court Southern District of Indiana, Indianapolis Division).  Deposition: September 2018.

*Move, Inc. v. Citigroup Global Markets, Inc.*, Case No. 08-0335 (State of California, LA Division). FINRA Dispute Resolution Testimony: December 2018.

*Duane & Virginia Lanier Trust, et al., v. SandRidge Mississippian Trust I, et al.,* Case No. 5:15-cv-00634-G (U.S. District Court Western District of Oklahoma). Deposition: June 2019.

*In re SandRidge Energy, Inc. Securities Litigation,* Case No.: 5:12-cv-01341-G (U.S. District Court Western District of Oklahoma). Deposition: June 2019.

*MBIA Insurance Corporation v. Credit Suisse Securities (USA) LLC, DLJ Mortgage Capital, Inc. and Select Portfolio Servicing, Inc.*, Case No. 603751/2009 (Supreme Court of The State Of New York County Of New York). Trial Testimony: August 2019.

*Benjamin Reetz v. Lowe's Companies, Inc., et al.,* Case No.: 5:18-cv-00075-KDB-DCK (U.S. District Court Western District Of North Carolina, Statesville Division). Deposition: November 2020.

*Fredric A. Guenther, et al. vs. BP Retirement Accumulation Plan, et al.,* Case No.: 4:16-cv-00995 (U.S. District Court Southern District of Texas, Houston Division). Deposition: December 2020.

*Ambac Assurance Corporation v. U.S. Bank National Association,* Case No. 17-cv-2614-PAE (U.S. District Court Southern District of New York). Deposition: August 2021.

*Commerzbank AG v. U.S. Bank National Association,* Case No. 16-CV-04569-DLC (U.S. District Court Southern District of New York). Deposition: November 2021.

**Highly Confidential**

# Appendix C
# Documents Considered

## Academic Articles

- Cornell, Bradford and R. Gregory Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review*, Vol. 37, 1990, pp. 883–924.

- Fama, Eugene F., "Efficient Capital Markets II," *Journal of Finance*, Vol. 46, No. 5, December 1991, pp. 1575–1617.

- Fama, Eugene F., "Efficient Capital Markets:  A Review of Theory and Empirical Work," *Journal of Finance*, Vol. 25, No. 2, 1970, pp. 383–417.

- Greene, Jason T. and Susan G. Watts, "Price Discovery on the NYSE and the NASDAQ:  The Case of Overnight and Daytime News Releases*," Financial Management*, Vol. 25, No. 1, 1996, pp. 19–42.

- Löfgren, Karl-Gustaf, Torsten Persson, and Jörgen W. Weibull, "Markets with Asymmetric Information:  The Contributions of George Akerlof, Michael Spence and Joseph Stiglitz," *Scandinavian Journal of Economics*, Vol. 104, No. 2, 2002, pp. 195-211.

- Lucas, Jr., Robert E., "Asset Prices in an Exchange Economy," *Econometrica*, Vol. 46, No. 6., 1978, pp. 1429–1445.

- Muth, John, "Rational Expectations and the Theory of Price Movements," *Econometrica*, Vol. 29, No. 3, 1961, pp. 315–335.

## Analyst Reports

- Analyst reports obtained from counsel, Thomson Eikon, and CapIQ during the period of September 2018 to February 2019 from the following contributors:  Acquisdata, Argus Research, Atlantic Equities, Baird, Bank of America, Bernstein, BMO, BTIG, BWS Financial, Canaccord Genuity, Citi, Cleveland Research, Credit Suisse, Crispidea, Cross Research, D.A. Davidson, Daiwa, Elazar, FBN, Goldman Sachs, Guggenheim, HSBC, Jefferies, JLWC, JP Morgan, KeyBanc, KTB, Longbow Research, Loop Capital, Macquarie Group, Maxim Group, Monness Crespi Hardt, Morningstar, Morgan Stanley, Needham & Company, Nomura, Oppenheimer, Piper Sandler, Raymond James, RBC, Rosenblatt, TF International, Tigress, Trefis, UBS, Wedbush, Wells Fargo, Wolfe, and Yuanta.  These analyst reports were produced with my Class Certification Report.

- Analyst reports included in Exhibit 1 ("Documents and Other Information Considered") of Dr. Feinstein's report dated May 5, 2021.

Highly Confidential

# Appendix C
# Documents Considered

## Books

- Campbell, John Y., Andrew W. Lo, and A. Craig MacKinlay, *The Econometrics of Financial Markets*, 2nd ed., Princeton University Press, Princeton, NJ, 1997.

- Hull, John C., *Options, Future, and other Derivatives*, 8th ed., Prentice Hall, Hoboken, NJ, 2012.

- Chance, Don M. and Robert Brooks, *An Introduction to Derivatives and Risk Management*, 10th ed., Cengage, Boston, MA, 2016.

## Case Rulings

- *Mark Smilovits et al. v. First Solar, Inc. et al.*, Order, December 27, 2019.

## Conference Calls

- Q3 2018 Apple Inc. Earnings Call, "Edited Transcript," July 31, 2018.

- Apple Inc. Special Event, "Edited Transcript," September 12, 2018.

- Apple Inc. Special Event, "Edited Transcript," October 30, 2018.

- Q4 2018 Apple Inc. Earnings Call, "Edited Transcript," November 1, 2018.

- Q1 2019 Apple Inc. Earnings Call, "Edited Transcript," January 29, 2019.

## Data

- CRSP

- Refinitiv

## Depositions

- 30(b)(6) Deposition of Donal Conroy, March 15, 2021.

- Deposition of Greg Joswiak, March 15, 2022.

- Deposition of Timothy D. Cook, February 9, 2022.

- Deposition of Luca Maestri, February 25, 2022.

Highly Confidential

# Appendix C
# Documents Considered

- Deposition of Don M. Chance (Rough Draft), June 8, 2022.

**Bates-Stamped Materials**

- APL-SECLIT_00284273.
- APL_SECLIT_00593593.
- APL-SECLIT_00055698–854.
- APL-SECLIT_00056796–952.
- APL-SECLIT_00057900–8057.
- APL-SECLIT_00058058–216.
- APL-SECLIT_00058217–375.
- APL-SECLIT_00058376–534.
- APL-SECLIT_00058535–693.
- APL-SECLIT_00058694–852.
- APL-SECLIT_00058853–9011.
- APL-SECLIT_00059012–170.
- APL-SECLIT_00059171–329.
- APL-SECLIT_00059330–488.
- APL-SECLIT_00059489–647.
- APL-SECLIT_00059648–806.
- APL-SECLIT_00059807–965.
- APL-SECLIT_00059966–60124.
- APL-SECLIT_00060125–283.
- APL-SECLIT_00060284–442.
- APL-SECLIT_00060443–601.
- APL-SECLIT_00060602–760.
- APL-SECLIT_00060761–919.

