1    JAMES N. KRAMER (SBN 154709)
     jkramer@orrick.com
2    MICHAEL D. TORPEY (SBN 79424)
     mtorpey@orrick.com
3    ALEXANDER K. TALARIDES (SBN 268068)
     atalarides@orrick.com
4    ORRICK, HERRINGTON & SUTCLIFFE LLP
     The Orrick Building
5    405 Howard Street
     San Francisco, CA  94105-2669
6    Telephone:      +1 (415) 773-5700
     Facsimile:      +1 (415) 773-5759
7
     Attorneys for Defendants Apple Inc.,
8    Timothy Cook, and Luca Maestri

9

10                   UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12                         OAKLAND DIVISION

13

14   IN RE APPLE INC. SECURITIES          Lead Case No. 4:19-cv-02033-YGR
     LITIGATION
15                                         **DEFENDANTS' OPPOSITION TO
                                           PLAINTIFF'S OMNIBUS MOTION TO
16   _____  EXCLUDE OPINION TESTIMONY OF
                                           DEFENDANTS' EXPERTS**
17   This Document Relates To:
                                           Hearing
18   ALL ACTIONS.                          Date:   TBD
                                           Time:   2:00 p.m.
19                                         Ctrm:   1, 14th Floor
                                           Judge:  Honorable Yvonne Gonzalez Rogers
20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

LEGAL STANDARD .................................................................................................... 1

ARGUMENT ................................................................................................................. 3

I.    Plaintiff's Relevancy Arguments Are Contrived and Demonstrate the Failings of Plaintiff's Case ........................................................................................................ 3

II.    Each of Defendants' Expert Opinions Are Helpful to the Trier of Fact .......................... 6

    A.    Dr. Trueman's Opinions Are Admissible in Their Entirety ................................. 6

        1.    Dr. Trueman's Evaluation of Analyst Reports is Grounded in His Extensive Experience and Helpful to the Trier of Fact ......................... 7

        2.    Dr. Trueman Accurately Characterizes Plaintiff's Claims ...................... 11

        3.    Dr. Trueman's Rebuttal Report Properly Rebuts Plaintiff's Theory of Fraud ................................................................................................... 13

    B.    Mr. Gauna's Opinions Are Admissible in Their Entirety ................................. 13

        1.    Mr. Gauna's Opinions Do Not "Distort" Plaintiff's Claims .................... 13

        2.    Mr. Gauna's Opinions Are Proper Subjects for Expert Testimony .......... 14

        3.    Mr. Gauna's Opinions Are Properly Informed by His Deep Experience as a Securities Analyst Who Covered Apple ........................................... 15

        4.    Mr. Gauna's Opinions on Public Company Disclosure Practices Are Helpful to the Trier of Fact ................................................................. 16

    C.    Dr. Yang's Opinions Are Admissible in Their Entirety ................................... 17

        1.    Dr. Yang's Opinions Are Relevant ........................................................ 18

        2.    Dr. Yang Does Not Purport to Offer Any Improper Legal Conclusions .. 18

        3.    Plaintiff's Concerns Regarding Dr. Yang's Opinions About The Arrest of Huawei's CFO Go to Weight, Not Admissibility ................................ 20

        4.    Plaintiff's Effort to Challenge Dr. Yang's Expertise and Methodology is Unavailing ..................................................................................... 20

    D.    Mr. Poer's Opinions Are Admissible in Their Entirety .................................... 21

        1.    Mr. Poer is a Qualified Expert Whose Opinions Are Helpful to the Trier of Fact ...................................................................................... 21

        2.    Plaintiff's Attacks on Mr. Poer as a Summary Witness are Premature and Unfounded ................................................................................... 24

        3.    Mr. Poer Adequately Disclosed the Information He Considered ............ 26

    E.    Dr. Grenadier's Opinions Are Admissible in Their Entirety .............................. 28

        1.    Dr. Grenadier's Rebuttal Opinions 1-3 Are Relevant and Helpful to the Trier of Fact .................................................................................. 29

        2.    Dr. Grenadier's Rebuttal of Plaintiff's Loss Causation Analysis is Admissible ........................................................................................ 30

        3.    Dr. Grenadier's Rebuttal of Plaintiff's Damages Analysis is Admissible ........................................................................................ 32

i

DEFENDANTS' OPPOSITION TO PLAINTIFF'S OMNIBUS MOTION
TO EXCLUDE OPINION TESTIMONY OF DEFENDANTS' EXPERTS
CASE NO. 4:19-CV-02033-YGR

F.    Ms. Taylor's Opinions Are Admissible in Their Entirety......................................33

CONCLUSION ............................................................................................................................35

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*In re Adobe Sys., Inc. Sec. Litig.*,
  787 F. Supp. 912 (N.D. Cal. 1992), *aff'd sub nom. Cloutier v. Adobe Sys., Inc.*,
  5 F.3d 535 (9th Cir. 1993) .................................................................................................. 8, 9

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*,
  738 F.3d 960 (9th Cir. 2013) .......................................................................................... 10

*In re Allstate Corp. Sec. Litig.*,
  2022 WL 842737 (N.D. Ill. Jan. 10, 2022) ................................................................... 31

*Apple, Inc. v. Samsung Elecs. Co. Ltd.*,
  2012 WL 3155574 (N.D. Cal. Aug. 2, 2012) ................................................................. 26

*In re Arris Cable Modem Consumer Litig.*,
  327 F.R.D. 334 (N.D. Cal. 2018) ................................................................................... 20

*Baker v. SeaWorld Entm't, Inc.*,
  423 F. Supp. 3d 878 (S.D. Cal. 2019) ................................................................... 9, 30, 31

*Biotechnology Valve Fund, L.P. v. Celera Corp.*,
  2015 WL 138168 (N.D. Cal. Jan. 9, 2015) ..................................................................... 8

*BP Prods. N. Am., Inc. v. Grand Petroleum, Inc.*,
  2021 WL 4482138 (N.D. Cal. Sept. 30, 2021) .............................................................. 19

*Brown v. Wal-Mart Store, Inc.*,
  2018 WL 2011935 (N.D. Cal. Apr. 27, 2018) ............................................................... 27

*Buffin v. City & Cnty. of San Francisco*,
  2019 WL 1017537 (N.D. Cal. Mar. 4, 2019) ................................................................. 25

*California v. Kinder Morgan Energy Partners, LP*,
  613 F. App'x 561 (9th Cir. 2015) .................................................................................. 29

*Canava v. Rail Delivery Serv. Inc.*,
  2021 WL 5445977 (C.D. Cal. Aug. 27, 2021) ............................................................... 25

*Chamberlain v. Hartog, Baer & Hand, APC*,
  2022 WL 526157 (N.D. Cal. Feb. 22, 2022) ................................................................. 19

*In re ConAgra Foods, Inc.*,
  302 F.R.D. 537 (C.D. Cal. 2014) .............................................................................. 19, 21

*Cooper v. Brown*,
  510 F.3d 870 (9th Cir. 2007) ..................................................................................... 2, 22

*In re Cryolife, Inc. Sec. Litig.,*
    2005 WL 8155579 (N.D. Ga. June 17, 2005) ......................................................................... 19

*CZ Servs., Inc. v. Express Scripts Holding Co.,*
    2020 WL 4518978 (N.D. Cal. Aug. 5, 2020)......................................................................... 15

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) .........................................................................................................*passim*

*In re Dig. Music Antitrust Litig.,*
    321 F.R.D. 64 (S.D.N.Y. 2017) ......................................................................................... 32

*Elosu v. Middlefork Ranch Inc.,*
    26 F.4th 1017 (9th Cir. 2022) ..........................................................................................*passim*

*Eng. v. D.C.,*
    651 F.3d 1 (D.C. Cir. 2011) ............................................................................................... 27

*Ferrari Club of Am., Inc. v. Bourdage,*
    2017 WL 1498080 (W.D.N.Y. Apr. 25, 2017) ................................................................. 25

*General Electric Company v. Joiner,*
    522 U.S. 136 (1997).............................................................................................................. 8

*Gillespie v. Sears, Roebuck & Co.,*
    386 F.3d 21 (1st Cir. 2004) ............................................................................................... 27

*Graystone Funding Co., LLC v. Network Funding, L.P.,*
    2022 WL 1063734 (D. Utah Apr. 8, 2022) ....................................................................... 34

*Grouse River Outfitters Ltd. v. Oracle Corp.,*
    2019 WL 8752335 (N.D. Cal. Feb. 19, 2019) ............................................................ 23, 28

*Hangarter v. Provident Life & Acc. Ins. Co.,*
    373 F.3d 998 (9th Cir. 2004).................................................................................. 1, 2, 8, 22

*Hausknecht v. John Hancock Life Ins. Co. of New York,*
    2022 WL 1664362 (E.D. Pa. May 25, 2022) ................................................................... 24

*Inline Connection Corp. v. AOL Time Warner Inc.,*
    470 F. Supp. 2d 435 (D. Del. 2007) ................................................................................. 26

*Kumho Tire Co. Ltd. v. Carmichael,*
    526 U.S. 137 (1999)............................................................................................................. 2

*In Re Lamictal Direct Purchaser Antitrust Litig.,*
    2018 WL 11413414 (D.N.J. Sept. 20, 2018) ................................................................... 27

*Lewert v. Boiron, Inc.,*
    212 F. Supp. 3d 917 (C.D. Cal. 2016), *aff'd*, 742 F. App'x 282 (9th Cir. 2018).................. 23

*Lloyd v. CVB Fin. Corp.*,
　811 F.3d 1200 (9th Cir. 2016)............................................................................. 30

*Manion v. Ameri-Can Freight Sys. Inc.*,
　2019 WL 3858415 (D. Ariz. Aug. 16, 2019).................................................. 29, 30

*Matrixx Initiatives, Inc. v. Siracusano*,
　563 U.S. 27 (2011)............................................................................................ 30

*Messick v. Novartis Pharms. Corp.*,
　747 F.3d 1193 (9th Cir. 2014)................................................................. 2, 4, 14, 22

*Microsoft Corp. v. Motorola, Inc.*,
　2013 WL 4008822 (W.D. Wash. Aug. 5, 2013) ................................................ 20

*Murphy v. Precision Castparts Corp.*,
　2020 WL 4040827 (D. Or. July 17, 2020) ........................................................ 10

*Nash-Perry v. City of Bakersfield*,
　2022 WL 3357516 (E.D. Cal. Aug. 15, 2022) ................................................... 17

*Nature's Plus Nordic A/S v. Nat. Organics, Inc.*,
　982 F. Supp. 2d 237 (E.D.N.Y. 2013) .............................................................. 34

*Otto v. LeMahieu*,
　2021 WL 1615311 (N.D. Cal. Apr. 26, 2021) ................................................... 16

*Perez v. Rash Curtis & Assocs.*,
　2019 WL 1491694 (N.D. Cal. Apr. 4, 2019) ...................................................... 1

*Primiano v. Cook*,
　598 F.3d 558 (9th Cir. 2010).............................................................................. 2

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,
　752 F.3d 807 (9th Cir. 2014)............................................................................. 23

*In re REMEC Inc. Sec. Litig.*,
　702 F. Supp. 2d 1202 (S.D. Cal. 2010) ......................................................... 29, 33

*S.E.C. v. Manouchehr Moshayedi*,
　2013 WL 12129282 (C.D. Cal. Nov. 20, 2013)........................................... 9, 15, 17

*Scott v. Ross*,
　140 F.3d 1275 (9th Cir. 1998)............................................................................ 26

*SEC v. Dunn*,
　2012 WL 475653 (D. Nev. Feb. 14, 2012) ........................................................ 10

*Shirar v. Guerrero*,
　2017 WL 6001270 (C.D. Cal. Aug. 2, 2017)....................................................... 9

*In re Silicone Gel Breast Implants Prod. Liab. Litig.*,
   318 F. Supp. 2d 879 (C.D. Cal. 2004) ............................................................. 23

*Smilovits v. First Solar, Inc.*,
   2019 WL 6875492 (D. Ariz. Dec. 17, 2019) ............................................*passim*

*Smilovits v. First Solar, Inc.*,
   2019 WL 7282026 (D. Ariz. Dec. 27, 2019) ..................................................... 28

*Stathakos v. Columbia Sportswear Co.*,
   2017 WL 1957063 (N.D. Cal. May 11, 2017) .........................................2, 15, 17

*In re Stratosphere Corp. Sec. Litig.*,
   66 F. Supp. 2d 1182 (D. Nev. 1999) .................................................................. 9

*In re Twitter, Inc. Sec. Litig.*,
   2020 WL 9073168 (N.D. Cal. Apr. 20, 2020) ...................................8, 9, 15, 16

*United States v. Baker*,
   10 F.3d 1374 (9th Cir. 1993) ............................................................................ 26

*United States v. Cervantes*,
   2016 WL 491599 (N.D. Cal. Feb. 9, 2016) ..................................................... 26

*United States v. Diaz*,
   876 F.3d 1194 (9th Cir. 2017) ................................................................... 15, 19

*United States v. Hankey*,
   203 F.3d 1160 (9th Cir. 2000) .................................................... 2, 8, 16, 21

*United States v. Pree*,
   408 F.3d 855 (7th Cir. 2005) ............................................................................ 26

*United States v. Rizk*,
   660 F.3d 1125 (9th Cir. 2011) .......................................................................... 24

*United States v. Singh*,
   2017 WL 4700042 (E.D. Cal. Oct. 19, 2017), *aff'd sub nom. United States v.
   Sharma*, 851 F. App'x 708 (9th Cir. 2021) ................................................... 24

*Ward v. Carnival Corp.*,
   2019 WL 1228063 (S.D. Fla. Mar. 14, 2019) ................................................. 28

*In re Yasmin & YAZ (Drospirenone) Mktg., Sales Pracs. & Prod. Liab. Litig.*,
   2011 WL 6302573 (S.D. Ill. Dec. 16, 2011) ................................................... 25

**Rules**

Fed. R. Civ. P.
Rule 26 ........................................................................................................................ 27
Rule 26(a)(2)(D)(ii) ..................................................................................................... 28

Fed. R. Evid.
Rule 702 ................................................................................................................ *passim*
Rule 703 ........................................................................................................................ 26
Rule 1006 ............................................................................................................... 24, 26

1

**INTRODUCTION**

2      Plaintiff's Motion asks the Court to preemptively exclude *every single opinion* offered by

3 each of Defendants' six expert witnesses in each of their nine separate expert reports.  The Court

4 should reject this unfounded and overreaching request.

