# EXHIBIT C

1   JAMES N. KRAMER (SBN 154709)
jkramer@orrick.com
2   MICHAEL D. TORPEY (SBN 79424)
mtorpey@orrick.com
3   ALEXANDER K. TALARIDES (SBN 268068)
atalarides@orrick.com
4   ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
5   405 Howard Street
San Francisco, CA  94105-2669
6   Telephone:     +1 (415) 773-5700
Facsimile:      +1 (415) 773-5759
7
Attorneys for Defendants Apple Inc.,
8   Timothy Cook, and Luca Maestri

9

10                      UNITED STATES DISTRICT COURT

11                   NORTHERN DISTRICT OF CALIFORNIA

12                          OAKLAND DIVISION

13

| 14 | IN RE APPLE INC. SECURITIES LITIGATION | Lead Case No. 4:19-cv-02033-YGR |
|---|---|---|
| 15 | | **DECLARATION OF PROFESSOR BRETT TRUEMAN IN SUPPORT OF** |
| 16 | _____ | **DEFENDANTS' OPPOSITION TO PLAINTIFF'S *DAUBERT* MOTION** |
| 17 | This Document Relates To: | |
| 18 | ALL ACTIONS. | Hearing |
| 19 | | Date:   TBD |
| 20 | | Time:   2:00 p.m. |
| 21 | | Ctrm:  1, 14th Floor |
| | | Judge:  Honorable Yvonne Gonzalez Rogers |

22

23

24

25

26

27

28

1    I, Brett Trueman, declare as follows:

2    1.    I prepared and submitted reports in this matter on April 27, 2022 (the "Trueman

3    Report") and on June 10, 2022 (the "Trueman Rebuttal Report"). On September 9, 2022, Plaintiff

4    filed a *Daubert* Motion (the "Motion") to exclude my expert opinions.[1]

5    2.    I disagree with the criticisms in the Motion and have prepared this Declaration to

6    explain why. Ordinarily, plaintiffs raise any questions or objections to my opinions at deposition,

7    but here Plaintiff did not take my deposition, so I have prepared this Declaration instead.

8    3.    The Motion claims my methodology is unreliable; that certain of my opinions are

9    unnecessary because a jury can read and interpret analyst reports; that I have distorted Plaintiff's

10   claims; and that my references to Apple's gaming applications and foreign currencies are

11   irrelevant.

12   4.    I disagree with these criticisms. I adopt by reference all of the terms defined in the

13   Trueman Report and the Trueman Rebuttal Report.

14   **I Used a Reliable and Appropriate Methodology**

15   5.    The Motion alleges that the Trueman Report "does not explain what 'analysis' [I]

16   in fact 'performed,'"; "how [I] determined what analyst reports to consider,"; and "what tools [I]

17   utilized to assess [the content of analyst reports] or how [I] determined what the analyst

18   purportedly understood based on what they wrote in the reports."[2]

19   6.    I disagree with these allegations. In the Trueman Report, I described the several

20   steps in my methodology and why they comprised a reliable approach:

21   ▪ I explained why it was a reliable approach to analyze analyst reports. Academic
22   research has shown that security analysts play a critical role in interpreting
     corporate disclosures and communicating their understanding to the securities
23   markets.[3] I cited academic articles that explain that analysts help investors

24

25

26   [1] Lead Plaintiff's Notice Of Motion And Omnibus Motion To Exclude Opinion Testimony Of
     Defendants' Proposed Experts; Memorandum Of Points And Authorities In Support Thereof,
     dated September 9, 2022.

27   [2] Motion at 18-19.

28   [3] Trueman Report, ¶23.

