# EXHIBIT A

2023 WL 2908827
Only the Westlaw citation is currently available.
United States District Court, M.D. Pennsylvania.

DOUGLAS S. CHABOT, COREY M. DAYTON,
and JOEL M. KLING, Individually and on
Behalf of All Others Similarly Situated, Plaintiffs

v.

WALGREENS BOOTS ALLIANCE,
INC., STEFANO PESSINA, and GEORGE
R. FAIRWEATHER, Defendants

CIVIL ACTION NO. 1:18-CV-2118
|
Filed 03/31/2023

**SEALED MEMORANDUM** [1]

[1]     This memorandum is provisionally filed under seal
because it references material included in sealed
exhibits submitted by the parties. Mindful of the
public right of access to the courts, it is our
intention to unseal the memorandum. Before doing
so, however, we will entertain any request for
appropriate redaction. We will task the parties to
meet and confer to review this memorandum and,
within seven days of today's date, to report what, if
any, material they believe should be redacted and
explain—with citations to applicable authority—
the basis for the requested redaction.
[Editor's Note: Decision later unsealed by the
court.]

Christopher C. Conner United States District Judge Middle
District of Pennsylvania

**\*1**   This certified class action arises from a failed
merger between defendant Walgreens Boots Alliance, Inc.
("Walgreens"), and Rite Aid Corporation ("Rite Aid").
Plaintiffs contend representatives of Walgreens made several
misleading statements regarding the attempted merger in
violation of federal securities laws. Before the court are
the parties' cross-motions for summary judgment pursuant
to Federal Rule of Civil Procedure 56. We will deny both
motions.

## I. Factual Background & Procedural History [2]

[2]

Local Rule 56.1 requires a motion for summary
judgment pursuant to Federal Rule of Civil
Procedure 56 be supported "by a separate, short,
and concise statement of the material facts, in
numbered paragraphs, as to which the moving
party contends there is no genuine issue to be
tried." M.D. PA. L.R. 56.1. A party opposing
a motion for summary judgment must file a
separate statement of material facts, responding
to the numbered paragraphs set forth in the
moving party's statement and identifying genuine
issues to be tried. Id. Unless otherwise noted,
the factual background herein derives from the
parties' Rule 56.1 statements of material facts. (See
Docs. 231, 237, 242-2, 245-1). To the extent the
parties' statements are undisputed or supported by
uncontroverted record evidence, the court cites
directly to the statements of material facts.

In addition to providing responses to defendants'
statements of fact, plaintiffs filed a document styled
as "Additional Statement of Material Facts." (See
Doc. 242-3). Defendants move to strike this
document and request that the court deem their
own Rule 56.1 statement unopposed; defendants
contend plaintiffs' additional statement is not
authorized by Rule 56.1, and their responsive
statement violates Rule 56.1's requirement that
such statements, like opening Rule 56.1 statements,
be "short and concise." (See Doc. 266). As for
the additional statement, neither Federal Rule of
Civil Procedure 56 nor Local Rule 56.1 authorizes
this filing, and plaintiffs did not request leave
of court therefor. We thus decline to accord this
document the weight contemplated by Rule 56.1.
See Barber v. Subway, 131 F. Supp. 3d 321, 322
n.1 (M.D. Pa. 2015) (Conner, C.J.); see also Rau
v. Allstate Fire & Cas. Ins. Co., 793 F. App'x
84, 87 (3d Cir. 2019) (nonprecedential) (citing
with approval, inter alia, Barber, 131 F. Supp.
3d at 322 n.1, in holding district courts enjoy
wide discretion in interpreting their local rules).
Turning to the responsive Rule 56.1 statement, we
agree the filing at times runs afoul of Rule 56.1's
spirit. Nonetheless, we have examined the entire
Rule 56 record, including plaintiffs' additional
statement. In light of our conclusion that the record
is teeming with genuine disputes of material fact,

defendants' requested relief—an order deeming virtually their entire Rule 56.1 statement admitted —is unwarranted and inappropriate. Hence, we will deny defendants' motion.

**A. Initial Merger Agreement**

Walgreens and Rite Aid announced their intended merger on October 27, 2015. (See Doc. 231 ¶ 6). Under the initial merger agreement, Walgreens would purchase all of the outstanding shares of Rite Aid for $9.00 a share, a 48% premium on the prior day's closing price. (See id.) The transaction valued Rite Aid, which operated 4,561 stores in 31 states but was struggling under the weight of its debts, at approximately $17.2 billion. (See id. ¶¶ 5-6, 23).

**\*2** Walgreens, Rite Aid, and the larger financial community recognized from the outset Walgreens taking possession of Rite Aid's entire store catalogue would create regulatory challenges with the Federal Trade Commission ("FTC"), whose approval was a prerequisite to closing the deal. (See id. ¶¶ 12-16, 65). Accordingly, Walgreens hired Weil, Gotshal & Manges LLP ("Weil") to assist in shepherding the transaction through the approval process. (See id. ¶¶ 29, 64-65). Before the merger was announced, Weil advised Walgreens the deal was "highly likely" to receive FTC approval with only a "small risk the FTC could seek to block" the merger. (See Doc. 234-4 at slide 12). Nonetheless, Weil warned that the FTC was likely to require Walgreens to divest up to 500 Rite Aid stores and would conduct a "lengthy investigation" lasting six to nine months or more. (See id.)

The companies wrote several contingencies into the merger agreement in anticipation of the regulatory approval process, three of which are especially relevant here. First, the agreement set a completion deadline of October 27, 2016; if the deal did not close by that date, the agreement would terminate automatically, unless the delay was due to the regulatory process, in which case either company could unilaterally extend the deadline to January 27, 2017. (See id. ¶ 18). Second, the agreement authorized Walgreens to sell out (divest) up to 1,000 Rite Aid stores to accommodate anticipated FTC antitrust concerns, and to terminate the agreement should the FTC require a larger divestiture. (See id. ¶ 19). Third, Walgreens agreed to pay Rite Aid a breakup fee of $325 million should the merger agreement be terminated due to FTC approval problems. (See id. ¶ 20).

When the merger was announced, Walgreens and Rite Aid publicly expressed confidence the deal would ultimately meet with regulatory approval. (See, e.g., id. ¶ 25 (Rite Aid Form 8-K reported the two companies "had extensive consultation with anti-trust counsel, and based upon the complementary nature of the market profiles of both companies, and the amount of pharmacy counters in the U.S., [they did] not believe the combination should cause regulatory concern")). The companies also announced they believed the transaction would "close in the second half of calendar 2016." (See id. ¶ 7). By the end of business on October 27, 2016, Rite Aid stock was selling for $8.67 per share, an increase of $2.59 per share or 42.6% from the prior day's closing price of $6.08. (See Doc. 238-1 ¶ 37 & n.42).[3]

[3]
> Our knowledge of the fluctuations in Rite Aid's stock price comes from the reports filed by the parties' financial experts, Allen Ferrell and Bjorn Steinholt. (See Docs. 234-98, 238-1, 238-2). The parties raise various challenges to one another's experts, but no one disputes the accuracy of the stock prices utilized by Ferrell and Steinholt in their analyses.

The companies initiated the FTC approval process on November 10, 2015. (See Doc. 231 ¶ 68). Weil took the lead in all of Walgreens' interactions with the agency, meeting with FTC staff on numerous occasions, exchanging hundreds of emails and phone calls, submitting dozens of white papers, and disclosing millions of pages of documents. (See, e.g., id. ¶¶ 64, 66-67, 70, 84). Weil also regularly updated Walgreens' executives and board of directors on the progress of discussions with FTC staff, working hand-in-hand with Walgreens to address the FTC's purported concerns. (See e.g., id. ¶¶ 65, 70-71, 75, 80).

Several individuals emerge as important figures in the negotiations, correspondence, and public statements surrounding the merger. They include named defendants Stefano Pessina, Walgreens' Chief Executive Officer, Executive Vice Chairman of the Board, and largest shareholder; and George Fairweather, Walgreens' Global Chief Financial Officer; as well as Gerald Gradwell, Senior Vice President for Investor Relations; Marco Pagni, Walgreens' General Counsel; and Mark Vainisi, Walgreens' head of mergers and acquisitions. (See id. ¶¶ 2-4, 42-43). Vainisi oversaw the team within Walgreens charged with effectuating the merger, (see Doc. 239-129, Vainisi Dep. 12:4-15; Doc. 234-12, Pagni Dep. 81:8-12, 84:7-13), and Pagni describes himself as serving as "consigliere" to Pessina and the Walgreens board, remaining "close to the [merger]

process" and offering legal guidance throughout, (see Pagni Dep. 84:13-17). Rite Aid's CEO, John Standley, also played a significant role in the merger. (See, e.g., Doc. 231 ¶¶ 95, 171, 189). The most prominent Weil attorneys involved in the approval process were Steven Newborn and Steven Bernstein. (See e.g., id. ¶¶ 33, 161, 185, 206, 213; Pagni Dep. 29:16-22, 128:11-17). Weil's primary contacts at the FTC in turn were Michael Moiseyev, Acting Director of the Bureau of Competition's Mergers I division, and Steven Mohr, staff attorney for the Mergers I division. (See Doc. 231 ¶ 64).

**B. Divestiture & "Plan B"**

**\*3** At the outset, Weil identified the FTC's most likely antitrust concern as being the merger would give Walgreens too much leverage in dealing with "third-party payors seeking to establish national pharmacy networks." (See id. ¶ 70; Doc. 234-25 at slide 7). Weil revised that opinion as the review stretched into summer of 2016, advising Walgreens on June 12, 2016, that the FTC's focus had crystalized around anticompetitive effects in specific geographic areas. (See Doc. 231 ¶ 70). On August 17, 2016, Weil presented a possible solution to FTC staff regarding their localized concerns. (See Doc. 231 ¶ 75; see also Doc. 234-32). Under the proposal, Walgreens would invoke the merger agreement's divestiture clause and sell off approximately 600 Rite Aid stores to a third-party buyer, thereby keeping the stores in competition with Walgreens' existing stores in those locations. (See Doc. 231 ¶ 76).

Weil initially sought feedback from the FTC regarding whether CVS Pharmacy, Inc. ("CVS"), would be an acceptable divestiture buyer. (See id. ¶ 77; see also Doc. 234-32 at slides 4, 11). Weil believed CVS typified what the FTC would want in a divestiture partner—a large, financially sound, competently managed company with experience in the retail pharmacy field. (See, e.g., Doc. 239-174; Pagni Dep. 32:15-34:18; Vainisi Dep. 39:24-40:10). Walgreens hired Bank of America Merrill Lynch ("BAML") on September 8, 2016, to solicit bids for the stores. (See Doc. 231 ¶ 90). The same day, Walgreens opened an "electronic data room" containing detailed information about the stores to potential bidders. (See id. ¶ 91).

