UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**ORIGINAL**

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

```
In re Apple Securities      )      Pages 1 - 80
Litigation                  )
                            )      NO. C 11-06714 YGR
                            )
                            )
                            )      Oakland, California
_____)      Wednesday, May 10, 2023
```

                                **Motion for Summary Judgment**


### REPORTER'S TRANSCRIPT OF PROCEEDINGS

**APPEARANCES**:

```
For PLAINTIFF:           Robbins Geller Rudman & Dowd LLP
                         Post Montgomery Center
                         One Montgomery Street, Suite 1800
                         San Francisco, California  94104
                BY:      SHAWN A. WILLIAMS,
                         KENNETH J. BLACK,
                         HADIYA K. DESHMUKH,
                         JACOB G. GELMAN,
                         DANIEL PFEFERBAUM,
                         MARK SOLOMAN, ATTORNEYS AT LAW



For DEFENDANT:           Orrick, Herrington & Sutcliffe
                         The Orrick Building
                         405 Howard Street
                         San Francisco, California  94105-2669
                BY:      JAMES N. KRAMER,
                         TRISTAN ALLEN, ATTORNEYS AT LAW



Reported By:        Raynee H. Mercado, CSR No. 8258


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

| | |
|---|---|
| 1 | Wednesday, May 10, 2023                                    9:56 a.m. |

2                    P R O C E E D I N G S

3                         --o0o--

4

5          **THE CLERK:**  Your Honor, calling the matter of

6    19-CV-02033-YGR, in re: Apple, Inc. Securities Litigation.

7       Will parties please step forward and state their

8    appearances for the record.

9          **MR. WILLIAMS:**  Good morning, Your Honor.  Shawn

10   Williams Robbins, Geller Rudman & Dowd, on behalf of

11   plaintiffs.  And with me I've got Dan Pfefferbaum, Ken Black,

12   Jacob Gelman, Hadiya Deshmukh, Mark Solomon, and our tech

13   person, whose name is Michael Torres.

14         **THE COURT:**  Okay.  And I take it, Mr. Williams, will

15   you be the person who is arguing the motion?

16         **MR. WILLIAMS:**  I will be.

17         **THE COURT:**  Anyone else on your side?

18         **MR. WILLIAMS:**  I don't think so unless Your Honor has

19   some questions that are beyond what I'm capable of addressing

20   myself.

21         **THE COURT:**  Okay.  Thank you.

22         **MR. KRAMER:**  Good morning, Your Honor.  James Kramer,

23   Orrick Herrington & Sutcliffe.

24         **THE COURT:**  Good morning, Mr. Kramer.

25         **MR. KRAMER:**  With -- good morning.  With me today is

```
 1   Tristan Allen from Orrick.  And we also have from Apple
 2   Legal -- Legal, Heather Grenier, Vice President of Litigation,
 3   Your Honor.
 4          THE COURT:  Okay.  Good morning.
 5      Let's go ahead, Mr. Kramer, and start with you.
 6      Mr. Williams, Mr. Kramer's been in this courtroom before,
 7   so he knows how things work.  I let you start.  Rarely does
 8   that last for very long so you should be prepared --
 9          MR. WILLIAMS:  Okay.
10          THE COURT:  -- at the microphone and --
11          MR. WILLIAMS:  Sure.
12          THE COURT:  -- and we will get started.  As I tell my
13   law clerks, now, I've got to re-put my head in securities
14   actions.  I was just in Chicago last night over the last
15   couple of days the ADA FTC Antitrust -- School teaching --
16   abut here we go, securities.
17      (Pause in the proceedings to resolve the Certified
18   Shorthand Reporter's technical issues with the sound in the
19   courtroom.)
20          THE COURT:  Okay.
21          MR. WILLIAMS:  Thank you, Your Honor.
22          THE COURT:  Mr. Kramer.
23          MR. KRAMER:  And, Your Honor, at the pleading stage,
24   the Court recognized -- and I'm on Slide 2 -- the Court
25   recognized the plaintiff would be unable to prove its claim if
```

1    the risks in China did not materialize until November and

2    December.  And defendant simply underestimated their eventual

3    impact.  And, again, Your Honor, that's from the motion to

4    dismiss.

5        Your Honor, the evidence we presented shows that that's

6    exactly what happened.  On page 2, we have a chart that comes

7    from the declaration of Kevin Parekh, and it's a chart that

8    compares Apple's forecasts from November 1 with the actual

9    results for the quarter for China.

10       Specifically the dotted line represents the guidance that

11   was given and the specific unit sales guidance for China.  And

12   the solid line shows what actually happened based on the

13   actual results from December 28th, the end of the quarter.

14            THE COURT:  Okay, Mr. Kramer.  I'm sorry.  I'm not

15   with you.

16       What page, and -- and do we not have this -- is their

17   evidence -- is this not on your PowerPoint?

18            MR. KRAMER:  Oh, it is, Your Honor.  Page 2.

19       I'm sorry.  It's page 2 of the materials I just handed up.

20            THE COURT:  And do we not have this for the public?

21   Is there a problem with our --

22            MR. KRAMER:  Oh, we -- Your Honor, we were only going

23   to present it by hard copy.  We didn't plan to present it by

24   PowerPoint.

25            THE COURT:  Oh, okay.  Is there some reason?

```
 1              MR. KRAMER:  No.  We just thought it would be easier
 2    to hand up a copy rather than having it displayed on the
 3    screen.
 4              THE COURT:  It is, but there are people here and it
 5    may be helpful for them to follow your argument if they could
 6    see it.
 7              MR. KRAMER:  Understood.  We have a set of materials
 8    they could look at while we're presenting, if that helps, Your
 9    Honor.
10              THE COURT:  We could turn on the -- on the ELMO if
11    you want.
12              MR. KRAMER:  Oh, okay.  That would work -- that would
13    be terrific, Your Honor.
14              THE COURT:  And, you know, it's -- we don't have to
15    have computers all the time.
16              MR. KRAMER:  Okay.
17              THE COURT:  And turn on the ELMO.  And then,
18    Mr. Kramer, perhaps your associate could come and --
19              MR. KRAMER:  Okay.
20              THE COURT:  -- and roll these as you talk about them.
21                   (Off-the-record discussion.)
22                   (Pause in the proceedings.)
23              THE COURT:  If you want to do it by computer, we can
24    hook you into the evidence presentation.
25              MR. ALLEN:  Is there a way to connect the computer?
```

```
 1          MR. KRAMER:  Yeah, Your Honor, we can connect.  May
 2   we take a two-minute?  Recess, we'll connect the computer and
 3   then we'll do it that way.
 4          THE COURT:  Yeah, let's do that.  I just think it's
 5   helpful to keep everybody on --
 6          MR. KRAMER:  Absolutely.
 7          THE COURT:  -- be able to follow the argument.
 8          MR. KRAMER:  Absolutely.
 9      Is there -- Your Honor, is there someone who can help us
10   connect?
11          THE COURT:  Do you have a cable?
12          MR. KRAMER:  Your Honor, we'll just use the ELMO,
13   that's fine.
14      So this is the ELMO here, Your Honor?
15          THE COURT:  It is.
16          MR. KRAMER:  Okay.
17          THE COURT:  I mean I do see -- I do see cables coming
18   out of those holes on the table.  I just don't know.
19          MR. KRAMER:  Okay.  If you want to go off the record,
20   Your Honor, we can try the cables first.  Would you want to do
21   that?
22          THE COURT:  That's fine.
23          MR. KRAMER:  Okay.  Let's go off the record then.
24   We'll do that.
25                  (Pause in the proceedings.)
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1          **THE COURT:**  All right, okay.  Let's go back on the

2     record.

3          We're on page 2 of the PowerPoint.

4          **MR. KRAMER:**  Yes.  Thank you, Your Honor.  And

5     apologies for the technical glitch.

6          Your Honor, in your order on the motion to dismiss, you

7     noted that plaintiffs would be unable to prove its claim if

8     the risks in China did not materialize until November and

9     December and that defendants simply underestimated their

10    eventual impact.

11         Your Honor, that's exactly what the evidence has shown.

12    The chart on the right side of page 2 shows exactly what

13    happened in Apple's business in China in Q1.  Specifically the

14    solid line -- I'm sorry, the dotted line is Apple's forecast

15    from November 1.  The dotted line -- the solid line, Your

16    Honor, above that, that's actually what occurred.

17         So the dotted line is based on Apple's forecast from

18    November 1st cast forward throughout the class period.  And

19    the solid line is the actual results that's taken from Apple's

20    December 28th end-of-quarter results.  These are all

21    authenticated in Mr. Parekh's declaration.

22         And what we see, Your Honor, is that on November 1, which

23    is the line on the left, Apple was ahead of its forecast in

24    China, which is the dotted line.  And although it dips

25    slightly in week six, Singles Day which is November 11th which

1    is the peak, they were ahead of unit sales.

2        Now, Your Honor, Singles Day, which is November 11th, is

3    like Black Friday here in the United States.  It's a day where

4    people go into the stores, it's a big shopping day.  And as

5    noted, Apple actually was ahead of expectations at that moment

6    as related to guidance.

7        Unfortunately what happened at week eight, which is the --

8    the forecast that was prepared on November 24th, Apple

9    declined significantly below, significantly below what it had

10   previously forecasted.

11       And as explained in Mr. Parekh's declaration at

12   paragraphs 20 through 24, there were -- it was a significant

13   increase in pressures, business pressures in China,

14   macroeconomic pressures in China.  And as a result, Apple

15   sales decreased significantly and they never recovered.

16       Your Honor noted, moving to Slide 3, on the motion to

17   dismiss that the key question as to when the risks

18   materialized in China was when the shortfall happened on

19   Apple's revenue guidance.  When did it occur.  You said that

20   was a critical question.

21       And you may recall, Your Honor, at the pleading stage, the

22   Court credited plaintiffs' allegations that it was implausible

23   to suggest that the entirety of the 9 billion-dollar shortfall

24   occurred in November and December.

25       Your Honor, the evidence establishes and shows that in

1    fact that's exactly what occurred.  The shortfall occurred

2    after November 1 because -- 'cause Apple reset its guidance on

3    November 1 to take into account all of its business and its

4    business conditions around the world including China.

5        If you go to the next page, Your Honor, Slide 3, you'll

6    see that in fact plaintiffs don't dispute the fact that Apple

7    is closely watching the XR launch.  And just to remind the

8    Court, the that XS and XS Max had launched in September, but

9    the XR had only launched in October 26 just a few days before

10   the November 1st earnings call.

11       According to plaintiffs in their undisputed fact

12   number 57, in the week leading up to the earnings call, Apple

13   cut its company-wide revenue forecast by $5.9 billion and cut

14   its sales forecast for iPhones by $6 million, and that -- the

15   forecast was revised downward because of that.

16       We agree completely, Your Honor.  That's exactly what

17   happened.  Going into the November 1st earnings call, Apple

18   looked carefully at what had been happening with the XR

19   launch, looked carefully at business conditions around the

20   world, and adjusted its guidance down.

21       Mr. Parekh and Mr. -- and Mr. Maestri, the chief financial

22   officer, in their declarations made clear that we've lowered

23   guidance the week before from a range of 97 to 93 billion,

24   down to a range of 89 to 93 million -- billion, specifically

25   to take into account what was happening around the world

1  including the XR launch.

2      And specifically, Your Honor, as it relates to the XR,

3  Apple lowered its unit sales forecast by 9.9 million units.

4  It was early.  It had just launched.  But Apple wanted to be

5  conservative, so they took down the unit sales forecast by

6  9.9 million units.

7      Your Honor, the guidance was reset on November 1, and it

8  fully incorporated everything that was happening in Apple's

9  business.  It fairly presented the state of affairs as of that

10  time.

11      Moving to Slide 5, Your Honor.  And the guidance that

12  Apple gave, it was not rosy.  The guide -- the midpoint of the

13  guidance range of $91 billion was below the market consensus

14  of 93 billion.  It represented a very modest 1 percent

15  year-over-year growth on the low end, which is down from

16  20 percent year over year from the prior quarter.

17      And it was the widest range Apple had ever presented, Your

18  Honor.  Normally Apple presented a guidance range of

19  $2 billion.  They doubled it to 4 billion now to signal the

20  uncertainty.  And the stock market took notice, Your Honor.

