ROBBINS GELLER RUDMAN
   & DOWD LLP
SHAWN A. WILLIAMS (213113)
DANIEL J. PFEFFERBAUM (248631)
KENNETH J. BLACK (291871)
HADIYA K. DESHMUKH (328118)
JACOB G. GELMAN (344819)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
dpfefferbaum@rgrdlaw.com
kennyb@rgrdlaw.com
hdeshmukh@rgrdlaw.com
jgelman@rgrdlaw.com
         – and –
MARK SOLOMON (151949)
JASON A. FORGE (181542)
RAPHAELLA FRIEDMAN (323324)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
marks@rgrdlaw.com
jforge@rgrdlaw.com
rfriedman@rgrdlaw.com

Lead Counsel for Lead Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re APPLE INC. SECURITIES LITIGATION | ) ) ) |
| | ) |
| This Document Relates To: | ) ) |
| ALL ACTIONS. | ) ) ) |

Case No. 4:19-cv-02033-YGR

<u>CLASS ACTION</u>

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DATE:       TBD
TIME:       2:00 p.m.
CTRM:       1, 4th Floor
JUDGE:      Hon. Yvonne Gonzalez Rogers

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................1

II.  SUMMARY OF FACTS .....................................................................................3

  A.   Apple Faces Significant Headwinds in Greater China, Its Most Important
       Growth Market ...........................................................................................3

  B.   Slowing Economic Growth in China and Intense Competition Results in
       Weak iPhone XR Demand ..........................................................................4

  C.   Apple's Revenue Outlook for China Turns Negative, 1Q19 Internal
       Forecast Reduced by $6 Billion Primarily Due to Weak iPhone XR
       Demand in Greater China ...........................................................................5

  D.   Weak Demand Caused Apple to Cut Production of the iPhone by 34
       Million Units ..............................................................................................6

  E.   The Investor Community Was Anxious to Hear Whether Apple's Business
       Would Be Affected by the Slowdown in China ..........................................7

  F.   Defendants Falsely Assure Investors that Its Business in China Was Not
       Experiencing Deceleration and Pressure Like Other Emerging Markets ....8

  G.   The Market Accepted Cook's Claim that Deceleration and Pressure in
       Emerging Markets Was Not Impacting Apple's Business in China ..............8

  H.   iPhone Production Cuts Leak and *Nikkei Asian Review* Reports that Apple
       Slashed iPhone XR Production By 100,000 Units Per Day ..........................9

  I.   Apple Pre-Announces Earnings Miss of up to $9 Billion, Blames Poor
       iPhone Performance and Pressure on Consumers in Greater China ...........10

  J.   Shocked Market Participants Accuse Apple and Cook of Misrepresenting
       Business Conditions in China ...................................................................11

III. LEGAL STANDARDS .....................................................................................11

IV.  ARGUMENT ....................................................................................................12

  A.   Defendants Fail to Demonstrate the Absence of a Genuine Issue of
       Material Fact as to Falsity ........................................................................12

       1.   Cook's November 1 Statement Concerning Apple's Current
            Business Conditions in China Was False and Misleading ...................12

       2.   The Evidence Demonstrates that Cook's November 1 Statement
            Misled the Investing Public ...............................................................15

       3.   The Evidence Demonstrates that, Contrary to Cook's Statement,
            Apple Was Experiencing Pressure in China Prior to Cook's
            November 1 Statement ......................................................................17

1

2                                                                                             **Page**

3

4.    The Evidence Demonstrates that, Contrary to Cook's Statement,
      Apple's Revenue Trajectory in China Had Turned Negative Prior
      to November 1 ............................................................................................18

5.    The Evidence Demonstrates that Cook's Statement Was False and
      Misleading Because He Failed to Disclose Apple Had Cut iPhone
      Production by 34 Million Units Prior to November 1 ...............................21

B.    Evidence of Defendants' Actual Knowledge of the Undisclosed Facts
      Raises a Genuine Issue of Material Fact as to Scienter .........................................21

C.    Plaintiff's Evidence Raises a Genuine Issue of Material Fact Concerning
      Loss Causation ........................................................................................................22

D.    Plaintiff's Evidence Raises a Genuine Issue of Material Fact Concerning
      Defendants Cook's and Maestri's Control over Apple..............................................24

V.    CONCLUSION...................................................................................................................25

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..................................................................................12

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..................................................................................11

*Davis v. Yelp, Inc.*,
2021 WL 4923359 (N.D. Cal. Sept. 17, 2021) ......................................22

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) ...................................................................13

*Flood v. Miller*,
35 F. App'x 701 (9th Cir. 2002) ..............................................................25

*Gebhart v. S.E.C.*,
595 F.3d 1034 (9th Cir. 2010) .................................................................21

*Hatamian v. Advanced Micro Devices, Inc.*,
2017 WL 2822645 (N.D. Cal. May 30, 2017).........................................13

*Hernandez v. Polanco Enters., Inc.*,
19 F. Supp. 3d 918 (N.D. Cal. 2013) ......................................................22

*In re Allstate Corp. Sec. Litig.*,
2022 WL 842737 (N.D. Ill. Jan. 10, 2022)..............................................24

*In re Allstate Corp. Sec. Litig.*,
966 F.3d 595 (7th Cir. 2020) ...................................................................23

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) .................................................................14, 17

*In re Apple Inc. Sec. Litig.*,
2020 WL 2857397 (N.D. Cal. June 2, 2020) ..........................................12

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ...................................................................23

*In re Convergent Techs. Sec. Litig.*,
948 F.2d 507 (9th Cir. 1991) ...................................................................13

*In re Robinhood Order Flow Litig.*,
2022 WL 9765563 (N.D. Cal. Oct. 13, 2022).....................................14, 19

1

2                                                                                                            **Page**

3

4    *In re Tesla, Inc. Sec. Litig.*,
        2022 WL 1497559 (N.D. Cal. Apr. 1, 2022) ........................................................................21

5    *In re Twitter, Inc. Sec. Litig.*,
        2020 WL 4187915 (N.D. Cal. Apr. 17, 2020) ......................................................................21

6

7    *Kaplan v. Rose*,
        49 F.3d 1363 (9th Cir. 1994) ..............................................................................................24

8    *Khoja v. Orexigen Therapeutics, Inc.*,
        899 F.3d 988 (9th Cir. 2018) ..............................................................................................12

9

10   *Lloyd v. CVB Fin. Corp.*,
        811 F.3d 1200 (9th Cir. 2016) ............................................................................................23

11

12   *Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
        513 F.3d 702 (7th Cir. 2008) ..............................................................................................22

13

14   *Miller v. Thane Int'l, Inc.*,
        519 F.3d 879 (9th Cir. 2008) ........................................................................................13, 17

15   *Mineworkers' Pension Scheme v. First Solar Inc.*,
        881 F.3d 750 (9th Cir. 2018) ....................................................................................22, 23, 24

16

17   *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
        730 F.3d 1111 (9th Cir. 2013) ............................................................................................22

18

19   *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
        575 U.S. 175 (2015)............................................................................................................15

20   *Provenz v. Miller*,
        102 F.3d 1478 (9th Cir. 1996) ................................................................................... *passim*

21

22   *Ret. Tr. v. RH, Inc.*,
        302 F. Supp. 3d 1028 (N.D. Cal. 2018) ..............................................................................23

23

24   *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*,
        845 F.3d 1268 (9th Cir. 2017) ............................................................................................12

25

26   *S.E.C. v. Todd*,
        642 F.3d 1207 (9th Cir. 2011) ......................................................................................24, 25

27

28   *Smilovits v. First Solar, Inc.*,
        2019 WL 7282026 (D. Ariz. Dec. 27, 2019) ......................................................................23

**Page**

*Snell v. Bell Helicopter Textron, Inc.*,
   107 F.3d 744 (9th Cir. 1997) ................................................................11

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
   §78t(a) ..........................................................................................24
   §78u-4(b)(4) ..................................................................................22

Federal Rules of Civil Procedure
   Rule 56 ..........................................................................................1
   Rule 56(c) ....................................................................................11
   Rule 56(d) ....................................................................................25

17 C.F.R.
   §240.10b.5 ....................................................................................12

## I.      INTRODUCTION

Defendants Apple Inc., Timothy D. Cook, and Luca Maestri's Motion for Summary Judgment (ECF 293) ("MSJ") fails to comply with Fed. R. Civ. P. 56 and does not attempt to show the absence of a genuine issue of material fact as to any element of Plaintiff's claim.  Instead, Defendants admit they knew the very facts that Plaintiff alleged were concealed from defrauded investors, but claim they were under no obligation to disclose this information.  Their arguments are legally and factually wrong.  If anything, the MSJ supports summary judgment in Plaintiff's favor.

The MSJ is a trial brief, advancing Defendants' preferred – but demonstrably false – storyline that Cook did not **mean** what he **said** or did not **intend** to say what he said during Apple's November 1, 2018 conference call.  While intent is for the jury determine, it is clear that Cook sought to soothe an investor community concerned about the impact of slowing economic conditions in China when he explicitly excluded China from the category of emerging markets where Apple was experiencing deceleration and pressure and that were "not growing the way [Apple] would like see."  Cook bolstered this misrepresentation by referencing prior quarter revenue growth in China and "very strong" iPhone sales as evidence of continuing performance.