Highly Confidential

# Appendix C
# Documents Considered

- APL-SECLIT_00060920–1078.
- APL-SECLIT_00061079–237.
- APL-SECLIT_00061238–396.
- APL-SECLIT_00061397–555.
- APL-SECLIT_00061556–714.
- APL-SECLIT_00061715–873.
- APL-SECLIT_00061874–2032.
- APL-SECLIT_00062033–192.
- APL-SECLIT_00062193–352.
- APL-SECLIT_00062353–504.
- APL-SECLIT_00062505–656.
- APL-SECLIT_00062657–808.
- APL-SECLIT_00062809–960.
- APL-SECLIT_00062961–3112.
- APL-SECLIT_00063113–264.
- APL-SECLIT_00063265–416.
- APL-SECLIT_00063417–568.
- APL-SECLIT_00063569–739.
- APL-SECLIT_00063740–910.
- APL-SECLIT_00063911–4081.
- APL-SECLIT_00064082–252.
- APL-SECLIT_00064253–423.
- APL-SECLIT_00064424–594.
- APL-SECLIT_00064595–766.
- APL-SECLIT_00064767–937.
- APL-SECLIT_00064938–5108.

Highly Confidential

# Appendix C
# Documents Considered

- APL-SECLIT_00065109–279.
- APL-SECLIT_00065280–450.
- APL-SECLIT_00065451–621.
- APL-SECLIT_00065622–793.
- APL-SECLIT_00065794–965.
- APL-SECLIT_00065966–6136.
- APL-SECLIT_00066137–308.
- APL-SECLIT_00066309–480.
- APL-SECLIT_00066481–652.
- APL-SECLIT_00066653–824.
- APL-SECLIT_00066825–996.
- APL-SECLIT_00066997–7168.
- APL-SECLIT_00067169–340.
- APL-SECLIT_00067341–512.
- APL-SECLIT_00261104–177.
- APL-SECLIT_00284221–8.
- APL-SECLIT_00284232.
- APL-SECLIT_00284951.
- APL-SECLIT_00361813.
- APL-SECLIT_00408660.

**Expert Reports**

- Expert Report of Professor Steven P. Feinstein, Ph.D., CFA, *In Re Apple Inc. Securities Litigation*, May 5, 2021, including material produced by Dr. Feinstein and all documents considered therein.
- Expert Report of Professor Steven Grenadier, *In Re Apple Inc. Securities Litigation*, July 9, 2021, including all documents considered therein.

**Highly Confidential**

# Appendix C
# Documents Considered

- Reply Expert Report of Professor Steven P. Feinstein, Ph.D., CFA, *In Re Apple Inc. Securities Litigation*, August 24, 2021, including material produced by Dr. Feinstein and all documents considered therein.

- Expert Report of Don Chance, *In Re Apple Inc. Securities Litigation*, April 15, 2022.

- Corrected Expert Report of Alex Gauna, MBA, *In Re Apple Inc. Securities Litigation*, May 9, 2022.

- Expert Report of Oded Shenkar, *In Re Apple Inc. Securities Litigation*, April 27, 2022.

- Expert Report of Professor Brett Trueman, Ph.D., *In Re Apple Inc. Securities Litigation*, April 27, 2022.

- Expert Report of Professor Dennis Yang, Ph.D., *In Re Apple Inc. Securities Litigation*, April 27, 2022.

- Expert Report of Steven P. Feinstein, Ph.D., CFA, *In Re Apple Inc. Securities Litigation*, April 27, 2022, including material produced by Dr. Feinstein and all documents considered therein.

- Summary and Expert Report of Eric Poer - Corrected, CPA, CFF, ABV, CFE, *In Re Apple Inc. Securities Litigation*, May 9, 2022.


**Public Press**

- Public press articles extracted from a Factiva search with "Apple" in the headline or lead paragraph, and "iPhone" and ("China" or "Chinese") anywhere in the text between October 1, 2018 to January 9, 2019 from a search of major business publications and wires including Dow Jones Institutional News, Dow Jones Newswires, PR Newswire, Business Wire, Barron's, Far Eastern Economic Review, Financial Times – Print and Online (ft.com), Forbes, Investor's Business Daily, Reuters News, The Economist (United Kingdom), The New York Times, and The Wall Street Journal; Chinese Publications including Central News Agency English News, China Daily, Global Times, People's Daily Online, South China Morning Post, scmp.com, Xinhua News Agency, and Yicai Global; Factiva's technology sources; and Theflyonthewall.com.  These public press articles were produced with my Class Certification Report.

- "Apple cancels production boost for budget iPhone XR:  sources," *Nikkei Asia*, November 5, 2018.

**Highly Confidential**

# Appendix C
# Documents Considered

- "CNBC Exclusive:  CNBC Transcript:  Apple CEO Tim Cook Speaks with CNBC's Josh Lipton Today," *CNBC*, January 2, 2019, https://www.cnbc.com/2019/01/02/cnbc-exclusive-cnbc-transcript-apple-ceo-tim-cook-speaks-with-cnbcs-josh-lipton-today.html.

## Case Documents

- *In re Apple Inc. Securities Litigation*, Revised Consolidated Class Action Complaint for Violation of the Federal Securities Laws, June 23, 2020.

- *In re Apple Inc. Securities Litigation*, Order Granting In Part And Denying In Part Defendants' Motion To Dismiss The Revised Consolidated Class Action Complaint, November 4, 2020.

- *In re Apple Inc. Securities Litigation*, Order Granting in Part and Denying in Part Motion for Class Certification, February 4, 2022.

- *In re Apple Inc. Securities Litigation*, Lead Plaintiff Norfolk County Counsel as Administering Authority of the Norfolk Pension Fund's Objections and Responses to Defendant Apple Inc.'s Second Set of Interrogatories to Lead Plaintiff, March 16, 2022.

## SEC Filings

- Apple Inc., Form 10-K for the fiscal year ended September 30, 2017, dated November 3, 2017.

- Apple Inc., Form 10-K for the fiscal year ended September 29, 2018, dated November 5, 2018.

- Apple Inc., Form 10-Q for the fiscal quarter ended December 29, 2018, dated January 30, 2019.

- Apple Inc., Form 10-Q for the fiscal quarter ended March 30, 2019, dated May 10, 2019.

- Apple Inc., Form 10-Q for the fiscal quarter ended June 29, 2019, dated July 31, 2019.

- Apple Inc., Form 10-K for the fiscal year ended September 28, 2019, dated October 31, 2019.