5      Plaintiff's attack on Defendants' experts is premised primarily on Plaintiff's view that the

6 experts' "analysis and testimony [are] built upon a fundamental distortion of Plaintiff's

7 allegations," and therefore are not relevant to the "actual facts of *this* case."  *See* Mot. at 5-6.  But

8 Plaintiff's claim that Defendants are "distorting" its allegations is easily refuted.  As explained

9 herein, Defendants' experts offer opinions that are directly relevant to the key elements of

10 Plaintiff's claims—including falsity, scienter, and loss causation.  Had Plaintiff bothered to

11 depose a single one of Defendants' experts—instead of scheduling and then cancelling each

12 deposition at the last minute—it might have better understood the plain relevance of Defendants'

13 experts' opinions.

14      Plaintiff fares no better with its remaining arguments.  The Motion's numerous,

15 scattershot attacks go largely to the weight to be afforded to Defendants' expert testimony, not its

16 admissibility.  Plaintiff may disagree with the opinions of Defendants' experts, and may probe

17 those opinions through cross-examination at trial, but Plaintiff has not shown that any of those

18 opinions, let alone all of them, should be excluded before trial even begins.

19      Defendants respectfully request that the Court deny Plaintiff's Motion in its entirety.

20

**LEGAL STANDARD**

21      Under Federal Rule of Evidence 702, "[a]n expert should be permitted to testify if the

22 proponent demonstrates that: (i) the expert is qualified; (ii) the evidence is relevant to the suit;

23 and (iii) the evidence is reliable."  *Perez v. Rash Curtis & Assocs.*, 2019 WL 1491694, at *3

24 (N.D. Cal. Apr. 4, 2019) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-90

25 (1993)).  An expert witness may be qualified by "knowledge, skill, experience, training, or

26 education."  Fed. R. Evid. 702.  FRE 702 "contemplates a *broad conception* of expert

27 qualifications" which requires just a "*minimal foundation* of knowledge, skill, and experience" in

28 order to give expert testimony.  *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015

1     (9th Cir. 2004).[1]

2        Likewise, "[t]he relevancy bar is low, demanding only that the evidence 'logically

3 advances a material aspect of the proposing party's case.'" *Messick v. Novartis Pharms. Corp.*,

4 747 F.3d 1193, 1196 (9th Cir. 2014); *see also Stathakos v. Columbia Sportswear Co.*, 2017 WL

5 1957063, at *4 (N.D. Cal. May 11, 2017) ("The standard for relevance is not high"). "Expert

6 opinion testimony is relevant if the knowledge underlying it has a valid connection to the

7 pertinent inquiry." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). "Encompassed in the

8 determination of whether expert testimony is relevant is whether it is helpful to the jury, which is

9 the 'central concern' of Rule 702." *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007).

10        The reliability inquiry is "a flexible one," which asks whether an expert's testimony has "a

11 reliable basis in the knowledge and experience of his discipline." *Kumho Tire Co. Ltd. v.*

12 *Carmichael*, 526 U.S. 137, 138, 150 (1999). The court "must assess the expert's reasoning or

13 methodology, using as appropriate criteria such as testability, publication in peer-reviewed

14 literature, known or potential error rate, and general acceptance." *Elosu v. Middlefork Ranch*

15 *Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022). But these factors "are not applicable to [the] kind of

16 testimony[] whose reliability depends heavily on the knowledge and experience of the expert,

17 rather than the methodology or theory behind it." *United States v. Hankey*, 203 F.3d 1160, 1169

18 (9th Cir. 2000). "In certain fields, experience is the predominant, if not sole, basis for a great deal

19 of reliable expert testimony." *Hangarter*, 373 F.3d at 1015.

20        "Although a district court may screen an expert opinion for reliability, and may reject

21 testimony that is wholly speculative, it may not weigh the expert's conclusions or assume a

22 factfinding role." *Elosu*, 26 F.4th at 1020. Ultimately, the court is "a gatekeeper, not a fact

23 finder." *Primiano*, 598 F.3d at 568. Accordingly, "the district court is not tasked with deciding

24 whether the expert is right or wrong, just whether his testimony has substance such that it would

25 be helpful to a jury." *Elosu*, 26 F.4th at 1024. "Challenges that go to the weight of the evidence

26 are within the province of a fact finder, not a trial court judge," and should be undertaken "by

27

28      ───────────────
[1] Citations and internal quotation marks and brackets are omitted and emphasis is in the original unless otherwise noted.

1   cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.*

2                                    **ARGUMENT**

3   **I.   PLAINTIFF'S RELEVANCY ARGUMENTS ARE CONTRIVED AND DEMONSTRATE THE
         FAILINGS OF PLAINTIFF'S CASE**

4

5          The Motion seeks to exclude the opinions of Defendants' experts because, according to

6   Plaintiff, their "analysis and testimony [are] built upon a fundamental distortion of Plaintiff's

7   allegations," and therefore are not relevant to the "actual facts of *this* case."  Mot. at 5-6 (citing

8   FRE 702).    But Plaintiff's claim that Defendants are "distorting" its allegations is easily

9   disproven, and effectively betrays *Plaintiff*'s effort to escape (or obscure) allegations that

10  discovery has revealed to be without merit.  As the Motion reveals, Plaintiff is now trying to run

11  away from its baseless allegations in three different ways.

12         *First,* the Motion insists that "Plaintiff does not allege that [Apple's FQ1 2019][2] revenue

13  guidance was . . . knowingly false without reasonable basis," and thus the "reasonableness and

14  reliability of Apple's forecasting process has only marginal, if any, relevance to the issues in this

15  matter."  Mot. at 2.  But despite Plaintiff's recent concession that Apple's FQ1 2019 guidance is

16  not "actionable, materially false, or misleading" (*see* Dkt. No. 279 at 9), the accuracy of Apple's

17  FQ1 2019 revenue guidance remains highly relevant to Defendants' case, as evidenced by its

18  inclusion as one of the undisputed facts offered in support of Defendants' motion for summary

19  judgment (the "MSJ").  *See* Dkt. No. 293-1 at 6.

20         As the MSJ demonstrates, because Apple's FQ1 2019 guidance was issued on the same

21  day as the Challenged Statement[3] and was accurate, it (i) necessarily incorporated all of the

22  ────────────────
    [2] As used herein, FQ4 2018 refers to Apple's fourth fiscal quarter of 2018, ended September 29,
23  2018, and FQ1 2019 refers to Apple's first fiscal quarter of 2019, ended December 29, 2018.

24  [3] The "Challenged Statement" refers to the italicized language below in the context of Mr. Cook's
    answer to an analyst question on Apple's FQ4 2018 earnings conference call ("FQ4 2018 Call" or
    the "Call") held on November 1, 2018:

25          The emerging markets that we're seeing pressure in are markets like Turkey, India, Brazil,
26          Russia. These are markets where currencies have weakened over the recent period. In
            some cases, that resulted in us raising prices and those markets are not growing the way
            we would like to see. To give you a perspective in of some detail, our business in India in
27          Q4 was flat. Obviously, we would like to see that be a huge growth. Brazil was down
            somewhat compared to the previous year. And so I think, or at least the way that I see
28          these, is each one of the emerging markets has a bit of a different story, and I don't see it

internal data that Plaintiff asserts rendered the Challenged Statement misleading; (ii) proves that Apple was then on pace to meet the guidance, notwithstanding whatever "pressure" it may have been experiencing in China at the time; and (iii) proves that the deceleration in Apple's business in China that ultimately caused the guidance miss arose only after Mr. Cook made the Challenged Statement—all of which demonstrate the Challenged Statement was not false or misleading at the time it was made. *See* Dkt. No. 293 at 18. As to scienter, the accuracy of the FQ1 2019 guidance proves true the previously "compelling" inference of Defendants' "innocence" because it shows "the risks [of pressure in China] did not materialize until November and December [2018], and defendants simply underestimated their eventual impact." Dkt. No. 123 at 21; *see* Dkt. No 293 at 23. And the fact that Apple was on track to meet its FQ1 2019 revenue guidance as of November 1, 2018 also means that Plaintiff could never establish loss causation or damages, because the subsequent revenue shortfall to guidance was necessarily the result of other intervening causes. *See* Dkt. No. 293 at 18.

In short, whether Plaintiff concedes the accuracy of Apple's FQ1 2019 revenue guidance or not,[4] the fact of its accuracy "logically advance[s] a material aspect" of Defendants' case, and thus satisfies the "low" bar for establishing relevance. *See Messick,* 747 F.3d at 1196 (citing *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995)).

*Second*, the Motion insists that Plaintiff "does not allege that [Mr. Cook] provided an intra-quarter update" about Apple's business in China. Mot. at 14. But as the Court previously recognized, the central question of this case is whether Mr. Cook's November 1, 2018 Challenged Statement "was referring to [Apple's] previous quarter," as Defendants maintain, or to "the [then] present tense," meaning one month into Apple's FQ1 2019, as Plaintiff alleges. Dkt. No. 123 at 8. At the pleading stage, the Court found that Plaintiff had plausibly alleged that Mr. Cook said

---

as some sort of issue that is common between those for the most part. In relation to China specifically, *I would not put China in that category.* Our business in China was very strong last quarter. We grew 16%, which we're very happy with. iPhone in particular was very strong, very strong double-digit growth there. Our other products category was also stronger, in fact, a bit stronger than even the overall company number.

[4] Defendants note that the Motion hedges its bets in this regard, stating that Plaintiff "does not allege that the 1Q19 revenue guidance was . . . knowingly false without reasonable basis, *though it appears that may have been the case*." Mot. at 2 (emphasis added).

1    "Apple was not experiencing pressure in China" as of November 1, 2018.  *Id.* at 9.

2          Though Plaintiff did not depose Mr. Cook about the substance of the Challenged

3    Statement, Plaintiff has consistently alleged Mr. Cook was discussing intra-quarter results.  For

4    example, in Plaintiff's verified interrogatory responses, it claims Mr. Cook "purported to provide

5    investors with the *current state* of the Company's business" as of November 1, 2018, "including

6    but not limited to the *current impact*, if any, of ongoing deceleration in emerging markets

7    including Greater China."  *See* Ex. A at 4 (emphasis added).[5]  Even the Motion itself repeatedly

8    asserts that "Defendants misrepresented the *current state* of Apple's performance . . . *specifically*

9    *as of November 1, 2018*" (Mot. at 24) (emphasis added), and admits that "Plaintiff alleges that *as*

10   *of November 1, 2018*, Defendants knew but failed to disclose material facts concerning conditions

11   in China" (*id.* at 9) (emphasis added).

12         To the extent Plaintiff is no longer alleging that Mr. Cook provided an intra-quarter update

13   about Apple's business in China as of November 1, 2018 (*id.* at 13-14), that would operate as an

14   admission that "Cook's version of his story" was true, and he was, in fact, referencing Apple's

15   historical results for FQ4 2018, the "accuracy of [which are] not at issue."  *Id.* at 6-7, n.9.  In

16   other words, if Plaintiff is no longer alleging that Mr. Cook provided an intra-quarter update, the

17   case must be dismissed, because Plaintiff concedes there was no misstatement.  Indeed, the *only*

18   way Plaintiff can maintain its claim is by continuing to assert, as it has throughout this litigation,

19   that Mr. Cook misrepresented Apple's intra-quarter business results as of November 1, 2018, in

20   which case the opinions of Defendants' experts regarding the substance and timing of Mr. Cook's

21   statement are unquestionably relevant to this dispute.