DECLARATION OF PROFESSOR BRETT TRUEMAN IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFF'S *DAUBERT* MOTION
CASE NO. 4:19-CV-02033-YGR

understand the implications of earnings announcements and help direct investors to the most important information in corporate disclosures.[4]

- ▪ <u>I explained how I determined which analyst reports to review</u>. I reviewed 38 publicly available analyst reports issued after the November 1, 2018 Conference Call and through November 4, 2018. I explained that I stopped at November 4, 2018 because the Complaint alleges that a corrective disclosure took place on November 5, 2018.[5]

- ▪ <u>I reviewed the contents of these analyst reports in detail</u>. I reviewed each of these reports to determine, broadly, whether they discussed China, pressure in China, Apple's performance in China, or any other similar topic.

- ▪ <u>I presented my detailed conclusions along with specific references to the relevant analyst reports</u>.

7.     In Exhibit 1 of the Trueman Report, I summarized my findings. I also (in the same Exhibit 1) compared those 38 reports to reports filed by the same analysts in October 2018 to the extent the analysts issued a report during this time period to see if there was any meaningful change in analysts' views about Apple's prospects in China after the November 1, 2018 Conference Call. There was not.

8.     In short, my report described my methodology and supported it with references to the academic literature. My methodology is based on collecting and classifying relevant information from analyst reports, which are widely used in academic research and understood to be a valuable source of corporate information. This analysis could be straightforwardly replicated by another expert wishing to do so.

9.     The Motion states that my sample consisted of 38 analyst reports but that my Exhibit 1 lists 44 analyst reports over the same time period of November 1 to November 4, 2018. This is simply incorrect: Exhibit 1 contains precisely 38 analyst reports dated between November 1 to November 4, 2018, as well as six additional reports outside this date range. Similarly, the Motion states that in my list of Documents Considered, I listed 47 analyst reports with dates ranging from November 1 to November 4, 2018.  In fact, nine reports of the reports were either:

---

[4] Trueman Report, ¶¶23-24.

[5] Trueman Report, ¶35, FN 27.

(i) reports issued on November 1, 2018 but prior to the Conference Call;[6] (ii) reports that were not about Apple,[7] or (iii) reports that were not relevant to the issues in this case or related to Apple's business.[8]

10.     The Motion claims that I did not discuss a November 1, 2018 Morgan Stanley Tech report.[9] But the report is not a research report. It states as much at the top, saying: "SALES COMMENTARY -- Not a product of MS Research and should not be regarded as a research report."[10]

11.     The Motion also states that I did not explain what "tools" I used in my analysis and, specifically, that I did not use "text analytics" or a "discounted cash flow ("DCF")" approach, as described (briefly) in Professor Partnoy's report. But there is no reason to believe that either approach—proposed by Professor Partnoy and repeated in the Motion—can be implemented here. Professor Partnoy provides only cursory and meaningless sketches of how he

---

[6] There were three such reports: Cross Research, "F4Q18 Quick Take; Solid Quarter But Guidance Reflects Uncertainty," November 1, 2018 (APL-SECLIT_00587788), Goldman Sachs, "Apple Inc. (AAPL): Preview Update: Quick Reference Into an Important Print," November 1, 2018 (APL-SECLIT_00001735), and RBC, "AAPL – Sept-qtr Beat But Dec-qtr EPS Below Expectations," November 1, 2018 (RBC_0000701).

[7] There were three such instances. The first is a report by Credit Suisse issued on November 2, 2018 titled, "Apple Behind Us, A Fresh Start." The report is about Dialog Semiconductor (not Apple) and does not mention any relevant details about Apple. The second and third instances result from a report that was inadvertently listed twice in the Documents Considered. This was a report by Deutsche Bank issued on November 4, 2018 titled, "Expect F4Q In-line With Conservative F1Q Guide on China/Apple Headwinds," which is a report about Qualcomm, not Apple.