As the bidding process got underway, certain executives involved in the merger acknowledged anxiety at the FTC and within the market regarding whether the bidding process would produce a buyer acceptable to the FTC. For example, Standley informed Rite Aid's board in early September 2016 that FTC staff were "skeptical" an "adequate buyer" would

emerge and were worried the proposal too closely tracked another recent failed divestiture deal. (See Doc. 239-86 at 2). Later that month, Ashish Kohli, Walgreens' Vice President of Investor Relations, emailed Pessina, Fairweather, Gradwell, and others reporting Walgreens' stock had been "relatively weak" due in part to "[n]ervousness" around the "deal closing" and particularly with regard to "finding buyers that the FTC will find acceptable." (See Doc. 239-141 at 2). It also became clear around this time CVS was not going to be able to be the primary purchaser of Rite Aid stores because of geographic overlap problems and CVS's general disinterest. (See, e.g., Doc. 231 ¶ 86; Doc. 239-143 at 15; Doc. 239-6, Pessina Dep. 105:2-106:3). Walgreens learned the FTC preferred a single buyer for the stores, (see Pessina Dep. 57:1-18), and would likely require Walgreens to divest more stores than initially proposed, (see Doc. 231 ¶ 87).

While divestiture talks continued, Walgreens executives began contemplating possible alternatives to the deal as then constituted. The parties vigorously dispute the seriousness and significance of these early discussions. (See id. ¶¶ 96-99, 209-210; Doc. 242-2 ¶¶ 96-99, 209-210). Nevertheless, Pessina's assistant noted a request from Pessina on July 13, 2016, to arrange a meeting "to discuss [Rite Aid] and debate scenarios should the deal not work out." (See Doc. 239-84 at 5). Pessina repeated this request to his assistant on July 22, 2016, who noted Pessina wanted the meeting to be in-person and include several specific Walgreens executives, most notably Timothy McLevish, Walgreens former Chief Financial Officer and then-advisor to Pessina. (See Doc. 239-85). He reiterated the purpose of the meeting was to "debate scenarios if our idea is not approved." (See id.) McLevish was the central figure in early discussions of alternatives to the merger. (See, e.g., Doc. 231 ¶¶ 44, 96, 98; Doc. 242-2 ¶¶ 44, 96, 98). Between July and November 2016, he held several discussions with Pessina, other Walgreens executives, and Weil attorneys regarding what the team dubbed "Plan B." (See, e.g., Doc. 231 ¶ 98; Doc. 242-2 ¶ 98; Docs. 239-95, 239-101, 239-106; Doc. 239-104 at 13). The crux of McLevish's Plan B proposal was an asset purchase where Walgreens would "buy a bunch of stores from [Rite Aid]" but not buy Rite Aid proper. (See Doc. 239-104 at 13; Doc. 239-96; Pagni Dep. 95:3-4). Walgreens had approached Rite Aid prior to negotiating the merger with a proposal for just such an asset purchase, but Rite Aid flatly rejected the idea. (See Doc. 231 ¶ 95; see also Pessina Dep. 92:3-22; Pagni Dep. 95:17-96:14). McLevish left Walgreens at the end of November 2016, (see Doc. 231 ¶ 100), at which point the paper trail regarding Plan B goes cold for a time.

**\*4** BAML reported the bidding results to Walgreens at the end of September 2016. Only four companies offered to buy the whole divestiture package—Sycamore Partners Management, L.P.; Fred's, Inc.; Specialty Retail Shops Holding Corp. ("Shopko"); and Albertsons Companies, Inc; CVS did not submit a bid. (See Doc. 231 ¶ 101; Doc. 242-2 ¶ 101; see also Doc. 239-162; Doc. 239-176). Vainisi summarized the offers in emails to Pagni and Pessina, describing the offers as "disappointing," (see Docs. 239-161 at 1-2; Doc. 239-319), sentiments Pagni and Pessina shared, (see Doc. 239-162 at 2; Pessina Dep. 52:2-5, 52:21-53:1). The business media took a gloomy tone regarding the bids too. Between September 28 and October 19, 2016, Kohli shared articles with Pessina, Fairweather, and Gradwell from the *New York Post, CTFN*, and *Wolfe Research* which called the divestiture package a tough sell, (see Doc. 234-41), described the deal as being "stalled" due to "tepid" interest among buyers for "a package that is at best second rate," (see Doc. 239-184), and relayed Kroger, a supermarket chain the *Post* called Walgreens' "best hope" to win FTC approval, was about to "back[ ] away" from the deal, (see Doc. 239-190 at 2-4, 6). An analyst's note on the second *Post* article announced "Deep Concerns Remain with the WAG/RAD merger." (See Doc. 239-190). Kohli commented "[r]eputable or not, the *Post* article creates further uncertainty in a market that is already quite nervous on this deal." (See id. at 2).

**C. Extension**

On October 20, 2016, recognizing they would not secure FTC approval before the October 27 deadline, Walgreens and Rite Aid triggered the extension provision of the merger agreement and extended the deadline for completing the merger to January 27, 2017. (See Doc. 231 ¶¶ 104-105). The same day, Pessina spoke on an earnings call with shareholders regarding the merger. (See id. ¶¶ 113-114). During the call, an analyst asked Pessina why he was confident the merger would close in early 2017 notwithstanding the delay. (See id. ¶ 113). Pessina acknowledged the approval process was taking longer than expected but reassured the analyst, "we are confident, as confident as we were before about this deal." (See id. ¶ 114). He also disputed recent media reports the FTC disfavored the merger:

> Nothing has changed. We have just delayed the execution of the deal. This is our perception. We have always been optimistic because we have never seen an attitude from the FTC, which was absolute negative. Of course they were inquiring. They were very detailed. They were asking a lot

of questions. Sometimes they were taking time to respond, but at the end of the day, I believe we have had a good collaboration. We are having a good collaboration. We tried to respond to all of their needs. This takes time, but at the end we are still confident.

> Of course, I know that we read on the papers very different news. No idea about the sources of this news, but for sure if we could talk, and of course you know that we cannot, our news would be different. For what we see today, we see just a long administrative process, but we don't see substantial differences from what we were expecting.

> Yes, probably more stores, a little more stores here and there, but at the end of the day, as far as I can see today, as far as we can see today, we are absolutely confident that we can create—that we can do the deal and we can create the value, just this value would be a little postponed ....

(Id.)

Pessina's statements were widely reported by the business media, (see, e.g., Doc. 239-20; Doc. 239-29 (collecting articles); Doc. 239-36 (same)), and bolstered confidence among analysts and financial figures the merger would be consummated, (see, e.g., Doc. 239-21 at 2; Doc. 239-25 at 3, 6, 9-10, 13). For example, a Goldman Sachs investment banker emailed Pessina the same day expressing relief, noting "[t]here had been concerns among investors that the Rite Aid deal may not get to the finish line," but Pessina's comments had "gone a long way to reassure the market." (See Doc. 239-17). Rite Aid's stock price closed on October 19 at $6.66 per share; on October 20, the day of Pessina's statement, Rite Aid closed at $7.11, an increase of 6.8%. (See Doc. 238-1 ¶ 43). By October 27, however, Kohli reported to Pessina and Gradwell that Rite Aid's stock had since "given up all those gains" because "[t]he market remains quite nervous around this deal." (See Doc. 239-39). On November 15, Bernstein emailed Pagni, Vainisi, and others reporting the latest feedback from the FTC. (See Doc. 239-169). While the FTC was "not ruling out any of the three potential buyers at this time," FTC staff indicated to Weil they believed "none of the buyers has the scale and scope of a national player." (See id. at 2-3). Bernstein advised Walgreens the buyers needed to do more to convince the FTC they could turn the divested stores into a genuine competitor. (See id. at 3).

**\*5** On November 17, 2016, Fairweather and Gradwell spoke at the Jefferies Healthcare Conference. (See Doc. 231 ¶¶ 126-128). During the conference, an analyst asked

Fairweather about the status of the regulatory approval process. (See id. ¶ 126). Fairweather responded by saying:

> We are very clear – from what we said in September, we expect the deal to complete. We have been absolutely consistent on that from day one when we announced it. As we said back in September and reinforced in our results, we do expect the store divestitures to now be in the range of 500 to 1000.
>
> We expect to be able to sign the divestiture agreements before the end of this calendar year and to be able to complete the transaction in the first quarter, so it is – sorry, early in the new year, in the calendar year.
>
> So other than really from where we are a year ago, it is a few more divestitures than we had originally anticipated but within what we had in the contract, and it has just taken us a little bit longer than – ideally we would have hoped to work through with the FTC when we work in a very collaborative manner.
>
> But, fundamentally, the economics of the deal are the same.... [N]othing really has changed other than it's just perhaps taken a little bit longer than we had thought in the first place. There's lots of stuff in the papers but it is amazing where it comes from.

(Id. ¶ 127). Gradwell then built on Fairweather's response, adding:

> [J]ust to be clear on where we are in the process and we have spoken about this – I mean we have enough clarity on what we have to do in terms of remedies with the FTC to be – to have opened the data room for sale of pharmacies to potential buyers.
>
> Everyone I know – there was large speculation in the marketplace that we would never find buyers. We are not entirely that green when it comes to doing transactions. We went into this in the knowledge that the Walgreens management team had looked at Rite Aid in many different ways and had not been able to justify the deal for a variety of reasons.
>
> And so we went into it having assessed initially that we would be able to find buyers and that those interested in the marketplace to buy stores we may have to divest. That remains the case. We have been in ongoing discussion with the FTC.

> The FTC have given permission for a number of potential buyers to access the data room. That is at their grant because, to be very clear, there is a level of detail on the Rite Aid stores that while we have done some extensive research ourselves, Rite Aid can't share that level of data with us for commercial reasons in case the deal doesn't go through.
>
> So the FTC have had to give – grant permission for the potential buyers to look at the data room. And what we said at the results was that we saw no reason, or no technical reason, why we shouldn't be able to complete our discussions with potential buyers before the end of this calendar year and that remains the same.
>
> ...
>
> So from our point of view, the process has never stopped, which is quite key, because if there was a blocking rationale the case team would stop working at the FTC. You can never guarantee anything. It still has to go through the commissioners of the FTC but we are slightly further behind where we thought we would be just because the level of detail, but things are progressing well.

**\*6**  (Id. ¶ 128). Financial journalists and analysts referenced the executives' comments in reports published over the ensuing weeks, with some citing their statements as supporting confidence the deal was on track for divestiture agreements to be etched by the end of the calendar year and the merger completed during the first quarter of 2017. (See e.g., Doc. 239-44 at 10; Doc. 239-48 at 2; Doc. 239-49 at 26). At least one report interpreted Gradwell's statements as indicating the FTC had approved the list of proposed buyers that were accessing the data room. (See Doc. 239-44 at 10). Rite Aid's stock price declined by 2.7% on November 17, 2016, to $7.61 per share. (See Doc. 234-98 ¶ 14 n.20).

### D. Fred's Divestiture Agreement

Walgreens eventually settled on Fred's, a discount store chain with locations across the southeastern United States, as the bidder to pitch to the FTC. (See Doc. 239-178; see also Doc. 231 ¶¶ 101, 121, 134, 136). The record suggests Fred's was not universally seen as an ideal choice within Walgreens' camp. (See, e.g., Doc. 239-163 (email from Vainisi on September 28, 2016, asking if recipients saw "any way Fred's could be made more real / doable?" and commenting on its "lack of sophistication"); Doc. 239-164 at 7-8 (BAML noting "[o]ther than the price and willingness to take all the stores, not much

to like in [Fred's] proposal")). According to an October 11, 2016 email from Vainisi, Pessina rejected Weil's guidance to "prioritize Shopko" and instead "wants to sell what we can to Fred's and basically challenged us to do what we need to do to make them more presentable." (See Doc. 239-178). On November 10, a member of the merger deal team circulated an email noting Fred's need for a substantial transition team from Rite Aid could "undermine Fred's viability as a buyer." (See Doc. 239-167 at 2-3).