21  The stock price declined 7 percent the next day.

22          **THE COURT:**  Okay.  So let's stop there.

23          **MR. KRAMER:**  Yes, Your Honor.

24          **THE COURT:**  All right, Mr. Williams, with respect to

25  the evidence in front of the Court, facts only, right?

1          **MR. WILLIAMS:**  Sure.

2          **THE COURT:**  What --

3          **MR. WILLIAMS:**  Sorry.

4          **THE COURT:**  -- of what I've just been told that are

5     in these pages -- which I assume that you all properly

6     exchanged before today, right?

7          **MR. WILLIAMS:**  Yes.

8          **MR. KRAMER:**  Yes, Your Honor.

9          **THE COURT:**  So you'd have them.

10        What of -- in terms of numbers only and/or statements or

11    disclosures, what, if anything, is not accurate?

12         **MR. WILLIAMS:**  I want to make sure that I understand

13    the question, Your Honor.

14         **THE COURT:**  I want to make sure we're all on the same

15    page.

16         **MR. WILLIAMS:**  Okay.

17         **THE COURT:**  Is what I've just been told, from a

18    factual matter, accurate?

19         **MR. WILLIAMS:**  From a factual matter -- can I answer

20    it this way, Your Honor?  I think that we've kind of been two

21    ships passing in the night.

22         **THE COURT:**  It could be.  And you're going to have

23    your opportunity --

24         **MR. WILLIAMS:**  Okay.

25         **THE COURT:**  -- to talk about your ship.

```
1              MR. WILLIAMS:  Okay.

2              THE COURT:  What I want to understand is have I been

3     told something that is not accurate?

4              MR. WILLIAMS:  All right.  So on page 2 --

5              THE COURT:  Yes.

6              MR. WILLIAMS:  -- you have been told something that

7     is not accurate.

8              THE COURT:  All right.  What on page 2 is not

9     accurate?

10                     (Simultaneous colloquy.)

11             THE COURT:  So you're talking about this summary

12    chart.

13             MR. WILLIAMS:  I'm actually talking about the text

14    next to the summary chart that was the preamble to explaining

15    the summary chart.  And so --

16             THE COURT:  If you're -- you're talking about my own

17    order?

18             MR. WILLIAMS:  I am.

19             THE COURT:  Okay.  Don't worry about that.  That's

20    not what I'm -- I can read my own order.

21             MR. WILLIAMS:  Sure.

22             THE COURT:  What -- in terms of again, the -- the --

23    what the evidence is -- has uncovered, what discovery has

24    uncovered in terms of the facts, the numbers, the time, that's

25    what I'm asking.
```

1     **MR. WILLIAMS:**  Sure.  The chart that's been provided

2     to Your Honor is not accurate.  And the details of the reasons

3     why the chart is not accurate is -- are presented in our

4     motion to exclude the report of -- of Mr. Poer.

5        This chart is -- was pulled from a report that defendants

6     submitted by a proposed expert, and his name is -- I forgot

7     his first name, but his name is Mr. Poer -- and he created

8     this chart that purports to suggest that the iPhones or

9     business in China was trending well before November 1st and

10    then declined after November 1st.

11    **THE COURT:**  Okay.  So let me -- let me then move to

12    Slide 4, the two bullet points with respect to -- on the

13    second part.

14                    (Demonstrative published.)

15    **THE COURT:**  You know, I'm assuming they properly

16    quoted your undisputed fact number 57.  Right?

17    **MR. WILLIAMS:**  Yes.

18    **THE COURT:**  Okay.  So the next -- the next portion of

19    that, are those two bullet points accurate?

20    **MR. WILLIAMS:**  Are you talking about the next two

21    bullet points on page 4?

22    **THE COURT:**  Yes.

23    **MR. WILLIAMS:**  The first bullet point I think is --

24    is true that they lowered guidance prior to November 1st and

25    that purports to incorporate some of the negative information

1  out of China, yeah.

2          THE COURT:  And the second bullet point?

3          MR. WILLIAMS:  The second bullet point, the units,

4  that -- that appears to be close to accurate that prior to

5  November 1st, they cut their internal outlook for the XR by

6  approximately 10 million units, but the -- the 10 million --

7  give or take.

8          THE COURT:  Okay.  And then on the next slide, those

9  four bullet points.

10                  (Demonstrative published.)

11          THE COURT:  Are those accurate from your perspective?

12          MR. WILLIAMS:  The guidance that was provided on

13  November 1st was below market consensus.

14          THE COURT:  Okay.

15          MR. WILLIAMS:  And I can't -- I can't -- I don't -- I

16  don't -- bullet point 2, I -- I can't say.

17          THE COURT:  Okay.  The other two?

18          MR. WILLIAMS:  I can't say the widest range ever.

19  I -- I don't --

20          THE COURT:  Okay.

21          MR. WILLIAMS:  I can't say.

22      The stock price did decline by 7 percent on --

23          THE COURT:  Okay.

24          MR. WILLIAMS:  -- November 2nd.

25          THE COURT:  All right.

```
 1        Mr. Kramer, keep going.

 2             MR. KRAMER:   Thank you, Your Honor.

 3        Let me just start first.

 4        Mr. Poer did put in an expert report, but that chart is

 5   not part of an expert opinion.  That's a summary chart he

 6   prepared.

 7        The foundation of data is cited and attached to the Parekh

 8   declaration, who was the company's VP of finance and sales,

 9   and all Mr. Poer did was take the data and plot it.  There's

10   no expert.  We didn't want to -- given the fact that you

11   haven't ruled on Dauberts, we did not want to cite any experts

12   and we don't need to, Your Honor.  So that's first.

13        But continuing on, Your Honor.  On page -- moving to

14   Slide 6.

15                 (Demonstrative published.)

16             MR. KRAMER:   Slide 6 is the internal Apple forecast.

17   And you see here, Your Honor, this is dated November 1st.  And

18   this is P&L Dashboard.  And this is the internal document that

19   aligns specifically with the guidance Apple gave and is the

20   internal document that came to rest just before the earnings

21   call when Apple lowered its guidance by 83 -- 93 to

22   $89 million.

23        And so, Your Honor, it all lines up.

24        And so the point is, Your Honor, Apple worked very hard to

25   reset its guidance for November 1 so that the guidance
```

```
 1    reflected fairly the state of affairs of Apple's business on

 2    that day.

 3        And if you move to the next page, Your Honor, Slide 7.

 4                    (Demonstrative published.)

 5        MR. KRAMER:  I don't think there's a genuine dispute

 6    that Apple's guidance did reflect the state of affairs of

 7    business as of that day.

 8        Plaintiffs specifically are not alleging the guidance was

 9    false or misleading --

10        THE COURT:  Okay.  Again, agree?

11        MR. WILLIAMS:  We are not alleging that the guidance

12    was false and misleading.

13        THE COURT:  Okay.  Keep going.

14        MR. KRAMER:  Yeah.  And, Your Honor, I appreciate

15    that's everything conceding it's accurate.  In fact the

16    plaintiffs objected to the guidance being accurate in their

17    separate statement.  And they had three objections, and

18    they're listed here.

19        The first is the guidance turned out to be incorrect.

20    And, Your Honor, the Ninth Circuit has held in Oracle that the

21    fact the guidance turned out to be wrong doesn't mean it

22    was -- it was not accurate at the time.

23        Secondly, they object on grounds that the guidance did not

24    disclose every detail.  And, Your Honor, again, the Ninth

25    Circuit in Semiconductor made clear that you don't need to
```

1    disclose every detail of guidance.

2        And the final thing they do is they introduce a document

3    which is an email, an October 31st email, it's Exhibit 88,

4    which refers to finding $800 million.

5        The plaintiffs argue that was a revenue number and that

6    somehow that document shows the guidance was not accurate.

7        But, Your Honor, Mr. Maestri testified to that document.

8    It referenced a discussion with him that that $800 million was

9    a cost document.  It was attempting to find $800 million in

10   cost savings for the quarter and not revenue.

11       And, Your Honor, if you move to Slide 8.

12                  (Demonstrative published.)

13       **MR. KRAMER:**  We presented voluminous direct evidence

14   that in fact the guidance was reset on November 1.  Again,

15   Mr. Parekh's declaration which is -- attaches the actual

16   contemporaneous Apple documents from the time says that as of

17   November 1 they were on track to meet the guidance.  And that

18   incorporated the relevant information concerning Apple's

19   business condition around the world including China, that

20   Apple did well on the XR on November 11 Singles Day and that

21   Apple was actually in line with -- with the guidance it issued

22   on November 1 through November 17th.

23       And it wasn't till subsequent to November 17th, till week

24   eight of the quarter, which is November 24th, that the bottom

25   fell out in China.  That the bottom fell out in China.

1          So, Your Honor, again going to Slide 9 which is --

2                    (Demonstrative published.)

3          **MR. KRAMER:**  -- you saw earlier, exactly what you

4   identified the motion to dismiss came to pass.

5          The shortfall in guidance which was primarily due to a

6   decline in business in China occurred after November 1.

7   Because by definition, Apple reset the guidance for November 1

8   to take into account everything that was happening including

9   the launch of the XR which we had just a few days of data, but

10  to take that into account, and what we see on Slide 9 is that

11  that's exactly what happened.  It wasn't until the second half

12  of November that China declined significantly away the

13  guidance.

14         And of course the shortfall in the guidance is what brings

15  us here today, Your Honor.  That's the plaintiff's case.  They

16  say the truth was not revealed until Apple announced its

17  results, preliminary results in January 2nd, and that the

18  9 billion guidance missed disclosed the truth -- the true

19  conditions about what was happening in China.

20         So, Your Honor, the fact that guidance was reset on

21  November 1 and reflected fairly the state of affairs of

22  Apple's business, Your Honor, that cuts across falsity, it

23  cuts across scienter, and it cuts across loss causation.  And

24  it demands summary judgment, Your Honor, on each of those

25  independent grounds.

1        **THE COURT:**  Okay.

2      Ships passing in the night.

3        **MR. WILLIAMS:**  All right, Your Honor.  Yes.

4      I feel like throughout the litigation we have been

5   shipping passing through the night.  You can see that

6   Mr. Kramer began his presentation talking about a -- a

7   forecast or guidance.  That's just not what the alleged

8   misrepresentation is.

9      In fact, if you look at the very last page of Mr. Kramer's

10  presentation, you don't have to read it, but you'll see that

11  that last page actually has the alleged misrepresentation that

12  the -- that the plaintiffs alleged and the court upheld which

13  is what actually brings us here today.

14     They don't like to address it directly and that's been

15  part of sort of the narrative throughout the case.  And that's

16  why the very first page of the presentation is about the

17  guidance, the forecast, a fact, factor that is simply not what

18  is alleged to be false and misleading.

19     And I just want to -- and I want to make a -- a more

20  clarifying point for me and as I'm preparing to talk to you

21  about it, the -- you know, the PSLRA actually provides a safe

22  harbor for forward-looking statements like guidance and

23  forecasts so long as a defendant is able to point to --

24  identify the statement and then give sufficient warnings.  And

25  they're protected from cases like, you know, securities cases

1    that allege false and misleading statements.

2        That's not what's happening here.  We have a current

3    misleading statement about the company's business conditions

4    in China.  That's what the case is about.

5        And so what defendants are -- it appears that what they're

6    trying to do is to move that current false statement into a

7    forward-looking statement suggesting that the issuance of

8    guidance that incorporated the factors that made the

9    misrepresentation false and misleading are somehow protected

10   because they incorporated those statements into the guidance.

11       But that -- there's no law on that.  There's -- there's --

12   Mr. Kramer, in their papers, not even in his presentation,

13   there's absolutely no authority for it.  So the premise, the

14   beginning of the conversation that we're having today, is the

15   wrong beginning.