The undisputed facts are the exact opposite: Apple's business in China, particularly its iPhone business, was under tremendous pressure as budget-conscious Chinese consumers were delaying iPhone purchases or opting for cheaper smartphones from Chinese competitors.  The launch of the iPhone XR – which was targeted to the Chinese market – failed to drive customer interest or traffic to stores in China while Huawei's latest release garnered all the hype.  Demand was so weak that, before November 1, Chinese iPhone resellers told Apple to stop shipping the phone.  By late October, Apple's revenue growth in China was **not just decelerating but had turned negative**, and the Company cut its 1Q19 China revenue outlook from **4% growth to -1% decline**.  By November 1, 2018, Apple had cut production for the iPhone XR by 34 million units and slashed the Company's 1Q19 companywide revenue outlook by nearly $6 billion.  According to Cook at the time, it was "obviously a disaster."  These material facts – all of which were concealed from investors – are admitted and undisputed.

1      Contrary to the MSJ, market analysts digested Cook's misrepresentations as concerning

2   Apple's current business condition, just as Plaintiff has alleged.  Morgan Stanley wrote: "Emerging

3   Market Weakness: Surprisingly, AAPL blamed Turkey, India, Brazil and Russia, *but *not*

4   China*."  CCS Insights reported that "[Cook] emphasized that *China is not in the same category

5   and continues to see strong demand*."[1]  When the truth was fully revealed that poor economic

6   conditions and iPhone sales in China caused the Company to pre-announce an earnings miss of up

7   to $9 billion, the *Wall Street Journal* fixated on Defendants' statements two months earlier:

8   "during a call with analysts in November, Mr. Cook said the company expected pressure in

9   emerging markets such as Turkey, India, Brazil, Russia – *but not China*."  *Bloomberg* stated:

10  "Cook said two months ago that Apple's China business was "very strong,""  *Yahoo! Finance* said

11  Cook had a "major credibility problem" after telling investors "on November 1, [that] Apple was

12  in fine standing around the globe," before specifically republishing as support the very statement

13  Plaintiff alleges to be false and misleading.

14      Defendants' efforts to concoct a scenario in which their statements were truthful via post-

15  discovery declarations about their understandings or intentions are not a proper basis for summary

16  judgment nor are they credible in light of the undisputable facts.  Moreover, Defendants' shifting

17  explanations of Cook's November 1 statement – including their latest about currency fluctuations

18  – demonstrate that summary judgment is inappropriate.  Falsity must be determined by a jury

19  applying a reasonable investor standard.  Defendants' assertion that Apple's 1Q19 guidance

20  constituted a sufficient disclosure is not a recognized defense to any element of Plaintiff's claim

21  and is refuted by the market's outraged reaction to the truth.  In fact, Defendants' MSJ, admitting

22  both knowledge and deliberate concealment of the alleged undisclosed facts, firmly establish

23  scienter rather than its absence.  Indeed, as the true conditions were revealed to the market, Apple's

24  stock price fell, and the Class suffered economic loss.

25      For the reasons set forth herein, as well as in the response to Defendants' Separate

26

27  _____
    [1]   All citations are omitted and emphasis is added unless otherwise noted.    Citations and

28  footnotes are omitted and emphasis is added unless otherwise indicated.

Statement of Undisputed Facts (ECF 293-1) filed herewith, Plaintiff has raised a genuine issue of material fact as to each element of its 10b-5 claim. The MSJ should be denied.[2]

## II.   SUMMARY OF FACTS

### A.   Apple Faces Significant Headwinds in Greater China, Its Most Important Growth Market

Prior to and during the period relevant to this litigation, Apple's performance in China was critical to its overall success: China was Apple's second-largest market by country, accounting for $52 billion in revenue in FY18. Ex. 122 at 26, 63.[3] China is the largest mobile phone market in the world and presented a significant opportunity for growth in Apple's iPhone user-base. ECF 301-16, ¶43; Ex. 104. But Apple faced stiff competition from Chinese smartphone manufacturers who copied the iPhone's features at lower price points. Exs. 91 at 008, 103, 104, 107, 108. By 2018, total smartphone sales in China were trending downward, due to slowing innovation, market saturation, and price increases. Exs. 101, 102, 103, 107.

Simultaneously, China was mired in a years-long trend of economic deceleration driven by rising consumer debt and changing demographics. Exs. 101, 105, 109; ECF 301-16, ¶54. Reports were emerging that Chinese consumers were reducing spending on luxury items, like smartphones. Exs. 105, 109, 111, 112. Compounding these pressures, the Trump administration repeatedly threatened and enacted tariffs on certain Chinese-made goods. Exs. 106, 112. In the second half of 2018, key monthly metrics, like auto sales, began an accelerating downward year-over-year trend. Ex. 112; ECF 301-2, ¶37 (July 2018 (-4%) to October 2018 (-11.7%)). GDP growth as of September 30, 2018, was the slowest in a decade. Ex. 112.

Into this environment, in Fall 2018, Apple launched its most expensive generation of iPhones, the premium iPhone XS/XS Max, priced from $999 to $1,449, and the more budget-friendly iPhone XR, priced from $749 to $899. Ex. 131, ¶14. The iPhone XR was specifically targeted to compete in the Chinese market, offering dual-sim card support, a larger screen, and a

---

[2]   Defendants' motion for summary judgment only challenges the falsity, scienter, and loss causation elements of Plaintiff's 10b-5 claim, in addition to Section 20 control liability for Maestri.

[3]   All "Ex. _" citations herein are to the Declaration of Shawn A. Williams, filed herewith.

lower price.  Exs. 4, 92 ("Some features in our newest iPhones, like Dual Sim and larger screens were created with the Chinese consumer in mind."), 110, 113 at 638, 126, 132, 133, 138.  Apple reportedly allocated over 65% of initial iPhone XR production to China.  Exs. 126, 133; ECF 197-2, ¶103.  However, Defendants knew that Apple was up against increasingly attractive domestic offerings, in particular, Huawei's Mate 20 smartphone line, which boasted comparable features at substantially lower prices than the iPhone XR.  Exs. 28; 42 at 798-99, 806, 838 (China pricing comparison); 58; 80.

In light of these headwinds, the market was keenly focused on Apple's ability to perform in China.  Ex. 12.  Apple had continued to generate revenue growth in China by raising prices, even as the number of iPhones sold declined.  Ex. 110.  But the sustainability of this approach, and Apple's ability to compete at lower price points, was of great interest to investors.  Ex. 93 at 516, 519 (Wedbush: "We continue to believe XR will be a linchpin around Cupertino's success in further penetrating the China consumer market . . . .").

**B.    Slowing Economic Growth in China and Intense Competition Results in Weak iPhone XR Demand**

Early demand signals for the iPhone XR in China were poor.  In early October 2018, before customer pre-orders, Defendants recognized a "glaring issue" – Chinese iPhone resellers (responsible for 80% of iPhone sales in Greater China) were placing lower than expected iPhone XR orders.  Exs. 2, 87 at 79-80.[4]  According to Donal Conroy, when Chinese "partner's orders are showing decline . . . this is an issue, *a big issue*."  Ex. 87 at 85-87.  By October 16, 2018, Cook was "concerned about demand risk in China."  Exs. 8 at 918, 87 at 107-108, 86 at 111-113.

Weak demand for the iPhone XR in China continued when pre-orders went live for consumers on October 19, 2018.  Ex. 16.  Apple's Worldwide Reseller Operations team reported that iPhone XR pre-orders were "softer than expectations across all reporting partners" and -79% below the iPhone 8/8+ launch the prior year.  Ex. 15.  Chinese reseller JD.com had only 17,000 iPhone XR pre-orders versus 45,000 iPhone XS/Max pre-orders for the same period.  Ex. 22.  Poor

---

[4]    Major Apple iPhone resellers/partners in China included China Mobile, China Telecom, China Unicom, and JD.com.  Ex. 87 at 81-82.

1  demand trends in Greater China continued on launch day, October 26, 2018, when iPhone XR

2  unbrickings were down -73% compared to the iPhone X and down -71% versus the iPhone 8/8+.

3  *Id.*, Exs. 21, 23, 24, 30.  Conroy would later admit about the iPhone XR launch: "We definitely

4  had some concerns based on pre orders . . . ***but the wheels fell off on Friday [October] 26th*** . . .

5  ."  Exs. 77, 87 at 243-245.

6          Customer traffic in Apple stores in China also reflected weak demand for the iPhone XR.

7  Compared to the iPhone X launch the prior year, traffic in Apple stores was down -34% on Launch

8  Day and -35% the following day.  Ex. 42 at 815.  On October 29, Kevan Parekh wrote that the

9  "[t]ake away on store traffic [wa]s that XR isn't driving the kind of lift pre/post launch that X or

10  XS drives."  *Id.* at 799.  A Greater China iPhone XR Launch Highlights document stated "Store

11  Traffic: half or less uplift vs previous launches."  Exs. 44, 90 at 252-253.  The Week 4 (October

12  21 to 27, 2018) "Weekly Business Report" emphasized that China was already $1.4 billion behind

13  in revenue less than a month into the quarter:

14          ***It's hard to overstate the importance of iPhone in the China market*.** . . .  ***The
         weak response to iPhone XR has left Greater China down -$1.4B QTD*.**

15

16  Ex. 36.  Similarly, the Week 4 "Greater China Sales Flash Report" showed the iPhone XR missed

17  Apple's internal forecasts by -33%.  Ex. 45 at 434.[5]  By October 28, 2018, Apple's Chinese

18  partners were threatening to reject shipments of, or withhold payment for, the iPhone XR.  Ex. 41.