Highly Confidential

# Appendix C
# Documents Considered

- Apple Inc., Form 10-K for the fiscal year ended September 26 2020, dated October 30, 2020.

- Apple Inc., Form 10-K for the fiscal year ended September 25, 2021, dated October 29, 2021.

**Press Releases**

- "Apple introduces iPhone XR," Apple Inc. Press Release, September 12, 2018.

- "Lumentum Updates Outlook For Fiscal Second Quarter 2019," Lumentum Press Release, November 12, 2018.

- "Letter from Tim Cook to Apple Investors," Apple Inc. Press Release, January 2, 2019.

- "Apple Reports First Quarter Results – Consolidated Financial Statements," Apple Inc. Press Release, January 29, 2019.

**Miscellaneous Documents**

- "The I/B/E/S Glossary," I/B/E/S International, Inc., 2000.

- Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4(e).

**All other materials cited in this report and exhibits to this report.**

Highly Confidential

# Appendix D

**Appendix D:  The Risk of Pressure from Economic Deceleration and Trade Tensions Was Disclosed by the Company and Commented on by Securities Analysts by November 5, 2018**

1.      Apple's 10-K filed November 5, 2018 specifically discusses the risk of trade tensions:

> International trade disputes could result in tariffs and other protectionist measures that could adversely affect the Company's business.  Tariffs could increase the cost of the Company's products and the components and raw materials that go into making them.  These increased costs could adversely impact the gross margin that the Company earns on its products.  Tariffs could also make the Company's products more expensive for customers, which could make the Company's products less competitive and reduce consumer demand.  Countries may also adopt other protectionist measures that could limit the Company's ability to offer its products and services.  Political uncertainty surrounding international trade disputes and protectionist measures could also have a negative effect on consumer confidence and spending, which could adversely affect the Company's business.[1]

2.      Following the filing of the 10-K on November 5, 2018, a Wells Fargo analyst report specifically acknowledged that Apple added a new risk disclosure on tariffs, and this was "no surprise":

> **New Tariff Disclosure in Risk Section:**  While no surprise, the 10-K include[s] a new disclosure in the risk section, outlining the potential risk / disruption from international trade disputes.[2]

---

[1] 2018 10-K, p. 15.  Furthermore, the same 10-K as well as the 10-K filed a year earlier both discuss the risk that "global and regional economic conditions could materially adversely affect the Company[]."  (Apple Inc., Form 10-K for the fiscal year ended September 30, 2017, dated November 3, 2017, p. 8; 2018 10-K p. 8)  On this topic, the 2018 10-K states:  "The Company has international operations with sales outside the U.S. representing a majority of the Company's total net sales.  In addition, a majority of the Company's supply chain, and its manufacturing and assembly activities, are located outside the U.S.  As a result, the Company's operations and performance depend significantly on global and regional economic conditions.  Adverse macroeconomic conditions, including inflation, slower growth or recession, new or increased tariffs, changes to fiscal and monetary policy, tighter credit, higher interest rates, high unemployment and currency fluctuations could materially adversely affect demand for the Company's products and services."  (2018 10-K, p. 8)

[2] "AAPL: 10-K Review - Record Mfg. Purchase Commit, F2019 Capex Guide & More," Wells Fargo, November 5, 2018, p. 1, emphasis in original.

**Highly Confidential**

# Appendix D

3.      Moreover, securities analysts extensively discussed these risks, both prior to and immediately following the November 1, 2018 earnings call and the issuance of Apple's 10-K on November 5, 2018.  For example, analysts noted:

### Goldman Sachs (October 24, 2018)

[G]iven market conditions in China and expanding uncertainty around trade and macro we believe Apple is likely to lean conservatively on their guidance for FQ1 to Dec.[3]

### UBS (October 29, 2018)

China is the greatest unknown given macro uncertainties. … Risks to our Apple thesis include … macro weakness dampening product demand, especially in China.[4]

### D.A. Davidson (October 31, 2018)

As we have stated previously, we see China-related risks as having the most potential to slow Apple's momentum, both from tariffs and when considering roughly 20% of its sales come from consumers in China, which could be at risk in the event a prolonged trade war results in protectionist purchasing by consumers.[5]

### D.A. Davidson (November 2, 2018)

We also consider the 16.4% revenue growth for its greater China [*sic*] region as also remarkable given some investors were concerned about slowing growth for that region and given, again, the aforementioned trade war between the U.S. and China. … That said, we still see China as representing the single greatest risk to

---

[3] "iPhone Mix Trending Better; Increasing ASPs.  China/Macro unit risk remains.  Reiterate Neutral," Goldman Sachs, October 24, 2018, p. 1.
[4] "FQ4:18 (Sep) Earnings Preview:  Survey Work Supports Very Strong iPhone ASP Narrative," UBS, October 29, 2018, pp. 5, 16.
[5] "Apple's New AMPed Product Line Up; BUY," D.A. Davidson, October 31, 2018, p. 1.

Highly Confidential

# Appendix D

shares and will be monitoring tariffs closely, especially in the event the next round is EVERYTHING out of China.[6]

### Needham & Company (November 2, 2018)

Risks to Our Target Price … China is the question that generates the most debate. Although greater China [*sic*] reported double digit growth in FY2Q18, risks to AAPL in China appear to be rising.[7]

### Wedbush (November 5, 2018)

Risks to the Attainment of Our Price Target and Rating: … Success of Apple's product strategy in China, which remains a key growth driver for the coming years and could be impaired by lower priced smartphones and competition.  China macro/tariffs issue remain a long-term risk.[8]

---

[6] "Selling Products at Higher Prices Is a Great Thing; BUY," D.A. Davidson, November 2, 2018, p. 1.

[7] "Not a Hardware Company.  Buy AAPL on Weakness," Needham & Company, November 2, 2018, p. 8, emphasis removed.

[8] "Taking a Bite Out of the Apple Bear Thesis; Seeing the Forest Through the Trees," Wedbush, November 5, 2018, p. 8, emphasis removed.

**Highly Confidential**



**Exhibit 1**
**Apple Inc.**
**Change in FQ1'19 iPhone Unbricking Forecast from 11/1/18**
**All iPhone Models**
11/1/18 – 12/29/18

Source:  Total iPhone Summaries dated 11/1/18 – 12/29/18 (APL_SECLIT_00057900 – APL_SECLIT_00067512)

Note:  Forecasts for each geographic region are from Apple's "Current Qtr Extrap" panel and "Qtr Total" column.  Forecasts exclude refurbished phones.