22         *Third*, the Motion insists that "Plaintiff does not allege Cook said 'there was no pressure

23   or risks related to Apple's business in China.'"  *Id.* at 15.  But the Court denied Defendants'

24   motion to dismiss exactly because Plaintiff "plausibly allege[d] that Cook represented that Apple

25   was not experiencing pressure in China."  Dkt. No. 123 at 9.  Later, the Court noted that the

26   "thrust of plaintiff's complaint . . . is not merely that Cook misrepresented *how* poorly Apple was

27

28   [5] All references to Exhibits A-D are to the Declaration of James N. Kramer in Support of
     Defendants' Opposition to Plaintiff's Daubert Motion ("Kramer Decl.").

1    performing in China, but that it was, in fact, performing poorly at all."  Dkt. No. 224 at 15.

2           Plaintiff's verified interrogatory responses parrot the Court's language, and assert in no

3    uncertain terms that Cook "*specifically den[ied]* that Apple was experiencing *any deceleration or*

4    *pressure* on its business in China, and [] fail[ed] to disclose the risk of such pressure from that

5    deceleration and trade tensions in China."  Ex. A at 5 (emphasis added); s*ee also id.* at 326 ("[t]he

6    'category' within which Lead Plaintiff contends that Cook stated he would not put China is the

7    category of emerging markets where the Company was then currently experiencing deceleration

8    and pressure.").  And though the Motion now insists that "Plaintiff's theory of harm is *not* that

9    Apple allegedly misrepresented that it was not facing any 'pressure' in Greater China" (Mot. at

10   32), in other places the Motion admits that "Plaintiff alleges . . . Cook assured investors he would

11   not put China in the category of emerging markets in which Apple was experiencing negative

12   economic pressure" (*id.* at 23).

13          For whatever reason, Plaintiff is now trying to escape this core allegation of its case.[6]  But

14   Plaintiff's late-game disavowal of its theory of liability is meaningless given the plain language of

15   the Court's prior orders and Plaintiff's own verified discovery responses.   Put simply, the

16   question of whether Mr. Cook "specifically den[ied] that Apple was experiencing *any*

17   deceleration or pressure on its business in China," as Plaintiff has long asserted (*see* Ex. A at 5)

18   (emphasis added), is of central relevancy to this dispute.

19   **II.      EACH OF DEFENDANTS' EXPERT OPINIONS ARE HELPFUL TO THE TRIER OF FACT**

20           **A.      DR. TRUEMAN'S OPINIONS ARE ADMISSIBLE IN THEIR ENTIRETY**

21          Defendants' expert Brett Trueman, Ph.D., is an emeritus professor of accounting at the

22   UCLA Anderson School of Management with extensive experience in analyzing stock market

23   analyst reports.  *See* Ex. 4 ¶¶ 1-5.[7]  Dr. Trueman was asked by Defendants to review the analyst

24

---

25   [6] The Court previously held that the "the thrust of Plaintiff's allegations is that [Mr. Cook]
     *affirmatively misrepresented* the state of Apple's business in China."  Dkt. No. 224 at 10 n.7
26   (emphasis added).  Lacking any evidence to prove that claim, it would appear Plaintiff has now
     pivoted to claiming that Defendants "knew, but *failed to disclose*, decelerating economic
27   conditions in China were putting significant pressure on its business there."  Mot. at 2, 5, 9, 32.

     [7] All "Ex. #" citations herein are to the Declaration of Shawn A. Williams in support of Plaintiff's
28   Motion, Dkt. No. 301-1, unless otherwise specified.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S OMNIBUS MOTION
                                                      TO EXCLUDE OPINION TESTIMONY OF DEFENDANTS' EXPERTS
                                                      CASE NO. 4:19-CV-02033-YGR

reports about Apple that were issued in the wake of the Challenged Statement and assess the analysts' reactions. *Id.* ¶ 17. He issued opinions regarding how the market understood and reacted to the Challenged Statement, including that the market did not report Mr. Cook to say there was not "any pressure on China" or give an intra-quarter update on Apple's business in China, as Plaintiff wrongly claims. *Id.* ¶ 27.

Plaintiff does not challenge Dr. Trueman's expertise in analyzing analyst reports. Rather, the Motion seeks to have Dr. Trueman's opinions excluded because, as Plaintiff would have it, they are "unreliable," not helpful to the trier of fact, and "mischaracterize" Plaintiff's claims to the point where they are "irrelevant" to resolution of Plaintiff's "actual claims." Mot. at 18-25. Plaintiff is wrong on each count.

### 1. Dr. Trueman's Evaluation of Analyst Reports is Grounded in His Extensive Experience and Helpful to the Trier of Fact

Plaintiff's primary objection to Dr. Trueman's opinions is that they are purportedly "not based on any reliable principles or methods." Mot. at 18. "Under Rule 702 and *Daubert*, expert testimony 'is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline.'" *Smilovits v. First Solar, Inc.*, 2019 WL 6875492, *4 (D. Ariz. Dec. 17, 2019) (citing *Primiano*, 598 F.3d at 565). Here, Dr. Trueman has more than 20 years' experience researching and publishing about the "content of analysts' reports," "the market reaction to the release of th[o]se reports," and "the predictive value of analysts' recommendations for future returns." Ex. 4 ¶¶ 4, 8-9. His opinions are based upon his "education, knowledge and research," (*id.* ¶ 14), and were reached by "review[ing] analyst reports published prior to the [FQ4 2018 Call] to develop [his] understanding of the analysts' assessment of Apple's business in China prior to November 1, 2018," and then "review[ing] analyst reports [issued after the Call to] assess analyst reactions to the Challenged Statement" (*id.* ¶ 17). Plaintiff asserts that "Trueman does not explain what 'analysis' he in fact 'performed'" (Mot. at 18), but Dr. Trueman explains he relied on his experience, his own research, and his knowledge of other research in the field (Ex. 4 ¶¶ 18, 25) to effectively "collect[] and classify[] relevant information from analyst reports, which are widely used in academic research and understood to be a valuable source of corporate

1    information." Ex. C at ¶ 8.

2        Courts have long held that informed evaluations of analyst reports, like the one performed

3    by Dr. Trueman, are sufficiently reliable to satisfy *Daubert*. *See, e.g.*, *In re Adobe Sys., Inc. Sec.*

4    *Litig.*, 787 F. Supp. 912, 916 (N.D. Cal. 1992), *aff'd sub nom. Cloutier v. Adobe Sys., Inc.*, 5 F.3d

5    535 (9th Cir. 1993) (expert with 22 years' experience in the securities industry had sufficient

6    expertise to opine on how Adobe executives' "comments would be taken [by the market] in the

7    context of corporate executives' communications to financial analysts."); *In re Twitter, Inc. Sec.*

8    *Litig.*, 2020 WL 9073168, at *5 (N.D. Cal. Apr. 20, 2020) (expert's opinions "about the

9    perceptions in the marketplace regarding Twitter's [disclosures]" had "sufficient foundation

10   because they [were] based on [his] seventeen years of experience as an industry analyst . . . as

11   well as his review of relevant analyst reports, public filings and disclosures, and financial

12   publications."); *Smilovits*, 2019 WL 6875492 at *4 (finding that where a former securities analyst

13   opined about analyst reports "based on documents she reviewed, her independent analysis, and

14   her knowledge and experience," she "employed a reliable methodology" sufficient to satisfy

15   *Daubert*). The Motion cites *General Electric Company v. Joiner*, 522 U.S. 136 (1997), to argue

16   that Dr. Trueman's opinions are unreliable because "there is simply no analytical connection

17   between the data, the methodology, and [his] conclusions" (Mot. at 18), but *General Electric*

18   concerns "scientific testimony," *see* 522 U.S. at 142, and the *Daubert* factors for scientific

19   testimony "simply are not applicable to [non-scientific] testimony, whose reliability depends

20   heavily on the knowledge and experience of the expert," *Hangarter*, 373 F.3d at 1017. *See also*

21   *Hankey*, 203 F.3d at 1168 (holding that "in considering the admissibility of testimony based on

22   some 'other specialized knowledge,' Rule 702 generally is construed liberally").

23       In its effort to discredit Dr. Trueman's opinions, Plaintiff argues that Dr. Trueman is doing

24   "nothing more than reading select analyst reports and claiming their contents support Defendants'

25   preferred construction of this litigation," which is "grounds for exclusion." Mot. at 19 (citing

26   *Biotechnology Valve Fund, L.P. v. Celera Corp.*, 2015 WL 138168 (N.D. Cal. Jan. 9, 2015)). But

27   in sharp contrast to the expert opinions excluded in *Biotechnology*, which did nothing more than

28   "improperly summarize the facts of the case," 2015 WL 138168 at *3, Dr. Trueman reviewed

voluminous analyst reports and business news articles (*see* Ex. 4 ¶¶ 21-22, App'x II) to evaluate both (i) the market's perception of Apple's business before the FQ4 2018 Call (*id.* ¶¶ 54-59), and (ii) how analysts understood and reacted to the Challenged Statement after the Call (*id.* ¶¶ 35-50, 60 & Ex. 1 thereto).  *See also* Ex. C ¶¶ 6-8 (further discussing Dr. Trueman's methodology).  In short, "[c]ontrary to [Plaintiff's] assertion that [Dr. Trueman] simply lists and summarizes these reports and articles, [Dr. Trueman's] opinion of *how* the market interpreted [the Challenged Statement] . . . will assist the trier of fact."  *See Baker v. SeaWorld Entm't, Inc.*, 423 F. Supp. 3d 878, 901-02 (S.D. Cal. 2019).

Plaintiff also insists it took no "special competence" for Dr. Trueman to evaluate how the market reacted to and interpreted the Challenged Statement (*see* Mot. at 21 (citing *In re Stratosphere Corp. Sec. Litig.*, 66 F. Supp. 2d 1182 (D. Nev. 1999)),[8] but indeed it did, as courts have repeatedly found.  *See, e.g.*, *S.E.C. v. Manouchehr Moshayedi*, 2013 WL 12129282, at *3 (C.D. Cal. Nov. 20, 2013) ("The world of corporate finance and securities disclosures is not within the knowledge of the typical lay juror."); *In re Adobe*, 787 F. Supp. at 916 (denying motion to exclude the "opinions of an expert interpreting how [executive] comments would be taken in the context of corporate executives' communications to financial analysts"); *In re Twitter,* 2020 WL 9073168 at *5 (same).  Plaintiff also impugns Dr. Trueman's opinions as "mere guesswork" (Mot. at 20) (citing *Shirar v. Guerrero*, 2017 WL 6001270, at *10 (C.D. Cal. Aug. 2, 2017)), but unlike the opinions excluded in *Shirar*, Dr. Trueman's opinions are not "based on assumptions of fact that are without evidentiary support or based on factors that are speculative or conjectural."  *Shirar*, 2017 WL 6001270 at *10.  Rather, they are grounded in the specific language of dozens of analyst reports, which are cited verbatim in support of Dr. Trueman's conclusions.  *See, e.g.*, Ex. 4 ¶¶ 35, 42, 44.  As Dr. Trueman testifies, his analysis "rest[s] on the views of the vast majority of the analysts" and could readily "be replicated by

---

[8]  *In re Stratosphere* is inapposite because it addresses the situation where an expert merely "read[s] pertinent public documents . . . to determine whether certain risks were conveyed to the public."  66 F. Supp. 2d at 1188.  Dr. Trueman is not merely summarizing what was "conveyed to the public," but rather evaluating and drawing conclusions about the "analysts' reaction" to what was conveyed.  *See* Ex. 4 ¶ 27.

1    another expert wishing to do so." Ex. C ¶¶ 8, 18, 22.[9]

2        Plaintiff further claims that Dr. Trueman has "no basis to testify as to what market

3    participants did or did not 'understand,'" as it "would be impermissible speculation into those

4    market participants' state of mind."   Mot. 20 n.22 (citing *MF Glob. Holdings Ltd. v.*

5    *PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 577 (S.D.N.Y. 2017)).   But Dr. Trueman's

6    report makes it clear he is "not suggesting that [he] can read the minds of the analysts," and is

7    instead "concluding from the carefully crafted language of their reports what [he] believe[s] they

8    understood, heard, and interpreted Mr. Cook to mean." Ex. 4 ¶ 26.  As Dr. Trueman testifies, his

9    analysis is based on the "*words* that were used in those [analyst] reports," because "[w]hat

10   analysts write in their reports is a function of what they heard or learned and how they interpreted

11   what they heard or learned. Equivalently, one can infer what analysts 'understood' from what

12   they wrote." Ex. C ¶ 17.[10]

13       As a last-ditch effort, Plaintiff criticizes Dr. Trueman's opinions because he failed to

14   perform certain analyses that Plaintiff would have preferred (Mot. at 19) and purportedly failed to

15   consider certain evidence (*id.* at 18-19, n.19).  But "[t]o the extent that [Dr. Trueman's] method of

16   identifying analyst[s'] [reactions] could have been more sophisticated, or to the extent he failed to

17   account for all potentially confounding information, those are issues that go to the weight of [his]

18   opinions, not admissibility." *Murphy v. Precision Castparts Corp.*, 2020 WL 4040827, *23 (D.