[8] There were three such reports. Macquarie Research's report issued on November 1, 2018 titled, "Preview of Apple's Supreme Court Case on App Store Economics," is about a Supreme Court case involving Apple's app store and does not otherwise contain relevant business information. Macquarie Research, "Preview of Apple's Supreme Court Case on App Store Economics," November 1, 2018 (APL-SECLIT_00001742). Macquarie Research's report issued on November 2, 2018 titled, "Internet and Media: UK and EU Digital Services Tax," is about new tax proposals in the U.K and the E.U. and does not contain other relevant information about Apple's business. Macquarie Research, "Internet and Media: UK and EU Digital Services Tax," November 2, 2018 (APL-SECLIT_00002057). The third is a report by ValuEngine issued on November 1, 2018 that valued Apple based on its financials but contains no relevant references to Apple's business in China and makes no mention of the Conference Call and appears to have been prepared prior to the Conference Call or else simply did not consider the information from the Conference Call.

[9] Motion at 19, FN 20.

[10] See APL-SECLIT_00587555 (E-mail from Thomas Wigg (Morgan Stanley) to Matt Blake (Apple), November 1, 2018.

DECLARATION OF PROFESSOR BRETT TRUEMAN IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFF'S *DAUBERT* MOTION
CASE NO. 4:19-CV-02033-YGR

1   thinks these approaches could be conducted and does not implement them himself. I discuss text

2   analytics first.

3         12.    Professor Partnoy's description of a text analytics approach provides no insight

4   into what is actually to be done, whether it can be done, or if the results would have any

5   relevance. Professor Partnoy does not explain what his proposed methodology even means as he

6   writes that text analytics can be used "to compare analyst reactions to language used by the same

7   analyst[.]"[11] Then he suggests a completely different approach, stating, one can "compare analyst

8   reactions to…other analysts in similar contexts."[12] What would count as a 'similar context?' He

9   does not say. In both instances, he does not explain how his methodology would be implemented

10   or provide any reason to believe his briefly-sketched approaches would result in any different

11   findings than mine.

12         13.    Professor Partnoy points to a single academic article as an example of text

13   analytics, presumably to shed some light on what he has in mind.[13] But the authors of that article

14   conducted an analysis not of the statements of a single company and its executives, as Professor

15   Partnoy advocates here, but of 17,750 conference calls with matched analyst reports, across all

16   S&P 500 companies from 2003 to 2012.[14] Their analysis (which addresses a very different issue

17   from that being addressed here) cannot be applied to the study of a single company. In fact, I am

18   not aware of any studies showing that textual analysis can be used on a single company in the

19   context at issue here. Professor Partnoy certainly does not point to any.

20         14.    A DCF approach, also advocated by Professor Partnoy, is also one that cannot be

21   implemented here. Professor Partnoy states that I could have used a DCF analysis "to assess the

22   extent to which analyst estimates were revised, or should have been revised, to reflect the

23   relationship between certain of Mr. Cook's statements and analysts' expected cash flow and

24

---

25   [11] Rebuttal Expert Report of Professor Frank Partnoy, June 10, 2022 ("Partnoy Report"), ¶21.

    [12] Partnoy Report, ¶21.

26

    [13] Huang, Allen H., Lehavy, Reuven, Zang, Amy Y., and Zheng, Rong, "Analyst Information

27   Discovery and Interpretation Roles: A Topic Modeling Approach," *Management Science* 64, (2018) 2833-2855.

28   [14] Ibid, p. 2838.

DECLARATION OF PROFESSOR BRETT TRUEMAN IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFF'S *DAUBERT* MOTION
CASE NO. 4:19-CV-02033-YGR

1    discount rate assumptions."[15] He writes that "the DCF methodology is the 'gold standard' for use

2    in the kinds of assessment and valuations made by analysts."[16] Yet, he himself fails to use this

3    purported gold standard and does not perform any analysis that would contradict my findings.

4           15.     One possible reason why he did not attempt such an analysis is that the data one

5    would need are not available. As the quotation above indicates, a DCF model, according to

6    Professor Partnoy, requires as inputs analysts' expectations of future cash flows from Apple's

7    business in China, immediately before and after Mr. Cook's Challenged Statement. But no

8    analysts broke out the China portion of Apple's cash flow forecasts separately. So this analysis is

9    simply not possible to perform.