The FTC also expressed significant reservations about the proposed divestiture agreement with Fred's. (See, e.g., Greenberg Dep. 30:8-17; Doc. 239-213). The FTC's concerns with the Fred's divestiture plan focused primarily on two issues. First, the FTC favored a "clean sweep"—where Walgreens sold off all the Rite Aid stores in a given region —to the more complex divestiture structure proposed by Walgreens. (See Doc. 231 ¶¶ 78-79, 84-85; see also Doc. 239-213 at slide 4). Second, the FTC had serious concerns about Fred's ability to take on the stores subject to divestiture. (See Doc. 231 ¶ 130; see also Doc. 234-52; Doc. 239-112 at 2-3). Weil reported to Walgreens on December 6, 2016, that FTC staff indicated they "would work with what has been proposed, but noted that Fred's is far from the ideal buyer and has financial issues of [its] own." (See Doc. 239-171). The same day, Standley informed Rite Aid's board of directors that its attorneys had advised "the FTC staff still had questions about Fred's suitability as a divestiture buyer, including about Fred's financial viability." (See Doc. 239-212 at 4; see also Pagni Dep. 127:10-25 ("If Rite Aid had heard it, we probably heard it as well.")). Two days later, Bernstein met with Pessina and thereafter relayed to a Weil attorney Pessina "seemed disappointed where we are at and had a lot of tough questions." (See Doc. 239-215). The following week, Weil cautioned Walgreens that the FTC "still has questions about whether Fred's can effectively execute the divestiture transition and operate the divested stores in a fully viable and competitive manner." (See Doc. 239-212).

Extant concerns notwithstanding, Walgreens and Rite Aid issued a press release on December 20, 2016, announcing Fred's had agreed to purchase 865 Rite Aid stores and related assets for $950 million on the condition the FTC approve the Walgreens-Rite Aid merger. (See Doc. 231 ¶ 136). The divestiture agreement also required Fred's to purchase any additional stores the FTC might require Walgreens to divest. (See id. ¶ 137). The day before the Fred's announcement, Rite Aid's stock closed at $8.17 per share; it ended the day of

the announcement at $8.61 per share, an increase of $0.44 or 5.4%. (See Doc. 238-1 ¶ 44).

**\*7** The FTC began subjecting Fred's to a formal vetting process. (See Doc. 231 ¶¶ 142-144; Doc. 242-2 ¶¶ 142-144; see also Doc. 234-55 at slide 3 (describing some vetting procedures)). On a January 1, 2017 call, Weil updated Walgreens (via Vainisi and David Schreibman, a Walgreens consultant) on that process. (See Doc. 231 ¶ 152; Doc. 239-115). Schreibman asked (apparently for a second time) if the FTC was "just trying to kill this deal," and a Weil attorney advised that, "although they don't like Fred's as the buyer" and there is "serious opposition from management, compliance, payors, commissioners, unions, and probably others," the FTC staff "is trying to find a solution." (See Doc. 239-115 at 2; see also Doc. 231 ¶ 152). On January 3, Vainisi reached out to several Walgreens executives to set meetings to discuss alternatives to the merger should Walgreens terminate it due to timing or increased divestitures; he noted he "expect[ed] this all to come up in a meeting with [Pessina] on Thursday [January 5] afternoon (if not before)." (See Docs. 239-116, 239-118; Doc. 239-225 at 2).

Walgreens held an earnings call on January 5, 2017. (See Doc. 231 ¶¶ 156-158). Pessina stated in his opening remarks on the call:

> [Y]ou have seen the progress we announced at the end of December regarding the proposed transaction with Rite Aid and having reached a conditional agreement with Fred's. We still have to complete our work with the FTC. And as we have seen, these things can take some time, as the FTC are scrupulous in ensuring that they can see everything properly and fully. That said, I remain as convinced as ever of the strategic benefit of the proposed Rite Aid transaction and look forward to being able to provide you with another update as soon as we can. We are clearly making progress, and while I would always like to move faster and do more, we must be measured and ensure we work at a pace with which we are confident we can deliver for our customers and

our shareholders on all the plans and strategies we have discussed with you.

(See id. ¶ 157). During the call, an analyst asked Pessina, "When we think about Rite Aid, what's the Plan B if it doesn't get approved as we get down to the end here in the U.S. business?" (See id. ¶ 158). Pessina replied:

We are working hard to have this deal approved. And for the time being, we don't want even to think of the fact that the deal could not be approved after so many months when we have given a lot of information and we have had a very good relationship with the people of the FTC. And they have continued to ask information and we have continued to give information. And in reality, we believe that if they have spent so much time asking and analyzing so many documents is because they want to understand the substance of this transaction, which is fine.

So we are not thinking of a Plan B today. We don't have to distract people today. I can assure you that if let's say we had a big surprise that this wouldn't happen after, we would have to sit down and decide what to do because there are many, many possible reactions to this, as you can imagine. We would have to see what our counterparty, Rite Aid, wants to do and see whether there are solutions or not, what are other alternatives.

(See Doc. 231 ¶ 159). Business journalists and analysts widely reported Pessina as having complete confidence in the merger and as disavowing contingency plans. (See, e.g., Doc. 239-53 at 4; Doc. 239-54; see also Doc. 326-332). Rite Aid's stock price declined by 1.0% to $8.19 on the day of the call. (See Doc. 234-98 ¶ 14 n.20). Vainisi and Pessina met after the call, but it is unclear whether they actually discussed terminating the deal. (See Doc. 239-118; Doc. 239-117; Vainisi Dep. 138:13-20).

**E. Revised Merger Agreement**

The FTC did not look upon the Fred's divestiture as favorably as Walgreens' executives hoped. On January 10, 2017, Newborn emailed Moiseyev asking if there was "anything I can tell my client [Walgreens]? [A]ny path forward in reality?" (See Doc. 239-234; Doc. 231 ¶ 161). Moiseyev responded that "[a]t this point, it's really tough," there was no "good solution," the deal carried "a lot of risk," and the FTC "doesn't have a great deal of tolerance for consents that it sees as risky." (See Doc. 239-234). Moiseyev reiterated he

has "been concerned all along that there is not any acceptable buyer that realistically brings anything to the table," and that "[t]he current guys" (presumably referencing Fred's) "seem to fall short of" FTC expectations. (See id.) Moiseyev concluded "I'm not sure that there's a clear path forward" or "that any buyer can solve the problems here." (See id.) The next day, Bernstein emailed Pagni to relay feedback from Mohr, whose tone was similar to Moiseyev's, namely, that "the big problem is Fred's and he does not see Fred's being approvable even if we substantially improved the store package," the FTC was "most concerned about Fred's track record, financial performance and ability to successfully execute on the transaction," and while Mohr did not categorically rule out the FTC ever approving Fred's as a buyer, he "said very little to give us any hope of changing their position." (See Doc. 239-91). According to Bernstein, "the more [the FTC] have looked into Fred's, the less comfortable they are with their capabilities." (Id.) Bernstein emailed Pagni and Newborn the next day reporting Rite Aid's antitrust attorneys were planning to inform Rite Aid "[i]t is unlikely that Fred's would be approved by current FTC decision makers." (See Doc. 239-119).

**\*8** On January 17, a group of Walgreens executives updated Pessina on the status of the FTC approval process. (See Doc. 239-120; see also Doc. 239-121; Pessina Dep. 168:1-25). They informed Pessina "the FTC is not currently in a position to approve Fred's as the divestiture buyer" and "refuses to give further feedback regarding the scope of the store package until concerns regarding Fred's are resolved." (See Doc. 239-120 at slide 3). They asserted there was some hope "that the transition to the Trump administration will lead to a more favorable FTC review" but cautioned, per Weil's estimate, it would take four to six months for "any meaningful change to manifest." (See id.) The team gave Pessina a menu of options, including (1) terminating the deal, (2) extending the agreement on current terms, (3) extending the agreement under renegotiated terms, and (4) arranging a short-term extension to "allow time for more comprehensive negotiation." (See id. at slide 6). They also suggested Pessina consider the "[c]osts of [c]ontinuing" with the merger—namely the approximately $20 million Walgreens was "burn[ing]" each month. (See id. at slide 8). The day after the presentation, BAML held a call with Walgreens executives, including Pessina; the group discussed Walgreens' "thinking about what are the alternatives if RAD does not happen," that the FTC "does not see how Fred's could possibly handle the stores," and whether Walgreens could "buy certain assets from [Rite Aid]" instead. (See Doc.

239-241 at 2). In an email chain scheduling a follow-up meeting, one BAML employee describes the agenda for the meeting as " 'Plan C' ideas" and asks Vainisi to "let us know what else if anything we can be doing on Plan A and B." (*See* Doc. 293-123).

Pessina chose the third option—extending the agreement under renegotiated terms—and opened negotiations with Rite Aid. (*See* Doc. 231 ¶¶ 168-72; Doc. 242-2 ¶¶ 168-171). At some point in January while Walgreens and Rite Aid were negotiating the revised merger agreement, Pessina called Fairweather, who relayed dissatisfaction that the merger was not "where we wanted to be at all" and registered concern regarding Rite Aid's "performance" and "drift down." (*See* Doc. 239-328, Fairweather Dep. 136:8-137:7, 235:12-16, 236:10-17). Fairweather also emphasized the unexpected length of the review process, telling Pessina he "just couldn't believe how long it was dragging on" and expressing frustration "we'd been at this for such a long period and still didn't have any clarity, real clarity, on the exact number of stores specifics." (*See id.* at 137:13-18, 236:2-5). Nonetheless, Fairweather indicated he supported Pessina renegotiating the deal. (*See id.* at 137:18-20, 236:11-17).

Walgreens and Rite Aid inked a revised merger agreement on January 29, 2017. (*See* Doc. 231 ¶ 172). Key changes included reducing the price-per-share from $9.00 to a range of $6.50 to $7.00, resetting the deadline for completion to July 31, 2017, and expanding the number of Rite Aid stores Walgreens could divest from 1,000 to 1,200. (*See id.*) The breakup fee remained set at $325 million. (*See id.* ¶ 173). The companies' respective boards approved the revised deal the same day and announced it to the public on January 30, 2017. (*See id.* ¶¶ 178-80). Rite Aid's stock was valued at $6.93 per share on Friday, January 27, 2017. (*See* Doc. 238-1 ¶ 46). On Monday, January 30, 2017, the price fell to $5.72 per share at close, a decrease of $1.21 per share or 17.5%. (*See id.*)

### F. New Rite Aid & Project DeLorean

Walgreens, Rite Aid, and Fred's pinned their hope the FTC would finally approve the merger on a divestiture plan dubbed "New Rite Aid." (*See* Doc. 231 ¶¶ 183, 186-87; Doc. 242-2 ¶¶ 183, 186-87; *see also* Pagni Dep. 138:14-19, 176:22-177:20, 193:6-17). The crux of the plan was to combine Fred's existing retail footprint with a larger subsection of Rite Aid's and transfer key management figures from Rite Aid to Fred's to create an entity large enough, competent enough, and financially strong enough to genuinely compete with

Walgreens. (*See* Pessina Dep. 192:2-194:1; Vainisi Dep. 167:12-18, 182:13-18; Pagni Dep. 126:3-10, 138:14-19).