16       So the correct beginning is the November 1st statement

17   that Mr. Cook made to the market in response to Mr. -- an

18   analyst's question.  I can go through my slides with you, Your

19   Honor, whatever's going to be easiest for you.

20       But on November 1st, Mr. Cook was asked about whether or

21   not China -- whether or not the company was experiencing any

22   pressure with respect -- in connection with decelerating

23   conditions in emerging markets.  This wasn't a surprise to

24   Mr. Cook.  He had prepared for the question the day before.

25       If you look at Slide 13 of our -- of our presentation, I

```
 1    can bring it up for you.

 2              THE COURT:  You can switch over to their side.

 3        I'm really happy.  I've got a very enthusiastic,

 4    hard-working new deputy clerk after mine left after 25 years.

 5    And so we're going to be patient with him as --

 6              MR. WILLIAMS:  Sure -- no -- no.

 7                   (Simultaneous colloquy.)

 8              MR. WILLIAMS:  I'm sorry.  I'm sorry, not slide 13.

 9    It's -- give me one second.

10                   (Pause in the proceedings.)

11              MR. WILLIAMS:  It's actually slide -- Slide 8, Your

12    Honor.

13                   (Demonstrative published.)

14              THE COURT:  Okay.  I'm there.

15              MR. WILLIAMS:  So on November 1st, Luca Maestri sends

16    Mr. Cook an email that was prepared by Nancy Paxton, and it

17    outlines questions that they are expecting from analysts later

18    that day later in -- later that day in an earnings conference

19    call.

20        And a summary of the questions are presented here for you

21    on Slide 8.

22        And they're -- the questions are, you know:

23        There's a broader concern about economic -- the economic

24    situation in China, how is your business performing there?

25        How is the weak smartphone market impacting your China
```

```
 1   business?
 2       What's happening to your smartphone market share in China?
 3       What is the outlook for the China -- for the China market
 4   given recent Chinese government stimulus efforts for
 5   consumers?
 6       So prior to -- prior to the November 1st conference call,
 7   the -- Tim Cook, Luca Maestri, they understood that the market
 8   was very concerned about conditions in China and what that
 9   meant for smart -- the smartphone sales there.
10       China represented 20 percent of the company's business.
11   And competition was -- was intensifying, plus the market in
12   China was slowing down substantially.  And the Trump
13   administration had also imposed tariffs on goods coming out of
14   China in the recent months.
15       So that was -- that was the -- the platform for which Tim
16   Cook went into this conference call the next day.
17       And so he was asked by one of the analysts who he was --
18   he knew was going to ask him the question.
19       And if you turn to Slide 10.
20       And this happened to be the very first question in the
21   conference call because, you know, Apple doesn't do things
22   without preparation.  And it just happened to be the first
23   question.
24       And Mr. Mohan asked, there's been some real deceleration
25   in some of these emerging markets partly driven by economic
```

1    concerns around some of the rules of administration -- that's

2    the tariff issue -- and partly driven by things that are more

3    specific to China, for instance like some of the regulations

4    around gaming.

5        And he goes on to say:  So can you talk about how you see

6    the trajectory there for the business?

7        He didn't ask about the fourth quarter.  He didn't ask

8    about the guidance.  This wasn't about the guidance.  He

9    wanted to know what was happening in China.

10       And of course Mr. Cook responds by saying:  Hey, that's a

11   great question.

12       He wasn't confused.  He knew what the question was

13   earlier.  It was going to be earlier in the day.

14       He says:  Starting with emerging markets, the emerging

15   markets that we're seeing pressure on the markets like Turkey,

16   India, Brazil, and Russia.  Has nothing to do with the

17   guidance there.

18           **THE COURT:**  Okay.  Response specifically on that.

19   And I think the point is well-taken, at least the way we've

20   looked at the papers.  You are frequently two ships passing in

21   the night.

22       So what -- so respond to that.  I mean he's basically

23   saying, look, you've -- you've created somewhat of a strawman

24   by saying:  Oh, look, we did all these things right.

25       It's like, okay, fine, you did them right.  That's not

1   what we're talking about.  That's not why we're here.  We're

2   here about these specific statements and only these specific

3   statements.  So you could be right about a hundred other

4   things, but on this, you're actually not responding directly.

5              **MR. KRAMER:**  So, Your Honor, I think we are, and let

6   me tell why.

7       So, first, how do you measure pressure?  The question is

8   we would not put China in that category, that -- sorry.  Those

9   are the eight words.

10      The plaintiffs measure their materialization of that risk,

11  the materialization of the fraud under their theory as the

12  $9 billion miss.  Right?  That's how they measure the damages.

13  That's how they allege in their complaint.  That's what their

14  expert says.

15      And, Your Honor, in your motion to dismiss order, five

16  times you referred to the guidance as being the proxy for the

17  risk.  Right.  Their case is Mr. Cook said we're 30 days into

18  Q1, we're not seeing any pressure in China.

19      Your Honor, specifically in your motion to dismiss order,

20  said the pressure has to be somehow quantified.  And the

21  pressure is the miss on the earnings guidance.

22             **THE COURT:**  All right.  So what is the pressure if

23  not the guidance?

24             **MR. WILLIAMS:**  The pressure is on whether or not the

25  company is going to be able to grow its market share with

1    these phones in China in light of the Chinese consumers

2    spending less money because of the economic slowdown there,

3    rising -- rising debt conditions, and a smartphone or a group

4    of smartphones that were very, very expensive when China --

5    Chinese manufacturers were creating new -- were creating

6    equally capable phones for a much lower price.  And that is

7    the -- the pressure that the market was expecting.  And I can

8    sort of the walk back a little bit for you because it's in our

9    presentation, the lead-up to this --

10            **THE COURT:**  Okay.  Go ahead.

11            **MR. WILLIAMS:**  -- conference call.

12        So why don't we just start on Slide 2.

13                    (Demonstrative published.)

14            **MR. WILLIAMS:**  Okay.  So this is just the -- the --

15    early 2018, it was widely reported that China -- the

16    smartphone industry in China was declining and economic

17    conditions were -- were -- were sliding there.

18        So early January 26, just Chinese eight-year -- China's

19    eight-year-long smartphone growth comes to an end.  February,

20    very specific, Forbes writes, "Why Apple will lose China's

21    market share in 2018 despite the phone" -- "despite the

22    success of the iPhone X."  And that is the phone that was

23    issued the year before -- or launched the year before.

24        And they go on to say:  If Apple wants to grow in China

25    volume, higher -- sorry.  "If Apple wants to grow iPhone

1    volume higher in China, it will have to push down, not up, the

2    pricing curve."

3        What they're talking about there is Apple's iPhones are

4    very expensive in China.  And if they wanted to grow share in

5    China, they were going to do something much cheaper because

6    Chinese consumers were no longer willing to pay for a very

7    expensive phone.

8        June, middle of the summer:  "China's economy shows signs

9    of slowing."  And the trade war won't help.  That's what I

10   mentioned a few minutes ago.  We're right in the middle of the

11   Trump administration's tariffs being imposed on China.

12           **THE COURT:**  But so --

13           **MR. WILLIAMS:**  Yeah.

14           **THE COURT:**  -- no one's saying that China's not

15   important.

16           **MR. WILLIAMS:**  Correct.

17           **THE COURT:**  Apple is not saying that.

18           **MR. KRAMER:**  No, Your Honor, we're not.

19           **THE COURT:**  No one's saying that.  And no one's

20   saying that there isn't a long history on these topics.  What

21   element then are we concerned with in a securities action?

22   What element specifically does this all go to?

23           **MR. WILLIAMS:**  This goes to the materiality of the

24   statement that was made by Tim Cook in context of market

25   expectations, particularly the analysts and investors, about

```
 1    whether or not Apple was going to be able to perform in this
 2    market that was under pressure.
 3              THE COURT:  Okay.
 4              MR. WILLIAMS:  And so --
 5              THE COURT:  So materiality and what else?
 6              MR. WILLIAMS:  Falsity.
 7        So you asked me about the elements, so falsity and
 8    materiality.
 9              THE COURT:  All right.  So let's go to the actual
10    statement that's being challenged.
11        Last -- I don't know if you have it.
12              MR. WILLIAMS:  Yeah, it's here.
13              THE COURT:  Go ahead and go to that slide.
14              MR. WILLIAMS:  It's 10.
15                    (Demonstrative published.)
16              MR. WILLIAMS:  And so --
17              THE COURT:  Wait.
18              MR. WILLIAMS:  Okay.
19              THE COURT:  To Mr. Kramer.
20              MR. KRAMER:  Yes, Your Honor.
21              THE COURT:  Statement on -- everybody agrees that's
22    the actual statement that I -- I don't -- let's just stay --
23    just don't touch it.  Let's just stay with what -- with me
24    right now.
25              MR. KRAMER:  Okay.
```

1      **THE COURT:**  Everybody agrees that's the statement

2  that I authorized.

3      **MR. WILLIAMS:**  Yes, Your Honor.

4      **THE COURT:**  Okay.  So is it material?

5      **MR. KRAMER:**  Is the statement material?

6      **THE COURT:**  Is it material?

7      **MR. KRAMER:**  Your Honor, standing alone, I don't

8  think it is.  But obviously we are attacking it on falsity,

9  scienter, and loss causation grounds.  And I had -- the reason

10 I had Mr. Allen come up is we've got a copy of -- I think a

11 better copy on Slide 22 of our presentation.

12                  (Simultaneous colloquy.)

13     **THE COURT:**  We all have it.

14     **MR. KRAMER:**  Yes, Your Honor, we do.

15     **THE COURT:**  So you dispute that it's material.

16     **MR. KRAMER:**  Your Honor, I think standing alone, how

17 do you measure pressure?  It is inherently unmeasurable.

18     **THE COURT:**  Yes or no, Mr. Kramer, do you dispute

19 that that's material?

20     **MR. KRAMER:**  I do dispute it's material,

21 understandable and, yes.  I think those words out of context

22 are not material unless they're tied to some other measure of

23 the business conditions in China.  Right?

24     If you say there is no pressure or we're not seeing

25 pressure, I don't know how you measure that which is -- look,

1    why we embrace the plaintiff's theory, we embrace Your

2    Honor's --

3          THE COURT:  Well, you only semi did.  But all right.

4    Let's talk about materiality.

5       Hold on.

6       So you believe that it's not material standing alone.

7          MR. KRAMER:  I do.  I do, Your Honor.  I think you

8    have to --

9          THE COURT:  Okay.  Hold on.

10         MR. KRAMER:  -- read in context.

11         THE COURT:  Plaintiffs believe that it is material,

12   correct, Mr. Williams?

13         MR. WILLIAMS:  It is correct, Your Honor.  And I

14   think defendants have said in their brief that they are not

15   challenging -- challenging materiality, page 10 of their

16   reply.

17         MR. KRAMER:  That's correct, Your Honor.  We're not

18   moving for summary judgment on materiality.  I don't think it

19   is material, but we're not moving for summary judgment on

20   that.

21         THE COURT:  So here's the thing --

22         MR. KRAMER:  Yes, Your Honor.

23         THE COURT:  -- Mr. Kramer.  When I get to summary

24   judgment, I'm figuring out is there something that I need to

25   try; right?  Because I'm a trial judge.  That's what I do.  I

1    try cases.

2        When I look at what I'm supposed to be trying, obviously

3    you have to look at the elements.  Materiality is one of them.

4    And so you can't -- you can't be entitled to summary judgment

5    unless you prove, you know, that there is no material dispute

6    of fact as to one of the core elements.

7        So for purposes of summary judgment then, I'm going to

8    assume from what you said and from page 10 of your reply brief

9    that you concede that there is a genuine dispute of material

10   fact as to materiality.

11            **MR. KRAMER:**  Very good, Your Honor.

12            **THE COURT:**  Is that right?

13            **MR. KRAMER:**  Very good.  Yes, Your Honor.

14            **THE COURT:**  Okay.  So we don't have to discuss

15   materiality because everybody now is on the same page that

16   there's a dispute of material fact.

17        Falsity?  Dispute of material fact on falsity?

18            **MR. KRAMER:**  I think -- I think no.  Because we

19   presented evidence that the statement on November 1 was

20   consistent with the state of affairs.

21        And, Your Honor, the theory here, remember, is that this

22   statement of not put China in that category created a

23   misleading impression because Mr. Cook used mixed text.

24        And because the question asked -- some of it's a four-part

25   question from Mr. Mohan from Bank of America, is disjointed

1     but there is language in there that says trajectory.

2         And so plaintiff's theory is you said it would not put

3     China in that category.  We put in a declaration of Mr. Cook

4     that says that was his opinion, comparing the currency

5     pressure of Q4.  But the -- plaintiff's core theory is that

6     statement was materially misleading because you said something

7     in the present tense while referring to the past tense.  So

8     you created a misleading impression to the market that China

9     was not experiencing pressure.