19  By November 1, 2018, Apple's Chinese sales partners refused additional iPhone XR shipments

20  and "significantly" cut their iPhone XR sales forecasts.  Ex. 58. On October 29, when the investor

21  relations team sought details from the China sales team, they received a warning: Apple "may want

22  to be ***cautious on the tone of XR launch in China*.**"  Ex. 43.

23      **C.     Apple's Revenue Outlook for China Turns Negative, 1Q19 Internal
            Forecast Reduced by $6 Billion Primarily Due to Weak iPhone XR
            Demand in Greater China**

24

25          As a result of weak iPhone demand in China during October 2018, particularly for the

26  iPhone XR, Apple slashed internal revenue expectations for the quarter.  Specifically, between

27  _____
   [5]   The Week 5 (October 28-November 3, 2018) Flash Report, sent November 5, 2018, was even

28  worse, showing that iPhone XR missed by -36%.  Ex. 76 at 803.

October 19 and October 23, 2018, Apple made a "a significant reduction" to forecasted 1Q19 revenue in Greater China from 4% year-over-year **growth** to -1% year-over-year **decline**: "**GC is now -1% Y/Y driven by iPhone** and iPad." Exs. 20, 88 at 252.

On October 27, 2018, the iPhone XR sales forecast was reduced by as much as -7.9 million units causing Conroy to tell Cook: "Obviously these numbers are an **extreme problem** and mainly hinge on the Xr performance." Exs. 30, 87 at 183-184. The same day, Apple cut its companywide 1Q19 revenue forecast from $96.6 billion to $93.3 billion. Exs. 25-26. According to Cook, this was "**obviously a disaster**" requiring "all hands on deck now." Exs. 32, 86 at 141:18-142:15. Maestri told Cook "[t]he whole issue of course is XR." Ex. 34.

On Sunday, October 28, 2018, Cook held a meeting to address what he called a "**5 alarm fire**" and demanded urgent action. Exs. 29, 38. Cook specifically told his team that "[i]n China, we're worried about the new [Huawei] Mate devices." Ex. 38. In a recap of the meeting, Parekh stated that initial iPhone XR sales results were so low that applying Apple's "traditional extrap[olations]" would result in quarterly sales "lower than anything we have seen in the past 4 years" and reiterated that "we are worried about the risk in Greater China . . . with the Huawei Mate 20 launch." Exs. 42, 90 at 201-202.

On November 1, 2018, in the hours before the 4Q18 conference call, Defendants **again** cut Apple's companywide revenue outlook by another $2.6 billion, to $90.7 billion in revenue and 70.6 million iPhone units sold. Exs. 56, 57. In total, from October 23 to November 1, 2018, the Company's forecast for 1Q19 was reduced by $5.9 billion and 6 million iPhone units. *Id.*, ECF 297-76, ¶38. The iPhone XR cuts were the "primary driver" of the revenue cuts. Ex. 88 at 230-231.

### D.    Weak Demand Caused Apple to Cut Production of the iPhone by 34 Million Units

Even before the launch of the iPhone XR, the Company took action to cut production in response to weak demand. By the week of October 15, 2018, Apple cut the iPhone XR master production schedule ("MPS") by 2 million, to 41 million units, and was considering an additional cut of 3 million units. Ex. 17. As demand failed to materialize, the cuts grew. On October 29,

2018, Apple told manufacturer Wistron it would not receive any iPhone XR orders.  Ex. 74.  On October 31, 2018, Apple directed its largest iPhone manufacturer, Foxconn, to cut or convert iPhone XR production lines.  Ex. 143.  On October 31, Apple prepared to cut production for the iPhone XR by 11 million units in 1Q19, and by 32 million over the next three quarters.  Ex. 55.  The majority of Foxconn's iPhone XR cuts were to units to be sold *in China*.  Exs. 97, 98.  On Friday, November 2, 2018, Conroy confirmed those cuts had been discussed the day before, on November 1, 2018.  Exs. 55, 66, 87 at 41-43, 142.

> **E.**      **The Investor Community Was Anxious to Hear Whether Apple's Business Would Be Affected by the Slowdown in China**

In the weeks leading up to the November 1, 2018 conference call, the investor community focused on decelerating economic trends in, and trade tensions with, Greater China, as well as questioned whether Apple could sell its new expensive iPhones there.  *See*, *e.g.*, Exs. 3 (October 14 Goldman Sachs Report: "There are multiple signs of rapidly slowing consumer demand in China which we believe could easily affect Apple's demand there this Fall"), 7 (October 15 Goldman Sachs Report: "all focus being on how the company decides to guide for its FQ1 to December given recent weaker consumer datapoints in China"), 10 (October 18 Wedbush Report: "Success of Apple's product strategy in China, which remains a key growth driver for the coming years and could be impaired by lower priced smartphones and competition.  China macro/tariffs issue remain a long-term risk."), 54 (October 31 The *Wall Street Journal*: "Apple will need to increase sales of handsets and other devices overseas . . . China's growth is under pressure amid trade uncertainty and rising debt, while emerging markets in general continue to cause apprehension."); *see also* Exs. 4, 5, 12, 86 at 82-85, 136.  These concerns were also echoed internally by sales personnel in China.  *See* Ex. 52 ("Broader economic situation is probably worse than what officials will admit to. . . .   My sense is consumer confidence and spending and will further decline in 2019."); *see also* Exs. 18 at 408, 49, 91.

On the morning of November 1, 2018, prior to the conference call, Nancy Paxton ("Paxton"), Apple's then-Head of Investor Relations, sent a list of expected questions, in the order they were expected to be asked.  She listed, for example, Wamsi Mohan ("Mohan"), of Bank of

America: "There is broader concern about the economic situation in China, how is your business performing there?"; Katy Huberty of Morgan Stanley: "Does your revenue guidance imply weak demand for XR?"; and Rod Hall from Goldman Sachs: "What is happening to your smartphone market share in China? What is your outlook for the China market given recent Chinese government stimulus efforts for consumers?" Ex. 59.

**F.      Defendants Falsely Assure Investors that Its Business in China Was Not Experiencing Deceleration and Pressure Like Other Emerging Markets**

On November 1, 2018, the Company announced 4Q18 results and 1Q19 revenue guidance of $89 to $93 billion, which was below analysts' estimates. Ex. 115. The Company surprised the market by announcing it would stop reporting unit sales for iPhones, iPads, or Macs. Ex. 114 at 7. As expected, Mohan asked Cook about deceleration in China and Apple's trajectory there. *Id.* at 8. In response, Cook explained that "[t]he emerging markets" that the Company was currently "***seeing*** pressure in" were "markets like Turkey, India, Brazil [and] Russia" and, addressing their trajectory, stated that "those markets ***are*** not ***growing*** the way we would like to see." *Id.* Cook stated, "[i]n relation to China specifically, I would not put China in that category. Our business in China was very strong last quarter. We grew 16%, which we're very happy with. iPhone, in particular, was very strong double-digit growth there." *Id.*

Analysts also asked: "what, if anything, can we take away from the December quarter guidance related to what you're seeing for early demand on the XR?" Ex. 114 at 10. Cook indicated that nothing should be inferred, claiming "[t]he Xs and Xs Max got off to a really great start" and Defendants had "very, very little data" on the iPhone XR. *Id.*, Ex. 258. Of course, Cook now admits that early demand for the iPhone XR was so weak that the revenue outlook was slashed by $5.9 billion. Exs. 57, 86 at 143-144; ECF 294, ¶31; ECF 297-76, ¶38; MSJ at 11.

**G.      The Market Accepted Cook's Claim that Deceleration and Pressure in Emerging Markets Was Not Impacting Apple's Business in China**

Analysts and investors were reassured by Cook's positive comments and their reports reflect Cook's plain language using the present tense: China, unlike Turkey, India, Russia, and Brazil, was not an emerging market in which the Company was currently experiencing pressure or

not growing as Apple wanted to see.  For example, one Morgan Stanley analyst even emphasized that "AAPL would *not* put China in the weaker EM bucket."  Ex. 63 at 557; *see also* Ex. 65 ("management was adamant about differentiating between these weaker markets and China, which still grew +16% year-over-year").  J.P. Morgan reported that "Apple cited pressures in emerging markets including Turkey, Brazil, India and Russia and challenges in growth following price increases.  Separately . . . Apple **continues** to see solid growth in EM countries like China."  Ex. 117.  Guggenheim noted that "Apple did, however, call out macro weakness it **now sees** in some **other** emerging markets, including Turkey, Brazil, Russia and India," and that China was not one of those markets.  Ex. 64; *see also* Exs. 67 "[Cook] emphasized that China is not in the same category and **continues** to see strong demand."), 116.  Not a single analyst report stated (that which Defendants had concealed) that Apple's revenue outlook for China had turned negative, that Chinese resellers told Apple to stop shipping the iPhone XR, that Defendants had cut iPhone production, or that Apple had cut its outlook by nearly $6 billion due to poor iPhone sales, particularly in China.