Highly Confidential

# Exhibit 2A
# Selected Analyst Commentary on
# Weaker Upgrade Cycle
# January 2, 2019 – January 9, 2019

### Bank of America (January 2, 2019)

In a further negative, Apple noted that developed markets were impacted by a worse than expected iPhone upgrade cycle, driven by weaker macro environment, fewer carrier subsidies, stronger dollar impacting ASPs, and prolonged use of older models given reduced pricing for iPhone battery replacements.[1]

### BMO (January 2, 2019)

**Lower revenue guide.** Apple's weaker December revenue guide was due largely to more macro weakness than expected (emerging markets), as well as fewer iPhone upgrades. There has been a lot of negative press about iPhone unit shipments and mix, although some of the reasons given for the miss are not all that surprising (lower subsidies, cheaper battery replacements, strong U.S. dollar, etc.). … The company pointed out a number of factors other than the China and emerging markets weakness, none of which is surprising to us: iPhone upgrades in developed markets were also weaker than expected, likely due to lengthening replacement rates.[2]

### BTIG (January 2, 2019)

**Subsidies?** CEO Tim Cook primarily cited a weakening economy in China as the reason for the revenue shortfall and the environment sounds very bad there and obviously not being helped by the ongoing trade war or the rising prices of Apple's products. Cook also noted the lack of subsidies by wireless operators in developed markets. That is not a new trend. On CNBC, Cook suggested that trade-ins offered by Apple can act as an effective subsidy, but operators have been offering trade-in promotions for years, albeit at lower levels in the past two years. (Link) There has not been evidence of an incremental acceleration in the decline in upgrade rates in the United States or other developed markets. The replacement cycle might not be rebounding, but it's very hard to believe that a further lengthening in the product cycle is a material contributor to the miss reported this afternoon.[3]

---

[1] "Rare Neg Pre: Cut to Guide on Weak China, iPhones; Services Better. PO to $195," Bank of America, January 2, 2019, p. 1.
[2] "Another Shoe Drops; Lowering Estimates, Target," BMO, January 2, 2019, pp. 1, 3, emphasis in original.
[3] "Cutting Apple Target as iPhones Miss by More than 12 Million," BTIG, January 2, 2019, p. 2, emphasis in original.

**Highly Confidential**

# Exhibit 2A
# Selected Analyst Commentary on
# Weaker Upgrade Cycle
# January 2, 2019 – January 9, 2019

## Canaccord Genuity (January 2, 2019)

While we had anticipated a stronger upgrade cycle heading into 2019 from to the new XS, XS Max and XR models, we believe the installed iPhone user base remains loyal and anticipate lower but stable replacements rates going forward to drive steady iPhone sales through C2020. Given the higher priced iPhones, we now believe consumers are holding on to their iPhones longer.  Therefore, we have lowered our replacement rate upgrades from roughly 23% of the new iPhone user base (excludes refurbished sales) to roughly 20% of iPhone owners will upgrade to a new iPhone in 2019 and 2020.[4]

## Cross Research (January 2, 2019)

Within the iPhone business, Apple noted lower than expected upgrade rates given the shift away from subsidies (we think likely impacting Japan which the company did not include in its list of record revenues), strength of the US dollar and a greater than expected number of customers taking advantage of the reduced price to replace batteries (ran from 12/30/17 to 12/31/18) all of which were in addition to weaker macroeconomic conditions.[5]

## Goldman Sachs (January 2, 2019)

A letter on this subject from Tim Cook also flagged weaker replacement demand than expected. … Beyond China, we don't see strong evidence of a consumer slowdown heading into 2019 but we just flag to investors that we believe Apple's replacement rates are likely much more sensitive to the macro now that the company is approaching maximum market penetration for the iPhone. … We believe that focus should now shift to ASP decline potential in 2019 as weaker macro and FX may push consumers toward less expensive iPhone models.  We are not yet modeling this but we plan to carefully analyze March guidance and third party data for any evidence that ASP momentum is shifting against Apple.[6]

---

[4] "Weak iPhone Sales Result in $7B Shortfall to Q1/F'19 Guidance; Lowering Estimates and PT to $190," Canaccord Genuity, January 2, 2019, p. 2.
[5] "China Fears Realized, Apple Warns," Cross Research, January 2, 2019, p. 2.
[6] "FQ1'19 Negative Pre-announcement as EM/China Demand Environment Remains Weak," Goldman Sachs, January 2, 2019, pp. 1–3.

Highly Confidential

# Exhibit 2A
# Selected Analyst Commentary on
# Weaker Upgrade Cycle
# January 2, 2019 – January 9, 2019

**KeyBanc (January 2, 2019)**

**Pricing elasticity and commoditization of hardware are likely larger problems for iPhone than macroeconomics**.  Apple appears likely to report a high teens y/y decline in iPhone unit sales in F1Q (Dec.).  While Apple suggested weak China sales as a significant contributor, we believe aggressive price increases and limited functional differentiation in new models are driving elongated holding periods and trade down activity across several geographies.  We see little to change this in the medium term, which suggests a likelihood for soft iPhone results to persist. … **Updated F1Q Guidance Suggests More Issues Than Just China** … While the deterioration in U.S.-China relations clearly contributed to the weakness in F1Q, we believe the results also reflect a lack of incremental iPhone pricing power on a global basis, commoditization of iPhone hardware, and App Store monetization that is likely near a medium-term peak.  This is a damaging combination of factors that has no simple fix, in our view, and seems unlikely to moderate in the foreseeable future.[7]

**Nomura (January 2, 2019)**

**Partly structural, partly cyclical.**  Apple noted fewer carrier subsidies and reduced battery replacement pricing.  These seem but a half step away from recognizing ASPs are structurally too high.  Conversely, trade tensions, product boycotts, and even macro concerns all seem cyclical.[8]

**RBC (January 2, 2019)**

The incremental challenges were related to: a) Greater China: Accounted for much of the revenue shortfall (~$7B) and all the y/y revenue decline (5%) was driven by China softness; b) some developed countries saw weaker than expected iPhone upgrades happen; & c) GM's are towards the low-end of guide and surprisingly OPEX remained at $8.7B.[9]

---

[7] "APPL:  Guidance Revision Suggests More Issues than Just China," KeyBanc, January 2, 2019, pp. 1–2, emphasis in original.
[8] "Bear in a China Shop:  Severe iPhone Miss Partially Offset by Other Units," Nomura, January 2, 2019, p. 1, emphasis in original.
[9] "From China with Love," RBC, January 2, 2019, p. 1.