19   Or. July 17, 2020).  *See also Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70

20   (9th Cir. 2013) ("The district court is not tasked with deciding whether the expert is right or

21   wrong, just whether his testimony has substance such that it would be helpful to a jury.");

22

23   [9] Plaintiff criticizes Dr. Trueman's analysis because he draws "conclusions about analysts'
     purported and affirmative understandings based on what they did not say."  Mot. at 19 (emphasis

24   in original omitted).  But Dr. Trueman's analysis is founded on research which shows that "by
     interpreting only the relevant topics in corporate disclosures, analysts attract and direct investors'

25   limited attention to *what they view as being important*." Ex. 4 ¶ 40 n.34 (emphasis added).  This
     matters because, as Dr. Trueman explains, if pressures in China were important enough for

26   analysts to comment on prior to Apple's FQ4 2018 Call, then Mr. Cook's purported denial of
     pressure there also would have been important to comment on, which no analysts did.  *Id.* ¶ 58.

27   [10] The Motion cites *SEC v. Dunn*, 2012 WL 475653, at *4 (D. Nev. Feb. 14, 2012), which
     addresses the inapposite situation where an expert asserted the defendant's "actions were

28   consistent with the actions of insider traders." Mot. at 21.

1    *Smilovits*, 2019 WL 6875492 at *5 ("Criticism of an expert's decision to base an opinion on some

2    facts but not others should be challenged through the traditional means at trial, not through a

3    *Daubert* motion.").

4         In any event, Plaintiff's quibbles with Dr. Trueman's analysis and conclusions are

5    baseless.   For example, Plaintiff claims Dr. Trueman "could have employed accepted

6    methodologies such as text analytics" or a "'discounted cash flow' DCF analysis" (Mot. at 19),

7    but it is not clear what "text analytics" are, or how they would be employed in this case (*see* Ex.

8    C ¶¶ 11-13), and a DCF analysis would require data showing "analysts' expectations of [Apple's]

9    future cash flows," which is simply not available (*id.* ¶¶ 14-15).   Plaintiff also claims Dr.

10   Trueman failed to consider "a November 1, 2018 Morgan Stanley Tech report that discusses

11   topics covered in the conference call" (Mot. at 19 n.19), but that report is labeled "SALES

12   COMMENTARY -- Not a product of MS Research and *should not be regarded as a research*

13   *report*" (*see* Ex. C ¶ 10) (emphasis added).   And while Plaintiff claims that Dr. Trueman's report

14   is in error because it asserts "he considered 38 analyst reports" published from November 1-4,

15   2018 and his "Exhibit 1 actually lists 44 reports from that time period" (Mot. at 18 n.19), in fact

16   Exhibit 1 lists several reports from outside of that time period.  *See* Ex. 4 at Ex. 1 thereto; Ex. C ¶

17   9.

18              **2.    Dr. Trueman Accurately Characterizes Plaintiff's Claims**

19        As with the other experts, the Motion asserts that Dr. Trueman's opinions should be

20   excluded because they "mischaracterize[s] Plaintiff's claims to such a degree that they pose a

21   serious danger of unfair prejudice."  Mot. at 22.  But as discussed above, the claim that Dr.

22   Trueman is somehow "distorting" Plaintiff's allegations is absurd.  *Supra* at Section I.  For

23   example, the Motion insists that Dr. Trueman "misleads the jury into believing that Plaintiff

24   alleges Cook's statements constituted an 'intra-quarter update'" (Mot. at 22), but the Motion itself

25   admits that "Plaintiff alleges that *as of November 1, 2018*," or one month into Apple's FQ1 2019,

26   "Defendants knew but failed to disclose material facts" (*id.* at 9) (emphasis in original).

27   Likewise, the Motion insists that Dr. Trueman's "opin[ion] that analysts distinguished China from

28   other emerging markets with regard to currency issues" has no relationship to Plaintiff's theory of

11

fraud (Mot. at 24), but indeed, it directly refutes Plaintiff's effort to put words into Mr. Cook's mouth—that there was zero "deceleration or pressure on [our] business in China" (Ex. A at 5)— that no one but Plaintiff seems to have heard.

The Motion further argues that Dr. Trueman creates the false impression that "Defendants are absolved of liability if the statements were framed in the past tense." Mot. at 23. But while Dr. Trueman says nothing whatsoever about Defendants' "liability," or the standards for liability, in fact Defendants *are* absolved of liability by proof that the market understood Mr. Cook's Challenged Statement just as he intended it—as a statement about how weakened currencies affected Apple's revenue growth in emerging markets *in FQ4 2018*, "the 'accuracy' of [which]," as the Motion admits, "is *not at issue*." Mot. at 6-7 n.9 (emphasis added). Plaintiff also claims to be "concerned" that Dr. Trueman admitted he shares the market's "purported [understanding] of Cook's statements" (*id.* at 24), but the Motion cannot explain how Dr. Trueman referencing his own understanding of Mr. Cook's statement improperly "divine[s] for the jury the truth of what actually occurred or what the mental state of an actor was." Mot. at 25. The analysts' consensus about Mr. Cook's Challenged Statement remains their verifiable consensus irrespective of whether Dr. Trueman agrees with it.

Plaintiff also takes Dr. Trueman to task for opining that "Cook's comments regarding Apple's gaming business in China constituted a disclosure of business pressures that Apple was facing in China." Mot. at 23. According to Plaintiff, it does not allege that Cook's statements about pressures on Apple's gaming business in China are misleading, and Dr. Trueman is somehow improperly "conflat[ing] Cook's statements regarding the App Store with the specific false and misleading statements alleged." *Id.* In reality, Dr. Trueman's opinion demonstrates that while Plaintiff falsely claims that Mr. Cook "specifically den[ied] that Apple was experiencing any deceleration or pressure on its business in China" (Ex. A at 5), market sources reported that Apple "executives stated that the gaming slowdown in China is a 'real issue' and is impacting App Store revenues," and "prolonged weakness in gaming could be a material headwind to Apple's all-important services revenue growth" (Ex. 4 ¶¶ 44-47) (emphasis in original omitted).

1

2

### 3.    Dr. Trueman's Rebuttal Report Properly Rebuts Plaintiff's Theory of Fraud

3       The Motion also argues that the "opinions in Trueman's rebuttal report offered to 'further

4   buttress' his opening report should be excluded as [improper] rebuttal testimony," because they

5   do not "explain, repel, counteract or disprove evidence of the adverse party.'"  Mot. at 25 (citing

6   *Clear-View Techs., Inc. v. Rasnick*, 2015 WL 3509384, at *2 (N.D. Cal. June 3, 2015)).  But Dr.

7   Trueman's opinion that "sources cited by Dr. Shenkar . . . further buttress [his] opinion" that

8   analysts did not hear Mr. Cook to say there was "no pressure" on Apple's business in China (Mot.

9   at 25 (emphasis in original omitted)) does, in fact, "repel, counteract and disprove" Dr. Shenkar's

10  assumption that "Tim Cook's statement exclud[ed] China from the category of markets where

11  Apple was experiencing pressure" (Ex. 15 ¶ 4).  Put simply, Dr. Trueman offers a valid rebuttal

12  opinion by noting that *even the evidence cited by Plaintiff's expert* Dr. Shenkar disputes

13  Plaintiff's theory of fraud.

14      ### B.    MR. GAUNA'S OPINIONS ARE ADMISSIBLE IN THEIR ENTIRETY

15      Alex Gauna is a former securities analyst with nearly 20 years' experience researching

16  and writing about technology companies, including Apple.  Ex. 3 ¶¶ 4-6.  In his report, Mr.

17  Gauna offers opinions on securities analysts and the work they do to help interpret corporate

18  disclosures (*id.* ¶ 12(a), 12(b), 12(f)), on public company disclosure practices (*id.* ¶ 12(c)), on

19  Apple's guidance process (*id.* ¶ 12(e)), and on the market's understanding of the Challenged

20  Statement (*id.* ¶ 12(g)).

21      Plaintiff seeks to exclude Mr. Gauna's opinions for reasons that largely overlap with

22  Plaintiff's criticisms of Dr. Trueman, including because Mr. Gauna's testimony "distorts

23  Plaintiff's claims," is "irrelevant, inappropriate, and unjustified," and "would be unhelpful and

24  misleading to a jury."  Mot. at 11.  As discussed below, Plaintiff's criticisms are unfounded, and

25  Mr. Gauna's opinions are helpful to the trier of fact.

26      ### 1.    Mr. Gauna's Opinions Do Not "Distort" Plaintiff's Claims

27      Plaintiff asks the Court to exclude Mr. Gauna's opinions because he purportedly distorts

28  Plaintiff's allegations.  Mot. at 13-15.  As with the other experts, Plaintiff argues that Mr. Gauna

gives a "false framing of Plaintiff's claims" to suggest Plaintiff is alleging (i) Apple's FQ1 2019 revenue guidance was misleading, (ii) Mr. Cook "provided intra-quarter results," and (iii) Mr. Cook said "there was *no* pressure or risks related to Apple's business in China." *Id.* (emphasis added).

As discussed above, however, whether Plaintiff challenges the accuracy of Apple's FQ1 2019 guidance or not, the fact of its accuracy advances several "material aspects" of Defendants' case, *see Messick*, 747 F.3d at 1196, and rebuts nearly every element of Plaintiff's misstatement claim. *Supra* at Section I. Even if Plaintiff is now arguing a pure omissions case, and alleging that "Defendants knew, but failed to disclose, decelerating economic conditions in China were putting significant pressure on its business there," Mot. at 2, Mr. Gauna's opinions remain relevant, because they show both that (i) Apple's FQ1 2019 guidance reflected decelerated conditions in China, and (ii) the investment community understood that.[11] Ex. 3 ¶¶ 51-62.

Further, Plaintiff's insistence that it "does not allege that Apple provided intra-quarter results" is contradicted by the Motion itself, which repeatedly asserts that on November 1, 2018 "Apple misrepresented the *current state* of its business." Mot. at 13-14 (emphasis added). And while the Motion insists Plaintiff does "not allege Cook said 'there was *no* pressure or risks related to Apple's business in China'" (*id.* at 15), the plain language of the Court's prior order and Plaintiff's own discovery responses show otherwise. *See supra* at Section I.

## 2. Mr. Gauna's Opinions Are Proper Subjects for Expert Testimony

As with Dr. Trueman, Plaintiff argues that Mr. Gauna's opinions about the market's understanding of the Challenged Statement should be excluded because they are "not a proper subject for expert testimony." Mot. at 17. Plaintiff again argues that reading and interpreting analyst reports "is hardly a matter of specialized analysis or inquiry," *id.* (citing *CZ Servs., Inc. v. Express Scripts Holding Co.*, 2020 WL 4518978, at *2 (N.D. Cal. Aug. 5, 2020)), but indeed it is, because "[t]he world of corporate finance and securities disclosures is not within the knowledge

---

[11] Plaintiff's claim that "this case [] involves no forward-looking statements" (Mot. at 13 n.16) is belied not only by its interrogatory responses, *see* Ex. A at 5 (Defendants "fail[ed] to disclose the risk of [] pressure"), but also its claim that Defendants failed to disclose internal forecasts for the FQ1 2019 quarter, which are inherently forward-looking, *see* Mot. at 2.

of the typical lay juror." *Manouchehr Moshayedi*, 2013 WL 12129282, at *3.  Plaintiff cites to *CZ Servs*., but unlike the expert in that case, who did little more than describe pharmacies (the court noted "just about any citizen . . . is familiar with what retail pharmacy businesses look like and how they function" (2020 WL 4518978, at *2)), Mr. Gauna evaluated a large volume of market information, including SEC filings and analyst reports, and relied on nearly 20 years of professional experience as a securities analyst to offer his expert opinions.  Ex. 3 ¶¶ 5-7.  As discussed above, federal courts regularly allow experienced securities analysts to provide testimony on the securities market and analyst reactions to market events. *See*, *e.g.*, *Smilovits*, 2019 WL 6875492, at *3; *In re Twitter*, 2020 WL 9073168, at *5.