10          16.     The Motion also claims that I draw improper inferences from analyst reports—that

11   I draw inferences based upon an understanding of the state of minds of analysts. This is incorrect.

12   I specifically explained in the Trueman Report that I was "not suggesting that I can read the

13   minds of the analysts, but rather I am concluding from the carefully crafted language of their

14   reports what I believe they understood, heard, and interpreted Mr. Cook to mean."[17] I explained

15   that instead of using the word "understand," I could have used the words "heard" or

16   "interpreted."[18]

17          17.     In other words, I based my conclusions upon the "carefully crafted language" in

18   analyst reports—and I specifically disclaimed any ability to read their minds. The Trueman

19   Report contains extensive discussion of the actual *words* that were used in those reports. What

20   analysts write in their reports is a function of what they heard or learned and how they interpreted

21   what they heard or learned. Equivalently, one can infer what analysts "understood" from what

22   they wrote. An expert can read and draw conclusions from the presence or absence of information

23

24   [15] Partnoy Report, ¶21.

25   [16] Partnoy Report, ¶21, FN 34. Despite his high praise for a DCF analysis when he criticized me
     for not using a DCF analysis, in his own writings (which he did not cite in his Report), Professor
     Partnoy describes a DCF analysis as not necessarily applicable in every securities case. Here, of

26   course, he provides no analysis or framework for showing whether a DCF would be helpful in
     *this* context.

27   [17] Trueman Report, ¶26.

28   [18] Trueman Report, ¶26.

DECLARATION OF PROFESSOR BRETT TRUEMAN IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFF'S *DAUBERT* MOTION
CASE NO. 4:19-CV-02033-YGR

in an analyst report.

18.     Furthermore, the opinions I expressed rest on the views of the vast majority of the analysts writing after the Conference Call on November 1, 2018, and through November 4, 2018. Neither the Motion nor the Partnoy Report even remotely addresses the view (of the vast majority of analysts) in these analyst reports—or offers any alternative analysis that reaches different conclusions from those that I reached.

**The Opinions I Expressed Were Based Upon My Specialized Knowledge and Experience**

19.     The Motion claims that a jury does not require expert testimony to understand what analysts wrote in their reports because "it does not provide information beyond the common knowledge of the jury."[19] I do not have an opinion on what a jury may or may not understand, as that is a topic for the Court to decide. I would note, however, that my opinions were based upon my specialized knowledge and extensive experience with analyst reports.

20.     Analyst reports seek to identify, among other things, value-relevant information for a company and often discuss the effects of complex and sophisticated economic and business forces affecting a company's stock price. They contain complex analyses of financial results and forecasts of future performance, presentations of historical and projected financial statements, buy/sell recommendations, earnings forecasts, and target prices. They discuss a myriad of topics, not all of which may be relevant to the issues at hand. I carefully reviewed all the information in the analyst reports issued after the Conference Call on November 1, 2018 and through November 4, 2018 in order to extract what I believed to be relevant to my assignment.

21.     I also performed a "before and after" expert analysis that involved a comparison of those analyst reports with prior analyst reports issued in October 2018 by the same analysts. The conclusions I reached depended on an examination of this combined set of analyst reports.

22.     As I noted above, my analysis was based on a holistic review of all these analyst reports and I reached conclusions based on the view of the vast majority of analyst reports, and not on readings of isolated analyst reports.

---

[19] Motion at 21.

DECLARATION OF PROFESSOR BRETT TRUEMAN IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFF'S *DAUBERT* MOTION
CASE NO. 4:19-CV-02033-YGR

**The Opinions I Expressed Result From an Economically Reasonable Reading of Analyst Reports**

23.     The Motion takes issue with the opinions I expressed, saying that I "have mischaracterize[d] Plaintiff's claims," and that I have "create[d] the impression that Plaintiff must prove the market believed Apple was not facing business pressures in China and that Defendants are absolved of liability if the statements were framed in the past tense."[20]

24.     This is incorrect. In my report, I was neither attempting to characterize the Plaintiff's claims nor resolve questions of liability. As I described in the Trueman Report, my assignment was as follows:

> I have been asked to review analyst reports and assess analyst reactions to the Challenged Statement. I have also been asked to review and consider other public information, if deemed relevant, for my analysis. Furthermore, I have been asked to review analyst reports published prior to the Conference Call to develop my understanding of the analysts' assessment of Apple's business in China prior to November 1, 2018.[21]

25.     The conclusions I reached flow directly from this assignment—and from a careful expert analysis of what was written in analyst reports issued after the Conference Call on November 1, 2018 and through November 4, 2018. I did not characterize (or mischaracterize) Plaintiff's claims—that was not part of my assignment.

26.     The Motion also says a term I used—"intra-quarter update"—is an "irrelevant and manufactured concept" and that, "nowhere has Plaintiff alleged Apple provided an intra-quarter update or that the Company was providing forward-looking guidance."[22] But I used this term in a specific way: to contrast it with a situation in which analysts wrote that Apple was merely discussing its previous quarter's (FQ4 2018) results. I wrote in the Trueman Report:

> In my opinion, analysts, and by extension the market, did not understand Mr. Cook to be offering an intra-quarter update or forward-looking guidance in the Challenged Statement, but was merely discussing the FQ42018 results that were

---

[20] Motion at 22-23.

[21] Trueman Report, ¶17.

[22] Motion at 22-23.

DECLARATION OF PROFESSOR BRETT TRUEMAN IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFF'S *DAUBERT* MOTION
CASE NO. 4:19-CV-02033-YGR

the subject of the Conference Call.[23]

27.    Under this definition, and as I explained in the Trueman Report, this was clearly the case—analysts did not take Apple to be providing an intra-quarter update or forward-looking guidance.

**My Opinions regarding Gaming and Foreign Currencies were Derived Directly from Analyst Reports**

28.    In the Trueman Report, through my expert analysis, I showed that analysts, in their reports taken as a whole, did not indicate that Apple was not facing pressure in China as a result of the Conference Call. I presented additional evidence from analyst reports to show that, from their comments about gaming, analysts expressed concerns about China. This evidence corroborates my opinion that it is simply untrue to state that analysts understood Mr. Cook to be saying Apple was not facing pressure in China—gaming provides additional evidence of this. The Motion criticizes me for offering an opinion on gaming, saying that Plaintiff has not made any claims with respect to gaming and that the Challenged Statement was not focused on gaming. But this fails to understand how analysts incorporate information from corporate disclosures, which is holistically. The evidence from gaming formed part of what analysts wrote about pressure on Apple's business in China, as I explained in the Trueman Report.[24] It is not appropriate to read analyst reports in a piecemeal fashion, as the Motion suggests.

29.    I also explained that many analysts discussed foreign currency issues. One natural question that arises is if the Challenged Statement was not read by analysts as saying that Apple was not facing pressure in China—and it was clearly not—then how did analysts interpret the Challenged Statement when they discussed it at all? As I showed in the Trueman Report, many analysts wrote that China's currency distinguished it from other emerging market countries.[25] The Motion claims that this opinion is irrelevant because:

---

[23] Trueman Report, ¶27.

[24] Trueman Report, ¶¶44-50.

[25] Trueman Report, ¶¶41-43.

[W]hether China was distinguishable on that basis [a currency basis] has no bearing on whether Defendants misrepresented the current state of Apple's performance in China during the Class Period and specifically as of November 1, 2018.[26]

30.     But this evidence is relevant because it is additional evidence that not only did analysts not interpret the Challenged Statement as saying that Apple was not facing pressure; in many instances when they did discuss it, they understood it to be addressing something different, namely currency issues.

31.     In short, gaming and currency issues are examples of the importance of reading analyst reports holistically. To do otherwise would be misleading.


I declare under penalty of perjury under the laws of California and the United States of America that the foregoing is true and correct. Executed in Los Angeles, California on October 19, 2022.


_____
Brett Trueman, Ph.D.

---

[26] Motion at 24.