The concept was not hailed by all in Walgreens' team; for example, Newborn emailed Pessina and others on February 6, 2017, warning "[f]rom the outset of this deal we have been concerned about the identity of a buyer for the divested assets. The buyer we have presented is the problem, not the package." (*See* Doc. 234-67 at 2). He closed: "The new package would be great with a buyer that impresses. Fred's does not." (*See id.*) The business media had reservations too. On March 15, 2017, a Walgreens employee forwarded a *Bloomberg* article to Pessina, Pagni, and Vainisi reporting FTC staff "still have 'significant reservations' about Fred's suitability as a buyer of divested stores." (*See* Doc. 239-257). The team viewed the article as evincing a leak from the FTC; Pagni forwarded it to Weil, copying Vainisi, suggesting they contact Moiseyev and "register our strongest concerns." (*See id.*) Two days later, another *Bloomberg* article circulated among Walgreens leadership, including Pessina, Pagni, and Vainisi, this one reporting the "former head at FTC's Bureau of Competition" had disclosed that "talks on Walgreens are 'at a standstill.' " (*See* Doc. 239-258). Pessina suggested the article was an "opportunity to show the new administration how these people are behaving," and Pagni concurred, stating "This is absolutely appalling and unprofessional behaviour." (*See id.*)

**\*9**  Meanwhile, Walgreens continued to receive negative feedback from the FTC. Bernstein emailed Vainisi, Pagni, and others on March, 18, 2017, advising that FTC staff had indicated an 865-store divestiture "will not get this resolved." (*See* Doc. 239-259 at 3). Bernstein asserted the "[b]ottom line" of the staff's feedback was "[the] FTC believes that they have a strong case" presumably for blocking the merger, "but also recognizes that we have significantly improved our proposal." (*See id.*) Weil advised Walgreens to prepare a 1200-store proposal but cautioned "it may not fully meet the FTC's optimal remedy." (*See* Doc. 239-260 at 3). Vainisi emailed Weil on March 20, 2017, suggesting "the continued and unfortunate refusal of the FTC to engage constructively on our overall strategy" may require considering "political solutions." (*See* Doc. 239-261 at 3). He asserted "Mo[i]seyev and team have moved in the wrong direction and still refuse to engage in good faith." (*See id.*)

Walgreens followed Weil's advice and, on April 3, 2017, submitted a revised divestiture plan selling off 1,200 stores and providing for essentially a "clean sweep" in the

geographic areas which were the focus of FTC concerns. (See Doc. 231 ¶ 194). In an email exchange between Vainisi and Pagni the same day, Pagni relayed a directive from Pessina: while Walgreens was "still absolutely pursuing the current path, ... [Pessina] wants us to confidentially develop a plan B." (See Doc. 239-126). Vainisi suggested "[w]e could buy the stores we would operate in areas permitted by the FTC." (See id.) The next day, Bernstein emailed Newborn stating Pagni had reached out to him and asked Weil "to think more about 'Plan B' in the event that the FTC continues to object to the current deal." (See Doc. 239-125). Specifically, Pagni wanted Weil to "think about the potential issues the FTC might have if [Walgreens] buy the non-problematic stores from [Rite Aid] and leave 1500 to 2000 stores behind (and wipe out [Rite Aid]'s existing $7 billion+ of debt)." (Id.) Pagni emphasized he did not "want this discussed widely at [Walgreens] or at Weil." (Id.)

When asked during his deposition what changed between September 2016 (when McLevish proposed an asset purchase to Pessina) and April 2017, Pessina answered, "the desperation of Rite Aid." (See Pessina Dep. 128:22-129:23). By April 5, 2017, Walgreens executives were referring to the asset purchase alternative by a codename—"Project DeLorean." (See Doc. 239-128). According to Vainisi, the name was a reference to the film *Back to the Future* meant to symbolize Walgreens was returning to an old idea. (See Vainisi Dep. 180:12-181:9).

Two days after reviving Plan B as Project DeLorean, on April 5, 2017, Walgreens held another earnings call. (See Doc. 231 ¶ 195). During the call, Pessina stated:

> Turning to Rite Aid, I am still optimistic that we will bring this deal to a successful conclusion, but there is no doubt that the process of getting clearance for the transaction is taking longer than we expected. We are constantly and currently collaborating with FTC, Rite Aid and Fred's to get the necessary approvals and close the transaction. At the same time, we are working to be in a position to certify compliance. We believe that we can achieve this in the coming weeks and are still working toward our revised timetable to obtain clearance by the

> end of July. The changes to the deal that we agreed in January demonstrate our absolute commitment to ensure all transactions meet our demanding financial and strategic requirements, while allowing us the ability to address any reasonable demand that may be made of us in obtaining regulatory approval.

(Id. ¶ 198). When asked by an analyst "where exactly" Walgreens and the FTC were not "seeing eye to eye," Pessina replied, "Well, as I said, I am still positive on this deal. I believe that we have a strong argument to defend this deal.... We are collaborating very well with the FTC." (See id. ¶¶ 199-200). A second analyst asked Pessina if the FTC rejecting Fred's as a buyer doomed the merger. (See Doc. 237 ¶ 46). Pessina responded by doubling down on Fred's: "For the time being, we believe that Fred's is the right buyer. We believe that they have—particularly in the configuration we are proposing now, they are absolutely a legitimate player in this industry." (See id.) Pessina's statements were, once again, reported widely in the business media, with many articles and reports asserting the protracted Walgreens-Rite Aid merger was still likely to close based on his comments. (See, e.g., 239-311 (collecting media coverage); Doc. 239-64 (same); Doc. 239-312 at 2 (collecting analyst coverage)). Rite Aid's stock rose 1.2% to $4.26 per share after Pessina's comments. (See Doc. 234-98 ¶ 14 n.20).

**E. Cancellation of the Merger**

 **\*10**  In mid-May, Walgreens and Rite Aid began discussing the terms of a possible asset purchase while talks with the FTC regarding the Fred's divestiture ostensibly continued. (See Doc. 231 ¶¶ 210-211; Doc. 242-2 ¶¶ 210-211; see also Pagni Dep. 177:21-180:7). On May 26, Newborn emailed Walgreens executives informing them Moiseyev had indicated the deal with Fred's was "DOA." (See Doc. 231 ¶ 213; Doc. 239-233, Greenberg Dep. 153:13-20). With divestiture no longer appearing like a viable option, Walgreens came to a tentative agreement with Rite Aid whereby Walgreens would purchase roughly 2,000 of Rite Aid's more than 4,000 stores. (See Doc. 231 ¶¶ 210-211; Doc. 242-2 ¶¶ 210-211; see also Doc. 234-80 (outlining details of proposed transaction)).

Acting Director of the Bureau of Competition Tad Lipsky informed Weil on June 21, 2017, the FTC staff had recommended suing to block the merger between Walgreens and Rite Aid. (See Doc. 231 ¶ 214). Lipsky also informed Walgreens' attorneys the FTC was unwilling to consider any asset sale between the two companies while the merger was still pending. (See id.) Finally recognizing the writing on the wall, Walgreens officially threw in the towel on June 28, 2017. (See id.) Its board of directors voted unanimously to terminate the merger and adopt the asset purchase agreement. (See id. ¶ 216). The next day, Walgreens issued a press release announcing the existing agreements with Rite Aid and Fred's were terminated, and Walgreens had entered into a new agreement with Rite Aid to purchase 2,186 stores. (See id. ¶¶ 218-219). Walgreens paid Rite Aid the $325 million breakup fee. (See id. ¶ 220).

**F. Procedural History**

Named plaintiffs are three individuals who bought or sold shares in Rite Aid after Pessina's statement on October 20, 2016, and cancellation of the merger on June 28, 2017. The instant lawsuit has its origins in Hering v. Rite Aid Corporation, No. 1:15-CV-2440 (M.D. Pa.), a putative securities class action brought by a Rite Aid shareholder after cancellation of the merger. The complaint alleged Walgreens, Rite Aid, and several of their executives violated Section 10(b) of the Securities Exchange Act by making false statements regarding the merger between October 27, 2015, and June 28, 2017. See Hering v. Rite Aid Corp., 331 F. Supp. 3d 412 (M.D. Pa. 2018). Former Judge John E. Jones III dismissed all claims against Rite Aid but found certain statements by Walgreens' executives to plausibly be actionable. See id. at 422-28. Hering, however, made his last purchase of Rite Aid stock before the earliest of the actionable statements; plaintiffs in the instant lawsuit attempted to intervene, but Judge Jones denied their motion and dismissed the case for lack of standing. See Hering, No. 1:15-CV-2440, Doc. 149 (M.D. Pa. Oct. 24, 2018).

Plaintiffs filed the present class action lawsuit based in the main on statements Judge Jones found actionable in Hering. This case was originally assigned to Judge Jones, who denied defendants' motion to dismiss. Judge Jones also certified plaintiffs to represent a class of "[a]ll persons or entities," subject to a few minor exceptions, "who purchased or otherwise acquired Rite Aid ... common stock between October 20, 2016 and June 28, 2017, inclusive (the "Class Period"), and were damaged thereby." (See Doc. 121).

The matter was reassigned to this court after Judge Jones' retirement in July 2021.

**II. Legal Standard**

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the nonmoving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. See Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The court is to view the evidence "in the light most favorable to the non[ ]moving party and draw all reasonable inferences in that party's favor." Thomas v. Cumberland County, 749 F.3d 217, 222 (3d Cir. 2014). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the nonmoving party on the claims. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. See Pappas, 331 F. Supp. 2d at 315.

**\*11** Courts may resolve cross-motions for summary judgment concurrently. See Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008); see also Johnson v. FedEx, 996 F. Supp. 2d 302, 312 (M.D. Pa. 2014); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 2015). When doing so, the court is bound to view the evidence in the light most favorable to the nonmoving party with respect to each motion. See FED. R. CIV. P. 56; Lawrence, 527 F.3d at 310 (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

**III. Discussion**

Plaintiffs bring their claim against Walgreens, Pessina, and Fairweather primarily under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5.[4] Section 10(b) "forbids (1) the use or employ[ment] ... of any ... deceptive device, (2) in connection with the purchase or sale of any security, and (3) in contravention of Securities and Exchange Commission rules and regulations." See Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341 (2005) (alterations in original) (internal quotation marks omitted) (quoting 15 U.S.C. § 78j(b)). Rule 10b-5, in turn, makes it unlawful "[t]o make any untrue statement of a material fact or to

omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). Together, Section 10(b) and Rule 10b-5 establish a private cause of action comprising six elements: (1) a material misrepresentation or omission, (2) scienter, (3) a connection with purchase or sale of a security, (4) reliance, (5) economic loss, and (6) loss causation. See Dura Pharms., 544 U.S. at 341-42 (citations omitted). Plaintiffs and defendants both move for summary judgment on certain elements. We address the parties' motions *seriatim*.