10         Under *Brody*, Your Honor, you can only have falsity in an

11     admission situation if Mr. Cook's statement presented the

12     appearance of a state of affairs that differed materially from

13     the one that actually existed.

14         The fact that the guidance that was given on November 1

15     included the up-to-date information on Apple's business,

16     including all of the slides that they present on the XR, every

17     fact, lowering the sales forecast by 9.9 billion -- I'm

18     sorry -- 9.9 million units worldwide tells you that Mr. Cook

19     could not have created a misleading impression because it was

20     not inconsistent with the state of affairs.

21         And when we get to the analyst reports, Your Honor, and

22     this is really important because plaintiffs have a big windup

23     that the analysts were keenly focused on China.  We agree.  We

24     agree.  The analysts did not hear Mr. Cook to say --

25              **THE COURT:**  Well, that's -- you know, they've got

1  plenty of analyst reports that are contrary to the analyst

2  reports that you put in the record.

3       MR. KRAMER:  Not on the issue of no pressure in

4  China.  They began -- we not -- so first of all, every analyst

5  report they cited lowered their price.  And I can walk through

6  them, they're in our materials.  None of them say in words or

7  substance, and Mr. Cook said there's no pressure on Apple's

8  business in China.

9       And, Your Honor, that's important because as plaintiffs

10  themselves say, and as the materials and slides 2 to 8 of

11  their presentation tell you, that Apple was listening

12  carefully.  This was a big deal to analysts.

13       The analyst reports we put in, Your Honor, which are all

14  in front of the Court in raw form, including the report from

15  Mr. Mohan who asked the question, say specifically Mr. Cook's

16  statement, "I would not put China in that category," was a Q4

17  statement on currency pressure.  And we continue to be

18  concerned about Apple's business in China.

19       Goldman Sachs lowered the rating and price target because

20  of it and specifically called out the fact that they expected

21  deceleration in China.

22       Your Honor, if it's helpful, I can walk through those

23  briefly.  They're in the presentation.  We can put them up.  I

24  don't want to waste the Court's time.

25       But it's -- if Mr. Cook had said, "Hey, everybody, 30 days

1    into Q1, launch a new product, everything's great here.  And I

2    know you saw our guidance and you're worried about our

3    guidance, but China's great," you would have seen an analyst

4    say that, but not one did.

5           **THE COURT:**  Okay.  So let me get a response.

6           **MR. WILLIAMS:**  Your Honor, responding to the falsity

7    of the analyst reports, I want to make sure I'm directing my

8    comments to what you would like to hear.

9           **THE COURT:**  Well, you made a number of points, right,

10   so I need to -- he's challenging falsity.

11          **MR. WILLIAMS:**  Okay.

12          **THE COURT:**  And he's saying that as a matter of law,

13   given the context and given the analysts' response, I can't

14   find that there's a material dispute of fact with respect to

15   falsity.

16          **MR. WILLIAMS:**  Okay.  With respect to falsity, the

17   statement in the context, that's what we were working through

18   before, which is what I mentioned, and we didn't get through

19   the analysts' reports leading up to the conference call

20   concerned about whether or not the company could perform in

21   this weakening environment is the reason why Mr. Mohan asked

22   the very first question in the conference call, and the

23   context is very important.

24       This context issue was one we talked about during the

25   motion to dismiss, and Your Honor -- Your Honor spent a lot of

1    time considering the context of this question in determining

2    whether or not we had alleged a material false statement.

3        Mr. -- Mr. Kramer likes to focus on just a few words at

4    the end, "I would not put China in that category," but the

5    statement was much broader than that.

6        It actually incorporates the question because Mr. Cook

7    purported to be answering a question which he understood

8    specifically about emerging markets and emerging markets that

9    were experiencing pressure.  And he said those were Turkey,

10   India, Brazil, and Russia.

11       He went on to say those markets are not growing the way

12   that we -- I'm sorry.

13            **THE COURT:**  Slow down.

14            **MR. WILLIAMS:**  Okay.

15            **THE COURT:**  I know you're getting excited, you had a

16   lot of coffee.  No worries.

17            **MR. WILLIAMS:**  Actually I haven't had any coffee this

18   morning yet.

19            **THE COURT:**  Well, then that's scary.  Go ahead, just

20   slow down.

21            **MR. WILLIAMS:**  And emerging markets that were seeing

22   pressure are markets like Turkey, India, Brazil, and Russia.

23   And he went to say those markets are not growing the way that

24   we'd like to see.

25       Then he -- he contrasts that with China.  In -- in

1    relation to China specifically, "I would not put China in that

2    category.  Our business in China was very strong last quarter.

3    We grew 16 percent...."

4        So the context was these markets are not growing the way

5    that we'd like to see.  I wouldn't put China in that category

6    because China was in fact growing.

7        Now we know that China was not growing because if you look

8    at Slide -- Slide 27.  I know I'm jumping around just a little

9    bit.  Slide 27.

10                    (Demonstrative published.)

11        **MR. WILLIAMS:**  On October 24th -- this is a week or

12   six days before the earnings conference call -- they brought

13   down the outlook for China by 5 percent.

14       So on October 19th, China was expected to grow by

15   4 percent.  And by October 23rd, it had declined to negative

16   1 percent.  That is not growing.  That is declining.

17       And when Tim Cook, on -- on November 1st, said that these

18   countries are not growing the way that we'd like to see, but

19   contrasting China and using the growth in the fourth quarter

20   as evidence that China was not in that category, it simply was

21   not true.  It wasn't true very specifically.  It wasn't true

22   in context.  And he knew that.

23       Now, Mr. Kramer has given you slides, I think Slide 4.  A

24   big part of his presentation is that the guidance incorporated

25   this information.  And I would submit that just Slide 4, the

1    first bullet point which we agree is undisputed, that between

2    October 23rd and November 1st, the company cut its -- cut its

3    company-wide revenue forecast by $5.9 billion, is an admission

4    that they knew that revenue, particularly in China, was in

5    fact declining and incorporated this information into the

6    guidance.

7        I think that it undermines the entirety of their motion

8    for summary judgment on falsity and scienter.

9        You cannot reconcile this admission that -- which they

10   characterize as an argument -- but the admission that they

11   took all this information and cut the guidance internally

12   before they went to the market on November 1st.

13       And it's -- you know, and this is one of those issues that

14   simply is not in dispute.  I deposed Tim Cook.  He admitted to

15   me that he understood all of these factors about the XR launch

16   in China going very poorly, much more poorly than they

17   expected, the economic situation in China declining, and that

18   they incorporated all of these factors into the guidance

19   before they issued it.

20       Now, it may be that they don't appreciate the facts of the

21   case.  When I deposed him, Mr. Cook, I asked him if he had

22   read the complaint or even understood the allegations, and he

23   told me he had not.  So it may be that he did not understand

24   the implications of what he was admitting to.

25       But we aren't alleging that the guidance was false.  We're

1    alleging that the very facts that were occurring in China were

2    damning and they knew it, but instead of disclosing it, when

3    asked a specific question about what was happening in China,

4    they said, China's not in the category of other emerging

5    markets that are -- that aren't growing.  We grew 16 percent.

6        He knew at the time that internally, they had cut their

7    outlook for China by 5 percent.

8            **THE COURT:**  All right.  Do you want to respond?

9            **MR. KRAMER:**  Yes, Your Honor.

10           **THE COURT:**  And I'm assuming the guidance didn't --

11   didn't reflect the internal -- the internal metrics that

12   Mr. Williams was talking about.

13           **MR. KRAMER:**  No, it did, Your Honor.  It reflected

14   exactly what was happening.

15           **THE COURT:**  No, explicitly.

16           **MR. KRAMER:**  What do you mean explicitly, Your Honor?

17           **THE COURT:**  They didn't come in -- they weren't

18   sharing this data with --

19                   (Simultaneous colloquy.)

20           **MR. KRAMER:**  Oh, no, Your Honor.  They didn't provide

21   in China --

22           **THE COURT:**  They didn't say that this was being

23   caused by --

24                   (Simultaneous colloquy.)

25           **THE COURT:**  -- by China versus Turkey, India, Brazil

1    and Russia.

2              MR. KRAMER:   That's correct, Your Honor.

3         But, Your Honor, the starting point -- Mr. Williams said

4    the statement "I would not put China in that category" equates

5    to "China is growing."

6         Your Honor, the only evidence in the record on what that

7    statement means is from Mr. Cook, Mr. Maestri, and Mr. Parekh.

8    Mr. Cook specifically said:  I was making a comparative

9    statement about Q4 currency pressure.

10        Mr. Williams did depose Mr. Cook.  But, Your Honor, he

11   never asked him what the statement meant.  He never asked him

12   what this referred to.

13        And so starting from the premise that Mr. Cook stood up

14   and said, hey, everybody --

15             THE COURT:   Does his subjective intent matter?

16             MR. KRAMER:   I think it does, Your Honor, for two

17   reasons.

18             THE COURT:   I mean, because if it did, then

19   executives -- I'm not saying anything specific about Mr. Cook

20   himself -- but as a rule, they could always create some other

21   story for what it is that they said.

22             MR. KRAMER:   They could, Your Honor.

23             THE COURT:   Don't -- don't we need to have objective

24   guidelines for what the market is hearing based upon the

25   actual words said?

1          **MR. KRAMER:**  We do, Your Honor.  And I think we do.

2      But let me start with your first question.

3      *Omnicare* says when you use words like "I believe," "I see

4  it," and Slide 22 of our presentation --

5      If we can show Slide 22 of our presentation.

6      Mr. Clerk, could we just flip over to the ELMO?  Thank

7  you, sir.

8                    (Demonstrative published.)

9          **MR. KRAMER:**  Okay.  Your Honor, this is Slide 22

10  which is a challenged statement.

11      And as Mr. Williams said, context matters.  Mr. --

12  Mr. Cook says four times in his answer that this makes clear

13  this is a statement of opinion, per *Omnicare*.

14      "So I think -- or at least the way that I see it," "I

15  don't see it as," and even the challenged statement itself, "I

16  would not put China in that category," under *Omnicare*, in

17  order to show that it's false, they have to show that Mr. Cook

18  did not subjectively believe the statement.

19      But my only point is, Your Honor, if we're going to look

20  at falsity, you have to start with evidence of what the

21  statement meant.  And the only evidence we have is from a

22  bunch of places.  The evidence we have from Mr. Cook that said

23  I was making a truthful statement in good faith about currency

24  pressure.

25      You have Mr. Maestri, the chief financial officer, who

1    understood the question is Q4.

2        And you have the analyst who heard it the same way.

3        Your Honor, if I could just go briefly to Slide --

4    actually let's go to Slide 23 because I want to explain what

5    was happening.

6        Slide 23 is the analyst's report that was issued by Mr. --

7    I'm sorry.  Slide 21 was the analyst's report that was issued

8    by Mr. Mohan on October 26th, a few days before the

9    November 1st call.

10                    (Demonstrative published.)

11        **MR. KRAMER:**  And Mr. Mohan -- again this is page 21.

12   Mr. Mohan specifically lowered his estimates to account for

13   China risk in for exchan- -- exchange headwinds.  He says,

14   "During the past cycle of a strengthening dollar...China

15   iPhone units declined 20 percent and overall Apple China

16   shares declined 24 percent."

17        Mr. Mohan was concerned about currency exchange.  As the

18   Court knows from the papers, Apple sells product in local

19   currency.  And if the dollar is strong when he converts it to

20   U.S. dollars for reporting purposes, there's a big hit.

21   Mr. Mohan was specifically focused on the currency exchange

22   issue, which is what Mr. Cook -- why Mr. Cook was prepared for

23   that question and why he put it in a currency situation.

24        If you go to --

25        If we can go to Slide -- real quickly, the analyst slides,

1    specifically -- let's go to Slide 13, Your Honor.

2                    (Demonstrative published.)

3        **MR. KRAMER:**   And, again, Your Honor, the context is

4    the whole world, according to Mr. Williams, is keenly focused

5    on Apple's business in China.  Right?

6        Mr. Mohan downgraded them.  Everyone's looking carefully.

7    And let's look at what the analysts heard.  The first one here

8    is Mr. Mohan's report from Bank of America, widely regarded as

9    the most seasoned and best analyst on Apple's stock at the

10   time.

11       He says China was strong in calendar 3Q -- that's Apple's

12   fourth quarter -- but emerging signs of weakness could

13   pressure.  And he goes on to say we expect meaningful

14   deceleration headed into the December quarter.