### H.    iPhone Production Cuts Leak and *Nikkei Asian Review* Reports that Apple Slashed iPhone XR Production By 100,000 Units Per Day

The series of iPhone production cuts that Apple dictated to manufacturers Foxconn, Pegatron, and Wistron prior to the November 1 conference call leaked to the press.  On Monday, November 5, 2018, before the market opened, the *Nikkei Asian Review* reported that Apple directed "Foxconn and Pegatron to halt plans for additional production lines" and cut iPhone production by 100,000 units per day – a 20%-25% reduction.  Exs. 118, 119, 120, 121.  Apple executives quickly confirmed that the report was accurate.  Ex. 74.  Despite its accuracy, executives called the leak "infuriating" and Cook called for a "substantial financial penalty."  Ex. 83.  Defendants also acknowledged that the *Nikkei* report caused an immediate overhang on the Company's stock price.  Ex. 73.  On this partial disclosure, Apple's stock price fell from $207.48 to $201.59.[6]  Ex. 118;

---

[6]    On November 12, 2018, an analyst report stated that Lumentum, one of Apple's key iPhone part suppliers, had received a request from Apple to cut shipments by 30%.  Exs. 79, ECF 301-19 at 30.  Following the Lumentum report, Apple's stock price declined from $204.47 to $194.17.  ECF 301-19 at 121 (Exhibit 7).

ECF 301-19 at 121 (Exhibit 7).

## I.    Apple Pre-Announces Earnings Miss of up to $9 Billion, Blames Poor iPhone Performance and Pressure on Consumers in Greater China

On January 2, 2019, Apple published a "Letter from Tim Cook to Apple Investors," pre-announcing 1Q19 revenue of $84 billion, far below the $89 to $93 billion range provided just eight weeks earlier.  The letter resembled a mirror-image of Cook's November 1, 2018, assurances, attributing the Company's poor performance to "***economic deceleration, particularly in Greater China***.  In fact, ***most of our revenue shortfall to our guidance***, and ***over 100 percent of our year-over-year worldwide revenue decline, occurred in Greater China*** across iPhone, Mac and iPad." The letter further explained: "***Lower than anticipated iPhone revenue, primarily in Greater China, accounts for all of our revenue shortfall to our guidance*** and for much more than our entire year-over-year revenue decline."  Ex. 123.  Defendants specified the factors driving these poor results that were known prior to November 1: "[A]s the climate of mounting uncertainty weighed on financial markets, the effects appeared to reach consumers as well, with traffic to our retail stores and our channel partners in China declining as the quarter progressed."  *Id.*

Later that same day, during a CNBC interview, Cook made further admissions concerning his contemporaneous knowledge of facts contradicting his November 1, 2018 statement.  Ex. 125. According to Cook on January 2, 2019, Apple's poor results were attributable to the slowing Chinese economy during the "the second half" of 2018, and Defendants "saw" declines in customer traffic, as well as contractions in the smartphone industry, prior to the Class Period: "[W]e ***saw***, as the quarter went on, things like traffic in our retail stores, traffic in our channel partner stores, the reports of the smartphone industry contracting, particularly bad in November." Ex. 125.  Cook had not seen December results but added, "[M]y sense is the much larger issue is the slowing of the economy and then this – the trade tension that's further pressured."  *Id.*[7]  Apple's stock price declined from $157.92 to $142.19, or 10%.  ECF 301-19 at 121 (Exhibit 7).

---

[7]   Cook concedes contemporaneous knowledge of the facts concerning the impact of conditions in China and iPhone sales as of November 1, 2018 and that he chose not to disclose them.  Ex. 86 at 224-234.

### J.   Shocked Market Participants Accuse Apple and Cook of Misrepresenting Business Conditions in China

Analysts and media outlets expressed shock at the Company's pre-announcement – and, more particularly, that it was attributed to poor performance in China – which Defendants denied on November 1, 2018.  On January 2, 2019, *Bloomberg* stated: "Apple failed in the No. 1 mission of being a public company: being honest with investors about its business."  Ex. 124.  *Bloomberg* continued: "Cook said two months ago that Apple's China business was "very strong," even amid signs of an economic slowdown and months of headlines about trade tensions. . . . executives failed to give any hints of red flags in the region [i.e. China]."  *Id.*  On January 3, 2019, *Yahoo! Finance* wrote that "CEO Tim Cook now has a major credibility problem" because management "failed to keep it real with investors on what they were seeing in iPhone demand data late in 2018."  Ex. 128.  The article highlighted that, "[j]udging by their comments on Apple's fourth fiscal quarter earnings call on November 1, Apple was in fine standing around the globe."  *Id.*  The article then quotes the very statement alleged to be false in this action and notes: "Nothing here from Cook indicates China would be mostly blamed as the culprit for a nasty financial warning some two months later."  *Id.*  *See also* January 6 RBC Report ("AAPL during their EPS call on 11/1 stressed that China wasn't seeing softer demand. However, during their pre-announcement on Jan 2nd, AAPL squarely attributed revenue miss to China."), *see also* Exs. 126, 127, 129.

## III.   LEGAL STANDARDS

Summary judgment is only proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Here, where the moving party does not bear the burden of proof at trial, that party bears the initial burden of demonstrating that no genuine issue of material fact exists.  *Id.* at 323.[8]  If the moving party has met its burden, the non-moving party

---

[8]   For Maestri's good-faith affirmative defense to control liability under §20, where he does bear the burden of proof at trial, "the issue [is] not whether [Maestri] had produced sufficient evidence to establish the defense but whether it was entitled to judgment as a matter of law, i.e., whether no reasonable jury could fail to find that the defense had been established."  *Snell v. Bell Helicopter Textron, Inc.*, 107 F.3d 744, 746 (9th Cir. 1997).

1    must then present some significant, probative evidence indicating that a genuine issue of material

2    fact exists as to each element of its claim.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56

3    (1986).  A genuine issue of material fact exists if the evidence – when viewed in light most

4    favorable to the non-moving party – would allow a reasonable trier of fact to find in favor of the

5    party opposing the motion.[9]  *Id.*

6          To recover for a violation under §10(b) of the Exchange Act, 15 U.S.C. §78j(b) and SEC

7    Rule 10b-5, 17 C.F.R. §240.10b.5, a plaintiff must prove: (i) a material misrepresentation or

8    omission by the defendant; (ii) scienter; (iii) a connection between the misrepresentation or

9    omission and the purchase or sale of a security; (iv) reliance upon the misrepresentation or

10   omission; (v) economic loss; and (vi) loss causation.

11   **IV.    ARGUMENT**

12         **A.    Defendants Fail to Demonstrate the Absence of a Genuine Issue of
          Material Fact as to Falsity**

13         "'[A] statement is misleading if it would give a reasonable investor the 'impression of a

14   state of affairs that differs in a material way from the one that actually exists.'"" *Retail Wholesale*

15   *& Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir.

16   2017).  Even if a statement is not false, it may be misleading if it omits material information.  *Khoja*

17   *v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018).

18         **1.    Cook's November 1 Statement Concerning Apple's Current
          Business Conditions in China Was False and Misleading**

19

20         Plaintiff has presented more than sufficient evidence to create a genuine issue of material

21   fact as whether Cook misrepresented the current state of Apple's business in China, such that a

22   jury could find the statement, "when read in light of all the information then available to the

23   market, or a failure to disclose particular information, conveyed a false or misleading impression."

24

25   _____
     [9]    Plaintiff objects to the admission of Defendants' Exs. 3, 5, and 27-83, for which they have
     sought judicial notice (ECF 293-2), to the extent the exhibits are offered for the truth.  *See In re*

26   *Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *6 (N.D. Cal. June 2, 2020).  Ex. 86 is irrelevant.
     Plaintiff objects to Exs. 1, 2, 6-14, 16, 17, 19-25, 99, 101, 102, 104, 105, and 107-109, as
     inadmissible hearsay under Rule 802.  Plaintiff objects to Exs. 91, 94-96, 100, and 106.  *See* ECF

27   301.  Plaintiff does not hereby waive any objections to the exhibits Defendants have submitted in
     support of their MSJ.

28

1    *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991); *Hatamian v. Advanced*

2    *Micro Devices, Inc.*, 2017 WL 2822645 (N.D. Cal. May 30, 2017) ("A statement is false if it gives

3    an impression of a state of affairs that does not exist ***at that time***.").

4            During the November 1 call, Mohan asked Cook to discuss the current state and trajectory

5    of Apple's business in China in light of the ongoing economic deceleration in emerging markets,

6    "partly driven by things that are more ***specific to China***." Ex. 114 at 8. Mohan continued by

7    asking Cook to "talk about how you see the ***trajectory there*** for the business." *Id.* The intention

8    of the question was clear. In fact, earlier in the day, Cook was told to expect this very question

9    about current conditions in China from Mohan. Ex. 59 ("There is a broader concern about the

10   economic situation in China, how ***is*** your business performance there?"). After acknowledging

11   that Mohan asked a "[g]reat question," using the ***present*** tense, Cook responded that China was

12   not one of the emerging markets in which Apple was currently "***seeing*** pressure" and that China

13   was not like Turkey, India, Brazil, and Russia, which were "not ***growing*** the way we would like

14   to see." Ex. 114 at 8. Cook's use of the present tense evidences that he, like Mohan, was talking

15   about Apple's current business conditions. Cook then made it clear that "[i]n relation to China

16   specifically, ***I would not put China in that category***." *Id.* "The fair and reasonable implication

17   an ordinary investor would derive" from Cook's statement is that he was speaking to the current

18   state of Apple's business in China. *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008).