**Highly Confidential**

# Exhibit 2A
# Selected Analyst Commentary on
# Weaker Upgrade Cycle
# January 2, 2019 – January 9, 2019

## Wells Fargo (January 2, 2019)

**REITERATED NEGATIVE VARIABLES:** Apple reiterated anticipated negative impacts in F1Q19 … **(2)** FX headwinds resulting in a -200bps y/y impact on y/y revenue growth; we would assume an as expected ~90bps neg. impact on GM%.[10]

## Argus Research (January 3, 2019)

CEO Tim Cook said that lower-than-expected revenue was primarily attributable to China, while also acknowledging that upgrades to new iPhones were not as strong as anticipated in other markets. … The fourth anticipated headwind turned out to be much stiffer than anticipated. Economic weakness in emerging markets exceeded expectations and contributed, along with other factors, to fewer iPhone upgrades than initially anticipated. …While China and some other emerging markets accounted for the 'vast majority' of the decline in iPhone sales, iPhone upgrades in some developed markets also failed to meet Apple's targets.  In addition to the worsening global economic climate, Apple pointed to other factors impacting developed-market upgrades including fewer carrier subsidies, U.S. dollar strength, and a battery replacement program that has likely extended the life of older phones.

…

Other anticipated headwinds were also in line with expectations.  U.S. dollar strength pushed up iPhone prices in numerous overseas markets, and the company experienced an as-anticipated 200-basis-point hit to annual revenue growth.  Also, Apple knew it had to ramp an 'unprecedented number' of new products in 1Q19, leading it to expect supply constraints that would 'gate' overall revenue growth.  In addition to the new iPhones, new products such as the Apple Watch Series 4 and the new iPad Pro were constrained for much or all of the quarter, while AirPods and MacBook Air were partly constrained.[11]

## Atlantic Equities (January 3, 2019)

**Apple lowered its Q1 revenue guidance to ~$84bn from $89-$93bn - implying an EPS of ~$4.16 vs $4.45-$4.78 previously – with the company citing macro weakness in China and lower iPhone replacement activity as the main reasons for the shortfall.  While the former should ultimately prove transitory, the latter appears more structural, reflecting both the**

---

[10] "AAPL:  Neg. F1Q19 Prean. – iPhone Rev. -15% + Y/Y; A Multi-Quarter Challenge," Wells Fargo, January 2, 2019, p. 1, emphasis in original.
[11] "Analyst's Notes," Argus Research, January 3, 2019, pp. 1–3.

Highly Confidential

# Exhibit 2A
# Selected Analyst Commentary on
# Weaker Upgrade Cycle
# January 2, 2019 – January 9, 2019

**mature nature of the smartphone market and Apple potentially having reached the limits of its pricing power.**

…

Even excluding China, the revised guidance implies flattish revenue YoY, indicating broader problems for the company.  The new outlook implies iPhone revenue down ~15% YoY (~$9bn), which we estimate implies a ~10m YoY fall in units to ~67m.  The company cited lower channel fill, fewer carrier subsidies, FX-related price increases and uptake of the battery replacement programme as factors impacting unit shipments.  However, we believe a combination of the maturing smartphone market, declining perceived innovation and the premium pricing of the new handsets all also contributed to the decline.  Of these, the latter is most troubling as it suggests Apple may have less pricing power in its iPhone franchise than had been perceived several months ago.[12]


### Baird (January 3, 2019)

**Greater China headwinds.**  Apple attributed most of the FQ1 shortfall and YOY revenue decline to softer China demand, which it attributed to slowing GDP and U.S. trade tensions, along with broader macro and Fx pressures in many emerging markets.  It appears Greater China revenue declined roughly 30% more YOY. … Apple also called out lower iPhone upgrades globally due to fewer carrier subsidies, price increases and iPhone battery replacement programs.[13]


### Bernstein (January 3, 2019)

**Perhaps in part because there are no easy fixes, Apple failed to acknowledge the possibility that current iPhone prices are simply too high (stunningly, we note that iPhones prices are nearly 5x higher than the average non-Apple smartphone sold globally).**  Moreover, we believe that the high-end smartphone market is fully mature with \*structurally\* elongating replacement cycles, which we maintain is the company's key long-term challenge.

…

---

[12] "Q1 Guidance Cut Highlights Structural Challenges," Atlantic Equities, January 3, 2019, p. 1, emphasis in original.
[13] "China Weak, But Still Positive on Broader Eco-System," Baird, January 3, 2019, p. 1, emphasis in original.

**Highly Confidential**

# Exhibit 2A
# Selected Analyst Commentary on
# Weaker Upgrade Cycle
# January 2, 2019 – January 9, 2019

While Apple attributed its miss to greater than expected economic weakness in emerging markets, it also highlighted that it experienced fewer iPhone upgrades due to less carrier subsidies, US dollar strength, and lower priced battery replacements.

The other real issue that Apple's press release did not mention explicitly is that the high-end smartphone market is increasingly mature (having declined for 3 straight years – Exhibit 7) and the overall market contracted for the first time in 2018 (Exhibit 8). Perhaps more importantly, we believe that replacement cycles are elongating. In recent conversations, Apple executives have conceded that they believe replacement cycles have elongated perhaps 3 to 4 months over the past few years, but that average replacement cycles for new iPhones remain under three years. We worry that the combination of increasing prices and limited new functionality lead to further elongation in replacement cycles over time, akin to what we have seen with PCs over the last 6 years.[14]

## Cleveland Research (January 3, 2019)

**iPhone notably weak[.]** Lower than anticipated sales in Greater China[.] Weaker iPhone accounts for all of rev shortfall vs. guidance[.] Other emerging market iPhone upgrades also weak; customers using devices longer (lower subsidy), US dollar strength related price increases, and iPhone battery replacements option at lower price[.][15]

## D.A. Davidson (January 3, 2019)

The company's management pointed to numerous issues including: 1) the ongoing trade war, 2) a slowdown in China, and 3) slower than expected upgrades. While the macro issues could drag on in the near future, we expect China, in particular, to be a strong market over time. However, until that time, we believe Apple must continue to traverse the tightrope, which should remain difficult.[16]

## Daiwa (January 3, 2019)

**iPhone cuts.** Apple pointed to Greater China, but also other emerging markets for 'the vast majority of the y/y iPhone revenue decline'. We move our 1Q19 unit growth to down 15% y/y,

---

[14] "AAPL: Yes, Apple Pre-Announced… Our Key Take-aways and What to Do Now," Bernstein, January 3, 2019, pp. 1–3, emphasis in original.
[15] "AAPL: Negative Pre-Announce on Weak China and Soft iPhone (Cleveland Research)," Cleveland Research, January 3, 2019, p. 2, emphasis in original.
[16] "Walking the Tightrope; BUY," D.A. Davidson, January 3, 2019, p. 1.