Plaintiff argues that Mr. Gauna's opinion that "Apple employed clear and non-misleading guidance metrics" constitutes an impermissible legal conclusion.  Mot. at 13 fn.15; Ex. 3 ¶ 50. But Mr. Gauna does not opine that he has reached the legal conclusion that Defendants actions or disclosure were not misleading, and Mr. Gauna's opinions do not attempt to instruct the jury on when a misstatement is misleading under the law.  Rather, he uses the term non-misleading "in [its] ordinary, everyday sense," to explain that the metrics of Apple's guidance processes were clear.  *See United States v. Diaz*, 876 F.3d 1194, 1199 (9th Cir. 2017).  In fact, Mr. Gauna "can certainly discuss certain corporate practices and may opine on whether certain practices may mislead [investors]."[12]  *See Stathakos*, 2017 WL 1957063, at *5.  The Motion repeatedly concedes that Apple's revenue guidance was not misleading, and Mr. Gauna's opinion regarding the metrics that forged that accurate guidance are properly before the Court.

### 3. Mr. Gauna's Opinions Are Properly Informed by His Deep Experience as a Securities Analyst Who Covered Apple

Plaintiff attacks Mr. Gauna's opinions because he purportedly "explains no methodology he used to reach his conclusions," and "expert opinion based merely on publicly available

---

[12] Contrary to Plaintiff's assertion that Mr. Gauna opines on "Defendants' intent vis-à-vis the 1Q19 guidance," Mr. Gauna does no such thing. Mot. at 13 n.15.  Instead, Mr. Gauna opines that Apple "*objectively* articulated [certain] concerns during the November 1, 2018 earnings call," from his perspective as a seasoned securities analyst.  Ex. 3 ¶ 62 (emphasis added); *cf. Stathakos*, 2017 WL 1957063, at *5 (excluding opinion that "Columbia must be fully aware of" the impact of certain pricing tactics).

1 information untethered to methodology fails under the *Daubert* standard." Mot. at 14. But Mr.

2 Gauna's opinions are rooted in his nearly 20 years of experience conducting sell-side technology

3 equity research, including six years as a publishing analyst on Apple (*see* Ex. 3 ¶¶ 5-7), which

4 makes them reliable under Rule 702. *See, e.g.*, *Smilovits*, 2019 WL 6875492, at *3; *Twitter*, 2020

5 WL 9073168, at *5; *Hankey*, 203 F.3d at 1169 (The reliability of expert evidence can "depend[]

6 heavily on the knowledge and experience of the expert."). Plaintiff would judge Mr. Gauna's

7 opinions on the standards of "scientific" testimony (*see* Mot. at 14), but as discussed, the law

8 clearly states that where the testimony is not scientific, reliability may be judged on the expert's

9 "knowledge and experience." *Hankey*, 203 F.3d at 1169.

10     Citing *Otto*, Plaintiff also argues that Mr. Gauna's opinions should be excluded because

11 they are based on publicly available information untethered to methodology. Mot. at 14. *Otto*

12 hardly stands for this proposition. There, the expert report in question contained "a blatant

13 overreliance on social media postings" and the expert himself "ha[d] no specific experience with

14 the cryptocurrency platform or asset (XRB) at issue." *Otto v. LeMahieu*, 2021 WL 1615311, at

15 *5 (N.D. Cal. Apr. 26, 2021). The court concluded that the report "reflect[ed] a woeful lack of

16 knowledge." *Id.* Here, Mr. Gauna identifies how each of his opinions is supported by his own

17 experience as an analyst, by his analysis of analyst reports and media reports, and by his review

18 of Apple's public disclosures. Ex. 3 ¶¶ 5, 9, 21, 23, 61, 65. Mr. Gauna's opinions are relevant,

19 reliable, and admissible.

20     **4.**     **Mr. Gauna's Opinions on Public Company Disclosure Practices Are
21         Helpful to the Trier of Fact**

22     Plaintiff challenges Mr. Gauna's opinions that discuss public company disclosure

23 practices, arguing they are irrelevant because they "misleadingly suggest[] that Defendants can

24 only violate securities laws with respect to documents filed with the SEC." Mot. at 12. But Mr.

25 Gauna's report says nothing about violating securities laws, or how securities laws can be

26 violated. Rather, in sections titled "Analysts Do Not Rely Solely On Company-Provided

27 Information" (Ex. 3 § III) and "Public Company Disclosures" (*id.* § IV), Mr. Gauna discusses the

28 public company disclosure obligations to help the trier of fact understand what type of corporate

information is available in the market, and, importantly, how it can vary from company to company, requiring securities analysts like Mr. Gauna to help analyze and interpret it for investors. *See id.* ¶¶ 32, 35-39; *Stathakos*, 2017 WL 1957063, at *5 (expert "can certainly discuss certain corporate practices"). Again, "[t]he world of . . . securities disclosures is not within the knowledge of the typical lay juror," *Manouchehr Moshayedi*, 2013 WL 12129282, at *3, and so Mr. Gauna's opinions will necessarily be helpful to the trier of fact, *see*, *e.g.*, *Nash-Perry v. City of Bakersfield*, 2022 WL 3357516, at *13 (E.D. Cal. Aug. 15, 2022) (expert testimony is helpful to the jury where it "address[es] an issue beyond the common knowledge of the average layman").

Plainly, Mr. Gauna is not trying to "opine on questions which are matters of law for the Court," as the Motion claims (Mot. at 12), because the public company disclosure obligations he discusses are not at issue in this case, and his comments are provided only as context to help the trier of fact understand how securities analysts do their jobs. Though the Motion argues Mr. Gauna's discussion of federal disclosure requirements is "unlikely to help the trier of fact decide the material issues in dispute in this case" (Mot. at 12-13), elsewhere the Motion admits that Mr. Gauna's opinions about "how analysts and investors obtain information, how public companies disclose information[] [and] how analysts respond to inconsistent disclosures *are relevant to this case*." *Id.* at 17 n.18 (emphasis added). Indeed, Mr. Gauna's discussion of public company disclosure practices is relevant to show how information is digested into the market, and why analysts would have reported on the statement that Plaintiff claims Mr. Cook made, when they did not.

## C. DR. YANG'S OPINIONS ARE ADMISSIBLE IN THEIR ENTIRETY

Plaintiff concedes that Dr. Dennis Yang, an economist at the University of Virginia and an expert on the Chinese economy, "is experienced and qualified to offer expert testimony" concerning the Chinese economy. Mot. at 4. Plaintiff contends, however, that Dr. Yang's opinions are "(i) unreliable; (ii) invade the province of the court and the jury; or (iii) while marginally relevant, are so highly misleading and prejudicial, they must be excluded." *Id.* at 4. None of these arguments has merit.

### 1.     Dr. Yang's Opinions Are Relevant

Dr. Yang opines that China's economy declined sharply and unexpectedly after the 2018 Singles' Day holiday, from mid-November through December 2018, citing information released after the second week of November 2018 that shows that China's economy was deteriorating more quickly than was previously known or expected.  *See* Ex. 1 ¶¶ 13-70.  He also opines that the smartphone market followed a similar pattern as the broader economy, in that it had been contracting for several months in mid-2018, appeared to be stabilizing in October, and then worsened sharply after Singles' Day.  *Id.* ¶¶ 71–77.  To make matters worse, the detention of the CFO of Huawei—one of Apple's largest competitors in China—on U.S. charges in early December turned Chinese consumer sentiment against Apple.  *Id.* ¶¶ 78–82.

Dr. Yang also opines that China is considered an emerging market country (*id.* ¶¶ 87–89), and that its currency weakened less during the relevant period than those of India, Russia, Turkey, and Brazil (*id.* ¶¶ 90-96).  From these opinions, Dr. Yang concludes that Mr. Cook's Challenged Statement contrasting China to those other emerging markets because of its strong currency was "accurate."  *Id.* ¶ 96.

Contrary to the Motion, Dr. Yang's opinions are highly relevant to Defendants' defense. As discussed above, the fact that business conditions in China drastically deteriorated *after* Mr. Cook made the Challenged Statement further establishes that Apple's guidance miss was attributable to factors that were not, and could not have been, known to Mr. Cook when he made the Statement, and thus further rebuts the falsity, scienter, loss causation, and damages elements of Plaintiff's claims.  *See generally* Dkt. No. 293 at 20-24.  Dr. Yang's opinions on the accuracy of Mr. Cook's statements regarding currencies in emerging markets are also probative of the objective truthfulness of Mr. Cook's opinion that China did not belong in the category of other emerging markets.  *See id.* at 13-15.

### 2.     Dr. Yang Does Not Purport to Offer Any Improper Legal Conclusions

According to Plaintiff, Dr. Yang's opinion that Mr. Cook's statements were "accurate" constitutes an impermissible legal conclusion.  Mot. at 6-8.  But the cases Plaintiff cites in favor

of that proposition are facially inapposite to the situation here.  *Id.* at 7-8.  For example, *In re ConAgra Foods, Inc.*, 302 F.R.D. 537 (C.D. Cal. 2014) involved the question of whether an expert's conclusion that certain statements were "false and deceptive" was an impermissible legal conclusion.  *Id.* at 557.  Unlike the situation here, however, "false and deceptive" are judicially defined terms.  *Id.* at 558.  Plaintiff points to no authority supporting its conclusion that the term "accurate" is "judicially defined" or somehow a legal term of art.  Similarly, in *BP Prods. N. Am., Inc. v. Grand Petroleum, Inc.*, 2021 WL 4482138, at *1 (N.D. Cal. Sept. 30, 2021), "defendants proffer[ed] an attorney to opine on the legal meaning of terms in [an] agreement," and in *Chamberlain v. Hartog, Baer & Hand, APC*, 2022 WL 526157, at *9 (N.D. Cal. Feb. 22, 2022), the expert opined that "Defendants did not breach their standard of care" and that they acted "reasonably."  Again, Plaintiff does not, because it cannot, explain how Dr. Yang's use of the term "accurate" is akin to the situation presented in these cases involving legal terminology.  *See Diaz*, 876 F.3d at 1199 ("phrases [] used in their ordinary, everyday sense" are not impermissible legal conclusions).  At no point does Dr. Yang opine that Mr. Cook's statement was not "false and misleading *under the federal securities laws*," but instead permissibly offers "opinions about the objective truth or falsity of statements based on [his] specialized . . . knowledge" in economics and China.  *See In re Cryolife, Inc. Sec. Litig.*, 2005 WL 8155579, at *7 (N.D. Ga. June 17, 2005).

Plaintiff likewise offers no explanation for its conclusion that an opinion as to whether Mr. Cook's statements "were 'accurate' will not assist the jury."  Mot. at 7.  As discussed above, the accuracy of Mr. Cook's statements is a relevant inquiry which will assist the jury in understanding the case.  Plaintiff's own cited cases acknowledge that expert testimony is helpful to the jury if it addresses an issue beyond the common knowledge of the average layman.  Mot. at 7-8 (citing *Microsoft Corp. v. Motorola, Inc.*, 2013 WL 4008822, at *9 (W.D. Wash. Aug. 5, 2013)).  Plaintiff does not argue (because it cannot) that the average layperson is familiar with issues such as whether China is considered an emerging market and how its currency performed in 2018 compared to other emerging markets.  Ex. 1 ¶¶ 87-96.  The accuracy of statements concerning the state of affairs in China or other emerging markets "is not part of the 'common

knowledge' of the average person, and the jury will receive 'appreciable help' from hearing [Dr. Yang's] expert opinion." *See Microsoft Corp.*, 2013 WL 4008822 at *11.

### 3. Plaintiff's Concerns Regarding Dr. Yang's Opinions About The Arrest of Huawei's CFO Go to Weight, Not Admissibility

Next, Plaintiff complains that Dr. Yang's opinion that the detention of Huawei CFO Meng Wanzhou had a significant negative impact on iPhone sales is "purely speculative" and "contradict[s] internal Apple documents." Mot. at 8. Again, however, it cannot seriously be disputed that Dr. Yang's opinions about an unexpected arrest during the class period which turned consumer sentiment in China against Apple are relevant to this case. At best, Plaintiff argues that Dr. Yang's opinion is not adequately supported, and that there are purportedly reasons to question Dr. Yang's findings. But Plaintiff admits that Dr. Yang provided a basis for his opinion—he cited to news articles and a survey about Chinese consumers boycotting Apple products or favoring local companies after the arrest. Mot. at 8 (citing Ex. 1 ¶¶ 78-84).[13] In any event, "[c]hallenges that go to the weight of the evidence are within the province of [the] fact finder, not a trial court judge." *Elosu*, 26 F.4th at 1024. Plaintiff's arguments with respect to Dr. Yang's opinions ask this Court to improperly "weigh the expert's conclusions or assume a factfinding role," *id.* at 1020, and should be rejected.