4    Plaintiffs also bring a claim under Section 20(a) of the Securities Exchange Act against Pessina and Fairweather. Section 20(a) "creates a cause of action against individuals who exercise control over a 'controlled person,' including a corporation, that has committed a violation of Section 10(b)." Inst'l Invs. Grp. v. Avaya, Inc., 564 F.3d 242, 252 (3d Cir. 2009). Plaintiffs' Section 20(a) claim, as the parties acknowledge, rises or falls with their Section 10(b) claim. See Rahman v. Kid Brands, Inc., 736 F.3d 237, 247 (3d Cir. 2013); (Doc. 232 at 72; Doc. 242-1 at 62). Because we will allow plaintiffs' claim under Section 10(b) to proceed to trial, we will also allow their claim under Section 20(a) to proceed.

**A. Defendants' Motion**

Defendants challenge three elements of plaintiffs' claims. They posit plaintiffs have failed to establish an actionable misrepresentation, to demonstrate scienter, and to establish loss causation. As we explain below, manifold disputes of material fact preclude summary judgment on each of these elements.

**1.** *Misrepresentation*

The threshold question in this matter is whether the specific statements challenged by plaintiffs constitute misrepresentations.[5] Rule 10b-5 limits liability to situations in which a defendant (1) makes an untrue statement of material fact or (2) omits a material fact necessary, in context, to make their statement not misleading. See 17 C.F.R. § 240.10b-5(b); Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 38 (2011).

5    Defendants claim the challenged comments are forward-looking statements protected by the safe-harbor provision of the Private Securities Litigation Reform Act ("PSLRA"). (See Doc. 232 at 64-67). Judge Jones addressed this argument in Hering, finding the statements in question were "*present impressions* about the regulatory review process" and, thereby, fell outside the safe harbor. See Hering, 331 F. Supp. 3d at 425. Judge Jones' ruling on defendants' motion to dismiss *sub judice* cited but did not explicitly incorporate his holding in Hering. (See Doc. 50 at 2-3, 5). Nonetheless, we find persuasive and adopt Judge Jones' reasoning. The challenged statements all pertain to present facts and assessments, or endeavor to contradict present news reportage. They are not forward looking.

**\*12** The Supreme Court of the United States in Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund, 575 U.S. 175 (2015), discusses at length when a comment appearing on its face to be an opinion may constitute an actionable misrepresentation.[6] The Court announces a general rule that "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong." Omnicare, 575 U.S. at 186 (quoting 15 U.S.C. § 77k(a)). That rule admits of several exceptions. First, it immunizes only *sincere* statements of opinion; ergo, an opinion statement may be actionable if the speaker is falsely describing their state of mind, see id. at 184-85, or lacks a reasonable basis for holding their opinion, see City of Edinburgh Council v. Pfizer, Inc., 754 F.3d 159, 170 (3d Cir. 2014) (citing In re Merck & Co., Inc. Sec., Derivative & "ERISA" Litig., 543 F.3d 150, 166 (3d Cir. 2008), aff'd sub nom. Merck & Co. v. Reynolds, 559 U.S. 633 (2010); Kleinman v. Elan Corp., 706 F.3d 145, 153 (2d Cir. 2013)); Merck, 543 F.3d at 166. Second, because only *pure* opinion statements are protected, an opinion suggesting facts about the basis for the speaker's opinion may be actionable "if the real facts are otherwise, but not provided." See Omnicare, 575 U.S. at 188. A speaker need not disclose *every* contrary fact, because a reasonable investor would understand "opinions sometimes rest on a weighing of competing facts," but they cannot omit material facts underlying the opinion if those facts "conflict with what a reasonable investor would take from the statement itself." See id. at 189-90. To illustrate this nuanced distinction, the Court offers the following example:

Consider an unadorned statement of opinion about legal compliance: "We believe our conduct is lawful." If the issuer makes that statement without having consulted a lawyer, it could be misleadingly incomplete. In the context of the securities market, an investor, though recognizing that legal opinions can prove wrong in the end, still likely expects such an assertion to rest on some meaningful legal inquiry—rather than, say, on mere intuition, however sincere. Similarly, if the issuer made the statement in the face of its lawyers' contrary advice, or with knowledge that the Federal Government was taking the opposite view, the investor again has cause to complain: He expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time.

See id. at 188-89.

6
    Omnicare considers Section 11 of the Securities Act of 1933, which prohibits "material misstatements or omissions" in certain registration statements relating to initial public offerings. See Omnicare, 575 U.S. at 178-79. Our court of appeals has not had occasion to consider if the logic articulated in Omnicare applies to actions under Section 10(b). Nonetheless, it has found Omnicare offers helpful guidance under another section of the Securities Exchange Act, see Jaroslawicz v. M&T Bank Corp., 962 F.3d 701, 717-18 & n.16 (3d Cir. 2020), and district courts in our circuit, as well as a consensus of courts beyond our circuit, have adopted it as applying to claims under Section 10(b), see, e.g., Ortiz v. Canopy Growth Corp., 537 F. Supp. 3d 621, 666 (D.N.J. 2021) (collecting cases).

Neither Section 10(b) nor Rule 10b-5 creates "an affirmative duty to disclose" material information. See Williams v. Globus Med., Inc., 869 F.3d 235, 241 (3d Cir. 2017) (quoting Matrixx, 563 U.S. at 44). Absent an otherwise-applicable disclosure obligation, silence alone "is not misleading." See id. (citing Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988))). However, once a company chooses voluntarily to speak on an issue, "it cannot omit material facts related to that issue so as to make its disclosure misleading." See id. (citing Kline v. First W. Gov't Sec., Inc., 24 F.3d 480, 490-91 (3d Cir. 1994)). A company's statement may be rendered misleading by nondisclosure, for example, if it "describes as hypothetical a risk that has already come to fruition," see

id., or characterizes an aspect of its business one way but "intentionally or recklessly omits certain facts contradicting these representations," see Shapiro v. UJB Fin. Corp., 964 F.2d 272, 282 (3d Cir. 1992), as amended (May 28, 1992).

*13   Against this legal backdrop, we have little difficulty finding plaintiffs have established genuine disputes of fact precluding summary judgment. Defendants' principal arguments are grounded largely in their flawed view that *all* challenged statements are statements of pure opinion, subject only to the requirement the speaker's belief be genuine and objectively reasonable. (See Doc. 232 at 42-60). As we will explain, that view is wrong for two reasons. First, several challenged statements are statements of fact, not of opinion, and even those statements that constitute opinion contain embedded facts. And as to all statements, plaintiffs have adduced evidence oppugning either the accuracy of the fact expressed or implied, or the genuineness and reasonableness of the opinion held.

### a. Pessina's October 20, 2016 Statement

We turn first to Pessina's statements on the October 20, 2016 earnings call. Pessina replied dismissively to a question about the FTC approval process by asserting "[n]othing has changed" other than a delay of the initial completion date and "we don't see substantial differences from what we were expecting." (See Doc. 231 ¶ 114). And he addressed recent media reports (presumably including recent negative reports about the bidding process) commenting "for sure if we could talk, and of course you know that we cannot, our news would be different." (See id.)

Plaintiffs have adduced evidence from which a jury reasonably could find these statements were misleading. Pessina's statements convey the merger was proceeding largely as expected and Pessina had inside knowledge contradicting negative media reports regarding Walgreens' early difficulties in securing a viable divestiture buyer. The record, however, contains evidence suggesting the FTC approval process was not going as smoothly as anticipated, and that Pessina knew it. For example, internal emails reveal Pessina knew in the weeks and days leading up to the earnings call that the merger team saw early bids as "disappointing obviously," (see Doc. 239-319), that the market apparently shared that view and was skeptical of Walgreens' ability to find a suitable divestiture partner, and that these developments prompted negative media reports about viability of the

merger, (*see, e.g.,* Doc. 239-141 at 1; Doc. 239-184 at 2-4; Doc. 239-190; *see also* Pessina Dep. 72:24-25). Nine days before the call, an internal email reflects Pessina was pushing the merger team, against his attorneys' recommendations, to "make [ Fred's] more presentable" and to find a way to "get[ ] Fred's to the point that the FTC will accept them," suggesting he knew any plan involving Fred's would be an uphill climb. (*See* Doc. 239-178). He also knew Walgreens executives had engaged in internal discussions regarding a possible alternative to the merger, the so-called "Plan B," because he was a part of and even initiated some of those discussions. (*See* Doc. 231 ¶ 98; Doc. 242-2 ¶ 98; Doc. 239-84 at 5; Docs. 239-85, 239-95).

We agree with defendants that Pessina was not obligated to affirmatively disclose every—or any—detail about the FTC review process. But once he made the choice to share some information and his opinions about the FTC review, the duty arose to be forthright in his disclosures. *See* Williams, 869 F.3d at 241-42. Pessina chose to speak, and in doing so, he implied he had inside information contradicting negative media reports about the approval process—in other words, that he had information the FTC review was proceeding as expected and the media was wrong to suggest Walgreens may not find a satisfactory buyer—when the record reflects Walgreens was itself displeased with the initial bids and knew it had work to do to sell the FTC on Fred's as its partner in this large-scale divestiture. Viewed, as it must be, in the light most favorable to plaintiffs, a jury could find that Pessina's statements were misleading either outright or by omission, and that his opinion "nothing had changed" was not genuinely held or was objectively unreasonable under the circumstances.

### b. Fairweather's and Gradwell's November 17, 2016 Statements

**\*14**  At the Jefferies Healthcare Conference held on November 17, 2016, Fairweather responded to a question about the Rite Aid merger by stating, "[w]e are very clear—from what we said in September, we expect the deal to complete. We have been absolutely consistent on that from day one when we announced it." (*See* Doc. 231 ¶¶ 126-27). He also directly addressed media rumors concerning the likelihood of FTC approval, stating "nothing really has changed other than it's just perhaps taken a little bit longer than we had thought in the first place. There's lots of stuff in the papers but it is amazing where it comes from." (*See id.* ¶

127). Like Pessina's statements a month before, Fairweather's comments not only express an opinion (a belief the merger would close) but also imply facts (the media was wrong and the approval process was proceeding in line with Walgreens' expectations).

Fairweather appears to have been less intimately involved with the merger than others, but he testified to being "pretty up to speed" and "well appr[ ]ised with the current status" by the time of his statement, including knowing the FTC had raised "a number of open issues" regarding the divestiture plan. (*See* Fairweather Dep. 152:2-8, 154:10-11). A jury drawing all inferences in plaintiffs' favor fairly could conclude Fairweather knew some things *had* changed at the time he stated they had not. Fairweather also implied he had insider knowledge disputing the veracity of articles reporting there was little interest in buying the Rite Aid stores Walgreens needed to sell; but those articles, on the whole, were true—only four stores offered to buy the whole package, and Walgreens itself saw the bidding process results as disappointing. (*See* Docs. 239-161, 239-162, 239-319; Pessina Dep. 52:2-5, 52:21-53:1). A jury thus could also conclude Fairweather's insinuation about insider knowledge contradicting those reports was misleading.