15       Goldman Sachs, who was also on the call, issued a report

16   that said that China was strong through the end of September,

17   which was Apple's Q4.

18       And then he goes on to say while Apple indicated China was

19   fine for fiscal Q4 through September, we believe the company

20   likely sees some demand risk there in the December quarter.

21       So, Your Honor, you asked about objective falsity, and

22   again, I do think the plaintiffs have to come up with some

23   evidence.  They had to ask Mr. Cook about the statement.  They

24   have to ask Mr. Maestri about the statement.  They didn't.

25   They can't just argue it means something it doesn't.

1      These analysts all heard Mr. Cook to be talking about Q4

2   and continued to expressly express concerns about China.

3          THE COURT:  All right.  A response.  In terms of

4   objective evidence, he's got -- he's got analysts' reports.

5   What do you have?

6          MR. WILLIAMS:  Sure.  That's -- if you can go

7   Slide 12.  We need to switch back to ours.

8          THE COURT:  Okay.

9                 (Demonstrative published.)

10         THE COURT:  So you have a Bernstein report, the CCS

11  report, the JP Morgan report.

12         MR. WILLIAMS:  Right.  And -- and it's important

13  to -- you know, what they say.

14     So Bernstein says:  Surprisingly Apple executives did not

15  appear uniquely concerned about China.

16     Bernstein goes on to say, and it's the third line down,

17  begin by saying:  During the Q and A, management struck us as

18  surprisingly forthcoming about macroeconomic uncertainty

19  within emerging markets."

20     "Nonetheless" -- I've skipped a line -- "nonetheless

21  management was adamant about differentiating between these

22  weaker markets and China...."

23     CCS says, "Apple cited Turkey, India, Brazil and Russia

24  specifically, but emphasized that China is not in the same

25  category and continues to see strong demand."

1            **THE COURT:**  Okay.  So how can I ignore Bernstein?

2            **MR. KRAMER:**  Ah, well, let's -- let's go to Slide --

3       Could we switch over to Slide 11?  Thank you.

4       I'm sorry.  Slide 12, Bernstein.

5       So what we have here -- let it come up.

6       And this is again, Your Honor, our presentation Slide 12.

7                    (Demonstrative published.)

8            **MR. KRAMER:**  We have the Bernstein report.

9       The blue is what plaintiff cites.  You got to read the

10      statement in context.  You don't get to cherry-pick words out

11      of a sentence.

12      You can see the sentence Apple business had weakened, past

13      tense.  And then reference to which still grew 16 percent year

14      over year.

15      This is not a statement, Your Honor.  Plaintiff's theory

16      is Mr. Cook said, hey, no pressure in China 30 days into Q1.

17      That's not what this reports.

18      Remember, it's a Q4 earnings call.  These are reporting

19      what Mr. Cook said about what they're seeing in Q4.  That's

20      the purpose of the call.

21      You know, it's like when my daughter comes home with a

22      report card, and I say how did it go last semester?  Well, we

23      got an A, we got a B, we got a C.  She's not telling me about

24      the current semester.  She's talking about the past.

25      All this does is repeat what Mr. Cook said.  It does not

```
1    say -- and I would emphasize Slides 2 to 8 of their

2    presentation.  If the market -- the market was keenly focused

3    on China.  And if Mr. Cook had said:  We continue to buck the

4    trend.  Don't worry about those Trump tariffs.  Don't worry

5    about anything.  30 days in, things are great.  There is zero

6    pressure in China.  That guidance we gave, which is going to

7    cause the stock price to go down by 7 percent, nothing to do

8    with China, you would see that, Your Honor.

9              THE COURT:  Slow down.

10             MR. KRAMER:  You would see that.

11        So while they cherry-pick, and again -- and let's go back

12   one page to the --

13             THE COURT:  So the bottom line for you -- and I'll go

14   back and --

15             MR. KRAMER:  Yes, Your Honor.

16             THE COURT:  -- look at these statements, and it's

17   helpful to have the -- you know, the PowerPoint.  But you're

18   basically saying they've told me they've got evidence of

19   Bernstein, JP Morgan, CCS, who all support their view, and

20   you're saying no, you're wrong, they don't.

21             MR. KRAMER:  No, Your Honor.  I'm saying their view

22   of Mr. Cook's statement is -- the legal inquiry, it is

23   Mr. Cook's statement create a question of state of affairs

24   that differed materially from the one that existed --

25                  (Simultaneous colloquy.)
```

1      **THE COURT:**  If I have multiple analysts who -- and

2  again I'm going to go back and look at these --

3      **MR. KRAMER:**  Yes, Your Honor.

4      **THE COURT:**  -- more specifically.  But if I have

5  multiple analysts who are not saying what your analysts saw

6  and that you pointed me to are saying, then that suggests to

7  me that there is a dispute.

8      **MR. KRAMER:**  I understand, Your Honor.  But what --

9  what the plaintiff's analysts have to say is no pressure.  It

10  can't be simply Mr. Cook said on the Q4 earnings call China

11  was different than emerging markets.  The -- the alleged fraud

12  here is Mr. Cook represented to the market that there was no

13  pressure in Q1 in China.

14      **THE COURT:**  Well, they don't say exactly no pressure.

15  So what is it that they have to say?

16      **MR. WILLIAMS:**  What did the analysts have to say,

17  Your Honor?  Are you asking me what -- what should be reported

18  in the analysts' reports?

19      Because the way we see the analysts' reports, it's -- the

20  misrepresentation left the market with a -- with a false

21  impression.  That impression was expressed in forms -- in

22  analysts' reports and news articles.

23      I think Mr. Kramer is saying that they have to be

24  expressed in the way that he thinks they ought to be

25  expressed, but I don't -- that's -- that's not -- there's no

1    law for that.  And we can all read the analysts' reports.

2    I've just read a number of them for Your Honor.

3        But if you take a look at Slide 38 of our -- our -- our

4    slide presentation, RBC --

5                    (Demonstrative published.)

6            MR. WILLIAMS:  -- after the disclosure that China's

7    performance was terrible, they talk with investors, investors

8    who are the plaintiffs in the case.  And they -- they wrote in

9    the third bullet point, Apple, during their EPS call on

10   November 1st stressed that China was not seeing softer demand.

11       So --

12           THE COURT:  You know, one of the -- I guess I -- I

13   heard what you had to say, Mr. Kramer, but why can I assume

14   that Cook is talking about the past in his answer when the

15   question is about the future?

16           MR. KRAMER:  Because, Your Honor, the case is about

17   his answer.  And the only evidence, and it's not disputed, is

18   that for Mr. Cook, that he was talking about the past.  And

19   his declaration, Your Honor, walks you through the specific --

20           THE COURT:  That -- the --

21           MR. KRAMER:  Go ahead, Your Honor.

22           THE COURT:  The question was about the future.

23           MR. KRAMER:  The question was multi-part.  There were

24   four parts to that question.  Some were present, some were

25   mixed.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
1      I appreciate the plaintiffs want to turn it into a simple
2   what's the trajectory like in China, but if you look at the
3   question, it is quite long, quite disjointed and quite
4   rambling.  And, Your Honor, I would just add --
5           THE COURT:  But that -- I don't know that that helps
6   you.  He may have to explain it to a jury.  That is, the --
7   the question I'm presented with is, is there -- can I make
8   this ruling as a matter of law.  That's the question that is
9   presented to me.
10      So let me ask you, Mr. Williams, why didn't you ask that
11  question to Mr. Cook?  Why didn't -- you had him on -- you
12  deposed him.
13           MR. WILLIAMS:  Um-hmm.
14           THE COURT:  Why didn't you ask him?
15           MR. WILLIAMS:  I asked him a number of questions and
16  I asked him what he was -- what he was -- about what he said
17  on November 1st and what he didn't disclose on November 1st.
18  And I had evidence of --
19           THE COURT:  Did you ask him what he meant?
20           MR. WILLIAMS:  No, I did not ask him --
21           THE COURT:  Why?
22           MR. WILLIAMS:  Because we had evidence of the
23  impression that what he meant -- what he -- what he -- the
24  impression that it left on the market.
25           THE COURT:  Well, isn't that a relevant question?
```

```
1            MR. WILLIAMS:  I asked --

2            THE COURT:  Why wouldn't you ask that question?

3            MR. WILLIAMS:  Your Honor, I've given -- I've

4    provided the Court with the transcript.  I deposed him for

5    seven hours.  That specific question was not a question that

6    was necessary in the line of my question.

7        I asked him a number of questions, you know --

8            THE COURT:  What?

9                      (Simultaneous colloquy.)

10           MR. WILLIAMS:  -- specific question.  He said -- he

11   did say, I was talking -- I remember being asked about Q4.

12   I -- I can -- I can -- I have some of his testimony here.  And

13   I can point you to exactly what he said.

14       And it's Exhibit 86 of our opposition.

15           THE COURT:  Do either of you have any law for the

16   proposition that the declarant's testimony about the meaning

17   of their statement matters one way or the other?

18           MR. KRAMER:  Yes, Your Honor.  Kaplan v. Rose, Ninth

19   Circuit decision, 493 F.3d, 1363 at 1380.

20       In re Apple Computers --

21           THE COURT:  Hold on.  That's a Ninth Circuit?

22           MR. KRAMER:  Yes, Your Honor.  Ninth Circuit, Kaplan

23   v. Rose, 49 F.3d 1363 at 1380.

24           THE COURT:  And I'm assuming this is in your papers?

25           MR. KRAMER:  I'm sorry, Your Honor?
```

1          THE COURT:  I'm assuming this is in your papers.

2          MR. KRAMER:  Absolutely, Your Honor.

3      In re Far Out Productions as well.

4      And In re Apple Computer Securities Litigation.

5      All three of those stand for the proposition that when you

6  have a declaration which lays out the meaning of the statement

7  and there's not evidence to the contrary, that's sufficient to

8  grant summary judgment, and that specifically the plaintiffs

9  have an obligation to come forth with evidence, not

10 arguments --

11         THE COURT:  Of course.  But it doesn't say that -- it

12 doesn't say that they have to get the declarant to -- it's

13 pretty rare, Mr. Kramer, as I'm sure you can appreciate, that

14 a declarant would say:  Oh, yes, I made a false statement.

15                  (Simultaneous colloquy.)

16         THE COURT:  I mean typically these are going to be

17 circumstantial case -- a circumstantial evidence cases where

18 the plaintiff's evidence is -- is not going to be direct from

19 the --

20         MR. WILLIAMS:  Right.

21         THE COURT:  -- speaker.

22         MR. KRAMER:  I understand, Your Honor, but here the

23 declaration is not -- we're seeing cases just say:  I acted in

24 good faith.

25     Here Mr. Cook's declaration painstakingly goes through --

and this is going to be relevant when we talk scienter also -- what he did to prepare, the materials he had in front of him, the page of material that had the currency chart he was referring to in Q4, that he in good faith believed he was answering the question about Q4.

And, Your Honor, so it's not just the normal barebones. He carefully threads what he did to get to the result and honestly believed the statement was accurate.

And I know that Mr. Williams, you know, he objected to the declaration because if he had testified about his depo, in other words, we just found out, Your Honor, he didn't ask him. So especially in a statement like this that's vague.

THE COURT:  In those Ninth Circuit cases, what was the procedural context?

MR. KRAMER:  They granted summary judgment.  The district court granted summary judgment and the Court of Appeals affirmed grant, some in whole and some in part, Your Honor.  So there were summary judgment cases and securities cases.

THE COURT:  All right.

MR. KRAMER:  And the *Far Out Production* case, Your Honor, which is from the Ninth Circuit in 2001, that's also in our papers, but 243 F.3d 986 at 997, the court said you can't just come in and oppose summary judgment by saying it's an issue of credibility.  You really need evidence both as to

1  falsity and going to the defendant's state of mind.

2      And I know we're going to talk about scienter.  But, Your

3  Honor, you know, it really -- this is about a mixed tense.  If

4  Mr. Cook had used a different tense, we wouldn't be here

5  today, right?  We really would not be here today.

6      So I think against that backdrop, the falsity should be

7  analyzed.  The fact that the analyst had asked a question that

8  Mr. Cook was in a conversation with, heard it exactly as

9  Mr. Cook intended, no -- no dispute, didn't ask a follow-up,

10  heard it the same way, I think that matters, Your Honor.

11          **THE COURT:**  Well, it's one piece of a puzzle.

12          **MR. KRAMER:**  Yes, you're right, Your Honor.  It is

13  one piece of a puzzle.

14          **THE COURT:**  Okay.

15          **MR. WILLIAMS:**  And I just want to, you know, just --

16  before we deposed Mr. Cook, Mr. Cook had taken multiple

17  different positions about what the statement meant beginning

18  from early only in the case.

19      At one point, he took the position that the statement was

20  about Q4.  And then he took the position that the statement

21  was about markets where -- markets --

22          **THE COURT:**  When you said -- when you said "he" --

23          **MR. WILLIAMS:**  Mr. -- I'm sorry.

24          **THE COURT:**  -- are you -- are you saying that he made

25  public statements?  Or are you saying that the lawyers made

```
1    arguments --

2                      (Simultaneous colloquy.)