19           Defendants' concession that "Cook used a combination of past- and present-tense

20   language" in responding to Mohan is sufficient on its own to deny the MSJ as to falsity. MSJ at

21   4; *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (unless reasonable minds could not differ,

22   falsity is to be left to the trier of fact). Defendants contend that Cook, despite his words, intended

23   to speak historically, but the Court previously recognized that even though Cook "subsequently

24   referred to the previous quarter, he apparently did so to provide an illustration for his present-tense

25   description." ECF 123 at 8. Defendants' newest contention that Cook's November 1 statement

26   was both historical ***and*** concerned currency effects in markets other than China is equally

27   unpersuasive and it too must wait for trial. As an initial matter, the subjective and self-serving

28   declarations of Cook, Maestri, and Parekh as to Cook's intent or interpretation of his statement are

irrelevant as falsity is assessed "objective[ly]" under the "'reasonable investor'" standard.  *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699-70 (9th Cir. 2021), *cert. denied*, _U.S._, 142 S. Ct. 1227 (2022); *In re Robinhood Order Flow Litig.*, 2022 WL 9765563, at *6 (N.D. Cal. Oct. 13, 2022) (same).

Accepting Defendants' newest reinterpretation would mean adopting the absurd *i.e.*, that despite Cook's acknowledgement of a "[g]reat question," a reasonable investor understood Cook to provide an entirely non-responsive answer.  Ex. 114 at 8.  Mohan's question made no reference to historical performance or currency effects, but asked about Apple's "trajectory" – *i.e.*, its current path or progression.[10]  And Mohan's question immediately followed Maestri's comments that "macroeconomic uncertainty, particularly in emerging markets" (a category that includes China) was negatively impacting the Company's current outlook.  Ex. 114 at 7.

Grasping at straws, the MSJ offers yet another alternative reinterpretation of Cook's statement as an accurate description of ***current*** currency performance because the "Chinese renminbi had remained stable against the dollar ***in October 2018***."  MSJ at 18.  This is disputed as the document relied upon shows that China (at -2% devaluation quarter to date) was in fact precisely in the middle of the referenced emerging markets in terms of currency fluctuations: Turkey (-10%), India (-5%) Russia (-1%) and Brazil (0%).  ECF 294-2 at 116.

Defendants' shifting characterizations of Cook's statement raise a genuine issue of material fact as to falsity.  Defendants previously argued that "Mr. Cook's statement" was an accurate historical statement because it referred to the "category" of emerging markets, "like Brazil or India that were down or flat in the previous quarter."  ECF 118 at 10.  During Cook's seven hour deposition, he never referenced the purported comparison among emerging markets on the basis of currency (historical or current), but instead reiterated that he was referring to China's 16% revenue growth.  *See* Ex. 86 at 13-14 ("My comments were made in regards to China's performance in Q4 . . . which was that the business had grown 60 [sic] percent during the quarter.").  In fact, in his deposition, Cook never mentioned currency at all.  Likewise, Defendants' March 15,

---

[10]  *See* https://www.merriam-webster.com/dictionary/trajectory.

2022 interrogatory responses addressing their denials and affirmative defenses never once mention the purported currency comparison.  Ex. 134 at 10-12, 14-15.

Finally, Defendants' efforts to frame Cook's statement as an opinion subject to *Omnicare*'s pleading standard should be rejected, again.  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015); *see* ECF 110 at 26 ("This statement contains representations of fact – that China is not facing emerging market issues like other countries and that Apple's business there is strong.").  MSJ at 15.  Even applying the *Omnicare* standard for pleading the falsity of opinions (which the Court already considered), Plaintiff has adduced evidence demonstrating that Cook's statement did not fairly align with the information in his and Apple's possession on November 1.  *See* §§IV.A.3-5; ECF 110 at 26.

### 2.   The Evidence Demonstrates that Cook's November 1 Statement Misled the Investing Public

It is undisputed that leading up to November 1, 2018, "Apple recognized that the analyst community was focused on its business in China," including the impact of economic deceleration, trade tensions with the United States, and intensifying competition from domestic smartphone manufacturers.[11]  MSJ at 7; *see* Exs. 137 (November 1, 2018 RBC Report: "Focus on the call will be . . . China: Demand trends for new iPhone sales . . ."), Ex. 10 (October 18, 2018 Wedbush Report: "Looking out into FY19; China consumer demand a key driver . . . main swing factor in our opinion looking ahead is China"), Ex. 46 (October 29, 2018 UBS Report: "China is the greatest unknown given macro uncertainties.").  Cook and the Apple investor relations team prepared to address those very concerns during the November 1, 2018 conference call.  Ex. 59.

Contrary to Defendants' contentions (MSJ at 16-17), analyst reports following the call confirm that the impression created by Cook's statement was that the current state of the Company's business in China was distinguishable from other emerging markets which were decelerating and under pressure, and not growing the way Apple would like to see.  Even their

---

[11]   Apple testified, through 30(b)(6) witness Parekh, that Apple was aware of each of these conditions.  Ex. 85 at 239-240, 244-246, 259, 269, 271, 307, 311-312, 315-316, 332, 336, 340-342, 344-345, 352, 383-384, 388, 409.

1   own proposed expert Dr. Brett Trueman plans to testify that at least one November 1, 2018 analyst

2   report stated that "Apple cited Turkey, India, Brazil and Russia specifically, ***but emphasized that***

3   ***China is not in the same category and continues to see strong demand***."   Ex. 67.   Numerous

4   other analysts reported the same: Exs. 63 at 557 (Morgan Stanley: "AAPL would *not* put China

5   in the weaker EM bucket."), 70 (November 2, 2018 J.P. Morgan Report "Apple ***continues*** to see

6   solid growth in EM countries like China."), 67 ("[Cook] emphasized that China is not in the same

7   category and ***continues*** to see strong demand."), 64 (November 1, 2018 Guggenheim Report:

8   "Apple did, however, call out macro weakness it ***now sees*** in some ***other*** emerging markets,

9   including Turkey, Brazil, Russia and India (*e.g.*, where revs were just flat Y/Y), compounded by

10   the stronger USD.").

11          Evidence of the market's reaction to the January 2, 2019 pre-announcement further

12   confirms that Cook's November 1 statement created a false impression of current condition.   A

13   January 3, 2019 *Yahoo! Finance* report stated that "Cook now has a major credibility problem"

14   and that "[j]udging by their comments on Apple's fourth fiscal quarter earnings call on November

15   1, Apple was in fine standing around the globe," before pointing to the very alleged

16   misrepresentation at the heart of this action.  Ex. 128; *see also* Exs. 130 (January 3, 2019 *The Wall*

17   *Street Journal*: "During a call with analysts in November, Mr. Cook said the company expected

18   pressure in emerging markets such as Turkey, India, Brazil, Russia – but not China."), 135 (January

19   3, 2019 Korea Times: "On Apple's earnings call in November, Cook cited slowing growth in

20   emerging markets such as Brazil, India and Russia . . . [b]ut Cook specifically said he 'would not

21   put China in that category' of countries with troubled growth."), 124 (January 2, 2019 Bloomberg:

22   Apple "failed to give any hints of red flags in [China]" during the November 1 call), 94 (RBC

23   Report: "AAPL during their EPS call on 11/1 stressed that China wasn't seeing softer demand.").

24          Defendants claim that because analysts covering the Company did not use the precise

25   words that Apple was not seeing "any pressure" or "no pressure" in China on November 1, 2018,

26   that investors were not misled.  MSJ at 16, 19.  That notion is belied by the multitude of reports

27   cited above.  Moreover, this type of hyper-textual tactic of citing analyst reports for what they do

28   not say has been rejected by *Provenz v. Miller*, 102 F.3d 1478 (9th Cir. 1996) where the court

1   found that, even though "defendants submitted 31 analyst reports and articles," the fact that none

2   of them mentioned the adverse facts allegedly concealed did not "show that 'no rational jury could

3   find' that the market was misled." *Id.* at 1493. Here, like in *Provenz,* none of the analyst reports

4   set forth the undisclosed facts known to Defendants as of November 1, 2018, for example: (i) that

5   Chinese resellers had directed Apple to stop shipping the iPhone XR; (ii) Apple was cutting 34

6   million units of iPhone XR production; (iii) that the 1Q19 revenue outlook for China had turned

7   negative; or (iv) its 1Q19 companywide outlook had recently been cut by nearly $6 billion.[12]

8              **3.     The Evidence Demonstrates that, Contrary to Cook's
                       Statement, Apple Was Experiencing Pressure in China Prior to
9                       Cook's November 1 Statement**

10          Contrary to Cook's November 1 statement, Apple was being materially impacted by

11  economic deceleration and business pressure in Greater China, which significantly suppressed

12  demand for Apple's latest generation of iPhones. By early October 2018, weeks before the iPhone

13  XR went on sale, Defendants knew that weak orders from Chinese iPhone resellers were a glaring

14  issue for the sales outlook. Exs. 1, 6, 9, 86 at 107:7-22, 87 at 94-96. When iPhone XR pre-orders

15  opened to the public on October 19, 2018, they were -79% below pre-orders for the iPhone 8/8+.