**Highly Confidential**

# Exhibit 2A
# Selected Analyst Commentary on
# Weaker Upgrade Cycle
# January 2, 2019 – January 9, 2019

65.9m units, from prior 76.2m, was -2% y/y.  For FY19 we move to 189m down 13%, from 214m down 2%.  With gross margins holding at 38%, we believe that the strong ASP's Apple has been delivering held.  Other iPhone issues Apple pointed to included less carrier subsidies, less upgrades as consumers opted to take advantage of the lower battery replacement offer.  1Q19 to be reported on 1/29/19.[17]


**FBN (January 3, 2019)**

**Stated factors that came in line with expectations.**  The following stated factors, which contributed to weaker revenue growth, played out roughly in line with expectations: … **Strong US dollar.**  The strong US dollar created a revenue headwind of ~200bp Y/Y.[18]


**JP Morgan (January 3, 2019)**

Apple's iPhone shipment volumes continued to be challenged by the worsening macro weakness in emerging markets (particularly China), and by elongating replacement cycles in developed markets, the combination of which led to a substantial -8% revision to F1Q19 (Dec-end) revenue guidance.  The guidance revision follows an already disappointing F1Q19 revenue guide issued in early November.

…

**Retain Overweight rating focusing on Services transformation, while looking past iPhone volume challenges largely led by cyclical drivers.**  Apple had already embedded various cyclical headwinds, including iPhone launch timing, adverse FX impact (estimated to be 200 bps), and supply chain constraints (for Airpods, Apple Watch, and iPad Pro) in the softer guidance issued in early November.  However, headwinds from the economic weakness in EMs drove incremental cyclical weakness, in addition to a structural driver in elongating replacement cycle for iPhones in the developed markets — led in our view by robustness of the product and success of the battery replacement plan, both of which are positive for the firm long-term, while proving painful near-term.[19]

---

[17] "iPhone Sales Materially Disappoint, China a Problem," Daiwa, January 3, 2019, p. 1, emphasis in original.

[18] "AAPL:  Large Deceleration in Sales to China, But Large Stock Decline Creates Value – Lowering PT to $190," FBN, January 3, 2019, p. 1, emphasis in original.

[19] "iPhone Volume Woes Continue on Cyclical Headwinds; Remain OW on Services Transformation & Leverage of Installed Base," JP Morgan, January 3, 2019, p. 1, emphasis in original.

**Highly Confidential**

# Exhibit 2A
# Selected Analyst Commentary on
# Weaker Upgrade Cycle
# January 2, 2019 – January 9, 2019

### Loop Capital (January 3, 2019)

AAPL saw iPhone upgrades softer than anticipated in certain developed markets.  Contributors included an impact from higher ASP iPhone X, US dollar strength-related price increases, and customers taking advantage of significantly reduced pricing for iPhone battery replacements.[20]

### Morgan Stanley (January 3, 2019)

In early December, we lowered FY19 iPhone shipments by 13M (or 6%) - from 213M to 200M - baking in a 6 month longer replacement cycle in China.  But the combination of an even weaker China and continued replacement cycle lengthening in developed markets that are digesting lower subsidies and cheaper battery upgrades lead us to take FY19 iPhone units down by another 20M, to 180.25M or -17% Y/Y.[21]

### Morningstar (January 3, 2019)

We believe the current headwinds experienced by Apple in China and lack of growth in other regions are consistent with our view that replacement cycles are lengthening in the face of higher priced flagships.  We don't believe the weakness is due to a significant number of users switching to Android-based phones, although we believe recent events have validated our moat trend downgrade from positive to stable in mid-2018, stemming from our view that Apple's narrow moat derived from switching costs and intangible assets are intact, but no longer strengthening.[22]

### Piper Sandler (January 3, 2019)

The lowered expectations are largely due to weaker than anticipated iPhone sales in Greater China, as well as several emerging markets.  China macro weakness was specifically highlighted as a primary reason for the miss, with that weakness being exacerbated by trade tensions with the U.S. and the stronger U.S. Dollar, among other factors.[23]

---

[20] "Downgrading to Hold as iPhone Visibility Again Brings Valuation into Question," Loop Capital, January 3, 2019, p. 1.
[21] "Weak China More than Offsets Revenue Strength Outside of iPhone; Lowering Estimates," Morgan Stanley, January 3, 2019, p. 1.
[22] "Apple's 1Q Headwinds Look Menacing; Longer-Term Outlook Remains Bright Thanks to Service," Morningstar, January 3, 2019, p. 2.
[23] "Dec Qtr Pre-Release Largely Due to China Weakness; Maintain OW, But PT to $187," Piper Sandler, January 3, 2019, p. 1.

Highly Confidential

# Exhibit 2A
# Selected Analyst Commentary on
# Weaker Upgrade Cycle
# January 2, 2019 – January 9, 2019

**Raymond James (January 3, 2019)**

While currency, component constraints, and timing of the new products launches represented headwinds in the quarter, management indicated these factors were all broadly consistent with expectations.[24]

**RBC (January 3, 2019)**

The incremental challenges were related to: … b) some developed countries saw weaker than expected iPhone upgrades … While we do think elongating replacement cycles are a key issue here broadly, there is a notable drop in China revenues that could have implications for companies with high China exposure.[25]

**UBS (January 3, 2019)**

**Q:  How would iPhone Perform in F19?**  We forecast iPhone revenue to decline 12% in F19 driven by roughly 15% decline in units partially offset by 5% growth in ASPs.  Macro uncertainties are impacting demand in emerging markets and developed markets are seeing elongating replacement cycle due to lower carrier subsidies and battery replacements.  High retention rates would ultimately lead to upgrades.[26]

**Wolfe (January 3, 2019)**

The surprises were (1) soft China hardware demand as economic slowing and trade tensions impacted consumers, and (2) upgrades not as strong as expected, likely because of fewer subsidies, currency-driven price increases, and battery replacements.[27]

---

[24] "iPhone >> Services; Cutting Estimates on Significant iPhone Miss – AAPL, AVGO, QRVO, SWKS," Raymond James, January 3, 2019, p. 1.
[25] "IT Hardware/Semis:  Apple Fallout – Sizing Up China," RBC, January 3, 2019.
[26] "Services Good, But China Headwinds Intensifying; Cutting Target on Negative Pre," UBS, January 3, 2019, p. 2, emphasis in original.
[27] "Negative Preannouncement Due to Weak China and Light Upgrade Demand; Maintain Peer Perform Rating," Wolfe, January 3, 2019, p. 1.