### 4. Plaintiff's Effort to Challenge Dr. Yang's Expertise and Methodology is Unavailing

Finally, Plaintiff is wrong to contend that "[Dr.] Yang provides no methodology or analytical basis" to support his opinion "that any changes in the Chinese economy after the alleged misrepresentations were 'unexpected.'" Mot. at 9. It is settled law in this circuit that "[t]he *Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to . . . testimony[] whose reliability depends heavily on the knowledge and experience

---

[13] Plaintiff also mischaracterizes an internal document that it claims "reject[s] the very opinion [Dr. Yang] wants to present," but that document merely suggests that other factors like the "softer economy" contributed to Apple's troubles in China, which is in fact consistent with Dr. Yang's opinion. Mot. at 8-9. Regardless, "[t]o the extent that [Plaintiff] believes that [Dr. Yang] failed to consider relevant evidence of record or formed opinions based on unreliable data, [Plaintiff] is free to cross-examine [Dr. Yang] at trial on the foundation for his opinions." *See In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 364 (N.D. Cal. 2018).

of the expert, rather than the methodology or theory behind it." *Hankey*, 203 F.3d at 1169.  As Plaintiff's cited cases acknowledge, Mot. at 7, "[t]he mere fact that [the expert] does not rely on a testable methodology does not render his testimony inadmissible under *Daubert*" (*ConAgra*, 302 F.R.D. at 553); instead, some expert testimony "is properly based on relevant knowledge and experience of a type that cannot be tested." *Id.* at 554.  That is precisely the case with Dr. Yang's opinions here.  Plaintiff concedes that Dr. Yang "is experienced and qualified to offer expert testimony" concerning the Chinese economy, Mot. at 4, and its sweeping, unsupported contentions that Dr. Yang "provides no analysis of what *was* 'expected' or 'anticipated' from macroeconomic conditions in China during the period he reviews" or "*to whom* changed conditions were unexpected," Mot. at 10, is directly contradicted by Dr. Yang's report itself.[14] Dr. Yang's report is almost exclusively dedicated to providing this analysis that Plaintiff claims is omitted, which includes his review and discussion of "economic indicators, [] analyst reports, [] news articles, [] earnings conference calls of other public companies operating in China," and academic research.  Ex. 1 ¶ 13; *see also id.* (App'x B, C.) (list of academic research considered).

### D.   MR. POER'S OPINIONS ARE ADMISSIBLE IN THEIR ENTIRETY

Defendants' expert Eric Poer is an experienced finance professional who summarizes Apple's internal data during the relevant period and then analyzes those results in order to reach opinions on the performance of Apple's business in China.  Ex. 6 ¶ 2; Ex. 7 ¶ 2.  Plaintiff's attacks on the opinions offered by Mr. Poer wholly lack merit, as shown below.[15]

#### 1.   Mr. Poer is a Qualified Expert Whose Opinions Are Helpful to the Trier of Fact

In his expert reports, Mr. Poer offers opinions on Apple's forecasting process (Ex. 6 § V.A. & C.), iPhone unbricking (or activation) trends in China (*id.* § V.B. & D.), the impact of

---

[14] Plaintiff makes much ado about nothing with its questions about "*to whom* changed conditions were unexpected." Mot. at 10.  The answer should be obvious: to Dr. Yang, in his capacity as an expert on the Chinese economy.

[15] Disregarding the Court's clear instructions, Plaintiff does not "clearly specify the paragraphs or portions of the report that the party seeks to exclude" (*see* Section 11 of Judge Gonzalez Rogers' Standing Order, as updated June 22, 2022).  Plaintiff's overbroad challenges to Mr. Poer's opinions should be rejected for this additional reason.

currency fluctuations on Apple's revenue in emerging markets (*id.* § V.E.), and, in rebuttal to the report of Plaintiff's expert Oded Shenkar, Apple's revenue trends in China and other emerging markets (Ex. 7 § III.B.a.-b.), store traffic trends in China (*id.* § III.B.c.), and data on the iPhone XR (*id.* § III.B.d.).

After broadly asserting that Mr. Poer opines on "largely irrelevant issues" (Mot. at 25), Plaintiff proceeds to identify only two specific topics that it claims are "non-relevant": (1) Apple's FQ1 2019 revenue guidance and (2) foreign currency. *Id.* at 26.  But Mr. Poer's opinions on these topics relate to central issues in the case, and thus easily overcome the "low bar" of establishing relevance, *see Messick*, 747 F.3d at 1196.  For example, Plaintiff alleges that Defendants failed to disclose aspects of Apple's business in October 2018; thus it is relevant that Apple's performance in October was incorporated into its FQ1 2019 revenue guidance, which Apple undisputedly disclosed.  *See* Ex. 6 § V.C; Dkt. No. 293 at 14.  Plaintiff also alleges that Apple's disclosure on January 2, 2019 that it would not meet its FQ1 2019 guidance fully revealed Defendants' alleged fraud, and therefore it is relevant that Apple's failure to meet the quarterly guidance was attributable to events that occurred *after* November 1, 2018.  *See* Ex. 6 § V.D; Dkt. No. 293 at 24.  Further, Mr. Poer's opinion that revenue and currency devaluation data support Mr. Cook's opinion that China was not in the "category" of certain other emerging markets is relevant to the objective truthfulness of that opinion.  *See* Ex. 6 § V.E; Dkt. No. 293 at 13-15.  And far from an instance where "the factual foundation [for an assumption] is lacking," Mot. at 26 (citing *Krouch v. Wal-Mart Stores, Inc.*, 2014 WL 5463333, at *6 (N.D. Cal. Oct. 28, 2014)), Mr. Cook has submitted a sworn affidavit attesting that his challenged statement about China was intended as an opinion on currency pressures faced by Apple in emerging markets in FQ4 2018.  *See* Dkt. No. 294.  Each of Mr. Poer's opinions "will assist the trier of fact to understand or determine a fact in issue."  *Cooper*, 510 F.3d at 942.

Mr. Poer also possesses more than "the *minimal foundation* of knowledge, skill, and experience required in order to give 'expert' testimony."  *Hangarter*, 373 F.3d at 1016.  Mr. Poer has more than 20 years of experience conducting accounting and financial analyses and investigations, he is the co-leader of a large consulting firm's Securities, Accounting, and

1   Regulatory Enforcement practice, he has testified as an expert in more than 35 matters, including

2   on issues related to corporate disclosures, and he is certified as a public accountant, a fraud

3   examiner, and in financial forensics.  Ex. 6 ¶¶ 5-12; *see also* Ex. B at App'x A & B.  Mr. Poer's

4   "many relevant certifications and decades of relevant experience render him qualified to issue his

5   expert opinion."  *See Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir.

6   2014).

7        Plaintiff does not challenge Mr. Poer's unassailable expertise in finance and accounting,

8   but instead tries to divorce that expertise from Mr. Poer's opinions on Apple's "product forecasts,

9   smartphone unbrickings, international currency fluctuations, and financial guidance and results."

10  Mot. at 25.  This misses the mark.  At core, Mr. Poer is opining on matters of finance and

11  accounting—i.e., Mr. Poer analyzed Apple's internal financial data and then reached conclusions

12  about the condition of Apple's business during the relevant period.  *See Grouse River Outfitters*

13  *Ltd. v. Oracle Corp.*, 2019 WL 8752335, at *3 (N.D. Cal. Feb. 19, 2019) (finding expert

14  "qualified to analyze [the plaintiff's] financial conditions" based on general finance and

15  accounting experience and certifications over objections that he lacked experience in "retail" or

16  "business in Canada" or "the outdoor sporting goods industry").  Mr. Poer does not need to have a

17  specialization within certain geographies or product categories in order to analyze and opine on

18  Apple's financial data because he is generally qualified in the field of public company financial

19  accounting.  *See In re Silicone Gel Breast Implants Prod. Liab. Litig.*, 318 F. Supp. 2d 879, 889

20  (C.D. Cal. 2004) ("A court abuses its discretion when it excludes expert testimony solely on the

21  ground that the witness's qualifications are not sufficiently specific if the witness is generally

22  qualified.  A lack of specialization affects the weight of the expert's testimony, not its

23  admissibility.").

24       Finally, Plaintiff's baseless accusation that Mr. Poer is merely a "mouthpiece" for

25  "uncomplicated evidence" is meritless.  Mot. at 26.  Even if analyzing the financial data of a

26  company the size of Apple were an "uncomplicated" matter (it is not), "an expert's testimony

27  need not be complicated to offer specialized expertise."  *See Lewert v. Boiron, Inc.*, 212 F. Supp.

28

3d 917, 926 (C.D. Cal. 2016), *aff'd*, 742 F. App'x 282 (9th Cir. 2018).[16]  Mr. Poer applied his extensive training, knowledge, and experience in finance and accounting to analyze Apple's complex financial data in order to reach opinions that will assist the trier of fact.  His opinions are admissible.

### 2.   Plaintiff's Attacks on Mr. Poer as a Summary Witness are Premature and Unfounded

Plaintiff additionally seeks to exclude Mr. Poer as a summary witness under Federal Rule of Evidence 1006.  Mot. at 27.  As an initial matter, this attempt is premature.  As Plaintiff acknowledges, a summary witness does not need to be an expert, *see* Mot. at 27, and therefore the question of whether Mr. Poer may serve as a summary witness is not a proper subject of a *Daubert* motion, which is limited to the determination of whether Mr. Poer's *expert* testimony is admissible.  *See United States v. Singh*, 2017 WL 4700042, at *3 (E.D. Cal. Oct. 19, 2017), *aff'd sub nom. United States v. Sharma*, 851 F. App'x 708 (9th Cir. 2021) ("There is no legitimate dispute that the Ninth Circuit allows the use of non-expert summary witnesses.").  "[W]hether an opinion is admissible under some rule of evidence separate from the rules governing expert opinions is an issue best saved for later in this litigation."  *Hausknecht v. John Hancock Life Ins. Co. of New York*, 2022 WL 1664362, at *10 (E.D. Pa. May 25, 2022).

In any event, Plaintiff's challenges to Mr. Poer's summary witness role are meritless. FRE 1006 permits the "admission of summaries based on voluminous records that cannot readily be presented in evidence to a jury and comprehended" where "the underlying materials upon which the summary is based (1) are admissible in evidence and (2) were made available to the opposing party for inspection."  *United States v. Rizk*, 660 F.3d 1125, 1130-31 (9th Cir. 2011). The records that Mr. Poer summarizes in chart form are voluminous—over 100 documents in total, including over 500 data points.  *See* Ex. B at App'x C & D; Ex. 7 at App'x A & B.

---

[16] Twisting Mr. Poer's words, Plaintiff states that Mr. Poer claims expertise in "complex data concepts," when instead his report indicates that his expertise is in finance and accounting, which entails "collecting, understanding, analyzing, and presenting complex data concepts."  Ex. 6 ¶ 5. To the extent that Plaintiff was confused about what Mr. Poer's reference to "complex data concepts" refers to, it would have behooved Plaintiff to ask Mr. Poer about this subject at his deposition, which Plaintiff instead elected to cancel.

Defendants will lay any necessary foundation for these documents as admissible business records at trial.  And both the underlying documents (which were all produced during fact discovery, *see* Kramer Decl. ¶ 3) and Mr. Poer's charts have been made available to Plaintiff for inspection well in advance of trial.  Plaintiff does not dispute any of this.  Instead, Plaintiff argues that Mr. Poer should be excluded as a summary witness because he does not have "first-hand knowledge" of the events underlying each of these documents. Mot. at 27.  But this is not what the law requires. "Personal knowledge of the records themselves is sufficient to testify as a summary witness." *Buffin v. City & Cnty. of San Francisco*, 2019 WL 1017537, at *5 n.20 (N.D. Cal. Mar. 4, 2019). Mr. Poer "prepared his summaries based on his own review of a set of [Apple's] financial records.  Therefore, he has the requisite personal knowledge to testify about the summaries." *See Ferrari Club of Am., Inc. v. Bourdage*, 2017 WL 1498080, at *6 (W.D.N.Y. Apr. 25, 2017).

Finally, Plaintiff's claims that Mr. Poer's "expert and summary opinions" are improperly "intermingled" are rooted in a fundamental misconception of Mr. Poer's role. Mot. at 29-30.  In his reports, Mr. Poer does not offer "summary opinions," only (1) summary charts, and (2) expert opinions.  Mr. Poer carefully and clearly delineates these two functions in his reports.  *See*, *e.g.*, Ex. 6 § IV (citing Ex. B at App'x D) (opening summary charts); *id.* § V (opening expert opinions); Ex. 7 § II (citing App'x B) (rebuttal summary charts); *id.* § III (rebuttal expert opinions).  Mr. Poer's summary charts do not contain "argumentative wording," *see* Mot. at 31, only neutral and factual headers like "iPhone Unbrickings (UBs) – Forecast (as of Week 5) Weekly UBs Beat/(Miss) %" (*see* Ex. B at Chart 6), and Mr. Poer is entitled to offer, as an expert, an analysis of the summary charts that he prepared.[17]   *See In re Yasmin & YAZ (Drospirenone) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 2011 WL 6302573, at *8 (S.D. Ill. Dec. 16, 2011) (noting the "approv[ed] use of an 'expert summary witness' who is permitted both to summarize evidence for the jury and to offer an expert analysis of the facts").