Gradwell built on Fairweather's comments by attempting to offer insight into the status of the divestiture plan.[7] (*See* Doc. 231 ¶ 128). Specifically, he repeatedly asserted the FTC had "given permission" for potential buyers to access the data room. (*See id.*) Unlike most of the other challenged statements, Gladwell's is a pure statement of fact, and it was apparently untrue; Walgreens opened the data room of its own volition without receiving the FTC's blessing. (*See* Doc. 231 ¶ 91; Doc. 234-37). Gradwell testified he could not recall any conversation or document supporting his statement, (*see* Doc. 239-12, Gradwell Dep. 127:14-131:19), and he conceded it could imply the FTC had approved certain buyers as at least potentially suitable, (*see id.* at 129:17-20). On point, at least one analyst interpreted Gradwell's statement precisely that way. (*See* Doc. 239-44 at 10 (writing "[management] commented that the FTC has approved the list of proposed buyers of the divesture assets")). A jury could reasonably find Gradwell's statement to be misleading.

7    Defendants insist we cannot consider Gradwell's statement because plaintiffs did not specifically identify it as misleading in their complaint. (*See* Doc. 245 at 3-5). Defendants are correct the PSLRA requires plaintiffs to identify "each

statement alleged to have been misleading ... with particularity" in their complaint. See 15 U.S.C. § 78u-4(b)(1). But the PSLRA only sets a pleading standard; it does not "bind[ ] ... plaintiffs to the precise set of alleged misstatements identified in their complaint throughout the entire course of litigation." *In re* Vivendi, S.A. Sec. Litig., 838 F.3d 223, 242 n.11 (2d Cir. 2016). Plaintiffs provided sufficient notice Gradwell's statement might be at issue when they quoted it at length in their complaint. (See Doc. 1 ¶ 57).

### c. Pessina's January 5, 2017 Statement

Plaintiffs challenge two statements made by Pessina during Walgreens' January 5, 2017 earnings call: his assertion he "remain[s] as convinced as ever of the strategic benefit of the proposed Rite Aid transaction," (see Doc. 231 ¶ 157), and his answers, in response to an analyst's question about a potential fallback plan, that it would be a "big surprise" if the merger were not approved and "we are not thinking of a Plan B today," (see id. ¶ 158).

**\*15**  A reasonable investor could read Pessina's statements to imply Walgreens was confident enough in the merger, based on then-available information, that it was not even bothering with contingency planning. Cf. Omnicare, 575 U.S. at 189. Pessina explicitly denied Walgreens was thinking about a "Plan B." Walgreens, though, *had* been considering such contingencies. Pessina participated in several meetings, and initiated at least one of them, to discuss alternatives (often dubbed "Plan B" in email exchanges) to the Rite Aid merger between July and September 2016. (See Doc. 239-84 at 5; Docs. 239-85, Doc. 239-95, 239-98, 239-101). Vainisi continued to explore alternatives to the merger as recently as two days before the January 5 earnings call, and he did so because he "expect[ed] this all to come up in a meeting with [Pessina]" scheduled for the day of the call (albeit several hours later), (see Docs. 239-116, 239-118; Doc. 239-225 at 2); it is unlikely Vainisi cut his expectation from whole cloth. When asked about the origins of Project DeLorean, Pessina responded "our people were thinking of it from time to time," implying the idea of an alternative to the merger had continued salience throughout the FTC approval process. (See Pessina Dep. 83:20-21). A reasonable jury could accept Pessina's explanation—that he meant he literally was not thinking about a "Plan B" *on that day;* it could also find his statement regarding Plan B, particularly in the context of his broader comments, to be a misleading statement regarding

Walgreens' degree of confidence in the deal. These conflicting interpretations constitute quintessential disputes of fact for resolution at trial.

### d. Pessina's April 5, 2017 Statement

During the April 5, 2017 earnings call, Pessina stated Walgreens was "constantly and currently collaborating with FTC, Rite Aid and Fred's to get the necessary approvals and close the transaction" and was "collaborating very well with the FTC." (See Doc. 231 ¶¶ 198-200). Pessina added that "[t]he changes to the deal that we agreed in January demonstrate our absolute commitment to ensure all transactions meet our demanding financial and strategic requirements, while allowing us the ability to address any reasonable demand that may be made of us in obtaining regulatory approval." (See id. ¶ 198). And he replied to a question from an analyst about the status of the divestiture plan with Fred's by insisting "[f]or the time being, we believe that Fred's is the right buyer. We believe that they have— particularly in the configuration we are proposing now, they are absolutely a legitimate player in this industry." (See Doc. 237 ¶ 46).

There is ample evidence from which a jury could conclude Walgreens was not "collaborating very well" with the FTC and Walgreens had reason to believe Fred's was not "the right buyer." By April 5, 2017, Pessina was aware Walgreens' relationship with the FTC had deteriorated. (See, e.g., Doc. 239-121 at 1 & slide 3 (January 17, 2017 presentation noting FTC staff refused to engage further "until concerns regarding Fred's are resolved" and FTC was not "currently in a position to approve Fred's"); Doc. 239-258 (email chain between Walgreens executives in mid-March 2017 describing leaked statements from FTC as "absolutely appalling and unprofessional" and "highly improper," with Pessina noting desire to "show the new administration how these people are behaving")). Discovery also has produced substantial evidence that by April 5, 2017, Walgreens and Pessina had reason to doubt the FTC would ever sign off on Fred's as the divestiture buyer. (See, e.g., Doc. 239-121 at 1 & slide 3 (January 17, 2017 presentation); Doc. 234-67 at 2 (February 6, 2017 email from Newborn warning "[t]he buyer we have presented is the problem, not the package," and "[t]he new package would be great with a buyer that impresses. Fred's does not.")). Just two days before his April 5 statement, Pessina instructed Vainisi to "confidentially develop a plan B," (see Doc. 239-126), suggesting Pessina's confidence

in the current Fred's proposal was fading. A jury could reasonably find from this evidence that Pessina's opinions about the status of Walgreens' relationship with the FTC and the viability of Fred's as a buyer were insincere or lacked a reasonable basis.

### e. Defendants' Remaining Arguments

Defendants raise three global challenges to plaintiffs' claim they made misleading statements: *first*, their confidence in the merger closing was genuine, *second*, their beliefs in that respect were objectively reasonable, and *third*, they had no duty to disclose interim regulatory feedback. We conclude, for many of the same reasons already set forth, genuine disputes of material fact preclude summary judgment on these grounds as well.

**\*16** Pessina, Fairweather, and Gradwell all testified to genuinely holding the opinions they expressed in their respective statements; defendants posit plaintiffs' claim impermissibly rests on a lone hope the jury will reject all three witnesses' credibility and defendants are therefore entitled to summary judgment across the board. (See Doc. 270 at 19-20 & n.17 (citations omitted)). As a threshold matter, at least some of the challenged statements—for example, Fairweather's statement about the FTC having opened the data room—are statements of fact, not opinion. Moreover, while defendants are correct that plaintiffs cannot defeat summary judgment merely on the possibility a jury will disbelieve adverse witnesses, this simply is not a case in which plaintiffs offer "*no* evidence or inferences," other than a blanket credibility challenge, to support their claims. Cf. Schoonejongen v. Curtiss-Wright Corp., 143 F.3d 120, 129-30 (3d Cir. 1998) (emphasis added). Plaintiffs point to ample circumstantial evidence, some of which we have just sampled, revealing mounting doubt and pessimism within Walgreens about FTC approval, from which a jury reasonably could question the sincerity of the beliefs expressed by Pessina, Fairweather, and Gradwell. This is precisely the type of case our court of appeals has instructed *should* be put to the jury —one in which "liability turns on an individual's state of mind" and there are genuine disputes as to credibility. See id. (citing Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989)). The central issues in this matter concenter upon whether Pessina, Fairweather, and Gradwell genuinely believed the opinions they expressed, and the record developed by plaintiffs would allow a jury to conclude they did not. [8]

[8] Defendants lean heavily on our court of appeals' decision in City of Edinburgh Council v. Pfizer, Inc., 754 F.3d 159 (3d Cir. 2014), in support of their argument they genuinely believed their opinions. In holding plaintiffs had not adequately alleged defendants' beliefs about interim regulatory feedback to be ingenuine at the Rule 12(b)(6) stage, the court reasoned, in part, that defendants' expenditure of "millions of dollars" made it "improbable" they did not genuinely believe they would eventually secure approval. See Pfizer, 754 F.3d at 170. As an initial matter, Pfizer addresses the sufficiency of the pleadings, not the sufficiency of the evidence, and we have already found that plaintiffs have established genuine disputes of fact as to whether defendants genuinely held the views expressed in the challenged statements. It is also factually distinguishable: the expenses cited by the court in Pfizer came after the alleged misrepresentation whereas here, defendants had agreed to the breakup fee and spent millions on antitrust lawyers, integration planning, and other merger-related expenses *before* the start of the class period. To be sure, Walgreens continued to spend millions after the alleged misrepresentations took place. But by the time Pessina made the first challenged statement on October 20, 2016, many of the investments cited by defendants were sunk costs. Moreover, nothing in Pfizer suggests ongoing investments can *alone* fell a Section 10(b) claim when plaintiffs have adduced other evidence oppugning defendants' alleged beliefs; that consideration was just one aspect of the court's reasoning. A reasonable juror could agree with defendants that ongoing expenditures and renewal of the breakup fee make it unlikely they did not believe their own statements; but viewed favorably to plaintiffs, and given the evidence set out *supra* regarding Walgreens' executives' contemporaneous knowledge, that factual dispute belongs to the jury.

Defendants also argue Pessina, Fairweather, and Gradwell possessed a reasonable basis for their opinions by shifting blame to Weil and contending their opinions relied on Weil's view the FTC was likely to eventually approve the merger. (See Doc. 232 at 51-54). The executives' testimony in this respect would support a jury finding their beliefs were reasonable. The record, however, reflects that Walgreens did not consistently follow Weil's advice, most notably

rejecting its suggestion to prioritize Shopko over Fred's as the divestiture buyer. (See Doc. 239-178). It also reflects that Weil's optimism waned considerably over time. (See, e.g., Doc. 239-91 (Bernstein reporting on January 10, 2017, that FTC "does not see Fred's being approvable even if we substantially improve[ ] the store package" and "said very little to give us any hope of changing their position"); Doc. 239-259 at 2 (Bernstein reporting on March 18, 2017, that FTC "remains skeptical" about Fred's cost structure, Fred's management and financial performance "remain[ ] a concern," then-existing proposal of 865 stores "will not get this resolved," and FTC "believes that they have a strong case" to block the merger)). The Rule 56 record is rife with disputed facts and warring inferences; summary judgment with respect to the objective reasonableness of the challenged statements is not appropriate.