3         THE COURT:  -- in their -- it makes -- it makes a

4    difference to me.  Did Mr. Cook specifically go out and say

5    things?  Or were the lawyers making arguments and now they're

6    shifting on you?

7         MR. WILLIAMS:  Right.  The lawyers were making

8    arguments about what the statement meant.

9       And -- but if you -- all you have to do again, Your Honor,

10   is look at what he actually said.  And I think that the

11   Court's -- the issue you presented was the correct one.

12      Because when he's responding to the question, he says

13   that -- these are markets we're seeing pressure in.  He

14   does -- he's not referencing the past, he says seeing.

15      And, you know, whether that's a mistake or not is

16   something that he can explain to a jury.  But he does it more

17   than once.  Then he goes on to say that those are markets that

18   are not growing the way that we would like to see.

19      And so to the extent that the investors are listening to

20   him in real time, there's no reason on the face or to the ear

21   to believe that he was referencing the fourth quarter when

22   he's using current grammar in response to a question that asks

23   about the current and the future, which he acknowledges is a

24   great question which he had prepared for earlier in the day.

25         THE COURT:  All right.  Let's -- let's move to the
```

```
 1    other elements.  And what I want to --
 2        Mr. Kramer, what I want you to focus on is try as much as
 3    you can to base your argument on the plaintiff's version of
 4    what their case is about --
 5            MR. KRAMER:  Yes, Your Honor.
 6            THE COURT:  -- as opposed to your reconstruction --
 7            MR. KRAMER:  Yes.
 8            THE COURT:  -- about what it's about.
 9            MR. KRAMER:  Okay.
10            THE COURT:  Because they get to control how they
11    litigate.  You have to respond.  And that particular statement
12    is the one that I allowed to -- to go through.  So recasting
13    it doesn't help me do my job.
14            MR. KRAMER:  I understand, Your Honor.  And, Your
15    Honor, to be clear, we did not try to recast.  We were relying
16    on the fact that five times in your motion to dismiss order,
17    you refer to the guidance as being the proxy for no pressure
18    in China, right?
19            THE COURT:  Right.  And of course everybody remembers
20    that at the motion to dismiss, all I have is a complaint.
21            MR. KRAMER:  That's right.
22            THE COURT:  I don't have evidence.
23            MR. KRAMER:  Right.
24            THE COURT:  I haven't litigated.  And so the question
25    is do people get to litigate.  And that's what I'm trying to
```

1    figure out in a relative vacuum.

2             **MR. KRAMER:**  Right.

3             **THE COURT:**  So by the time I get here, I actually

4    have to figure it out with --

5             **MR. ALLEN:**  Right.

6             **THE COURT:**  -- evidence, not -- not based upon some

7    uninformed opinion at the start of the case.

8             **MR. KRAMER:**  Okay.  Your Honor, I will say, though, I

9    don't think your opinion was uninformed to the extent you said

10   if the risks materialized after November 1, there could be no

11   falsity and scienter.  But I will address the argument based

12   on their theory.

13        Their theory is Mr. Cook somehow created a misimpression

14   of the market that 30 days into the first quarter, Apple was

15   growing in China.  Even that, assuming that's the case --

16            **THE COURT:**  So let's -- the other elements -- what

17   else do you all want to talk about?

18            **MR. KRAMER:**  Well, obviously, Your Honor, scienter.

19   And then I would say on the loss causation because of the fact

20   that the guidance was correct and the plaintiffs tie their

21   claim to the truth coming out on January 2nd when we announced

22   the results, because those didn't -- there's the intervening

23   facts there, we couldn't have loss causation.

24        And if their theory, Your Honor, is really Mr. Cook said

25   no pressure in China, the class period's got to end on

1    November 5th when the *Nikkei* article comes out and discloses

2    that Apple had cut its production surges.

3        So that the case is really -- if no pressure really means

4    no pressure, the class period is -- is from November 2nd

5    through November 5th because that's when the market learns

6    that Apple's cut production on the XR.  And so first stop,

7    I'll come back to that later unless Your Honor wants to spend

8    time on it now.

9            **THE COURT:**  Let's just briefly touch on scienter.

10           **MR. KRAMER:**  Okay.  So, Your Honor, here's what I

11   would say.  First, plaintiffs don't argue that there's any

12   actual intent to defraud here.  And, you know, I don't think

13   they could, Your Honor, because the evidence here is very

14   powerful.  There's powerful evidence of good faith.

15       Remember, Apple lowered its guidance --

16           **THE COURT:**  Do you agree, Mr. Williams, no actual

17   intent to defraud?

18           **MR. WILLIAMS:**  I don't agree.

19           **MR. KRAMER:**  Okay.  Your Honor, I'd refer to pages 21

20   and 22 of their opposition where their scienter argument is

21   two paragraphs.  Two paragraphs.  And they cite one case, and

22   it's about deliberate recklessness.  So again I'm going on

23   their papers.  Your Honor can check.  It's bottom of page 21,

24   top of page 22.

25           **THE COURT:**  Okay.

 1          **MR. KRAMER:**  But, Your Honor, here, you know, and we

 2     know from the *Apple Computer Securities Litigation* case, which

 3     again Ninth Circuit, 1989, that you have to look at the

 4     overall facts, the overall pattern of conduct.

 5       Let's go to slide -- we'll go the slide 15, Your Honor, if

 6     we can flip back to the ELMO.

 7       And here, Your Honor, we have a situation where it's

 8     conceded that in the week leading up to the November 1st

 9     call --

10                    (Demonstrative published.)

11          **MR. KRAMER:**  -- Apple significantly lowered its

12     guidance and significantly lowered it XR unit forecast, that

13     Apple issued guidance that it knew would disappoint the

14     market, and it did; that Apple issued guidance with a range

15     that was double what the market was expecting.  All the stuff

16     we went up there with Mr. Williams earlier.

17       And in addition to doing all those things which are

18     exactly contrary to trying to lie to the market, Apple and

19     Mr. Cook and Mr. Maestri did the following:  First, Apple had

20     a $2 billion buyback.  Mr. Cook didn't sell a single share of

21     stock nor did Mr. Maestri.

22       So, Your Honor --

23          **THE COURT:**  Okay.  And -- I don't know that this is

24     disputed.

25       You agree with those facts, right, Mr. Williams?

1          **MR. WILLIAMS:**  Those facts.  (Nods head.)

2          **THE COURT:**  Okay.  So given that you only spent two

3    paragraphs on the topic, what do you have to say on scienter?

4          **MR. WILLIAMS:**  Well, I think that, number one, I

5    don't think that the facts concerning what was known by

6    Mr. Cook and Apple are disputed.  So to the extent that he

7    knew facts, material facts that were undisclosed, he had

8    actual knowledge.

9       With respect to what is -- what the law requires, I think

10   that it's a -- a low bar considering these circumstances.  The

11   Ninth Circuit has made it clear in -- in -- in *Oracle* at

12   627 F.3d 376, that an actor is deliberately reckless if he

13   has -- if he had reasonable grounds to believe material facts

14   existed that were misstated or omitted but nonetheless failed

15   to obtain and disclose such facts although he could have done

16   so without extraordinary effort.

17      In fact --

18         **THE COURT:**  And your critical facts on this that he

19   knew for which there is no dispute?

20         **MR. WILLIAMS:**  Sure.

21         **THE COURT:**  What slide am I looking at?

22         **MR. WILLIAMS:**  Okay.  Let's go to -- sorry, let me

23   just --

24                   (Pause in the proceedings.)

25         **MR. WILLIAMS:**  Sorry, let me just get there.

```
 1              Okay.  Your Honor, I want to start on -- I'll just start

 2    on 17, but I know that Your Honor has interposed some

 3    questions and I want is to make sure that I get through some

 4    of the rest so -- let's -- why don't we just start on 21

 5    because that's some of the key -- key information.

 6              THE COURT:  Hold on.

 7              MR. WILLIAMS:  And I'll just work backwards.

 8                   (Demonstrative published.)

 9              MR. WILLIAMS:  One of the key factors as to why --

10    what Mr. Cook knew about --

11              THE COURT:  Hold on.  Just -- and perhaps you can

12    just tell me which are your critical undisputed material

13    facts.  You just said that there were certain facts --

14              MR. WILLIAMS:  Um-hmm.

15              THE COURT:  -- that were undisputed that supported

16    the notion of deliberate recklessness.

17              MR. WILLIAMS:  Yeah.

18              THE COURT:  Okay.  Where can I find those facts?

19    What's the -- what's the undisputed fact number --

20              MR. WILLIAMS:  Okay.

21              THE COURT:  -- whatever it is?

22              MR. WILLIAMS:  Can you give me a minute?  I don't

23    have -- I don't have the number handy.  I'll have one of my --

24    my team --

25              THE COURT:  Okay.
```

```
 1            MR. WILLIAMS:  -- get the -- the number of the

 2   undisputed facts.

 3            THE COURT:  And Apple said undisputed in its

 4   response?

 5            MR. WILLIAMS:  Yeah.  I don't think that they dispute

 6   any of this.  So, for example, what's on line -- Slide 21

 7   where there --

 8            THE COURT:  So line --

 9            MR. WILLIAMS:  I'm sorry, page 21.

10                 (Simultaneous colloquy.)

11            THE COURT:  And the reason that I'm asking is because

12   it says here "Apple staff reports," that's not Mr. Cook.

13            MR. WILLIAMS:  Um-hmm.

14            THE COURT:  So this has to be regarding Mr. Cook's

15   knowledge, not Apple generically its knowledge.

16            MR. WILLIAMS:  Sure.  And I asked him about this

17   during his deposition and he acknowledged that he knew these

18   facts.