16  Exs. 11 at 989, 13, 14. This decelerating demand trend continued when the iPhone XR was made

17  available for purchase on October 26, 2018; Greater China unbrickings were down -73% compared

18  to the iPhone X and -71% compared to the iPhone 8/8+. Ex. 22. Conroy would later call

19  iPhone XR launch day the day "***the wheels fell off***." Ex. 77.

20          Prior to November 1, customer traffic in Greater China Apple stores was down compared

21  to prior launches. Ex. 42 at 815 (October 26 and 27 traffic down -34% and -35% respectively).

22  On October 29, Parekh wrote the "[t]ake away on store traffic [wa]s that XR isn't driving the kind

23

---

[12]   Defendants' attempt to point to its risk factors section of its 2018 Form 10-K as an adequate
24  disclosure of the truth fails because that document was unavailable to investors as of November 1,
     2018. Moreover, while they argue that the risk factors "explicitly warned of 'downward pressure
25  on gross margins' from 'highly competitive global markets'" (MSJ at 20), the risk factors never
     mention China, and only speak to potential and unrealized future risk while ignoring that those
26  risks had manifested and were currently impacting Apple. *See Alphabet*, 1 F.4th at 703
     (recognizing that warning of risk not sufficient when the risk has already manifested). Moreover,
27  investors are not required to look to other sources to determine the truth of Cook's statements made
     during the investor call. *See Miller*, 519 F.3d at 887.
28

1    of lift pre/post launch that X or XS drives. . . . we are worried about the risk in Greater China.""[13]

2    Exs. 42 at 799, 84 at 623 ("importantly traffic was nothing like an iPhone" launch).  The China

3    sales team stated that "Store Traffic: half or less uplift vs previous launches."  Exs. 35, 40, 44 at

4    794, 90 at 252-253.

5         By Sunday, October 28, 2018, demand in China for the iPhone XR was so weak Apple's

6    Chinese telecom partners told Apple to stop shipping the iPhone XR and were threatening to not

7    accept additional shipments or refuse payment if shipments continued.  Exs. 37, 41, 47, 49, 58.

8    On October 31, Kaiann Drance, Vice President of iPhone Marketing, wrote to sales counterparts

9    in China regarding the launch, stating, "[w]e saw unbrickings from China again and are very

10   concerned."  Ex. 53.  On October 29, 2018, the sales and marketing team in China warned that

11   Apple "may want to be cautious on the tone of XR launch in China" during the November 1, 2018

12   conference call.  Ex. 43.  On October 31, 2018, Isabel Ge Mahe ("Mahe"), Vice President and

13   Managing Director, Greater China Region, who Cook testified was the person "we look to in China

14   to aggregate . . . sales[ and] marketing," wrote that "everywhere I look I see Huawei Mate 20s

15   advertisement."  Exs. 86 at 29:23-30:11; 86.  By contrast, she did not "see a lot of buzz on the new

16   iPhones anymore, especially not much on XR."  Exs. 62, 68, 96.  On November 1, sales staff in

17   China reaffirmed to Mahe that "[Chinese] Sales / Partners have ceased sell-in[14] of XR and they've

18   taken down the XR forecast down significantly."  Ex. 58.

19              **4.    The Evidence Demonstrates that, Contrary to Cook's**
                 **Statement, Apple's Revenue Trajectory in China Had Turned**
20               **Negative Prior to November 1**

21        On November 1, 2018, Cook falsely assured investors that China was not among the

22   emerging markets which "are not growing the way that we like to see."  Ex. 114 at 8.  In truth,

23   _____

24   [13]  Parekh's declaration portrays traffic trends in China as positive going into November 1, 2018,
     pointing to a year-over-year comparison slide from an excerpted presentation.  ECF 296, ¶12
25   (citing Defs' Ex. 11 at 236).  In 2018, however, Parekh focused on the slides comparing traffic
     launch-over-launch – which are curiously omitted from the cited exhibit.  *Compare* ECF 296-4
26   (Defs' Ex. 11) to Ex. 42 at 815.  Contemporaneously, Parekh declared to his boss, Greg Joswiak,
     that the iPhone XR was not driving traffic and Defendants were "worried about the risk in Greater
27   China."  *See* Ex. 42 at 798-799; *see also* Ex. 90 at 201-202.

28   [14]  "Sell-in" refers to Apple sales to reseller partners, and "sell-through" generally refers to Apple
     reseller sales to end-consumers.

1    Apple's revenues in China were ***declining year over year***.  Exs. 19, 20, 87 at 136, 88 at 119-121.

2    A "Weekly Business Report" for Apple online sales for October 21 to 27, 2018 (1Q19, Week 4)

3    emphasized that China revenues were already $1.4 billion behind the prior year just four weeks

4    into the quarter.  Ex. 36 ("It's hard to overstate the importance of iPhone in the China market. . . .

5    The weak response to iPhone XR has left ***Greater China down -$1.4B QTD***, -86% YoY.").  In

6    fact, by October 23, 2018, the Company had already cut its internal 1Q19 revenue outlook from

7    ***annual quarterly revenue growth of 4% to annual quarterly decline of -1%*** – "driven by iPhone

8    and iPad." Ex. 20.  In other words, Apple's growth in Greater China was ***not merely decelerating***

9    ***but declining***.

10       Defendants now admit that these negative trends – particularly for the iPhone XR in China

11   – caused Apple to materially reduce its 1Q19 overall companywide revenue outlook ***by $5.9 billion***

12   and cut the MPS just days prior to the November 1 conference call.  Exs. 57, 86 at 225:16-226:3

13   ("Q: [You had] begun to cancel production plans because of soft demand, particularly in China,

14   right?  A: We cut the forecast . . . .  And when you cut the forecast, generally speaking you also

15   cut the MPS. . . you know, two always follows one."); *see also* Exs. 86 at 206-207, 88 at 221:23-

16   222:6 ("[Q:] you don't have any basis . . . to dispute Ms. Mahe's statement that initial iPhone XR

17   sales had been softer than anticipated in Greater China, do you?  [A:] I do not have any reason to

18   dispute. And I would add that we reduced our forecast for iPhone XR during that period of time

19   between October 26th and November 1.").

20       Defendants incorrectly contend that they had no duty to disclose these known facts

21   because: (i) they incorporated them into their 1Q19 revenue guidance; (ii) Apple's 1Q19 guidance

22   was accurate; and (iii) Apple was "on track" to meet its 1Q19 guidance.  All three of these

23   arguments are irrelevant, meritless, and without authority.  MSJ at 18; *see Robinhood*, 2022 WL

24   9765563, at *7 ("By suggesting that it was answering [the question], [defendant] was under a duty

25   to ensure its disclosures on that page were complete, accurate, and not misleading.").  While

26   Plaintiff has not alleged the 1Q19 forecast as an actionable false statement, it was decidedly ***not***

27   "accurate," but wildly overstated potential revenue results as Apple missed its guidance by up to

28   $9 billion.  Ex. 123.  The evidence shows, and Defendants knew but failed to disclose, that Apple's

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT -
4:19-cv-02033-YGR                                                                                    - 19 -

1   1Q19 forecast would require the iPhone XR to "surprise[] us all with week on week strength" and

2   experience "a [demand] curve we've never seen before."  Ex.  51.  Parekh stated at the time that

3   Apple's iPhone XR sales forecast was not supported by the "traditional extrap[olations]" which

4   projected iPhone XR sales would be worse than even the lowest range used in setting guidance.

5   Ex. 69.  And, Cook told the Board of Directors that Apple had "no historical experience to project

6   the demand curve" for a product like the iPhone XR.  Ex. 61.[15]

7         Finally, Defendants' factual narrative that "as of mid-November, *i.e.*, after November 1,

8   2018, iPhone demand in China remained on track and consistent with Apple's November 1

9   forecast" is irrelevant to the claims at issue.  MSJ at 12; ECF 123 at 21 (whether the risks to

10  Apple's business did or "did not materialize until November and December" does not determine

11  liability here).  It is also false: By mid-November, Greater China iPhone unbrickings were 21%

12  below forecast.[16]  On November 4, 2018, Conroy wrote that the iPhone XS, XS Max, and XR all

13  ***missed*** the forecast.  Ex. 99.  On November 6, 2018, Conroy wrote "Obviously it looks like we

14  have got Xr way wrong."  Ex. 77 at 906.  And on November 8, 2018, Parekh wrote that the XS,

15  XS Max, and XR all missed internal projections.  Ex. 78.

16

17

18

---

19  [15]   Cook's November 1, 2018 memorandum to the Board of Directors further undermines his
20  claim that November 1 statement concerned historical results.  Ex. 61.  After detailing the 4Q18
    results, he told the Board he would "talk about 4 revenue ***headwinds***," *i.e.*, "a wind blowing in the
21  opposite direction to the one you are moving in."  https://tinyurl.com/mr2tce5z.  Headwinds are
    not historical.