**Highly Confidential**

# Exhibit 2B
# Selected Analyst Commentary on
# Global iPhone Pricing Power and Price Concerns
# January 2, 2019 – January 9, 2019

**KeyBanc (January 2, 2019)**

While the deterioration in U.S.-China relations clearly contributed to the weakness in F1Q, we believe the results also reflect a lack of incremental iPhone pricing power on a global basis, commoditization of iPhone hardware, and App Store monetization that is likely near a medium-term peak.  This is a damaging combination of factors that has no simple fix, in our view, and seems unlikely to moderate in the foreseeable future.[28]

**Nomura (January 2, 2019)**

**Partly structural, partly cyclical**.  Apple noted fewer carrier subsidies and reduced battery replacement pricing.  These seem but a half step away from recognizing ASPs are structurally too high.  Conversely, trade tensions, product boycotts, and even macro concerns all seem cyclical.[29]

**Atlantic Equities (January 3, 2019)**

Even excluding China, the revised guidance implies flattish revenue YoY, indicating broader problems for the company. … The company cited lower channel fill, fewer carrier subsidies, FX-related price increases and uptake of the battery replacement programme as factors impacting unit shipments.  However, we believe a combination of the maturing smartphone market, declining perceived innovation and the premium pricing of the new handsets all also contributed to the decline.  Of these, the latter is most troubling as it suggests Apple may have less pricing power in its iPhone franchise than had been perceived several months ago.[30]

---

[28] "APPL:  Guidance Revision Suggests More Issues than Just China," KeyBanc, January 2, 2019, p. 2.
[29] "Bear in a China Shop:  Severe iPhone Miss Partially Offset by Other Units," Nomura, January 2, 2019, p. 1, emphasis in original.
[30] "Q1 Guidance Cut Highlights Structural Challenges," Atlantic Equities, January 3, 2019, p. 1.

Highly Confidential

# Exhibit 2B
# Selected Analyst Commentary on
# Global iPhone Pricing Power and Price Concerns
# January 2, 2019 – January 9, 2019

**Bernstein (January 3, 2019)**

**Perhaps in part because there are no easy fixes, Apple failed to acknowledge the possibility that current iPhone prices are simply too high (stunningly, we note that iPhones prices are nearly 5x higher than the average non-Apple smartphone sold globally).**  Moreover, we believe that the high-end smartphone market is fully mature with *structurally* elongating replacement cycles, which we maintain is the company's key long-term challenge. … Surprisingly, the company did not acknowledge the possibility that iPhone prices have simply become too expensive, and that the company may have misjudged elasticity of demand. … The fact that Apple didn't raise the issue of price in its pre-announcement letter maybe a reflection of the fact that there is no easy solution to the problem.[31]

**FBN (January 3, 2019)**

**Unstated reasons for the miss**.  In addition to the factors noted above, we believe that the following factors also played a role in the miss:  Share loss in China.  China has been losing share in China to Huawei Oppo, Vivo, and Xiaomi (all private). … **Nationalism in China.**  We believe that Chinese consumers may be getting irritated by recent trade battles initiated by the Trump administration and are deciding to buy from local manufacturers.  High-priced iPhones mismatch vs. consumer purchasing power in emerging markets.  AAPL's iPhone ASP, which hit $790 last quarter, are priced too high for many consumers in emerging markets.[32]

**Rosenblatt (January 3, 2019)**

In addition to China weakness, we believe product pricing may be another reason other markets are not seeing much growth.[33]

---

[31] "AAPL:  Yes, Apple Pre-Announced… Our Key Take-aways and What to Do Now," Bernstein, January 3, 2019, pp. 1, 3, emphasis in original.
[32] "AAPL:  Large Deceleration In Sales to China, But Large Stock Decline Creates Value – Lowering PT to $190," FBN, January 3, 2019, p. 1, emphasis in original.
[33] "Apple Trims Down Q1 Guidance, More Headwinds Expected in March Quarter," Rosenblatt, January 3, 2019, p. 1.

Highly Confidential

# Exhibit 2B
# Selected Analyst Commentary on
# Global iPhone Pricing Power and Price Concerns
# January 2, 2019 – January 9, 2019

## Wedbush (January 3, 2019)

Herein lies the quagmire for Apple and Cook going forward, continue to steer ahead with no pricing changes and hope future iPhone designs will catalyze upgrades OR take the medicine now and significantly cut prices ahead of the next iPhone cycle in the September timeframe to stimulate demand with China front and center.[34]

## Goldman Sachs (January 4, 2019)

Apple maintained its SP unit share on a Y/Y basis in Q3'18 at ~12%, but our iPhone estimates for CQ4 imply ~3.2pp of share loss Y/Y.  Note that Apple may not be losing share in its target high end market but rather that whole market is likely ceding share to lower priced phones in places like China where consumer demand is weak.[35]

---

[34] "Apple's Darkest Day in the iPhone Era; Massive Negative Dec Results on China," Wedbush, January 3, 2019, p. 1.
[35] "Technology:  Hardware:  Smartphone Model Update:  Reducing Estimates as EMs Including China Continue to Falter," Goldman Sachs, January 4, 2019, p. 1.

**Highly Confidential**

# Exhibit 2C
# Selected Analyst Commentary on
# Gross Margin at Low End of Guided Range
# January 2, 2019 – January 9, 2019

**BTIG (January 2, 2019)**

**Gross margin** of 38% was at the low end of the guided range and reflected some contraction from last year.  We cut our future gross margin estimates by 50 basis points.  Guidance on this line item given the lower revenue expectations will be critical.[36]

**Goldman Sachs (January 2, 2019)**

We also cut our gross margin estimates a touch due to the lower revenues.  Our FY'19 gross margin forecast falls by 0.3pp to 38.1%.  We also cut our EBIT margin estimates in-line with the new guidance.  As a result, our estimate for FY'19 EBIT margin falls by 1.2pp to 24.7%.[37]

**Nomura (January 2, 2019)**

**iPhone weakness, primarily in China, drove a ~$7bn miss.**  F1Q sales should be ~$84bn vs. consensus of $91bn.  Apple noted China suffers from a softening macro picture and trade tensions; an Apple boycott in support of the Huawei CFO couldn't have helped.  Other emerging markets were soft.  Finally, Apple alluded to a weaker macro and pricing in some developed markets.  We believe the weakness was primarily in the new Xs/Xr models.  The gross margin should reach 38% despite lower iPhone volumes.[38]

**RBC (January 2, 2019)**

The incremental challenges were related to: a) Greater China: Accounted for much of the revenue shortfall (~$7B) and all the y/y revenue decline (5%) was driven by China softness; b) some developed countries saw weaker than expected iPhone upgrades happen; & c) GM's are towards the low-end of guide and surprisingly OPEX remained at $8.7B.[39]

---

[36] "Cutting Apple Target as iPhones Miss by More than 12 Million," BTIG, January 2, 2019, p. 2, emphasis in original.
[37] "FQ1'19 Negative Pre-Announcement as EM/China Demand Environment Remains Weak," Goldman Sachs, January 2, 2019, p. 3.
[38] "Bear in a China Shop:  Severe iPhone Miss Partially Offset by Other Units," Nomura, January 2, 2019, p. 1, emphasis in original.
[39] "From China with Love," RBC, January 2, 2019, p. 1.