---

[17] Plaintiff's argument that Mr. Poer erred with an "apples-to-oranges" comparison in one of his charts goes at most to the weight to be given to Mr. Poer's expert testimony, not its admissibility. Mot. at 30; *See Elosu*, 26 F.4th at 1024.  Nor can summary charts be excluded merely because they "present only one party's side of the case."  *Canava v. Rail Delivery Serv. Inc.*, 2021 WL 5445977, at *10 (C.D. Cal. Aug. 27, 2021).

1    Nor is it unduly prejudicial for Mr. Poer to serve as both a summary and expert witness.

2    "[E]xperts in accounting and other disciplines regularly give summary evidence of the sort

3    envisioned by Federal Rule of Evidence 1006." *United States v. Pree*, 408 F.3d 855, 869 (7th

4    Cir. 2005).   Mr. Poer's charts will be helpful to the trier of fact, the charts are clearly

5    distinguished from his expert opinions, and the charts consist of summaries of voluminous

6    financial data, not "oral testimony." *Cf. United States v. Baker*, 10 F.3d 1374, 1412 (9th Cir.

7    1993); Mot. at 27, 31.   In any event, any potential for jury confusion over Mr. Poer's dual role

8    can be mitigated through appropriate jury instructions at trial.   *See United States v. Cervantes*,

9    2016 WL 491599, at *9 (N.D. Cal. Feb. 9, 2016).

10           **3.      Mr. Poer Adequately Disclosed the Information He Considered**

11           Under Federal Rule of Evidence 703, the facts and data considered by an expert "need not

12   be otherwise admissible if they are 'of a type reasonably relied upon by experts in a particular

13   field.'"   *Scott v. Ross*, 140 F.3d 1275, 1286 (9th Cir. 1998).   Accordingly, Mr. Poer may

14   appropriately rely on information obtained from interviews of Apple's employees, even if those

15   employees were not identified in Defendants' initial disclosures, so long as that type of

16   information is reasonably relied upon by experts in his field.   *See Inline Connection Corp. v. AOL

17   Time Warner Inc.*, 470 F. Supp. 2d 435, 442 (D. Del. 2007) (rejecting plaintiff's argument that

18   defendants' experts "obtained [information] through interviews with defendant's employees" that

19   "defendants never identified" because the interviews were consistent with the "professional

20   standards for litigation services for accountant or economic experts in obtaining their data").

21   Likewise, here, Mr. Poer's interviews of Naznin Shroff, Tejas Gala, Anish Patel, Tina Tong, and

22   Karen Wang were conducted for the purposes of validating the systems and processes that Apple

23   used to collect the data that Mr. Poer relied upon in his reports, which is consistent with industry

24   practices.  Ex. D ¶¶ 3, 7-8 (citing American Institute of Certified Public Accountants professional

25   standards); *see also Inline Connection Corp.*, 470 F. Supp. 2d at 443 (crediting AICPA

26   standards).  Mr. Poer did not conduct these interviews for the purposes of gathering percipient

27   facts or substantive theories, which is also why these individuals were not and did not need to be

28   identified in Defendants' disclosures.  Ex. D ¶ 9; *cf. Apple, Inc. v. Samsung Elecs. Co. Ltd.*, 2012

WL 3155574, at *5 (N.D. Cal. Aug. 2, 2012) (finding error because "Samsung did not disclose its *theories* prior to the close of fact discovery") (emphasis added).

In any event, any purported failure to previously identify these employees was substantially justified and harmless.  "Courts commonly find that the ability to take expert discovery and respond to an expert's testimony is sufficient to cure an expert-specific deficiency," such as where the previously undisclosed information "has little significance in the case apart from its connection to" the expert's report.  *Brown v. Wal-Mart Store, Inc.*, 2018 WL 2011935, at *8 (N.D. Cal. Apr. 27, 2018).  Defendants served their "expert reports according to the agreed upon schedule," Plaintiff had "the opportunity to file a rebuttal report, to depose the expert witnesses, and will be able to cross examine any of the experts during trial," and therefore "[i]t is not clear that [Plaintiff is] so severely prejudiced to warrant exclusion."  *See In Re Lamictal Direct Purchaser Antitrust Litig.*, 2018 WL 11413414, at *3 (D.N.J. Sept. 20, 2018).  Moreover, Mr. Poer did not rely on these brief, non-substantive interviews to form his expert opinions regarding Apple's financial data, but rather used them only to validate Apple's data collection systems and to explain certain metrics, which Mr. Poer's produced interview notes confirm.  Ex. D ¶ 9; Exs. 13-14; *see Eng. v. D.C.*, 651 F.3d 1, 13 (D.C. Cir. 2011) ("[T]he interview did not change [the expert's] opinion. Appellant thus suffered no unfair prejudice.").  And everything Mr. Poer did rely on to form his opinions, i.e., Apple's financial data, was appropriately produced during the fact discovery period.  Ex. D ¶ 9; Kramer Decl. ¶ 3.  Plaintiff's attempt to exclude *the entirety* of Mr. Poer's testimony on the basis of non-substantive facts from interviews which supported a total of five references in his two reports would be an overbroad, extreme, and unjustified sanction.  *See* Ex. 6 ¶ 18, n.10, n.25, n.31; Ex. 7 n.29.  "Nothing in the record indicates such an extreme sanction is warranted."  *In Re Lamictal*, 2018 WL 11413414, at *3.

Importantly, Mr. Poer made adequate and timely disclosures of these interviews and cited the information he considered from them in his report.  Federal Rule of Civil Procedure 26 does not require more.  *See Gillespie v. Sears, Roebuck & Co.*, 386 F.3d 21, 35 (1st Cir. 2004) ("[Rule 26] does not require that the expert report contain, or be accompanied by, all working notes or

recordings[.]").  Nevertheless, Mr. Poer also produced his notes from those interviews and well in advance of his scheduled deposition, should Plaintiff have wished to question him on them. Kramer Decl ¶ 3.  Instead, Plaintiff canceled that deposition the day before and now, ironically, poses rhetorical questions in its Motion about those same interview notes.[18]  Mot. at 29.  This is gamesmanship.  "[I]f Plaintiff lacks salient details as to what [Mr. Poer] did or did not do in reaching [his] conclusions, . . . it seems to us that this occurred as a result of Plaintiff's own failure to seek the information [it] claims [it] now does not possess, and not because the expert's process is somehow lacking."  *See Ward v. Carnival Corp.*, 2019 WL 1228063, at *5 (S.D. Fla. Mar. 14, 2019).

**E.    DR. GRENADIER'S OPINIONS ARE ADMISSIBLE IN THEIR ENTIRETY**

Defendants' rebuttal expert Steven Grenadier, Ph.D., is a professor of financial economics at the Graduate School of Business at Stanford University, where he has conducted research and published numerous articles in finance and economic journals on matters of investment analysis. Ex. 8 ¶¶ 1-2.  In his report, Dr. Grenadier responds to the opinions of Plaintiff's loss causation and damages expert, Dr. Steven Feinstein.  Fed. R. Civ. P. 26(a)(2)(D)(ii).

Plaintiff does not question Dr. Grenadier's expert qualifications.  Mot. at 31.  Nor does Plaintiff contend that Dr. Grenadier's opinions extend beyond the permissible scope of a rebuttal report.  Rather, under the mantra of "jury confusion," Plaintiff presents indiscriminate challenges to Dr. Grenadier's opinions in an insincere attempt to exclude a perspective that is unhelpful to its narrative.  *Id.* at 31-38.  But Plaintiff's predictable—albeit unfounded—disagreement with Dr. Grenadier's conclusions "is not a basis for inadmissibility."  *See Smilovits v. First Solar, Inc.*, 2019 WL 7282026, at *11 (D. Ariz. Dec. 27, 2019).  Instead, Plaintiff "may make use of the

---

[18] The answer to Plaintiff's rhetorical question about how Mr. Poer came to understand Apple's reseller traffic data if the Apple employee he interviewed was not knowledgeable on retail traffic data is also quite simple: *reseller* traffic data is different than *retail* traffic data.  *See* Mot. at 29. Moreover, Mr. Poer did not base his conclusions on his interviews with the Apple employees; he based his conclusions on his review of the traffic data that he analyzed. Ex. D ¶ 7.  Plaintiff does not challenge the reliability of that data, arguing only that Mr. Poer "opine[d] on data in an area beyond his expertise."  Mot. at 29.  Once again, Mr. Poer does not need to be specialized in "retail" when he is generally qualified to analyze and opine on corporate financial data.  *See Grouse River Outfitters*, 2019 WL 8752335, at *3.

1    traditional methods of testing the weight of an expert's opinion by vigorous cross examination

2    and presentation of contrary evidence." *See In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202,

3    1220 (S.D. Cal. 2010).

### 1. Dr. Grenadier's Rebuttal Opinions 1-3 Are Relevant and Helpful to the Trier of Fact

6         Plaintiff seeks to exclude Dr. Grenadier's opinions 1 and 2 on the grounds that the jury

7    will not reach issues of loss causation or damages if "the jury finds the alleged misrepresentation

8    is not actionable." Mot. at 31-32. That may be true, but these opinions are not premised on a

9    finding of "falsity" as an element of Plaintiff's securities claim. Rather, Dr. Grenadier's opinions

10   rest on assumptions about the substance or meaning of Mr. Cook's statement, i.e., whether a

11   factfinder determines that the statement was about currency trends or Apple's performance in

12   FQ4 2018. Ex. 8 ¶¶ 13-14, 37-42. To the extent that Plaintiff intends to present arguments at

13   trial, as it appears inclined to do, that Mr. Cook's statement left a "misleading impression" on

14   investors despite its factual accuracy, Dr. Grenadier's opinions 1 and 2 remain relevant. *See*, *e.g.*,

15   Dkt. No. 275 at 2. Moreover, it is of no consequence that Dr. Grenadier conditioned these

16   opinions on factual findings because "[a]n expert may, in appropriate circumstances, rely on

17   assumptions when formulating opinions." *Manion v. Ameri-Can Freight Sys. Inc.*, 2019 WL

18   3858415, at *4 (D. Ariz. Aug. 16, 2019); *California v. Kinder Morgan Energy Partners, LP*, 613

19   F. App'x 561, 564 (9th Cir. 2015) (challenges to an expert's assumption "goes to weight and not

20   admissibility").

21        Additionally, as explained above, *supra* at Section I, Plaintiff's last-ditch effort to back

22   away from its previous theory of liability does not render Dr. Grenadier's opinion 3 irrelevant or

23   prejudicial. Mot. at 32-33. While Plaintiff now exclaims that its theory is "***not*** that Apple

24   allegedly misrepresented that it was not facing ***any pressure*** in Greater China," *id.* at 32

25   (emphasis in original, quotation marks omitted), this stands in stark contrast to Plaintiff's verified

26   interrogatory responses, in which it contended that Mr. Cook "specifically den[ied] that Apple

27   was experiencing any deceleration or pressure on its business in China." Ex. A at 5; Ex. 8 ¶ 44

28   (citing the same). If anything is likely to confuse the jury, it is Plaintiff's amorphous, ephemeral

1   theory of liability, not Defendants' assertion of key defenses.  In any event, challenges to "the

2   [purported] weakness in [Dr. Grenadier's] assumptions are issues to be explored on cross-

3   examination," not matters justifying exclusion.  *See Manion*, 2019 WL 3858415, at *4.  And

4   though Plaintiff contests the fact that Dr. Grenadier did not offer a study to support his

5   conclusion, Mot. at 33, "Defendants have absolutely no obligation to conduct their own event

6   study."  *See SeaWorld*, 423 F. Supp. 3d at 916.

7           **2.      Dr. Grenadier's Rebuttal of Plaintiff's Loss Causation Analysis is
                    Admissible**

8

9           Plaintiff bases its overarching challenge to Dr. Grenadier's opinion 4 on the faulty

10  premise that Dr. Grenadier "opin[ed] that Plaintiff must redraft the alleged misrepresentation,"

11  and that such an opinion is contrary to law.  Mot. at 33-34.  But Dr. Grenadier does not venture an

12  opinion on what disclosures securities laws require.  Rather, he simply (and correctly) notes that

13  "Dr. Feinstein offers inconsistent views on what Apple could and should have disclosed" on

14  November 1, 2018, within the context of a "but-for full disclosure" framework that Dr. Feinstein

15  himself originally proposed. Ex. 8 ¶ 52 & n.72.  "[I]dentifying flaws in [Dr. Feinstein's] analysis

16  is proper rebuttal testimony."  *See SeaWorld*, 423 F. Supp. 3d at 918.  Dr. Grenadier also never

17  opines that Plaintiff's alleged corrective disclosures needed to "precisely mirror the earlier

18  misrepresentation," Mot. at 34, but instead validly points out that ever-shifting allegations

19  preclude Dr. Feinstein's ability to "evaluate the *extent* to which the but-for disclosure matches the

20  actual alleged corrective disclosures."  Ex. 8 ¶ 52 (emphasis added).  While Ninth Circuit law

21  may not require a mirror image, it is undisputed that a corrective disclosure must "at least relate

22  back to the misrepresentation and not to some other negative information about the company."