**\*17** Defendants lastly cite Tongue v. Sanofi, 816 F.3d 199 (2d Cir. 2016), for its holding that the defendant was not required to disclose negative interim regulatory feedback after having publicly touted "a 90% likelihood" of achieving approval of a proposed pharmaceutical. (See Doc. 232 at 55 (quoting Tongue, 816 F.3d at 211)). The court reasoned plaintiffs were "sophisticated investors, no doubt aware that projections provided by issuers are synthesized from a wide variety of information, [some of which] may be in tension with the ultimate projection." See Tongue, 816 F.3d at 211. The court concluded that absent "serious conflict" between interim regulatory feedback and defendants' expressed optimism of eventually securing approval, the failure to disclose the negative feedback was not actionable. See id. at 212. As defendants note, our court of appeals recently cited the district court decision in Tongue with approval in a nonprecedential decision, Lungu v. Antares Pharma Inc., No. 21-1624, 2022 WL 212309, at \*6 (3d Cir. Jan. 25, 2022) (citing In re Sanofi Sec. Litig., 87 F. Supp. 3d 510, 541-42 (S.D.N.Y. 2016), aff'd sub nom., Tongue, 816 F.3d 199).

Neither decision is squarely applicable here. Lungu rested primarily on its conclusion that the defendant's statement that "nothing unusual" occurred during the FDA's review of a proposed pharmaceutical went more to timing of regulatory milestones than it did "the substance or contents of the FDA's review," and that in any event, there was no indication anything unexpected had occurred. See id. The secondary holding defendants cite here—that defendant in Lungu "did not need to disclose the 2016 interim feedback from the FDA"—was the logical result of the court finding no serious

conflict between what the defendant said and what had happened. See id.; see also Tongue, 816 F.3d at 212. A reasonable juror could conclude, in light of evidence adduced sub judice, that defendants' updates did seriously conflict with the interim feedback. As for Tongue, defendants there offered projections regarding the likelihood of FDA approval. See Tongue, 816 F.3d at 210-13. Pessina, Fairweather, and Gradwell did not offer mere projections; they spoke to the present state of the FTC approval process, expressed present reasons for confidence the merger would obtain approval, disputed present rumors and reports regarding the approval process, and expressed and implied present facts about that process. Once they elected to make such statements, they had the duty to do so without being misleading. See Williams, 869 F.3d at 241.[9]

[9]
Tongue suggests its reasoning may not apply if the victims of the misrepresentations were "layperson[s], unaccustomed to the subtleties and intricacies" of regulatory processes. See id. at 211-12. Defendants point to nothing in the record conclusively establishing plaintiffs or the class they represent were all, at the time of transactions at issue, sophisticated merger arbitrageurs. Per contra, in the portion of their opposition brief taking up class-wide reliance, defendants suggest sophisticated arbitrage investors are just one subcategory of the larger class. (See Doc. 245 at 20 n.38).

## 2. Scienter

Plaintiffs can establish scienter by showing defendants made the challenged misrepresentations either (1) intentionally —with "a mental state embracing intent to deceive, manipulate[,] or defraud," see In re Ikon Off. Sols., Inc., 277 F.3d 658, 667 (3d Cir. 2002) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976)); see also Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 319 (2007) (same), or (2) recklessly—under circumstances evincing "an extreme departure from the standard of ordinary care, ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it," see Ikon, 277 F.3d at 667 (alteration in original) (citations omitted). The inquiry essentially reduces to a question of "bad faith," and "[i]f a plaintiff can show—by whatever means—that defendants did not have an honest belief in the truth of their statements, then

they are liable, so far as (scienter) is concerned." See id. at 667 n.7, 670 (citations and internal quotation marks omitted).[10]

[10]     Defendants insist any inference of scienter must be "cogent and at least as compelling as any opposing inference of non-fraudulent intent" to survive summary judgment. (See Doc. 232 at 61 (quoting Tellabs, 551 U.S. at 314)). Defendants again misapprehend the PSLRA's procedural effect on securities actions. Section 21D(b)(2) of the PSLRA requires plaintiffs in Section 10(b) and Rule 10b-5 cases to plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." See Tellabs, 551 U.S. at 314 (quoting 15 U.S.C. § 78u-4(b)(2)). In defining "strong inference," the Supreme Court holds the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." See id. The PSLRA, however, only applies to the pleadings stage of securities litigation; it left untouched the summary judgment standard. See 15 U.S.C. § 78u-4; In re Bristol-Myers Squibb Sec. Litig., No. 00-1990, 2005 WL 2007004, at *16 (D.N.J. Aug. 17, 2005) (citing In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999)). Assuming arguendo, the PSLRA elevated the Rule 56 standard too, for the reasons explained infra, the evidence with respect to the challenged statements is sufficient to support a strong inference of scienter.

**\*18** The scienter inquiry is both content and context specific; no single factor controls. One consideration is the speaker's knowledge—their individual awareness of the facts making their statement misleading. Cf. Avaya, 564 F.3d at 270. "[S]pecific and not insignificant" defects in statements may also, in the aggregate, support scienter. Cf. Ikon, 277 F.3d at 677 n.26. Motive, too, is a "persuasive" factor. See Rahman, 736 F.3d at 245 (citing Tellabs, 551 U.S. at 325-26). Any motive must be "a concrete and personal benefit to the individual defendants resulting from this fraud"; general motives common to all corporate executives do not suffice. See id. (quoting Avaya, 564 F.3d at 278). Our court of appeals has observed that the existence of scienter is a fact-intensive determination, inherently "intertwined ... with an assessment of witness credibility," that often cannot be made at the Rule 56 stage. See Ikon, 277 F.3d at 668.

That general rule applies here: genuine disputes of material fact, particularly as to credibility, combine to preclude summary judgment. As to Pessina, discovery has produced evidence which, viewed in the light most favorable to plaintiffs, would allow a jury to find he acted with intent to defraud. Pessina persisted in painting a far rosier picture of talks with the FTC than was the reality, and he expressed a more absolute commitment to the merger than reflected by Walgreens' internal dialogues. See supra pp. 31-33, 35-38. Defendants ask what motive Pessina could have had for lying to the market about a deal in which he had a major pecuniary stake.[11] Plaintiffs identify a plausible motive: assuaging anxieties in the market and among Walgreens' shareholders while buying time to find a solution to the FTC's perceived intransigence and the increasingly bleak odds of approval. (See Doc. 242-1 at 43-45). Pessina knew the market was listening and reacting to Walgreens' comments on the deal, conceding "if negative information came out regarding the likelihood of completion of the merger, Rite Aid stock price would probably go down." (See Pessina Dep. 80:17-81:24). He further testified the protracted nature of the approval process resulted in Rite Aid being in a more desperate position and, thereby, more amenable to the asset purchase proposal it had previously rejected, Pessina's original "Plan A." (See id. at 92:4-5, 128:22-129:6, 129:15-131:11). A jury resolving all factual disputes in plaintiffs' favor could find Pessina acted with intent to defraud investors.

[11]     As already noted, lack of motive will not fell a Section 10(b) or Rule 10b-5 claim; it is merely one consideration in our "holistic review" of the record. See Rahman, 736 F.3d at 245.

So too for Fairweather and Gradwell. Fairweather testified to being "very concerned" about what the protracted approval process was doing to Rite Aid in terms of its downward performance and escalating "financial pressure," and to knowing time was of the essence to complete the merger in the fall of 2016. (See, e.g., Fairweather Dep. 128:12-18, 129:18-23, 137:10-18). He also testified his statement pushing back on media reports was in response to a question about a specific rumor that Kroger was disinterested in the divestiture stores, and he admitted to knowing the Kroger rumor was true. (See Fairweather Dep. 195:19-202:6). Gradwell, for his part, incorrectly and repeatedly suggested the FTC had opened the data room for preapproved buyers, (see Doc. 231 ¶ 128), implying the FTC was looking more favorably on the deal than was the case. He also acknowledged Walgreens' goal in its public statements on

the merger broadly was to "help defer—help disperse or dilute that pressure that we were under." (See Gradwell Dep. 203:21-204:5). Viewed most favorably to plaintiffs, these facts would allow a reasonable jury to infer Fairweather and Gradwell intended to mislead the market to keep Rite Aid's stock price propped up while Walgreens tried to salvage the deal.

**\*19** For many of the same reasons, the record necessarily also would support a finding at the lower threshold—that Pessina, Fairweather, and Gradwell acted recklessly. They testified, to varying degrees of understanding, that the market was quite nervous about the merger and therefore hypersensitive to any news or public statements about its status. See supra pp. 45-46. It was at minimum reckless for Pessina, Fairweather, and Gradwell to offer incomplete or misleading statements implying their insider knowledge about the merger was different from, and better than, what the public was hearing. Drawing all reasonable inferences in plaintiffs' favor, a jury could find defendants knew or should have known their statements presented an obvious danger of misleading the market. See Ikon, 277 F.3d at 667. Accordingly, we will deny defendants' motion for summary judgment as to this element.

### 3. Loss Causation

To prevail on their claim, plaintiffs must prove defendants' challenged statements "actually caused the economic loss suffered." See McCabe v. Ernst & Young, LLP, 494 F.3d 418, 425 (3d Cir. 2007) (citing Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 172-73 (3d Cir. 2001)). That is, plaintiffs must prove defendants "misrepresented or omitted the very facts that were a substantial factor in causing [their] economic loss." See id. In a typical Section 10(b) action, like this one, the plaintiff alleges a fraudulent misrepresentation or omission artificially inflated the price of a security, which plaintiff purchased in reliance on that misleading statement; to prove loss causation, plaintiff must show subsequent "revelation" of the truth "was a substantial factor in causing a decline in the security's price." See id. at 425-26. At bottom, the question is whether the challenged statement "proximately caused the economic loss." See id. at 426 (citing Semerenko v. Cendant Corp., 223 F.3d 165, 185, 187 (3d Cir. 2000)). That question "is usually reserved for the trier of fact." EP Medsystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 884 (3d Cir. 2000) (citation omitted). To survive a motion for summary judgment plaintiffs must "create a

genuine issue" as to whether defendants' misrepresentations or omissions played a substantial role in causing plaintiffs' economic loss. See McCabe, 494 F.3d at 436.

It is undisputed that from the time the merger was announced, the market was monitoring closely and reacting to Walgreens' public statements about it. Defendants' expert admits as much, (see Doc. 234-3 ¶¶ 77-92), as do several Walgreens executives, (see, e.g., Pessina Dep. 80:17-81:24 ("[I]f negative information came out regarding the likelihood of completion of the merger, Rite Aid stock price would probably go down."); Doc. 239-4, Kohli Dep. 50:4-15 (acknowledging Rite Aid's stock "no longer trad[ed] on fundamentals, but rather on the potential completion of the transaction with us")). What matters for purposes of loss causation, however, is whether plaintiffs can connect the precise misrepresentations and omissions they challenge to the subsequent drop in Rite Aid's stock price. See McCabe, 494 F.3d at 425-26 (citing Semerenko, 223 F.3d at 184-85; EP MedSystems, 235 F.3d at 884).