19        So there -- again, I -- I don't think I'll hear from

20   Mr. Kramer.  There isn't a dispute that we've had with one

21   another as to what was known by Mr. Cook and Apple about what

22   was happening in China with respect to, for example, their

23   largest resellers and partners who are --

24            THE COURT:  Okay.  Finish your sentence.

25            MR. WILLIAMS:  -- are responsible for selling
```

1    80 percent of iPhones in China were telling them that demand

2    for the product was -- for the XR was very weak, and in fact,

3    they didn't want them to ship any more, they may not pay for

4    it, and were canceling orders.

5              **THE COURT:**  Okay.  Do you agree?

6              **MR. KRAMER:**  I agree that there was information from

7    resellers that they wanted to slow down the selling.  But all

8    of that was incorporated in the guidance, Your Honor,

9    specifically.

10             **THE WITNESS:**  Okay.

11             **MR. KRAMER:**  So, yes, China -- there was some

12   conservatism at the launch.  We had very limited data because

13   launch had happened five days earlier.  And to be

14   conservative, we brought down the unit numbers for the XR by

15   9.9 million.

16             **THE COURT:**  Right.  But we've also already

17   established, right, that the guidance itself didn't

18   specifically identify the basis -- the factual basis for the

19   shifts.  So that's -- I'm just -- look, we're going to --

20   we're going to wrap up here, and I want to make sure to get to

21   everything so I don't want to be arguing about things over

22   which there's really no dispute.

23        So if there's no dispute that -- you know, you can argue

24   what the facts mean, that's different than saying that there's

25   a dispute about what the facts are.

1    Do you have the numbers for me?

2        **MR. WILLIAMS:**  Fifty, Your Honor.  Our undisputed

3    facts, 50.

4        **THE COURT:**  All right.

5    All right.  So then no dispute about what facts are known.

6    There's no real actual intent to defraud, but he could have

7    been deliberately reckless.  You disagree about the facts and

8    its application.

9        **MR. KRAMER:**  Your Honor, undisputed fact number 50

10   cites emails.  Mr. Cook's not on a single one of those emails,

11   Your Honor.

12   So to your point a moment ago, he's just not on them.

13   He's not.

14   But, Your Honor, my point on all of this is scienter

15   requires conscious disregard.  It is not enough that you know

16   of an adverse fact.  If you knew if that was enough --

17       **THE COURT:**  Is there a difference between -- in the

18   law between conscious disregard and deliberate -- deliberately

19   reckless?

20       **MR. KRAMER:**  No, Your Honor, there's not.  They're

21   the same.  And the law is going to be the *Align Technology*

22   case which is, you know, a case Your Honor has cited in other

23   decisions.  The statement must be an extreme departure from

24   standards of ordinary care that creates a danger misleading

25   that is either known or so obvious that the speaker must have

1   known.  And that's *Align Technologies*, 856 F.3d at 619.

2       So, Your Honor, it's not enough to know an adverse fact.

3           **THE COURT:**  You agree with the state of the law?

4           **MR. WILLIAMS:**  I disagree with the state of the law,

5   Your Honor.  As I -- I cited the *Oracle* decision just a few

6   minutes ago at -- I'll cite it again.  627 F.3d 376, 390.

7           **THE COURT:**  You both are citing Ninth Circuit cases?

8           **MR. WILLIAMS:**  Ninth Circuit.

9           **MR. KRAMER:**  Yes, Your Honor.

10          **MR. WILLIAMS:**  Ninth Circuit, Your Honor.  And in

11  fact --

12          **THE COURT:**  Isn't it great when the Ninth Circuit

13  gives me differing standards.

14                  (Simultaneous colloquy.)

15          **MR. KRAMER:**  I don't think they are different when

16  you read them.  I think you're going to see they're the same.

17  Because, Your Honor, if you -- and I'm looking at plaintiff's

18  Slide Number 24.  It -- and this is -- they're citing it, and

19  they cite --

20      Maybe we could -- maybe put up Slide 24.

21      It says deliberate recklessness requires, quote, highly

22  unreasonable admission involving not merely simple or

23  excusable negligence but an extreme departure from the

24  standards of ordinary care...which presents a danger of

25  misleading buyers or sellers that is either known to the

1    defendants or so obvious the actor must have known."

2        Knowledge of the adverse fact is not enough.  Mr. Cook --

3    there must be evidence that he had an awareness:  Oh, my

4    goodness, it's obvious I'm going to mislead the market.  Or:

5    It was unreasonable to suggest otherwise.

6        And, Your Honor, they had zero evidence in this -- and

7    remember, the test isn't zero.  They don't have evidence to

8    create a triable issue.  Knowledge is not enough.

9        They cite -- again their two paragraphs of their

10   opposition that go to this, they cite the *Tesla* case.  And,

11   you know, again there they take out of context when --

12       Maybe we can put this up on Slide 17 of our presentation.

13       It's the same standard, Your Honor.  There's really no

14   dispute.  They cite --

15                    (Demonstrative published.)

16       **MR. KRAMER:**  -- when defendants are aware of the

17   facts that made the statement misleading, he cannot ignore the

18   facts and plead ignorance to the risk.

19       But then it goes on to say:  If no reasonable person could

20   deny the statement was materially misleading, a defendant with

21   knowledge of the relevant facts cannot manufacture genuine

22   issue merely by denying or disregarding what any reasonable

23   person must know.

24       Knowledge of the adverse facts is not enough, Your Honor.

25       **THE COURT:**  So, Mr. Williams, I do want to make sure

1     that I understand your --

2              MR. WILLIAMS:  Yeah.

3              THE COURT:  -- perspective here.  Because in your

4     memo, you seem to indicate that you can establish scienter

5     with a showing that the statement was, one, false when made,

6     and we've discussed that at length, and two, that the party

7     making the statement knew it was false.  And you can have

8     third-party information to show that.

9          Is that your argument or not?

10             MR. WILLIAMS:  That -- that is certainly the

11    argument, but the law is broad on it.  Like I said, we cited

12    the *Oracle* case.  Judge Tigar just issued an -- just issued an

13    opinion in summary judgment in the *Twitter* case which

14    concluded that knowledge of undisclosed facts, the knowledge

15    of material undisclosed facts can be sufficient at summary

16    judgment to create a genuine issue of fact.  And the cite for

17    Judge Tigar's opinion in *Twitter* is -- it's in the Westlaw

18    opinion, 2020 Westlaw 4187915.

19         But I want to point -- I want to get to the -- to the --

20    to the obvious issue.  And that's what we talked about with

21    respect to facts that are so obvious that they may -- that

22    they may mislead investors.

23         Mr. Cook had actual knowledge of the underlying facts

24    concerning the downturn in Apple's business in China,

25    particularly that the China -- China's revenue prospects had

1  declined, and he knew that the market was concerned about it.

2      He knew prior to the conference call that he was going to

3  be asked very specific questions about the current conditions

4  in China and whether the market -- whether they would perform

5  there.

6      And he knew that failing to disclose the truth which --

7  the true facts which are not disputed were -- would obviously

8  mislead the market.

9      And the market said so.  And especially when -- when the

10  disclosure came out on January 2nd when investors and market

11  watchers and Apple watchers found that he -- that he had a

12  serious credibility problem because he had not disclosed what

13  was occurring in China earlier.  And in fact, he had the

14  opportunity to do so and didn't.

15          THE COURT:  All right.  I understand the arguments.

16  Let's --

17          MR. KRAMER:  Your Honor, I'd like to respond.  But I

18  also want to save two minutes for the control person claim

19  before we wrap.

20          THE COURT:  No, we will.

21          MR. KRAMER:  Thank you, Your Honor.

22          THE COURT:  Let's move to loss causation.

23          MR. KRAMER:  Okay.  Your Honor, it's simple, and let

24  me pull up our slide on this.

25      Mr. Allen, could we pull up our slide on loss causation

```
 1      please.  And then -- thank you.
 2                      (Demonstrative published.)
 3              MR. KRAMER:  So this is going to be Slide 19, Your
 4      Honor, and the control person slide follows so it will be
 5      pretty straightforward.
 6          So, Your Honor, and this is not, I don't think, a
 7      controversial legal concept, but you can't have loss causation
 8      if the plaintiffs' losses are the result of intervening causes
 9      such as changed circumstances, changed investor expectations,
10      or other facts that intervene post the alleged fraudulent
11      statement.
12              THE COURT:  Right.  But no one can really know that
13      as a matter of law.
14              MR. KRAMER:  So I think here you can, Your Honor,
15      because again the plaintiffs measure the truth coming out by
16      Mr. Cook's letter to shareholders on January 2nd saying we've
17      missed by 9 billion and that's primarily due to China.
18          Per the chart we presented on Slide 2, Apple was ahead of
19      or tracking two guides until late in November.  So we -- the
20      fact that developed -- and again, Mr. -- Mr. Parekh, in his
21      declaration, provides very specific details on the business
22      slipping away in China.  That didn't happen till later.
23          So again plaintiffs' damages measured by the 9 billion,
24      that's how they measure it, then the events didn't occur until
25      after November 1 because that's when the guidance was given.
```

```
 1          If they're now pivoting to, you know, the amorphous no
 2    pressure, then the class could have ended on November 5th
 3    because that's when it was -- I'm just saying, Your Honor --
 4          THE COURT:  You heard chuckle, Mr. Kramer, because
 5    the amorphous no pressure --
 6          MR. KRAMER:  Yes.
 7          THE COURT:  -- was created by you.  So you created
 8    the no pressure phrase, and now you call it amorphous for
 9    which is quite convenient for you.
10          MR. KRAMER:  I appreciate that, Your Honor.  And I
11    refer to it that way because the analysts didn't hear it the
12    way plaintiff said.  Again --
13          THE COURT:  Like I said --
14                  (Simultaneous colloquy.)
15          THE COURT:  -- I will go back and track --
16          MR. KRAMER:  That's fine.
17          THE COURT:  They have obviously, you know, think that
18    they have analysts who heard it differently.
19          MR. KRAMER:  I understand, Your Honor.  But again,
20    when you look, just keep in mind:  Do they hear, 30 days into
21    Q1, Mr. Cook saying:  China continues to grow at the pace it
22    did last quarter which was 16 percent.
23          THE COURT:  It doesn't have to say it specifically.
24    The question is did he mislead knowingly or not?
25          MR. KRAMER:  Understood, Your Honor.  Understood.
```

1      So that's what I would say on loss causation.

2      On moving finally to control person.

3            **THE COURT:**  No.  Response.

4            **MR. KRAMER:**  I'm sorry, Your Honor.  I'll stop there.

5            **THE COURT:**  Response on loss causation.

6            **MR. WILLIAMS:**  Your Honor, I -- on loss causation,

7      this is one of those rare instances where the -- the alleged

8      misrepresentation is nearly a mirror image of the disclosure

9      on January 2nd with respect to conditions in China.  Obviously

10     we don't need that.  But, you know, this is one of those

11     cases.

12     And we cite to the *First Solar* case out of the Ninth

13     Circuit.  And if you want to just look at our Slide number 33.

14     Not that Your Honor needs this but we kind of recite --

15                  (Demonstrative published.)

16           **MR. WILLIAMS:**  -- the law here of kind of the most

17     recent position of the Ninth Circuit.

18     And, you know, what's needed to prove loss causation is

19     simply a causal connection between the fraud and the loss

20     tracing -- by tracing the loss back to the very facts about

21     which defendant lied.

22     That's what we have here.  The alleged misrepresentation

23     is about the conditions in China.  And the disclosure was

24     about the significance of the difficult business in China

25     which caused them to miss the financial forecast.

```
 1              And, you know, we've -- we had briefed this at class
 2      certification with Your Honor, and I think some of the same
 3      arguments that defendants made there they're making here.  And
 4      I think that you -- you made it clear, at least in your view
 5      with the evidence before you, class certification was that
 6      on -- on page 15 of Docket 224, this is yet another distortion
 7      by defendants, this time of the allegedly corrective
 8      disclosure, which is not about the earnings shortfall, but
 9      rather the true state of Apple's business in China.
10              And that's what's the disclosure was.  So with respect to
11      loss causation, we -- we, you know, we've put for the
12      evidence.  We actually also have an expert who provided a
13      report on loss causation and damages.  Defendants have not
14      sought to exclude that report of Mr. Feinstein so I'm assuming
15      that it will be admitted unless the Court finds some flaw that
16      I can't anticipate.
17              So to the extent that there is a genuine issue of fact on
18      loss causation, I would say that at a minimum, there is and we
19      believe that we can prove it.
20              Last point.
21              The defendants have lightly suggested that there was an
22      intervening factor here that sort of disturbs the link between
23      the misrepresentation and the disclosure, and that link being
24      a false forecast that was missed.
25              I think we can just, you know, without going back to the
```

1    beginning, that that was not -- never the misrepresentation in

2    the first place.  And the economic conditions that defendants

3    contend were intervening were not intervening.  They were the

4    very conditions that existed prior to defendant Cook's false

5    and misleading statement that actually, you know, made the --

6    that was the impetus to this action.

7         So that's our -- our view on loss causation.

8              **THE COURT:**  Let's move to section 20(a).

9          **MR. KRAMER:**  Yeah, thank you, Your Honor.

10        You know, Luca Maestri is the company's chief financial

11   officer, and this is Slide 20.  As you may recall, Your Honor,

12   he is not named in a primary claim --

13        It's 20, small A.

14        For 20(a) you need to have control over the speaker --

15                   (Demonstrative published.)

16         **MR. KRAMER:**  -- and he has to induce the allegedly

17   fraudulent statement.

18        Here, Your Honor, there's evidence of neither.  And in

19   fact, Mr. Maestri put forth a declaration to support the fact

20   that he did not control Mr. Cook.

21        And of course the statement here, unlike many cases where

22   it's written in a script and it's vetted ahead of time, this

23   was an unscripted answer to a question from an analyst.  And

24   as Mr. Maestri sets forth in his declaration -- and I would

25   refer the Court specifically to paragraphs 6 through 8 --

```
1    Mr. Maestri --

2              THE COURT:  Does he have a separate obligation as the

3    CFO to the -- to the company and the public to correct false

4    statements?