22  [16]   The internal forecast as of November 1, 2018 was Apple's Week 4 forecast, revised on or
23  around October 28-October 30, 2018.  *E.g.*, Ex. 48 (starting at 223).  The Week 4 forecast projected
    (in thousands) Week 7 (*i.e.*, November 11 to November 17, 2018) Greater China iPhone
24  unbrickings of 1,734; the actual unbrickings were 1,378 – a miss of 20.5%.  Ex. 48 at 225 (Week
    4); Ex. 95 at 270 (Week 7).  Defendants and Parekh claim that Apple's "November 1, 2018
25  forecast" is the Week 5 forecast, which was not released until on or around November 4, 2018, but
    the basis for this assertion is the report of an outside expert with no role in Apple's forecasting
26  process.  *See, e.g.*, MSJ at 12 (citing Parekh Decl.; Ex. 94 (Poer Report)); Ex. 27 (starting at 210).
    Regardless, the story is the same: Apple was below this forecast by mid-November, as well.  The
27  Week 5 forecast projected (in thousands) Week 7 unbrickings of 1,474 iPhones in Greater China,
    actual results were 1,378 iPhone unbrickings – a 6.5% miss.  Ex. 27 at 212 (Week 5); Ex. 95 at
28  270 (Week 7).

1

> **5.     The Evidence Demonstrates that Cook's Statement Was False**
> **and Misleading Because He Failed to Disclose Apple Had Cut**
> **iPhone Production by 34 Million Units Prior to November 1**

2

3       Based on the November 5, *Nikkei* Report, Plaintiff alleged that Apple had already begun

4   to cut production for iPhone XR prior to November 1, 2018, and the Court found it "implausible

5   that Cook would not have known that iPhone demand in China was falling mere days before cutting

6   production lines." ECF 110 42; ECF 123 at 16.  The evidence now proves those allegations.  By

7   October 22, 2018, the iPhone XR MPS was cut from 43 million units to 41 million units.  Ex. 17.

8   On October 29, 2018, manufacturer Wistron was told its iPhone XR production program was

9   cancelled.  Ex. 74.  On October 31, 2018, Apple directed Foxconn to cut or convert its iPhone XR

10  production lines.  Ex. 143 at 226.  On October 31, 2018, the Company updated MPS cuts for the

11  XS, XS Max, and XR, including more than 11 million iPhone XR units in 1Q19, and 32 million

12  units through 4Q19.  Exs. 50, 55.  On Friday, November 2, 2018, Conroy confirmed that those

13  MPS cuts had been discussed the day before, *i.e.*, on November 1, 2018.  Exs. 55, 66, 71, 142; Ex.

14  87 at 33:15-34:6, 37:6-38:3; MSJ at 11 (cuts "fully incorporated" into November 1 forecast).

15  Contrary to Defendants' prior arguments to the Court, the *Nikkei* Report that Apple had cut iPhone

16  production by 100,000 units per day was not just accurate, if anything understated the cuts.  Exs.

17  74, 75; *compare* ECF 118 at 15-16.  Nonetheless, Cook and Apple executives expressed anger

18  about the leak and its impact on the stock price.  Exs. 72 ("The leak is infuriating."), 73.

19

> **B.     Evidence of Defendants' Actual Knowledge of the Undisclosed Facts**
> **Raises a Genuine Issue of Material Fact as to Scienter**

20

21       "Scienter may be established . . . by showing that the defendants knew their statements

22  were false, or by showing that defendants were reckless as to the truth or falsity of their

23  statements." *Gebhart v. S.E.C.*, 595 F.3d 1034, 1041 (9th Cir. 2010).  "'Generally, scienter should

24  not be resolved by summary judgment.'" *In re Twitter, Inc. Sec. Litig.*, 2020 WL 4187915, at *12

25  (N.D. Cal. Apr. 17, 2020) (quoting *Provenz*, 102 F.3d at 1489-90).  "When the defendant is aware

26  of the facts that made the statement misleading, 'he cannot ignore the facts and plead ignorance of

27  the risk.'" *In re Tesla, Inc. Sec. Litig.*, 2022 WL 1497559, at *15 (N.D. Cal. Apr. 1, 2022) (quoting

28

1    *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008)).[17]

2         The evidence establishing Cook's actual knowledge of the facts constituting fraud is

3    overwhelming.  *See Davis v. Yelp, Inc.*, 2021 WL 4923359, at *13-*14 & n.7 (N.D. Cal. Sept. 17,

4    2021) (denying summary judgment because there was "more than enough evidence they had actual

5    knowledge").  While access to information can be sufficient to show scienter (ECF 123 at 18-19),

6    Cook was apprised of, or involved in, the key events leading up to his November 1

7    misrepresentation: He knew of weak reseller demand in China (*e.g.*, Exs. 2, 6, 9), he was updated

8    on the poor iPhone XR launch in China (*e.g.*, Exs. 13, 30, 31), he reviewed decreasing revenue

9    forecasts (*e.g.*, Exs. 32, 34, 56, 57, 60), he called a Sunday meeting to drive revenues (*e.g.*, Exs.

10   38-39), he was updated that China revenues were expected to decline (*e.g.*, Ex. 20), and he brought

11   down the iPhone XR sales forecast (*e.g.*, Ex. 60).  Further, Cook and Maestri admitted in deposition

12   they both knew of poor performance in China, which resulted in material reductions to the forecast,

13   and deliberately chose not to disclose the information.  Exs. 86 at 224:19-225:4, 88 at 142:24-

14   145:12; 221:14-222:6.[18]  Against these facts, Cook's claim that he intended to be truthful and acted

15   in good faith is insufficient for summary judgment; his credibility will be assessed at trial.

16   *Hernandez v. Polanco Enters., Inc.*, 19 F. Supp. 3d 918, 928 (N.D. Cal. 2013).

17        **C.    Plaintiff's Evidence Raises a Genuine Issue of Material Fact
            Concerning Loss Causation**

18

19        "To prove loss causation, plaintiffs need only show a 'causal connection' between the fraud

20   and the loss, by tracing the loss back to 'the very facts about which the defendant lied.'"

21   *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (quoting

22   *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120 (9th Cir.

23   2013)); 15 U.S.C. §78u-4(b)(4).  The "'ultimate issue is whether the defendant's misstatement, as

24   opposed to some other fact, foreseeably caused the plaintiff's loss.'"  *First Solar*, 881 F.3d at 753

25   ───────────────

26   [17]    That Cook did not sell stock or that Apple repurchased shares during the Class Period, simply
        does not negate scienter at summary judgment.  *See* ECF 123 at 20-21 (collecting authority).

27   [18]    While Defendants seek to reframe this case to be one about the 1Q19 guidance, even a revenue
        projection can be actionably false where, like here, the speaker is aware of undisclosed facts that
28      seriously undermine the statement's accuracy.  *Provenz*, 102 F.3d at 1487.

1  (citing *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016)).  A "'corrective disclosure

2  need not be a "mirror image" disclosure – a direct admission that a previous statement is untrue;

3  it must simply "relate to the same subject matter as the alleged misrepresentation."'"  *City of Mia.*

4  *Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1046 (N.D. Cal.

5  2018); *see In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, n.3 (9th Cir. 2020), *cert. denied*,

6  _U.S._, 142 S. Ct. 71 (2021).   Here, Plaintiff has submitted powerful evidence of the causal

7  connection between the alleged misrepresentations and Plaintiff's economic loss.  *See* ECF 301-

8  19.  That includes evidence of the relationship between the November 5 and November 12, 2018

9  partial disclosures of material cuts to iPhone production, and the January 2, 2019 revenue pre-

10  announcement and poor results in China.  *Id.*  Indeed, while not required, the January 2, 2019

11  disclosure is effectively a mirror image of the November 1, 2018, misrepresentation that China

12  was not among the emerging markets experiencing deceleration and pressure.  Ex. 114 at 8.

13  Specifically, on January 2, 2019, Cook explained that the disappointing earnings were due to

14  "economic deceleration, particularly in Greater China."  Ex. 123.  He added that, "most of our

15  revenue shortfall to our guidance, and over 100 percent of our year-over-year worldwide revenue

16  decline, occurred in Greater China across iPhone, Mac and iPad."  *See* Exs. 123, 125.

17       Plaintiff's evidence shows that it was the concealment of these "very facts" which were

18  ongoing on November 1, 2018, that were a substantial factor in causing Plaintiff's loss.  *First*

19  *Solar*, 881 F.3d at 753.  Plaintiff has also submitted the expert analysis and conclusions of Dr.

20  Steven Feinstein, who conducted an event study analysis of the allegations, isolating Apple stock

21  price declines driven by disclosures of Company-specific information and accounting for

22  potentially confounding information.  ECF 301-19, ¶¶90-120.  *In re Allstate Corp. Sec. Litig.*, 966

23  F.3d 595, 613 n.6 (7th Cir. 2020) ("event studies have come to be treated as the *sine qua non* for

24  proving . . . loss causation"); *see Smilovits v. First Solar, Inc.*, 2019 WL 7282026, at *5 (D. Ariz.

25  Dec. 27, 2019).  Defendants do not challenge the admissibility of Dr. Feinstein's expert report on

26  loss causation and damages report.

27       Defendants' arguments challenging loss causation are all premised on the flawed assertion

28  that the Company's 1Q19 revenue guidance was not false when made.  MSJ at 24.  As discussed

1    above however, the actionable falsity of the revenue guidance was never Plaintiff's theory of fraud.