**Highly Confidential**

# Exhibit 2C
# Selected Analyst Commentary on
# Gross Margin at Low End of Guided Range
# January 2, 2019 – January 9, 2019

## Wells Fargo (January 2, 2019)

**GM% & OPEX**: Apple is guiding F1Q19 GM% at ~38% (vs. 38.0%-38.5% initial guide that included ~30bps q/q benefit from improving component costs and a -90bps FX impact; services mix a consideration) and opex at ~$8.7B (vs. $8.7-$8.8B initial guide).[40]

## Argus Research (January 3, 2019)

Apple revised its gross margin guidance to 38.0% from an initial range of 38.0%-38.5%.  It shaved its operating cost guidance to $8.7 billion from $8.7-$8.8 billion.[41]

## Baird (January 3, 2019)

**Other guidance comments.**  Gross margins lowered from 38-38.5% to 38% with opex expected at $8.7 billion vs. $8.7-8.8 billion previously.[42]

## Bernstein (January 3, 2019)

**Our analysis suggests that iPhone margins declined about ~100-150 bps YoY, reinforcing bears' concerns about the vulnerability of HW margins.**  Overall gross margins are now expected to come in at the low end (38%) of Apple's guidance range for Q1, and decline about 40 bps YoY, despite a very favorable commodity environment, stable to increasing ASPs and a mix shift to services that added about 80 bps to company GMs.  The upshot is that we estimate that iPhone margins may be down 100 to 150 bps YoY to an estimated ~37.5-38% in FY Q1, dramatically below the 50%+ level that iPhone enjoyed as recently as 2012.  Part of Apple's re-rating in 2018 was the driven by the belief that the company's services business (with its faster growth rate and higher margins) could help buoy the fortunes of the company.  While this is true to some degree, Q1's results suggest that GMs remain vulnerable to Apple's hardware business, which still amounts to 80%+ of revenues, and remains sensitive to volumes, competition, and commodity prices.[43]

---

[40] "AAPL:  Neg. F1Q19 Prean. – iPhone Rev. -15% + Y/Y; A Multi-Quarter Challenge," Wells Fargo, January 2, 2019, p. 2, emphasis in original.
[41] "Analyst's Notes," Argus Research, January 3, 2019, p. 4.
[42] "China Weak, But Still Positive on Broader Eco-System," Baird, January 3, 2019, p. 1, emphasis in original.
[43] "AAPL:  Yes, Apple Pre-Announced… Our Key Take-aways and What to Do Now," Bernstein, January 3, 2019, p. 3, emphasis in original.

Highly Confidential

# Exhibit 2C
# Selected Analyst Commentary on
# Gross Margin at Low End of Guided Range
# January 2, 2019 – January 9, 2019

**JP Morgan (January 3, 2019)**

**Lower EPS estimates by -14% and -10% for FY19 and FY20, respectively; price target goes up to $228 ($266 prior).**  Led by the combination of the lower iPhone volume shipment outlook and slightly lower margin outlook (led by weaker revenue outlook for iPhones), we are lowering our FY19 and FY20 EPS estimates by -14% and -10%, respectively.  Our out-year estimate for FY21 declines more modestly, partly on account of continued strong pace of share buybacks (Apple emphasized its target of being net cash neutral long-term) at a lower share price relative to that assumed prior driving higher earnings accretion in the out-year.[44]

**Oppenheimer (January 3, 2019)**

**What's Next?**  We believe with slowing smartphone revenue, possibly degrading ASPs, investors will start to worry about gross margins.  For example, iPhone revenue levels are similar to December 2015.  Then, service and wearable sales were half of what they are today, yet gross margins are lower by over 200 bps.  Additionally, take rates, innovations, and M&A may become dominant story lines.[45]

---

[44] "iPhone Volume Woes Continue on Cyclical Headwinds; Remain OW on Services Transformation & Leverage of Installed Base," JP Morgan, January 3, 2019, p. 2, emphasis in original.
[45] "Is This the First Crack?" Oppenheimer, January 3, 2019, p. 1, emphasis in original.

**Highly Confidential**

# Exhibit 3
# Apple Inc.
# Examples of Implied Volatilities Before and After January 3, 2019 and Resulting Impact on Option Price[1]

| | Option Type | Strike Price | Maturity | Using Dr. Feinstein's Methodology[2] | | | | | |
| | | | | Implied Volatility on 1/2/19 | Implied Volatility on 1/3/19 | Change in Implied Volatility[3] | Option Price on 1/2/19[4] | Option Price on 1/2/19 using Implied Volatility on 1/3/19[5] | Percent Change in Option Price |
|---|---|---|---|---|---|---|---|---|---|
| **By Maturity** | | | | | | | | | |
| | Call | $150 | 1/18/19 | 38.90% | 38.11% | -0.79% | $10.05 | $9.97 | -0.81% |
| | Call | $150 | 1/25/19 | 32.21% | 36.94% | 4.73% | $10.08 | $10.68 | 5.99% |
| **By Option Type** | | | | | | | | | |
| | Call | $140 | 1/18/19 | 40.33% | 42.72% | 2.39% | $18.50 | $18.61 | 0.60% |
| | Put | $140 | 1/18/19 | 44.14% | 43.19% | -0.95% | $0.61 | $0.56 | -8.06% |
| **By Strike Price** | | | | | | | | | |
| | Call | $155 | 2/15/19 | 39.10% | 37.51% | -1.59% | $10.03 | $9.69 | -3.34% |
| | Call | $190 | 2/15/19 | 34.41% | 39.78% | 5.37% | $0.53 | $0.98 | 85.31% |

Source:  Feinstein Merits Report and Backup; EXP_FEINSTEIN0000002.xlsx

Note:
[1]  These options have positive trading volume on at least one day during the Class Period.  Apple's closing stock price was $157.92 on 1/2/19 and $142.19 on 1/3/19.
[2]  Implied volatility is calculated using the inputs and methodology Dr. Feinstein employs to compute inflation dissipation caused by the alleged corrective disclosures for an example call option with a strike price of $200 and maturity date of 1/18/19 in his report.
[3]  Change in implied volatility is calculated by subtracting the option's implied volatility on 1/2/19 from its implied volatility on 1/3/19.
[4]  Option price is the mid price (the average of the bid and ask price) for the given option on 1/2/19 consistent with Dr. Feinstein's approach.
[5]  Option price is calculated using Dr. Feinstein's Binomial pricing model with implied volatility corresponding to 1/3/19 and all other input variables corresponding to 1/2/19.

**Highly Confidential**