23  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016).[19]

24

25  _____

26  [19] Plaintiff also takes issue with Dr. Grenadier's statements about "Apple's standard [disclosure] practice[s]," but this constitutes proper criticism of information that Dr. Feinstein should have but failed to consider.  Mot. at 34-35 (citing Ex. 8 ¶¶ 58, 69, 78).  In any event, Plaintiff is wrong in

27  its suggestion that Apple must always disclose the material information it possesses.  Mot. at 34; *Cf. Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011) ("[C]ompanies can control

28  what they have to disclose … by controlling what they say to the market.").

1          Plaintiff also regurgitates its criticism that Dr. Grenadier "mistakes Plaintiff's claims,"

2    which as discussed above, *supra* at Section I, should be roundly rejected.  Mot. at 34.  Dr.

3    Grenadier appropriately relied on Plaintiff's interrogatory responses to understand its contentions

4    (Ex. 8 ¶ 44); if those interrogatory responses are now unreliable, that speaks more to Plaintiff than

5    to Dr. Grenadier.  Moreover, Dr. Grenadier explicitly notes that "[m]ost of [his] many criticisms

6    of Dr. Feinstein's loss causation and damages analyses do not depend on whether the but-for

7    disclosure would have been about the existence of 'pressure' in Greater China or about severity of

8    such 'pressure.'"  *Id.* ¶ 17 n.29.

9          Finally, Plaintiff's challenges to Dr. Grenadier's disclosure-specific opinions, which boil

10   down to claims that Dr. Grenadier's analysis "lack[ed] any methodological basis," are also

11   wrong.  Mot. at 35-36.  Dr. Grenadier's "failure to conduct an event study does not render his

12   testimony inadmissible," especially when he accepts the returns estimated by Dr. Feinstein's

13   event study.  *See SeaWorld*, 423 F. Supp. 3d at 917.  But doing so does not mean that Dr.

14   Grenadier cannot opine on the "limitations to [Dr. Feinstein's] event study analysis," including

15   Dr. Feinstein's "fail[ure] to appropriately account for confounding information."  Ex. 8 ¶ 66.

16   Indeed, Dr. Feinstein himself recognized that "a statistically significant stock price decline can be

17   driven by confounding information."  *Id.* ¶ 65 n.94 (citing *id.* ¶ 98).  Moreover, Dr. Grenadier's

18   conclusions about confounding information contained in the November 5 and 12, 2018 and

19   January 2, 2019 alleged corrective disclosures are reliably based on an extensive analysis of

20   Apple's internal documents, deposition testimony, and other relevant expert testimony, in

21   addition to Dr. Grenadier's unchallenged qualifications as a loss causation expert.  *Id.* ¶¶ 1-2, 64-

22   102.[20]

23

24

_____

25   [20] Plaintiff's reliance on *In re Allstate Corp. Sec. Litig.*, 2022 WL 842737, at *18 (N.D. Ill. Jan.
     10, 2022) is inapposite, or even undermines Plaintiff's argument.  Mot. at 36.  There, the
26   defendants sought to exclude the plaintiffs' loss causation expert on the grounds that it relied on
     impossible allegations, which the court rejected.  *Allstate*, 2022 WL 842737, at *18.  But
27   Defendants did not move to exclude Dr. Feinstein's testimony, but rather reserve their arguments
     on Dr. Feinstein's deficiencies for trial, just as Plaintiff should have done with respect to Dr.
28   Grenadier.  *See* Dkt. No. 292.

1

### 3. Dr. Grenadier's Rebuttal of Plaintiff's Damages Analysis is Admissible

2

3      All of Plaintiff's challenges to Dr. Grenadier's damages opinions amount to bickering

4  with his conclusions, which is an improper inquiry at this stage.  Mot. at 36-38; *see Elosu*, 26

5  F.4th at 1024 ("[T]he test under *Daubert* is not the correctness of the expert's conclusions but the

6  soundness of his methodology.").  Plaintiff does not articulate any unsound methodology that Dr.

7  Grenadier employed when criticizing Dr. Feinstein for failing to account for information that the

8  market knew or the quantitative aspects of the alleged corrective disclosures in his price inflation

9  calculation.  Mot. at 36-37 (citing Ex. 8 ¶¶ 106-14); *see In re Dig. Music Antitrust Litig.*, 321

10  F.R.D. 64, 78 (S.D.N.Y. 2017) ("Rebuttal experts . . . have a less demanding task because they

11  have no burden to produce models or methods of their own; they need only attack those of

12  plaintiffs' expert.").  Plaintiff's reliance on this Court's class certification order or loss causation

13  case law to (incorrectly) attack Dr. Grenadier's conclusions on damages is simply beside the

14  point.  Mot. at 36-37.

15      Likewise, Plaintiff cannot seriously challenge the methodology of Dr. Grenadier's damage

16  calculation examples when those illustrations "use Dr. Feinstein's own methodology" and

17  "adopt[] Dr. Feinstein's assumption" on apportioning confounding information.  Ex. 8 ¶¶ 119-20;

18  *see* Mot. at 37.  Moreover, to ensure their reliability, Dr. Grenadier supports each example with a

19  careful analysis of the relevant internal and public documents, and employs his extensive

20  qualifications in the field of finance and economics.  Ex. 8 ¶¶ 1-2, 121-31.  Plaintiff's criticism

21  that there should be no price inflation where "analysts' consensus perfectly aligned with a

22  defendant's guidance range" only betrays the fact that Dr. Grenadier correctly opined that Dr.

23  Feinstein failed to consider this oddity.  Mot. at 37; *see* Ex. 8 ¶ 110.

24      Finally, Plaintiff sets forth no basis to exclude Dr. Grenadier's opinions on options

25  damages, but once again resorts to attacks on weight.[21]  Mot. at 38.  Plaintiff points to no

26

---

27  [21] Despite Plaintiff's assertion that it "does not proceed under . . . a materialization of the risk" damages theory, see Mot. at 38 n.30, Plaintiff contends in its verified interrogatories that Mr.

28  Cook "fail[ed] to disclose the risk of [] pressure from [] deceleration and trade tensions in China," and therefore Dr. Grenadier is entitled to respond to that allegation.  *See* Ex. A at 5.

1    authority that an options damages analysis should not consider, as a matter of law, how an options

2    investor would have traded but for the alleged price inflation—an opinion that Dr. Grenadier

3    premised on the testimony of Plaintiff's own options expert.  Ex. 8 ¶¶ 139-43.  And Plaintiff's

4    defense of Dr. Feinstein's ability to account for changes in implied volatility is simply "[a]

5    presentation of contrary evidence," which has no bearing on the admissibility of Dr. Grenadier's

6    opinions.[22]  *See In re REMEC*, 702 F. Supp. 2d at 1220.

7         **F.     MS. TAYLOR'S OPINIONS ARE ADMISSIBLE IN THEIR ENTIRETY**

8         Finally, Plaintiff raises a handful of meritless challenges to the opinions offered by Apple

9    expert Carlyn Taylor, a CPA and business consultant with three decades of extensive experience

10   in matters involving financial forecasting.  Mot. at 38-40.  The Court should reject each of

11   Plaintiff's challenges, for the reasons explained below.

12        *First*, Ms. Taylor's opinions are appropriately offered as a rebuttal to those offered by

13   Plaintiff's expert Oded Shenkar.  As relevant here, Dr. Shenkar's report purports to identify a list

14   of allegedly negative "warning signs" about consumer demand for iPhone sales in China in the

15   period leading up to the November 1, 2018 earnings call.  Ex. 15 ¶ 130-49.  But as Ms. Taylor

16   explains at length in her rebuttal, Dr. Shenkar's report "contains no organizing framework for

17   understanding the evidence that Dr. Shenkar cites."  Ex. 9 ¶ 6.  More specifically, Ms. Taylor

18   critiques Dr. Shenkar's analysis by pointing out that "Dr. Shenkar does not describe or analyze

19   Apple's forecasting process, and he does not address whether the allegedly negative information

20   he cites was already incorporated into Apple's guidance."  *Id.*  Ms. Taylor then goes on to

21   "describe Apple's forecast process and explain that it was extensive, robust, and has been

22   historically reliable."  *Id.* ¶ 7.

23        Plaintiff contends that Ms. Taylor's rebuttal report "should be excluded because it is far

24   outside the scope of Shenkar's report."  Mot. at 38.  Not so.  As Plaintiff would have it, because

---

25
[22] Notably, however, to support this argument, Plaintiff cites to evidence contained in its options
26   expert's reply report in support of its supplemental motion for class certification, Mot. at 38
     (citing Dkt. No. 289), which, in addition to being improper reply evidence for the class
27   certification briefing, *see* Dkt. No. 291, was not part of Plaintiff's expert disclosures and therefore
     constitutes inadmissible and untimely expert testimony should Plaintiff intend to present this as
28   evidence at trial.

Dr. Shenkar "***does not*** provide any opinion whatsoever about the nature or reliability of Apple's forecasting or guidance issuing process," (*id.* at 39) (emphasis in original), neither can Ms. Taylor so much as mention Apple's forecasting process. But Plaintiff's overly simplistic argument ignores that the thrust of Ms. Taylor's rebuttal critique is about precisely what Dr. Shenkar *failed to consider*—she opines that Dr. Shenkar's analysis was faulty because he identified certain documents that purportedly constitute "warning signs" about Apple's business in China, but failed to acknowledge that these purported warning signs were actually reflected in Apple's November 1, 2018 revenue guidance. That is a glaring omission in Dr. Shenkar's analysis that Ms. Taylor appropriately critiqued as a rebuttal witness. *See Graystone Funding Co., LLC v. Network Funding, L.P.*, 2022 WL 1063734, at *12 (D. Utah Apr. 8, 2022) (allowing rebuttal expert to testify "regarding the assumptions underlying [the opening expert's] analysis, as well as factors that [the opening expert] allegedly failed to consider or include in his analysis"); *Nature's Plus Nordic A/S v. Nat. Organics, Inc.*, 982 F. Supp. 2d 237, 239 (E.D.N.Y. 2013) (allowing rebuttal expert testimony critiquing opening expert's failure to consider relevant factors).[23]

*Second*, Plaintiff argues, incorrectly, that Ms. Taylor's opinions relating to Apple's forecasting process are irrelevant because "the reliability and robustness of Apple's 1Q19 forecasting and guidance process is not at issue in this case." Mot. at 39. For the reasons already explained at length above (*supra* at Section I), Plaintiff is wrong.

*Finally*, the Court should not exclude Ms. Taylor's opinions merely because, as Plaintiff argues, both Ms. Taylor and Mr. Poer opine on issues relating to Apple's forecasting process. Mot. at 38. As an initial matter, Ms. Taylor's opinions relating to forecasting are offered specifically in the context of her rebuttal to Dr. Shenkar's report, whereas Mr. Poer's forecasting-related opinions are, by contrast, offered in his opening report. In any event, Defendants do not

---

[23] Ms. Taylor's report additionally critiques a number of the factors that Dr. Shenkar does cite in his opening report, opining that "the various pieces of evidence cited by Dr. Shenkar in relation to what Apple knew about the iPhone XR launch were reasonably understood by Apple to be imprecise indicators of consumer demand for the iPhone XR." Ex. 9 ¶ 7. Plaintiff's Motion does not even mention this additional opinion, nor explain how it could be beyond the scope of an appropriate rebuttal. For that reason alone, the Court should deny Plaintiff's request to exclude the entirety of Ms. Taylor's opinions.

1   intend to put on unnecessarily duplicative evidence at trial.   As the Court has previously

2   recognized, "expert reports must be comprehensive and . . . as a consequence, the reports may

3   have overlapping material.   However, that does not necessitate the Court excluding the

4   presentation of such evidence in advance."   *Apple iPod iTunes Antitrust Litig.*, 2014 WL

5   12719192, at *1 (N.D. Cal. Nov. 18, 2014).

6   <u>**CONCLUSION**</u>

7       For the foregoing reasons, the Court should deny Plaintiff's omnibus motion to exclude

8   opinion testimony of Defendants' experts.

9

10  Dated:  October 20, 2022

    Respectfully submitted,
    ORRICK, HERRINGTON & SUTCLIFFE LLP

11

12

    */s/ James N. Kramer*
    JAMES N. KRAMER

13

14

    Attorneys for Defendants Apple Inc., Timothy
    D. Cook, and Luca Maestri

15

16

17

18

19

20

21

22

23

24

25

26

27

28

35