To make that connection, plaintiffs advance an expert report from certified financial analyst Bjorn Steinholt. (See Doc. 238-2). Steinholt endeavors to quantify price inflation by identifying a series of corrective disclosures which "incrementally revealed the previously concealed truths." (See id. ¶ 140). Those five disclosures are (1) a January 20, 2017 Bloomberg report announcing "Walgreens said to face U.S. antitrust concerns for Rite-Aid fix," a second Bloomberg report announcing "FTC said to be worried about sale of stores to Fred's," and an accompanying article reporting Walgreens' plan to divest 865 Rite Aid stores to Fred's "hasn't satisfied officials at the [FTC]," so the deal was unlikely to close by the January 27, 2017 deadline, (see id. ¶ 141); (2) the January 30, 2017 joint press release from Walgreens and Rite Aid announcing an extension of the merger deadline and downwardly adjusted acquisition price, and an accompanying news article commenting on the announcement, (see id. ¶¶ 147-148); (3) an April 19, 2017 Capitol Forum piece headlined "Walgreens/Rite Aid: FTC Lawyers Deposing Walgreens, Rite Aid Executives, Making Other Preparations to Litigate," reporting FTC officials "have remained skeptical that any sell-off would address their concerns with the merger," (see id. ¶ 153); (4) several June 9, 2017 reports that FTC staffers were preparing to recommend the FTC sue to block the merger based on dissatisfaction with the revised proposal of divesting up to 1,200 stores to Fred's, (see id. ¶¶ 157-158); and (5) the June 29, 2017 announcement that Walgreens and Rite Aid had abandoned the merger and

were pursuing a store purchase instead, (see id. ¶¶ 163-164). Steinholt notes that with each partial disclosure of the alleged truth, Rite Aid's stock value decreased. (See id. ¶¶ 144, 150, 155, 160, 168).

**\*20**  Steinholt uses the disclosure dates and corresponding stock-price drops as benchmarks for calculating the inflation of Rite Aid's stock caused by defendants' misrepresentations or omissions about the status of the merger. For the January 20 and January 30 disclosures, Steinholt begins the liability period at the start of the class period (October 20, 2016) and assumes plaintiffs can eventually prove their factual allegations—that Walgreens knew on October 20, 2016, it was unlikely to secure FTC approval of its divestiture package and buyer by the January 27, 2017 end date or under the existing 1,000-store cap. (See id. ¶ 176). With respect to the last three disclosures, Steinholt runs the liability period from January 5, 2017, once again assuming plaintiffs can prove Walgreens knew then it was unlikely to secure FTC clearance of any merger with Rite Aid. (See id.)

Defendants do not challenge Steinholt's findings regarding the impact of each of the five cited revelatory events on the value of Rite Aid's stock. Their own expert concedes the price of Rite Aid's stock dropped with each announcement of increasingly grim merger news. (See Doc. 239-333, Ferrell Dep. 96:5-97:10, 162:23-165:22, 173:16-175:12, 190:23-192:11, 202:12-203:21, 205:18-206:25). Rather, they claim his report is essentially unusable because it rests on faulty premises—namely, that defendants should have disclosed in their challenged statements specific factual developments that had not yet occurred at the time of those statements. (See Doc. 232 at 68-71). They ask us to reject Steinholt's report outright because it assumes an "impossible" earlier disclosure of later developments. (See id.; Doc. 270 at 53).

A corrective disclosure, however, need not "mirror" the challenged misrepresentation or omission. See In re Urban Outfitters, Inc. Sec. Litig., 103 F. Supp. 3d 635, 655-56 (E.D. Pa. 2015) (citing Marsden v. Select Med. Corp., No. 04-4020, 2007 WL 1725204, at \*2 n.7 (E.D. Pa. June 12, 2007)). The disclosure must only "be related to the same subject as" the challenged misrepresentation or omission and "not some other adverse facts about the company." See id.; cf. McCabe, 494 F.3d at 428-28 (losses due to other circumstances, such as "subsequent decline in the market, or insolvency of the corporation brought about by business conditions or other factors in no way relate[d] to the representations"

are not compensable (quoting W. PAGE KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 110 (5th ed. 1984) (alteration in original) (emphasis added))). Importantly, revelation of the truth "need not occur in a single, all-encompassing corrective disclosure"; it might occur over time, in "a series of partial corrective disclosures" through which the truth gradually leaks out. See In re Urban Outfitters, 103 F. Supp. 3d at 655-56 (citations omitted).

Defendants' read of Steinholt's report misses the forest for the trees. It is not the facts revealed in later corrective disclosures, but what those facts reveal, that informs Steinholt's analysis. Specific factual developments reported in January 2017 obviously could not have been disclosed in October or November 2016; details were not hammered out on the Fred's proposal referenced in the Bloomberg article until December 2016, and the merger extension could not have been announced until it was agreed upon in late January. But what the disclosures confirm—that the FTC had serious antitrust concerns about the merger and that making Fred's presentable enough to secure FTC approval, particularly by the January 27, 2017 deadline, would be difficult—was known to Walgreens in the fall of 2016. See supra p. 32. Steinholt assumes an earlier disclosure of those known-but-concealed risks, not of the subsequent events themselves. (See Doc. 238-2 ¶¶ 143, 149; see also Doc. 234-97, Steinholt Dep. 220:8-221:15 (explaining "concealment can lead to damages, either by, of course, the company admitting the truth, but more commonly it is revealed when the consequences of the alleged truth are revealed")).

**\*21**  The same analysis applies to the second series of corrective disclosures, to wit: reports on April 19, 2017, that FTC officials remained skeptical any satisfactory sell-off package could be reached with Fred's, reports in early June 2017 that FTC officials were not satisfied by a reconstituted Fred's divestiture package, and the announcement in late June 2017 that the merger was off. Defendants are plainly correct that those specific factual developments had not occurred, and could not have been disclosed, when Pessina spoke about the merger on January 5 or April 5, 2017. Again, Steinholt does not claim otherwise. (See Steinholt Dep. 95:16-97:14). It is not the factual developments themselves that Steinholt assumes should have been disclosed, but what they reveal —viz., the unlikelihood that the deal would close given the FTC's serious skepticism. (See Doc. 238-2 ¶ 154 (April 19, 2017 disclosure "reveal[s] the FTC's strong skepticism of Walgreens' divestiture proposal and buyer"); id. ¶ 159 (June 9, 2017 disclosure "reveal[s] that the FTC was leaning against

approving the Merger"); id. ¶ 169 (June 29, 2017 termination of merger is "final disclosure of the alleged truth")). Those revelations relate squarely to the falsehoods and omissions alleged in this case, namely, that defendants knew in January and April 2017 that things were far more dire with the FTC than they publicly insisted.

Pairing an alleged misrepresentation with a corresponding corrective disclosure is an inexact art. The crux of plaintiffs' claim is defendants repeatedly represented the state of the FTC approval process as being more promising than they knew it to be. Steinholt emphasizes the selected corrective disclosure events not because he believes Walgreens should have clairvoyantly disclosed them before they happened, but because they could fairly be viewed as revealing to the public what Walgreens long knew internally. A jury reasonably could draw the inferences necessary to support loss causation from Steinholt's report—the misrepresented information in Pessina's, Fairweather's, and Gradwell's statements resulted in an inflated stock price, and revelation of the true state of affairs through subsequent events caused a decline in the price. Conversely, a jury could read the corrective disclosures as narrowly as defendants do and reject that link. It is the jury and not this court that shall resolve this dispute. See EP Medsystems, 235 F.3d at 884 (citation omitted). Accordingly, we will deny defendant's motion on this ground. [12]

[12]    Defendants argue Steinholt's failure to find significant price increases on November 17, 2016, and April 5, 2017, indicates the statements on those days did not cause price inflation. (See Doc. 232 at 71-72). But defendants miss the point. The absence of a price increase after a misrepresentation does not mean the statement had no impact on price; misrepresentations can prevent, mitigate, or delay declines in price. Cf. In re Advance Auto Parts, Inc., Sec. Litig., No. 18-212-RGA, 2020 WL 6544637, at *4 (D. Del. Nov. 6, 2020) ("The movement of a stock price immediately after a false statement often tells us very little about how much inflation the false statement caused." (citation omitted)). The key factor in assessing loss causation is decline after disclosure, not inflation after the misrepresentation. Bubbles tend to burst quite quickly, but they take time to inflate.

## B. Plaintiffs' Motion

Plaintiffs move for summary judgment on a handful of elements of their claim. They also ask us to declare as a matter of law that two of the challenged statements were misleading. Because of the many disputes of material fact in this matter which are set forth at length in this memorandum, and the inherent and inextricable overlap between various elements of plaintiffs' claims, we will deny plaintiffs' motion.

We first address the element of materiality. A fact is material if there is a "substantial likelihood" disclosure of the unobscured truth "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." See Matrixx, 563 U.S. at 38 (internal quotation marks omitted) (quoting Basic, 485 U.S. at 231-32). Our court of appeals has repeatedly observed that materiality is a question typically reserved for the jury. See EP Medsystems, 235 F.3d at 875 (quoting Shapiro, 964 F.2d at 280 n.11). All misleading statements identified by plaintiffs pertain directly or indirectly to the likelihood of the FTC approving the merger, and there is ample record evidence supporting a close association between Rite Aid's stock price and how confident financial markets felt on a given day the deal would ultimately close. (See, e.g., Doc. 238-2; Pessina Dep. 80:17-81:24; Doc. 237 ¶ 18; Kohli Dep. 50:4-15). Nonetheless, the challenged statements vary in source and substance. Determining whether any particular alleged misrepresentation changed the "total mix" requires precisely the sort of "delicate assessments" our court of appeals views as appropriately reserved for a jury. See EP Medsystems, 235 F.3d at 875. We will deny plaintiffs' motion on this ground.

**\*22** Plaintiffs also ask us to hold, as a matter of law, the record establishes the "in connection with" and "reliance" elements of their claim. (See Doc. 236 at 4-9). And they ask us to hold Gradwell's statement about the FTC opening the data room and Pessina's denial of a "Plan B" are misleading as a matter of law. (See Doc. 236 at 16-21). We decline. Although Rule 56 permits courts to grant summary judgment on parts of a claim or defense, see FED. R. CIV. P. 56(a), there is little appetite within the Third Circuit for piecemeal Rule 56 adjudications that do not resolve at least one entire claim, see, e.g., Avaya, Inc. v. Telecom Labs, Inc., No. 06-2490, 2009 WL 2928929, at *2 (D.N.J. Sept. 9, 2009) (collecting cases). We agree with defendants that extricating the elements contemplated in plaintiffs' partial motion will not in any way streamline trial. Cf. Adams v. Klein, No. 18-1330, 2020 WL 2404772, at *4 (D. Del. May 12, 2020) (denying plaintiffs' motion for partial judgment on two elements of Section 10(b)

claim because "it will do nothing to shorten or simplify the trial issues" and "jury will be better able to decide the issues of the case without some partial judicial imprimatur on a very narrow part" of it). Particularly in a case as factually nuanced as this, severing subparts of claims very likely would undermine rather than aid trial efficiencies. We accordingly will exercise our discretion and deny plaintiffs' motion to take fragments of their claims away from the jury.

**IV. Conclusion**

For all these reasons, we will deny the parties' cross-motions for summary judgment. An appropriate order shall issue.

**All Citations**

Slip Copy, 2023 WL 2908827

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2023 Thomson Reuters. No claim to original U.S. Government Works.  21