5              MR. KRAMER:  If he believes it is, there's a scienter

6    element, if he hears a statement that's false, he has to

7    correct it.  But there's an element of scienter under 20(a),

8    and I would refer the Court to the Kaplan v. Rose case which

9    we talked about earlier, 49 F.3d 1363 at 1383, it's a Ninth

10   Circuit decision, where the court granted summary judgment on

11   a 20(a) claim based on the same declaration that we've

12   submitted here essentially.

13      Mr. Cook -- if Mr. Maestri heard --

14              THE COURT:  I want a response on that.

15      So do you have specific evidence that Maestri controlled

16   Cook?  Yes or no?

17              MR. WILLIAMS:  I would say yes.  And I would just --

18              THE COURT:  Give me the fact numbers.

19              MR. WILLIAMS:  Can you give me the number?

20              THE COURT:  While he's answering my next question --

21              UNIDENTIFIED SPEAKER:  58 and 63.

22              MR. WILLIAMS:  58 and 63.

23              THE COURT:  58 and 63.

24      Hold on.

25      Do you agree that Kaplan v. Rose says what Mr. Kramer
```

1  indicated?

2      **MR. WILLIAMS:**  I think *Kaplan v. Rose* sort of does

3  provide a standard.  But it -- but the -- but the facts

4  matter.  And in this case, for example, Mr. Maestri, obviously

5  he was the CE -- CFO, he --

6      **THE COURT:**  You're proceeding on one specific

7  statement.

8      **MR. WILLIAMS:**  Yes.

9      **THE COURT:**  I understand he's the CFO.

10     **MR. WILLIAMS:**  I was going to add --

11     **THE COURT:**  And Mr. Cook's the CEO and not an

12  insignificant CEO.  It's hard to imagine how many people

13  actually control him other than perhaps his board of

14  directors.

15    So what evidence do you have that Maestri, as CFO,

16  directly controls Cook on the one hand, and/or that, you

17  know -- or are you proceeding on some independent obligation

18  basis with respect to Maestri?

19     **MR. WILLIAMS:**  With respect to Maestri, I think that

20  Mr. Maestri also controlled the statement.  Because the

21  question you asked of Mr. Kramer about whether he has an

22  opportunity or a duty to correct Mr. Cook's --

23     **THE COURT:**  That's right.  And that's why I asked

24  whether he had an independent obligation.

25     **MR. WILLIAMS:**  Yes.

1            **THE COURT:**  So if he has an independent obligation,

2    Mr. Kramer says that, first of all, he has to believe that the

3    statement is false.  Right?  And there are disagreements.

4    Obviously Apple doesn't believe that it was false or

5    misleading.  You disagree.

6        Did you ask him that question at his deposition?

7            **MR. WILLIAMS:**  I did not ask him that question at his

8    deposition.

9            **THE COURT:**  So did he say the statement was true?

10           **MR. WILLIAMS:**  He believed that -- yeah, he believed

11   that the statements at issue were correct.

12           **THE COURT:**  Okay.  So then the next question is what

13   evidence of scienter do you have with respect to his

14   independent obligation under 20(a)?

15           **MR. WILLIAMS:**  With respect to his independent

16   obligation, can I -- I'd like to make two quick points.

17       Number -- the first point is that Mr. -- Mr. Maestri

18   actually cosigned or -- or re -- reiterated the

19   misrepresentation that was made by Mr. Cook, and that is an

20   R -- during the -- on the transcript, during the conference

21   call, he says following Mr. Cook's statement, he's talking

22   about the products ramping and he says the products -- the

23   ramps are going fairly well, but obviously we have some

24   uncertainty around supply/demand balance for some of these

25   products.  And finally, there's the last point, we've taken

1    into account is what Tim's talked about in terms of the level

2    of uncertainty at the macroeconomic level in some emerging

3    markets.

4        So Mr. -- Mr. Maestri, well, number one, he had all of the

5    negative information about what was occurring in China just as

6    Mr. Cook did.  In fact, the evidence is they -- they talked

7    about it, exchanged emails about it, and together decided to

8    bring down the -- the internal expectations, the forecasts

9    because of that information.

10       So he had the information the same time that Mr. Cook made

11   the misrepresentation.  And instead of correcting him, he just

12   said that we've taken into account what Tim talked about in

13   terms of the emerging markets.

14       So with respect to scienter, he had the same information

15   and had a duty with that information to disclose it.  And --

16           **THE COURT:**  And where is this in your --

17        **MR. WILLIAMS:**  In our --

18               (Simultaneous colloquy.)

19        **MR. WILLIAMS:**  It's Exhibit 14 to my declaration in

20   support of our opposition.  And I can get the docket entry.

21           **THE COURT:**  Exhibit 14 is fine.  My question is where

22   is it in your opposition papers?  Because it's -- this is a --

23        **MR. WILLIAMS:**  The -- the detail of that is not in

24   our opposition papers.  It's as we were preparing for it and

25   preparing for the argument and my review of the transcript

```
 1    again, I wanted to make sure that I made that point.  But the

 2    transcript is in the record.

 3              THE COURT:  Do you have a slide on it?

 4              MR. WILLIAMS:  There's no -- there's no slide on it.

 5              THE COURT:  Do you have a response, Mr. Kramer?

 6              MR. KRAMER:  I do, Your Honor.  I'm going to put up

 7    the -- and excuse my handwriting, Your Honor.

 8         So first --

 9                        (Demonstrative published.)

10              MR. KRAMER:  -- this is the first time we're hearing

11    this argument.

12         Second, the statement is -- refers to macroeconomic

13    uncertainty in some emerging markets.  So it is not a repeat

14    of the alleged challenged statement.

15         And there was -- there's no dispute that Apple continued

16    to have pressure in a number of emerging markets.  So the

17    statement is true.

18         And, Your Honor, none of this goes to scienter.  I looked

19    at the undisputed statement of facts.  It doesn't go to

20    scienter.  Nor does it go to inducement.  A control person has

21    to control and induce.  And there is zero evidence that

22    Mr. Maestri somehow induced Mr. Cook to answer the question

23    orally in response to the Bank of America analyst --

24              THE COURT:  Okay.

25              MR. KRAMER:  -- Your Honor.
```

 1          **THE COURT:**  Closing comments?

 2       We'll start with you, Mr. Williams.  It's -- it's

 3    Mr. Kramer's motion so he'll get the last word.

 4          **MR. WILLIAMS:**  Okay.  Just -- we've talked about it a

 5    lot, but we have -- we've proven or at least we've got --

 6    we've adduced the evidence to prove what we've pled.  And in

 7    our view, like I -- like we said in our brief that defendants

 8    don't dispute many of the facts.  They've really provided a

 9    trial brief which is their version of what the facts actually

10    mean.

11       And at summary judgment, that simply is not enough.  We've

12    far exceeded what's necessary to create a genuine issue of

13    fact on all of the elements.

14       I'll answer any specific questions that Your Honor has,

15    but I don't -- I don't want run through my entire argument

16    again.

17          **THE COURT:**  You don't think I had enough?

18       Mr. Kramer.

19          **MR. KRAMER:**  Thank you, Your Honor.

20       Your Honor, as you noted a moment ago, Mr. Cook is one of

21    the most closely followed chief executive officers in Silicon

22    Valley.  And the one thing we haven't spent a lot of time

23    talking about is the following.  This is a case of securities

24    fraud.  They allege Mr. Cook either intentionally or

25    recklessly decided to lie to the market, ignored -- ignored

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    the truth and lied to the market.

2        And we can parse words and we can look at tenses, but

3    there's honestly, Your Honor, no evidence why Mr. Cook would

4    do that.  Zero.  There isn't.

5        And I think at the end of the day, as we saw from the *In*

6    *re Apple Computer Securities Litigation* case from the Ninth

7    Circuit, you need more than just let's look at this thing in

8    isolation, let's look at this.  The pattern here is of a

9    company trying to get it right.  We're going to bring down

10   guidance by $6 billion to account for a new product launch.

11   We're going to give guidance that's going to disappoint the

12   markets.

13            **THE COURT:**  You say that again, but that's not --

14                    (Simultaneous colloquy.)

15            **THE COURT:**  They brought it down, but they didn't say

16   why.

17        **MR. KRAMER:**  You're right, Your Honor, but the

18   market -- so putting aside that they didn't say why, the

19   market understood.  And again all those factors are

20   inconsistent with the intent to defraud.

21        So we've gone through a great detail in our papers on

22   falsity and scienter and loss causation.  But again, the

23   question that's not answered by any of this, including the

24   argument today, is why would Mr. Cook, being the man he is,

25   not some CEO in some town that no one pays attention to, why

1    would he commit securities fraud?  Is that plausible?  Is that

2    a question for the jury?  And, Your Honor, I think the

3    evidence here is no.

4        And I appreciate they want to run to the analysts and this

5    analyst used this tense and that.  I got that.

6        But Mr. Cook's declaration is right on point.  And they

7    didn't even ask him the question, Your Honor.  They didn't

8    even ask him the question.  And instead want to argue, well,

9    Mr. Cook put it in a declaration, he didn't say that at his

10   depo.  Because they didn't ask him.

11       So I think that fundamental question cuts across

12   everything.  It's securities fraud, Your Honor, not securities

13   negligence, not securities "I used the wrong tense in an

14   answer."  It's securities fraud.

15           THE COURT:  Well, I guess it also begs the question.

16   He had the information.  He could have, you know, when he was

17   talking about China, he could have said what he knew and he

18   didn't.

19           MR. KRAMER:  Your Honor, he thinks he said what he

20   knew.  He thinks he was referring specifically to Q4, right?

21   He said -- this is his declaration, "I am looking at this

22   chart which compares currency pressure in all these markets.

23   China wasn't impacted by the dollar exchange rate.

24       It was not.  That's a true statement.

25       You're right, if he had said --

1          **THE COURT:**  Again, you know, what may have been in

2    his head and what he said given the context, those could be

3    two different things.

4          **MR. KRAMER:**  They could be, Your Honor, but I think

5    when you look at the evidence, roll up your sleeves and read

6    the declarations, I think you're going to see that in fact

7    they are the same thing.

8          **THE COURT:**  All right.  Any response on that?

9          **MR. WILLIAMS:**  With respect to why Mr. Cook didn't

10   disclose what he knew, you -- it's obviously not an element of

11   our claim that we have to prove what his motivation was.

12      We can speculate that, you know, they didn't want them --

13   a nervous market to understand what was really happening in

14   China because it would have had a serious impact on the market

15   cap.

16      But I'm not in his head.  And I think that the

17   Supreme Court and the Ninth Circuit recognized that motivation

18   is not part of what we have to prove.

19          **THE COURT:**  I agree.  That's -- that's not really an

20   issue that I'm going to look at, nor do I need to look at it

21   nor should I look at it because it's not the law.  That's a

22   trial thing.

23      Right.  So anyway.

24          **MR. KRAMER:**  I would only add, Your Honor, that the

25   Computer Securities case, *Apple Computers Securities* from the

1    Ninth Circuit says all of that is relevant to scienter.  All

2    of those facts, the overall course of conduct, all those facts

3    is relevant to the analysis, Your Honor.  That's why we argued

4    it.

5            **THE COURT:**  Okay.  I know this has been out there for

6    a while, we're finally getting some help.  We've got a couple

7    new judges so we're finally getting through all the backlog.

8    And we've got a couple more hopefully coming soon.  So I

9    should be able to get this up relatively quickly.  I do have a

10   couple trials coming up.

11           **MR. WILLIAMS:**  Thank you, Your Honor.

12           **THE COURT:**  All right.

13           **MR. KRAMER:**  Thank you for your time, Your Honor.  We

14   appreciate it.

15           **THE COURT:**  Thank you.

16               (Proceedings were concluded at 11:48 A.M.)

17                             --o0o--

18

19

20

21

22

23

24

25

1

2                        **CERTIFICATE OF REPORTER**

3

4              I certify that the foregoing is a correct transcript

5      from the record of proceedings in the above-entitled matter.

6      I further certify that I am neither counsel for, related to,

7      nor employed by any of the parties to the action in which this

8      hearing was taken, and further that I am not financially nor

9      otherwise interested in the outcome of the action.

10

11      _____

12           Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

13                   Monday, May 15, 2023

14

15

16

17

18

19

20

21

22

23

24

25

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228**