2    *First Solar*, 881 F.3d at 754 (evaluating whether plaintiffs "have pleaded or proved the facts

3    relevant to **their theory**," not Defendants' theory). Defendants' claim that unexpected changes in

4    economic circumstances occurring after the November 1 misrepresentation caused Apple's stock

5    price declines (ECF 296, ¶¶20-31) is contradicted by undisputable evidence that the underlying

6    conditions that caused Plaintiff's loss were in existence, and known, prior to November 1. *In re*

7    *Allstate Corp. Sec. Litig.*, 2022 WL 842737, at \*18 (N.D. Ill. Jan. 10, 2022) ("Allstate could have

8    been truthful about and disclosed earlier in time **the underlying causes**" of business challenges

9    resulting in poor financial performance). And, contrary to Defendants' arguments (MSJ at 13),

10   the December 1, 2018 arrest of Huawei's CFO did not change consumer sentiment or cause poor

11   iPhone performance in China. Ex. 82. Apple sales executives **in China** rejected that very notion

12   explaining, on January 9, 2019, that there was no evidence that the arrest hurt iPhone sales. Rather,

13   Huawei's success in China in 1Q19 was directly attributed to Huawei's offering an equally capable

14   and cheaper phone in a "softer economy." *Id.*

15       **D.    Plaintiff's Evidence Raises a Genuine Issue of Material Fact**
              **Concerning Defendants Cook's and Maestri's Control over Apple**
16

17       Defendants do not dispute that Cook and Maestri are control persons of Apple. Therefore,

18   they can avoid liability as control persons only if they prove they "acted in good faith based on an

19   absence of scienter" and did not "'directly or indirectly induce the [] acts constituting the

20   violation.'" *S.E.C. v. Todd*, 642 F.3d 1207, 1224 (9th Cir. 2011) (quoting 15 U.S.C. §78t(a)).

21   "The burden is on the defendant to show that both requirements of the good-faith exception are

22   met." *Todd*, 642 F.3d at 1223. "The defendants bear a heavy burden of proof," because where, as

23   here, they have the burden to prove an affirmative defense, "[s]ummary judgment is proper only

24   if they show that 'no rational jury could find' that" Maestri did not act in good faith and did not,

25   directly or indirectly, induce the violation. *Provenz*, 102 F.3d at 1493 (quoting *Kaplan v. Rose*,

26   49 F.3d 1363, 1376 (9th Cir. 1994)).

27       Here, Defendants fail to prove that both requirements of the good faith exception are met.

28   Like Cook, Maestri was in possession of the undisclosed facts that made the alleged statement

1  misleading.  *See supra* §IV.B.  And as the Court has explained, "Maestri . . . could have corrected

2  the record, disclosed omitted facts, and explained that Apple faced issues in China . . . .  Having

3  failed to do so, Maestri may be liable as the executive charged with delivering the company's

4  financial information who understood it to have made misleading statements."  ECF 123 at 22; *see*

5  *also Flood v. Miller*, 35 F. App'x 701, 703 (9th Cir. 2002) ("'[I]naction in the form of a failure to

6  supervise can . . . result in secondary liability . . . .'").

7        Defendants also fail to prove that Maestri did not directly or indirectly induce the fraud.

8  Indeed, the Court cannot credit Defendants' bald claim that "Mr. Maestri ***could not*** have induced

9  the violation" (MSJ at 25), because Maestri knew of Mohan's question ahead of time, and

10  forwarded the list of anticipated questions to Cook.  Ex. 59.  And, he had substantial responsibility

11  for preparing Apple's responses to those questions.  *See, e.g.*, Ex. 89 at 54:11-14 (Maestri

12  participated "[i]n the earnings prep meetings"), 85:16-86:10 ("edits . . . to the Q&A document . . .

13  could be . . . direct edits that [Blake] received from Luca"); *see also* Exs. 33, 81.  *See Todd*, 642

14  F.3d at 1224 (that defendant "substantially participated in the press release . . . vitiate[s the good

15  faith] defense at the summary judgment stage").

16  **V.     CONCLUSION**

17        For the reasons set forth herein, and in the documents and exhibits filed herewith,

18  Defendants' Motion for Summary Judgment must be denied.[19]

19   DATED:  October 20, 2022                ROBBINS GELLER RUDMAN
                                                  & DOWD LLP
20                                          SHAWN A. WILLIAMS
                                           DANIEL J. PFEFFERBAUM
21                                          KENNETH J. BLACK
                                           HADIYA K. DESHMUKH
22                                          JACOB G. GELMAN

23

24                                              s/ Shawn W. Williams
                                             SHAWN A. WILLIAMS
25

26

27  [19]   Pursuant to Fed. R. Civ. P 56(d), the Court may also deny or defer ruling on the MSJ due to
    Defendants' continued efforts to withhold documents not properly subject to privilege.  *See*
28  Declaration of Shawn A. Williams Pursuant to Fed. R. Civ. P 56(d) filed herewith.

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
dpfefferbaum@rgrdlaw.com
kennyb@rgrdlaw.com
hdeshmukh@rgrdlaw.com
jgelman@rgrdlaw.com

ROBBINS GELLER RUDMAN
   & DOWD LLP
MARK SOLOMON
JASON A. FORGE
RAPHAELLA FRIEDMAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
marks@rgrdlaw.com
jforge@rgrdlaw.com
rfriedman@rgrdlaw.com

Lead Counsel for Lead Plaintiff

LABATON SUCHAROW
CAROL C. VILLEGAS
140 Broadway
New York, NY 10005
Telephone: 212/907-0700
212/883-7524 (fax)
cvillegas@labaton.com

Counsel for Employees' Retirement System of the
State of Rhode Island

VANOVERBEKE, MICHAUD & TIMMONY,
P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Additional Counsel

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on October 20, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

 s/ Shawn A. Williams
SHAWN A. WILLIAMS
ROBBINS GELLER RUDMAN
   & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
Email:  shawnw@rgrdlaw.com

4855-2900-9210.v1

**Mailing Information for a Case 4:19-cv-02033-YGR IN RE APPLE INC. SECURITIES LITIGATION**

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Tristan Allen**
  tallen@orrick.com

- **Adam Marc Apton**
  aapton@zlk.com,Files@zlk.com

- **Kevin Michael Askew**
  kaskew@orrick.com

- **Kenneth Joseph Black**
  KennyB@rgrdlaw.com,E_File_SD@rgrdlaw.com

- **Mary K. Blasy**
  mblasy@rgrdlaw.com

- **Frank H. Busch**
  busch@wvbrlaw.com,abarca@wvbrlaw.com,myers@wvbrlaw.com,pallister@wvbrlaw.com

- **Hadiya Khan Deshmukh**
  hdeshmukh@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **William Joseph Foley**
  wfoley@orrick.com

- **Jason A. Forge**
  jforge@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Christine M. Fox**
  cfox@labaton.com,ndonlon@labaton.com,lpina@labaton.com,electroniccasefilings@labaton.com,6312349420@filings.docketbird.com

- **Raphaella Friedman**
  rfriedman@rgrdlaw.com

- **Jacob G. Gelman**
  jgelman@rgrdlaw.com

- **Tor Gronborg**
  torg@rgrdlaw.com,E_File_SD@rgrdlaw.com

- **Nicomedes Sy Herrera**
  nherrera@herrerakennedy.com

- **J Alexander Hood , II**
  ahood@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Austin Thomas Jackson**
  ajackson@structurelaw.com,cford@structurelaw.com

- **James Neil Kramer**
  jkramer@orrick.com,lpatts@orrick.com,mwatkins@orrick.com,vmorse@orrick.com,tallen@orrick.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,fgravenson@pomlaw.com,ipareja@pomlaw.com

- **Francis P. McConville**
  fmcconville@labaton.com,HChang@labaton.com,lpina@labaton.com,9849246420@filings.docketbird.com,electroniccasefiling@labaton.com

- **Danielle Suzanne Myers**
  shawnw@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,dmyers@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,jalieberman@pomlaw.com,ahood@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,abarbosa@pomlaw.com,fgravenson@poml

- **Daniel Jacob Pfefferbaum**
  DPfefferbaum@rgrdlaw.com,jgeorge@rgrdlaw.com,dpfefferbaumRGRD@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,jgeorge@ecf.courtdrive.com,sbloyd@rgrdlaw.c

- **Samuel H. Rudman**
  srudman@rgrdlaw.com

- **Juan Carlos Sanchez**
  jsanchez@rgrdlaw.com,e_File_SD@rgrdlaw.com

- **Craig Wallace Smith**
  notice@robbinsllp.com,noticerobbinsllp@ecf.courtdrive.com,csmith@robbinsllp.com

- **Mark Solomon**
  marks@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Alexander K. Talarides**
  atalarides@orrick.com,lpatts@orrick.com,casestream@ecf.courtdrive.com,tallen@orrick.com

- **Michael David Torpey**
  mtorpey@orrick.com

- **Carol C. Villegas**
  cvillegas@labaton.com,ndonlon@labaton.com,lpina@labaton.com,5739893420@filings.docketbird.com,electroniccasefiling@labaton.com,dsaldamando@labaton.com

- **James Matthew Wagstaffe**
  wagstaffe@wvbrlaw.com,Myers@WVBRlaw.com,pallister@wvbrlaw.com

- **Steven Ray Wedeking , II**
  swedeking@robbinsllp.com,notice@robbinsllp.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,kennyb@rgrdlaw.com,jgelman@rgrdlaw.com,rfriedman@ecf.courtdrive.com,ShawnW@ecf.courtdrive.com,smorris@rgrdlaw.com,e_file_sd@r

- **Ariel Brianna Winawer**
  awinawer@orrick.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)